**JUDG**

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| GLENN MURRAY, | Case No. 08A571984 |
| Plaintiff, | Dept. No. XIII |
| Vs. | |
| KENNETH JOWDY; DOES I through X, inclusive, | |
| Defendant. | |
| KENNETH JOWDY, | |
| Third-Party Plaintiff, | |
| Vs. | |
| PHILIP KENNER, an individual; DOES I through X, inclusive, and ROE CORPORATIONS I through X, inclusive, | |
| Third-Party Defendants. | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

This matter came on for trial before the bench on the 1st, 2nd, 3rd and 9th days of December 2010 before Department XXII of the Eighth Judicial District Court, in and for Clark County, Nevada, with JUDGE SUSAN H. JOHNSON presiding; Plaintiff GLEN MURRAY appeared by and through his attorneys, ROSS C. GOODMAN, ESQ. and RONALD RICHARDS, ESQ.; Defendant/Third-Party Plaintiff KENNETH JOWDY appeared by and through his attorneys, MICHAEL K. WALL, ESQ. and PATRICIA LEE, ESQ. of the law firm, HUTCHISON & STEFFEN; and Third-Party Defendant PHILIP KENNER appeared in *pro se*.  Having reviewed the

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

| | | | FINAL DISPOSITIONS |
|---|---|---|---|
| ☐ Voluntary Dis | ☐ Stip Dis | ☐ Sum Jdgmt | ☐ Time Limit Expired |
| ☐ Involuntary (stat) Dis | ☐ Stip Jdgmt | ☐ Non-Jury Trial | ☐ Dismissed (with or without prej. |
| ☐ Jdgmt on Arb Award | ☐ Default Jdgmt | ☐ Jury Trial | ☐ Dismissed (with or without prej. |
| ☐ Mtn to Dis (by deft) | ☐ Transferred | | ☐ Judgment Satisfied/Paid in full |

papers and pleadings on file herein, including the trial exhibits admitted into evidence, heard

statements and arguments of counsel and testimonies of the witnesses, namely, Plaintiff GLEN

MURRAY, Defendant/Third-Party Plaintiff KENNETH JOWDY, Third-Party Defendant PHILIP

KENNER, ROBERT "BOB" GAUDET, MARK THALMANN and FERNANDO GARCIA, and

taken this matter under advisement, this Court makes the following Findings of Fact and

Conclusions of Law:

## FINDINGS OF FACT

**1.**     Plaintiff GLEN MURRAY is a retired National Hockey League (NHL) player, whose

lengthy career ended in approximately 2008.

**2.**     Defendant/Third-Party Plaintiff KENNETH JOWDY is a developer of real estate,

whose developments include Diamante Cabo San Lucas and Diamante Del Mar, both located in

Mexico, Laurel Cove in Tennessee, and Boot Ranch in Texas, as discussed more fully below.

**3.**     Third-Party Defendant PHILIP KENNER is, and has been a business manager for

several professional athletes, including Plaintiff GLEN MURRAY, for over seventeen (17) years.

According to MR. KENNER, he had known MR. MURRAY since they were in their early 20s.

**4.**     It was undisputed by the parties that, in 2005 and prior thereto, MR. KENNER and

MR. JOWDY were friends and conducted business together, mostly with respect to real estate

developments, such as Diamante Cabo San Lucas.[1]

**5.**     In approximately February 2005, GEORGE MALOOF, JR., the majority shareholder

or owner-operator of the Palms Casino Resort, offered to sell condominiums in the anticipated

Palms Place to a select group of friends and investors, which included MISTERS KENNER and

---

[1] *See* Defendant's/Third-Party Plaintiff's Trial Exhibit A53, Bates 00114.  MR. KENNER was listed as a principal or contact person for Baja Ventures 2006, LLC and CSL Properties 2006, LLC on the Register of Class A Members of Diamante Cabo San Lucas, LLC.  Baja Ventures 2006, LLC contributed 39 percent ($2,500,000) and CSL Properties 2006, LLC paid eight (8) percent ($2,000,000) toward the Diamante Cabo San Lucas project.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

JOWDY, at low, pre-construction prices.   It was projected, given the rising market in Las Vegas, Nevada, the value of these condominiums would rise dramatically, and there would be a price increase with each of the five or six anticipated phases of construction.

6.      There is a factual dispute between the parties concerning whether MR. MALOOF limited the number of condominiums that could be purchased by an individual person or entity at pre-construction prices.  MR. KENNER attested there was no limit, and that he, in fact, had placed deposits to purchase four.[2]  MR. JOWDY testified MR. KENNER represented to him there was a three-unit purchase limit, and he (KENNER) desired to buy more than that allotted.  To circumvent the limitation, MR. JOWDY testified MR. KENNER and he decided to purchase three condominiums together, and ultimately sell them and split the profits.[3]

7.      In February 2005, MR. MALOOF met with MISTERS KENNER and JOWDY, as well as other friendly investors, concerning prospects of purchasing and owning condominiums at Palms Place.

8.      On February 16, 2005, MR. JOWDY registered to purchase three condominiums at Palms Place, notably, Units 25320, 25322 and 58308, and he signed a Reservation Deposit Agreement as the "purchaser."[4]  *See* Plaintiff's Trial Exhibits 74 and 110.  The Agreement provided in pertinent part:  "Purchaser shall not and has no right to assign, sell or transfer Purchaser's interest in this Reservation Deposition Agreement without Developer's prior written consent, which consent

---

[2]*See* Defendant's Trial Exhibit A99, redacted Financial Statement for PHILIP KENNER as of February 2006, admitted into evidence.  Evidence presented also indicated the "Andretti Group" had placed deposits to purchase ten (10) condominiums in Palms Place, of which six (6) were to be owned specifically by "Michael" and/or "Mario."  See Plaintiff's Exhibit 129 admitted into evidence.

[3]MR. KENNER denied he had any ownership or other interest in the condominiums MR. JOWDY intended to purchase, i.e. Units 25320, 25322 and 58308.  MR. JOWDY testified he had no money to invest in the condominiums, but that MR. KENNER assured him he (KENNER) would get the money.  He noted it was unusual that all he had to do was to put his name on the deal.

[4]MR. JOWDY printed his name under "Baja Development Corp." on page 2 of the Agreement.  He also identified his own Social Security Number, as opposed to Baja Development Corp.'s tax identification number within the Agreement.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

may be withheld in Developer's sole discretion." *See* Plaintiff's Trial Exhibit 110.

9.      Although MR. JOWDY claims both he and MR. KENNER had ownership or financial interests in the three condominiums, it is undisputed MR. KENNER never registered to purchase Units 25320, 25322 or 58308.  MR. KENNER denied having any financial, ownership or other interest in Units 25320, 25322 or 58308 or that he desired to circumvent any three-unit purchase limit, as there was none.  Further, MR. JOWDY never told anyone at Palms Place, including SANDRA BOHN in the Sales Office, of MR. KENNER'S ownership or other interest in the three condominium units.

