UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

PHILLIP A. KENNER,
        also known as,
          "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
        also known as
          "Tommy C. Hormovitis,"

        Defendants.
– – – – – – – – – – – – – – – –X

                       DECLARATION OF
                       KELLIE FEDKENHEUER

                       13-CR-607 (S-2)(JFB)

1. I, Kellie Fedkenheuer hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury the following:

2. I am a Partner at Cotton & Company LLP (Cotton & Company), a CPA firm located in Alexandria, Virginia. I am a certified public accountant ("CPA"), a certified fraud examiner ("CFE") and am certified in financial forensics ("CFF") and have been involved in analyzing and reviewing documents for numerous financial investigations.

3. On April 10, 2020, the United States Attorneys Office, Eastern District of New York (the "USAO" or the "government"), engaged Cotton & Company to provide litigation consultant services on matters related to the *U.S. v. Kenner, et. al.* case.

4. Specifically, the USAO requested that I review the claims that Danske Bank ("Danske") submitted related to the Diamante Cabo San Lucas resort property, owned by Diamante Cabo San Lucas S. De R.L. De C.V. (DCSL), to determine if Danske properly supported its claim amount of $197,100,000 and if the claim amount was allocable to the construction and development of the DCSL property.

1

5. Attachment 1 identifies the documentation and other information I relied upon while determining if Danske supported its claim and if the claim was allocable to the construction and development of the DCSL property.

6. Attachment 2 contains my Curriculum Vitae, which includes my education, certifications, and experience.

7. It is my understanding that the USAO requested additional documentation from Danske that was necessary to validate Danske's claim. Danske provided some but not all of the requested documentation, thereby limiting my review. This affidavit identifies the documentation that Danske did not provide that is necessary to complete my review.

8. Based on my review of the documents available to me, my educational background, and my previous experience in reviewing documentation in financial investigations, I determined that Danske has not properly supported its claim for the reasons outlined throughout this affidavit.

## INCONSISTENCIES BETWEEN THE DANSKE LOAN STATEMENTS AND THE TRIMONT ACCOUNT INVOICES

9. Danske provided internal loan statements for Facilities A, B, and C that included loan activity for the entire period that Danske held the loan. These separate facilities represent the loan extended by Danske to DCSL. These loan statements served as the basis for Danske's claim of $128,500,000 related to Facilities A, B and C, as shown below.

| Table 1 | | | | |
|---|---|---|---|---|
| | **Facility A** | **Facility B** | **Facility C** | **Total** |
| Principal | $82,338,371 | $16,462,951 | $3,180,111 | $101,981,433 |
| Capitalized Interest | 13,860,658 | - | - | 13,860,658 |
| Accrued Interest | - | - | 7,671,811 | 7,671,811 |
| Fees | 200,971 | 1,537,049 | 3,248,078 | 4,986,098 |
| **Total** | **$96,400,000** | **$18,000,000** | **$14,100,000** | **$128,500,000** |

10. In addition, Danske provided a certain amount of documentation from Trimont Real Estate Advisors, Inc. ("Trimont") related to Facilities A, B, C, and D. Trimont is a third-party entity

that serviced the DCSL loan from March 2006, when Lehman Brothers Holdings, Inc. ("Lehman Brothers") held the loan, through December 31, 2016. Danske provided Trimont account invoices ("Trimont Invoices"), which, it is my understanding, were issued to DCSL as statements for the loan accounts; Trimont summary statements ("Trimont Summary"), which summarized the loan activity from the origination date of the Facility through December 31, 2016; and the Servicing and Asset Management Agreement between Trimont and Danske, dated June 11, 2009, which established the services that Trimont would provide for the loans.

11. To validate the reliability of Danske's loan statements, I attempted to reconcile the transactions included in Danske's loan statements with the transactions included in Trimont's records. Because Trimont issued the Trimont Invoices as statements for the loan account, I attempted to use the Trimont Invoices to perform the reconciliation. However, Danske did not provide all of the Trimont Invoices, which impacted my reconciliation. It is my understanding the government submitted Document Request No. 27 requesting that Danske provide "all Trimont summary statements, account statements, and invoices…." Danske provided some additional Trimont Invoices for Facilities A, B, and C in response to this request; however, the documentation is still incomplete, as identified in the table below.

| Table 2 | | | | |
|---|---|---|---|---|
| | Facility A | Facility B | Facility C | |
| Month/Year | Trimont Invoices | Trimont Invoices | Trimont Invoices | Trimont Summary |
| April 2006 | Incomplete | | | |
| June 2006 | Incomplete | | | |
| July to August 2006 | Not Provided | | | |
| September to October 2006 | Incomplete | | | |
| December 2006 to January 2007 | Incomplete | | | |
| June to July 2008 | Incomplete | | | |
| August 2008 | Not Provided | | | |
| June to August 2010 | Not Provided | Not Provided | | |
| March to June 2012 | Not Provided | Not Provided | | |
| December 2012 | | Incomplete | | |
| April to December 2013 | | | | Not Provided |
| January to March 2014 | Not Provided | Not Provided | Not Provided | Not Provided |

| Table 2 | | | | |
|---|---|---|---|---|
| | Facility A | Facility B | Facility C | |
| Month/Year | Trimont Invoices | Trimont Invoices | Trimont Invoices | Trimont Summary |
| April 2014 | | | | Not Provided |
| January to March 2015 | | Not Provided | | |
| July to December 2015 | Not Provided | Not Provided | Not Provided | |
| October to December 2016 | Not Provided | Not Provided | Not Provided | |

Because Danske did not provide all of the relevant Trimont documentation, I was unable to perform a complete reconciliation of the loan statements supporting Danske's claim in order to determine the statements' completeness and accuracy. Further, because I was unable to complete the reconciliation, I was unable to determine, in total, the differences between Danske and Trimont's account balances for Facilities A, B, C, and D.

12. In addition, Danske provided certain Trimont Invoices for the period during which Lehman Brothers held the loan. The last Trimont Invoice issued during the period in which Lehman Brothers held the loan, dated December 18, 2008, identified a principal balance of $107,538,328; however, because Danske did not provide certain Trimont Invoices, I was unable to validate that this balance was accurate. The purported Trimont Invoices that Danske provided for the period during which Lehman Brothers held the loan included transactions of $101,240,922. Danske did not provide any documentation to support the remaining $6,297,406 of the funding that Lehman Brothers allegedly provided to DCSL.

13. Despite the incomplete records, I attempted to reconcile the Danske loan statements and Trimont Invoices that covered the same time period. The Danske loan statements and the Trimont Invoices should report the same transactions, as these documents both reflect activity on the loan account. However, my reconciliation identified numerous differences between the Danske loan statements and the Trimont Invoices.

4

14. First, I identified numerous transactions that Trimont included in the Trimont Invoices but that Danske did not include in its loan statements. Specifically, the Trimont Invoices for Facility B included advances of $25,572,508 and principal payments of $23,493,848 that Danske's loan statements did not include. I have summarized these transactions in Attachment 3. In addition, although Danske provided loan statements for the entire period of the loan, some of these statements did not report any loan activity. For example, Danske Statement No. 15 for Account 90003761, Facility B, which covered the period from December 31, 2011, through December 31, 2012, only identified a principal balance of $18,000,000 and did not report any transactions during that period (see Attachment 4). However, the Trimont Invoices showed 52 transactions during this period, including $12,449,440 in advances and $9,382,994 in principal payments[1]. The table below compares the number of transactions reported in the Danske loan statements to the number of transactions reported in the Trimont Invoices for Facility B. As the table illustrates, beginning in July 2010, the activity reported in the Trimont Invoices substantially exceeds the activity reported in the Danske loan statements.

| Table 3 | | | | |
|---|---|---|---|---|
| Danske Statement Number | Statement Date | Period Covered by Statement | Number of Transactions | |
| | | | Danske Loan Statements | Trimont Invoices |
| 1 | 03/31/09 | 03/09/09 to 03/31/09 | 1 | 0 |
| 2 | 06/30/09 | 04/01/09 to 06/30/09 | 4 | 5 |
| 3 | 09/30/09 | 07/01/09 to 09/30/09 | 5 | 5 |
| 4 | 11/30/09 | 10/01/09 to 11/30/09 | 4 | 3 |
| 5 | 12/31/09 | 12/01/09 to 12/31/09 | 3 | 3 |
| 6 | 01/29/10 | 01/01/10 to 01/29/10 | 4 | 3 |
| 7 | 02/26/10 | 01/30/10 to 02/26/10 | 1 | 1 |
| 8 | 03/31/10 | 02/27/10 to 03/31/10 | 1 | 3 |
| 9 | 05/31/10 | 04/01/10 to 05/31/10 | 1 | 1 |
| 10 | 06/30/10 | 06/01/10 to 06/30/10 | 1 | 1* |
| 11 | 12/31/10 | 07/01/10 to 12/31/10 | 0 | 25* |
| 12 | 06/30/11 | 01/01/11 to 06/30/11 | 1 | 30 |
| 13 | 09/30/11 | 07/01/11 to 09/30/11 | 2 | 20* |

---

[1] The $12,449,440 in advances and $9,382,994 in principal payments represent the 2012 transactions that were reported in the Trimont Invoices (see in Attachment 3).

| Table 3 | | | | |
|---|---|---|---|---|
| **Danske Statement Number** | **Statement Date** | **Period Covered by Statement** | **Number of Transactions** | |
| | | | **Danske Loan Statements** | **Trimont Invoices** |
| 14 | 12/31/11 | 10/01/11 to 12/31/11 | 0 | 7 |
| 15 | 12/31/12 | 12/30/11 to 12/31/12 | 0 | 52* |
| 16 | 03/29/13 | 01/01/13 to 03/29/13 | 1 | 24 |
| 17 | 06/28/13 | 03/30/13 to 06/28/13 | 2 | 17 |
| 18 | 12/31/13 | 06/29/13 to 12/31/13 | 2 | 24 |
| 19 | 03/31/14 | 01/01/14 to 03/31/14 | 0 | 0* |
| 20 | 12/31/14 | 04/01/14 to 12/31/14 | 0 | 38 |
| 21 | 09/30/15 | 01/01/15 to 09/30/15 | 2 | 14* |
| 22 | 12/31/15 | 10/01/15 to 12/31/15 | 2 | 0* |
| 23 | 06/30/16 | 01/01/16 to 06/30/16 | 2 | 41 |
| 24 | 09/30/16 | 07/01/16 to 09/30/16 | 2 | 17 |
| 25 | 12/31/16 | 10/01/16 to 12/31/16 | 2 | 0* |
| *Because Danske did not provide all of the Trimont Invoices for this period, the number of transactions reported in the Trimont Invoices may be understated. | | | | |

Similarly, the Trimont Invoices included $3,020,424 in payments for Facility C that Danske did not include in its loan statements. Danske's claim based on these loan statements could be overstated by $3,020,424. I have summarized these transactions in the table below.

| Table 4 | | | | | | |
|---|---|---|---|---|---|---|
| **Facility** | **Invoice Number** | **Loan Number** | **Transaction Date** | **Description** | **Transaction Value** | **Bates Number** |
| C | 47670 | 1133621 | 07/01/13 | Payment Received | $4,578 | DANSKE_0015460 |
| C | 63784 | 1133641 | 07/01/14 | Payment Received | 568,750 | DANSKE_0015392 |
| C | 95577 | 1133641 | 10/01/14 | Payment Received | 454,167 | DANSKE_0015396 |
| C | 104895 | 1133641 | 01/02/15 | Payment Received | 470,073 | DANSKE_0015399 |
| C | 138300 | 1133641 | 04/07/15 | Payment Received | 157,709 | DANSKE_0016761 |
| C | 190981 | 1133641 | 01/07/16 | Payment Received | 385,842 | DANSKE_0015602 |
| C | 197519 | 1133641 | 04/01/16 | Payment Received | 498,144 | DANSKE_0015644 |
| C | 197519 | 1133641 | 07/01/16 | Payment Received | 481,161 | DANSKE_0015467-68 |
| | | | | **Total Payments Received:** | **$3,020,424** | |

15. Second, I identified transactions that Danske included in its loan statements that were not included in Trimont's Invoices.[2] While these transactions did not always impact the principal

---

[2] These transactions are only for periods that Danske provided both the Danske loan statements and the Trimont Invoices. If Danske provided all Trimont Invoices, there could be additional transactions that were identified in the Danske loan statements that were not reported in the Trimont Invoices.

balance, the Danske loan statements and the Trimont Invoices should report the same

transactions regardless of the transactions' impact, as both sources are reporting the same loan

activity. The table below summarizes the transactions that Danske included in its loan

statements that were not included in Trimont's Invoices.

| Table 5 | | | | | |
|---------|---|---|---|---|---|
| Facility | Account Number | Entry Date | Value Date | Transaction Description | Amount |
| A | 90003664 | 11/19/08 | 11/19/08 | OUTWARD 4022-83245122794* | $20,015 |
| A | 90003664 | 01/20/09 | 11/19/08 | CHARGES RETURN* | (15) |
| A | 90003664 | 02/25/09 | 02/25/09 | LEGAL FEE CABO* | (20,000) |
| A | 90003664 | 04/29/13 | 04/29/13 | INTERNAL TRANSFER | 72,639 |
| A | 90003664 | 06/24/15 | 06/25/15 | VALUE ADJUST 3825-0040186408* | 24,999,992 |
| A | 90003664 | 06/24/15 | 06/25/15 | PAYMENT 3825-0040186408* | (24,999,992) |
| B | 90003761 | 09/13/11 | 09/12/11 | TRIMONT REAL ESTATE | (649,942) |
| C | 36030240 | 01/03/14 | 01/02/14 | TRIMONT REAL ESTATE ADVISORS INC | (11,479) |
| C | 36030240 | 01/02/15 | 12/30/14 | DEBIT INTEREST* | 1,381,919 |
| C | 36030240 | 01/02/15 | 12/30/14 | REVERSE ENTRY* | (1,381,919) |
| C | 36030240 | 03/10/15 | 03/10/15 | REVERSAL ENTRY 3825-0038668519* | 905,927 |
| C | 36030240 | 03/10/15 | 03/10/15 | PAYMENT 3825-0038668519* | (905,927) |
| C | 36030240 | 07/05/16 | 06/30/16 | CABO SALE PROCEEDS | (14,770) |
| *Transactions had a net impact of $0 on the principal balance. | | | | | |

16. Third, I identified differences in the manner in which Danske and Trimont accounted for certain

transactions, as explained in detail below.

| Table 6 | | | | | | |
|---------|---|---|---|---|---|---|
| Facility | Account Number | Entry Date | Value Date | Transaction Description | Transaction Amount | Note |
| A | 90003664 | 04/29/13 | 04/29/13 | INTERNAL TRANSFER | $13,860,658 | a |
| C | 36030240 | 04/30/14 | 04/30/14 | CLOSING FACILITY D | 3,000,000 | b |
| B | 90003761 | 12/18/09 | 12/18/09 | OUTWARD 4022-93517677256 | 250,387 | |
| B | 90003761 | 12/18/09 | 12/18/09 | OUTWARD 4022-93517677258 | 68,484 | |
| B | 90003761 | 10/29/09 | 10/29/09 | OUTWARD 4022-93026251756 | 1,477,890 | |
| B | 90003761 | 11/06/09 | 11/06/09 | TRAVEL COSTS | 18,702 | |
| B | 90003761 | 01/29/10 | 01/29/10 | TRANSFER INTERNAL | 10,000 | c |
| B | 90003761 | 01/29/10 | 01/29/10 | OUTWARD 4022-00298855524 | 1,419,343 | |
| C | 36030240 | 01/06/16 | 01/06/16 | TFR TO PROFESSIONAL FEES | 98,000 | |
| C | 36030240 | 01/06/16 | 01/06/16 | OUTWARD 4022-60068010908 | 1,402,000 | |

a.  The *Amended and Restated Loan Agreement* dated March 6, 2009 only identified required interest payments, and did not specify required principal payments which implies that when Danske initially took over the loan, the Facility A and B loan accounts were initially interest only loans. Further, the *Amended and Restated Loan Agreement* stated that "unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance…." DCSL failed to make the interest payments for accrued interest on Facility A and therefore, the unpaid accrued interest was capitalized which increased the principal balance. Danske and Trimont accounted for the capitalization of the unpaid accrued at different times. While the Trimont Invoices began capitalizing interest on a monthly basis beginning on August 25, 2009, Danske did not account for the capitalization of interest until April 2013. Danske Facility A Bank Statement No. 8 included an internal transfer of $13,860,658 in April 2013. According to the Danske Funding Memorandum dated April 29, 2013, the $13,860,658 transaction related to the capitalization that was compounding, of unpaid accrued interest for the period from March 2009 through December 2011.  It is unclear why the Danske loan statements did not begin reflecting the capitalization of interest until April 2013, particularly as Trimont's records reflected the capitalization of interest as it occurred. Because Trimont and Danske began accounting for the capitalization of interest at different times, they reported different principal balances for Facility A from August 2009 through the second quarter of 2013, as shown in Attachment 5.[3]

---

[3] The Facility A principal balances reported in the Danske loan statements and the Trimont Invoices reconcile beginning in the second quarter of 2013, with the exception of an internal transfer of $72,639 that Danske included in its loan statements but that Trimont did not include in its Invoices.

8

b.  On April 26, 2013, Danske and DCSL executed the *Second Amended and Restated Loan Agreement*, which split the Facility B loan into three separate facilities: a replacement Facility B loan of $18,000,000; a new Facility C loan of $2,000,000; and a new Facility D loan that advanced an additional $3,000,000. According to the 2013 modification, the parties established the Facility C and Facility D loans to fund specific phases of the project, and Section 4.1 of the modification, *Agreement to Borrow and Lend*, places restrictions on the use of the funds loaned from these facilities. Specifically, Section 4.1 states in part:

> (f) The proceeds of the Facility C Loan shall be used solely for the construction and completion of the Lagoon Improvements in accordance with the Lagoon Construction Budget and for no other purpose.

> (g) The proceeds of the Facility D Loan shall be used solely for the construction and completion of the Resort Vertical Improvements in accordance with the Resort Vertical Construction Budget and for no other purpose.

The parties subsequently consolidated the Facility C and Facility D loans into one replacement Facility C revolving loan under the *Third Amended and Restated Loan Agreement*, dated April 29, 2014. Under the 2014 modification, Danske transferred the $2,000,000 balance of the existing Facility C loan and the $3,000,000 balance of the existing Facility D loan to the replacement Facility C loan and simultaneously increased the credit limit for the replacement Facility C loan to $15,000,000, an increase of $10,000,000. The 2014 modification noted that DCSL was to use the funds for the "…construction and completion of those construction and infrastructure items set forth in the Project Construction Budget and for no other purpose."

Danske Facility C Statement No. 5 accounted for this consolidation by reporting a transaction of $3,000,000 in the Facility C loan account on April 30, 2014, with the description "closing

9

facility D." This transaction represented the transfer of the Facility D principal balance of $3,000,000 from Facility D to Facility C. Because Danske did not provide loan statements for Facility D, I was unable to identify the transactions that were included in the $3,000,000 principal balance.

Trimont also accounted for the $3,000,000 principal balance related to Facility D, although its methodology differed from Danske's. Trimont accounted for the consolidation by closing the previous loan accounts for Facility C (Loan Identifier No. 1133621) and Facility D (Loan Identifier No. 1133631) and setting up a new loan account (Loan Identifier No. 1133641). Trimont then reported a transaction of $5,000,000 in the new loan account, dated May 5, 2014; this transaction appears to represent the merger of the principal balances from the previous Facility C and D accounts.

