UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – X
UNITED STATES OF AMERICA

13-CR-607 (S-2)(JFB)

- against -

PHILLIP A. KENNER,
         also known as,
             "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
         also known as
             "Tommy C. Hormovitis,"

             Defendants.
– – – – – – – – – – – – – – – –X

# UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THIRD-PARTY PETITIONER DANSKE BANK'S MOTION FOR SUMMARY JUDGMENT

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York

MADELINE O'CONNOR
DIANE C. LEONARDO
Assistant U.S. Attorneys
(Of Counsel)

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………………………... 1

STATEMENT OF PROCEEDINGS…………………………………………………..  2

A.    The Relevant Criminal Proceedings………………………………………………  2

B.    Claim and Other Documents Submitted by Danske………………………………  4

      1.    Danske's Petition…………………………………………………………... 5

      2.    The Initial Loan…………………………………………………………..6

      3.    The Relevant Lehman Bankruptcy Proceedings…………………………....7

      4.    Certain Proffered Additional Loan Agreements…………………………… 9

STATUTORY FRAMEWORK AND AUTHORITIES……………………………………9

A.    Third Party Claims…………………………………………………………………9

B.    Discovery Regarding Third Party Claims……………………………………………17

C.    Summary Judgment………………………………………………………………... 19

ARGUMENT…………………………………………………………………………21

I.    Several Exhibits Proffered by Danske are Inadmissible Hearsay and Should Not Be Considered by the Court in Support of Danske's Motion for Summary Judgment………………………………………………………………... 21

II.    Danske Has Failed to Satisfy the Pleading Requirements of 21 U.S.C. § 853(n)(3)…………………………………………………………… 25

III.    Danske Has Not Met Its Burden of Proving that it is a Bona Fide Purchaser for Value…………………………………………………………………27

      A.    Danske Has Failed to Meet its Burden of Proving that it Has a Valid Legal Interest in the Forfeitable Property………………………….. 27

      B.    Danske Has Failed to Meet its Burden of Proving that it is a Bona Fide Purchaser for Value of the Forfeitable Property………….. 32

            1.    Danske Has Failed to Prove that it is a Bona Fide Purchaser for Value of the Initial Loan……………………………… 32

i

a.     Danske Has Failed to Provide Any Evidence of When it Purchased the Initial Loan or of the Value it Gave in the Purported Transaction…………………………………………………..32

b.     Lehman Bankruptcy Records Indicate that Danske Did Not Provide Adequate Value to Confer Bona Fide Purchaser For Value Status... 33

c.     Principles of Judicial Estoppel Preclude Danske From Claiming a Higher Value for the Initial Loan in this Forfeiture Proceeding……37

d.     Danske Has Failed to Provide Actual Evidence that the Initial Loan Was Worth $157 Million……………….…………………….…... 39

2.     Danske Has Failed to Prove that it is a Bona Fide Purchaser for Value of the Additional Loans……………………………………...40

a.     Danske Cannot Be Considered a Bona Fide Purchaser for Value of the Additional Loans Because it Has Failed to Demonstrate that it is a Bona Fide Purchaser for Value of the Initial Loan and the Evidence Does Not Substantiate its Claim to the Forfeitable Property……….40

b.     Danske is Not a Bona Fide Purchaser for Value of the Additional Loans Because the Additional Loans Were Not Innocent, Arm's Length Transactions…………………………………………...40

c.     If Danske Were to Obtain the Entire Sum it Claims, It Would Reap Windfalls Totaling in Excess of $203 Million……………………...47

C.     Danske Has Failed to Meet its Burden of Proving that It Was Reasonably Without Notice that the Forfeitable Property Was Subject to Forfeiture…..48

IV.     Danske's Motion for Summary Judgment Should Be Denied Because the Government Has Not Been Afforded Adequate Time to Engage in Discovery……55

V.     Danske is Not Entitled to Summary Judgment Regarding Priority of Its Purported Claim……………………………………………………………60

CONCLUSION………………………………………………………………… 60

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986))……………………………………..……56

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)…………………………………………..……………...12

*Assoc. of Car Wash Owners Inc. v. N.Y.C.*, 911 F.3d 74 (2d Cir. 2018)………………………..20

*Bank of Dixie v. Fed. Deposit Ins. Corp.*, 766 F.2d 175 (5th Cir. 1985)……………………41-42

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………………………….…………..20, 56

*In re Cerrato*, 504 B.R. 23 (Bankr. E.D.N.Y. 2014)…………………………………….……...33

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018)…………………….…………..12

*Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783 (D.C. Cir. 1971)…………..56

*de la Fuente v. F.D.I.C.*, 332 F.3d 1208 (9th Cir. 2003)………………………………….……41

*Deutsche Bank Nat'l Trust Co. v. Castellanos*, 841 N.Y.S.2d 819,
15 Misc. 3d 1134(A) (Sup. Ct. Kings Cty. May 11, 2007)………………………………………..46

*Dolphin v. Marocik*, 222 A.D.2d 549, 635, N.Y.S.2d 84 (2d Dep't 1995)……………...………34

*Elghourab v. Vista JFK, LLC*, 2018 WL 6182491 (E.D.N.Y. Nov. 27, 2018)…………………..22

*Emerson Hills Realty, Inc. v. Mirabella*, 220 A.D.2d 717, 633 N.Y.S.2d 196
(2d Dep't 1995)………………………………………………………..………………….……33-34

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)……………………...……..16

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000)………………………20

*Heredia v. Americare, Inc.*, 2020 WL 3961618 (S.D.N.Y. July 13, 2020)……………………..23

*Hood v. Webster*, 271 N.Y. 57 (1936)………………………………………………………...34

*Irwin v. Regal 22 Corp.*, 175 A.D.3d 671, 108 N.Y.S.3d 57 (2d Dep't 2019)…………………33

*Jaffer v. Hirji*, 887 F.3d 111 (2d Cir. 2018)……………………………..……………….……19-20

*In re J.F.K. Acquisitions Grp.*, 166 B.R. 207 (Bankr. E.D.N.Y. 1994)…………………..……38

*In re Krumm*, 534 B.R. 142 (W.D.N.C. 2015)……………………………………….......……38

*Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019)…………….....………….…..…………...20

*Liberty Mutual Fire Ins. Co. v. Scott*, 486 F.3d 418 (8th Cir. 2007)……………….…………38

*Littner v. McKanic*, 130 B.R. 129 (Bankr. E.D.N.Y. 1991)……………….………………….56

*M & Z Trading Corp. v. Hecny Grp.*, 41 F. App'x 141 (9th Cir 2002)…………………………24

*Maggers v. Jones*, 2016 WL 2939419 (E.D. Cal. May 20, 2016)……………….…………......……38

*Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372 (2d Cir. 1995)……………….……………..……..21, 59

*In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463 (E.D. Va. 1994),
*aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.*,
83 F.3d 660, 666 (4th Cir. 1996) ….……………………………………………….………17

*Mowrey v. Walsh*, 8 Cowen 238, -- (N.Y. 1828)……………………….……………..……47

*Ochenkowski v. Dunaj*, 137 Misc. 674, 244 N.Y.S. 267 (Sup. Ct. Mont. Cty. 1930),
*aff'd*, 232 A.D. 441 (3d Dep't 1931)…………………………………………….......………34

*Pacheco v. Serendensky*, 393 F.3d 348 (2d Cir. 2004)……………….…….…..………10, 12, 14

*Pepper v. Litton*, 308 U.S. 295 (1939)……………….…………………………………..45

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997)……………….….…………………21

*Ravenell v. Avis Budget Grp., Inc.*, 2014 WL 1330914 (E.D.N.Y. March 31, 2014)………......22

*Richie v. Vilsack*, 287 F.R.D. 103 (D.D.C. 2012)…………….………………………….56

*Singh v. Bay Crane Servs., Inc.*, 2013 WL 5655931 (E.D.N.Y. October 11, 2013).…….……….22

*Ten Eyck v. Witbeck*, 135 N.Y. 40 (1892)……………………….………………………...32-33

*Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506 (2d Cir. 1989)………..…...56

*Ulrich v. U.S. Dep't of Treasury*, 129 F. App'x 386 (9th Cir. 2005)………………….……...41

*United States v. Allmendinger*, 2012 WL 966615 (E.D. Va. Mar. 21, 2012) ……...……….……14

*United States v. Armstrong*, 2007 WL 7335173 (E.D. La. June 1, 2007) ………...…………16, 53

*United States v. BCCI Holdings (Luxembourg), S.A. (In re DPA)*,
1993 WL 760232 (D.D.C. Dec. 8, 1993)…………………….…………………….…….......18

*United States v. BCCI Holdings (Luxembourg), S.A. (In re BCP)*,
169 F.R.D. 220 (D.D.C. 1996)……………….……………………………….……………..…19

*United States v. BCCI Holdings (Luxembourg), S.A. (In re Am. Express Bank)*,
961 F. Supp. 287 (D.D.C. 1997)   …………………………….……………………..…15-16, 17

*United States v. Burge*, 829 F. Supp. 2d 664 (C.D. Ill. 2011)………………...……..…..……..25

*United States v. Butler*, 543 F. App'x 95 (2d Cir. 2013) ………….…………………………...11

*United States v. Coffman (In re Dacorta, LLC)*, 612 F. App'x 278 (6th Cir. 2015) ….………..…16

*United States v. Coffman (In re Anderson)*, 2012 WL 5611510
(E.D. Ky. Nov. 15, 2012)   ……………………………….……….……………………16, 17

*United States v. DSI Associates LLC*, 496 F.3d 175 (2d Cir. 2007)…........................................ 10

*United States v. Frykholm*, 362 F.3d 413 (7th Cir. 2004) ………..……………....……17, 47, 49, 60

*United States v. Hailey*, 924 F. Supp. 2d 648 (D. Md. 2013) ……………..…….……………..…18

*United States v. Hopkins*, 2009 WL 9054954 (D.S.C. Sept. 4, 2009)…………...….…………..…19

*United States v. Kokko*, 2007 WL 2209260 (S.D. Fla. July 3, 2007)………..……...…………….18

*United States v. Kramer*, 957 F. Supp. 223 (S.D. Fla. 1997)……………………………..…..44

*United States v. Lazarenko*, 575 F. Supp. 2d 1139 (N.D. Cal. 2008),
*rev'd on other grounds sub nom. United States v. Liquidators of European
Fed. Credit Bank*, 630 F.3d 1139 (9th Cir. 2011) …………………………..….………..…………..13

*United States v. Lavin*, 942 F.2d 177 (3d Cir. 1991)……………………….,,…….…………...47

*United States v. Madoff*, 2012 WL 1142292 (S.D.N.Y. Apr. 3, 2012)……..................................14

*United States v. McCorkle*, 143 F. Supp. 2d 1311 (M.D. Fla. 2001)……………..….……………15

*United States v. McHan*, 345 F.3d 262, 277 (4th Cir. 2003)………………………………..…..29

*United States v. Mendez*, 2008 WL 3874318 (E.D.N.Y. Aug. 19, 2008)……..…….….……..14

*United States v. Murray*, 2015 WL 404779 (S.D. Ga. Jan. 29, 2015)…………..…….………..19

*United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005)…………….…………………………12, 13

*United States v. O'Brien*, 181 F.3d 105 (6th Cir. 1999)……………….….……………………..14

*United States v. One 1996 Vector M12*, 442 F. Supp. 2d 482 (S.D. Ohio 2005)…………….…....34

*United States v. Orozco-Prada*, 636 F. Supp. 1537 (S.D.N.Y. 1986),
*aff'd*, 847 F.2d 836 (2d Cir. 1988). ……………….………………………………………….……16

*United States v. Parenteau*, 647 F. App'x 601 (6th Cir. 2016)…………….…....……………….14

*United States v. Petters*, 857 F. Supp. 2d 841 (D. Minn. 2012)....................................................14

*United States v. Preston*, 123 F. Supp. 3d 117 (D.D.C. 2015)………………….…...………….11, 26

*United States v. Rem*, 38 F.3d 634 (2d Cir. 1994)……………….…………………….……….20

*United States v. Reyes*, 307 F.3d 451 (6th Cir. 2002)…….............................................................19

*United States v. Ribadeneira*, 105 F.3d 833 (2d Cir. 1997)…………………………………….…13

*United States v. Sabatino*, 2018 WL 2074191 (S.D. Fla. Apr. 13, 2018),
*report and recommendation adopted*, 2018 WL 2016500 (S.D. Fla. Apr. 30, 2018)………..54, 55

*United States v. Sigillito*, 938 F. Supp. 2d 877 (E.D. Mo. 2013)…………….…...……………12, 27

*United States v. Simmons*, 2019 WL 4412443 (S.D.N.Y. Sept. 16, 2019)....................................15

*United States v. Smith*, 953 F. Supp. 2d 1260 (M.D. Fla. 2013)………………….………………..…47

*United States v. Soreide*, 2005 WL 8137780 (S.D. Fla. Mar. 23, 2005) …...…….…….…….13-14

*United States v. Soreide*, 461 F.3d 1351 (11th Cir. 2006)…….……………………………….12, 32

*United States v. Strube*, 58 F. Supp. 2d 576 (M.D. Pa. 1999) ………………...……….…….…..12

*United States v. Swartz*, 391 F. Supp. 3d 199 (N.D.N.Y. 2019)………………….……………..…26

*United States v. Timley*, 507 F.3d 1125 (8th Cir. 2009)………………….………10, 11, 12, 13, 27, 59

*United States v. Titus*, 2013 WL 6540164 (E.D. La. Dec. 12, 2013)………………….……...……34

*United States v. Vithidkul*, 2014 WL 1515130 (D. Md. Apr. 16, 2014) ………...…………….…18

*United States v. Von Nothaus*, 2016 WL 4180967 (W.D.N.C. Aug. 4, 2016)………….…….…..19

*United States v. Watts*, 786 F.3d 152 (2d Cir. 2015)....................................................................10

*United States v. Weidner*, 2004 WL 432251 (D. Kan. Mar. 4, 2004) ……………………..………15

*Utica Ins. Co. v. Toledo Ins. Co.*, 17 Barb. 132 (Sup. Ct. N.Y. 1853)…………….……...…..43

*Wells Fargo Bank, N.A. v. Hughes*, 897 N.Y.S.2d 605,
27 Misc. 3d 628 (Sup. Ct. Erie Cty. 2010)…………………………….…………..……46

*Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236 (2d Cir. 2011)….….………11, 60

*In re 300 Washington Street LLC*, 528 B.R. 534 (Bankr. E.D.N.Y. 2015)………….………..38

## STATUTES

18 U.S.C. § 981(a)(1)(C)……………………………………………………………………… 2, 4

18 U.S.C. § 982(a)(1)…..……………………………………………………………….......2, 4

18 U.S.C. § 982(b)……………………………………………………………………………...4

18 U.S.C. § 982(b)(1)………………………………………………………………………....4

18 U.S.C. § 1343………………………………………………………………………….......2, 4

18 U.S.C. § 1349……………………………………………………………………………… 2, 4

18 U.S.C. § 1356(h)…...…………………………………………………………….………2, 4

18 U.S.C. § 1963………………………………………………………………………………44

18 U.S.C. § 1963(k)…………………………………………………...……………………18

18 U.S.C. § 1963(l)…………………………………………………………………………18

21 U.S.C. § 853……………………………………………………………………………9, 10

21 U.S.C. § 853(n)…………………………………………………….................................*passim*

21 U.S.C. § 853(n)(2)…………………………………………………...……………10, 12, 14

21 U.S.C. § 853(n)(3)……………………………………………….................................*passim*

21 U.S.C. § 853(n)(6)………………………………………………………………………12, 13

21 U.S.C. § 853(n)(6)(A)………………………………………………………………………13

21 U.S.C. § 853(n)(6)(B)……………………………………….....................................*passim*

21 U.S.C. § 853(p)……………………………………….................................................4

28 U.S.C. § 2461(c)……………………………………….........................................2, 4

**RULES**

FED. R. CIV. P. 56(d)…..……………………………………………1, 20, 56, 59

FED. R. CIV. P. 37(b)……………………………..………………………….…...19

FED. R. CRIM. P. 32.2……………………..………………….…………10, 17

FED. R. CRIM. P. 32.2(c)(1)………………………....…….…………………...….10

FED. R. CRIM. P. 32.2(c)(1)(A)……………………………….…………….…..…...10

FED. R. CRIM. P. 32.2(c)(1)(B)……………………………...….……1, 10, 17, 18

Federal Rules of Evidence 803……………………………….…….……..…….......…..5, 22

Federal Rules of Evidence 901……….……………………….…..………….....….…24

## PRELIMINARY STATEMENT

The UNITED STATES OF AMERICA (the "United States" or the "government"), by and through its counsel, Seth D. DuCharme, Acting United States Attorney for the Eastern District of New York, Madeline O'Connor and Diane C. Leonardo, Assistant United States Attorneys, of counsel, respectfully submits this memorandum in support of its motion for summary judgment, and in opposition to third-party petitioner Danske Bank A/S London Branch's ("Danske") motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56, with respect to the Petition filed by Danske asserting an interest in the real property known as Diamante Cabo San Lucas, Cabo San Lucas, Mexico, located at Diamante Boulevard 23473 Cabo San Lucas B.C.S. Mexico (the "DCSL Resort"), and secured interests in shares in Baja Ventures 2006, LLC, Diamante Properties, LLC, CSL Properties 2006, LLC, and KAJ Holdings, LLC (collectively, the "Equity Interests") (the DCSL Resort and Equity Interests, collectively, the "Forfeitable Property").

