**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

-against-

PHILIP A. KENNER, *et al.*,

Defendants.

No. 13-cr-0607 (JFB)

**REPLY IN SUPPORT OF DANSKE BANK A/S LONDON BRANCH'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE GOVERNMENT'S COUNTER MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ................................................................................. 2

II. ARGUMENT ....................................................................................................... 5

    A.  The Government Has Not Offered Any Material Fact In Dispute
    Countering Danske's Statement of Material Facts ........................................... 5

    B.  The Undisputed Facts Establish Danske's Claim. ........................................... 8

        1.  Danske Has Established That It Has A Valid Legal Interest in the
        Resort Property. ........................................................................................ 8

        2.  The Government's Remaining Arguments Challenging Danske's Legal
        Interest Are Meritless.............................................................................. 10

        3.  The Government's Consultant's Opinion as to the Validity of Danske's Claim
        Should Be Stricken and Her Other Opinions Are Otherwise Irrelevant in
        Determining Whether Danske Has a Legal Interest Arising from the
        Additional Loans...................................................................................... 12

        4.  The Purported Inconsistencies and Deficiencies Identified by the Government's
        Forensic Accountant Are Incorrect and,  in any event, Do Nothing to Challenge
        Danske's Legal Interest in the Resort Property. ....................................... 16

    C.  Danske Is A Bona Fide Purchaser For Value. ............................................... 23

        1.  The Undisputed Facts Demonstrate that Danske Purchased Lehman's
        $107 Million Interest for More than It Was Worth and that Danske
        Has Advanced Millions and Millions of Dollars Since 2009. .................. 23

        2.  Judicial Estoppel Does Not Apply.......................................................... 25

        3.  Danske has Provided Evidence Supporting that the Amount Owed
        on the Initial Loan Was $157 Million...................................................... 26

        4.  The Government's Baseless and False Assertions as to Danske's
        Lending Practices Are a Red Herring. ..................................................... 27

        5.  The Government's Windfall Argument Is Yet Another Baseless and Legally
        Unsupportable Argument That Attempts to Strip Danske of Its Rights
        Under the Loan Agreements .................................................................... 29

    D.  Danske Was Reasonably Without Cause to Know the Resort Property
    and Equity Interests Were Subject to Forfeiture............................................ 32

        1.  The Newspaper Articles and Civil Complaints Do Not Create Reasonable
        Cause to Know Property Is Subject to Forfeiture. ................................... 32

        2.  Danske Is a Bona Fide Purchaser as to Amounts Advanced After 2015. .................. 37

    E.  Danske Has the Most Senior Secured Interest in the Resort Property and
    the Equity Interests and the Preliminary Order Should Be Amended to
    Recognize Danske's Claim. ........................................................................... 39

i

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST
ATTORNEY WORK PRODUCT
DRAFT: October 9, 2020

III. THE GOVERNMENT HAS NOT ESTABLISHED THAT THERE IS A NEED
FOR ADDITIONAL DISCOVERY. ..................................................................... 40

IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT. ..................... 41

V.  CONCLUSION ..................................................................................................... 42

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC*,
439 B.R. 47 (Bankr. S.D.N.Y. 2010) ...................................................................41

*In re 300 Washington St.*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015) ................................................................24

*Ament v. Townsend*,
No. 98 C 1918, 1998 U.S. Dist. LEXIS 8448 (N.D. Ill. May 29, 1998) ...................5

*Arment v. Townsend*,
No. 98 C 1918, 1998 WL 299806 (N.D. Ill. May 29, 1998) ....................................5

*Bennett v. Target Corp.*,
16-CV-5816 (ADS)(SIL), 2018 U.S. Dist. LEXIS 189067 (E.D.N.Y. Nov. 5,
2018) ..................................................................................................................12

*Biggs v. Midland Credit Mgmt., Inc.*,
No. 17-CV-340 (JFB)(ARL), 2018 WL 1225539 (E.D.N.Y. Mar. 9, 2018) ............5

*Buesing v. United States*,
42 Fed. Cl. 679 (Fed. Cl. 1999) ..........................................................................38

*Carr v. Gillis Associated Indus.*,
No. 04-5345, 2006 U.S. Dist. LEXIS 16469 (E.D. Pa. April 4, 2006) ..................24

*In re CCT Commc'ns, Inc.*,
420 B.R. 160 (Bankr. S.D.N.Y. 2009) ................................................................24

*Davis v. Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013) ................................................................13

*Design Partners, Inc. v. Five Star Elec. Corp.*,
No. 12-CV-2949 (PKC)(VMS), 2016 U.S. Dist. LEXIS 41913 (E.D.N.Y.
Mar. 29, 2016) ...............................................................................................4, 40

*Dewees Mellor, Inc. v. Weise*,
No. 91 CV 2518 (EKR), 1993 U.S. Dist. LEXIS 19299 (E.D.N.Y. Dec. 29,
1993) ..................................................................................................................30

*DMJ Assocs., L.L.C. v. Capasso*,
288 F. Supp. 2d 262 (E.D.N.Y. 2003) ................................................................11

*Equator Int'l, Inc. v. NH St. Inv'rs, Inc.*,
   43 Misc. 3d 251 (N.Y. Sup. Ct. 2014) ..................................................................30

*In re Finlay Enters.*,
   Case No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592 (Bankr. S.D.N.Y. May
   18, 2010) ..............................................................................................................38

*Hersko v. United States*,
   No. 13-CV-3255 (JLC), 2016 U.S. Dist. LEXIS 145552 (S.D.N.Y. Oct. 20,
   2016) ....................................................................................................................13

*Hochberg v. Howlett*,
   92-cv-1822, 1992 WL 373631 (S.D.N.Y. Dec. 1. 1992) ........................................5

*Hogan v. Novartis Pharms. Corp.*,
   06 Civ. 0260 (BMC) (RER), 2011 U.S. Dist. LEXIS 43800 (E.D.N.Y. April
   23, 2011) ..............................................................................................................13

*IMH Broadway Tower Sr. Lender, LLC v. Hertz*,
   415 F. Supp. 3d 455 (S.D.N.Y. 2019) ..................................................................38

*In re J.F.K. Acquisitions Grp.*,
   166 B.R. 207 (Bankr. E.D.N.Y. 1994) ..................................................................24

*J.P. Morgan Chase Bank, N.A. v. Yuen*,
   11 Civ. 9192 (NRB), 2013 WL 2473013 (June 3, 2013) ........................................6

*Jackson v. POM Recoveries, Inc.*,
   No. 17-CV-6118 (AMD)(AKT), 2020 U.S. Dist. LEXIS 151824 (E.D.N.Y.
   Aug. 21, 2020) ..........................................................................................4, 40, 41

*In re Krumm*,
   534 B.R. 142 (W.D.N.C. 2015) ............................................................................24

*In re La Difference Rest., Inc.*,
   29 B.R. 178 (Bankr. S.D.N.Y. 1983) ....................................................................37

*Liberty Mut. Fire Ins. Co. v. Scott*,
   486 F.3d 418 (8th Cir. 2007) ................................................................................24

*Magers v. Jones*,
   No. 2:14-cv-001184-GEB-EFB, 2016 WL 2939419 (E.D. Cal. May 20, 2016) ....24

*In re Metmor Fin., Inc.*,
   819 F.2d 446 (4th Cir. 1987) ................................................................................30

*Miller v. Tate & Kirlin Assocs.*,
No. 1:19-cv-01353-JRS-DLP, 2020 U.S. Dist. LEXIS 37239 (S.D. Ind. Mar. 4, 2020) ........................................................................................................4

*Monty v. US Bank, N.A. ex rel JPMorgan Mortgage Acquisition Trust 2006-CW*,
No. 5:15–cv–97, 2015 WL 6441725 (D.Vt. Oct. 22, 2015) ........................6

*In re Ollag Constr. Equipment Corp.*,
665 F.2d 43 (2d Cir. 1981)............................................................................6

*Pearlman v. Cablevision Sys. Corp.*,
10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 172080 (E.D.N.Y. Dec. 28, 2015) .........................................................................................................12

*Schwebel v. Crandall*,
No. 18-3391-cv, 2020 U.S. App. LEXIS 22844 (2d Cir. July 22, 2020) ...............................37

*SEC v. Revelation Capital Mgmt.*,
215 F. Supp. 3d 267 (S.D.N.Y. 2016)..........................................................12

*Tonkonogy v. United States*,
417 F. Supp. 78 (S.D.N.Y. 1976) ................................................................37

*United States v. 1461 W. 42nd St., Miami, Fla.*,
998 F. Supp. 1438 (S.D. Fla. 1998) .............................................................30

*United States v. 1461 W. 42nd St., Miami, Fla.*,
No. 91-1077-CIV-DAVIS, 1999 U.S. Dist. LEXIS 23343 (S.D. Fla. Mar. 10, 1999) ...........................................................................................................30

*United States v. BCCI Holdings (Luxembourg), S.A.*,
961 F. Supp. 287 (D.D.C. 1997).................................................................35

*United States v. Cox*,
641 F. Supp. 2d 489 (W.D.N.C. 2007), *rev'd and remanded on other grounds*, 575 F.3d 352 (4th Cir. 2009) ......................................................................34

*United States v. Jakobetz*,
955 F.2d 786 (2nd Cir.1992)..........................................................................6

*United States v. Lazy FC Ranch*,
481 F.2d 985 (9th Cir. 1973) .......................................................................37

*United States v. Petters*,
No. 08-364, 2013 U.S. Dist. LEXIS 10396 (D. Minn. Jan. 24, 2013)....................34

*United States v. Preston*,
123 F. Supp. 3d 117 (D.D.C. 2015) ..............................................................8

*United States v. Sabatino,*
No. 16-20519-CR-LENARD/GOODMAN, 2018 WL 2074191 (S.D. Fla.
April 13, 2018) .........................................................................................35, 36

*United States v. Swartz,*
391 F. Supp. 3d 199 (N.D.N.Y. 2019) ..............................................................7, 8

*United States v. Varner,*
13 F.3d 1503 (11th Cir. 1994) ..............................................................................5

*United States v. Watts,*
786 F.3d 152 (2d Cir. 2015)..................................................................30, 31, 32

*Yevstifeev v. Steve,*
860 F. Supp. 2d 217 (W.D.N.Y. 2012) ...........................................................9, 40

**Statutes**

N.Y.U.C.C. § 1-204 .........................................................................................22

N.Y.U.C.C. § 3-303 .........................................................................................22

**Other Authorities**

Dep't of Justice Manual, Criminal Forfeiture Procedures at 9-113-420, available
at https://www.justice.gov/jm/jm-9-113000-forfeiture-settlements .......................33

Fed. R. Civ. P. 56...............................................................................................1

Fed. R. Crim. P. 32.2 ..........................................................................................1

Local Rule 56.1 ........................................................................................4, 7, 41

Fed. R. Evid. 803 ...............................................................................................6

Fed. R. Evid. 902(9).............................................................................................5

Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure and Rule 56 of the Federal Rules of Civil Procedure, Danske Bank A/S London Branch ("Danske") respectfully submits this opposition (the "Opposition") to the government's cross-motion for summary judgment (the "Cross-Motion") and this reply (the "Reply") in support of its Motion.[1]

## I.   PRELIMINARY STATEMENT

Far from establishing that there is a genuine issue of material fact as to any element of Danske's claim, the government's opposition is simply a mish mash of irrelevant and false or incorrect factual assertions. The undisputed facts establish that Danske's interest is superior to the government's interest. This is not surprising as Danske is the senior secured lender who purchased Lehman's interest as part of a repurchase agreement and subsequently fully acquired Lehman's remaining interest when Lehman went bankrupt, and then advanced over $98 million to fund the development of the Resort Property into the facility it is today. The weakness of the government's factual assertions and legal arguments is matched only by the strength of its efforts to throw the kitchen sink and hope something sticks.

