# EXHIBIT 3

**DATE OF TRANSLATION:**     2-Oct-20

**ELECTRONIC FILE NAME:**     Exhibit 4

**SOURCE LANGUAGE:**     Spanish
**TARGET LANGUAGE:**     English (United States)
**TRANSPERFECT JOB ID:**     US0799868

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

TCert v. 2.0

# MSJ EXHIBIT 4

# LOAN AGREEMENT

### for a loan in an amount up to

### $125,000,000

## MADE BY AND BETWEEN

**DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**
**a Mexican limited liability company,**
**as Borrower**

**and**

**LEHMAN BROTHERS HOLDINGS INC.,**
**a Delaware corporation,**
**as Lender**

Dated as of March 10, 2006

"Diamante Cabo San Lucas", Cabo San Lucas, Baja California Sur, Mexico

HF 3183497v.8 #04737/0094

CONFIDENTIAL

DANSKE_0010553

# TABLE OF CONTENTS

ARTICLE I     INCORPORATION OF RECITALS AND EXHIBITS.........................................1

    Section 1.1     Incorporation of Recitals.............................................................1

    Section 1.2     Incorporation of Exhibits. ..........................................................1

ARTICLE II     DEFINITIONS...............................................................................1

    Section 2.1     Defined Terms. .........................................................................1

ARTICLE III     REPRESENTATIONS AND WARRANTIES...................................11

    Section 3.1     Representations and Warranties...............................................11

    Section 3.2     Reaffirmation of Representations and Warranties. ....................14

ARTICLE IV     LOAN AND LOAN DOCUMENTS...............................................15

    Section 4.1     Agreement to Borrow and Lend. ..............................................15

    Section 4.2     Loan Documents. .....................................................................15

    Section 4.3     Term of the Loan. ....................................................................16

    Section 4.4     Prepayments.............................................................................17

    Section 4.5     Late Charge. ............................................................................17

ARTICLE V     INTEREST AND ADDITIONAL FEE ...........................................17

    Section 5.1     Interest Rate. ...........................................................................17

    Section 5.2     Additional Fee..........................................................................18

ARTICLE VI     LOAN EXPENSE AND ADVANCES ...........................................18

    Section 6.1     Loan and Administration Expenses. ..........................................18

    Section 6.2     Brokerage Fees.........................................................................19

    Section 6.3     Protective Advances..................................................................19

ARTICLE VII     CONDITIONS TO THE MAKING OF THE LOAN.........................19

    Section 7.1     Conditions Precedent. ..............................................................19

HF 3183497v.8 #04737/0094

ARTICLE VIII CONDITIONS PRECEDENT TO THE FIRST  DISBURSEMENT FOR CONSTRUCTION COSTS ...................................................20

    Section 8.1    Required Construction Documents. ...........................................20

ARTICLE IX    CONSTRUCTION BUDGET .....................................................21

    Section 9.1    Construction Budget. .........................................................21

    Section 9.2    Budget Line Items. ...........................................................22

    Section 9.3    Contingency Reserve. .......................................................22

    Section 9.4    Tax and Insurance Reserve. ...............................................22

ARTICLE X    SUFFICIENCY OF LOAN.........................................................23

    Section 10.1    Loan In Balance. .............................................................23

ARTICLE XI    CONSTRUCTION PAYOUT REQUIREMENTS...........................23

    Section 11.1    Documents to be Furnished for Each Disbursement..................23

    Section 11.2    Retainage.......................................................................24

    Section 11.3    Future Equity Requirement..................................................24

ARTICLE XII FINAL DISBURSEMENT FOR CONSTRUCTION COSTS ...........................24

    Section 12.1    Final Disbursement for Construction Costs.............................24

    Section 12.2    Retainage.......................................................................25

ARTICLE XIII COVENANTS .......................................................................25

    Section 13.1    Certain Covenants. ..........................................................25

    Section 13.2    Insurance.......................................................................29

    Section 13.3    Special Purpose Covenants. ...............................................31

ARTICLE XIV CASUALTY AND CONDEMNATION .........................................33

    Section 14.1    Lender's Election to Apply Proceeds to the Debt......................33

    Section 14.2    Borrower's Obligation to Rebuild. ........................................33

HF 3183497v.8 #04737/0094

ARTICLE XV  TRANSFERS................................................................................34

    Section 15.1  Prohibition of Assignments and Transfers by Borrower ......................34

    Section 15.2  Prohibition of Transfers in Violation of ERISA. .......................35

    Section 15.3  Successors and Assigns...............................................35

ARTICLE XVI SPECIAL PROVISIONS RE: PARTICULAR PHASES ..................................35

    Section 16.1  Phase IC ...............................................................35

    Section 16.2  Phase IA ...............................................................37

    Section 16.3  Other Phases...........................................................38

    Section 16.4  Opportunities upon Maturity or Sooner Prepayment..............................39

ARTICLE XVII   SERVICER ...............................................................39

    Section 17.1  Servicer. ...............................................................39

ARTICLE XVIII  EVENTS OF DEFAULT ...............................................................39

    Section 18.1  Events of Default. ...............................................................39

ARTICLE XIX LENDER'S REMEDIES IN EVENT OF DEFAULT.......................................41

    Section 19.1  Remedies Conferred Upon Lender. ...............................................41

ARTICLE XX  GENERAL PROVISIONS ...............................................................41

    Section 20.1  Captions. ...............................................................41

    Section 20.2  Modification, Waiver. ...............................................................41

    Section 20.3  Governing Law. ...............................................................41

    Section 20.4  Acquiescence Not to Constitute Waiver of Lender's Requirements. ........42

    Section 20.5  Disclaimer by Lender...............................................................42

    Section 20.6  Partial Invalidity; Severability. ...............................................43

    Section 20.7  Definitions Include Amendments ...............................................43

    Section 20.8  Execution in Counterparts...............................................................43

    Section 20.9  Entire Agreement ...............................................................43

HF 3183497v.8 #04737/0094

DANSKE_0010556

Section 20.10 Waiver of Dama ges......................................................................43

Section 20.11 Jurisdiction ................................................................................43

Section 20.12 Set -Offs......................................................................................44

Section 20.13 Authorized Representati ve...........................................................44

Section 20.14 Non -Recourse Provisions............................................................44

Section 20.15 Time is of the Essenc e ...............................................................44

ARTICLE XXI    NOTICES.................................................................................45

ARTICLE XXII    WAIVER OF JURY TRIAL.......................................................46

ARTICLE XXIII  GROSS-UP ..............................................................................46

Section 23.1    Gross-Up ..................................................................................46

ARTICLE XXIV  SALE OF NOTE AND SECURITIZATION ...................................47

Section 24.1    Cooperation...............................................................................47

Section 24.2    Intentionally Omitted. ...............................................................48

Section 24.3    Loan Components. .....................................................................48

Section 24.4    Costs.........................................................................................48

Section 24.5    Conversion of Loan and Creation of Subordinate Debt.............48

Section 24.6    Securitization Indemnification. ..................................................48

Section 24.7    Rating Surveillance. ..................................................................51

HF 3183497v.8 #04737/0094

CONFIDENTIAL

DANSKE_0010557

## LOAN AGREEMENT

Project commonly known as "Diamante Cabo San Lucas",
Cabo San Lucas, Baja California Sur, Mexico

THIS LOAN AGREEMENT (this "Agreement") is made as of March 10, 2006, between DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a Mexican limited liability company ("Borrower"), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Lender").

## RECITALS

A.      Borrower has applied to Lender for a loan in an amount up to $125,000,000 (the "Loan").  The Loan shall be used to fund acquisition and pre-development costs in respect of the Land (hereinafter defined) and such other costs as are set forth in the Budget (her einafter defined); and

B.      As security for Borrower's obligations under this Loan Agreement and the other Loan Documents (hereinafter defined), Borrower has on this date conveyed all of its right, title and interest in the Land to Banco J.P. Morgan, S.A. ("Trustee"), as Trustee under a Trust Agreement dated as of the date hereof among Borrower, Lender and Trustee (the "Trust Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## INCORPORATION OF RECITALS AND EXHIBITS

Section 1.1    Incorporation of Recitals.

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

Section 1.2    Incorporation of Exhibits.

The Exhibits to this Agreement are incorporated in this Agreement and expressly made a part hereof by this reference.

## ARTICLE II
## DEFINITIONS

Section 2.1    Defined Terms.

The following terms as used herein shall have the following meanings:

HF 3183497v.8 #04737/0094

<u>Additional Fee</u>:  The greater of (i) $125,000,000, less all interest theretofore paid by Borrower on account of the Loan and any Mezzanine Loan and (ii) an amount equal to a cumulative return of 25% on the principal amount of the Loan and any Mezzanine Loan outstanding from time to time, calculated for any period on the basis of a 360-day year and the actual number of days elapsed in such period, compounded monthly.

<u>Affiliate</u>:  With respect to a specified Person, any Person which, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, including, without limitation, any general or limited partnership in which such Person is a partner.

<u>Agreement</u>:  This Loan Agreement.

<u>Appraisal</u>.   An appraisal of the Land and any improvements thereon, prepared at Borrower's expense, in form and content satisfactory to Lender.

<u>Architect</u>:  The architect in respect of the Project, selected by Borrower and approved by Lender.

<u>Architect's Certificate</u>:  A certificate by the Architect in form satisfactory to Lender to the effect that the Improvements, upon completion, shall comply with Laws and as to such other matters as Lender requires.

<u>Assignment of Leases and Rents</u>:  The Assignment of Leases and Rents, dated as of the date hereof, by Borrower in favor of Lender.

<u>Authorized Representative</u>:  Kenneth A. Jowdy and/or William J. Najam, Jr.

"<u>Balance</u>" shall have the meaning given in Section 10.1 hereof.

<u>Bankruptcy Code</u>:  Title 11 of the United States Code, entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute, or any bankruptcy or insolvency statute of the United Mexican States.

<u>Borrower</u>:  As defined in the opening paragraph of this Agreement.

<u>Borrower Parties</u>:  Guarantor, Diamante Member, Baja Ventures 2006, LLC, Diamante Properties, LLC, CSL Properties 2006, LLC and KAJ Holdings, LLC.

<u>Budget Line Item(s)</u>:  As defined in Section 9.2(a).

<u>Business Day</u>:  Any day other than a Saturday, Sunday or day on which banks are required or authorized to be closed in New York, New York.

<u>Change Orders</u>:  As defined in Section 13.1(c).

<u>Commencement Date</u>: August 15, 2006.

CONFIDENTIAL                                                                            DANSKE_0010559

Completion Date:  The Maturity Date (without giving effect to any extension of the Term), i.e., March 31, 2009.

Completion Guaranty:  The Completion Guaranty, dated as of the date hereof, by Guarantor in favor of Lender.

Construction:  The construction of the Improvements in accordance with the Plans and Specifications.

Construction Budget:  The budget for the Construction of the Improvements in the form of Exhibit A-1 annexed hereto.

Construction Contracts:  All contracts for the design, engineering and construction of the Improvements.

Construction Schedule:  A schedule, satisfactory to Lender, establishing a timetable for completion of the Construction, showing, on a monthly basis, the anticipated progress of the Construction, and confirming that the Improvements can be completed on or before the Completion Date.

Contingency Reserve:  As defined in Section 9.3.

Control:  As such term is used with respect to any Person, including the correlative meanings of the terms "controlled by" and "under common control with", the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

Debt:  The outstanding principal balance of the Note from time to time, together with all accrued and unpaid interest thereon, the Additional Fee and all other sums now or hereafter due under the Loan Documents.

Default or default:  Any event, circumstance or condition, which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default.

Default Rate:  A rate per annum equal to twenty percent (20%), compounded monthly, but not in excess of the highest rate permitted by law.

Deferred Interest:  As defined in Section 5.1(b).

Deficiency Deposit:  As defined in Section 10.1.

Depositary Bank:  Hudson United Bank, Banco Santander Serfin or such other depositary bank as Lender shall approve from time to time.

Development Fee:  The Budget Line Item for payment of a development fee.

Diamante Member:  Diamante Cabo San Lucas LLC, a Delaware limited liability company.

CONFIDENTIAL                                                                 DANSKE_0010560

Disclosure Document:  As defined in Section 24.6(a).

Dollars or $:  United States dollars.

Effective Date:  The date hereof.

Environmental Indemnity:  The Environmental Indemnity dated as of the date hereof by Borrower and Guarantor in favor of Lender.

Environmental Laws:  As defined in the Environmental Indemnity.

Environmental Proceedings:  Any environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Property.

Environmental Report:  An environmental report prepared at Borrower's expense by an environmental consultant approved by Lender, dated not more than six (6) months prior to the Effective Date and addressed to Lender.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

Event of Default:  As such term is defined in Article 18.

Exchange Act:  As defined in Section 24.6(a).

Extension Notice.  As defined in Section 4.3(b)(i).

Extension Period.  As defined in Section 4.3(b).

Fitch:  Fitch, Inc.

Future Development Parcel I:  The portion of the Land (consisting of 64.93 acres) identified as "Future Development Parcel I" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Lender and Borrower.

Future Development Parcel II:  The portion of the Land (consisting of 234.05 acres) identified as "Future Development Parcel II" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Lender and Borrower.

Future Equity Requirement:  The requirement that Borrower, subsequent to the Initial Advance, contribute equity to the Project in the amount of $12,028,887.

General Contract.  A contract for the Construction between Borrower and General Contractor for the Construction of the Improvements (or any lesser portion thereof approved by Lender), in form and substance satisfactory to Lender.

General Contractor.  The contractor(s) under the General Contract(s), selected by Borrower and approved by Lender.

HF 3183497v.8 #04737/0094                          4

Geotechnical Report:  A geo-technical report prepared at Borrower's expense by an environmental consultant approved by Lender, dated not more than six (6) months prior to the Effective Date and addressed to Lender (or subject to a separate "reliance letter").

Governmental Authority:  Any federal, state, county or municipal government having jurisdiction over the Property.

Guarantor:  Kenneth A. Jowdy.

Hard Costs.  All costs for labor, materials or equipment supplied to or incorporated in the Project.

Hazardous Material:  Any hazardous or toxic material, substance or waste (including, without limitation, gasoline, petroleum, asbestos-containing materials and radioactive materials) which is regulated under Environmental Laws.

Improvements:  Collectively, (i) engineering, transportation, mechanical and other infrastructure required for the development of the first phase of the Project, including roads, a waste water treatment plant and a desalination plant, (ii) a clubhouse and (iii) the "Dunes" golf course, all as more particularly shown on the Master Plan and all as more particularly described in the Plans and Specifications to be approved by Lender.

Included Taxes:  As defined in Section 23.1.

Indemnified Party:  As defined in Section 13.1(l).

Initial Advance:  $72,380,620.08.

Initial Equity Requirement:  The requirement, as a condition to the disbursement of the Initial Advance, that Borrower contribute not less than $8,415,523 of equity to the Project. Lender's making of the Initial Advance shall constitute its acknowledgment of Borrower's satisfaction of the Initial Equity Requirement.

Insurance Premiums:  As defined in Section 13.2(b).

Interest Rate.  A rate per annum equal to fifteen percent (15%), compounded monthly.

Internal Revenue Code:  The Internal Revenue Code of 1986, as amended from time to time.

Land:  The parcel of land located in the City of Los Cabo, Baja California Sur, Mexico and more particularly described on Exhibit A annexed hereto.

Late Charge:  As such term is defined in Section 4.5.

Laws:  All federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations of the United States of America and the United Mexican States, including, without limitation, Environmental Laws.

CONFIDENTIAL                                                                                  DANSKE_0010562

Leases:  All leases, licenses and occupancy agreements affecting the Property or any part thereof now or hereafter existing.

Lehman:  As defined in Section 24.6(b).

Lehman Group: As defined in Section 24.6(b).

Lender:  As defined in the opening paragraph of this Agreement.

Lender's Consultant.  The consultant retained by Lender, at Borrower's expense, to act as Lender's representative in respect of the Construction, as provided in this Agreement.

Liabilities.  As defined in Section 24.6(b).

Loan:  As defined in the Recitals to this Agreement.

Loan Documents:  Collectively, this Agreement, the documents and instruments listed in Section 4.2 and all other documents and instruments entered into from time to time which evidence or secure the Debt.

Loan Fee:  An amount equal to two percent (2%) of the maximum principal amount of the Loan.

Loan-to-Value Ratio:  The ratio obtained by dividing the outstanding principal balance due on the Loan and any Mezzanine Loan by the fair market value of the Property.

Major Contracts:  All Construction Contracts which provide for an aggregate contract price equal to or greater than $100,000.

Master Plan:  The master plan for the Project annexed hereto as Exhibit B.

Material Adverse Change or material adverse change:  If, in Lender's reasonable determination, the business prospects, operations or financial condition of a Person or property has changed in a manner which could impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its obligations under the Loan Documents.

Maturity Date:  March 31, 2009.

Mezzanine Loan:  Any Phase IC Mezzanine Loan and any other mezzanine loan made by Lender in accordance with the provisions of Article 16 hereof.

Mezzanine Loan Borrower:  Phase IC Designee or any other borrower under any Mezzanine Loan Documents.

Mezzanine Loan Documents:  Any Phase IC Mezzanine Loan Documents and any other mezzanine loan documents executed and delivered by Borrower to Lender in accordance with the provisions of Article 16 hereof.

CONFIDENTIAL                                                    DANSKE_0010563

<u>Minimum Phase IA Contract Price</u>:  As defined in Section 16.2.

<u>Minimum Phase IA Release Price</u>:  As defined in Section 16.2.

<u>Moody's</u>:  Moody's Investors Service, Inc.

<u>Note</u>:  A promissory note, dated as of the date hereof, by Borrower to the order of Lender, in the amount of $125,000,000.

<u>OFAC</u>:  Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

<u>Operating Account</u>:  A deposit account opened and maintained by Borrower with Depositary Bank, on behalf of Lender, to be utilized in the manner set forth in Section 4.1(d).

<u>Opportunity</u>:  As defined in Section 16.1.

<u>Order of Priority</u>:  In respect of any payment made or required to be made by Borrower or any Mezzanine Loan Borrower, the application of such payment in the following order of priority (i) <u>first</u>, to accrued, unpaid interest at the Default Rate in respect of the Loan or any Mezzanine Loan (in such order of priority, as between the Loan and any Mezzanine Loan, as Lender shall elect), (ii) <u>second</u>, to other amounts (*e.g.*, protective advances) due in respect of the Loan and any Mezzanine Loan (in such order of priority, as between the Loan and any Mezzanine Loan, as Lender shall elect), (iii) <u>third</u>, to current interest in respect of the Loan and any Mezzanine Loan (in such order of priority, in respect of the Loan and any Mezzanine Loan, as Lender shall elect), (iv) <u>fourth</u>, to Deferred Interest in respect of the Loan and any Mezzanine Loan (in such order of priority, as between the Loan and any Mezzanine Loan, as Lender shall elect), (v) <u>fifth</u>, to the principal amount of the Loan and any Mezzanine Loan (in such order of priority, in respect of the Loan and any Mezzanine Loan, as Lender shall elect) and (vi) <u>sixth</u>, to the Additional Fee.

