UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>PHILIP A. KENNER, *et al.*,<br><br>Defendants. | 13-cr-0607 (JFB)<br><br>**SUPPLEMENTAL DECLARATION OF DAVID DANIEL IN FURTHER SUPPORT OF DANSKE BANK A/S LONDON BRANCH'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to 28 U.S.C. § 1746, I, David Daniel, declare as follows:

1.As set forth in my prior Declaration dated June 18, 2020 [Dkt. No. 860-9], I have been an employee of Danske Bank A/S London Branch ("Danske") since November 2008 and I am currently a Managing Director, Large Special Credits. Prior to my current role, I was Head of London Non-Core.

2.This Supplemental Declaration is submitted in response to certain arguments the government made in opposition to Danske's motion for summary judgment (Dkt. No. 848). Specifically, I submit this Supplemental Declaration to certify to the Court, as set forth under Fed. R. Evid. 803(6), that documents submitted in the Declaration of George Kostolampros in support of Danske's motion for summary judgment (referenced herein as the "**MSJ Ex.**") are true and correct copies of what they purport to be. I also submit this Supplemental Declaration to provide facts in response to certain statements made by the Government in its opposition brief and in the Declaration of Kellie Fedkenheuer, the government's consultant.

1

A. **Danske Business Records Submitted in Support of Danske's Summary Judgment Motion**

3.  I am authorized to make this Supplemental Declaration and am familiar with the manner in which Danske's records are created and maintained by virtue of my duties and responsibilities at Danske.

4.  In my capacity as Managing Director, Large Special Credits, and in my former capacity as Head of London Non-Core, I am one of Danske's employees principally responsible for managing matters arising from or relating to the loan agreement between Danske and Diamante Cabo San Lucas S. De R.L. De C.V. ("DCSL") and for monitoring the progress of the development at the resort property, known as Diamante Cabo San Lucas (the "Resort Property"), located in Cabo San Lucas, Mexico at Diamante Boulevard 23473 Cabo San Lucas B.C.S. Mexico. I have personal knowledge of the facts and circumstances set forth herein and have custody and/or access to Danske's records relating to Danske's books, records, and files that pertain to Danske's loan agreements (the "Loan Agreements") with DCSL (the "DCSL Loan") for the development of the Resort Property that is at issue in this case.

5.  Each of the Exhibits referred to herein was made and/or maintained in the regular course and scope of Danske's business and was created at the time of or within a reasonable amount of time after the act, transaction, occurrence, or event to which it relates.

6.  Pursuant to an Acquisition and Assignment Agreement dated January 13, 2009 (the "Assignment and Assumption Agreement") between Lehman Brothers Holdings Inc. ("Lehman") and Danske, Lehman confirmed that it "sold, transferred, assigned, delivered, set-over and conveyed . . . all of it rights, title and interest with respect to the [DCSL] loan" to Danske. A true and correct copy of the Assignment and Assumption Agreement was submitted as **MSJ Ex. 35** (Dkt. No. 853-5).

7. Attached as Exhibit B to the Assignment and Assumption Agreement is a listing of the underlying loan-related documents Danske acquired from Lehman and for which Danske integrated and incorporated into its own records. Those underlying loan-related documents include the following that were submitted as part of Danske's Motion for Summary Judgment:

    a. The 2006 Loan Agreement between Lehman and DCSL, a true and correct copy of which was submitted as **MSJ Ex. 4** (Dkt. No. 850-4);

    b. A March 2006 Pledge Agreement of Diamante Cabo San Lucas, LLC, Kenneth A. Jowdy, and Diamante, a true and correct copy of which was submitted as **MSJ Ex. 6** (Dkt. No. 850-6);

    c. A March 2006 Pledge and Security Agreement of Diamante Cabo San Lucas, LLC and Kenneth A. Jowdy, a true and correct copy of which was submitted as **MSJ Ex. 7** (Dkt. No. 850-7);

    d. A March 2006 Pledge and Security Agreement made by Equity Interest Pledgors, a true and correct copy of which was submitted as **MSJ Ex. 8** (Dkt. No. 850-8);

    e. A March 2006 Pledge and Security Agreement made by Pledgors Diamante Cabo San Lucas, LLC and Kenneth A. Jowdy, a true and correct copy of which was submitted as **MSJ Ex. 9** (Dkt. No. 850-9);

    f. An Irrevocable Guarantee Trust Agreement by Borrower in Favor of Lender (the "2006 Trust Agreement"), a true and correct copy of which was submitted as **MSJ Ex. 12** (Dkt. No. 851-2, Dkt. No. 851-3);

