**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>PHILIP A. KENNER, *et al.*,<br><br>　　　　　　　　Defendants. | 13-cr-0607 (JFB)<br><br>**DECLARATION OF MICHAEL DELVIN** |

Pursuant to 28 U.S.C. § 1746, I, Michael Delvin, declare as follows:

　　　　1.　　I am a registered engineer in California, Arizona, and Georgia and am the owner of M. Delvin & Associates, Inc., ("MD&A") a consulting firm founded in 2000 whose primary expertise is observing construction and development projects for owners and lenders. MD&A provides the following services to clients:

　　　　　　a.　　Owner/Lender Representative Services: MD&A provides asset risk management to owners and/or lenders, by overseeing project development and observing construction and providing advice prior to construction, during construction and during project closeout.

　　　　　　b.　　Construction Review: MD&A provides critical observations to review and evaluate construction activities and observe means and methods, as well as the finished product, to provide opinions on the overall quality of the construction and conformance with contractual documents.

　　　　　　c.　　Property / Portfolio Condition Assessments: MD&A reviews and evaluates properties to discern overall condition, identify potential risks and quantify potential costs

associated with the project over specified evaluation periods, and provide reports which serve to document condition and provide negotiation leverage during sales transactions.

2. Since 2000, MD&A has provided services to, among others, Lehman Brothers, Lincoln Financial, J.P. Morgan, Barclays Capital, and Danske Bank A/S London Branch ("Danske").

3. MD&A has provided consulting services to the lender for the Diamante Cabo San Lucas development (the "DCSL Project") since the project began construction in September 2006, when I was engaged by the then lender, Lehman Brothers, to act as the "Lender's Consultant" under the Loan Agreement between Lehman and DCSL, dated March 10, 2006. MD&A's role included an initial project evaluation, which included a budget and feasibility review, and review of the development and construction team. At the time the DCSL Project was initiated, the property consisted of a ranch home, stables, and one water well. The first major project development undertaken was the construction of a desalinization plant because there was no available water for the scale of the project.

4. When Lehman Brothers was the lender, the borrower would send all draw requests to Trimont Real Estate Advisory Services ("Trimont"), who acted as the servicer, and copy MD&A and Lehman Brothers. Prior to any advance being made, I reviewed all draw requests, compared the draw request to invoices, contracts or other information on costs incurred and then recommended whether such advances should be approved in whole or with some changes based on my assessment of whether the work in fact had been performed. Initially, under Lehman, the process was that advances were made to pay for work that had already been performed but not yet paid. Later, after Danske took over and after sales began on the Resort Property, the developer

paid for work performed through sale proceeds and advances were used to reimburse the developer for the work performed and paid.

5. In performing my services for Lehman Brothers, I would visit the site in Cabo San Lucas once per month. My site visits corresponded in time with the borrower's draw requests. I would meet with the manager of the borrower and the contractor to go over how the advances were being spent, the volume of the work, and whether the construction work corresponded with the draw request. I independently verified by reviewing invoices, contracts and visiting the site to view first-hand whether construction had taken place.

6. I also provided a monthly report to Trimont and Lehman Brothers on the development of the DCSL Project, my site visits, and assessments of draw requests. Specifically, in my monthly report, I advised Trimont and Lehman Brothers as to the status of the development project and construction. This included reporting on the quality of construction and whether the developer was meeting plans and specifications. My report also discussed whether the draws advanced by Lehman Brothers matched the work that I had reviewed in order to confirm that amounts funded by Lehman Brothers were in fact used as intended by the developer.

7. After Lehman Brothers filed for bankruptcy, Danske engaged MD&A in January 2009 to continue performing the same services MD&A performed for Lehman Brothers as to the DCSL Project. A true and correct copy of MD&A's engagement letter with Danske is attached as **Exhibit 1**.

8. As I did for Lehman Brothers, I act as "Lender's Consultant" under the Loan Agreement between Danske and the borrower. In addition to performing all the services that I performed for Lehman Brothers set forth in a paragraphs 3-6 and providing a monthly report on the construction development, beginning in 2013 to the present date, I also provide Danske with a

monthly report regarding the operations of the developer. In drafting a monthly operations report, I review the monthly profit and loss statements of the developer/borrower and perform a revenue and expense review.

9. I understand that the government has taken the position that Danske "failed to collect documentation from the DCSL Resort that the loan agreements required be submitted as a precondition to the lending of funds to ensure that the funds were being properly used, . . . ." Government's Brief at 43. This statement is factually incorrect. As described above, as the Lender's Consultant I have reviewed and collected such documentation as a precondition to each advance made by Danske to the borrower. I review those advance requests and compare them to invoices submitted to ensure that monies are advanced for work that has already been performed.

10. I previously described my role to the government when I spoke with the government on Wednesday, May 4, 2016, by telephone. My recollection is that the phone call was with Assistant U.S. Attorneys Diane Leonardo, Madeline O'Connor and Special Agent Matthew Galioto and attorneys from Danske's counsel at Venable, LLP, Kelly Weiner and Doreen Martin. On that call, I described to the government the services I provided to Danske, including reviewing borrower advance requests and providing monthly reports to Danske. It is also my understanding that in June 2016, Danske produced to the government copies of some of my monthly reports to Danske (DB000001–DB000113, DB000139–DB000186). True and correct copies of my November 2015 Project Status Report and December [2015] Draw and Operational Cost Review, which I understand from speaking with counsel for Danske were previously produced to the government, are attached hereto as **Exhibits 2** (Bates Number DB000001 through 25) and **3** (Bates Number DB000026 through 112), respectively.

In accordance with 28 U.S.C. § 1746 and Local Rule 1.9, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7 day of October, 2020, at CAVE CREEK, Arizona.

Michael Delvin
M. Delvin & Associates, Inc.

5