UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

13-CR-607 (S-2)(JFB)

- against -

PHILLIP A. KENNER,
         also known as,
            "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
         also known as
            "Tommy C. Hormovitis,"

                Defendants.
– – – – – – – – – – – – – – – – – – – – – – X


**UNITED STATES' REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL OF THE PETITION FILED BY THIRD-PARTY PETITIONER DANSKE BANK**


SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York


MADELINE O'CONNOR
DIANE C. LEONARDO
Assistant U.S. Attorneys
(Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT ...................................................................... 1

ARGUMENT.................................................................................................. 1

    A.  Danske Fails to Plead, Much Less Present Any Proof of, the Specific Details of Its Purported Acquisition of the Initial Loan ............................................... 2

    B.  Danske Has Failed to Rebut the Government's Argument that Judicial Estoppel Should Apply ................................................................................. 9

    C.  There is No Basis for Equitable Estoppel ....................................................10

    D.  Danske Cries Victim When, In Reality, Allowing the Claim It Seeks Would Prejudice the Real Victims in This Case ........................................................14

    E.  Danske Fails to Address or Cure the Numerous Discrepancies In Its Proof ...15

    F.  Danske's Knowledge of the Forfeitability of the DCSL Resort Does Not Turn on What the Government Knew or Did, But What Danske Knew or Reasonably Should Have Known ...................................................................15

    G.  Much of Danske's Evidence Is Inadmissible...............................................17

CONCLUSION.............................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Biggs v. Midland Credit Mgmt., Inc.*, 2018 WL 1225539  (E.D.N.Y. Mar. 9, 2018)...............18

*Crews v. County of Nassau*, 2019 WL 6894469  (Bianco, J.) (E.D.N.Y. Dec. 18, 2019)...……...13

*Dolphin v. Marocik,* 222 A.D.2d 549, 635,  N.Y.S.2d 84 (2d Dep't 1995) ……………………….3

*Giannullo v. City of New York*, 322 F.3d 139  (2d Cir.  2003)…………………………………….....4

*Hood v. Webster*, 271 N.Y. 57 (1936)  …...……………………………….……………………...3

*In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463  (E.D. Va. 1994),
*aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.*,
83 F.3d 660 (4th Cir. 1996) …………………………………………………………………..16

*New Hampshire v. Maine*, 532 U.S. 742 (2001)……………………………………………….9

*Ochenkowski v. Dunaj*, 137 Misc. 674, 244 N.Y.S. 267 (Sup. Ct. Mont. Cty. 1930),
*aff'd*, 232 A.D. 441 (3d Dep't 1931)………………………………..………….…...……8

*Singh v. Bay Crane Servs., Inc.*, 2013 WL 5655931  (E.D.N.Y. Oct. 11, 2013)…………………18

*Smeraldo v. City of Jamestown*, 512 F. App'x 32 (2d Cir.  2013)………..…………………...11

*In re Technical Land, Inc.*, 172 B.R. 429 (Bankr. D.D.C. 1994),
*aff'd*, 175 B.R. 792 (D.D.C. 1994)………………………..………………….…………..8

*Ten Eyck v. Witbeck*, 135 N.Y. 40 (1892)……………………………………………..…….8

*United States v. One 1996 Vector M12*, 442 F. Supp. 2d 482 (S.D. Ohio 2005)………….....……8

*United States v. Sabatino*, 2018 WL 2074191  (S.D. Fla. April 13, 2018), *report and recommendation adopted*, 2018 WL 2016500  (S.D. Fla. Apr. 30, 2018) …………….……...17

*United States v. Stevenson*, 834 F.3d 80 (2d Cir. 2016)………………………..……………..14

## STATUTES

21 U.S.C. § 853(n)..................................................................................... 1

21 U.S.C. § 853(n)(3)………………………………………………………………………….2, 7

21 U.S.C. § 853(n)(6)(B)…………………………………………………………………….2, 14

**RULES**

Federal Rule of Evidence 408…………………………………………………………..……..11

Federal Rule of Evidence 408(a)(2)………………………………………………………...11

Local Rule 56.1 of the Southern and Eastern Districts of New York……………..…………….4

Local Rule 56.1(c) of the Southern and Eastern Districts of New York…………….…………4

## PRELIMINARY STATEMENT

The United States of America (the "United States" or the "government") respectfully submits this reply memorandum of law in further support of the government's motion for summary judgment seeking dismissal of the Verified Petition of Danske Bank A/S London Branch to Adjudicate Interest in Property Pursuant to 21 U.S.C. § 853(n) (the "Petition") filed by third-party petitioner Danske Bank A/S London Branch ("Danske") on May 6, 2020.

