FILED
CLERK

12:38 pm, Oct 30, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     *    Case No. 13-CR-00607(JFB)
                       *
                       *    Long Island Federal
    v.                *     Courthouse
                       *    814 Federal Plaza
PHILLIP A. KENNER, et al.,    *    Central Islip, NY  11222
                       *
         Defendants.    *    October 28, 2020
                       *

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CRIMINAL CAUSE FOR
ORAL ARGUMENT TELEPHONE CONFERENCE
BEFORE VISITING JUDGE JOSEPH F. BIANCO

APPEARANCES:

For the Plaintiff:            MADELINE M. O'CONNOR, ESQ.
                          DIANE C. LEONARDO, ESQ.
                          U.S. Attorney's Office EDNY
                          610 Federal Plaza, 5th Floor
                          Central Islip, NY 11722

For the Defendant,           MATTHEW W. BRISSENDEN, ESQ.
 Phillip A. Kenner:        Matthew W. Brissenden PC
                          666 Old Country Road, Suite 501
                          Garden City, NY 11530-2004

For the Defendant,           SANFORD TALKIN, ESQ.
 Tommy C. Constantine:     Talkin, Muccigrosso & Roberts LLP
                          40 Exchange Place
                          18th Floor
                          New York, NY 10005

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, Connecticut 06484 (203)929-9992

2

```
APPEARANCES (Cont'd):

For the Interested Party,      GEORGE KOSTOLAMPROS, ESQ.
 Danske Bank:                  XOCHITL S. STROHBEHN, ESQ.
                               DOREEN MARTIN, ESQ.
                               KELLY WEINER, ESQ.
                               Venable LLP
                               1270 Avenue of the Americas
                               New York, NY  10020

For the Interested Party,      SEETHA RAMACHANDRA, ESQ.
 Owen Nolan:                   Proskauer
                               Eleven Times Square
                               New York, NY  10036

For the Interested Party,      KEVIN M. MULRY, ESQ.
 Ken Jowdy:                    THOMAS McSOUTHER, ESQ.
                               620 Eighth Avenue
                               New York, NY  10018
```

3

```
 1              (Proceedings commenced at 2:10 p.m.)
 2              THE CLERK:  Calling case no. 13-criminal-607, the
 3   United States of America vs. Phillip A. Kenner and Thomas C.
 4   Constantine.
 5              Counsels, please state your appearances for the
 6   record.
 7              MS. O'CONNOR:  For the government AUSA Madeline
 8   O'Connor and Diane Leonardo.  Good afternoon, Your Honor.
 9              THE COURT:  Good afternoon.
10              MR. BRISSENDEN:  Good afternoon, Your Honor.  Matt
11   Brissenden, standby counsel for Mr. Kenner.  Unfortunately, I
12   don't believe we have Mr. Kenner on the line.
13              THE COURT:  Okay.
14              MR. TALKIN:  Your Honor, Sam Talkin for Mr.
15   Constantine, who is on the line.
16              THE COURT:  Good afternoon to both of you.
17              MR. TALKIN:  Thank you.
18              MR. CONSTANTINE:  I'm sorry. I'm here, Your Honor.
19   Tommy Constantine.
20              THE COURT:  Good afternoon, Mr. Constantine.
21              DEFENDANT CONSTANTINE:  Good afternoon, Your Honor.
22              THE COURT:  And we have -- for the bank?
23              MR. KOSTOLAMPROS:  Yes, Your Honor. George
24   Kostolampros of Venable, along with my colleague, Xochitl
25   Strohben, Doreen Martin and Kelly Weiner.  Good morning, Your
```

4

```
 1        Honor -- or good afternoon, Your Honor.

 2                  THE COURT:  And we have Mr. McSouther and Mr. Mulry.

 3                  MR. McSOUTHER:  Yes.  Good afternoon, Your Honor.

 4        Yes, this is Tom McSouther on the line.

 5                  MR. MULRY:  And Kevin Mulry.  Good afternoon, Your

 6        Honor.

 7                  THE COURT:  Good afternoon.

 8                  And then we have Ms. Ramachandra for Mr. Nolan?

 9                  MS. RAMACHANDRA:  Yes, Your Honor. This is Seetha

10        Ramachandra for Mr. Nolan.

11                  THE COURT:  Good afternoon.  We have Mr. and Mrs.

12        Peca.

13                  MS. PECA:  Hi.  Good afternoon, Your Honor.

14                  MR. PECA:  Good afternoon, Your Honor.

15                  THE COURT:  Good afternoon.  Mr. Kaiser.

16                  MR. KAISER:  Yes, Judge.  Good afternoon.

17                  THE COURT:  Good afternoon.  Mr. Wolinsky?

18                  MR. WOLINSKY:  Yes, Your Honor.  I'm here.  Good

19        afternoon.

20                  THE COURT:  All right.  Good afternoon.

21                  And is there a Mr. Main?

22                  MR. MAIN:  Yes, Your Honor.  Steve Main on behalf of

23        CSL Properties.

24                  THE COURT:  Good afternoon.

25                  So as you know, this is scheduled for the oral
```

5

1    argument on the cross motions for summary judgment filed by

2    the government and Danske Bank in connection with the

3    ancillary proceedings related to the forfeiture.

4             I know that there are other -- Mr. and Mrs. Peca

5    sent me a letter which I don't think has been docketed yet but

6    requested an opportunity to speak today which I will grant and

7    I also received counsel for Mr. Nolan's letter.

8             So once I'm done with the argument, I will give

9    anyone who has made an appearance today an opportunity to say

10   anything they wish to say in connection with this particular

11   motion/motions.

12            Mr. Brissenden, with respect to Mr. Kenner,

13   obviously the forfeiture with respect to him was done as part

14   of the sentencing.  I'm glad that you're on the call.  And if

15   he wants a copy of this transcript, I will, you know,

16   authorize that under CJA.  And if in the future it relates to

17   the ancillary proceedings he wants to be on the call to listen

18   as Mr. Constantine is doing, I have no issues with that and

19   I'll make the government arrange that.  Okay?

20            MR. BRISSENDEN:  Thank you, Your Honor.

21            THE COURT:  All right.  All right.

22            So even though there are cross motions, I'm going to

23   have the counsel for the bank go first.  And then obviously

24   we're not going to have two rounds of arguments.  You should

25   address the government's cross motion at the same time.

6

1    Obviously, I think all the legal and factual issues overlap,

2    so I don't think that should be an issue.

3           I would also say I've obviously read all the papers.

4    Please don't go through every last argument and fact that's

5    contained in the papers.  I would prefer if both sides just

6    highlight anything they want to highlight from their papers.

7    I do have questions for both sides.  All right?

8           So, Mr. Kostolampros, you can go first.

9           MR. KOSTOLAMPROS:  Thank you, Your Honor.

10          Your Honor, at its core here, Your Honor, Danske's

11   claim is straightforward.  It is claim of a financial

12   institution that has a secured interest in property, and it

13   obtained that interest first in acquiring amid another

14   financial institution's interest claimants.  And then too,

15   loaning millions of additional documents.

16          Yes, Danske's interest, initial interest arose from

17   a sophisticated repurchase agreement, but the underlying facts

18   here are not dissimilar than any other case involving property

19   subject to a loan and its secured interest.

20          The government seeks to manufacture a genuine issue

21   of material fact by challenging literally every aspect of

22   Danske's claim and disparaging Danske, its lending, its

23   employees, all part of the government's zeal to wipe Danske of

24   its interest in whole in an effort to obtain some funds back

25   to get some funds back to the victims.

7

1          Now, Danske's empathetic to the victims, but the

2     government seeks to deprive Danske of its rights in creating a

3     new class of victim in Danske and its shareholders.

4          This is simply not the law and cannot be more

5     unjust, especially considering that without Danske's support

6     of the resort property for the number of years that Danske has

7     held its interest, there is no doubt that the resort property

8     would not have been developed as it is today.

9          Now, getting to Danske's claim, it's made up of

10     facility A, which amounts to $96.4 million.  That amount is

11     directly tied to the original Lehman loan of $107 million,

12     facility B of 18 million, facility C of 14.1 million, a profit

13     participation fee of $50 million that originally is tied back

14     to unpaid capitalized interest under that original Lehman

15     loan.  And then unpaid interest and fees which are

16     accumulating at a default interest rate that at our

17     calculation at this time is about $24 million.

18          Now, Your Honor, all of that is set forth in the

19     documents that we've provided, Exhibit 57 and Danske's

20     exhibits 91, 92 and 93.  And let me add the unpaid interest

21     isn't 24 -- 29 million.

22          Now, getting to the standard in establishing Danske

23     as a bona fide purchaser for value under 21 USC Section

24     853(n), there's three aspects of that. A legal interest in the

25     property, acquired as the bona fide purchaser for value, and

8

1    was reasonably without cause to believe that the property was

2    subject to forfeiture.  Danske has established all of those

3    elements.

4         Your Honor, the government takes issue with Danske's

5    lending claiming that its lending practices weren't

6    appropriate and somehow claims that Danske's obtaining a

7    windfall.  This is patently incorrect.  Danske paid for

8    Lehman's interest, a $107 million loan and its secured

9    interest and then lent millions more.

10        The effective interest rate that Danske charged on

11   the commercial loan after 2009 was under six percent.  To put

12   that into comparison, Lehman charged 15 percent.  And to put

13   this into context, this is a loan for a Mexican resort

14   property in Cabo San Lucas.

15        Surely any lender would categorize this as a high

16   risk loan requiring a higher interest rate, but Danske charged

17   a more than reasonable effective rate of under six percent

18   through the lifetime of the loans.

19        Now, let's get to the government's arguments here.

20   The government argues that Danske has not provided any

21   evidence of when or how or how much Danske paid for its

22   interest.  But that simply ignores the underlining MRA, the

23   repurchase agreement, in which Danske's interest arose from.

