November 17, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Your Honor,

**RE: New evidence &/or *Brady*[1] issues have been raised—again; with defendant, Kenner, requesting re-opening Rule 33 for additional consideration.**

John Kaiser presented more new evidentiary issues during an October 28, 2020 post-sentence hearing.   Kaiser exposed incremental *Brady* disclosures in the instant case that were known to the government—and hidden from the defendants; complementing recent *Brady* issue submissions (*ECF No. 915, 916*) and prior Rule 33 submissions.   These include but are not limited to (*October 28, 2020, H'rg Tr.49-50*):
- Kaiser's audio recordings of Jowdy and his accomplices' frauds;
- Kaiser's video recordings of Jowdy and his accomplices' frauds; and
- Kaiser's direct communication with the FBI/government about his findings and exculpatory materials: pretrial.

Federal prosecutors have constitutional and statutory duties to disclose many types of evidence to defendants.   The principle of disclosure is central to our criminal justice system.   "A prosecutor that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant…That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).   And federal prosecutors, like all parties that appear before the court, have ethical duties of candor.   *United States v. Universita*, 298 F.2d 365, 367 (2d Cir 1962) ("The prosecution has a special duty not

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963); As a result of the selective removal of exculpatory evidence, one can look to the Law journal: Scott E. Sundby, Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland, 33 McGeorge L. Rev. 643, 651 (2002) (prosecutor would have to think: "This piece of evidence is so exculpatory in nature that it actually undermines my belief that a guilty verdict would be worthy of confidence…once I turn this evidence over…I can assume my zealous efforts to obtain a guilty verdict that I have just concluded will not be worthy of confidence.").

to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth.").

This has not been the case with all Second Circuit prosecutors in the last decade, with the stake higher than ever, according to Judge Allison Nathan.

Here, federal prosecutors have repeatedly violated their disclosure obligations and, at best, toed the line with respect to their duty of candor.   Over the course of years—before, during and after trial—the government has made countless belated disclosures of arguably exculpatory evidence.   For some pieces of evidence, the government offered explanations, weak at that, but in most occurrences, they offered nothing.   And when the Court pressed for more information about these exculpatory items and failures to disclose, the government made misrepresentations to the court, or ignored the request outright.   This serious dereliction requires a serious response.

More often than justice requires, the issues lacking candor by the U.S. Attorneys disclosures here are not unique to this case; *See United States v. Robert Pizarro*, No. 17-cr-151 (AJN).   Moreover, the manifold problems that have arisen throughout this prosecution—and that may have well gone undetected in countless others—cry out for a coordinated, systematic response from the highest levels of leadership within the United States Attorney's Office (Second Circuit).

When pressed post-trial by the defendant for explanations as to acquisition of exculpatory spreadsheets, affirming the government's misrepresentations of defendant's 'theft' at trial, the government alleged they were not material as they were "*cumulative*" (*ECF No. 440 at 6*).   Shockingly—lacking candor—these are the same 'thefts' they advocated for, but post-disclosure, are at a crossroads to explain their prosecutorial inconsistencies in the most critical matter litigated in the 10-week trial.   Thus—they thrusted the burden back to the defendant, effectively asserting that the defendant was tasked with disproving their prosecutorial theories with evidence 'they' themselves possessed, yet ignored; See *Berger*.   The government's "*cumulative*" defense of other exculpatory evidence—belies logic—conversely asserting its inculpatory nature.   The presentation of the "money tracing" documents by the government verify that their theories of defendant's theft were skewed and untested, yet relied upon as definite and unchallengeable.   It prejudiced the entire trial; wholly redefining their conclusive proclamations.

To deter similar future actions, the Court should exercise its authority to sanction the prosecutorial team.   See *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir 2000)

(discussing district courts' inherent power to impose sanctions).   The government's bad faith by knowingly withholding exculpatory material from the defense or intentionally making misleading statements to the Court, then some sanction or referral to the Grievance Committee in the Second Circuit would be appropriate.

It is clear that, based on the different temporal circumstances of exculpatory document production under *Brady*, further proceedings for additional fact-finding or credibility determinations is necessary.

Almost a century ago, the Supreme Court defined the singular role federal prosecutors play in our system of justice:

> *"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is <u>not</u> that it shall win a case, but that <u>justice shall be done</u>.   As such, he is in a peculiar and very definite sense the servant of the law. He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, <u>he is not at liberty to strike foul ones</u>.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one".*

*Berger v. United States*, 295 U.S. 78 (1935).

The government in this case has failed to live up to these ideals.   The cost of such government misconduct is high.   With each misstep, the public faith in the criminal-justice system further erodes.   With each document wrongfully withheld, an innocent person faces the chance of wrongful conviction.   And with each unforced error, the likelihood grows that a reviewing court will be forced to reverse a conviction or even dismiss an indictment, resulting in wasted resources, delayed justice, the individuals guilty of crimes potentially going unpunished.   The system relies on the prosecution to use only "legitimate means to bring about a just" result. *Id*.   Nothing less is expected of the revered Second Circuit U.S. Attorney's Offices— but they also have the responsibility to maintain it.   Here, they failed.

*Missing 3500 materials brought to light by Kaiser's 2020 proffers…*Kenner previously requested the court secure and deliver all of the known sequentially missing 3500 materials from the government; specifically including Kaiser.

Kenner was denied after the specific listed items were requested and withheld (*supra* and *infra*).   As part of Kaiser's 10-28-2020 new disclosures, his above referenced communications have not been delivered by the government, presenting incremental *Brady* issues to the previous mounting lists argued by both defendants.   It is not clear if the above items are the sequentially absent 3500 materials—or if they are additionally withheld *Brady* materials.

**Note**: Absent in the Kaiser sequential 3500 production items (at a minimum):
    (1) 3500-JK-4;
    (2) 3500-JK-5; and
    (3) 3500-JK-6;

Previously, Kenner also requested sequentially missing 3500 documents for John Kaiser [Arizona deposition, number unknown], Berard [Arizona deposition, number unknown], Gaudet [3500-RG-2, 3500-RG-3], Grdina [3500-JGR-2], Jowdy [3500-KJ-7, 3500-KJ-8 "raw notes"], Nash [3500-TN-2], and Kristen Peca [3500-KP-3, 3500-KP-4].

Kaiser, as Hawaii Managing Member since 2007, per his 2006 're-payment in full' agreement with Kenner, signed off his 2006 JV disclosure confirming his full repayment: *Ex. 39 at 6, ¶4*: "*The risks attendant on your investments should be greatly reduced by the return of your capital…*").   Now—Kaiser's renewed affirmations "*to the government*" "*say[ing] it's a crime what's going down there.  He's stealing millions of dollars.*" (*10-28-2020, H'rg Tr.49*) affects the Kenner investors/lenders.  Kaiser was the glue, as the Hawaii Managing Member, the government needed to 'forget what he used to know' throughout his trial testimony.   Now—Kaiser alters his recollections once again, affecting the veracity of his testimony and the underlying government prosecutorial themes in total about the unauthorized Jowdy loans.

The core Hawaii defense at trial was that Jowdy, an innocent third-party (according to the government at trial and probation thru at least their July 2016 submission), stole the authorized loan funds.   While the Jowdy-loans have been documented extensively (*infra*), discussed ad nauseum with the cross-over Hawaii-Mexico investors prior to commencing them, re-verified by eight of the Hawaii-Mexico investors under oath pretrial, and re-verified as vetted by then Managing Member Kaiser to the FBI in 2010, the government argued in opposition that the Jowdy loan and loan agreement[2] was "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and

---

[2] The government interviewed loan agreement signature witness Robert Gaudet (*Ex. 32 at 24-25*) approximately ten times; many in person.  Not one FBI-question or answer was

"*supposed*" (*Tr.5707-5708*), in their efforts to "*demean, humiliate, and destroy*" [Kenner's] *credibility*" (*October 5, 2020, Tr.75*).

"There is no per se rule in the Second Circuit that prejudice cannot occur if the defense was able to use the late-disclosed evidence at trial."; see *United States v. Washington*, 294 F. Supp. 246, 251 (D. Conn. 2003).   Here, the government and their star-witness hid *Brady* materials that Kaiser recently identified (and perhaps extensive others).

At trial—Kaiser vehemently testified he did not believe Jowdy was a "*thief*" nor "*stole*" money (*Tr.1230-35*)—two-years after these apparent new evidence disclosures by Kaiser to the FBI/government occurred; contradicting that specific testimony.[3]   The court should recall Kaiser was required, during trial, to listen to a recording of himself <u>after</u> denying ever calling Jowdy a "*thief*" (*Tr.1230-32*)— recorded in 2011 before he received his pay-for-play job from Jowdy (with Berard and Donlan) began.   After listening to the recording of himself calling Jowdy a

---

related to Gaudet's signature on the Jowdy loan document.  Yet—Gaudet verified the agreement and his signature during three independent lawsuits in 2009-10 (*Exs. 2, 3, 4*). The government <u>lied</u> to the court during the forfeiture hearings about Gaudet's recollection of his signature (*April 6, 2016 Forfeiture Tr.288-90*)—prior to Kenner producing the authenticating items multiple times to the Court—at the court's request.

**Note**: Trial counsel refused to assist Kenner with the court's request—a pre-cursor to the dispute over the Rule 33 submission.  For the first time—the Rule 33 notes were prepared by Kenner for trial counsel (approximately 12 months post-trial) in response to the court's request for other "*inaccurate*" testimony and contradicting exculpatory evidence (*Id. at 206-08*).

- Somehow—without it in evidence—probation also alleged that Gaudet, Kaiser and Jowdy all testified at the forfeiture hearing that the loan agreement was a forgery— despite <u>none of them testifying at the hearings</u>.   It was baffling—and hi-lighted the repeated lack of arms-length analysis by probation, including their July 16, 2016 submission.

[3] Kaiser was present for Jowdy's two-day California depositions, January 5-6, 2010—when Jowdy admitted to all of the Hawaii-loans—and other personal loans from Kenner, Norstrom, Stumpel, Murray, Gaudet, and Lehtinen that had not repaid.   Jowdy's January 2010 reformative testimony shocked all in attendance.  The two-days were live-streamed by investors Jason Woolley and Greg deVries for the rest of the investors who chose not to personally attend the depositions.   Anything Kaiser denied believing (in trial testimony) was said by Jowdy in Kaiser's presence—not heard from Kenner or any other third party indirectly.  The FBI received copies of the January 2010 Jowdy California depositions from Kenner, attorney Madia, and attorney Richards (who represented the investors in the California cases).

