UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,           :
                                    :
                                    :
          - against –               :
                                    :
                                    :           **DECLARATION OF**
                                    :           **KENNETH A. JOWDY**
PHILIP A. KENNER, *et al.*,          :           Criminal Docket No. 13-0607 (JFB)
                                    :
                     Defendants.     :
                                    :
                                    :
------------------------------------------------------------x

     KENNETH A. JOWDY, declares and states the following:

     1.     I am (i) the managing member of Diamante Cabo San Lucas, LLC ("DCSL"), a

Delaware limited liability corporation; (ii) the general administrator of Diamante Cabo San

Lucas S. De R.L. De C.V., a Mexican limited liability company ("Diamante SRLCV"), which is

the designated developer and Second Place Beneficiary under a Mexican Guaranty Trust that

owns the Subject Property; (iii) the owner and managing member of KAJ Holdings, LLC ("KAJ

Holdings"), a Delaware limited liability corporation; and (iv) a member and managing member

of Diamante Properties, LLC, a Delaware limited liability corporation.  I also am the owner and

managing member of Legacy Properties, LLC, a Delaware limited liability corporation, which is

the entity that is responsible for the development operations and management of a golf course

resort community located in Cabo San Lucas, Mexico known as Diamante Cabo San Lucas

("Diamante").  I submit this declaration in support of the application by DCSL, Diamante

SRLCV, KAJ Holdings, Diamante Properties,  and me for relief from the Post-Conviction

Protective Order, dated August 21, 2015 (the "Protective Order"), which currently prohibits the

sale, transfer, assignment, pledging or encumbering of any interests in Diamante, without prior

approval of the Court.  Diamante is described as the "Subject Property" in the Protective Order,

and will be referred to in this declaration as either the Subject Property or Diamante.

2.     More than ten years ago, I identified nearly 1,500 acres of undeveloped land located approximately five miles north of downtown Cabo San Lucas, Mexico that I envisioned would be well suited for development as a world class, master planned, golf resort community.[1] Since that time, I have dedicated myself to the planning and development of this project, and I have worked diligently to make it a success.[2] I have struggled to overcome numerous challenges and obstacles over the years, including the collapse of the world economy and the bankruptcy of the project's original lender, Lehman Brothers Holdings, Inc. ("Lehman"), in 2008. I also have struggled to overcome the significant damage to the property and the region caused by the direct hit on Cabo San Lucas by Hurricane Odile in 2014. I firmly believe, however, that the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated and promoted by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints. That campaign was renewed by Kenner in the course of the trial and the forfeiture proceeding, and he appears to have been emboldened by the Government's unsubstantiated accusations that I was somehow complicit in Kenner's misconduct.

3.     Over the past two years, we have had the ability to draw on a short-term revolving line of credit of $15 million in connection with the continued development of the Diamante project. As of November 2016, that revolving line of credit is now nearly fully drawn, and the principal repayment of the short-term loan is due in October 2017. Because of the uncertainty related to the ownership and management of the project, and the prohibition against parcel sales not in the ordinary course of business in the wake of the imposition of the Protective Order, it is

---

[1]   See photos taken in or about 2006 attached as Exhibit A.
[2]   See photos taken in or about 2016 attached as Exhibit B, and images posted at www.diamantecabosanlucas.com.

#41785506 v4

becoming increasingly unrealistic to believe that the project will be able to meet that repayment obligation.

4.    I have acted in good faith to fulfill my duties to make this project the success that I envisioned when I first conceived of this development.  The disparaging comments that Kenner and some of his clients and business associates have made about me over the years, and their wrongful attempts through various means to wrest control of the project from me have served to undermine my ability to develop the project.  Following Kenner's conviction in 2015, I was optimistic that the project had overcome yet another hurdle in the path of its progress.  For the first time since nearly the inception of the project, I had been able to identify an investor willing to pay value for an equity interest in the project.  That optimism was short-lived.  The entry of the Protective Order not only caused us to lose that opportunity, but also adversely affected our ability to sell larger parcels of land within the development.  It also impaired our ability to identify and contract with third-party partners to develop portions of the property as planned and finance aspects of the operation, and seriously threatens to hinder our ability to repay our lender on a timely basis.  Regrettably, the adverse impact of the Protective Order on the Diamante project has been exacerbated by the Government's assertion that the entire project should be subject to forfeiture.

5.    Of immediate concern are two recent developments that serve as the impetus for this application for relief from the Protective Order.  The first development is a settlement that I have negotiated with the majority in interest of the investors in the two Mexican golf resort development projects with which I am affiliated, DCSL and Diamante Del Mar ("DDM"). Nearly all of the investors in DCSL and DDM were at one time clients of Kenner, but most if not almost all of those individuals now acknowledge that they were misled by Kenner.  The second development is a proposed sale of a small parcel of land within the Diamante project, consisting

-3-

of approximately 10 acres, to a third party for development by that third party of approximately 200 condominiums (the "San Marcos Condominiums").

6.      I will describe both of these transactions in more detail below, but it may be helpful if I provide some background to the ownership of the Diamante development.  This background provides a brief summary of the origins of the ownership interests in DCSL, but does not address the allegations raised by the Government in its memorandum of law filed on October 7, 2106 in connection with this forfeiture proceeding ("Government's Forfeiture Memorandum"), or the many false allegations of defendant Kenner in his November 28, 2016 submission in connection with his motion for a new trial.

**Ownership of DCSL**

7.      Diamante is a master planned golf resort community located approximately five miles from downtown Cabo San Lucas, Mexico.  Diamante is owned by a Mexican Guaranty Trust pursuant to which the lender (originally Lehman) is the First Place Beneficiary and the designated developer and Second Place Beneficiary is Diamante SRLCV.  The vast majority of Diamante SRLCV is owned by the Delaware limited liability company, DCSL.  DCSL owns 99% of the ownership interest in Diamante SRLCV, and the remaining 1% of Diamante SRLCV is owned by me.  DCSL, in turn, is owned by the following individuals or entities, in the percentages indicated:

| | |
|---|---|
| Baja Ventures 2006, LLC | 39% |
| KAJ Holdings LLC | 35% |
| Diamante Properties LLC | 13% |
| CSL Properties 2006, LLC | 8% |
| PF Ventures LLC | 1% |
| David Boyden | 1% |
| Joseph Juneau | 1% |
| Ethan Moreau | 1% |
| Owen Nolan | 1% |

A chart reflecting the ownership structure of DCSL and Diamante SRLCV is attached as Exhibit C.

