Government Exhibit

3500 - JK - 1
13-CR-607(JFB)

Oct. 19, 2010 ≡ 11AM

Scott R
Matt G - FBI
John Kaiser

2002 ≡ vacation - Hawaii - after 9/11/01 ≡ Main Island
- saw property = cheap w/ Chris Manfredi
$700K purchase price ≡ $110K downpmt
≡ (JK) - trying to raise $ (JK)'s pmt $
≡ had property's in NY to sell
≡ couple homes -

(CM) had friend ≡ James Milana → lives on Long Island
Phil Kenner ≡ knew
introd to (PK)
≡ had hockey clients/investors ≡ to start purchasing
property in Hawaii

starting
closing
2003 ≡ Closed on some more parcels
≡ 6,000 acres total ≡ kept adding/buying more adjacent
properties

≡ Lehman - comes in ≡ Windwalker - developer
Scott / Lehman brought in

(JK)'s ≡ $1.1M - (JK)
investment amt.
↓ family members $
(JK) - $1.2M ≡ sold house in NY
↓ took $1.1M to pay family off

①

Masood Bhatti — Lehman Bros.
— got a piece of Hawaii deal

260 acres — 1st piece of Hawaii investment
just kept buying/expanding ➝ 6,000 acres total

Alan Warden = Windwalker = Accountant/contact

(JE) met Jowdy = 2x in NYC

① in NYC = Trust (2003) = Jowdy restaurant
times                                   discuss.
                                = discuss project in Hawaii
there (JE)
@                               = funding in Mexico
(KJ) - with a girl

② another time @ a bar = in NYC = bar
time   - discussed Hawaii                    (KJ)
       - lending $ from Hawaii to Mexico     (JE)

(JE) - not sure how (KJ) & (MC) met

(JE) Saw (KJ) in Mexico couple times

again   (KJ) wanted to borrow $ from Hawaii to Mexico
discussed   would pay back after closing            ②

(KT) brought up borrowing $ from Hawaii project

→ $5 M-6 M

borrowed millions from Hawaii project
- 1st was going to be $100's k = not millions
→ (JK) not happy $ amt started
to grow to Millions of $
discussed ≡ Brian Bevard          to Mexico
(JK)

≡ was Agreement to borrow $ from Hawaii -

≡ (KT) → (JK) | (KT) - don't worry all $ will come
                (JK)    back; get repaid
- in NYC
discussed $ from Hawaii to Mexico
≡ just to be used for Mexico
↓ no other project

Question to (JK):
2006 ≡ update Letter on Hawaii project -

- (JK) - yes, I recall letter
(JK) - made these; many times

(JK) - never got $ back from (KT) / Mexico

(JK) -

③

Eufora

2007 = (JK) met Tommy Constantine in AZ @ (JK)'s house

(TC) = intrd'd as self made millionaire to (JK)

(JK) = heard about Eufora thru players / guys that
Eufora - company will be big one day

in
beginning = need couple hundred thousand @ first

(JK) (B2.2M) - over 3yr period invested

(JK) borrowed from family - majority of $
  - Mother
  - brothers - both

(JP) =
  includes (JK)'s friends $ -
  - (JK) got 4 friends to invest

Donny Rae → ex-hockey player - lives in AZ
  - bringing investors in Hawaii

(JK) = met (DR) - 1yr ago = heard of him prior
  - when put house for sale in AZ - (JK)'s house
  - Brian Berard & (JK) own - 2½ yrs ago bought
  - (JK) - raised $ from friends to buy house in AZ

④

- Tim Gaaun - used to work in banking industry
   - 1st intro to Lehman from (TG)

- not invested in Hawaii

- (TC) - trying to ~~raise~~ fund $ for Hawaii w/ own funds
   - suppose to use own $ to fund Hawaii

ultimately → $ came from friend of (TC)
   $84M - waikapuna closing

Robert Gaudet
(JK) met (RG) - ≡ golf pro
               ≡ knows people in Mexico

- tried to get $ for Hawaii                    (RG)

- believe above indiv. getting paid for getting $
                        ≡ (RG)  ≡
                        ≡ (TG)

1st heard
2005 ≡ heard of Eufora from (JK) or players

(TC) ≡ showed (JK) Agreements w/ banks + credit card companies
     ≡ wanted increase ownership in Eufora → (TC)'s own shares in
     → appeared to be great company → (JK)

(5)

and Mark Ambrosio

= Dish Zero = (TC) running $ from Eufora
Taser | accounts to these investments

Sergei Gonchar $ going to

all (JK) investment $ to (TC) went from
(JK) = TD Bank accts

(JK) - rec'd couple hundred thousand back
from (PK)
(JK) from fronted $ for renovation (PK)
house in AZ

(PK) ← (JK) - gave (PK) $ from his house sale in
needed        Smithtown, NY
for Myrick        (PK) never repaid
lawsuit

