

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JHK:DCL:MMO

*610 Federal Plaza*
*Central Islip, New York 11722*

December 7, 2020

Honorable Joseph F. Bianco
United States Circuit Judge
United States Court of Appeals for the Second Circuit
Long Island Federal Courthouse
Central Islip, New York 11722

Re:     United States v. Kenner and Constantine
         No. CR-13-607 (S-2) (JFB)

Dear Judge Bianco:

        The government respectfully submits this letter pursuant to the Court's direction on November 23, 2020 to address: 1) the amount of Danske Bank A/S London Branch's ("Danske") claim for which the Court granted Danske summary judgment in the Court's November 23, 2020 oral ruling on Danske's and the government's cross-motions for summary judgment (the "Oral Ruling"), as well as the amount of Danske's claim that remains in dispute; 2) the discovery the government seeks with respect to Danske's claim pursuant to the Oral Ruling; and 3) the government's response to Danske's proposed next steps.

I.      The Amount of Danske's Claim For Which Danske was Granted Summary Judgment
        and the Amount of Danske's Claim that Remains in Dispute

        In the Oral Ruling, the Court identified two main issues of fact that remain outstanding: 1) "the amount of the claims that are linked to the [I]nitial [L]oan";[1] and 2) whether Danske is a bona fide purchaser for value as to "the entire amount of the additional loans that the bank made," "includ[ing] . . . what happened after the 2015 protective order."  *See* Transcript of Oral Ruling ("Oral Ruling Tr.") at p. 5.

        With respect to the first issue, the Court agreed with the government that the Trimont

_____

        [1] The defined terms used in the government's summary judgment motion papers are also used herein.

records establish only $101,240,922[2] of the $107,538,328 that Danske claims Lehman advanced to the DCSL Resort prior to Danske's acquisition of the Initial Loan.  *Id.* at p. 15.  The Court granted Danske summary judgment as to, at most, $101,240,922 of the Initial Loan.[3]  However, because the DCSL Resort made $26,799,972 in loan repayments toward the principal balance of the Initial Loan, the amount for which Danske is entitled to summary judgment pursuant to the Oral Ruling should be at most $74,440,950 (*i.e.*, $101,240,922 minus the $26,799,972 Danske has already received in repayment).  In addition, as addressed further herein, without a determination of Danske's entire claim, it cannot be determined at this time whether Danske is entitled to the entire $74,440,950 because the Court could determine that Danske was already repaid those funds by the DCSL Resort.

With respect to Danske's claim as to the Additional Loans, the Court held that issues of fact remain as to whether Danske is a bona fide purchaser for value for those funds.  *See* Oral Ruling Tr. at p. 16.  Specifically, the Court held that there are issues of fact as to: 1) whether Danske "was . . . a bona fide purchaser [for] value of the [A]dditional [L]oans because the [A]dditional [L]oans were not innocent arm's length transactions"; and 2) whether Danske was a bona fide purchaser for value for the funds advanced after the Bill of Particulars was filed.  *See* Oral Ruling Tr. at pp. 16, 23-24, 26-27.  While Danske acknowledges that there is an issue of fact as to the funds advanced after the Bill of Particulars was filed, Danske incorrectly asserts that the issues of fact pertaining to the Additional Funds is limited to that issue, and fails to acknowledge that the Oral Ruling authorizes discovery as to whether all of the Additional Loan transactions, beginning in 2009, were arm's length transactions.  *See* Danske November 30, 2020 letter, DE 962, at p. 2.  As discussed above, the Court held that there is an issue of fact as to whether Danske is a bona fide purchaser for value as to "the *entire amount of the additional loans* that the bank made," "*includ[ing]* . . . what happened after the 2015 protective order."  Oral Ruling Tr. at p. 5 (emphasis added).

The government asserted and Danske admitted that the DCSL Resort has repaid approximately $103,793,247 to Danske to date towards the principal of the facility loans.  Of that amount, $76,993,275 was applied to pay down the principal balances of Additional Loan Facilities B and C.  Should the Court determine that Danske is not a bona fide purchaser for value for some or all of the Additional Loan transactions, the funds the DCSL Resort repaid to Danske that were applied to pay down the Additional Loans should instead be applied to reduce the Initial Loan-related amount for which Danske is entitled to summary judgment pursuant to the Oral Ruling.

The following chart addresses the amounts claimed by Danske, Danske's assertions regarding each claimed amount, the effect of the Oral Ruling on each claimed amount, and the

---

[2] The Oral Ruling states that this amount is $100,240,992, but the government's consultant believes the correct amount is $101,240,992.

[3] The government respectfully disagrees with the Court's Oral Ruling and that Danske is a bona fide purchaser for value.  The government preserves any and all challenges to the Oral Ruling.  However, for purposes of this letter, the government will address the issues according to the Court's Oral Ruling.

