FILED
CLERK

9:39 am, Dec 21, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  . Criminal No.:2.13-CR-00607-JFB-AYS
                      .
         Vs.       .
                      . 100 Federal Plaza
                      . Central Islip, NY  11722
PHILLIP A. KENNER,        .
                      . December 10, 2020
. . . . . . . . . . . . . .

TRANSCRIPT OF HEARING (Telephonically)
BEFORE HONORABLE VISITING JUDGE JOSEPH F. BIANCO

APPEARANCES:

For the Government:       UNITED STATES ATTORNEYS OFFICE
                         EASTERN DISTRICT OF NEW YORK
                         BY: DIANE LEONARDO, ESQ.
                             MADELINE O'CONNOR, ESQ.
                         610 Federal Plaza
                         Central Iselip,  NY  11722

For the Defendant:        MATTHEW W. BRISSENDEN PC
                         BY: MATTHEW W. BRISSENDEN, ESQ.
                         666 Old Country Road, Suite 501
                         Garden City, NY  11530-2004

For CSL Properties:       QUINN EMANUEL URQUHART & SULLIVAN, LLP
                         BY: CHRISTOPHER HILL, ESQ.
                         51 Madison Avenue, 22nd Floor
                         New York, NY  10010

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044   Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

**A D D I T I O N A L   A P P E A R A N C E S:**

For Danske Bank:              VENABLE LLP
                              BY: GEORGE KOSTOLAMPROS, ESQ.
                                  DOREEN MARTIN, ESQ.
                                  KELLY WEINER, ESQ.
                                  XOCHITL STROHBEHN, ESQ.
                              1290 Avenue of the Americas
                              20th Floor
                              New York, NY  10104

Spokesman for Homeowners:     MARC WOLINSKY, PRO SE

For Owen Nolan:               PROSKAUER ROSE LLP
                              BY: SEETHA RAMACHANDRAN, ESQ.
                              Eleven Times Square
                              (Eighth Avenue & 41st Street)
                              New York, NY  10036-8299

For Diamant (phonetic):       PEPPER HAMILTON LLP
                              BY: THOMAS MccSOUTHER, ESQ.
                              620 Eighth Avenue, 37th Floor
                              New York, NY  10018-1405

3

1                              I N D E X

2

3                                              PAGE

4    ORAL ARGUMENT                              7

5

6    DECISION                                   24

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Calling Criminal Case 2013-607, United

2    States of America versus Phillip Kenner. Counsel, please state

3    your appearances for the record.

4          MS. LEONARDO-BECKMAN:  For the United States of

5    America Diane Leonardo, Assistant United States Attorney.

6    Along with me is Madeline O'Connor.

7          THE COURT:  Good afternoon.

8          MR. BRISSENDEN:  Good afternoon, Your Honor --

9          THE COURT:  Go ahead.

10          MR. BRISSENDEN:  Matt Brissenden, standby counsel for

11    Phillip Kenner.

12          MR. KOSTOLAMPROS:  For Danske Bank this is George

13    Kostolampros of Venable.  My colleagues Doreen Martin, Xochitl

14    Strohbehn and Kelly Weiner are on the line as well.

15          MR. WOLINSKY:  Good afternoon, Your Honor, this is

16    Marc Wolinsky, spokesperson for (indiscernible - connection).

17          MS. RAMACHANDRAN:  Good afternoon, Your Honor, this

18    is Seetha Ramachandran for Owen Nolan.

19          MR. McCSOUTHER:  Good afternoon, Your Honor, Tom

20    MccSouther on behalf of Diamante (phonetic).

21          THE COURT:  All right, good afternoon, everybody,

22    this is Judge Bianco.  As you know I've scheduled this

23    conference after the Court's oral ruling with respect to some

24    of the issues in the bank's summary judgment motion.  I did

25    receive the letters that we had discussed first from Mr.

1   Kostolampros on November 30, the Government's on December 7,

2   and then a reply letter on December 9.  I also received Ms.

3   Ramachandran's letter with respect to Mr. Nolan that was I

4   think filed earlier today, which I'd like some time to discuss.

5           So I would just ask that if you're not speaking, and

6   since you're on mute because there seems to be a lot of

7   background noise.  I know there's a lot of people on the line

8   so just check to make sure your phone is muted so that we don't

9   have trouble hearing everybody.

10          Before I have a discussion with the lawyers I just

11  want to clarify the Court's ruling.  Obviously there was a back

12  and forth in the papers, not just with respect to potential

13  amounts that are still in dispute, but also with respect to the

14  scope of the Court's ruling that the Court wants to address.

15          I think the most fundamental issue and I just want to

16  clarify is with respect to the additional loans.  It was not my

17  ruling that the only portion of that with respect to whether it

18  was an arms length transaction, my ruling was not limited to

19  the period after the protective order was put into place.  I

20  certainly made reference to that contrary, I think I used the

21  word including that period.  If I misspoke at any point, I

22  apologize for that.