10.     The Reservation Deposit Agreement (Exhibit 110) signed by MR. JOWDY further provided:

> After Developer has completed its registration with the Department of Housing and Urban Development or otherwise determines to commence sales, Developer will provide Purchaser with the Purchase Agreement, a public offering statement and a property report (if such property report is required by law to be provided to Purchase at time of sale).  Purchase shall have ten (10) days after Purchaser receives the Purchase Agreement, the public offering statement and the property report (if applicable) to execute the Purchase Agreement and deliver it to Developer along with the difference between the Deposit required hereunder and the deposit required pursuant to the Purchase Agreement to Developer.  In the event Purchase fails to execute the Purchase Agreement and deliver it to Developer within said ten (1) day period, this Reservation Deposit Agreement shall become null and void, Developer shall cause the Escrow Agent to return the Deposit to Purchase and this Reservation deposit Agreement shall be deemed terminated and all rights and liabilities of the parties hereto shall cease and terminate.

11.     On or about April 11, 2005, MR. JOWDY tendered a check in the amount of $150,000.00 written from TLJ MANAGEMENT CORP.'S[5] bank account to STEWART TITLE representing three (3) refundable deposits[6] to reserve the aforementioned Palms Place condominiums.  *See* Plaintiff's Trial Exhibits 111 and 128.  The escrow agent acknowledged receipt of the funds on April 15, 2005.

---

[5]TLJ MANAGEMENT CORP. is an entity wholly owned by MR. JOWDY.
[6]The deposits were (1) $25,000.00, (2), $25,000.00, and (3) $100,000.00, respectively, totaling $150,000.00.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

12.     The developer of Palms Place presented MR. JOWDY with the Purchase and Sale Agreements for the three condominium units, i.e. 25320, 25322 and 58308, on or about July 30, 2005.[7] *See* Defendant's Trial Exhibit A98.  MR. JOWDY, identified as the "buyer," signed, acknowledging he had received various items, including, but not limited to the Public Offering Statement and Purchase and Sale Agreement.   MR. JOWDY signed the Purchase and Sale Agreements on or about August 1, 2005.  *See* Defendant's Trial Exhibit A98.

13.     On August 1, 2005, SANDRA BOHN of Palms Place Sales sent MR. JOWDY an electronic mail (referred to herein as "e-mail"), which stated:

Kenny,

To assist with your wire transfer(s) for your Palms Place suites, below are the escrow numbers and deposit amounts owing on each unit:

| Unit 25320:  Deposit Due = $  80,750 | Escrow Number = 504143 |
| Unit 25322:  Deposit Due = $143,260 | Escrow Number = 504144 |
| Unit 58308:  Deposit Due = $567,400 | Escrow Number = 504146 |

Total deposit due = $791,410

The wire transfer can be the entire sum – just reference Palms Place and the three unit numbers and escrow numbers and Stewart Title will contact me to confirm how the funds should be dispersed.

Just for quick reference the wire transfer instructions again are:

Wells Fargo Bank, N.A.
San Francisco, CA
Routing #: 121000 248
Credit to:  Stewart Title of Nevada
Account # ******7527[8]

*See* Plaintiff's Trial Exhibit 119 (Bates 00119.00006).

14.     MR. JOWDY then asked his friend and Director of Golf Operations at Diamante

---

[7]MR. JOWDY testified he received notice in June or July 2005 that he needed to put down 20 percent or $791.410 in addition to the $150,000 previously deposited.
[8]Where specific account numbers are listed within the trial exhibits, this Court will use asterisks.  By separate Order, this Court will order a redaction of all account numbers, given the parties' interest in privacy.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

Cabo San Lucas, BOB GAUDET,[9] to seek short-term financing for the three (3) additional deposits totaling $791.410.00.  According to Defendant/Third-Party Plaintiff, however, MR. KENNER was to fund the deposit and he requested that MR. JOWDY "buy time" as he (KENNER) was in the process of acquiring the monies due.   Given that, MR. JOWDY engaged in transmitting what he admitted were "embarrassing" e-mails to MS. BOHN, as discussed more fully below.  *See* Plaintiff's Exhibit 119.   MR. KENNER denies he instructed MR. JOWDY to "buy time," or to string the Palms Place along.  In fact, he testified he never asked MR. JOWDY about his communications with the Palms Place, but if he had known, MR. KENNER would have told MR. JOWDY it was not a smart idea to do that to "our friend, Mr. Maloof."

15.     Three days after signing the Purchase and Sale Agreement, August 4, 2005, MR. JOWDY wrote:

> Sandra...I just wanted to confirm that I received your info and that Stewart Title should receive 3 separate wires...I will be on the road for the next several days, so email is the best form of communication...I will look for some confirmation from you this afternoon...thank you...Ken Jowdy.

Within hours, MS. BOHN responded: "I have Stewart [Title] on the 'lookout' for your wires – I'll let you know what I hear...."  *See* Plaintiff's Trial Exhibit 119.

16.     The next day, August 5, 2005, MS. BOHN wrote MR. JOWDY via e-mail: "Followup: No sign of the wires as yet – when were they sent?"  MR. JOWDY responded within minutes: "Sandra...the wires were sent Wed afternoon from Mexico...I will do my best to track them today...please let me know when they show up...thank you...Ken."  By the end of the day, MS. BOHN wrote again:  "Kenny, No word yet, but I have everybody on alert at Stewart!  I'll let you know what/when I hear – let me know what you found out as well..."  On Monday, August 8, 2005, MR. JOWDY responded to MS. BOHN by e-mail: "Sandra...please let me know as soon as

---

[9]MR. GAUDET testified that, while in his position, he had met "a lot of wealthy" individuals in Mexico.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

you can this morning if the wires arrived…it is not unusual for them to be delayed from Mexico, but

not this long…I will check on my end…hopefully this will be resolved today…thank you…Kenny."

That afternoon, at 3:29 p.m., MS. BOHN wrote MR. JOWDY another e-mail which said: "So far

your wires have not shown up (as of 3:00 p.m. today – Aug 8).  Do you have a Fed wire reference

number that we can use to track them?  Let me know ASAP – I'm hoping they are not MIA

somewhere out there!!!  Were the 3 amounts the same as the email I sent you?  Fill me in on all

details so Stewart's accounting department can locate them as readily as possible.  Thanks – take

care……." *See* Plaintiff's Trial Exhibit 119.