Although Danske did not provide loan statements for Facility D, Trimont's Invoices for Facility D (Loan Identifier No. 1133631) identified three advances that made up the principal balance of $3,000,000. However, Danske did not provide wire transfer documentation or bank statements to support that DCSL received this funding, nor did it provide the documentation specified in the loan documents (see paragraph 25) to support that DCSL used the funds for the required purpose.

c. Danske and Trimont accounted differently for some of the transactions related to Facility B. Although the total of the transactions reported on the Danske loan statements reconciles to the total of the transactions reported on the Trimont Invoices, the entities recorded the transactions differently and reported different dates for some of the transactions, as shown in the table below.

| Table 7 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Example | Danske Loan Statements | | | | Trimont Invoices | | |
| | Facility | Date | Description | Amount | Date | Description | Amount |
| 1 | B | 12/18/09 | OUTWARD 4022-93517677256 | $250,387 | 12/18/09 | Advance to Borrower | $318,571 |
| | B | 12/18/09 | OUTWARD 4022-93517677258 | 68,484 | 12/22/09 | Advance to Borrower | 300 |
| 2 | B | 10/29/09 | OUTWARD 4022-93026251756 | 1,477,890 | 10/29/09 | Advance to Borrower | 1,496,592 |
| | B | 11/06/09 | TRAVEL COSTS | 18,702 | | | |
| 3 | B | 01/29/10 | TRANSFER INTERNAL | 10,000 | 01/29/10 | Advance to Borrower | 1,429,343 |
| | B | 01/29/10 | OUTWARD 4022-00298855524 | 1,419,343 | | | |
| 4 | C | 01/06/16 | TFR TO PROFESSIONAL FEES | 98,000 | 01/06/16 | ADVANCE | 1,500,000 |
| | C | 01/06/16 | OUTWARD 4022-60068010908 | 1,402,000 | | | |

17. Lastly, in addition to the inconsistencies between the Danske loan statements and the Trimont Invoices, I identified notable discrepancies between the various Trimont documents that Danske provided. Specifically, I noted that the Trimont Summaries, which are intended to provide a consolidated schedule of the loan activity for each Facility, do not reconcile to the Trimont Invoices. I reconciled the transactions recorded in the Trimont Invoices for Facility B to the transactions recorded in the Trimont Summary for Facility B and noted a discrepancy of more than 200 transactions between the two sources from 2009 to 2016. Some of these discrepancies were caused by Danske's failure to provide all of the Trimont Invoices; however, I noted that some transactions are reported in one source but not the other. For example, the 2009 Trimont Summary included 22 transactions that did not appear in the Trimont Invoices, including two advances to DCSL that totaled $1,753,649, as shown in the table below.

11

| Table 8 | | | |
|---------|---|---|---|
| Loan Number | Transaction Date | Description | Transaction Amount |
| 1133611 | 09/01/09 | LOAN ADVANCE | $600,000 |
| 1133611 | 09/04/09 | LOAN ADVANCE | 1,153,649 |
| | | **Total** | **$1,753,649** |

18. In performing my analysis, I was limited to the transaction details from Danske's loan

statements to determine the loan activity, as these loan statements were the only documents

provided by Danske that covered the majority of the loan period[4]. However, as a result of the

discrepancies I identified between Danske's loan statements and Trimont's Invoices, I was

unable to rely solely on the Danske loan statements to validate Danske's claim amount. It is my

understanding that the government therefore submitted Document Request No. 27 to request

that Danske provide "all Trimont summary statements, account statements, and invoices

identified as 'Missing'…" and Document Request No. 54 to request that Danske provide "a full

accounting of all monies due, including advances of credit, payments, and charges from the

acquisition of the underlying loans under the Loan Agreements to date that were used to

calculate the amount Danske is owed as indicated in its Verified Petition." However, Danske

has not provided all of the documentation requested by the government. As a result, I was

unable to determine whether DCSL received all of the funds included in Danske's claim,

whether the funds in Danske's claim were allocable to the construction and development of the

DCSL property, or validate if Danske's claim accounted for all payments made by DCSL

related to the Facility A, B and C loan accounts. My determinations included in this affidavit are

therefore based on the limited information that Danske provided, as discussed further below.

---

[4] Danske's claim is through April 30, 2020, however Danske only provided Facility A and B loan statements through February 28, 2020 and Facility C loan statements through December 31, 2019.

**DANSKE DID NOT SUPPORT OVER $90 MILLION IN ADVANCES THAT WERE ALLEGEDLY ALLOCABLE TO THE CONSTRUCTION AND DEVELOPMENT OF THE DCSL PROPERTY, AS REQUIRED BY THE LOAN AGREEMENTS**

19. I reviewed Danske's claim of $197,100,000 and analyzed the loan activity reported in Danske's loan statements to determine the breakdown of the claim. The table below summarizes the claim elements. Attachment 6 includes a more detailed breakout of the claim[5]. categorize

| Table 9 | | | | |
|---|---|---|---|---|
| Description | Facility A | Facility B | Facility C | Total |
| Principal[6] | $109,138,343 | $19,141,342 | $77,494,995 | $205,774,680 |
| Principal Payments | (26,799,972) | (2,678,391) | (74,314,884) | (103,793,247) |
| Unpaid Principal | $82,338,371 | $16,462,951 | $3,180,111 | $101,981,433 |
| Capitalized Interest | 13,860,658 | - | - | 13,860,658 |
| Unpaid Accrued Interest | - | - | 7,671,811 | 7,671,811 |
| Unpaid Fees | 200,971 | 1,537,049 | 3,248,078 | 4,986,098 |
| **Facilities Claim** | **$96,400,000** | **$18,000,000** | **$14,100,000** | **$128,500,000** |
| Profit Participation Fee | | | | 50,000,000 |
| Interest and Fees | | | | 18,600,000 |
| **Total Claim** | | | | **$197,100,000** |

20. Although DCSL allegedly received $205,774,680 in funds over the course of the loan period, $107,538,328 of this amount was purportedly advanced through Lehman Brothers, rather than Danske. After Danske took over the loan, it advanced DCSL $1,600,015 through Facility A,

---

[5] I relied on the Danske loan statements to segregate the transactions in the loan accounts into certain categories (principal, capitalized interest, accrued interest, fees). While I used the transaction activity in the Danske loan statements, I used the Trimont Invoices in certain situations to determine what the amount of the transaction was related to, as the Trimont Invoices, in certain situations provided a more detailed transaction description.

[6] This amount only includes the alleged amount that Lehman Brothers advanced of $107,538,328 and the advances Danske made to DCSL of $98,236,352. Capitalized interest, accrued interest, loan modification fees and other miscellaneous fees are identified separately.

13

$19,141,342 through Facility B, and $77,494,995 through Facility C, for a total of $98,236,352.[7]

21. I reviewed the wire transfer documentation that Danske provided to support the $98,236,352 in advances that it made to DCSL through Facilities A, B and C and determined that Danske wired $53,476,556 of this amount to a bank account owned by Trimont.

22. It is my understanding that Danske stated that it does not have wire transfer documentation to support that Trimont subsequently wired the $53,476,556 in advances to DCSL; however, Danske indicated that the Trimont Invoices would support this transfer, as the Trimont Invoices included loan advances. I reviewed the Trimont Invoices and noted that, although Trimont identified loan advances of $53,476,556, the Trimont Invoices only include the dates and amounts of the loan advances; they **do not** identify the ordering customer or the beneficiary name/bank account number. The Trimont Invoices therefore do not provide sufficient evidence to prove that DCSL received those funds.

23. On August 6, 2020, Danske provided redacted bank statements for the DCSL bank accounts ending in #4660 and #3166 that it obtained from DCSL in an attempt to support Danske's argument that Trimont transferred the $53,476,556 to a DCSL bank account. I reviewed the bank statements and determined that the only relevant non-redacted information they contained related to deposits from Danske and Trimont. Danske redacted all of the other transactions in the bank statements, such as deposits from entities other than Danske or Trimont, wire transfers to another account, withdrawals, and checks to vendors. I reviewed the DCSL banks statements

---

[7] Facilities B and C were revolving accounts that had credit limits of $18,000,000 and $15,000,000, respectively, as discussed in Footnote 26. As a result, although Danske advanced DCSL $96,636,337 through Facilities B and C over the course of the loan, it never advanced more than this credit limit, or $33,000,000, at one time. Once DCSL reached the credit limit, it would have to pay down the principal balance to obtain additional credit before it could continue drawing down funds.

to identify the $53,476,556 that Trimont allegedly wired to DCSL, and determined that according to the DCSL bank statements Trimont only deposited $52,589,169 or $887,387 less than the amount included in Danske's loan statements, as summarized below.

| Table 10 | | | | | |
|---|---|---|---|---|---|
| | Danske Loan Statements | | DCSL Bank Statements | | |
| Facility | Date | Amount | Date | Amount | Difference |
| A | 01/14/09 | $1,600,015 | 01/14/09 | $1,591,188 | $8,827 |
| B | 12/18/09 | 250,387 | 12/22/09 | 216,845 | 33,542 |
| C | 12/30/14 | 1,587,637 | 12/30/14 | 1,587,619 | 18 |
| C | 01/13/15 | 910,934 | 01/13/15 | 905,934 | 5,000 |
| C | 11/06/15 | 1,394,488 | 11/06/15 | 974,488 | 420,000 |
| C | 01/06/16 | 1,402,000 | 01/06/16 | 982,000 | 420,000 |
| | | $7,145,461 | | $6,258,074 | $887,387 |

24. Because the DCSL bank statements that Danske provided were redacted and the only information provided were the deposits from Trimont and Danske, I was unable to validate whether DCSL used the funds deposited into the DCSL bank account to pay construction and/or development expenditures. As discussed in paragraphs 25-28, Danske failed to produce the documents required by the loan documents that would support the purpose of the funding disbursed to DCSL, but unredacted bank statements from DCSL may have provided information that would have demonstrated the purpose of the loaned funds. For example, I may have been able identify disbursements that DCSL made to construction vendors to pay for construction costs at the DCSL property. Moreover, the loan documents that Danske produced indicate that DCSL owned at least 22 separate bank accounts, including 3 Wells Fargo Collateral Accounts in the Cayman Islands; the documents also identify an additional 18 accounts[8] owned by affiliated entities, as well as 12 Homeowner Association (HOA) accounts.

---

[8] These accounts are identified in the '*Borrower's and Borrower Affiliates' Bank Accounts Identified in Loan Documents*' section of Attachment 7 and include all accounts that do not identify "Diamante Cabo San Lucas S. De R.L. De C.V." as the account name.

(See Attachment 7 for a list of these bank accounts.) DCSL could have transferred the funds that Danske and Trimont deposited into the DCSL bank accounts ending in #4660 and #3166 to any of these accounts, or to other accounts that were not identified in the loan documents. The government requested this information. Specifically, Document Request No. 26 requested that Danske provide "bank statements for other bank accounts identified that funds from Facility A, B and C may have been indirectly transferred to…" As noted above, Danske has only provided redacted bank statements for two DCSL bank accounts. However, no additional documents responsive to this request have been produced.

25. Article XI, Section 11.1 of the *Second Amended and Restated Loan Agreement* identified documents that DCSL was required to provide before receiving each disbursement of funds from Danske. This documentation included, but was not limited to:

> *(a) A Requisition, duly executed by an Authorized Representative;*
>
> *(b) A certification, executed by Borrower, as to all costs included within the request for disbursement (all of which costs shall have been verified by Lender's Consultant);*
>
> *(c) Such invoices, contracts or other information as Lender may require to evidence that Borrower has **incurred all costs covered by the request for disbursement**;*
>
> *(d) **Paid receipts or other proof of payment** (including, with respect to Hard Costs, lien waivers or the equivalent) **of all Construction costs covered by the prior disbursement of the Loan**;*
>
> *(e) Copies of any Change Orders executed since the date of the last disbursement, if required by Lender or Lender's Consultant;*
>
> *(f) Copies of all Construction Contracts which have been executed since the last disbursement if required by Lender or Lender's Consultant…* **[Emphasis Added]**

16

26. This documentation would validate that the funds advanced to DCSL related to construction and other development costs that DCSL had already **incurred** and **paid**. The Government requested that Danske provide this documentation[9]. Document Request No. 28 requested that, for each disbursement and/or loan advance, Danske provide "complete draw request packages, containing all documents identified in Section 11.1, Documents to be Furnished for Each Disbursement, of the loan agreements as a condition precedent to the disbursement of funds from the loan facilities." Without this information, I was unable to determine whether DCSL used the funding that Danske disbursed to reimburse itself for construction and development costs that DCSL had already **incurred** and **paid**.

27. Danske did provide some, but not all, of the documentation required by Article XI, Section 11.1 of the *Second Amended and Restated Loan Agreement* for **one** advance of $1,394,488 made on November 6, 2015, which supported that this advance was related to the construction of the DCSL property, but did not support that the costs had been **incurred** or **paid** by DCSL prior to submitting the disbursement request. Specifically, Danske provided a funding memo that it had prepared; a summary breakdown of the draw request; a summary of gross sales deposits; Trimont's draw request review form; email correspondence between Danske, Trimont, and DCSL regarding the draw request; and an application for disbursement. Danske did **not** provide invoices, contracts, receipts or other proof of payment, or construction contracts and change

---

[9] The Government also requested additional construction documentation required per the *Second Amended and Restated Loan Agreement*. Document Demand No. 18 requested "all required construction documents identified in the Loan Agreements" under Article VIII, Section 8.1 and Article IX, 9.2. Document Demand No. 19 requested "all reports furnished by the Borrower to Danske pursuant to the Loan Agreements" under Article XIII, Section 13.5. Without this information, in addition to the documents requested through Document Demand 28, I could not validate that the funds were properly advanced according to the terms of the loan agreement, which was to reimburse the DCSL resort for expenses already incurred for the construction and development of the DCSL resort property.

orders executed since the previous disbursement, all of which were also required by the loan documents. If Danske was able to provide some of this information for one advance, it should have been able to provide the same documentation for all of the advances, unless Danske did not follow the loan requirements and did not require that DCSL provide this information prior to Danske disbursing funds.

28. In order for me to validate that Danske advanced the $98,236,352 in funding to reimburse DCSL for construction and development costs that DCSL had previously **incurred** and **paid**, Danske would need to produce the documentation required per Article XI, Section 11.1 of the *Second Amended and Restated Loan Agreement* and provide unredacted bank statements.

### THE PROFIT PARTICIPATION FEE OF $50,000,000 IS UNSUPPORTED AND NOT A DIRECT COST OF THE CONSTRUCTION OR DEVELOPMENT OF THE DCSL PROPERTY

29. Danske's claim includes a Profit Participation Fee (PPF) of $50,000,000. The *Amended and Restated Loan Agreement,* dated March 6, 2009, Section 5.3, *Profit Participation Fee,* establishes the PPF. It states:

> (a) Borrower shall pay to Lender, in addition to interest and all other amounts due hereunder, the Profit Participation Fee. The Profit Participation Fee shall be fully earned on the Effective Date, and shall be payable, subject to the Order of Priority, (i) on the Maturity Date, (ii) the earlier repayment of the Debt by acceleration or otherwise; or (iii) such earlier date as Borrower shall elect. For purposes of this Agreement and the Notes, "Profit Participation Fee" shall mean the greater of (i) $45,000,000, or (ii) thirty percent (30%) of the amount that is equal to the difference between: (x) the Current Value as determined in accordance with Section 5.3(d) below, less (y) the amount that is the lesser of (1) the outstanding principal balance of the Loan, or (2) the original face amount of the Notes (i.e., $125,138,327.83).

18

30. As indicated in the above quote, Section 5.3 of the loan documents states that a formula is necessary to determine the amount of the PPF. Danske did not originally provide documentation to support the claimed PPF of $50,000,000. The Government requested documentation to support this amount. Specifically, Document Request No. 22 requested that Danske provide "any and all documents showing the calculation and valuation for Danske's claimed profit participation fee under the Loan Agreements." Danske provided documentation of its formula, which used amounts from 2008 to calculate a PPF of $45,000,000. According to the document, the PPF was based on an implied equity value of $142,500,000, which Danske calculated using a market value from 2008 of $250,000,000, instead of a current market value, as required by the loan agreement, less $107,500,000 of drawn opening debt as of 2008, rather than the current drawn opening debt. As stated in the *Amended and Restated Loan Agreement*, the PPF would be the greater of either $45,000,000 or 30 percent of the implied equity value of the DCSL property. Therefore, because 30 percent of the implied equity value of $142,500,000 is $42,750,000, the PPF would be $45,000,000. However, this formula supported a PPF of $45,000,000, not the $50,000,000 that Danske included in its claim. The only documentation provided that references a PPF of $50,000,000 is the *Second Amended and Restated Loan Agreement*, dated April 26, 2013 and DCSL's Consolidated Financial Statements for the years ending December 31, 2015 and 2016, which identified the increase of the PPF to $50,000,000 [10]. Danske has not provided documentation to explain the justification for the $5,000,000 increase.

---

[10] Danske has not provided financial statements for DCSL for the years ending December 31, 2017 through December 31, 2019. The Government submitted Document Request No. 37 to request that Danske provide "the most recent financial information for DCSL Mexico, including financial statements and tax returns." Without this information, I was unable to determine if any other modifications to the PPF have been made since 2016.

31. According to the "Discussion Proposals for the DCSL Resort Property Profit Participation Fee" document that Danske provided on August 6, 2020, the PPF appears to be an agreement giving Kenneth Jowdy purchase rights to Danske's equity stake, rather than a direct cost related to the construction and development of the DCSL property. Specifically, the document states "We would then propose that KJ has purchase rights to take us out of our Equity…" followed by Danske's calculation of the purchase rights. This agreement is not referenced in the loan documents that I reviewed. Moreover, neither the loan documents, nor DCSL's Financial Statements, include any reference to Danske owning an equity stake in the DCSL resort property separate from its security interests established in the loan documents.

### DANSKE PAID DOWN ONE LOAN USING FUNDING FROM ANOTHER LOAN

32. The Danske loan statements for Facility B included two advances of $696,281 that were made to DCSL in March and April 2013, as shown in the table below.

| Table 11 | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Loan Number | Statement Number | Entry Date | Value Date | Transaction Description | Amount |
| B | 90003761 | 16 | 03/01/13 | 03/01/13 | OUTWARD 4022-30602283364 | $390,011 |
| B | 90003761 | 17 | 04/12/13 | 04/12/13 | OUTWARD 4022-31023628668 | 306,271 |
| | | | | | Rounding | 1 |
| | | | | | **Total** | **$696,281** |

33. Shortly after these funds were advanced to DCSL through Facility B, $696,281 was transferred from Facility C to Facility B to reduce the Facility B loan balance. However, using the funds from one DCSL loan account to pay down a different DCSL loan account does not result in a net change to the credit extended to the borrower. The table below summarizes this facility-to-facility transfer.

| Table 12 | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Loan Number | Statement Number | Entry Date | Value Date | Transaction Description | Amount |
| C | 36030240 | 1 | 04/29/13 | 04/29/13 | TFR TO 90003761 | $696,281 |
| B | 90003761 | 17 | 04/29/13 | 04/29/13 | TFR FROM 36030240 | (696,281) |
| | | | | | **Difference** | = |

### THE PRINCIPAL BALANCE FOR FACILITIES A, B, AND C DID NOT DECREASE OVER TIME AS A RESULT OF DCSL'S LIMITED PAYMENTS AND DANSKE'S CONTINUED FUNDING

34. Danske's claim includes $96,400,000 related to Facility A, including $82,338,371 in unpaid principal (related to the purported Lehman Brothers loan of $107,538,328), $13,860,658 in capitalized interest[11] added to the principal because DCSL did not make its required interest payments, and did not pay $200,971 in fees. Although DCSL paid approximately $26,800,000 toward the principal balance over the loan period, only $1,800,000 of this amount was related to ordinary payments from DCSL[12]; the remaining $25,000,000 was related to a one-time payment due to the sale of property for the Hard Rock Hotel (the "KTRC sale"). Put differently, 93 percent of DCSL's payments toward Facility A were not ordinary payments, but were instead the result of a one-time payment that would not happen regularly. As a result of DCSL's limited payments toward the principal and failure to make required interest payments, which resulted in the capitalization of interest that ultimately increased the principal balance, Facility A still has a

---

[11] In addition to the capitalized interest of $13,860,658, the Danske loan statements identified two instances where interest was accrued on the Facility A loan account of $1,690,048 ($708,398 on January 3, 2014 and $981,650 on May 7, 2014) and four payments of interest of $1,690,048 ($708,398 on January 3, 2014, $159,424 on May 7, 2014, $322,226 on May 7, 2014, and $500,000 on May 7, 2014). While the Danske loan statements do not record the accrual of interest or interest payments after May 7, 2014, the Trimont Invoices account for accrued interest and interest payments through September 30, 2016 (which is the last Trimont Invoice that was provided by Danske for Facility A).