Significantly, if Danske succeeds on its motion for summary judgment, it will reap total windfalls in excess of $203 million, and thereby deprive third party petitioner victims of Defendants' criminal conduct of an opportunity to recoup at least some of their losses.   For the reasons further explained below, the Court should deny Danske's motion because Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3) and has not met its burden of proving that it is a bona fide purchaser for value without cause to believe the property was subject to forfeiture.   In the alternative, the Court should authorize additional discovery because the government has not been afforded the opportunity to conduct discovery in accordance with Federal Rule of Civil Procedure 56(d) and Federal Rule of Criminal Procedure 32.2(c)(1)(B).

1

Finally, should the Court determine that additional discovery is unnecessary or undesirable, the Court should grant the government's motion for summary judgment because Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3), and Danske has not met its burden of proving that it is a bona fide purchaser for value without cause to believe the property was subject to forfeiture.

## STATEMENT OF PROCEEDINGS

### A.  The Relevant Criminal Proceedings

On July 9, 2015, defendant Phillip A. Kenner, also known as "Philip A. Kenner" ("Kenner"), was convicted after a jury trial of the offenses charged in Counts One through Four, Seven and Nine of the above-captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1343, 1349, and 1956(h).   CR-13-607(S-2), Docket Entry ("DE") 324.   Also on July 9, 2015, defendant Tommy C. Constantine ("Constantine") was convicted after a jury trial of the offenses charged in Counts One through Six and Count 9 of the above-captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1343, 1349, and 1956(h).   *Id.*

The Indictment filed on October 29, 2013 included forfeiture allegations, which provided notice that, upon the conviction of Kenner or Constantine of any of the wire fraud and conspiracy to commit wire fraud offenses charged in the Indictment, the government would seek forfeiture in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 § U.S.C. 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds traceable to a violation of such offenses or a conspiracy to commit such offenses.   DE 1 at ¶ 52.   The Indictment also provided notice that, upon the conviction of Kenner or Constantine of the money laundering conspiracy offense charged in the Indictment, the government would seek forfeiture in accordance with 18 U.S.C. § 982(a)(1), which requires

2

any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.   *Id.* at ¶ 55.   In addition, the forfeiture allegations sought the forfeiture of specific assets and properties, as well as the imposition of a forfeiture money judgment.   *Id.* at ¶¶ 53, 56.   The first Superseding Indictment, filed on February 26, 2015, contained the same forfeiture allegations.   DE 172 at ¶¶ 31, 32, 34, 35.   The second Superseding Indictment, filed on April 22, 2015, contained the same forfeiture allegations.   DE 214 at ¶¶ 31, 32, 34, 35.

On April 22, 2015, the government filed a Bill of Particulars, which provided notice that the government would be seeking forfeiture of the following additional properties: a) all right, title and interest in Baja Ventures 2006, LLC, and all proceeds traceable thereto ("Baja Ventures"); and b) all right, title and interest in Diamante Properties, LLC, and all proceeds traceable thereto ("Diamante Properties").   DE 208.

On August 20, 2015, the government filed another Bill of Particulars, which again provided notice that the government would be seeking forfeiture of Baja Ventures and Diamante Properties, and also provided notice that the government would be seeking forfeiture of the following additional properties: a) all right, title and interest, directly or indirectly, in KAJ Holdings, LLC, and all proceeds traceable thereto ("KAJ Holdings"); b) all right, title and interest, directly or indirectly, in CSL Properties 2006, LLC, and all proceeds traceable thereto ("CSL Properties"); c) all right, title and interest, directly or indirectly, in Somerset, LLC, and all proceeds traceable thereto ("Somerset"); d) all right, title and interest, directly or indirectly, in the real property and premises known as Diamante Cabo San Lucas located at Boulevard Diamante s/n, Los Cangrejos, Caho San Lucas, B.C.S. Mexico 23473, and all proceeds traceable thereto (the "DCSL Resort"); and e) all right, title and interest, directly or indirectly, in real

3

property and premises located at, Mosquito Rojo, Block 17 Lot 30, Cerrada Del Mar No. 148,

Fracc. El Pedregal, Caba San Lucas, B.C.S. Mexico 23453 in the name of Phillip Kenner, and all

proceeds traceable thereto.   DE 328.

      Following the convictions of Kenner and Constantine (collectively, the "Defendants"),

the government moved for the forfeiture of specific assets and the entry of forfeiture money

judgments against the Defendants.   *See* DE 401.   After briefings were submitted in support and

in opposition to the government's forfeiture motion and oral arguments were held, the Court

determined that, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and 982(b), and 28 U.S.C.   §

2461(c), the Defendants must forfeit all right, title and interest in, *inter alia*, the following: a)

DCSL Resort; b) Baja Ventures 2006, excluding all liabilities; c) KAJ Holdings, excluding all

liabilities; d) CSL Properties, excluding all liabilities; e) Diamante Properties, excluding all

liabilities; f) Somerset, excluding all liabilities; g) the real property and premises located at 95-

4928 Hawaii Belt Road, Naalehu, Hawaii, parcel number 3-9-5-014-046, and all proceeds

traceable thereto; and h) one 1976 Falcon 10 airplane, Aircraft Serial Number: 69, Engine Type:

Garrett TFE731-2, Serial Numbers P73202, P73222 and FAA Registration Mark N530TC, and

all proceeds traceable thereto, as property, real or personal, constituting or derived from proceeds

obtained directly or indirectly as result of the Defendants' violations of 18 U.S.C. §§ 1343 and

1349; property, real or personal, involved in the Defendants' violation of 18 U.S.C. § 1956(h), or

any property traceable to such property; and/or substitute assets, pursuant to 21 U.S.C. § 853(p),

as incorporated by 18 U.S.C. § 982(b)(1).   *See* DE 819, 825, 826.   The Court also entered

forfeiture money judgments against each defendant.   *Id*.

**B.   Claim and Other Documents Submitted by Danske**

      The government submits the following statement of the claim and documents submitted

by Danske; however, most of the documents proffered by Danske have not been properly authenticated and constitute inadmissible hearsay under Federal Rules of Evidence 803, as discussed further below, and, therefore, may not be relied upon in support of Danske's motion for summary judgment.

**1. <u>Danske's Petition</u>**

On June 20, 2020, Danske filed a Verified Petition of Danske Bank A/S London Branch to Adjudicate Interest in Property Pursuant to 21 U.S.C. § 853(n) (the "Petition"). *See* Declaration of George Kostolampros in Support of Interested Party Danske Bank A/S London Branch's Motion for Summary Judgment, dated June 19, 2020 ("Kostolampros Decl."), Exhibit 3. The Petition asserts that Danske has an interest in the DCSL Resort, Baja Ventures, Diamante Properties, CSL Properties, and KAJ Holdings. *Id.* at ¶ 1. The purported basis for Danske's interest in these properties is a loan, with modifications thereto, that collectively can be broken down into two parts. First, Danske claims a $125 million loan from Lehman Brothers Holdings Inc. ("Lehman") to the DCSL Resort (the "Initial Loan"). *Id.* at pp. 4-7.[1] According to Danske, at the time Danske acquired the Initial Loan from Lehman "[i]n early 2009, the Borrower owed Lehman $107,538,327.83 in principal and $49,132,479 in unpaid accrued interest." *Id.* at p. 8. Second, there are the subsequent loans (the "Additional Loans") Danske alleges it made to the DCSL Resort under modifications to the Initial Loan agreement. *Id.* at pp. 9-12. Danske's total claim of $197.1 million consists of the combined total of the Initial Loan and Additional Loans, the associated interest, and unspecified miscellaneous fees and expenses to which Danske claims it is entitled. *Id.* at p. 3.

---

[1] Citations to page numbers refer to ECF pagination.

2.  **The Initial Loan**

According to the documents proffered by Danske, on or about March 10, 2006, Lehman

entered into a loan agreement with the DCSL Resort (the "2006 Loan Agreement"), *i.e.*, the

Initial Loan.   *See* Kostolampros Decl., Exhibit 4 at p. 2.   The "Borrower Parties" are described

as being: Kenneth A. Jowdy ("Jowdy"), as the Guarantor; Diamante Member (*i.e.*, Diamante

Cabo San Lucas, LLC); Baja Ventures; Diamante Properties; CSL Properties; and KAJ

Holdings.[2]   *Id.* at p. 8.   The 2006 Loan Agreement between Lehman and the DCSL Resort

describes, in Spanish, the property to be developed.   *Id.* at p. 67.   Danske has not proffered a

certified English translation of the property description.   *Id.*

The 2006 Loan Agreement required, in part, that the Borrower produce construction

documents, including, but not limited to, construction contracts, financial statements, permits,

plans and specifications, and a construction schedule, prior to the first distribution of the loan.

*Id.* at pp. 26-27.   The 2006 Loan Agreement also required, in part, that the Borrower produce

certain documents, including, but not limited to, an A1A form of cost certification executed by

the General Contractor, invoices, contracts, paid receipts or proof of payment, and copies of all

construction contracts for each disbursement.   *Id.* at p. 30.   A trust agreement proffered by

Danske purportedly established a Mexican trust; however, the proffered trust agreement is

written in Spanish and Danske has not proffered a certified English translation.   *See*

Kostolampros Decl., Exhibit 12.   A purported copy of registration of a 2006 Trust Agreement

with the Public Registry is written in Spanish and Danske has not proffered a certified English

translation.   *See* Kostolampros Decl., Exhibit 13.   A purported copy of a 2006 Trust Agreement

---

[2] For sake of simplicity, the government refers to the Borrower under the alleged loan agreements as being the DCSL Resort.

Notary Plus Public Registration filing is written in Spanish and Danske has not proffered a certified English translation.  *See* Kostolampros Decl., Exhibit 14.

According to Danske, it purchased the Initial Loan from Lehman for an unspecified amount of consideration on an unspecified date, pursuant to a 1999 Master Repurchase Agreement ("MRA") and 2005 committed repurchase facility agreement (collectively, the "Repo Agreements").  *See* Kostolampros Decl., Exhibit 3 at pp. 5-6.

### 3.  <u>The Relevant Lehman Bankruptcy Proceedings</u>

Lehman filed for bankruptcy protection in September 2008.  *See In Re Lehman Brothers Holdings, Inc. et. al.*, 08-13555 (Bank. S.D.N.Y.) (the "Lehman bankruptcy").   According to Danske's Petition, Lehman's filing for bankruptcy was "an event of default that allowed Danske to require immediate payment of the repurchase prices owed for all transactions completed under the Repo Agreements," and that "Danske had the option to" retain the interests it had purchased under the Repo Agreements, or "refuse to retain the interest[s] it purchased and instead demand Lehman satisfy its debt through some other form of value or payment."  *See* Kostolampros Decl., Exhibit 3 at p. 6.   Danske asserts that it decided to "retain" the Initial Loan, "along with certain other assets, as partial satisfaction of the repurchase price Lehman still owed to Danske under the Repo Agreements."  *See id.* at p. 7.   Danske further claims that, even after it elected to retain the Initial Loan as well as other loans Danske purportedly purchased under the Repo Agreements, "and credited Lehman's account, Lehman still owed Danske hundreds of millions of dollars under the Repo Agreements and a separate, but related residential mortgage repurchase agreement."  *Id.*   Thus, Danske alleges, it filed a proof of claim (Claim No. 19487) in the Lehman bankruptcy proceeding in which Danske sought to recover $699,657,333.82 as the net

aggregate amount Lehman owed to Danske.   *Id.*; *see also* Declaration of Madeline O'Connor, dated September 9, 2020 ("O'Connor Decl.") at Exhibit GX-1, Danske's Proof of Claim, *In re Lehman Brothers Holdings Inc.*, Docket No. 08-13555 (Bankr. S.D.N.Y.), Claim No. 19487.

In the course of settlement discussions between Lehman and Danske in the Lehman bankruptcy proceedings, a value was assigned to the Initial Loan so as to determine the amount Lehman purportedly owed Danske and to calculate a deficiency judgment.   *See* O'Connor Decl. at Exhibit GX-2, Declaration of Daniel Ehrmann in Support of Debtors' Motion, 08-13555 (Bankr. S.D.N.Y.), DE 21409.   A document proffered by Danske appears to state that Lehman valued the "Cabo San Lucas Land Whole Loan," presumably the Initial Loan, at $58,490,000, whereas Danske valued it at $33,700,000.   *See* O'Connor Decl. at Exhibit GX-3, Lehman and Danske 9/23/08 Loan Value Comparisons, produced by Danske on August 6, 2020, DANSKE_17822.   Danske allegedly settled with Lehman in the Lehman bankruptcy proceedings by, *inter alia*, assigning a total value of $248,191,560 to 11 commercial loans, including the Initial Loan.   *See* Motion for Summary Judgment in Support of Verified Petition of Danske Bank A/S London Branch to Adjudicate Interest in Property Pursuant to 21 U.S.C. 853(n) ("Danske Mem.") at p. 8.   Danske does not allege the value that was specifically assigned to the Initial Loan in the settlement.   The settlement, which was approved by the Lehman bankruptcy court, also "set Danske's deficiency claim amount as $580 million."   *Id.* Danske then "unconditionally and irrevocably" sold, transferred and assigned" its deficiency judgment to Goldman Sachs "for value received."   *See* O'Connor Decl. at Exhibit GX-4, Danske's settlement with Goldman Sachs; *In re Lehman Brothers Holdings Inc.*, 08-13555 (Bankr. S.D.N.Y.), DE 23002 and 31123.

8

4.  **Certain Proffered Additional Loan Agreements**

According to Danske, in or about March 2009, the DCSL Resort and Danske entered into an Amended and Restated Loan Agreement (the "2009 Amended and Restated Loan Agreement").   *See* Kostolampros Decl., Exhibit 40.   A purported copy of the 2009 Amended and Restated Loan Agreement proffered by Danske appears to be signed by David Daniels, as a representative of Danske.   *Id*. at p. 69.   The 2009 Amended and Restated Loan Agreement defined the "Kenner Parties" as Baja Ventures and CSL Properties.   *Id*. at p. 14.   In the 2009 Amended and Restated Loan Agreement, Jowdy represented that he believed "there is a possibility that the Kenner parties could be joined into the litigation" described as *Little Isle IV, LLC v. Kenneth A. Jowdy*, CV-09-142 (Dist. Ct. Az.).   *Id*. at pp. 20, 90.   On or about April 26. 2013, Danske and the DCSL Resort purportedly entered into a Second Amended and Restated Loan Agreement.   *See* Kostolampros Decl., Exhibit 51.   A purported copy of the Second Amended and Restated Loan Agreement proffered by Danske defined "Investor Parties" as Baja Ventures 2006, LLC and CSL Properties 2006, LLC.   *See id.* at p. 20.   In the Second Amended and Restated Loan Agreement, Jowdy represented that he believed "there is a possibility that the Investor Parties could be joined into the litigation described in Exhibit 3.1 (b)."   *Id*. at p.32. However, Exhibit 3.1 (b) is not attached to the Second Amended and Restated Loan Agreement. *Id*.   The Second Amended and Restated Loan Agreement appears to be signed by David Daniels and Peter Hughes, as representatives of Danske.   *Id*. at p. 62.