First, the government does not offer any fact in dispute of Danske's claim. Instead, the government asserts admissibility objections that are either incorrect, or easily addressed or refuted. The government does not challenge the factual substance or the accuracy of the underlying documents submitted by Danske.

Second, astoundingly, the government argues that Danske does not have a legal interest in the Resort Property because it purportedly did not pay any value in purchasing Lehman's interest. This is a frivolous argument. There is no dispute that Danske paid $800 million to acquire a pool

---

[1]   Capitalized terms not defined herein shall take the meaning ascribed to such terms in the Motion.

of collateral consisting of liens secured against commercial real estate, which included the Resort Property. The government's theory that Danske's claim should be limited to the amount it and Lehman valued the underlying loan at the time of Lehman's bankruptcy has no legal basis. That valuation was used in determining amounts still owed to Danske under the $800 million Repurchase Agreement—not a purchase price of those assets. The government's theory would effectively make any loan purchased in the secondary market limited to the amount the subsequent purchaser paid for that loan—that is simply not the law and would turn the secondary market on its head. The undisputed facts are that Lehman and Danske represented to the bankruptcy court, and the bankruptcy court approved the settlement recognizing Danske's prior purchase of Lehman's interest in the Resort Property and Danske's decision to retain that interest to partially satisfy the debt owed to Danske. There is simply no factual dispute that Danske acquired all of Lehman's interest and is entitled to payment of the $107 million that was owed to Lehman at the time of Lehman's bankruptcy filing, plus the additional millions Danske itself advanced and is unpaid as well as unpaid interest and fees.

Third, despite the fact that the government itself did not include the Resort Property as subject to forfeiture until almost two years after indicting the defendants, the government claims Danske had reason to believe that the Resort Property was subject to forfeiture. In its opposition the government ignores Danske's argument that the fact that the government itself did not bring its indictment until years after Danske acquired Lehman's interest is dispositive that Danske had no reason to believe that the Resort Property was subject to forfeiture. The government argues that Danske should have known about the forfeiture because of unproven allegations in civil complaints or news articles, but the cases it cited do not support this theory. As the Court has already recognized, the government's argument is weak.

The government also resorts to asserting an array of false and defamatory arguments—that Danske did not conduct diligence and that Danske engaged in improper lending practices. These arguments are unsupported by the facts and case law. In fact, the government has known *for years* that Danske conducts monitoring on a continuous and ongoing basis. This includes, among other things, Danske's engagement of an experienced third-party lender consultant to review and conduct diligence on every lender advance request to ensure that the expenses were incurred and/or paid for development and related purposes *prior* to an advance being made.

Fourth, the government asks the Court to consider a declaration submitted by the government's forensic accountant. As explained below, however, the government's consultant declaration opines on the legal issue of whether Danske has established its claim and issues that are not before the court in this ancillary proceeding, i.e., how the developer used the funds.  These aspects of the government's declaration should be stricken.  Further, the remaining portions of the government's consultant's statements relate to purported discrepancies in Danske's claim—many of which are wrong and all of which do nothing to challenge Danske's claimed interest in the Resort Property.

Finally, the government also contends that Danske—which has lost hundreds of millions of dollars as a result of the repurchase transactions with Lehman—will somehow reap a windfall if it is permitted to enforce its lien. The government seeks to rewrite the underlying agreements that would effectively make the underlying loans (which were entered into years ago) interest-free loans and wipe Danske's secured interest away. Not surprisingly, the government offers no case law in support of such a theory because it is contrary to law. In fact, it is the government that stands to reap a windfall by stripping Danske of its rightful superior position as a secured lender and of its entitlement to full repayment of the amounts it is owed. Even if the government were to repay

4

victims in whole, then the government stands to take all value above that amount at Danske's expense. That is simply not the law.

For the reasons set forth above and below (as well as in Danske's Motion and Petition), Danske's Motion should be granted and the government's Cross-Motion should be denied.

## II.     <u>ARGUMENT</u>

### A.    The Government Has Not Offered Any Material Fact In Dispute Countering Danske's Statement of Material Facts

Summary judgment is appropriate where it is demonstrated that "there is 'no genuine dispute as to any material fact,' and the movant is 'entitled to judgment as a matter of law . . . . Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Jackson v. POM Recoveries, Inc.*, No. 17-CV-6118 (AMD)(AKT), 2020 U.S. Dist. LEXIS 151824, at *3-4 (E.D.N.Y. Aug. 21, 2020); *Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949 (PKC)(VMS), 2016 U.S. Dist. LEXIS 41913, at *14-15 (E.D.N.Y. Mar. 29, 2016).

In its Counter Rule 56.1 Statement, the government does not contest the validity of these documents or their substance nor does the government offer any material fact in dispute. Instead, the government "disputes the authenticity and admissibility" of the underlying documents supporting Danske's claim, all of which are easily addressed and/or cured.

Although the government is correct that evidence must be admissible on a summary judgment motion, the government is incorrect that the underlying loan and related agreements are not authenticated. "Courts have consistently held that loan agreements and similar bank documents are self-authenticating under [Federal Rule of Evidence] 902(9)." *Miller v. Tate & Kirlin Assocs.*, No. 1:19-cv-01353-JRS-DLP, 2020 U.S. Dist. LEXIS 37239, at *6-7 (S.D. Ind. Mar. 4, 2020); *see*

*also United States v. Varner*, 13 F.3d 1503, 1509-10 (11th Cir. 1994) (holding that promissory notes and assumption agreements were self-authenticating under Rule 902(9) as "relating to" commercial paper); *Ament v. Townsend*, No. 98 C 1918, 1998 U.S. Dist. LEXIS 8448, at *11-12 (N.D. Ill. May 29, 1998) (holding that copies of checks and invoices were self-authenticating under Rule 902(9)). This is true "'even if the document is originally created by another entity . . . .'" *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340 (JFB)(ARL), 2018 WL 1225539, at *4 (E.D.N.Y. Mar. 9, 2018).

Further, the government recognizes that Danske relies on the business records exception to the hearsay rule, but argues that the loan agreements and other documents are inadmissible hearsay because Danske did not provide a declaration from custodians of record. As part of this submission, Danske has produced additional declarations affirming that the underlying loan and related agreements and other documents submitted by Danske are what they purport to be and are business records and thus admissible as an exception to the hearsay rule. *See Hochberg v. Howlett*, 92-cv-1822, 1992 WL 373631, at *4 (S.D.N.Y. Dec. 1, 1992) (finding that supplemental declarations may be used to cure any possible defects in an initial declaration and support a party's motion for summary judgment); *Arment v. Townsend*, No. 98 C 1918, 1998 WL 299806, at *5 (N.D. Ill. May 29, 1998) (holding that there was nothing improper about relying on an authentication affidavit submitted on reply where "it did not provide a separate basis for granting summary judgment" and instead was provided "in response to the [ ] argument that the Trustee's evidence was not properly authenticated").

In addition to records created by Danske, records that Danske received from Lehman, Trimont (the servicer of the loan) and Bank of New York (the custodian under the MRA) were incorporated into Danske's business records. *See* Declaration of Jovan Atkinson ("Atkinson

Decl.") ¶ 7; Supplemental Declaration of David Daniel ("Supp. Daniel Decl.") ¶¶ 7-8. As such, these documents are admissible under Rule 803(6). *See, e.g.*, *United States v. Jakobetz*, 955 F.2d 786, 801 (2nd Cir.1992) (stating that "[e]ven if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity")*; In re Ollag Constr. Equipment Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (affirming lower court ruling that financial statements were admissible under Rule 803(b) as business records because such statements were integrated into bank records and relied upon in day-to-day activities); *Monty v. US Bank, N.A. ex rel JPMorgan Mortgage Acquisition Trust 2006-CW*, No. 5:15–cv–97, 2015 WL 6441725, at *5 (D.Vt. Oct. 22, 2015) (finding loan documents were integrated into subsequent servicer's, stating that "'under Rule 803(6) business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day-to-day operations'"); *J.P. Morgan Chase Bank, N.A. v. Yuen*, 11 Civ. 9192 (NRB), 2013 WL 2473013, at *6 (June 3, 2013) (finding that although record was created by predecessor entity, it was admissible as record of successor because it was incorporated into successor's records).

Danske has also submitted a declaration from Trimont setting forth that the Trimont invoices and statements appear to be what they purport to be and are documents Trimont would have kept and maintained in the regular course of its business and would have created at the time of or within a reasonable amount of time after the act, transaction, occurrence or event to which it relates. *See* Declaration of Jennifer Britt ("Britt Declaration") and Exhibits A-D attached thereto. Accordingly, there is now no technical issue as to the admissibility of the underlying documents.[2]

---

[2]      Danske has also submitted in a supplemental declaration certified English translations of Spanish language documents that Danske had originally submitted with uncertified translations. In many instances, the government has had these Spanish language documents with the uncertified

Stripped of its admissibility objections, the government's Counter Rule 56.1 Statement and opposition brief identifies no material fact that is in dispute. Rather, as set forth below, the government offers conclusory statements and arguments that are unsupported by fact or law.