<u>Other Phase Release Price</u>:  As defined in Section 16.3.

<u>Payment Date</u>:  The first (1st) day of each calendar month (or such other day of a calendar month selected by Lender to collect or accrue debt service payments), or, if such day is not a Business Day, the immediately preceding Business Day.

<u>Permits</u>.  Any building permit, environmental permit, utility permit, zoning permit or other permit required in respect of the Property.

<u>Permitted Exceptions</u>:  The matters disclosed by the Title Policy issued to Lender on the date hereof.

<u>Person</u>:  Any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any U.S. or Mexican federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

CONFIDENTIAL                                                                                DANSKE_0010564

Personal Property:  All personal property, fixtures and equipment required or beneficial for the operation of the Land or the Improvements.

Phase(s):  The individual (or collective) reference to Phase IA, Phase IB, Phase IC, Phase ID, Phase 2A, Phase 2B, Future Development Parcel I and Future Development Parcel II.

Phase IA:   The portion of the Land (consisting of 75.06 acres) identified as "Phase I" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Borrower and Lender.  It is anticipated that fifty (50) single-family homes shall be developed on Phase IA.

Phase IB:  The portion of the Land (consisting 130.79 acres) identified as "Phase IB" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Borrower and Lender.

Phase IC:  The portion of the Land (consisting of 22.58 acres) identified as "Phase IC" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Borrower and Lender.  It is anticipated that 35 villas shall be developed on Phase IC.

Phase IC Designee:  As defined in Section 16.1(c).

Phase IC Mezzanine Loan:  As defined in Section 16.1(c).

Phase IC Mezzanine Loan Amount:  An amount equal 89.1% of the value of Phase IC (as improved by the Improvements completed thereon), as determined by an Appraisal.

Phase IC Mezzanine Loan Documents:  The Phase IC Mezzanine Note, the Phase I Mezzanine Loan Pledge Agreements, the Phase IC Mezzanine Loan UCC Financing Statements and such other documents or instruments as Lender shall require to evidence or secure the Phase IC Mezzanine Loan.

Phase IC Mezzanine Loan Financing Statements:  Such UCC Financing Statements as Lender shall require in connection with the execution and delivery of the Phase IC Mezzanine Loan Pledge Agreements.

Phase IC Mezzanine Loan Note:  As defined in Section 16.1(c).

Phase IC Mezzanine Loan Pledge Agreements:  Two agreements (one governed by U.S. law, another governed by Mexican law), in form satisfactory to Lender, whereby the members of Phase IC Designee pledge to Lender, as security for the repayment of Phase IC Designee's obligations under the Phase IC Mezzanine Note, all of their right, title and interest in and to their respective membership interests in Phase IC Designee.

Phase ID:  The portion of the Land (consisting of 43.77 acres) identified as "Phase ID" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Lender and Borrower.

CONFIDENTIAL                                                                          DANSKE_0010565

Phase 2A:  The portion of the Land (consisting of 26.41 acres) identified as "Phase 2A" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Borrower and Lender.

Phase 2B:  The portion of the Land (consisting of 19.7 acres) identified as "Phase 2B" on the Master Plan, as the same may be adjusted in accordance with the mutual agreement of Lender and Borrower.

Plans and Specifications:  Plans and specifications for the Improvements, prepared by Architect and approved by Lender.

Pledge Agreement (Assets):  The Pledge Agreement by Borrower in favor of Lender in respect of the contract rights, intellectual property, movable assets, personal property and other "Pledged Assets" identified therein.

Pledge Agreement (Membership Interests in Borrower: US):  The Pledge Agreement, governed by U.S. law, by Diamante Member and Guarantor in favor of Lender, in respect of their respective membership interests in Borrower.

Pledge Agreement (Membership Interests in Borrower: Mexico):  The Pledge Agreement, governed by Mexican law, by Diamante Member and Guarantor in favor of Lender, in respect of their respective membership interests in Borrower.

Pledge Agreement (Membership Interests in Diamante Member):  The Pledge Agreement by Guarantor, Baja Ventures 2006, LLC, Diamante Properties, LLC, CSL Properties 2006, LLC and KAJ Holdings, LLC in respect of their respective membership interests in Diamante Member.

Pledge Agreements:  The collective reference to the Pledge Agreement (Assets), the Pledge Agreement (Membership Interests in Borrower: US), the Pledge Agreement (Membership Interests in Borrower: Mexico) and Pledge Agreement (Membership Interests in Diamante Member).

Policy.  As defined in Section 13.2(b).

Proceeding:  As defined in Section 20.11.

Proceeds:  As defined in Section 14.1.

Project:  A resort and residential development consisting of residences, two golf courses, a club house, restaurant, spa and fitness center and other amenities, all as more particularly shown on the Master Plan.

Property:  The Land and any improvements located thereon.

Provided Information.  As defined in Section 24.1.

Rating Agencies:  Each of S&P, Moody's and Fitch.

CONFIDENTIAL                                                                DANSKE_0010566

REA:   A reciprocal easement, homeowners' association or other agreement in form satisfactory to Lender, containing such easements, covenants and other agreements as Lender shall reasonably require for the maintenance of Project common elements and the sharing of Project infrastructure following the completion of all or any portion of the Project and the conveyance to third parties thereof.

Recourse Obligations:  As defined in the Note.

Recourse Guaranty:  The Guaranty, dated as of the date hereof, by Guarantor in favor of Lender, pursuant to which Guarantor guarantees to Lender the payment of the Recourse Obligations.

Registration Statement:  As defined in Section 24.6(b).

Related Parties:  As defined in Section 13.3(d).

Repayment Guaranty:  The guaranty of repayment of the Loan (including any portion of the Loan theretofore converted to a Mezzanine Loan in accordance with the terms of Section 16 hereof) by Borrower Parties in favor of Lender.

Requisition:  A request for an advance of a portion of the Loan (other than the Initial Advance) in the form required by Lender.

S&P:  Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

Securities.  As defined in Section 24.6(a).

Securities Act.  As defined in Section 24.6(a).

Securitization.  As defined in Section 24.1.

SEMARNAT.  As defined in Section 8.1(d).

Servicer:  As defined in Section 17.1.

Servicing Agreement:  As defined in Section 17.1.

Servicing Fees.  As defined in Section 17.1.

Soft Costs:   All costs, other than Hard Costs, to be incurred in respect of the Improvements, including, without limitation, architects' fees, engineers' fees, Taxes, Insurance Premiums and bond fees.

SRE Permit:  As defined in Section 13.1(s).

Subordinate Loan:  As defined in Section 24.5.

Taxes.  All real estate taxes and assessments and charges of every kind levied or assessed with respect to the Property.

CONFIDENTIAL                                                   DANSKE_0010567

Tax and Insurance Reserve:  As defined in Section 9.4.

Tenant:   A tenant or licensee under a Lease.

Title Insurer:  Stewart Title Guaranty de Mexico, S.A. de C.V., as agent for Stewart Title Guaranty Company, and New York Land Services, as agent for Lawyers Title Insurance Corporation, each as co-insurers of 50% of the liability under the Title Policy.

Title Policy:  An ALTA Mortgagee's Loan Title Insurance Policy or its equivalent, issued by Title Insurer, insuring Lender's interest as first place beneficiary under the Trust Agreement, subject only to the Permitted Exceptions, and otherwise in form satisfactory to Lender.

Transfer:    Any sale, transfer, lease, conveyance, alienation, pledge, assignment, mortgage, encumbrance hypothecation or other disposition of (i) all or any portion of the Land or any of the improvements thereon, (ii) all or any portion of Borrower's right, title and interest (legal or equitable) in and to the Land or any of the improvements thereon or (iii) any interest in Borrower or any interest in any Person which directly or indirectly holds an interest in, or directly or indirectly controls, Borrower.

Trust.  The trust created by the Trust Agreement.

Trust Agreement:  As defined in the Recitals to this Agreement.

Trustee:  As defined in the Recitals to this Agreement.

UCC Financing Statements:  The financing statements required to be filed to perfect the security interests conferred on Lender by the Pledge Agreements.

UCC Policy:  The policy of UCC title insurance, issued by UCC Title Insurer, insuring Lender's first priority, perfected security interest in the collateral under the U.S. Pledge Agreements.

UCC Title Insurer:  Commonwealth Land Title Insurance Company.

Underwriter Group:  As defined in Section 24.6(b).

U.S. Pledge Agreements:    The collective reference to the Pledge Agreement (Membership Interests in Borrower: US) and the Pledge Agreement (Membership Interests in Diamante Member).

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

Section 3.1   Representations and Warranties.

To induce Lender to execute this Agreement and perform its obligations hereunder, Borrower hereby represents and warrants to Lender as follows:

CONFIDENTIAL                                    DANSKE_0010568

(a)     Trustee has good and marketable legal title to the Property, subject only to the Permitted Exceptions.

(b)     No litigation or proceedings are pending, or, to the best of Borrower's knowledge, threatened, against Borrower, any of the Borrower Parties or the Property.  There are no pending, or, to Borrower's knowledge, threatened, Environmental Proceedings in respect of the Property.

(c)     Borrower (i) is a limited liability company with variable capital (*sociedad de responsibilidad limitada de capital variable*), duly organized and validly existing under the laws of the United Mexican States, (ii) has full power and authority to execute, deliver and perform all Loan Documents to which it is a party, and (iii) such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower.  Each of Borrower Parties (other than Guarantor) (x) is a limited liability company, duly organized and validly existing under the laws of the State of Delaware, (y) has full power and authority to execute, deliver and perform all Loan Documents to which it is a party, and (z) such execution, delivery and performance has been duly authorized by all requisite action on the part of each of such Borrower Parties.

(d)     Neither Borrower nor any of the Borrower Parties is subject to any liens or judgments, other than, with respect to Borrower, liens for real estate taxes which are not yet due, and other than, with respect to Guarantor, such liens as are disclosed on the financial statements furnished to Lender in connection with its underwriting of the Loan.

(e)     Each of Borrower and Borrower Parties is in compliance with all Laws applicable to it and, other than with respect to Guarantor, has obtained all permits required for it to operate.

(f)     Neither Borrower nor any Borrower Parties is involved in any dispute with any taxing authority.  Neither Borrower nor any Borrower Parties is in default of any obligation to pay taxes to any taxing authority.

(g)     Borrower has never owned any property, or engaged in any business, other than the ownership of its interest in the Property.  Each Borrower Party (other than Guarantor) has never owned any property, other than its direct or indirect interest in Borrower, and has never engaged in any business, other than business incidental to its direct or indirect ownership of an interest in Borrower.

(h)     No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental Person, including any creditor, partner, or member of Borrower or any Borrower Party, is required in connection with the execution, delivery and performance of this Agreement or any of the Loan Documents, other than the registration of the Pledge Agreement (Assets) and the Trust Agreement in the Public Registry of Property and Commerce of Cabo San Lucas and Ensenada and the filing of the UCC Financing Statements in the Offices of the Delaware and Nevada Secretaries of State.

CONFIDENTIAL                                                                                    DANSKE_0010569

(i)    The execution, delivery and performance of this Agreement, the execution and payment of the Note and the creation of the Trust and the other security interests under the other Loan Documents will not constitute a breach or default under any other agreement to which Borrower or any Borrower Party is a party or may be bound, or a violation of any law or court order which may affect the Property.

(j)    There is no Default or Event of Default under this Agreement or the other Loan Documents.

(k)    There are no pending or, to Borrower's knowledge, threatened, condemnation or eminent domain proceedings in respect of the Land.

(l)    Upon completion of the Improvements, the Property will have adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, fire and police protection, and means of access between the Property and public streets.

(m)    Borrower has dealt with no broker or finder in connection with this Agreement or the Loan.

(n)    All financial statements and other information previously furnished by Borrower or any Borrower Party (or any Affiliate of any of them) in connection with the Loan are true, complete and correct in all material respects and fairly present the financial conditions of the subjects thereof as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and no Material Adverse Change with respect to Borrower or any Borrower Party has occurred since the respective dates of such statements and information. Neither Borrower nor any Borrower Party has any material liability, contingent or otherwise, not disclosed in such financial statements.

(o)    The amounts set forth in the Construction Budget represents a full and complete itemization by category of all costs, expenses and fees which Borrower reasonably expects to pay or reasonably anticipates becoming obligated to pay to complete the Construction.

(p)    Neither the construction of the Improvements nor the use thereof when completed will violate (i) any Laws or (ii) any restrictions of record or agreements affecting the Property. Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is or will be to any extent dependent upon or related to any real estate other than the Land. All Governmental Approvals required for the Construction in accordance with the Plans and Specifications have been obtained or will be obtained prior to the commencement of Construction, and all Laws relating to the Construction and operation of the Improvements have been complied with.

(q)    Except as disclosed in the Environmental Report: (i) the Property is free of Hazardous Material and is in compliance with all Laws; (ii) neither Borrower nor, to the best knowledge of Borrower, any other Person, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Property and the Property has never been used (whether by Borrower or, to the best knowledge of Borrower, any other Person) for any activities involving, directly or indirectly, the use,

CONFIDENTIAL    DANSKE_0010570

generation, treatment, storage, transportation, or disposal of any Hazardous Material; and (iii) there are no underground tanks, vessels, or similar facilities for the storage or containment of Hazardous Materials of any sort on, under or affecting the Property.

(r)     The Property is taxed separately without regard to any other property and for all purposes the Property may be conveyed and otherwise dealt with as an independent parcel.

(s)     There are no Leases, subleases or other arrangements for occupancy of space within the Property.

(t)     The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(u)     Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(v)     Neither Borrower nor any Borrower Party nor any Person holding a direct or indirect interest in any of them is (or will be) a person with whom Lender is restricted from doing business under OFAC (including Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such Persons.  In addition, Borrower hereby agrees to provide Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with all Laws concerning money laundering and similar activities.

(w)     Borrower is in compliance with Article 225 of the Mexican Income Tax Law.

Section 3.2    Reaffirmation of Representations and Warranties.

Borrower agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement are true as of the Effective Date and, except for matters which have been disclosed by Borrower and approved by Lender, will be true at all times thereafter.  Lender shall be deemed to have approved changes to such representations and warranties occurring subsequent to the date hereof, if the same arise by reason of acts undertaken by Borrower in accordance with the terms hereof.  Each request for a disbursement under the Loan Documents shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the disclosures made and approved (or deemed approved) as aforesaid, as of the date of such request.  It shall be a condition precedent to the making of the Initial Advance and each subsequent disbursement that each of said representations and warranties is true and correct as of the date of such requested disbursement, except as aforesaid.

HF 3183497v.8 #04737/0094                    14

CONFIDENTIAL                                                                    DANSKE_0010571

## ARTICLE IV
## LOAN AND LOAN DOCUMENTS

Section 4.1    <u>Agreement to Borrow and Lend</u>.

Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower the Loan, for the purposes and subject to all of the terms, provisions and conditions contained in this Agreement.

(a)    The Loan shall be made to Borrower on the terms and conditions hereinafter set forth.  The Loan will bear interest at the rate or rates, and will be repaid, as set forth in this Agreement and in the Note.  Borrower shall use the proceeds of the Loan solely for the purposes specified herein.

(b)    The aggregate amount of the Loan shall not exceed (i) One Hundred Twenty-Five Million Dollars ($125,000,000).  The Loan is not revolving in nature, and amounts repaid may not be subsequently readvanced.

(c)    Provided that Borrower satisfies the conditions to the making of the Loan set forth in Article 7 hereof, Lender shall disburse the Initial Advance to Borrower on the Effective Date.

(d)    Borrower shall, prior to the Effective Date, open the Operating Account. Borrower authorizes Lender to disburse the Loan proceeds by crediting the Operating Account; provided, however, that Lender shall not be obligated to use such method.

(e)    At Lender's option, disbursements may be made by Lender into an escrow held by Title Insurer and subsequently disbursed by Title Insurer to Borrower.  If such option is exercised, Loan proceeds so disbursed shall be deemed to be disbursed to Borrower on the date of deposit into the escrow and interest shall accrue thereon from that date, regardless of the date such proceeds are released to Borrower by Title Insurer.

Section 4.2    <u>Loan Documents</u>.

On the Effective Date, Borrower shall execute and deliver (and cause any party thereto other than Borrower or Lender to execute and deliver) to Lender and Trustee, as appropriate, the following (in the presence, where required, of a Mexican notary);

(a)    The Note;

(b)    The Trust Agreement;

(c)    The Assignment of Leases and Rents;

(d)    The Omnibus Assignment;

(e)    The Completion Guaranty;

HF 3183497v.8 #04737/0094                    15

(f)    The Recourse Guaranty;

(g)    The Repayment Guaranty;

(h)    The Environmental Indemnity;

(i)    The Pledge Agreements; and

(j)    Such other documents, instruments or certificates as Lender or its counsel shall require.

Section 4.3   <u>Term of the Loan.</u>

(a)    All principal, interest and other sums due under the Loan Documents (including the Additional Fee) shall be due and payable in full on the Maturity Date.

(b)    Borrower may elect to extend the Maturity Date for two additional terms of one year each (each, an "<u>Extension Period</u>"), subject to the satisfaction of each of the following conditions:

(i)    Borrower furnishes Lender with not less than sixty (60), but not more than one hundred twenty (120), days' advance written notice of its election to extend the Maturity Date (an "<u>Extension Notice</u>");

(ii)    No Default or Event of Default exists under this Agreement or any of the other Loan Documents;

(iii)    In respect of Borrower's exercise of the first extension option, Borrower shall pay to Lender an amount which, when aggregated with all payments theretofore made on account of the Loan or any Mezzanine Loan, equals One Hundred Twenty-Five Million Dollars ($125,000,000), for application in the Order of Priority;

(iv)    In respect of Borrower's exercise of the second extension option, Borrower shall pay to Lender an amount which, when aggregated with all payments theretofore made on account of the Loan or any Mezzanine Loan, equals Fifty Million Dollars ($50,000,000), for application in the Order of Priority;

(v)    Guarantor executes and delivers to Lender a reaffirmation of the Recourse Guaranty and the Environmental Indemnity;

(vi)    Borrower Parties execute and deliver to Lender a reaffirmation of the Repayment Guaranty;

(vii)    Borrower causes Title Insurer to deliver to Lender an endorsement to the Title Policy, insuring Lender's interest as first place beneficiary under the Trust Agreement, subject only to the Permitted Exceptions; and

HF 3183497v.8 #04737/0094       16

CONFIDENTIAL

DANSKE_0010573

(viii)   Borrower causes UCC Title Insurer to deliver to Lender an endorsement to the UCC Policy, insuring Lender's first priority security interest in the collateral under the Pledge Agreements.