    g. Lehman's Delaware UCC Financing Statements for Diamante Cabo San Lucas, LLC, KAJ Holdings, LLC, CSL Properties 2006, LLC, Diamante Properties, LLC, Baja Ventures 2006, LLC, true and correct copies of which were submitted as **MSJ Exs. 15** (Dkt. No. 851-6), **16** (Dkt. No. 851-7), **17** (Dkt. No. 851-8), **18** (Dkt. No. 851-9), **19** (Dkt. No. 851-10), **20** (Dkt. No. 851-11), **21** (Dkt. No. 852-1), **22** (Dkt. No. 852-2), and **23** (Dkt. No. 852-3); and

    h. Lehman's Nevada UCC Financing Statements for Kenneth A. Jowdy, true and correct copies of which were submitted as **MSJ Exs. 24** (Dkt. No. 852-4) and **25** (Dkt. No. 852-5).

8. Danske also acquired other documents directly from Lehman in connection with Danske's acquisition of the DCSL Loan. Danske kept those records in the course of Danske's

regular business activity in managing Danske's interest in the DCSL Loan and those documents are integrated and incorporated within Danske's records. Among others, these documents included the following:

    a. A March 2, 2006 Memorandum describing the underlying property and the then development plan of the Resort Property, a true and correct copy of which was submitted as **MSJ Ex. 5** (Dkt. No.850-5);

    b. A copy of the 2006 Trust Agreement Registration with the Public Registry in Mexico, a true and correct copy of which was submitted as **MSJ Ex. 13** (Dkt. No. 851-4); and

    c. A copy of the 2006 Trust Agreement Notary Plus Public Registration in Mexico, a true and correct copy of which was submitted as **MSJ Ex. 14** (Dkt. No. 851-5) to the Kostolampros Declaration.

9. Danske and the Borrower entered into subsequent amendments of the Loan Agreement and true and correct copies of those amendments and related documents were submitted as exhibits to the Kostolampros Declaration. Additionally, other documents in Danske's records were also submitted as exhibits to the Kostolampros Declaration. Specifically, those exhibits included the following:

    a. A true and correct copy of the March 6, 2009 Amended and Restated Loan Agreement submitted as **MSJ Ex. 40** (Dkt. No. 853-10);

    b. True and correct copies of Substitute Promissory Notes, submitted as **MSJ Exs. 41** (Dkt. No. 854-1) and **44** (Dkt. No. 854-4);

    c. A true and correct copy of a March 2009 Delaware UCC Financing Statement replacing Lehman with Danske as the secured party for debtor KAJ Holdings, LLC submitted as **MSJ Ex. 43** (Dkt. No. 854-3);

    d. A true and correct copy of a Connecticut UCC Financing statement for the pledge of interests in PF Ventures, LLC was submitted as **MSJ Ex. 36** (Dkt. No. 853-6);

    e. A true and correct copy of the First Amendment to the Amended and Restated Loan Agreement and Modification Agreement was submitted as **MSJ Ex. 46** (Dkt. No. 854-6);

f. A true and correct copy of the June 29, 2012 Letter Agreement for the Extension of Maturity Date was submitted as **MSJ Ex. 47** (Dkt. No. 854-7);

g. A true and correct copy of the September 28, 2012 Letter Agreement for the Third Extension of Maturity Date was submitted as **MSJ Ex. 48** (Dkt. No. 854-8);

h. A true and correct copy of the December 31, 2012 Letter Agreement for the Fourth Extension of Maturity Date was submitted as **MSJ Ex. 49** (Dkt. No. 854-9);

i. A true and correct copy of the March 31, 2012 Letter Agreement for the Fifth Extension of Maturity Date and Related Modifications was submitted as **MSJ Ex. 50** (Dkt. No. 854-10);

j. A true and correct copy of the April 2013 Second Amended and Restated Loan Agreement was submitted as **MSJ Ex. 51** (Dkt. No. 855-1, Dkt. No. 851-2);

k. A true and correct copy of the 2013 Note Splitter and Modification Agreement was submitted as **MSJ Ex. 52** (Dkt. No. 855-3);

l. A true and correct copy of the April 26, 2013 Second Substitute Facility A Promissory Note was submitted as **MSJ Ex. 53** (Dkt. No. 855-4);

m. A true and correct copy of the April 26, 2013 Third Substitute Facility B Promissory Note was submitted as **MSJ Ex. 54** (Dkt. No. 855-5);

n. A true and correct copy of the April 26, 2013 Facility C Promissory Note was submitted as **MSJ Ex. 55** (Dkt. No. 855-6);

o. A true and correct copy of the April 26, 2013 Facility D Promissory Note was submitted as **MSJ Ex. 56** (Dkt. No. 856-1);

p. A true and correct copy of an April 29, 2013 Danske Bank Funding Memo was submitted as **MSJ Ex. 57** (Dkt. No. 856-2).