## ARGUMENT

Danske's motion papers are most notable not for what they say, but for what they do *not* say. Nowhere in Danske's 25-page motion for summary judgment (Docket Entry ("DE") 848) ("Danske Mem.") or 43-page reply/opposition (DE 923) ("Danske's Reply"), does Danske state or provide evidence of (1) when it purchased the $125 million loan (the "Initial Loan") from Lehman Brothers Holdings Inc. ("Lehman") that was established to fund the development of a resort on the real property known as Diamante Cabo San Lucas (the "DCSL Resort"); (2) the price Danske paid for the Initial Loan; and (3) the value attributed to the Initial Loan in Danske's subsequent settlement with Lehman in the course of Lehman's bankruptcy proceeding. *See In Re Lehman Brothers Holdings, Inc., et. al.*, 08-13555 (Bankr. S.D.N.Y.) (the "Lehman bankruptcy"). Similarly, Danske's Reply -- which is long on vituperation and rhetoric, and short on evidence, case law and substantive argument -- (1) ignores and/or downplays the numerous discrepancies contained in the documents it submitted to purportedly support its claim; (2) describes its lack of substantiation for millions of dollars in claimed "miscellaneous expenses" as "[im]material"; (3) fails, among other things, to provide any evidence of the due diligence that its own employee, Peter Hughes, claimed to Fortune Magazine that Danske performed; (4) ignores the evidence that defendant Tommy Constantine ("Constantine") informed it that the DCSL Resort manager, Kenneth Jowdy ("Jowdy"), was involved in misconduct; (5) ignores the fact that a civil lawsuit filed by Jowdy in 2010 put Danske on notice that the DCSL Resort may have been purchased with

stolen funds -- the exact crime that rendered the DCSL Resort forfeitable; and (6) describes itself as a victim despite its inability to deny that it has already been repaid the amount of money it advanced to the DCSL Resort in full, plus millions more, and that its near-$211 million claim would be pure profit for it at the expense of the other third-party petitioners -- some of whom are the true victims in this case.  *See* Government's Memorandum of Law dated September 9, 2020 ("Gov. Mem.") at pp. 31, 45-46, 50, 52; Danske's Reply at pp. 16, 18-19, 22, 31-32.

As discussed below and more fully in the Gov. Mem., Danske has failed to satisfy the pleading requirements of 21 U.S.C. § 853(n)(3), and, additionally, failed to meet its burden of proving that it is a bona fide purchaser for value under Section 853(n)(6)(B) of the Initial Loan, or the subsequent loans that it alleges it made to the DCSL Resort under modifications to the Initial Loan agreement (the "Additional Loans"), and, therefore, not only must Danske's motion for summary judgment be denied, but also its Petition must be dismissed.

A.    Danske Fails to Plead, Much Less Present Any Proof of, the Specific Details of Its Purported Acquisition of the Initial Loan

Rather than come forward with the specific details of its acquisition of the Initial Loan, Danske once again insists that the Court should infer that Danske is a bona fide purchaser for value of the Initial Loan based upon a 1999 Master Repurchase Agreement ("MRA") and 2005 committed repurchase facility agreement (collectively, the "Repo Agreements"), which contain absolutely no reference to the Initial Loan purchase transaction -- and, indeed, could not, given that the Initial Loan did not exist at the time the Repo Agreements were entered into.  *See* Gov. Mem. at pp. 25, 28. Danske's position is also based upon documents dated years after the purchase transaction purportedly occurred (*i.e.*, a letter sent by the trustee listing the loans Danske purportedly acquired under the Repo Agreements;[1] an assignment and assumption agreement that

---

[1] Danske refers to the letter sent by the Bank of New York Mellon to LaSalle Bank as a "trust receipt." However, it is not a receipt in the sense that it confirms a purchase on a specific date for a specific price. Rather, the document purports only to list "[e]ach of the Mortgage Loans . . . [that] *were located in*

2

purportedly assigned the Initial Loan to Danske for unspecified "good and valuable consideration"; and Lehman bankruptcy documents that state in a conclusory manner that Danske had purchased the Initial Loan from Lehman), which similarly fail to contain any specific information about the Initial Loan purchase transaction, such as the purchase date and purchase price. *See* Danske's Reply at pp. 9-11. Danske's reliance on documents that contain only bare recitals of a purchase is insufficient to meet its burden. *See Hood v. Webster*, 271 N.Y. 57, 60 (1936) ("The subsequent deed to [the defendants] expressed their payment of 'One Dollar and other good and valuable consideration.' This recital was not enough to put them into the position of purchasers for a valuable consideration in the sense of the statute."); *see also Dolphin v. Marocik*, 222 A.D.2d 549, 550, 635, N.Y.S.2d 84, 85 (2d Dep't 1995) (finding that the respondent "failed to establish that he paid valuable consideration for his mortgage," because even though he "testified as to several payments he claimed to have made, as well as to mortgages, liens, and judgments he claimed to have assumed in exchange for the mortgage in question, he failed to submit sufficient documentation of these claims"). Danske has failed to present the requisite evidence to meet its burden of proof, namely, evidence of the actual purchase transaction that identifies the purchase date and purchase price, and evidence of the value ascribed to the Initial Loan in the Lehman bankruptcy settlement.[2]

Significantly, Danske concedes that the Repo Agreements permitted Lehman to "*substitute or withdraw* Purchased Assets," that "there was the potential for a *change in the composition* of the commercial real estate liens included within [the] collateral pool," and that "the collateral pool

---

Buyer's Master Custodial Account on the Event of Default Date." *See* Danske's Reply at p. 11; Danske Mem. at Exhibit 32 (emphasis added).