24   There was $800 million of value that Danske provided.

25        The government again ignores the Bank of New York

9

letter, which is dated September of 2008, that lists out the
resort property loan as part of the -- called the pool of
assets that were collateral assets under the MRA.  The face
value of the loan in that Bank of New York letter is $107
million, Your Honor.

The government also ignores the underlying
settlement agreement, the documents submitted by Lehman and
Danske in the settlement -- I mean, in the Lehman bankruptcy
-- and the ultimate settlement order, court order, approving
of the settlement allowing for Danske to acquire all of
Lehman's interest.  This is determinative that Danske provided
value for the underlying Lehman loan, Your Honor.

So as to subsequent loan amounts, Danske has also
pleaded the time and circumstances of those acquisitions and
the value it has provided.  Let me go through some of those.

16 million of new funding to facility B in March of
2009.  Four million of new funding in January of 2010.  Two
million from facility B to facility C.  Three million of new
funding to facility B in April 2013.  And then ultimately
consolidating original facility C and B into a replacement
facility C and advancing ten million of new funding.

You know, both parties agreed that Danske has
advanced at least 98 million to the borrower to develop the
resort party since Danske acquired Lehman's interest.  The
government's consultant acknowledges that.

1          Now, Your Honor, the government rests its argument

2     that Danske has not established its interests in these new --

3     in these additional loans and additional funds advanced purely

4     on its argument that Danske argued that it need not establish

5     that it acquired a new security interest after it purchased

6     the initial security interest.

7          But the fact that Danske made that argument does not

8     defeat that these new additional advances under the amended

9     loan agreement stand on their own and that our secured

10    interest is established under those loan agreements.

11         Your Honor, I'll stop there as to the government's

12    argument as to value and legal interests and move forward to

13    Danske had no reason to know the property was subject to

14    forfeiture.

15         First, as to the initial loan, the government does

16    not provide any evidence that suggests there was any cause for

17    Danske to have known of any forfeiture prior to September

18    15th, 2008.  All of the government's articles and civil

19    complaints are dated after that purchase.

20         Second, as to the subsequent loans, the fact that

21    the government did not list the property as subject to

22    forfeiture until its second bill of particulars along with the

23    Second Circuit's determination in *U.S. v. Walker*

24    (indiscernible).  The government did not include the resort

25    property in its indictment, nor at the time of trial, nor on

11

1    the initial bill of particulars.  It was not included until

2    August of 2015.  That is after every loan agreement between

3    Danske and the borrower.

4            Again, Your Honor, this is just simply determinative

5    that there is no basis to argue that Danske was not a bona

6    fide purchaser for value without knowledge.

7            Now, the government argues that advances made by

8    Danske subsequently after the August 2015 are -- do not meet

9    that standard.  But, Your Honor, those advances were made

10   pursuant to facility C, which was entered into in April of

11   2014, Your Honor.

12           Danske's obligated to advance those funds.  And

13   there's no basis for Danske to cease advances.  The only basis

14   would be an actual event of default and that did not happen

15   until much later, Your Honor.  That didn't happen until 2018,

16   at the end of 2018 when facility C wasn't paid off.

17           The other argument that the -- and I'm looking --

18   the government's essential argument can be boiled down into

19   they want to get money here to victims.  And again we're

20   empathetic to the fact that the government wants to get

21   victims funds here, but at the end of the day, that does not

22   mean it has a right to deprive Danske of its legal interests.

23   It's just simply against the forfeiture laws.

24           And what the government does knowing very well that

25   forfeiture wouldn't allow for this it raises this judicial

1    estoppel argument.  And essentially what it's arguing here is

2    that there's some windfall to Danske.  That is simply not

3    correct.

4              Danske acquired Lehman's loan fully, all agreements

5    written in 2008, Your Honor.  Danske has amassed millions of

6    additional funds.

7              Essentially what the government is trying to do is

8    wipe out and rewrite those agreements, make all of those loans

9    basically wipe any interest that would be -- interest that's

10   required under the terms of those loan agreements and any

11   other terms within those agreements away.  That's not the law.

12             And the notion that Danske is somehow obtaining a

13   windfall here is just -- is just simply incorrect.  It's

14   purely the government's contrived argument.

15             Danske advanced millions of dollars over what now is

16   over 12 years.  The government ignores that those funds could

17   have been used elsewhere, but weren't.  There's simply no

18   profit on the sale of Danske's allowed claim here too.  Danske

19   ultimately sold its claim in bankruptcy to Goldman Sachs at a

20   discount, Your Honor.

21             Let me add that the government uses also its

22   consultant to seek to manufacture a material issue of fact.

23   At its heart, the government's consultant's declaration raises

24   no dispute.  It's either -- the government's consultant is

25   either wrong on many of her claims, either irrelevant or

13

1    simply immaterial.

2           First, she raises differences between Trimont's

3    statements and Danske's statements.  As explained in our

4    papers, those are simply irrelevant.  Statements were not

5    meant or required to be identically the same reports of

6    transactions as the same.

7           And ultimately, Your Honor, the government's

8    consultant also acknowledges that Danske's debt is over $98

9    million and acknowledges that facility A's and facility B's

10   principal balances are the same.

11          Your Honor, the government's cross motion should be

12   denied.  On its face, the government's cross motion should be

13   denied because Danske's motion should be granted.

14          The government in its cross motion has not raised

15   any issue that would satisfy showing that the government

16   itself wins as to Danske's claim.  Essentially what the

17   government does here is simply arguing that Danske does not

18   satisfy, at least at this point, summary judgment standard.

19          But again, Your Honor, our point is this.  Is that

20   Danske has satisfied summary judgment motion standards.  It

21   has established its claim.  The government has not raised any

22   material issue of fact in dispute.  I'll stop there, Your

23   Honor.

24          THE COURT:  Yeah.  Let me ask you some questions.

25          And I know -- you have to bear with me because I

14

1    know your ultimate point is that some of these things I'm

2    going to ask you aren't necessary for you to establish your

3    claim, but I just want to make sure I understand why there may

4    or may not be documentation for particular things that the

5    government has pointed out.  So if you can just bear with me.

6            And I'm not a corporate lawyer, never been a

7    corporate lawyer, so some of these very complicated

8    transactions may not -- you know, I may not understand every

9    aspect of it, but as you know, they make a big point about the

10   fact that there is no documentation.

11           Obviously, the master repurchase agreement was

12   entered into in 1999 and the acquisition of the initial loan

13   took place after that, because it didn't exist at the time of

14   the MRA, which is obviously fine, but they point out the lack

15   of any documentation as to when, like the specific date, and

16   how and for how much the acquisition of that particular loan

17   was made.

18           So can you just help me understand what, you know,

19   is there no such documentation for that?  I understand -- I'm

20   going to ask them about the Bank of New York document and what

21   happened in the bankruptcy, so I understand all that, but I

22   just want to understand why there may not be documentation for

23   that of that type of detail.

24           MR. KOSTOLAMPROS:  Sure, Your Honor.  And the

25   declaration of Jovan Atkinson, who is a long term counsel at

15

1    Danske, helps explain this.

2            Under the MRA, the collateral pool of assets changed

3    over every week.  Every week there would be a changeover in

4    the assets.

5            And the reason why we have not produced a document

6    that shows that listing of the assets, Your Honor, is because

7    frankly we're talking about documents that are 12 years old,

8    and just simply we haven't produced and we haven't found it

9    yet.

10           But that's the only reason, Your Honor, that it's

11   not there.  But ultimately it's irrelevant.  The point is is

12   that all that matters -- because the collateral pool of assets

13   could have changed, you know, every week.

14           What mattered is what was in the collateral pool of

15   assets as of the event of default which was September 15th,

16   2008, which is what's set forth in the Bank of New York

17   letter.

18           Once Bank of New York was advised and given notice

19   that Lehman had defaulted, then what was operable is what was

20   included in the pool assets as of that date.  And that's what

21   the Bank of New York letter shows.

22           And not only that, the bankruptcy proceeding, the

23   submissions in the bankruptcy proceeding which -- bear with

24   me, Your Honor, I think it's Exhibit 32 in our submission --

25   sets forth clearly, I mean, it's listed in the exhibits of

16

1    that submission in the bankruptcy court that the collateral

2    pool of assets included the $125 million original loan from

3    Lehman.

4         THE COURT: All right.  So then when they point to

5    the MRA saying there will be a written -- I understand, you

6    know, that the collateral had been moving constantly, but they

7    point out the agreement suggests that there be a written

8    confirmation of each transaction in the custody agreement

9    between Lehman and the bank and the trustees.  There's

10   apparently a reference to a transaction file that would

11   contain similar information.

12        So you're just saying that you're not fully aware

13   that those documents exist at this point.  Is that fair or is

14   that not fair?

15        MR. KOSTOLAMPROS:  That's fair, Your Honor.

16        THE COURT: Okay.  And then you were talking about

17   the bankruptcy.  But again I'm just going to ask you -- I know

18   your argument is it doesn't legally matter, but I just want to

19   understand whether or not such a document existed or not.

20        They point out that when -- in the bankruptcy itself

21   there were a number of commercial loans that were sort of

22   valued together I guess without any individual assignment of

23   value to this particular loan and they point to the absence of

24   any appraisals or valuations within the bankruptcy.

25        So what's your response to that?

17

1           MR. KOSTOLAMPROS:  Yeah.  Our response is, Your

2    Honor, there were competing valuations that were provided and

3    that's set forth in the government's Exhibit 3, which is a

4    document Danske produced, and it's a document that sets forth

5    the various valuations that the competing sides had come up

6    with, being Danske and Lehman Brothers.  And, Your Honor,

7    that's set forth in government Exhibit 3.

8           As we mentioned, when we produced the various -- we

9    produced valuation documents.  We didn't produce all of them

10   that the government asked for because we produced what was in

11   our records.  Remember this is going back to 2008.  And under

12   that government Exhibit 3, you'll see that there's various

13   asset loan values attributed to each specific loan, including

14   Cabo San Lucas.

15          Now, Danske submitted a value of 33.7 million and

16   Lehman submitted a value of 58.49 million.  And remember,

17   those valuations were submitted to ascertain how much Lehman

18   still owed Danske under the loan agreement.  Right?  That's

19   what it was.  It was to set forth the deficiency claim.