"*thief*" "*around 2010*", he reluctantly agreed that he called Jowdy a "*thief*"…but added, "*If that's what was said on the tape. I wasn't focusing -- I was focusing -- It was 15 minutes that I listened to.*" (*Tr.1312*)—deflecting the impact of his previous lie.[4] Prior to the recording being played (away from the jury)—Kaiser blamed any potential knowledge of Jowdy's thefts solely on Kenner's representations (*Tr.1236*)—also contradicting his 10-28-2020 statements. Kaiser was recorded calling Jowdy a "*thief*" shortly <u>after</u> he was present at Jowdy's January 2010, 2-day California depositions when Jowdy admitted to specific thefts[5] from:

---

[4] Kaiser's surreal acceptance-denial testimony was identical in tone to Donlan's attempt to re-certify her "*tracing*" testimony with Kenner in 2005 (*Tr.3424*)—when evidence affirms (1) Kenner <u>never</u> spent a single night in Boston that year—with the NHL lockout in progress (despite Donlan's recollection, *Tr. 3458*), (2) Donlan, the FBI, nor the government produced a single document (of the 2,000,000-plus in Rule 16) that had a group of Kenner-clients "*sign[ed] [] onto the same sheet of paper so that all the guys were on one sheet*"—and (3) <u>never</u> explained had a single reason to ever have a group of Kenner-clients "*sign it onto the same sheet of paper so that all the guys were on one sheet*"—for any private equity deal or otherwise.

- Donlan's testimony failed every possible evidentiary challenge (logistically speaking, including lacking materiality), yet as a Jowdy-employee and Berard's <u>best</u> friend, she verified it, back-peddling: "*I don't know. I don't know. It's in '05. I don't have it. I have the memory of it. It's just something I really remembered.*" (*Tr.3457*).

**Note**: In a 2015 contemporaneous Arizona civil case, Berard, Donlan, and Kaiser were exposed by a Maricopa County judge (The Honorable John Hannah Jr.) for approximately 10 alleged forgeries (*Ex. 30*), again in the face of all empirical emails and texts—while blaming them on Kenner (who was in federal custody). The judge still didn't find them "*credible*" – repeating "*Kaiser denied that he signed the promissory note to [five] intervener[s], implying that he was a victim of fraud by Kenner.*" and "*The Court generally did not find Kaiser's testimony credible*" (*Id. at 4, 6, 7, 8, 11*[with Donlan])—based on Kaiser's own confirmation emails.

- Donlan and Berard attempted the same forgery scheme (with former FBI agent Galioto and IRS agent Wayne aware of the fabrications and 3500 materials to verify the Berard-Donlan graft: *3500-LD-2*).  The court <u>cannot</u> overlook that Kaiser-Berard were <u>also</u> caught lying about a Mexico forgery (*ECF No. 112-9*), introduced by the U.S. Attorneys in 2014, and debunked based on Berard's 2012-FBI recording-admission that he and Kaiser actually signed the documents in the Mexico Courthouse related to the *Stumpel v. Jowdy* [$1.6 million criminal theft case] (before alleging they were forgeries—once they were hired by Jowdy…hmmm…noting that *when it walks and quacks like a duck*…yada-yada-yada!)

[5] **Note**: The only loan Jowdy refused to acknowledge during his January 2010 deposition was the $791,000 loan in Nevada from Glen Murray (*Ex. 9*)—because Murray's lawsuit was pending trial months later (December 2010).  Jowdy lost at trial based on his defense that he '*had access to the Hawaii loan at 15% annual interest*' (full admission of the loan—again as authentic), so '*why would he borrow $791,000 from Murray for 30-days 10% interest?*'.

6

(1) The Hawaii loan;

(2) The Kenner loan;

(3) The Norstrom loan;

(4) The Stumpel loan;

(5) The Gaudet loan;

(6) The Lehtinen loan; and

(7) The KSI loan—ultimately losing the $68.9 million, first Mexico property to foreclosure—after Jowdy and Najam robbed $2.1 million of the net collateral-loan (*Ex. 35 at 9-11: with attorney Harvey's help*) without any investor knowledge (*ECF No. 667 at 13—f.6, 21-24*).

Now that Kaiser has impeached his trial testimony, again, the court must observe that Kaiser's 2020 reformative recollection of the Jowdy loans would have grossly changed the court's perception of the loans at trial.   Kaiser's reformative 2020 statements corroborated his 2009 arbitration testimony (*Ex. 16*), his 2010 FBI proffers (*Ex. 1 at 2, 3, 10*), his actions as Hawaii Managing Member since 2007—and all verified by Hawaii inside counsel's emails (*Exs. 5, 6, 7*).   Kaiser verified to the FBI in 2010 that he vetted the loans independently with Jowdy before the "*group*" decision [corroborating 2011 SDNY Grand Jury testimony: (*Ex. 13 at 30-33, 35, 40, 42, and 45 [Peca]*) (*Ex. 14 at 19-21, 25-26 [Sydor]*) (*Ex. 15 at 17-18 [Stevenson]*)] was made via conference calls (*Ex. 5 at 1*) on a short-term basis to Mexico partner, Jowdy (*Ex. 32 at 24-25*).   Zero funds benefitted Kenner or ending up in the Kenner, Stumpel, and Lehtinen's Baja Ventures 2006 LLC capital account.

**Note (re: multiple Ponzi denunciations)**: In 2011, Peca verified his knowledge of the Hawaii capital accounts, funded by his LOC for "*speculative real estate investments*" (emphasis on its plurality) of "*$1,775,000.00*" (*Ex. 37: signed and dated by Peca*) as capital his source "*all in one account*" that paid for the monthly LOC fees (in addition to all Hawaii authorized expenses); clearly not a Ponzi-like scheme (*Peca 2011 SDNY Grand Jury: Ex. 13 at 45*):

> *Q: Would you have authorized your line of credit to be transferred to pay his line of credit off?*

---

Jowdy testified that Kenner borrowed the funds (not him)—in spite of the Nevada judge pointing out that Jowdy's own bank records, emails, accounting records, signed banking, and trust documents (presented at trial) verified the funds were borrowed by Jowdy and solely for Jowdy—and when the deal fell thru, Kenner specifically asked Jowdy to return the funds ASAP to Glen Murray (*Ex. 23*).   Jowdy—like Kaiser and Berard at the 2015 trial—denied any knowledge of the factually documented issues that contradicted their testimonies—with straight faces.

>  *A [Michael Peca]: I don't think they came in separately to that extent.   It was all in one account.*

Michael Peca further explained to the 2011 SDNY Grand Jury (*Id. at 31-32*):

>  *Q: When you signed those papers, where did you think that money was going?*
>  *A [Michael Peca]: It was going to a capital account for Little Isle 4.*

This echoed Berard's 2009 arbitration testimony (*Ex. 17*):

>  "*Basically the company – it was set up.   The company would pay the payments.  I would pledge the money, obviously to get a loan for the property.   Again, the company would pay the payments, and I was not forfeiting all the amount of money for the piece of property.*"

In fact—even though Kristen Peca's 2012-FBI recording verified she was not aware (until the 2012 phone call with Kenner) that her husband had a LOC for his "*speculative real estate investments*" of "*$1,775,000.00*", she testified that "*he [Kenner] was to be taking care of the monthly payments on the line of credit*" (*Tr.709*)—further distancing a Ponzi-like scheme.

Clearly lacking all corporate knowledge, the government cannot describe any alternative protocols expected to fulfill the "*investment*" LOC monthly payment obligations—only offering bluster, perhaps to a court that counted on their business acumen to access it.[6]  When Kenner contributed $267,000 of his own capital alongside his investors to pay their monthly LOC fees, the government charged Kenner (*ECF No. 214 at 10*, Counts 7, 8).   It defies logic: with Kenner again following the expectations of the investors.   Continuing, Berard explained to the FBI in 2013 (on the eve of Kenner's detainment) that he expected the Hawaii Company to pay his monthly fees as well (*Ex. 38: "The LOC would be used to pay the interest…"*); echoing his 2009 voluntary arbitration testimony (*Ex. 17*)—and trial testimony (*Tr.3035-36*):

>  *Q. When you opened up your line of credit with respect to the Hawaii deal, did you have any understanding as to how that line of credit funding could be used?*
>  *A [Berard]: …I thought it would be interest payments.*

---

[6] [Court: *July 2, 2019, H'rg Tr.24-25*]: "*I'm a judge.   I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.   And I don't think we're at that point.  If the government just continues to not really focus on this, I'm going to have to try to figure out myself in terms of where I should draw the line.*"

Kaiser's 10-28-2020 statements to the trial court about knowing Jowdy was a "*thief*", specifically after the well-documented loans, would have destroyed the government theory that no one knew of the loans or they were unauthorized (notwithstanding the By Laws, signed by Kaiser himself authorizing the loan activity: *Ex. 36*—or the government supported faulty memory, confusion and mistakes explanations).

In 2019, *ECF No. 667* highlighted the same refrain Kenner has requested to a deaf EDNY audience—to the government's prosecutorial benefit—and not the real investors.  [Kenner]: "*Shamefully, the government officials have never shared the real evidence with the investors*" about the Jowdy-Hawaii loan thefts (disclosed in government-forfeiture-44, post trial only)—leaving some investors to believe Kenner has their Hawaii funds (specifically including Kristen Peca thru former FBI agreement Galioto's graft).[7]

At trial—Kaiser further attempted to deny (without the recording being played in front of the jury) that what he said was factually consistent with what he said, or did not say, earlier in his testimony.  The government left his prior inconsistent statements during cross-examination uncorrected (*Tr.1313*):

> *Q. So would you agree with me that when you testified earlier that you didn't use the words or -- withdraw that.   Did you not use the words Mr. Jowdy is a thief? This refreshes your recollection and in fact you did use those words; is that correct?*
> *A [Kaiser]: Yes.*
>
> *Q. So correct me if I'm wrong, would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated the money was because Mr. Kenner told you so; is that correct?*
> *A [Kaiser]: No.*
>
> *Q. Do you remember testifying earlier this morning and responding yes to that question?*
> *A [Kaiser]: No.*

---

[7] Kristen Peca identified former FBI agent <u>Matt</u> Galioto's misdirection on her 2012-FBI recordings, confirming:
> [Kristen Peca]: *Matt told Michael and I that you <u>stole</u> all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*

The government knew Kaiser's temporal abyss was wrong again, yet they let the testimony stand, unchallenged (a *Napue* violation).[8]

Kaiser and Berard worked intimately with the FBI and U.S. Attorney's Office throughout 2012 and 2013 leading to the October 2013 indictment and November 2013 arrest of Kenner; including posing with Jowdy's NY Daily News acquaintance on November 13, 2013 to brag of their scheme to arrest Kenner (explained by an NHL attorney to Kenner immediately after Kaiser and Berard received their jobs form Jowdy).[9]

By the time of Kenner's arrest (November 2013)—Kaiser and Berard had completed criminal "*fraudulent transfer[s]*" of millions of dollars of real estate from Kenner thru title thefts (*Ex. 30 at 12, ¶57*).   Kenner sued Berard and Kaiser for these frauds: in two separate real estate lawsuits.   In 2013, Jowdy (who was also being sued for several millions of dollars by Kenner in Mexico, personally) benefitted from all of the case dismissals—with Kaiser and Berard's assistance.   All stipulated bank records explicitly prove that Kenner is a multi-million dollar victim of Berard and Kaiser—not the other way around, but the government continues to hide this salient fact from the court—while the court has denied all requests for evidentiary hearings; actually naming Kaiser and Berard victims, erroneously.