-4-

#41785506 v4

8.      CSL Properties 2006, LLC ("CSL") is a Delaware limited liability corporation

that was established at the direction of Kenner at or about the time of the closing of the

acquisition of the undeveloped property by Diamante SRLCV in March of 2006.  CSL was the

corporate entity through which Kenner granted his clients an indirect interest in DCSL.  Kenner

designated himself as the managing member of CSL at the time of its formation.  At or about the

time of the closing in March 2006, Baja Ventures 2006, LLC ("Baja Ventures"), a Delaware

limited liability corporation, was formed at the request of Kenner and was wholly owned by

Kenner.  In discussions with Kenner in or about February 2006, Kenner made the determination

to allocate an 8% ownership interest in DCSL to CSL, and retain a 39% ownership interest in

DCSL through Baja Ventures for himself.  A chart reflecting the ownership structure of CSL is

attached as Exhibit D.

9.      In March 2006, Kenner owned approximately 6.5% of Diamante Properties LLC,

and it is my understanding that he continues to own 6.5% of Diamante Properties LLC to this

day.  I also own 6.5% of Diamante Properties LLC, and I am the managing member of Diamante

Properties LLC.  The remaining 87% of Diamante Properties LLC is owned primarily by various

current and former employees or consultants who worked for the developer of Diamante or for

Kenner.  A chart reflecting the ownership structure of Diamante Properties LLC is attached as

Exhibit E.

10.     I located the undeveloped property that eventually would become Diamante in or

about December 2004.  I engaged in negotiations with the owner of the property and reached an

assignable purchase agreement with the owner, using a Mexican company, Propriedades DDM,

to hold the contractual interest in the property until closing pursuant to Mexican property laws.  I

signed the agreement to acquire the Diamante property in or about January 2005.  The down

#41785506 v4

payment on the purchase of the Diamante property was due to be paid by in or about April 2005 and the closing was to take place in or before January 2006. The original purchase price for the undeveloped property was approximately $65,000,000, but because of delays in making the down payment and scheduling the closing, the project incurred late payment penalties and interest charges. The ultimate purchase price for the Diamante property was $72,825,823, not including pre-closing development costs.

11.    Kenner and I initially referred to the development near Cabo San Lucas as "Diamante South." Kenner agreed that he would be responsible for contributing the down payment and the pre-closing development costs for his interest in the project. I agreed to be responsible for (i) securing the balance of the acquisition financing and the Phase I development financing (which I fulfilled by successfully negotiating and closing a $125,000,000 loan from Lehman); (ii) personally executing a Completion Guaranty, a Recourse Guaranty (with partial and full recourse obligations), a Payment Guaranty, a Pledge and Security Agreement, and an Environmental Indemnity Agreement; and (iii) managing the relationship with the lender and serving as the developer of the project after the closing.

12.    At no time prior to the closing on March 10, 2006 was I aware that any money contributed to the acquisition of the Diamante property by Kenner or his clients was an unauthorized transfer of client funds or Hawaii project funds. It was my understanding, from communications with Kenner, that his clients knew that the money contributed was being loaned to Kenner personally or loaned in connection with the acquisition and development of the golf resort in Mexico. Moreover, to the extent that the money was transferred by Kenner or at his direction through the accounts identified in the Government's Forfeiture Memorandum, I had no knowledge at that time that the transfers were inconsistent with my fundamental understanding that they were authorized transfers.

-6-

#41785506 v4

13.    We closed on the Lehman loan and the acquisition of the property on March 10, 2006.  Prior to the closing, we were advised that the Diamante property should be owned through a Mexican Guaranty Trust with Lehman as the lender and First Place Beneficiary, and a Mexican limited liability company, Diamante SRLCV, as the Second Place Beneficiary and developer. Diamante SRLCV was created by our Mexican attorneys at or about the time of closing.  The Mexican Guaranty Trust provides that upon repayment of the loan obligation to the lender, Diamante SRLCV would then become the First Place Beneficiary and owner of the Diamante property.

14.    Kenner agreed in February 2006 to hold his personal interest in DCSL through Baja Ventures, the new entity that was created at Kenner's request and owned and controlled by Kenner as managing member.  Prior to the closing, Kenner and I agreed that (i) I would receive a 40% member interest in DCSL through KAJ Holdings[3], an entity owned and controlled by me as managing member; (ii) Kenner would receive a 39% member interest in DCSL, which he would hold through Baja Ventures; (iii) Kenner's clients would receive an 8% interest, which they would hold through CSL; and (iv) the remaining 13% would be transferred to an investor and staff members, most of whom had worked on both the Diamante and the DDM projects, and whose interests would be held through Diamante Properties LLC.[4]  The agreed upon allocation

---

[3] In or about 2007, I transferred 1% ownership interests in DCSL from my KAJ Holdings interests to two additional staff members, Patricia Formisano (through PF Ventures, LLC) and David Boyden, and in or about 2009 I transferred 1% ownership interests each to Owen Nolan, Joe Juneau, and Ethan Moreau.  This reduced my KAJ Holdings ownership interest in DCSL from 40% to 35%.

[4]   At or about the time of the closing in March 2006, the limited liability corporation agreement for DCSL reflected capital contributions for the four members in the aggregate amount of $7.1 million.  The capital contributions were allocated as follows: KAJ Holdings - $2.5 million; Baja Ventures - $2.5 million; CSL - $2.0 million; and Diamante Properties - $100,000.  Kenner was responsible for raising approximately $7 million of the $7.1 million, which reflected the funds he had raised from CSL members or borrowed prior to closing for the down payment and pre-closing development costs.  The remaining $100,000 was contributed by one of the members of Diamante Properties.  Consistent with the understanding that Kenner and I had from the outset of the project, I was not required to contribute cash to DCSL.  When a cash contribution of $2.5 million was allocated to my member interest prior to the closing to accommodate a requirement by the lender that I have an equity stake in the project, Kenner and I agreed that I would transfer an additional 5% ownership interest in Baja Management to Kenner.  This transfer increased Kenner's ownership interest in Baja Management from 5% to 10%.