6



(PK) - living in Vegas - Condo
- house in AZ = is wife's from Divorce

(JK) = Palms Condos

(TC) - new Maloof in Vegas
↓ invested - (JK) friends /3

2007 or 2008

① Keith Kaiser - brother
② Dobby          = police officer    $350K together
③ and doctor friend of (JK)          for penthouse @ Palms

= Jay Mckee ⎫ on Note = 2 separate Units      get 15% from #
= Mike Peca  ⎭                                 - promised by (TC)

= closing went through (TC)

went into it to buy + sell quickly

= (PK) - was not involved in Palms R/E
- as far as (JK) remembers

★ • Global Settlement Fund • set-up by (TC) =     w/ (CD) & (JE)
- pay Ethan Marvan back - from Palms
- Eufora - #
- Mexico - players #

• used to straighten # investment mess which happened through-out years.

Eufora    (TC) instructed Ronald Richard to send # to Eufora
Palms     acct so he can distribute to players = GS Fund #
          (TC) instructed (JK) friends = investment # - to go to
          Ronald Richards - not Eufora                    ⑦

(JK) inveloed w/ → renovated — (JK)'s brothers did work
≡ Hermosa beach — house . (PK) - owned — to them sold
   - (PK) - owes $ from house construction / renovate

   - (JK) - brothers worked on house ≡ took 4 months

   - (JK) - raised funds to buy house from:
             - (PK) - mother
             - brothers
             - friends
   - (JK) - not rec'd $ from (PK) on house yet
   - (PK) - will get $ from Hermosa Beach house when
      AZ house sells
             ≡ on market now

                    (JK) - met (NJ) in Hawaii
   Nick James -
             - did stuff for flagship racing + (TC)

   (NJ)  called (TC) to get married
             $20k-80k - asked $ from (PK) ≡ (PK) - said no
                Borrowed from (PK)

   (NJ) did not work or invest in Hermosa Beach house

⑧

Los Frailles - investment

— (JK) + has friends invested in
≈ $1M

≈ 2008

(JK) - included in the $1M

⊕ purchase property + develop

$1M used to purchas property ≣ sell parcels to
get $ back from 1st
investment

→ Bobby Goudet — told (JK) about investment

(JK) — not involved in Los Frailles

↓ does have clients involved / hockey players

(JK) - went down there w/ friends to see

(JK) — 6 mos. ago in Cabo ≣ Toudy project

≣ golf course — done

≣ suppose to put up condo

≣ never went to North property
DDM

⑨

≡ $5M-6M — (KJ) borrowed /rec'd /loaned

(KJ) - borrowed from Hawaii project → To Mexico

(KJ) - borrowed from Glen Murray too for Mexico.

(KJ) ≡ might have repaid couple hundred thousand To Hawaii

(JF) - did see Hawaii bank acct statements

- accountant for Hawaii project ⟩ (JK) will get name
(JF) not rec'd K-1's ever                    of accountant
                                             before Lehman came
                                             in.

(JK) ≡ never rec'd K-1's from Hawaii

≡ took two yrs to gt from Allan Warden

                    will receive
                    K-1's soon

END
1:15 PM

(10)



Government Exhibit

3500 - JK   - 2
13-CR-607(JFB)

Day5.txt

826

AMERICAN ARBITRATION ASSOCIATION

DIANA NOLAN; OWEN NOLAN,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Claimant,　　　　　) NO. 76 148 Y 00223 08 DEAR
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
PHILLIP A. KENNER; STANDARD　　　)
ADVISORS, INC.; STANDARD　　　　　)
ADVISORS, LLC,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Respondents.　　　　 )
　　　　　　　　　　　　　　　　　)
Owner(s) or Reputed Owner(s)　　　)

TRANSCRIPT OF PROCEEDINGS

Volume IV

(Pages 826 - 1100)

Phoenix, Arizona
May 30, 2009
8:34 a.m.

Prepared By:　MARY E. MANNING, RPR
　　　　　　　 Certified Reporter
　　　　　　　 Certificate No. 50444

Prepared for:

827

INDEX TO EXAMINATIONS

1

2    WITNESS                                    PAGE

3    TOMMY CONSTANTINE

Page 1

Day5.txt

|  4 | Direct Examination by Mr. Richards | 829 |
|  5 | Cross-Examination by Mr. Meeks | 874 |
|  6 | Redirect Examination by Mr. Richards | 898 |
|  7 | Redirect Examination Continued by Mr. Richards | 908 |
|  8 | BRYAN BERARD | |
|  9 | Direct Examination by Mr. Richards | 912 |
| 10 | Cross-Examination by Mr. Meeks | 917 |
| 11 | JOHN KAISER | |
| 12 | Direct Examination by Mr. Richards | 918 |
| 13 | Cross-Examination by Mr. Meeks | 927 |
| 14 | Redirect Examination by Mr. Richards | 930 |
| 15 | JASON WOOLLEY | |
| 16 | Direct Examination by Mr. Richards | 933 |
| 17 | Cross-Examination by Mr. Meeks | 937 |
| 18 | Redirect Examination by Mr. Richards | 943 |
| 19 | ROBERT GAUDET | |
| 20 | Direct Examination by Mr. Richards | 945 |
| 21 | PHILIP A. KENNER | |
| 22 | Direct Examination by Mr. Richards | 956 |
| 23 | Cross-Examination by Mr. Meeks | 1010 |
| 24 | Redirect Examination by Mr. Richards | 1026 |