2

government's position regarding each claimed amount.

| Claimed Amount | Danske's Position as to What Is Undisputed | Oral Ruling | Government's Position |
|---|---|---|---|
| **Facility A Claimed by Danske in its Petition:** | | | |
| Facility A unpaid principal in the amount of $82,338,371.  Notably, this claimed amount for Facility A consists of the $107,538,328 Initial Loan, plus $1,600,015 advanced by Danske after acquiring the Initial Loan from Lehman, minus $26,799,972 in principal repayments Danske received from the DCSL Resort. | Danske asserts that this sum, minus the $6,297,406 that Court stated remains at issue, is undisputed, and includes this sum in the $90,102,594 it claims is undisputed for Facility A. | The Court granted Danske summary judgment as to $101,240,922 of the $107,538,328 Initial Loan. The Court did <u>not</u> grant summary judgment with respect to, and did not even address, the $1,600,015 advanced by Danske after acquisition of the Initial Loan. | The Court granted Danske summary judgment as to, at most, $101,240,922 of the Facility A unpaid principal balance.  The DCSL Resort repaid $26,799,972 of this amount.  Accordingly, Danske is entitled to summary judgment as to, at most, $74,440,950. |
| $13,860,658 in interest capitalized on Facility A by Danske after it acquired the Initial Loan from Lehman. | Danske asserts that this sum is undisputed and includes it in the $90,102,594 it claims is undisputed for Facility A. | The Court did <u>not</u> grant summary judgment with respect to, and did not even address, this claimed amount. | Danske capitalized the interest upon the DCSL Resort's default under the loan agreements by failing to make the required interest payments.<br><br>Danske has not explained why its records regarding the capitalization of interest are inconsistent with Trimont's records for the capitalized interest. |
| $200,971 in modification fees and closing costs charged by Danske for Facility A after it acquired the Initial Loan from Lehman | Danske asserts that this sum is undisputed and includes it in the $90,102,594 it claims is undisputed for Facility A. | The Court did <u>not</u> grant summary judgment with respect to, and did not even address, this claimed amount. | These modification fees and closing costs pertain to modifications to the Initial Loan agreement, and, therefore, are fees and costs associated with the Additional Loans that remain in dispute. |

| Claimed Amount | Danske's Position as to What Is Undisputed | Oral Ruling | Government's Position |
|---|---|---|---|
| **Facility A Total Claimed by Danske in its Petition**: $96,400,000 | Danske claims that $90,102,594 of the $96,400,000 is undisputed for Facility A. | The Court granted Danske summary judgment as to $101,240,922 of the $107,538,328 Initial Loan, but the Court did not account for the sums that Danske received in repayment of the Facility A loan. | While Danske deducts the funds that it received from the DCSL Resort in repayment for the Initial Loan, Danske's nevertheless improperly characterizes as undisputed $1,600,015 + $13,9860,658 + $200,971 that the Court did <u>not</u> grant summary judgment with respect to, and did not even address. |
| **Profit Participation Fee Claimed by Danske in its Petition:** | | | |
| $50,000,000 Profit Participation Fee ("PPF"). This represents the unpaid interest the DCSL Resort owed Lehman at the time Danske acquired the Initial Loan. | Danske claims that $45,000,000 of the $50,000,000 is undisputed for the PPF. | The Court did <u>not</u> grant summary judgment with respect to, and did not even address, this claimed amount. | This amount remains in dispute. |
| **Facility B Claimed by Danske in its Petition:** | | | |
| Facility B unpaid principal in the amount of $16,462,951. | Danske asserts that this sum is undisputed and includes it in the $18,000,000 it claims is undisputed for Facility B. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loan transactions were at arm's length. | Danske was not a bona fide purchaser for value as to these Additional Loans. Danske has failed to provide documentation to support its claim to this amount. |
| $1,537,049 in closing costs and miscellaneous fees charged by Danske for Facility B | Danske asserts that this sum is undisputed and includes it in the $18,000,000 it claims is undisputed for Facility B. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loan transactions were at arm's length. | Danske was not a bona fide purchaser for value as to these Additional Loans. Danske has failed to provide documentation to support its claim to this claimed amount. |

| Claimed Amount | Danske's Position as to What Is Undisputed | Oral Ruling | Government's Position |
|---|---|---|---|
| **Facility B Total Claimed by Danske in its Petition**: $18,000,000 | Danske claims that the entire $18,000,000 is undisputed for Facility B. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loan transactions were at arm's length. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. |
| **Facility C Claimed by Danske in its Petition:** | | | |
| Facility C unpaid principal in the amount of $3,180,111. | See below. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loans were arm's length transactions and whether Danske was a bona fide purchaser for value for funds advanced under Facility C after the Bill of Particulars was filed. | Danske was not a bona fide purchaser for value as to these Additional Loans. Danske has failed to provide documentation to support its claim to this amount. |
| $7,671,811 in unpaid interest on Facility C | See below. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loans were arm's length transactions and whether Danske was a bona fide purchaser for value for funds advanced under Facility C after the Bill of Particulars was filed. | Danske was not a bona fide purchaser for value as to these Additional Loans. Danske has failed to provide documentation to support its claim to this amount. |
| $3,248,078 in miscellaneous fees charged by Danske for Facility C | See below. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount. On the contrary, the Court held there is an issue of fact as to whether these Additional Loans were arm's | Danske was not a bona fide purchaser for value as to these Additional Loans. Danske has failed to provide documentation to support its claim to this amount. |