23          But it was not my intention to suggest that that

24  would be the only period of time for which the Government could

25  argue that.  Obviously the Government's argument with respect

1   to that is different for that time period as they pointed out

2   multiple times.  It's April 2014, their argument for that time

3   frame, that (indiscernible - connection) no new monies

4   (indiscernible) to pay down the facility fee and re-borrow at

5   at anytime.  I guess that's why there's a focus on that time

6   period, but I was not suggesting that this was not

7   (indiscernible) make an argument and/or could not seek

8   discovery with respect to the additional loans acquired for

9   that time period.

10          So that's probably the most important clarification I

11  needed to make.  The other one that the Government noted, I

12  guess I misspoke.  At one point I made reference to, with

13  respect to the initial loan the amount that, the difference

14  between $101,240,922 and $107,538,328.  I guess there was

15  another reference to a different amount that I made during the

16  course of the ruling of  I think of $100 million

17  (indiscernible) that is the scope of the dispute of the initial

18  loan.

19          So before I get to your issues regarding the

20  discovery and some of the other things regarding documentation

21  about certain amounts, and I know Mr. Kostalampros was anxious

22  to make the point that the bank believed my ruling to be, the

23  bank was taking the position that a lot of those other disputed

24  amounts may be in the bank's view moot and would withdraw those

25  particular amounts since they would not be material in light of

1  the bank believes the property is worth.

2          But I don't believe, given the Court's current

3  ruling, that that would be, obviously it would not be true.

4  There's a lot more money that is in dispute.  And the

5  Government's view if they were to prevail with (indiscernible)

6  some portion of the additional loans that the Court shouldn't

7  even recognize the $101 million because their argument would be

8  that any money then that was used to pay down the additional

9  loans (indiscernible) -- the Court would determine it's not a

10 bona fide (indiscernible) the bank (indiscernible) value at

11 that point would then be deducted from the bank's claim with

12 respect to the initial loan.  So in other words it does not

13 appear to me that (indiscernible) somehow sever that out and

14 recognize a partial claim.

15         So that's sort of I think the global issues that,

16 before I go through with particulars, Mr. Kostalampros, do you

17 want to be heard on that?

18         MS. STROHBEHN:  Judge Bianco, I, this is Xochitl

19 Strohbehn, I think Mr. Kostalampros has been bounced.  He'll be

20 rejoining --

21         MR. KOSTOLAMPROS:  No, no, I'm sorry.  I was on mute,

22 I apologize.

23         THE COURT:  That's all right.

24         MR. KOSTOLAMPROS:  I'm sorry, Your Honor.  There was

25 a little bit of background noise, so I think I got everything

1   that you said, the clarification.  Obviously, you know, we

2   viewed it that you had taken a position on post bill of

3   particulars.  So for us it would be very important to get

4   clarification as to what is recognized.

5          Frankly, you know, there's still a significant amount

6   taking into account the original Facility A, and the amount

7   remaining at the Facility A, as well as the PPN.  Taking those

8   amounts alone gets you well over $100 million.  And we

9   recognize the Government has made this argument that

10  essentially they would claw back amounts that were repaid, used

11  to repay Facility B and Facility C and apply it to Facility A.

12         We see nowhere in the law that that is allowed.  You

13  know, we haven't found one case that would support such a

14  theory here.  You know, it's one thing to say look, we're not

15  recognizing your claim because you weren't a BFP, but it's

16  another thing to say, you know, we're going to claw back

17  amounts that you will repay on different loans.  And it's, you

18  know, it bears reminding the Court and the parties here is, you

19  know, the amounts that they claim are revolvers, these are all

20  revolvers where principals were given an advance, and then the

21  same principal was repaid over time.

22         And these revolvers, going back to the original

23  Facility B and then Facility C, were implemented at a time

24  period in which but for those revolvers there would have been

25  no sales as the resort.  So you know, the point being is that

1  those amounts shouldn't be at issue as to what gets assessed at

2  Facility A.  What all that that issue is, is Danske's claim.

3  And that claim right now is just essentially three facilities

4  and the BFN (phonetic) and the PPF (phonetic).

5          And it's one thing to say look, you know, we don't,

6  they claim that we weren't a BFP as to amounts advanced-post,

7  the initial Lehman loan, I guess, or the acquisition of the

8  Lehman loan.  But it's another thing to apply amounts that were

9  repaid as to those loans to another separate loan.

10         And again, Your Honor, I ask the question, you know,

11  where is there any support for such a period?  We have not seen

12  one.

13         THE COURT:  Well, let me just, that issue has only

14  come up in the past, you know, week or so since these rulings.

15  But I'm just a little confused about, you're suggesting that if

16  that theory were rejected as a matter of law, then we're

17  combing in the initial loan and the interest on that initial

18  loan, and I guess the $45 million for the (indiscernible) you

19  think that might be enough to moot out everything else where

20  there's not, all the other issues with respect to the

21  additional loans with the, potentially at least moot, is that

22  what you're suggesting to me?

23         MR. KOSTOLAMPROS:  I am suggesting today, Your Honor.

24  We would have to confirm that with our client, but I can tell

25  you right now our client doesn't believe that.  And again I

1  have to go back to confirm it, but I don't believe we believe

2  that there's any value that even gets you to that amount.