   17.   The next morning, August 9, 2005, MR. JOWDY responded to MS. BOHN:

"Sandra…the bank is going to let me know the status this morning…I will let you know what they

say, and have a fed ref number for you…please email me if you hear anything on your end…thank

you…Kenny"  MS. BOHN replied within hours:  "Kenny, In order to help expedite the process of

locating the wires, can you provide me with the name of the bank used, their telephone number and

your contact person there, as well as the fed ref number – we have to resolve this today – thanks for

all…."  Within minutes, MR. JOWDY sent another e-mail to MS. BOHN, stating: "Sandra…I am

dealing with this through my Mexican Attorney who handles my accounts in Mexico…he is telling

me that the wire was rejected and the money has been returned …I am in the NY area now, and I can

do one of two things…I can resend a wire from the U.S., or I can Fed Ex a check or checks today to

you or directly to Stewart Title…please let me know how to proceed…thank you…Kenny."  Within

six minutes, MS. BOHN replied: ***"Resend the wire from NY ASAP – need to show money in***

***today……."*** (Emphasis in original).  MR. JOWDY responded: "Sandra…I can resend the wire in the

morning (the cutoff for wires is 2pm est.), or I can fed ex a check anywhere you want today…I

really do not have any other option…I would hate to lose the condo's over this, but I understand that

you have been waiting for the money…I will be able to check my emails again in an hour, and I

have until 6:30pm est. to get something to fed ex, if that is what you want me to do...thank

you...Kenny."  Upon receiving MR. JOWDY'S last transmission, MS. BOHN forwarded the string

of e-mail communications to THOMAS K. LAND, Executive Vice President and Chief Financial

Officer of the Palms Casino Resort.  *See* Plaintiff's Trial Exhibit 119.  That day, MR. LAND wrote

MR. JOWDY via electronic and certified mail that, as Palms Place had not received the deposits, it

elected not to enter into a binding purchase agreement with him for the units.  *See* Defendant's Trial

Exhibit A94.

17.    As set forth above and in the meantime, MR. GAUDET testified he was attempting to

acquire short-term financing for MR. JOWDY.  He contacted his long-time, wealthy friend, JOHN

MAHONEY, regarding prospects of making a short-term loan to KEN JOWDY in the amount of

$800,000.00.  MR. GAUDET testified the terms offered by MR. JOWDY were he would borrow

the money for a period of thirty (30) days, and pay ten percent (10%) interest on the loan.  MR.

GAUDET followed up via e-mail dated August 5, 2005:

JD,

Any luck on the $800,000.
30 day term $80,000 return.
Ken would write a personal check for the full amount pd for 30 days.
Obviously with his ventures going on he could not jeopardize an issue with this type of loan.

Let me know if I could give more info.

Thanks,

Bob

*See* Plaintiff's Trial Exhibit 120.  From what the Court gleaned from the evidence, MR. MAHONEY

was not interested in loaning the money.  However, both he and MR. GAUDET, in turn, e-mailed

WILLIAM "HUBBA" MAZENKAS regarding MR. JOWDY'S proposition.  *See* Plaintiff's Trial

Exhibit 122.  MR. MAZENKAS, in turn, referred them to "BLACK BART" MABY.[10]  MR.

GAUDET also contacted BYRON HILL on August 4, 2005, forwarding the link to Palms Place sent

to him by MR. JOWDY, as well as a copy of MS. BOHN'S August 1, 2005 e-mail to MR. JOWDY,

which outlined the deposits needed.  *See* Plaintiff's Trial Exhibits 121 and 119 (Bates 00119.00006).

As noted by MR. GAUDET, in his August 4, 2005 e-mail to MR. HILL:

> Byron,
>
> Find attached reference documents to support position.  Ken is willing to give a personal
> guarantee on this short term loan.  As I mentioned on the phone 800,000 – 80,000 return on a
> 30 day term.
>
> I will call you to further discuss.
> Thought the 80,000 sounded good is why I'm sharing this info with you? (sic)
>
> Bob

*See* Plaintiff's Trial Exhibit 121.[11]  Ultimately, MR. GAUDET was unable to obtain the short-term

financing for MR. JOWDY.

    18.    In or about early August 2005, MR. KENNER testified he was approached by MR.

JOWDY to acquire financing to pay the twenty percent (20%) deposit.[12]  The terms proposed by

MR. JOWDY were he would repay the amount of the principal, plus ten percent (10%) interest

within 30-45 days.  MR. KENNER indicated MR. JOWDY told him Palms Place was frantic for the

money and that he had put them off.  MR. KENNER contacted approximately fifteen (15)

prospective investors regarding MR. JOWDY'S proposed loan terms.  It was during this time, MR.

---

[10] According to Plaintiff's Trial Exhibit 122, MR. MAZENKAS also checked with his friend and lender, KEN KASTEN, for an investor interested in MR. JOWDY'S proposition.

[11] *Also see* Plaintiff's Trial Exhibit 131, "talking points" MR. JOWDY gave to MR. GAUDET to send to "WAYNE," another contact.  As noted in Trial Exhibit 131, MR. JOWDY represented he would could repay the money in thirty (30) days as (1) the sale of four equity spots for Diamante Del Mar were pending, with all anticipated to be closed by the end of the month, (2) the sale of Startime Entertainment, his business in Roswell, Georgia, which was to close "no later than" August 20th, (3) funding from the mortgage of Diamante Del Mar property, and (4) Sale or mortgage of property in Danbury, Connecticut with appraised value of $1,600,000.00.  As a fall back position, MR. JOWDY noted MR. KENNER would pledge necessary dollars for repayment out of his funding from a $30,000,000.00 mortgage on property located in Hawaii.

[12] As discussed above, MR. JOWDY testified MR. KENNER was to obtain the financing for the twenty percent (20%) down payment for the purchase of the three condominium units.

9

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

KENNER attested he was receiving about fifteen (15) calls per day from MR. JOWDY regarding the financing of the deposit.

19.     On or about August 11, 2005, one of MR. KENNER'S clients, Plaintiff GLEN MURRAY, orally agreed to loan MR. JOWDY the $791,410.00, with the understanding he would be repaid the principal and ten percent (10%) interest within 30-45 days.  On August 11, 2005, MR. JOWDY wrote MR. KENNER, asking to send the following e-mail to SANDRA BOHN:

> Subject:  Phil…obviously I have not sent this, but I would like to…please give me the go ahead!!!

> Sandra. Because I did not hear from you yesterday, I am going to send the money to you today, and I assume that one of 4 things will occur: 1) you accept the money and the deal is done as is. 2) you accept the money and charge market price for the units 3) you hold the money in a position to take other units as they become available 4) You return the money.  I have put them in order of what I would like to see happen, but I will accept whatever decision you make. thank you. Ken.