[12] DCSL did not begin making principal payments until the *First Amendment to Third Amended and Restated Loan Agreement* dated October 30, 2014, which required a payment towards the principal.

21

balance of $96,400,000, only $11,138,328 less than the amount of the loan when Danske originally took it over from Lehman Brothers in 2009 (calculated as $107,538,328 - $96,400,000).

35. Danske's claim includes $18,000,000 related to Facility B, including unpaid principal of $16,462,951 and unpaid fees of $1,537,049[13]. DCSL made a total of $14,364,984 in payments toward the loan; however, $11,686,579 of these payments, or approximately 81 percent ($11,686,579/$14,364,984),[14] related to accrued interest. DCSL only paid $2,678,391 toward the principal balance. In addition, it transferred $696,281 of that amount from Facility C, thereby causing a corresponding increase in the balance of Facility C (as discussed above in paragraphs 32-33). As a result of these limited payments, the Facility B loan balance did not decrease over the course of the loan.

36. Danske's claim includes $14,100,000 related to Facility C, including $3,180,111 in unpaid principal, $3,248,078 in unpaid fees, and $7,671,811 in unpaid interest. DCSL made $74,314,884 in payments toward the principal balance over the course of the loan, of which $16,374,513, or 22 percent, related to the KTRC sale ($15,000,000), the Cabo sale ($474,513)[15],

---

[13] The Trimont Invoices for Facility B included two transactions, dated June 6, 2009 and September 6, 2009, which recorded a total of $159,435 in capitalized interest. The capitalization of interest was not accounted for in the Danske loan statements, and as I relied on the Danske loan statements for my analysis, capitalized interest is not reflected in Attachment 6 to this affidavit.

[14] If I exclude the $696,281 internal transfer from the total payments, the percentage of total payments related to interest increases to 85 percent ($11,686,579/($14,364,970 - $696,281)).

[15] Danske Facility C Statement No. 14 reported two payments in the Facility C loan account ($14,770 on June 30, 2016 and $459,743 on August 4, 2016) with the description of "Cabo Sale Proceeds." Danske has not provided any information or documentation providing details about these sales.

and timeshare deposits made in March 2020 ($900,000).[16] The majority of the payments that did

not relate to sales proceeds occurred shortly before Danske advanced additional funds to DCSL.

It therefore appears that DCSL made these payments primarily to generate sufficient credit to

permit an additional draw on the account.[17] Therefore, although DCSL made payments toward

the principal, the principal balance did not decrease significantly over time because the

payments did not substantially exceed the amounts drawn, as shown in the table below.



---

[16] According to the Danske Verified Petition filed May 6, 2020, "On March 13, 2020, the Borrower deposited approximately $900,000 of certain timeshare deposits into a Facility C reserve. These ring-fenced funds have, for now, been applied to Facility C, and have reduced its principal balance, as of April 30, 2020, to $14.1 million."

[17] According to the loan documents, in addition to the interest charged on the unpaid balances of the loan facilities, Danske could also assess a non-utilization fee on the undrawn balances of Facilities B, C, and D. This fee ranged from 1 to 6 percent of the average daily undrawn balances of those facilities. While DCSL could be charged either an interest fee or a non-utilization fee, the non-utilization fee would have resulted in a lower fee, as the rates were lower than the interest rate applicable to the loan accounts.

37. Danske decreased its claim by $900,000 for timeshare deposits that it alleged it received as payment towards the loan in March 2020. The Danske Verified Petition filed May 6, 2020, states, "On March 13, 2020, the Borrower deposited **approximately** $900,000 of **certain** timeshare deposits into a Facility C reserve. These ring-fenced funds have, for now, been applied to Facility C, and have reduced its principal balance, as of April 30, 2020, to $14.1 million" **[Emphasis added]**. The Petition specifically identifies the $900,000 as an approximate amount. Because this is an estimate, the amount that DCSL actually received could have been higher or lower, which in turn would impact Danske's claim amount, assuming these funds were applied to the Facility C principal balance. In addition, Danske did not provide documentation to support the $900,000 of timeshare deposits that it applied to its claim, nor did it provide any Facility C loan statements with a date more recent than December 2019[18]. I was therefore unable to verify the exact amount that Danske received from the timeshare deposits. More importantly, because Danske did not provide any Facility C loan statements with a date more recent than December 2019, there could be additional loan activity for Facility C in 2020 that would impact Danske's claim.

38. In reviewing the transactions identified in the Danske loan statements for Facility C, I noted that a large percentage of the loan advances were round-dollar amounts that exceeded $1,000,000. Based on the level of detail that is required by Article XI, Section 11.1 of the *Second Amended and Restated Loan Agreement*, it appears unusual that the advances would be round-dollar amounts rather than the exact amounts of the construction and development costs, as DCSL

---

[18] Danske provided 2020 loan statements for Facilities A and B covering the period through February 28, 2020. However, Danske has not provided Facility C loan statements from January 1, 2020 through February 28, 2020. Additionally, Danske has not provided loan statements for any of the loan facilities after February 28, 2020 even though Danske's Verified Petition claims costs incurred through April 30, 2020.

would be required to support its costs with invoices and receipts. Therefore, it is unlikely that Danske obtained the required support from DCSL prior to disbursing funds in a round-dollar amount, as that support would include actual construction costs that likely would not be round-dollar amounts. Facility C included $71,957,605 in outward transactions, of which $62,482,000, or approximately 87 percent, were round dollar-amounts, as summarized below.

| Table 13 | | | | | | |
|---|---|---|---|---|---|---|
| | Round-Dollar Transactions | | Total Transactions | | Round-Dollar as a % of Total Transactions | |
| Year | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| 2013 | - | - | 3 | $1,303,719 | - | - |
| 2014 | 5 | $10,000,000 | 6 | 11,587,637 | 10.64% | 86.30% |
| 2015 | 7 | 11,250,000 | 10 | 14,461,257 | 14.89% | 77.79% |
| 2016 | 4 | 5,902,000 | 4 | 5,902,000 | 8.51% | 100.00% |
| 2017 | 1 | 1,450,000 | 2 | 2,881,894 | 2.13% | 50.31% |
| 2018 | 15 | 24,305,000 | 16 | 26,246,098 | 31.91% | 92.60% |
| 2019 | 9 | 9,575,000 | 9 | 9,575,000 | 19.15% | 100.00% |
| **Total** | **41** | **$62,482,000** | **47** | **$71,957,605** | **87.23%** | **86.83%** |

## THE DANSKE STATEMENTS AND TRIMONT INVOICES WERE MAILED TO VARIOUS ADDRESSES

39. The Danske loan statements for Facilities A, B, and C were addressed in care of (c/o) Danske, and the mailing address used appears to be for a Danske-owned location, rather than for DCSL. It is therefore unclear if DCSL ever received copies of the Danske loan statements, which appears to be unusual, as these statements include the loan activity for DCSL's Facilities A, B, and C loans. The table below summarizes the entities and mailing addresses to which Danske sent the loan statements for each facility.

| Table 14 | | |
|---|---|---|
| Facility | Loan Statement No. | Addressed To |
| A | 1 | DIAMENTE CABO SAN LUCAS, **REFER TO CAD NO KYC** C/O DANSKE BANK, ATTN: CREDIT, SHB, 75 KING WILLIAM STREET, LONDON, LONDON, EC4N 7DT, STORBRITANNIEN |

| Facility | Loan Statement No. | Addressed To |
|---|---|---|
| | | **Table 14** |
| | 2-4 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, ATTN: CREDIT, SHB, 75 KING WILLIAM STREET, LONDON, LONDON, EC4N 7DT, STORBRITANNIEN |
| | 5-6 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, ATTN: D. DANIEL, 75 KING WILLIAM STREET, LONDON, EC4N 7DT, STORBRITANNIEN |
| | 7 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, USA |
| | 8-23 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, USA |
| | 24-52 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, MEXICO |
| B | 1-10 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, ATTN: CREDIT, SHB, 75 KING WILLIAM STREET, LONDON, LONDON, EC4N 7DT, STORBRITANNIEN |
| | 11-14 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, ATTN: D. DANIEL, 75 KING WILLIAM STREET, LONDON, EC4N 7DT, STORBRITANNIEN |
| | 15 | CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, USA |
| | 16-30 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, USA |
| | 31-59 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT LONDON, MEXICO |
| C | 1-19 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, USA |
| | 20-28 | DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V., C/O DANSKE BANK, KING WILLIAM STREET, 75 EC4N 7DT, LONDON, MEXICO |

### DANSKE'S CLAIM INCLUDES FEES OF AT LEAST $7,094,438

40. Each time the parties modified the loan agreement, modification fees were applied. I identified modification fees of at least $3,588,638 that were identified in the loan modifications, as summarized below.

26

| Table 15 | | |
|---|---|---|
| **Agreement Date** | **Agreement** | **Amount** |
| March 6, 2009 | Amended and Restated Loan Agreement | $578,005[19] |
| January 28, 2010 | First Amendment to the Amended and Restated Loan Agreement | 1,419,343[20] |
| April 26, 2013 | Second Amended and Restated Loan Agreement | 501,014[21] |
| April 29, 2014 | Third Amended and Restated Loan Agreement | 215,276[22] |
| October 30, 2014 | First Amendment to the Third Amended and Restated Loan Agreement | Unknown[23] |
| September 8, 2018 | Second Amendment to Third Amended and Restated Loan Agreement | 875,000 |
| | **Total** | **$3,588,638** |

41. Danske's loan statements for Facilities A, B, and C included additional fees of $3,505,800 and

other expenses incurred between February 2009 and November 2019. The government

submitted Document Request No. 50 requested that Danske provide "any and all documentation

regarding the miscellaneous fees claimed in your Verified Petition". In a letter sent to

government counsel on April 15, 2020, Danske only provided a generalized explanation for

these fees – namely, that "these miscellaneous fees are contractual entitlements." *See*

---

[19] The Danske loan statements did not specifically identify this amount as a transaction in its loan statements; however, the Borrower Closing Statement between DCSL and Stewart Title Guaranty Company International Group (Stewart Title) included closing costs of $578,005. I was therefore unable to validate that Danske incurred this costs and that the amount was included in Danske's claim.

[20] The First Amendment to the Amended and Restated Loan Agreement stated that the loan accounts would incur modification fees but did not identify the amount. However, the Facility B loan account included closing costs of $1,419,343 paid to Fidelity National Title on January 29, 2010.

[21] The Second Amended and Restated Loan Agreement identified closing costs of $428,375. This amount is included in Danske's loan statements for Facility A, in addition to another $72,639 for costs related to the execution of the agreement.

[22] Danske did not specifically identify this amount as a transaction in its loan statements; however, Trimont identified it as a modification fee in the Trimont Settlement Statement [DANSKE_0013513 through DANSKE_0013514]. I was therefore unable to validate that Danske included the amount in its claim. It is possible that Danske included the amount as an outward transaction but did not provide any identifying information with the transaction.

[23] The *First Amendment to the Third Amended and Restated Loan Agreement*, dated October 30, 2014, also stated that the loan accounts would incur modification fees as a result of the amendment but did not identify the amount of the fees. I was unable to identify these costs in the Facility A, B, or C loan statements.

Attachment 8 for a copy of the letter to government counsel. However, Danske has not provided documentation to support the purpose of the fees totaling $3,505,800, identified in the table below.

| | | | Table 16 | | |
|---|---|---|---|---|---|
| Facility | Loan Number | Loan Statement No. | Date | Transaction Description | Transaction Value |
| A | 90003664 | 1 | 11/19/08 | OUTWARD 4022-83245122794 | $20,015 |
| A | 90003664 | 23 | 09/13/17 | DIAMANTE COST REIMB | 59,993 |
| A | 90003664 | 25 | 11/07/17 | DIAMANTE-REIMB FEE | 59,993 |
| B | 90003761 | 2 | 04/27/09 | VALUATION FEE & LEGAL CHG CHEESWRIGHTS | 20,535 |
| B | 90003761 | 4 | 11/06/09 | TRAVEL COSTS | 18,702 |
| B | 90003761 | 5 | 12/18/09 | OUTWARD 4022-93517677258 | 68,484 |
| B | 90003761 | 6 | 01/29/10 | TRANSFER INTERNAL | 10,000 |
| C | 36030240 | 7 | 12/30/14 | RECOVERABLE EXPENSES | 1,381,919 |
| C | 36030240 | 19 | 09/13/17 | WIRING FEE REIMB | 7 |
| C | 36030240 | 20 | 12/29/17 | DIAMANTE PROF FEES | 120,000 |
| C | 36030240 | 23 | 09/28/18 | DIAMANTE - CABO FEES | 100,000 |
| C | 36030240 | 21 | 02/28/18 | DIAMANTE - PROF FEES | 100,000 |
| C | 36030240 | 22 | 04/30/18 | DIAMANTE COSTS | 100,000 |
| C | 36030240 | 23 | 07/31/18 | DIAMANTE FEE | 100,000 |
| C | 36030240 | 23 | 08/29/18 | DIAMANTE FEE PYT | 100,000 |
| C | 36030240 | 22 | 06/29/18 | DIAMANTE FEES | 100,000 |
| C | 36030240 | 24 | 11/01/18 | DIAMANTE FEES | 100,000 |
| C | 36030240 | 22 | 05/30/18 | DIAMANTE PROF FEE | 100,000 |
| C | 36030240 | 21 | 01/31/18 | PROFESSIONAL FEE CHG | 100,000 |
| C | 36030240 | 21 | 03/29/18 | PROFESSIONAL FEE CHG | 100,000 |
| C | 36030240 | 12 | 01/06/16 | TFR TO PROFESSIONAL FEES | 98,000 |
| C | 36030240 | 19 | 09/13/17 | DIAMANTE FEE REIMB | 60,000 |
| C | 36030240 | 25 | 03/28/18 | DIAMANTE FEE | 50,000 |
| C | 36030240 | 26 | 06/27/19 | DIAMANTE FEE | 50,000 |
| C | 36030240 | 27 | 08/02/19 | DIAMANTE FEE | 50,000 |
| C | 36030240 | 24 | 11/29/18 | DIAMANTE FEES | 50,000 |
| C | 36030240 | 25 | 02/27/19 | DIAMANTE FEES | 50,000 |
| C | 36030240 | 26 | 04/30/19 | DIAMANTE FEES | 50,000 |
| C | 36030240 | 24 | 12/27/18 | DIAMANTE PROF FEES | 50,000 |
| C | 36030240 | 26 | 06/04/19 | DIAMANTE PROF FEES | 50,000 |
| C | 36030240 | 27 | 08/30/19 | DIMANTE FEE | 50,000 |
| C | 36030240 | 25 | 02/01/19 | PROFESSIONAL FEES | 50,000 |
| C | 36030240 | 11 | 11/06/15 | PROFESSIONAL FEES | 48,000 |
| C | 36030240 | 28 | 11/04/19 | DIAMANTE PROFESSIONAL FEES | 40,152 |
| | | | | **Total** | **$3,505,800** |

**DANSKE FUNDED APPROXIMATELY $50 MILLION AFTER THE GOVERNMENT FILED THE BILL OF PARTICULARS**

42. On August 20, 2015, the Government filed a Bill of Particulars, which provided notice that the Government would be seeking forfeiture of DCSL, among other assets related to the Kenner matter. Following this notice, Danske allegedly funded an additional $50,749,480 in advances on the Facility C loan account, as shown below.

| Table 17 | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Loan Number | Statement Number | Entry Date | Value Date | Transaction Description | Amount |
| C | 36030240 | 10 | 09/15/15 | 09/15/15 | OUTWARD 4022-52583918698 | $1,750,000 |
| C | 36030240 | 11 | 10/02/15 | 10/02/15 | OUTWARD 4022-52754633438 | 1,750,000 |
| C | 36030240 | 11 | 11/06/15 | 11/06/15 | OUTWARD 4022-53105862840 | 1,394,488 |
| C | 36030240 | 11 | 12/10/15 | 12/10/15 | OUTWARD 3826-53447096398 | 1,250,000 |
| C | 36030240 | 12 | 01/06/16 | 01/06/16 | OUTWARD 4022-60068010908 | 1,402,000 |
| C | 36030240 | 14 | 07/26/16 | 07/26/16 | OUTWARD 4022-62085531840 | 1,500,000 |
| C | 36030240 | 15 | 10/13/16 | 10/13/16 | OUTWARD 4022-62878535812 | 1,500,000 |
| C | 36030240 | 15 | 12/28/16 | 12/28/16 | OUTWARD 4022-63631625114 | 1,500,000 |
| C | 36030240 | 16 | 03/17/17 | 03/17/17 | OUTWARD 4022-70764778798 | 1,431,894 |
| C | 36030240 | 17 | 05/12/17 | 05/12/17 | OUTWARD 4022-71327433154 | 1,450,000 |
| C | 36030240 | 21 | 02/12/18 | 02/12/18 | OUTWARD 4022-80431628978 | 950,000 |
| C | 36030240 | 21 | 02/23/18 | 02/23/18 | OUTWARD 4022-80542422980 | 2,000,000 |
| C | 36030240 | 21 | 03/27/18 | 03/27/18 | OUTWARD 4022-80864099028 | 1,750,000 |
| C | 36030240 | 22 | 04/12/18 | 04/12/18 | OUTWARD 4022-81024789440 | 2,500,000 |
| C | 36030240 | 22 | 05/04/18 | 05/04/18 | OUTWARD 4022-81246121754 | 1,750,000 |
| C | 36030240 | 22 | 05/30/18 | 05/30/18 | OUTWARD 4022-81507516988 | 1,800,000 |
| C | 36030240 | 22 | 06/22/18 | 06/22/18 | OUTWARD 4022-81738787708 | 2,100,000 |
| C | 36030240 | 23 | 07/31/18 | 07/31/18 | OUTWARD 4022-82120916452 | 800,000 |
| C | 36030240 | 23 | 08/24/18 | 08/24/18 | OUTWARD 4022-82362133682 | 550,000 |
| C | 36030240 | 23 | 09/06/18 | 09/06/18 | OUTWARD 4022-82492825476 | 1,200,000 |
| C | 36030240 | 23 | 09/13/18 | 09/13/18 | OUTWARD 4022-82563109794 | 1,850,000 |
| C | 36030240 | 23 | 09/28/18 | 09/28/18 | OUTWARD 4022-82714119646 | 1,905,000 |
| C | 36030240 | 24 | 10/10/18 | 10/10/18 | OUTWARD 4022-82834633272 | 900,000 |
| C | 36030240 | 24 | 11/16/18 | 11/16/18 | OUTWARD 4022-83206788520 | 1,941,098 |
| C | 36030240 | 24 | 11/30/18 | 11/30/18 | OUTWARD 4022-83347713714 | 2,000,000 |
| C | 36030240 | 24 | 12/19/18 | 12/19/18 | OUTWARD 4022-83538891662 | 2,250,000 |
| C | 36030240 | 25 | 01/25/19 | 01/25/19 | OUTWARD 4022-90250851766 | 1,300,000 |
| C | 36030240 | 25 | 02/22/19 | 02/22/19 | OUTWARD 3826-90532477592 | 475,000 |
| C | 36030240 | 25 | 03/14/19 | 03/14/19 | OUTWARD 4022-90733552344 | 650,000 |
| C | 36030240 | 26 | 04/17/19 | 04/17/19 | OUTWARD 4022-91075749852 | 1,500,000 |
| C | 36030240 | 26 | 05/10/19 | 05/10/19 | OUTWARD 3826-91307068190 | 1,500,000 |

| | | | | | Table 17 | |
|---|---|---|---|---|---|---|
| Facility | Loan Number | Statement Number | Entry Date | Value Date | Transaction Description | Amount |
| C | 36030240 | 26 | 05/24/19 | 05/24/19 | OUTWARD 4022-91448050600 | 1,800,000 |
| C | 36030240 | 27 | 07/03/19 | 07/03/19 | OUTWARD 4022-91840475862 | 550,000 |
| C | 36030240 | 27 | 07/12/19 | 07/12/19 | OUTWARD 4022-91930981954 | 800,000 |
| C | 36030240 | 28 | 11/05/19 | 11/05/19 | OUTWARD 4022-93098099318 | 1,000,000 |
| | | | | | **Total** | **$50,749,480** |

43. According to Danske's Verified Petition, filed May 6, 2020, Danske's claim for interest and

    fees of $18,600,000 includes a loan modification fee of $875,000, a lenders fee of $1,031,000

    and unpaid interest on Facilities A, B and C of $16,700,000. The unpaid interest of $16,700,000

    reflects default interest of 20 percent compounded on the unpaid balance of Facilities A, B and

    C since October 1, 2019[24]. The advance of $1,000,000 made on November 5, 2019 was made to

    DCSL after Danske began compounding default interest on the unpaid balance of Facilities A,

    B and C. According to Article XIX, Section 19.1, Remedies Conferred Upon Lender, of the

    *Amended and Restated Loan Agreement* dated March 6, 2009, "upon the occurrence of any

    Event of Default, Lender may…withhold further disbursement of the proceeds of the Loan

    and/or terminate Lender's obligations to make further disbursements…"

44. Finally, Danske and DCSL entered into the *Second Amendment to Third Amended and Restated*

    *Loan Agreement* years after the Government filed the Bill of Particulars. This Amendment did

    not change the amount of funding available for any of the loan facilities; however, it did make

    several changes to the terms and conditions of the Loan Agreement, many of which specifically

    related to repayments and defaults.