## STATUTORY FRAMEWORK AND AUTHORITIES

A.  **Third Party Claims**

Title 21, United States Code, Section 853 sets forth the exclusive remedy for asserting and adjudicating third party claims to property forfeited in a federal criminal case.   *See, e.g.,*

*United States v. DSI Associates LLC*, 496 F.3d 175, 183 (2d Cir. 2007) ("[S]ection 853(n)

provides the exclusive means by which a third party may lay claim to forfeited assets—after the

preliminary forfeiture order has been entered").   When a third party files a petition asserting an

interest in specific property that has been ordered forfeited, "the court must conduct an ancillary

proceeding." Fed. R. Crim. P. 32.2(c)(1).

 The ancillary proceeding closely resembles a civil action and, as such, is generally

governed by the same procedures as those set forth in the Federal Rules of Civil Procedure.   *See,*

*e.g.*, *Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004) (commenting that civil

procedures aid efficient resolution of claims in ancillary proceeding).   In this regard, the Court

may entertain motions to dismiss a petition "for lack of standing, for failure to state a claim, or

for any other lawful reason."   Fed. R. Crim. P. 32.2(c)(1)(A).   In the event that a claim survives

a motion to dismiss and, after the conclusion of a period of time for the parties to conduct any

discovery that "is necessary or desirable to resolve factual issues, . . . a party may move for

summary judgment" pursuant to Rule 56 of the Federal Rules of Civil Procedure.   Fed. R. Crim.

P. 32.2(c)(1)(B).

 As a threshold matter, a petitioner bears the bears the burden of demonstrating standing

by establishing a "legal interest" in a particular asset identified in an order of forfeiture, within

the meaning of 21 U.S.C. § 853(n)(2).   *See United States v. Watts*, 786 F.3d 152, 160 (2d Cir.

2015) (stating that in order to advance a claim in an ancillary proceeding, a third-party petitioner

must first establish a "legal interest" in a particular asset identified in the order of forfeiture,

within the meaning of 21 U.S.C. § 853(n)(2)); *United States v. Timley,* 507 F.3d 1125, 1129 (8th

Cir. 2009) ("[U]nder both § 853 and Rule 32.2, 'a party seeking to challenge the government's

forfeiture of money or property used in violation of federal law must first demonstrate [a legal]

10

interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture.' " (citation omitted)).

In determining the nature of a petitioner's legal interest in property, the court must look to law of the jurisdiction that created the property right.   *See Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 242 (2d Cir. 2011) ("State law determines a petitioner's legal interest in the property at issue."); *United States v. Butler*, 543 F. App'x 95, 96-97 (2d Cir. 2013) (summary order) (because spouse has no interest in bank account held in other spouse's name under New York law, defendant's wife could not contest forfeiture of defendant's bank account, even though it contained some funds traceable to her legitimate income).   Here, New York law would govern any interest that may have been created by the loan agreements.   *See* Danske Mem. at p. 9.

In addition, a petitioner must meet the detailed pleading requirements set forth in 21 U.S.C. § 853(n)(3):

> The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

*See United States v. Preston*, 123 F. Supp. 3d 117, 125 (D.D.C. 2015) (dismissing petition and holding that "[e]ven if the [p]etition could be construed as asserting a legal interest in the [property] sufficient to establish statutory standing, it . . . fail[ed] to satisfy the more detailed pleading requirements of Section 853(n)(3)").

All grounds for recovery must be set forth within the petition, and a petitioner may not later amend the petition to assert additional grounds for relief.   *See, e.g.*, *United States v.*

*Soreide*, 461 F.3d 1351, 1355 (11th Cir. 2006) (holding that claims not asserted in petition were statutorily time-barred); *United States v. Strube*, 58 F. Supp. 2d 576, 585 (M.D. Pa. 1999) (rejecting third-party claims as untimely because they were not raised in petition but first asserted in response to government's motion to dismiss).   A petition, therefore, will succeed or fail in its original and unamended form.

Only after a petitioner makes a threshold showing of standing under Section 853(n)(2) by establishing a legal interest in the forfeitable property, and complies with 21 U.S.C. § 853(n)(3)'s pleading requirements, may a court reach the merits of its claim.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("[T]he doors of discovery" do not unlock for those "armed with nothing more than conclusions"); *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory"); *United States v. Sigillito*, 938 F. Supp. 2d 877, 885 (E.D. Mo. 2013) ("If the petitioner complies with the 21 U.S.C. § 853(n)(3) pleading requirements and has . . . standing, then the court considers the merits of the petitioner's claim.").   When the court does reach the merits of the claim, the court must determine whether the petitioner has met its burden of proving its legal interest qualifies as a Section 853(n)(6) superior legal interest – *i.e.*, a legal interest superior to that of the government at the time of the acts giving rise to the forfeiture.   *Pacheco*, 393 F.3d at 351; *Timley*, 507 F.3d at 1130, n.2 (distinguishing between "legal interest" required for petitioner to establish standing under Section 853(n)(2), and "superior legal interest" required for petitioner to ultimately prevail on merits under Section 853(n)(6)).   The petitioner bears the burden of proving that it has a superior legal interest under Section 853(n)(6).   *Pacheco*, 393 F.3d at 351; *United States v. Nava,* 404 F.3d 1119, 1125 (9th Cir. 2005) ("[T]he petitioner bears the burden of proving his right, title, or interest under Section

853(n)(6).").

A petitioner may prove a superior interest in one of two ways.   First, the petitioner can demonstrate under Section 853(n)(6)(A) that it had priority of ownership over the forfeited property at the time of the offense.   *United States v. Ribadeniera*, 105 F.3d 833, 835 (2d Cir. 1997).   Danske does not seek to prove a superior interest under Section 853(n)(6)(A).   Second, the petitioner can demonstrate under Section 853(n)(6)(B) that it subsequently acquired the property as a bona fide purchaser for value without cause to believe the property was subject to forfeiture.   *Id.*   Under the relation back doctrine, the government's exclusive interest in forfeited property "vests in the United States upon the commission of the act giving rise to forfeiture . . . ."   21 U.S.C. § 853(c); *Nava*, 404 F.3d at 1124 ("The title to the forfeited property vests in the United States at the time the defendant commits the unlawful acts . . . .").

Thus, a defense to forfeiture under Section 853(n)(6)(B) has three elements.   A petitioner bears the burden of proving that (1) it "has a legal interest in the forfeited property"; (2) "the interest was acquired as a bona fide purchaser for value"; and (3) "the interest was acquired at a time when the claimant was reasonably without cause to believe that the property was subject to forfeiture."[3]   *Timley*, 507 F.3d at 1130–31; *United States v. Lazarenko*, 575 F. Supp. 2d 1139, 1151 (N.D. Cal. 2008) (three elements of a claim under § 853(n)(6)(B) are legal interest, acquired as a bona fide purchaser for value, at a time when petitioner was without reason to know the property was subject to forfeiture), *rev'd on other grounds sub nom. United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139 (9th Cir. 2011); *United States v. Soreide*, 2005 WL 8137780, at *6 (S.D. Fla. Mar. 23, 2005) (three elements of the defense are

---

[3] For purposes of this Memorandum of Law, the government uses the terms claimant and petitioner interchangeably.

separate and conjunctive).

The Court does not reach the bona fide purchaser element if the petitioner does not first establish a legal right, title, or interest in the forfeitable property. *United States v. Madoff*, 2012 WL 1142292, at *5 (S.D.N.Y. Apr. 3, 2012) (legal interest element of § 853(n)(6)(B) is the same as the legal interest required to establish standing under § 853(n)(2); attorney who never perfected an attorney's lien under state law lacked standing and likewise cannot satisfy the first element of § 853(n)(6)(B)); *United States v. O'Brien*, 181 F.3d 105, 1999 WL 357755, at *2 (6th Cir. 1999) (table) (because claimant had no legal interest in the property as a matter of state law, court need not reach bona fide purchaser claim). Further, the Court does not reach the "cause to believe" element if the petitioner does not establish that it was a bona fide purchaser for value. *United States v. Allmendinger*, 2012 WL 966615, at *2 (E.D. Va. Mar. 21, 2012) ("If the claimant is a not a bona fide purchaser for value, it is unnecessary to decide whether the claimant was 'reasonably without cause to believe that the property was subject to forfeiture' ").

State law determines whether a petitioner is a bona fide purchaser. *See Pacheco*, 393 F.3d at 353 (meaning of "bona fide purchaser" is determined by reference to state law); *United States v. Mendez*, 2008 WL 3874318, *5 (E.D.N.Y. Aug. 19, 2008) (it is a question of state law whether the seller of real property is a bona fide purchaser for value of a reservation deposit that is held in escrow pending closing).

As discussed above, a petitioner asserting a claim under Section 853(n)(6)(B) must also prove that it was reasonably without cause to believe that the property was subject to forfeiture. *United States v. Petters*, 857 F. Supp. 2d 841, 847–48 (D. Minn. 2012) (stating that whether the claimant was a purchaser for value does not end the inquiry; claimant must still show that despite media attention to the investigation of defendant, it did not have reason to know defendant's

14

property was subject to forfeiture when it acquired its liens).

A petitioner who was aware of the defendant's criminal conduct in connection with the property cannot be a bona fide purchaser for value.   *United States v. Parenteau*, 647 F. App'x 601, 604-05 (6th Cir. 2016) (affirming dismissal of defendant's son's § 853(n) petition because at the time petitioner obtained assignment of interest in forfeited property, he was not reasonably without cause to believe that the property may be subject to forfeiture); *United States v. Simmons*, 2019 WL 4412443, at *2 (S.D.N.Y. Sept. 16, 2019) (holding that where claimant obtained purported interest in real property after husband was arrested in connection with fraud scheme that was ongoing when they purchased the property, claimant could not have a reasonable belief that the property was not subject to forfeiture at time she obtained her claimed interest); *United States v. Weidner*, 2004 WL 432251, at *7 (D. Kan. Mar. 4, 2004) (person who loans money and takes lien on forfeitable property, suspecting that there is something illegal going on, is not "reasonably without notice"; third party must be engaged in an arm's-length transaction); *United States v. McCorkle*, 143 F. Supp. 2d 1311, 1328–31 (M.D. Fla. 2001) (holding that bank that performed a due diligence inquiry of its customer, knew that the customer was under investigation by law enforcement, and knew that customer's account at the bank had been seized, yet continued to do business with the customer and acquire an interest in the customer's property, was not "without cause to believe" that the property was subject to forfeiture).

Significantly, media reports regarding the defendant's wrongdoing that link the wrongdoing to the forfeitable property have been held to put the third party on notice that the property is forfeitable.   *United States v. BCCI Holdings (Luxembourg), S.A. (In re Am. Express Bank)*, 961 F. Supp. 287, 296 (D.D.C. 1997) (holding that due to the press coverage of

15

defendant's misconduct, claimant knew or should have known that defendant's assets were subject to forfeiture).

Courts have held that a petitioner has an affirmative duty to conduct a reasonable inquiry into the forfeitability of the property. *See United States v. Coffman (In re Anderson)*, 2012 WL 5611510, at *2 (E.D. Ky. Nov. 15, 2012) (denying claimant's motion for summary judgment due to a dispute as to whether she conducted a reasonable inquiry to determine if the property she purchased was subject to forfeiture); *United States v. Armstrong*, 2007 WL 7335173, at *7 (E.D. La. June 1, 2007) ("[Claimant] had a duty to conduct a reasonable inquiry into the facts and circumstances in the case before it attempted to acquire an interest in the forfeitable property"); *see also FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1144–45 (9th Cir. 2010) (holding that defense attorney must undertake an "objectively reasonable and diligent inquiry" into the source of his fee; an attorney who remains "willfully ignorant of how his fees are paid," or who "simply take[s] his client at his word that the fees [a]re not tainted," cannot be a bona fide purchaser (citation and internal quotation marks omitted)).   Furthermore, if a petitioner avoids conducting a reasonable inquiry, he is chargeable with the knowledge which ordinary diligence would have elicited and cannot be considered a bona fide purchaser. *United States v. Orozco-Prada*, 636 F. Supp. 1537, 1544 (S.D.N.Y. 1986), *aff'd*, 847 F.2d 836 (2d Cir. 1988).

A petitioner that is willfully blind cannot satisfy the "without cause to believe" requirement; the petitioner's belief must be objectively reasonable. *United States v. Coffman (In re Dacorta, LLC)*, 612 F. App'x 278, 287 (6th Cir. 2015) (LLC was not a bona fide purchaser of yacht after it failed to demonstrate "it was reasonably without cause to believe that [the] money was not . . . proceeds of [defendant's] fraud"; defendant's wife was the sole proprietor of the LLC, and was aware of the "red flags" concerning defendant's finances around the time of

16

purchase); *United States v. Frykholm*, 362 F.3d 413, 416 (7th Cir. 2004) (a claimant who remains willfully blind cannot claim to have been without reason to know that defendant's property was subject to forfeiture; third party claimant that acquired a security interest in defendant's property worth "200% of the amount [the claimant] invested (making a tidy profit from [the defendant's] scam), while the other victims' recovery [would] fall)" was on notice—or was willfully blind to the fact—that the property represented funds obtained from the fraud scheme); *BCCI Holdings (In re Am. Express Bank)*, 961 F. Supp. at 295-96 (given extensive media coverage of defendant's misconduct, claimant bank knew or should have known that defendant's assets were subject to forfeiture; standard is objective reasonableness); *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 475 (E.D. Va. 1994) (a claim that a third party was without cause to believe property was subject to forfeiture must be "objectively reasonable"; the issue in an ancillary proceeding is not whether the claimant believed that the government would institute a forfeiture action, or knew that it had done so, but whether the claimant knew that the property was "subject to forfeiture"), *aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 666 (4th Cir. 1996) (affirming district court's finding that the claimant law firm had reason to know that the fee it received was subject to forfeiture); *Coffman (In re Anderson)*, 2012 WL 5611510, at *2 ("[O]ne who is willfully blind cannot satisfy the "without cause to believe" requirement of 21 U.S.C. § 853(n)(6)(B).").