**B.      The Undisputed Facts Establish Danske's Claim.**

**1.      Danske Has Established That It Has A Valid Legal Interest in the <u>Resort Property</u>.**

Despite meeting with Danske multiple times to discuss Danske's interest and entering into settlement discussions (an odd thing for the government to do with a creditor who supposedly lacks standing), and receiving all materially relevant documents supporting Danske's claim the government still argues that Danske does not even have a legal interest in the Resort Property. The government claims Danske has not identified "exactly when, how and for how much it acquired its interest in the Initial Loan from Lehman." The two cases the government cites to support this argument, however, are starkly different than the facts here. In *United States v. Swartz*, 391 F. Supp. 3d 199 (N.D.N.Y. 2019), the court dismissed a petition asserting an interest in the Jreck Subs franchise, finding that the claimant failed to "set forth 'the time and circumstances' of its right, title or interest" in the [Jreck Subs Franchise]." 391 F. Supp. 3d at 213. In *Swartz*, the petitioner asserted its claim in a one-page letter that attached two promissory notes issued by a nominee entity of the defendant, which was not Jreck Subs, and offered no explanation as to how those notes supported its interest in Jreck Subs. Declaration of Xochitl Strohbehn ("<u>Strohbehn Decl.</u>"), Ex. 2 (Swartz Petitioner Claim). In *United States v. Preston*, 123 F. Supp. 3d 117 (D.D.C.

---

translations for years. As with the loan agreements and other documents, the government does not challenge that the uncertified translations are incorrect. Therefore, the government's suggestion that certified translations are somehow necessary is nothing more than the government's latest effort to harass Danske to spend money and resources that are better spent on maintaining the value at the Resort Property. Nevertheless, Danske has submitted certified translation and has cured any technical issue.

2015), the court dismissed an ancillary petition brought by the husband of the defendant because the petitioner did not set forth the basis of his legal interest in his petition. *Id.* at 125. The court noted that "the petition does not reference any state law or the Trust's governing documents." *Id.* The court also found that the petition did not plead the time and circumstances relating to any legal interest petitioner acquired because, with respect to a transfer of securities from a personal account to a trust account, the petition did not allege the date, provide a record, or explain the reason for the transfer. *Id.* at 126.

Unlike the petitions in *Swartz* and *Preston*, the facts and circumstances of Danske's interest in the Resort Property are set forth in Danske's Petition and Motion, which show the following:

❖ Danske and Lehman entered into a master repurchase agreement in 1999 and a committed repurchase facility agreement in 2005. Under the 2005 agreement, Danske paid approximately $800 million to purchase commercial mortgage loans from Lehman that Lehman agreed to repurchase at a later date. *See* MSJ Ex. 27 at DANSKE_0015720. Danske obtained title to a pool of collateral, consisting of liens secured by commercial real estate, upon purchase, though Lehman retained the right to receive income. *See* MSJ Ex. 26, ¶¶ 3(a), 5.

❖ Even though the loan to DCSL (the "DCSL Loan") was extended after the Repo Agreements were executed, the DCSL loan was included among the pool of collateral, consisting of liens secured by commercial real estate, that Danske had purchased under the Repo Agreements. MSJ Exs. 32 and 37. Danske and Lehman typically purchased and repurchased collateral every week, *i.e.*, the collateral rolled over approximately every 7 days. Atkinson Decl. ¶ 11. Furthermore, to the extent that it was necessary, Lehman could substitute commercial real estate liens into the pool of collateral on its own. MSJ Ex. 26, ¶ 9a. There was no expectation that the collateral purchased under the Repo Agreements could only consist of commercial mortgage loans that were extended before or at the same time the Repo Agreements were executed. Atkinson Decl. ¶ 12.

❖ On September 15, 2008, Lehman filed for bankruptcy and defaulted under the MRA. That same day, Bank of New York, as custodian, sent a letter detailing the collateral Danske had purchased under the Repo Agreements that was held for Danske's benefit. MSJ Ex. 32. The DCSL Loan was amongst the collateral.[3] *Id.* Because of Lehman's default, Danske was entitled to retain some or all the assets in the collateral pool and

---

[3]     Specifically, the DCSL Loan is listed on Page 30 of 31 (MSJ Ex. 32 at DANSKE_0016009), and the Asset Amount and Market Value are listed as $107,529,665.05.

use the value of that collateral to offset the amount Lehman owed under the Repo Agreements. MSJ Ex. 26, ¶ 11(d)(i).

❖ Danske elected to retain Lehman's interests in the Resort Property and Equity Interests. *See* MSJ Ex. 37, ¶ 16., Ex. C-1 In January 2009, Danske and Lehman executed the Omnibus Assignment and Assumption Agreement, which confirmed that Danske had acquired all of Lehman's perfected senior interest in the Resort Property, as first place beneficiary under the Mexican Trust Agreement, and Equity Interests for "good and valuable consideration." MSJ Ex. 35.

❖ In September 2009, Danske filed a claim in Lehman's bankruptcy to recover the amount Lehman owed Danske after Danske set-off the amount owed by the value of pool of collateral, consisting of liens secured by commercial real estate, that Danske retained. MSJ Ex. 96.

❖ Danske perfected its interests in the Resort Property and Equity Interests. MSJ Exs. 36, 60, 65-72.

The government, in response, has offered no evidence disputing these material facts, and therefore has not met its burden. *Yevstifeev v. Steve*, 860 F. Supp. 2d 217, 220 (W.D.N.Y. 2012) (citing *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)) ("In responding to a properly-supported motion for summary judgment, the plaintiffs may not rely upon conclusory allegations or denials, but instead must produce evidence in admissible form, setting forth 'concrete particulars' showing that a trial is needed.").

## 2.    The Government's Remaining Arguments Challenging Danske's Legal Interest Are Meritless.

First, the government argues, without any factual or legal support, that Danske could not have purchased Lehman's interest in the Resort Property under the Commercial Repo because the lien was created after the 2005 Repurchase Letter Agreement was executed. Govt. Brf. at 25. This argument lays bare that the government is either ignoring or does not understand the plain terms of the Repo Agreements, which as set forth in Danske's summary judgment motion, expressly contemplated substitute assets being added by Lehman at any time. *See* MSJ Ex. 26, ¶ 9(a)-(b); MSJ Ex. 27, ¶ 16 ("Without limiting the rights of a Seller [*i.e.,* Lehman] under the

Master Agreement, at any time, from time to time, Seller shall have the unlimited right to substitute or withdraw Purchased Assets . . .”). As explained above, the collateral pool rolled over every week—and during that rollover, there was the potential for a change in the composition of the commercial real estate liens included within collateral pool. Atkinson Decl. ¶¶ 11-12. The government cannot refute the trust receipt provided by Bank of New York, which shows that the DCSL loan was included in the collateral pool subject to the MRA and thus Danske had purchased all interest in the DCSL Loan as of September 15, 2008. MSJ Ex. 32; Atkinson Decl. ¶ 15. The government also blindly ignores the Bankruptcy Court documents filed by Lehman stating that Danske *had purchased* Lehman's interest under the MRA. MSJ Ex. 37, ¶ 10 (setting forth that pursuant to the MRA, Commercial Mortgage Assets that included the DCSL loan “***were sold to Danske***”); *id.*, Exhibit B. In a later filing, Lehman represented that “commencing in December 2008 . . . [Lehman], over the course of several months, assigned to Danske all of the loans ***that had been sold to Danske under the MRA as of the Commencement Date*** . . . .” MSJ Ex. 37, ¶ 17 (emphasis added) (defining “Commencement Date” as September 15, 2008, the day Lehman filed for bankruptcy); Atkinson Decl. ¶ 15.

Second, the government argues that Danske “conclusorily alleges” that it settled with Lehman regarding a pool of commercial loans. Govt. Brf. at 25. There is nothing “conclusory” about it—Danske has provided evidence showing that the settlement occurred, that there was no dispute as to the ownership of the commercial loan pool, *and* that the Court agreed with Lehman and Danske that Danske paid $580 million more for the pool of collateral, consisting of liens secured by commercial real estate, purchased under the Commercial Repo (and a pool of residential mortgages purchased under an unrelated repurchase agreement) than the collateral was

11

worth as of that point in time. MSJ Ex. 38; MSJ Ex. 39. Distorting and ignoring contrary facts does not create a genuine issue of material fact.

Third, the government argues that Danske cannot establish a legal interest in the additional millions of dollars it advanced to the borrower. The government contends that these loans were not new loans, but rather modifications and amendments of the loan Lehman extended to the Borrower and therefore, that Danske must establish it acquired a legal interest in the initial loan to establish a legal interest in the subsequent funds Danske advanced. Even if Danske has not established a legal interest in the loan Lehman extended in 2006 (and it has), Danske's advances made pursuant to modifications and amendments on their own establish that Danske has a legal interest in the Resort Property. Danske has submitted documentation showing the time and circumstances for *every* instance in which Danske advanced millions of dollars of funds, secured against the Resort Property and Equity Interests, to the Borrower. MSJ Ex. 94. It is black letter law that a party acquires a legal interest in property when it provides funds to a borrower in exchange for a security interest in property. *See DMJ Assocs., L.L.C. v. Capasso*, 288 F. Supp. 2d 262, 268 (E.D.N.Y. 2003) (finding that plaintiff's defaulted mortgage interest in the subject property represented a security interest in the property and plaintiff therefore had a legal interest in the property, providing plaintiff with standing to sue for contamination). That black letter principle does not turn on establishing that an earlier interest was valid.

### 3. The Government's Consultant's Opinion as to the Validity of Danske's Claim Should Be Stricken and Her Other Opinions Are Otherwise Irrelevant in Determining Whether Danske Has a Legal Interest Arising from the Additional Loans.