(c)   Borrower shall not be entitled to any further disbursements of Loan proceeds during any Extension Period.  Notwithstanding the foregoing, Borrower shall be entitled, during the first six (6) months of the first Extension Period (if applicable), to advances for costs of Construction incurred, but not paid, prior to the expiration of the initial term of the Loan, subject to Borrower's satisfaction of the conditions to advances set forth in this Agreement.

Section 4.4    Prepayments.

Other than in connection with partial releases of the lien of the Trust Agreement as provided in Article 16 hereof below and prepayments made in connection with extensions of the Loan in accordance with the provisions of Section 4.3(b) above, partial prepayments of the Loan are not permitted.  Subject to the provisions of Section 16.4 hereof, Borrower may prepay the Loan in whole only upon not less than thirty (30) days' written notice to Lender, provided that any such prepayment must occur on a Payment Date.  No such prepayment of the Loan shall be permitted unless the same is accompanied by (i) all interest and other amounts accrued on the Loan through the date of prepayment, (ii) reasonable attorneys' fees incurred by Lender as a result of the prepayment and (iii) the Additional Fee.

Section 4.5    Late Charge.

Any amount due hereunder or under the other Loan Documents which remains unpaid more than ten (10) days after the date said amount was due and payable shall incur a fee (a "Late Charge") of five percent (5%) of said amount, which payment shall be in addition to all of Lender's other rights and remedies under the Loan Documents.  Notwithstanding the foregoing, Lender shall not assess a Late Charge in respect of any installment of interest to be paid from the Interest Reserve in accordance with the terms of Section 10.4 hereof, so long as (i) no Event of Default exists, (ii) no dispute exists in respect of amounts to be disbursed for the payment of interest from the Interest Reserve and (iii) adequate funds are on deposit in the Interest Reserve.

**ARTICLE V**
**INTEREST AND ADDITIONAL FEE**

Section 5.1    Interest Rate.

(a)    Interest shall accrue on the Loan at the Interest Rate.

(b)    Interest in arrears at the Interest Rate shall be payable on each Payment Date.  Notwithstanding the foregoing, unless funds are available for payment of interest on any Payment Date by reason of the application of amounts in the Order of Priority in accordance with the provisions of Section 4.4. or Article 16 hereof, interest at the Interest Rate shall be deferred on each Payment Date, whereupon such deferred interest shall itself bear interest at the Interest Rate (such deferred interest and the interest thereon, collectively, "Deferred Interest").

CONFIDENTIAL                                                                      DANSKE_0010574

(c)     All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d)     Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (i) the actual number of days elapsed in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year by (iii) the outstanding principal balance of the Loan.

(e)     The Loan shall bear interest at the Default Rate at any time during which an Event of Default exists.

Section 5.2     Additional Fee.

Borrower shall pay to Lender, in addition to interest and other amounts due hereunder, the Additional Fee.  The Additional Fee shall accrue and be fully earned on the Effective Date, and shall be payable, subject to the Order of Priority, (i) on the Maturity Date or the earlier repayment of all or any portion of the Loan by acceleration or otherwise, (ii) upon any extension of the Loan, as provided in Section 4.3(b) hereof  and (iii) upon any partial release of the lien of the Trust Agreement, as provided in Article 16 hereof.  The Additional Fee shall remain payable in respect of any portion of the Loan converted into a Mezzanine Loan, as provided in Article 16 hereof.  For illustrative purposes, sample calculations of the Additional Fee payable under the circumstances enumerated above are set forth in Exhibit F annexed hereto.

**ARTICLE VI**
**LOAN EXPENSE AND ADVANCES**

Section 6.1     Loan and Administration Expenses.

Borrower shall reimburse Lender, from time to time upon five (5) days' demand therefor, for reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan, including all amounts payable pursuant to Sections 6.2 and 6.3 hereof and any and all other fees owing to Lender pursuant to the Loan Documents, and also including, without limitation, (i) all recording, filing and registration fees, (ii) all fees of the Trustee under the Trust Agreement, (iii) mortgage or documentary taxes, (iv) insurance premiums, title insurance premiums and other charges of Title Insurer or UCC Title Insurer, (v) premiums and fees payable in connection with the UCC Policy and the Title Policy, (vi) survey fees and charges, (vii) cost of premiums on surety company bonds, (viii) appraisal fees, (ix) insurance consultant's fees, (x) Lender's Consultant's fees, (xi) environmental consultant's fees and (xii) travel-related expenses.  Further, if any Default or Event of Default occurs or if the Loan is not paid in full when and as due, Borrower shall pay to Lender upon five (5) days' demand therefor, all costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and court costs) incurred in attempting to enforce payment of the Loan or to realize upon the security therefor.  Borrower agrees to pay Lender's fees and disbursements incurred in connection with title updates and title endorsements ordered by the Lender in connection with each disbursement of Loan proceeds.

HF 3183497v.8 #04737/0094

18

Section 6.2    Brokerage Fees.

Borrower shall pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold Lender harmless against all claims, liabilities, costs and expenses (including attorneys' fees and expenses) incurred in relation to any claim by any broker, finder or similar person; provided however, as an inducement to Borrower to make the foregoing undertaking, Lender represents to Borrower that Lender has not dealt with any broker, finder or similar person in connection with this Loan.

Section 6.3    Protective Advances.

If Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Loan Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing shall be added to the Debt and bear interest at the Default Rate.

## ARTICLE VII
## CONDITIONS TO THE MAKING OF THE LOAN

Section 7.1    Conditions Precedent.

Lender's obligation to fund the Initial Advance and thereafter to make any further disbursements of the Loan is conditioned upon Borrower's satisfaction of the following conditions precedent in form and substance satisfactory to Lender.

(a)    There shall exist no Default or Event of Default;

(b)    Borrower shall have paid to Lender the Loan Fee;

(c)    Borrower shall have satisfied the Initial Equity Requirement;

(d)    Borrower shall have furnished Lender with the Title Policy, together with legible copies of all title exception documents cited in the Title Policy and all other legal documents affecting the Property or the use thereof;

(e)    Borrower shall have furnished Lender with the UCC Policy;

(f)    Borrower shall have furnished to Lender an ALTA/ACSM "Class A" Land Title Survey of the Land or its equivalent for the Property;

(g)    Borrower shall have furnished Lender with a certificate from the appropriate Governmental Authority confirming that the Land is not subject to any "*ejido*" regime;

CONFIDENTIAL                                                            DANSKE_0010576

(h)     Borrower shall have furnished Lender with policies or binders evidencing that Borrower has obtained and maintains insurance coverage in respect of Borrower and the Property in compliance with the requirements of Section 13.2 hereof, and paid all Insurance Premiums in respect thereof;

(i)     All of the representations of Borrower set forth in Article 3 hereof shall be true and correct in all material respects;

(j)     Borrower shall have furnished Lender with opinions from U.S. and Mexican counsel to Borrower and Borrower Parties as to the due authorization, execution, delivery and enforceability of the Loan Documents and as to such other matters as Lender shall reasonably require;

(k)     Borrower shall have furnished Lender with current bankruptcy, federal tax lien, litigation, judgment and UCC searches in respect of Borrower and such other Persons as Lender shall require;

(l)     Borrower shall have furnished Lender with current, certified annual financial statements of Guarantor and such other Persons as Lender shall require;

(m)     Lender shall have reviewed and approved the Environmental Report, the Geotechnical Report and such other documents as Lender determines in its sole discretion; and

(n)     The grantor and Borrower shall have mutually executed and delivered to each other a deed of transfer in a form acceptable to Lender.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO THE FIRST
## DISBURSEMENT FOR CONSTRUCTION COSTS

Section 8.1     Required Construction Documents.

In addition to satisfying the requirements set forth in Article XI hereof, Borrower shall, as a condition to the first disbursement of proceeds of the Loan for Construction Costs, submit each of the following to Lender, each of which shall be satisfactory to Lender in its sole discretion.

(a)     Fully executed copies of: (i) the General Contract in respect of the Construction (or such portion thereof as Lender approves); (ii) Major Contracts representing not less than eighty percent (80%) of the aggregate dollar amount of all Construction Contracts in respect of the Construction (or such portion thereof as Lender approves); (iii) the Architect's Agreement and (iv) all contracts with engineers;

(b)     A current annual financial statement of General Contractor, satisfactory to Lender and certified as being true, complete and correct by General Contractor;

(c)     A schedule of values, including a trade payment breakdown, setting forth a description of all Construction Contracts;

CONFIDENTIAL                                                     DANSKE_0010577

(d)     Evidence that the Project has been approved by the Mexican Federal Ministry of the Environment and Natural Resources ("SEMARNAT") and all other Governmental Authorities, including, without limitation, evidence that the Land has been rezoned from forestry and vegetation ("*forestal*") use to recreational tourist real estate use;

(e)     All Permits then required in respect of the Construction;

(f)     The Plans and Specifications;

(g)     A Bond in favor of Lender, guaranteeing the obligations of General Contractor under the General Contract;

(h)     The Construction Schedule;

(i)     A report from Lender's Consultant which contains an analysis of the Plans and Specifications, the Construction Budget, the Construction Schedule, the General Contract and all Construction Contracts.  Such report shall contain (i) an analysis demonstrating the adequacy of the Construction Budget to complete the Project and (ii) a confirmation that the Construction Schedule is realistic.  Lender's Consultant shall monitor construction of the Improvements and shall visit the site at least one (1) time each month, and shall certify as to amount of Construction costs for all requested advances.  Borrower shall reimburse Lender from time to time for costs incurred by Lender in connection Lender's Consultant's performance of the foregoing;

(j)     The Architect's Certificate, executed by the Architect;

(k)     Consents from the General Contractor, the Architect and other Persons reasonably specified by Lender to the collateral assignment by Borrower to Lender of construction documents, including, without limitation, the General Contract, the Architect's Agreement, engineering contracts, the Plans and Specifications and all permits, licenses and approvals in respect of the Project;

(l)     A lock-box agreement in form reasonably acceptable to Lender, executed by Lender, Borrower and Depositary Bank, in respect of the Operating Account; and

(m)     Such other materials and documents as Lender may reasonably require with respect to the Construction.

## ARTICLE IX
## CONSTRUCTION BUDGET

Section 9.1     Construction Budget.

Disbursements of the Loan shall be governed by the Construction Budget.  The Construction Budget shall include, in addition to the Budget Line Items described in Section 9.2 below, the Contingency Reserve and the Tax and Insurance Reserve.  Borrower shall not modify the Construction Budget without first obtaining Lender's prior written consent thereto.

HF 3183497v.8 #04737/0094                    21

CONFIDENTIAL                                                                            DANSKE_0010578

Section 9.2    Budget Line Items.

(a)    The Construction Budget includes as line items ("Budget Line Items") all Hard Costs and Soft Costs.  All Loan proceeds disbursed by Lender shall be used only for the Budget Line Items for which such proceeds were disbursed.

(b)    Lender shall not be obligated to disburse any amount for any category of costs set forth as a Budget Line Item which is greater than the amount set forth for such category in the applicable Budget Line Item.  Borrower shall pay as they become due all amounts set forth in the Construction Budget with respect to costs to be paid by Borrower.  If any Budget Line Item shall be completed without the expenditure of all amounts in the Construction Budget allocated to such Budget Line Item, Borrower may reallocate the savings, provided that: (i) Lender shall have theretofore approved a revised Construction Budget reflecting the reallocation of Budget Line Items; (ii) no Budget Line Item for Hard Costs shall be reallocated to pay any Budget Line Item for Soft Costs until Borrower has paid all Hard Costs and completed the Improvements; and (iii) amounts shall not be reallocated from the Tax and Insurance Reserve and/or the Contingency Reserve.  Further, subject to the provisions of clauses (i) through (iii) above, Borrower may reallocate savings between unfinished Budget Line Items, provided that Lender determines, in its sole discretion, that such reallocation shall not result in an increase in the Construction Budget or otherwise cause the Construction Budget or any Budget Line Item to be out of Balance.

Section 9.3    Contingency Reserve.

The Construction Budget shall contain a Budget Line Item for additional, unforeseen costs and expenses (the "Contingency Reserve").  Borrower may from time to time request that Lender permit the reallocation of portions of the Contingency Reserve to pay costs of the Improvements for which amounts remaining in any Budget Line Item are insufficient.  Borrower agrees that the decision with respect to utilizing portions of the Contingency Reserve in order to keep the Loan in Balance shall be made by Lender in its sole discretion, and that Lender may require Borrower to make a Deficiency Deposit even if funds remain in the Contingency Reserve.

Section 9.4    Tax and Insurance Reserve.

The Construction Budget shall contain Budget Line Items for payment of Taxes and Insurance Premiums (the "Tax and Insurance Reserve").  Borrower hereby authorizes Lender from time to time, for the mutual convenience of Lender and Borrower, to disburse Loan proceeds to pay Taxes and Insurance Premiums, to the extent then due and payable, regardless of whether Borrower shall have specifically requested disbursement of such amount.  Any such disbursement, if made, shall be added to the outstanding principal balance of the Note and shall, when disbursed, bear interest at the Interest Rate.  The authorization hereby granted, however, shall not obligate Lender to make disbursements of the Loan for Taxes and Insurance Premiums, unless Borrower requests, and qualifies for, disbursement of the portion of the Construction Budget allocated therefor.

HF 3183497v.8 #04737/0094                                          22

                                                                          DANSKE_0010579

## ARTICLE X
## SUFFICIENCY OF LOAN

Section 10.1  <u>Loan In Balance</u>.

Anything contained in this Agreement to the contrary notwithstanding, the Loan shall at all times remain in Balance, on a Budget Line Item basis and in the aggregate.  A Budget Line Item shall be deemed to be in "Balance" only if Lender, in its sole discretion, determines that the amount of such Budget Line Item is sufficient for its intended purpose.  The Loan shall be deemed to be in Balance in the aggregate only when the total of the undisbursed portion of the Loan less the Contingency Reserve equals or exceeds the aggregate of: (i) the costs required to complete the Construction in accordance with the Plans and Specifications and the Construction Budget; (ii) the amounts to be paid as retainages to persons who have supplied labor or materials to the Project; (iii) the amount required to pay interest on the Loan and any Mezzanine Loan through the Maturity Date; (iv) the amount required to pay Taxes and Insurance Premiums and through the Maturity Date and (v) all other Hard Costs and Soft Costs not yet paid for in connection with the Project, as such costs and amounts described in clauses (i) through (v) above may be estimated and/or approved in writing by Lender from time to time.  If, in Lender's sole discretion, either any Budget Line Item or the aggregate amount of the undisbursed portion of the entire Loan is insufficient for such purpose, Borrower shall, within ten (10) days after written request by Lender, deposit the deficiency with Lender (a "<u>Deficiency Deposit</u>").  The Deficiency Deposit shall first be exhausted before any further disbursement of the applicable Loan proceeds shall be made.  Any Deficiency Deposit remaining after a particular Budget Line Item or the Loan, as the case may be, is back in Balance shall be returned to Borrower.  Lender shall not be obligated to make any Loan disbursements if and for as long as the Loan is not in Balance.

## ARTICLE XI
## CONSTRUCTION PAYOUT REQUIREMENTS

Section 11.1  <u>Documents to be Furnished for Each Disbursement</u>.

As a condition precedent to each disbursement of Loan proceeds (other than the Initial Advance), Borrower shall furnish or cause to be furnished to Lender the following documents covering such disbursement, in form and substance satisfactory to Lender:

(a)  A Requisition, duly executed by an Authorized Representative;

(b)  An AIA form of cost certification, executed by the General Contractor, as to all Hard Costs included within the request for disbursement (all of which costs shall have been verified by Lender's Consultant);

(c)  Such invoices, contracts or other information as Lender may require to evidence that Borrower has incurred all costs covered by the request for disbursement;

(d)  Paid receipts or other proof of payment (including, with respect to Hard Costs, lien waivers or the equivalent) of all Construction costs covered by the prior disbursement of the Loan;

CONFIDENTIAL

DANSKE_0010580

(e)     An endorsement to the Title Policy though the date of the disbursement, confirming Lender's position first place beneficiary under the Trust Agreement, subject only to the Permitted Exceptions;

(f)     Copies of any Change Orders executed since the date of the last disbursement;

(g)     Copies of all Construction Contracts which have been executed since the last disbursement;

(h)     All Permits then required in respect of the Construction; and

(i)     Such other instruments, documents and information as Lender or Title Insurer shall require in their sole discretion.

Section 11.2  Retainage.

At the time of each disbursement of Loan proceeds, ten percent (10%) of the total amount then due the General Contractor and the various contractors under the Construction Contracts for Hard Costs shall be withheld from the amount disbursed.  The retained amounts will be disbursed only at the time of the final disbursement of Loan proceeds pursuant to Article 12 hereof.  Notwithstanding the foregoing, Lender shall disburse to Borrower retained amounts in respect of any trade itemized in the Construction Budget if Lender determines, in its reasonable discretion, that such trade has been completed for not less than ninety (90) days, provided, however, that until the final disbursement of Loan proceeds pursuant to Article 12 hereof, in no event shall retained amounts equal less than five percent (5%) of Hard Costs theretofore advanced by Lender.

Section 11.3  Future Equity Requirement.

Borrower shall fund the Future Equity Requirement, at such time and in such amounts as Lender shall require.  Until such time as Borrower has satisfied the Future Equity Requirement, an amount equal to 10.1% of all amounts that would otherwise be applied in the Order of Priority shall be deposited into an account with Depositary Bank in which Lender has a perfected security interest (the "Future Equity Account").  Amounts on deposit in such account from time to time shall be used to satisfy the Future Equity Requirement.  Following Borrower's satisfaction of the Future Equity Requirement, all amounts paid by Borrower hereunder shall be applied in the Order of Priority and no further amounts shall be deposited into the Future Equity Account.

## ARTICLE XII
## FINAL DISBURSEMENT FOR CONSTRUCTION COSTS

Section 12.1  Final Disbursement for Construction Costs.

Lender will advance to Borrower the final disbursement for costs of Construction (including retainages) when the following conditions have been satisfied, provided that all other conditions in this Agreement for disbursements have also been satisfied:

CONFIDENTIAL                                                    DANSKE_0010581

(a)     There shall exist no Default or Event of Default;

(b)     The Improvements have been substantially completed in substantial accordance with the Plans and Specifications, free and clear of construction liens and security interests;

(c)     Borrower shall have furnished Lender with a certificate from the Architect stating that (i) the Improvements have been substantially completed in accordance with the Plans and Specifications and (ii) the Improvements, as so substantially, completed comply with Laws and any requirements imposed by SEMARNAT in connection with its approval of the Project; and

(d)     Lender shall have received a certificate from Lender's Consultant for the sole benefit of Lender that the Improvements have been substantially completed in accordance with the Plans and Specifications.