q. A true and correct copy of the April 2014 Third Amended and Restated Loan Agreement was submitted as **MSJ Ex. 58** (Dkt. No. 856-3, Dkt. No. 856-4);

r. A true and correct copy of the April 29, 2014 Consolidated, Amended and Restated Replacement Note C Promissory Note was submitted as **MSJ Ex. 59** (Dkt. No. 856-5);

s.  A true and correct copy of the 2009 Amendment and Restatement Agreement to the Irrevocable Guaranty Trust Agreement, including an unofficial English translation and the original in Spanish, was submitted as **MSJ Ex. 60** (Dkt. No. 856-6);

t.  A true and correct copy of the October 30, 2014 First Amendment to Third Amended and Restated Loan Agreement and Modification Agreement was submitted as **MSJ Ex. 62** (Dkt. No. 857-2);

u.  A true and correct copy of the September 8, 2018 Second Amendment to Third Amended and Restated Loan Agreement and Modification Agreement was submitted as **MSJ Ex. 63** (Dkt. No. 857-3);

v.  A true and correct copy of the April 30, 2013 Second Amended Trust Agreement was submitted as **MSJ Ex. 64** (Dkt. No. 857-4);

w.  A true and correct copy of the March 6, 2009 Reaffirmation of Pledge and Security Agreement of Kenneth A. Jowdy and Diamante Cabo San Lucas, LLC was submitted as **MSJ Ex. 65** (Dkt. No. 857-5);

x.  A true and correct copy of the March 6, 2009 Reaffirmation of Pledge and Security Agreement of Kenneth A. Jowdy was submitted as **MSJ Ex. 66** (Dkt. No. 858-1);

y.  A true and correct copy of the March 6, 2009 Pledge and Security Agreement of PF Ventures, LLC was submitted as **MSJ Ex. 67** (Dkt. No. 858-2);

z.  True and correct copy of Danske's March 2009 UCC Financing Statements replacing Lehman with Danske as the secured part of debtors KAJ Holdings, LLC, CSL Properties 2006, Baja Ventures 2006, Diamante Properties, LLC, Diamante Cabo San Lucas, LLC, and Kenneth A. Jowdy were submitted as **MSJ Exs. 68** (Dkt. No. 858-3) and **69** (Dkt. No. 858-4);

aa.  A true and correct copy of the 2014 Amended and Restated Trust Agreement and related lien searches was submitted as Updated **MSJ Ex. 70** Part 2 (Dkt. No. 870-3);

bb.  A true and correct copy of the June 5, 2013 Fidelity National Title Insurance Company UCC 9 Loan Insurance Policy was submitted as **MSJ Ex. 71** (Dkt. No. 859-1);

cc.  A true and correct copy of the June 12, 2014 Fidelity National Title De Mexico, S.A. De C.V. Loan Policy of Title Insurance was submitted as **MSJ Ex. 72** (Dkt. No. 859-2);

dd.     A true and correct copy of the April 26, 2013 Reaffirmation of Pledge and Security Agreement of PF Ventures, LLC was submitted as **MSJ Ex. 73** (Dkt. No. 859-3);

ee.     A true and correct copy of an April 26, 2013 Reaffirmation of Pledge and Security Agreement made by Pledgor Kenneth A. Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 74** (Dkt. No. 859-4);

ff.     A true and correct copy of an April 26, 2013 Pledge and Security Agreement made by Pledgors Diamante Properties, LLC and KAJ Holdings, LLC in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 75** (Dkt. No. 859-5);

gg.     A true and correct copy of an April 26, 2013 Pledge and Security Agreement made by Pledgors Diamante Cabo San Lucas LLC and Kenneth A. Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 76** (Dkt. No. 859-6);

hh.     A true and correct copy of an April 26, 2013 Pledge and Security Agreement made by Pledgors Diamante Cabo San Lucas LLC and Kenneth A. Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 77** (Dkt. No. 859-7)

ii.     A true and correct copy of an April 26, 2013 Pledge and Security Agreement (U.S. Accounts) made by Pledgor Diamante Cabo San Lucas S. De R.L. de CV in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 78** (Dkt. No. 859-8);