[2] Danske disingenuously questions why the government met with Danske to discuss a settlement if the government believed Danske did not have standing. In fact, the government had been meeting with Danske for years prior to the ancillary proceeding in a good faith effort to reach a settlement, initially relying on Danske's representations that it had a valid claim and under the impression that Danske would provide proof of its claim. The settlement discussions ultimately ceased upon Danske's refusal and failure to produce such proof. *See* Government's Letter to the Court dated July 3, 3020, DE 871, at p. 6.

rolled over every week." *See* Danske's Reply at p. 11 (emphasis added). These admissions serve to further demonstrate that there is simply no way to know -- without, *inter alia*, specific, detailed proof of a completed Initial Loan purchase transaction -- whether the Initial Loan was *ever* acquired, or whether it was acquired and subsequently substituted out of the pool by Lehman for another loan, but was mistakenly included in the pool of assets when it should not have been. Danske's failure to provide the operative purchase transaction documents, which the MRA and custody agreement confirm would exist if the purchase had actually occurred, is thus fatal to Danske's claim. *See* Gov. Mem. at p. 29 (discussing the MRA's reference to "a written confirmation of each Transaction" that would be entered into by Lehman and Danske, which would "set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date . . . ., (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with [the] Agreement," and the custody agreement's reference to a "Seller's Repurchase Transaction Data File" that would "contain[], among other things, for each Repurchase Transaction: (i) the Purchase Date and Purchase Price; (ii) the Repurchase Date; (iii) the identity of the Buyer; and (iv) instructions to Master Custodian …."). It is especially noteworthy that Danske's 43-page reply does not contain any explanation for Danske's failure to produce this crucial evidence.

Moreover, in failing to respond to the government's statement pursuant to the Rule 56.1 of the Local Rules of the Southern and Eastern Districts of New York ("United States' Local Rule 56.1"), Danske is deemed to have admitted, *inter alia*, that the Repo Agreements do not contain any reference to the Initial Loan. *See* United States Local Rule 56.1 at ¶ 25; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citing Local Rule 56.1(c)).

In a further attempt to demonstrate that it provided some kind of value for the Initial Loan,

Danske proposes that the Court again *infer* that Danske paid value for the Initial Loan because it allegedly paid a total of approximately $800 million to acquire a pool of commercial loans, which included the Initial Loan. Danske's Reply at pp. 2-3, 11-12, 23-26, 29-30. Danske's argument, however, fails to take into account that the purchases of the commercial loans under the Repo Agreements were *separate* transactions, and, thus, it is possible that Danske paid only $1 for the Initial Loan while having paid an *aggregate* purchase price of up to $800 million for all of the loans. *See* Petition at ¶ 16 ("Under the Repo Agreements, Lehman agreed to sell and Danske agreed to buy certain assets, e.g., interests in commercial loans, in *transactions totaling up to* $800 million.") (emphasis added).

Indeed, Danske has not provided evidence of the actual amount it paid for the pool of loans, which could have been *any amount* "up to" $800 million. *Id.* At times in Danske's Reply, Danske states that it paid exactly $800 million, while at others it states that it paid "approximately $800 million," but none of the exhibits to which it cites identify the purchase price. *See* Danske's Reply at pp. 2, 9, 23, 24, 29. Further, in the Danske Mem. on page 7, Danske states that it paid "$800,587,599.41" for the pool of loans, yet the exhibit it cites to support its assertion, *i.e.*, Exhibit 32, p. 12 (Schedule 1 to Proof of Claim), identifies the $800,587,599.41 as the *repurchase* price for the pool of loans, which ostensibly would have consisted of the purchase prices *plus* the profit Danske was to make upon Lehman's repurchase of the loans. *See* Petition at ¶ 15 ("The second transaction occurs on the repurchase date when [Danske] sells the asset back to [Lehman] for full repayment and an additional sum . . . ."). Thus, it is unclear how much Danske paid for the pool of loans, much less the Initial Loan.

Similarly, the Court cannot infer, as Danske would like it to, that Danske purchased the Initial Loan for more money than the value that was attributed to the Initial Loan at the time of the Lehman bankruptcy settlement simply because the sum total of the values of the loans at the time of settlement, *i.e.*, approximately $220 million, was less than the sum total that Danske purportedly

5

paid for the loans, *i.e.*, up to $800 million, resulting in a deficiency judgment in the amount of $580 million.[3]   Danske's Reply at pp. 23-24.   Danske's argument is based on the faulty premise that each individual loan must have been purchased for a greater value than the value attributed to that loan at the time of settlement, solely because the *sum total* Danske purportedly paid for the loans was greater than the *sum total* of the values of the loans at the time of settlement.   Indeed, Danske may have paid significantly *less* for the Initial Loan than the distressed value Danske attributed to the Initial Loan in the Lehman bankruptcy settlement.   For example, Danske could have paid $1 for the Initial Loan, and later agreed in the settlement proceeding that the Initial Loan was worth $35 million, and paid $50 million for a second loan, Loan B, and later agreed in the settlement proceeding that Loan B was worth only $5 million.   In this hypothetical, the total amount paid for the two loans would have be $50,000,001, and the total value attributed to the two loans in the settlement proceeding would have been $40 million.   Thus, while the total purchase price paid in the hypothetical would have been more than the total settlement value -- much like what Danske says occurred in the Lehman bankruptcy settlement -- the purchase price for the Initial Loan would nevertheless have been only $1, which is certainly much less than the $35 million distressed value ascribed to the Initial Loan in the hypothetical settlement.[4]   Of course, if