20          THE COURT:  All right.  I'm moving now to the issue

21   of what the -- well, before I get to that, the issue of

22   whether or not the later additional loans were at arm's

23   length.  You did address that in your papers and a few moments

24   ago, but I just want to make sure that I understand again what

25   you're relying on.

1          In terms of whether or not the money that was

2     advanced actually went back into the resort, you're relying on

3     Mr. Delvin's role in reviewing all that documentation to make

4     sure that it was not being diverted.  Is that accurate?

5          MR. KOSTOLAMPROS:  That is, Your Honor.  And look,

6     at the end of the day, Your Honor, the government, you know,

7     wants this ancillary proceeding to be about -- to make this

8     into a much bigger proceeding and to how the developer used

9     the funds, Your Honor, and that's not what an ancillary

10    proceeding as to a financial institution's claim is about

11    here.

12         Your Honor, the fact that the resort is developed

13    and the government -- remember, the government just months ago

14    argued that the value of the resort was above Danske's then

15    claim of $190 million.  Where do they think that value came

16    from?  I mean, the value came from the amounts that Danske and

17    Lehman loaned.

18         THE COURT:  All right.  And in terms of what the

19    bank was or was not aware of with respect to any possible

20    fraud over time, the individuals who would have been -- I see

21    that you did produce some due diligence reports as we had

22    talked about months ago. In fact,there's three different

23    documents.  The government says there's no reference to the

24    civil litigation or any of these issues that they're raising.

25    But you're essentially saying that I guess Mr. Daniels and/or

1    Mr. Hughes were involved in that, but just not on the radar

2    screen.  Is that --

3              MR. KOSTOLAMPROS:  No.  No, Your Honor.  We've told

4    you -- I mean, you told the government, and we acknowledged,

5    is look, the government should assume that Danske was aware of

6    the litigation that was out there.  But that does not put

7    Danske on notice of the potential forfeitability of the

8    resort.

9              And the cases that we think -- that we've cited to

10   are dispositive of this, Your Honor.  *U.S. v. Watts*, you know,

11   is a case where an attorney submitted a claim and the

12   government argued that the claim couldn't be valid because the

13   attorney couldn't be a bona fide purchaser because the

14   government actually sought forfeiture.  And the government --

15   and the attorney knew that.

16             Now, the attorney was relying on a *Monsanto* hearing

17   where the court said, look, you know, we're not going to seize

18   the underlying funds at this point.  Now, the government said,

19   look, if we were arguing at that point that the funds should

20   be forfeited, the attorney was surely on notice.

21             Here, we don't even have that the government was

22   arguing that.  Remember, as you're fully aware, I mean, the

23   indictment didn't even include the resort property.  The bill

24   of particulars, the initial bill of particulars didn't even

25   include the resort property.

1    There's simply no indication that Danske should have

2    known more than the government itself that the resort property

3    was subject to forfeiture. And what the government's trying

4    to do is put some duty of investigation on Danske beyond its

5    due diligence, Your Honor, and that's not what the law is.

6    And, Your Honor, I'll refer -- we cited to this case

7    -- *U.S. v. Peters.* And it's helpful because it directly

8    disputes the -- the government made a similar argument and the

9    court there, citing to the Seventh Circuit decision as well to

10   a Third Circuit decision, says look, that's not what Section

11   853(n) is meant to do. It's actually meant to protect

12   innocent purchasers and not require them to have a duty to

13   investigate whether the underlying property was subject to

14   forfeiture to the extremes that the government is asking for

15   here.

16   THE COURT: All right. But I guess my -- I

17   understand all that.

18   But on terms of what the documentation that you

19   provided, if, in fact, obviously the litigation was on "the

20   radar screen of the bank," the question would be why is there

21   not a due diligence report reflecting some investigation of

22   those lawsuits as to whether or not they were problematic.

23   You're suggesting that the absence of such

24   documentation may suggest that there's more out there that the

25   bank did that has not been produced.

1           And I cite Mr. Hughes' Fortune Magazine comment

2     about having done due diligence so I guess that's the

3     question.

4           If, in fact, the bank was aware of the civil

5     litigation and presumably did some due diligence with respect

6     to that litigation, why isn't there some report reflecting

7     that?

8           MR. KOSTOLAMPROS:  Sure, Your Honor.

9           I mean, look, at the end of the day, there is no due

10    diligence report on that.  But, again, as we've said, that's

11    simply not enough to say, look, because of the allegations

12    made in the underlying press reports or in the litigation

13    that's simply not enough to put Danske on notice.

14          THE COURT:  I understand that.  But if there was

15    some investigation done and the bank became aware of more than

16    what was out in the public domain, newspapers or wherever

17    else, that could potentially be problematic, right?

18          MR. KOSTOLAMPROS:  Yeah.  But the government hasn't

19    shown more.  All the government's shown is the litigation that

20    it submitted and the article, Your Honor.  And we submit that

21    that alone -- assuming Danske knew about that -- is not

22    enough.

23          What more could the government -- Danske have done

24    to investigate when the government itself didn't bring a

25    forfeiture action that included the resort property even after

1     it indicted the defendants?

2          THE COURT:  All right.  Again, I'm just going to

3     focus you one more time on what my question is.

4          They're entitled to at least some basic discovery to

5     determine whether  the bank knew more than what was in the

6     allegations, the civil allegation, and/or newspaper articles,

7     and that's why I've urged you to produce any such due

8     diligence reports that were done.  But I just want to make

9     sure --

10         MR. KOSTOLAMPROS: Your Honor, I'm saying --

11         THE COURT: You don't have it?

12         MR. KOSTOLAMPROS:  There's nothing else.

13         THE COURT:  All right.  All right.

14         And then my last question before I hear from the

15    government is -- I just wanted to make sure I understood what

16    was in your papers and what you said here today about the

17    advances that took place after the bill of particulars was

18    filed, you're suggesting that those were pursuant to, you

19    know, the agreements that had already been entered into,

20    correct?

21         That there were no -- the government said that you

22    entered -- the bank entered into the second amended, and third

23    amended, and I guess restated loan agreement, after the bill

24    of particulars.  I just want to make sure --

25         MR. KOSTOLAMPROS:  Sure.

23

```
1              THE COURT:  -- is that correct or not correct?

2              MR. KOSTOLAMPROS:  Yes, Your Honor.

3              THE COURT:  So that is correct?

4              MR. KOSTOLAMPROS:  Let me go back, Your Honor.  Hold

5    on.

6              THE COURT:  All right.

7              MR. KOSTOLAMPROS:  Which modification are you

8    talking about?

9              THE COURT:  They said the second amendment to the

10   third amended and restated loan agreement was entered into

11   after the government filed the bill of particulars.  I don't

12   know how much money then was advanced.

13             MR. KOSTOLAMPROS:  Yes.  That wasn't a new form of

14   funding, Your Honor.  That was simply, if my recollection is

15   correct, to move out ultimately the payment date.  There was

16   no new funding on that.

17             THE COURT:  All right.  And you're saying -- so

18   every dollar that was advanced after the bill of particulars

19   was pursuant to contractual obligations that already existed

20   and that the bank could only refuse if there was a default of

21   some type, is that your position?

22             MR. KOSTOLAMPROS:  Yes, Your Honor.  Up until

23   December of 2018 -- December 31st, 2018.  And I'll go back and

24   look at my records, but at that point in time, facility C was

25   either fully advanced or near full advancement.
```

24

1          THE COURT:  All right.  And then the last -- I said

2     the last question, but I had one more -- I just want to make

3     -- again, this was in your papers, but the government points

4     out that there obviously are numerous other third-party

5     petitions and suggest that the Court's decision on this

6     motion, these motions, should await addressing those other

7     petitions I guess simultaneously.  And your response is that

8     they're in a different position than the bank?

9          MR. KOSTOLAMPROS:  Yes, Your Honor.  Our response is

10    that we hold the most -- the senior secured position here.

11    And that's something that Your Honor could determine at this

12    point based on what the other interests are.  The other

13    interests here are equity interest which all sit below the

14    Danske secured interest.

15         THE COURT:  All right.  All right.  Thank you.

16         All right.  I'll hear from the government.

17         MS. O'CONNOR:  Thank you, Your Honor.  The

18    government's motion papers assert numerous grounds for denying

19    Danske's motion for summary judgment, granting the

20    government's motion for summary judgment, and dismissing

21    Danske's petition.

22         But the primary grounds of granting the government's

23    motion and dismissing Danske's petition is that Danske has not

24    met its burden of pleading and substantiating that it

25    purchased the DCSL loans.

1          There's nothing in Danske's petition or motion

2     papers that demonstrates that on a specific day Danske

3     purchased the loan for a specific amount of money.

4          And the evidence shows that if such a purchase had

5     occurred there would have been documentation to prove it.

6     There would have been documents showing when Danske bought the

7     loan, the amount of money it paid for the loan, and the amount

8     of money Lehman would have paid to repurchase it.  (Inaudible)

9     based on Danske's unsupported conclusory assertion that it

10    purchased the loan.  Danske completely failed to meet its

11    burden of proving that it provided sufficient value for the

12    loan (indiscernible) transaction.

13         As we sit here today, no one knows, with perhaps the

14    exception of Danske, how much Danske paid for the loan in the

15    purchase transaction and how much the loan was valued at

16    during the Lehman bankruptcy settlement decision.

17         And (indiscernible) it hasn't shared its knowledge

18    with the Court, the United States (indiscernible), and the

19    other third-party petitioners.  The Court should, therefore,

20    draw a strong inference that the facts do not support Danske's

21    claims that it was a bona fide purchaser for value.