---

[8] *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).   Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the Court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."   *Sanders*, 863 F.2d at 226; see also *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir 1975) (The test "'is whether there was a significant chance that this added item, underlined by skilled counsel...could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.'") (underlines not in original) (Citations omitted).

[9] Former Edmonton Oiler and New York Ranger assistant to the President notifies Kenner of Berard-Kaiser-Jowdy scheme 15-months before the original arrest date:

| | | | | |
|---|---|---|---|---|
| 1<br>1<br>0<br>6<br>2 | +17057171<br>405<br>**Peter<br>Stephan** | 6/25/2012<br>11:48:38<br>PM(UTC+0) | R<br>e<br>a<br>d | [Stephan]: Hey ran into Rem [Murray]. James, Wooley, **Berard**, etc. These guys obviously cast things in a different light. ***They said that they speak to Jowdy daily and that t*** |
| 1<br>1<br>0<br>6<br>3 | +17057171<br>405<br>**Peter<br>Stephan** | 6/25/2012<br>11:48:39<br>PM(UTC+0) | R<br>e<br>a<br>d | [Stephan]: ***hey had all just signed some form of Bank depositions. They expect to have you incarcerated soon***. This all came up obliquely. Neither Rem [Murray] nor I let on. |

Based on Kaiser's newborn 10-28-2020 proffers, he knew (in 2012-13, pretrial) that Jowdy was stealing from the Cabo investors—just like he proffered to the FBI in October 2010 (*Ex. 1 at 2, 3, 10*).   At trial in 2015, three years *after* the date of Kaiser's 2020 representations about his 2012-13 <u>knowledge</u> of the Jowdy's crimes; Kaiser offered more inconsistent statements to the court (*Tr.1236*):

> *Q. One last question on this area before I move on, Mr. Kaiser. Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?*
>
> *A [Kaiser]: Yes.*

Other issues were raised at the 10-28-2020 hearing, *infra*—in direct contradiction to prosecutorial themes, exculpatory evidence, and misrepresentations that have permeated this case—since the investigation phase.   The majority of inconsistencies are based on multiple misdirection schemes, initiated by individuals who have various interests to protect thru graft (like Jowdy, Kaiser, and Berard, *supra*)—but all aligning to orchestrate the same perception for the court: Kenner's guilt based on *any* set of non-empirical representations (a.k.a. testimony), truthful or not.   Their end goal has already been achieved.  These individuals needed to protect their-own varied interests (financial and otherwise).   But—the more the court allows unscripted rhetoric (by Kaiser, Berard, Peca, Nolan, etcetera), the more the unprotected pre-orchestration of trial-fabrications are exposed.  It appears again, here—affecting the confidence in the verdict and harshness of the sentence—with some of the loudest voices having stolen the most from Kenner (i.e. Kaiser, Berard, and Peca—all verifiable in stipulated Rule 16 production records).

**John Kaiser:**
John Kaiser verified significant FBI/government pretrial communication; items he "*actually audioed, videotaped*" -- "*roughly in 2013*" (*H'rg Tr.48*).[10]   These pre-trial exculpatory items were never turned over (*Brady* issue)—despite their origination as much as two years pretrial—and striking at the heart of the government's case in the court's eye addressing the government (*H'rg Tr.37*, [Court]: "*your position is the government <u>didn't</u> know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?*").[11]

---

[10] All *H'rg Tr.xxx* cites refer to the court's October 28, 2020 forfeiture status conference.   For some unknown reason—Kenner was restricted from attending the call.

[11] **Note**: Former FBI agent Galioto's affidavit October 2020 identified his professional credentials as a CPA—yet <u>no fund tracing</u> occurred in the instant case for the authorized

*Kaiser inconsistent statements, as usual…*

Proffering 10-28-2020, "*G-d willing it will be forfeited because it was our funds that paid for that.*" (*10-28-2020, H'rg Tr.48*).[12]  Government-forfeiture-36 verified this is

---

Hawaii-Jowdy loans.   It is incredulous—and the court pointed it out <u>5-½ years after trial</u>— never realizing this salient issue until post-sentencing.

[12] <u>Kaiser had no money in the Hawaii deal</u>.   Kaiser friends & family $1 million contribution was fully repaid in August 2006 (Naalehu bank records stipulated in evidence).   That is an indisputable fact—which the government ignores.

Kaiser is <u>not</u> a "*victim*" of anything (*10-28-2020, H'rg Tr.50*) (See Kaiser testimony of collateral agreement, *Tr.1089*)—moreover, Kaiser <u>needs</u> the court (and subsequently all the people he has robbed) to believe Kenner has their money—when the empirical evidence verifies Kaiser (1) stole it, (2) admitted it to Kenner (via 2011 text, *infra*), and (3) re-verified it to the FBI (via proffer) (*Ex. 1 at 7*, including (1) his handi-capped brother Keith, (2) DEA agent Rizzi, and (3) several Long Island doctors (withheld by Galioto as additional *Brady* issues: *Ex. 40*) as part of a $550,000 theft)—yet the court lets this documented abomination stand unchallenged with the government's fear of unwinding their star-witness; *see Wallach, infra*.

In addition—the Kaiser/FBI fabricated back story about "*back pay*" and "*expenses*" is a fraud on this court (*Tr.1413-14*), provable with 10 seconds of evidentiary hearings, although denied to date in appearance to protect Kaiser's lies and documented thefts from (1) Kenner, (2) Kaiser's friends & family, (3) Vincent Tesoriero, (4) Tesoriero's parents (*Ex. 22 ¶12-13*). It is in evidence—but ignored in lieu of presenting the actual exculpatory evidence to the court.

- In a tangential issue (restitution and veracity related)—Kaiser testified he received a collateral agreement from Kenner in 2006 for the <u>same money</u> (*Tr.1089*)—so (if you believe Kaiser at his word, including his forged/fabricated agreements created with Jowdy and attorney Harvey—only discovered after Kenner's arrest), Kaiser testified that he was fully re-compensated by the $100 million Baja Ventures 2006 collateral agreement with Kenner, 14 years ago (2006).   This exposes his inflammatory testimony that "*he ruined my life*" (*Tr.1089*) (with a $100 million collateral agreement allegedly in hand), reiterated by the government for effect during summation (*Tr.5753*); see *Upton v. Tribilcock*:

  "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc*., 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility…to review a document before signing it.").

In 2011—Kaiser admitted to Kenner via text message that he owed Kenner money (not the other way around as falsely alleged at trial)—in addition to (1) his mother, (2) his handi-capped brother, (3) Vincent Tesoriero, and (4) Tesoriero's parents money from the 2005 loans—all of which he testified (with the government aware of the lies) that he repaid them after selling his home in 2005 (*Tr.980: "I paid back my family members and friends with*

not true; no Kaiser funds were involved in the acquisition.   Hawaii Managing Member-Kaiser voluntarily testified about the Hawaii-Jowdy loans in 2009 like Jowdy's attorney expressed to the court:

> [McSouther] (*Id. at 54*): "*it's kind of incredible to me that here's a man who in 2009 testified on behalf of Phil Kenner in an arbitration proceeding that was brought by Owen Nolan in which he said that he knew that the loan – the money was (indiscernible).  And then six years later he testifies before Your Honor that he had no idea it was a loan until after the fact.*"

*Kaiser 2010 FBI proffers…*
Further supporting McSouther's comments, perhaps unknown to "McC", would have been that Kaiser also re-admitted this to the FBI on October 19, 2010, 1-½ years later.[13]   Hawaii Managing Member, Kaiser detailed his knowledge of the Jowdy-loans in 2010 to the FBI (*Ex. 1*):

---

*interest.*"):

| 1 2 6 7 2 | +16312 350308 John Kaiser* | 7/22/2011 2:17:04 PM(UTC+0) | R e a d | [Kaiser]: <u>that is nit the only money that is owed out</u>, that I have been working everyday to pay back everyone |
| 1 2 6 7 4 | +16312 350308 John Kaiser* | 7/22/2011 2:57:35 PM(UTC+0) | R e a d | [Kaiser]: …<u>100k went to u</u> [to Kenner for loan repayments], <u>150 vin</u> [Tesoriero] owes, 3300 a month goes towards cards from Pv [Arizona] Reno, <u>was paying my mother</u> [Ethel], <u>$ 2500 a month for the 1 mil…took from her</u>, left her with no money to live, now paying her $1500 a month, <u>Took 380k from brother Keith</u>, left him w/shit…Should I continue ????? It's a fucking joke. <u>And please don't tell me about Mex I am not one of the hockey guys</u> |

Kaiser <u>never</u> repaid his friends & family in 2005—nor did he have any Mexico interest (per his own 2011 text message, until employed by Jowdy, fabricating the collateral agreements—as Kaiser's pay-for-play rewards).   It is inarguable and is in evidence.

[13] The FBI-government were aware of their star-witness's 2009 arbitration testimony and 2010 FBI-proffer statements—but allowed his contradictory 2015 trial testimony to proceed without correction (a *Napue* violation).

> "[D]etermining that a new trial was necessary, because lies of his key witness who <u>tied all the pieces together</u> even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991) (emphasis not in original).

As to materiality,
> Defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Cromitie*, 727 F.3d at

1) Kaiser's <u>pre-loan</u> meetings with Jowdy in 2003-04: "*met Jowdy 2x in NYC...2003 Jowdy restaurant...discuss project in Hawaii funding in Mexico*"—and "*another time...in NYC...discussed Hawaii lending $ from Hawaii to Mexico*" (*Id. at 2*);

2) Kaiser's meetings <u>during the pendency of the lending period</u> (2004-06): "*saw KJ in Mexico a couple times...KJ wanted to borrow̶i̶n̶g̶ $ from Hawaii to Mexico – would pay back after closing*" (*Id. at 2-3*)...referring to the expected-original December 2005 Lehman Brothers funding-closing date in Cabo san Lucas— delayed several times until March 2006—and "*KJ brought up borrowing $ from Hawaii project...borrowed millions → $5M-$6M from Hawaii project..."discussed Brian Berard=PK*"—and "*was Agreement to borrow $ from Hawaii*";[14] and

---

221-22 (quoting *Agurs*, 427 U.S. at 103).  "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'"  *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir 1991) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975)).

Notwithstanding former-FBI agent Galioto was present at Kaiser's 2 hour, 15 minute 2010-meeting when agent Romanowski created the raw notes during the meeting; not "*written before the interview or after the interview*" as AUSA Komatireddy vouched for Kaiser's credibility during rebuttal summation (*Tr.5992*).

The Court recognizes that "summations, and particularly rebuttal summations, are not fully constructed in advance."  See *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  But "[t]he improvisatory nature of a rebuttal summation is no license for improper vouching, referencing facts not in the record, or appealing to extraneous 'consequences' of a verdict."  *United States v. Friedman*, 909 F.2d 705, 710 (2d Cir 1990).