Jowdy fraud --
See Timeline 023

- 7 -

#41785506 v4

of interests was confirmed by Kenner by email prior to the closing.[5]   At the time of the closing, Kenner was the managing member of CSL and the sole owner and managing member of Baja Ventures.  I was not, and am not, a member or owner of either entity.  Kenner also confirmed by email that his clients were aware of the "overall interest in the DCSL project for CSL Properties 2006, LLC, so we will have no surprises."[6]

15.     After closing on the Lehman loan in March 2006, our development team immediately began work on obtaining preliminary Master Plan, environmental, subdivision and golf course permits and approvals for the Diamante project.  In September 2006, we started construction on the championship Davis Love III designed Dunes Course, which was completed and opened for play in October 2009.  In December 2007, we completed construction of the Desalination Plant, in order to provide a reliable source of irrigation water for the golf course, as well as potable water to our future residents.

## 2008 Financial Crisis and Lehman Bankruptcy

16.     On September 15, 2008, Lehman filed for bankruptcy, and all funding for the Diamante project immediately ceased.  Following the bankruptcy, the global financial crisis crippled the resort development industry.  The resulting financial pressure was devastating, but we were able to persevere and survive for the better part of the next two years.  I learned subsequently that the note evidencing the debt obligation of DCSL to Lehman (the "DCSL Note") had been pledged by Lehman to Danske Bank A/S London Branch ("Danske").

17.     As of the time of the Lehman bankruptcy filing, we had incurred substantial development and construction obligations, and we had to survive without any funding, or any assurance of continued funding, until the Lehman/Danske issues were resolved.  Our

---

[5]  See email correspondence, dated February 19-20, 2006, between Kenner and me, attached as Exhibit F.
[6]  See email correspondence, dated March 6, 2006, between Kenner and William Najam and me, attached as Exhibit G.

-8-

management staff was offered the option of staying on without any assurance that compensation would ever be paid. Most of our senior staff and I elected to stay on without pay or at a reduced pay for an extended period of time in the hope that somehow we would be able to continue with the development of the project.

18.     It took Lehman and Danske from September 2008 to in or about March 2009 to resolve the assignment issue and to agree on an amendment to the guaranty trust replacing Lehman with Danske as the First Place Beneficiary.  During that period, my development team and I provided Danske with any and all documentation that it requested regarding the use of proceeds of the Lehman loan, the prospects for success of the Diamante project, and the reasons that Danske should continue funding of the loan.

19.     Fortunately, after a thorough review of all of the financial loan documentation, including a detailed review of all of the Lehman draw request documentation, Danske agreed to continue to fund the balance of the original Lehman loan, and we were finally able to execute amended loan documents with Danske on March 6, 2009.  Draw requests continued to be meticulously documented, and it took us some time to pay down all of the immediate outstanding development obligations due to contractors and vendors as a result of the suspension of the funding by Lehman for the project.

20.     The economic challenges that this project faces have been constant, even since the transition from Lehman to Danske as the lender.  I have been able to work through several difficult off season periods with bank officials, including negotiating the 2010 Amended Loan Documents, the 2013 and 2014 Amended and Restated Loan Agreements and five separate Loan Extension Agreements.  By the end of 2014, our total loan obligation, including additional loan advances and deferred interest obligations to Danske, had been increased to $156,500,000, but we had successfully negotiated a ten year extension of the term for repayment of the loan.

-9-

#41785506 v4

Fortunately, in 2015 we closed on the sale of an approximately eighty (80) acre ocean-front parcel of land to a hotel developer for $40 million, all of which proceeds were used to reduce the debt obligation to Danske.  The long-term debt was reduced by $25 million and the short-term revolving credit line debt, which was then due, was repaid with the remaining $15 million.  These payments enabled us to obtain a new short-term revolving line of credit of approximately $15 million, which is due to be repaid by October 2017.

21.    Throughout the entire period, I always have endeavored to be totally transparent with Danske, and I have kept Danske fully informed as to all aspects of the Diamante project.  I also have kept Danske fully informed on my continuing legal issues with Kenner and Kenner's clients, and continue to do so.  Over the past two years, we have had to draw on the new short-term revolving line of credit in connection with the continued development of the Diamante project.  As of November 2016, that revolving line of credit is now nearly fully drawn, and the principal repayment due in October 2017 looms large.  Given the direct and indirect consequences that have flowed from the imposition of the Protective Order, it is unrealistic to believe that the project will be able to meet that repayment obligation.

**Kenner's Campaign to Malign Jowdy Continues**

22.    As we struggled to navigate our way through the financial crisis, Kenner's attacks on me continued to escalate.  I learned in or about 2011 that Kenner and Constantine, using Attorney Ronald Richards client escrow account, had raised in excess of $3,000,000 from Kenner's clients in 2009 for a so-called "Global Settlement Fund" to be used with the specific objective of removing me as managing member of DCSL and as general administrator of the Diamante project in violation of the operating agreements.  The emails and information that have surfaced clearly indicate that Kenner and his clients were willing to do just about anything to remove me.  Such actions included suing me in a myriad of jurisdictions in Mexico and the

#41785506 v4

United States for fraud and mismanagement, and bribing Mexican court and government officials to have me arrested on false criminal charges.

23.    It is my understanding that some of Kenner's and his clients' false reports filed with local officials in Mexico resulted in a Mexican federal police investigation that would have required my immediate incarceration had they been successful in having me arrested.  Perhaps most shocking, however, was the revelation that steps apparently were taken to use force to remove me from my role as managing member of the Diamante project.  Upon information and belief, several of Kenner's clients appeared in Mexican courts and filed false affidavits against me on a variety of these false charges.  In addition, it is my understanding that there were occasions on which Kenner and/or his hired thugs waited for me outside of the project in an attempt to apprehend or harm me.