25

828

| 1 | EXHIBITS | | |
|---|---|---|---|
| 2 | NO. | IDENTIFIED | ADMITTED |
| 3 | 46 | | 881 |
| | 57 | | 893 |
| 4 | 58 | | 894 |
| | 60 | | 897 |
| 5 | 64 | | 886 |
| | 66 | | 888 |
| 6 | 143 | | 882 |
| | 144 | | 882 |
| 7 | 145 | | 883 |
| | 170 | | 918 |
| 8 | 180 | | 884 |

```
                              Day5.txt
 9    Respondent Exhibits:

10    1         1018        1019
      8         1017        1018
11    11        1012        1014
      12        1015        1015
12    13        1015        1016
      279        848         849
13    280        871         871

14

15

16

17

18

19

20

21

22

23

24

25
                                                        829


 1    APPEARANCES:

 2        Arbitrator Meyerson
          Arbitrator Gordon
 3        Arbitrator Campbell

 4

 5    For the Respondent:

 6        LAW OFFICES OF RONALD RICHARDS & ASSOCIATES
          By Ronald Richards, Esq.
 7        P.O. Box 11480
          Beverly Hills, California  90213
 8
          LAW OFFICES OF THOMAS M. BAKER
 9        By Thomas M. Baker, Esq.
          5050 North 8th Place
10        Suite 10
          Phoenix, Arizona  85014
11

12    For the Claimants:

13        BUCHALTER NEMER
```
Page 3

Day5.txt
17        MR. RICHARDS:  John Kaiser.

18

19                    JOHN KAISER,

20    having been first duly sworn, was examined and testified as

21    follows:

22

23                    DIRECT EXAMINATION

24    BY MR. RICHARDS:

25        Q.   Can you tell the panel what your background and

                                                          920

1     training in law enforcement is?

2         A.   I was a New York City police officer for

3     approximately six years, and I went to Suffolk County, who

4     I retired from, Suffolk County Police Department in New

5     York.  I was a defensive tactics instructor, trained

6     throughout the country and world.

7              I specialized in narcotics and taking guns,

8     working both.  I also did some community orientation of

9     police enforcement out in Suffolk County.

10        Q.   Are you presently the manager of any LLC in the

11    state of Hawaii?

12        A.   Yes.

13        Q.   What's that?

14        A.   Na'Alehu Ventures.

15        Q.   Are you familiar with the properties that were

16    subject to the Lehman Brothers financing that are issued in

17    this litigation?

18        A.   Yes, I am.

19        Q.   And are you aware that the Nolans are investors

20    in Little Isle IV, which is part of a group of LLCs that

21    owns 50 percent of a joint venture with Windwalker, the

                          Page 80

Day5.txt

22   Nolans and Alan Wordan?

23        A.   Yes, I have.

24        Q.   Have you spoken to the Nolans on the phone

25   before?

921

1         A.   Yes.

2         Q.   What was that conversation about?

3         A.   I had a couple of conversations.  We also

4    talked -- they were trying to build a house, so I was

5    trying to help him out.  I don't think we ever met.  They

6    were very nice -- they were very nice people.

7              The last conversation I had was in reference to

8    the house, if they needed help on it or any kind of -- they

9    were trying to get a house built.

10        Q.   Now, with respect to cash, the entities that made

11   up your investor pool with Little Isle IV, did they have

12   some cash that was sitting around waiting for a potential

13   closing to occur?

14        A.   Yes.

15        Q.   Tell us what your experience was with respect to

16   that money right at the point there was a decision made to

17   start loaning money to Mr. -- that Mr. Kenner had made a

18   decision to start loaning some of that investor money to

19   Mr. Jowdy.

20        A.   Any money that was allocated towards land for the

21   Hawaiian Investment Group that wasn't being used -- we

22   ended up ultimately purchasing about 6,000 acres.  There

23   were some parcels we were looking at.

24             The due diligence in Hawaii takes a long time, so

25   if you find something, it takes a long time to actually do

922

Page 81

Day5.txt

1   all the due diligence to purchase it.  So if we had some

2   funds that were -- that was stagnant and that warrant

3   purchasing land, we would utilize it for a loan, so we

4   actually made some money off of it.

5        Q.   Just so the panel doesn't get confused, I'm

6   talking -- I want to direct your attention prior to April

7   26th, 2006.  Were you a manager prior to that time?

8        A.   No, I was not.

9        Q.   At that time were you an investor?

10       A.   Yes.

11       Q.   How much of your own money did you have invested

12   in this Hawaii project?