| Claimed Amount | Danske's Position as to What Is Undisputed | Oral Ruling | Government's Position |
|---|---|---|---|
| | | length transactions and whether Danske was a bona fide purchaser for value for funds advanced under Facility C after the Bill of Particulars was filed. | |
| **Facility C Total Claimed by Danske in its Petition**: $14,100,000 | Danske acknowledges that its claim as to the funds advanced after the Bill of Particular was filed remains in dispute.<br><br>In an attempt to calculate the amount that it contends is not in dispute, Danske revised the figures contained in its Petition, apparently by using figures concerning the balance owed under Facility C as of a date prior to the filing of the Bill of Particulars.  Danske increased the unpaid principal amount from $3,180,111 to $3,852,184; changed the amount of unpaid accrued interest from $7,671,811 to $0; and reduced the $3,248,078 in unpaid miscellaneous fees to $1,381,919. | The Court did <u>not</u> grant summary judgment with respect to this claimed amount.  On the contrary, the Court held there is an issue of fact as to whether these Additional Loans were arm's length transactions and whether Danske was a bona fide purchaser for value for funds advanced under Facility C after the Bill of Particulars was filed. | Danske was not a bona fide purchaser for value as to Facility C.  Danske has failed to provide documentation to support its claim to Facility C. |

| Claimed Amount | Danske's Position as to What Is Undisputed | Oral Ruling | Government's Position |
|---|---|---|---|
| **Unpaid Interest and Fees Claimed by Danske in its Petition:** | | | |
| Unpaid Interest and Fees: $35,000,000.   This sum includes interest and fees charged by Danske between September 30, 2019 and November 30, 2020 for Facilities A, B, and C. | Danske claims that $30,057,460 of the $35,000,000 is undisputed. | The Court did _not_ grant summary judgment with respect to this claimed amount.  The Court held there is an issue of fact as to whether the Additional Loans were arm's length transactions and whether Danske was a bona fide purchaser for value for funds advanced under Facility C after the Bill of Particulars was filed. | This claimed amount is in dispute.  Danske was not a bona fide purchaser for value as to the Additional Loans. Danske has failed to provide documentation to support its claim to these charges. |

II.     The Discovery the Government Seeks With Respect to Danske's Claim Pursuant to the Oral Ruling

In the Oral Ruling, the Court held that the government is permitted to obtain discovery regarding: 1) the amount of the Initial Loan; and 2) whether Danske is a bona fide purchaser for value as to all of the Additional Loans, beginning in 2009, because they were not arm's length transactions and/or because Danske advanced funds after the Bill of Particulars was filed.  *See* Oral Ruling Tr. pp. 15-16, 18.  The Court also stated that it would consider other limited categories of documents or gaps in the documentation for the Additional Loans that the government still seeks.  *See id.* at p. 25.  The government will address each of these areas of potential discovery in turn.

A.   Discovery Regarding the Initial Loan

Based on the Court's Oral Ruling, the government is permitted to conduct discovery regarding the $6,297,406 of the principal of the Initial Loan that Danske claims, which is not supported by the proffered Trimont records.  *See* Oral Ruling Tr. at p.15.  As such, the government respectfully requests the following discovery:

- Trimont Invoices to support the transactions of $6,297,406 included in the Initial Loan of $107,538,328.

B.  Discovery Regarding Whether the Additional Loans Were Arm's Length Transactions

The Oral Ruling expressly permits the government to conduct discovery on the issue of whether Danske is a bona fide purchaser for value for all of the Additional Loans because they were not arm's length transactions.  *See* Oral Ruling Tr. at pp. 5, 16, 23-24.  The Court held that the government would be permitted to conduct limited discovery regarding the government's argument that "the bank and Mr. Jowdy had some arrangement through which Jowdy would permit the bank to systematically deplete the equity in the [DCSL Resort through] modified loan agreement[s] [that] increase[d] the [DCSL Resort's] debt without the bank having to advance any new funds, while the bank in return made no effort [to] determine that the loan funds were being used for their intended purpose for the benefit of . . . the [DCSL Resort] and not for Mr. Jowdy personally, or for other entities controlled by Mr. Jowdy, and that they also promised to pay a substantial sum upon the sale of the [DCSL Resort] through a foreclosure, or [if] the bank recovers [its] investment through a forfeiture sale."  Oral Ruling Tr. at pp. 16-17.  The Court suggested, as an example, that the government could conduct a video deposition of Danske's consultant, Mr. Michael Delvin, and with the Court's permission, the government intends to conduct that deposition.  Oral Ruling Tr. at p. 18.   The government also seeks production of the following documents:

1.  Complete draw request packages for the sample of draw requests identified in Table 1,[4] containing the documents identified in Section 11.1 of the loan agreements, entitled "Documents to be Furnished for Each Disbursement," which should include, but is not limited to:

    a.  All Invoices, contracts or other information that support that the DCSL Resort incurred all costs included in the draw request; and

    b.  Paid receipts or other proof of payment of all construction and development costs.