3           THE COURT:  All right, let me just ask the Government

4  about the PPF because again I wasn't specifically focused on

5  every individual item.  But the bank has suggested in their

6  response to the Government's letter that even the Government's

7  accountant does not, in light of the Court's ruling with

8  respect to the initial loan, that the only issue with respect

9  to the PPF would be the difference between $45 and $50 million.

10  And that's from the Government.  Is that correct or incorrect?

11  Obviously in light of the Court's ruling.

12           MS. LEONARDO:  Your Honor, this is AUSA Leonardo.

13  I'm having a very hard time hearing everybody.  I don't know

14  what the background noise is, but it's really, if everybody

15  could mute again if they're not speaking.

16           THE COURT:  Yes, I'm hearing some background noise

17  too.  Again, I'm emphasizing everybody on the call other than

18  the person speaking should be on, have their phone on mute.

19           MS. LEONARDO:  Right.  So with regards to PPF, I

20  believe the $45 million, I don't believe that would be

21  contested.  We are contesting the $5 million.  And in response

22  to what was said earlier with regard to the monies that would

23  be attributed to Facility A, if what discovery can show is that

24  the other facilities are not, the monies attributed to those

25  are not arms-length transactions, it would be our argument that

those should have been outside Facility A instead of, you know,
we've argued in our summary judgment brief in a letter we
submitted the other day that, you know, by allowing the non-
arms-length transactions it was exceeding the value of the
resort and those funds should have been applied to Facility A.

And I think the PPF was also calculated on, there was
supposed to be a percentage.  And I don't believe we ever got
those documents.

THE COURT:  Yes, well, on the issue of whether or
not, he says it's a matter of law, there's support for that
type of clawback, I guess, among, with respect to the initial
loan.  So you know, I don't think anybody briefed that
particular legal issue for the Court in connection with it.
You can correct me if I'm wrong, is that brief anywhere in the
summary judgment papers?  I don't remember seeing that.

MS. LEONARDO:  I believe we had discussed what the
amounts should be, but I don't believe we briefed it in terms
of any applicable case law on this.

THE COURT:  All right.  All right, I guess we'll have
to come back to that in a minute.  But the other, and I guess
Mr. Kostolampros, depending upon your client's view on that,
the other thing the Court is prepared to do, although you know,
the Government made a number of requests for discovery and
additional documentation and I'm prepared to go through some of
those and discuss those.  But I'm not sure if we should do that

1  now or we should try to figure out whether or not, if the Court

2  would address that legal issue, whether or not the bank would

3  even want to contest those things.

4        MR. KOSTOLAMPROS:  Sure, Your Honor.  I mean, our

5  view on it, it would be very important to have an understanding

6  of what is recognized.  Like I said, because it could moot out

7  all of those other discovery issues.

8        THE COURT:  All right.  I want to come back to that.

9  I do want to, Ms. Ramachandran, now a separate issue that

10  suggests that the Court is violating their due process, their

11  client's due process rights by proceeding in the fashion that

12  it is.

13       Actually before I hear from the bank on that or hear

14  from the Government, Ms. Ramachandran, I was quite surprised to

15  receive your letter with that argument in it because you've

16  been participating in this process for many, many months.

17  You've made multiple submissions to the Court in writing.  In

18  fact, I went back and I looked, on October, I think it was

19  October 27 you put in a letter answering, amplifying certain

20  points that the Government was making in response to the bank's

21  summary judgment argument.  And I heard you orally at the oral

22  argument on the summary judgment motion.

23       And you can correct me if I'm wrong, but I don't

24  think at any point in any of your letters to the Court or when

25  we had oral argument did you say wait a second, Judge, we want

1  to put in our own submissions independent of the Government on

2  potentially having a superior interest in the bank because of

3  the money back in 2006 creating a constructive trust.

4          I don't remember you ever alerting to the Court that

5  it was your desire over those many months that we were briefing

6  this and then arguing it, that you had a separate argument that

7  you wanted to raise with the Court prior to the summary

8  judgment motion being decided.

9          And similarly, at no point did you say Judge, all

10 this discovery that the Government is getting from the bank,

11 you want that discovery too, we want to make our own argument

12 about amounts.

13         So I was quite surprised to get this letter on the

14 morning of this conference.  So can you explain that to the

15 Court?

16         MS. RAMACHANDRAN:  Yes, Your Honor.  I think all of

17 those are fair points.  I mean, I certainly want to suggest

18 that I haven't been participating in these proceedings.  But I

19 do think, I didn't realize until, you know, I saw Danske Bank's

20 summary judgment motion and the Government's response to it

21 that their claim was going to, I mean, essentially they were

22 arguing that they were the senior to any other claim in the

23 proceeding.

24         Like, I had always anticipated that after this motion

25 was resolved, you know, it was a fight between the Government

1  and Danske Bank there would be an opportunity for the claimants

2  to also be heard on their petition.  I didn't realize that this

3  was my only opportunity to do that.

4       And strategically, just as Mr. Nolan's counsel, I

5  mean, he's a victim here.  I didn't want to be in the driver's

6  seat.  Typically victims do look to the Government to sort of

7  take the lead in these types of matters even when they're

8  claimants in a forfeiture because ultimately if the Government

9  reaches a settlement they include the victims and they, you

10  know, try to make everybody whole.