*See* Plaintiff's Exhibit 124 and Defendant's Exhibit A11.  MR. KENNER responded: "As soon as I hear from muzz [Plaintiff MURRAY].[13] Pk."  Later, on August 11, 2005, MR. JOWDY received MR. KENNER'S and MR. MURRAY'S approval, and he sent the e-mail to MS. BOHN.  *See* Plaintiff's Trial Exhibit 119.[14]

20.     On August 12, 2005, MR. KENNER, having MR. MURRAY'S Power of Attorney, arranged three wires of funds, i.e. $567,400.00, $143,260.00 and $80,750.00, totaling $791,410.00, to be transmitted from MR. MURRAY'S account with Charles Schwab Institutional to the escrow account at Stewart Title on behalf of MR. JOWDY.  *See* Plaintiff's Trial Exhibit 109.

21.     According to MR. KENNER, MR. JOWDY thereafter contacted him on or about August 22, 2005, indicating the wire of funds from MR. MURRAY'S Charles Schwab account came

---

[13]Plaintiff testified his nickname is "Muzz."
[14]This e-mail was forwarded to MR. LAND and then to ANDY RANKIN for his "thoughts."  *See* Plaintiff's Trial Exhibit 119.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

10

too late and it was rejected by Palms Place.[15]   MR. KENNER testified MR. JOWDY desired to

return the money to MR. MURRAY without incurring the ten percent (10%) interest payment, as he

(JOWDY) received no benefit from using the funds.  MR. KENNER was not authorized to "let go"

the ten percent (10%), and he replied to MR. JOWDY he needed to speak with his client.  MR.

KENNER instructed MR. JOWDY to wire the funds back to MR. MURRAY'S Charles Schwab

account, which was confirmed in e-mail.[16]  *See* Plaintiff's Trial Exhibit 124 and Defendant's Trial

Exhibit A32.

22.     MR. JOWDY testified he later received oral instructions from MR. KENNER to wire

or send the $791,410.00 to BAJA DEVELOPMENT.  MR. KENNER denies making any such

communication to MR. JOWDY.

23.     On August 24, 2005, MR. LAND sent MR. JOWDY a certified letter and e-mail,

requesting he (JOWDY) complete and execute disbursement instructions for the $941,410.00 that

had been deposited.  *See* Plaintiff's Trial Exhibit 112 (0112.00004).[17]  MR. JOWDY executed

Cancellation and Disbursement Instructions that the deposits be made payable to BAJA

DEVELOPMENT CORP., "the originating party of the deposit funds."[18]  On August 25, 2005, MR.

JOWDY requested the wires be made to the benefit of BAJA DEVELOPMENT CORP. at its

account with Hudson United Bank.  *See* Plaintiff's Trial Exhibit 113.  While MR. JOWDY claims he

---

[15]A review of the trial exhibits, i.e. Defendant's Trial Exhibit A94, indicates Palm Place elected "not to enter into a binding purchase agreement with [MR. JOWDY] for those units" on August 9, 2005. *Also see* Defendant's Trial Exhibit 95 (e-mail transmissions between MR. JOWDY and MS. BOHN after the wire transfers were received).

[16]The e-mail stated in bold: **"Please let me know when you send it.  I need to speak with Glen, so the sooner the better."**  After this line, wire instructions were provided. *See* Plaintiff's Trial Exhibit 124.

[17]The $941,410.00 represented $791,410.00 paid by MR. MURRAY and $150,000.00 previously paid from the TLJ MANAGEMENT CORP. account. *See supra.*

[18]The Cancellation and Disbursement Instructions dealing with Escrows 504143, 504144 and 504146, identify monies to be disbursed as $105,750.00, $168,260.00 and $667,400.00.  Added together, they total the $941,410.00 ($791,410.00 + $150,000.00) paid. *See* Plaintiff's Trial Exhibit 124. *Also see* Plaintiff's Trial Exhibit 108 (ledgers). Ultimately, from BAJA DEVELOPMENT, $500,000.00 was wired to Propiedades DDM or PDDM and $412,385.42 was wired to Fidelity National Title as part of the funds used to purchase MR. MALOOF'S home, 74 Innisbrook, Las Vegas, Nevada. *See* Plaintiff's Trial Exhibit 37. According to FERNANCO GARCIA, MR. JOWDY'S Mexican attorney, PDDM is a Mexican entity of which 99 percent is owned by MR. JOWDY, and 1 percent by him.

11

received oral instructions from MR. KENNER to transfer the funds to BAJA DEVELOPMENT CORP., MR. KENNER denies such statement, and, if anything, maintains he told MR. JOWDY to wire the funds back to MR. MURRAY'S Charles Schwab account as reflected in his e-mail. *See* Plaintiff's Trial Exhibit 124.

    24.    Neither the $791,410.00 nor the ten (10) percent accrued interest was ever sent to MR. MURRAY.

    25.    MR. JOWDY testified he understood the $791,410.00 was "Kenner's investment," and he was never told the money was a loan from MR. MURRAY to him. He further attested he never obligated himself to a loan.

    26.    In the interim and prior thereto, in or about April 2005, a second transaction, involving the purchase of MR. MALOOF'S private residence, 74 Innisbrook, Las Vegas, Nevada, took place. According to MR. JOWDY, he and MR. KENNER were to purchase the home and equally share the ownership. For his share, MR. KENNER was to raise funds for the initial $200,000.00 unrefundable deposit and acquire financing for the remainder. MR. JOWDY then would pay the monthly payments toward the mortgage for his one-half share. However, when MR. KENNER was unable to obtain the financing for the mortgage because of his "bad credit" rating,[19] they acquired another partner, MARK THALMANN, to purchase the home, utilizing his "good credit" to obtain the financing. The ownership of the home was to then be split three ways between MISTERS JOWDY, THALMANN and KENNER.[20] All in all, of the house's purchase price, $200,000.00 came from ULA MAKIKA, LLC, $412,385.42 from BAJA DEVELOPMENT,[21] and $1,000,000.00 was financed via mortgage.

---

[19]MR. KENNER denied having a "bad" credit rating.
[20]MR. THALMANN received his one-third share as his credit was used to obtain the $1,000,000 mortgage. He testified the deal included his name being taken off the note in a couple of years.
[21]*See* Plaintiff's Trial Exhibit 37. The $412,385.42 was identified as a loan toward the "LV House Purchase" in the "BD" or BAJA DEVELOPMENT Ledger kept by MR. THALMANN and MR. JOWDY.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

27. While MR. KENNER attested there were initial talks regarding the sharing of house's ownership between MR. JOWDY and him, the specific terms were never discussed and the transaction never occurred. Instead, he attests MR. JOWDY borrowed $200,000.00 from ULA MAKIKA, LLC,[22] a holding company encompassing a pool of investors and managed by MR. KENNER,[23] as a down payment for the home on or about August 5, 2005. *Also see* Defendant's Trial Exhibit A97 (showing wire of $200,000.00 from ULA MAKIKA, LLC to the escrow agent, Fidelity National Title of Nevada). MR. KENNER arranged for MR. THALMANN to acquire $1,000,000.00 mortgage secured by the property through Dream Homes. MR. KENNER further testified he arranged for refinancing about six weeks later, replacing the $1,000,000.00 mortgage for a $1,280,000.00 loan. Of the $280,000.00 additional monies received, $238,219.00 was paid to ULA MAKIKA, LLC for reimbursement of the loan's principal ($200,000.00) and interest ($38,219.00).