---

[24] The default notice was not issued until January 14, 2020 but Danske's claim includes default interest
from October 1, 2019 through April 30, 2020.

**DANSKE HAS RECOVERED THE SUPPORTED AMOUNT OF FUNDS ADVANCED TO DCSL**

45. As discussed above in paragraphs 19-20, Danske's claim of $197,100,000 included an
outstanding balance for Facilities, A, B and C of $101,981,433, which was based on the total
funds Lehman Brothers and Danske loaned to DCSL of $205,774,680 and the payments made
by DCSL. However, while DCSL received a total of $205,774,680 in advances over the course
of the loan, $107,538,328 of this amount was funded by Lehman Brothers, not Danske. Because
Danske has not provided documentation to support the amount it paid Lehman Brothers for the
original loan, it is possible that Danske paid less than $107,538,328. The Government requested
this information. Specifically, Document Request No. 14 requested that Danske provide "any
and all documents that supported Danske's proof of claim filed in the Lehman Bankruptcy";
Document Request No. 15 requested production of "any and all documents that established
Danske's reduced proof of claim in the amount of $580 million in the Lehman Bankruptcy
proceedings"; and Document Request No. 16 requested "any and all documents that established
the consideration to transfer Danske's $580 million claim in the Lehman Bankruptcy to
Goldman Sachs." Since Danske has not provided sufficient documentation to support the
purchase value of the loan, I am not able to validate the amount Danske paid to Lehman for the
loans. Therefore, Danske has only provided some documentation to support $98,236,352
($1,600,015, $19,141,342, and $77,494,995, through Facilities A, B and C, respectively) of
funds that it advanced to DCSL after acquiring the loan from Leman Brothers[25]. Further, 98
percent of the total funds that Danske advanced, or $96,636,337, were through Facilities B and

---

[25] This amount only includes advances made to DCSL and does not include the interest or fees.

C, which were revolving accounts with credit limits of $18,000,000[26] and $15,000,000, respectively. As a result, although Danske advanced DCSL a total of $96,636,337 through Facilities B and C over the course of the loan, Danske could not advance more than $33,000,000 through these revolving accounts at one time. As a result, at any given time, Danske could not have an unpaid total balance of more than $34,600,015 related to Facilities A, B and C ($33,000,000 plus the $1,600,015 that Danske advanced through Facility A).

46. The table below compares the loan advances Danske made to DCSL of $98,236,352 through Facilities A, B and C to the $103,793,247 in principal payments that DCSL paid Danske for Facilities A, B, and C. The amount that DCSL has paid Danske exceeds the funds that Danske advanced through Facilities A, B and C subsequent to the takeover of the Lehman Brothers loan by $5,556,895.

| Table 18 | | | | |
|---|---|---|---|---|
| Description | Facility A | Facility B | Facility C | Total |
| Funds Advanced by Danske to DCSL | $1,600,015 | $19,141,342 | $77,494,995 | $98,236,352 |
| Principal Payments Received | (26,799,972) | (2,678,391) | (74,314,884) | (103,793,247) |
| **Amount Paid in Excess of Funds Advanced and Supported by Danske [27]** | **($25,199,957)** | **$16,462,951** | **$3,180,111** | **($5,556,895)** |

47. If Danske is awarded the full amount of its claim, or $197,100,000, in addition to the $103,793,247 in principal payments it has already received from DCSL, Danske's will recover

---

[26] The Facility B loan revolving line of credit was initially established at $16,000,000, but was increased to $20,000,000 under the *First Amendment to the Amended and Restated Loan Agreement* dated January 28, 2010. Subsequently, the *Second Amended and Restated Loan Agreement* dated April 26, 2013, split the Facility B loan into two facilities; Replacement Facility B revolving loan of $18,000,000 and a new Facility C loan of $2,000,000.

[27] This calculation only accounts for advances made by Danske to DCSL and DCSL's principal payments. It does not account for capitalized interest, accrued interest, or fees.

$202,656,895, or 206 percent more than it has **supported** that it **advanced** to DCSL, as shown below.

| Table 19 | |
|---|---|
| Description | Amount |
| Principal Payments Received from DCSL | $103,793,247 |
| Claim Amount | 197,100,000 |
| **Total** | **$300,893,247** |
| Less: Funds Advanced and Supported by Danske | (98,236,352) |
| **Amount Paid in Excess of Funds Advanced and Supported by Danske** | **$202,656,895** |

48. As noted in footnote 27, the calculation above does not include the loan modification and miscellaneous fees included in the Danske's loan statements for Facilities A, B and C. If it is determined that Danske is entitled to reimbursement for these charges under the loan agreements, Danske's will recover $197,670,797, or approximately 191 percent, more than it extended to DCSL, as shown below.

| Table 20 | |
|---|---|
| Description | Amount |
| Principal Payments Received from DCSL[28] | $104,233,305 |
| Claim Amount | 197,100,000 |
| **Total** | **$301,333,305** |
| Less: Funds Advanced and Supported by Danske[29] | (103,662,508) |
| **Amount Paid in Excess of Funds Advanced and Supported by Danske** | **$197,670,797** |

Kellie Fedkenheuer, CPA/CFF, CFE
Cotton & Company LLP

September 9, 2020

---

[28] Includes the principal payments included in Table 19 of $103,793,247 and the fees of $5,426,156 (*see* Attachment 6).

[29] Includes the funds advanced by and supported by Danske of $98,236,352 included in Table 19 and the fees of $440,058 (*see* Attachment 6).

33

_Dare_ County, North Carolina

I certify that the following person(s) personally appeared before me this day, each

acknowledging to me that he or she signed the foregoing document:

_Kellie Mathis Cdenheuer_

*Name(s) of principal(s)*

Date: _9/9/2020_

JENNIFER D. HOUSAND
Notary Public
Dare County, NC (Official Seal)

_____
*Official Signature of Notary*

_JENNIFER D. HOUSAND_, Notary Public

*Notary's printed or typed name*

My commission expires: _9/27/2023_

VA Drivers license
TW7252233
exp. 10/12/28

verification of affidavit

## <u>AFFIDAVIT ATTACHMENTS</u>

**ATTACHMENT 1:** DOCUMENTS RELIED UPON

**ATTACHMENT 2:** KELLIE FEDKENHEUER'S CURRICULUM VITAE

**ATTACHMENT 3:** FACILITY B LOAN ADVANCES AND PRINCIPAL PAYMENTS INCLUDED IN THE TRIMONT INVOICES BUT NOT THE DANSKE STATEMENTS

**ATTACHMENT 4:** DANSKE LOAN STATEMENT NO. 15 FOR FACILITY B

**ATTACHMENT 5:** COMPARISON OF DANSKE AND TRIMONT STATEMENTS RELATED TO CAPITALIZED INTEREST INCLUDED IN FACILITY A

**ATTACHMENT 6:** SUMMARY OF DANSKE'S CLAIM OF $197,100,000

**ATTACHMENT 7:** BANK ACCOUNTS IDENTIFIED IN LOAN DOCUMENTS

**ATTACHMENT 8:** DANSKE'S CLAIM AND CURRENT SETTLEMENT PROPOSAL DATED APRIL 15, 2020

## ATTACHMENT 1: DOCUMENTS RELIED UPON

| | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|
| 1 | BILL OF PARTICULARS filed AUGUST 20, 2015 | CASE NO. 2:13-CR-00607-JFB, DOCUMENT NO. 328 |
| 2 | DCSL PARTIES' LETTER RESPONSE TO GOVERNMENT'S REQUEST FOR PRELIMINARY ORDERS OF FORFEITURE filed JANUARY 30, 2019 | CASE NO. 2:13-CR-00607-JFB-AYS, DOCUMENT NO. 611 |
| 3 | EXHIBIT A, JOWDY AFFIDAVIT, TO DCSL PARTIES' LETTER RESPONSE TO GOVERNMENT'S REQUEST FOR PRELIMINARY ORDERS OF FORFEITURE filed JANUARY 30, 2019 | CASE NO. CASE 2:13-CR-00607-JFB-AYS, DOCUMENT NO. 611-1 |
| 4 | VERIFIED PETITION OF DANSKE BANK filed MAY 6, 2020 | CASE NO. 2:13-CR-00607-JFB-AYS, DOCUMENT NO.'S 835 AND 835-1 |
| 5 | UNITED STATES' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO CLAIMANT, dated JUNE 17, 2020 | |
| 6 | MOTION FOR SUMMARY JUDGEMENT, AND SUPPORTING DOCUMENTS AND EXHIBITS, filed JUNE 19, 2020 | CASE NO. 2:13-CR-00607-JFB-AYS, DOCUMENT NO. 848 |
| 7 | DANSKE'S OBJECTION TO GOVERNMENT'S DISCOVERY DEMANDS LETTER AND EXHIBITS filed JUNE 22, 2020 | CASE NO. 2:13-CR-00607-JFB-AYS, DOCUMENT NO.'S 863, 863-1 AND 863-2 |
| 8 | GOVERNMENT'S RESPONSE TO DANSKE'S DISCOVERY OBJECTIONS AND EXHIBITS, filed JULY 3, 2020 | |
| 9 | DANSKE'S RESPONSE TO GOVERNMENT'S DISCOVERY DEMAND LETTER, filed JULY 6, 2020 | CASE NO. 2:13-CR-00607-JFB-AYS, DOCUMENT NO. 872 |
| 10 | DANSKE BANK COUNTER SETTLEMENT PROPOSAL EMAIL dated MARCH 30, 2020 | |
| 11 | DANSKE'S CLAIM AND CURRENT SETTLEMENT PROPOSAL LETTER AND EXHIBITS dated APRIL 15, 2020 | |
| 12 | DANSKE BANK PRODUCTION LETTER AND INDEX OF DANSKE BANK PRODUCTION dated JULY 2, 2020 | |
| 13 | DANSKE BANK PRODUCTION LETTER AND INDEX OF DANSKE BANK PRODUCTION dated AUGUST 6, 2020 | |
| 14 | DANSKE BANK INDEX OF WIRE TRANSFERS TO TRIMONT IDENTIFIED BY GOVERNMENT dated AUGUST 6, 2020 | |
| 15 | LOAN AGREEMENT dated MARCH 10, 2006 | DANSKE_0010553 TO DANSKE_0010641 |
| 16 | PROMISSORY NOTE dated MARCH 10, 2006 | DANSKE_0010658 TO DANSKE_0010666 |
| 17 | EXECUTED FUNDING MEMO dated FEBRUARY 19, 2009 | DANSKE_0010807 TO DANSKE_0010808 |
| 18 | AMENDED AND RESTATED LOAN AGREEMENT dated MARCH 6, 2009 | DANSKE_0013639 TO DANSKE_0013727 |
| 19 | NOTE SPLITTER AND MODIFICATION AGREEMENT dated MARCH 6, 2009 | DANSKE_0013739 TO DANSKE_0013768 |

| | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|
| 20 | SUBSTITUTE PROMISSORY NOTE FOR FACILITY A DATED MARCH 6, 2009 | DANSKE_0013779 TO DANSKE_0013788 |
| 21 | SUBSTITUTE PROMISSORY NOTE FOR FACILITY B DATED MARCH 6, 2009 | DANSKE_0013795 TO DANSKE_0013804 |
| 22 | VENABLE CLOSING INSTRUCTION LETTER DATED MARCH 6, 2009 | DANSKE_0014600 TO DANSKE_0014682 |
| 23 | BORROWER CLOSING STATEMENT | DANSKE_0013615 TO DANSKE_0013616 |
| 24 | TERM SHEET DATED JANUARY 30, 2009 | DANSKE_0013621 TO DANSKE_0013638 |
| 25 | TERM SHEET COMPARISON FOR LOAN ASSUMPTION BETWEEN DIAMANTE CABO SAN LUCAS S. DE. R.L. DE C.V. AND DANSKE | DANSKE_0017141 TO DANSKE_0017143 |
| 26 | EXECUTED NON-BINDING TERM SHEET DATED DECEMBER 30, 2008 | DANSKE_0010783 TO DANSKE_0010799 |
| 27 | DISCUSSION PROPOSALS FOR THE DCSL RESORT PROPERTY PROFIT PARTICIPATION FEE | DANSKE_0017827 |
| 28 | FIRST AMENDMENT TO AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT DATED JANUARY 28, 2010 | DANSKE_0010809 TO DANSKE_0010839 |
| 29 | SECOND AMENDED AND RESTATED LOAN AGREEMENT DATED APRIL 26, 2013 | DANSKE_0011080 TO DANSKE_0011546 |
| 30 | NOTE SPLITTER AND MODIFICATION AGREEMENT DATED APRIL 26, 2013 | DANSKE_0011683 TO DANSKE_0011740 |
| 31 | SECOND SUBSTITUTE PROMISSORY NOTE FOR FACILITY A DATED APRIL 26, 2013 | DANSKE_0011865 TO DANSKE_0011884 |
| 32 | THIRD SUBSTITUTE PROMISSORY NOTE FOR FACILITY B DATED APRIL 26, 2013 | DANSKE_0012068 TO DANSKE_0012087 |
| 33 | PROMISSORY NOTE FOR FACILITY C DATED APRIL 26, 2013 | DANSKE_0012098 TO DANSKE_0012117 |
| 34 | PROMISSORY NOTE FOR FACILITY D DATED APRIL 26, 2013 | DANSKE_0012118 TO DANSKE_0012137 |
| 35 | DISBURSEMENT STATEMENT PREPARED BY FNF TITLE INTERNATIONAL HOLDING COMPANY DATED APRIL 26, 2013 | DANSKE_0011963 TO DANSKE_0011969 |
| 36 | DISBURSEMENT STATEMENT RELATING TO APRIL 2013 LOAN MODIFICATION CLOSING [NATIVE FILE] | DANSKE_0017136 |
| 37 | DANSKE BANK FUNDING MEMO DATED APRIL 29, 2013 | DANSKE_0015736 TO DANSKE_0015738 |
| 38 | MANDATE AGREEMENT FOR FOUR BANORTE ACCOUNTS DATED MAY 29, 2013 | DANSKE_0010547 TO DANSKE_0010550 |
| 39 | DEPOSIT ACCOUNT CONTROL AGREEMENT DATED NOVEMBER 1, 2013 | DANSKE_0010934 TO DANSKE_0010944 |
| 40 | THIRD AMENDED AND RESTATED LOAN AGREEMENT DATED APRIL 29, 2014 | DANSKE_0012231 TO DANSKE_0012345 |

| | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|
| 41 | CONSOLIDATED, AMENDED, AND RESTATED PROMISSORY NOTE (REPLACEMENT NOTE C) DATED APRIL 29, 2014 | DANSKE_0013058 TO DANSKE_0013068 |
| 42 | SETTLEMENT STATEMENT DATED APRIL 25, 2014 | DANSKE_0013513 TO DANSKE_0013514 |
| 43 | CLOSING LETTER FROM VENABLE LLP DATED APRIL 28, 2014 | DANSKE_0013501 TO DANSKE_0013502 |
| 44 | FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT DATED OCTOBER 30, 2014 | DANSKE_0013826 TO DANSKE_0013864 |
| 45 | SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT DATED SEPTEMBER 8, 2018 | DANSKE_0011031 TO DANSKE_0011067 |
| 46 | SECOND LETTER EXTENSION AGREEMENT FOR EXTENSION OF MATURITY DATE, DATED JUNE 29, 2012 | DANSKE_0010886 TO DANSKE_0010898 |
| 47 | THIRD LETTER EXTENSION AGREEMENT FOR EXTENSION OF MATURITY DATE, DATED SEPTEMBER 28, 2012 | DANSKE_0010899 TO DANSKE_0010913 |
| 48 | FOURTH LETTER EXTENSION AGREEMENT FOR EXTENSION OF MATURITY DATE, DATED DECEMBER 31, 2012 | DANSKE_0010870 TO DANSKE_0010885 |
| 49 | FIFTH LETTER EXTENSION AGREEMENT FOR EXTENSION OF MATURITY DATE, DATED MARCH 31, 2013 | DANSKE_0010850 TO DANSKE_0010869 |
| 50 | DANSKE BANK STATEMENTS FOR FACILITY A (STATEMENT OF ACCOUNT NO.'S 1-52) | DANSKE_0015363 TO DANSKE_0015382; DANSKE_0015673 TO DANSKE_0015706 |
| 51 | TRIMONT SUMMARY STATEMENT FOR FACILITY A | DANSKE_0015604 TO DANSKE_0015618 |
| 52 | TRIMONT ACCOUNT INVOICES FOR FACILITY A | DANSKE_0015385; DANSKE_0015389; DANSKE_0015394 TO DANSKE_0015395; DANSKE_0015397 TO DANSKE_0015398; DANSKE_0015420; DANSKE_0015422; DANSKE_0015424; DANSKE_0015426; DANSKE_0015451; DANSKE_0015456 TO DANSKE_0015457; DANSKE_0015463; DANSKE_0015495; DANSKE_0015497; DANSKE_0015500; DANSKE_0015584; DANSKE_0015586 TO DANSKE_0015587; |

| | | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|---|
| | | | DANSKE_0015590; DANSKE_0015592; DANSKE_0015594; DANSKE_0015596; DANSKE_0015598; DANSKE_0015600; DANSKE_0015603; DANSKE_0016758; DANSKE_0016762 TO DANSKE_0016769; DANSKE_0016771 TO DANSKE_0016772; DANSKE_0016774; DANSKE_0016777 TO DANSKE_0016778; DANSKE_0016780 TO DANSKE_0016781; DANSKE_0016783; DANSKE_0016785 TO DANSKE_0016786; DANSKE_0016788; DANSKE_0016790 TO DANSKE_0016794; DANSKE_0016796 |
| 53 | | DANSKE BANK STATEMENTS FOR FACILITY B (STATEMENT OF ACCOUNT NO.'S 1-59) | DANSKE_0015322 TO DANSKE_0015346; DANSKE_0015515 TO DANSKE_0015548 |
| 54 | | TRIMONT SUMMARY STATEMENT FOR FACILITY B | DANSKE_0015502 TO DANSKE_0015514 |
| 55 | | TRIMONT ACCOUNT INVOICES FOR FACILITY B | DANSKE_0015383 TO DANSKE_0015384; DANSKE_0015386 TO DANSKE_0015387; DANSKE_0015390 TO DANSKE_0015391; DANSKE_0015393; DANSKE_0015423; DANSKE_0015425; DANSKE_0015427; DANSKE_0015449 TO DANSKE_0015450; DANSKE_0015454 TO DANSKE_0015455; DANSKE_0015458 TO DANSKE_0015459; |

| | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|
| | | DANSKE_0015465 TO DANSKE_0015466; DANSKE_0015496; DANSKE_0015498 TO DANSKE_0015499; DANSKE_0015501; DANSKE_0015579 TO DANSKE_0015583; DANSKE_0015585; DANSKE_0015588 TO DANSKE_0015589; DANSKE_0015597; DANSKE_0015599; DANSKE_0015601; DANSKE_0016744; DANSKE_0016759 TO DANSKE_0016760 |
| 56 | DANSKE BANK STATEMENTS FOR FACILITY C (STATEMENT OF ACCOUNT NO.'S 1-28) | DANSKE_0015347 TO DANSKE_0015362; DANSKE_0015549 TO DANSKE_0015578 |
| 57 | TRIMONT SUMMARY STATEMENT FOR FACILITY C | DANSKE_0015670 TO DANSKE_0015672 |
| 58 | TRIMONT ACCOUNT INVOICES FOR FACILITY C | DANSKE_0015388; DANSKE_0015392; DANSKE_0015396; DANSKE_0015399; DANSKE_0015453; DANSKE_0015460; DANSKE_0015464; DANSKE_0015467 TO DANSKE_0015468; DANSKE_0015602; DANSKE_0015644; DANSKE_0016761 |
| 59 | TRIMONT ACCOUNT INVOICES FOR FACILITY D | DANSKE_0015452; DANSKE_0015461 TO DANSKE_0015462; |
| 60 | DANSKE BANK STATEMENTS FOR TAX RESERVE ACCOUNT (STATEMENT OF ACCOUNT NO.'S 1-35) | DANSKE_0016566 TO DANSKE_0016575 |
| 61 | DANSKE BANK STATEMENTS FOR INTEREST RESERVE ACCOUNT (STATEMENT OF ACCOUNT NO.'S 1-10) | DANSKE_0016576 TO DANSKE_0016612 |
| 62 | DANSKE BANK STATEMENTS FOR OCEANS CLUB (OCR) RESERVE ACCOUNT (STATEMENT OF ACCOUNT NO.'S 1-6) | DANSKE_0016613 TO DANSKE_0016618 |
| 63 | DANSKE BANK STATEMENTS FOR COMMISSION RESERVE ACCOUNT (STATEMENT OF ACCOUNT NO.'S 1-3) | DANSKE_0016619 TO DANSKE_0016621 |

| | DOCUMENT DESCRIPTION | BATES NO. |
|---|---|---|
| 64 | DANSKE BANK DECLARATION OF DEFAULT AND FORBEARANCE LETTER TO BORROWER DATED JANUARY 14, 2020 | DANSKE_0015713 TO DANSKE_0015718 |
| 65 | DEFAULT INTEREST STATEMENT FOR DIAMANTE LOAN FACILITIES DATED APRIL 13, 2020 | DANSKE_0015739 |
| 66 | DANSKE BANK WIRE TRANSFER CONFIRMATIONS FROM FACILITY A, B & C | DANSKE_0015707 TO DANSKE_0015712; DANSKE_0015883 TO DANSKE_0015955; DANSKE_0016888 |
| 67 | EXHIBITS A-K TO DANSKE'S DOCUMENT PRODUCTION DATED JUNE 8, 2020, CONTAINING DOCUMENTATION RELATED TO $14.8M IN INTERNAL TRANSFERS | DANSKE_0015736 TO DANSKE_0015980 |
| 68 | WACHOVIA STATEMENTS FOR DIAMANTE CABO SAN LUCAS S. DE. R.L. DE. C.V. ACCOUNT ENDING 4660 [REDACTED] | DANSKE_0017828 TO DANSKE_0017866 |
| 69 | BANORTE STATEMENTS FOR DIAMANTE CABO SAN LUCAS S. DE. R.L. DE. C.V. ACCOUNT ENDING 8946 [REDACTED] | DANSKE_0017867 TO DANSKE_0017870 |
| 70 | DIAMANTE CABO SAN LUCAS, LLC AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR DECEMBER 31, 2016 AND 2015 | DANSKE_0015619 TO DANSKE_0015643 |
| 71 | DIAMANTE CABO SAN LUCAS, LLC AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR DECEMBER 31, 2014 AND 2013 | DANSKE_0015645 TO DANSKE_0015669 |
| 72 | DIAMANTE CABO SAN LUCAS, LLC AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR DECEMBER 31, 2013 AND 2012 | DANSKE_0015428 TO DANSKE_0015448 |
| 73 | DIAMANTE CABO SAN LUCAS, LLC AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR DECEMBER 31, 2015 AND 2014 | DANSKE_0015469 TO DANSKE_0015494 |
| 74 | DIAMANTE CABO SAN LUCAS, LLC AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR DECEMBER 31, 2012 AND 2011 | DANSKE_0015400 TO DANSKE_0015419 |
| 75 | DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V. OFFICERS CERTIFICATE AND EXHIBIT A, *ORGANIZATIONAL CHART*, TO OFFICERS CERTIFICATE DATED SEPTEMBER 8, 2018 | DANSKE_0011015 TO DANSKE_0011030 |
| 76 | SERVICING AND ASSET MANAGEMENT AGREEMENT AND EXHIBITS BETWEEN TRIMONT AND DANSKE BANK, DATED JUNE 11, 2009 | DANSKE_0016798 TO DANSKE_0016827 |
| 77 | DANSKE BANK'S CLAIM AND NOTICE OF DEFAULT AGAINST LEHMAN BROTHERS DATED SEPTEMBER 23, 2008 | DANSKE_0015740 TO DANSKE_0015882 |
| 78 | PROOF OF CLAIM OF DANSKE BANK A/S, LONDON BRANCH FILED SEPTEMBER 18, 2009 | |
| 79 | MONTEVERDE INC. SUMMARY APPRAISAL REPORT OF DCSL RESORT PROPERTY DATED FEBRUARY 8, 2008 | DANSKE_0017200 TO DANSKE_0017467 |

| | Document Description | Bates No. |
|---|---|---|
| 80 | Letter from MonteVerde Inc. to Danske regarding Valuation Services Agreement dated November 12, 2008 | DANSKE_0017196 to DANSKE_0017199 |
| 81 | Lehman and Danske Loan Value Comparisons for Loans Subject to the MRA dated September 23, 2008 | DANSKE_0017822 |
| 82 | Committed Repurchase Facility Agreement between Danske Bank A/S and Lehman Brothers dated March 17, 2005 | DANSKE_0015719 to DANSKE_0015735 |
| 83 | Summary Appraisal Report prepared by Bruce D Greenberg, Inc. dated November 12, 2008 | DCSL04176 to DCSL04528 |
| 84 | 2009 Valuation Summary Report prepared by Jones Lang LaSalle | DANSKE_0016673 to DANSKE_0016722 |
| 85 | Valuation Report prepared by CBRE, Inc. dated January 16, 2020 | |
| 86 | DCSL Interest Rollover Spreadsheet Prepared by Danske | DANSKE_0016723 |



*Years Experience*
Cotton & Company          10
***2010 - Present***

*Education*
B.B.A., Accounting Major, Computer IS Minor, James Madison University, Harrisonburg, Virginia, May 2010

*Certification*
CPA: Virginia, 2011 (#39007)
CFE: 2015 (#636538)
CFF: 2018

*Affiliations*
VSCPA (Virginia Society of Certified Public Accountants)
   ***2018 Top 5 CPAs Under 35 recipient***
AICPA (American Institute of Certified Public Accountants)
ACFE (Association of Certified Fraud Examiners)

*CPE*
2019:   38.0
2018:   58.5
2017:   39.5

*Security Clearance*
DSS Top Secret: June 18, 2019

Ms. Fedkenheuer has audit and accounting experience gained since 2010 with Cotton & Company LLP. She leads a number of the firm's litigation support and consulting engagements. Her professional experience is summarized below.

**FORENSIC ACCOUNTING AND LITIGATION SUPPORT SERVICES**

**Forensic Accounting Investigations.** Cotton & Company assists the Office of Inspector General, the United States Attorney's Offices, and other entities with criminal investigations by estimating damages related to fraud allegations. Ms. Fedkenheuer has participated in the following engagements:

- ***USAID OIG.*** Cotton & Company is currently retained by the USAID OIG to assist with an ongoing investigation related to a freight shipping company that was retained by USAID to deliver to food aid to various countries. Cotton & Company is estimating USAID's damages related to inflated rates invoiced by the carrier resulting from the carrier reporting costs to the government that were unrelated to food aid. Ms. Fedkenheuer has assisted with the review of costs reported by the carrier to the government in order to determine damages.

- ***U.S Attorneys' Office Eastern District of Pennsylvania.*** Cotton & Company is currently retained by the U.S Attorneys' Office (Eastern District of Pennsylvania) to assist with an ongoing investigation related to the overruns by a prime contractor on a contract to provide installation, procurement and engineering services on naval vessels. Ms. Fedkenheuer is leading the engagement to identify potential damages related to the allegations.

- ***Non-profit religious organization.*** Cotton & Company was engaged by a non-profit religious organization to calculate the entity's damages resulting from an employee that was being investigated for the misappropriation of assets at one of the entity's locations. Ms. Fedkenheuer assisted with the development of a work plan to determine the extent of damages, performed activities and analyses to calculate damages, and assisted with the preparation of an expert report summarizing the results of Cotton & Company's evaluation. Cotton & Company presented the calculation of damages to the State's Attorney's Office in order to assist the prosecution of the defendant. Cotton & Company also assisted the entity with assessing potential misappropriation of assets at a second location.

- ***United States of America v. Derish Wolff.*** Ms. Fedkenheuer provided analysis regarding accounting adjustments that a contractor made to its home office indirect cost that significantly impacted the its indirect cost rates applied to projects related to reconstruction efforts in Iraq and Afghanistan. Cotton & Company provided an expert report and was prepared to provide testimony, but the case settled prior to the start of the trial.

**Litigation Support for U.S. Department of Justice (DOJ), Civil and Criminal Division.** Cotton & Company assists DOJ in resolving litigation disputes before the U.S. Federal Claims Court and other adjudicators. Ms. Fedkenheuer has participated in the following engagements:

- ***San Carlos Irrigation Drainage District v. United States.*** Cotton & Company is currently assisting DOJ with its evaluation of claims submitted by the San Carlos Irrigation Drainage District (SCIDD) against the San Carlos Irrigation Project (SCIP) for alleged overcharges, unauthorized charges for Operation & Maintenance (O&M) expenditures and unreasonable arbitrary estimated O&M expenditures that are included in the Districts water rate. Ms. Fedkenheuer is leading the engagement to evaluate the alleged damages to ensure the expenditures were incurred and appropriately allocated to the O&M Rate.

- ***Alcan Forest Products.*** Cotton & Company was retained by DOJ to evaluate claims submitted by Alcan Forest Products, LP (Alcan) against the United States Forest Service (USFS), a branch of the Department of Agriculture, for damages resulting from the suspension of two timber sale contracts. Alcan's claim was made up of numerous claim elements, including lost profits, subcontractor costs, idle labor and equipment costs, relocation costs, and travel costs. Ms. Fedkenheuer led the engagement, which included assisting DOJ with discovery requests, analyzing Alcan's claim calculations and determining if the amounts were reasonable, allowable and allocable to the government suspension, preparing an expert report, assisting DOJ with depositions of fact and 30 (b) (6) witnesses, and assisting with settlement negotiations at mediation.

- ***Shoshone-Bannock Tribes of the Forth Hall Reservation.*** Cotton & Company assisted the Department of Justice (DOJ) with analyzing and evaluating the Shoshone-Bannock Tribes of the Forth Hall Reservation (Shoshone-Bannock) claim for unpaid pre-award and start-up costs. Ms. Fedkenheuer managed the engagement which reviewed Shoshone-Bannock's claim for unpaid pre-award and start-up costs, and assisted DOJ with settlement negotiations.

- ***Navajo Health Foundation – Sage Memorial Hospital.*** Cotton & Company assisted DOJ with the evaluation of claims submitted by Navajo Health Foundation – Sage Memorial Hospital (Sage Memorial Hospital) against the Department of Health and Human Services(HHS) for unpaid contract support costs. Ms. Fedkenheuer managed the analysis and assisted with the development of expert opinions and reports. In addition, Ms. Fedkenheuer assisted DOJ with deposition support by preparing for, reviewing, and attending depositions and assisted DOJ with settlement negotiations.

- ***United States v. Ramah Navajo Chapter, et al.*** Numerous American Indian tribes and tribal organizations brought suit against the Secretary of the Interior, seeking to collect contract support costs for activities that had to be carried on by a tribal organization as contractor to ensure compliance under the Indian Self-Determination and Education Assistance Act (ISDA). Ms. Fedkenheuer assisted in calculating the total contract support cost that the Bureau of Indian Affairs (BIA) owed to tribes as a result of this lawsuit and assisted with settlement negotiations.

- ***Meridian Engineering.*** Ms. Fedkenheuer assisted with an engagement to provide expert reports on the reasonableness of claimed costs related to a channel construction project.

- ***Always at Market.*** Ms. Fedkenheuer assisted in providing analysis and expert opinions regarding a contractor's lost profits calculation submitted as a breach of contract claim.

- ***Alutiiq International Corporation.*** Ms. Fedkenheuer managed an engagement to provide analysis and expert reports on the reasonableness of claimed termination costs. Ms. Fedkenheuer performed claim analyses of varying forms, reviewed GSA audit reports, provided support for and attended depositions, and provided Federal Acquisition Regulation (FAR)/Termination for Convenience of the Government (T4C) research to DOJ.

- ***Kellogg, Brown & Root.*** Ms. Fedkenheuer assisted in the preparation of expert reports regarding a $42 million claim for costs initially determined to be unreasonable, incurred by a subcontractor to provide dining facility services in Iraq. Ms. Fedkenheuer assisted in determining if the contractor met its burden of establishing that the costs claimed were reasonable and allowable.

Cotton & Company also provided an expert report involving a separate Request for Equitable Adjustment for $50 million in costs allegedly incurred by a subcontractor that provided living containers in Iraq. Ms. Fedkenheuer managed the engagement when Cotton & Company issued supplemental opinions in 2017. Cotton & Company

provided hearing preparation support and expert witness testimony at the Armed Services Board of Contract Appeals hearing. The Judge ruled in favor of the U.S. government.

**Litigation Support for Other Federal, State, or Municipal Projects.** Cotton & Company has evaluated costs and entity procurement functions on various public projects. Many projects involve large construction contractors' claims for damages or other complaints. Ms. Fedkenheuer has participated in the following engagements:

- ***Rutgers University.*** Cotton & Company is currently assisting Rutgers University with a claim that resulted from the termination of the prime contractor on a construction contract at the university. Due to the termination of the contract, the surety was required to find a replacement contractor to complete the work. The surety has filed a claim against Rutgers University related the costs it incurred outside of the contract value. Ms. Fedkenheuer is assisting with the evaluation of the surety's claim to determine if the claim amount is reasonable, allowable and allocable to the project.

- ***NVS Technologies, Inc.*** Cotton & Company was retained by the Department of Homeland Security (DHS) to review claims submitted by NVS Technologies, Inc. resulting from the termination of NVS's research and development contract. NVS submitted claims against DHS related to the termination of the contract, and alleged bad faith on behalf of DHS. Ms. Fedkenheuer provided testimony at the Civilian Board of Contract Appeals (CBCA) regarding one of NVS's claims related to the bad faith allegations.

- ***Virginia Department of Transportation (VDOT), Change Order Review.*** Cotton & Company is currently retained by VDOT to review a change order that was awarded to a contractor on a road construction project. Ms. Fedkenheuer is reviewing the change order to ensure that the amount awarded was reasonable and properly awarded.

- ***Virginia Department of Transportation (VDOT), Work Order Reviews.*** Cotton & Company is currently retained by VDOT to review work orders that were awarded to contractors on various construction projects. Ms. Fedkenheuer is reviewing the work order requests submitted by contractors, as well as the amounts awarded by VDOT, to ensure that the amounts awarded were reasonable, allowable and allocable project costs that the contractors incurred, were not duplicative of the original scope of work, and were in compliance with the Federal Acquisition Regulation and the contract.

- ***Virginia Department of Transportation (VDOT), Claim Analysis.*** Cotton & Company is currently retained by VDOT to review a construction contractor's costs incurred under various work orders regarding the development of a beneficial transportation system in the Hampton Roads area of Virginia. The project was impacted by a 591-day delay period; as a result, the contractor requested additional funds resulting from the delay, as well as remobilization and escalation costs that allegedly resulted from the delay.

  Ms. Fedkenheuer reviewed the contractor's claimed costs under each work order to determine if the costs were reasonable, allocable, and allowable. Ms. Fedkenheuer provided her written findings to VDOT and assisted is currently supporting VDOT with the settlement of this claim.

- ***General Logistics Group, LTD.*** Ms. Fedkenheuer managed an engagement to assist the Army Contracting Command in analyzing a claim for customs taxes incurred to supply and furnish petroleum oil, and lubrication supplies to Afghanistan National Security Forces sites throughout the Government of the Islamic Republic of Afghanistan. Cotton & Company provided an expert report summarizing its opinions and provided expert witness testimony at the Armed Services Board of Contract Appeals hearing.

- ***Zalzar FZE.*** Cotton & Company assisted the Armed Services Board of Contract Appeals with the assessment of five claims that Zalzar FZE submitted against AAFES related to the termination of Zalzar's manpower services to AAFES facilities located on military installations in the Middle East. Ms. Fedkenheuer managed the analysis and assisted with the development of the expert opinions, as well as producing an expert report. In addition, Ms. Fedkenheuer provided support for opposing depositions and cross-examinations at the hearing.

- ***NASA Kennedy Space Center Vehicle Assembly Building.*** Cotton & Company assisted NASA in assessing change orders submitted by Hensel Phelps and its subcontractors to NASA for delays and inefficiencies related to the Vehicle Assembly Building construction project. Ms. Fedkenheuer led the review and analysis of the subcontractor claims and assisted NASA with settlement negotiations. NASA was unable to settle the change orders which resulted in Hensel Phelps submitting a Request for Equitable Adjustment.

- ***Miami-Dade Airport Construction.*** Ms. Fedkenheuer assisted the airport in calculating and supporting its claims against an operations and maintenance contractor. She accumulated allowable and recoverable damages incurred by the airport.

**Commercial Litigation Support and Consulting Engagements.** Cotton & Company assists contractors with claim preparation and other support surrounding termination and equitable adjustment claims against the government. Ms. Fedkenheuer has participated in the following engagements:

- ***Charlotte Apartment Building Construction Dispute.*** Ms. Fedkenheuer is currently leading an engagement to evaluate various claims submitted by an Owner against the general contractor and multiple subcontractors, resulting from the construction of an apartment complex in Charlotte, North Carolina. The claims submitted include lost profits, impaired value, carrying costs, lost returns, executive and project team time, legal expenses, reputational remediation expenses, and design professional expenses. Ms. Fedkenheuer has been designated as the expert on behalf of the architect and numerous subcontractors, to opine on the alleged damages.

- ***Philadelphia Condo Building Construction Dispute.*** Ms. Fedkenheuer lead an engagement to assist a construction contractor with evaluating claims submitted by the Owner related to alleged defective work on the construction of a luxury condo building in Philadelphia, PA. Ms. Fedkenheuer validated the contractor's GMP contract value and verified that the construction costs invoiced to the Owner were supported by accounting records and are reasonable, allowable and allocable to the project. Ms. Fedkenheuer assisted the contractor with settlement negotiations.

- ***Alstom Transportation Inc.*** Cotton & Company is currently assisting Alstom Transportation Inc. (Alstom) with claims related to its Acela Trainset Service Contract with the National Railroad Passenger Corporation. Ms. Fedkenheuer is leading the engagement that is currently assisting Alstom with settlement negotiations with Amtrak.

- ***Toll Brothers.*** Cotton & Company assisted Toll Brothers, a home construction company, in validating legal fees and other costs billed as a result of a settlement with more than 60 homeowners. Ms. Fedkenheuer managed the review of the legal fees, as well as other reimbursable costs incurred by the homeowners, and provided support at the arbitration hearing for one of the homeowners.