## B. Discovery Regarding Third Party Claims

Federal Rule of Criminal Procedure 32.2 specifically contemplates the need for discovery to resolve third party claims in ancillary forfeiture proceedings, and provides that the Court may permit the parties to conduct discovery "if the court determines that discovery is necessary or desirable to resolve factual issues."   Fed. R. Crim. P. 32.2(c)(1)(B).   Under this lenient,

17

discretionary standard, district courts have repeatedly authorized discovery in forfeiture proceedings. *See, e.g.*, *United States v. BCCI Holdings (Luxembourg), S.A. (In re DPA)*, 1993 WL 760232, at *1 (D.D.C. Dec. 8, 1993) (agreeing with the government that the court has the inherent authority to permit discovery in an ancillary forfeiture proceeding under 18 U.S.C. § 1963(k)); *United States v. Kokko*, 2007 WL 2209260, at *6 (S.D. Fla. July 3, 2007) (granting government's motion for discovery under Fed. R. Crim. P. 32.2(c)(1)(B)). As the court stated in *BCCI Holdings (In re DPA)*, "Congress could not have intended for discovery to be permissible to determine the location or identity of an asset but not to determine the owner of that same asset." *BCCI Holdings (In re DPA)*, 1993 WL 760232, at *2. Additionally, as the court observed in *United States v. Porcelli*, 1992 WL 355584, at *2 (E.D.N.Y. Nov. 5, 1992), "[a]t [a] section 1963(l) [forfeiture] hearing, petitioners must establish the superiority of their interest in the forfeited property. Discovery will often be a necessary part of such hearing." In order to sort out competing interests to forfeitable property, the government may conduct discovery that "is necessary or desirable to resolve factual issues" under Federal Rule of Criminal Procedure 32.2(c)(1)(B). *BCCI Holdings (In re DPA)*, 1993 WL 760232, at *4 (holding that the government may take discovery from the claimant); *United States v. Vithidkul*, 2014 WL 1515130, at *3 (D. Md. Apr. 16, 2014) (authorizing government to conduct discovery regarding, among other things, "source of funds" used to purchase the forfeitable property, "basis of [claimant's] ownership" of forfeitable property, and "clarification of [a] claim" that lacked adequate supporting documentation); *United States v. Hailey*, 924 F. Supp. 2d 648, 659 (D. Md. 2013) ("Here it appears that there are factual issues to be resolved regarding the source of funds to Mrs. Hailey and the provenance of the Disney artwork. It is desirable that evidence on these issues be disclosed via discovery before a hearing.").

18

Because discovery is necessary for the government to litigate the merits of a forfeiture claim, courts have held that a petitioner's failure to respond to discovery requests can result in dismissal of its claim.   *United States v. Reyes*, 307 F.3d 451, 457–58 (6th Cir. 2002) (holding that under Rule 37, district court has authority to dismiss third party's claim for failure to comply with discovery without first issuing an order compelling compliance and without considering other sanctions; failure to provide requested documents prejudices government by preventing it from conducting depositions and other discovery); *United States v. Von Nothaus*, 2016 WL 4180967, at *2 (W.D.N.C. Aug. 4, 2016) (holding that the petitioner's refusal to answer interrogatories and to provide any documentation confirming his alleged purchase of coinage warranted dismissal of his petition under Fed. R. Civ. P. 37(b)); *United States v. Murray*, 2015 WL 404779, at *2 (S.D. Ga. Jan. 29, 2015) (dismissing claim filed by pro se claimant in ancillary proceeding as a sanction for his repeated failure to respond to discovery requests, "which severely hinder[ed] the Government's ability to address his claim on the merits"); *United States v. Hopkins*, 2009 WL 9054954, at *2 (D.S.C. Sept. 4, 2009) (noting that the court previously dismissed a third party claim as a sanction for the claimant's failure to respond to the government's discovery requests); *United States v. BCCI Holdings (Luxembourg), S.A. (In re BCP)*, 169 F.R.D. 220, 223-24 (D.D.C. 1996) (dismissing third party claim for failure to comply with government's discovery requests; "Because the failure to produce discovery blocks the United States' ability to litigate the merits of [the claim], a less severe sanction would not be effective.").

### C.  <u>Summary Judgment</u>

"Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Jaffer v. Hirji*, 887 F.3d

19

111, 114 (2d Cir. 2018) (citation and internal quotation marks omitted).   The party moving for summary judgment "bears the initial burden of showing that there is no genuine dispute as to a material fact."   *Id.* (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citations and internal quotation marks omitted).   "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried."   *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

However, summary judgment is appropriate only "after adequate time for discovery." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   "Only in the rarest of cases may summary judgment be granted against a party who has not been afforded the opportunity to conduct discovery."   *Assoc. of Car Wash Owners Inc. v. N.Y.C.*, 911 F.3d 74, 83 (2d Cir. 2018) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)) (internal quotation marks omitted).   "This is because the nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Id.* (citations and internal quotation marks omitted).   Accordingly, Federal Rule of Civil Procedure 56(d) -- formerly Rule 56(f) -- provides that in adjudicating a motion for summary judgment, a "court may: (1) defer considering [a] motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order" if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]"   Fed. R. Civ. P. 56(d).

20

Thus, in *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995), the Second Circuit held that the district court erred in failing to allow the non-moving party an opportunity to take discovery prior to ruling on a summary judgment motion, as the non-moving party did not have sufficient time to "digest" the discovery provided by the moving party, "much less to take depositions."

## ARGUMENT

Danske's motion for summary judgment must be denied for three separate reasons: first, Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3); second, Danske has not met its burden of proving its claim under 21 U.S.C. § 853(n)(6)(B) that it is a bona fide purchaser for value without cause to believe the Forfeitable Property was subject to forfeiture; and, third, the government has not been afforded adequate time to engage in discovery to test the merits of Danske's claim.   However, should the Court determine that additional discovery is unnecessary or undesirable, then the government's motion for summary judgment must be granted because: 1) Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3); and 2) Danske has not met its burden of proving its claim under 21 U.S.C. § 853(n)(6)(B) that it is a bona fide purchaser for value without cause to believe the Forfeitable Property was subject to forfeiture.

**I.**     **Several Exhibits Proffered by Danske are Inadmissible Hearsay and Should Not Be Considered by the Court in Support of Danske's Motion for Summary Judgment**

"The principles governing admissibility of evidence do not change on a motion for summary judgment."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).   A number of exhibits proffered by Danske are inadmissible hearsay and should not be considered by the Court in support of Danske's motion for summary judgment.   Danske relies on its own purported

21

business records and the purported business records of Trimont Real Estate Advisors ("Trimont") to establish the amount of monies that were allegedly loaned by Lehman and Danske to the DCSL Resort.[4]   However, both sets of purported business records are inadmissible hearsay because Danske failed to submit declarations or affidavits from custodians of records for Trimont and Danske in order to establish that the records are business records of each entity.   *Elghourab v. Vista JFK, LLC*, 2018 WL 6182491, at *1 (E.D.N.Y. Nov. 27, 2018) ("Under the business-records exception to the hearsay rule, business records are admissible if a custodian or another qualified witness testifies that the records were kept in the course of a regularly conducted business activity and that it was the regular practice of that business to keep such records.   At the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial." (internal citations and quotation marks omitted)); *Ravenell v. Avis Budget Grp., Inc.*, 2014 WL 1330914, *2 (E.D.N.Y. March 31, 2014) ("Thus, a movant who relies on business records must introduce those records in a manner, typically through a custodian's affidavit, that identifies them and establishes that they are admissible under Federal Rule of Evidence 803(6)."); *Singh v. Bay Crane Servs., Inc.*, 2013 WL 5655931, *2 n.4 (E.D.N.Y. October 11, 2013) ("While the [documents] certainly appear to be admissible business records, they are not self-authenticating, and the declaration of [plaintiff's] attorney does not provide the Court with all the information necessary to establish their admissibility under Federal Rule of Evidence 803.").

---

[4] Although not relied upon or provided as part of Danske's motion for summary judgment, Danske produced, *inter alia*, records from the DCSL Resort in purported support of its claim.   However, these records are also inadmissible for the reasons stated herein.

The purported Trimont business records and purported Danske business records are thus inadmissible and should not be considered by the Court.[5]   Accordingly, in the absence of admissible records, Danske has not proven its claim and its Petition should be dismissed.

Further, some of the unauthenticated documents are in Spanish and lack certified English translations to support Danske's claim that Lehman was the first place beneficiary of a trust that "held the [DCSL] Resort Property for Lehman's benefit," and, that when Danske assumed the loan, it acquired Lehman's beneficiary rights under the trust.   *See* Danske Mem., at p. 9-10, 12; Kostolampros Decl., Exhibit 12.   However, "[i]t is a well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation."   *Heredia v. Americare, Inc.*, 2020 WL 3961618, *5 (S.D.N.Y. July 13, 2020) (citation and internal quotation marks omitted).   Accordingly, any document for which Danske failed to submit a certified English translations is inadmissible and cannot be relied upon in support of Danske's motion for summary judgment.

Among the unauthenticated documents is a purported trust agreement, which is entirely in Spanish.   *See* Kostolampros Decl., Exhibit 12, Part 1.   An uncertified English translation of the trust agreement submitted by Danske contains disclaimers which provide, among other things, that it is a "DRAFT SUBJECT TO REVIEW FOR DISCUSSION PURPOSES ONLY" and that "[t]he [b]ackground translation is a summary of the actual Spanish document and is not a complete translation."   *See* Kostolampros Decl., Part 2, at p. 3 & n.1.   Additional deficiencies in the English translation, include, for example, footnotes inserted by the translator which state,

---

[5] Notably, as discussed in the Affidavit of Kellie Fedkenheuer, CPA/CFF/CFE, Cotton & Company LLP, dated September 9, 2020 (the "Fedkenheuer Aff."), at ¶¶ 9-18, the proffered Trimont and Danske loan statement records contain inconsistencies, which casts additional doubt on the reliability, and, thus, admissibility, of those records.

23

*inter alia*, "This section was not translated because it does not contain any rights or obligations," Kostolampros Decl., Exhibit 12, Part 2, at p. 52 n.2, and "The exhibits were provided by JPMCB.   They basically identify and name the representative for each of the parties. Let me know if you need a translation."   *Id.* at p. 54 n.4.[6]

Next, Danske relies on another unauthenticated purported business document, an "Amendment and Restatement Agreement to the Irrevocable Guaranty Trust Agreement," to establish its claim that it became the first place beneficiary under the trust.   *See* Kostolampros Decl., Exhibit 60.   This document is also in Spanish with an English translation that contains the disclaimer, "TRANSLATION FOR INFORMATION PURPOSES, JNN DRAFT."   *Id.* at p. 2. Even assuming *arguendo* that the Court could consider this document, the English translation does not define the two most salient provisions of a trust agreement.   The English translation specifically omits: 1) the "description of the properties to be contributed to the trust"; and 2) the "description of the rights contributed to the trust."   *Id.* at p. 4.   Without authentication of the translations, which are, at best, incomplete, the trust documents (Kostolampros Decl., Exhibits 12 and 60) are not admissible in support of Danske's summary judgment motion.   *See M & Z Trading Corp. v. Hecny Grp.*, 41 F. App'x 141, 143 (9th Cir 2002) ("Rule 901 of the Federal Rules of Evidence requires all evidence to be authenticated prior to admission. Fed. R. Ev. 901. Without providing any affidavits or testimony regarding the competency of the translators for the translations it submitted, M&Z failed to satisfy the accuracy and reliability requirements of Rule 901.").[7]

---

[6] Indeed, it appears that instead of translating the entire document, the translator, whom neither Danske nor the document identifies, unilaterally decided the relevance of certain sections of the document.

[7] In addition, Danske did not provide any translation for Exhibits 13 and 14, which are entirely in Spanish.

24

## II.     **Danske Has Failed to Satisfy the Pleading Requirements of 21 U.S.C. § 853(n)(3)**

Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3).

Pursuant to Section 853(n)(3), Danske's petition must "set forth the nature and extent" of its

interest in the Forfeitable Property, the "time and circumstances" of its acquisition of its interest

in the Forfeitable Property, and any "additional facts" that support its claim.   "Federal courts

require strict compliance with the pleading requirements of § 853(n)(3), primarily because there

is a substantial danger of false claims in forfeiture proceedings."   *United States v. Burge*, 829 F.

Supp. 2d 664, 667 (C.D. Ill. 2011).

Here, Danske's Petition fails to set forth the time and circumstances of its alleged

acquisition of its interest in the Forfeitable Property.   Specifically, Danske has failed to allege

exactly when, how, and for how much value, it acquired its interest in the Initial Loan from

Lehman.   Instead, Danske alleges, in a conclusory fashion, that it purchased the Initial Loan

from Lehman pursuant to the Repo Agreements, both of which predate the existence of the Initial

Loan, and, thus do not -- and, indeed, could not have -- specifically addressed the details of the

acquisition of the Initial Loan, much less the Additional Loans.   *See* Kostolampros Decl.,

Exhibit 3 at pp. 5-6.   Simply put, the Repo Agreements, upon which Danske relies, contain no

information about the Initial Loan or the Additional Loans.   *See* Kostolampros Decl., Exhibits

26, 27.   Further, Danske conclusorily alleges that it settled with Lehman with regard to a pool of

commercial loans, including the Initial Loan, in the Lehman bankruptcy proceedings, but does

not specify the value that was attributed to the Initial Loan in the settlement.   *See* Kostolampros

Decl., Exhibit 3 at pp. 7-8.   Thus, by failing to allege the specific details of its supposed

---

Accordingly, these exhibits are not admissible and should not be considered by the court.  *See* Kostolampros Decl., Exhibits 13, 14.

purchase of the Initial Loan from Lehman, Danske has failed to satisfy the stringent pleading

requirements of Section 853(n)(3).   *See United States v. Swartz*, 391 F. Supp. 3d 199, 213

(N.D.N.Y. 2019) (dismissing petition that "merely set[] forth two occasions on which another

entity . . . issued promissory notes to the petitioner" for "fail[ing] to set forth the 'time and

circumstances' of [the petitioner's] 'acquisition of the right, title or interest' in the [claimed

property]"); *Preston*, 123 F. Supp. 3d at 125-26 (holding that the petition failed to set forth the

"time and circumstances" of the petitioner's acquisition of an interest in securities that were

allegedly transferred to a trust because the petition did not allege the date of the transfer of the

securities to the trust nor did the petition attach a record of the transfer that would provide details

of time and circumstances of the transfer).

Because Danske has not adequately pled the time and circumstances of the acquisition of

its claimed interest in the Initial Loan, its entire claim must be dismissed, including any claim to

the Additional Loans.[8]   Indeed, all of the funds Danske claims in its Petition were purportedly

loaned under the Initial Loan agreement, or a modification thereto (*i.e.*, the Additional Loans).

*See, e.g.*, Kostolampros Decl., Exhibit 3 at p. 8.   In fact, Danske acknowledges that the

Additional Loans were not funds loaned under new loan agreements, but rather were additional

funds loaned under modifications or amendments to the Initial Loan agreement.   *See* Danske

Mem. at p. 19 ("Danske advanced additional funding in 2010, 2013, and 2014. . . . In each

instance, the additional funding was secured by Danske's *existing* perfected senior interests in

the Resort Property and Equity Interests.   Unless it is expressly altered or removed, a security

---

[8] Because Danske's claimed interest in the Forfeitable Property, including the Equity Interests, stems from its alleged acquisition of the Initial Loan, all arguments regarding Danske's failure to meet its burden of proof as to the Initial Loan and Additional Loans are intended to address Danske's failure to meet its burden with respect to all of the Forfeitable Property it claims.

interest remains intact after an agreement is amended."). Thus, Danske's failure to adequately plead the time and circumstances of the acquisition of its interest in the Initial Loan must result in the dismissal of its entire claim. *Sigillito*, 938 F. Supp. 2d at 885 (stating that the court does not reach the merits of a petitioner's claim unless the petitioner has complied with Section 853(n)(3)'s pleading requirements). Accordingly, the government's motion for summary judgment must be granted and Danske's motion for summary judgment denied.

### III. Danske Has Not Met Its Burden of Proving that it is a Bona Fide Purchaser for Value

Even assuming *arguendo* that Danske has sufficiently pleaded an interest in the Forfeitable Property, Danske's Petition should be dismissed for failure to provide proof of such an interest. Danske's attempt to reap a windfall in this ancillary proceeding, with nothing more than conclusory and unsupported assertions that it is a bona fide purchaser for value, must fail. Danske has the burden of substantiating that it is a bona fide purchaser for value, but it has utterly failed to do so. In order to succeed on its claim under Section 853(n)(6)(B), Danske has the burden of proving the following three elements: 1) that it has a valid legal interest; 2) that it was a bona fide purchaser for value of its interest; and 3) that it was reasonably without cause to believe that the Forfeitable Property was subject to forfeiture. *Timley*, 507 F.3d at 1130–31. However, for the reasons discussed below, Danske has failed to meet its burden as to all three elements. Accordingly, the government's motion for summary judgment must be granted and Danske's motion for summary judgment must be denied and its Petition stricken.