The government offers the Declaration of Kellie Fedkenheuer, the government's forensic accountant, to challenge Danske's claim. Fedkenheuer, however, opines on legal issues that are not within the scope of her expertise and also opines on issues that are not before this Court in

determining Danske's claim. For instance, Fedkenheuer opines that "Danske has not provided sufficient documentation to support its claim." Fedkenheuer Decl. ¶ 8. This is a legal issue to be determined by the Court and not by an expert, let alone a forensic accountant with no legal expertise in forfeiture claims. As such, this opinion should be struck. *See, e.g.*, *SEC v. Revelation Capital Mgmt.*, 215 F. Supp. 3d 267, 281-82 (S.D.N.Y. 2016) (striking expert report that was irrelevant and contained improper legal opinions); *Bennett v. Target Corp.*, 16-CV-5816 (ADS)(SIL), 2018 U.S. Dist. LEXIS 189067, at \*24-27 (E.D.N.Y. Nov. 5, 2018) (recognizing that "The Second Circuit 'is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion'" and recommending that district court judge strike portion of expert report that included conclusions of law); *Pearlman v. Cablevision Sys. Corp.*, 10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 172080, \*30 (E.D.N.Y. Dec. 28, 2015) (recognizing that "[i]t is well settled that expert testimony must be excluded where it 'states a legal conclusion'" and striking expert report where it "crosse[d] the boundary from opinion to legal conclusion").

Fedkenheuer also opines that Danske has not established that the funds advanced by Danske to the Borrower were "allocable to the construction and development of the DCSL property," Fedkenheuer Decl. ¶¶ 4, 19-28. Fedkenheuer concludes that she cannot determine whether a third-party, the Borrower, used the funds Danske advanced for construction. What the government seeks to do is turn this proceeding into a fishing expedition into how the developer used each advance. There is simply no basis in law or fact to do so. Because of its lack of relevance, Fedkenheuer's conclusion should be struck or, at a minimum, ignored. *See Hogan v. Novartis Pharms. Corp.*, 06 Civ. 0260 (BMC) (RER), 2011 U.S. Dist. LEXIS 43800, at \*4-12 (E.D.N.Y. April 23, 2011) (striking an expert report in part because the testimony offered was not relevant to the claims before the court); *Hersko v. United States*, No. 13-CV-3255 (JLC), 2016 U.S. Dist.

LEXIS 145552 (S.D.N.Y. Oct. 20, 2016) (striking expert report where the report contained opinions that were not relevant to plaintiff's lawsuit); *Davis v. Carroll*, 937 F. Supp. 2d 390, 420 (S.D.N.Y. 2013) (partially granting motion to strike expert testimony where the proposed testimony was "irrelevant to the legal question in this case")*.*

Further, Fedkenheuer incorrectly assumes that by providing one example of a loan advance Danske could have produced more, "unless Danske did not follow the loan requirements and did not require that DCSL provide this information prior to Danske disbursing funds." Fedkenheuer ¶ 27. Fedkenheuer ignores the obvious—to provide detail of every advance and supporting documentation for the underlying construction since Danske began advancing funds (a nearly 12 year period) would be a mountain of documents. Supp. Daniel Decl. ¶¶ 17, 25.

Strikingly, Fedkenheuer and the government also never address the development progress reports prepared by Michael Delvin, Danske's consultant, examples of which Danske produced to the government in 2016. *See* Declaration of Michael Delvin ("Delvin Decl.") ¶ 8 and Exhibits 2 and 3 attached thereto. In a phone conversation on May 4, 2016, Delvin detailed to the government the procedures he follows on behalf of Danske to ensure that advances made by Danske, and before that for Lehman, were for costs incurred or already paid by the developer. *Id.* ¶ 10. As Delvin explained to the government, he "reviewed all draw requests, compared the draw request to invoices, contracts or other information on costs incurred and then recommended whether such advances should be approved in whole or with some changes based on my assessment of whether the work in fact had been performed." *Id*. ¶ 4, 8. Delvin also conducted monthly site visits that corresponded with when draw requests were made by the borrower and met "with the manager of the borrower and the contractor to go over how the advances were being spent, the volume of the work and whether the construction work corresponded with the draw request [and] independently

14

verified by reviewing invoices, contracts and visiting the site to view first-hand whether construction had taken place." *Id.* ¶¶ 5, 8. Additionally, Delvin provided Danske with monthly reports as to the status of development project and whether the draws advanced by the borrower matched the work he had reviewed in order to confirm that amounts funded were used as intended. *Id.* ¶¶ 6, 8. Beginning in 2013, Delvin included a review of the operations of the developer in his reports. *Id.* ¶ 8. The government, knowing full well the scope of Delvin's work, falsely and baselessly represented to this Court that Danske "failed to collect documentation from the DCSL Resort that the loan agreements required be submitted as a precondition to the lending of funds to ensure that the funds were being properly used." *See* Govt. Br. at 43. The government simply has not offered any legal basis for turning this ancillary proceeding in determining Danske's claim as a secured lender into a fishing expedition into how the developer used funds advanced. Especially in light of the fact that in the five years since the government included the Resort Property in a Bill of Particular, the government has not challenged any draw requests submitted by the developer for reimbursement of construction and development costs, despite being provided financial statements of the development and the government itself actually visited the Resort Property in November 2019. Indeed, as discussed below, the government agreed in 2018 that the developer should continue to manage the Resort Property. Supp. Daniel Decl. ¶ 26. Moreover, the government's baseless allegations are contradicted by the government's own assessment of the value of the Resort Property. The government and its consultant do not explain how, if money was not used for construction, the Resort Property, with its multiple golf courses, a lagoon, thousands of time share units, and homes arose from the sand in Mexico and, according to the government just several months ago, was appraised at an amount over and above Danske's then-claim of $190 million.

4.      **The Purported Inconsistencies and Deficiencies Identified by the Government's Forensic Accountant Are Incorrect and, in any event, Do Nothing to Challenge Danske's Legal Interest in the Resort Property.**

The government, relying on its consultant, contends that even if the Court were to find that Danske has a legal interest in the additional loans made by Danske, there are "inadequacies and deficiencies" in Danske's proof. Even if the purported discrepancies were actual discrepancies (and as explained below, they are not), the alleged discrepancies comprise only a fraction of what Fedkenheuer admits Danske has funded and of Danske's total claim, which, as a result of accruing default interest (and inclusive of approximately $1.9 million in fees), totals $210,885,989.06 as of September 30, 2020, Supp. Daniel Decl. ¶ 29. Fedkenheuer admits that Danske provided $98 million in funding and recognizes that records produced establish at least $101 million of the $107 million in Lehman advances, Fedkenheuer Decl. ¶¶ 12, 20. Further, as explained in the Supplemental Declaration of David Daniel and below, these purported inconsistencies Fedkenheuer identifies are easily reconcilable and/or are not inconsistencies at all. Moreover, the Court need not address any of these amounts, which are immaterial, to decide Danske's Motion—indeed, the Court can decide now that Danske has a valid claim up to a certain undisputed amount and then decide the validity of any disputed amounts thereafter.

In all events, to the extent the Court decides to consider the alleged discrepancies in Danske's claim, Fedkenheuer is simply wrong. Each of the government's points are addressed below:

(a)     **The government contends that Danske did not provide loan statements for Facility A and B after February 28, 2020 or Facility C after January 1, 2020.**

The government's consultant is simply incorrect. Danske attached a Facility C statement dated *March 31, 2020* as an exhibit to its Motion, *see* MSJ Ex. 91. Fedkenheuer overlooked it.

This exhibit not only showed the Facility C balance as of March 31, 2020, it also provided the back-up for the alleged $900,000 that Fedkenheuer claimed was unsupported, Fedkenheuer Decl. ¶ 37. Danske is attaching to this Reply the most recent bank statements that make clear that the facility balances have not changed since December 31, 2019 (or, in the cases of Facilities A and B, before) other than for the accruing interest, which the government already knows about. Daniel Decl. Ex. 1 (September 30, 2020 Statement for Facility A); Daniel Decl. Ex. 2 (September 30, 2020 Statement for Facility B); Daniel Decl. Ex. 3 (September 30, 2020 Statement for Facility C).

> **(b)    The government contends that there are numerous inconsistencies between Danske loan statements and Trimont invoices.**

The government's consultant, who is not an expert in loans (commercial or otherwise) or servicing loans, incorrectly assumes that the "Danske loan statements and the Trimont Invoices should report the same transactions." Fedkenheuer Decl. ¶ 13. Danske statements, which were originally meant to be internal records given that Trimont was the servicer, included information specific to Danske, such as transfers to Danske-specific accounts, e.g., the Danske professional fee account. Supp. Daniel Decl. ¶ 15. Danske's statements also reflect internal transfers to fund Danske interest and/or transfers to reserve accounts. Supp. Daniel Decl. ¶ 16. The fact of the matter is that, as the government's own consultant's acknowledged as to Facility B, "the total of the transactions reported on the Danske loan statements *reconciles to the total of the transactions reported on the Trimont Invoices . . .*" Fedkenheuer ¶ 16(c). Fedkenheuer also acknowledges that the Facility A principal balances on Trimont's invoices and Danske's statements reconciled beginning in the second quarter of 2013, with the exception of an internal transfer of $72,639. *Id.* at ¶ 16(a) n.3.

Further, the government's consultant acknowledges that Danske advanced over $98 million and, of that amount, $53,476,556 were transfers from Danske to Trimont—which is

consistent with Danske's representations and the Trimont invoices. *Id.* ¶ 22. The only discrepancy raised by the government's consultant as to the amounts funded by Danske is that purportedly the Borrower's bank records showed that Trimont advanced $52,589,169—a difference of $887,387. *Id.* ¶ 23. As explained in the Supplemental Declaration of David Daniel, Fedkenheuer does not take into account that the two separate advances of $420,000 each, totaling $840,000 of the $887,387, are amounts that went into the interest reserve account. Supp. Daniel Decl. ¶ 16. Accordingly, these amounts would not have been advanced directly to the borrower, but went into the interest reserve account held by Trimont. *Id.* The remaining purported inconsistency of $37,387 is simply immaterial.

Further, the government's consultant acknowledges that, as to Danske's claim arising from the DCSL Loan (a $107,538,328 claim), Trimont's invoice dated December 18, 2008 identified a principal balance of that exact amount. Fedkenheuer Decl. ¶ 12. Fedkenheuer alleges that the Trimont records provided by Danske included transactions of $101,240,922 and claims that Danske did not provide documentation supporting the remaining $6,297,406. Fedkenheuer, however, ignores[4] the September 15, 2008 Letter from Bank Of New York that specifically sets forth that $107,529,665.05 was advanced by Lehman and owed at the time of Danske's acquisition of Lehman's interest. MSJ Ex. 32; *see also* Supp. Daniel Decl. ¶ 10(a) (setting forth that $107,538,327.83 was owed at the time Danske assumed Lehman's interest). The government's consultant recognizes that there are Trimont invoices and statements that are missing that could explain the discrepancies. *See* Fedkenheuer ¶ 17. The fact of the matter, which the government

---

[4]     Fedkenheuer also ignores the fact that the Bankruptcy Court recognized the extent of Danske Bank's claim and ignores other documents which set forth that the amount outstanding under the Lehman loan was $107 million, one of which is a document the government submitted as GX-7.  MSJ Ex. 42 (DANSKE_0015590); *see* Supp. Daniel Decl. ¶ 10(a).

fails to appreciate, is that these records span a nearly 12-year period and it would simply be unduly burdensome to require Danske to comb its records for every last Trimont invoice and statement to reconcile what other documents specifically show and support, especially when the government offers no reason why these missing records are material to determining Danske's claim.