Section 12.2  Retainage.

Notwithstanding the provisions of Section 12.1 hereof, the disbursement of the retainage shall be subject to the retention of such sums as Lender's Consultant shall determine are necessary to assure full completion of punch-list items.  Upon the completion of such punch-list items, Lender shall disburse any remaining retainage to Borrower.

**ARTICLE XIII**
**COVENANTS**

Section 13.1  Certain Covenants.

(a)     Inspections.  Borrower will cooperate with Lender in arranging for inspections by Lender and/or Lender's consultant of the Property and the books and records of Borrower.

(b)     Construction of the Improvements.  Borrower shall commence Construction on or before the Commencement Date.  Borrower shall perform the Construction in a good and workmanlike manner with materials of high quality and in substantial accordance with the Plans and Specifications.  Borrower shall prosecute the Construction with due diligence and continuity in accordance with the Construction Schedule and shall substantially complete the Construction before the Completion Date.

(c)     Change Orders.  No changes will be made to the Plans and Specifications (any such change, a "Change Order") without the prior written approval of Lender; provided, however, that Borrower may make changes to the Plans and Specifications without Lender's consent if (i) Borrower notifies Lender in writing of such change within five (5) Business Days thereafter; (ii) Borrower obtains the approval of all parties whose approval is required, including sureties and Governmental Authorities; (iii) the structural integrity of the Improvements is not impaired; (iv) no material change in architectural appearance is effected; and (v) the cost of or reduction resulting from such change (x) does not exceed $50,000 and (y) when added to all other changes which have not been approved by Lender in writing, the

CONFIDENTIAL                                                                                    DANSKE_0010582

resulting aggregate cost or reduction does not exceed $250,000. Changes in the scope of Construction or to any Construction Contract shall be documented with a Change Order on the AIA Form G701.

(d)     Liens.  Borrower will not suffer or permit any lien claims to be filed or otherwise asserted against the Property, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower may contest in good faith and with reasonable diligence the validity of any such lien or claim, provided that Borrower posts a statutory lien bond which removes such lien from title to the Property within thirty (30) days after Borrower's receipt of written notice thereof. Lender will not be required to make any further disbursements of the proceeds of the Loan until any lien claims have been removed (by payment or by posting a bond) and Lender may, at its option, restrict disbursements to reserve sufficient sums to pay 150% of the lien.  If Borrower shall fail timely to (i) discharge any such lien or (ii) post a statutory lien bond, Lender may, at its election (but shall not be required to), procure the release and discharge of such lien and any judgment or decree thereon and, further, may in its sole discretion, settle or compromise the same, or may furnish such security or indemnity as Title Insurer shall require to insure Lender against the enforcement thereof, and any amounts so expended by Lender shall be added to the Debt.  In settling, compromising or discharging any claims for lien, Lender shall not be required to inquire into the validity or amount of any such claim.

(e)     Payment of Taxes.  Borrower shall pay all Taxes and assessments and charges of every kind upon the Property before the same become delinquent, provided, however, that Borrower may pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Property or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes and (iii) Borrower has deposited security for the  payment of contested taxes in form and amount satisfactory to Lender.   If Borrower fails to commence such contest or, having commenced to contest the same, thereafter fails to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended in excess of any security posted by Borrower shall be added to the Debt and bear interest at the Default Rate.  Borrower shall furnish Lender with evidence that taxes are paid at least ten (10) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.  Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Taxes, provided that (x) there exists no Event of Default and (y) adequate funds for the payment of Taxes and Insurance Premiums exist in the Tax and Insurance Reserve.

(f)     Personal Property.  Borrower shall keep all Personal Property incorporated in the Project free of all liens, encumbrances and security interests, other than the liens, encumbrances and security interests in favor of Lender created by the Loan Documents.

CONFIDENTIAL

DANSKE_0010583

(g)   Leases.  Without the prior written consent of Lender, Borrower shall not (i) enter into any Lease of all or any portion of the Property, (ii) materially modify or terminate (other than by reason of a default by the tenant thereunder) any Lease of any portion of the Property or (iii) accept any rental payment in advance of one month of its due date.  Borrower shall deposit all security deposits under Leases in a segregated account with a financial institution reasonably acceptable to Lender.

(h)   Construction Contracts.   Borrower shall not enter into, or materially modify, any Major Contract unless Borrower shall theretofore obtained Lender's prior written consent thereto.  Promptly following its execution or modification thereof, Borrower shall furnish Lender with a copy of each Construction Contract.  Borrower shall timely perform its obligations under each Construction Contract.  Promptly following its receipt thereof, Borrower shall furnish Lender with a copy of any material notice received or delivered by Borrower in respect of any Construction Contract, including, without limitation, any notice of default.

(i)   Appraisals.  Borrower shall, within thirty (30) days after the date hereof, furnish Lender with a reliance letter in form reasonably satisfactory to Lender with respect of the Appraisal heretofore furnished to Lender.  Lender may obtain a new or updated Appraisal of the Property from time to time.   Borrower shall cooperate with Lender in this regard. Notwithstanding the foregoing, Lender shall not obtain a new or updated Appraisal more than once in any twelve (12) month period, unless either (i) an Event of Default exists or (ii) such Appraisal is then required under the terms of this Agreement.  Borrower shall reimburse Lender upon demand for the cost of any Appraisal obtained by Lender in accordance with the terms of this Section 13.1(i).

(j)   Furnishing Information.  Borrower shall deliver or cause to be delivered to Lender, within ninety (90) days after the end of each calendar year, (i) with respect to Borrower, an annual financial statement, in a form satisfactory to Lender, audited by an independent, certified public accountant reasonably satisfactory to Lender and (ii) with respect to Guarantor, a personal financial statement, in a form satisfactory to Lender, certified as true and correct by the party to whom it relates.  Within ten (10) days after request by Lender, Borrower shall deliver to Lender the most recently filed federal annual income tax returns with respect to Borrower (U.S. and Mexican) and Guarantor.  Borrower and Guarantor shall provide such additional financial information as Lender reasonably requires.  Upon reasonable advance notice from Lender, Borrower shall permit Lender to review all of Borrower's books and records regarding the development and operation of the Property.   Notwithstanding the foregoing, Borrower's annual financial statement need only be reviewed, and not audited, by Borrower's accountant, until such time as Lender furnishes Borrower with notice that it has effectuated a Securitization or syndication of the Loan, whereupon Borrower shall be obligated to furnish Lender with audited, annual financial statements as provided above.

(k)   Lost Note.  Upon Lender's delivery to Borrower of an affidavit to such effect, Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new note containing the same terms and conditions.

CONFIDENTIAL                                                                                          DANSKE_0010584

(l)     Indemnification.     Borrower shall indemnify Lender and its officers, directors, employees and consultants (each, an "Indemnified Party") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, loss and liability, cost and expense (including reasonable attorneys' fees and court costs) of any and every kind to any persons or property by reason of (i) the operation or maintenance of the Property; (ii) any breach of representation or warranty, default or Event of Default; or (iii) any other matter arising in connection with the Loan, the Improvements or the Property.   No Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct.   The foregoing indemnification shall survive repayment of the Debt.

(m)     Compliance With Laws.   Borrower shall comply with all Laws applicable to the Property, including, without limitation, (i) any requirements imposed by SEMARNAT in connection with its approval of the Project and (ii) Article 225 of the Mexican Income Tax Law.

(n)     Furnishing Reports.     Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower which in any way relate to the Property.

(o)     Furnishing Notices.   Borrower shall provide Lender with copies of all material notices received by Borrower pertaining to the Property, including notices from Governmental Authorities.

(p)     Hold Disbursements in Trust.   Borrower shall receive and hold in trust for the sole benefit of Lender (and not for the benefit of any other person, including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying the cost of the Budget Line Item for which such disbursement was made. Borrower will pay all other costs, expenses and fees relating to the acquisition, equipping, use and operation of the Property.

(q)     Alterations.     Except in accordance with the approved Plans and Specifications, Borrower shall not make any material alterations to the Property.

(r)     Cash Distributions.   At all times until the Loan (including the Additional Fee) is paid in full, Borrower shall not make any distributions to its shareholders, partners or members, other than the Development Fee.   The foregoing shall not preclude the payment of salaries and other amounts contemplated by the Construction Budget.

(s)     SRE Permit.   Promptly following the execution and delivery hereof, Borrower shall request, on behalf of the Trust, that the Mexican Foreign Ministry issue a permit in respect of the Trust, as more particularly described in Clause Eighteenth of the Agreement (the "SRE Permit").     Thereafter, Borrower shall comply with the provisions of Clause Eighteenth of the Trust Agreement, until such time as the Mexican Foreign Affairs Ministry has issued the SRE Permit.

(t)     Title Exceptions.   Borrower shall obtain Lender's prior written consent to any homeowners' association agreement, condominium declaration, easement agreement or other agreement that would burden the Property, other than the Permitted Exceptions.

HF 3183497v.8 #04737/0094                        28

Section 13.2   Insurance.

(a)   Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property as follows:

(i)   comprehensive all risk insurance on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the outstanding principal balance of the Loan; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions; (C) permitting no deductible in excess of $25,000; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses.   In addition, Borrower shall obtain earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity.

(ii)   commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) permitting a deductible acceptable to Lender, (B) to be on the so-called "occurrence" form with a combined limit, of not less than $2,000,000, (C) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (D) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Loan Agreement;

(iii)   Intentionally Omitted.

(iv)   at all times during which structural construction, repairs or alterations are being made to the Improvements, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)   comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

CONFIDENTIAL                                                                      DANSKE_0010586

(vi)    umbrella liability insurance in an amount not less than $25,000,000, with the primary $25,000,000 on an occurrence basis and the excess $25,000,000 on an aggregate basis, on terms consistent with the commercial general liability insurance policy required under underline subsection (ii) above;

(vii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $25,000,000; and

(viii)    upon thirty (30) days' written notice from Lender, such other reasonable insurance, in such reasonable amounts, as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around Cabo San Lucas, Mexico.

(b)    All insurance provided for in Section 15.2(a) hereof shall be obtained under valid and enforceable policies (collectively, the "Policies" or in the singular, the "Policy"), shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds, and shall be enforceable in the United States of America. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state of Baja California Sur and having a claims paying ability rating of "A" or better by S&P or "A2" or better by Moody's.  Notwithstanding the foregoing, Lender hereby waives the foregoing rating requirement in respect of ACE Seguros, S.A., provided that upon the consummation of any Securitization or syndication of the Loan, such waiver shall be null and void and void, whereupon all Policies must be issued by insurance companies in compliance with the foregoing rating requirement.  The Policies described in Section 15.2(a) (other than those strictly limited to liability protection) shall designate Lender as loss payee.  Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the renewal of the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums thereunder (the "Insurance Premiums"), shall be delivered by Borrower to Lender.  Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (x) there exists no Event of Default and (y) adequate funds for the payment of Taxes and Insurance Premiums exist in the Tax and Insurance Reserve.

(c)    Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 13.2(a) hereof.

(d)    All Policies of insurance provided for by Section 13.2(a) hereof shall name Borrower as the insured and Lender as the additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All Policies of insurance provided for in Section 13.2(a) hereof shall contain clauses or endorsements to the effect that:

HF 3183497v.8 #04737/0094                    30

CONFIDENTIAL
DANSKE_0010587

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant or other occupant of the Property, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)     the Policy shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Lender and any other party named therein as an additional insured;

(iii)     the issuers thereof shall give written notice to Lender if the Policy has not been renewed fifteen (15) days prior to its expiration; and

(iv)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate.  All Insurance Premiums incurred by Lender in taking such action or obtaining such insurance shall be added to the Debt and shall bear interest at the Default Rate.

(g)     Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (i) there exists no Event of Default and (ii) adequate funds for the payment of Insurance Premiums exist in the Tax and Insurance Reserve.

Section 13.3  Special Purpose Covenants.

(a)     The purpose for which Borrower is organized is and shall be limited solely to (i) owning, holding, constructing, selling, leasing, transferring, exchanging, operating and managing the Property, (ii) entering into this Agreement and the other Loan Documents and (iii) transacting any business that is incident, necessary and appropriate to accomplish the foregoing.

(b)     Borrower has not owned, does not own and will not own any asset or property other than (i) the Property and (ii) incidental personal property necessary for and used or to be used in connection with the ownership or operation of the Property.

(c)     Borrower has not engaged in and will not engage in any business other than the ownership, construction, management and operation of the Property.

(d)     Borrower has not entered and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower, any guarantors of the obligations of Borrower or any Affiliate of any constituent party, owner or guarantor (collectively, the "Related Parties"), except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties not so affiliated with Borrower or such Related Parties.

HF 3183497v.8 #04737/0094                                  31

(e)     Except for the Loan, Borrower shall neither incur nor guarantee any indebtedness (whether personal or non-recourse, secured or unsecured) other than customary trade payables contemplated by the Budget, aged not in excess of sixty (60) days, and unsecured loans from members of Borrower that are subordinate to the Loan.

(f)     Borrower has not made and will not make any loans or advances to any Person and shall not acquire obligations or securities of any Related Party.

(g)     Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(h)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any Related Party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or such Related Party without the prior written consent of Lender.

(i)     Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of any other Person and Borrower's assets will not be listed as assets on the financial statement of any other Person.  Borrower has filed and will file its own tax returns and will not file a consolidated federal income tax return with any other Person.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate or other Related Party), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

(k)     Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(l)     Neither Borrower nor any Related Party will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part of Borrower, or the sale of material assets of Borrower.

(m)     Borrower has not commingled and will not commingle its assets with those of any other Person and will hold all of its assets in its own name;

(n)     Borrower has not guaranteed and will not guarantee or become obligated for the debts of any other Person and does not and will not hold itself out as being responsible for the debts or obligations of any other Person.

CONFIDENTIAL

DANSKE_0010589

(o)     Borrower shall allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate or Related Party.

(p)     Borrower shall not pledge its assets for the benefit of any Person, other than Lender.

(q)     Borrower shall maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of employees from its own funds and the proceeds of the Loan.

(r)     Borrower shall not engage, hire or contract with any employees, all of whom shall be engaged or hired by a third party approved by Lender.

## ARTICLE XIV
## CASUALTY AND CONDEMNATION

Section 14.1  Lender's Election to Apply Proceeds to the Debt.

(a)     Subject to the provisions of Section 14.1(b) below, Lender may elect to apply to the Debt, in the Order of Priority, all proceeds of insurance or condemnation (individually and collectively referred to as "Proceeds"), after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and charges.  Any Proceeds remaining after repayment of the indebtedness under the Loan Documents shall be paid by Lender to Borrower.

(b)     Notwithstanding anything in Section 14.1(a) to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Property, Lender agrees to make the Proceeds available for restoration of the Improvements if (i) no Default or Event of Default exists, (ii) all Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Proceeds available for restoration of the Improvements (together with undisbursed proceeds of the Loan or other security acceptable to Lender deposited with Lender by Borrower for such purpose) is sufficient to pay the full and complete costs of such restoration, (iv) in Lender's reasonable determination, the Property can be restored to an architecturally and economically viable project in compliance with applicable Laws and (v) in Lender's reasonable judgment, following the restoration of the Property, the Loan to Value Ratio shall not exceed 75%.

Section 14.2  Borrower's Obligation to Rebuild.

(a)     If Lender does not elect (or does not have the right) to apply the Proceeds to the Debt, as provided in Section 14.1 above, Borrower shall:

(i)     Proceed with diligence to make settlement with insurers or Governmental Authorities and cause the Proceeds to be deposited with Lender;

HF 3183497v.8 #04737/0094                    33

(ii)     In the event of any delay in making settlement with insurers or Governmental Authorities or effecting collection of the Proceeds, deposit with Lender such amount as Lender reasonably deems appropriate to insure the timely restoration of the Property;

(iii)     If the Proceeds and the undisbursed balance of the Loan are insufficient to keep the Loan in Balance, promptly deposit with Lender any amount necessary to restore the Loan to Balance; and

(iv)     Promptly proceed with the resumption of Construction of the Improvements and restore the Property to its former condition.

(b)     Any request by Borrower for a disbursement by Lender of Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for an advance of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an advance of the Loan.

## ARTICLE XV
## TRANSFERS

Section 15.1   Prohibition of Assignments and Transfers by Borrower.

Borrower shall not assign its rights under this Agreement and any purported assignment shall be void.  Except to the extent permitted pursuant to Article 16 hereof, Borrower shall not, without first obtaining the prior written consent of Lender (which consent may be withheld by Lender in its sole discretion), suffer or permit (a) any change in the management (whether direct or indirect) of the Property or of Borrower or (b) any Transfer. Notwithstanding the foregoing to the contrary, the following Transfers shall be permitted without the need for any such Lender approval: (i) Transfers to Lender or any other party by reason of Lender's exercise of its remedies under the Pledge Agreements; and (ii) Transfers of direct or indirect ownership interests in Borrower by any of its constituent members as of the date hereof if made to effect bona fide estate planning needs, so long as following any such transfer pursuant to this clause (y), no more than 70% of the beneficial economic interest in Borrower (whether directly or indirectly) has been transferred in the aggregate and Control of Borrower has not changed, provided, further, that in connection with any permitted Transfer pursuant to this Section 15.1, Lender receives: (i) all documentation evidencing the Transfer; (ii) confirmation that such Transfer shall not cause a breach of the representation made by Borrower in Section 3.1(v) hereof, in respect of OFAC, (ii) evidence satisfactory to Lender that the Transfer does not derogate in any way from the liens and security interests created by the Pledge Agreements, or otherwise impair Lender's first priority security interest thereunder; (iii) an endorsement to the UCC Policy to the effect that, after giving effect to the Transfer, Borrower retains a first priority security interest in the collateral under the Pledge Agreements; and (iv) payment for all out-of-pocket expenses incurred by Lender in connection with its review of the Transfer documentation and the issuance of the endorsement to the UCC Policy.  Lender's consent if given in connection with any Transfer request shall not be deemed to be a waiver of Lender's right to require such consent in the future.  Any Transfer made in contravention of this Agreement shall be null and void and of no force or effect.

HF 3183497v.8 #04737/0094                                34

Section 15.2 <u>Prohibition of Transfers in Violation of ERISA</u>.

In addition to the prohibitions set forth in Section 15.1 above, Borrower shall not permit any Transfer, if such Transfer would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA. Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including attorneys' fees and expenses), taxes, damages (including consequential damages) and expenses Lender may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions. The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Debt, notwithstanding any limitations on recourse contained herein or in any of the Loan Documents.

Section 15.3 <u>Successors and Assigns</u>.