jj.     A true and correct copy of a March 6, 2009 Reaffirmation of Pledge and Security Agreement made by Pledgor Kenneth Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 79** (Dkt. No. 859-9);

kk.     A true and correct copy of an April 29, 2014 Reaffirmation of Pledge and Security Agreement made by Pledgors Diamante Properties, LLC and KAJ Holdings, LLC in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 80** (Dkt. No. 859-10);

ll.     A true and correct copy of an April 29, 2014 Reaffirmation of Pledge and Security Agreement made by Pledgor PF Ventures, LLC in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 81** (Dkt. No. 860-1);

mm.     A true and correct copy of an April 29, 2014 Reaffirmation of Pledge and Security Agreement made by Pledgors Diamante Cabo San Lucas, LLC and Kenneth A. Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 82** (Dkt. No. 860-2);

nn.     A true and correct copy of an April 29, 2014 Reaffirmation of Pledge and Security Agreement made by Pledgor Kenneth A. Jowdy in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 83** (Dkt. No. 860-3);

oo.     A true and correct copy of the January 14, 2020 Letter from Danske Bank, A/S London Branch to Diamante Cabo San Lucas S. de R.L. de C.V. noticing Diamante Cabo San Lucas S. de R.L. de C.V.'s Event of Default under the Loan Documents was submitted as **MSJ Ex. 90** (Dkt. No. 860-10);

pp.     A true and correct copy of a March 31, 2020 Foreign Currency Account – Statement of Account No. 29 issued to Diamante Cabo San Lucas S. de R.L de C.V. by Danske Bank A/S, London Branch setting forth the amount owed under Facility C as of that date was submitted under seal as **MSJ Ex. 91** (Dkt. No. 861-1);

qq.     A true and correct copy of a February 28, 2020 Foreign Currency Account – Statement of Account No. 52 issued to Diamante Cabo San Lucas S. de R.L. de C.V. by Danske Bank A/S, London Branch setting forth the amount owed under Facility A as of that date was submitted under seal as **MSJ Ex. 92** (Dkt. No. 861-2);

rr.     A true and correct copy of a February 28, 2020 Foreign Currency Account – Statement of Account No. 59 issued to Diamante Cabo San Lucas S. de R.L. de C.V. by Danske Bank A/S, London Branch setting forth the amount owed under Facility B was submitted under seal as **MSJ Ex. 93** (Dkt. No. 861-3);

ss.     A true and correct copy of a table listing out the advances Danske made under the Loan Agreements as well as true and correct copies of wire transfer confirmations from Danske Bank to Diamante Cabo San Lucas, S. de R.L. de C.V. were submitted under seal as **MSJ Ex. 94** (Dkt. No. 861-4);

tt.     A true and correct copy of a March 6, 2009 Pledge and Security Agreement by Pledgor PF Ventures, LLC in favor of Danske Bank A/S, London Branch was submitted as **MSJ Ex. 95** (Dkt. No. 861-5); and

uu.     A true and correct copy of a January 29, 2010 Danske Bank Funding Memo for the Property Diamante Cabo San Lucas, Mexico was submitted under seal as **MSJ Ex. 98** (Dkt. No. 861-8).

10.     Trimont was originally engaged by Lehman Brothers as the servicer for the loan. From April 1, 2009 until December 31, 2016, Trimont was engaged by Danske as the loan servicer for the DCSL Loan. Among its duties, Trimont generated periodic invoices setting forth the

amount of principal and interest due and fees and other amounts to be paid by the borrower as well as the amounts advanced by the borrower. As part of Danske's regular business activity in managing its interest in the DCSL Loan and monitoring the progress of the development at the Resort Property, Danske received periodic statements and invoices from Trimont. The records Danske received from Trimont were maintained within Danske's business records. True and correct copies of certain Trimont statements and invoices that are in Danske's possession, custody, or control were submitted as part of the Kostolampros Declaration and included the following:

a. A true and correct copy of a Diamante Facility A Balance Sheet was submitted under seal as **MSJ Ex. 10** (Dkt. No. 850-10) that shows, consistent with Danske's own statements, DANSKE_0015363 (December 31, 2016 Facility A Danske Statement), that as of December 31, 2016, DCSL owed Danske $97 million under Facility A and that, at the time Danske acquired Lehman's full interest under the DCSL loan, Lehman had advanced and was owed $107,538,327.83;