---

[3] Danske also suggests that it sustained a loss of hundreds of millions of dollars.  Danske's Reply at p. 29.  However, it is unclear how Danske sustained a loss given that – as it acknowledges – it obtained a deficiency judgment for the balance of the money Lehman purportedly owed Danske after accounting for the value of the loans Danske retained.  Therefore, any loss was attributable to Danske's decision to sell the deficiency judgment (which was only obtained as a result of attributing a distressed value to the Initial Loan, among others) rather than retain it.  In addition, even if Danske incurred a loss from selling its deficiency judgment, that does not mean that Danske may claim a loss with regard to its alleged purchase of the Initial Loan, and, further, has no bearing on whether Danske's claim should be recognized in this ancillary proceeding.

[4] Danske's proposition also asserts that the deficiency judgment was calculated as the difference between the *purchase* prices and the values of the loans at the time of settlement.  In fact, the deficiency judgment was calculated based on the difference between the *repurchase* prices (which would have consisted of the purchase prices *plus* the profit Danske was to make upon Lehman's repurchase of the loans) and the values of the loans at the time of settlement, and, thus, the total amount Danske paid for the loans was even less than Danske suggests.  *See* Danske Mem. at Exhibit 32, p. 12 (Schedule 1 to Proof of Claim).

Danske had produced evidence of the purchase price and settlement value for the Initial Loan, there would be no need to discuss hypothetical scenarios.

Danske bears the burden of demonstrating the actual value it provided when it acquired the Initial Loan. Rather than meet its burden by producing proof of the Initial Loan transaction details, including, *inter alia*, the purchase price and settlement value -- which Danske would possess, if such a transaction had in fact occurred -- Danske asks the Court to *infer* that value was given based on a series of faulty assumptions, and to rely on conclusory, unsupported statements in documents. Consequently, Danske's motion for summary judgment must be denied and its Petition must be dismissed because Danske has failed to meet its burden of proving that it is a bona fide purchaser for value. *See also* Gov. Mem. at pp. 27-32, 40. In addition, the Petition should be dismissed as inadequately pleaded under 21 U.S.C. § 853(n)(3) due to Danske's failure to allege the time and circumstances of its acquisition of the Initial Loan. *See* Gov. Mem. at pp. 25-26.

In an attempt to salvage its claim as to the Additional Loans, Danske argues that, "[e]ven if [it] has not established a legal interest in the [Initial Loan] . . . , [its] advances made pursuant to modifications and amendments on their own establish that [it] has a legal interest in the [DCSL Resort]," because Danske allegedly advanced the funds in exchange for a security interest in the DCSL Resort. Danske's Reply at p. 12. However, the factual underpinning of this argument is flatly inconsistent with Danske's statement in its moving brief that "the additional funding was secured by Danske's *existing* perfected senior interests in the Resort Property and Equity Interests." *See* Danske Mem. at p. 19 (emphasis in original). Because Danske has not proven the initial acquisition that purportedly created the security interests, it cannot rely on those security interests as providing security for the Additional Loans. As such, Danske has not demonstrated a legal interest in the Additional Loans.

In addition, Danske fails to refute the government's argument that, even if Danske provided some value for the Initial Loan in a purchase transaction, Danske has not proven that the value

7

provided was enough to confer bona fide purchaser for value status. *See* Gov. Mem. at pp. 33-37. As the hypotheticals discussed above demonstrate, the Court cannot infer that any value, much less sufficient value, was given for the Initial Loan. Even if the Court were to take the inferential leap that Danske requests, and assume that some amount of consideration were provided by Danske for the Initial Loan, Danske has not demonstrated that it provided *valuable consideration.*[5] Danske ignores the line of cases which make clear that valuable consideration is more than the mere consideration required to support a contract. *Ochenkowski v. Dunaj*, 137 Misc. 674, 675-76, 244 N.Y.S. 267, 270 (Sup. Ct. Mont. Cty. 1930) ("The consideration must not only be good but valuable in the sense that a fair equivalent is given for the property granted in order to constitute the grantee a purchaser for value. . . The words *valuable consideration . . .* are used in contradistinction from a mere valid or sufficient consideration as between grantor and grantee.") (citations omitted), *aff'd*, 232 A.D. 441 (3d Dep't 1931); *Ten Eyck v. Witbeck*, 135 N.Y. 40, 47 (1892) (stating that bona fide purchaser for value status will not be found "where the money consideration is purely nominal, or infinitesimal in amount, when compared with the value of the property granted, and is shown not to have been the real inducement of the grant"); *see also United States v. One 1996 Vector M12*, 442 F. Supp. 2d 482, 487 (S.D. Ohio 2005) (rejecting claimant's argument that "*any* consideration, regardless of the value, nature, or quality of such consideration, will give rise to a bona fide purchase for value"); *In re Technical Land, Inc.*, 172 B.R. 429, 435 (Bankr. D.D.C. 1994) ("The requirement of valuable consideration is not the same as legally sufficient consideration to support a contract, which can be nominal."), *aff'd*, 175 B.R. 792 (D.D.C. 1994). Accordingly, Danske has not met its burden of proving that it provided sufficient value --