22         The facts do show that Danske ignored the DCSL

23    resort's default and repeatedly extended the loan agreements,

24    charged the resort between a half a million to one and a half

25    million dollars.  Most times Danske entered into a modified

1    loan agreement, allowed the resort to pay down the

2    (indiscernible) facilities and then withdraw the same funds so

3    that Danske (indiscernible) new funds and knew that the resort

4    could never repay the ever growing debt.

5            By inducing that conduct, Danske was receiving

6    interest payments and fees at an exponential rate and

7    systematically depleting the equity in the resort.

8            (Indiscernible) this court (indiscernible) make more

9    than a $216 million profit -- (indiscernible) 20 percent

10    profit in this forfeiture proceeding.

11           This is not a situation where the Court assumes that

12    Danske (indiscernible) values and the government has the

13    burden of disproving that assumption.

14           This is a situation where Danske, as a third-party

15    petitioner that wants its interest to be recognized, has the

16    burden of coming forward with proof that it is the bona fide

17    purchaser for value that was reasonably without cause to

18    believe that the property was subject to forfeiture.  Danske

19    has not established any of these elements.

20           In sum, Your Honor, Danske has failed to adequately

21    plead the time and circumstances of the acquisition of its

22    purported interests and failed to substantiate that it

23    acquired a valid interest in the resort as a bona fide

24    purchaser for value that was reasonably without cause to

25    believe that the property is subject to forfeiture.

27

1          And, therefore, it's petition must be dismissed.

2     The government's motion for summary judgment be granted and

3     its motion be denied.

4          THE COURT:  Well, let me ask you some questions.

5     This issue of the lack of a date with respect to the

6     acquisition of the (indiscernible) loan, I'm having a hard

7     time with your suggestion that in the absence of such a date

8     that they have no interest.

9          I'm just -- there's no question that there was

10    consideration, hundreds of millions of dollars, for the

11    entrance into the master repurchase agreement, right?

12         MS. O'CONNOR:  Actually, Your Honor, there is a

13    question.  The master repurchase agreement contemplated future

14    purchases of commercial loans up to the amount of $800

15    million.

16         THE COURT:  Right.

17         MS. O'CONNOR:  It did not specify that this loan

18    would be included.  And there's no evidence that, in fact, it

19    was purchased.

20         THE COURT:  But what about --

21         MS. O'CONNOR: Besides we don't even have --

22         THE COURT:  The Bank of New York sent a letter that

23    detailed this, that they had purchased it under the MRA and

24    valued it at $107 million on September 15th of 2008.  What's

25    wrong with that document?

1        MS. O'CONNOR:  Your Honor, that doesn't say that

2   that's what the -- it's saying that the face value of the loan

3   itself.  It doesn't demonstrate that it was purchased or for

4   any amount of money.

5        And the fact of the matter is Lehman's records -- I

6   mean, Danske's reply papers point out that this pool of loans

7   was constantly changing and that Lehman had the opportunity to

8   swap out loans.

9        So under those circumstances, it's entirely unclear

10  if the loan was crossed out before it was purchased or crossed

11  out after the fact and was inadvertently included in the list

12  from the trustee.

13       Without any actual proof of a purchase on a certain

14  date for a certain amount of money, we don't know for sure

15  that this loan was purchased.

16       THE COURT:  All right.  In January of 2009, there

17  was an assignment and assumption agreement which confirmed

18  that they had acquired this interest in the resort for good

19  and valuable consideration.  So you think that document is

20  wrong too?

21       MS. O'CONNOR:  It's a conclusory document based on

22  the assertions of Lehman and Danske (indiscernible) document.

23       THE COURT:  On the basis of who?

24       MS. O'CONNOR:  Of Lehman and Danske.  However --

25       THE COURT:  Why would Lehman be agreeing to that if

1    that wasn't true?  Why would they do that?

2           MS. O'CONNOR:  It's entirely possible it was

3    inadvertent considering the number of loans at issue and the

4    fact that it wasn't a receipt.  Perhaps Lehman did not pay

5    attention to the fact that this was crossed out accidentally

6    at some point in time.  (Indiscernible) certainly an agreement

7    was –

8           THE COURT:  And then the bankruptcy court –– the

9    government's position is the bankruptcy court erroneously

10   recognized the bank as the owner of this asset in an October

11   25, 2010 order?  The bankruptcy court made a mistake that the

12   bank should not have been recognized as the owner, is that

13   what the government is saying?

14          MS. O'CONNOR:  The government's position is that the

15   bankruptcy court did not make any findings of fact, but rather

16   relied on Danske and Lehman's representations in the

17   settlement agreement which is ––

18          THE COURT:  Isn't it a bankruptcy court's job to

19   make sure that people who are claiming interest in various ––

20   in properties in bankruptcy that they are bona fide purchasers

21   of and have a real interest in those assets?  Isn't that

22   exactly what bankruptcy courts do?

23          MS. O'CONNOR:  In this case, Your Honor, there was a

24   (indiscernible) from all appearances –– and again this is

25   based on the government going through the records

30

1    (indiscernible) the production from Danske, which it's

2    required to produce to meet its burden, those (indiscernible)

3    indicate that the Court, through a stipulation -- some

4    agreement was submitted and the Court allowed it based on

5    representations by those parties.

6             So it's entirely possible there was a mistake in

7    there and the Court accepted that fact as true.

8             But the government in this case, unlike the

9    bankruptcy case -- Lehman -- Danske has the burden of coming

10   forward and demonstrating the purchase and it has not done

11   that with any concrete evidence.  It's just asking the Court

12   to infer based on --

13            THE COURT:  I understand.  These are all -- all

14   these things are concrete -- these are all documents that are

15   confirming their interest over time.

16            And you just keep speculating that all the documents

17   may be wrong simply because they don't have a particular date

18   on which they acquired, you know, the loan when the nature of

19   the transactions were very fluid.  I don't think you can say

20   that they have no evidence.

21            They have a lot of documents suggesting that they've

22   had this interest over a long period of time, that it had been

23   valued, that they paid hundreds of millions of dollars at the

24   start of this relationship to be able to acquire these types

25   of loans, and all you keep saying is that these documents

31

1    could all be wrong, the bankruptcy court might be wrong, and

2    the government has no -- you have nothing to suggest that any

3    of those things are wrong other than that they can't give you

4    a date that they initially acquired the loan, you know 15

5    years ago.

6              MS. O'CONNOR:  Your Honor -

7              THE COURT:  So in the absence of a date, no matter

8    how many documents say that they got this interest over time,

9    the Court should ignore all those and say they have no

10   interest --

11             MS. O'CONNOR: Your Honor, it's the government's --

12             THE COURT:  -- even though your consultant said that

13   they've advanced $98 million.  You're saying the bank that

14   advanced $98 million to the resort, right?  There's no dispute

15   they advanced $98 million, right?

16             MS. O'CONNOR:  Your Honor, there's no -- well, as to

17   the first part of your question in terms of that there's no

18   documentation, the government's concern is with the fact that

19   Danske, more so than the date,  has not shown that it actually

20   bought it for adequate consideration.  There is no proof of

21   the consideration.

22             The repo agreement did not say that the amount of

23   money was expended all at once for the pool.  The repo

24   agreement contemplated that Danske would be able to purchase

25   up to $800 million worth of individual separate loans and then

1      Lehman would then repurchase those loans.

2              So each loan was a separate transaction and each

3      loan would then be tallied up to the amount of 800 million.

4      It's entirely unclear how much was given.  It could have been

5      one dollar, it might not have been anything.  So that's the

6      biggest issue with this loan. They also have to show that it

7      was a purchaser for value and that's what it's unable to do in

8      this case.

9              THE COURT:  I still don't understand why Lehman

10     would be in a conspiracy with the bank to say that they gave

11     consideration for this.

12             If, in fact, they didn't, what would be the benefit

13     to Lehman to agree to that and to settle something that they

14     could have argued that the bank had no legal interest in

15     bankruptcy?  I don't understand that.  What would be the

16     benefit?

17             MS. O'CONNOR:  By all appearances --

18             THE COURT:  What would be the benefit to Lehman to

19     doing what you're suggesting happened here, that there was no

20     consideration, there was one dollar consideration, there was

21     no consideration, yet Lehman for some unknown reason believed

22     that there was consideration, that it was a valid interest

23     that they needed to settle, and the bankruptcy court approved

24     it?

25             MS. O'CONNOR:  Your Honor, Lehman was concerned with

33

1      resolving the outstanding debt.  And, yes, it certainly

2      involved a pool of loans.  Whether Lehman scrutinized how much

3      consideration was provided or not, we can only guess.

4              But in this case it's still Danske's burden to show

5      it purchased it for a certain amount of money, this specific

6      loan, rather than the pool.  The loan at issue here is the

7      Lehman -- is the resort loan and Danske still has not shown

8      that it bought it for a certain amount of money.  And all it

9      can do is ask the Court to infer.

10             Now, we know the documentation would exist.  And

11     it's certainly questionable why Lehman -- Danske has come

12     forward with thousands of pages of documents, but the most

13     crucial document hasn't been produced and there's been no

14     explanation for it.

15             THE COURT:  So my second --

16             MS. O'CONNOR: There were declarations submitted.

17             THE COURT:  My second question was that the

18     government's position is that even though there's no dispute

19     that they (indiscernible) initial, loan that they've advanced

20     $98 million, that that does not establish a legal interest in

21     the resort, even though it's undisputed that they had advanced

22     $98 million, that's the government's position?

23             MS. O'CONNOR:  Your Honor, the government's position

24     -- the government's position is that that money was already

25     paid back by the resort so there's nothing here for Danske to

34

1     claim.

2              THE COURT:  You're saying it's paid back, but

3     they're saying that the agreements allowed for interest

4     (indiscernible) and that's what banks do and that's what

5     (indiscernible) entitled to.  The fact that the dollar amount

6     may have been --

7              MS. O'CONNOR: Your Honor -

8              THE COURT:  -- 98 million doesn't mean that the bank

9     doesn't (indiscernible).