[14] The Hawaii-Jowdy agreement was offered as forged, unsolicited by Kaiser, on cross-examination (*Tr.1106-08*).  The government/FBI was aware that the signature witness on the Hawaii-Jowdy loan agreement, Robert Gaudet, was interviewed by the FBI approximately 10 times pretrial.  There is not a single note that reflects asking Gaudet about his verification signature—<u>Gaudet's sole connection to the instant case</u>.  Yet—the FBI-government was aware that Gaudet verified thru testimony his signature during: (1) the 2009 arbitration (*Ex. 2 at 1, 9*), (2) during a deposition by Jowdy's Arizona attorney, July 2, 2009 (*Ex. 3*), and (3) as a Jowdy-defense-witness in December 2010 (*Ex. 4*), in the Jowdy $791,000 theft defense case: *Glen Murray v. Jowdy* [Nevada].  The government tried to mislead the court during forfeiture hearings about the multitude of Gaudet affirmations (*April 6, 2016, Tr.288-291*).

During the July 2, 2009 deposition—Gaudet verified about Kaiser and the loan document:

*Q: Did he [Kaiser] mention he had any involvement with the creation of this loan agreement document?*

*A [Gaudet]: Yes...He told me it was a document he needed for – it was a document he had for the Hawaii entity, for the Hawaii company*. (*Ex. 3 at 6-7*)

3) Kaiser's meetings, <u>post lending</u>, "*never got $ back from KJ/Mexico*"—and "*KJ to JK = don't worry all $ will come back; get repaid*" (*Id. at 3*).

McSouther was more-likely-than-not aware of the Hawaii "*updates*" Kaiser verified to the FBI (October 19, 2010): *"2006 update letter on Hawaii project...yes, I recall letter...PK made these; many times"* (*Id. at 3*).   These exculpatory "*updates*" were addressed to <u>all</u> of the Hawaii members—and known to the 2010-FBI interviewing agents who presented them to Kaiser.  Kaiser <u>verified</u> them in 2010, and as such, nothing was concealed or unknown during the original loan period (2004-06).  The updates identified a myriad of exculpatory items:

[February 24, 2006 "*update*": *Ex. 5*]:
*"We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project*[15]....*Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004 Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications.*[16]*

*The questions during our last conference call by Owen Nolan, Mike Peca, and Bryan Berard were important to all of you.   If you are still confused about the individual*

---

The government's star-witness was allowed to freelance his testimony to fit his personal animosity of the day—as attorney McSouther pointed out to the court's chagrin (*10-28-2020: H'rg Tr.54*).

[15] Pre-Cabo closing in January 2006, Jowdy and Lehman Brothers lender Masood Bhatti (referenced in Kaiser's February 2019 letter as a Jowdy co-conspirator: *ECF No. 628 at 2*)—submitted the original January 2006 CM&D (3rd-party) project evaluation to Kenner, which verified the closing payout of $7 million; covering the Hawaii-Jowdy loan outstanding amounts (*Ex. 24 at 11*).  **Note**: The $16 million commission (*Id. at 11*) was explained as how the (1) Kenner, (2) Murray, (3) Stumpel, (4) Norstrom, (5) Gaudet, and (6) Lehtinen personal loans to Jowdy would also be repaid thru Bhatti's distributions.   It all changed before the March 2006 closing, once Jowdy and Bhatti received the necessary signatures from Kenner and Kenner investors on the operating agreements; a classic bait-and-switch (as AUSA Michiewicz alleged Kenner should have done to Kenner, *infra*, *Tr.4700-01*).  Kenner was never presented with the updated February 2006 version (discovered in Rule 16 production), which removed the $7 million payment in the final February 2006 2nd column (*Id. at 11*).  The $17 million commission was never traced post-closing (*Id. at 11*).

[16] During trial—Glen Murray (*Tr.3608*) and John Kaiser (*Tr.1127*) verified their possession of the lending agreement at their homes.

*equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

*Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records.   It has been given to Masood [Bhatti] at Lehman Brothers[17] so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay. They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.   The 15% is not a normal loan interest.  The extra accrued interest for the Hawaii project will assist in defraying the development expenses Chris Manfredi, Chris Hawkins and John Kaiser have explained to you on previous conference calls.*"

- Only willful blindness could explain any investors' lack of knowledge (more transparency included in the complete "*update*" emails)—but certainly not criminal intent thru concealment.   Kenner—and those involved in the Hawaii project management team—could not have been more transparent about information.

*Continuing…*

[May 17, 2007 "*update*": *Ex. 6*]:

"*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC[18] (your investment LLC as attached) and the $5 million*

---

[17] Kaiser represented in his February 2019 letter (*ECF No. 628*) that Masood Bhatti is still robbing the Cabo san Lucas project with Jowdy via monthly consulting fees to "*find 'investors' or 'loans' for Diamante*" (*Id. at 2*); with distributions approved by the complicit Danske Bank members, and consultant—Mike Delvin.   For color—Delvin also serviced the Cabo, Texas, Tennessee, and Hawaii loans for Bhatti/Jowdy and Bhatti's hand-picked managers for easy pilfering.   Kaiser proffered: "*You can't service the loan from the sports bar when you're drinking, because he wasn't servicing the loan.*" (*10-28-2020, H'rg Tr.49*).

[18] CSL Properties 2006, LLC contributed $2.3 million, as the last, and lowest risk money in the Cabo purchase—as noted in the May 17, 2007 update to the Hawaii-Mexico investors (*Ex. 6*).   The CSL funds were applied to the CSL capital account (with $300,000 left out by Jowdy in 2006) and still being argued by Kenner as Managing Member a year later.   The "*update*" clearly laid out the approximate $5 million capital account contribution from

*capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.  Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy.  They want to negotiate with Jowdy through Tommy.   You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on.*"

> Kenner reply to attorney:
>
> "*nolan and peca called me about an hour or so ago after reading your message and said f-jowdy.  berard called and told me he wanted to choke Jowdy…kaiser and constantine do not want to sue Lehman…*"

**Note**: CSL attorney Main proffered 10-28-2020 that he represents "*the real victims of the crimes that Mr. Kenner was recently sentenced on and they're the ones that contribute at least 2.3 or almost one third of the initial capital.*" (*10-28-2020, H'rg Tr.60*)".   Kenner's conviction was about three unrelated schemes (and without a directed verdict).   Nothing was related to (1) Jowdy's Cabo san Lucas project thefts or (2) Jowdy's March 2006 misrepresentations of the Cabo san Lucas capital accounts; only discovered months after March 2006 closing, *supra* (see Kenner exposé and attempted mitigation with Jowdy and Najam: *Ex. 6*).   And specifically— the CSL members are merely investors in Cabo, nothing else.   Jowdy independently

---

Kenner, Stumpel, and Lehtinen to Baja Ventures 2006—seemingly forgotten by the government and other investors as the "*initial investments before Lehman agreed to fund*". All CSL money was contributed <u>after</u> the Lehman Brothers commitment—thus lowering their investment risk to minimal—notwithstanding Jowdy's unchecked and protected 15-years of embezzlements (per Kaiser's, *ECF No. 628*, and 10-28-2020 proffer "*And then I go to the government and say it's a crime what's going down there.  He stealing millions of dollars.*") (*10-28-2020, H'rg Tr.49*)

This is a new evidence issue and *Brady* disclosure issue; fully exculpatory to the government preeminent claims that Kenner lied to the investors about the Hawaii loan money (*Tr.33*):

> [AUSA Komatireddy]: *"This is the fraud where the defendants lie to the investors about who's stealing from them…The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it"*

- According to Kaiser's 10-28-2020 proffers—the government knew about the Jowdy crimes pretrial, **directly from Kaiser**, and covered up this explosive evidence Kaiser explained to the prosecutorial team.  Its reformative status highlights gross prejudice.

received 100% of their CSL capital account funds into Jowdy controlled-project accounts.   <u>Kenner received none of it</u>.

Any potential Cabo san Lucas resort fraud issues and settlements were negotiated by Attorney Main with Jowdy's legal team and settled in 2017 (*Ex. 12*) at the urging of former FBI agent Galioto. The settlement terms included <u>any legal entity of Jowdy's</u> that was involved in <u>any transaction with the Hawaii-Mexico investors</u> (including their un-repaid Hawaii loans, whether attorney Main was aware of the full dynamic of his settlement breath or not).  As a result of Galioto's urging, Main represented to his CSL clients February 20, 2017:

> [Attorney Main]: "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project and the relationship between Kenner and Jowdy <u>has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY</u>.*"

Kristen Peca identified former FBI agent "*Matt*" Galioto's misdirection on her 2012-FBI recordings, confirming:

> *[Kristen Peca]: Matt told Michael and I that <u>you stole</u> all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*

- Kristen Peca was clearly aware of the Hawaii loan to Jowdy (exclusively thru her husband)—but not that her husband had an "*investment*" LOC (opened in 2005—and closed in 2009).   Any testimony at trial about her knowledge was fabricated based on her 2012-FBI recording admissions (*Tr.709-13*).[19]   The government knew about her trial fabrication, perhaps planned it with her, as Kristen Peca offered, "*Do you want me to get into the line of credit situation?*" (*Tr.709*).  The government let the admitted fabrication stand (see *Napue*).

---

[19] Kristen Peca's 2012-FBI recording <u>verified</u> her lack of knowledge (actually stunned)—8-years after the date she testified at trial she was aware of Michael Peca's LOC (*Tr.709-713*)—but she clearly equated the "*Hawaii…line of credit*" as the Jowdy loan:

> [Kristen Peca]: *Do you mean the Hawaii; you had a line of credit, <u>but not for us?</u>*

> [Kenner]: *No, no, you guys had lines of credit for 5 years at Northern Trust.*

> [Kristen Peca]: *For 5 years?*

> [Kenner]: *For 5 years!   When you were in OHIO, that's when the thing closed.*

*ECF No. 628*...John Kaiser's February 2019 letter (referenced by him, *10-28-2020, H'rg Tr.47-48*) highlighted the Jowdy, Galioto (and Kaiser/Berard while working for Jowdy) fabrication to all the Hawaii-Mexico investors about Kenner stealing the loans they all knew about and expected Jowdy to receive (*infra*); never alleging any lack of authorization for the underlying loan pretrial—or even Kenner concealment.