24.    In March 2011, according to emails I have reviewed from in or about that time period between Kenner and Bryan Berard and John Kaiser, and between Kenner and John Kaiser, Kenner apparently was seeking to bribe a Mexican judge to issue an arrest warrant for me in connection with his fraud lawsuit in Mexico.  Kenner described how he had recruited six heavily armed men to track me down at the Diamante resort, and according to the email, Kenner was awaiting a court order that would have allowed him and the six heavily armed men to apprehend me and "take the target [me] with deadly force". [7]  Emails from Kenner acknowledge the initial bribe was $20,000 "as part of the $1.5 million we [Kenner and Kenner client's] would owe the Mex City fed guy for the support in the process.  The system here is corrupt at all levels.  No way around that". [8]

25.    I lived in fear for my life during this period.  I rarely left the project, and when I

---

[7]  See Kenner email to Berard, Kaiser and Gaarn, dated March 12, 2011; and email exchange between Kenner and Kaiser, dated March 15-16, 2011, attached as Exhibit H.
[8]  See email exchange between Kenner and Berard and Kaiser, dated March 17, 2011, attached as Exhibit I.

-11-

did, I often hid under a blanket on the floor of a vehicle. At times, when I learned that bribed officials might have an order allowing them access to the project site, I moved from hotel to hotel to escape being picked up, until my attorneys could obtain a court order protecting me from arrest. As a result, I have not traveled in Cabo without security personnel with me since 2007.

26.    Kenner's efforts to lodge false accusations against me and have me removed from managing the project continued even after his indictment and arrest in November 2013. Based on reports conveyed to me by members of my staff who were present, on or about December 18, 2013, upon information and belief, Todd White (an individual to whom Kenner purportedly had transferred an investment interest in Baja Ventures), Karlos De La Puerta, Paul Donion, at least two of Kenner's clients, and others, accompanied by approximately 30 armed individuals, entered the Diamante property without any valid court order. I am informed that they also visited our bank in Mexico and attempted to take over our bank accounts, but were unsuccessful. I subsequently learned that for a brief period of time, these armed insurgents actually took over the Diamante resort and began issuing directives to our staff. It is my understanding that the armed insurgents had been hired for the incursion by Karlos de la Puerta.

27.    Karlos de la Puerta presented our attorney in Mexico with a copy of what we learned was an illegally notarized power of attorney in which he alleged that (i) Kenner had granted him a power of attorney to act as managing member of Baja Ventures and to act as managing member of CSL Properties; (ii) that a meeting had been held by all of the members of DCSL, and that he, Karlos de la Puerta, had been named to replace me as managing member of that entity (when in fact I was managing member of that entity and no such meeting had ever taken place); and (iii) that a meeting had been held of Diamante SRLCV, and that he, Karlos de la Puerta, had been named to replace me as general administrator (when in fact I was general administrator of that entity and no such meeting had ever taken place).

-12-

28.     The notarized statement had not been submitted to or sanctioned by any court, and yet it was used by Todd White, Karlos De La Puerta, Paul Donion, at least two of Kenner's clients, and others, including the armed insurgents, to gain the unlawful entry onto the property. The notarized statement was not only untrue, but I have been advised that it is clear under Mexican Law that it alone could not and would not authorize or justify the unlawful incursion or attempt to take control of the project. I am advised that the insurgents directed that our staff be brought together for a meeting, and in the presence of the armed insurgents, the staff was advised that I had been replaced by Karlos de la Puerta, and that I was no longer general administrator of Diamante SRLCV. Our entire staff and all of our guests who were present in the Dunes Club were put in fear for their lives. For a period of time after this armed incursion, our staff expressed concern about ramifications for their employment. Rumors were rampant in Cabo San Lucas that control of the project had changed hands, and it took me several months thereafter to allay the suspicions and fears that resulted from this armed incursion on the Diamante property.

29.     Fortunately, we had developed a good relationship with the Mexican navy, and with the help of a commander based in Cabo San Lucas, we were able to arrange for a contingent of armed military personnel to appear on site and restore order the same day that this armed incursion had occurred.

**The Proposed Silverpeak Investment**

30.     My prior attorney and I had been encouraged by federal law enforcement agents and some of Kenner's clients to attempt to identify a strategy that would give Kenner's clients an opportunity to recover their initial investments in DCSL and move on with their lives. In or about 2013 and 2014, I received and rejected at least two capital investment offers regarding Diamante from investment firms that would have provided infusions of capital to the Diamante project. One of the investment firms was Silverpeak Real Estate Partners, a New York-based

#41785506 v4

real estate investment advisory firm ("Silverpeak").  Both of the offers, however, maintained that there was no present equity value of member interests in DCSL, and therefore neither proposal offered to pay anything for a buyout of any of the Class A Membership interests of DCSL. Accordingly, I refused to consider any offer that did not provide for at least a partial equity buyout of the DCSL membership interests.

31.    By early 2015 we had experienced growth in time-share and real estate property sales, and closed on the sale of a large oceanfront parcel of land to a developer committed to building a Hard Rock and a Nobu hotel.  In light of these positive developments, I commenced a second round of negotiations with Silverpeak, in which we discussed the possibility that Silverpeak would make an investment in the Diamante project by purchasing up to fifty percent (50%) of the Class A Membership Interests in DCSL.  Silverpeak indicated at the outset that it would not get involved in doing any further due diligence or in protracted negotiations, unless it had a guaranty of being able to purchase at least a twenty percent (20%) membership interest in DCSL.  Pursuant to the terms discussed, I was required and agreed to sell a ten percent (10%) membership interest in DCSL to Silverpeak, reducing my ownership interest in DCSL from 35% to 25%.  I also was required to guaranty a sale of up to an additional ten percent (10%) interest in DCSL, if at least that percentage membership interest in DCSL was not tendered for sale by other members.  Protracted negotiations among our lender, Danske, Silverpeak and me continued through the winter, spring and summer of 2015.  On or about August 13, 2015, I arranged for a conference call with the investors in DCSL and others in which I outlined the Silverpeak proposal.  The following week, we distributed a summary package outlining the offer that Silverpeak was prepared to make, and soliciting the consent of the DCSL investors to certain favorable amendments to the DCSL limited liability company agreement.  The letter that accompanied the package of consent materials sent to the DCSL investors, and the summary

#41785506 v4

statement of the DCSL Managing Member, both dated August 14, 2015, are attached as Exhibit J.