13       A.   1.1 million.

14       Q.   Dollars?

15       A.   Dollars.

16       Q.   Did Mr. Kenner make you aware that he was going

17   to be lending some money?

18            ARBITRATOR CAMPBELL:  Can you just clarify for me

19   when he went from an investor to being an actual manager of

20   the property again?

21       Q.   BY MR. RICHARDS:  August of 2006 -- after the

22   Lehman Brothers -- after the Lehman Brothers refinancing

23   did you become a manager?

24       A.   It wasn't right away.  I actually thought it was

25   in '07.  I don't have --

                                                    923


1        Q.   '07?

2        A.   I don't have the document in front of me.

3            MR. RICHARDS:  Prior to '07 he was an investor

4   only.

                     Page 82

Day5.txt

 5          THE WITNESS:   I'm actually the person who found

 6    the property in 2002 and who funded it prior to Mr. Kenner.

 7          Q.   BY MR. RICHARDS:   Okay.   And at some point you

 8    were made aware as an investor that this money was going to

 9    be lent on a short-term basis to Mr. Jowdy?

10          A.   Yes.

11          Q.   And what was your understanding of how it was

12    supposed to get paid back?

13          A.   Well, the first -- my first concern was to make

14    sure that he had some collateral so it could get paid back,

15    which he did.   It was a parcel in Mexico, on North Baja,

16    and that was his collateral.   I think he had 70 percent

17    interest, and I think the property was appraised maybe at

18    30-, 35 million.

19          Q.   Was Mr. Jowdy at that time someone that appeared

20    credible to you?

21          A.   Yes.

22          Q.   Why is that?

23          A.   Well, the first thing, Mr. Kenner told me he was,

24    and I met him a couple of times.   He seemed -- a big thing

25    it was 15 percent interest rate, and I thought it was a

                                                              924

 1    good move.

 2          Q.   Did Mr. Jowdy have anything to do with bringing

 3    Lehman Brothers to your Hawaii project?

 4          A.   Yes.

 5          ARBITRATOR MEYERSON:   I'm a little confused.   I

 6    understood the warrants were made before 2006.   He didn't

 7    become the manager until 2007 --

 8          MR. RICHARDS:   You're right.

 9          ARBITRATOR MEYERSON:   And so was his status at

                          Page 83

Day5.txt
10      the time simply an investor?

11           MR. RICHARDS:  Yes.  That's why I'm offering him

12      as a witness.  That's correct.

13           ARBITRATOR MEYERSON:  I thought you were offering

14      him as some special knowledge about --

15           MR. RICHARDS:  He found the property.  He had a

16      lot of knowledge, but I wanted to show you that he became a

17      manager later, but at the time --

18           ARBITRATOR MEYERSON:  He was an investor in the

19      same status as the other investors at the time of these

20      transactions?

21           MR. RICHARDS:  $1.1 million.

22           ARBITRATOR MEYERSON:  I understand.

23      Q.   BY MR. RICHARDS:  So in your investor pool, your

24      money was with all the other investor money, correct?

25      A.   Correct.

                                                        925


1       Q.   So at the time was there any representation about

2       getting paid back this money when the Cabo deal closed?

3       A.   It was supposed to be a short-term loan.  I

4       thought it was three to six months, because I had also

5       raised some other funds from family and friends that were

6       getting a little antsy about it.

7       Q.   Go ahead.

8       A.   That's it.

9       Q.   Now, you retired from the police due to a medical

10      reason?

11      A.   Yes.

12      Q.   An injury on the job?

13      A.   Injuries, yes.

14      Q.   You'd been dealing with Mr. Kenner now for a

                        Page 84

Day5.txt

15    couple of years?

16        A.   Yes.

17        Q.   Have you ever seen him do anything inappropriate?

18        A.   No.

19        Q.   As a police officer you have no problem arresting

20    Mr. Kenner if you saw him stealing your money basically?

21        A.   I certainly would.

22        Q.   And you have never been convicted of any offense,

23    correct?

24        A.   No.  No.

25        Q.   You are also an expert in martial arts?

                                                        926


1         A.   Correct.

2         Q.   And you have $1.1 million of your money in this

3     deal?

4         A.   Correct.

5         Q.   Did anybody at the time anticipate that Mr. Jowdy

6     wasn't going to pay you guys back when the Cabo deal

7     closed?

8         A.   Say that again.

9         Q.   At the time this money was lent to Mr. Jowdy to

10    be spent in the Mexican project, did anybody anticipate he

11    wasn't going to pay you back when the Cabo deal closed, the

12    Lehman's Cabo deal?

13        A.   No.  Otherwise I wouldn't have lent it.  I

14    wouldn't want to go down that route.

15        Q.   Did Mr. Jowdy -- as far as the credibility issue,

16    why did you feel it was credible that he was bring -- why

17    did it give Jowdy credibility that he bought Lehman to

18    Hawaii?

19        A.   He had a very good relationship with, I believe

                              Page 85

Day5.txt

20   his name is Masood, who actually he was the lead guy for

21   Lehman, and they were very close.

22        Q.   Did Mr. Jowdy appear to be someone that was

23   credible and had assets or someone that was broke and a

24   thief?