| TABLE 1. SAMPLE OF FACILITY C DISBURSEMENTS | | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 1 | C | 5 | 05/06/14 | OUTWARD 4022-41266802658 | $2,000,000 |
| 2 | C | 6 | 07/23/14 | OUTWARD 4022-42049409644 | $2,000,000 |
| 3 | C | 7 | 10/07/14 | OUTWARD 4022-42802014522 | $2,000,000 |
| 4 | C | 7 | 12/30/14 | OUTWARD 4022-43644982596 | $1,587,637 |
| 5 | C | 8 | 03/04/15 | OUTWARD 4022-50637156334 | $2,000,000 |
| 6 | C | 9 | 04/02/15 | OUTWARD 4022-50928178314 | $1,750,000 |

---

[4] It is the government's understanding that there are approximately 70 draw requests. The government has identified a sampling of 20 draw request packages to be produced, but reserves the right to request the production of additional draw request packages.

| TABLE 1. SAMPLE OF FACILITY C DISBURSEMENTS | | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 7 | C | 10 | 07/03/15 | OUTWARD 4022-51841485826 | $1,500,000 |
| 8 | C | 10 | 08/04/15 | OUTWARD 4022-52162524448 | $1,250,000 |
| 9 | C | 10 | 09/15/15 | OUTWARD 4022-52583918698 | $1,750,000 |
| 10 | C | 11 | 11/06/15 | OUTWARD 4022-53105862840 | $1,394,488 |
| 11 | C | 11 | 12/10/15 | OUTWARD 3826-53447096398 | $1,250,000 |
| 12 | C | 12 | 01/06/16 | OUTWARD 4022-60068010908 | $1,402,000 |
| 13 | C | 21 | 02/23/18 | OUTWARD 4022-80542422980 | $2,000,000 |
| 14 | C | 22 | 04/12/18 | OUTWARD 4022-81024789440 | $2,500,000 |
| 15 | C | 22 | 06/22/18 | OUTWARD 4022-81738787708 | $2,100,000 |
| 16 | C | 23 | 09/28/18 | OUTWARD 4022-82714119646 | $1,905,000 |
| 17 | C | 24 | 12/19/18 | OUTWARD 4022-83538891662 | $2,250,000 |
| 18 | C | 24 | 11/30/18 | OUTWARD 4022-83347713714 | $2,000,000 |
| 19 | C | 26 | 05/24/19 | OUTWARD 4022-91448050600 | $1,800,000 |
| 20 | C | 28 | 11/05/19 | OUTWARD 4022-93098099318 | $1,000,000 |

2. Complete funding memos for the disbursements identified in Table 1.

3. Any and all servicing agreements with Trimont, Michael Delvin, and any other third-party utilized by Danske or the Borrower to provide services regarding the DCSL Resort loan; and any and all correspondence, status reports and documents prepared according to such servicing agreements for the draw requests identified in Table 1.

4. All required construction documents identified in the Loan Agreements under Article VIII, Section 8.1, Replacement Facility C - Required Construction Documents, and under Article IX, Section 9.2, Construction Budget-Replacement Facility C, for each disbursement and/or loan advance identified in Table 1.

5. M. Delvin & Associates reports and supporting work papers pertaining to the disbursements identified in Table 1.

In the course of the Oral Ruling, the Court noted that the government did not proffer a "declaration from any industry experts that suggest that what the bank was doing . . . would be indicative of a lack of an [arm's length] transaction by a bank in this type of situation." Oral Ruling Tr. at p. 18. As the Court is aware, Danske sought an expedited briefing schedule, which allotted insufficient time for the government to engage numerous experts on the various issues at hand. Further, it was, and still is, the government's intention to request depositions of Danske's employees to ask, *inter alia*: 1) on how many other occasions Danske entered into side agreements with an employee/member of its borrower, in which Danske promised to pay the employee/member of the borrower a portion of the principal recovered by Danske on the loan; 2) of those other occasions -- if any such other occasions exist -- how many involved similar side arrangements for the employee/member of the borrower even though the borrower had been

9

unable to pay down the loan, and, in fact, was in default over the entire course of the loan; 3) Danske's rationale for entering into the side agreement with Jowdy under the circumstances; 4) why Danske decided to enter into a side agreement with Jowdy that could result in a payment of approximately $10 million to him, rather than using that money to reduce the principal balance of the loan – which also would have reduced the amount of accrued interest – and which would have benefitted the entire DCSL Resort, and not only Jowdy, individually; 5) whether Danske entered into any other side arrangements with Jowdy; and 6) why Danske elected to continue entering into loan agreements with the DCSL Resort when the DCSL Resort had been in default since 2009.