11       So I never thought that I had to be, you know, the

12  driver of this proceeding.  And then when I heard your ruling,

13  Your Honor's ruling on November 23 then it became clear to me

14  that you were recognizing arguments that was, essentially your

15  ruling was going to obliterate any opportunity we had to

16  continue this and be heard on our petitions.

17       You know, I didn't, I mean, this could have been my

18  mistake in not perceiving it that way.  I just always thought

19  particularly from comments that had been made by both the

20  Government and the Court at earlier proceedings that, you know,

21  this was a cross motion filed by Danske Bank and the

22  Government.  And then you know, we would also be heard on our

23  petitions.

24       I recall at one point Your Honor asked the Government

25  what about these other petitions, and they weren't prepared to

1 set a briefing schedule on that yet because we had just filed

2 those claims.

3        So you know, that is really the point of my letter.

4 And I apologize for the lateness, sending it to the Court this

5 morning.  I just had to, you know, read what the other parties

6 submitted, and then by the time I got it in it was quite late.

7        THE COURT:  I don't, I'm not, the lateness of the

8 letter in terms of, you know, it's not a long letter.  But you

9 know, this issue, the bank, I asked the bank this issue at the

10 oral argument, and they argued that.  I said to the bank, what

11 about these other claimants, and the bank said our view is our

12 right and nobody is claiming their rights superior to ours,

13 you know, we're differently situated and they would have,

14 they're not even claiming they're superior to our interests.

15 And even at that point you didn't say to me well, Judge, we are

16 claiming that we are superior.

17        So I understand that you don't want to be in the

18 driver's seat and that you were piggybacking on a lot of the

19 Government's arguments that, you know, were I guess in common.

20 But on this issue of whether or not a constructive trust was

21 created back in 2006, that would have been obviously the time

22 for you to say to the Court well, before you, if you're going

23 to decide this.

24        But the bottom line is the Court has not, obviously

25 the bank is trying to get the Court to somehow recognize its

1  claiming and finalize its claims. But the Court hasn't done

2  that at this point.

3      But Mr. Kostalampros, what's your response to this

4  suggestion, and if you go back and look at their submission

5  they did, it is in the petition where they are claiming that

6  based upon events in 2006 that a constructive trust

7  (indiscernible) for the bank. I don't know if that's something

8  you'd like to address.

9      MR. KOSTOLAMPROS: Sure, Your Honor. Yeah, we're

10 prepared to address that. I mean, first, you know, my

11 understanding is that between CSL and Ms. Ramachandran's client

12 Mr. Nolan, they serve essentially two interests. One is equity

13 holders in an entity that, it holds an interest in an entity

14 that holds an interest in the resort property.

15      So if you look at the law shareholders in an entity

16 don't have an interest, a legal interest in a forfeiture

17 proceeding. So that's one argument there. The second argument

18 as to a constructive trust, again they argue a constructive

19 trust has to at least DSL argues it's entrusted trust as to

20 shares in Baha Ventures. Again, not enough.

21      But even if they had, they're alleging a construct

22 trust as to the amount that flowed into the resort property,

23 New York law is clear that a BFP basically cuts their interest

24 off. BFP has a superior interest. And we have case law, Your

25 Honor, I'm prepared to cite it to you. It's clear that a BFP

1  is like a bank, it's secured interest is ahead of an equity

2  holder and a holder of a constructive trust.

3         THE COURT:  All right.  Well, I think to avoid any,

4  you know, procedural issues the Court should allow formally, I

5  guess, allow Ms. Ramachandran or any other claimants who want

6  to make any arguments with regard to a superior interest to the

7  bank, to put in opposition to the bank's summary judgment

8  motion and then give (indiscernible) the law in a reply

9  (indiscernible).  Is that acceptable, Mr. Kostolampros?

10        MR. KOSTOLAMPROS:  Yes, Your Honor.  I guess one

11 other question that I have, and it would be relevant, is what's

12 the Government's view on their interest?  You know, on the

13 cases that we see typically the Government argues that there

14 isn't an interest here at least as to the equity holders.

15 What's their view on that?

16        THE COURT:  Is the Government prepared to address

17 that now, or do you want to put in something in writing on

18 that?

19        MS. LEONARDO:  Your Honor, we could address that in

20 writing.

21        THE COURT:  All right.  So I'll make the Government

22 respond at the same time the claimants will, the same dates,

23 okay.  And then this way any issues that any claimants have

24 with respect to the bank claim or the bank's motion, they can

25 put it in writing, okay.

1          But I did want to address something in Ms.

2  Ramachandran's letter which struck me again, and I'm curious of

3  the Government's response before I hear from the bank.  But Ms.

4  Ramachandran suggests that given the situation, and obviously

5  the bank is continuing to try to pursue foreclosure, it might

6  revoke into their claim versus the value of resort.  Why hasn't

7  the Government at all pursued the idea of an interlocutory

8  sale?  That was discussed over a year ago.

9          This Court, I think it was carved out in the

10  preliminary order of forfeiture to allow that to occur and

11  putting aside the issue of letting the bank foreclose and, that

12  that would be then forfeitable interest, I'm not sure why the

13  Government has not pursued the idea of an interlocutory sale.

14  Is there a response from the Government on that?

15          MS. LEONARDO:  Yes, Your Honor.  We haven't pursued

16  it because we really needed to have an understanding of the

17  amount of the bank's claim and what was going to be recognized.