28. According to MR. THALMANN, the house's ownership is split equally between MR. JOWDY and him. All parties agree MR. KENNER had no titled ownership interest in or used the house as his own residence.

29. Of note, other than what has been discussed above, and documented via e-mail communication, there are no specific writings signifying the loan agreement between MR. MURRAY and MR. JOWDY. MR. MURRAY testified there was no demand for a writing as he had had previous financial dealings with MR. JOWDY[24] and thus, trusted him.[25] Further, the monies would be deposited in a casino's (Palm Place's) escrow account, and MR. MURRAY trusted

---

[22]MR. KENNER testified ULA MAKIKA, LLC was a "buffer" for LITTLE ISLE IV.
[23]According to MR. JOWDY, MR. KENNER "owned" ULA MAKIKA, LLC.
[24]MR. MURRAY and other professional athletes, through their business manager, MR. KENNER, had invested monies in Diamante Del Mar, which, according to MR. JOWDY, remains a viable investment and development opportunity.
[25]Although MR. JOWDY insinuated that such was an odd situation, MR. THALMANN testified he had loaned MR. KENNER monies in the past, and there were no writings between them as he trusted MR. KENNER.

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

casinos.

**30.**     Plaintiff MURRAY now sues Defendant JOWDY for (1) breach of contract, (2) breach of covenant of good faith and fair dealing, (3) unjust enrichment, and (4) constructive trust. Defendant JOWDY defends, arguing, *first,* the elements of Plaintiff's breach of contract claim were never met. There was no offer and acceptance; there was no meeting of the minds Defendant JOWDY would take the money as a loan. In this regard, MR. JOWDY points out there are no e-mails between MR. MURRAY and him regarding any loans. *Second,* Defendant proposes all monies went to MR. KENNER, whereby MR. JOWDY was not unjustly enriched. *Third,* MR. JOWDY notes there can be no constructive trust claim as there was no confidential relationship between MR. MURRAY and him.

MR. JOWDY filed his Third-Party Complaint against MR. KENNER, asserting claims of (1) intentional misrepresentation, (2) negligent misrepresentation, (3) implied indemnity, (4) contribution, (5) apportionment, and (6) fraud in the inducement.

## CONCLUSIONS OF LAW

### Plaintiff's First Cause of Action, Breach of Contract

**1.**     Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds and consideration. May v. Anderson, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005), *citing* Keddie v. Beneficial Insurance, Inc., 94 Nev. 418, 421, 580 P.2d 955 (Badjer, C.J., concurring). A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite. *Id.*

**2.**     The question whether a contract or agreement exists is one of fact, and based upon substantial evidence. *See* Truck Insurance Exchange v. Palmer J. Swanson, Inc., 124 Nev. 59, 189 P.3d 656, 659 (2008), *quoting* May, 121 Nev. at 672-673, 119 P.3d at 1257. Substantial evidence is "'that which "a reasonable mind might accept as adequate to support a conclusion."'" Truck

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

Insurance Exchange, 124 Nev. 59, 189 Nev. at 659, *quoting* McClanahan v. Raley's, Inc., 117 Nev. 921, 924, 34 P.3d 573, 576 (2001)[*quoting* State Department Employment Security Division v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986), which, in turn, *quotes* Richardson v. Perales, 402, U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)].

    **3.**    A breach of contract occurs where a party does not perform a duty arising under the agreement, and such failure is material. *See* Calloway v. City of Reno, 116 Nev. 250, 256, 993 P.2d 1259, 1263 (2000), *reversed on other grounds,* Olson v. Richard, 120 Nev. 240, 89 P.3d 31 (2004).

    **4.**    Here, the parties provided this Court with both documentary evidence, as well as testimonies from various witnesses, which not only dealt with the contractual issues, but also described the parties' relationships and financial dealings.  Although MR. JOWDY attested he was unaware a loan was being made from MR. MURRAY to him and it was his understanding the funds came personally from MR. KENNER, the documentary and testimonial evidence, as well as the allegations contained in his Third-Party Complaint, contradict his stance, as discussed below.

    Both MISTERS KENNER and GAUDET separately were asked by MR. JOWDY to obtain short-term financing for an approximate $800,000.00 loan through their contacts to cover the required deposits toward the three (3) condominium units MR. JOWDY desired to purchase from Palms Place.[26]  Notably, the terms offered by MR. JOWDY to both MISTERS KENNER and GAUDET were virtually identical, i.e. MR. JOWDY would borrow approximately $800,000.00 for 30-45 days, paying an interest rate of 10 percent, or $80,000.00 return on the short-term loan. Documentary evidence showed both MISTERS KENNER and GAUDET contacted several prospective investors, and ultimately, MR. MURRAY expressed interest and agreed to loan the funds.  If the funds had come personally from MR. KENNER, as so attested by MR. JOWDY, it is odd (1) both MR. GAUDET and MR. KENNER were asked to seek financing through their wealthy

---

[26]Also see Plaintiff's Trial Exhibit 120 (MR. GAUDET'S e-mail to MR. MAHONEY)

1    friends/investors with virtually identical terms, and (2) they both presented the same offered terms to

2    their business contacts as demonstrated in the e-mails.

3         There is no question monies were wired from MR. MURRAY'S account with Charles

4    Schwab Institutional to the escrow account with Stewart Title on or about August 12, 2005, whereby

5    Plaintiff met his obligation under the bargain.

6         MR. JOWDY'S claims he was unaware of MR. MURRAY'S involvement, or that the

7    $791,410.00 he received was a loan from MR. MURRAY are further contradicted by the other

8    testimony, documentary evidence and even the allegations contained in his Third-Party Complaint.

9    Notably, MR. KENNER attested he informed MR. JOWDY he had obtained the financing from

10   Plaintiff.   Subsequently, MR. JOWDY wrote MR. KENNER an e-mail on August 11, 2005, asking

11   to send a proposed response to MS. BOHN regarding the availability of funds. *See* Plaintiff's

12   Exhibit 124 and Defendant's Exhibit A11.   MR. KENNER replied *"As soon as I hear from muzz*

13   *[Plaintiff MURRAY]."* (Emphasis added)  In listening to the testimony, it was evident MR. JOWDY

14   knew "muzz" was MR. MURRAY.  If the funds were being invested by MR. KENNER as opposed

15   to loaned by MR. MURRAY, as MR. JOWDY proclaims, it makes no sense for MR. KENNER to

16   inform MR. JOWDY he had to acquire permission from "muzz" before MR. JOWDY could send the

17   e-mail to MS. BOHN.   In addition, MR. JOWDY admitted he knew about MR. MURRAY'S

18   involvement in that he alleged in his Third-Party Complaint, paragraph 58, p. 10: "Kenner told

19   Jowdy that monies he was receiving from Murray was an investment and made absolutely no

20   mention of a 'loan.'"