- ***Midasco, LLC.*** Cotton & Company performed an analysis of a claim submitted by the general contractor for the Silver Line project, Capital Rail Constructors (CRC), against Midasco LLC, a subcontractor on the project, for replacement costs it incurred after Midasco left the project. Ms. Fedkenheuer led the analysis of the claim by ensuring that the claimed replacement costs were reasonable, allowable and allocable to the project, were not duplicative of other costs, and were actually incurred by CRC. Cotton & Company provided an expert report with opinions and conclusions regarding the replacement costs and provided deposition testimony.

- ***Miami Beach Hotel Lost Profits Claim.*** Ms. Fedkenheuer managed the analysis and rebuttal of a lost profits analysis that was used to calculate damages resulting from extended renovations of a hotel in Miami Beach, Florida. Ms. Fedkenheuer reviewed financial statements, history and forecast reports, profit and loss reports, and other supporting documentation to determine the reasonableness of the hotel's lost profit calculation using AICPA guidelines.

  In addition, plaintiffs in this matter performed a reconciliation regarding the contract balances for each defendant. Cotton & Company was retained to rebut the reconciliation for one of the co-defendants in this matter. Ms. Fedkenheuer prepared an expert report and provided deposition testimony for this portion of the matter.

  Cotton & Company provided pre-trial support and was prepared to testify at trial; however, the case settled prior to the start of trial.

- ***Ralph Puig Architect, LLC.*** Ms. Fedkenheuer assisted with the calculation of lost profits related to a delay in construction of two car dealerships. Ms. Fedkenheuer reviewed financial statements, job costs, and supporting documentation to determine the lost profits using AICPA guidelines.

- ***New York City Water Pollution Control Plant Construction.*** The City of New York (City) contracted with a joint venture to furnish equipment and provide materials required for a water pollution control plant upgrade. The joint venture submitted a total cost claim in excess of $129 million asserting breach of contract, unreasonable delay,

and interference and disruption of work. Cotton & Company was retained by the City of New York to provide damages analysis related to the claim. Ms. Fedkenheuer reviewed the claimed costs to determine the amount that was reasonable, allowable, and allocable to the project, and assisted the City with settlement negotiations.

- *Lifestar Response.* Ms. Fedkenheuer assisted with the preparation of a lost profits calculation for an ambulatory company who was damaged as a result of employees forming another ambulatory company, which breached the non-compete clause in the employment agreement.

- *Fyfe Co., LLC.* Ms. Fedkenheuer assisted with the calculation of lost profits related to a breach of a Private Label Agreement.

- *DEH Services, LLC.* Cotton & Company assisted DEH Services, LLC (DEH) in supporting costs incurred on a contract to provide fabrication services on a crane project. Ms. Fedkenheuer provided assistance in determining how invoices were prepared, determining what documentation was provided to support invoiced amounts, testing invoiced costs to supporting documentation, validating claimed labor and material costs, and determining the unpaid contract balance.

- *Eden Roc Hotel.* Cotton & Company assisted the hotel owner of Eden Roc LLP, who was in arbitration with the contractor Hensel Phelps Construction Co. The contractor claimed a lien on the hotel for construction costs incurred for the renovation and expansion of the hotel. Ms. Fedkenheuer assisted in providing analysis on the construction costs and preparing expert reports.

### FINANCIAL CONSULTING ENGAGEMENTS

- **Virginia Department of Transportation, Assurance and Compliance Office.** Ms. Fedkenheuer participated on an engagement to conduct a review of audits over consulting engineering firms' indirect cost rates. The audits were performed by CPA firms in accordance with the American Association of State Highway and Transportation (AASHTO) *Uniform Audit and Accounting Guide for Audits of Architecture and Engineering Consulting Firms.* The Cotton & Company team reviewed the CPA firms' workpapers to ensure that they were in compliance with Generally Accepted Government Auditing Standards (GAGAS), Generally Accepted Auditing Standards (GAAS), Federal Acquisition Regulation (FAR) Part 31, AASHTO guidance, and other interpretive guidance. The team also determined whether the recommended indirect cost rates are in accordance with FAR.

### FINANCIAL AND PERFORMANCE AUDITS

**Smithsonian Institution Libraries (SIL).** Ms. Fedkenheuer managed a review of funds received and expenditures incurred by SIL on a grant from the Charities Aid Foundation (CAF). Ms. Fedkenheuer confirmed the receipt of CAF contributions and reviewed grant expenditures to evaluate whether the expenses appeared to have been incurred in accordance with the purpose of the grant awards, as well as with the charitable aims and objectives of SIL.

**Smithsonian National Museum of Natural History (NMNH).** Ms. Fedkenheuer managed a review of funds received and expenditures incurred by NMNH on a grant from the Charities Aid Foundation (CAF). Ms. Fedkenheuer confirmed the receipt of CAF contributions and reviewed grant expenditures to evaluate whether the expenses appeared to have been incurred in accordance with the purpose of the grant awards, as well as with the charitable aims and objectives of NMNH.

**Corporation for National and Community Service (CNCS), Office of Inspector General.** Ms. Fedkenheuer participated on an agreed-upon procedures review of federal assistance funds awarded by CNCS to an AmeriCorps grantee. She performed testing for allowability of expenses under CNCS programs and reviewed member files for eligibility.

**TESTIMONY UNDER OATH**

| | |
|---|---|
| 2018 | Hearing Testimony: NVS Technologies, Inc. v. Department of Homeland Security. **Civilian Board of Contract Appeals**. [Case No.: 4775] (At issue: Lost profits resulting from a contract termination.) |
| 2017 | Deposition Testimony: New National, LLC v. Reliance Construction Company, LLC, et al. **Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida**. [Case No.: 2015-006120-CA-01] (At issue: Contract Value and Payment Amounts related to the renovation of a Miami Beach hotel.) |

**PUBLIC SPEAKING ENGAGEMENTS**

| Date | Topic | Audience |
|---|---|---|
| 2020 | The False Claims Act | Private Transportation Industry Professionals |
| 2019 | Virginia-Specific Ethics Course 2019 | General Dynamics |
| 2019 | Virginia-Specific Ethics Course 2019 | Grant Thornton (two separate sessions) |
| 2019 | Virginia CPA Ethics: 2018 Required Course | Virginia Society of CPAs |
| 2018 | Virginia CPA Ethics: 2018 Required Course | Virginia Society of CPAs (two separate sessions) |
| 2018 | Virginia CPA Ethics: 2018 Required Course | VSCPA's Knowledge Now Conference (two separate sessions) |
| 2018 | Virginia CPA Ethics: 2018 Required Course | General Dynamics |
| 2018 | Virginia CPA Ethics: 2018 Required Course | Capital One Financial Corporation |
| 2018 | Virginia CPA Ethics: 2018 Required Course | Financial Planning Association, Financial Planning Forum |
| 2018 | Virginia CPA Ethics: 2018 Required Course | VSCPA Professional Issues Updates Conference |
| 2018 | Virginia CPA Ethics: 2018 Required Course | Grant Thornton (four separate sessions) |
| 2017 | Virginia CPA Ethics: 2017 Required Course | VSCPA's Knowledge Now Conference |
| 2017 | Virginia CPA Ethics: 2017 Required Course | Grant Thornton (five separate sessions) |
| 2016 | Litigation 101 | Cotton & Company LLP |
| 2016 | CPA Ethics: 2016 Required Course | National Rural Utilities Cooperative Finance Corporation |
| 2016 | CPA Ethics: 2016 Required Course | Capital One Financial Corporation |
| 2016 | CPA Ethics: 2016 Required Course | Cotton & Company LLP |
| 2016 | CPA Ethics: 2016 Required Course | Grant Thornton LLP |
| 2015 | CPA Ethics: 2015 Required Course | Capital One Financial Corporation |
| 2015 | Professionalism & Communication | Cotton & Company LLP |
| 2014 | Federal Contract Auditing | Department of Labor, Office of Inspectors General |
| 2014 | Ethics 2014 - Your License Depends on It! | Capital One Financial Corporation |
| 2014 | Ethics 2014 - Your License Depends on It! | AOL |
| 2014 | Ethics 2014 - Your License Depends on It! | Raffa, P.C. |
| 2014 | Ethics 2014 - Your License Depends on It! | Homes, Lowry, Horn & Johnson, Ltd. |
| 2014 | Ethics 2014 - Your License Depends on It! | Tate & Tryon |
| 2014 | Ethics 2014 - Your License Depends on It! | National Rural Utilities Cooperative Finance Corporation |
| 2014 | Ethics 2014 - Your License Depends on It! | NII Holdings, Inc. |
| 2013 | Using Your Expert Like an Expert | Virginia Society of CPAs Fraud Conference |

## **ATTACHMENT 3: FACILITY B LOAN ADVANCES AND PRINCIPAL PAYMENTS INCLUDED IN THE**

## **TRIMONT INVOICES BUT NOT THE DANSKE STATEMENTS**

| Facility | Loan Number | Transaction Date | Description | Transaction Value | Bates Number |
|----------|-------------|------------------|-------------|-------------------|--------------|
| B | 1133611 | 09/02/10 | Advance | $27,500 | DANSKE_0015588-89 |
| B | 1133611 | 09/16/10 | Advance | 27,500 | DANSKE_0015588-89 |
| B | 1133611 | 09/28/10 | Advance | 7,500 | DANSKE_0015588-89 |
| B | 1133611 | 10/08/10 | Advance | 80,000 | DANSKE_0015588-89 |
| B | 1133611 | 10/16/10 | Advance | 169,985 | DANSKE_0015588-89 |
| B | 1133611 | 10/25/10 | Advance | 1,210,000 | DANSKE_0015588-89 |
| B | 1133611 | 11/17/10 | Advance | 163,533 | DANSKE_0015588-89 |
| B | 1133611 | 11/22/10 | Advance | 45,000 | DANSKE_0015588-89 |
| B | 1133611 | 12/14/10 | Advance | 390,000 | DANSKE_0016744 |
| B | 1133611 | 12/28/10 | Advance | 459,400 | DANSKE_0016744 |
| B | 1133611 | 01/26/11 | Advance | 305,000 | DANSKE_0016744 |
| B | 1133611 | 02/11/11 | Advance | 288,712 | DANSKE_0016744 |
| B | 1133611 | 02/23/11 | Advance | 479,374 | DANSKE_0016744 |
| B | 1133611 | 03/16/11 | Advance | 302,000 | DANSKE_0015423 |
| B | 1133611 | 03/24/11 | Advance | 349,450 | DANSKE_0015423 |
| B | 1133611 | 04/13/11 | Advance | 265,000 | DANSKE_0015423 |
| B | 1133611 | 04/28/11 | Advance | 250,000 | DANSKE_0015423 |
| B | 1133611 | 05/03/11 | Advance | 109,400 | DANSKE_0015423 |
| B | 1133611 | 05/09/11 | Advance | 266,615 | DANSKE_0015423 |
| B | 1133611 | 05/11/11 | Advance | 271,000 | DANSKE_0015423 |
| B | 1133611 | 05/26/11 | Advance | 675,000 | DANSKE_0015423 |
| B | 1133611 | 06/06/11 | Advance | 309,906 | DANSKE_0015425 |
| B | 1133611 | 06/14/11 | Advance | 137,541 | DANSKE_0015425 |
| B | 1133611 | 06/27/11 | Advance | 515,000 | DANSKE_0015425 |
| B | 1133611 | 07/08/11 | Advance | 495,627 | DANSKE_0015425 |
| B | 1133611 | 07/14/11 | Advance | 199,970 | DANSKE_0015425 |
| B | 1133611 | 07/21/11 | Advance | 100,000 | DANSKE_0015425 |
| B | 1133611 | 07/27/11 | Advance | 705,570 | DANSKE_0015425 |
| B | 1133611 | 08/05/11 | Advance | 110,684 | DANSKE_0015425 |
| B | 1133611 | 08/12/11 | Advance | 88,000 | DANSKE_0015425 |
| B | 1133611 | 09/07/11 | Advance | 800,399 | DANSKE_0015427 |
| B | 1133611 | 10/19/11 | Advance | 729,082 | DANSKE_0015427 |
| B | 1133611 | 10/20/11 | Advance | 492,662 | DANSKE_0015427 |
| B | 1133611 | 11/16/11 | Advance | 171,815 | DANSKE_0015427 |
| B | 1133611 | 01/03/12 | Advance | 752,487 | DANSKE_0015496 |
| B | 1133611 | 01/20/12 | Advance | 524,970 | DANSKE_0015496 |
| B | 1133611 | 01/30/12 | Advance | 172,085 | DANSKE_0015496 |
| B | 1133611 | 02/10/12 | Advance | 815,000 | DANSKE_0015496 |
| B | 1133611 | 06/29/12 | Advance | 839,825 | DANSKE_0015498-99 |
| B | 1133611 | 07/05/12 | Advance | 412,010 | DANSKE_0015498-99 |
| B | 1133611 | 07/11/12 | Advance | 400,000 | DANSKE_0015498-99 |
| B | 1133611 | 07/11/12 | Advance | 1,249,891 | DANSKE_0015498-99 |
| B | 1133611 | 08/01/12 | Advance | 400,000 | DANSKE_0015498-99 |

| Facility | Loan Number | Transaction Date | Description | Transaction Value | Bates Number |
|---|---|---|---|---|---|
| B | 1133611 | 08/03/12 | Advance | 1,680,696 | DANSKE_0015498-99 |
| B | 1133611 | 08/14/12 | Advance | 859,000 | DANSKE_0015498-99 |
| B | 1133611 | 09/04/12 | Advance | 1,350,000 | DANSKE_0015498-99 |
| B | 1133611 | 09/13/12 | Advance | 1,568,520 | DANSKE_0015498-99 |
| B | 1133611 | 10/01/12 | Advance | 802,182 | DANSKE_0015501 |
| B | 1133611 | 10/04/12 | Advance | 340,000 | DANSKE_0015501 |
| B | 1133611 | 11/01/12 | Advance | 50,000 | DANSKE_0015501 |
| B | 1133611 | 12/03/12 | Advance | 50,000 | DANSKE_0015501 |
| B | 1133611 | 12/12/12 | Advance | 159,024 | DANSKE_0015501 |
| B | 1133611 | 12/28/12 | Advance | 23,750 | DANSKE_0015449-50 |
| B | 1133611 | 01/02/13 | Advance | 350,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/03/13 | Advance | 50,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/10/13 | Advance | 738,238 | DANSKE_0015449-50 |
| B | 1133611 | 01/31/13 | Advance | 350,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/31/13 | Advance | 50,000 | DANSKE_0015449-50 |
| B | 1133611 | 03/01/13 | Advance | 50,000 | DANSKE_0015449-50 |
| B | 1133611 | 03/04/13 | Advance | 186,605 | DANSKE_0015449-50 |
| B | 1133611 | 04/01/13 | Advance | 300,000 | DANSKE_0015454-55 |
| B | 1133611 | 04/01/13 | Advance | 50,000 | DANSKE_0015454-55 |
| | | | **Total Advances:** | **$25,572,508** | |
| B | 1133611 | 06/20/11 | Principal Payment | 515,000 | DANSKE_0015425 |
| B | 1133611 | 06/20/11 | Principal Payment | 1,000,000 | DANSKE_0015425 |
| B | 1133611 | 07/08/11 | Principal Payment | 199,970 | DANSKE_0015425 |
| B | 1133611 | 07/20/11 | Principal Payment | 50,000 | DANSKE_0015425 |
| B | 1133611 | 07/21/11 | Principal Payment | 549,970 | DANSKE_0015425 |
| B | 1133611 | 07/21/11 | Principal Payment | 50,000 | DANSKE_0015425 |
| B | 1133611 | 07/22/11 | Principal Payment | 88,000 | DANSKE_0015425 |
| B | 1133611 | 07/25/11 | Principal Payment | 155,600 | DANSKE_0015425 |
| B | 1133611 | 08/24/11 | Principal Payment | 1,500,000 | DANSKE_0015425 |
| B | 1133611 | 08/24/11 | Principal Payment | 1,500,000 | DANSKE_0015427 |
| B | 1133611 | 09/07/11 | Principal Payment | 800,399 | DANSKE_0015427 |
| B | 1133611 | 09/08/11 | Principal Payment | 780,550 | DANSKE_0015427 |
| B | 1133611 | 10/11/11 | Principal Payment | 868,474 | DANSKE_0015427 |
| B | 1133611 | 10/11/11 | Principal Payment | 160,000 | DANSKE_0015427 |
| B | 1133611 | 10/13/11 | Principal Payment | 70,000 | DANSKE_0015427 |
| B | 1133611 | 11/17/11 | Principal Payment | 1,500,000 | DANSKE_0015427 |
| B | 1133611 | 01/13/12 | Principal Payment | 524,970 | DANSKE_0015496 |
| B | 1133611 | 02/07/12 | Principal Payment | 600,000 | DANSKE_0015496 |
| B | 1133611 | 02/09/12 | Principal Payment | 215,000 | DANSKE_0015496 |
| B | 1133611 | 02/16/12 | Principal Payment | 1,000,000 | DANSKE_0015496 |
| B | 1133611 | 03/01/12 | Principal Payment | 1,460,000 | DANSKE_0015496 |
| B | 1133611 | 06/28/12 | Principal Payment | 100,000 | DANSKE_0015498-99 |
| B | 1133611 | 07/11/12 | Principal Payment | 200,000 | DANSKE_0015498-99 |
| B | 1133611 | 07/31/12 | Principal Payment | 1,500,000 | DANSKE_0015498-99 |
| B | 1133611 | 08/09/12 | Principal Payment | 659,000 | DANSKE_0015498-99 |
| B | 1133611 | 08/30/12 | Principal Payment | 350,000 | DANSKE_0015498-99 |
| B | 1133611 | 09/11/12 | Principal Payment | 1,275,000 | DANSKE_0015498-99 |

| Facility | Loan Number | Transaction Date | Description | Transaction Value | Bates Number |
|----------|-------------|------------------|-------------|-------------------|--------------|
| B | 1133611 | 09/28/12 | Principal Payment | 940,000 | DANSKE_0015501 |
| B | 1133611 | 11/30/12 | Principal Payment | 50,000 | DANSKE_0015501 |
| B | 1133611 | 12/11/12 | Principal Payment | 159,024 | DANSKE_0015501 |
| B | 1133611 | 12/31/12 | Principal Payment | 350,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/02/13 | Principal Payment | 50,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/07/13 | Principal Payment | 740,000 | DANSKE_0015449-50 |
| B | 1133611 | 01/18/13 | Principal Payment | 36,819 | DANSKE_0015449-50 |
| B | 1133611 | 01/30/13 | Principal Payment | 400,000 | DANSKE_0015449-50 |
| B | 1133611 | 02/13/13 | Principal Payment | 200,000 | DANSKE_0015449-50 |
| B | 1133611 | 03/29/13 | Principal Payment | 350,000 | DANSKE_0015454-55 |
| B | 1133611 | 04/26/13 | Principal Payment | 2,546,072 | DANSKE_0015454-55 |
| | | | **Total Principal Payments:** | **$23,493,848** | |

## ATTACHMENT 4: DANSKE LOAN STATEMENT NO. 15 FOR FACILITY B



4036

CABO SAN LUCAS S. DE. R.L. DE C.V.
C/O DANSKE BANK
KING WILLIAM STREET, 75
EC4N 7DT, LONDON
USA

S

Danske Bank
DBM London Institutional Clients U
75 King William Street
London EC4N 7DT
Telephone +44 0207-410 8000
SWIFT-BIC:  DABAGB2L
www.danskebank.com/ci

31 December 2012

Sort Code 301281
Account 90003761
Account Currency USD

**Foreign Currency Account - Statement of Account No.  15**
**IBAN: GB21 DABA 3012 8190 0037 61**
**Period this statement relates to: 31.12.2011 to 31.12.2012**

| Entry date | Value date | | Credited + Debited  - | Credit balance + Debit balance  - |
|---|---|---|---|---|
| | Balance as at 30.12.2011 | | | 18, 000, 000. 00  - |

Balance as at 31. 12. 2012                        :        18, 000, 000. 00  -

The following  conditions  apply  on the date  of this statement.