### A. Danske Has Failed to Meet its Burden of Proving that it Has a Valid Legal Interest in the Forfeitable Property

Danske has failed to prove the first element of its claim under Section 853(n)(6)(B) --

27

that it has a valid legal interest -- because it has failed to produce evidence of when and how it acquired a valid legal interest in the Initial Loan from Lehman.   As discussed above, Danske alleges, in a conclusory fashion, that it purchased the Initial Loan from Lehman pursuant to the Repo Agreements.   However, these two unauthenticated documents (*i.e.*, the 1999 MRA and the 2005 committed repurchase facility agreement), relied upon by Danske to establish its claim, predate the existence of the 2006 Initial Loan, and do not -- and, indeed, could not -- specifically address the details of a purchase of the Initial Loan.   *See* Kostolampros Decl., Exhibit 3 at pp. 5-6.   In fact, Danske vaguely acknowledges that the Repo Agreements only "*contemplated* that Danske and Lehman would engage in multiple [unidentified] repurchase transactions" at some point in the future.   Danske Mem. at p. 4 (emphasis added).

Noticeably lacking from Danske's petition are any factual allegations or documents to demonstrate that Danske purchased the Initial Loan from Lehman on a particular day, for a specified amount of consideration.   Instead, Danske vaguely asserts, without reference to any documents, and without reasonable proof of same regarding its so-called acquisition, the following: "Danske acquired its perfected secured senior interests in the Resort Property and Equity Interests *no later than* January 2009"; "*By September 12, 2008*, Lehman's perfected senior lien against the Resort Property was among the assets held in Danske's account at LaSalle"; and, ". . . , indeed, the MRA contemplated that Danske, as buyer, *would provide value* for its interests," Danske Mem. at pp. 17, 18, 21 (emphases added).   The lack of specific material factual allegations and supporting documents is particularly noteworthy given that Danske is a multinational financial institution that held itself out as engaging in sophisticated financial transactions.

Moreover, the unauthenticated MRA expressly provides that "a written confirmation of each Transaction" would be entered into by Lehman and Danske, which would "set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date . . . ., (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with [the] Agreement."   *See* Kostolampros Dec. Ex. 26 at p. 4. Additionally, the unauthenticated custody agreement between Lehman, Danske and the trustee explicitly references a "Seller's Repurchase Transaction Data File" that would "contain[], among other things, for each Repurchase Transaction: (i) the Purchase Date and Purchase Price; (ii) the Repurchase Date; (iii) the identity of the Buyer; and (iv) instructions to Master Custodian ...." *See* Kostolampros Dec. at Ex. 30, at p. 15.   Thus, the specific details of Danske's purported purchase of the Initial Loan from Lehman should have been memorialized in these documents, yet Danske has failed to produce these or any comparable documents.[9]   *See United States v. McHan*, 345 F.3d 262, 277-78 (4th Cir. 2003) (affirming lower court's finding that the petitioners were not bona fide purchasers for value and reasoning, *inter alia*, that the petitioners' disclosure during discovery of only one of the three parts of the agreement that formed the basis for the petitioners' claimed acquisition, and late disclosure of the other two parts of the agreement, was "suspicious and convenient").

---

[9] Much like Danske's Petition, Danske's Rule 56.1 Statement contains a glaring gap in its statement of undisputed facts.   Sections IV through VI of Danske's Rule 56.1 Statement assert purported facts regarding Lehman's establishment of a loan and security interests; Section VII asserts purported facts regarding Danske and Lehman's repurchase agreements; and then VIII skips to addressing purported facts regarding Lehman's default and the Lehman bankruptcy.   Conspicuously missing between Section VII and VIII are any asserted "undisputed" facts regarding Danske's purchase of the Initial Loan from Lehman.   *See* Danske Bank A/S London Branch's Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, DE 870-1 ("Danske Revised Rule 56.1") at pp. 3-17.

Danske also conclusorily contends that it settled with Lehman with regard to a pool of commercial loans, including the Initial Loan, for an unspecified value in the Lehman bankruptcy proceedings.  *See* Danske Mem. at pp. 7-8.   Here, too, Danske failed to allege the specific terms of the settlement or to provide written documentation identifying the specific terms of the settlement with regard to the Initial Loan, and, consequently, has failed to meet its burden of proving that it acquired a legal interest in the Initial Loan through such an undocumented settlement.

Notably, Danske acknowledges in its Memorandum of Law that it did not obtain the "rights, obligations, and interests under the loan agreements and related documents," until "[a]fter" it settled with Lehman by "agree[ing] to accept the senior secured lien in the Resort Property as partial satisfaction of amounts owed to Danske."   *See* Danske Mem. at p. 8. Because Danske concedes that it did not step into Lehman's shoes until *after* it acquired the Initial Loan through the supposed purchase and settlement with Lehman, its failure to come forward with proof of such purchase and settlement precludes it from asserting any claim that Lehman may have been able to assert to the Forfeitable Property.

Furthermore, Danske has not demonstrated that it has a valid legal interest in the Additional Loans.   Because Danske has not proven that it acquired a valid legal interest in the Initial Loan, it necessarily follows that Danske has not proven that it has acquired a valid legal interest in the Additional Loans, which were merely funds loaned under modifications to the Initial Loan agreement, as discussed above.

Assuming *arguendo*, the Court were to find that the Additional Loans should be considered separately acquired legal interests, Danske's documentary proof nonetheless fails to substantiate Danske's claim to the Additional Loans.   As set forth in the Fedkenheuer Aff.,

30

Danske's documentary proof as to the Additional Loans suffers numerous inadequacies and

deficiencies.   These inadequacies and deficiencies include, but are not limited to:

- Danske has not provided loan statements for Facilities A and B dating after February 28, 2020, or Facility C loan statements dating after January 1, 2020, even though the Petition claims costs incurred through April 30, 2020 (Fedkenheuer Aff. ¶ 37 n.18);

- Numerous discrepancies between Danske's loan statements and Trimont's Invoices, which limit the ability to validate the unpaid principal balances in Danske's claim (Fedkenheuer Aff. at ¶¶ 9-18, 35 n.12);

- Notable inconsistencies between the various Trimont documents provided by Danske, in addition to the discrepancies between the Danske loan statements and the Trimont Invoices, which further limit the ability to properly validate Danske's claim (Fedkenheuer Aff. at ¶ 17);

- The Trimont Invoices that were provided do not support $6,297,406 of the funding that Lehman allegedly extended to the DCSL Resort (Fedkenheuer Aff. at ¶ 12);

- Danske did not provide the documentation required by the loan documents prior to making a disbursement to Danske. This documentation was requested to support that the funding would be used for the reimbursement of construction or developmental costs incurred and paid by the DCSL Resort (Fedkenheuer Aff. at ¶¶ 19-28, 38);

- Danske had not provided documentation to support the increase of the Profit Participation Fee ("PPF") from $45,000,000 to $50,000,000 (Fedkenheuer Aff. at ¶¶ 29-31);

- Danske's support for the $45,000,000 PPF was based on data from 2008 (*id.*);

- Funds were used from one facility to pay down the balance of another facility, therefore the overall principal owed by the DCSL Resort did not decrease (Fedkenheuer Aff. at ¶¶ 32-33, 35);

- Danske has not provided support for the estimated $900,000 in timeshare deposits that it applied to its claim, nor did it provide any Facility C loan statements with a date more recent than December 2019 (Fedkenheuer Aff. at ¶¶ 36-37);

- Danske addressed the bank statements to entities other than the DCSL Resort (Fedkenheuer Aff. at ¶ 39);

31

- Danske's claim includes at least $7,094,438 of fees of which $3,505,800 has not been supported by Danske (Fedkenheuer Aff. at ¶¶ 40-41); and

- Danske has not provided sufficient documentation to support its purchase value of the Initial Loan (Fedkenheuer Aff. at ¶ 45-48).[10]

Accordingly, Danske has failed to prove that it has a valid legal interest in the Forfeitable Property.[11]

**B. Danske Has Failed to Meet its Burden of Proving that it is a Bona Fide Purchaser for Value of the Forfeitable Property**

Danske has also failed to prove the second element of its claim under Section 853(n)(6)(B) -- that it acquired its interests in the Initial Loan and the Additional Loans as a bona fide purchaser for value.

**1. Danske Has Failed to Prove that it is a Bona Fide Purchaser for Value of the Initial Loan**

Danske has failed to proffer any evidence that it purchased the Initial Loan on a specific date, for a specific value, and, further, that the value it provided in the transaction was sufficient to confer bona fide purchaser for value status as a matter of law.

**a. Danske Has Failed to Provide Any Evidence of When it Purchased the Initial Loan or of the Value it Gave in the Purported Transaction**

As set forth above, Danske has not come forward with any evidence, or even allegations,

---

[10]   In its motion for summary judgment, Danske attempts to increase the amount of its claim by stating that its purported "lien totals approximately $200 million." Danske Mem. at p. 13.   However, if the Court were to find that Danske has demonstrated that it is a bona fide purchaser for value of its interest, Danske would be limited to the amount it claimed in its Petition, i.e., $197.1 million. *See* Kostolampros Decl., Exhibit 3 at p. 3.   Any attempt by Danske to increase or change its claim through its summary judgment motion is barred. *See, e.g.*, *Soreide*, 461 F.3d at 1355 (holding that claims not asserted in petition were statutorily time-barred).

[11]   Danske claims that it owns shares in the "Borrower," but fails to provide any additional allegations or proof to support this claim. *See* Danske Revised Rule 56.1 at ¶ 90 (". . . .the remaining assets under the Trust shall be reverted to the Borrower (which is owned by the LLCs in which equity holders, *including Danske*, hold shares) . . . .") (emphasis added). *See also* Fedkenheuer Aff. at ¶ 31.

as to when, how, and for how much value, it allegedly acquired its interest in the Initial Loan from Lehman.   Further, Danske has failed to allege or provide evidence as to how much value was attributed to the Initial Loan when it settled with Lehman in the Lehman bankruptcy proceedings.   Danske's vague and conclusory contentions and lack of proof fail to satisfy its burden of proving that it acquired a valid legal interest in the Forfeitable Property as a bona fide purchaser for value.

### b.   <u>Lehman Bankruptcy Records Indicate that Danske Did Not Provide Adequate Value to Confer Bona Fide Purchaser For Value Status</u>

Even if Danske had alleged and presented proof of an actual purchase, it would also have to prove that the consideration it provided in the transaction was valuable consideration sufficient to confer bona fide purchaser for value status.   *See In re Cerrato*, 504 B.R. 23, 33 (Bankr. E.D.N.Y. 2014) ("In New York, to qualify as a bona fide purchaser, a purchase must be made in good faith, without notice of any adverse interests in the property, and for *valuable consideration*." (emphasis added)); *Irwin v. Regal 22 Corp.*, 175 A.D.3d 671, 672, 108 N.Y.S.3d 57, 58 (2d Dep't 2019) (stating that under New York law, a "bona fide purchaser for value has been described as one which purchased property for 'valuable consideration' and with no 'knowledge' of an 'alleged prior fraud by the seller' "; "The term has also been defined as 'one who purchases real property in good faith, for valuable consideration, without actual or record notice of another party's adverse interests in the property and is the first to record the deed or conveyance' " (citations omitted)); *Emerson Hills Realty, Inc. v. Mirabella*, 220 A.D.2d 717, 717, 633 N.Y.S.2d 196, 197 (2d Dep't 1995) (affirming lower court's holding that purchasers

were bona fide purchasers under New York law because "they purchased their subject parcels for valuable consideration and they did not have knowledge of the alleged prior fraud by the seller").

"The consideration must not only be good but valuable in the sense that a fair equivalent is given for the property granted in order to constitute the grantee a purchaser for value. . . The words *valuable consideration* . . . are used in contradistinction from a mere valid or sufficient consideration as between grantor and grantee." *Ochenkowski v. Dunaj*, 137 Misc. 674, 675-76, 244 N.Y.S. 267, 270 (Sup. Ct. Mont. Cty. 1930) (citations omitted), *aff'd*, 232 A.D. 441 (3d Dep't 1931); *see also United States v. Titus*, 2013 WL 6540164, at *5 (E.D. La. Dec. 12, 2013) (granting motion to dismiss § 853(n)(6)(B) claim on the ground that person who pays only $10 for valuable real property cannot be a bona fide purchaser for value); *United States v. One 1996 Vector M12*, 442 F. Supp. 2d 482, 487 (S.D. Ohio 2005) (rejecting claimant's argument that "*any* consideration, regardless of the value, nature, or quality of such consideration, will give rise to a bona fide purchase for value"); *Ten Eyck v. Witbeck*, 135 N.Y. 40, 47 (1892) (stating that bona fide purchaser for value status will not be found "where the money consideration is purely nominal, or infinitesimal in amount, when compared with the value of the property granted"). To be sure, Danske's bare recitals that it conveyed valuable consideration do not suffice. *See Hood v. Webster*, 271 N.Y. 57, 60 (1936) ("Under their defense of purchase for value without notice the defendants offered no evidence of actual considerations given. The subsequent deed to them expressed their payment of 'One Dollar and other good and valuable consideration.' This recital was not enough to put them into the position of purchasers for a valuable consideration in the sense of the statute."); *Dolphin v. Marocik*, 222 A.D.2d 549, 550, 635, N.Y.S.2d 84, 85 (2d Dep't 1995) (finding that the respondent "failed to establish that he paid valuable consideration for his mortgage," because even though he "testified as to several payments he claimed to have

34

made, as well as to mortgages, liens, and judgments he claimed to have assumed in exchange for the mortgage in question, he failed to submit sufficient documentation of these claims").

Here, a thorough review of the Lehman bankruptcy proceeding indicates that Danske did not provide adequate value as, based on the available records, Danske acquired the Initial Loan for significantly less than its face value.   According to Danske's proof of claim filed in the Lehman bankruptcy proceeding, it purchased commercial loans with a face value of $1.174 billion, yet Danske stated in its proof of claim that the actual value of the loans was only $248.2 million (*i.e.*, approximately 21% of the face value of the loans).   *See* O'Connor Decl. at Exhibit GX-1, at p. 8.   Because Danske contends the Initial Loan was allegedly one of those commercial loans, the records support the conclusion that Danske acquired the Initial Loan for much less than its face value.[12]

Lehman disputed Danske's valuation of the assigned loans, and engaged appraisers and valuation firms to value the assigned loans, including the Initial Loan, and ultimately reached a settlement with regard to the value of the loans.   *See* O'Connor  Decl. at Exhibit GX-2, at pp. 2-3.   Notably, Danske, represented by the same counsel here as it was in the Lehman bankruptcy proceedings, should possess the appraisals and valuations, despite its assertion otherwise. *Compare id.* at p. 3 ("Upon receipt of the final appraisals, [Lehman] and Danske exchanged valuations on the assigned Loans and underlying real estate projects and proceeded to engage in negotiations regarding the calculation of a deficiency claim based on the parties [sic] respective

---

[12] Notably, Danske contends that the face value of the Initial Loan was $125 million. *See* Kostolampros Decl., Exhibit 3 at p. 4.   Danske, however, asserts in its Petition that it is entitled to approximately $157 million for the Initial Loan, *id.* at p. 8, which includes principal *and* interest.   Thus, if Danske claimed in the Lehman bankruptcy proceeding that the Initial Loan was worth only a small percentage of its $125 million face value, then the value attributed to the Initial Loan in the Lehman bankruptcy proceeding was an even smaller percentage of the approximately $157 million value that Danske seeks for the Initial Loan in this proceeding.

valuations."), *with* O'Connor Decl. at Exhibit GX-5, Danske's Objections to Discovery, DE 863, at p. 8 (stating that the appraisals and valuations "are not in Danske's custody or control because it is Danske's understanding that these entities were hired by Lehman.").