The government's consultant also speculates that "Danske's claim . . . could be overstated by \$3,020,424" because certain Trimont Invoices included \$3,020,424 in "payments for Facility C" that were not included on Danske's loan statements, Fedkenheuer Decl. ¶ 14. Fedkenheuer's speculation that Danske was overpaid is incorrect because of her evident failure to reconcile interest accruals listed on the Trimont summary statements with the Trimont invoices and to recognize that the Trimont summary statements, Trimont invoices, and Danske statements for Facilities A & B set forth the same balance and the materially same balance of Facility C. *See* Supp. Daniel Decl. ¶ 15. Fedkenheuer also incorrectly claims that Danske included a \$24,999,992 payment on its statements (in two places) but did not include it in Trimont's invoices. Fedkenheuer Decl. ¶ 15. Danske included a June 24, 2015 payment of \$25 million (less a \$7.87 wire charge), with a value date of June 25, 2015, on its statements—including the very Danske statement Fedkenheuer claims to have reviewed. Supp. Daniel Decl. ¶ 15. Trimont's corresponding invoice reflects a \$25 million principal payment on June 24, 2015, DANSKE_0016758, just as the relevant Trimont summary statement does. MSJ Ex. 10 (DANSKE_0015604 at DANSKE_0015606).

> **(c)** **The government incorrectly contends that Danske did not provide documents required by loan agreements prior to making a loan advanced.**

As addressed herein, at issue here is Danske's claim, not a fishing expedition into how the developer, not the claimant here, used funds over an almost 12-year period.

**(d)   Contrary to the government's claim, Danske has submitted evidence supporting the increase in the PPF from $45 million to $50 million.**

The government's consultant acknowledges that Danske has provided documents supporting a PPF of $45 million but claims that Danske has not supported the justification for the increase in the PPF from $45 million to $50 million. Fedkenheuer Decl. ¶ 30. It bears noting that the government's consultant analyzes Danske's entitlement to the PPF under the loan agreement, but does so by reviewing the *wrong* document, leading her to insist that, with respect to the PPF, "Section 5.3 of the loan documents states that a formula is necessary to determine the amount of the PPF." *Id.* Fedkenheuer recognizes that the PPF increased from $45 million to $50 million in the Second Amended & Restated Loan Agreement though she again fails to cite to the extant agreement, which also provides that the PPF is $50 million. *Id.* Ignoring the underlying agreed to contract signed by the parties, Fedkenheuer claims that "Danske has not provided documentation to explain the justification for the $5,000,000 increase." *Id*. This $5 million increase was part of the consideration for entering into Second Amended & Restated Agreement. Supp. Daniel Decl. ¶ 19.  Further, the increase in the PPF reflected Danske's view of the increased risk profile for the loan at that time as well as the significant concessions Danske had previously made when it entered into the Amended and Restated Loan Agreement in March 2009. *Id.*

Moreover, the government's consultant's opinion and interpretation of contractual terms, as well as her assessment of whether Danske provided documents supporting the $50 million PPF are beyond her expertise and is, in all events, otherwise improper opinion testimony on an ultimate issue of fact that needs no expert testimony. *See* Section 3, *supra*.

> **(e)     Funds were used from one facility to pay down the balance of another, therefore the overall principal balance did not decrease.**

The government's consultant also identifies two advances made by Danske to Facility B in the total amount of $696,281, and shortly after that, a transfer for the same amount was made from Facility C to reduce the Facility B loan balance. Supp. Daniel Decl. ¶ 21. The two advances identified by Fedkenheuer were in fact part of the agreement to lend additional funds under the then new Facility C and had no effect on the interest rate being charged. *Id.*

> **(f)     Danske addressed the bank statements to entities other than the DCSL Resort.**

Fedkenheuer elects to analyze how loan statements were addressed, but this fact does nothing to challenge Danske's legal interest in the Resort Property. As explained in the Daniel Supplemental Declaration, when Trimont was the servicer, Danske did not send Danske's own internal statements to the Borrower but created its own statements for its own records. When Trimont stopped acting as servicer, Danske simply did not change the address. Instead, at the Borrower's request, Danske would email pdfs of the statements to the Borrower. Supp. Daniel Decl. ¶ 24. Danske also would provide the Borrower with quarterly updates of its balances when it would disclose the quarterly interest rate for Facilities A and B to the Borrower, and when the Borrower requested to draw on Facility C, the balance of Facility C was included on the funding memorandum for the draw. *Id.* Moreover, the principal balances of Facilities A and B have changed very little since 2017—and the Borrower would have been given its balance when it drew on Facility C. At no time did the Borrower lack knowledge of what it owed. *Id.*

21

> **(g)**     **Danske's claim includes at least $7,094,438 of fees of which Fedkenheuer claims $3,505,800 has not been supported by Danske.**

Danske is entitled to its fees under the loan agreements. MSJ Ex. 58 (April 2014 Third Amended and Restated Loan Agreement, § 6.1). Fedkenheuer states that $3,588,638 relates to modification fees, which are all closing costs.[5] As to the other fees, Fedkenheuer claims that Danske did not provide documentation to support the purpose of the fees. Danske did provide documentation as it provided the underlying Loan Agreement, which specifically sets forth that Danske is entitled to have any fees it incurs to be reimbursed by the borrower. MSJ Ex. 58 (April 2014 Third Amended and Restated Loan Agreement, § 6.1). The government's request for Danske to produce every document relating to every fee charged by Danske over a nearly 12 year period is nothing more than a fishing expedition that would entail gathering and producing thousands of pages of documents. The government has offered no reason why these fees are material in determining Danske's claim. The government's request to conduct a fishing expedition into all fees charged by Danske go beyond this ancillary proceeding. To the extent the Court disagrees with Danske's position, the Court can decide Danske's claim and limit its claim by the $3.5 million subject to Danske providing supporting documentation to the government.

> **(h)**     **Danske has not provided sufficient documentation to support its purchase value of the Initial Loan.**

As described above and set forth in more detail below, *see* Section C.1, this contention is incorrect. Moreover, the government's consultant has no basis to opine on whether Danske gave

---

[5]     Table 15 of Fedkenheuer's declaration and the accompanying footnotes to that table acknowledge that the modification fees were closing costs, but for the $875,000 amount for the September 8, 2018 modification. Danske, in fact, never charged that $875,00 modification fee. Supp. Daniel Decl. ¶ 25.

value in purchasing Lehman's interest in the DCSL loan. This again is a legal issue as to which no expert opinion is necessary.

### C.   Danske Is A Bona Fide Purchaser For Value.

#### 1.   The Undisputed Facts Demonstrate that Danske Purchased Lehman's $107 Million Interest for More than It Was Worth and that Danske Has Advanced Millions and Millions of Dollars Since 2009.

As explained above in Section B.1, Danske submitted admissible evidence showing that it had purchased a pool of collateral[6], consisting of liens against commercial real estate, and that, as of September 15, 2008, MSJ Ex. 32, included the lien against the Resort Property (and the Equity Interests), for a price of approximately $800 million, MSJ Ex. 96. The purchase price Danske paid to Lehman is indisputably "value" under New York law, and so are the millions of dollars Danske has advanced to the Borrower since 2009. *See* MSJ at 20-21; N.Y.U.C.C. § 1-204 ("[A] person gives value for rights if the person acquires them: . . . (c) by accepting delivery under a preexisting contract for purchase; or (d) in return for any consideration sufficient to support a simple contract."); N.Y.U.C.C. § 3-303 ("A holder takes the instrument for value: (a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or (b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or (c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person.").

---

[6]     The government contends that the loan is not identified on the Trust Receipt, but the identifying information set forth on the Trust Receipt, i.e., the loan balance, maturity date, and interest rate, correlate with the relevant documents. *See* MSJ Ex. 4 at DANSKE_0010562-63 (reflecting maturity date and interest rate matching information on trust receipt); *see also* Atkinson Decl. ¶ 15.

The government's contention that Danske "did not provide adequate value" by pointing to the valuation of the loan in determining Danske's claim in the Lehman bankruptcy ignores that Danske paid $800 million for its interest as part of the MRA. The fact that the value of the loans at the time of Lehman bankruptcy was significantly less show that Danske paid hundreds of millions of dollars more than the  values of the underlying commercial loans as of the time of Lehman's bankruptcy. This is a fact with which Lehman and the Bankruptcy Court agreed when the parties agreed and the Court so-ordered that Danske's claim in bankruptcy (representing amounts still owed to Danske under the Commercial Repo and the unrelated residential mortgage repurchase agreement after taking into account the value of the collateral Danske purchased was $580 million. MSJ Exs. 38, 39. Lehman and Danske also agreed that, prior to the Lehman bankruptcy, Danske had purchased a number of commercial loans as part of the MRA, including the DCSL Loan. MSJ Ex 37. And the Bankruptcy Court recognized that Danske and Lehman agreed that "Danske is the owner of the Mortgage Assets" that included the DCSL loan. Strohbehn Decl., Ex. 1 (October 25, 2010 Bankruptcy Court Order, 08-13555(JMP) (Bankr. S.D.N.Y.)). The government's representative, the United States Trustee, did not file an objection to Lehman and Danske's stipulation. It is the government who is now taking a different position and should be estopped.

Danske also gave value by advancing, as the government consultant concedes, funds totaling more than $98 million (exclusive of interest and the PPF) to the Borrower since 2009. *See* MSJ Ex. 94. By making this concession, the government itself establishes that summary judgment is appropriate because there is *no issue*, let alone a genuine one, of material fact that Danske has a legal interest and gave value for it. *Carr v. Gillis Associated Indus.*, No. 04-5345, 2006 U.S. Dist.

LEXIS 16469, at *4 (E.D. Pa. April 4, 2006) (holding that movant was entitled to summary judgment where expert conceded a point central to plaintiff's claims).