Subject to the foregoing restrictions on Transfers contained in this Article 15, this Agreement shall inure to the benefit of, and shall bind, the parties hereto and their respective successors and assigns.

## ARTICLE XVI
## SPECIAL PROVISIONS RE: PARTICULAR PHASES

Section 16.1 <u>Phase IC</u>.

Borrower has advised Lender that, subsequent to the completion of the Improvements in respect of Phase 1C, but prior to the Maturity Date (as the same may be extended in accordance with the terms hereof), Borrower may wish to commence the next phase of the development of Phase IC (*i.e.*, the construction of residences and such other improvements as shall be required to complete Phase IC). As consideration for Lender's agreement to make the Loan, Borrower hereby irrevocably grants Lender a first opportunity to consider, make or refuse each and every loan, financing opportunity or equity investment in any new or restructured financing, equity investment or recapitalization contemplated by Borrower (or its affiliates) with respect to Phase IC (each, an "Opportunity"). If Borrower wishes to enter into an Opportunity, Borrower shall promptly notify Lender in writing of all of the material terms thereof and shall thereafter attempt to negotiate in good faith with Lender a mutually satisfactory agreement with respect to Lender's involvement in the Opportunity. If Lender fails to respond to Borrower's notice of an Opportunity within thirty (30) days after Lender's receipt thereof (or the parties, notwithstanding Borrower's compliance with the provisions of this Section 16.1, fail to agree upon the terms of the Opportunity within thirty (30) days after Borrower's receipt of Lender's acceptance of an Opportunity), Lender shall be deemed to have waived the Opportunity. Notwithstanding the foregoing provisions of this Section 16.1, Lender shall not be deemed to have waived an Opportunity by reason of its failure to respond to Borrower's notice thereof unless such notice states, in capital letters, that Lender's failure to respond thereto in the time provided shall result in the waiver of its rights. Borrower shall not contact or engage any party other than Lender in connection with an Opportunity unless Lender has theretofore waived its rights in respect of such

HF 3183497v.8 #04737/0094                    35

Opportunity in writing or otherwise consents in writing thereto.  If Lender waives (or is deemed to have waived) its Opportunity in respect of Phase IC, Lender shall, upon the closing of the Opportunity, subordinate Lender's interest in Phase IC in  the manner hereinafter set forth, provided that (i) there shall then be no Default or Event of Default, (ii) Borrower shall have closed the third party transactions substantially in accordance with the terms of the Opportunity offered to Lender, (iii) the Opportunity shall not contemplate construction costs in respect of Phase IC in excess of $200 per square foot, (iv) Lender, acting reasonably, shall have determined that, after payment of construction costs and debt service or other payments required in respect of the third party transaction, the net sale proceeds in respect of Phase IC shall suffice to repay the Phase IC Mezzanine Loan Amount, accrued interest thereon and the Additional Fee payable with respect thereto, (v) Borrower shall have theretofore completed the Improvements contemplated for Phase IC by the Plans and Specifications, (vi) Borrower shall have theretofore subjected the entire Property (or such portions thereof as Lender shall require) to an REA, (vii) Borrower shall have furnished Lender with an endorsement to the Title Policy, insuring Lender's position as first place beneficiary under the Trust Agreement in respect of the remainder of the Property, subject only to the Permitted Exceptions; (viii) Borrower reimburses Lender for all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with such release, (ix) Phase IC Designee and its members execute and deliver to Lender the Phase IC Mezzanine Loan Documents, (x) Phase IC Designee furnishes Lender with an opinion of counsel in form and substance satisfactory to Lender as to (A) the due formation and valid existence of Phase IC Designee and its members (each of which shall be a limited liability company formed under the laws of, or a natural person resident in, a state of the United States of America), (B) the due authorization, execution and delivery of the Phase IC Mezzanine Loan Documents by Phase IC Designee and its members, (C) the enforceability of the Phase IC Mezzanine Loan Documents, (D) the creation and perfection of the security interests in the collateral covered by the Phase IC Mezzanine Loan Pledge Agreements and (E) such other matters as Lender shall reasonably require, (xi) Borrower shall have theretofore caused Phase IC to be lawfully subdivided, in a manner reasonably acceptable to Lender, for real estate tax, zoning and other purposes required by Laws, (xii) Phase IC Designee furnishes Lender with a policy of UCC title insurance, insuring Lender's first priority security interest in the collateral covered by the Phase IC Mezzanine Loan Pledge Agreements, (xiii) Borrower pays all transfer taxes, trustees fees and other amounts required in respect of the conveyance of Phase IC to Phase IC Designee and  (xiv) Borrower causes the third party lender or investor to enter into an intercreditor or like agreement in form satisfactory to Lender.  Upon Borrower's satisfaction of the conditions set forth in clauses (i) through (xiv) above, Lender shall cause Trustee to convey Phase IC to Borrower's designee ("Phase IC Designee") or to a trust under which Phase IC Designee is the second place beneficiary, whereupon (i) Lender shall be deemed to have made a Mezzanine Loan to Phase IC Designee in the amount of the Phase IC Mezzanine Loan Amount and (ii) the principal amount of the Loan shall be reduced, dollar for dollar, by the amount of the Mezzanine Loan.  For purposes of this Agreement, the term "Phase IC Mezzanine Loan Note" shall mean a note which is (A) is in the amount of the Phase IC Mezzanine Loan Amount, (B) has a maturity date which is the sooner to occur of (x) the maturity, redemption or sooner repayment of the applicable third party loan or investment and (y) two (2) years after the date of the Phase IC Mezzanine Note, (C) which bears interest at the Interest Rate (which interest shall be added to the principal amount thereof and thereafter accrue interest in the manner provided in Section 5.1 hereof) and (D) which remains subject to the payment of the Additional Fee at

CONFIDENTIAL                                                      DANSKE_0010593

maturity or any acceleration of prepayment thereof. Amounts received in respect of the Phase IC Mezzanine Note shall be applied in the Order of Priority. Borrower's acknowledges that Lender's agreement to grant Lender a right of first opportunity in respect of each Opportunity constitutes a material inducement to Lender's agreement to make the Loan, and that Lender would not have made the Loan but for such agreement.

Section 16.2 <u>Phase IA.</u>

Borrower has advised Lender that, subsequent to the completion of the Improvements in respect of Phase IA but prior to the Maturity Date (as the same may be extended in accordance with the terms hereof), Borrower may wish to convey individual, single-family home lots within Phase IA to third party purchasers thereof. Borrower may enter into contracts for the sale of individual lots within Phase IA, provided that, (i) each such contract requires a contract deposit of not less than ten percent (10%) of the purchase price thereunder (which amount shall be payable to Lender, for application in the Order of Priority, in the event of the purchaser's default thereunder), and is otherwise in form reasonably acceptable to Lender and (ii) the purchase price under the contract is not less than the applicable Phase IA Minimum Contract Price. Upon the consummation of the sale of a lot in accordance with a contract of sale entered into by Borrower in accordance with the provisions of this Section 16.2, Lender shall cause Trustee to release the lien of the Trust Agreement from such lot, provided that (i) there shall then be no Default or Event of Default, (ii) Borrower shall have completed the Improvements contemplated for Phase IA by the Plans and Specifications, (iii) Borrower shall have paid to Lender an amount in respect the applicable lot equal to the greater of (A) the Phase IA Minimum Release Price and (B) the net sale proceeds in respect of the sale (i.e., gross sale proceeds less customary, third-party transaction costs), for application on the next Payment Date in the Order of Priority, (iv) Borrower shall have theretofore subjected the Property (or such portions thereof as Lender shall require) to an REA, (v) Borrower shall have theretofore caused the applicable lot to be subdivided for real estate tax, zoning and any other purpose required by Laws, (vi) Borrower (or the purchaser) pays all transfer taxes, trustees fees and other costs associated with the conveyance of the applicable lot, (vii) Borrower furnishes Lender with an endorsement to the Title Policy, insuring Lender's position as first place beneficiary under the Trust Agreement in respect of the remainder of the Property, subject only to the Permitted Exceptions and (viii) Borrower reimburses Lender for all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with such release. Subsequent to the date hereof but prior to the first advance of the costs of Construction, Lender shall establish the "<u>Minimum Phase IA Contract Price</u>" and the "<u>Minimum Phase IA Release Price</u>" for each lot comprising Phase IA, it being understood that the Minimum Phase IA Release Price in respect of a lot shall equal 125% of the maximum principal amount of the Loan allocated to such lot by Lender. Upon Lender's establishment of such amounts, Borrower shall execute and deliver to Lender such instrument as Lender shall require to evidence such agreement, whereupon the amounts set forth therein shall constitute the "<u>Minimum Phase IA Contract Price</u>" and the "<u>Minimum Phase IA Release Price</u>" for each lot comprising Phase IA. Any amount paid to Lender but not applied (subject to the Order of Priority) to the principal amount of the Loan or any Mezzanine Loan until the next Payment Date shall continue to bear interest at the Interest Rate until the applicable Payment Date.

HF 3183497v.8 #04737/0094

37

Section 16.3   Other Phases.

(a)     Borrower has advised Lender that it may wish to convey one or more Phases (other than Phase IC and Phase IA) or portions thereof (including single family home lots or villas) to a third party purchaser or purchasers una ffiliated with Borrower or any Borrower Party prior to the Maturity Date (as the same may be extended in accordance with the terms hereof).  Lender hereby agrees that, upon the request of Borrower from time to time, it shall cause Trustee to release the lien of the Trust Agreement from the applicable Phase (or portion thereof) upon the consummation of a bona fide, third party sale to a party other than an Affiliate of Borrower or any of Borrower Party, provided that (i) there shall then be no Default or Event of Default, (ii) Borrower shall pay to Lender an amount in respect of the applicable Phase (or portion thereof) equal to the greater of (A) the applicable Other Phase Release Price and (B) the net sale proceeds (*i.e.*, gross sale proceeds less customary, third party transaction costs), for application on the next Payment Date in the Order of Priority, (iii) Borrower has theretofore subjected the Property (or such portions thereof as Lender shall require) to an REA, (iv) Borrower shall have theretofore caused the applicable Phase (or portion thereof) to be lawfully subdivided, in a manner reasonably acceptable to Lender, for real estate, zoning and other purposes required by Laws, (iv) Borrower (or the purchaser) shall pay all transfer taxes, trustees fees and other amounts associated with the conveyance of the Phase (or portion thereof), (vi) Borrower furnishes Lender with an endorsement to the Title Policy, insuring Lender's interest as first place beneficiary under the Trust Agreement in respect of the remainder of the Property, subject only to the Permitted Exceptions, (vii) in respect of any conveyance of a portion of a Phase, Lender, acting reasonably, shall have concluded that such conveyance shall not impair the development of the remainder of the Phase and (viii) Borrower reimburses Lender for all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with such release.  The term "Other Phase Release Price" shall mean an amount equal to 125% of the amount of maximum principal amount of the Loan allocated to the applicable Phase (or portion thereof) by Lender.  Borrower, upon Lender's request therefor, shall execute such instrument as Lender shall require to establish the Other Phase Release Price in respect of a Phase (or portion thereof).  Any amount paid to Lender but not applied (subject to the Order of Priority) to the principal amount of the Loan or any Mezzanine Loan until the next Payment Date shall continue to bear interest at the Interest Rate until the applicable Payment Date.

(b)     Borrower has further advised Lender that it may wish to either commence "vertical" improvements or pre-development improvements not contemplated by the Construction Budget in respect of one or more Phases (other than Phase IC and Phase IA) prior to the Maturity Date (as the same may be extended in accordance with the terms hereof).  If Borrower so wishes to commence the development of any Phase (other than Phase IC and Phase IA), Borrower hereby irrevocably grants Lender a first opportunity to consider, make or refuse each and every commercial loan, financing opportunity or equity investment in or in connection with the financing thereof.  Each such opportunity shall be considered an Opportunity and shall be subject, *mutatis mutandis*, to the provisions of Section 16.1 above (including, without limitation, the provisions thereof which confer upon Lender a right of first opportunity, and which provide for the making of a mezzanine loan by Lender upon Lender's waiver of such opportunity).

CONFIDENTIAL                                                                                          DANSKE_0010595

Section 16.4   Opportunities upon Maturity or Sooner Prepayment

The provisions of Section 16.1 hereof shall apply to any Opportunity contemplated by Borrower in respect of the Property upon the maturity of the Loan or any sooner prepayment of the Loan.

## ARTICLE XVII
## SERVICER

Section 17.1   Servicer.  At the option of Lender, the Loan may be serviced by a servicer or trustee (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender and Servicer.  Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement.  Thereafter, Borrower shall reimburse Lender for the monthly servicing fees payable under the Servicing Agreement ("Servicing Fees").  Borrower shall further reimburse Lender upon demand for reasonable out-of-pocket costs and expenses incurred by Servicer in (i) reviewing Borrower's requisitions for advances of the Loan, (ii) reviewing proposed Leases, (iii) conducting inspections of the Property, (iv) applying the provisions of this Agreement to any casualty or condemnation proceeding affecting the Property, (v) responding to any Default or Event of Default or (vi) otherwise incurred in connection with this Agreement.

## ARTICLE XVIII
## EVENTS OF DEFAULT

Section 18.1   Events of Default.

The occurrence of any one or more of the following shall constitute an "Event of Default" as said term is used herein:

(a)   Failure of Borrower (i) (A) to make any principal or interest payment when due or (B) for a period of ten (10) days after written notice from Lender that the same is due and payable, to observe or perform any of the other covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Loan Document concerning the payment of money, or (ii) for a period of thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Section 19.1 with respect to a particular breach, or if another subsection of this Section 19.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control;

CONFIDENTIAL                                                                 DANSKE_0010596

(b)    Any Transfer or other disposition in violation of Article 15 hereof;

(c)    If any warranty, representation, statement, report or certificate made now or hereafter by Borrower or any Borrower Party is untrue or incorrect in any material respect at the time made or, subject to the provisions of Section 3.2 hereof, deemed remade;

(d)    Borrower or any Guarantor shall commence a voluntary case concerning Borrower or Guarantor under the Bankruptcy Code; or an involuntary proceeding is commenced against Borrower or Guarantor under the Bankruptcy Code and relief is ordered against the applicable party, or the petition is controverted but not dismissed or stayed within sixty (60) days after the commencement of the case, or a custodian (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Borrower or Guarantor; or Borrower or Guarantor commences any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect relating to Borrower or Guarantor; or there is commenced against Borrower or Guarantor any such proceeding which remains undismissed or unstayed for a period of sixty (60) days; or Borrower or Guarantor fails to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or Borrower or Guarantor by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or suffers any such appointment to continue undischarged or unstayed for a period of sixty (60) days;

(e)    Borrower or Guarantor shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof or if all or a substantial part of the assets of Borrower or Guarantor are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors;

(f)    One or more final, unappealable judgments are entered (i) against Borrower in amounts aggregating in excess of $100,000 or (ii) against Guarantor in amounts aggregating in excess of $250,000, and said judgments are not satisfied, stayed or bonded over within thirty (30) days after entry; and

(g)    The occurrence of any other event or circumstance denominated as an Event of Default in this Agreement or under any of the other Loan Documents or any of the Mezzanine Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

CONFIDENTIAL                                          DANSKE_0010597

## ARTICLE XIX
## LENDER'S REMEDIES IN EVENT OF DEFAULT

Section 19.1 <u>Remedies Conferred Upon Lender</u>.

Upon the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)     Withhold further disbursement of the proceeds of the Loan and/or terminate Lender's obligations to make further disbursements hereunder;

(b)     Declare the Note to be immediately due and payable;

(c)     Exercise all of Lender's rights under the Trust Agreement; and

(d)     Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Lender by Laws.

## ARTICLE XX
## GENERAL PROVISIONS

Section 20.1 <u>Captions</u>.

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

Section 20.2 <u>Modification, Waiver</u>.

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

Section 20.3 <u>Governing Law</u>.

THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE AND WILL BE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY.  IN ALL RESPECTS, INCLUDING, WITHOUT LIMITATION, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND

HF 3183497v.8 #04737/0094                   41

CONFIDENTIAL                                                   DANSKE_0010598

PERFORMED IN SUCH STATE AND APPLICABLE LAW OF THE UNITED STATES OF AMERICA.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  NOTWITHSTANDING THE FOREGOING, PROVISIONS IN THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED HEREUNDER AGAINST PROPERTY LOCATED IN THE UNITED MEXICAN STATES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE UNITED MEXICAN STATES.

Section 20.4  Acquiescence Not to Constitute Waiver of Lender's Requirements.

Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any construction or nonconstruction conditions precedent to the making of the Initial Advance or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds.

Section 20.5  Disclaimer by Lender.

(a)     This Agreement is made for the sole benefit of Borrower and Lender, and no other Person shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement.  Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, Tenant or other party for labor or services performed or materials supplied in connection with the Property.  Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Property.  Lender, by making the Loan or taking any action pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower.  No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third party beneficiary status or recognition of same by Lender.  Without limiting the generality of the foregoing:

(i)     Lender shall have no liability, obligation or responsibility whatsoever with respect to the Property.  Any inspections of the Property made by or through Lender are for purposes of administration of the Loan only and neither Borrower nor any third party is entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship of the Property or any portion thereof.

CONFIDENTIAL                                                                    DANSKE_0010599

Section 20.6     Partial Invalidity; Severability.

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 20.7     Definitions Include Amendments.

Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Section 20.8     Execution in Counterparts.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 20.9     Entire Agreement.

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

Section 20.10     Waiver of Damages.

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower for itself and Guarantor waives all claims for punitive, exemplary or consequential damages.

Section 20.11     Jurisdiction.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT

CONFIDENTIAL

DANSKE_0010600

ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION, NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

Section 20.12   Set-Offs.

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by Borrower with Lender (or its Affiliates).

Section 20.13   Authorized Representative.

Each Authorized Representative shall deal with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. Each Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by either Authorized Representative shall be final and binding on Borrower. Lender may rely on the authority given to each Authorized Representative until actual receipt by Lender of a duly authorized resolution depriving such Authorized Representative of his authority. No more than two Persons shall serve as Authorized Representative at any given time.

Section 20.14   Non-Recourse Provisions.

The provisions of Article 9 of the Note pertaining to the personal liability of Borrower and its members, officers, directors and employees are hereby incorporated herein by reference.

Section 20.15   Time is of the Essence.

Time is of the essence under this Agreement.