b. A true and correct copy of several loan notices to DCSL from Trimont were submitted under seal as **MSJ Ex. 42** (Dkt. No. 854-2) that show that, at the time Danske acquired Lehman's full interest under the DCSL Loan in January 2009, Lehman had advanced and was owed $107,538,327.83 and that the uncapitalized deferred interest balance under the loan was $45,203,607.24 and, as of March 1, 2009, the uncapitalized deferred interest balance was $49,132,479.63;

c. A true and correct copy of a 2016 Facility B balance sheet issued by Trimont was submitted as **MSJ Ex. 45** (Dkt. No. 854-5) that shows, consistent with the underlying Loan Agreements, *see* **MSJ Ex. 58** (Dkt. No. 856-3, Dkt. No. 856-4) and consistent with Danske's own statements, DANSKE_0015322 (December 31, 2016 Facility B Danske Statement), that Danske advanced and was owed $18 million under Facility B; and

d. A true and correct copy of a 2016 Facility C balance sheet issued by Trimont was submitted under seal as **MSJ Ex. 97** (Dkt. No. 861-7) that shows, that as of December 31, 2016, Danske advanced to DCSL and was owed $14,699,649.84 under Facility C. Danske's own statements, DANSKE_0015549 (at DANSKE_0015577) reflect that the balance was $14,559,639.84; although there is a discrepancy, the amount on Danske's statements should govern.

9

11. In addition, while Trimont was the servicer for the loan and thereafter through to the present Danske created and maintained its own statements. True and correct copies of these statements were attached to the Kostolampros Declaration or are attached to this declaration:

    a. A true and correct copy of Danske's Statement of Account for Facility A, dated February 28, 2020 was submitted under seal as **MSJ Ex. 92** (Dkt. No. 861-2);

    b. A true and correct copy of Danske's Statement of Account for Facility B, dated February 28, 2020 was submitted under seal as **MSJ Ex. 93** (Dkt. No. 861-3);

    c. A true and correct copy of Danske's Statement of Account for Facility A, dated September 30, 2020, bearing bates beginning number DANSKE_0017872, is attached as **Daniel Exhibit 1**;

    d. A true and correct copy of Danske's Statement of Account for Facility B, dated September 30, 2020, bearing bates beginning number DANSKE_0017873, is attached as **Daniel Exhibit 2**; and

    e. A true and correct copy of Danske's Statement of Account for Facility C, dated September 30, 2020, bearing bates beginning number DANSKE_0017871, is attached as **Daniel Exhibit 3**.

12. Danske also maintained in its files the servicing agreement between Danske and Trimont, funding memoranda created at or around the time that the Borrower requested a draw, and an interest calculation spreadsheet. True and correct copies of the servicing agreement, two exemplar funding memoranda, and a pdf of certain pages of the interest calculation spreadsheet are attached to this declaration as:

    a. A true and correct copy of the November 6, 2015 funding memorandum (DANSKE_0015958) is attached as **Daniel Exhibit 4**;

    b. A true and correct copy of certain worksheets included within the interest rollover spreadsheet, which was previously produced to the government (DANSKE_0016723), is attached as **Daniel Exhibit 5**; and

    c. A true and correct copy of a January 29, 2010 funding memorandum (DANSKE_0015956) is attached as **Daniel Exhibit 6**.

B. **Response to Statements Made In the Declaration of Kellie Fedkenheuer**

13. As set forth above, as part of my job responsibilities at Danske, I oversee and manage the DCSL Loan and have personal knowledge regarding amounts advanced by Danske under the Loan Agreements and the amounts owed to Danske by DCSL. I provide the following in response to the Government's opposition, including the Declaration of Kellie Fedkenheuer, the government's consultant.

14. First, the government's consultant identified certain Trimont invoices that she characterized as not provided and/or incomplete. Some of the invoices that the government claims are missing or incomplete are invoices for the periods prior to Danske acquiring Lehman's interest. *See* Declaration of Kellie Fedkenheuer ¶ 11, Table 2 (listing invoices as incomplete or missing for period from April 2006 to August 2008). In some instances, invoices may be missing because Trimont did not provide them to Danske. In other instances, given the passage of time and the fact that Trimont stopped acting as servicer at the end of 2016, these invoices have not been located in Danske's records.