---

[5] Should the Court accept Danske's faulty proposition that it paid more for the Initial Loan than the value that was attributed to the Initial Loan in the Lehman bankruptcy settlement, it is nonetheless evident that whatever Danske may have paid for the Initial Loan would still have been a scant fraction of the $157 million Danske now claims for the Initial Loan, and, thus, was not *valuable consideration* sufficient to confer bona fide purchaser for value status.

and, indeed, has failed to prove that it has provided any value at all -- to be considered a bona fide purchaser for value of the Initial Loan.

     B.    <u>Danske Has Failed to Rebut the Government's Argument that Judicial Estoppel Should Apply</u>

Assuming *arguendo*, Danske has demonstrated that it provided adequate value to confer bona fide purchaser for value status, Danske has failed to rebut the government's argument that judicial estoppel should apply in this case. Contrary to Danske's assertion, the government is not arguing that Danske's claim should be limited to the amount Danske *paid* for the Initial Loan. *See* Danske Reply at p. 3. Instead, it is the government's position that the value Danske claims for the Initial Loan should be limited to the *value* Danske attributed to the Initial Loan in the Lehman bankruptcy settlement. As the Supreme Court has observed, "[t]he purpose of the [judicial estoppel] doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. Courts have recognized that the circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation." *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001). A court's decision to apply judicial estoppel is informed by several factors: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* The Supreme Court further elucidated that "[i]n enumerating these factors, [It was] not establish[ing] inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel" and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.*

Here, Danske admits that the Initial Loan was given a "distressed value" in the Lehman bankruptcy proceeding. Danske's Reply at p. 30. By attributing such a distressed value to the Initial Loan, and others, in the Lehman bankruptcy proceeding, Danske was able to obtain a $580 million deficiency judgment that it subsequently sold to Goldman Sachs. While not denying that it did so, Danske attempts to argue that "it did not obtain a profit" from selling the $580 million deficiency judgment because it obtained only approximately $226 million for it. Danske's Reply at p. 30. However, Danske misses the point. If Danske had valued the Initial Loan at the full $157 million that it now claims the Initial Loan is worth, rather than at a "distressed value," then Danske would not have been able to obtain the full $580 million deficiency judgment that it later sold for $226 million. Further, the bankruptcy estate would not have been depleted of the $580 million that Danske claims it was owed as a result of the "distressed values" it attributed to the loans at the time of its settlement with Lehman.

Contrary to Danske's assertion, applying judicial estoppel in this case will not "turn the secondary market on its head." Danske Reply at p. 3. To begin with, this is not a secondary market transaction, nor was the Lehman bankruptcy proceeding at which Danske purportedly acquired its interest in the Initial Loan. This is an ancillary proceeding that is intended to determine a claimant's legitimate interest in a forfeitable property. Here, by choosing to attribute a "distressed value" to the Initial Loan in the Lehman bankruptcy proceeding, *Danske itself* determined the value of its interest in the Initial Loan, and the Lehman bankruptcy court relied on Danske's representations about the value of the Initial Loan. Danske cannot now reverse course, in an effort to reap a tremendous profit, and state that the value of its interest in the Initial Loan should be the full $157 million. This is the precise type of situation that judicial estoppel is intended to prevent, especially because there are victim claimants who are looking to the DCSL Resort as a source of recovery for at least some of the millions they lost.

C.      There is No Basis for Equitable Estoppel

In an attempt to distract the Court from the dearth of evidence to support its claim, Danske asserts that the government should be equitably estopped from arguing that Danske is not a bona fide purchaser for value for the funds Danske allegedly advanced after the protective order was entered in 2015, based upon a declaration submitted by David Daniel ("Daniel Decl."). Danske's Reply at pp. 37-39. Daniel purports to describe statements made by the government to him and Danske's counsel at numerous meetings beginning in 2015. *See* Daniel Decl. at ¶¶ 26-28. In fact, the only meeting that Daniel personally attended was a meeting held on November 18, 2015. *See* Affidavit of Matthew Galioto ("Galioto Aff.") at ¶ 4. As such, any assertions contained in Daniel's Declaration regarding discussions between Danske's counsel and the government at meetings he did not attend are pure hearsay and are not based upon his personal knowledge, and, therefore, must be disregarded. *See Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013). Further, any statements made during the course of settlement discussions are subject to Federal Rule of Evidence 408, which prohibits use of statements made during such discussions as evidence to support a party's claim. FRE 408(a)(2).