10             MS. O'CONNOR:  I'm sorry, Your Honor.  We're hearing

11    static on our end and we don't know if you're hearing it on

12    your end.

13             THE COURT:  Yeah.  I'd just ask everyone to mute

14    their lines other than the government.  All right.  That's

15    better.

16             MS. O'CONNOR:  Your Honor, the government's

17    statement that the 98 million was advanced is actually

18    assuming that all of the advances were supported.

19             The inadequacies in the documentation still exist

20    and the government still challenges certain of those advances.

21    But assuming for argument sake that their advances had been

22    supported, then the government's position is that they were

23    nevertheless paid back that amount of money plus six million

24    on top of it, so they haven't suffered a loss.

25             We would point again to the declaration of our

```
1    expert showing that there are numerous, numerous issues with

2    their proof of these additional advances.  And that also

3    (indiscernible)

4    --

5              THE COURT:  Well, they said they had -- that their

6    third-party consultant, Mr. Delvin, put in a declaration about

7    what he did over time.  They said that they informally I think

8    speak to Mr. Delvin.  So why isn't his role sufficient?

9              MS. O'CONNOR:  We have not received the full amount

10   of documentation from Mr. Delvin.  And in looking at Mr.

11   Delvin's reports, he has said he only reviewed samplings of

12   the paperwork required.

13             THE COURT:  So the government thinks in a forfeiture

14   proceeding you're entitled to every penny that was ever spent

15   by that resort and the government should be able to look at

16   that and that should be produced for the government?  Do you

17   know how much paperwork you're talking about?

18             UNIDENTIFIED:  Millions of pages.

19             THE COURT:  You think that's the type of discovery

20   the government's entitled to in a forfeiture proceeding?

21             MS. O'CONNOR:  Your Honor, the bank is seeking a

22   $200 million claim.

23             THE COURT: I would ask whoever is on the line that's

24   not muted to mute their phone.

25             Go ahead.
```

36

1          MS. O'CONNOR:  Your Honor, it's the bank's burden to

2    come forward with proof that it was a bona fide purchaser for

3    value.

4          And it's the government's position that if it was

5    lending the funds outside the parameter of the loan agreements

6    and the loan agreements required that documentation as a

7    condition precedent to loaning the funds, then that is an

8    indication that these funds, especially when looked at all the

9    other facts in the aggregate, that this was not an arm's

10   length transaction and that they were not a bona fide

11   purchaser for value.

12         THE COURT:  All right.  And on the last issue about

13   whether they should have had reason to believe the resort was

14   subject to forfeiture, you know, in your papers you -- when

15   they point to the fact that the government in 2013, you know,

16   indicted this case, for two years did not include it in the

17   forfeiture allegations, your response to that I think in your

18   reply was, well, it's not what the government knew, it's what

19   the bank knew.

20         But to the extent that your argument is a

21   reasonable, you know, person, a reasonable bank would have

22   understood this was subject to forfeiture, why isn't it

23   relevant that the government -- notwithstanding the

24   investigation that was done pursuant to the grand jury, with

25   the subpoena power of the grand jury having indicted two

1    people in connection with the fraud related to the resort --

2    did not think there was a sufficient basis to put it in the

3    forfeiture allegations?  Doesn't that speak to what a

4    reasonable entity looking at the situation, looking at the

5    civil lawsuits would think?

6              MS. O'CONNOR:  Your Honor, as you're well aware, the

7    crimes that were charged did not include the crime involving

8    the funds that went to the resort.

9              The government's investigation was expansive,

10   certainly took a number of years, and the government takes it

11   time rather than -- Danske might learn something much sooner -

12   - the government of course as you know is required to do

13   significant investigation and make sure that its position is

14   justified.

15             THE COURT:  I was going back to say your position is

16   the government didn't know when it was indicting the case that

17   money had been diverted from Hawaii to Mexico and to the

18   resort?  Yet the government is saying that -- I'm a little

19   confused by that.

20             Wasn't that the whole basis for part of the initial

21   indictment, the diversion of the investors' money from Hawaii

22   to Mexico, to various investments in Mexico, right?  You're

23   saying --

24             MS. O'CONNOR:  The government included the resort

25   when it determined that the resort should be forfeitable

1    property.  The government gives general forfeiture allegations

2    in the bill of particulars which would encompass the resort.

3            Later it subsequently added the bill of particulars

4    to give specific notice.  But that still -- but the general

5    allegations, it covers any forfeiture that the government

6    might seek.  So what requires us to (indiscernible) --

7            THE COURT:  So what case do you have anywhere in the

8    history of the United States where an entity like a bank or

9    any similar entity, based upon civil lawsuits that have been

10   filed or articles in a newspaper, has been found to have had

11   reason to believe that they're subject to forfeiture and,

12   therefore, can't recover?  Which case?

13           MS. O'CONNOR:  Your Honor, the government's pointing

14   to case law of the general proposition that what's relevant is

15   the knowledge that the bank had.

16           And even the Second Circuit case in *Watts,* which was

17   relied upon by Danske, involved an attorney were the

18   government was unable to establish probable cause in a

19   *Monsanto* hearing.

20           The Second Circuit nonetheless recognized that if

21   the attorney, in fact, had reason to know the criminal origins

22   of the property, then that attorney would not be considered a

23   bona fide purchaser for value (indiscernible) --

24           THE COURT:  I understand that.  I understand.  I

25   think you heard me asking those questions.  But the government

39

1    in your papers is relying heavily on this idea that the civil

2    litigation should have been sufficient to put them on notice.

3          When in *Watts*, it wasn't sufficient when the

4    government put it in the indictment when there was a *Monsanto*

5    hearing saying they couldn't establish probable cause.  And

6    the Second Circuit said in that case that apart from what they

7    may or may have not known on their own, which required some

8    investigation, the simple fact that the government put it in

9    the indictment was not sufficient.

10         Here, we don't even have that, so I'm not sure how

11   *Watts* would support your position.

12         MS. O'CONNOR:  Your Honor, in this case, Danske

13   actually was in a unique position to learn about the

14   forfeitability of the resort before the government given its

15   relationship with Jowdy.

16         If Your Honor would recall from the government's

17   filings, that in the civil lawsuit between Jowdy and the

18   hockey players, Jowdy states that Constantine reached out to

19   Danske Bank to point out the conduct of Jowdy.  And, in fact,

20   he reached out to Lehman beforehand.  And we don't have

21   Danske's due diligence to know what --

22         THE COURT:  What else do you want them to produce?

23   They produced -- they said these are the due diligence reports

24   that they have.  We just got a representation from an attorney

25   that this is all they have.  What more do you want from them?

40

1          MS. O'CONNOR:  Well, they --

2          THE COURT:  They don't have any other due diligence

3     reports.  They don't have any.  So what discovery am I going

4     to give you?

5          MS. O'CONNOR:  Your Honor, it's the bank's burden to

6     come forward and show that it didn't have any reason to know.

7     And the government's position is the conclusory statements in

8     the affidavit are belied by the facts here.

9          Jowdy's own civil complaint points out the fact that

10    Danske was notified by Constantine.  One of them is a

11    defendant in this case.  Peter Hughes told *Fortune* magazine

12    that he engaged in due diligence, yet those records have not

13    been produced.

14         THE COURT:  On this issue of continuing to advance

15    the money, obviously, this was occurring over a long period of

16    time.

17         And the government over the past -- since 2015

18    obviously has been heavily involved in what's been going on at

19    the resort.  And the bank has pointed out,and you can correct

20    me if I'm wrong, the government never came to court or never

21    came to -- I think never came to the bank and said stop

22    advancing all of that money.  You're just depleting the

23    victims' interest in this resort.  Why are you continuing to

24    do this?

25         Their argument is that if they had, in fact, done

41

1      that, the government would have argued that they were

2      depleting the value of the resort and hurting the victims by

3      not continuing to try to keep the resort going.

4                So why didn't the government -- if the government

5      believed that it was inappropriate for them to continue to

6      lend the money to this, you know, venture, why didn't the

7      government say something to me or to them?  I don't recall

8      that ever coming up.

9                MS. O'CONNOR:  Your Honor, the government told the

10     bank numerous times, and that's in the affidavit of Special

11     Agent Galioto, that it did not deem Danske to be a bona fide

12     purchaser for value for any of the funds advanced after the

13     bill of particulars was filed.  It absolutely told Danske that

14     on numerous occasions.

15               THE COURT:  When did the government tell the bank --

16               MS. O'CONNOR:  (Indiscernible) --

17               THE COURT:  When did the government tell the bank to

18     stop -- not whether or not they were a bona fide purchaser for

19     value -- when did the government tell them to stop advancing

20     money to the resort because they were depleting the interests

21     of the victims and the government in this forfeitable asset?

22     When did the government tell them that?

23               MS. O'CONNOR:  The government would not tell Danske

24     whether or not to continue to loan funds.  That's Danske's

25     decision to do so.  However, the facts show it was never

42

1    advancing any new funds.

2            First of all, the government didn't even know

3    exactly when –

4            THE COURT:  When did the government tell -- when did

5    the government tell them to not have Mr. Jowdy continue to

6    manage the company because of issues of fraud and

7    mismanagement?  When did the government tell the bank that?

8            MS. O'CONNOR:  Your Honor, the government on

9    numerous occasions expressed its concern.  In fact, if you

10   recall, we filed a motion to force a protective order to go

11   down to the resort to look at the books and records because of

12   the concern that the money was being funneled out of the

13   resort.

14           THE COURT:  And what happened?  You didn't come back

15   and tell the Court --

16           MS. O'CONNOR: Your Honor denied the government's

17   (indiscernible) --

18           THE COURT:  -- you didn't us.  You didn't tell me

19   that you found something that should be of concern.

20           MS. O'CONNOR:  Your Honor, the government didn't

21   find anything because the records that were being produced

22   were limited and that was the problem all along.

23           Representations were made that funds were continuing

24   to be advanced by the resort -- by Danske to keep the resort

25   afloat.