It is a classic mis-direction that Kenner believes that court may still not have a full grasp of due to the government's ever-changing "goalpost positioning".   This is apparent during the 10-28-2020 hearing colloquy (*10-28-2020, H'rg Tr.37*):

> [Ms. O'Connor]: *Your Honor, as you're well aware, the crimes that were charged <u>did not include</u> the crime involving the funds that went to the resort...the government of course as you know is required to do significant investigation and make sure that its position is justified.*
>
> [THE COURT]: *I was going back to say your position is the government didn't know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?  Yet the government is saying that – I'm a little confused by that.   Wasn't the whole basis for part of the initial indictment, the diversion of investors' money from Hawaii to Mexico, to various investments in Mexico, right?*

This is stunning to read 5-½ years post trial.   Obviously every investor was aware of the loans, *supra* and *infra*.   Pretrial—the government could not propose the loan-knowledge as a crime to prosecute, except to investors who were compromised for a myriad of self-preservation reasons; including: (1) <u>Kaiser</u> and <u>Berard</u> from their (i) documented personal thefts from Kaiser's friends & family (*Ex. 1 at 7*—*et.al.*), (ii) theft from the five Arizona interveners in the Arizona renovation lawsuit (*Ex. 30*), (iii) thefts of two multi-million dollar properties from Kenner, and/or (iv) excessive lifestyle, (2) <u>Michael Peca</u> who had concealed his investments from his wife[20]—*at*

---

[20] Michael Peca sent Kenner a February 2009 text, the day he and Kenner discussed the first default letter being sent by Northern Trust Bank.  Michael Peca clearly wanted his LOC "*investment*" debt (*Ex. 37*) <u>hidden</u> from his wife:

| 5 2 8 7 | +17163743234 Michael Peca* | 2/2/2009 8:07:47 PM(UTC+0) | R e a d | [Michael Peca]: Have an idea. <u>Agaist my better judgement and my wife is not to know</u>. Call me |
| 5 2 8 9 | +17163743234 Michael Peca* | 2/2/2009 8:27:44 PM(UTC+0) | R e a d | [Michael Peca]: <u>Just get me a general letter saying the matter is concluded without mention of the payment</u>. |

*his choice*—but needed to cover his own proverbial behind for investments that did not turn out as he hoped; see *Archer*[21], and/or (3) others who simply could not recall passive-equity details; whether or not they were influenced by former FBI agent Galioto, like <u>Sydor</u> and <u>Ranford</u> explained to Kenner on pretrial phone calls: documented in pretrial communication between Kenner and his trial counsel (*Ex. 18*), [Kenner]: "*I told you that when I spoke to Sydor, Ranford and others on the phone from jail, that they told me they were going to be thrown out of the USA by Galioto if they did not say what he wanted from them.   The investors are scared but they have no duty to the Court.  I hope their lies will be obvious at trial, and we can impeach them.*"

| 6 2 2 7 | +17163743234 Michael Peca* | 2/2/2009 8:40:14 PM(UTC+0 ) | S e n t | [Kenner]: My pleasure |
|---|---|---|---|---|

• Michael Peca was Kenner's client, <u>not Kristen Peca</u>.

Less than 3-months later—Michael Peca panicked about his wife receiving an email to their family account about the LOC default.   She testified in 2015 about being "*shocked*" (*Tr.709-10*) over a month earlier (clearly fabricated for effect)—when she <u>never</u> knew about the LOC in the first instance (per her 2012-FBI admissions).   Michael Peca wrote:



| 6 8 5 1 | +171637 43234 Michael Peca* | 5/1/2009 5:57:01 PM(UTC+0 ) | R e a d | [Michael Peca]: Get in touch with Glen yet. <u>Also</u>, <u>NT sent an email to my wifes aol acct.</u> <u>Attatched is the transfer info.</u> <u>She's going to f'n loose it when she sees loan paid</u> |
|---|---|---|---|---|

Michael Peca's panic followed transparent communication re: Peca's "*Hawaii capital accts*" and its legal recovery efforts with Hawaii Managing Member, John Kaiser—post-seizure (authorized by Peca):



| 6 8 4 3 | +171637 43234 Michael Peca* | 5/1/2009 3:00:52 PM(UTC+0) | R e a d | [Michael Peca]: <u>I'll be great when the Hawaii capital accts are paid back.</u> <u>Any news there</u>? |
|---|---|---|---|---|

Kenner replied to Peca (*ECF No. 719 at 27*): "*I hear you clearly. Me too. Working on it with john Kaiser [the Hawaii Managing Member].  Just slowly moving thru the process. We have to get all the other legal hammered out in the meantime. We are making great progress versus Jowdy. That will lead the rest of the deals like the Hawaii loans, etc*"

[21] The Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." *United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).

All references, *infra*, were in the government's *Jenks* and *Brady* materials (all late drops); *See Gil*.[22]   The government-FBI was crystal clear about all previous statements by their witnesses, whom they depended on to <u>forget</u> what they previously testified to and actions they took in litigation to corroborate their signed and previously testified actions.   Every trial affirmation by Kenner was grounded in the investors' previous under oath statements, not a newfound explanation by Kenner *ipse dixit.*

There were <u>never</u> concerns for the actual Jowdy-loans (just the <u>stolen</u> lie).   Kristen Peca, like all of the Hawaii-Mexico investors, never had concerns about the loan to Jowdy (other than his non-repayment, *infra* on Kristen Peca 2012-FBI recording)— as known to all actual investors.   Michael Peca detailed his knowledge of the Jowdy-loans during his 2011 SDNY Grand Jury testimony (*Ex. 13 at 30-31: 3500-MP-5*):

> *Q: <u>How much did you put into Little Isle 4?</u>*
>
> *A [Michael Peca]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used <u>at the time</u>. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan <u>until the lending came in</u>. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. <u>That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.</u>*
>
> *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to Ken Jowdy, our business partner</u>, <u>so there is no need at the time to be worried about anything.</u> <u>The money was loaned to Ken Jowdy to basically help some of the</u>*

---

[22] See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was not disclosed timely enough for it to be useful to defendant</u>.   The production of the documents on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.") (emphasis not in original). *Gil's* guilty verdict was vacated and remanded for late production of exculpatory information.

> *purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.*
>
> *I knew 100 percent it was going to Little Isle IV initially. Shortly after that the short-term loan was something that took place."*

Although most of the Hawaii investors were also Jowdy-Mexico investors—they <u>all</u> participated in the initial authorizations of the Jowdy loans, per their emails and testimony; including but not limited to all exculpatory evidence in FBI possession pretrial, including:

1) <u>Peca</u> (*supra*), <u>Sydor</u>[23], and <u>Stevenson</u>[24] to the 2011 SDNY Grand Jury;

---

[23] Sydor 2011 SDNY Grand Jury verifications thru testimony (*Ex. 14 at 25-26*) (as a subset of his total exculpatory disclosures):

> *Q: Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
> *A [Sydor]: <u>Yes</u>, <u>but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back</u>.*
>
> *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
> *A [Sydor]: <u>Yes</u>. <u>It was to help with the short-term loan to keep funding the Cabo</u>, <u>but then its supposed to be paid back</u>, but that's –*
>
> *Q: Paid back to you or to Little Isle 4?*
> *A [Sydor]: <u>Paid back to Little Isle 4</u>.*
>
> *Q: So –*
> *A [Sydor]: <u>Back to Hawaii</u>, <u>not me personally</u>.*
>
> *Q: But that didn't happen?*
> *A [Sydor]: <u>That didn't happen</u>. <u>And Lehman came up with the $129 million loan</u>. <u>It was supposed to be back at closing</u>.*

[24] Stevenson 2011 SDNY Grand Jury verifications thru testimony *(Ex. 15 at 17-18)* (as a subset of his total exculpatory disclosures):

> *Q: When you put up the $100,000 for Hawaii, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawaii project?*
> *A [Stevenson]: In the beginning it was supposed to go to Hawaii. Then **I saw** they needed, <u>the group of us got together</u>, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to <u>transfer as a group</u> like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*
>
> *Q: So you are saying you agreed to transfer some of the money from the Hawaii project to the Cabo project?*
> *A [Stevenson]: <u>I would say that</u>, <u>YES</u>.*

22

2) The 2009 arbitration testimony by <u>Kaiser</u> (*Ex. 16*) (per McSouther's 10-28-2020 references) and <u>Berard</u> (*Ex. 17*);

3) The 2009 arbitration affidavits by <u>Norstrom</u> (*Ex. 19 at 3, 4, 6*), <u>Gonchar</u> (*Ex. 20 at 2-4*), and <u>Stumpel</u> (*Ex. 21 at 3-6*);

4) The filing of *Murray v. Jowdy*-Nevada, identifying "*Jowdy had sought and obtained several previous loans with the assistance of Kenner*"—and *"Murray authorized Kenner to lend Jowdy monies*" (*Ex. 9 at 3*);

5) The filing of the Arizona litigation to recover the Jowdy-loans (*Ex. 8*: signed by 19 of the 25 Hawaii investors), the remainder identified as pro-Jowdy (*Id. at 7*—*et.al.*) in the <u>signed</u>, <u>initialed</u>, and <u>dated</u> disclosures, which simplified on page 1: "*<u>the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.</u>*"; and

6) The filing of two California lawsuits to recover the same funds (*Ex. 10 at 7*—and *Ex. 11 at 7*) corroborating: *"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

*Continuing…*

[July 13, 2007 "*update*": *Ex. 7*]:

*"I am sure many of you are concerned about the settlement talks between Tommy and Ken and rightfully so.   I have been told that Tommy exchanged a final revision last week with Ken to the deal points.   <u>Ken acknowledged his loans in excess of 8 million with the Hawaii deal and unpaid.</u>   The final points if we sign this version of the agreement will relieve Ken of the debt in exchange for Ken leaving the Cabo project.   Phil or Tommy will assume the management for good or until another developer deal can be done.   Either way the deal will be finally managed properly.   Ken will be reduced to a 15% equity stake in Cabo. Phil told me he heard from <u>Darryl Sydor</u>, <u>Glen Murray</u>, and I think one or two other guys that you do not understand why Ken in*

---

*Q: Who made that decision?*
*A [Stevenson]: <u>I think all of us as a group</u>.*

*Q: What do you mean "as a group", who is the group?*
*A [Stevenson]: <u>All the guys who were invested in it</u>.*

*retaining anything after what he did to us but sometimes deals require compromise.* <u>*This appears to be one of those times because ridding ourselves of any involvement in the future from Ken and his people is far more valuable than many of you may realize at this point*</u>*.   I was equally annoyed as you but we will begin real work in Cabo without him assuming Lehman approves the deal.   There are several other deal point that include the Diamante air planes and others.   We will resolve those with the incremental equity we take back from Ken and disburse it to cover the* <u>*Hawaii loans and personal loans Jowdy received and failed to honor*</u>*.   If any deal affects you like Glen Murray and Ken's unpaid Vegas loan we will deal individually with those.   Some of the Diamante del Mar issues are still in progress but we have covered the majority of issues Phil and Tommy have deemed critical.   It is more than enough for the attorneys on both sides to generate the final settlement agreements.   <u>I see this as an overdue success after Phil exposed Jowdy almost nine months ago.</u>*

*You may call me directly or email any group questions.   I expect us to be completing this deal in the next thirty to sixty days.   Rob"*

> Contemporaneously, Kenner forwarded another set of the Nolan LOC documents in 2007 to Nolan thru the attorney, at Nolan's request (*Id. at 2*)— further highlighting Nolan's memory loss issues at trial about the LOC (*Tr.2065-66*):
>
> [Kenner to attorney Madia]: "…*send a full copy to Owen at his California address as well with my FedEx account. I just spoke with Owen and his wife and they need another copy of what he signed in 2003 for Little Isle 4 and all the renewals from 2004-06 for his personal LOC.   I think he was trying to sort out last years land loan versus the LOC for the Hawaii investment and the Jowdy loans..thx.pk*"

**Kristen Peca:**

Kristen Peca was *never* a Kenner client.   She has no first-hand knowledge of any transaction between Kenner and her husband.   <u>It was all fabricated for trial</u>.   Her 2012-FBI recordings affirm this, not Kenner's testimony.   Upon information and belief from people in the hockey world, Michael Peca is suffering badly from CTE symptoms—like Berard admitted he had been during his 2014 CTE lawsuit versus the NHL (a pre-trial public admission hidden from the defendants—a.k.a. *Brady*).   As a result—Kristen Peca is now speaking on his behalf, without any personal foundation of knowledge—only what she has been told second or third hand at this point.