32.    Silverpeak offered to pay $200,000 per 1% membership interest in DCSL, contingent on a majority in interest of the DCSL Class A Members consenting to certain amendments of the DCSL Amended and Restated Operating Agreement and also contingent on our senior lender, Danske, agreeing to include certain amendments of the financial terms of the current loan agreement.  This marked the first time in the nine years since DCSL had been formed that any investor had made a credible offer to purchase any of the equity.  Priority on a voluntary sale of membership interests would be given to members of CSL, the Kenner clients' investment entity, and Baja Ventures, the Kenner investment entity, the ownership and control of which I understood by 2015 was subject to dispute.

33.    If the consent had been approved by members of DCSL, the revised loan agreement would have resulted in substantial benefits to DCSL and its members.  Significantly, Danske had agreed to (i) relinquish its right to a $50,000,000 Profit Participation Fee, if the balance of the long-term loan was repaid in full by October 30, 2022; (ii) create a Tax Escrow account to assist members of DCSL by helping to defray income taxes on paper profits generated by DCSL; (iii) allow members of DCSL on an entirely voluntary basis, to either (a) sell their interests to Silverpeak and get a significant portion of their investment in DCSL repaid; or (b) retain their interests in DCSL (and perhaps benefit with greater returns on their investment in the future); (iv) allow DCSL to bring in an investment partner with an established record in global real estate finance and over $5 billion of gross asset value; and (v) require Silverpeak and me (and not the other members) to cure certain shortfalls or defaults under the loan agreement, all to the benefit of the Class A Members of DCSL.

34.    The consent package with a full description of the offer to be made by Silverpeak

#41785506 v4

was sent to all DCSL Class A Members on or about August 21, 2015.  Within about an hour of it being sent, and before the members could vote on the consent package, I received notice that the Government had filed a request for a protective order in the United States District Court for the Eastern District of New York, which the Court had granted.

35.   The negative impact of the issuance of the Protective Order was immediate.  That impact was exacerbated when the affidavit in support of the application for the Protective Order was unsealed, revealing the unsubstantiated allegation that "[t]here are also grounds to believe that Jowdy is not currently fulfilling his fiduciary duties as manager of the Subject Property and is currently taking measures to waste, damage, depreciate, or generally diminish the value of the Subject Property."  A handwritten footnote to that sentence in the affidavit stated, "On or about August 13, 2015, during a conference call with members of CSL Properties, Jowdy indicated that he was actively negotiating the sale of his interest in the Subject Property."  The handwritten note appears to have been inserted in support of the conclusory statement that I was not fulfilling my fiduciary duties.  In fact, in that call to familiarize members of DCSL with the consent package that I was about to send to members, I made clear that investment members of CSL and Baja Ventures would have a first option to sell their interests on a voluntary basis. I would commit to sell up to a 20% interest in DCSL to Silverpeak from my interest, only if the other members of DCSL elected not to sell at least a total of 20% of the member interests in DCSL to Silverpeak.  Moreover, I would have maintained, at a minimum, a 15% interest in DCSL in the Silverpeak transaction, and continue to manage the development of the project.  A copy of the Silverpeak proposal was provided to the Government within days of the entry of the Protective Order, but the Government apparently did not believe the proposal was compelling.  As a result of the Government's failure to give the Silverpeak proposal serious consideration, an incredible opportunity that would have greatly benefited Diamante and all of the investors in the project

#41785506 v4

was lost.

36.     Since 2010, Diamante has grown real estate and time-share sales at a compound annual growth rate of nearly 25% with over $300 million in real estate and time-share sales.[9] We now have more than 4,000 whole ownership and time-share members and are generating just under 1,000 new members each year. Funds received from real estate, residence club, golf, food and beverage, and resort operations have been used to meet our loan obligations to Danske, build homes, time-share units, two championship golf courses, recreational amenities, two club houses, maintenance facilities and related roads, infrastructure and utilities, including our desalinization plant.  These vertical, horizontal, and amenity-related improvements have all enhanced the value of the Diamante project and have made the property more appealing to our members and the more than 4,500 sales tours we bring through the property each year.  Such work is the reason that Diamante has been recognized for numerous honors and accolades since 2010.   The sales figures mentioned above are as of September 30, 2016.

Accolades include:

(a) In 2010, the Davis Love III designed championship "Dunes Course" was named "Best New International Course" by GOLF Magazine;

(b) In 2012, the Dunes Course was ranked the Number 1 Golf Course in Mexico by Golf Digest;

(c) In 2014, Diamante's ten acre Crystal Lagoon's beach was named as Number 2 on Fox News' list of the "World's Most Stunning Beaches".

(d) In 2014, the Dunes Course was named "Mexico's Best Golf Course" by the World Golf Awards;

(e) In 2015, the Dunes Course was ranked as No. 38 on GOLF Magazine's "Top 100 Courses in the World" (bettering its Golf Magazine rating from 58 in 2011 and 52 in 2013. Diamante is currently the top ranked golf course in all of Mexico and Latin America);

(f) In 2015, the Diamante Resort sold an 80 acre oceanfront parcel to a

---

[9]   Real Estate sales figures count a real estate "sale" if (1) a customer has executed a Reservation Deposit Agreement or other binding agreement and has provided a non-refundable deposit toward the purchase price of a real estate unit; and (2) Diamante reasonably expects to receive the remainder of the purchase price according to a payment schedule provided in the Reservation Deposit Agreement.