25        A.   No.  He had assets.  I believe he was very

                                                          927

1   credible at the time.

2        Q.   As you're aware he hasn't paid the money back,

3   right?

4        A.   Correct.

5        Q.   Do you blame Mr. Kenner for him not paying the

6   money back?

7        A.   No.

8        Q.   When you made the decision -- or when you were

9   made aware that some of this money was going to be lent,

10   rather than sitting idle in an account, at 15 percent, did

11   you know there were some risks?

12        A.   At the 15 percent -- actually, the loans, I

13   didn't think they were going to be -- to me it wasn't a

14   risky loan.

15             Now, some of the land purchases were a risk.  It

16   was a few miles away from a volcano.  It was a tough sale.

17   But the loans -- even investors that I brought in, I said,

18   Listen.  This guy -- I gave him the whole story about Ken

19   Jowdy backed by land.  It's good.  Better than your money

20   sitting somewhere.

21        Q.   And being in the course of the years you've been

22   over in Hawaii dealing with this, have you met a lot of

23   investors of Mr. Kenner?

24        A.   Yes.

                        Page 86

Day5.txt

25          Q.    Has this ever been a secret that Mr. Kenner lent

928

1    this money to Mr. Jowdy?

2          A.    No.

3          Q.    Was this a transaction that, as your view as an

4    investor was open and disclosed to everybody?

5          A.    It was open.  There was no secret handshakes or

6    nothing like that.

7          Q.    Even now, sitting here in May of 2009, is there

8    anything that you've uncovered, as someone that obviously

9    knows how to investigate, that Mr. Kenner has done anything

10   inappropriate throughout these transactions?

11         A.    No.

12         Q.    Not one complaint?

13         A.    None.

14               MR. RICHARDS:  I'll pass the witness.

15               ARBITRATOR MEYERSON:  Thank you.

16

17                         CROSS-EXAMINATION

18   BY MR. MEEKS:

19         Q.    Mr. Kaiser, how are you?

20         A.    I'm hanging in there.

21         Q.    Good.  In 2000 -- at some point did Mr. Kenner

22   transfer --

23               MR. RICHARDS:  Mr. Kaiser, just face the court

24   because they have to hear you.

25         Q.    BY MR. MEEKS:  At some point did Mr. Kenner

929

1    transfer like 90 percent of his interest in the Na'alehu

2    entity to you?

Page 87

Day5.txt

3    A.   Yes.

4    Q.   When did that happen?

5    A.   In '07.

6    Q.   Right.  And why did that happen?

7    A.   He needed some money.  He was actually trying to

8  actively work out a negotiation with Mr. Jowdy.

9    Q.   Okay.  And you paid him for that?

10    A.   Yes.

11    Q.   How much did you pay him?

12    A.   I don't recall the exact amount.

13    Q.   Can you recall roughly?

14    A.   3- or 400,000.

15    Q.   3- or 400,000 for --

16    A.   It was more of a -- if I can finish.  It was more

17  of a loan.  He always had an option to get it back, to get

18  out from under, so ...

19    Q.   As of today you own 90 percent of Mr. Kenner's

20  interest in Na'alehu Ventures?

21    A.   That's correct.

22    Q.   And do you recall on October 10th of last year

23  Mr. Kenner and Mr. Berard quitclaiming a deed to the

24  property here in Phoenix to you?

25    A.   What's the address?

930

1    Q.   It's in Camelback Country Club Estates.  It says

2  it's a quitclaim to John R. Kaiser, trustee of the

3  Shangri-La Trust in 1999.

4    A.   M'hum.  Yes.

5    Q.   What was the reason for that transfer?

6    A.   I paid for the house.

7    Q.   You paid for the house?

Page 88

Day5.txt

```
 8      A.   Yes.  Myself and investors.

 9      Q.   And when did you pay for the house?

10      A.   On the purchase.

11      Q.   When?

12      A.   I don't know.  You have the document in your

13  hand.

14      Q.   In October --

15      A.   I want to say about a year ago.

16      Q.   On October 3rd, 2008, you paid for this house?

17      A.   Yes.

18      Q.   How much did you pay?

19      A.   1.6-.

20           MR. RICHARDS:  Well, don't confuse the witness.

21  You're looking at the quitclaim deed.  Don't confuse --

22           ARBITRATOR MEYERSON:  Direct your comments to me.

23           MR. RICHARDS:  My --

24           ARBITRATOR MEYERSON:  Hang on.  If you have an

25  objection, make it.
```