The government submits, based on its prior discussions with Danske, that discovery will reveal that Danske engaged in, or attempted to engage in, numerous transactions, and/or settlement agreements with the government, with the purpose of protecting or benefitting Jowdy, in addition to the Danske-Jowdy side agreement discussed by the Court in its Oral Ruling. Further, the government submits that discovery will reveal -- contrary to Danske's insinuation to the Court that the government did not take issue with the side agreement because the government did not object to it -- that Danske and Jowdy entered into the side agreement *without waiting* for the government to provide its consent to, or comments regarding the appropriateness of, the side agreement. Indeed, although the Court did not recall the government objecting to the side agreement as not being at arm's length, *see* Oral Ruling Tr. at p.17, the government raised the issue in filings and during court conferences. *See, e.g.*, Transcript of Court Conference held on October 11, 2019 at p. 26 (after discussing the February 28, 2019 letter filed by John Kaiser that contained "serious allegations about Jowdy's management of the [DCSL] Resort," the government stated, "In addition . . . the bank has engaged in a very atypical side agreement with Jowdy in its most recent loan modification. The bank has designated their loan documents confidential, but the Government is more than willing to discuss it with the Court, if the Court's so inclined."). Based on the foregoing, the Government requests the opportunity to depose Jowdy, as well as Danske's employees in London who had the relationship with Jowdy and controlled the lending decisions, and to serve document demands on these issues.

In fact, evidence that Danske's dealings with Jowdy were not at arm's length came to light earlier in this action. As Your Honor will recall, in November 2016, the government moved to enforce the Protective Order to permit a site visit to the DCSL Resort and a physical inspection of the books, records, and accountings maintained on site. *See* DE 408.[5] At the same

---

[5] The government argued, among other things, that Jowdy had not complied with the Protective Order because he had not provided the government with the original books and records associated with the maintenance and operation of the DCSL Resort. *See* DE 425 at p. 5. Further, the government argued that a review of the DCSL Resort's summary spreadsheets that were provided revealed discrepancies and inconsistencies. The government pointed to an example in which the sale of a DCSL Resort investment unit was documented in July 2012 and recorded on a spreadsheet that was sent to Danske in February 2013 as having sold for $51,561, but the same transaction was recorded on a spreadsheet created in 2016 with a sale price for the same unit of over $550,000. *Id.* at p. 7. Although the government had requested the underlying documentation used to create the summary spreadsheets, such as actual invoices, Jowdy refused to produce that documentation. *Id.*

time the government moved to enforce the Protective Order, Jowdy moved the Court to modify the Protective Order to allow the sale of a parcel of the DCSL Resort known as San Marcos, and to approve a settlement between Jowdy and several victims in a Delaware books and records action. *See* DE 432. The government objected to the sale of the San Marcos parcel, arguing that Jowdy had not provided any evidence that the San Marcos sale was an arm's length transaction that would benefit the DCSL Resort. *See* DE 425 at pp. 11-12. Specifically, the government argued that no marketing or appraisal of the parcel had been performed, and the government would expect Jowdy to use his best efforts in marketing the property to get the best available price for the property. *See id.*; *see also* Transcript of Court Proceeding held on January 11, 2017 ("January 11, 2017 Tr.") at p. 19. Notably, Danske opposed the government's motion and joined in Jowdy's application, and stated that, "most major acts with regard to the [DCSL] Resort require the joint consent of Danske and the Borrower. For example, no sale of the resort or change in ownership or management of the Resort or the Borrower can occur without Danske's consent." *See* DE 425 at p. 9; DE 423 at p. 2. In response, the government questioned "why, if th[e] proposed sale [were] truly at market value and at arms-length, neither Danske Bank nor DCSL ha[d] obtained an independent appraisal of the San Marcos Property or provided marketing information." *Id.* at pp. 14-15. In its ruling on these motions, the Court denied the government's request for additional books and records, stating, "I consider it significant as pointed out in some of the papers that the government is asking for significantly more documentation than even Danske Bank has asked for and obviously a bank with a $180 million stake in this resort has every incentive to ensure there is not dissipation of assets." *See* January 11, 2017 Tr. at p. 10. Similarly, in discussing the prospective sale of the San Marcos parcel, the Court stated, "I understand that there does not appear to be an appraisal of that particular parcel, but the bank who has examined the parcel as I said has $180 million at stake understands, I would think, the market in the area where the resort i[s] . . . [and] approved the transaction." *Id.* at pp. 13-14. However, the Court continued, "[N]otwithstanding that, . . . I think it is a reasonable request by the government, if the government wishes, to have an independent appraisal of that parcel just to confirm that Danske['s] judgment is not erroneous with respect to this particular transaction." *Id.* at pp. 13-14. Pursuant to the Court's ruling, the government obtained an appraisal of the San Marcos parcel. The appraisal revealed, as the government had predicted, that the property was worth approximately $7.15 million, which was nearly 3 times the proposed sale price of $2.5 million for which Jowdy and Danske were willing to sell it. After the government provided the appraisal to the DCSL Resort and Danske, the government heard nothing more about the proposed sale. But for the appraisal ordered by the Court at the government's request, Danske would have permitted Jowdy to engage in a transaction that was not at arm's length and not in the interest of the DCSL Resort, which demonstrates that Danske's engaging in non-arm's length transactions with Jowdy is not limited to Danske's failure to obtain the documentation required under the loan agreements.