18          THE COURT:  Explain to me why, wouldn't an

19  interlocutor sale have kept everybody's interest?  An

20  interlocutory sale doesn't say anything with respect to what

21  the bank is claiming their interest is, right?

22          MS. LEONARDO:  Well, I think if, I think for the sake

23  of argument if the Court were to recognize the entire amount of

24  the bank's claim which is, you know, is increasing every day,

25  then if, there would be no equity and we would not even become

1  involved in an interlocutory sale at that point.  So I think we

2  needed to have some kind of parameters with regard to what the

3  Court was going to recognize as to the amount of, in loans.

4          THE COURT:  And do you mean at this point the

5  Government is not to the point where they can assess that?

6          MS. LEONARDO:  Well, Your Honor, if where we're

7  headed is that the Court is going to recognize only, you know,

8  let's say $75 million or $100 of the bank's loans, then sure,

9  then I think that's something that we would pursue, an

10  interlocutory sale.

11          You know, I just wanted to point out also that you

12  know, we've discussed with the bank numerous times on how to

13  proceed with this, and it's changed on numerous occasions, you

14  know, and I don't even know if they're still, what they're

15  seeking at this point.  You know, we were, and I think we've

16  addressed it with the Court several times that, you know, we

17  discussed with the bank about just selling the note and then

18  literally days later they changed it and wanted an

19  interlocutory sale.

20          So I guess, you know, it would depend on what the

21  amount of the recognized claim would be and, you know, if it's

22  going to be limited then certainly we could discuss an

23  interlocutory sale.

24          THE COURT:  But I guess I just heard Mr. Kostolampros

25  say what the Government should consider if, in fact, the

1  initial loan and $45 million of the PPF, and there is no

2  clawback of the, you know, the additional money that was paid

3  on the other facilities, the Government should consider whether

4  or not that would reach the threshold that the bank needs to

5  reach where it would, you know, the bank would not be pursuing

6  any of these other issues.  And I think they're suggesting it

7  would not be even in the Government's interest to pursue it.

8        So it's something the Government, because obviously,

9  you know, that's now a legal issue apart from, you know,

10  discovery on these other, on these other amounts, unless I'm

11  missing something.

12        MS. LEONARDO:  Well, I think, you know, obviously,

13  Your Honor, that's something we'd have to discuss.  But if the

14  loan is limited to, I add that up to be about $130 million, 135

15  million, the initial loans.

16        THE COURT:  No, $135 million plus the money that was

17  I guess paid on the other loans.  Yes, not being, I don't know,

18  Mr. Kostolampros, do you want to explain how you get to the

19  math?

20        MR. KOSTOLAMPROS:  Sure, Your Honor.  We get to the

21  math by applying the Facility A, the remaining amount that's

22  owed under it.  Remember, Facility A basically derives from the

23  original Lehman loan.  So there's, what's outstanding is $90.4

24  million.

25        The Government takes issue with a couple of things

out of that amount.  For the first time they didn't raise any

issues with it before but they do now, in their latest letter

is capitalized interest, unpaid interest of $13.6 million.  Now

remember, that was capitalized long before this (indiscernible)

So that was $13.6 million, that's part of Facility A.

And then they also take issue with $200,000 in

closing costs which their consultant acknowledges went to this

title company.  And then they take issue with $1.6 million that

was advanced literally at the same time that Danske acquired

the loan.  So you know, in January of 2009, in acquiring the

loan formally from Lehman, Danske also advanced $1.6 million.

It's essentially an advance that was required by Lehman, and

that's what Danske advanced.

And now they're claiming well, that was post the

initial loan, the acquisition of the Lehman loan.  Your Honor,

that's somewhat outrageous.  I mean, frankly neither a BFP as

of January 2009, which the Court found we're done.  The Court

already found that we were.  I mean, what would have changed in

the matter of a day to make Danske not a BFP.  And frankly,

Your Honor --

THE COURT:  But how to do get to the rest of the

money though?

MR. KOSTOLAMPROS:  Okay, so the rest of the money, so

that's $90.4 million taking into account the $6 million that

the Government's consulting took issue with based on the

1  records of Trimex (phonetic).  Then the remainder is $18

2  million in the revolver Facility B.  Again, the revolver

3  Facility B, Your Honor, and I, let me just look at the time

4  period here, we're talking about a time period of 2009 to 2014.

5  So again, that's $18 million.  90 plus the 18, that gives us

6  $118 million.

7          And then you add in the $45 million, and that gets

8  you, of the PPF, they acknowledge that their only issue of the

9  $45 million is the $5 million, and they increased from the from

10  the PPF to 15.  So not picking (indiscernible) that $5 million

11  increase we have three (indiscernible), the $90.4 million at

12  Facility A, $18 million in Facility B and then the PPF of $45

13  million.  And that gets you to $163 million.

14          And Your Honor, it seems like the Government is

15  acknowledging if we get to that amount then there's no, there's

16  no equity here.  The property should (indiscernible) these

17  proceedings.