21        Notwithstanding the aforementioned, the evidence demonstrates MR. JOWDY, at the least,

22   learned the funds came from MR. MURRAY shortly thereafter.  Notably, MR. KENNER attested

23   MR. JOWDY informed him on or about August 22, 2005 the wire from MR. MURRAY'S Charles

24   Schwab account came too late and was rejected by Palms Place.  MR. KENNER further testified

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

16

MR. JOWDY wanted to return the money to MR. MURRAY without incurring the ten percent (10%) interest payment, as he (JOWDY) received no benefit from using the funds.  MR. KENNER testified he was not authorized to "let go" the ten percent (10%); he instructed MR. JOWDY to return the funds, and that he needed to speak with MR. MURRAY regarding MR. JOWDY'S request.  His instructions to MR. JOWDY were confirmed in e-mail sent that day, written in bold: **"Please let me know when you send it.  I need to speak with Glen, so the sooner the better."** *See* Plaintiff's Trial Exhibit 124.  Within that e-mail, MR. KENNER also gave wire instructions to MR. JOWDY, which identified the account by bank name, address and account number, *"[f]or the Account of: Glen Murray."*  (Emphasis added)  Again, this Court questions why MR. KENNER would have written MR. JOWDY an e-mail he needed to speak with "Glen" and instructed MR. JOWDY to wire the funds back to MR. MURRAY'S account if the money came from MR. KENNER and not loaned by MR. MURRAY, as MR. JOWDY professes.

Further, MR. JOWDY'S testimony he later received conflicting oral instructions by MR. KENNER to wire the funds to BAJA DEVELOPMENT (wholly-owned by MR. JOWDY and MR. GARCIA) is not supported by any testimony or documentary evidence, such as confirming e-mails.

Lastly, what is also evident is MR. JOWDY never understood the $791,410.00 to be a gift, whether it came from MR. KENNER or MR. MURRAY.  When demands were made to return the funds, MR. JOWDY refused to return it.  Such refusal to return the principal plus interest constitutes a breach of contract.

All in all, this Court concludes MR. MURRAY met his burden of proof by a preponderance of the evidence a contract existed between MR. JOWDY and him for the latter to loan $791,410.00 to MR. JOWDY for a period of 30-45 days in exchange for a ten percent (10%) return.  This Court further concludes MR. JOWDY breached the contract by failing to repay MR. MURRAY the principal and ten percent interest in 30-45-days' time, or by September 26, 2005 at the latest.  To

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

17

wit, this Court finds in favor of Plaintiff GLEN MURRAY as against Defendant KENNETH JOWDY with respect to the First Cause of Action.

### Plaintiff's Third Cause of Action, Unjust Enrichment

5.     "Unjust enrichment occurs whenever a party has or retains a benefit which in equity and good conscience belongs to another." *See* Coury . Robison, 115 Nev. 84, 90, 976 P.2d 518, 521 (1999), *quoting* Nevada Industrial Development v. Benedetti, 103 Nev. 360, 363 n.2, 741 P.2d 802, 804 n.2 (1987).  The obligation of the party who retained the benefit to make restitution does not rest upon any agreement, express or implied in fact.  Mikulich v. Diltz, 71 Nev. 115, 117-118, 281 P.2d 800, 801 (1955).  The obligation, if it is present, exists by virtue of a contract implied in law, that is, a quasi-contract imposed to prevent the unjust enrichment of the retaining party at the expense of the other. *Id.*, 71 Nev. at 117-118, 281 P.2d at 801, *citing* Restatement of the Law, Restitution, §1.

6.     As noted above, this Court concludes a contract existed between Plaintiff MURRAY and Defendant JOWDY for the former to loan $791,410.00 for a period of 30-45 days in exchange for a ten percent (10%) return.  As a consequence, there is no need to imply a contract in law under an "unjust enrichment" theory.  This Court, therefore, dismisses Plaintiff MURRAY'S Third Cause of Action lodged against Defendant JOWDY.

### Plaintiff's Second Cause of Action, Breach of Covenant of Good Faith and Fair Dealing

7.     There is no question "[t]he covenant of good faith and fair dealing is implied into every commercial contract...."  Ainsworth v. Combined Insurance Co. of America, 104 Nev. 587, 592 n.1, 763 P.2d 673, 676 n.1 (1988).  Under the implied covenant of good faith and fair dealing, each party must act in a manner that is faithful "to the purpose of the contract and the justified expectations of the other party."  Morris v. Bank of America, 110 Nev. 1274, 1278, 866 P.2d 454, 457 (1994), *quoting* Hilton Hotels v. Butch Lewis Productions, 107 Nev. 226, 234,, 808 P.2d 919, 923 (1991).  Such position is true even where, ultimately, there is no breach of contract; a plaintiff

"may still be able to recover damages for breach of the implied covenant of good faith and fair dealing." Hilton Hotels, 107 Nev. Nev. at 232, 808 P.2d at 922.  To wit, whether a breach of the *letter* of the contract exists, the implied covenant of good faith is an obligation independent of the consensual contractual covenants. Morris, 110 Nev. at 1278, 866 P.2d at 457.

15.    In this case, whether there was a valid contract between Plaintiff MURRAY and Defendant JOWDY, it is evident MR. JOWDY never acted in a manner that was faithful to Plaintiff's justified expectations when Defendant refused to return the money upon demand.  In this Court's view, *even if* MR. JOWDY believed no loan existed when the funds were wired to the escrow account, at the least, he should have refunded the principal or $791,410.00 when he learned the money belonged to MR. MURRAY, and there was a demand for its return.  If he had returned the principal, the dispute here would have been MR. MURRAY'S right to the return on the investment, i.e. the ten percent interest.  Accordingly, in this Court's view, Defendant KENNETH JOWDY breached the implied covenant of good faith and fair dealing, and thus, it finds in favor of Plaintiff with respect to his Second Cause of Action.

**Plaintiff's Fourth Cause of Action, Constructive Trust**

16.    A "constructive trust" is a remedial device by which the holder of legal title to property is deemed to be a trustee of that property for the benefit of another whom in good conscience is entitled to it. See Namow Corporation v. Egger, 99 Nev. 590, 592, 668 P.2d 265 (1983), *citing* Locken v. Locken, 98 Nev. 369, 372, 650 P.2d 803, 804 (1982), *and* Schmidt v. Merriweather, 82 Nev. 372, 418 P.2d 991 (1966).  Generally speaking, a "constructive trust" will arise and affect property acquisitions under circumstances where: (1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.[27] Locken, 98 Nev. at 372.