Credit  interest                                    :        0. 000%  per annum

If a currency  ceases  to be convertible  and/or transferable,  and consequently  cannot  be traded  freely  in
the international  foreign  exchange  market,  deposits  in that currency  will no longer  be at your disposal
unless  previously  agreed  with the bank.  Under  such circumstances,  credits  granted  in that currency  are
at your disposal  only according  to arrangement  with the bank.

Regulated by the Financial Services Authority Limited
for the conduct of investment business in the UK
Member of the London Stock Exchange

Registered Branch in England and Wales
Company No.FC011846 Branch No.BR000080

Danske Bank A/S
Incorporated in Denmark
CVR No.61 12 62 28 - Copenhagen

CONFIDENTIAL                                                                                    DANSKE_0015332

**ATTACHMENT 5: COMPARISON OF DANSKE AND TRIMONT STATEMENTS RELATED TO**

**CAPITALIZED INTEREST INCLUDED IN FACILITY A**

| Danske Billing Statements | | | Comparable Trimont Invoice | | | Difference |
|---|---|---|---|---|---|---|
| Statement Number | Period | Loan Balance | Bates Number | Period | Loan Balance | |
| 1 | 11/18/08-12/31/08 | $20,015 | DANSKE_0015590 | 11/17/08 - 12/18/08 | $107,538,328 | ($107,518,313) |
| 2 | 01/01/09 - 03/31/09 | 109,138,328 | DANSKE_0015592 | 12/20/08 - 02/17/09 | 109,138,328 | - |
| | | | DANSKE_0015594 | | | |
| 3 | 04/01/09 - 06/30/09 | 107,847,772 | DANSKE_0015596 | 03/02/09 - 06/02/09 | 109,138,328 | (1,290,556) |
| 4 | 07/01/09 - 12/31/09 | 107,847,772 | DANSKE_0015598 | 05/25/09 - 08/25/09 | 110,335,545 | (2,487,773) |
| | | | DANSKE_0015600 | 08/25/09 - 11/24/09 | 111,359,796 | (3,512,024) |
| 5 | 01/01/10 - 12/31/10 | 107,847,772 | DANSKE_0015584 | 11/25/09 - 02/23/10 | 112,292,770 | (4,444,998) |
| | | | DANSKE_0015586 | 03/05/10 - 06/03/10 | 113,206,990 | (5,359,218) |
| | | | DANSKE_0015587 | 09/03/10 - 12/03/10 | 115,179,686 | (7,331,914) |
| 6 | 01/01/11 - 12/31/11 | 107,847,772 | DANSKE_0015420 | 12/02/10 - 03/02/11 | 116,138,109 | (8,290,337) |
| | | | DANSKE_0015422 | 03/02/11 - 06/02/11 | 117,097,247 | (9,249,475) |
| | | | DANSKE_0015424 | 06/06/11 - 09/06/11 | 118,087,522 | (10,239,750) |
| | | | DANSKE_0015424 | 09/02/11 - 12/06/11 | 119,068,832 | (11,221,060) |
| 7 | 12/31/11 - 12/31/12 | 107,847,772 | DANSKE_0016751 | 12/06/11 - 02/20/12 | 120,072,783 | (12,225,011) |

| Danske Billing Statements | | | Comparable Trimont Invoice | | | Difference |
|---|---|---|---|---|---|---|
| Statement Number | Period | Loan Balance | Bates Number | Period | Loan Balance | |
| | | | DANSKE_0016753 | 06/16/12 - 09/16/12 | 120,452,914 | (12,605,142) |
| | | | DANSKE_0016756 | 09/14/12 - 12/17/12 | 120,452,914 | (12,605,142) |
| | | | DANSKE_0015451 | 12/31/12 - 03/27/13 | 120,452,914 | (12,605,142) |
| 8 | 01/1/13 - 06/28/13 | 123,500,000 | DANSKE_0015451 | 12/31/12 - 03/27/13 | 120,452,914 | 3,047,086 |
| | | | DANSKE_0015456 | 03/28/13 - 06/25/13 | 123,427,361 | 72,639 |
| 9 | 06/29/13 - 12/31/13 | 123,500,000 | DANSKE_0015457 | 07/01/13 - 09/25/13 | 123,427,361 | 72,639 |
| | | | DANSKE_0015463 | 09/26/13 - 12/26/13 | 123,427,361 | 72,639 |
| 10 | 01/01/14 - 03/31/14 | 123,500,000 | *No Trimont Invoices Provided* | | | |
| 11 | 04/01/14 - 06/30/14 | 123,500,000 | DANSKE_0015385 | 04/01/14 - 07/01/14 | 123,427,361 | 72,639 |
| 12 | 07/01/14 - 09/30/14 | 123,500,000 | DANSKE_0015389 | 07/01/14 - 10/01/14 | 123,427,361 | 72,639 |
| 13 | 01/01/15 - 06/30/15 | 98,225,000 | DANSKE_0015397 | 10/01/14 - 01/01/15 | 123,427,361 | (25,202,361) |

**ATTACHMENT 6: SUMMARY OF DANSKE'S CLAIM OF $197,100,000**

| | Facility A | | | Facility B | | | Facility C | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Amount** | **Paid** | **Balance** | **Amount** | **Paid** | **Balance** | **Amount** | **Paid** | **Balance** | **Amount** | **Paid** | **Balance** |
| Principal | $109,138,343 | ($26,799,972) | $82,338,371 | $19,141,342 | ($2,678,391) | $16,462,951 | $77,494,995 | ($74,314,884) | $3,180,111 | $205,774,680 | ($103,793,247) | $101,981,433 |
| Capitalized Interest | 13,860,658 | - | 13,860,658 | - | - | - | - | - | - | 13,860,658 | - | 13,860,658 |
| Accrued Interest | 1,690,048 | (1,690,048) | - | 11,686,579 | (11,686,579) | - | 18,528,536 | (10,856,725) | 7,671,811 | 31,905,163 | (24,233,352) | 7,671,811 |
| Fees | 641,015 | (440,044) | 200,971 | 1,537,063 | (14) | 1,537,049 | 3,248,078 | - | 3,248,078 | 5,426,156 | (440,058) | 4,986,098 |
| **Facilities A, B, and C Claim** | **$125,330,064** | **$(28,930,064)** | **$96,400,000** | **$32,364,984** | **$(14,364,974)** | **$18,000,000** | **$99,271,609** | **$(85,171,609)** | **$14,100,000** | **$256,966,657** | **($128,466,657)** | **$128,500,000** |
| Profit Participation Fee | | | | | | | | | | | | 50,000,000 |
| Interest and Fees | | | | | | | | | | | | 18,600,000 |
| **Total Claim** | | | | | | | | | | | | **$197,100,000** |

### ATTACHMENT 7: BANK ACCOUNTS IDENTIFIED IN LOAN DOCUMENTS

| Bank Name | Account Number | Name on Account | Account Description |
|---|---|---|---|
| **Borrower's Bank Accounts Subject to Deposit Account Agreement Dated November 1, 2013:** | | | |
| Wells Fargo Bank, Cayman Islands Branch | 2000030104660 | Diamante Cabo San Lucas S. de R.L. de C.V. | Checking Account & Collateral Account |
| Wells Fargo Bank, Cayman Islands Branch | 2000058292732 | Diamante Cabo San Lucas S. de R.L. de C.V. | Sales Account & Collateral Account |
| Wells Fargo Bank, Cayman Islands Branch | 2000046014993 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operating Account & Collateral Account |
| **Borrower's and Borrower Affiliates' Bank Accounts Identified in Loan Documents:** | | | |
| Bank of New York | 6550253668 | Diamante CSL LLC | Unknown |
| Banco Mercantil del Norte | 540653166 | Diamante Cabo San Lucas S. de R.L. de C.V. | Checking - Development Expenses |
| TD Bank | 4337813269 | Diamante CSL LLC | Sales Revenue |
| TD Bank | 4342295808 | Diamante Management Services, Inc. | Operations / Private Construction |
| Wells Fargo Bank | 7014523448 | Diamante Cabo San Lucas S. de R.L. de C.V. | Holding Account |
| Wells Fargo Bank | 8405659858 | Diamante Cabo San Lucas S. de R.L. de C.V. | Money Market Account |
| Wells Fargo Bank | 515552179 | Diamante Cabo San Lucas S. de R.L. de C.V. | Holding Account |
| Wells Fargo Bank | 7014523331 | Diamante Cabo San Lucas S. de R.L. de C.V. | Closing Costs Account |
| Wells Fargo Bank | 70452291 | Diamante Club LLC | Checking Account |
| Banco Mercantil del Norte | 626436124 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operations Revenue |
| Banco Mercantil del Norte | 626436160 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operations Revenue |
| Banco Mercantil del Norte | 647958993 | Diamante Cabo San Lucas S. de R.L. de C.V. | Sales Revenue |
| Banco Mercantil del Norte | 885768006 | Diamante Cabo San Lucas S. de R.L. de C.V. | Private Construction Expenses/Deposits |
| Banco Mercantil del Norte | 811253725 | Diamante Cabo San Lucas S. de R.L. de C.V. | TRC Expenses |
| Banco Mercantil del Norte | 537788291 | Diamante Cabo San Lucas S. de R.L. de C.V. | Checking - Development Expenses |
| Banco Mercantil del Norte | 654187045 | Diamante Cabo San Lucas S. de R.L. de C.V. | Sales Revenue |
| Banco Mercantil del Norte | 629300744 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operations Expenses |
| Banco Mercantil del Norte | 626436058 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operations Revenue |

| Bank Name | Account Number | Name on Account | Account Description |
|---|---|---|---|
| Banco Mercantil del Norte | 813490962 | Diamante Cabo San Lucas S. de R.L. de C.V. | TRC Expenses |
| Banco Mercantil del Norte | 893014435 | Diamante Cabo San Lucas S. de R.L. de C.V. | Private Construction Expenses/Deposits |
| Banco Mercantil del Norte | 646208440 | Diamante Cabo San Lucas S. de R.L. de C.V. | Closing Cost/GV33 |
| Banco Mercantil del Norte | 640368650 | Diamante Cabo San Lucas S. de R.L. de C.V. | Closing Cost/GV33 |
| Santander Bank | 82-500603302 | Diamante Cabo San Lucas S. de R.L. de C.V. | Operations Revenue |
| Banco Mercantil del Norte | 404167402 | DCSL Residential Services S. de R.L. de C.V. | Residential Services |
| Banco Mercantil del Norte | 417271215 | DCSL Residential Services S. de R.L. de C.V. | Residential Services |
| Banco Mercantil del Norte | 404167224 | DCSL Residential Services S. de R.L. de C.V. | Residential Services |
| Banco Mercantil del Norte | 420856633 | DCSL Residential Services S. de R.L. de C.V. | Residential Services |
| Banco Mercantil del Norte | 218796607 | Diamante Development S. de R.L. | Construction Payroll |
| Banco Mercantil del Norte | 219135744 | Diamante Development S. de R.L. | Construction Payroll |
| Banco Mercantil del Norte | 807291878 | Diamante Life S. de R.L. de C.V. | Dlife Exp-Dep |
| Banco Mercantil del Norte | 540653184 | Diamante Life S. de R.L. de C.V. | Dlife Exp-Dep |
| Banco Mercantil del Norte | 644363868 | Prestadora de Servicios S. de R.L. de C.V. | PS Bank Account |
| Banco Mercantil del Norte | 212349937 | Prestadora de Servicios Diamante S. de R.L. de C.V. | Payroll Expenses |
| Banco Mercantil del Norte | 646208459 | Prestadora de Servicios Diamante S. de R.L. de C.V. | Payroll Expenses |
| Banco Mercantil del Norte | 241523315 | Prestadora de Servicios Turistico y de Golf S. de | Payroll Expenses |
| Banco Mercantil del Norte | 242265256 | Prestadora de Servicios Turistico y de Golf S. de | Payroll Expenses |
| Unknown | 8832 | Pacifico Associates SA | USD Bank Account |
| **HOA Accounts Identified in Loan Documents:** | | | |
| | 489827440 | Regimen Secundario de Propiedad en Condominium Casitas Fase 1 | HOA Account |
| | 489827507 | Regimen Secundario de Propiedad en Condominium Casitas Fase 2 | HOA Account |
| | 485615694 | Diamante SCL Master HOA AC | HOA Account |
| | 485615649 | Diamante SCL Master HOA AC | HOA Account |
| | 485615779 | Regimen de Propiedad en Condominio Beach Estates | HOA Account |
| | 488710536 | Regimen de Propiedad en Condominio Beach Estates | HOA Account |

| Bank Name | Account Number | Name on Account | Account Description |
|---|---|---|---|
| | 485615818 | Sub-Regimen de Propiedad en Condominio 1 Golf Villas del RE | HOA Account |
| | 489827413 | Sub-Regimen de Propiedad en Condominio 1 Golf Villas del RE | HOA Account |
| | 485615676 | Sub-Regimen de Propiedad en Condominio 2 Sunset Hill | HOA Account |
| | 485615621 | Sub-Regimen de Propiedad en Condominio 2 Sunset Hill | HOA Account |
| | 485615742 | Sub-Regimen de Propiedad en Condominio Denominado DRC-Lote A | HOA Account |
| | 488710518 | Sub-Regimen de Propiedad en Condominio Denominado DRC-Lote A | HOA Account |
| **Unrelated Party Bank Accounts Identified in Loan Documents:** | | | |
| BBVA Bancomer | 8000541817100 | Stewart Title Guaranty de Mexico S.A. | Unknown |
| Banco Nacional de Mexico | 0660 / 9582454 | Fidelity National Title de Mexico S.A. | Unknown |
| Keybank | 1001516552 | Baker & Hostetler LLP | Unknown |
| PNC Bank | 5501298602 | Venable LLP | Escrow Account |
| HSBC Mexico | 21041070029475400 | Jose Alberto Castro Salazar | Unknown |
| JP Morgan Chase | 447449955 | FNF Title International Holding Co. | Unknown |
| Unknown | 03706797575 | Daniel Urrea Gonzalez Paul or Narda Rodriguez | Unknown |
| Compass Bank | 2511134873 | Bruce D Greenberg, Inc. | Unknown |



600 MASSACHUSETTS AVE., NW   WASHINGTON, DC 20001
**T** 202.344.4000   **F** 202.344.8300   www.Venable.com

George Kostolampros

**T 202.344.4426**
**F 202.344.8300**
gkostolampros@venable.com

**FOIA CONFIDENTIAL
TREATMENT REQUESTED
SUBJECT TO FRE 408
FOR SETTLEMENT PURPOSES
ONLY**

April 15, 2020

**By Email**

Diane C. Leonardo
Madeline O'Connor
Assistant United States Attorneys
U.S. Attorney's Office
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Re:     United States v. Philip A. Kenner, et al, 13-CR-607 (JFB)--Danske's
         Claim and Current Settlement Proposal

Dear Counsel:

　　　　We write in furtherance of our recent settlement discussions to further set forth Danske Bank's claim as to the Resort Property and urge that the government proceed expeditiously and accept Danske's recent offer of settlement.  As of March 31, 2020, Danske's claim stood at over $194.6 million inclusive of unpaid costs and fees to which Danske is contractually entitled.  By September 2020, assuming interest continues not to be paid, Danske's aggregate claim will total approximately $211 million.  As you know, because of the Covid-19 Pandemic, the Resort Property is essentially closed, which has resulted in staff layoffs, shutdowns of certain of the Resort Property's amenities, e.g., the Lagoon, and a complete cessation of revenue generation.  By email on March 30, 2020, we provided you with Danske's revised offer to reach a settlement in which Danske would effectively reduce its claim to $100 million and the government would effectively be guaranteed a recovery of $1.5 million and the potential upside of obtaining every dollar of an ultimate sale of the Resort Property over $100 million.  As we have explained in our recent discussions, there is no doubt that the Resort Property will need a capital infusion and it is



April 15, 2020
Page 2

imperative that a deal be reached soon because, without a settlement, Danske will not and cannot provide any additional liquidity to the Resort Property.  If a settlement in principle cannot be reached soon, Danske will seek to protect its interest by filing its claim with the Court and requesting that the Court determine Danske's claim expeditiously.

In this letter, we write to set forth the following:  (1) Summarize Danske's interest and the documents that have been produced to the government supporting Danske's claim; (2) Reiterate Danske's offer of settlement and further explain the need to move forward expeditiously with a settlement at this time;  and (3) Answer recent questions you have asked regarding Danske's claim and certain miscellaneous fees.

\*        \*        \*        \*        \*        \*        \*        \*        \*

## 1.  Danske's Claim

 In the numerous meetings we have had with you since the beginning of the forfeiture proceedings, Danske has asserted its claim and sought a mutual agreeable resolution in which Danske's legitimate claim is recognized and the Resort Property is able to continue as a viable going concern.  Nearly three years ago, at a meeting in June 2017, we advised you that Danske's claim then amounted to over $179 million and consisted of the following:

- Facility A: fixed loan of up to $123.5 million, which at the time of our June 2017 meeting had a principal outstanding balance of just over $96 million.

- Facility B: fixed loan with a principal outstanding balance of $18 million.

- Facility C: revolving line of credit of up to $15 million.

- Profit Participation Exit Fee: $50 million (representative of a cap on accrued and unpaid interest that had not been capitalized).

As part of our recent settlement discussions, we provided you with a spreadsheet setting forth the current amounts owed to Danske Bank, including sub-sheets setting forth the dates and amounts of advances and payments of any principal to Danske.  That spreadsheet is attached hereto in pdf form as **Exhibit 1**.



April 15, 2020
Page 3

     In summary, as of March 31, 2020, the amounts owed to Danske are the following:

| Facility A | $96.4 million |
|---|---|
| Facility B | $18 million |
| Facility C | $14.1 million[1] |
| Exit Fee/Profit Participation Fee | $50 million |
| Unpaid Interest and unpaid fees[2] | $16.1 million |
| Total | **$194.6 million** |

     Over the course of several years of the forfeiture proceedings, Danske has produced thousands of pages of documents.  Set forth below is a relevant history of Danske's claim, going back to the original loan by Lehman Brothers Holdings Inc. ("Lehman"), including references to the relevant documents that have already been produced as well as several additional documents being produced contemporaneously to the government.

     As you know, Lehman issued the original acquisition, pre-development, development and construction loan in the amount of up to $125 million to Diamante Cabo San Lucas S. De R.L. de C.V. (the "Borrower" or "Diamante") dated March 10, 2006 and secured by the underlying collateral, i.e. the Resort Property.[3]  *See* **Exhibit 3**, Loan Agreement dated March 10, 2006 [Bates No. DANSKE_0010553].[4]  In addition to the underlying contractual documents for the Lehman loan, Danske also produced to the government summary spreadsheets from Trimont, the former third-party servicer of the loan, which shows each advance from Lehman to the Borrower for each Facility up to December 31, 2016.  *See* **Exhibit 4**, Trimont Summary Statements for Facility A,

---

[1]     For the sake of completeness, Danske recently required that the Borrower not spend certain timeshare deposits and those amounts ($900,000) have, for now, been applied on Facility C.  These "blocked funds" have reduced the Facility C principal amount to $14.1 million.

[2]     Unpaid interest on all three facilities amounts to $14.4 million as of March 31, 2020.  **Exhibit 2**, April 13, 2020 Danske Statement [Bates No. DANSKE_0015739].  Additionally, unpaid lenders fees total more than $882,000 and there remains an $875,000 unpaid modification fee arising from the September 8, 2018 modification.  If these unpaid costs and fees are added to the drawn balance of $14.1 million, Facility C now has a balance totaling $15.8 million.

[3]     As you know, Danske's interest in the Resort Property is secured through a Mexican guaranty trust, which owns the Resort Property.  Danske is the first beneficiary of the trust; only upon Danske being repaid in full, the Borrower becomes the first beneficiary of the trust.

[4]     Danske also produced other agreements that were executed as part of that loan agreement, which include, among other things, the Promissory Note, the Payment Guarantee, Completion Guarantee, UCC Financing Statements, and Pledge and Security Agreement (*see, e.g.*, Bates Nos. DANSKE_0001940 through DANSKE_0002056; *see also* Bates Nos. DANSKE_010532-DANSKE_015287).