On August 6, 2020, Danske provided the government with a document entitled "Lehman and Danske 9/23/08 Loan Value Comparisons," without disclosing any information as to who prepared the document or when it was prepared.  *See* O'Connor Decl. at Exhibit GX-3.  The document states that "CBRE" -- presumably on behalf of Lehman -- valued the "Cabo San Lucas Land Whole Loan" -- presumably the Initial Loan -- at $58,490,000, whereas Danske valued it at $33,700,000.  *Id.*  Although the document does not clearly identify how much Danske purportedly paid for the Initial Loan or the value that was ultimately attributed to the Initial Loan in the settlement, it supports the reasoned conclusion that, in the settlement, Danske valued the Initial Loan at only a small percentage of the approximately $157 million that it now claims for the same loan.  Importantly, if Danske had valued the Initial Loan in the Lehman bankruptcy settlement at the near-$157 million value that it now claims the Initial Loan was worth, the deficiency judgment Danske obtained against Lehman in the Lehman bankruptcy proceeding would have been substantially less, leaving more money and/or property in the Lehman bankruptcy estate.

In sum, while the value of the loans was a central issue in the litigation between Danske and Lehman, and the Lehman bankruptcy proceeding records indicate that Danske attributed a significantly reduced value to the Initial Loan in Danske's settlement with Lehman in the Lehman bankruptcy proceedings, Danske nonetheless takes a contrary position in this forfeiture proceeding, claiming the full value of the Initial Loan (both principal *and* interest), and deliberately and repeatedly refuses to produce documents that reflect the actual value Danske

36

provided when it purportedly purchased the Initial Loan, as well as the value attributed to the Initial Loan when it settled with Lehman in the Lehman Bankruptcy proceedings.

### c.   **Principles of Judicial Estoppel Preclude Danske From Claiming a Higher Value for the Initial Loan in this Forfeiture Proceeding**

Assuming *arguendo*, Danske has properly alleged and provided proof that it purchased and gave value for the Initial Loan in its transactions with Lehman, and assuming *arguendo*, the Court were to find that the value given was sufficient for Danske to be considered a bona fide purchaser for value, under principles of judicial estoppel, Danske's claim to the Initial Loan should nevertheless be limited to the value Danske attributed to the Initial Loan when it settled with Lehman in the Lehman bankruptcy proceedings.

As discussed above, if Danske had valued the Initial Loan in the Lehman bankruptcy settlement at the near-$157 million value that it now claims the Initial Loan was worth, the deficiency judgment Danske obtained against Lehman in the Lehman bankruptcy proceeding would have been substantially less, leaving more money and/or property in the Lehman bankruptcy estate.   In addition, Danske "unconditionally and irrevocably" sold, transferred and assigned its deficiency judgment of approximately $580,000,000 to Goldman Sachs "[f]or value received."   *See* O'Connor Decl. at Exhibit GX-4, DE 23002 at p. 3.   Thus, the Lehman bankruptcy court relied on a reduced valuation of the Initial Loan in calculating Danske's deficiency judgment, which deficiency judgment Danske subsequently sold to Goldman Sachs for unspecified value received.

In similar circumstances, courts have refused to allow a party to change the valuation applied to property in order to take a more advantageous position in subsequent litigation.   *See Maggers v. Jones*, 2016 WL 2939419, at *2-4 (E.D. Cal. May 20, 2016) (applying judicial

estoppel and dismissing a case on subject matter jurisdiction grounds because the plaintiff had ascribed the value of certain tools that had been stolen at $120,000, but had previously valued the same tools at $18,975 in a bankruptcy case, and, therefore, could not satisfy the jurisdictional requirements for diversity); *In re Krumm*, 534 B.R. 142, 147 (W.D.N.C. 2015) (finding bankruptcy trustee judicially estopped from disputing sale price of a property after he had filed a motion to approve the sale at the lower price); *In re 300 Washington Street LLC*, 528 B.R. 534, 546-47 (Bankr. E.D.N.Y. 2015) (applying judicial estoppel to require that a municipality be held to the dollar amount of its claim previously put forth in the bankruptcy case, and debtor be held to the value set forth in its plan—not its later claimed higher value, holding that judicial estoppel "prevents a party from switching to an inconsistent theory to gain an advantage in litigation"); *Liberty Mutual Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007) (affirming district court decision that the insured could not prove she had suffered a loss of over $90,000 in personal property when she had previously claimed a value of only $830 in her bankruptcy proceeding); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 210-11 (Bankr. E.D.N.Y. 1994) (applying judicial estoppel to preclude a debtor from asserting that its hotel property was worth only $11 million when it had previously advocated for a valuation in excess of $30 million in a lift stay proceeding; reasoning that the debtor's current and prior positions were "grossly inconsistent").

Accordingly, should the Court find that Danske has met its burden of proving that it was a bona fide purchaser for value of the Initial Loan, Danske's claim as to the Initial Loan should be limited to the value it attributed to the Initial Loan in the Lehman bankruptcy proceedings, so as to prevent Danske from gaining an improper advantage and potential windfall in this litigation. Preventing Danske from gaining an improper advantage in this litigation is especially important given that any improper advantage it might receive would be at the expense

of other potential third party petitioners, some of whom were victims of the Defendants' crimes and without whom there would not have been a DCSL Resort, as their stolen money provided the means to purchase the DCSL Resort in the first instance.

> ### d.  Danske Has Failed to Provide Actual Evidence that the Initial Loan Was Worth $157 Million

Danske is not entitled to the nearly $157 million it claims as the Initial Loan's value at the time it purportedly acquired the Initial Loan from Lehman for an additional reason: Danske has failed to provide admissible evidence, let alone documents to substantiate, that the DCSL Resort owed Lehman nearly $157 million in early 2009.   Here, too, Danske conclusorily contends, without admissible, supporting evidence, that "[i]n early 2009, the Borrower owed Lehman $107,538,327.83 in principal and $49,132,497 in unpaid accrued interest."   *See* Kostolampros Decl., Exhibit 3 at p. 8.   Notably, Trimont serviced the loan first for Lehman and then for Danske, *see* Fedkenheuer Aff. at ¶¶ 10-13, and, as such, Danske should possess the Trimont records pertaining to the funds loaned by Lehman.    Indeed, Danske produced other records from Trimont dating back to 2006 -- when Lehman was the note holder -- however, the Trimont records are incomplete and inadmissible, and do not establish that Lehman actually loaned the $107,538,327.83 that Danske now claims.    The Trimont records demonstrate that Lehman loaned, at most, $101,240,922 to the DCSL Resort.   *Id.* at ¶ 12.   Moreover, because Danske's and Trimont's records are inadmissible in support of Danske's summary judgment motion, as discussed above, and Danske's records are inconsistent with Trimont's records, *id.* at ¶¶ 9-18, Trimont's records cannot be relied on to establish Danske's claim.   Consequently, Danske has not met its burden of proving its claim to the Initial Loan and its motion must be denied and its Petition stricken.

**2.** **Danske Has Failed to Prove that it is a Bona Fide Purchaser for Value of the Additional Loans**

**a.** **Danske Cannot Be Considered a Bona Fide Purchaser for Value of the Additional Loans Because it Has Failed to Demonstrate that it is a Bona Fide Purchaser for Value of the Initial Loan and the Evidence Does Not Substantiate its Claim to the Forfeitable Property**

If the Court finds that Danske is not a bona fide purchaser for value of the Initial Loan, then the Court necessarily must find that Danske is not a bona fide purchaser for value of the Additional Loans, which were merely funds loaned under modifications to the Initial Loan agreement, as discussed above.   Moreover, as discussed *passim*, Danske's incomplete and inconsistent documentation belies Danske's contention that it is a bona fide purchaser for value of the Additional Loans.

**b.** **Danske is Not a Bona Fide Purchaser for Value of the Additional Loans Because the Additional Loans Were Not Innocent, Arm's Length Transactions**

In addition to the lack of admissible and reliable evidence to substantiate the claimed Additional Loans discussed above, the documents Danske has produced regarding its lender practices as pertains to the Additional Loans demonstrates that Danske was not an innocent, arm's length lender that could be entitled to bona fide purchaser for value protection.   In this regard, a review of the records Danske has provided as to the Additional Loans reveals that a majority of the "payments" toward the loan balance were, in reality, either funds drawn down from one facility to pay down another facility,[13] or payments on the revolver facilities that were withdrawn within a close proximity of the payments.   *See* Fedkenheuer Aff. at ¶¶ 32-36.   The produced records show that: a) the loan balance did not decrease over time; b) there were few

---

[13] On April 29, 2013, $696,281 from Facility C was used to pay down Facility B.

payments made against the principal for Facilities A and B, and the payments that were made against the revolving Facility C, were done so to generate sufficient credit to permit additional draws on the same facility; and c) the capitalization of the interest owed on Facilities A and B resulted in an exponentially increasing debt in Danske's favor.   *See id.*; *see also* Fedkenheuer Aff. at Attachment 6.   In sum, the records Danske has produced to date fail to show a true paying down of the debt, while the interest, which was capitalized (*i.e.*, compounded), rapidly and sizably accrued to Danske's benefit.[14]

A bona fide lender should take measures to ensure that the borrower is able to meet its obligations.   *See, e.g.*, *Ulrich v. U.S. Dep't of Treasury*, 129 F. App'x 386, 390 (9th Cir. 2005) (holding that a bank director's continued lending to "a delinquent borrower with negative net worth unable to pay them back and unable to pay the supply and production costs necessary to fill its orders . . . was an unsafe or unsound practice"); *de la Fuente v. F.D.I.C.*, 332 F.3d 1208, 1224-25 (9th Cir. 2003) (finding that a bank director engaged in unsafe and unsound practices by, *inter alia*, allowing a non-credit worthy borrower to assume liability for a loan and failing to keep accurate records of the status of a loan); *Bank of Dixie v. Fed. Deposit Ins. Corp.*, 766 F.2d 175, 176 (5th Cir. 1985) (affirming lower court's finding that a bank engaged in unsafe and unsound banking practices by, *inter alia*, renewing loans without collecting the interest due, and, in the case of at least one loan, renewing the loan "without any collection of principal and in

---

[14] For years Danske has represented to the Court that it has infused the DCSL Resort with *additional* funds to keep the DCSL Resort afloat; however, the records provided to date show that Danske has not actually provided any new funds to the DCSL Resort since 2014.   Instead, Danske has merely allowed the DCSL Resort to continue to pay down the revolver facilities and then withdraw the same funds.   Importantly, this was a significant benefit to Danske because Danske did not have to loan any new funds, while charging millions of dollars in loan "modification fees," and allowing the facilities to continue to accrue an exorbitant amount of interest, creating an even greater debt in Danske's favor.   *See* Fedkenheuer Aff. at ¶ 36, 38, 40, 45-48 & Attachment 6.

spite of an agreed repayment plan").

Having modified and amended the loan agreement in March 2009, January 2010, April 2013, April 2014, October 2014, and September 2018, and having "agreed to a series of extensions of the loan maturity dates" "[b]eginning in March 2012 and through March 2013," Danske Mem. at pp. 9-12, Danske should have been repeatedly evaluating its lending arrangement with the DCSL Resort, yet the documents provided establish that Danske did not.

For instance, despite the fact that Jowdy, the manager of the DCSL Resort, has been: 1) unable to maintain the financial viability of the DCSL Resort and pay down the balance of the debt (*see* Fedkenheuer Aff. at ¶¶ 34-36), and 2) accused of wrongdoing involving the very asset at issue since as early as 2008 (*see, e.g.*, O'Connor Decl. at Exhibit GX-6, *Juneau v. Kenner, et. al.*, 08-CV-8284, (C.D. Cal. 2008), DE 1), Danske continued its lending relationship with the DCSL Resort, has stated that it wants Jowdy to remain as the manager of the DCSL Resort, and, quite astoundingly, incorporated terms in the loan agreements that conferred special benefits on Jowdy. *See* Fedkenheuer Aff. at ¶ 31; O'Connor Decl. at Exhibit GX-20, Danske August 23, 2018 letter to government at pp. 1-2 and Danske Agreement with Legacy at ¶¶ 1 (defining "Disposition Event"), 4, 6(e).[15]

---

[15] Interestingly, documents titled "Deal Status Report Cabo San Lucas Land" and" Credit Application," which were produced to the government on August 6, 2020, state that Jowdy was "well placed/regarded in the local community to bring [the DCSL Resort] development forward," and that an "experienced development team [was] running the project," yet a civil complaint filed by Jowdy in 2010, states that the El Rosario project, which was the other development project that Jowdy was working on with Kenner in Mexico, was Jowdy's *first* development project, and that Jowdy and Kenner started the DCSL Resort project to generate interest in the El Rosario project because they "had difficulty generating interest from new investors" for the El Rosario project. *See* O'Connor Decl. at Exhibit GX-7, Deal Status Report Cabo San Lucas Land, at DANSKE_0016936; Exhibit GX-8, Credit Application, at DANSKE_0016944; Exhibit GX-9, *Jowdy v. Berard*, Case No. BC436632 (L.A. Cty. CA 2010) at pp. 5-7, ¶¶ 21, 24, 27. To be sure, Jowdy's own claims evidence that he was not an experienced and sophisticated developer, and his failure to pay back the loan and complete the DCSL Resort project confirm that fact. *See, e.g.*, O'Connor Decl. at Exhibit GX-9 at pp. 4-5.

Indeed, the totality of the facts and circumstances indicate that Danske did not meet ordinary lender standards and engage in arm's length transactions, but rather: 1) failed to collect documentation from the DCSL Resort that the loan agreements required be submitted as a precondition to the lending of funds to ensure that the funds were being properly used, despite the fact that nearly all of the loan money went to Jowdy or Jowdy-owned and controlled entities (Fedkenheuer Aff. at ¶¶ 19-28; O'Connor Decl. at Exhibit GX-10, Organizational Charts, at DANSKE_0011017 (entities list in left-hand side column));[16] 2) amended the loan agreements to confer a substantial, personal financial benefit on Jowdy, in the event the government successfully forfeits his equity interests, by paying him 10% of the principal payment received by Danske through a sale of the DCSL Resort or its loan, even though Jowdy's management company, Legacy Properties, LLC, was already being paid $225,000 *per month*, plus an annual "Operating Net Profit" fee to manage the DCSL Resort, the duties of which included paying down the debt (*see* O'Connor Decl. at Exhibit GX-20, Danske August 23, 2018 letter to government at pp. 1-2 and Danske Agreement with Legacy at ¶¶ 1 (defining "Disposition Event"), 4, 6(e); Exhibit GX-11, Contracts with Legacy Properties, LLC, at DANSKE_0012875, Section 3.2 and DANSKE_0012851, Section 3.1);[17] 3) proposed in PPF related documents a

---

[16] Jowdy has created numerous entities to provide services, such as payroll services, real estate sales, construction, management, residential services and administrative services, for the DCSL Resort.  *See* O'Connor Decl. at Exhibit GX-10 at DANSKE_0011017, DANSKE_0011023, DANSKE_0011025, DANSKE_0011027, DANSKE_0011028, DANSKE_0011029, DANSKE_0011030.   Jowdy further executes contracts on behalf of both the DCSL Resort, as the buyer of services, and on behalf of his entities, as the service providers.  *See, e.g.,* O'Connor Decl. at Exhibit GX-11 at DANSKE_0012880 and DANSKE_0012862.   This is a classic conflict of interest arrangement that should have raised red flags with Danske, but, instead, Danske permitted these interested transactions while it accrued a massive debt in its favor.   *See Utica Ins. Co. v. Toledo Ins. Co.*, 17 Barb. 132, 135 (Sup. Ct. N.Y. 1853) (holding that "an agent of the seller cannot become the agent of the purchaser in the same transaction"; reasoning "that the duties which [the agent] owed to his two principals were in conflict; his duty to each requiring him to make the best terms that he could with the other" (citation and internal quotation marks omitted)).