    2.    **Judicial Estoppel Does Not Apply.**

The government argues that Danske should be judicially estopped from asserting a value to its acquisition of the DCSL Loan above the valuations of the DCSL at the time of the Lehman bankruptcy. In order for judicial estoppel to apply, the government must show that Danske's position here is inconsistent with its earlier position, the bankruptcy court accepted that position, and Danske would obtain an unfair advantage if not estopped. *In re CCT Commc'ns, Inc.*, 420 B.R. 160, 169 (Bankr. S.D.N.Y. 2009). To support its contention that judicial estoppel should apply, the government cites nothing but inapposite cases. *See In re 300 Washington St.*, 528 B.R. 534 (Bankr. E.D.N.Y. 2015); *Magers v. Jones*, No. 2:14-cv-001184-GEB-EFB, 2016 WL 2939419 (E.D. Cal. May 20, 2016); *In re Krumm*, 534 B.R. 142 (W.D.N.C. 2015); *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418 (8th Cir. 2007); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207 (Bankr. E.D.N.Y. 1994). The common threads in all of these cases are that a party took a position and then directly contradicted that same position *and* a court adopted the previous position in reaching a finding on an issue. Not a single one of these cases addresses a loan (secured by an interest in the underlying property)purchased pursuant to a complex financial transaction where the purchaser subsequently sought or asserted its right repayment in full of the underlying loan.

The government confuses the valuation at the time of the Lehman bankruptcy in determining Danske's claim with the amount Danske paid to purchase its interest as well as the amount Danske is entitled to under the loan agreement. Contrary to the government's theory, Danske purchased its interest in DCSL under the Repo Agreements. As mentioned above, both Lehman and Danske stipulated to this fact in the bankruptcy proceeding. There is, therefore, no

inconsistent position that Danske took there or that the Bankruptcy Court agreed with. Danske never represented to the Bankruptcy Court that it did not purchase the DCSL Loan as part of the MRA or that the amount owed to Lehman was anything less than $107 million, or that Danske would not seek to enforce its right to full repayment on that amount against the Resort Property. Although the Bankruptcy Court made a determination, based on the settlement between Danske and Lehman, that the value of Lehman's claim was $580 million, *i.e.*, that Danske paid $580 million more for the assets it purchased, the Bankruptcy Court did not address Danske's entitlement to receive full repayment under the loan to the Borrower, because it was not in dispute.

### 3. Danske has Provided Evidence Supporting that the Amount Owed on the Initial Loan Was $157 Million.

The government claims that Danske has not provided evidence that Lehman was owed $157 million through the loan it extended in 2006. The government rests its argument entirely on its admissibility objections to the Trimont records, but as set forth above, those records are, admissible and show that, as of September 2008, Lehman was owed $107 million in principal, and that, by March 2009, approximately $49 million of unpaid interest had accrued, Supp. Daniel Decl. ¶ 20. Further, the government ignores that its own exhibit (a document Danske produced that was created at or around the time Danske assumed the DCSL Loan) reflects that Lehman had funded $107 million, GX-7 (Dkt. No. 907-7), and that other documents reflect that funding as well as the basis for the PPF. *See id.* ¶¶ 10(a), 20; MSJ Ex. 42 (DANSKE_0015590). The government offers no fact disputing that over $49 million of unpaid interest was owed by the Borrower under the original Lehman loan by March 2009.

### 4.   The Government's Baseless and False Assertions as to Danske's Lending Practices Are a Red Herring.

The government baselessly claims that Danske cannot be a bona fide purchaser as to the advances it made after 2009 because these loans "were not innocent, arm's length transactions." Govt. Brf. at 40. The government begins by stating that draws on Facility C, the revolver facility, were withdrawn within a close proximity of the payments. *Id.* This should not be surprising though because it was a "revolver" for an on-going development project.

Further, the government's contention that the capitalization of interest owed on Facilities A and B resulted in "exponentially increasing debt in Danske's favor" is simply wrong. Danske agreed in 2009 to reduce the amount of accrued interest the Borrower owed—from $50 million to a maximum of $45 million. Further, the government fails to mention that in acquiring Lehman's interest, Danske agreed to forego the "Additional Fee" of $125 million under the original DCSL Loan, MSJ Ex. 4 at § 2.1, and agreed to significantly reduce the interest rate charged from fifteen percent to a far lower rate that, at the start of 2015, was a blended rate (across all three facilities) of 3.47%. Supp. Daniel Decl. ¶ 20; MSJ Ex. 40 at DANSKE_0013875; MSJ Ex. 51 at DANSKE_0011090, DANSKE_0011098, DANSKE_0011101; MSJ Ex. 58 at DANSKE_0012241, DANSKE_00122419, DANSKE_0012253. Far from "exponentially increasing debt," Danske has gone out of its way to make concessions in an effort to keep the Resort Property afloat and the Borrower more likely to fully repay Danske.

The government then goes on to accuse Danske of shoddy lending practices—a shocking and defamatory assertion that is unsupported by evidence or commercial reality and is, in fact, contrary to information the government has in its possession. As explained above, the government spoke with Michael Delvin, Danske's (and before it, Lehman's) development consultant and was well aware of the due diligence that Mr. Delvin performed (and continues to perform) to confirm

27

and independently verify that loan advances were for work performed and paid and to confirm that amounts were in fact used as intended. That the government knew this fact and still pursued this defamatory line of attack is further evidence of the government's bad faith interactions, throughout this entire forfeiture process, with Danske.

Moreover, the government casts aspersions at Danske's retention of Ken Jowdy as manager of the Resort Property, Govt. Brf. at 42, but the government was fully informed as to Danske's reasoning—and importantly, agreed with it—in a meeting with Danske on August 23, 2018, Supp. Daniel Decl. ¶ 28. Danske informed the government that it was considering entering into an agreement with the developer to ensure he and his team remained in place to the extent that the Court's Preliminary Order of Forfeiture included the Resort Property. Danske asked the government whether it had any objections to it, and the government not only had no objections, it agreed with keeping the current developer in place to ensure consistency. After that meeting, Danske forwarded the draft agreement with the developer to the government and again asked if it had any questions. The government had none. *See* GX-20 (8/23/2020 Venable letter to the government stating "as we discussed in our last meeting and ***as the government recognized***, it is imperative to keep the current development team in place for a number of reasons" and "[i]f you have any questions regarding the [proposed agreement with the developer] please contact us . . ."). At any point, if the government had a real concern about these arrangements, it could simply have informed Danske. It never did.

The government's false assertions regarding Danske's lending practices also ignore that, without Danske's advances and forbearances over the past almost 12 years, the Resort Property likely would not have survived as a going concern. The government also conveniently leaves out that Danske has told the government that it was contemplating foreclosing on the property to

28

protect its interest, but the government has in every instance told Danske that to do so would be a violation of law. At the same time, Danske also sought a resolution with the government but the government consistently told Danske it was premature to discuss a resolution. At no time until this ancillary proceeding did the government ever inform Danske that it would challenge Danske's interest. So, as a lender who is owed millions of dollars, was Danske supposed to forego making additional advances, thus ensuring the Resort Property's demise as a going concern? Further, as discussed below in Section D.2, in response to Danske telling the government that it may stop lending, the government questioned why Danske would do so.

> **5.    The Government's Windfall Argument Is Yet Another Baseless and Legally Unsupportable Argument That Attempts to Strip Danske of Its Rights Under the Loan Agreements.**

Incredibly, the government argues that Danske, which *lost* hundreds of millions of dollars as a result of the repurchase agreements with Lehman, is "attempt[ing] to reap a windfall in this ancillary proceeding . . . ." Govt. Brf. at 27. The government's windfall argument turns in part on its incorrect and unsupported claim that, because Danske stated that the collateral pool it purchased was worth only $248.2 million against a face value of $1.174 billion, Danske paid less for the lien than face value. Govt. Brf. at 35. The government also argues that because Danske and Lehman retroactively valued the interest in the Resort Property at $33.7 and $58.5 million respectively, Danske valued the interest at "only a small percentage of the approximately $157 million that it now claims for the same loan." Govt. Brf. at 36. As explained above, the government does not understand either the secondary loan market or that the value of collateral and the value a party paid for that collateral are separate concepts.

What actually happened, as Danske's evidence demonstrates, is that Danske paid approximately $800 million to buy the pool of collateral, consisting of liens secured by commercial

real estate, including the Resort Property and Equity Interests (and other collateral). MSJ Ex. 27 at DANSKE_0015720; MSJ Ex. 96 at DANSKE_0015746. When Lehman defaulted, Danske was entitled to auction, retain, or reject the collateral it purchased. MSJ Ex. 26 at DANSKE_0015768-70; MSJ Ex. 27 at DANSKE_0015720. Had Danske then tried to auction the collateral, the-then distressed financial and real estate markets likely would have valued these assets at *zero* or close to it. Atkinson Decl. ¶ 16. If the markets had valued the collateral at zero, that does not mean that Danske paid zero for the loan or that Danske was not entitled to full repayment on the note, but instead that Lehman owed Danske *more*.

Regardless of the reasoning, neither Lehman's nor Danske's distressed valuation reflects what Danske *paid* to acquire the interests but instead what the parties thought the interests were worth as of September 23, 2008. The Bankruptcy Court (and Lehman) recognized this distinction in agreeing that Danske was owed an additional $580 million to compensate Danske for the difference between the price Danske paid (and that Lehman was to repay) and what the collateral was worth. *See* MSJ Ex. 38 at ¶ 18a; MSJ Ex. 39 at 3.

The government also contends that Danske will receive a windfall because it sold its $580 million claim in the Lehman bankruptcy to Goldman Sachs, which the government concludes yielded a "profit" to Danske. Govt. Brf. at 45. The government's conclusion is incorrect. As the government is aware, because Danske produced documents to it, Danske sold its claim to Goldman Sachs and recovered only approximately $226 million—a loss of more than $300 million. *See* Atkinson Decl. ¶ 20. Even if Danske had fully recovered on its $580 million claim, however, Danske would still be entitled to enforce the right to repayment and/or the right to recover against the Resort Property and Equity Interests that it purchased and assumed from Lehman. *See, e.g.*, *Equator Int'l, Inc. v. NH St. Inv'rs, Inc.*, 43 Misc. 3d 251, 257-58 (N.Y. Sup. Ct. 2014) (enforcing

assignee's right to full repayment of principal and interest); *United States v. Watts*, 786 F.3d 152, 167 n.7 (2d Cir. 2015) (recognizing that "[w]hen a valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights the latter had") (internal citation omitted); *Dewees Mellor, Inc. v. Weise*, No. 91 CV 2518 (EKR), 1993 U.S. Dist. LEXIS 19299, at *3 (E.D.N.Y. Dec. 29, 1993) ("It is well established that an assignee will step into the shoes of the assignor, acquiring exactly what the prior mortgage holder had").