CONFIDENTIAL                                                    DANSKE_0010601

# ARTICLE XXI
## NOTICES

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered, (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

If to Borrower:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o Kenneth A. Jowdy
74 Innisbrook Avenue
Las Vegas, Nevada 89113
Telecopy: 702-222-9281

With a copy to:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o William J. Najam, Jr.
2 Dogwood Drive
Danbury, Connecticut 06811
Telecopy: (203) 205-0016

With a copy to:

Baker & Hostetler LLP
666 Fifth Avenue
New York, New York  10103
Attention: Laurence Markowitz, Esq.
Telecopy: 212-589-4291

If to Lender:

Lehman Brothers Holdings Inc.
399 Park Avenue
New York, New York 10022
Attention: Masood Bhatti
Telecopy: 212-520-0130

With a copy to:

Herrick, Feinstein LLP
Two Park Avenue
New York, New York 10016
Attention:  Paul Shapses, Esq.
Telecopy:  (212) 545-3443

HF 3183497v.8 #04737/0094                                 45

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

## ARTICLE XXII
## WAIVER OF JURY TRIAL

BORROWER AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

## ARTICLE XXIII
## GROSS-UP

Section 23.1  Gross-Up

ALL PAYMENTS BY BORROWER HEREUNDER AND UNDER ANY OF THE OTHER LOAN DOCUMENTS SHALL BE MADE FREE AND CLEAR OF AND WITHOUT DEDUCTION FOR ANY PRESENT OR FUTURE TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES OR WITHHOLDINGS, AND ANY LIABILITIES WITH RESPECT THERETO, EXCLUDING, IN THE CASE OF LENDER, TAXES IMPOSED ON ITS NET INCOME OR CAPITAL AND FRANCHISE TAXES IMPOSED ON IT BY THE JURISDICTION UNDER THE LAWS OF WHICH LENDER IS ORGANIZED OR ANY POLITICAL SUBDIVISION THEREOF (ALL SUCH NON-EXCLUDED TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES WITHHOLDINGS AND LIABILITIES BEING HEREINAFTER REFERRED TO AS "INCLUDED TAXES"). IF BORROWER SHALL BE REQUIRED BY LAW TO DEDUCT ANY INCLUDED TAXES FROM OR IN RESPECT OF ANY SUM PAYABLE HEREUNDER, OR UNDER ANY ANCILLARY AGREEMENT, TO LENDER (I) THE SUM PAYABLE SHALL BE INCREASED AS MAY BE NECESSARY SO THAT AFTER MAKING ALL REQUIRED DEDUCTIONS (INCLUDING DEDUCTIONS APPLICABLE TO ADDITIONAL SUMS PAYABLE UNDER THIS SECTION) LENDER RECEIVES AN AMOUNT EQUAL TO THE SUM IT WOULD HAVE RECEIVED HAD NO SUCH DEDUCTIONS BEEN MADE, (II) BORROWER SHALL MAKE SUCH DEDUCTION, AND (III) BORROWER SHALL PAY THE FULL AMOUNT DEDUCTED TO THE RELEVANT TAXATION AUTHORITY OR OTHER AUTHORITY IN ACCORDANCE WITH APPLICABLE LAW.  BORROWER WILL INDEMNIFY LENDER FOR THE FULL AMOUNT OF INCLUDED TAXES PAID BY LENDER, ANY LIABILITY (INCLUDING PENALTIES, INTEREST AND EXPENSES) ARISING THEREFROM OR WITH RESPECT THERETO, WHETHER OR NOT SUCH INCLUDED TAXES WERE CORRECTLY OR LEGALLY ASSERTED.  PAYMENT UNDER THIS INDEMNIFICATION SHALL BE MADE WITHIN 10 DAYS FROM THE  DATE LENDER MAKES WRITTEN DEMAND THEREFOR.  A CERTIFICATE AS TO THE AMOUNT OF SUCH INCLUDED TAXES SHALL BE SUBMITTED TO BORROWER BY LENDER AND SHALL, IN THE ABSENCE

CONFIDENTIAL

OF MANIFEST ERROR, BE PRIMA FACIE EVIDENCE OF THE AMOUNT DUE BY BORROWER TO LENDER. WITHIN 10 DAYS AFTER THE DATE OF ANY PAYMENT OF INCLUDED TAXES BY BORROWER TO THE APPROPRIATE TAXING AUTHORITY, BORROWER WILL FURNISH TO LENDER EVIDENCE OF PAYMENT THEREOF SATISFACTORY TO LENDER. THE PROVISIONS OF THIS ARTICLE 23 SHALL SURVIVE REPAYMENT OF THE DEBT. PROMPTLY FOLLOWING THE DATE HEREOF, LENDER SHALL TAKE SUCH REASONABLE MEASURES AS SHALL BE REQUIRED TO REGISTER WITH THE MEXICAN FOREIGN REGISTRY FOR BANKS, FINANCIAL INSTITUTIONS, PENSION FUNDS AND INVESTMENT FUNDS OF THE MEXICAN TREASURY (*SECRETARÍA DE HACIENDA Y CRÉDITO PUBLICO*) UNDER ARTICLES 5 AND 195 OF THE MEXICAN INCOME TAX LAW, AND ARTICLE 11 OF THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED MEXICAN STATES AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME, TO THE EXTENT REQUIRED TO OBVIATE (TO THE EXTENT POSSIBLE) ANY WITHHOLDING REQUIREMENT ON THE PART OF BORROWER.

## ARTICLE XXIV
## SALE OF NOTE AND SECURITIZATION

Section 24.1  Cooperation.

Borrower acknowledges that Lender may sell the Loan to a party who may pool the Loan with a number of other loans and grant participations therein or issue one or more classes of Mortgage Backed, Pass-Through Certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (such sale and/or securitization, a "Securitization"; the securities evidencing such Securitization the "Securities") or syndicate the Loan to one or more third parties. In connection therewith, Borrower agrees to make available to Lender such financial and other information with respect to the Property, Borrower and Guarantor as Lender reasonably requests (collectively, the "Provided Information"). The Securities and/or the Loan may be rated by one or more of the Rating Agencies. Lender may share the Provided Information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan or the Securities. The Provided Information may ultimately be incorporated into the offering documents for the Securities or in connection with a syndication and thus such information may be disclosed to various investors. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower. Lender, at its sole option, may also elect to split the Loan into two or more loans, each secured by liens on the Property, and sell, assign, pledge or otherwise hypothecate one or more of such loans to third parties. Borrower shall cooperate in all such efforts by executing and delivering all such documents, certificates, instruments and other things reasonably necessary to evidence or confirm Borrower's obligations hereunder, provided, however, that in no event shall the Debt or Borrower's obligations hereunder be increased as a result thereof. Upon presentation of paid receipts or invoices therefor, Lender shall reimburse Borrower for out-of-pocket costs (including, without limitation, reasonable legal fees) paid or incurred by Borrower in connection with the performance of its obligations under this Section 24.1.

CONFIDENTIAL                    DANSKE_0010604

Section 24.2  Intentionally Omitted.

Section 24.3  Loan Components.

Borrower agrees that in connection with any Securitization or syndication of the Loan, upon Lender's reasonable request and at Lender's sole cost and expense, Borrower shall deliver one or more new component notes to replace the original Note or modify the original Note to reflect multiple components of the Loan.  Such new notes or modified Note shall bear interest at the Interest Rate and shall otherwise be on the same terms as the original Note.  In the event of a prepayment of the Loan, Lender shall be entitled to apply the amount of such prepayment to one or more of the new component notes as Lender in its sole discretion decides.

Section 24.4  Costs .

Lender shall bear all costs and expenses incurred by Lender in connection with any Securitization or syndication of the Loan.

Section 24.5  Conversion of Loan and Creation of Subordinate Debt.

Lender shall have the right, at Lender's sole cost and expense, to convert a portion of the Loan into subordinate financing, including, but not limited to, mezzanine debt, subordinate debt or participations in the Loan (collectively, the "Subordinate Loan"), provided that (i) the aggregate principal amount of the Loan and the Subordinate Loan on the date of such adjustment shall equal the aggregate outstanding principal balance of the Loan immediately prior to such adjustment and (ii) the notes evidencing the Loan and the Subordinate Loan shall bear interest at the Interest Rate and shall otherwise be on the same terms as the original Note.  Borrower shall cooperate with all reasonable requests of Lender in connection with any such adjustment of the Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith.

Section 24.6  Securitization Indemnification.

(a)  Borrower understands that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.  In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holders of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)  Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus, as applicable, including without

CONFIDENTIAL

DANSKE_0010605

limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 24.6(b), Lender hereunder shall include its officers and directors), the Affiliate of Lehman Brothers Inc. ("<u>Lehman</u>") that has filed the registration statement relating to the securitization (the "<u>Registration Statement</u>"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "<u>Lehman Group</u>"), and Lehman, each of its directors and each Person who controls Lehman within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "<u>Underwriter Group</u>") for any losses, claims, damages or liabilities (collectively, the "<u>Liabilities</u>") to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lehman Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender and Lehman in connection with investigating or defending the Liabilities; <u>provided</u>, <u>however</u>, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the Debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property.  This indemnity agreement will be in addition to any liability which Borrower may otherwise have.  Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

(c)     In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Lehman Group and the Underwriter Group for Liabilities to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Lehman Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lehman Group or the Underwriter Group in connection with defending or investigating the Liabilities.

CONFIDENTIAL                                                                 DANSKE_0010606

(d)     Promptly after receipt by an indemnified party under this Section 24.6 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 24.6, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 24.6, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties.  The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreements provided for in Sections 24.6(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Sections 24.6(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lehman's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 24.6 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

CONFIDENTIAL                                                                                   DANSKE_0010607

Section 24.7  <u>Rating Surveillance</u>.

Borrower will retain the Rating Agencies to provide rating surveillance services on any certificates issued in a Securitization.   Such rating surveillance will be at the expense of Borrower in an amount determined by Lender in its reasonable discretion prior to the occurrence of a Securitization.  Such expense will be paid in monthly installments.

[NEXT PAGE IS THE SIGNATURE PAGE]

CONFIDENTIAL                                                    DANSKE_0010608

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

LENDER:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation

By: _____

Name: MASOOD BHATTI

Title: Authorized Signatory

BORROWER:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a Mexican limited liability company

By: _____

Name:

Title:

CONFIDENTIAL

DANSKE_0010609

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

LENDER:

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation

By:_____
Name:
Title:

BORROWER:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE
C.V., a Mexican limited liability company

By: _____
Name: Kenneth A. Jowdy
Title: Sole Administrator

DANSKE_0010610

**EXHIBIT A**

**The Land**

CONFIDENTIAL                                             DANSKE_0010611

# EXHIBIT A-1

## Construction Budget

CONFIDENTIAL                                                           DANSKE_0010612

**EXHIBIT B**

**Master Plan**

CONFIDENTIAL

DANSKE_0010613

# EXHIBIT C

**Sample Calculations of the Application of Payments in the Order of Priority**

CONFIDENTIAL                                    DANSKE_0010614

**Example 1: $10,000,000 lot sale prepayment on 9/30/07**

CONFIDENTIAL

DANSKE_0010615

**Example 2:  Payment at Maturity**

CONFIDENTIAL

DANSKE_0010616

**Example 3: $10,000,000 Prepayment on 9/30/07 and Exercise of First Extension Option**

CONFIDENTIAL                                                                      DANSKE_0010617

d.1. - PLOT 1 ONE: on the property known as LA LAGUNA, in the portion known as Rancho El Cardonal in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, with cadastral key 4-02-013-0081 four dash zero two dash zero one three dash zero zero eight one, with an area of 5-92-68 hectares. (five hectares ninety-two ares and sixty-eight centiares) and the following measurements and boundaries: ...............................................................................................

From vertex G to vertex H towards the North for a distance of (191.83 m) one hundred ninety-one point eighty-nine [sic] meters, and an angle of (115º 38' 05") one hundred fifteen degrees, thirty-eight minutes, and five seconds, adjacent to Plot (VII) seven .............................................

From vertex H to vertex I towards the North for a distance of (127.52 m) one hundred twenty-seven point fifty-two meters, and an angle of (120º 00' 21") one hundred twenty degrees, nine minutes [sic], and twenty-one seconds, adjacent to Plot (VII) seven...........................................

From vertex I to vertex J towards the North for a distance of (31.50 m) thirty-one point fifty meters, and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (VII) seven .........................................................................

From vertex J to vertex A towards the North for a distance of (125.00 m) one hundred twenty-five meters, and an angle of (107º 08' 24") one hundred seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (VII) seven.......................................................................

From vertex B to vortex C towards the South for a distance of (125.00 m) one hundred twenty-five meters, and an angle of (287º 08' 24") two hundred eighty-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (III ) three....................................................................

From vertex C to vertex D towards the South for a distance of (31.50 m) thirty-one point fifty meters, and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (III) three ...........................................................................................

From vertex D to vertex E towards the South for a distance of (127.52 m) one hundred twenty-seven point fifty-two meters, and an angle of (300º 09' 21") three hundred degrees, nine minutes, and twenty-one seconds, adjacent to Plot (III) three......................................................

From vertex E to vortex F towards the South for a distance of (191.88 m) one hundred ninety-one point eighty-eight meters, and an angle of (295º 38' 05") two hundred ninety-five degrees, thirty-eight minutes, and five seconds, adjacent to Plot (IV) four...

From vertex A to vertex B towards the East for a distance of (135.00 m) one hundred thirty-five meters, and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to the property of Mr. Francisco Arbalio. From vertex F to vertex G towards the West for a distance of (135.00 m) one hundred thirty-five meters, and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (II) two ..............................................................................................................

DANSKE_0010618

d.2. - PLOT II TWO: of the property known as LA LAGUNA in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, with cadastral key 4-02-013-0082 four dash zero two dash zero one three dash zero zero eight two, with an area of 5-94-86 hectares. (five hectares ninety-four ares and eighty-six centiares) and the following measurements and boundaries: ...................................................................................................

From vertex L to vertex M towards the North for a distance of (299.94 m) two hundred ninety-nine point ninety-four meters, and an angle of (114º 38' 35") one hundred fourteen degrees, thirty-eight minutes, and thirty-five seconds, adjacent to Plot (VII) seven ....................................

From vertex F to vertex (D-5) "D" dash five towards the South for a distance of (116.98 m) one hundred sixteen point ninety-eight meters, and an angle of (294º 38' 35") two hundred ninety-four degrees, thirty-eight minutes, and thirty-five seconds, adjacent to Plot (V) five......................

From vertex (D-5) "D" dash five to vertex K towards the South for a distance of (183.01 m) one hundred eighty-three point zero one meters, and an angle of (294º 38' 35") two hundred ninety-four degrees, thirty-eight minutes, and thirty-five seconds, adjacent to Plot (VI) six. ....................

From vertex M to vertex G towards the East for a distance of (65.00 m) sixty-five meters, and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (VII ) seven ........................................................................................

From vertex G to vertex F towards the East for a distance of (135.00 m) one hundred thirty-five meters, and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (I) one............................................................................

From vertex K to vertex L towards the West for a distance of (200.00 m) two hundred meters, and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to the property of Mr. Afilio Colli .....................................................................................

d.3. - PLOT III THREE of the property known as LA LAGUNA, in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, identified with cadastral key 4-02-013-0083 four dash zero two dash zero one three dash zero zero eight three, with an area of 11-34-41 hectares (eleven hectares thirty-four ares and forty-one centiares), and the following measures and boundaries: ....................................................................................

From vertex (D-1) "D" dash one to vertex D towards the North for a distance of (61.58 m) sixty-one point fifty-eight meters and an angle of (300º 09' 21") three hundred degrees, nine minutes, and twenty-one seconds, adjacent to Plot (I) one. ......................................................................

From vertex D to vortex C towards the North for a distance of (31.50 m) thirty-one point fifty meters and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (I) one ...............................................................................

From vertex C to vertex B towards the North for a distance of (125.00 m) one hundred twenty-five meters and an angle of (287º 08' 24") two hundred eighty-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (I) one................................................................................

From vertex (V-1) V dash one to vertex (V-2) V dash two towards the South for a distance of (171.26 m) for seventy-one point twenty-six meters, adjacent to the Pacific Ocean .....................

From vertex (V-2) V hyphen two to vertex (D-2) D hyphen two to the South with a distance of (16.96 m) sixteen point ninety-six meters, bordering the Pacific Ocean.........................................

From vertex (V-1) V dash one to vertex 0 to the East for a distance of (617.87 m) six hundred seventeen point eighty-seven meters and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to the property of Francisco Arballo.........................

From vertex (D-1) D dash one to vertex (D-2) D dash two towards the West for a distance of (628.56 m) six hundred twenty-eight point fifty-six meters) and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (IV) four....................................................................................................................................

DANSKE_0010620

d.4. - PLOT IV FOUR: on the property known as LA LAGUNA, in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, identified with cadastral key 4-02-013-0084 four dash zero two dash zero one three dash zero zero eight four, with an area of 11-62-60 hectares. (eleven hectares, sixty-two ares, and sixty centiares) and the following measurements and boundaries: .................................................................................

From vortex (D-1) D dash one to vortex E towards the North for a distance of (65.93 m) sixty-five point ninety-three meters and an angle of (300º 09' 21") three hundred degrees, nine minutes, and twenty-one seconds, adjacent to Plot (I) one ........................................................................

From vertex E to vertex (D-3) D dash three towards the North for a distance of (122.10 m) one hundred twenty two point ten meters and an angle of (295º 38' 05") two hundred ninety five [degrees], thirty-eight minutes, and five seconds, adjacent to Plot (I) one.....................................

From vertex (D-4) D dash four to vertex (VZF-5) V, Z, F dash five towards the South for a distance of (4.95 m) four point ninety-five meters and an angle of (119º 55' 06") one hundred nineteen degrees, fifty-five minutes, and six seconds, adjacent to the Pacific Ocean. .................

From vertex (VZF-5) V, Z, F dash five to vertex (V-4) V dash four towards the South for a distance of (60.27 m) sixty point twenty-seven meters and an angle of (117º 07' 54") one hundred and seventeen degrees, seven minutes, and fifty-four seconds, adjacent to the Pacific Ocean. ...................................................................................................................

From the vortex (V-4) V dash four to the vertex (V-3) V dash three towards the South for a distance of (74.40 m) seventy-four point forty meters and an angle of (117º 55' 10') one hundred and seventeen degrees, fifty-five minutes, and ten seconds, adjacent to the Pacific Ocean..............................................................................................................

From the vertex (V-3) V dash three to the vertex (D-2) D dash two towards the South for a distance of (48.88 m) forty-eight point eighty-six [sic] meters and an angle of (119º 36' 06") one hundred nineteen degrees, thirty-six minutes, and six seconds, adjacent to the Pacific Ocean ....

From vertex (D-2) D dash two to vertex (D-1) D dash one towards the East for a distance of (628.56 m) six hundred twenty-eight point fifty-six meters and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (III) three ..............

From the vertex (D-3) D dash three to the vertex (D-4) D dash four to the West for a distance of (625.87 m) six hundred twenty-five point eighty-seven meters and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (V) five.... ..................................................................................................................