15. The Government's consultant also states that she identified numerous purported differences between the Danske loan statements and the Trimont Invoices and that these documents "should report the same transactions." The assumption that these documents should report the same transactions is incorrect. While Trimont was in place as servicer, Danske maintained its own statements related to the DCSL Loan as internal records of Danske only. Some of the transactions booked on Danske's internal loan statements are internal transfers between Danske's own accounts that would not have been included on Trimont's statements. The purported differences between Danske's and Trimont's loan statements are addressed below:

   a. Fedkenheuer states that the Trimont invoices included $3,020,424 in payments reflected in Table 4 of her declaration for Facility C that Danske did not include

11

      in its loan statements. The amounts listed on Table 4 are interest payments as reflected on the Trimont invoices that Fedkenheuer referenced. These amounts do not change the principal amounts owed that are reflected on Danske's loan statements.

    b. Fedkenheuer sets forth in Tables 5 and 6 of her declaration purported inconsistencies in transactions set forth in Danske's statements but not on Trimont statements, as well as inconsistencies in transactions reported on Trimont invoices, but not on Danske's statements. She goes on to state that Danske and Trimont accounted differently for some of the transactions related to Facility B and, although recognizing that the total amount owed reconciles, she lists out in Table 7 those purported inconsistencies. As stated above, Danske's statements were not intended to report the same transactions in the same way as Trimont and included internal Danske transfers/bookings that would not be included in Trimont's invoices. For instance, Fedkenheuer lists in Table 5 two entries of just under $25 million and for $905,927 that were made as credits and then on the same respective day as debits. As clearly reflected in the Danske statements, Danske was crediting the Borrower for the wire fees. These were internal Danske bookings that had no effect on the principal balance owed.

    c. Finally, Fedkenheuer states that there are purported inconsistencies between Trimont invoices and Trimont's consolidated statements and lists two of the purported 22 inconsistencies in Table 8. Those two purported inconsistencies relate to two loan advances. Danske has provided the government with evidence of those loan advances showing that Danske advanced those funds to the borrower. DANSKE_0015322 at DANSKE_0015344.

    16.    Second, the Government's consultant states that Danske did not support over $90 million in advances that were allocable to the construction and development of the property. Fedkenheuer acknowledges that Danske provided wire transfer information and DCSL bank statements showing advances Danske made. Fedkenheuer raises that of the amounts Danske advanced through Trimont, based on her review of the DCSL bank statements, there is a purported discrepancy of $887,387, as reflected in Table 10 of her declaration. Fedkenheuer does not take into account that the two separate advances of $420,000 each, totaling $840,000 of the $887,387, are amounts that went into the interest reserve account. Therefore, these amounts would not have

been advanced directly to the borrower, but were directed into the interest reserve account held by Trimont.

17. Fedkenheuer then states that she "was unable to determine whether DCSL used the funding that Danske disbursed to reimburse itself for construction and development costs that DCSL had already incurred and paid." Fedkenheuer Decl. ¶ 26. She goes on to state that Danske provided some, but not all documentation supporting a November 6, 2015 advance, and that "[i]f Danske was able to provide some of this information for one advance, it should have been able to provide the same information for all advances unless Danske did not follow the loan requirements and did not require that DCSL provide this information prior to Danske disbursing funds." *Id.* ¶27. The government's consultant's speculation that by providing some information regarding one funding request, Danske could have provided other such information ignores that the supporting documents for each advance made over the nearly 12-year period since Danske began funding the Resort Property directly can reasonably be expected to entail producing hundreds of thousands of pages of documents.

18. Additionally, the government's consultant is incorrect in her speculation that Danske may not have followed the loan requirements and did not require that DCSL provide documentation supporting Danske's disbursing funds. Danske engaged Michael Delvin & Associates to review and confirm that each advance request was supported by documentation showing that costs were incurred and/or paid. Further, while Trimont was engaged its duties included review drawing requests to ensure compliance with the requirements and conditions of the loan agreements. After Trimont was no longer engaged as the servicer for the DCSL Loan, Danske engaged WC Asset Management to provide accounting review support and to reconcile sales with cash on hand. As another measure to protect Danske's interests, I traveled to the Resort

13

Property, generally twice a year, sometimes with other Danske colleagues, to evaluate the progress of the development and ensure that the development was proceeding in line with Danske's expectations and the requirements set forth in the loan agreements. In general, I tried to time one of my trips to the Resort Property to coincide with one of the trips Mr. Delvin made to the Resort Property to review the status of the development.