Moreover, both Danske's Reply's and Daniel's characterization of representations made by the government at the meeting Daniel attended, as well as at meetings between the government and Danske's counsel that Daniel did not attend, are patently false. In Danske's Reply, it cites to paragraph 26 of the Daniel Decl. to support its argument that "[d]uring an in-person meeting in 2015, . . . the government expressed incredulity when Danske suggested that it was concerned about continuing to advance funds to the Borrower." Danske's Reply at p. 37. In fact, the cited paragraph makes no mention of either the government's alleged expression of incredulity or Danske's alleged suggestion of concern. That paragraph merely states, "In fact, during a meeting on November 18, 2015, the government commented that Danske would of course keep lending in order to protect its interest and never informed Danske that it intended to challenge Danske's interest in forfeiture proceedings." Daniel Decl. at ¶ 26. Further, Daniel's statement that "the

11

government commented that Danske would of course keep lending in order to protect its interest and never informed Danske that it intended to challenge Danske's interest in forfeiture proceedings," *id.*, is simply false. As stated in the Galioto Aff., at no point in time in the November 18, 2015 meeting, or the many other meetings between the government and representatives of Danske that Special Agent Galioto attended, did the government instruct Danske to, or comment as to whether Danske should, continue to lend money to the forfeitable DCSL Resort. Galioto Aff. at ¶ 5. Furthermore, the government made clear to Danske's counsel during the numerous meetings attended by Special Agent Galioto that the government did not view Danske as a bona fide purchaser for value for the money Danske loaned after the filing of the bill of particulars naming the DCSL Resort as forfeitable property. *Id.* at ¶ 6. Moreover, the government did not indicate whether in an ancillary proceeding it would consider Danske a bona fide purchaser for value as to the rest of Danske's claim. *Id.* Since the government's meeting with Daniel on November 18, 2015, and at the numerous meetings between the government and Danske that Special Agent Galioto attended thereafter, the government has expressed its concern with Danske's insistence that Jowdy remain as the manager of the DCSL Resort, and has repeatedly questioned Danske about its staunch support for Jowdy, despite Jowdy's relationship with defendant Philip Kenner ("Kenner") and Jowdy's involvement in the conduct that gave rise to the forfeiture of the DCSL Resort. *Id.* at ¶ 7. Most certainly, contrary to Daniel's averments, the government has never given Danske reason to believe that its claim would go unchallenged. *Id.* at ¶ 6.

Most significantly, Daniel's averments, and Danske's argument that the government "never [told] Danske that it would challenge Danske's claim," Danske's Reply at p. 37, are completely contradicted by Danske's admissions to this Court. For instance, in a letter to the Court dated September 18, 2019, Danske admitted that the government would *not* recognize its claim, by stating, "As a public company with duties to shareholders, Danske cannot provide additional liquidity to the Resort *without the government recognizing Danske's claim. The government,*

12

*however, refuses to do so* until potentially some later date." DE 716 at p. 1 (emphasis added). Indeed, Danske acknowledged in a subsequent court conference that the government has the right to challenge Danske's bona fide purchaser for value status. *See* Transcript, October 11, 2019, at p.33:20-25, 34:1-3 ("I mean, I don't understand what the down side is to the Government ultimately. They've raised in their letter, the only thing that we've asked for is recognition of our discounted claim. But we've always proposed this in conjunction with DOJ policy. DOJ policy as to these settlements say . . . the Government always reserves the right, to the extent they find evidence that the bank is not a BFP or is an owner, that they can -- the agreement will be null and void.").

Even were the Court to believe Daniel's falsehoods and statements made without personal knowledge, his unsupported assertions fall short of meeting the standard for equitable estoppel against the government. The bar for asserting that defense against the government -- federal, state, or local – is very high. *Crews v. County of Nassau*, 2019 WL 6894469, at *4 (Bianco, J.) (E.D.N.Y. Dec. 18, 2019). "[E]quitable estoppel against a government agency is foreclosed in all but the rarest cases, and requires a showing of fraud, misrepresentation, deception, or similar affirmative misconduct, along with reasonable reliance thereon." *Id.* (citations and quotation marks omitted). Even accepting Daniel's statements as true, they do not demonstrate that Danske is entitled to equitable estoppel against the government because Danske alleges, at most, government silence, and not misrepresentations or other affirmative misconduct.[6] *See* Daniels Decl. at ¶¶ 26, 27. Furthermore, Danske cannot show any reliance on governmental conduct. Danske admits that it

---

[6] On page 28 of Danske's Reply, Danske attempts to rebut the government's evidence and argument that Danske did not engage in arms' length transactions by asserting that the government did not object to Danske's side agreement with Jowdy that confers a substantial, personal financial benefit on Jowdy in the event the government successfully forfeits his equity interests by paying Jowdy 10% of the principal payment received by Danske through a sale of the DCSL Resort or its loan. Here, too, Danske relies solely on the government's alleged silence and not on any misrepresentation or affirmative misconduct by the government.

continued to lend funds "in order to protect its investment," and because it was allegedly "contractually obligated" to do so, rather than in reliance on anything the government said or did not say. *Id.* at ¶ 26; Danske's Reply at p. 37; *see also* Danske letter to the Court, dated February 6, 2019, DE 616 (stating that after the DCSL Resort became "subject to forfeiture proceedings," Danske provided "liquidity and various loan amendments in an effort to preserve as much value as possible in the development"; and indicating that a reason it would not foreclose on the DCSL Resort was because it would "likely seriously diminish the value of the resort.").[7] Danske also cannot demonstrate harm given that it was fully repaid for the funds it advanced, plus millions more, as discussed *infra*. Accordingly, Danske has not met the exacting standard for equitable estoppel.