43

1          However, once we finally got the bank's bank records

2      and we're looking at them, we've learned that that's not

3      actually what was occurring.

4          The government did not know that the majority of the

5      equity was being consumed through compounding interest until

6      we hired our consultant and got the records.  Upon the

7      commencement of the ancillary proceeding, we did not know what

8      was occurring down there.  We only had at best suspicions,

9      Your Honor.

10         THE COURT:  All right.  And on this issue of whether

11     or not the Court should decide this motion, given the other

12     petitions that have been filed, the bank's position is that

13     they have a superior -- you know, if the Court grants their

14     motion, they have a superior interest and that the other

15     petitions aren't claiming that type of interest, so that

16     there's no reason that the Court would need to await

17     resolution of all those petitions.  What are they missing?

18         MS. O'CONNOR:  Your Honor, Danske's pushed for an

19     expedited briefing of its motions.  The third parties were

20     being noticed while the motions were being briefed.

21         It would be unfair to give priority to Danske's

22     claims when these third-party petitioners have a right to

23     participate and challenge Danske's claims.  So it's a question

24     of fairness.  And it's the third parties' arguments as to

25     priority in addition to the government's.

44

1          THE COURT:  All right.  All right.

2          I'll give the bank a few minutes to respond to

3     anything the government has said.

4          MR. KOSTOLAMPROS:  Thank you, Your Honor.  Just a

5     couple of points.

6          First, as to the settlement agreement and all the

7     documents of the Court referenced, you know, it bears noting

8     that the U.S. Trustee and the U.S. Trustee's representative in

9     the Lehman bankruptcy never objected.

10         And, look, Lehman's bankruptcy was the biggest, if

11    not one of the biggest, bankruptcies in the world at that

12    time.  It just -- it's incredible to think that the Court --

13    the government -- Lehman itself who owed billions of dollars

14    would have allowed Danske to take an asset for a dollar or

15    less.  That's just not -- it's just not factually correct.

16         Your Honor, as to the bona fide purchaser status,

17    the government now hinges -- seems to hinge on this

18    conversation that Constantine apparently had with Danske.  I

19    mean, even if you look at what the government alleges, what

20    the government alleges is that Constantine disparaged Jowdy.

21    Not that somehow the resort property was subject to

22    forfeiture, Your Honor.

23         And, again, there's just not enough.  I mean, the

24    government itself didn't bring an action.  And from the

25    government's statements today, didn't even know it had an

1    action at the time of indictment.

2            Surely if it had to take the government two more

3    years to investigate, how is Danske supposed to investigate.

4    At the time of the bankruptcy -- it had to decide at the time

5    of the bankruptcy whether it was going to take this asset or

6    not.

7            And the notion that the asset would have been

8    included in their by some erroneous belief is just -- it's

9    belied by the Bank of New York document that sets forth the

10   amount and the date.  They keep saying there isn't an amount

11   and a date.  There is.  The Bank of New York date is

12   determinative, Your Honor.

13           And then finally, Your Honor, the notion that we

14   need to wait for the additional petitioners' claims, we have

15   those claims.  On the face of those claims, the Court can

16   determine that Danske stands ahead of those because those are

17   equity interests, Your Honor.

18           THE COURT:  And then on the last issue, there's

19   obviously some dispute about the exact amount of the claim.

20   Your position is that the Court could grant your motion up to

21   the amount that would be undisputed and resolve those issues

22   at some future time, is that your position?

23           MR. KOSTOLAMPROS:  That is our position, Your Honor.

24           THE COURT:  All right.  All right.

25           I'm going to hear from anybody who wants to be heard

46

1    on this, from those individuals who we recognized at the

2    beginning of the call.  So I know --

3              Mr. or Mrs. Peca want to speak?

4              MS. PECA:  Sure.  If it's our turn, we can go ahead.

5              THE COURT:  Yeah.

6              MS. PECA:  All right.  Well, thank you, Your Honor,

7    for letting us speak today.  We'll be brief.  But we felt it

8    was necessary for our voices to be heard at this hearing.

9              You've obviously heard a lot from the bank's

10   representation today and at previous hearings, but the victims

11   who happen to be the original investors, the real

12   shareholders, need to be heard too.

13             Basically, as you saw in our letter, we support the

14   government's motion to oppose Danske Bank's claim.  As a

15   reminder, Diamante Cabo San Lucas is one of the investments

16   that Phil Kenner had us involved in, one in which he stole a

17   lot of money from us in the form of ownership percentage.

18             A group of hockey players, CSL Properties, put up

19   millions of dollars to start the project and purchase the land

20   and were given only eight percent ownership in return, while

21   Kenner who put exactly zero dollars of his own money into the

22   project assigned himself approximately 40 percent.  So

23   millions of dollars from original investors equated to just

24   eight percent while zero dollars somehow got Kenner 40

25   percent.

1          Therefore, we are a claimant through CSL as

2     legitimate and lawful investors -- no one disputes that -- and

3     are hoping to recover our investment and stolen funds.

4          Danske should not be given priority over us original

5     investors as our investment was how this project got off the

6     ground in the first place by purchasing the land well before

7     the bank was even involved.

8          Danske's lawyers mentioned the bank's interest and

9     the shareholders.  Well, we are the real shareholders.  There

10    would be no project if it weren't for our money along with the

11    other original investors' money.

12         If Danske's claim were to be given priority there

13    likely won't be anything left for us investors.  And, again,

14    the hockey players and original investors were the only ones

15    to put their own money into the project via CSL.

16         And it would be yet another massive loss for all of

17    us if Danske's claim were to be given priority over the

18    government's claim.

19         So, Your Honor, our claim and the government's

20    should take priority over Danske's.  We don't want to be

21    victimized yet again.  Thank you.

22         THE COURT:  All right.  Thank you, Ms. Peca.

23         Mr. Kaiser, is there anything you want to add?

24         MR. KAISER:  Yes, sure. I'd like to add something.

25         Judge, if you can recall my letter on February 28th,

48

1    2019 I kind of laid everything out of the scams and the

2    corruption, the mismanagement between Ken Jowdy and company,

3    including his attorneys, Fernando Garcia, accountant, Antonio

4    Marques.

5          So when I went down there in 2012 it wasn't long

6    before I caught wind of how he was doing this and -- which was

7    roughly in 2013.  I actually audioed, videotaped. I built a --

8    had a chronological order of how he does it, how he works with

9    David Daniels with his close relationship with him.  David

10   Daniels and Company staying on site even though for optics he

11   always had a hotel room in town.

12         And if you look at this from a thousand foot view

13   Diamonte sold north of $500 million in real estate.  $500

14   million in real estate and still in this debt.

15         So in 2014 I sat with Ken Jowdy and said you could

16   pay out this loan.  You could pay off this loan doing 60, $70

17   million in sales a year.  It's at $125 million at the time.

18         And I said you could also take care of all the

19   victims, you know, because everyone -- and I want to say one

20   other thing.

21         Everybody knew that Diamonte could have been

22   forfeited, including Mark Lewinsky and Company and a lot of

23   the members that are on this call because I personally sat

24   with them. I said this is under forfeiture and God willing it

25   will be forfeited because it was our funds that paid for that.

1          So for them to be like woe is me, or babe in the

2     woods is simply not true.

3          And let me say another things because the bank --

4     Danske bank was talking about these checks and balances. Oh,

5     yeah.  And a guy by the name of Mike Devlin, who will still be

6     servicing the loan, well, you know, what?

7          You can't service the loan from the sports bar when

8     you're drinking, because he wasn't servicing the loan.

9     Because Jowdy was doing whatever he wanted to do with these

10    funds, including in my letter funding his own companies, or

11    his own house and doing whatever -- there was no checks and

12    balances. And when he redid the loan in 2014 and put the $50

13    million kicker, that was as per Mr. Jowdy's request.  So he

14    alone with the bank were fully aware of what's going on.  So -

15    - and just like with the $98 million, Judge, I was on the

16    ground.  No one else on the phone call was actually on the

17    ground going through it.

18          And I was treating it as an investigation, just like

19    I was a police officer, and I was uncovering everything.  And

20    then I go to the government and say it's a crime what's going

21    down there. He's stealing millions of dollars.  This loan

22    could have been paid off.

23          And at that point that's when Jowdy caught wind of

24    what I was doing, called me in the office and said I had to

25    leave the property ASAP because I was getting into his

1    business and the bank's business.  I even had the accountant

2    on tape, Antonio Marques, talking about the criminal activity.

3    And I said if only the FBI knew what Danske and Ken Jowdy were

4    doing.

5              So this whole thing is just laughable with the bank

6    about oh, yeah, all this money.  It's going to straight there.

7    It's simply not true.  I was the one on the ground.

8              And if you noticed during -- Danske Bank kept on

9    coming up and said oh, yeah.  You know, you have to keep Mr.

10   Jowdy. He's an integral part of the project, at the same time

11   saying the project is going bankrupt and making no money.  How

12   the hell does that make any sense to anybody?

13             So me being the victim, knowing everything, I was

14   pleading with the government or someone to listen to say get

15   this guy out of here and his family because he's going to

16   steal every single penny.  And that's what finally prompted me

17   in 2019 to write that letter, Judge, because I didn't know if

18   you getting the message.

19             So that's why I wrote that and no one questioned it,

20   that it was valid, neither the bank, Mr. Jowdy, nobody did

21   because it was all true and spot on.  Thanks for listening.

22             THE COURT:  All right.  Thank you, Mr. Kaiser.

23             Ms. Ramachandra, do you want to speak on behalf of

24   Mr. Nolan?

25             MS. RAMACHANDRA:  Yes, Your Honor.

51

1          You know, I'd just like to follow up on something

2     Mr. Kaiser said.  Unlike him, I wasn't on the ground, but just

3     reading all the papers and all of the facts that have been set

4     forth so far I just find it hard to believe that the bank as a

5     petitioner was without -- reasonably without cause to believe

6     that the property was subject to forfeiture, which is one of

7     the prongs that are necessary to prevail under, you know, the

8     relevant statute here.