During Kristen Peca's first significant conversation with Kenner—she recorded

Kenner for the FBI in 2012.  Kristen Peca <u>admitted</u> and <u>agreed</u> to all of the Jowdy-Galioto led graft (with Kaiser and Berard's assistance, as Jowdy lackeys once hired). She affirmed her and Michael Peca's knowledge of the Jowdy loans—stunningly forgotten just 3-years later in contradiction to Michael Peca's well-articulated 2011 SDNY Grand Jury testimony (well-known to the FBI/government):[25]

> [Kenner]: *Kristen – please – are you really asking me that after all of the lies you have heard from Bryan [Berard] – and John [Kaiser] – and that matt [Galioto] guy who refuses to meet with me and review the evidence?   Why would they have beaten me in Mexico in that jail if I had the money – and then killed our attorney?*
>
> [Kristen Peca]: *this is too scary.   I told you that when we heard from – I don't remember who –*
>
> [Kenner]: *I did not tell you…*

---

[25] With Kenner arrested in 2013, Berard and Kaiser were released from two multi-million dollar lawsuits as defendants they were losing in Arizona.   They were sued by Kenner for several million dollars they stole from Kenner (and 5 other NHL players) with fabricated/forged documents and a fraudulent conveyance of title, and a forgery defense (debunked at the Arizona trial in 2015).   Former FBI agent Galioto had full knowledge of the fabrications, Kaiser/Berard forgeries and "*fraudulent transfer*" documents (all in Rule 16 production: *Ex. 30 ¶57, Ex. 31*).  Kaiser and Berard lost on every defense claim; noted by the Arizona judge, "*The Court generally did not find Kaiser's testimony credible. Some of the reasons are stated elsewhere in these Findings. In addition, Kaiser's testimony in general was frequently self-contradictory and self-serving, his demeanor at times suggested a lack of veracity, and he had an obvious motive for denying responsibility for the loans.*" (*Ex. 30 ¶26*).

- Ironically—a clean read of Kaiser's 2015 testimony reveals the same revisionary history, self-contradicting at every affirmation (known by the FBI/government and ignored, a *Napue* violation)—specifically now with his Jowdy "thief" recollections in 2020.

And—sewing chaos into the known-truths was apparently a successful formula for Jowdy as well.   He and several cabal members—including former FBI associates under Freeh—were released from multiple Mexico criminal lawsuits.  And—Jowdy saved millions of dollars in stolen funds from Kenner, personally.  The $5 million-plus Hawaii litigation to recover the Hawaii-loans ceased as well (ironically—with Kaiser as Hawaii Managing Member, working for Jowdy).

- It was an epic scheme and monumental financial windfall for Kaiser, Berard, and Jowdy that could not have been carried out without a complicit FBI agent in conjunction with Jowdy's mastermind, Attorney Tom Harvey.
- Any legit—post-sentencing—investigation into the real facts in this case would alarm any trustworthy prosecutor or judicial advocate (all empirically based)—and available to the court.

[Kristen Peca]: *...maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and...and the attorney guy getting killed.   It's too scary.   Michael and I can't thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes.   I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that?*

[Kenner]: *a protected criminal – that's who.*

With Kenner's 2013 arrest and detainment—the Pecas received a $750,000 windfall from Kenner's capital contributions to their joint Las Vegas real estate deal with Kenner; and still have it.   They breached the agreement (*Ex. 33*) by keeping Kenner's $650,000 initial deposit and $90,000 of monthly fees (the first 6-months)—while Kristen Peca refused to turn over the monthly revenue checks, per the terms of the agreement.    Kristen Peca's financial windfall was significant incentive for her to fabricate the LOC story (*Tr.709-13*) in concert with the FBI's coercion; regardless of her 2012 admission she knew nothing about her husband's LOC thru the 2012 call.   This does not suggest an equal standard of justice.

On 10-28-2020, Kristen Peca proffered "*but the victims, who happen to be the original investors, the real shareholders, need to be heard too.*" (*10-28-2020, H'rg Tr.46*).
- To the government's continued benefit—her statement co-mingles two separate transactions into one for sake of confusion: (1) the Hawaii loans to Jowdy, and (2) the equity investments in the Diamante Cabo san Lucas project.   They are not and have never been one-in-the-same; or co-mingled.

Despite her 2012 FBI recording admissions—Kristen Peca is *still* referring to her fabricated testimony that:

(1) The Hawaii-Jowdy loans were stolen by Kenner (per former FBI agent Galioto's misleading coercion, *supra*) and not given to Jowdy (debunked by government-forfeiture-44);
(2) And—Used to buy Kenner's Baja Ventures 2006 equity (debunked by government-forfeiture-36)—verifying at a minimum the $4.1 million capital contributions by Stumpel and Lehtinen: Kenner's Baja Ventures 2006 partners. The $4.1 million capital contributions were verified at the forfeiture hearings (*April 4, 2016, Forf. Tr.27-31*—et.al.).

Yet—the government's summations mis-represented these same facts, confusing

even the most proficient juror (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709:* included, *"what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him."..." you know what, Baja Development Corporation*[26]*...You know exactly what the money was for...Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."..." He used it for personal use to get an interest in that resort in Cabo."*).

- Yet—<u>none of this is true</u>—and the Kaiser testimony about Jowdy's thefts and crimes would have devastated the basic government premise and timelines in the case.
- This is an epic *new evidence* issue—and/or *Brady* disclosure that only a new trial could un-ring (and eliminate) the repeated false premises that led to a verdict lacking confidence (especially the more the government witnesses speak un-tethered by Galioto post-trial).

The government/FBI have still refused to tell the investors the truth—even 5-½ years post trial.   It is clear that Galioto misled Kristen Peca about Kenner stealing the loans she believed (thru her husband's affirmations) went to Jowdy before her 2012-FBI recording admissions to Kenner.   It is a tragedy of justice that Michael Peca and other investors are not made aware of the lies spread by Galioto, Jowdy, Kaiser, and Berard to obfuscate the Jowdy corruption (and some of their own); now over-exposed by the government (July 2020 and August 2020 submissions re: Jowdy-Danske graft) and Kaiser (too late, as planned, for trial defense application).

After assisting Jowdy's cover-up graft, Kaiser told this court in February 2019, *"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…"*.   These are the loans the Hawaii investors expected Jowdy to receive—verified by Peca, Sydor, Stevenson, Norstrom, Gonchar, Stumpel, Kaiser, Berard, *supra*—and as Kristen Peca admitted to Kenner during her 2012-FBI recording.   Ironically—<u>Jowdy did receive them</u>—no one else.   Reformatively—the

---

[26] The FBI knew Ken Jowdy individually owned Baja Development Corporate—but insinuated it was Kenner's account throughout trial.   Jowdy directly <u>verified</u> it during his March 2010 FBI proffer (*Ex. 32 at 2*).   Jowdy <u>verified</u> the Hawaii loans (*Id. at 11-14*).   Yet— with IRS agent Wayne as a witness, it was stunning that Wayne did not know who owned the Baja Development Corp account where the majority of the Hawaii loans were sent (*Tr.4046*):

> *Q Do you know who the principal of the Baja Development Corporation is?*
> *A [Wayne]:* <u>*I don't.*</u>

government verified it post-trial (see government-forfeiture-44).  Thus—they were never stolen by Kenner.  Yet—the prejudicial and false government summations were left unchallenged.

Kenner proffered to 100% of these Jowdy-criminal issues in June 2009—11 years ago.  But—why only now are they true?  The major difference is that former FBI agent Galioto is not in charge—and new U.S. Attorneys (Leonardo and O'Connor) are ferreting out the mess left to them.   Shocking the conscience—with the same information available for 6-years of pretrial investigation, they gracefully flushed out that Jowdy was a criminal (*May 14, 2019, H'rg Tr.37*):

> [The Court]: *Are you concerned with how the property is being managed at this point, I mean just in terms of maintaining status quo?*
>
> [AUSA O'Connell]:  *Your Honor, the government does have certain concerns that its being run by Jowdy, who is someone that the government feels is an unindicted co-conspirator.*

Kenner denies any complicit actions with Jowdy with pre-loan decisions vetted by Kaiser (*Ex. 1 at 2, 3, 10, supra*) and pre-loan meetings verified as well by Kaiser (*Ex. 16 at 2: "my first concern was to make sure that he had some collateral so it could get paid back, which he did."*), matching the language of the Jowdy-Hawaii loan agreement (*Ex. 32 at 24-25: "Borrower pledges his individual interests in DDM, DCSL, and any related entity controlled by Borrower as additional consideration for the loan presented by Lenders"*).  Loan signature witness, Robert Gaudet, testified in a 2009 Arizona deposition that Kaiser assisted in the creation of the loan agreement (*Ex. 3 at 6-7: "Q: Did he [Kaiser] mention that he had any involvement in the creation of this loan agreement document?  A [Gaudet]: Yes.  Q: What did he tell you?  A [Gaudet]: He told me that it was a document that he needed for -- it was a document that he had for the Hawaii entity, for the Hawaii company."*).    It was Kenner's discovery in 2006 and immediate exploitation of Jowdy's crimes that led to the decade of investor negotiations with, and litigation versus Jowdy—never in a vacuum absent investor involvement.

Jowdy highlighted his recollection of Kenner's actions—never implicating Kenner as a complicit partner in his December 2016 declaration to the court (submitted to Pacer by Jowdy's counsel in 2016—and again in 2019) (*Ex. 27 at 2*).