#41785506 v4

developer for the development of a Hard Rock Hotel, a Nobu Hotel and 200 condominium units, resulting in a significant reduction in the Company's loan with Danske. Site work has commenced on the hotel projects;

(g) In 2015, the Diamante Resort was named to the "2015 Platinum Clubs of the World" list;

(h) In 2015, Diamante opened the first Tiger Woods designed golf course in the world, and the "El Cardonal" course was immediately ranked "Best New Golf Course in Cabo San Lucas in 2016" by Forbes Life;

(i) In 2016, the Dunes Course was ranked #52 Golf Course in the World on the Golf Digest's list of the "World's 100 Greatest Courses"; and in the same year, the Dunes Course was ranked #1 in Mexico on Golf Digest's "Best Golf Courses in 206 Countries";

(j) In 2016, the Diamante Resort was named one of the "Top 25 Golf Developments in all of North America" by GOLF Magazine.

37.    I have been working since closing on the initial loan with Lehman in March 2006 to make the Diamante resort a success. The allegations in the Government's affidavit that "there are grounds to believe that Jowdy is not fulfilling his fiduciary duties as managing member of the Subject Property and is taking measures to waste, damage, depreciate, or generally diminish the value of the Subject Property" are completely unsubstantiated and untrue.

38.    The combination of the Protective Order and the Government's continued efforts to seize the Subject Property and all of the DCSL Class A Member interests, including the interests of KAJ Holdings, Diamante Properties, LLC, and CSL and not simply Kenner's interests in DCSL, has had a serious negative impact on the development of the Diamante project. For example, we have been unable to reach an agreement on obtaining financing for time share installment loans, because of the uncertainty of who will own and manage Diamante on a going forward basis. This puts us and our time-share sales team at a tremendous disadvantage in comparison to competing resort developments in the Cabo San Lucas region. We also have been unable to market and sell other large hotel parcels similar to our sale in 2015 of the Hard Rock and Nobu hotel parcel for $40 million, which would enable Diamante to reduce

-18-

its debt obligations and potentially provide access to renewed revolving lines of credit to support continued construction and development.  I have been unable to enter into serious negotiations with any major potential hotel or large parcel developer, because each would immediately want assurances that our lender is supportive, our loan is secure, and that current management will be continuing to develop the balance of the project in accordance with the master plan.  In the meantime, since early 2015, several thousand new hotel rooms are planned or under construction in the Cabo San Lucas market, and other than the Hard Rock and Nobu hotel parcel sale we have been unable to benefit from this development boom.  These are but two examples of the adverse impact the Protective Order and the Government's protracted pursuit of the forfeiture of the Subject Property have had, and continue to have, on the Diamante project.

39.     Despite my cooperation throughout the investigation and ultimate prosecution and conviction of Kenner and Constantine, the Government apparently is relying on erroneous assumptions rather than evidence in connection with its efforts to seek the forfeiture of the Subject Property and my interests in the Subject Property.  One of the more glaring examples of this is illustrated by the inaccurate assertion in the Government's Forfeiture Memorandum that "on August 30, 2006, $650,000 from Lehman Bros., the primary lender for the DCSL project, was deposited in the Baja Development account for the purchase of DCSL." (Government Forfeiture Memorandum, p. 51).  The Government's own brief observed that the closing on the purchase of the property took place five months earlier, on March 10, 2006 (Government Forfeiture Memorandum, p. 21), so I am at a loss to understand how the Government can erroneously claim as a fact that the August 2006 transfer was for the purchase of DCSL.  More aggravating, however, is that had the Government bothered to inquire about that $650,000 transfer from Lehman to a Baja Development account on or about August 30, 2006, an account I in fact controlled, they would have learned that the $650,000 payment was unrelated to DCSL or

#41785506 v4

DDM.  Rather, the $650,000 payment was a fee that I earned from having introduced Lehman to a developer who was developing a different tract of land along the Pacific coast of the Baja Peninsula, which was nearby property but wholly unrelated to either the Diamante or the DDM projects.

**Proposed Sale of a Parcel for the San Marcos Condominium Development**

40.    I noted above two illustrations of the adverse impact that the Protective Order and the Government's pursuit of forfeiture of the Subject Property have had on my ability to manage this project in an unencumbered fashion.  Another instance in which my ability to manage the project has been hindered serves as one of the bases for my seeking relief from the Protective Order.  The relief I am seeking asks the Court to permit the sale of an approximately 10 acre parcel of land by Diamante SRLCV to a third party to allow that third party to develop approximately 200 condominium units within the Diamante resort property.

41.    In or about 2013, I engaged in preliminary discussions with a third party about entering into a joint venture with Diamante to develop and build approximately 200 condominium units.  The development was contemplated for a tract of land along the man-made lagoon within the Diamante property and was referred to as the San Marcos Condominiums. Negotiations progressed slowly, but in August 2015, after the entry of the Protective Order, the discussions were suspended pending the outcome of the forfeiture proceedings scheduled for the Fall of 2015.  This was a set-back for the overall development of the Diamante property, because it is critical for the marketing of the project to continue to demonstrate to the existing time-share owners and property owners, and to the potential purchasers of time-share interests and real estate, that vertical development of the Diamante property is ongoing and continuing.

42.    As it became apparent that the forfeiture proceedings were going to be more extensive than I originally believed they would be, the third party involved in the earlier San

-20-

#41785506 v4

Marcos Condominium project discussions and I renewed our negotiations.  At that point in time, we no longer were discussing the project in terms of a joint venture.  Rather, we shifted our negotiations to an outright sale of the parcel to the third party with an obligation by the third party to finance and develop the San Marcos Condominiums.  I signed a Letter of Intent with the third party, a copy of which is submitted to the Court as Exhibit K, which sets forth the terms of the agreement in principal with the third party.

43.     It is my understanding that the Government has expressed the view that sales of time-share interests and real estate lots in the ordinary course of business are not prohibited under the Protective Order and therefore did not require that I seek Court approval of each and every time-share interest sale and real estate lot sale.  I also understand, however, that the Government has taken the position that sales of parcels of land within the Diamante property, including proposed sales of a parcel such as the one contemplated for the purpose of the San Marcos Condominium development, would fall within the parameters of the Protective Order. The proposal was submitted to the Government for its consideration on September 27, 2016, but it appears that the Government apparently objects, so I am seeking relief from the Protective Order to permit me to pursue the sale of the parcel for the San Marcos Condominium development.