931

```
 1           MR. RICHARDS:  My objection is it's not proper

 2  questioning if counsel has a document that he knows is not

 3  the grant deed.  He knows it's a quitclaim deed.  He's

 4  intentionally confusing the witness.

 5           ARBITRATOR MEYERSON:  I don't think

 6  intentionally.

 7           MR. RICHARDS:  I'm not saying intentionally,

 8  but --

 9           ARBITRATOR MEYERSON:  If you have any questions

10  and want to refer to a document, you're free to answer.

11      Q.   BY MR. MEEKS:  Was your name on the title to that

12  property when you purchased it?
```

Page 89

Day5.txt

```
13    A.   No.

14    Q.   Whose name was on the title?

15    A.   Mr. Kenner.

16    Q.   Why was Mr. Kenner's name on the title?

17    A.   Because I live in New York.  He lives here, right

18  next to the place.

19         As far as doing renovation, the permit process --

20  I have four kids at home.  I didn't want to be going back

21  and forth.  It was just easier that way.

22         MR. MEEKS:  No further questions.

23              REDIRECT EXAMINATION

24  BY MR. RICHARDS:

25    Q.   Did you have any problem trusting Mr. Kenner to
```

932

```
1   transfer the property to you at the time you wanted it

2   transferred?

3     A.   No.  Once I said I wanted it transferred, he did

4   it.

5     Q.   That wasn't part of some underhanded secretion of

6   assets from Mr. Kenner, was it?

7     A.   No.  I know they had a forensic accountant that

8   charged $120,000.  I'm sure he could track it down, where

9   the funds came from.

10    Q.   The bottom line is you had no problem trusting

11  Mr. Kenner to acquire this house for you, right?

12    A.   Exactly right.  Correct.

13         ARBITRATOR CAMPBELL:  What side of management do

14  you do for the Hawaii properties?

15         THE WITNESS:  My role has been basically, since I

16  became managing member, working on getting our K-1s back,

17  and reaching those milestones.  That's my primary objective
```

Page 90

Day5.txt

18   back and forth.

19          ARBITRATOR CAMPBELL:  Is there any development

20   going on?

21          THE WITNESS:  Right now all the permits in -- all

22   the permits on the property is in a holding pattern right

23   now in reference to the funding and as to the issue with

24   legal.

25          ARBITRATOR CAMPBELL:  Do you spend a substantial

933

1    amount of time out there on the Big Island?

2           THE WITNESS:  I used to fly back and forth quite

3    a lot.  Not anymore.  I'm sure everyone knows -- Windwalker

4    actually took over the day-to-day operation, who are our JV

5    partners.

6           ARBITRATOR CAMPBELL:  They're doing most of the

7    work on it now?

8           THE WITNESS:  They are still waiting for

9    infrastructure.  Like I said, it's a very tough task to get

10   all the permit process.  All that is up to date and ready

11   to go.  We'll start digging as soon as we get some funding

12   again, which Alan is working on right now.

13          MR. RICHARDS:  Just for the panel, I drew like

14   a -- what's this thing called when you have bubbles and

15   then the lines?  Diagram?  I had a diagram drawn for me

16   that I put on my computer.  Would it help if I draw a

17   diagram of the various entities that make up the 50/50 --

18   once I saw it in a diagram it made sense.

19          ARBITRATOR CAMPBELL:  No.

20          ARBITRATOR MEYERSON:  Thank you very much.

21          MR. RICHARDS:  I have one follow-up based on your

22   question.

Page 91

Day5.txt
23        Q.   BY MR. RICHARDS:  Just so we're clear, Windwalker

24   Holdings, slash, Alan Wordan, they're responsible now to

25   get the funding.  They are in charge of the project?

                                                        934


1        A.   That is correct.

2        Q.   Is that why you're not flying out there?

3        A.   Windwalker actually took over the day-to-day

4   operation.  So they're in charge of that unless -- any big

5   decisions, they'll notify me if something is going to

6   change, a big movement or to re-fund it again.  Right now

7   they are just kind of crawling along.

8        Q.   Do you think they are in a better position than

9   you are to get it funded?

10       A.   Yes.

11            MR. RICHARDS:  Thank you.

12            ARBITRATOR MEYERSON:  No questions.  Thank you

13   very much.

14

15

16

17

18

19

20

21

22

23

24

25

- 1 of 4 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Government
Exhibit

3500 - JK - 3
13-CR-607(JFB)

Date of entry _____ 09/09/2013

JOHN KAISER, date of birth (DOB) ▮▮▮▮▮▮, was interviewed at the
United States Attorney's Office in Central Islip, NY.  Also present during
the interview were SA Josh Wayne of the IRS and AUSA Carrie Capwell.  After
being advised of the identity of the interviewing Agent and the nature of
the interview, KAISER provided the following information:

A few months after September 11, 2001, KAISER, his wife, CHRIS MANFREDI
and his wife went to Hawaii for a vacation.  MANFREDI had a friend who
owned a place on the Big Island of Hawaii.  While they were there, KAISER
and MANFREDI decided to look for real estate.  They ended up placing a down
payment on a piece of land.