The government submits that Danske's failure to engage in due diligence prior to entering into each modified loan agreement would also demonstrate that Danske was not engaging in arm's length transactions and was only interested in accruing a substantial debt in

its favor.[6]  Approximately $13,860,658 million of Danske's claim consists of capitalized interest on the Initial Loan.  Danske's claim also includes $4,986,098[7] in unpaid closing costs, modification fees, and other miscellaneous fees charged by Danske for entering into the Additional Loan agreements with the DCSL Resort.  Moreover, had Danske applied the DCSL Resort's loan repayments to pay down the principal and interest on the Initial Loan Facility A, rather than towards the Facility B and Facility C loans, the Facility A balance would have been reduced by $76,993,275 plus interest.  Accordingly, the government requests the discovery discussed above pertaining to the due diligence Danske engaged in prior to entering into each Additional Loan, and documentation regarding the loan repayments and the allocation of the funds to the different facilities, as well as the following:

- Any and all documentation identifying the procedures, policies, and practices of Danske, and its officers, employees or owners, for receiving, soliciting, preparing, reviewing, approving or denying loans or client relationships.
- Any and all documents or information available to or within the knowledge of Danske and/or any such company's officers, employees, owners, concerning the conduct or assets of Jowdy, his associates, relatives, representatives, and related entities.
- Any and all documents pertaining to any agreements and guarantees between Danske and any and all Jowdy related entities, including, but not limited to, Legacy Cabo, LLC, Legacy Properties, LLC, KAJ Holdings LLC and Silverpeak.
- Identification of: (a) any and all Danske employees or contractors who visited the DCSL resort; (b) the date(s) of any visit; (c) the purpose of the visit(s); (d) the lodging used by the employee(s)/contractor(s) during the visit(s); (d) any gifts or benefits conferred, directly or indirectly, on a Danske employee/contractor by Jowdy and/or any employee or contractor of the DCSL resort; and (e) any gifts or benefits conferred, directly or indirectly, on Jowdy and/or any employee or contractor of the DCSL resort by a Danske employee/contractor.
- Any and all correspondence between Danske and the Defendants.
- Any and all documentation, or correspondence between Danske and the Borrower and/or Jowdy, regarding the Borrower's ability or inability to meet its loan obligations to Danske and/or Lehman.
- Any and all documentation and agreements (whether in draft or executed form), and correspondence between, Danske and Jowdy and/or the Borrower, regarding: (a) Jowdy's future ownership interest(s), direct or indirect, in the DCSL resort and/or Equity Interests; (b) any Lehman or Danske employee's future ownership interest(s), direct or indirect, in the DCSL resort and/or Equity Interests; (c) potential purchasers of the DCSL resort and/or the DCSL resort loan; (d) foreclosure or forfeiture on the DCSL resort loan in

---

[6] Similarly, Danske's failure to engage in due diligence regarding Jowdy's potential mismanagement of the DCSL Resort demonstrates that Danske was not engaging in arm's length transactions and was only interested in accruing a substantial debt.

[7] Danske's Petition seeks $4,986,098 in closing costs, modification fees, and other miscellaneous fees, and its December 1, 2020 letter erroneously states that the Court has granted it summary judgment as to $3,119,939 of its closing costs, modification fees, and miscellaneous fees.

Mexico or in the United States; (e) bankruptcy or insolvency proceedings concerning the DCSL resort or the Equity Interests in either Mexico or the United States; and (f) Jowdy's direct or indirect management of the DCSL resort during and/or after the instant criminal case.

- Any and all documentation and correspondence concerning agreements between Danske and the Borrower and/or Jowdy that confer a, direct or indirect, personal or financial benefit on Jowdy.
- Any and all documentation and correspondence related to a potential or contemplated sale or auction of the DCSL resort by Danske.
- Any and all documentation and correspondence related to Danske's reports to shareholders regarding the status of the DCSL Resort loan.
- Any and all documentation regarding the due diligence performed by Danske regarding the (a) acquisition of the DCSL Resort loan; and (b) entering into loan agreements and/or modifications with the Borrower, including deliverables, obligations, and the satisfaction of conditions by DCSL Mexico as required under all extensions, modifications, facility increases, advances and amendments to the Loan Documents.

C. Discovery Regarding Whether Danske is a Bona Fide Purchaser for Value as to the Funds Advanced After the Bill of Particulars was Filed

The government argued in its summary judgment motion that Danske cannot show that it was reasonably without notice of the forfeitability of the DCSL Resort for the funds it loaned to the DCSL Resort after the government filed the Bill of Particulars on August 20, 2015, as Danske was indisputably on notice that the DCSL Resort was subject to forfeiture at that time. In the Oral Ruling, the Court questioned why the government would not view Danske a bona fide purchaser for value for the funds advanced after the Bill of Particulars was filed when: 1) the money was advanced pursuant to agreements that were entered into prior to the filing of the Bill of Particulars; 2) the Court had entered the Protective Order to preserve the property; 3) the Court did not recall the government disputing Danske's argument that the government wanted Danske to continue to fund the DCSL Resort; and 4) the government suggested to Danske that Danske would not be permitted to foreclose on the DCSL Resort. *See* Oral Ruling Tr. at p. 26. The Court then stated, ". . . . I'm opening my mind to you and you can suggest to me some category of limited discovery on [this] if you want to." *Id.* at p. 27.