18          MS. LEONARDO:  Your Honor, if I could just respond,

19  just a couple of issues.  So with regard to the several amounts

20  that counsel just mentioned, with regards to the $1.6 million

21  that was advanced, that wasn't advanced until February of 2009,

22  and that was advanced as part of the draw request that was made

23  by the resort and that was not properly, actually it was not

24  properly supported by the documentation.  The draw was allowed

25  anyway.

1        And we did contest these amounts previously in that

2   there's lacking documentation.  Those additional amounts were

3   add-ons by the bank, by Danske Bank, they were not part of the

4   initial Lehman loan, they came, they were add-ons to the

5   initial Lehman loans.

6        I understood Your Honor to (indiscernible) the

7   Government as if we're talking about the initial loan and the

8   PPF with no clawback, not the additional $18 million on

9   Facility B.  So by my calculation we're at $135 million.  We

10  are, there is equity in the resort at that amount.

11       THE COURT:  Again, the issue, the 18, the key issue

12  is the $18 million on Facility B, is that what you're, is that

13  the difference that I just heard?

14       MS. LEONARDO:  No, well, Your Honor, right, that

15  would be the $18 million.  And then if there's no clawback,

16  which as we had indicated, you know, we would like to submit

17  something in writing or do some research on that issue for the

18  Court, you know, if it's $135 million with Facility B taken

19  out, then sure, there would be equity in the resort.

20       MR. KOSTOLAMPROS:  Your Honor, if I may add one

21  comment.  We provided the Court with an appraisal that Danske

22  had received from JLL and that appraisal was dated in June

23  2017.  We are prepared, you know, to tell the Court and the

24  parties here that appraisal valued the property at that time at

25  $150-I believe-million, a little over $150 million.

1        But under a forced sale, which would essentially be

2 an interlocutory sale or a foreclosure, the property was valued

3 again by JLL at $96 million.  It's our view that given the

4 situation now, the time period we're in, especially given

5 COVID, that that amount is significantly less than even that.

6        So the Government is saying that it's, you know, the

7 $18 million makes a difference, frankly I don't know what the

8 basis for that is.

9        THE COURT:  All right.  Well, I think what we should

10 do at this point, I think, I do want to give any other

11 claimants an opportunity to be heard in writing with respect to

12 the bank's claims.  So I'll set a date for that for January.

13 And then the Bank, the Government will also state its position

14 with respect to the other claimants on that date.  The bank

15 will reply, and I do want the Government to let the Court know,

16 this is an important tactical issue, whether or not if the

17 Court decides against the Government and the other claimants on

18 these particular issues where the if the Government agrees with

19 the bank that it would not be pursuing the forfeiture.  Because

20 that obviously is something the Court should know, and I think

21 if the Government doesn't need more information to make that

22 decision from where we're out now.  Does anybody have any

23 objection to proceeding in that manner?

24        MR. KOSTOLAMPROS:  Your Honor, this is George

25 Kostolampros again.  I don't have any objection to that.  But I

1 would be remiss if I'm forgetting to add one other point in our

2 claim, which we're entitled to, and I don't think the

3 Government has any argument saying that we're not, is accruing

4 interest that continues to accrue under a default interest

5 rate.  So even if we take into account that $90 million, you

6 know, that also needs to be added to that.  We submit to the

7 Court what that amounts to, applying only Facility A, and again

8 we think that gets you into this $150 million range taking into

9 account the $45 million of PPF.

10       THE COURT:  All right, well, I think in light of what

11 you're saying, and so that everybody is clear what the bank's

12 position is going into this additional briefing, I think you

13 should put in a letter supplementing obviously everything

14 you've already submitted just as not something new but in

15 addition, that putting aside the additional loan the bank's

16 position based upon these various components, that this would

17 be the amount that the Court should recognize based upon the

18 initial loan and the interest on the initial loan, and no

19 clawback, so that everybody is clear as to what the numbers

20 are, okay.

21       MR. KOSTOLAMPROS:  Yes.

22       THE COURT:  The only other thing I would say, to the

23 extent I don't know whether these other amounts, the $1.6

24 million and the $200,000, again I don't know whether those are

25 ultimately going to be material.  But if the bank wants to

1  include those amounts in its claims that's independent of the

2  additional loans, I would just ask that if you provided, you

3  know, to the extent the Government says that it lacks

4  documentation, if you provided documentation to the Government,

5  then you should provide it to the Court.  Or point me, if it's

6  already been submitted, you know, in the summary judgment

7  motions, just point me to where I have it already.  Because I

8  may have to, if those things turn out to be material I guess I

9  would have to see whether or not there is sufficient

10 documentation to support that they, you know, that it was

11 substantiated and that it related to the initial loan.  Okay?

12         MR. KOSTOLAMPROS:  Sure, Your Honor.  And we believe

13 that we've submitted all of these documentation and we're happy

14 to do so.  Just one thing for clarification for us all is

15 what's sort of the order that you want these letters to come

16 in, and when?