17.     In this Court's view, the imposition of the remedial device of a "constructive trust" is not warranted here for at least a few reasons. *First,* MR. MURRAY does not seek ownership or title to property.  To the contrary, he seeks return of $791,410.00, plus interest, or damages for breach of the loan agreement, as well as for breach of the implied covenant of good faith and fair dealing. *Second,* there was no confidential relationship between MR. JOWDY and MR. MURRAY.   *Third,* MR. JOWDY was never afforded legal title to any of the three (3) condominium units at Palms Place, whereby there is no legal title to convey or hold for the benefit of MR. MURRAY. Accordingly, this Court dismisses Plaintiff's Fourth Cause of Action entitled Constructive Trust.

### Third-Party Plaintiff Jowdy's First Cause of Action, Intentional Misrepresentation, and Sixth Cause of Action, Fraud in the Inducement

18.     In Nevada, the elements of a claim for fraud or intentional misrepresentation are:

a.      A false representation made by the defendant;

b.      Defendant knew or believed the representation was false, or there was insufficient basis for making the representation;

c.      Defendant intended to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation;

d.      Plaintiff justifiably relied upon the misrepresentation; and

e.      Plaintiff sustained a damage resulting from such reliance.

*See* Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 110, 825 P.2d 588, 592 (1992), *citing* Lubbe v.

---

[27]It should be noted here that the Nevada Supreme Court also noted in Namow Corporation v. Eggers, 99 Nev. at 592 that "[w]hen a thief embezzles money and uses it to purchase property, he or she can be required to convey the property to the person from whom the money was taken, by means of a constructive trust." *Citing* Haskel Engineering & Supply v. Hartford Acc., 144 Cal.Rptr. 189 (Ct.App. 1978); G&M Motor Co. v. Thompson, 567 P.2d 80 (Okla. 1977). "Where the property which is subject to a constructive trust is gratuitously transferred to a donee, the donee holds the property upon a constructive trust for the equitable owner." *Id.* at 592, *citing* Kline v. Orebaugh, 519 P.2d 691 (Kan. 1974).

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

Barba, 91 Nev. 596, 540 P.2d 115 (1975); *also see* Barmettler v. Reno Air, Inc., 114 Nev. 441, 446-447, 956 P.2d 1382, 1386 (1998); NRS 42.001(2)(definition of "fraud") *and* Prosser, Law on Torts, p. 685 (4th ed. 1971).  There is no question the plaintiff has the burden of establishing the elements of his fraud or intentional misrepresentation claim by clear and convincing evidence.  Lubbe, 91 Nev. at 599, 540 P.2d at 117, *citing* Clark Sanitation, Inc. v. Sun Valley Disposal Co., 87 Nev. 338, 487 P.2d 337 (1971).

19.    Here, MR. JOWDY claims Third-Party Defendant KENNER committed fraud in the inducement and made intentional misrepresentations in that:

a.    MR. KENNER told MR. JOWDY monies he was receiving from MR. MURRAY was an investment; that is, there was no mention the $791,410.00 was a loan;[28]

b.    MR. KENNER told MR. MURRAY that MR. JOWDY was soliciting a loan to be repaid within thirty (30) days at a cost of ten percent (10%) interest;

c.    MR. KENNER told MR. MURRAY that MR. JOWDY purchased units at Palms Place;

d.    MR. KENNER told MR. MURRAY that MR. JOWDY unilaterally re-diverted his funds into the purchase of the Innisbrook property, omitting material facts regarding his instructions to MR. JOWDY to transfer funds and his own involvement in the purchase of the home;

e.    When MR. MURRAY repeated inquired as to the status of repayment of the loan, MR. KENNER informed him MR. JOWDY was working on obtaining funds to repay the funds;

f.    MR. KENNER failed to inform MR. MURRAY that MR. JOWDY was not

---

[28]Within Paragraphs 111 and 112 on page 16 of the Third-Party Complaint, MR. JOWDY alleges the misrepresentations took place in May 2005.

working on obtaining the funds and that he (KENNER) had instructed MR. JOWDY to re-divert the monies into the purchase of the Innisbrook property;

g.      MR. KENNER failed to inform MR. MURRAY he (KENNER) caused the Innisbrook property to be re-financed, subsequently obtained a home equity loan against the Innisbrook property, and personally received approximately $388,000.00 from the refinancing and loan;

h.      MR. KENNER failed to inform MR. MURRAY he subsequently instructed MR. JOWDY to place the remaining funds from MR. MURRAY into MR. KENNER'S investment portion of the Los Cabos project, and that, in exchange, MR. KENNER was given shares in the ownership of the Los Cabos project.

20.      Third-Party Plaintiff JOWDY'S claims of fraud and intentional misrepresentation fail for several reasons. *First,* in this Court's view, there was no misrepresentation, intentionally made or otherwise, by MR. KENNER to MR. JOWDY in May 2005 or thereafter. As noted above, this Court has found MR. MURRAY met his burden of proof by a preponderance of the evidence that he, through his business manager, MR. KENNER, loaned $791,410.00 to MR. JOWDY on or about August 12, 2005 in exchange for a ten percent (10%) return. This Court found MR. KENNER was asked by MR. JOWDY to acquire short-term financing in the amount of the three deposits, totaling $791,410.00, and MR. KENNER complied, finding an investor in MR. MURRAY. *Second, even if* this Court found MR. KENNER had made misrepresentations to MR. MURRAY, MR. JOWDY does not allege these misrepresentations set forth in Paragraphs 59 through 65 of the Third-Party Complaint were conveyed by MR. KENNER to him. It follows, then, MR. KENNER could not have intended MR. JOWDY to act or refrain from acting upon alleged misrepresentations never made to him. Further, MR. JOWDY could not have detrimentally relied upon alleged misrepresentations made to someone other than him, or sustained a damage based upon that

22

detrimental reliance. Accordingly, this Court finds in favor of Third-Party Defendant KENNER as against Third-Party Plaintiff JOWDY with respect to his First and Sixth Causes of Action entitled Intentional Misrepresentation and Fraud in the Inducement.

### Third-Party Plaintiff's Second Cause of Action, Negligent Misrepresentation

21.     In Nevada, as in the majority of jurisdictions, a *prima facie* claim for negligence consists of four elements:

      a.     Existing duty of care;

      b.     Breach;

      c.     Legal and/or proximate causation; and

      d.     Damages.

*See* Turner v. Mandalay Sports Entertainment, LLC, 124 Nev. ____, 180 P.3d 1172, 1175 (2008). "Negligent misrepresentation" is a special financial harm claim for which tort recovery is permitted because without such liability, the law would not exert significant financial pressures to avoid such negligence. Terracon Consultants Western, Inc. v. Mandalay Resort Group, 125 Nev. ____, 206 P.3d 81, 88 (2009).