April 15, 2020
Page 4

Facility B, and Facility C [Bates No. DANSKE_0015604; DANSKE_0015502; DANSKE_0015670].

In September 2008, following Lehman's well-publicized bankruptcy filing, Danske issued a notice of default that related to a Master Repurchase Agreement ("MRA") pursuant to which Lehman originally owed Danske $800 million.[5]  Danske later filed a proof of claim (Claim No. 19487) of $699,657,333.82 in the Lehman bankruptcy proceeding as amounts owed by Lehman to Danske at that time under the MRA.  *See* **Exhibit 6**, Notice of Default and Claim [Bates No. DANSKE_0015740].

In January 2009, Lehman and Danske entered into an Omnibus Assignment and Assumption Agreement in which Lehman ceded all rights in the original Lehman/Diamante loan to Danske as part of a settlement of the amounts Lehman owed Danske under the MRA.  *See* **Exhibit 7,** Omnibus Assignment and Assumption [Bates No. DANSKE_0012223].  At the time of the assignment, Lehman had advanced to Diamante over $107,538,327.83.  *See* **Exhibit 4**, Trimont Summary Statement for Facility A [Bates No. DANSKE_0015604 at DANSKE_0015614].  Additionally, unpaid accrued interest owed by Diamante under the loan from March 10, 2006 through March 1, 2009 totaled $49,132,479.  *See* **Exhibit 8**, First Quarter 2009 Trimont Statements [Bates No. DANSKE_0015590 at DANSKE_015594]. Contemporaneously with the Omnibus Assignment Agreement, Danske advanced additional funds to the Borrower, increasing the total amount advanced to the Borrower to $109,138,327.83.  *See* **Exhibit 9**, February 19, 2009 Trimont Funding Memorandum [Bates No. DANSKE_0010807]. Inclusive of the unpaid accrued interest, the total amount then owed by the Borrower amounted to over $158 million.

On March 6, 2009, Danske and the Borrower restructured the original loan.  The Promissory Note in the original amount of up to $125,000,000 (of which over $109,000,00 had been funded) was split into two facilities:  Facility A Promissory Note in the principal amount of $109,138,327.83 (the amount then advanced) ("Facility A") and Facility B Promissory Note in the principal amount of $16,000,000 (the remaining amount of the original Promissory Note left to fund) ("Facility B").  *See* **Exhibit 10**, March 2009 Amended & Restated Loan Agreement, Promissory Notes and Note Splitter [Bates Nos. DANSKE_0013865, DANSKE_0013984, DANSKE_0014021, and DANSKE_0014031].  Additionally, the then-approximately $49 million in unpaid accrued interest was recharacterized as a Profit Participation Fee ("PPF") of at least $45,000,000.  *See* **Exhibit 10**, March 2009 Amended & Restated Loan Agreement, Section 5.3 [Bates No. DANSKE_0013865 at DANSKE_0013891].  The additional amounts to be funded

---

[5]       Under the MRA, Lehman sold and agreed to repurchase a number of commercial and residential loans to and from Danske.  *See* **Exhibit 5**, March 17, 2005 Letter Between Lehman and Danske Detailing Purchase and Sale Process [Bates No. DANSKE_0015719].



April 15, 2020
Page 5

under Facility B were intended to finance operations, the development plan, and construction of the Dunes golf course and related infrastructure.

By December 31, 2009, Danske had advanced the full $16 million under Facility B. *See* **Exhibit 14**, Trimont Summary Statement for Facility B [Bates No. DANSKE_015502 at DANSKE_015514]. These monies were used by the Borrower to fund operations, complete the Dunes golf course and related general infrastructure improvements, and support initial development and construction costs associated with speculative units on a new phase of development, the golf villas.

On January 20, 2010, Danske and Diamante modified Facility B to increase the principal balance available from $16,000,000 to $20,000,000. *See* **Exhibit 11**, January 2010 First Amendment to Amended & Restated Loan Agreement [Bates No. DANSKE_010809]. The additional monies were used to fund ongoing operations and continue development at the Resort Property.

On April 26, 2013, pursuant to the terms and conditions of the Second Amended and Restated Loan Agreement, Danske and Diamante restructured the bank facilities as follows:

- Increasing the principal amount of Facility A from $109,138,327.83 to $123,500,000 to reflect the capitalization of all unpaid interest that had accrued on Facility A and Facility B from February 2009 through December 2011, *see* **Exhibit 13**, April 29, 2013 Funding Memo [Bates No. DANSKE_0015736];

- Splitting Facility B (which was then drawn at over $21 million, *see* **Exhibit 4**, Trimont Summary Statement for Facility B [Bates No. DANSKE_015502 at DANSKE_015507]) into three facilities:

  o Replacement Facility B in the amount of $18 million ("Facility B");

  o Creating a new Facility C Promissory Note in the amount of $2 million as evidenced by the Facility C Promissory Note ("Facility C") with a maturity date of March 31, 2014;

  o Creating a new Facility D in the principal amount of $3 million as evidenced by the Facility D Promissory Note with a maturity date of March 31, 2014 ("Facility D");

  o Increasing the PPF from an approximate $45 million to a definitive $50 million (to account for additional unpaid interest); and



April 15, 2020
Page 6

- Extending the maturity date for Facilities A and B to March 31, 2016.

*See* **Exhibit 14**, April 2013 Second Amended & Restated Loan Agreement, Promissory Notes, and Note Splitter [Bates Nos. DANSKE_011080, DANSKE_011683, DANSKE_0011865, DANSKE_0012068, DANSKE_0012098, DANSKE_0012118].  The purpose of the 2013 modifications and advancement of new money was to finance further development of the Resort Property, including advancing construction of the Lagoon and the Tiger Woods El Cardonal golf course.  It is important to note that from the time of Lehman's loan origination in March 2006 through April 2013, the funds loaned by Lehman and then Danske were the primary source of financing for development, construction and operational support at the Resort Property.[6]

On April 29, 2014, Danske and Diamante modified the facilities by consolidating and replacing the Facility C note and the Facility D line of credit note with a replacement Facility C revolving line of credit note.  The replacement Facility C increased the Borrower's revolving available line of credit by $10,000,000 such that the aggregate available principal amount that could be drawn and redrawn on Facility C equaled $15,000,000.  *See* **Exhibit 15**, April 2014 Third Amended & Restated Loan Agreement and Consolidated, Amended, & Restated Promissory Note for Facility C [Bates Nos. DANSKE_012231, DANSKE_0013058].  Additionally, the maturity date of the replacement Facility C Note was extended to April 1, 2016.  The primary purpose of this modification and advancing of new money was to continue development, including completing construction of the Tiger Woods El Cardonal golf course and the Lagoon.

In October 2014, Danske and Diamante modified the terms of the loans by extending the maturity date for Facilities A and B to October 30, 2024 and extending the maturity date for replacement Facility C to October 31, 2017.  *See* **Exhibit 16**, First Amendment to Third Amended & Restated Loan Agreement [Bates No. DANSKE_0013826].[7]

In December 2014, following the sale of a large parcel of land to KTRC for $40 million, upon receipt of the first installment of the purchase price, the Borrower paid down the then-fully drawn balance of $15 million on Facility C, which  allowed the Borrower to make further draws on Facility C moving forward.  **Exhibit 4**, Trimont Summary Statement for Facility C [Bates No. DANSKE_0015670];  **Exhibit 17**, December 2014 Wire Confirmation [Bates No. DANSKE_0015712].  In June 2015, upon receipt of the second and final installment of the

---

[6] From 2009 through 2013, Danske also entered into several letter agreements extending the maturity date of Facility A.  *See* **Exhibit 12**, June 29, 2012 Second Extension of Maturity, September 28, 2012 Third Extension of Maturity, December 31, 2012 Fourth Extension of Maturity, and March 31, 2013 Fifth Extension of Maturity [Bates Nos. DANSKE_0010886, DANSKE_0010899, DANSKE_0010870, DANSKE_0010850].

[7] Diamante and Danske agreed upon additional changes to the terms in connection with the October 2014 modification, but the material modification for the purposes of the settlement discussions is the extension of the maturity dates.



April 15, 2020
Page 7

purchase price, the Borrower paid the remainder of the purchase proceeds, $25 million, to reduce the principal balance of Facility A.  **Exhibit 4**, Trimont Summary Statement for Facility A [Bates No. DANSKE_0015604 at DANSKE_0015606]; *see also* **Exhibit 18**, June 2015 Wire Confirmation [Bates No. DANSKE_0015708].

In early September 2018, after advising the Government in an August 23, 2018 email, Danske modified and amended the facilities retroactive to November 1, 2017 by, among other things, extending the maturity date for Facility C from October 31, 2017 to December 31, 2018 and extending the due date for certain scheduled amortization payments on Facility A.[8]  *See* **Exhibit 19**, September 8, 2018 Second Amendment to Third Amended & Restated Loan Agreement [Bates No. DANSKE_011031].  At that time, Danske believed it was in its best interest in order to maximize recovery under the loan agreements to forbear on declaring the Borrower in default for failure to make certain scheduled amortization payments when due and to allow the Borrower to use funds to continue operating and developing the Resort Property.

Although technically in default of the underlying agreement for failures to make principal and other payments in 2018 and throughout 2019, the Borrower continued to make interest payments timely from 2014 through August 2019.  On September 30, 2019, the Borrower did not make payment of approximately $605,000 of accrued interest owed on the loans.  As Danske had explained numerous times before, the Borrower needs a liquidity infusion because sales of the resort have unequivocally been affected by the specter of the then-pending Preliminary Order of Forfeiture.  In September 2019, Danske elected not to issue a notice of default at that time because it was engaged in settlement discussions with the government that potentially would have removed the Resort Property from the forfeiture proceedings.

In January 2020, when it became clear that a settlement would not be reached before the Court would issue the Preliminary Order of Forfeiture, Danske issued a notice of default to the Borrower in order to protect its interest and rights under the loan agreements.  **Exhibit 20**, January 2020 Notice of Default [Bates No. DANSKE_0015736].  As you know, prior to issuing the Notice of Default, we advised you of Danske's intent to do so in a January 2020 telephone call.  The notice of default enumerated that the Borrower defaulted on or around December 31, 2018 (and, again throughout 2019 and on September 30, 2019) by failing to make certain interest, principal and fee payment obligations by the date due.  As a consequence to these defaults, default interest is accruing on Facility A, Facility B, and Facility C such that Danske's claim at the time of this letter is as set forth in the chart on page 3 of this letter.  As explained above, default interest continues to accrue and Danske's claim will continue to increase as each month passes.

---

[8]       While Danske and the Borrower agreed to certain other modifications of terms, those modifications are not material to the amount owed to Danske.  *See, e.g.*, **Exhibit 18**, September 8, 2018 Second Amendment to Third Amended & Restated Loan Agreement [Bates No. DANSKE_011031 at DANSKE_011034-35].



April 15, 2020
Page 8

## 2.   Danske's Offer and The Need to Move Forward Expeditiously—Either Through Settlement or Through an Ancillary Proceeding

Danske has made a series of settlement proposals over the past four and a half years.  Our recent discussions have been on-going for several months.  However, because of the Covid-19 Pandemic and the resulting worldwide financial impacts, Danske withdrew its prior offer, which it presented during the first week of March 2020.  As we explained to you, Danske did so because of its view that the value of the Resort Property has been affected adversely by the Pandemic and because Danske believes that the Resort Property will absolutely require a liquidity infusion in the very near future in order to continue sales and development, *i.e.* the lifeblood of the Resort Property's viability.  Danske's March 30, 2020 offer is set forth in the attached **Exhibit 21** (March 30, 2020 Email from K. Weiner to M. O'Connor, *et al.*).  Assuming there is no involuntary bankruptcy proceeding brought in Mexico that ensnares the Resort Property, Danske's offer would provide the government a guaranteed $1.5 million and, to the extent a sale of the Resort Property closes by December 31, 2020, the government receives any and all sums above $100 million.

Danske's offer is more than reasonable given Danske's legitimate claim.  Danske's latest offer effectively reduces Danske's claim by $100 million and provides the government with substantial upside if the government's expert's assessment of the value of the Resort Property is correct.  As an example, if proceeds from the sale of the Resort Property amounted to $116 million, the government would receive in total $17.5 million, which would ***fully cover*** the total amount of the defendants' forfeiture money judgement representing the proceeds involved in the underlying crimes defendants were convicted of.  In the alternative, if the proceeds of a sale of the property are under $100 million or no sale is consummated (because any bid was below the agreed-to floor of $100 million), which Danske's valuation experts have advised is a realistic potential outcome, the government will receive a guaranteed $1.5 million.

To put Danske's offer in perspective, if we cannot reach a settlement, Danske will assert its claim in an ancillary proceeding and request that the Court move forward with determining Danske's claim expeditiously.  As the Court stated in its recent forfeiture ruling, "**the Court intends to move forward with the ancillary hearings in an expeditious manner in order to minimize any negative impact to the property rights of innocent third parties**."  March 10, 2020 Decision on Forfeiture at 17 n.24 (emphasis added).  Given the Court's statement and the obvious financial impact of the current Pandemic, Danske is confident that the Court will proceed expeditiously in a summary proceeding and ultimately recognize Danske's claim of approximately $200 million, leaving the government with no recovery for victims at all if a sale ultimately nets proceeds under Danske's approximately $200 million claim.

As we also discussed, Danske's proposal would obviate the need for an ancillary proceeding over the Resort Property.  As we had envisioned and discussed previously, if a settlement is reached, Danske would proceed with an expedited foreclosure proceeding in Mexico



April 15, 2020
Page 9

and seek to begin the sale process in the third and fourth quarters of 2020, with closing (to the extent a sale is consummated) by December 31, 2020.  This would in effect complete all proceedings over the Resort Property in the district court with essentially guaranteed monies of at least $1.5 million available to potentially be provided by the government to victims.

**3.   The Government's Recent Questions Regarding Miscellaneous Fees and PPF**

Over the last couple of weeks, the government has raised questions regarding certain "miscellaneous fees" set forth in the Trimont statements Danske has produced.  As we explained before, under the loan documents that Danske has already produced to the government, Danske is contractually entitled to payment of those amounts.  Specifically, Section 6.1 of the loan agreement provides for the following:

> Section 6.1     Loan and Administration Expenses.
>
> Borrower shall reimburse Lender, from time to time upon five (5) Business Days' demand therefor, for reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan, including all amounts payable pursuant to Sections 6.2 and 6.3 hereof and any and all other fees owing to Lender pursuant to the 2014 Amended Loan Documents, and also including, without limitation: (i) all recording, filing and registration fees, (ii) all fees of the Trustee under the Trust Agreement, (iii) mortgage or documentary taxes, (iv) insurance premiums, title insurance premiums and other charges of Title Insurer or UCC Title Insurer, (v) premiums and fees payable in connection with the UCC Policy and the Title Policy, (vi) survey fees and charges, (vii) cost of premiums on surety company bonds, (viii) appraisal fees, (ix) insurance consultant's fees, (x) Lender's Consultant's fees, (xi) environmental consultant's fees and (xii) travel-related expenses, and (xii) all costs and expenses (including due diligence-related expenses and legal fees) reasonably incurred by Lender in connection with the preparation, negotiation, execution and delivery of the 2014 Amended Loan Documents and the other closing deliveries.  Further, if any Default or Event of Default occurs or if the Loan is not paid in full when and as due, Borrower shall pay to Lender upon five (5) Business Days' demand therefor, all costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and court costs) incurred in attempting to enforce payment of the Loan or to realize upon the security therefor. Borrower agrees to pay Lender's fees and disbursements incurred in



April 15, 2020
Page 10

> connection with title updates and title endorsements ordered by the Lender in connection with each disbursement of Loan proceeds.

*See* **Exhibit 10**, March 2009 Amended & Restated Loan Agreement [Bates No. DANSKE_0013865 at DANSKE_0013984]; **Exhibit 14**, April 2013 Second Amended & Restated Loan Agreement [Bates No. DANSKE_0011080 at DANSKE_0011129]; **Exhibit 15**, April 2014 Third Amended & Restated Loan Agreement [Bates No. DANSKE_0012231 at DANSKE_0012280]. Further, under Section 13.1(k) of the loan agreement, Danske is entitled to indemnification from the Borrower of all costs and expenses, including reasonable attorneys' fees and court costs of any and every kind.

For example, the Trimont statements set forth a charge of $12,581.34 with a due date of July 1, 2014 and a review of Danske records set forth that those amounts were for legal fees incurred by Danske for work done by Danske's outside counsel in connection with  the loan documents. **Exhibit 4**, Trimont Summary Statement for Facility A [Bates No. DANSKE_0015604 at DANSKE_0015607]. In sum, these miscellaneous fees are contractual entitlements and, over 10 years, represent an insignificant fraction as compared to the $100 million in reduction of Danske's overall claim it has offered to the government as a potential settlement.

You have recently requested "an explanation of the profit participation fee." As explained above, the PPF goes back to the original assignment of the Lehman loan and represents interest that had accrued on the original Lehman loan—but had not been paid as of the time that Danske assumed Lehman's interest—in an amount of over $49 million. The loan documents set forth that the "Debt" includes the outstanding principal balance of the promissory notes, all accrued and unpaid interest thereon, the Profit Participation Fee, the Non-Utilization Fee and all other sums now or hereafter due. **Exhibit 10**, March 2009 Amended & Restated Loan Agreement [Bates No. DANSKE_0013865 at DANSKE_0013874]; **Exhibit 14**, April 2013 Second Amended & Restated Loan Agreement [Bates No. DANSKE_0011080 at DANSKE_0011093]; **Exhibit 15**, April 2014 Third Amended & Restated Loan Agreement [Bates No. DANSKE_0012231 at DANSKE_0012245]. The PPF is defined as "$50,000,000.00 USD" and Section 5.7 of the loan agreement provides as follows:

> > Profit Participation Fee. Borrower shall pay to Lender, in addition to interest and all other amounts due hereunder with respect to the Loan, the Profit Participation Fee. The Profit Participation Fee shall be fully earned on the Effective Date, and shall be payable, subject to the Order of Priority, (i) on the Maturity Date, (ii) upon the earlier repayment of the Debt by acceleration or otherwise; or (iii) on such earlier date as Borrower shall elect.



April 15, 2020
Page 11

**Exhibit 14**, April 2013 Second Amended & Restated Loan Agreement [Bates No. DANSKE_0011080 at DANSKE_0011128]; **Exhibit 15**, April 2014 Third Amended & Restated Loan Agreement [Bates No. DANSKE_0012231 at DANSKE_0012279].

\*    \*    \*    \*    \*    \*    \*    \*    \*

In sum, it is imperative that the government respond to Danske's latest offer no later than April 30, 2020. The Resort Property will need liquidity to continue as a viable business, but Danske will not and cannot provide any such liquidity unless its claim is recognized. It simply would make no business sense for Danske to expend additional funds on the Resort Property when its legitimate claim of almost $200 million is not recognized by the government. Further, no lender would extend additional funds knowing that Danske will stand ahead of that lender in priority. Danske is owed nearly $200 million and must seek to protect that investment. Danske must move quickly so that the Resort Property can ultimately obtain liquidity and Danske can protect its legitimate property interest.

To the extent the government does not respond to Danske's offer with an agreement in principle by April 30, 2020 and a binding acceptance by May 31, 2020[9], Danske intends to file its Verified Claim soon after and ask the Court to move forward with determining Danske's claim in an expedited summary proceeding.

We fully believe that it is in the best interests of third parties, such as Danske, innocent home and time share owners, as well as victims of defendants' crimes that a settlement is reached on the terms Danske has proposed. Danske stands ready to move forward with that settlement.[10]

Sincerely,

George Kostolampros
Doreen S. Martin
Kelly S. Weiner
Xochitl S. Strohbehn

cc: James H. Knapp, Esq.
    Laura Mantell, Esq.

---

[9]    Danske must have a binding commitment by May 31, 2020 in order to have sufficient time to conduct and complete an agreed-to foreclosure and sales process in Mexico.

[10]    As we mentioned when we presented Danske's offer, Danske's offer is contingent on approval by its credit committee.