[17] This arrangement is in contravention of the law given Jowdy's conduct of receiving from Kenner the

43

provision permitting only Jowdy -- not the DCSL Resort or the other DCSL Resort owners/investors -- the opportunity to purchase Danske's equity interest in the DCSL Resort (Fedkenheuer Aff. at ¶ 31); 4) continued to lend money to the DCSL Resort despite the DCSL Resort's ongoing failure to repay Danske, and the DCSL Resort's ongoing failure to satisfy conditions precedent to the lending of funds, thereby continuing to bury the DCSL Resort in debt (Fedkenheuer Aff. at ¶¶ 19-28, 38); 5) did not send the DCSL Resort's bank statements, which showed the loan balance and other pertinent information, to the DCSL Resort in Mexico, but rather sent them to various other addresses, including, at various points in time, to the address of Danske's own loan officers in London (Fedkenheuer Aff. at ¶ 39); 6) was aware that the DCSL Resort utilized dozens of bank accounts to receive the loan funds, including at least 22 different accounts owned by the DCSL Resort, including three DCSL Resort accounts in the Cayman Islands, 18 accounts owned by DCSL Resort affiliated entities, and 12 homeowner association accounts (Fedkenheuer Aff. at ¶ 24 & Attachment 7); 7) charged exorbitant, if not usurious, interest and fees, including millions of dollars in "miscellaneous" and "loan modification" fees (Fedkenheuer Aff. at ¶¶ 34-36, 40, 41 & Attachment 8); and 8) ignored all of the evidence indicating that the DCSL Resort was subject to forfeiture (*see* discussion, *infra*, regarding notice to Danske that DCSL Resort was subject to forfeiture).

Here, the facts suggest that, far from having an arm's length relationship, Danske and Jowdy had an arrangement, through which Jowdy would permit Danske to systematically deplete

---

proceeds that were used to purchase the DCSL Resort.   *See* 21 U.S.C. § 853(h) (barring "any person acting in concert with" the defendant from "purchas[ing] forfeited property at any sale held by the United States"); *United States v. Kramer*, 957 F. Supp. 223, 225 (S.D. Fla. 1997) (holding that 18 U.S.C. § 1963 bars any person "acting in concert with the defendant" from purchasing the forfeited property regardless of whether that person was ever charged or convicted of any crime).

the equity in the DCSL Resort via modified loan agreements that substantially increased the DCSL Resort's debt without Danske having to advance any new funds, while Danske, in return, made no effort to determine that the loan funds were being used for their intended purpose -- *i.e.*, for the benefit of the DCSL Resort -- and not for Jowdy, personally, or for other entities controlled by Jowdy, and promised to pay him a substantial sum upon the sale of the DCSL Resort through a foreclosure, or after Danske recovered its "investment" through a forfeiture sale.[18]   *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (recognizing that a "bankruptcy trustee may collaterally attack a judgment offered as a claim against the estate for the purpose of showing that it was obtained by collusion of the parties or is founded upon no real debt").

Most importantly, as the government's forensic accountant has determined, *Danske has already received approximately $5.6 million more than it loaned to the DCSL Resort*.   *See* Fedkenheuer Aff. at ¶ 46.   Specifically, Danske advanced approximately $98 million to the DCSL Resort, but has received approximately $104 million in repayments.   *See id.* at ¶¶ 45-48. As such, if Danske succeeds on its claim for $197.1 million, it stands to make a profit of approximately $203 million (*i.e.*, more than a 206% profit, and this does not include the amount of profit that Danske has already made on the sale of its deficiency judgment to Goldman Sachs, as discussed above).   *Id.* at ¶ 47.   Thus, by ignoring the DCSL Resort's defaults and repeatedly extending the loan agreements; allowing the DCSL Resort to pay down the revolver facilities and

---

[18] Notably, Jowdy has not filed any claim to his purported equity interests in the DCSL Resort, even though his equity interests in KAJ Holdings, LLC (which owns 35% of the Mexican LLC that owns the interest in the DCSL Resort) and Diamante Properties, LLC (which owns 13% of the Mexican LLC that owns the interest in the DCSL Resort), and his 1% ownership interest as the general administrator (in which Jowdy, individually and directly, owns 1% of the Mexican LLC that owns the interest in the DCSL Resort), comprise approximately *half* of the ownership interests in the DCSL Resort.   *See* O'Connor Decl. at Exhibit GX-10 at DANSKE_0011017, DANSKE_0011018, DANSKE_0011019.

then withdraw the same funds, without having to advance any new funds; and knowing that the

DCSL Resort could not repay the ever-growing debt, Danske was accruing interest and fees at an

exponential rate, and now seeks to "expeditiously" make more than a 206% profit in this

forfeiture proceeding.   Indeed, Danske established what was essentially a subprime mortgage

with the DCSL Resort that would inure to Danske's benefit upon the DCSL Resort's inevitable

default on the loan, or, as it turned out, the forfeiture of the DCSL Resort.[19]   Moreover,

Danske's continued "lending" of money to the DCSL Resort despite the numerous red flags, and

charging exorbitant interest, fees, and penalties, destroyed the value of the victims' ownership

---

[19] In *Deutsche Bank Nat'l Trust Co. v. Castellanos*, 841 N.Y.S.2d 819, 15 Misc. 3d 1134(A) (Sup. Ct. Kings Cty. May 11, 2007), a New York court addressed a subprime mortgage similar to the loan at issue here.   In so doing, the court quoted U.S. Senator Christopher Dodd (D-Connecticut), Chairman of the Senate Committee on Banking, Housing, and Urban Affairs, as stating at a March 22, 2007 Committee hearing on "Mortgage Market Turmoil: Causes and Consequences," that:

> The subprime market has been dominated in recent years by hybrid ARMs, loans with fixed rates for 2 years that adjust upwards every 6 months thereafter. These adjustments are so steep that many borrowers cannot afford to make the payments and are forced to refinance, at great cost, sell the house, or default on the loan. No loan should force a borrower into this kind of devil's dilemma. These loans are made on the basis of the value of the property, not the ability of the borrower to repay. This is the fundamental definition of predatory lending.

*Id.*, at *2-3. The *Deutsche* court also observed that:

> [S]ubprime loans, similar to the one in this action, are designed to make borrowers refinance and keep the loan production mill churning. . . . While subprime borrowers try to climb out of the holes they fell into, those who sold and packaged the loans are laughing all the way to the bank.

*Id.*, at *2 (citation and internal quotation marks omitted).    In addition, New York State Governor David A. Patterson's Interagency Task Force to Halt Abusive Lending Transactions observed in a report that "interest-only" loans, much like the Additional Loans, "have been a particular contributor to the foreclosure crisis, as rates reset or loans begin to amortize and many borrowers face payment shock."   *Wells Fargo Bank, N.A. v. Hughes*, 897 N.Y.S.2d 605, 607, 27 Misc. 3d 628, 631 (Sup. Ct. Erie Cty. 2010); *see also* Fedkenheuer Aff. at ¶ 16a.   Although the subprime mortgage crisis centered around residential mortgages because the residential mortgage borrowers were typically "unsophisticated" borrowers, *id.* at 630, here, Jowdy, who was the signatory to all of Danske's Additional Loan agreements, was also inexperienced in managing a resort of the magnitude of the DCSL Resort, as discussed *supra*, and, thus, an unsophisticated borrower in the Additional Loan transactions.

interest in the DCSL Resort while Danske stood to heavily profit.  *See Frykholm*, 362 F.3d at

416 (noting, with disdain, the claimant's attempt to make a 200% profit through its forfeiture

claim at the expense of the other victims' recovery).

   In light of the conduct described herein, Danske cannot qualify as a bona fide purchaser

for value because it was not an innocent, arm's length purchaser for valuable consideration.  *See*

*United States v. Lavin*, 942 F.2d 177, 186 (3d Cir. 1991) (stating that Section 853(n)(6)(B) is

intended to protect "'innocent purchaser[s] for valuable consideration'" (quoting *Mowrey v.*

*Walsh*, 8 Cowen 238, -- (N.Y. 1828)))； *see also United States v. Smith*, 953 F. Supp. 2d 1260,

1268 (M.D. Fla. 2013) ("The legislative history of section 853(n)(6)(B) indicates that Congress

intended to protect bona fide purchasers who give value in an *arm's length transaction*."

(emphasis added)).

### c. <u>If Danske Were to Obtain the Entire Sum it Claims, It Would Reap Windfalls Totaling in Excess of $203 Million</u>

   If Danske were to obtain the full amount that it seeks, it would reap windfalls in excess of

$203 million on both the Initial Loan and the Additional Loans.  As discussed above, if Danske

succeeds on its entire claim, it would make a profit on the Initial Loan and Additional Loans of

approximately $203 million, which is more than double the amounts that Danske loaned.[20]  And

that figure of $203 million would not include the additional profit that Danske made on the sale

of the deficiency judgment to Goldman Sachs.   Most of the $203 million windfall would come

from the Initial Loan.   If Danske were to recover the approximately $157 million it seeks

regarding the Initial Loan, Danske would obtain much more than it appears to have paid for the

---

[20] This calculation does not include any amount that Danske may have paid to purchase the loan because that amount is unknown.

Initial Loan.   Assuming *arguendo* that the Initial Loan was valued at $33,700,000 -- the amount

that Danske apparently valued the Initial Loan in the Lehman bankruptcy proceedings, *see*

O'Connor Decl. at Exhibit GX-3 -- Danske would be making a profit of approximately $123

million -- *i.e.*, more than three and one-half times the sum that Danske paid for that loan.

Danske should not be permitted to use these forfeiture proceeds to obtain these windfalls,

especially when Danske's windfalls would come at the expense of other third parties, among

them, the numerous victims of the criminal conduct.

### C. Danske Has Failed to Meet its Burden of Proving that It Was Reasonably Without Notice that the Forfeitable Property Was Subject to Forfeiture

Danske has also failed to prove the third element of its claim under Section 853(n)(6)(B),

namely, that it was reasonably without notice that the Forfeitable Property was subject to

forfeiture: a) when it purchased the Initial Loan; and b) on each occasion when it entered into the

Additional Loans and continued to fund the DCSL Resort.

In an attempt to meet its burden, Danske submits a conclusory affidavit from David

Daniels, denying that he or any Danske employee had knowledge of the forfeitability of the

DCSL Resort until August 2015.   *See* Kostolampros Decl. at Exhibit 89, p. 3 ¶ 7.   However,

evidence shows that as early as 2008, civil lawsuits were being brought by individuals and

entities that asserted, *inter alia*, that the DCSL Resort was connected to the Defendants'

misconduct.   *See* O'Connor Decl. at Exhibit GX-12, Chart of lawsuits and newspaper and

magazine articles.   In addition, between 2008 and 2013, there were a total of at least 22 news

articles and two press releases discussing the lawsuits, criminal conduct, the indictment in this

action and/or the DCSL Resort's connection to potential misconduct, which put Danske on

notice that the DCSL Resort was subject to forfeiture.   *Id.*   During that time period, there were

also three publicly-filed complaints and one publicly-filed judicial decision in civil actions involving Jowdy and Kenner. *Id.*   Nevertheless, in its Petition, Danske contends that it was without reason to believe that the DCSL Resort was subject to forfeiture. *See* Kostolampros Decl., Exhibit 3 at ¶¶ 21, 24.   Danske even alleges that after numerous loan extensions and loan modifications between 2009 and 2014, following the assignment of the Initial Loan in 2009, it was without reason to believe that the DCSL Resort was subject to forfeiture. *See id.* at ¶ 35.   These allegations are without merit.   The evidence shows that Danske, which stands to " 'mak[e] a tidy profit . . . while the other victims' recovery will fall, . . . knew enough to permit an ostrich reference," *i.e.*, that Danske was willfully blind and ignored the warning signs of fraud, or was actually aware or should have been aware of the allegations of fraud involving the DCSL Resort. *Frykholm*, 362 F.3d at 416; *see also* Fedkenheuer Aff. at ¶¶ 37, 42-44.

In fact, in the inadmissible copy of the 2009 Amended and Restated Loan Agreement proffered by Danske, and signed by David Daniels as a representative of Danske, Jowdy represented that he believed "there is a possibility that the Kenner parties could be joined into the litigation" described as *Little Isle IV, LLC v. Kenneth A. Jowdy*, CV-09-142 (Dist. Ct. Az.). *See* Kostolampros Decl., Ex. 40 at pp. 20, 90.   In the purported copy of the Second Amended and Restated Loan Agreement proffered by Danske, and signed by David Daniels and Peter Hughes, a Danske manager, Jowdy again represented that he believed "there is a possibility that the Kenner parties could be joined into the litigation described in Exhibit 3.1 (b)." *See* Kostolampros Decl., Ex. 51 at p. 32.   However, the purported Second Amended and Restated Loan Agreement proffered by Danske did not attach the referenced Exhibit 3.1(b).   Accordingly, Danske knew about pending litigation involving Jowdy and should have conducted due diligence to inquire into the circumstances.

Moreover, Hughes told Fortune Magazine in an interview in 2012 regarding the DCSL Resort's management that, "[i]f there had been mismanagement, I think it would have turned up in the due diligence we've conducted on the project over the past three years."   *See* O'Connor Decl. at Exhibit GX-13, *Former Financial Advisor to NHL Players Attempts to Close the Book on Fraud Allegations by Luring Fortune Reporter to Arizona Chicken Coop to Tell His Side of the Story*.   This interview, which took place years after the lawsuits and news reports connecting the DCSL Resort to criminal conduct, demonstrates that as far back as 2009 – the year Danske allegedly assumed the Initial Loan (*see* Kostolampros Decl., Exhibit 3 at p.8), Danske represented that it had conducted due diligence, and should have been aware of the allegations of wrongdoing that gave rise to the forfeiture of the property.

Further, although Hughes stated that Danske was unaware of mismanagement of the DCSL Resort, even if that were true, that does not mean that Danske was without reason to know that the DCSL Resort was subject to forfeiture.   Indeed, the proper inquiry is whether Danske was reasonably without notice that the DCSL Resort was subject to forfeiture, or stated more specifically, whether Danske was reasonably without notice that proceeds of Defendants' crimes had been used to purchase the DCSL Resort and/or that the DCSL Resort was involved in money laundering.

Here, the facts establish that Danske had such notice.   For instance, in a 2008 civil lawsuit filed against Jowdy, the Defendants, and others, by one of the Defendants' victims, Joe Juneau, Juneau alleged, *inter alia*, that Jowdy and the Defendants "misappropriated and/or diverted the funds loaned by Juneau and used them for a different development called Dia Monte

Caba [sic; *i.e.*, the DCSL Resort].   Juneau did not consent to any such diversion of funds."

O'Connor Decl. at Exhibit GX-6 at p. 13, ¶ 51.[21]

Moreover, a complaint filed by Jowdy in a 2010 civil lawsuit against several of Defendants' victims contained numerous allegations that provided notice to Danske that the DCSL Resort was subject to forfeiture.   *See* O'Connor Decl. at Exhibit GX-9.   In his complaint, Jowdy alleged, *inter alia*: that he was involved in the establishment and fundraising of projects with Kenner, including the DCSL Resort project, *id.* at p. 6; that he and Kenner did not have money for the down payment on the DCSL Resort and did not contribute any of their own money to obtain their interests in the DCSL Resort, yet each of them were to own a "half-interest" in the DCSL entity that owned 99% of the DCSL Resort property, *id.* at pp. 6-7; that Constantine "proposed" becoming a "joint partner" with Kenner and Jowdy, and "Constantine intended to acquire some or all of Jowdy's equity in the Cabo project," and Constantine further "told Jowdy that unless [Jowdy] acquiesced to [Constantine's] demands, Kenner would sue Jowdy and claim that [Jowdy] had stolen funds relating to the projects, publish embarrassing information about Jowdy's friends and potential investors, and contact [Lehman] to claim that Jowdy had mismanaged the Cabo project," *id.* at p. 8; that Constantine had contacted Lehman to "spread[] negative information about Jowdy," and make "extremely disparaging comments" about Jowdy's performance and conduct as the manager of the Cabo project, including that Jowdy had wasted the funds [Lehman] had disbursed to the Cabo project and that Jowdy was incapable of completing the project," *id.* at pp. 8, 18; and, that "some of Kenner's hockey player

---

[21] The numerous lawsuits and newspaper and magazine articles that provided notice to Danske that the DCSL Resort was forfeitable are attached to the O'Connor Decl., along with a summary chart.   *See* O'Connor Decl. & Exhibit GX-12.

clients . . . filed two virtually identical lawsuits on behalf of certain hockey players, stating

claims against Jowdy," *id.* at p. 10, which alleged "among other things, Jowdy arranged for porn

stars, strippers, escorts and party girls to attend functions at the projects' expense, . . . and that

Jowdy had falsified financial statements," *id.* at p. 11.   Significantly, Jowdy asserted that

*Constantine contacted Danske* to make disparaging remarks about "Jowdy's management

abilities and conduct," *id.* at pp. 12, 18, which, at the very least, should have triggered an inquiry

by Danske into the DCSL Resort's and Jowdy's connection to Kenner, Constantine, and the

criminal activity alleged in the numerous news articles and civil complaints.