The government's last primary argument as to Danske's purported windfall relies on Fedkenheuer's conclusion that, setting aside the interest due under the loan agreements, the PPF due under the loan agreement, and the amounts due to Danske through its acquisition of the Lehman loan agreement (and all subsequent agreements), Danske has actually been repaid more than it advanced to the Borrower. Govt. Brf. at 45. With this argument, the government seeks to transform the millions Danske loaned over nearly 12 years into an interest-free loan. The government, however, is not entitled to rewrite the loan agreements (or the law for that matter) just because it wishes to wrest value from an innocent party. *See In re Metmor Fin., Inc.*, 819 F.2d 446, 449 (4th Cir. 1987) (holding that lender was entitled to post-seizure interest and recognizing that "[t]he forfeiture cannot change the nature of [the lender's] rights"); *United States v. 1461 W. 42nd St., Miami, Fla.*, 998 F. Supp. 1438, 1441 (S.D. Fla. 1998) (holding that, because the government took an interest in forfeitable property subject to the rights an innocent lienholder bargained to obtain, a lender was entitled to recover lost principle, default interest, and late fees accrued as a result of government seizure of a property in a civil forfeiture proceeding); *United States v. 1461 W. 42nd St., Miami, Fla.*, No. 91-1077-CIV-DAVIS, 1999 U.S. Dist. LEXIS 23343, at *3-4 (S.D. Fla. Mar. 10, 1999) (calculating amount of interest and late charges due to mortgagor).

Further, the government's contention that Danske would reap millions in windfall assumes that a sale of the Resort Property would pay off the amounts that Danske is owed, a fact that Danske does not concede and for which the government has offered no proof. Of course, if the government is correct that the Resort Property does fetch more than reasonable industry experts would expect, it is not *Danske* that would reap the windfall but rather the government who—at the expense of Danske's investment of millions in the Resort Property—is seeking to forfeit the entire Resort Property to provide restitution to victims while pocketing the balance and creating a new class of victims—Danske and its shareholders.

**D.    Danske Was Reasonably Without Cause to Know the Resort Property and Equity Interests Were Subject to Forfeiture.**

**1.    The Newspaper Articles and Civil Complaints Do Not Create Reasonable Cause to Know Property Is Subject to Forfeiture.**

There is no dispute that, in the Second Circuit, a party is a bona fide purchaser if it gave value and, when it acquired its interest, was reasonably without cause to know that property is subject to forfeiture. *See, e.g.*, *Watts*, 786 F.3d at 172-74. Danske has established there is no genuine dispute as to this issue.

Controlling precedent in the Second Circuit, as articulated in *United States v. Watts*, makes clear that a party is a bona fide purchaser if that party did not have reason to believe the property was subject to forfeiture. 786 F.3d at 172-74 (holding that defense counsel was reasonably without cause to believe that certain funds were subject to forfeiture—and instead were merely potentially forfeitable—after a *Monsanto* hearing finding that government lacked probable cause to restrain the funds). Danske has met this standard.

To establish that when it acquired its interests, it was reasonably without cause to believe that the Resort Property and Equity Interests were subject to forfeiture, Danske submitted the

32

declaration of David Daniel, a Danske employee throughout the relevant time period. MSJ Ex. 89. Mr. Daniel testified under penalty of perjury that, to his knowledge, Danske first learned that the Resort Property and the Equity Interests were subject to forfeiture in August 2015 when the protective order was entered. The government, which does not challenge the admissibility of the Daniel declaration, can only respond by arguing that Mr. Daniel's declaration is "conclusory" because there were "lawsuits and newspaper and magazine articles" that the government concludes "put Danske on notice that the DCSL Resort was subject to forfeiture." Govt. Brf. at 48. This argument is not supported by actual facts or the standard set forth in *Watts*.

       First, as is its pattern when facts do not suit its narrative, the government never addresses the argument raised in Danske's summary judgment motion that the government itself did not determine that the Resort Property and Equity Interests were subject to forfeiture until 2015—7 years after the Lehman Bankruptcy, when it finally included Kenner's equity interests in the first Bill of Particulars just prior to the start of the trial, and the Resort Property and all of the Equity Interests in the second Bill of Particulars after the trial concluded, ***and nearly two years after the government indicted the defendants***. The government attempts to paper over this fact by noting that it included forfeiture counts in its initial and subsequent indictments. Govt. Brf. at 2-3. Of course, although the government declines to acknowledge it, each of those indictments listed specific properties, but ***did not*** include the Resort Property or Equity Interests, as subject to forfeiture. The government's refusal to address this inconvenient fact of course makes sense—it simply has no explanation for how Danske should or could have known that the Resort Property was subject to forfeiture when the government, then in the midst of an investigation and trial regarding criminal conduct that the government argues Danske should have known about, did not.

Further, the Department of Justice's own guidance sets forth that "[t]o the extent property is known to be subject to forfeiture, it should be listed in the indictment, information or in a subsequent Bill of Particulars." Dep't of Justice Manual, Criminal Forfeiture Procedures at 9-113-420, available at https://www.justice.gov/jm/jm-9-113000-forfeiture-settlements. Therefore, if the government knew at the time of indictment that the Resort Property was subject to forfeiture, it should have included it in the indictment. The government did not, however, include the Resort Property in the indictments as subject to forfeiture and it therefore stands to reason that the government did not even know that the Resort Property was subject to forfeiture. If the government did not know, surely Danske, a third-party non-victim of defendants' conduct, could not have known.

Second, the government attempts to create a genuine issue of material fact by alleging that Danske should have been on notice of the forfeiture because it either knew or should have conducted diligence to learn of "red flags" consisting of certain articles and civil litigation involving the Defendants or Mr. Jowdy. Govt. Brf. at 49. The Court made clear to the government during the July 8, 2020 status conference that this argument is "fairly weak," July 8, 2020 Conf. Tr. 9:23-10:5. In the time since that conference, the argument has weakened even further because victims of Defendants' crimes have since submitted verified petitions stating that they were not aware that the Resort Property was subject to forfeiture. *See* Dkt. Nos. 874, 880, 881, 882, 883, 884, 885. It strains credulity to suggest that Danske should have known more than Defendants' victims or, again, the government investigating and prosecuting the crimes that have led to this forfeiture proceeding.

The government's argument is also beset by multiple other problems. One is that Danske acquired ownership of Lehman's interests in the Resort Property and Equity Interests on

September 15, 2008—before any of the litigation or articles were even published, *see* GX-12. And Danske formally assumed all of Lehman's rights **and obligations** in January 2009 and at that time there were three lawsuits, only two of which, as characterized by the government, made even passing, vague, and unproven allegations relating to the Resort Property. *See id.* Yet another issue for the government is that, although Danske did acknowledge in the 2009 Amended & Restated Loan Agreement the potential that a lawsuit that could involve the "*Kenner Parties*" (a defined term in that agreement that does not include Danske), that acknowledgement did not indicate that there was potential criminality or that the government was investigating the Resort Property.

In any event, these articles and allegations set forth in civil complaints are simply not enough to put a party on notice that property is subject to forfeiture. *See United States v. Petters*, No. 08-364 (RHK/AJB), 2013 U.S. Dist. LEXIS 10396, at *15-18 (D. Minn. Jan. 24, 2013) (finding that news articles referencing defendant's alleged fraud were not enough to put third-party petitioner on notice that the specified property was subject to forfeiture; "generalized knowledge of fraud is not enough"); *United States v. Cox*, 641 F. Supp. 2d 489, 497 (W.D.N.C. 2007) (finding that third-party petitioner was not on notice that all of defendant's property was subject to forfeiture where petitioner was not aware that the government was investigating defendant for bank fraud and the only possible criminal conduct disclosed to petitioner was health care fraud, which defendant vehemently denied and hired an expert to prove his innocence in the parties' divorce proceeding), *rev'd and remanded on other grounds*, 575 F.3d 352 (4th Cir. 2009).

The government contends that Danske did not produce any documentation of a due diligence inquiry, even though the government acknowledges that Danske produced an "unauthenticated, undated document titled 'Due Diligence Report.'" Govt. Brf. at 53. Of course, that report did not include that the Resort Property was potentially subject to forfeiture because

Danske had no such knowledge. The government also claims that the diligence report did not include any statement regarding the pending litigations, but as the Court told the government at the July 10, 2020 hearing, July 10, 2020 Hr'g Tr. at 10:3-11:10, the government should assume that Danske was aware of these litigations—which is consistent with the statement in the 2009 Amended and Restated Loan Agreement.

The government cites *United States v. BCCI Holdings (Luxembourg), S.A.*, 961 F. Supp. 287 (D.D.C. 1997) to claim that newspaper articles are sufficient to put a claimant on notice that property is subject to forfeiture. But in *BCCI Holdings*, the newspaper articles included news that BCCI had pleaded guilty to money laundering charges, which led to a finding that the petitioner, American Express Bank, was not reasonably without cause to know that the property there was subject to forfeiture. 961 F. Supp. at 290.

The government's reliance on *United States v. Sabatino*, No. 16-20519-CR-LENARD/GOODMAN, 2018 WL 2074191 (S.D. Fla. April 13, 2018) is also misplaced. *Sabatino* simply highlights how different Danske's claim is from the facts here. *Sabatino* involved a pawnbroker that purchased stolen designer goods at below-market prices. The pawnbroker was deemed to have reasonably had cause to know that the property was subject to forfeiture because there were red flags indicating that criminal activity was afoot. 2018 WL 2074191, at *8-10. As one example, the pawnbroker turned a blind eye as to how the participants in the scheme, one of whom described herself as a student, had the income to legitimately purchase the goods. *Id.* at *9. And the pawnbroker and its employees never asked whether the property belonged to the participants or asked how, if they needed to pawn goods, they could afford to arrive at the store in limousines accompanied by a security guard. *Id.* at *9-10. There are no such allegations here. Here, Danske acquired a commercial loan from another sophisticated financial institution, Lehman, and

then subsequently Danske advanced millions to develop a Resort Property that the government has consistently insisted and represented to the Court is extremely valuable.