DANSKE_0010621

d.5. - PLOT V FIVE: of the property known as LA LAGUNA, in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, identified with cadastral key 4-02-013-0085 four dash zero two dash zero one three dash zero zero eight five, with an area of 11-40-91 hectares. (eleven hectares, forty ares, and ninety-one centiares) and the following measurements and boundaries: ...............................................................................

From vertex (D-3) D dash three to vertex F towards the North for a distance of (69.78 m) sixty-nine point seventy-eight meters and an angle of (295º 38' 05") two hundred ninety-five degrees, thirty-eight minutes, and five seconds, adjacent to Plot (II) two.......................................................

From vertex F to vertex (D-5) D dash five towards the North for a distance of (116.96 m) one hundred sixteen point ninety-eight meters and an angle of (294º 38' 35") two hundred ninety-four degrees, thirty-eight minutes, and thirty-five seconds, adjacent to Plot (II) two ............................

From vertex (D-6) D dash six to vertex (VZF-6) V, 2, F dash six [sic] towards the South for a distance of (99.17 m) ninety-nine point seventeen meters and an angle of (122º 53 10") one hundred twenty-two degrees, fifty-three minutes, and ten seconds, adjacent to the Pacific Ocean ...............................................................................................................................................

From vertex (VZF-6) V, Z, F dash six to vertex (D-4) D dash four towards the South for a distance of (91.81 m) ninety-one point eighty-one meters and an angle of (119º 55' 07") one hundred nineteen degrees, fifty-five minutes, and seven seconds, adjacent to the Pacific Ocean

From vertex (D-4) D dash four to vertex (D-3) D dash three towards the East for a distance of (825.87 m) six hundred twenty-five point eighty-seven meters [sic] and an angle of (17º 08' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (V) five .................

From vertex (D-5) D dash five to vertex (D-6) D dash six towards the West for a distance of (604.23 m) six hundred four point twenty three meters and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot (VI) six

DANSKE_0010622

d.6. - PLOT VI SIX: of the property known as LA LAGUNA, in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, identified with cadastral key 4-02-013-0086 four dash zero two dash zero one three dash zero zero eight six, with an area of 11-03-90 has, (eleven hectares, three ares, and ninety centiares) and the following measurements and boundaries: ..............................................................................

From the vertex (D-5) D dash five to vertex K towards the North for a distance of (133.01 m) one hundred thirty-three point zero one meters and an angle of (294º 38' 35") two hundred ninety-four degrees, thirty-eight minutes, and thirty-five seconds, adjacent to Plot (II) two ......................

From vertex (D-7) D dash seven to vertex (VZF-9) V, Z, F dash nine towards the South for a distance of (67.38 m) sixty-seven point thirty-six meters and an angle of (269º 51' 08") two hundred sixty-nine degrees, fifty-one minutes, eight seconds, adjacent to the Pacific Ocean.......

From vertex (VZF-9) V, Z, F dash nine to vertex (VZF-8) V, Z, F dash eight towards the South for a distance of (46.26 m) forty-six point twenty-six meters and an angle of (114º 34' 05") one hundred fourteen degrees, thirty-four minutes, and five seconds, adjacent to the Pacific Ocean..

From vertex (VZF-8) V, Z, F dash eight to vertex (VZF-7) V, Z, F dash seven towards the South for a distance of (66.73 m.) sixty-six point seventy-three meters and an angle of (111º 07' 02") one hundred eleven degrees, seven minutes, and two seconds, adjacent to [sic]

From vertex (VZF-7) V, Z, F dash seven to vertex (D6) D dash six towards the South for a distance of (1.77 m) one point seventy-seven meters and an angle of (122º 53' 15") one hundred twenty two degrees, fifty-three minutes, and fifteen seconds, adjacent to the Pacific Ocean ........

From vertex (D-6) D dash six to vertex (D-5) D dash five towards the East for a distance of (604.23 m) six hundred four point twenty-three meters and an angle of (17º 06' 24") seventeen degrees, eight minutes, and twenty-four seconds, adjacent to Plot (V) five ...................................

From vertex K to vertex (D-7) D dash seven towards the West for a distance of (613.71 m) six hundred thirteen point seventy-one meters and an angle of (197º 08' 24") one hundred ninety-seven degrees, eight minutes, and twenty-four seconds, adjacent to the property of Atillo Colli. .

DANSKE_0010623

d.7.- PLOT VII SEVEN: of the property known as LA LAGUNA, in the portion known as Rancho El Cardonal, in Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, with cadastral key 4-02-013-0087 (four dash zero two dash zero one three dash zero zero eighty-seven) with an area with an area [sic] of 26-00-98 hectares. (twenty-six hectares, zero ares, and ninety-eight centiares) and the following measurements and boundaries:

From vertex ninety-six to vertex sixty towards the North for a distance of 87.67m eighty-seven point sixty-seven meters at (117º 15' 23") one hundred seventeen degrees, fifteen minutes, and twenty-three seconds, adjacent to the property of Mr. Atillo Colli..................................................

From vertex sixty to vertex sixty-four towards the North for a distance of 54.26m fifty-four point twenty-six meters at (113º 29' 56") one hundred thirteen degrees, twenty-nine minutes, and fifty-six seconds, adjacent to the property of Mr. Atillo Colli...............................................................

From vertex sixty-four to vertex R towards the North for a distance of 59.19m fifty-nine point nineteen meters at (120º 51' 16") one hundred twenty degrees, fifty-one minutes, and sixteen seconds, adjacent to the property of Mr. Atillo Colli ......................................................................

From vertex R to vertex sixty-five towards the North for a distance of 75.37m seventy-five point thirty-seven meters at (112º 48' 01") one hundred twelve degrees, forty-eight minutes, and one second, adjacent to the property of Mr. Atillo Colli ........................................................................

From vertex sixty-five to vertex sixty-eight towards the North for a distance of 57.64m fifty-seven point sixty-four meters at (114º 22' 21") one hundred fourteen degrees, twenty-two minutes, and twenty-one seconds, adjacent to the property of Mr. Afilio Colli [sic]. ...........................................

From vertex sixty-eight to vertex sixty-nine towards the North at a distance of 77.33m seventy-seven point thirty-three meters at (127º 28' 03") one hundred twenty-seven degrees, twenty-eight minutes, and three seconds, adjacent to the property of Mr. Afilio Colli. .............................

From vertex sixty-nine to vertex seventy-three towards the North for a distance of 40.74m forty point seventy-four meters at (115º 39' 35") one hundred fifteen degrees, thirty-nine minutes, and thirty-five seconds, adjacent to the property of Mr. Atillo Colli.......................................................

From vertex seventy-three to vertex seventy-four towards the North for a distance of 74.11m seventy-four point eleven meters at (104º 58' 12") one hundred four degrees, fifty-eight minutes, and twelve seconds, adjacent to the property of Mr. Atillo Colli ......................................................

From vertex seventy-four to vertex eighty towards the North for a distance of 44.26m forty-four point twenty-six meters (98º 31' 27") at ninety-eight degrees, thirty-one minutes, and twenty-seven seconds, adjacent to the property of Mr. Atillo Colli. ............................................................

From vertex eighty to vertex seventy-nine towards the North for a distance of 34.90m thirty-four point ninety meters at (128º 42' 48") one hundred twenty-eight degrees, forty-two minutes, and forty-six seconds [sic], adjacent to the property of Mr. Atillo Colli...................................................

From vertex seventy-nine to vertex seventy-eight towards the North at a distance of 48.34m forty-six [sic] point thirty-four meters at (117º 18' 42") one hundred seventeen degrees, eighteen minutes, and forty-two seconds, adjacent to the property of Mr. Atillo Colli. .................................

DANSKE_0010624

From vertex seventy-eight to vertex seventy-seven towards the North for a distance of 51.26m fifty-one point twenty-six meters, at (123º 57' 37") one hundred twenty-three degrees, fifty-seven minutes, and thirty-seven seconds, adjacent to the property of Mr. Atillo Colli. .............................

From vertex seventy-seven to vertex eighty-three towards the North for a distance of 44.09m forty-four point [zero] nine meters (110º 40' 31 ") at one hundred ten degrees, forty minutes, and thirty-one seconds, adjacent to the property of Mr. Atillo Colli. ....................................................

From vertex one hundred and seventeen to vertex J towards the South for a distance of 127.83m one hundred twenty-seven point eighty-three meters at (287º 08' 24") two hundred eighty-seven degrees, eight minutes, and twenty-four seconds, adjacent to Plot I........................

From vertex J to vertex I towards the South for a distance of 31.50m thirty-one point fifty meters at (17º 08' 33") seventeen degrees, eight minutes, and thirty-six seconds [sic], adjacent to Plot I. ...............................................................................................................................................

From vertex I to vertex H towards the South for a distance of 127.50m one hundred twenty-seven point fifty meters at (300º 09' 20") three hundred degrees, nine minutes, and twenty seconds, adjacent to Plot I .........................................................................................................

From vertex H to vertex G towards the South for a distance of 191.89m one hundred ninety-one point eighty-nine meters at (295º 38' 05") two hundred ninety-five degrees, thirty-eight minutes, and five seconds, adjacent to Plot I.......................................................................................

From vertex G to vertex M towards the South for a distance of 85.00m sixty-five meters [sic] at (17º 08' 57") seventeen degrees, eight minutes, and fifty-seven seconds, adjacent to Plot II ......

From vertex M to vertex L towards the South for a distance of 299.94m two hundred ninety-nine point ninety-four meters at (294º 39' 15") two hundred ninety-four degrees, thirty-nine minutes, and fifteen seconds, adjacent to Plot II.......................................................................................

From vertex eighty-three to vertex one hundred and seventeen towards the East for a distance of 395.92m three hundred ninety-five point ninety-two meters at (198º 64' 59") one hundred ninety-six degrees, fifty-four minutes, and fifty-nine seconds, adjacent to the Property of Francisco Arballo.......................................................................................................................

From vertex L to vertex ninety-six towards the West for a distance of 315.33m three hundred fifteen point thirty-three meters at (18º 13' 32") eighteen degrees, thirteen minutes, and thirty-two seconds, adjacent to the property of Mr. Atillo Colli ....................................................................

DANSKE_0010625

f.1. - POLYGON I of the Plot LA LAGUNA (EL CARDONAL), in the Municipal delegation of Cabo San Lucas, Municipality of Los Cabos, Baja California Sur, with Cadastral key 4-02-013-0001 FOUR DASH ZERO TWO DASH ZERO ONE THREE DASH ZERO ZERO ZERO ONE, and with an area of 528-88-49.427 Hectares FIVE HUNDRED TWENTY-EIGHT HECTARES, EIGHTY-EIGHT ARES FORTY-NINE POINT FOUR HUNDRED TWENTY-SEVEN CENTIARES, with the following measurements and boundaries: ..................................................................................

TO THE NORTH: IN TWO STRETCHES, 2,299.705 M. TWO THOUSAND TWO HUNDRED AND NINETY-NINE METERS SEVEN HUNDRED AND FIVE MILLIMETERS, owned or that was owned by Mr. VICTOR HUGO CESEÑA, plus 139.771 M. ONE HUNDRED AND THIRTY-NINE METERS SEVEN HUNDRED AND SEVENTY-ONE MILLIMETERS, with POLYGON III;............

TO THE SOUTH: IN THREE SECTIONS, 139.815 M. ONE HUNDRED AND THIRTY-NINE METERS EIGHT HUNDRED FIFTEEN MILLIMETERS, with POLYGON III; plus 1,605.070 M. ONE THOUSAND SIX HUNDRED FIVE METERS SEVENTY MILLIMETERS, with a FEDERAL MARITIME LAND ZONE OF THE PACIFIC OCEAN; plus 747.160 M. SEVEN HUNDRED FORTY-SEVEN METERS ONE HUNDRED SIXTY MILLIMETERS, with PLOT VII;.....................

TO THE EAST: IN TWO SECTIONS. 1,714.370 M. ONE THOUSAND SEVEN HUNDRED FOURTEEN METERS THREE HUNDRED SEVENTY MILLIMETERS, with the property that belongs or belonged to Mr. NESTOR HERRERA, plus 1,129.040 M. ONE THOUSAND ONE HUNDRED TWENTY-NINE METERS FORTY MILLIMETERS, with PLOTS II, VI, and VII:..........

TO THE WEST; IN THREE SECTIONS, 1,995.580 M. ONE THOUSAND NINE HUNDRED NINETY-FIVE METERS FIVE HUNDRED EIGHTY MILLIMETERS, with POLYGON II, plus 100,000 M. ONE HUNDRED METERS, with POLYGON III, plus 374,414 M. THREE HUNDRED SEVENTY-FOUR METERS, FOUR HUNDRED FOURTEEN MILLIMETERS, with the property that belongs or belonged to Mr. LUIS BULNES MOHEDA..........................................................

CONFIDENTIAL

DANSKE_0010626

**EXHIBIT A-1**

**Construction Budget**

CONFIDENTIAL

DANSKE_0010627

| Costs | Total $ | Costs to Date At Closing Total $ | Remaining After Closing Total $ |
|---|---|---|---|
| Permit, Licenses & Fee | $1,333 | $0 | $1,333 |
| Construction Costs - Site Work | $22,814 | $0 | $22,814 |
| Vertical - Villas | $0 | $0 | $0 |
| Vertical - Spa and Health Club | $980 | $0 | $980 |
| Golf Course | $8,000 | $0 | $8,000 |
| Vertical - Club House | $5,000 | $0 | $5,000 |
| Signage | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 |
| Operating Equipment | $1,155 | $0 | $1,155 |
| Design & PM Costs | $3,229 | $0 | $3,229 |
| Pre-Opening and Misc. | $1,403 | $1,403 | $0 |
| Insurance | $501 | $501 | $0 |
| Taxes & Legal | $1,205 | $480 | $726 |
| Land Cost | $72,826 | $72,826 | $0 |
| Closing Costs | $4,711 | $4,711 | $0 |
| Marketing | $5,555 | $876 | $4,679 |
| Developer's Mgt. Fee | $3,000 | $0 | $3,000 |
| Contingency (5% Soft) | $2,164 | $0 | $2,164 |
| Contingency (15% Hard Costs) | $4,492 | $0 | $4,492 |
| Additional Contingency | $3,952 | $0 | $3,952 |
| Vertical Villa Int. Exp | $0 | $0 | $0 |
| Golf Course Operating Loss | $3,125 | $0 | $3,125 |
| **Total Development Costs** | **$145,444** | **$80,796** | **$64,648** |

CONFIDENTIAL

**EXHIBIT B**

**Master Plan**

CONFIDENTIAL
DANSKE_0010629



DANSKE_0010630

CONFIDENTIAL

**EXHIBIT C**

**Sample Calculations of the Application of Payments in the Order of Priority**

CONFIDENTIAL

DANSKE_0010631

**Example 1: $10,000,000 lot sale prepayment on 9/30/07**

CONFIDENTIAL

DANSKE_0010632

| | | 04/30/06 Projected | 05/31/06 Projected 1 | 05/31/06 Projected 2 | 06/30/06 Projected 3 | 07/31/06 Projected 4 | 08/31/06 Projected 5 | 09/30/06 Projected 6 | 10/31/06 Projected 7 | 11/30/06 Projected 8 | 12/31/06 Projected 9 | 01/31/07 Projected 10 | 02/28/07 Projected 11 | 03/31/07 Projected 12 | 04/30/07 Projected 13 | 05/31/07 Projected 14 | 06/30/07 Projected 15 | 07/31/07 Projected 16 | 08/31/07 Projected 17 | 09/30/07 Projected 18 | 10/31/07 Projected 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total to be applied to Waterfall | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Available for Distribution | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000,000 | |
| Ending Cash | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000,000 | 0 |
| Current Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (7,967,747) | 0 |
| Deferred Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2,032,253) | 0 |
| Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (10,000,000) | 0 |
| Additional Fee - $125MM | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000,000 | 0 |
| **LOAN** | | | | | | | | | | | | | | | | | | | | | |
| **Interest:** | 0.4100% | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | 0 | 2,708,333 | 2,708,333 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,524 | 16,808,425 | 18,699,204 | 20,435,569 | 22,374,710 | 24,278,300 | 26,308,677 | 28,222,565 | 30,265,532 | 24,367,992 | 26,359,266 |
| Accruals | | 2,708,333 | 1,702,778 | 1,702,778 | 1,671,560 | 1,747,769 | 1,771,073 | 1,738,603 | 1,817,868 | 1,784,541 | 1,865,900 | 1,890,779 | 1,939,141 | 1,901,590 | 1,990,377 | 2,042,968 | 2,070,207 | 2,012,253 | 3,771,936 | 2,132,565 | 24,367,992 |
| Payments | | | | | | | | | | | | | | | | | | | | (10,000,000) | |
| Ending Balance | | 2,708,333 | 4,411,111 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,524 | 16,808,425 | 18,699,204 | 20,435,569 | 22,374,710 | 24,278,300 | 26,308,677 | 28,222,565 | 30,265,532 | 32,335,739 | 24,367,992 | 26,359,266 |
| **Principal:** | 15.00% | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 115,000,000 |
| Payments | | | | | | | | | | | | | | | | | | | | | (10,000,000) |
| Ending Balance | | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 115,000,000 | 115,000,000 |
| **ADDITIONAL FEE** | | | | | | | | | | | | | | | | | | | | | |
| **Interest:** | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accruals | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **25% IRR CHECK** | 28.07% | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | 0 | 4,459,297 | 4,459,297 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 | 52,233,310 | 56,050,065 | 49,821,942 |
| Accruals | 25.50% | 4,459,297 | 2,787,932 | 2,787,932 | 2,755,151 | 2,907,304 | 2,969,913 | 2,934,992 | 3,097,076 | 3,060,660 | 3,229,684 | 3,299,236 | 3,040,982 | 3,435,774 | 3,395,375 | 3,582,884 | 3,540,755 | 3,736,293 | 3,816,755 | 3,771,876 | 3,764,826 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (10,000,000) | |
| Ending Balance | 0 | 4,459,297 | 7,247,230 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 | 52,233,310 | 56,050,065 | 49,821,942 | 53,586,768 |

| | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11/23/07 | 12/31/07 | 01/31/08 | 02/29/08 | 03/31/08 | 04/30/08 | 05/31/08 | 06/30/08 | 07/31/08 | 08/31/08 | 09/30/08 | 10/31/08 | 11/30/08 | 12/31/08 | 01/31/09 | 02/28/09 | 03/31/09 | |
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| **Total to be applied to Waterfall** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 254,783,363 | 264,783,363 | 264,783,363 |
| | | | | | | | | | | | | | | | | | | |
| **Cash Available for Distribution** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 254,783,363 | 264,783,363 | |
| | | | | | | | | | | | | | | | | | | |
| **Current Interest Due** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (4,516,527) | (4,516,527) | |
| Deferred Interest Due | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (61,320,535) | (69,208,262) | |
| Principal Interest Due | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (125,000,000) | (125,000,000) | |
| Additional Fee - \$125MM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (65,978,554) | (65,978,554) | |
| | | | | | | | | | | | | | | | | | | |
| **Ending Cash** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | | | | | |
| **Principal** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (125,000,000) | (125,000,000) |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 0 | |
| | | | | | | | | | | | | | | | | | | |
| **Interest** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 26,359,566 | 28,314,627 | 30,358,822 | 32,430,273 | 34,398,151 | 36,523,460 | 38,609,805 | 40,791,269 | 42,932,739 | 45,171,842 | 47,440,800 | 49,668,161 | 51,997,069 | 54,383,282 | 56,673,725 | 59,096,042 | 61,320,535 | |
| Accruals | 1,955,061 | 2,071,451 | 1,967,878 | 2,125,309 | 2,183,464 | 2,181,464 | 2,141,471 | 2,239,103 | 2,268,958 | 2,327,360 | 2,328,909 | 2,386,312 | 2,390,444 | 2,472,316 | 2,484,274 | 2,484,274 | 2,484,274 | 73,804,809 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (73,804,809) | (73,804,809) |
| Ending Balance | 28,314,627 | 30,358,822 | 32,430,273 | 34,398,151 | 36,523,460 | 38,609,805 | 40,791,269 | 42,932,739 | 45,171,842 | 47,440,800 | 49,668,161 | 51,997,069 | 54,383,282 | 56,673,725 | 59,096,042 | 61,320,535 | 0 | |
| | | | | | | | | | | | | | | | | | | |
| **ITIONAL FEE** | | | | | | | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 124,412,220 | 124,412,220 | |
| Accruals | | | | | | | | | | | | | | | | | (65,978,554) | (65,978,554) |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Ending Balance | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 119,658,256 | 124,412,220 | 124,412,220 | | |
| | | | | | | | | | | | | | | | | | | |
| **25% IRR CHECK** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 53,386,768 | 57,307,325 | 61,233,351 | 65,243,924 | 69,075,904 | 73,353,325 | 77,383,603 | 81,741,975 | 86,049,099 | 90,594,084 | 95,236,947 | 99,825,216 | 104,666,873 | 109,451,600 | 114,590,562 | 119,658,256 | 124,412,220 | |
| Accruals | 3,720,558 | 3,926,025 | 4,010,573 | 3,829,980 | 4,178,421 | 4,130,278 | 4,358,372 | 4,307,124 | 4,544,985 | 4,642,862 | 4,588,270 | 4,841,657 | 4,784,727 | 5,048,963 | 5,137,693 | 4,753,964 | 5,371,143 | |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (65,804,869) | |
| Ending Balance | 57,307,325 | 61,233,351 | 65,243,924 | 69,075,904 | 73,253,325 | 77,383,603 | 81,741,975 | 86,049,099 | 90,594,084 | 95,236,947 | 99,825,216 | 104,666,873 | 109,451,600 | 114,590,562 | 119,658,256 | 124,412,220 | 65,978,554 | |

**Example 2: Payment at Maturity**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 03/31/06 | 04/30/06 | 05/31/06 | 06/30/06 | 07/31/06 | 08/31/06 | 09/30/06 | 10/31/06 | 11/30/06 | 12/31/06 | 01/31/07 | 02/28/07 | 03/31/07 | 04/30/07 | 05/31/07 | 06/30/07 | 07/31/07 | 08/31/07 | 09/30/07 | 11/30/07 |
| | | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| Total to be applied to Waterfall | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Available for Distribution | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additional Fee - $125MM | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Cash | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **LOAN** | | | | | | | | | | | | | | | | | | | | | |
| Principal | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Interest | 15.00% | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 0 | 0 | 2,708,333 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,534 | 16,808,425 | 18,699,204 | 20,455,569 | 22,374,710 | 24,278,500 | 26,268,677 | 28,222,565 | 30,265,532 | 32,335,739 | 34,367,992 | 36,492,899 |
| Accruals | | 2,708,333 | 1,702,778 | 1,671,560 | 1,747,769 | 1,771,073 | 1,738,603 | 1,817,868 | 1,784,541 | 1,865,900 | 1,890,779 | 1,756,565 | 1,959,141 | 1,900,390 | 1,903,590 | 1,990,377 | 1,953,887 | 2,042,968 | 2,070,207 | 2,032,253 | 2,124,907 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 0 | 2,708,333 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,534 | 16,808,425 | 18,699,204 | 20,455,569 | 22,374,710 | 24,278,500 | 26,268,677 | 28,222,565 | 30,265,532 | 32,335,739 | 34,367,992 | 36,492,899 | 38,578,849 |
| **ADDITIONAL FEE** | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Accruals | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| **25% IRR CHECK** | | | | | | | | | | | | | | | | | | | | | |
| | 28.070 | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 25.000% | 0 | 4,459,297 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 | 52,233,310 | 56,050,065 | 59,821,942 | 63,802,120 |
| Accruals | | 4,459,297 | 2,787,932 | 2,755,151 | 2,907,204 | 2,906,913 | 3,097,076 | 3,060,060 | 3,259,913 | 3,259,336 | 3,440,982 | 3,451,774 | 3,595,775 | 3,582,884 | 3,416,755 | 3,773,176 | 3,816,755 | 3,771,876 | 3,380,178 | 3,930,377 | |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 4,459,297 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 | 52,233,310 | 56,050,065 | 59,821,942 | 63,802,120 | 67,733,497 |

DANSKE_0010636

| | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/07 | 01/31/08 | 02/29/08 | 03/31/08 | 04/30/08 | 05/31/08 | 06/30/08 | 07/31/08 | 08/31/08 | 09/30/08 | 10/31/08 | 11/30/08 | 12/31/08 | 01/31/09 | 02/28/09 | 03/31/09 | 04/30/09 | |
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| **Total to be applied to Waterfall** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 269,357,241 | 269,357,241 | | 269,357,241 |
| | | | | | | | | | | | | | | | | | | |
| **Cash Available for Distribution** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 269,357,241 | | | 269,357,241 |
| Current Interest Due | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2,650,593) | | | (2,650,593) |
| Deferred Interest Due | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (73,794,462) | | | (73,794,462) |
| Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (125,000,000) | (125,000,000) | | (125,000,000) |
| Additional Fee - $123.0M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (67,912,186) | (67,912,186) | | (67,912,186) |
| Ending Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 |
| | | | | | | | | | | | | | | | | | | |
| **Principal** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | | | 125,000,000 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (125,000,000) | (125,000,000) | | (125,000,000) |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 0 | 0 | | 0 |
| | | | | | | | | | | | | | | | | | | |
| **Interest** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 38,578,849 | 40,759,900 | 42,970,032 | 45,069,658 | 47,317,233 | 49,563,276 | 51,890,786 | 54,175,626 | 56,564,634 | 58,985,466 | 61,361,975 | 63,846,801 | 66,286,073 | 68,836,554 | 71,421,041 | 73,794,462 | | |
| Accruals | 2,181,051 | 2,110,132 | 2,099,625 | 2,267,595 | 2,236,023 | 2,327,510 | 2,284,839 | 2,389,008 | 2,420,832 | 2,376,479 | 2,484,826 | 2,439,271 | 2,550,481 | 2,584,487 | 2,373,421 | | | |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (76,445,055) | (76,445,055) | | (76,445,055) |
| Ending Balance | 40,759,900 | 42,970,032 | 45,069,658 | 47,317,233 | 49,563,276 | 51,890,786 | 54,175,626 | 56,564,634 | 58,985,466 | 61,361,975 | 63,846,801 | 66,286,073 | 68,836,554 | 71,421,041 | 73,794,462 | | | |
| | | | | | | | | | | | | | | | | | | |
| **25% IRR CHECK** | | | | | | | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 67,735,497 | 71,886,095 | 76,126,077 | 80,175,137 | 84,595,625 | 88,960,159 | 93,567,834 | 98,121,331 | 102,926,294 | 107,834,733 | 112,685,457 | 117,804,061 | 122,862,479 | 128,200,248 | 133,652,967 | 138,678,863 | | |
| Accruals | 4,150,598 | 4,239,982 | 4,049,059 | 4,418,488 | 4,366,534 | 4,607,675 | 4,553,497 | 4,804,963 | 4,908,439 | 4,850,724 | 5,118,605 | 5,058,418 | 5,337,769 | 5,452,719 | 5,025,896 | 5,678,378 | | |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (76,445,055) | (76,445,055) | | (76,445,055) |
| Ending Balance | 71,886,095 | 76,126,077 | 80,175,137 | 84,595,625 | 88,960,159 | 93,567,834 | 98,121,331 | 102,926,294 | 107,834,733 | 112,685,457 | 117,804,061 | 122,862,479 | 128,200,248 | 133,652,967 | 138,678,863 | | | 1,252,666,722 |
| | | | | | | | | | | | | | | | | | | |
| **ITIONAL FEE** | | | | | | | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 128,200,248 | 128,200,248 | 133,652,967 | 138,678,863 | | 125,000,000 |
| Accruals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (67,912,186) | (67,912,186) | | (67,912,186) |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 128,200,248 | 128,200,248 | 133,652,967 | 138,678,863 | | | 67,912,186 |

CONFIDENTIAL

DANSKE_0010637

HF 3183497v.8 #04737/0094 03/10/2006 02:01 PM

59

**Example 3: $10,000,000 Prepayment on 9/30/07 and Exercise of First Extension Option**

DANSKE_0010638

|  | 03/10/06 | 04/30/06 | 05/31/06 | 06/30/06 | 07/31/06 | 08/31/06 | 09/30/06 | 10/31/06 | 11/30/06 | 12/31/06 | 01/31/07 | 02/28/07 | 03/31/07 | 04/30/07 | 05/31/07 | 06/30/07 | 07/31/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|  |  | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| **Total to be applied to Waterfall** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Available for Distribution | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Interest Due | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additional Fee - $125MM | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Cash | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**LOAN**

| Principal: | 125,000,000 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Interest: | 15.00% | | | | | | | | | | | | | | | | |
| Beginning Balance | 0 | 0 | 2,708,333 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,524 | 16,808,425 | 18,699,204 | 20,435,569 | 22,374,710 | 24,278,300 | 26,268,677 | 28,222,565 |
| Accruals | | 2,708,333 | 1,702,778 | 1,671,560 | 1,747,769 | 1,771,073 | 1,738,603 | 1,817,868 | 1,784,541 | 1,865,900 | 1,890,779 | 1,736,365 | 1,939,141 | 1,903,590 | 1,990,377 | 1,953,887 | 2,042,968 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 0 | 2,708,333 | 4,411,111 | 6,082,671 | 7,830,440 | 9,601,513 | 11,340,116 | 13,157,984 | 14,942,524 | 16,808,425 | 18,699,204 | 20,435,569 | 22,374,710 | 24,278,300 | 26,268,677 | 28,222,565 | 30,265,532 |

**ADDITIONAL FEE**

| Interest: | 125,000,000 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Accruals | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |

**25% IRR CHECK**

| Beginning Balance | 28.07% / 25.00% | 0 | 4,459,297 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accruals | | 4,459,297 | 2,787,932 | 2,755,151 | 2,907,304 | 2,969,913 | 2,934,992 | 3,097,076 | 3,060,660 | 3,229,684 | 3,299,236 | 3,040,982 | 3,435,774 | 3,395,375 | 3,582,884 | 3,540,755 | 3,736,293 |
| Payments | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 0 | 4,459,297 | 7,247,230 | 10,002,380 | 12,909,684 | 15,879,597 | 18,814,589 | 21,911,665 | 24,972,325 | 28,202,009 | 31,501,245 | 34,542,227 | 37,978,002 | 41,373,377 | 44,956,261 | 48,497,017 | 52,233,310 |

CONFIDENTIAL

DANSKE_0010639

| | 17 (08/31/07) | 18 (09/30/07) | 19 (10/31/07) | 20 (11/30/07) | 21 (12/31/07) | 22 (01/31/08) | 23 (02/29/08) | 24 (03/31/08) | 25 (04/30/08) | 26 (05/31/08) | 27 (06/30/08) | 28 (07/31/08) | 29 (08/31/08) | 30 (09/30/08) | 31 (10/31/08) | 32 (11/30/08) | 33 (12/31/08) | 34 (01/31/09) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
| **Total to be applied to Waterfall** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Available for Distribution | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Cash | 10,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additional Fee - $125MM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Principal | 0 | (10,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Interest Due | 0 | (7,967,747) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current Interest Due | 0 | (2,032,253) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Interest:** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 30,265,532 | 32,335,739 | 24,367,992 | 26,359,566 | 28,314,627 | 30,358,822 | 32,430,273 | 34,398,151 | 36,523,460 | 38,609,805 | 40,791,269 | 42,932,739 | 45,171,842 | 47,440,800 | 49,668,161 | 51,997,069 | 54,383,282 | 56,673,725 |
| Accruals | 2,070,207 | 2,032,253 | 1,991,573 | 1,955,061 | 2,044,195 | 2,071,451 | 1,967,878 | 2,125,309 | 2,086,345 | 2,181,464 | 2,141,471 | 2,239,103 | 2,268,958 | 2,227,360 | 2,328,909 | 2,386,212 | 2,390,444 | 2,422,316 |
| Payments | 0 | (10,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 32,335,739 | 24,367,992 | 26,359,566 | 28,314,627 | 30,358,822 | 32,430,273 | 34,398,151 | 36,523,460 | 38,609,805 | 40,791,269 | 42,932,739 | 45,171,842 | 47,440,800 | 49,668,161 | 51,997,069 | 54,383,282 | 56,673,725 | 59,096,042 |
| **Principal:** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 |
| Payments | 0 | (10,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 | 115,000,000 |
| **N ...ITIONAL FEE:** | | | | | | | | | | | | | | | | | | |
| **Interest:** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accruals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Principal:** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 | 125,000,000 |
| **25% IRR CHECK** | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 52,233,310 | 56,050,065 | 49,821,942 | 53,586,768 | 57,307,325 | 61,233,351 | 65,243,924 | 69,073,904 | 73,253,325 | 77,383,603 | 81,741,975 | 86,049,699 | 90,594,084 | 95,236,947 | 99,825,216 | 104,666,873 | 109,451,600 | 114,500,562 |
| Accruals | 3,816,755 | 3,771,876 | 3,764,826 | 3,720,558 | 3,926,025 | 4,010,573 | 3,829,980 | 4,179,421 | 4,130,278 | 4,358,372 | 4,307,124 | 4,544,985 | 4,642,862 | 4,588,270 | 4,841,657 | 4,784,727 | 5,048,963 | 5,157,693 |
| Payments | 0 | (10,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 56,050,065 | 49,821,942 | 53,586,768 | 57,307,325 | 61,233,351 | 65,243,924 | 69,073,904 | 73,253,325 | 77,383,603 | 81,741,975 | 86,049,699 | 90,594,084 | 95,236,947 | 99,825,216 | 104,666,873 | 109,451,600 | 114,500,562 | 119,658,256 |

CONFIDENTIAL

DANSKE_0010640

| | 35 02/28/09 Projected | 36 03/31/09 Projected | 37 04/30/09 Projected | 38 05/31/09 Projected | 39 06/30/09 Projected | 40 07/31/09 Projected | 41 08/31/09 Projected | 42 09/30/09 Projected | 43 10/31/09 Projected | 44 11/30/09 Projected | 45 12/31/09 Projected | 46 01/31/10 Projected | 47 02/28/10 Projected | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total to be applied to Waterfall | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 175,854,195 | 300,854,195 |
| Cash Available for Distribution | 115,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 175,854,195 | 300,854,195 |
| Ending Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current Interest Due | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (5,552,964) |
| Deferred Interest Due* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (79,602,357) |
| Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (125,000,000) |
| Additional Fee - $125MM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (90,718,874) |
| **Principal:** | | | | | | | | | | | | | | |
| Beginning Balance | 125,000,000 | 125,000,000 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 125,000,000 |
| Payments | 0 | (51,195,191) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (51,195,191) |
| Ending Balance | 125,000,000 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 | 73,804,809 |
| **N — Interest:** | | | | | | | | | | | | | | |
| Beginning Balance | 59,096,042 | 61,320,535 | 0 | 953,312 | 1,950,087 | 2,928,588 | 3,951,700 | 4,988,453 | 6,006,200 | 7,070,346 | 8,114,984 | 9,207,248 | 10,314,075 | |
| Accruals | 2,224,494 | 2,484,274 | 953,312 | 996,775 | 978,501 | 1,023,112 | 1,036,753 | 1,017,746 | 1,064,147 | 1,044,637 | 1,092,264 | 1,106,827 | 1,016,437 | 85,135,321 |
| Payments | 0 | (63,804,809) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (11,330,512) | (85,135,321) |
| Ending Balance | 61,320,535 | 0 | 953,312 | 1,950,087 | 2,928,588 | 3,951,700 | 4,988,453 | 6,006,200 | 7,070,346 | 8,114,984 | 9,207,248 | 10,314,075 | 0 | 0 |
| **...TIONAL FEE — Interest:** | | | | | | | | | | | | | | |
| Beginning Balance | 124,412,220 | 124,412,220 | 65,978,554 | 68,890,707 | 71,963,684 | 75,000,527 | 78,205,081 | 81,478,644 | 84,713,716 | 88,127,445 | 91,501,034 | 95,060,929 | 98,697,486 | |
| Accruals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,016,437 | 85,135,321 |
| Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (90,718,874) | (85,135,321) |
| Ending Balance | 124,412,220 | 65,978,554 | 68,890,707 | 71,963,684 | 75,000,527 | 78,205,081 | 81,478,644 | 84,713,716 | 88,127,445 | 91,501,034 | 95,060,929 | 98,697,486 | 90,718,874 | |
| **25% IRR CHECK** | | | | | | | | | | | | | | |
| Beginning Balance | 119,658,256 | 124,412,220 | 65,978,554 | 68,890,707 | 71,963,684 | 75,000,527 | 78,205,081 | 81,478,644 | 84,713,716 | 88,127,445 | 91,501,034 | 95,060,929 | 98,697,486 | 119,658,256 |
| Accruals | 4,753,964 | 5,371,143 | 2,912,153 | 3,072,977 | 3,036,844 | 3,204,553 | 3,273,564 | 3,235,072 | 3,413,729 | 3,373,589 | 3,559,895 | 3,636,558 | 3,551,899 | |
| Payments | 0 | (63,804,809) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (90,718,874) | (90,718,874) |
| Ending Balance | 124,412,220 | 65,978,554 | 68,890,707 | 71,963,684 | 75,000,527 | 78,205,081 | 81,478,644 | 84,713,716 | 88,127,445 | 91,501,034 | 95,060,929 | 98,697,486 | 90,718,874 | (90,718,874) |

(300,854,195)



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit 4**is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
October 9, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public