19. Third, the government's consultant claims that "Danske has not provided documentation to explain the justification for the $5,000,000 increase [in the PPF from $45 million to $50 million]." Fedkenheuer Decl. ¶ 30. The April 2013 Second Amended & Restated Loan Agreement recites that Danske is entitled to a $50 million PPF. **MSJ Ex. 51** (DANSKE_0011080 at DANSKE_0011103, DANSKE_0011128). The $5 million increase in the PPF was part of the consideration for the additional funding and extension of maturity dates as part of the modification reflected in the Second Amended & Restated Loan Agreement. The increase in the PPF reflected Danske's view of how the risk profile of the DCSL Loan had changed as a result of Danske advancing additional funding.

20. Additionally, in her analysis, the government's consultant ignores that Danske gave up its right to payment of an Additional Fee, which the 2006 loan agreement provided would be at least $125 million, and agreed to reduce the amount of accrued interest the Borrower owed from $49 million (as of March 2009) to the amount calculated by the formula in the 2009 Amended and Restated Loan Agreement, which was capped at $45 million. Danske also reduced the 15% interest rate charged by Lehman on Facility A to a quarterly rate that was calculated by adding 300 basis points to the three month LIBOR for U.S. Dollar deposits and set a quarterly rate for Facility B that was calculated by adding 500 basis points to the three month LIBOR for U.S. Dollar deposits. In April 2013, Danske reduced the quarterly interest rate, effective January 1, 2012, to 200 basis

points to the three-month LIBOR for U.S. Dollar deposits. In April 2014, Danske maintained the extant interest rate structure for existing Facilities A and B, but, due to the higher risk Danske was undertaking by advancing new money in April 2014, fixed interest at a 15% rate for funding advanced under replacement Facility C on or after January 1, 2014. At the start of 2015, the blended interest rate, inclusive of all three facilities, was 3.47%. The interest rate that Danske charged on Facilities A and B, 200 basis points over LIBOR, is not reflective of the return Danske would ordinarily expect for another loan with a similar risk profile.

21.     Fourth, the government's consultant claims that Danske paid down one loan using funding from another loan. The example that Fedkenheuer provides occurred when new Facility C was extended and funding advanced under Facility B, which was specific to the purpose of new Facility C, was redirected to utilization under Facility C. Both Facilities had an interest rate of 200 points above LIBOR. At other times, funds were used from Facility C, a revolver account, to pay interest payments on Facilities A and B. Fedkenheuer does not take into consideration that if those funds were not used to pay interest then-due, then Facilities A and B would have been in default and interest would have begun accruing at the 20% default interest rate. **MSJ Ex. 58** (Third Amended and Restated Loan Agreement, §§ 5.1(e), 5.2(e), 5.3(e)).

22.     Fifth, the government's consultant claims that the principal balance for Facilities A, B and C did not decrease over time. As to Facility C, Fedkenheuer is incorrect because the borrower did pay down the amounts owed on that facility, but were allowed to re-access funds because it was a revolving account. DANSKE_0015347 at DANSKE_0015356. As to Facilities A and B, as mentioned below, Danske and/or its attorneys have met with the government numerous times and explained to the government that Danske anticipated material debt amortization by way of bulk large parcel/property sales, like the sale made to KTRC (for the construction of a Hard

15

Rock Hotel and a Nobu Hotel). Since 2015, Danske also made clear in meetings with the government that the protective order in this matter had a significant impact on the ability to sell any large undeveloped parcel properties on the Resort Property without a significant discount because of the pending forfeiture proceeding.

23. The government's consultant notes that for Facility C a number of advances were round numbers and goes on to speculate that "it is unlikely that Danske obtained the required support from DCSL prior to disbursing funds in a round-dollar amount . . . ." *See* Fedkenheuer Decl. ¶ 38. Again, the government's consultant's comments are incorrect. In fact, Danske received the required documentation and the underlying expenses were not round dollar expenses. As one example, the Borrower drew $1.75 million on November 6, 2015, and although the overall figure was a round number, there were specific amounts broken out that were not round dollar amounts. **Daniel Exhibit 4** (DANSKE_0015958). This funding request shows that the actual amounts advanced were not all round numbers, but collectively added up to a round number. *Id*. ($48,000 + $307,511.55 + $1,394,488.45 = $1,750,000). In some instances, the numbers were round numbers because the Borrower's advance request was more than available credit in Facility C. In those cases, Danske advanced a rounded amount only up to the credit available under Facility C.