D.    Danske Cries Victim When, In Reality, Allowing the Claim It Seeks Would Prejudice the Real Victims in This Case

While Danske claims to be a victim, it does not deny that it has already been repaid millions more than the amount of money it actually loaned. Instead, it argues that if it does not recover on its roughly $211 million claim, the loan would essentially be rendered interest free. Danske's Reply at p. 31. However, a forfeiture proceeding is not intended to provide a profit of greater than 220% for a major international bank, especially when, as Danske admits, the Initial Loan may have be worth *nothing* on the market at the time it was acquired by Danske, *id.* at p. 30, much less the full $157 million in principal and interest Danske now seeks for the same Initial Loan in this proceeding. Notably, during the course of this briefing, Danske has *twice* increased the amount of money that it claims it is owed despite the bar on such increases. *See* Gov. Mem. at p. 32.

_____

[7] Danske fails to cite any case law to support its argument that it was contractually obligated to continue to lend despite its knowledge of the forfeitability of the DCSL Resort, and, therefore, that the bona fide purchaser for value statute, 21 U.S.C. § 853(n)(6)(B), should not apply. Indeed, the Second Circuit has recognized that where there is a conflict between state law and federal law, the "provisions of state law are preempted by federal forfeiture law." *United States v. Stevenson*, 834 F.3d 80, 87 (2d Cir. 2016). In addition, Danske fails to cite to any provision in the loan agreements that required it to continue to lend even after learning of the DCSL Resort's connection to criminal conduct and forfeitability.

Further, it is inconceivable that Danske should be permitted to reap a $216 million windfall when it has not even established that it purchased the loan in the first instance, let alone that it is a bona fide purchaser for value without reason to know the property was forfeitable. What is more, although Danske dismisses the discrepancies in its proof as amounting to mere tens of thousands of dollars, as well as the over $3.5 million in unexplained fees it claims as "[im]material," Danske's Reply at pp. 16, 18-19, 22, it is certain that the other third-party petitioners, particularly the Defendants' victims, would not be so flippant about such claimed sums.

E.    Danske Fails to Address or Cure the Numerous Discrepancies In Its Proof

As addressed more fully in the Supplemental Declaration of Kellie Fedkenheuer ("Fedkenheuer Supp. Decl."), Danske, among other things: (1) has failed to address substantial inconsistencies between Danske's and Trimont Real Estate Advisors' ("Trimont") documentation previously identified by Ms. Fedkenheuer; (2) has failed to provide supporting documentation for over $90 million in alleged advances; (3) confirms that the principal balance for Facilities A, B, and C did not decrease over time; (4) has failed to substantiate its claim to the Profit Participation Fee of $50 million that it claims; and (5) does not dispute that it has already received approximately $5.6 million more than the $98 million it advanced to the DCSL Resort, and, if it succeeds on its claim for approximately $211 million, stands to garner a windfall of approximately $216 million (*i.e.*, more than a 220% profit, and this does not include the amount of profit that Danske has already made on the sale of its deficiency judgment to Goldman Sachs, as discussed above). *See generally* Fedkenheuer Supp. Decl.

F.    Danske's Knowledge of the Forfeitability of the DCSL Resort Does Not Turn on What the Government Knew or Did, But What Danske Knew or Reasonably Should Have Known

Danske attempts to misdirect the Court's attention from, *inter alia*, the numerous lawsuits and articles cited by the government as providing Danske with knowledge of the forfeitability of the DCSL Resort, by arguing that Danske should not or could not have known that the DCSL

Resort was subject to forfeiture because "the government itself did not determine that the [DCSL] Resort [p]roperty and [e]quity [i]nterests were subject to forfeiture until 2015." Danske's Reply at p. 33. However, Danske's knowledge of the forfeitability of the DCSL Resort does not turn on what the government knew or did, but rather what *Danske* knew or reasonably should have known. *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 475 (E.D. Va. 1994) (a claim that a third party was without cause to believe property was subject to forfeiture must be "objectively reasonable"; the issue in an ancillary proceeding is not whether the claimant believed that the government would institute a forfeiture action, or knew that it had done so, but whether the claimant knew that the property was "subject to forfeiture"), *aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 666 (4th Cir. 1996) (affirming district court's finding that the claimant law firm had reason to know that the fee it received was subject to forfeiture).[8]