9          And the test isn't really whether the property is

10    named in a forfeiture allegation  A forfeiture allegation is

11    to give notice to the defendant that something's being

12    forfeited.

13         You know, the case law in this area actually

14    requires a lot more. You know, third parties should be on

15    notice of newspapers articles. It's not even required that the

16    defendant be indicted sometimes for a third party to be deemed

17    to have knowledge that the property was subject to forfeiture

18    or reasonably subject to forfeiture.

19          I mean, we would ask the government is there a case

20    out there that says this?  Well, *BCCI* says it.  You know, in

21    that case the defendant hadn't even been indicted, but I think

22    it was American Express Bank or BCCI Bank had notice that the

23    property was subject to forfeiture.

24         *Cutters* is another case that comes out the same way.

25    In that case the issue had to do with was loan made -- could a

1    loan still be made at the time a search warrant was being

2    executed in the defendant's house.  And that was a question of

3    fact for the court.  There's no legal requirement that

4    property needs to be put in a forfeiture allegation before a

5    third party is on notice of it.

6         And, in fact, there are all kinds of reasons why the

7    government fails to pursue forfeitable assets, but that

8    doesn't mean that third parties who have knowledge that the

9    property is subject to forfieture that there's a nexus between

10   the property and the crime, don't actually have to come in and

11   prove that they don't have that knowledge to prevail as a

12   third party.

13        And so here I mean it seems like there's ample

14   evidence in the record, at least by 2013, by 2014, after the

15   defendants had been indicted, that this property was subject

16   to forfeiture or could be subject to forfeiture. And the facts

17   that Mr. Kaiser laid out support that as well.

18        I would also just address one other point that

19   counsel for the bank made, which is they sort of summarily say

20   that well, the victims here have equity interests and our

21   interests are superior.

22        I mean, that may be in a bankruptcy but in

23   forfeiture general creditors aren't protected, but the victims

24   here aren't general creditors.  They have equity interest.

25        So it's not clear to me why the bank's interests are

53

1      suddenly superior or should be given priority over the victims

2      who also have equity interests, they have real interest in the

3      property, separate from the point I made in my letter which

4      was about any remaining funds could be used for restitution.

5              THE COURT:  Well, I just want to go back to your

6      citation to the *BCCI Holdings* case, because I did look at that

7      case.

8              And even if the American Express Bank in that case

9      may have advanced the money, the money before the actual

10     indictment, the district court there had pages, and pages and

11     pages of public documents indicating fraud with respect to

12     BCCI.

13             So I don't think -- you know, I don't know if you

14     can compare Mr. Owens' civil lawsuit and, you know, some

15     articles in the *New York Post* to the level of notice that

16     existed in that case.

17             MS. RAMACHANDRA:  I take your point, Your Honor,

18     although I would point out that Danske Bank is a regulated

19     financial institution and I just find it hard to believe that

20     they wouldn't do due diligence when extending millions and

21     millions of dollars in loan proceeds. You know, they say they

22     don't have a memo on that.

23             That may be true, but I still thing there's a

24     question of knowledge here and particularly like what we heard

25     from Mr. Kaiser, I think there are all kind of fact questions

1   here.  I mean, at the very least I don't think that this is a

2   case for summary judgment.

3              THE COURT:  All right.  Thank you.

4              Mr. McSouther and Mulry, is there anything you want

5   to add?

6              MR. McSOUTHER:  Yes, Your Honor, I would.

7              And I'm sorry to take up some of the time.  I mean,

8   Mr. Jowdy categorically denies all of those specious

9   allegations by Mr. Kaiser.

10             I mean, it's kind of -- I mean, while they're

11  irrelevant, frankly, to this -- to the decision that is before

12  the court at this point, I just can't let the record go

13  without being corrected.

14             We did not respond to that letter because we didn't

15  want to get into this public back and forth.  That was

16  irrelevant to the issue before the court.

17             But, frankly, it's kind of incredible to me that

18  here's a man who in 2009 testified on behalf of Phil Kenner in

19  an arbitration proceeding that was brought by Owen Nolan in

20  which he said that he knew that the loan -- the money was

21  actually a loan to the property in advance of when the money

22  was (indiscernible). And then six years later testifies before

23  Your Honor that he had no idea it was a loan until after the

24  fact.  It's just -- it's mind boggling to me --

25             THE COURT:  I don't want to get into --

1          MR. McSOUTHER:  But in any event -- and that's all

2     I'm going to say to that.  But that can't go -- can't be on

3     the record and not have a response to it, Your Honor.

4          You know, the bank has made the argument so I'm not

5     going to -- unless there's anything else that the court has

6     about -- questions for me, then I don't have anything.

7          THE COURT:  Let me -- before I -- I was going to

8     hear from Mr. Wolinsky in a minute, but what -- I should maybe

9     ask this to others.

10         What's the status of the resort right now?  What's

11     going on with respect to the resort right now?

12         MR. McSOUTHER:  Well, right now, Your Honor, the

13     resort is operating on sort of a day-to-day basis.  I mean,

14     it's not -- it hasn't been able to pay interest on the loans

15     for years -- two years now.  It needs a capital infusion

16     immediately because it's in such a difficult financial

17     position.

18         You know, currently we're coming into what would

19     normally be the high season, but now with the pandemic

20     apparently the threat level in Mexico was just raised to

21     orange, which may have an adverse impact on the ability to

22     bring in -- you know, have people travel there even if they're

23     willing to travel under these circumstances.

24         So it is in a very difficult financial position and

25     it's just trying to operate on a day-to-day basis.

1          THE COURT:  All right.  Thank you.

2          All right.  Mr. Wolinsky?

3          MR. WOLINSKY:  Yes.  Thanks for hearing me today.

4          Look, at the start, let me say there's no question

5     that I have sympathy for the homeowners and all the other

6     homeowners -- excuse me, for the victims.  They're victims of

7     a terrible fraud and many people lost their life savings.

8          The only thing I do want to address is whether this

9     issue can or should be deferred.  And from where we sit it

10    should not be deferred.

11         The issue has to be resolved now.  I'll legally --

12    Your Honor, I'm not going to lecture you or point you to

13    legalities, but I would like to bring a sense of some

14    commercial reality to this question of whether the issue

15    should be resolved now or later.

16         The project, as you know, has been subject to a

17    cloud for years.  That cloud has to be lifted.  The forfeiture

18    process contemplates the sale.  The objective of the sale is

19    to compensate the victims.

20         In the real world a sale cannot go forward unless a

21    buyer knows whether there's a mortgage on the property and the

22    extent of the mortgage.

23         Deutsche Bank can't lend new money to the project

24    unless it knows that it's a secured lender.  No other third

25    party is going to lend money to the project unless it knows

1    that it's -- what its position is going to be in the capital

2    structure. No lender or equity investor in a forfeiture

3    proceeding is going to forward unless they knew whether and

4    the extent of Danske Bank's financial position.

5            When Your Honor asked the question to the

6    government, you know, what's your position?  Should it be

7    resolved now or later?  Their answer was well others should be

8    permitted to address that. Other victims -- the victims should

9    be permitted to litigate that issue.

10           Your Honor, from where I sit the government is

11   supposed to stand in the position of protecting the interests

12   of the third parties and shouldn't be pointing to the victims

13   to protect their rights.

14           But in this case you have a unique situation.  Ms.

15   Ramachandra made a very cogent argument.  She's a partner at

16   Proskauer. I respect her arguments and Your Honor has heard

17   from not only the government but from Proskauer on whether the

18   victims have superior rights to Danske Bank.

19           So I think the issue is ripe in hundreds of pages of

20   briefing, an expert forensic affidavit submitted by the

21   government. I think Your Honor has everything in front of you

22   to make this decision and it's now time for a dose of

23   commercial reality to be brought to this case.

24           And, frankly, listening to the government's

25   argument, I've heard a total lack of commercial reality. I

1    mean, I hear them argue that a bankruptcy court order

2    approving an assignment and assumption agreement ten years ago

3    was entered in error or that the Lehman Brothers estate did

4    not know what loans it was assigning over to Danske Bank.

5    That's not how the commercial world works.

6          You heard the government argue that Danske Bank

7    $98,000 million to support the resort after the fact, but

8    maybe Danske Bank was a stranger to this project and was

9    lending money to a project that it didn't have a secured

10   mortgage to.  There's no commercial reality in that argument.

11         Your Honor, the basic point is the secured lenders

12   are secured and come ahead of the equity. If that's going to

13   be up ended in this case, that's fine, but it should

14   (indiscernible) happen now.

15         And let me just make two other person points.  One,

16   I can tell you that if Mr. Kaiser had told me that the

17   property was subject to forfeiture and I was buying a lot that

18   was going to be taken out from under me, I wouldn't have

19   bought a lot and I certainly would not have entertained Mr.

20   Kaiser's bid to build a house that I then proceeded to build.

21         And the other thing I would say just in weighing the

22   equities, I respect completely that the victims have put their

23   own money into this resort and have certainly an equitable

24   interest in their position.

25         But obviously, the homeowners have all put their

1 money into the project and our interest is to at end of the

2 day to bring certainty to this proceeding and resolution to

3 this proceeding.

4    So, I guess, Your Honor, my final conclusion is I

5 really urge you to resolve this issue now so that the cloud

6 can be removed and the project can move forward to a

7 settlement, hopefully, maybe naively, or through the

8 forfeiture sale that Your Honor's order of forfeiture

9 contemplates.

10    THE COURT:  All right.  Thank you, Mr. Wolinsky.

11    Mr. Main, is there anything you want to add?

12    MR. MAIN:  Yes, Your Honor, but I'll be short.

13    As it relates to the arguments that have already

14 been made I guess one of the principal questions that I've had

15 in reviewing all of the briefing relating to the cross motions

16 is something that's reflected on page 8 of the reply that the

17 government just filed a couple of days ago.