Yet—the forfeiture AUSAs realized in 2019, at least 7-years after (1) Kenner, (2) Shawn Hughes (Jowdy former assistant), (3) Robert Burdick (a Jowdy former land manager), (4) David Boyden (an Jowdy former golf course designer), and (5) Robert

28

Gaudet (a Jowdy former golf pro and sales director), <u>all verified</u> thru FBI proffer (in *Jenks* materials) between 2009-11 that Jowdy "*tricked a lot of people*" and was "*'living the life'*" of "*lavish spending*" and Jowdy "*spent most of the money on entertainment at the Cabo san Lucas property*" with the "*plane usually 'filled with girls'*" for a "*free trip*" and "*when investors asked for an update on the project, Jowdy would always brush them off and say he would get around to it*" and "*did not keep investors in the loop*" but  "*put on a 'dog and pony' show and put up 'smoke and mirrors' because he could not deliver what he promised*" (*Ex. 28*: Hughes proffer—5 days after Kenner's equivalent proffers—plus Kenner's proffers of Jowdy's $10 million theft with account back-ups, sent to former FBI agent Galioto after the proffer).  **Note**: These quotes are from former FBI agent Galioto's refined June 29, 2009 notes—before he was informed that Jowdy was represented by his former boss; former FBI Director Freeh.

- Isn't this what Kaiser just told the 10-28-2020 court—11 years later?

Galioto managed the entire 11-years of this investigation—thru sentencing.  He <u>never</u> exposed the underlying Jowdy crimes that everyone else saw, leading to the post-trial revisionary truths that the Hawaii loans were real (government-forfeiture-44) (and previously per Kaiser—*Ex. 1, Ex. 16*).  The real loans authenticate that the Global Settlement efforts by Constantine clearly attempted to remove Jowdy from the Cabo san Lucas project thru negotiations, litigation, and mediation (in California)—and recover the funds Jowdy actually stole from the Hawaii-loans.

- As McSouther proffered (*10-28-2020, H'rg Tr.54*)—Kaiser and every Hawaii partner whom Kaiser represented (as Managing Member since 2007) knew that the Jowdy loans were real; <u>including McSouther and his client's previous verifications</u>.   Every investor who testified pretrial (in real time) verified the loans, while they sued for recovery.   Every Hawaii-Mexico investor participated versus Jowdy, who Jowdy and his attorneys had not convinced—as Kaiser documented in 2019 "*Jowdy would like the court [and everyone] to think that Kenner stole $7 million from the hockey players and others…*"—It is still not true…

**Note**: During forfeiture—the government never pursued an 853(p), substitute asset forfeiture, to forfeit any portion of the Cabo transaction as AUSA O'Connor affirmed: "*Your Honor, as you're well aware, the crimes that were charged did not include the crime involving the funds that went to the resort…*"

*Example*: Instead, they employed the theory (under 18 U.S.C. § 981 (a)(2)(A) or (B)) that if Kenner robbed $1 million from a bank and gave a Church $5,000 to

be repainted, then the "*traceable*" funds would allow the government to forfeit the church (regardless of the millions of actual and intrinsic value of the Church); disregarding the precedent for applying money judgment forfeiture (to dissipated funds by the defendant)[27] and 8th Amendment issues.   This is not what Congress had in mind.

*Business 101*…Kristen Peca continued: "*Diamante Cabo san Lucas is one of the investments that Phil Kenner had us involved in, one in which he stole a lot of money from us in the form of ownership percentage.*" (*10-28-2020, H'rg Tr.46*).   This statement covers a lot of issues but all empirically wrong.

First—Kristen Peca was not part of any 2005-06 Cabo investment conversations; none occurring in her presence.

Second—the May 17, 2007 "*update*" letter (*Ex. 6 at 1-2*) highlighted the equity dispute with Jowdy—and documented the back-up capital contributions; defining Kenner's Baja Ventures 2006 (with Stumpel and Lehtinen) as contributing the first at risk money ($4.1 million, non-refundable hard deposits to the seller).   The Baja Ventures 2006 contributions occurred <u>before</u> Kenner received confirmation from Lehman Brothers, verifying they would fund the necessary $70+ million to close the initial land purchase.   <u>Only after</u> the Lehman Brothers' confirmation to fund did the CSL members contribute their $2.3 million of much lower risk funds.   All of the Hawaii loan funds were guaranteed by the Diamante del Mar property[28] (which no one knew Jowdy, Najam, and Harvey had collateralized, <u>violating</u> several previous collateral representations to Kenner and Kenner investors: *Ex. 35 at 2, 3*—and KSI *at 7*).

This is business 101, and seemingly foreign to the government whom the court

---

[27] In 2019—this issue still confused the court as planned by the government (*July 2, 2019, H'rg Tr.29*):

> [Judge Bianco]: *"I understand that not every dollar was, you know, dissipated and spent on other things.   I understand that a significant amount of the money went to Mexico."*

- <u>It did not</u>. Ken Jowdy personally received it—just like the loan agreement documented (*Ex. 32 at 24-25*).

[28] Kaiser's 2009 arbitration testimony verified the collateral:

> [Kaiser]: "*Well, the first – my first concern was to make sure he had some collateral so it could get paid back, which he did.   It was a parcel in Mexico, on North Baja, and that was his collateral.   I think he had 70 percent interest, and I think the property was appraised maybe at 30-, 35 million.*" (*Ex. 16 at 2*).

relied upon to evaluate the legal business transactions in the instant case.[29]

- Regardless—Kenner never received any of the Cabo deposit funds—despite the government's summation lies.

Nevertheless—the May 2007 "*update*" email identified the 40% Baja Ventures 2006 – 40% CSL Properties equity expectations (clearly—not a normal risk/equity distribution model, and to the CSL members favor thru Kenner) (*Id. at 2*).   The May 2007 "*update*" identified the futile resolution attempts with Jowdy and Najam, in person.   Perhaps—Michael Peca <u>hid</u> the emails from his wife, again.

Third—Kristen Peca is wrong about Kenner's personal contributions.  Like many of the funds Jowdy received—Jowdy specifically chose to 're-allocate' investor funds to his worthless LLCs, whenever Jowdy stole them, before Jowdy bankrupted these single-purpose entities with no assets; a classic conspiracy-man scheme.   Kristen Peca is factually incorrect that "*somehow Kenner got 40 percent*", insinuating thru graft—based on her unfamiliarity with the facts and stipulated records.

*Urban Expansion similarities…*Kaiser raised the Danske-Lehman Brothers-Cabo penalty "*the $50 million kicker…as per Mr. Jowdy's request*" (*10-28-2020, H'rg*

---

[29] July 2, 2019 Hearing (*Tr.24-25*):

> [Court]: "*I'm a judge.   I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.   And I don't think we're at that point.   <u>If the government just continues to not really focus on this</u>, I'm going to have to try to figure out myself in terms of where I should draw the line.*"

The government's negligence is troubling considering the court's understandable position, in self-reflection, that, "*I'm not a corporate lawyer, never been a corporate lawyer, so some of the very complicated transactions may not – you know, I may not understand every aspect of it, but as you know, they make a big point about the fact that there is no documentation.*"  (*10-28-2020, H'rg Tr.54*)

- Troubling is not the court's resume on these crucial matters, but moreover, that in Kenner's defense advocacy, Kenner presents nothing but document after document to impeach government theories and testimony.   The government's best defense was defending the impeached testimony as "confusion, mistake, or faulty memory"; *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (*ECF No. 440 at 16*).

  This opened the door for 3-years of post-trial advocacy by Kenner (at the courts request: *April 6, 2016, H'rg Tr.288-91*), leading to the discovery of widespread Chronic Traumatic Encephalopathy ("CTE") amongst the government witnesses.   Kenner was not the first advocate thru this seemingly emotional yet truthful faulty memory, confusion and mistakes door for the court—but was more harshly punished for it.

*Tr.49*)—after the Cabo loan was (1) already in place, (2) over 5-years under Danske's control, and (3) with Danske refinancing years of Jowdy management failures and loan defaults; notwithstanding personally enriching himself and his complicit actors (*ECF No. 628*)—three of which included Kaiser, Berard, and Donlan for an extended period of time.

It was under similar business 101 inaccuracies, the Urban Expansion loan was prosecuted as a fraud—in large part because of a back-end penalty fee (albeit normal in the hard money lending world: i.e. *Ex. 25 at 2*).  Despite Constantine-Urban Expansion delivering exactly what Hawaii COO Manfredi affirmed as 11<u>th</u> <u>hour</u> and <u>dire</u> (*Tr.1312-13*), even Manfredi's government-theory-supporting testimony could not dance around the truth that millions of Hawaii investment dollars would have been lost if they did not accept the deal at two minutes to midnight after dozens of other lenders failed and COO Manfredi was despondent when another lender, of many, failed to show for a closing (*Ex. 25*):

> [Manfredi]:  *"I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does...I think the likelihood of losing Waikapuna and Moa Ula [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding. Chris Manfredi, COO/Project Manager, Big Isle Ventures, LLC, 516-526-xxxx"*).

There is no evidence that Kenner—in a vacuum—delayed or diverted the lending transaction to any party, lacking the best interest of the Hawaii land acquisition efforts at that time.

COO Manfredi affirmed it—while attempting to play coy about the reality of the lending conundrum[30], to the government's favor:

---

[30] Manfredi maintains a visceral hatred for Kenner after Kenner discovered and exposed Manfredi stealing Hawaii corporate funds thru an operations bank account and personal charges on a Hawaii-corporate credit card just before the August 2006 JV.  Manfredi was being fired if the Lehman Brothers-JV deal did not go thru in August 2006.  The discovery led to tremendous acrimony between Kaiser and Manfredi (former best friends) because "*Manfredi did not want to sign off on the Lehman Brothers closing to fund the Hawaii project...Kaiser was upset after the meeting*" (Kaiser-FBI proffer 9-9-2013) after Kaiser assaulted Manfredi in Sabarro's restaurant in Manhattan that night, leaving before the NYPD arrived.  Manfredi told the NYPD, in Kenner's presence, it was a misunderstanding, but ultimately it resulted in Kaiser demanding the post-closing, $395,000 LedBetter loan to orchestrate removing Manfredi from their Sag Harbor transaction—in part for Kaiser's JV signature.  The court should recall—during trial, AUSA Michiewicz insinuated under Michiewicz' normal business practices (perhaps defined by Jowdy's similar morals of not repaying loans or equity), Kenner should have stiffed Kaiser and not loaned him the short-term funds as agreed.   Michiewicz' insinuation lacked all ethics (*Tr.4700-01*):

*Q. Again, so without the moneys from Urban Expansion, Mr. Kenner would have been in default of that contract and have lost the down payment, whatever the amount might have been, if he didn't find that funding.*
*A [Manfredi]: Well, you are making an assumption based on a timeline and <u>you are also making an assumption that Urban Expansion money was the only money in the world.</u>*

*Q. Well, was anybody else coming up with the money at that time, Mr. Manfredi?*
*A [Manfredi]: <u>No</u>, <u>sir.</u>*

*Q. It was pretty urgent to get that money from Urban Expansion to pay off this contract so that they could purchase the property. Is that correct?*
*A [Manfredi]: You would have to define urgent.*

*Q. Any other lender come forward and say, I'll pay the money, forget Urban Expansion, I can give you better deals?*
*A [Manfredi]: <u>No</u>, <u>sir</u>, <u>not to my knowledge.</u>*

*"No sir"*!   That is all the court needs to know after over 20 failed funding efforts (in Rule 16 production)—following Manfredi, Kaiser, and Kenner terminating the 2005 "*egregious*" Lehman Brothers lending scheme (*Ex. 26*)—not Kenner in a vacuum.