44.     The purchase price for the parcel negotiated by me with the third party is $2,500,000.  It is an arms-length transaction that our lender and I believe represents a fair value for the land to be purchased.  In addition, since the Diamante project currently does not have the financial resources available to develop the San Marcos Condominiums, nor does the Diamante project have financing available to it to develop the San Marcos Condominiums on its own, I must rely on third parties who have those resources to ensure that we continue to have sufficient vertical development of the Diamante property.

**Settlement of Delaware Court of Chancery Civil Actions**

45.     The second development that serves as the impetus for this application for relief from the Protective Order is related to a request for Court approval of a Settlement Agreement with a majority in interest of the owners of membership interests in DDM and CSL (which those who are settling believe presents the best opportunity for them to recover their initial investment in the two Mexican projects and realize a potential return on those investments).  In June 2014, former clients of Kenner initiated the filing of a books and records action in Delaware Court of Chancery against DCSL on behalf of CSL and Baja Ventures with regard to the Diamante project.  That lawsuit is still pending in the Delaware Court of Chancery.  In or about June 2014, former clients of Kenner, including Greg de Vries and Raymond Murray, also initiated a separate books and records action in Delaware Court of Chancery against DDM.

46.     On July 7, 2015, plaintiffs, Greg de Vries and Raymond Murray,  individually and derivatively on behalf of Diamante del Mar, LLC, filed a complaint in Delaware Court of Chancery against me, individually and in my capacity as managing member of DDM, and against DDM, in which the plaintiffs falsely alleged that I continuously "delayed and postponed" development of the DDM project and "essentially abandoned" the grand development plans shortly after the plaintiffs and the other investors in DDM made their respective investments.

47.     I steadfastly denied the allegations in the Delaware litigation that I had in any way breached my fiduciary duties with respect to the two Mexican golf resort developments, DDM and Diamante.  I have responded to extensive discovery requests in both actions, and the disputes were litigated in the Delaware Court of Chancery for more than two years.  Earlier this year, after encouraging initial settlement discussions in which I met directly with counsel for the plaintiffs in the Delaware litigation, the parties agreed to convene in Wilmington, Delaware and to participate in a day-long mediation conference before a former Vice Chancellor of the Court

-22-

of Chancery. The scope of the mediation included both the DDM and the Diamante projects in Mexico. The principal plaintiffs in the Delaware actions were present in person with their counsel, and others participated by telephone. It was the first time I had ever met or spoken to some of these former clients of Kenner who participated in the mediation.

48.    All parties participating seemed to agree that the best way to finally resolve our differences was to reach a settlement in which all parties gave a little in the hope that we could end the senseless litigation and work together to make the Diamante project a success. All parties agreed that a forfeiture of the Subject Property and everyone's interest (other than the Kenner interests) and my removal as general administrator would seriously risk a default of the loan agreement and a foreclosure by Danske. The mediation proved to be fruitful, and by the end of the day we had an agreement in principal to resolve the Delaware litigation. The terms of the agreement were outlined initially in a memorandum of understanding, and then a more formal settlement agreement was drafted and finalized. To date, a majority in ownership interests of the members of the entities that have ownership interests in DDM and DCSL have signed the settlement agreement. On September 27, 2016, we provided the Government with a copy of the settlement agreement, and it appears that the Government apparently objects to the settlement agreement as well. It is this settlement agreement and our desire to obtain this Court's approval of the settlement agreement that also is a basis for my seeking relief from the Protective Order.

49.    The settlement agreement is conditioned on, among other things, the approval of the Court of Chancery of Delaware and the approval of the United States District Court for the Eastern District of New York. On October 24, 2016, plaintiff's counsel submitted a joint request to the Court of Chancery in Delaware seeking preliminary approval of the settlement agreement (the "October 24th Delaware Filing"). A copy of that filing, including the exhibits, is attached to

#41785506 v4

this declaration as Exhibit L.[10]

50.     The settlement agreement provides in pertinent part that to the extent that there are profit distributions payable to the owners of the membership interests in DCSL, I will pay a portion of the profits that I receive through my ownership interest in DCSL through KAJ Holdings to the signatories of the settlement agreement.  The settlement agreement sets forth in detail the formula for the sharing of those profits.  While there is no guarantee that there will ever be any profits in which to share, both I and the majority in interest of the owners of membership interests in DDM and CSL believe, that this is the best alternative available to them to possibly recover their initial investment in the two Mexican projects and realize a potential return on that investment.  The entire settlement is predicated on my retaining my ownership interest in DCSL through KAJ Holdings.  If the Government is successful in obtaining forfeiture of the Subject Property, or my interests in the Subject Property by obtaining the forfeiture of my holdings in DCSL through KAJ Holdings and Diamante Properties, the settlement agreement will be null and void.

51.     In addition to the sharing of profits by me with the investors in DDM and CSL, a significant benefit that inures to all parties who have a financial stake in the Diamante project is the public support to be expressed for the Diamante project by the parties, as reflected in the statement attached to the settlement agreement.  Significantly, the statement acknowledges that the players had been misled by their former financial advisor (Kenner) and been given inaccurate and misleading information about me and the status of the Mexican projects, and that the players

---

[10]  Exhibit A to the October 24th Delaware Filing is the memorandum of understanding agreed to following the mediation.  Exhibit B to the October 24th Delaware Filing is the correspondence from plaintiff's counsel to the investors in DDM and the members of CSL.  Exhibit C to the October 24th Delaware Filing is the final settlement agreement including the signature pages obtained to the date of the filing.  That included eleven of the seventeen investors in DDM.  It also included eight of the twelve investors in CSL.  Exhibit D to the October 24th Delaware Filing is a copy of correspondence from plaintiff's counsel to the investors in DDM and CSL forwarding a copy of the final settlement agreement and summarizing its terms.  Since the October 24th Delaware filing, I was advised that a ninth investor in CSL has signed the settlement agreement.

#41785506 v4

now support me and my development team in our efforts to achieve the full potential of the Diamante project.