A friend of MANFREDI's, JAMES MILANA, told them that if they needed to
raise money to close on the property, he knew of a guy, PHIL KENNER, who
managed money for professional athletes.  At some point, KENNER flew to
Hawaii and met with KAISER and MANFREDI.  KENNER said he was worth a lot of
money and showed them an article in Forbes or Money Magazine that described
how he managed money for high profiled people.  KENENR told KAISER and
MANFREDI that he wanted to get involved in buying the property and also
wanted to purchase some of the surrounding property.

From 2003 to 2005, KAISER invested more money to keep the property.
KENNER told him he had raised money from his hockey player clients to
invest in the Hawaii properties.

In 2006, KENNER asked KAISER if he could raise one million for the
project on a short term basis.  KENNER needed a 30-60 day bridge loan and
he would give an 8-10% profit.  KAISER and some family and fiends gave
KENNER the million dollars.  After more than 90 days past and KENNER did
not repay the one million dollars, KAISER's friends and family started to
get antsy.  KAISER decided to sell a property he owned in Smithtown, NY for
1.25 million dollars, so he could pay back his family and friends that gave
KENNER the one million dollars.

At some point, KAISER, MANFREDI and KENNER had a meeting on the Big
Island in Hawaii.  MANFREDI told KASIER that KENNER was putting down
deposits on land on the Big Island but not closing.  MANFREDI asked KENNER

Investigation on __09/04/2013__ at __Central Islip, New York, United States (In Person)__

File # __318B-NY-302683__                                    Date drafted __09/09/2013__

by __GALIOTO MATTHEW__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318B-NY-302683

Continuation of FD-302 of __John Kaiser__ , On __09/04/2013__ , Page __2 of 4__

what happened to the two million dollars that was recently raised.  KENNER
told MANFEDI and KASIER that he lost the two million in Europe while
looking for funding for the project.  MANFREDI questioned KENNER on the one
million dollars that KAISER raised.  MANFREDI said the money was not spent
on the Hawaii project but instead the money was sent to Mexico for the
investment with KEN JOWDY.  KENNER said if KAISER's money went to Mexico,
then he was 50-50 partners with KENNER in the project.  MANFREDI told
KENNER that he was scaming them.  They also talked about financing the
project through Lehman Brothers.  MANFEDI's and KENNER's relationship fell
apart after the meeting.

In June or July of 2006, KAISER, MANFEDI and KENNER had another meeting
in Manhattan, NY.  MANFREDI did not want to sign off on the Lehman Brothers
closing to fund the Hawaii project.  KENNER had previously told KASIER that
if MANFREDI did not sign off on the deal, they would all lose their money.
KAISER was upset after the meeting because MANFREDI did not want to sign
off on the deal.  KENNER spoke to MANFREDI and convinced him to sign off so
the Lehman deal could go through.

KENNER told KASIER, after the Lehman Brothers funding, investors of the
project would get 75-80% of their initial investment back.  Investors ended
up received approximately 40% back.

KAISER knows that former NHL player BRYAN BERARD invested $100,000 in
the Hawaii project through KENNER.  KENNER was surprised that BERARD had
only $100,000 in the deal, since KENNER had said in the past that he raised
millions of dollars from his NHL clients.

At one point, KAISER told KENNER that he needed some sort of
documentation to show the one million dollars that was supposed to go to
Hawaii ended up in Mexico.  KENNER gave KAISER a document that stated if
KENNER did not pay KAISER back, KAISER would end up 90% owner of BAJA
VENTURES(BV).  BV was the vehicle KENNER used to invest in the Mexico
properties with JOWDY.  When KENNER took KAISER to the property in Mexico,
JOWDY did not acknowledge that KAISER was one of the partners in the
project.

KENNER told KASIER, the profit they made from selling the house they
had previously purchased in Hermosa Beach, CA was not in the bank account
KENNER had set up.  KENNER said he used 1.5 million dollars to buy a house
in Pedrogal, Mexico.  KENNER was going to take a loan out on the house and
then he would pay KAISER his share of the Hermosa Beach profit.  KENNER
also told him he wanted to get KASIER involved in other projects like
EUFORA.  While in Arizona, KASIER was introduced to TOMMY CONSTANTINE by
KENNER.  KENNER told KASIER that CONSTANTINE was worth approximately 90
million dollars and was the guy behind EUFORA.  CONSTANTINE pitched the

FD-302a (Rev. 05-08-10)

318B-NY-302683

Continuation of FD-302 of  John Kaiser                                    , On   09/04/2013   , Page   3 of 4

investment in EUFORA to KASIER.  CONSTANTINE told KASIER that since KENNER had some of your money, he and KENNER would work out the percentage KASIER would receive in the company.  KENNER ended up telling KASIER that $275,000 of his money went to EUFORA.

In June 2008, KASIER , KENNER and one or two hockey players went to look at a property in Mexico called Los Frailes.  KENNER told KASIER that $500,000 of his Hermosa Beach profit went to the Los Frailes property and there was a buyer lined up already to buy a parcel.  KASIER went to some friends and raised an additional $750,000 that went to the Los Frailes property.