In fact, Danske had no obligation to continue lending funds to the DCSL Resort because the DCSL Resort was in default from the time Danske acquired the Initial Loan from Lehman in 2009. This is evidenced by the fact that interest was capitalized on the unpaid accrued principal from 2009 through 2012, which was permitted only upon the DCSL Resort's failure to make the required interest payments, which was an event of default. Moreover, contrary to Danske's argument that it was required to continue lending under the existing loan agreements, the loan agreements expressly provided that Danske could withhold further disbursements of funds upon the occurrence of the default. Further, Danske's records do not indicate that the DCSL Resort cured the condition of default at any point in time after 2009. Under these circumstances, Danske *should not have been lending new funds* to the DCSL Resort after Danske acquired the Initial Loan in 2009, including the funds that were loaned after the Bill of Particulars was filed,

especially from 2014 through the present -- when Danske was allowing the debt to amass without lending any new money.

Indeed, the government questions why Danske did not pursue a foreclosure action years prior to the filing of the Bill of Particulars, and raised the subject of a foreclosure only in 2020, especially considering that the DCSL Resort has been in default since Danske acquired the loan in 2009.  As mentioned, Danske has not loaned any new money to the DCSL Resort *since April 2014*, but rather *for the past 6 years* has allowed the DCSL Resort to pay down the Facility C revolving loan and then re-borrow the same funds.  If Danske had foreclosed in 2009, or even in 2014 -- when it stopped lending new money -- instead of allowing the DCSL Resort to repeatedly borrow on the revolving loan instead of applying the funds to pay down the principal and interest on Facilities A and B, then the principal and interest owed to Danske would have been substantially less and there would have been equity remaining in the DCSL Resort.  Indeed, the appraisal Danske obtained in 2014 indicates that if Danske had foreclosed in 2014 after if it stopped lending new money, Danske would have fully recovered on its debt, which at that time was $146,500,000, *and* there would have been between $135.5 million and $244.5 million in equity remaining in the property.  However, *now*, Danske's debt is allegedly nearly $213.5 million,[8] and there will likely be no equity remaining in the DCSL Resort.

Danske argued that it was required to continue to lend funds under the Additional Loan agreements, but Danske failed to cite any case law to support its argument that it was contractually obligated to continue to lend despite its knowledge of the forfeitability of the DCSL Resort.  Moreover, the reality is that Danske has not loaned any *new* funds since 2014.  Instead, Danske was merely allowing the DCSL Resort to pay down the revolver and then re-borrow the *same* funds, while Danske amassed interest on the unpaid principals of Facility A and Facility B.  However, if Danske had applied the loan repayments to pay down the principals of Facility A and Facility B, then the interest on Facility A and Facility B would not have accrued and the debt would have been substantially smaller.  Thus, rather than complying with the Protective Order, Danske's conduct violated it by allowing the debt to consume the equity in the DCSL Resort, and, thus, decrease the value of the DCSL Resort.

At no point in time did the government instruct Danske to, or comment as to whether Danske should, continue to lend money to the forfeitable DCSL Resort.  *See* DE 937-2 at ¶ 5.  In fact, the government made clear to Danske's counsel on numerous occasions that the government did not view Danske as a bona fide purchaser for value for any funds advanced by Danske after the filing of the Bill of Particulars.  Id. at ¶ 6.  While the government indicated to Danske that a foreclosure action would violate 21 U.S.C. § 853(k), that did not mean that Danske was necessarily required to continue lending to the DCSL Resort.  The government submits that Danske's settlement proposals and other settlement materials, which have not been presented to the Court, will demonstrate that the government never agreed that Danske had a valid claim as a

---

[8] Danske has again improperly increased its claim and now seeks $213.5 million.

bona fide purchaser for value.[9]  In sum, discovery on this issue will reveal that Danske's decision to continue to advanced funds to the DCSL Resort after the Bill of Particulars was filed was not done in reliance on anything the government said or did not say, and, therefore, Danske is not a bona fide purchaser for value for the $50 million advanced under the Facility C revolver loan when Danske was undeniably on notice of the forfeiture action.

   For these reasons, among others, the government requests the following discovery:

1) Danske's internal correspondence and documents regarding its decision to continue lending, documentation regarding the DCSL Resort's defaults, and documentation regarding Danske's decisions pertaining to foreclosure;

2) Danske's settlement proposals, settlement materials, notes of meetings with the government, and emails regarding its bona fide purchaser for value status.

3) Any and all documents showing the amount and calculation of Danske's claimed default interest.

4) Any and all notices of default of the DCSL Resort loan, and any and all documentation that notices of default were sent to the Borrower and/or Trustee of the Mexican trust.

5) Any and all documentation, agreements and correspondence between, Danske and Jowdy, the Borrower, and/or the Trustee, regarding the potential or actual foreclosure of the DCSL resort.