17         THE COURT:  Well, your letter is just going to have

18 math in it and references to documents I guess that are, that I

19 already have or you're submitted with it.  So you can tell me

20 when you think you can get that in.  And then I was going to

21 give the Government, any claimants, Ms. Ramachandran and any

22 claimants to make any opposition they want to make independent

23 of what the Government has briefed to the Court, or if they're

24 going to amplify what the Government has briefed.  I'll give

25 them until early January to do that.

1        And then I think you would then reply to their motion

2  with respect to, and the Government will put in, and on that

3  same date in early January its clawback theory and any laws to

4  support that clawback theory.  And then you would reply to all

5  of that some time in January.  That's my thinking.

6        Is that okay with everybody?  Ms. Ramachandran, is

7  that okay with you?

8        MS. RAMACHANDRAN:  Yes, Your Honor.  Thank you.

9        THE COURT:  All right.  So when do you think you

10 could put in that letter that has the math in it?

11        MR. KOSTOLAMPROS:  Your Honor, we could put that in

12 next week.  So most likely --

13        THE COURT:  A week from today?

14        MR. KOSTOLAMPROS:  Sure.

15        THE COURT:  All right.  So let's say December 17.

16 And then let's say January 15 for the Government, the claimants

17 to put in any opposition to the bank's motion.  At that time I

18 want the Government to respond to what their positions with

19 respect to the other claimants and their argument, whether

20 they're taking a position at this point.  And that, and on that

21 date as part of that I want the Government to advise the Court

22 whether or not the Government believes that if the bank were to

23 prevail with respect to these amounts of its claim that it

24 would obviate the need for there to be any additional

25 litigation with respect to the other portions of the claim

1  because the Government would not be in a position then to

2  further pursue forfeiture.

3          And then how long do you want to put in your reply,

4  Mr. Kostolampros?  July 15?

5          MR. KOSTOLAMPROS:  One week is fine, Your Honor.

6          THE COURT:  All right, so not July, I mean January.

7  January 22.  And then we'll have oral argument on that by phone

8  on January 27 at, let's say 2 p.m.

9          MS. LEONARDO:  Your Honor, this is AUSA Leonardo.

10  Did you also, you wanted the clawback research by January 15

11  also?

12          THE COURT:  Yes.

13          MS. LEONARDO:  Okay.

14          THE COURT:  All right.  And also in the Government's,

15  to the extent in Mr. Kostolampros' letter to the Court next

16  week, if obviously the Government is still contesting the $1.6

17  million or the $200,000, on that January 15 date the Government

18  should explain why that documentation is somehow insufficient,

19  okay?

20          MS. LEONARDO:  Yes, Your Honor.

21          THE COURT:  All right.  That's all I have.  Does

22  anybody have any other issues?

23          MR. HILL:  Your Honor, Chris Hill for CSL Properties.

24  If Mr. Kostolampros is correct, and I have no reason to doubt

25  him, and the value of this property drops from an appraised

1  $150 million to $90 million depending on whether it's a forced

2  sale, it seems like it behooves everyone on this call,

3  including the Court, to try to avoid the forced sale.  Is there

4  any thought that a mediation would be productive?

5          THE COURT:  I don't know what to, Ms. Ramachandran

6  suggested that as well.  But what's the bank's view on that?

7          MR. KOSTOLAMPROS:  Your Honor, our view is that we

8  tried this before.  I mean, you see the distance, you know, the

9  Government's discovery request is just a case in point.  I

10 mean, you asked for limited discovery and we've got a discovery

11 request that's basically over 30 categories of documents.  You

12 know, the last time we did this the Government wouldn't even

13 recognize our claim and it was like well, what are we even

14 doing here, we're at that stage.

15         And I just think, you know, what would help us, and

16 we've told all of the parties this, including speaking to Mr.

17 Mane (phonetic) and Ms. Ramachandran is, have the Government or

18 the victims with the Government's blessing come to us and give

19 us an offer so that we can consider that, and whether we're

20 even in the ball park.

21         But no one has done that, you know, so we're left

22 with wasting time and resources for a mediation and the bank is

23 unwilling to do that given, you know, it went nowhere last

24 time.

25         THE COURT:  I think that's, I'm not going to refer

1   this to the Magistrate Judge at this juncture, in this posture.

2   I don't think that's going to be fruitful for all of the

3   reasons that Mr. Kostolampros indicated.  But I do think that's

4   a good suggestion.  To the extent that Ms. Ramachandran and DSL

5   or any other victims are concerned about where this is heading,

6   my suggestion is you reach out to the Government and explain to

7   them what your concerns are and see if jointly through your

8   discussions with the Government you can propose something, some

9   type of offer to the bank.

10          That's, I think, and then if the bank receives that

11  offer and thinks that, you know, it's worth them going to a

12  Magistrate Judge on, or worth further discussions, then I'm

13  happy to, you know, the Court is here and we're willing to

14  facilitate any of those, not me, but the Magistrate Judge will

15  facilitate those discussions.

16          But I think he's right, that the victims in

17  conjunction with the Government should make an offer to the

18  bank on how to resolve this potentially more quickly.  And it

19  would be helpful to the bank and it would allow potentially the

20  victims to get something with respect to their debts in the

21  resort and their interest in the resort without, you know,

22  losing everything completely.  All right.