22.     In this case, MR. JOWDY alleges a claim for negligent misrepresentation within his Third-Party Complaint, pp. 12-13, based upon alleged "misrepresentations" which are identical to those supporting his "fraud" and "intentional misrepresentation" causes of action. His claim for negligent misrepresentation fails for various reasons. *First,* as noted above, this Court has concluded no misrepresentation was made by MR. KENNER to MR. JOWDY. Again, as outlined above, this Court found MR. KENNER was asked to acquire short-term financing for the deposits MR. JOWDY needed to secure the purchase of the three condominium units at Palms Place. MR. KENNER acquired such short-term financing by way of a loan made by MR. MURRAY. Inasmuch as this Court concludes there was no misrepresentation, there could have been no breach of any duty

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

23

1    of care. Accordingly, this Court finds in favor of Third-Party Defendant KENNER as against Third-

2    Party Plaintiff JOWDY with respect to the Second Cause of Action, Negligent Misrepresentation.

3    **Third-Party Plaintiff's Claims for Implied Indemnity, Contribution and Apportionment**

4         **23.**     Implied indemnity is an equitable remedy that allows a defendant to seek recovery

5    from other potential tortfeasors whose negligently primarily caused the injured party's harm. *See*

6    Rodriguez v. Primadonna Corp., 125 Nev. ___, 216 P.3d 793, 801 (2009), *citing* Doctors Company

7    v. Vincent, 120 Nev. 644, 650, 98 P.3d 681, 686 (2004). A claimant seeking implied indemnity must

8    prove: (1) he has discharged a legal obligation owed to a third party; (2) the party from whom he

9    

10   seeks liability also was liable to the third party; and (3) as between the claimant and the party from

11   whom he seeks indemnity, the obligation should be discharged by the latter. Rodriguez, 216 P.3d at

12   801.

13   

14        **24.**     With respect to contribution and apportionment, Third-Party Plaintiff JOWDY must

15   establish MR. KENNER'S actions were the cause of MR. MURRAY'S injuries.

16        **25.**     As noted above, this Court has concluded MR. KENNER engaged in no wrongdoing.

17   He simply arranged short-term financing for MR. JOWDY, which, in turn, would have been

18   beneficial to his client, MR. MURRAY, if no breach of contract had occurred.  As this Court finds

19   MR. KENNER did not act wrongly, the obligation owing to MR. MURRAY must be discharged by

20   

21   MR. JOWDY alone. Accordingly, this Court finds in favor of Third-Party Defendant KENNER as

22   against Third-Party Plaintiff JOWDY.

23        Accordingly, based upon the foregoing,

24        **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** this Court finds in favor of

25   Plaintiff GLEN MURRAY as against Defendant/Third-Party Plaintiff KENNETH JOWDY with

26   respect to his First and Second Causes of Action for Breach of Contract, and Breach of the Implied

27   Covenant of Good Faith and Fair Dealing;

28

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

24

1      **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** this Court dismisses

2   Plaintiff GLEN MURRAY'S Third and Fourth Causes of Action for Unjust Enrichment and

3   Constructive Trust.  As noted above, this Court concludes there was a contract between Plaintiff and

4   Defendant whereby there is no need to imply one in law.  Further, Plaintiff is seeking return of his

5   monies and not title or ownership to property and there is no legal title to convey or hold for the

6

7   benefit of MR. MURRAY, whereby the remedial device of constructive trust should not be imposed;

8      **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that judgment is rendered

9   in favor of Plaintiff GLEN MURRAY as against Defendant/Third-Party Plaintiff KENNETH

10   JOWDY in the total principal amount of **EIGHT HUNDRED SEVENTY THOUSAND FIVE**

11   **HUNDRED FIFTY-ONE AND NO DOLLARS ($870,551.00),** which represents the principal,

12   $791,410.00 plus ten percent (10%) interest, 79,141.00.  Plaintiff is further awarded pre-judgment

13   interest accrued at the legal rate, 5.25 percent, per annum, from date of service of process,

14   September 29, 2008, to January 14, 2011; this Court calculates that figure to be **ONE HUNDRED**

15

16   **FOUR THOUSAND EIGHT HUNDRED FIVE AND 99/100 ($104,805.99).**[29]  The total

17   judgment, therefore, is **NINE HUNDRED SEVENTY-FIVE THOUSAND THREE HUNDRED**

18   **FIFTY-SIX AND 99/100 DOLLARS ($975,356.99).**  Post-judgment interest shall accrue upon

19   such judgment at the legal rate of interest, 5.25 percent, per annum, until such time as it is satisfied

20

21   or paid.

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

---

[29]Such calculation is made as follows:  $870,551 x .0525(837 days/365 days) = $104,805.99.

1    **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that, as this Court finds in

2    favor of Third-Party Defendant PHILIP KENNER as against Third-Party Plaintiff KENNETH

3    JOWDY with respect to all claims, judgment is rendered in favor of Third-Party Defendant

4    KENNER, whereby Third-Party Plaintiff JOWDY shall take nothing by way of his Third-Party

5    Complaint.

6       DATED and DONE this 14th day of January 2011.

7

8

9       SUSAN H. JOHNSON, DISTRICT COURT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

1

2 **CERTIFICATE OF SERVICE**

3     I hereby certify that, on the 18th day of January 2011, I electronically served (E-served),

4 placed within the attorneys' folders located within the Court Clerk's Office or mailed a true and

5 correct copy of the foregoing FINDINGS OF FACT, CONCLUSIONS OF LAW, AND

6

7 JUDGMENT to the following counsel and party of record, and that first-class postage was fully

8 prepaid thereon:

9 ROSS C. GOODMAN, ESQ.
    GOODMAN LAW GROUP

10     520 South Fourth Street, Second Floor
    Las Vegas, Nevada 89101

11     ross@goodmanlawgroup.com

12 RONALD RICHARDS, ESQ.

13 LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC
    9255 Doheny Road, Suite 602

14     West Hollywood, California 90069

15 MICHAEL K. WALL, ESQ.

16 PATRICIA LEE, ESQ.
    HUTCHISON & STEFFEN, LLC

17     10080 West Alta Drive, Suite 200
    Las Vegas, Nevada 89145

18     mwall@hutchlegal.com

19     plee@hutchlegal.com

20 PHILLIP KENNER
    200 Hoover Avenue, Suite 1711

21     Las Vegas, Nevada 89101

22                        *Laura Banks*

23                Laura Banks, Judicial Executive Assistant

24

25

26

27

28

SUSAN H. JOHNSON
DISTRICT JUDGE
DEPARTMENT XXII

27