Danske most certainly had notice that Kenner stole victims' money to fund the down

payment on the DCSL Resort, and, thus, that the DCSL Resort was subject to forfeiture, given

Jowdy's allegations that when "it became apparent that Kenner did not have the money" "to

provide the down payment on the Cabo property in return for [Kenner's] interest in DCSL,"

"Kenner initially 'borrowed' $2.5 million from two hockey players clients – Jere Lehtinen and

Jozef Stumpel – to purchase his equity interest," and that "when the 'borrowed' and other funds

proved insufficient, Kenner began soliciting his hockey player clients for the additional funds for

the down payment."   *Id.* at p. 7.   Jowdy's use of quotation marks around the word "borrowed"

was a clear indication that, at best, the funds derived from a specious source, and, at worst, the

funds used for the down payment on the DCSL Resort were not in fact borrowed, but were

stolen.   Indeed, these allegations, coupled with Jowdy's additional allegation that Lehtinen and

Stumpel had *not* invested in the DCSL Resort project, *id.* at p. 11, lead to the only logical

conclusion -- that the funds had been stolen.   Jowdy subsequently swore in a declaration filed in

this action that he "kept Danske fully informed [of his] continuing legal issues with Kenner and

Kenner's clients, and continue[s] to do so."   O'Connor Decl. at Exhibit GX-14, Declaration of

Kenneth A. Jowdy, *United States v. Kenner, et.al.*, CR-13-607 (S-2), DE 611-1 at ¶ 21.   Jowdy's

admissions prove that Danske was on notice of the wrongdoing that gave rise to the forfeiture of

the DCSL Resort, and that, at the very least, Danske should have engaged in a reasonable inquiry

as to the forfeitability of the DCSL Resort.   Indeed, "a genuinely held belief that property is not

subject to forfeiture is unavailing unless the belief was objectively reasonable in the

circumstances . . . . This standard precludes willful blindness on the part of a petitioner and

imposes a duty of reasonable inquiry, where warranted, before objective reasonableness can be

established."   *Armstrong*, 2007 WL 7335173, at *3 (citation and internal quotation marks

omitted).

          Absent from Danske's Petition is any documentation of a due diligence inquiry to

support Danske's claim that it was reasonably without notice of the forfeitability of the DCSL

Resort, which is particularly notable given the wealth of evidence showing that Danske had

reason to know of the forfeitability of the DCSL Resort.   The government sought due diligence

related records in its document demands, but Danske refused to produce the records.   *See*

O'Connor Decl. at Exhibit GX-15, Government's Document Demands.   Notwithstanding

Danske's initial refusal, on August 6, 2020, Danske produced an unauthenticated, undated

document titled "Due Diligence Report," which consists of a chart listing the name of certain

loan documents, a brief description of each document, and notes about each document, such as

whether it had been received and whether it had been reviewed.   Completely missing from the

summary report, however, is any mention of the DCSL Resort's potential connection to criminal

conduct or the accusations surrounding Jowdy, Kenner and Constantine, including the potential

litigation of which Danske was repeatedly made aware.   *See* O'Connor Decl. at Exhibit GX-16,

Danske's Due Diligence Report produced by Danske on August 6, 2020; *see also* O'Connor

Decl. at Exhibit GX-12.   Similarly, on August 6, 2020, Danske produced two documents, both

titled "2013 Loan Modification Due Diligence Items and Schedule for Delivery," which identify

numerous documents, such as sales contracts and schedules, as well as what is presumably the

dates those documents were to be delivered to Danske by the DCSL Resort; however, the

documents lack any reference to the DCSL Resort's involvement in criminal conduct or the

conduct of Jowdy, Kenner and Constantine.   *See* O'Connor Decl. at Exhibit GX-17, 2013 Loan

Modification Due Diligence Items and Schedule for Delivery; Exhibit GX-18, 2013 Loan

Modification Due Diligence Items and Schedule for Delivery.   Danske provided no additional

due diligence documents for its acquisition of the Initial Loan or for when it entered into the

numerous other loan modifications and extensions.

In a case analogous to the instant case, *United States v. Sabatino*, 2018 WL 2074191

(S.D. Fla. Apr. 13, 2018), *report and recommendation adopted*, 2018 WL 2016500 (S.D. Fla.

Apr. 30, 2018), the court found that a claimant was not a bona fide purchaser for value, and was

"responsible for its own predicament because it did not conduct sufficient due diligence when

confronted with myriad flags warning of suspicious and atypical activity underlying the

defendants' offer to sell it the forfeited items."   2018 WL 2074191, at *1.   In *Sabatino*, an

experienced pawnbrokering company purchased stolen luxury goods for pennies on the dollar,

ignored numerous red flags suggesting that the goods were stolen, failed to make a reasonable

inquiry, and ignored its own anti-money laundering compliance program, as well as state and

federal law.   *Id.*, at *7-12.   Hence, the court found that the pawnbroker claimant failed to meet

the objective test demonstrating that it was reasonably without cause to believe that the goods

were forfeitable.   *Id.*, at 13.

Here, much like the facts in *Sabatino*, Danske, a sophisticated multi-national lender, ignored evidence (including statements made to it *by one of the criminal* defendants that the DCSL Resort manager had engaged in misconduct, and allegations by the DCSL Resort manager suggesting that *the DCSL Resort was purchased with stolen money*) that the DCSL Resort was connected to the Defendants' criminal activity; appears to have purchased the DCSL Resort loan for pennies on the dollar; and has failed to provide any evidence that it engaged in a reasonable inquiry despite modifying the Initial Loan numerous times over the course of approximately 11 years.

At the very least, there can be no dispute that Danske was not a bona fide purchaser for value of the funds it loaned to the DCSL Resort after the government filed the Bill of Particulars on August 20, 2015, as Danske was indisputably on notice that the DCSL Resort was subject to forfeiture at that time.   *See* Fedkenheuer Aff. at ¶¶ 42-44 (stating that Danske allegedly advanced $50,749,480 and entered into the Second Amendment to Third Amended and Restated Loan Agreement after the Government filed the Bill of Particulars).[22]

## IV.     Danske's Motion for Summary Judgment Should Be Denied Because the Government Has Not Been Afforded Adequate Time to Engage in Discovery

Even if the Court were to find that Danske has satisfied the pleading requirements of 21 U.S.C. § 853(n)(3), Danske's motion for summary judgment must be denied because the government has not been afforded adequate time to engage in discovery.   Utterly refusing to provide the requested proof of its nearly $200 million claim, Danske improperly seeks an

---

[22] In fact, on April 22, 2015, the government filed a Bill of Particulars, DE 208, which provided notice that the government would be seeking the forfeiture of Baja Ventures and Diamante Properties – properties in which Danske now asserts an interest.   Thus, the filing of this Bill of Particulars should have triggered an inquiry by Danske into the forfeitability of all of the Forfeitable Property.

expedited summary adjudication of its claim, in an apparent effort to deny the government an opportunity to discover the basis of Danske's interest and an opportunity test the veracity of Danske's assertions.   Moreover, contrary to Danske's contentions, the factual record on its claim, charitably put, remains ambiguous and undeveloped.   Accordingly, this Court should deny Danske's motion and allow the government to conduct discovery on Danske's claim.

Rule 56(d) protects parties from being "railroaded" by a premature motion for summary judgment, and allows the court to deny the motion, or postpone ruling on the motion, "if the nonmoving party has not had an opportunity to make full discovery." *Celotex Corp.*, 477 U.S. at 326; *see also Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.D.C. 2012) ("[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986))).   "The nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250 n.5).   A full opportunity to conduct discovery includes the "opportunity for deposition in order to establish the existence of a material issue." *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971).   Summary judgment may be particularly inappropriate where, as here, little to no formal discovery has occurred.   *Richie v. Vilsack,* 287 F.R.D. 103, 105 (D.D.C. 2012) (finding summary judgment "comes too early" where "parties have had no opportunity, let alone a full opportunity, to conduct discovery."); *Littner v. McKanic*, 130 B.R. 129, 132 (Bankr. E.D.N.Y. 1991) ("In light of plaintiffs['] limited opportunity to conduct discovery and the numerous material issues of fact in dispute, summary judgment is premature.")

Here, Danske's motion for summary judgment is premature.   Little formal discovery has taken place.   The government served Danske with discovery requests on June 17, 2020, and just two days later, on June 19, 2020, Danske filed its motion for summary judgment, and five days after that, on June 22, 2020, Danske responded to the government's discovery requests, objecting to nearly every request that was served.   Moreover, Danske's informal and reluctant, piecemeal document production over the course of several years has been and continues to be woefully inadequate.   Although Danske, on more than one occasion, represented to the Court that it has provided all of the documents needed for a determination of its claim, Danske continues to produce documents to the government, even after having filed the instant motion for summary judgment.   In fact, on the evening of June 30, 2020, Danske filed a revised statement pursuant to Local Rule 56.1, and a revised exhibit consisting of 276 pages, *see* Danske Revised Rule 56.1, and on the evening of August 6, 2020, 11 days before the government's deadline to file this motion for summary judgment and opposition to Danske's motion, Danske served the government with an additional near 1,000 pages of documents.   *See* DE 890 (government's letter requesting additional time to file the instant motion papers because of Danske's August 6, 2020 production).   In addition, having not received a formal statement of Danske's claim prior to Danske's filing of its Petition on May 6, 2020, the government did not know the nature and extent of Danske's claim, nor the time and circumstances of Danske's acquisition of its claimed interest.   Indeed, as discussed *supra*, the government still does not know the time and circumstances of Danske's acquisition of its claimed interest.   Thus, the government has not had adequate opportunity to seek the discovery needed to test Danske's claim.

As set forth in the Fedkenheuer Aff., Danske's documentary proof as to the Initial Loan and Additional Loans suffers numerous inadequacies and deficiencies, which can only be

remedied, if at all, through additional discovery.   As discussed *supra*, these inadequacies and

deficiencies include, but are not limited to:

- Danske has not provided loan statements for Facilities A and B dating after February 28, 2020, or Facility C loan statements dating after January 1, 2020, even though the Petition claims costs incurred through April 30, 2020 (Fedkenheuer Aff. ¶ 37 n.18);

- Numerous discrepancies between Danske's loan statements and Trimont's Invoices, which limit the ability to validate the unpaid principal balances in Danske's claim (Fedkenheuer Aff. at ¶¶ 9-18, 35 n.12);

- Notable inconsistencies between the various Trimont documents provided by Danske, in addition to the discrepancies between the Danske loan statements and the Trimont Invoices, which further limit the ability to properly validate Danske's claim (Fedkenheuer Aff. at ¶ 17);

- The Trimont Invoices that were provided do not support $6,297,406 of the funding that Lehman allegedly extended to the DCSL Resort (Fedkenheuer Aff. at ¶ 12);

- Danske did not provide the documentation required by the loan documents prior to making a disbursement to Danske. This documentation was requested to support that the funding would be used for the reimbursement of construction or developmental costs incurred and paid by the DCSL Resort (Fedkenheuer Aff. at ¶¶ 19-28, 38);

- Danske had not provided documentation to support the increase of the Profit Participation Fee ("PPF") from $45,000,000 to $50,000,000 (Fedkenheuer Aff. at ¶¶ 29-31);

- Danske's support for the $45,000,000 PPF was based on data from 2008 (*id.*);

- Funds were used from one facility to pay down the balance of another facility, therefore the overall principal owed by the DCSL Resort did not decrease (Fedkenheuer Aff. at ¶¶ 32-33, 35);

- Danske has not provided support for the estimated $900,000 in timeshare deposits that it applied to its claim, nor did it provide any Facility C loan statements with a date more recent than December 2019 (Fedkenheuer Aff. at ¶¶ 36-37);

- Danske addressed the bank statements to entities other than the DCSL Resort (Fedkenheuer Aff. at ¶ 39);

58

- Danske's claim includes at least $7,094,438 of fees of which $3,505,800 has not been supported by Danske (Fedkenheuer Aff. at ¶¶ 40-41); and

- Danske has not provided sufficient documentation to support its purchase value of the Initial Loan (Fedkenheuer Aff. at ¶ 45-48).

Further, a chart attached to the O'Connor Decl. at Exhibit GX-19, The Government's Responses to Danske Bank's Objections to the Government's First Set of Requests for Production of Documents, DE 871-4, identifies each of the government's document demands served on Danske, and how each document demand pertains to an element that Danske must prove to establish its claim to be a bona fide purchaser for value.

According to the Second Circuit's decision in *Meloff*, a party opposing summary judgment under Rule 56(d) on the basis that it lacks facts essential to its opposition, must submit a declaration setting forth: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff*, 51 F.3d at 375 (citation and internal quotation marks omitted).   Here, the Fedkenheuer Aff. and the O'Connor Decl. collectively satisfy the *Meloff* requirements as they identify the government's document demands, Danske's response to the government's requests (in most cases, Danske refused to provide any response), and how each document demand pertains to an element that Danske must prove to establish its claim to be a bona fide purchaser for value.

In sum, as discussed more fully *supra*, Danske has the burden of proving, by a preponderance of the evidence, the following three elements in order to succeed on its claim under Section 853(n)(6)(B) that it has a superior legal interest in the Forfeitable Property: 1) that it has a valid legal interest in the Forfeitable Property; 2) that it was a bona fide purchaser for

59

value of its interest in the Forfeitable Property; and 3) that it was reasonably without cause to believe that the Forfeitable Property was subject to forfeiture.   *Timley*, 507 F.3d at 1130–31. The government served Danske with document demands, directed to the allegations set forth in Danske's Petition, with regard to the three elements that Danske must prove under the above summarized case law, but Danske failed to produce, and refuses to produce, evidence to meet its burden as to all three elements.   Accordingly, Danske's motion for summary judgment must be denied.   However, should the Court determine that additional discovery is unnecessary or undesirable, then the government's motion for summary judgment must be granted and Danske's Petition dismissed for the reasons discussed, *supra*.

## V.      Danske is Not Entitled to Summary Judgment Regarding Priority of Its Purported Claim

In this case, numerous third party petitions have been asserted to the Forfeitable Property. As such, the Court must weigh all interests before determining the priority of claims.   *See Willis Mgmt.*, 652 F.3d at 246 ("[T]he purpose of the ancillary proceeding is for the District Court . . . to amend orders of forfeiture and apportion assets when one or more third parties claim an interest in the property to be forfeited."); *see also Frykholm*, 362 F.3d at 416-17 (noting that the claimant, that was attempting to "reap a profit while . . . [the] other creditors go begging," had to "stand in line with the rest").   Accordingly, Danske's motion seeking adjudication of the priority of its purported claim must be denied.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Danske's motion for summary judgment and authorize additional discovery, or, alternatively, if the Court determines that additional discovery is unnecessary or undesirable, the government

respectfully requests that the Court grant the government's motion for summary judgment.

Dated: Central Islip, New York
September 9, 2020

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York
*Attorney for Plaintiff*
610 Federal Plaza
Central Islip, New York 11722

By: */s/ Madeline O'Connor*
Madeline O'Connor
Diane C. Leonardo
Assistant U.S. Attorney
(631) 715-7870
(631) 715-7854

61