2.        **Danske Is a Bona Fide Purchaser as to Amounts Advanced After 2015.**

The government argues that Danske should not be a bona fide purchaser as to any amounts advanced after the protective order was entered in 2015. Govt. Brf. at 55. As an initial matter, this argument overlooks that Danske agreed to advance funding under new Facility C in **April *2014***, more than a year before Danske had notice of the forfeiture, MSJ Ex. 89, ¶ 7, and therefore was contractually obligated to advance funds *unless* the Borrower defaulted. MSJ Ex. 58 at §§ 4.1, 19.1.

The government's argument is also yet another example of its bad faith in its dealings with Danske. During an in-person meeting in 2015, Supp. Daniel Decl. ¶ 26, the government expressed incredulity when Danske suggested that it was concerned about continuing to advance funds to the Borrower. *Id.* During this same meeting, the government questioned why Danske would not want to advance funds when lending would preserve value. *Id.* Had Danske known in 2015 that the government would later seek to invalidate Danske's interest as to funds advanced after 2015, Danske would have charted a different course. Had Danske stopped funding, the Resort Property would have been left without needed capital and development would have ended *five years* ago. There can be no doubt that Danske's continued funding and forbearance enabled the project to survive as a going concern. It is outrageous that, after assuring Danske that it should continue to fund, telling Danske that Danske could not foreclose on the property, and never telling Danske that it would challenge Danske's claim, the government now seeks to penalize Danske for continuing to fund. The government should be equitably estopped from attempting to capitalize on its bad faith conduct.

The government is properly equitably estopped where there was "a material representation, reasonable reliance, and provable damages," *Schwebel v. Crandall*, No. 18-3391-cv, 2020 U.S. App. LEXIS 22844, at *12 (2d Cir. July 22, 2020), and "extraordinary circumstances" that compel estopping the government to prevent injustice. *See, e.g.*, *Tonkonogy v. United States*, 417 F. Supp. 78 (S.D.N.Y. 1976) (applying equitable estoppel against the IRS where a gravely ill taxpayer relied to his detriment upon a letter from an IRS agent directing him to make a payment "as soon as possible"). Courts equitably estop the government where, as here, "basic notions of fairness" require it because, as a result of relying on government misrepresentations, a party suffers damage that cannot be rectified. *See In re La Difference Rest., Inc.*, 29 B.R. 178, 182-83 (Bankr. S.D.N.Y. 1983) (finding that the IRS was equitably estopped from asserting an additional tax liability claim against debtor after entering into a stipulation fixing the debtor's tax liability amount and providing for a schedule of payment where the feasibility of debtor's bankruptcy plan relied upon the stipulation with the IRS); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973) (estopping the government from refusing payment on a government contract, despite the fact that defendants' actions were in violation of government regulations, where defendants reasonably relied on statements from the Department of Agriculture in dividing up their land parcels).

The facts here justify equitably estopping the government from arguing now that Danske is not a bona fide purchaser as to wires issued in or after August 2015. First, the government made a material misrepresentation by assuring Danske that its continued funding would not be problematic. *Buesing v. United States*, 42 Fed. Cl. 679, 695 (Fed. Cl. 1999) (recognizing that a misrepresentation is material if it "would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so") (internal quotation omitted). It is reasonable to conclude that the government expected, and indeed hoped,

that its representations to Danske regarding continued funding would induce Danske to do so. Second, Danske reasonably relied on the government's assurances that Danske's continued funding of the development of the Resort Property would not impact Danske's position in the forfeiture proceedings. Indeed, as the party that could elect to seek forfeiture or to challenge (or not challenge) Danske's claim, Danske had no reason to believe that the government would later renege on those assurances. Third, to the extent the government prevails in reducing Danske's claim (or entirely defeating it), Danske would be damaged by its reliance on the government's assurances. Finally, the government's misrepresentation to Danske, as evidenced by its now dramatic change in conduct, can only be seen as reckless or willful.

### E.    Danske Has the Most Senior Secured Interest in the Resort Property and the Equity Interests and the Preliminary Order Should Be Amended to Recognize Danske's Claim.

The government has made much of the notion that Danske's claim should not be recognized until the Court has decided all of the ancillary petitions asserting an interest in the forfeitable property. Dkt. No. 844 (June 9, 2020 Govt. Lttr. at 3). There is no reason to wait—none of the petitions assert claims that are superior to Danske's, *see generally* Dkt. Nos. 874, 880, 88, 884, 886, 888, because the other petitions assert interests in the out-of-the-money Equity Interests and none asserts a secured lien in the Resort Property. *IMH Broadway Tower Sr. Lender, LLC v. Hertz*, 415 F. Supp. 3d 455, 460 n.5 (S.D.N.Y. 2019) (recognizing that "equity is junior to debt"); *In re Finlay Enters.,* Case No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592, *153 (Bankr. S.D.N.Y. May 18, 2010) ("Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest"). As such, there is no other petition that would be affected if the Preliminary Order is amended to recognize Danske's

claim. In all events, the Court need not amend the Preliminary Order immediately after recognizing Danske's claim, but instead can find that Danske has a valid claim now and amend the Preliminary Order down the road after the Court decides the validity of the other claims submitted.

### III.    THE GOVERNMENT HAS NOT ESTABLISHED THAT THERE IS A NEED FOR ADDITIONAL DISCOVERY.

The government's demand for additional discovery should be denied. The government's request for additional discovery is nothing more than a fishing expedition aimed at creating delay while also further eroding the Resort Property's value and causing Danske to incur additional unwarranted costs and further harming and creating a new victim in the form of the Danske Bank shareholders. As a threshold matter, the Court instructed the government at the July 8, 2020 conference that in responding Danske's motion for summary judgment it could also include—a "[Rule] 56(d) declaration from the forensic accountant or from someone . . . *but it has to be detailed with respect to why . . . a particular document or category of documents is material to [the government's] ability to respond to [Danske's] motion.*" July 2020 Tr. at 6:19-25 (emphasis added). Rather than comply with the Court's request with an explanation as to why the specific discovery is material to responding to Danske's motion, the Declaration of Madeline O'Connor refers the Court to GX-19 which is a chart that the government filed *in exactly the same form* on July 6, 2020 (Dkt. No. 871-4) and to Fedkenheuer's Declaration. The chart, which has not even been updated to reflect additional documents Danske produced subsequent to the July 8, 2020 conference, provides nothing more than generic descriptions, e.g., "[t]o prove its BFP status, Danske must demonstrate its legal interest," GX-19 at 1, rather than the "detailed" declaration the Court requested. And the Fedkenheuer Declaration similarly refers, largely in passing, to documents that, as discussed above, Fedkenheuer claims to need for an analysis that has little to no bearing on the issue before this Court. Neither the Fedkenheuer Declaration nor GX-19 satisfy

the Court's request and the Court should decline to allow the government yet another bite at the discovery apple.

The government  has not articulated how the discovery it seeks is pertinent to its efforts to establish that there is a genuine issue of material fact in Danske's claim. Indeed, as described above at pages 13-15, the government's request for documents pertaining to whether the Borrower, whose interest is not at issue here, used funds advanced by Danske for construction simply have no bearing on whether Danske is a bona fide purchaser for value. Similarly, the government demands that Danske produce all Trimont invoices, but again does not explain why any missing invoices or statements are material in responding to Danske's claim. Without establishing that the demanded additional discovery could create a genuine issue of material fact, the government has not shown a need for it and its request should be denied.

## IV.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT.

The government's Cross-Motion should be denied. The government can only prevail on its Cross-Motion if it submits evidence establishing that there is a genuine issue of material fact that the government has an interest superior to Danske's interest. *POM Recoveries*, 2020 U.S. Dist. LEXIS 151824, at *3-4; *Design Partners*, 2016 U.S. Dist. LEXIS 41913, at *14-15; *Yevstifeev*, 860 F. Supp. 2d at 220 ("In responding to a properly-supported motion for summary judgment, [non-movant] may not rely upon conclusory allegations or denials, but instead must produce evidence in admissible form, setting forth 'concrete particulars' showing that a trial is needed.") (internal citation omitted). Rather than provide evidence showing that its interest is superior to Danske's senior secured interests, the government argues that if it does not get the discovery it demands, the Court should simply grant its Cross-Motion. Govt. Brf. at 2. The government has not made an affirmative case that there is a genuine issue of material fact that the government holds

an interest in the Resort Property and Equity Interests that is superior to Danske's perfected and senior interests. *See generally* Govt. Brf.; *see generally* Govt. Rule 56.1 Stmt. Without making an affirmative case of its own, the government has not established that it is entitled to summary judgment in its favor. *See POM Recoveries*, 2020 U.S. Dist. LEXIS 151824, at *3-4.

Furthermore, the government never explains how it is entitled to summary judgment if, as it insists, additional discovery is needed. A finding that additional discovery is necessary on an issue forecloses granting summary judgment. *See In re 1031 Tax Grp., LLC*, 439 B.R. 47, 74-75 (Bankr. S.D.N.Y. 2010) (recognizing that, where additional discovery is warranted, a motion for summary judgment may be denied or held in abeyance and granting partial summary judgment and denying motion for additional discovery). To the extent that the Court concludes that Danske has not yet established its claim, Danske respectfully submits that the Court should deny the Cross-Motion.

## V.    CONCLUSION

For the reasons set forth in Danske's Petition, its Motion for Summary Judgment, and herein, Danske respectfully requests that the Court deny the government's Cross-Motion and grant Danske's Motion, recognize Danske (and its successors and assigns) as a bona fide purchaser for value of senior secured interests in the Equity Interests and Resort Property, including Danske's right to default interest, and amend the Preliminary Order to reflect Danske's senior secured interests with the amount of Danske's claim to be calculated (inclusive of default interest) at the time of amendment. Danske also respectfully requests that the Court grant Danske any and all relief that it deems necessary and proper.

Dated:  New York, New York
         October 9, 2020

**VENABLE LLP**


By: */s/ George Kostolampros*

George Kostolampros
(gkostolampros@venable.com)
600 Massachusetts Ave NW
Washington DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

     AND

Doreen S. Martin
Xochitl S. Strohbehn
(dsmartin@venable.com)
(xochitl.strohbehn@venable.com)
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone: (212) 307-5500
Facsimile: (212) 307-5598

*Attorneys for Danske Bank A/S London Branch*