24. Sixth, the government's consultant questions why Danske's loan statements were addressed in care of Danske with a Danske address instead of DCSL. As mentioned above, Danske loan statements were originally intended for Danske's use, when Trimont was the servicer and provided invoices to the Borrower. Beginning in 2017, when Trimont no longer acted as servicer, Danske did not change the address on the statements because there was no need to change it. Between the end of 2016 through the period funds were advanced during 2019, the Borrower

would sometimes ask for statements from Danske. When the Borrower requested statements, I would send scanned copies of the statements via email. Further, the borrower was aware of its Facility C balance during the 2017-2019 period because Danske provided the borrower with its loan balances on the funding memo that accompanied a draw from that facility. In addition, as set forth in the loan agreements, the interest rate for Facilities A and B changed every quarter, with the changes to the rate based on LIBOR. Each quarter, when the interest rate changed, Danske would disclose the new rate to the Borrower in a spreadsheet (which has been provided to the government) that also provided the Borrower with an update on the Facility C balance. **Daniel Exhibit 5** (DANSKE_0016723).

25. Seventh, the government's consultant identifies that Danske's claim includes fees of at least $7,094,438, which includes $3.5 million in modification fees and $3.5 million in fees incurred by Danske from February 2009 through November 2019. As for the modification fees, $875,000 remains unpaid and Fedkenheuer overlooks that a portion of the $1,419,343 modification fees paid on January 28, 2010 was advanced to the Borrower. **Daniel Exhibit 6** (DANSKE_0015956). In all events, repayment of modification fees were agreed to as part of Danske's agreement to fund additional amounts. Further, as to the other fees, as set forth in the underlying Loan Agreement, Danske is entitled to have any fees it incurs reimbursed by the Borrower. **MSJ Ex. 58** (April 2014 Third Amended and Restated Loan Agreement, § 6.1). Based on my 25 years of experience, including 12 years of experience handling U.S. commercial real estate lending, this is a customary provision in commercial loan agreements. Monthly entries on Danske statements for fees totaling $50,000 or $100,000 relate to a repayment plan put in place to allow the Borrower pay down a balance of accrued fees that had accumulated. The balance was never fully repaid and continues to increase. To produce documents relating to every fee charged

by Danske over a nearly 12-year period would entail gathering and producing thousands of pages of documents.

26. Finally, the government claims that "Danske continued its relationship with the DCSL Resort, has stated that it wants Jowdy to remain as manager of the DCSL Resort, and . . . incorporated terms in the loan agreements that conferred special benefits on Jowdy." Govt. Brf at 42. Danske has continued its lender relationship with DCSL in order to protect its investment. Beginning with a meeting on November 18, 2015, Danske and/or its counsel have met with the government at least 5 or 6 times to discuss the Resort Property and Danske's claim and, up until its recent filings to the Court in 2020, the government never told Danske that it would challenge Danske's claim. In fact, during a meeting on November 18, 2015, the government commented that Danske would of course keep lending in order to protect its interest and never informed Danske that it intended to challenge Danske's interest in forfeiture proceedings.

27. Additionally, in the meetings between the government and Danske and/or its counsel, Danske (and/or its counsel) has continually advised the government that Danske has considered foreclosing on the Resort Property in Mexico, but each time Danske raised the possibility of doing so on its own, the government responded that Danske could not do so because it would be a violation of U.S. law. Given these circumstances, *i.e.* that the Government never expressed the view that it would challenge Danske's claim and that Danske could not foreclose on the Resort Property, in order to protect its investment Danske continued to allow the Facility C revolver to be re-drawn. Without Danske's advancing funds after 2015, the Resort would not have been able to continue as a going concern.

28. Further, on August 23, 2018, Danske's counsel met with the government and notified the government that, subject to the government's view, Danske was contemplating

18

entering into an agreement with the developer to ensure consistency at the Resort Property post-forfeiture. At that meeting, I understand that the government agreed that the developer should stay on post-forfeiture. After that meeting, Danske's counsel attached a copy of the draft agreement between Danske and the developer to a letter to the government that noted that "as we discussed in our last meeting and as the government recognized, it is instrumental to keep the current development team in place for a number of reasons." *See* GX 20. The letter also asked the government if they had any questions about the agreement—of which the government raised none.

29. Since the time it filed its motion for summary judgment, Danske's claim has increased, as a result of accruing default interest, to $210,885,989.06 (inclusive of approximately $1.9 million in fees) as of September 30, 2020. Danske's claim will continue to increase each month as default interest accrues and as costs continue to accumulate. I project that Danske's claim, including an estimate of fees and costs that Danske will incur between now and year-end, will total approximately $220 million as of December 31, 2020.

**[SIGNATURE PAGE FOLLOWS]**

In accordance with 28 U.S.C. § 1746 and Local Rule 1.9, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of October, 2020, at London, United Kingdom.

_____
David Daniel