Furthermore, Danske dismisses the numerous articles and lawsuits as providing only "generalized knowledge of fraud." Danske's Reply at p. 35. Danske disregards that the articles and lawsuits provided specific notice of the fraudulent conduct that gave rise to the forfeiture of the DCSL Resort, and that Danske -- given its close relationship with Jowdy, the manager of the DCSL Resort -- was in the unique position to inquire into the forfeitability of the DCSL Resort and either failed to do so, or ignored what it learned.[9] For example, the civil lawsuit filed by Jowdy in 2010 against several of the victims in this case alleged, among other things, that Constantine had contacted both Lehman and Danske to inform them about Jowdy's -- who had

---

[8] Danske's reliance on Department of Justice Guidelines to support its position is also misplaced. *See In re Moffitt*, 846 F. Supp. at 475 (stating that the Department of Justice Guidelines "confirm" that they "are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal, nor do they place any limitations on otherwise lawful litigative prerogatives of the Department of Justice," and, thus, "the Guidelines do not establish the governing forfeiture standard").

[9] Indeed, Danske, given its relationship with Jowdy and access to Lehman's and the DCSL Resort's financial and other records, was in an equal, if not better, position than the government to learn of the DCSL Resort's forfeitability.

partnered with Kenner to purchase the DCSL Resort -- misconduct and mismanagement. *See* Gov. Mem. at pp. 51-52. Jowdy's lawsuit undeniably put Danske on notice that the DCSL Resort may have been purchased with stolen funds -- the exact crime that rendered the DCSL Resort forfeitable. *See id.* at p. 52. Danske also completely fails to address the fact that its own employee, Peter Hughes, told Fortune Magazine that Danske had conducted due diligence regarding Jowdy and the DCSL Resort project, and that, if there had been mismanagement, the due diligence would have uncovered it, yet, Danske has failed to produce any proof of such due diligence. *Id.* at p. 50.

In a failed attempt to distinguish the case law cited by the government, Danske argues that the facts in this case are unlike the facts in *United States v. Sabatino*, 2018 WL 2074191 (S.D. Fla. April 13, 2018), *report and recommendation adopted*, 2018 WL 2016500 (S.D. Fla. Apr. 30, 2018), because in *Sabatino*, "the pawnbroker turned a blind eye as to how the participants in the scheme, one of whom described herself as a student, had the income to legitimately purchase the goods." Danske's Reply at p. 36 (citing *Sabatino*, 2018 WL 2074191, at *9). Contrary to Danske's argument, the facts in this cases are analogous to the facts in *Sabatino*, because, here, much like the student fraudster in *Sabatino* who lacked the legitimate income to purchase the forfeitable property, Jowdy has admitted that neither he nor Kenner had the funds to purchase the DCSL Resort, and, indeed, as discussed above, gave clear indication that the DCSL Resort was purchased with stolen funds. *See* Gov. Mem. at p. 52. Accordingly, Danske has failed to rebut the government's argument that Danske knew or reasonably should have known of the forfeitability of the DCSL Resort.

G.    Much of Danske's Evidence Is Inadmissible

Lastly, in an attempt to remedy the inadmissibility of proffered Exhibits 10, 42, 45, and 97, Danske offers a declaration from Trimont employee, Jennifer Britt (the "Britt Decl."). The Britt Decl., however, does not meet with the standard for the business records exception to the Hearsay rule because Britt admits that Trimont did not retain the records, so she can only state that the

records "appear" to be Trimont's.   Britt Decl. at ¶ 2.   Furthermore, despite Danske's citation to case law from other jurisdictions to support its suggestion that business records are self-authenticating, *see* Danske's Reply at pp. 5-6, courts in this jurisdiction have determined that business records are not self-authenticating.   *Singh v. Bay Crane Servs., Inc.*, 2013 WL 5655931, at *2 n.4 (E.D.N.Y. Oct. 11, 2013) (Dearie, J.) ("While the [documents] certainly appear to be admissible business records, they are not self-authenticating, and the declaration of [plaintiff's] attorney does not provide the Court with all the information necessary to establish their admissibility under Federal Rule of Evidence 803."). Danske also incorrectly relies on *Biggs v. Midland Credit Mgmt., Inc.*, 2018 WL 1225539, at *4 (E.D.N.Y. Mar. 9, 2018) (Bianco, J.) for the proposition that records are self-authenticating "even if the document is originally created by another entity." Danske Reply at pp. 5-6.  In *Biggs*, this Court discussed the requirements for the admissibility of business records based upon properly submitted declarations. *Biggs*, 2018 WL 1225539, at *4. Contrary to Danske's contention, this Court did not hold that business records are self-authenticating.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant its motion for summary judgment, dismiss Danske's Petition in its entirety with prejudice, and grant such further relief as the Court deems just and proper.

Dated: Central Islip, New York
       October 23, 2020

<div style="margin-left:40%">

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York
*Attorney for Plaintiff*
610 Federal Plaza
Central Islip, New York 11722

By:   */s/ Madeline O'Connor*
      Madeline O'Connor
      Diane C. Leonardo
      Assistant U.S. Attorneys

</div>