18    And when it discusses the master repurchase

19 agreement, there's apparently a reference in there that

20 specifically states, "there should be a written confirmation

21 of each transaction," and then there's an enumeration of

22 certain things that that written confirmation should include,

23 including the purchase date, the purchase price, the

24 repurchase date and pricing rate.

25    And then there's also a mention of the custody

60

1      agreement and the same sort of information should be included

2      in there.

3              So, you know, as it relates to the bank's burden of

4      establishing when it acquired the Diamonte loan and how much

5      it paid for it, I mean, those would seem to be very important

6      documents that I just don't understand why they have not yet

7      been produced.

8              The only other thing I would say is I guess just to

9      echo what Mrs. Peca said.  You know, I represent CSL

10     Properties.  As the court is aware, there's 14 former NHL

11     players that are the ownership or the membership of CLS

12     Properties.

13             They're the real victims of the crimes that Mr.

14     Kenner was recently sentenced on and they're the ones that

15     contribute at least 2.3 or almost one third of the initial

16     capital that was needed to get this project off the ground and

17     they're very much concerned, Your Honor, that depending on the

18     court's ruling on these cross motions that they may find

19     themselves in a situation where there's no equity to recoup

20     there investment and there's likewise no equity from which a

21     restitution a judgment might be made.

22             So, you know, those are my comments at this time.

23     Thank you.

24             THE COURT:  All right.  Thank you.

25             I do want to speak to some of the things that I've

1    heard from the property owners and the victims but let me just

2    make sure -- I don't think Mr. Talkin has anything he wants to

3    say.  Mr. Talkin, is there anything you want to say today?

4              MR. TALKIN:  No.  Thank you, Your Honor.

5              THE COURT:  All right.  So obviously I'm going to

6    reserve decision.  I want to go back and look at the papers

7    and the law before rendering a decision.

8              I'll just take a minute about the importance of the

9    timing of this.  Obviously, I understand that. I set this down

10   on a very accelerate briefing schedule, even though the papers

11   were quite voluminous.  And I scheduled -- I usually wouldn't

12   schedule an oral argument a few days after getting a reply but

13   I did that because I'm very sensitive to the situation that

14   everybody who has an interest in this is in.

15             I just want to -- with respect to some of the things

16   that Ms. Peca said and some of the others, including Mr.

17   Wolinsky and Mr. Main, that obviously, the legal requirements

18   for who has an interest and a security interest are well

19   settled and the court obviously will apply them.

20             But on this issue of sort of the victims and

21   fairness and the equity that they have in the property I think

22   obviously the victims know that the court is highly focused on

23   that, has been from day one, and I don't want to repeat

24   because I know many people have been on -- I don't know how

25   many of these conference and I don't know whether Mr. and Mrs.

1    Peca participated in some of the forfeiture conferences and I

2    don't know whether Mr. and Mrs. Peca participated in some of

3    the forfeiture conference and proceedings.

4             But I have been saying for over two years that

5    everybody has an interest; the bank has an interest, the

6    government has an interest, the victims have an interest, the

7    property owners have an interest, the victims have an

8    interest, the property owners have an interest in sitting down

9    and resolving this issue without being at the point that we're

10   at now, I said that two years ago when this obviously became

11   an issue after the trial.

12            And I said it multiple times. I had a magistrate

13   judge involved at one point to try to get the parties to

14   resolve it.  The bank said they wanted to resolve it. I wasn't

15   involved in the settlement discussions but they represented to

16   me in one of the proceedings that they put many millions of

17   dollars on the table to try to resolve it because the

18   uncertainty in and of itself creates a lot of financial

19   ramifications for the bank.

20            So the bank, unless they're operating in bad faith

21   and they're suggesting to the court they're willing to try to

22   do something that they're not has said over and over again we

23   want to sit down with the government and resolve this.

24            When I keep asking the government about that at

25   every proceeding over the past years the government has told

63

1    me different things at different times about why they were not

2    in a position to do this.

3           And as Ms. Ramachandra noted in her letter, the

4    government does have the discretion to utilize the forfeiture

5    funds and prioritize them to go to the victim rather than the

6    government as a matter of fairness.

7           And I would hope that that would be their intention

8    with respect to any funds that they obtain through this

9    forfeiture, is not to give it to the government but to give it

10   to the victims.  That would be my hope, that would be my

11   expectation. But it's obviously -- the court doesn't decide

12   that.  The government decides that.

13          But upon urging the government repeatedly to sit

14   down, initially the government told me well, we can't -- how

15   can we sit down with the bank?  We don't know the value of the

16   property.

17          And I said well, figure out the value of the

18   property.  Do a valuation.  Well, you should forfeit the

19   property first.  The bank was telling me if I forfeited the

20   property the ramifications economically would not be good for

21   anybody and that made a lot of sense to me.

22          So I was telling the government basically to try to

23   get whatever they would need to be able to resolve this

24   quickly upon the preliminary order of forfeiture, do to

25   everything they needed to do with the bank, in terms of

1    documentation, in terms of an appraisal, get all that in line

2    so that upon the preliminary order of forfeiture this could be

3    resolved very quickly to everyone's benefit, including the

4    victims.

5           The government did its appraisal.  The court did

6    sign the preliminary order of forfeiture and then we started

7    having this issue where the government was suggesting -- and

8    the government can point out to me if they ever suggested this

9    to the court, you know, in years that this was being litigated

10   before the preliminary order of forfeiture that -- and when

11   the bank was trying to resolve the case, that the bank is not

12   a bona fide purchaser for value.

13          But because of the civil litigation, they have no

14   legal interest in this -- or they don't have a superior legal

15   interest, they're not a bona fide purchaser of value.

16          I don't recall any of that when we were discussing

17   and trying to resolve this case where the government's

18   position was this is -- this is our problem, Judge. It was

19   about valuing the property so that the government could make -

20   - which I understand.  Make a good determination of whatever

21   offer it is the bank was making versus (indiscernible) the

22   property was of what it would be worth to try to resolve it

23   quickly.

24          So that's where we're at, you know.  But I just want

25   the victims to specifically know the court has done everything

1    it can to try to be able to resolve this in a way that allows

2    the money to go to the victims, because that I think is the

3    most equitable think for this to happen.

4            But I don't control the government.  The government

5    makes its own decisions about timing and about discretion and

6    about what arguments they're going to make.

7            And they are pursuing this argument, but I would

8    continue for the, I don't know, umpteenth time to encourage

9    the government -- I assume the bank is -- whatever the court's

10   decision on this -- obviously, the uncertainty continues.

11           And so I would assume that the bank continues to try

12   to resolve this matter, and Mr. Kostolampros will correct me

13   if I'm wrong, but I assume the bank stands willing to again

14   sit down with the government (indiscernible)?

15           MR. KOSTOLAMPROS:  Your Honor, we would always

16   entertain any offer by the government, but as we said, you

17   know we tried before, Your Honor, and all Your Honor has to do

18   is look at the declaration of the government's consultant and

19   our letter, including an offer that gave, you know, guaranteed

20   funds to the victims.

21           And mind you, that was a lesser offer than the

22   original offer and a significant upside to the extent the

23   government's appraisal was right.

24           But the government we believe wasn't really acting

25   in good faith because we constantly got back -- we can't give

1   you even a preliminary thought on whether we could move

2   forward.  All we were asking for -- just give us an initial,

3   you know, view of the government that this could move forward

4   and they wouldn't.

5           And it was all about producing, producing more

6   documents that eventually it became clear to us that they were

7   just trying to challenge every instance of our claim.

8           So my point is this, Your Honor.  Yes, we are open

9   to entertain any offer and we've always been.  But that

10  shouldn't stop Your Honor from moving forward with --

11          THE COURT:  I'm not suggesting -- I'm not going to

12  delay this decision -- that's not my suggestion.

13          But my suggestion is whatever this decision is that

14  the parties should continue to try to work this out, because

15  the continuing litigation is not in anybody's interest.  So

16  the value just -- everybody (indiscernible) the value. So

17  that's all I have to say for that.

18          So I'm going to reserve decision --

19          MS. O'CONNOR:  Your Honor --

20          THE COURT:  Yes.

21          MS. O'CONNOR:  The government respectfully would

22  just like the opportunity to respond.

23          Over the years the government has in good faith sat

24  down with the bank and the resort to discuss potential

25  resolutions.  It has endeavored to do so at every opportunity.

1    The fact remains that Danske was refusing to produce proof of

2    its claim.

3         The government was very clear about the bona fide

4    purchaser for value status for any funds loaned after the bill

5    of particulars was filed, but did not offer any opinion about

6    the funds that were advanced prior to that time, having not

7    seen any of the documentation.

8         And having finally received some documentation as to

9    Danske claim it's the government's position that Danske's not

10   a bona fide purchaser for value, having failed to show a

11   purchase, particularly consideration -- adequate consideration

12   for the loan.

13        Under these circumstances, the government is not

14   permitted to settle, nor would it be fair to the other third

15   parties or the government to do so.  So that is primarily the

16   reason the government has not been able to advance any kind of

17   settlement.

18        It was really due to the bank's refusal to produce

19   proof of it's claim and it's time to force the government to

20   recognize its claim in its entirety and give the priority over

21   the other third-party petitions, which hadn't even been

22   noticed at the time, or the petitioners were -- we were not

23   aware.

24        There were many variables involved, but none of

25   which was government's bad faith or failure to try to reach

68

1    some kind of resolution.

2            THE COURT:  All right. Thank you very much.  Have a

3    good -- I appreciate everybody's arguments.  Have a good day.

4            (Proceedings concluded at 3:39 p.m.)

5        I, CHRISTINE FIORE, court-approved transcriber and

6    certified electronic reporter and transcriber, certify that

7    the foregoing is a correct transcript from the official

8    electronic sound recording of the proceedings in the above-

9    entitled matter.

10

11   _Christine Fiore_

12   _____          October 29, 2020

13       Christine Fiore, CERT

14           Transcriber

15

16

17

18

19

20

21

22

23

24

25