Kaiser further incriminated Jowdy (*10-28-2020, H'rg Tr.49*)—in direct contradiction to his trial testimony and the government theories of Jowdy as an "*innocent*" party— 6 years into the investigation (and after Kenner proffered about the Jowdy criminal acts in June 2009—no different than what the government and Kaiser exposed in

---

*Q. So he [Kaiser] already signed on the dotted line for the Lehman closing before any of this stuff happened with the Sag Harbor property. Isn't that correct?*
*A [Kenner]: Yes, sir. He signed after we had agreed to give him a short-term loan.*

*Q. Not much leverage at that point, right? I mean, Lehman is on board, Kaiser, Manfredi, everybody signs the closing documents, and then he forces you or demands from you this short-term loan?*
*A [Kenner]: Are you suggesting that after we agreed to it prior to the signature I should have lied to him and not given him the loan?*

*Q. Well, you are a businessman, sir, aren't you?*
*A [Kenner]: Not one to lie to people, if that's what you are insinuating.*

2020).[31]

> [Kaiser]: "*I even had the accountant on tape, Antonio Marques [Jowdy's Mexico accountant], talking about the criminal activity.  And I said if only the FBI knew what Danske and Ken Jowdy were doing.*"

Kaiser's *Brady* disclosures would have debunked the government theories of Hawaii thefts by Kenner—and Kaiser's testimony about what he knew at time of trial—as McSouther explained (*10-28-2020, H'rg Tr.54*); specifically considering it echoes Kaiser's 2009 arbitration testimony knowledge (*Ex. 16*) and his 2010 FBI proffer statements (*Ex. 1 at 2, 3, 10*); simply parsed and forgotten to aid in Galioto's prosecutorial theories—thru graft.

**Conclusion:**

The Court must intercede as a neutral arbiter and unwind this injustice, regardless of the 7-years of elapsed time (even post-sentencing)—based on the surreal admissions by Kaiser 10-28-2020; coupled with Kristen Peca's misrepresentation of everything her husband authorized (albeit, unknown to her).   Justice has no time limits.   But proper resolution can still undo a lot of unnecessary damage and unintended consequences.

---

[31] Probation's July 2016 addendum for the court identified Jowdy as an "*innocent victim*" of Kenner—over one-year post-trial.  This reiterated Jowdy's December 2016 affidavit for this court, attesting to his honesty, and blaming Kenner for any misconceptions of his integrity (*Ex. 27 at 2*) [Ken Jowdy]: *"I firmly believe, however, the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints."*

- 7 years in and they *still* all got it wrong...but why wouldn't the former FBI agent listen to his co-hero, Kaiser in 2012-13—or did he systematically hide more *Brady* information?  Was Jowdy's protection that much of a priority to justice?  Everyone around Jowdy in 2009 proffered the same sentiments as Kenner—now reiterated by Kaiser 11-years later, *supra*.
- Kaiser has never explained to this court why at trial—years after his Jowdy-Cabo theft knowledge-discoveries ("*audioed*" and "*videotaped*": *10-28-2020, H'rg Tr.48*)—he never mentioned it at trial when the government knew (another *Napue* violation).

It is obvious that harming Kenner—in order to blame his own millions in friends & family thefts on Kenner—was Kaiser's primary goal.  Even Galioto was aware of the multitude of Kaiser crimes (*Ex. 29*: Frailes theft from his friends & family, explained in Kaiser's 2010 FBI proffer by himself—*Ex. 1 at 7*)—but Galioto needed Kaiser (in doses) to protect Jowdy and get rid of Kenner—with Kaiser as a star-witness; See *Wallach* at 457-8.

Here—if there is truly a criminal fraud by Jowdy and company in Mexico—as Kenner proffered to the FBI, SEC, U.S. Attorney's Office in June 2009 (and stands by the same today)—then, the U.S. Attorney's need to indict Jowdy and any complicit person, which may include Kaiser (with Berard and Donlan) with 5 years as Jowdy's co-conspirator(s), falsely testifying about forgeries in Mexico to save millions in judgments and jail time for Jowdy (criminal case: *Stumpel [$1.6 million] v. Jowdy*— after Jowdy failed to include the $1.6 million in the Baja Ventures 2006 capital account, but rather misappropriated it, known to the government; See government-forfeiture-36) amongst Jowdy's other documented criminal acts.[32]

The U.S. Attorney's office (forfeiture division)—perhaps un-influenced by former FBI agent Galioto has taken the morass and reached beyond their forfeitable scope. Clearly—based on the court's question (*at H'rg Tr.54*), the court has been deftly misled by the former AUSAs into believing Kenner was indicted for diverting unknown or unauthorized or unexpected funds to Mexico—despite fully documented authorizations, by all investors, to execute the transactions exactly as Kenner did (as loans to Ken Jowdy, personally)—with both investor and corporate authorizations obvious to the government and court.

Kristen Peca told the court she still believes Kenner stole the Jowdy-loans.  This was echoed months ago by Nolan's NY attorney, verifying Nolan's "*contributions*" to the "*real estate at the heart of this matter*"; in contradiction to her client's 2009 arbitration and 2015 testimony (*Tr.2065-66*)—while echoing former FBI agent Galioto's subterfuge, "*Mr. Kenner clearly carried out a scheme to defraud Mr. Nolan and other victims by gaining their trust and persuading them to invest in various development projects*", none of which was illegal—"*and then stole their money*" (*ECF No. 843*), which never happened (See government-forfeiture-44, government-forfeiture-36). Only the misdirection that is traceable to Galioto, Jowdy, Kaiser, and

---

[32] Kaiser's theft from his friends & family are unchallengeable—verified by his own text messages, email, banking records, FBI proffer—and only refuted by his constant story-changing rhetoric, Jowdy-style.   Perhaps, Kaiser's 5-year apprenticeship under Jowdy taught him well.   He has surely followed in Jowdy's forgery of everything litigation defenses, and other meandering tales of what occurred—to save himself from the money he stole (stipulated in evidence).  If the mis-direction is clear to: (1) Attorney McSouther, (2) the 2015 Arizona court, and (3) every defense attorney who has read Kaiser's 2015 EDNY testimony in disbelief...then surely the government knows what dirty hands they continue to parade out.   The government has a duty under *Berger v. United States (Supreme Court 1935)* to define it and act upon it.

- The court also has the unfettered authority to recommend a special counsel investigation as to the underlying matters and criminal graft—exposed by Kenner.   The investors deserve to know the *real* truths, regardless of the consequences on the current case.

Berard has laid the foundation for the utter confusion still today.

In fact—the FBI arrest-day press release laid out the same known access to the lines of credit—verifying, "*Kenner also convinced several NHL players to open lines of credit, to which Kenner was given access*"—complemented by the U.S. attorney in 2014 (pretrial) affirming: "*And some of them will even say they understood that some of their money would go to a real estate development in northern [Baja] California run originally by Mr. Jowdy*" (*ECF No. 235 at 46-47*) in contrast to several investors failed-recollections 10-years later of when they began the LOCs—yet never being asked the obvious: "*If you were not aware when your LOC was opened, what did you do once you found out and continued to sign annual renewal packages?*"   The answer is a resounding, "*Nothing…*"—because they knew it and signed every document directly with Northern Trust Bank.   It was simply another Red Herring to add more morasses.

**Note**: Glen Murray testified he thought his LOC was opened five years <u>prior</u> to its actual opening date (*Tr.3478, 3481: "I would be guessing, but late '90s, maybe 2000s. I don't know. I can't remember…. I think, if I can remember, the money was for the Hawaii project, to develop the project, develop the land and pay the people that are looking after it and whatever.")*—ANSWER: October 27, 2004.

In the instant case—the question is: What else has been prejudicially distorted to the court and the investors—simply to secure an empirically contradicting and grandiose sentence—deflecting attention for too many people with different goals, *supra*?

Kenner has advocated, post ProSe admission March 12, 2018 (3 years after trial), with empirical and exculpatory evidence for the court to assess, each issue and memory loss testimony independently—based solely on prior inconsistent statements (not Kenner *ipse dixit*).  The myriad of submissions has highlighted documented coercion by former FBI agent Galioto and the subsequent court-government confusion 5-½ years post-trial on the most monumental issue at hand. The court has denied every independent evidentiary request to sort thru the quagmire (investor-by-investor).   It appears that now, more than any other time, the dichotomy of the government, the court, and the investors' recollections are a chasm so great that perhaps—as Kenner has advocated since 2018 in ProSe— requires an evidentiary deep dive.

Similarly—Judge O'Brien opined while overturning *United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*), a second time—after nearly 5 years in jail for Evans:

> [Judge O'Brien]: "*The result here may not be heralded as a model of perfect justice, but it will stand as a conscientious application of the law.*"

Judge O'Brien followed Justice Gorsuch's initial 10th Circuit *Evans I* appellate opinion in 2014 to calculate the *Evans'* fraud appropriately; See *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014).  It was similarly prosecuted by allegations of concealment from *Evans'* investors during financial troubles in their real estate company—based on a faulty and flawed investment model.  As a result in the E*vans II* decision, Judge O'Brien (who replaced Justice Gorsuch following his appointment to the Supreme Court in 2017) was forced to:

(1) Order no restitution or loss; and
(2) Reduce the re-sentence guidelines to 4-10 months after the original 14-year sentence; once they determined and opined that authorized business transactions of a corporation cannot result in a loss factor for equity investors—as they accept the risk-reward premise of private equity.

That is the case here.  There are <u>hundreds</u> of exculpatory records—left unobserved to date by the court.   The government fears their dissemination, which would result in the undoing of 11-years of chaos since 2009.  Yet—it needs to be corrected.  The truth needs to be told, as Judge O'Brien advocated.

Under Rule 33, the court should grant a new trial based on this incremental <u>new evidence</u> discovery and lack of *Brady* disclosures by the government's star-witness;[33] at all times required to turn over; not just upon request.  In the alternative—an evidentiary hearing should be held after Kaiser and the government turn over the exculpatory materials Kaiser proffered 10-28-2020, and other identified *supra*.   Kaiser's audio and video affirmations of the two-decade Jowdy criminality shed a reformative light on Kaiser's specific trial testimony and government theories (beginning at *Tr.33*)—as false.

---

[33] "[D]etermining that a new trial was necessary, because lies of his key witness who <u>tied all the pieces together</u> even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991) (emphasis not in original).

These new disclosures—coupled with honest representations to the Hawaii-Mexico investors—by the government—about the real money tracing would dynamically change the playing field and manipulated beliefs of many; intended to protect a few.


Sincerely,

Phil Kenner


Submitted November 17, 2020