52. The Government made a conclusory allegation in support of the application for the Protective Order that I purportedly was "taking measures to waste, damage, depreciate, or generally diminish the value of the Subject Property," without citing any specific conduct or evidence. That conclusory allegation seems to be at odds with the experience of the project lender, Danske, the party that has the most at stake in this project. Danske holds nearly $130 million in debt on the project and is entitled to an additional $50 million profit participation fee before any payments are required to be paid to any equity holders. I believe that Danske has been extremely satisfied with my efforts to preserve and enhance the value of the Diamante property since it succeeded Lehman as lender in 2009. I also believe that Danske, its construction consultant and its servicer have never expressed concern that there is any indication of fraud or waste by me in connection with the Diamante project. Danske would like me to continue to work to preserve and increase the value of the Diamante project, to preserve and increase value for Danske, which in turn would also enhance value for the DCSL investors.

53. The Government's position now also is at odds with the desire of the majority in interest of the hockey players who invested in Diamante through CSL, and who invested in the DDM project. That sentiment is reflected by the players acknowledgment in the settlement that they were misled by Kenner, and the best hope for continued success of the Diamante project is under my leadership.

54. The repeated false allegations and illegal attempts to seize the Diamante project by Kenner and his associates have taken a serious toll on me over the years. I was encouraged that we finally had turned a corner after the conviction of Kenner and Constantine, and that we would be able to move forward with the project after years of acrimony, unimpeded by litigation.

#41785506 v4

Sadly, I was mistaken, because the Government then obtained the Protective Order and asserted that I was not fulfilling my fiduciary duty to the shareholders and I was wasting or dissipating the asset. I was angry and demoralized, because the Government's allegations are harmful to me personally and to the project, and they simply are untrue. This personal attack by the Government against me and its pursuit of my financial interests is as perplexing as it is shortsighted, in my opinion. The Government has not presented any evidence of wrongdoing on my part and appears to have not fully considered the adverse implications that its actions will have on the project and the future value of the equity interests in the project of the victims of the defendants' fraud. I firmly believe that the Government simply does not understand the consequences that will flow from seizing my interests and removing me from the project.

55. The Government's allegations in its recent filings have emboldened Kenner and Constantine to renew their personal attacks and to blame their illegal activity on me, as evidenced by their recent letter filings with the Court, and Kenner's motion for a new trial. It has been more than seven years since I received the first grand jury subpoena in connection with this investigation. I have cooperated with the Government from the outset, and I was available to all parties to be called as a witness at trial, but I was never called. It is disheartening to have overcome so many hurdles over the years to now find myself facing the renewed false allegations of Kenner and Constantine, and have the Government essentially bolstering the defendants accusations by disparaging me in its court filings.

56. I believe that I have faithfully fulfilled my responsibilities and earned my member interest in the Diamante resort. My services included identifying the property, negotiating with the seller, negotiating the original Lehman loan for $125 million, convincing Danske as substitute lender to continue to fund the project, entering into the Danske Amended and Restated Loan Agreement, negotiating several loan increases, extensions and amendments with Danske,

-26-

#41785506 v4

and overseeing the entire development project, all to the substantial benefit of the Diamante resort. I also have worked to the best of my ability for more than ten years, since initial funding in 2006, to preserve and increase value for all members, despite the Lehman bankruptcy, the downturn in the economy, the direct hit by Hurricane Odile, and the relentless attacks by Kenner and Kenner's clients in their unlawful efforts to wrest control of the project from me, all of which have had a substantial negative impact on the project. Despite all of this, I was still able to negotiate with a third party investor to make a fair offer to buy out any unhappy equity holders, until the Government blocked that effort. I also was able to successfully negotiate a settlement with the hockey players with whom I had been at odds for almost 10 years.

57.    The Government questioned my motives and actions by publicly accusing me of wasting the asset when it obtained the Protective Order. At the same time, however, I am being asked by the Government to continue to preserve and create value for the project, despite the fact that the Government has ignored my contributions and is determined to seek forfeiture of the Subject Property and my interests. This has created a circumstance in which it is likely everyone will lose.

58.    It is my desire to retain my interest in the project and continue to manage and develop the Diamante project in an effort to make it a success for all involved. I believe it is unfair, however, for me to be placed in the untenable position of having to preserve and create value in the project while under the cloud of the Protective Order. I am being asked to bear all of the management responsibility and most of the risk in the wake of the Government's precipitous action in seeking the Protective Order, which continues to have an adverse impact on the project. The Government, however, is insisting that I am not entitled to any reward if the project ultimately is successful. I will be blamed by the Government for mismanaging the project if there is a default on the bank loan, which is a distinct possibility, but if we survive, I will face the

-27-

prospect of having toiled for yet another year or more for the benefit of others.  The Government is adamant that I do not deserve to keep my interests in Diamante, and apparently insists that is the remedy that is in the best interest of the victims of the defendants' fraudulent conduct.  I believe, however, that this result is not only unfair to me personally, but likely will result in an event of default under the loan documents.  If that occurs, the victims of the defendants' fraud will have lost any prospect of recovering any value from the Subject Property or Kenner's interest in the Subject Property as a result of the Government's shortsightedness.  Ironically, it is entirely possible that even if I lose my interest, whoever succeeds me as manager of the project will want to enlist my services.  Apart from the Government's negative view of me, we have been widely commended for what we have accomplished to date at Diamante.

59.  I am proud of what we have been able to accomplish at Diamante under very trying circumstances.  My team and I have taken raw, undeveloped property along the Pacific coast and developed a world-class golf resort community.  There is still an enormous amount of work to be done to achieve financial success for this project, but the longer it takes to resolve the uncertainty hanging over the ownership of the project, the more likely it is that the outcome will be detrimental to all parties in interest.  I therefore respectfully request that the Court permit the sale of the parcel of land for the development of the San Marcos Condominiums, approve the settlement that I have reached with the hockey players in the Delaware Court of Chancery litigation, and allow me to retain my interest in DCSL and continue to pursue the successful development and completion of the project unencumbered by the requirements of the Protective Order.

#41785506 v4

Case 2:13-cr-00607-JFB-AYS   Document 959-28   Filed 11/24/20   Page 29 of 29 PageID #: 32184

60.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 13, 2016.


KENNETH A. JOWDY

-29-