In the middle of 2008, KENNER told KASIER that he needed $660,000 to close on condo units at The Palms in Las Vegas, NV.  The money would come back in 60-90 days with a 15-20% profit.  KASIER raised $550,000 and sent it to KENNER.  KENNER told KASIER that he and CONSTANTINE were the owners of the units.  One of KASIER's friends, Dr. Frank Sconza, invested in the condo's.  After a year went by and the money was not returned by KENNER, SCONZA told KASIER the other doctors that invested wanted to sue KASIER.

In the fall of 2006, KASIER and two other friends, Vincent Tesoriero and Thomas Milana, were trying to sell a piece of property they owned in Sag Harbor, NY.  Apparently a female spoke to the broker and was willing to buy the property.  The female ended up calling on behalf of KENNER.  KASIER told KENNER the property was on the market because Milana wanted his money back.  KASIER suggested KENNER just buy Milana's share of the property.  KENNER said he wanted to buy the property in a company name, LED BETTER, and then KASIER and Tesoriero could buy back into the deal.  KASIER said doing a full sale would cause them to pay the Peconic sales tax.  KENNER said not to worry, that he would pay the tax.  At some point, KAISER realized that BERARD invested the other half of the money for the property, not KENNER.  Since KENNER did not put any money in the deal, KASIER and BERARD voted him out of LED BETTER.  KENNER did confirm that he had no money in the deal to KASIER when he was confronted.

There were times that KENNER asked him to sign a document for the Hawaii project when KASIER was in a rush.  KENNER had not finished creating the document and would tell him to just sign a blank piece of paper and he would take care of the rest.

Right before a few shareholders filed a lawsuit in Arizona against EUFORA and CONSTANTINE, KASIER met with CONSTANTINE in EUFORA's office.  CONSTANTINE was talking about how EUFORA was about to hit it big.  KASIER wanted to know what percentage he had in the company.  CONSTANTINE told KASIER that KENNER claimed the money invested in EUFORA was KENNER's and not KAISER's.  CONSTANTINE told KASIER, "if you think I'm bad you should

FD-302a (Rev. 05-08-10)

318B-NY-302683

Continuation of FD-302 of  John Kaiser _____ , On  09/04/2013 , Page  4 of 4

get a load of what KENNER has done." CONSTANTINE also told KASIER that he
was going to buy out the hockey players for 25 cents on the dollar. He
called one player while KASIER was there, who said he would take the deal.
Later KASIER called the player to say CONSTANTINE just told him EUFORA was
about to explode. KENNER was texting KASIER while he was with CONSTANTINE
asking him why he was still there and that it shouldn't have taken so long
to meet with him. After the meeting, KASIER, DAVE BOYDON and KENNER met in
a pizzeria. KASIER told KENNER that CONSTANTINE said KENNER was a bad guy.
KENNER immediately ran out of the pizzeria, jumped a few fences and did not
return. KENNER didn't call or speak to KASIER for a few months after the
incident.

In early 2009, KENNER owed KASIER money. KENNER said that TIM GAARN
owed him money and he was going to have GAARN send KASIER money. On at
least two occasions, money was sent from GAARN's account to KASIER's
account. Both times, KENNER told KASIER that he needed the money and to
send the money to his personal account.

KASIER gave KENNER $50,000 to help with attorney fees in the KRISTY
MYRICK lawsuit.



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



Government
Exhibit

3500 - JK - 7
13-CR-607(JFB)

---

**Investigation #:** 1000259846              **Location:   Phone call**
**Investigation Name:** Phillip Kenner
**Date:** October 2, 2014
**Time:** Approx. 1:50 PM
**Participant(s):** John Kaiser, Witness
Joshua Wayne, Special Agent
Matthew Galioto, Special Agent

On the above date and time Special Agents Wayne and Galioto spoke on the phone with John Kaiser.  Agents asked Kaiser about the investment property in Mexico known as Frailes.  Kaiser provided the following:

1.  Nicholas Privitello and Jonathan Smith invested money in the Frailes property in Mexico.  Their money was to be used to purchase more of the Frailes property.

2.  It was never Kaiser's understanding that PHILLIP KENNER was selling his shares in the Frailes property to Privitello or Smith.

3.  Kaiser was told by KENNER that from the sale of an investment property in Hermosa Beach, California that Kaiser and KENNER were partners on, KENNER sent money to Mexico for the Frailes investment for Kaiser.  Initially KENNER told Kaiser that he (KENNER) sent $500,000 from the proceeds of the sale of Hermosa Beach property for Frailes, he later told Kaiser that he sent $1,000,000 down for Frailes for Kaiser.

4.  Kaiser was aware that NHL players had invested in Frailes prior to Kaiser investing.

I began preparing this memorandum on October 10th, 2014, after refreshing my memory from notes made during and immediately after the interview with John Kaiser.

*Joshua R. Wayne*
Joshua R Wayne
Special Agent