D. <u>Discovery Regarding Categories of Documents or Gaps in the Documentation for the Additional Loans</u>

The Court stated that "if there is some limited category of documents or gaps in the documentation[] the government still wants . . . with respect to the[] additional loans[,] I'd be willing to consider it . . . ."  Oral Ruling Tr. at p. 25.  Accordingly, the government requests that the Court order Danske to provide the following documentation that Danske has failed to produce to support its claim:

• Documentation or an explanation for why Danske did not account for capitalized interest until April 2013 even though interest began accruing in March 2009 after the DCSL Resort first failed to make required interest payments;

• Loan statements for Facilities A and B dating after February 28, 2020, and Facility C loan statements dating after January 1, 2020, to support Danske's claim for costs incurred after those respective dates (which documentation Danske has not produced);

---

[9] The government is prepared to provide the Court with settlement materials that are in the government's possession, but Danske is in possession of additional materials that it should be ordered to produce in discovery.

- Documentation or an explanation for the numerous discrepancies between Danske's loan statements and Trimont's Invoices that limit the government's ability to validate the unpaid principal balances in Danske's claim;

- Documentation to support Danske's allegation that the $840,000 difference between the amount funded to the DCSL Resort and the amount of Danske's claim is due to amounts transferred to interest reserve accounts;

- Documentation or an explanation for the $47,387 Danske claims it advanced to the DCSL Resort that is not reflected in the DCSL Resort's bank statements;

- Documentation or an explanation as to why $3,020,424 of interest payments included in Trimont's Invoices were not included in Danske's Bank Statements;

- Documentation or explanation for the notable inconsistencies between the various Trimont documents provided by Danske, as well as the discrepancies between the Danske loan statements and the Trimont Invoices;

- Documentary support for the estimated $900,000 in timeshare deposits that Danske applied to its claim, or Facility C loan statements with a date more recent than December 2019;

- Documentary support for the at least $6,516,433 in claimed miscellaneous fees and closings costs; and

- All reports furnished by the Borrower to Danske pursuant to the Loan Agreements, Section 13.5, Reporting Covenants, including, but not limited to: Section 13.5(a) Weekly Reports, Section 13.5(b) Monthly Reports, Section 13.5(c) Quarterly Reports, and Section 13.5(d) Annual Reports.

In addition, as set forth in the chart on the pages 3 through 7 *supra*, the Court did not grant summary judgment with respect to, and did not address, whether Danske has proven its claim to the $50 million PPF.  While the Court recognized that Danske's claim to the Initial Loan consists of both $107,538,327.83 in principal and $49 million interest (*i.e.*, the PPF), the Oral Ruling did not address whether there is an issue of fact as to Danske's claim to the PPF.  Danske asserts "there is no dispute as to [its] entitlement under the loan agreements as to at least $45 million of the $50 million PPF."  *See* DE 962 at p. 3.  The government requests, at the very least, discovery regarding the $5 million of the PPF that Danske admits is at issue.  Specifically, the government requests documentation to support Danske's assertion that the increase in the PPF reflected Danske's view of how the risk profile of the DCSL Loan had changed as a result of Danske advancing additional funding.

III.     The Government's Response to Danske's Proposed "Next Steps"

Danske proposed that based on the Oral Ruling, "the Government should agree to amend the Preliminary Order of Forfeiture to remove the Resort Property from the Forfeitable Assets listed there."  DE 962 at p. 4.  Danske further requested that, if the government refuses to amend the Preliminary Order of Forfeiture, the Court allow Danske to foreclose on the DCSL Resort.[10]  *Id.*  Either proposal would effectively terminate the forfeiture action against the DCSL Resort, even though Danske's claim has not been fully and finally determined, and even though it is possible that Danske's claim could be extinguished in large part, if not entirely, if the Court finds that Danske is not a bona fide purchaser for value for the Additional Loans and if the Court deducts from the claim the amount that Danske has been repaid.  As stated on page 2, *supra*, should the Court determine that Danske is not a bona fide purchaser for value for some or all of the Additional Loans, the funds the DCSL Resort repaid to Danske that were applied to pay down the Additional Loans should instead be applied to reduce the amount for which Danske is entitled to summary judgment pursuant to the Oral Ruling.

The government proposes that the parties engage in the discovery described above.  Further, at the close of discovery, the government proposes that the Court refer the case to Magistrate Judge Shields for a settlement conference.[11]

Thank you for Your Honor's consideration of this submission.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:     /s/ Madeline O'Connor
        Madeline O'Connor
        Diane C. Leonardo
        Assistant U.S. Attorneys
        (631) 715-7870
        (631) 715-7854

---

[10] Attached to Danske's December 1, 2020 letter is a Proposed Order.  *See* DE 962-1.  The government objects to this Proposed Order for the reasons discussed herein.  Additionally, Danske's Proposed Order contains a provision stating that the Order "is a final judgment appealable upon entry of th[e] Order."  *Id. at ¶ 6.*  Should the Court enter an Order at this stage of the litigation, the Order would not include a final determination of Danske's Petition, and, thus, the Order should not be denominated a final judgment that is appealable upon entry.

[11] The government disputes Danske's assertions regarding the settlement discussions between Danske and the government and is prepared to provide the Court with documentation that will demonstrate that the government has engaged in extensive settlement discussions with Danske's counsel over a period of approximately five years, and, further, that the settlement efforts were frustrated by Danske's conduct, not the government's.

cc:  Philip Kenner, by mail
     All counsel of record by ECF