23          MS. LEONARDO:  Your Honor, I believe, and the third

24  parties can speak to this, I believe they did reach out to the

25  bank, it was not interested in discussing anything with the

1  third parties while this proceeding was (indiscernible).

2         MR. KOSTOLAMPROS:  Your Honor, that's not, that's not

3  correct.  What we just told you is what we've told the victims,

4  is look, we would consider any offer.  But we think provide us

5  with an offer that's vetted by the Government so we can

6  seriously consider it.

7         THE COURT:  All right.  I think that's a fair

8  request.  The Government should put out an offer and it's in

9  conjunction with the victims if they're interested in pursuing

10  that.  And then I assume there would be back and forth on that,

11  and if both side think it would be helpful to have Magistrate

12  Judge Shields involved once there's an offer out there, then

13  that will be great.  But I think that's a fair request.  All

14  right, anyone else?

15         MR. WOLINSKY:  Your Honor, this is Mr. Wolinsky.

16         THE COURT:  Yes.

17         MR. WOLINSKY:  I appreciate the position you're in,

18  and I know you appreciate the position that everyone else is

19  in.  And my takeaway from today's conference understandably is

20  that we have more delay.  I'd like to make one suggestion just

21  to move it down the road to avoid the delay (indiscernible).

22  If there's going to be an interlocutory sale and the Government

23  is going to be controlling that sale, if the process that the

24  Government has to go through to retain someone to administer

25  the sale, document that retention, claim an order for Your

1  Honor to oversee the sale, I'm sure the bank will have an

2  interest in overseeing how that sale moves forward.

3          So rather than find ourselves at the end of January

4  looking at everyone and saying okay, now we have a start to the

5  process to get an interlocutory sale going, my suggestion is

6  that the Government now take the steps necessary to be prepared

7  so that if we find ourselves in January going down the

8  interlocutory sale road we're not starting from scratch at the

9  end of January.

10          I make that suggestion in the interest of moving

11  things along and I know that's been important to you, it's

12  obviously important to the homeowners and understandably

13  important to the bank.

14          THE COURT:  I understand that point, and it's a good

15  point, and I assume the Government understands that as well.

16  So I think it's a good point to raise.  But my understanding

17  is, and maybe I don't understand what potentially could be the

18  settlement here, my understanding is that there potentially

19  could be an offer made for the Government and/or through the

20  victims that would involve the Government not getting in an

21  interlocutory sale with respect to the properties.  But maybe

22  I'm wrong about that.  Is that, Mr. Kostolampros, am I wrong

23  about that, or is that something that would be on the table?

24          MR. KOSTOLAMPROS:  Yeah, Your Honor, I think that's,

25  from our perspective, yes, that could be on the table.  And

1  then also I think from our perspective is the Government I

2  think is going to address in its brief is look, you know, the

3  value is at a certain point, the Government should walk away,

4  just like they said they would on this call.  If it reaches a

5  certain amount there's no net equity there.

6       But I think Mr. Wolinsky raises a great point, is

7  what is the next step here.  And if we find ourselves at the

8  end of January the moving into an interlocutory sale and

9  waiting another three months for that, that's why from our

10 perspective, assuming Danske's research is recognized to a

11 certain amount, Danske is going to be the largest constituent

12 here with the largest interest here.  Allowing the bank to

13 foreclose on the property, again subject to the Court's

14 procedures here, is the most efficient and most effective way

15 to effectuate a sale here.

16      The Government, and we've argued this now years ago

17 it seems like, the Government hasn't shown that it can

18 effectuate a sale of a resort property in Mexico, how long

19 would it take to do that, or even if it could do that.  And

20 that's why we raised in our letter look, allow us to foreclose

21 on the property.  To the extent any amounts come in that are

22 above Danske's claims, that goes into the Court's coffers for

23 determination as to whether there are any other legitimate

24 claimants, and if not then it goes into the Government's

25 coffers for distribution ultimately for potentially victims.

1        MS. LEONARDO:  Your Honor, we, the United States can

2  assure the Court that we have taken those steps.

3        THE COURT:  All right.  I think all these things

4  obviously should be on the table and I would just remind, and

5  I'm sure you're aware of this from the bank, that obviously

6  everybody has the ability to appeal whatever this Court's

7  ruling is with respect to this.  So that's another risk that

8  the bank takes with regard to this whole litigation.  But I'm

9  sure you're aware of that as well.

10        So I think that I would strongly suggest that Ms.

11  Ramachandran, DSL's counsel and whoever else wants to, you

12  know, have a meeting with the Government, discuss the situation

13  with the Government and propose something that could be

14  workable to the bank.  That is my suggestion, strong

15  suggestion, all right.

16        MS. RAMACHANDRAN:  Thank you, Your Honor, I plan to

17  do that.

18        THE COURT:  All right, thank you, have a good day.

19        MR. KOSTOLAMPROS:  Thank you, Your Honor.

20                    *  *  *  *  *

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2                I, **TRACY GRIBBEN**, court approved transcriber,

3      certify that the foregoing is a correct transcript from the

4      official electronic sound recording of the proceedings in the

5      above-entitled matter.

6

7      /S/ TRACY GRIBBEN

8      TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: December 11, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25