# EXHIBIT B

LIMITED LIABILITY COMPANY AGREEMENT

OF

DIAMANTE CABO SAN LUCAS, LLC

# TABLE OF CONTENTS

Page

**ARTICLE ONE**
Definitions.................................................................................................................1

**ARTICLE TWO**
General..........................................................................................................................6
Section 201.   Formation and Purpose ............................................................6
Section 202.   Name of Company ......................................................................6
Section 203.   Principal Place of Business ......................................................6
Section 204.   Term ..............................................................................................6
Section 205.   Liability of Members .................................................................7
Section 206.   Company Expenses .....................................................................7
Section 207.   Title to Property .........................................................................8
Section 208.   Interest of Creditors ..................................................................8
Section 209   Filings ...........................................................................................8

**ARTICLE THREE**
Contributions and Interests ...................................................................................8
Section 301.   General.........................................................................................8
Section 302.   Additional Interests. ................................................................9
Section 303.   No Interest on Contributions.................................................10
Section 304.   No Priority Among Members .................................................10
Section 305.   No Withdrawals ........................................................................10
Section 306.   Capital Accounts and Adjustments.......................................10
Section 307.   Allocation of Net Profits and Net Losses. ...........................11
Section 308.   Allocations in Fiscal Year in which a Transfer of Interest Occurs............12
Section 309.   Special Allocations ...................................................................12
Section 310.   Allocation Rules........................................................................14
Section 311.   Section 704(c) Allocations.......................................................14
Section 312.   Allocation of Nonrecourse Liabilities...................................14
Section 313.   Distributions..............................................................................14

**ARTICLE FOUR**
Management.............................................................................................................15
Section 401.   Management................................................................................15
Section 402.   Restrictions on Authority .......................................................17
Section 403.   Delegation to Agents and Officers.........................................17
Section 404.   Reliance by Third Parties ........................................................18
Section 405.   Application of Management Fee ............................................18
Section 406.   Affiliated Transactions............................................................18
Section 407.   Other Business of Members ....................................................18

Table of Contents
(continued)

Page

ARTICLE FIVE
   General Accounting Provisions ................................................................19
      Section 501.  Fiscal Year ...................................................................19
      Section 502.  Capital Determined; Financial Statements and Reports. .........19
      Section 503.  Valuations by the Managing Member...........................................19
      Section 504.  Determinations of the Managing Member Conclusive....................19
      Section 505.  Books and Records .........................................................20
      Section 506.  Tax Elections .................................................................20
      Section 507.  Information Tax Returns ..................................................20
      Section 508.  Designation of Tax Matters Partner .....................................20

ARTICLE SIX
   Exculpation and Indemnification ................................................................20
      Section 601.  General Fiduciary Duty..................................................20
      Section 602.  Limitation on Liability ..................................................21
      Section 603.  Indemnification ...........................................................21

ARTICLE SEVEN
   Dissolution ...................................................................................23
      Section 701.  Events Causing Dissolution. .............................................23
      Section 702.  Dissolution Procedures. ..................................................24
      Section 703.  Withdrawal or Death of a Class A Member..............................26

ARTICLE EIGHT
   Transferability of Managing Member Interest................................................25
      Section 801.  Managing Member Interest .............................................25

ARTICLE NINE
   Transferability of Class A Member Interests................................................26
      Section 901.  Restrictions on Transfer .................................................26
      Section 902.  Indemnification by Transferor ........................................26
      Section 903.  Effect.........................................................................27
      Section 904.  Status of Transferor........................................................27
      Section 905.  Substituted Class A Members..........................................27
      Section 906.  Conditions of Admission ...............................................27
      Section 907.  Transfers During a Fiscal Year .......................................28

ARTICLE TEN
   Miscellaneous ..................................................................................28
      Section 1001.  Resolution of Disputes...................................................28
      Section 1002.  No Bill for an Accounting.............................................28
      Section 1003.  Firm Name ...............................................................28
      Section 1004.  Binding Nature of Agreement........................................28
      Section 1005.  Amendments ...........................................................28

Table of Contents
(continued)

Page

Section 1006.  Amendments Without Consent ...................................................29
Section 1007.  Execution of Amendments ........................................................29
Section 1008.  Communications ......................................................................29
Section 1009.  Governing Law; Severability .....................................................30

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## DIAMANTE CABO SAN LUCAS, LLC

AGREEMENT, dated as of March    , 2006, among KENNETH A. JOWDY ("Jowcy"), as Managing Member, BAJA VENTURES 2006, LLC, a Delaware limited liability compaiy ("BV"), DIAMANTE PROPERTIES, LLC, a Delaware limited liability company ("Diamante Properties"), CSL PROPERTIES 2006, LLC, a Delaware limited liability company ("CSL"), and KAJ HOLDINGS, LLC, a Delaware limited liability company ("KAJ").

## W I T N E S S E T H:

WHEREAS, Diamante Cabo San Lucas, LLC (the "Company") was formed on February 3, 2006, by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware; and

WHEREAS, BV, Diamante Properties, CSL and KAJ are being admitted as Class A Members, on the date of this Agreement;

WHEREAS, the Company has organized the Mexican Subsidiary (as defined below) to acquire rights in, and develop, the Property (as defined below), including the development of the Resort (as defined below);

WHEREAS, the Company owns 99% of the equity of the Mexican Subsidiary and Jowdy acts as Sole Administrator, and owns the remaining 1% of the equity, of the Mexican Subsidiary; and

WHEREAS, the Managing Member and the Class A Members wish to set forth their agreement as to their respective rights, duties and obligations and as to the operation and management of the Company;

NOW, THEREFORE, in consideration of the mutual agreements set forth below, the parties agree as follows:

## ARTICLE ONE

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as amended from time to time.

"**Additional Managing Member**" means any Member admitted to the Company as a Managing Member, other than Jowdy.

"**Adjusted Capital Account**" means, with respect to any Member, the positive balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Period, after (i) crediting to such Capital Account the amount which such Member is deemed obligated to restore to the Company pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and (ii) charging to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations. This definition, and the definition of Adjusted Capital Account Deficit below, are intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently with such provisions.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Adjusted Capital Account, after giving effect to the adjustments described in the definition of Adjusted Capital Account.

"**Affiliate**" means, when used with reference to a specified Person, (a) any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the specified Person, (b) any Person who is an officer, director or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, director or trustee, or serves in a similar capacity with respect to, such Person, (c) any Person who, directly or indirectly, is the beneficial owner of 25% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 25% or more of any class of equity securities or in which the specified Person otherwise has a substantial beneficial interest, or (d) the spouse or any children of the specified Person.

"**Agreement**" means this Limited Liability Company Agreement, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

"**Bankruptcy**" means and shall be deemed to have occurred with respect to a Person if such Person (i) makes an assignment for the benefit of creditors, (ii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief in any bankruptcy or insolvency proceeding, (iii) files a petition or answer seeking for itself any reorganization, arrangement, winding-up, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation or fails to have any proceeding for such relief instituted against it by others dismissed within 120 days following its commencement, (iv) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of the nature described in clause (iii) above or (v) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of it or all or any substantial part of its properties or, if such appointment is made without its consent, such appointment is not vacated or stayed within 90 days or, if stayed, such appointment is not vacated within 90 days after the expiration of any such stay.

"**Book Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted in accordance with Section 306 and the applicable provisions of the Code and the Regulations, except that the initial Book Value of any asset contributed by a Member shall be the gross fair market value of such asset at the time of

contribution, as determined by the Managing Member in consultation with the Company's accountants, and the Book Value of an asset shall be reduced by the depreciation, amortization or other cost recovery deductions taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member pursuant to Section 306, and shall equal the Contributions by such Member, plus or minus the adjustments described in Article Three.

"**Class A Interest**" means the Interest of a Class A Member as described in this Agreement.

"**Class A Member**" means a Person admitted to the Company as a Class A Member by the Managing Member pursuant to Section 301(b) on the date of this Agreement or at any time thereafter, and includes a Substituted Class A Member.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Company**" means the limited liability company organized pursuant to this Agreement, as it may from time to time be constituted.

"**Contribution**" has the meaning specified in Section 301.

"**Designated Additional Managing Member**" has the meaning specified in Section 701(c).

"**Equalization Amount**" has the meaning specified in Section 302.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Fiscal Quarter**" refers to any period of three months ending on March 31, June 30, September 30 or December 31 of any year, and, if the term of the Company ends on another date, the period beginning on the first day following the last full Fiscal Quarter and ending on the date of such termination.

"**Fiscal Period**" refers to (i) any Fiscal Quarter, (ii) any period beginning on the date of admission of any Member in addition to the persons who are Members on the date of this Agreement and ending on the last day of the Fiscal Quarter in which such admission occurred or (iii) the period beginning on the first day of the then current Fiscal Quarter and ending on the last business day preceding the day when any such additional Member is admitted to the Company.

"**Fiscal Year**" has the meaning specified in Section 501.

"**Interest**" of a Member at any time means the entire ownership interest of a Member in the Company at such time, consisting of such Member's Capital Account and the right of such Member to distributions of cash and other property and allocations of Net Profits and Net Losses, as well as any other benefits to which a Member may be entitled as provided in

-3-

this Agreement and the Act, together with the obligations of such Member to comply with all the terms and provisions of this Agreement and applicable provisions of the Act. "Interest" includes any Class A Interest, the Managing Member Interest and any other interest in the Company created by the Managing Member pursuant to Section 302.

"**Majority in Interest of the Class A Members**" means Class A Members whose aggregate Percentages constitute more than 50% of all of the Percentages.

"**Managing Member**" means Jowdy or any Person who serves as the Managing Member of the Company, including any Additional Managing Member.

"**Managing Member Interest**" means the Interest of the Managing Member as described in this Agreement.

"**Member Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company's Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Sections 1.704-2(i)(2) and (3) of the Regulations.

"**Member Non-recourse Debt**" has the meaning specified in Section 1.704-2(b)(4) of the Regulations.

"**Member Non-recourse Deductions**" has the meaning specified in Sections 1.704-2(i)(1) and (2) of the Regulations. The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year shall equal the net increase, if any, in the amount of Member Minimum Gain during such year attributable to such Member Nonrecourse Debt, reduced by any distributions during that year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent that such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined according to the provisions of Sections 1.704-2(h) and (i) of the Regulations.

"**Members**" means the Managing Member and the Class A Members and "**Member**" means any of them.

"**Mexican Subsidiary**" means Diamante Cabo San Lucas S. de R. L. de C. V., a Mexican limited liability corporation.

"**Minimum Gain**" has the meaning and shall be determined as provided in Sections 1.704-2(d) and 1.704-2(g) of the Regulations.

"**Net Profits**" and "**Net Losses**" means, for any Fiscal Period, an amount equal to the taxable income or loss of the Company for such Fiscal Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

-4-

(a)     any income that is exempt from federal income tax or excluded from federal gross income and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     any expenditure described in Section 705(a)(2)(B) of the Code or treated as a Section 705(a)(2)(B) expenditure pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)     if the Book Value of any asset is adjusted pursuant to Section 306, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d)     gain or loss resulting from any disposition of any asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed, notwithstanding that the adjusted tax basis of such asset differs from its Book Value;

(e)     in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations; and

(f)     Notwithstanding any other provision hereof, any items which are specially allocated pursuant to Section 309 shall not be taken into account in computing Net Profits or Net Losses

"**Percentage**" means the percentage for each Member set forth in the Register.

"**Person**" means any individual, Company, corporation, limited liability company, trust, governmental plan, governmental unit or other entity.

"**Property**" means the approximately 1,500 acres of primarily undeveloped land located in Cabo San Lucas, Baja California, Mexico, and described in Exhibit A, to be acquired by the Mexican Subsidiary.

"**Register**" has the meaning specified in Section 301.

"**Regulations**" means the Regulations promulgated from time to time under the Code by the United States Department of the Treasury.

"**Resort**" means the private resort, including, among other things, golf, tennis, swimming, spa, health club and other recreational facilities, and/or club facilities and residential properties proposed to be developed on a portion of the Property.

"**Subsidiary**" means a corporation, limited liability company or other entity, including a joint venture, organized by the Company to hold particular assets, perform particular

functions or otherwise facilitate the Company's business to further the development or disposition of the Property.

"**Substituted Class A Member**" has the meaning specified in Section 902.

"**Tax Matters Partner**" has the meaning specified in Section 508.

"**Transfer**" has the meaning specified in Section 901.

"**Unrecovered Contributions**" means, with respect to any Class A Member, the excess of its initial cash Contributions made pursuant to Section 301(b) over the cash distributions to such Class A Member made pursuant to Sections 313(a).

All other defined terms used in this Agreement shall have the respective meanings assigned to them in the Sections in which they appear.

## ARTICLE TWO

## GENERAL

**Section 201.   Formation and Purpose.**   Effective as of February 3, 2006, the Company was formed pursuant and subject to the Act for the purpose of acquiring, developing, selling and managing the Property and the Resort through the Mexican Subsidiary and possibly other Subsidiaries and (ii) generally, to carry on any other business that a limited liability company organized under the Act may legally do in furtherance of the foregoing.

**Section 202.   Name of Company.**   The name of the Company shall be "Diamante Cabo San Lucas, LLC". The business of the Company may be conducted under any other name that the Managing Member deems necessary or desirable, including the name of the Managing Member or any of its Affiliates. The Managing Member, in its sole discretion, may change the name of the Company from time to time and shall promptly notify each Class A Member if it does so.

**Section 203.   Principal Place of Business.**   The principal place of business of the Company in the United States shall be 2 Dogwood Drive, Danbury, Connecticut 06811, and in Mexico shall be Calle Obregon 1289, 22800 Ensenada, Baja California, Mexico, or such other places as the Managing Member may determine. The post office address in the State of Delaware to which the Secretary of State shall mail a copy of any process against the Company served on him or her is 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19801. The name of its registered agent at such address is the Corporation Service Company. The Company may have such other offices and places of business, at such locations, both within and without the State of Delaware, as the Managing Member may from time to time determine.

**Section 204.   Term.**   The term of the Company began on the date on which the Company's Certificate of Formation was filed with the Secretary of State of the State of Delaware in accordance with the Act and shall continue until December 31, 2056 or until otherwise dissolved pursuant to Article Eight; *provided, however,* that the Managing Member

-6-

may, with the consent of a Majority in Interest of the Class A Members, extend the date for termination for such period as they may agree.

**Section 205. Liability of Members.** Except as provided under the Act, no Member shall be personally liable for the debts, obligations or liabilities of the Company solely by reason of being a Member. Each Member and former Member shall be liable for the debts and obligations of the Company attributable to any Fiscal Period during which they were Members, but only to the extent of their respective Interests. No Member shall otherwise have any liability for the debts and obligations of the Company.

**Section 206. Company Expenses.** The Company, and not the Managing Member, shall be solely responsible for payment of all expenses of operating the Company including any incurred by the Managing Member on its behalf in the first instance, and including, without limitation, the following expenses:

(a) all fees and other amounts paid to consultants, service providers, employees and other third parties, the fees payable to the Managing Member and salaries payable to the officers and other staff of the Company pursuant to Section 405 and any other expenses, charges or fees, including, without limitation, attorneys', accountants' and auditors' fees and disbursements, incurred or payable in connection with business and affairs of the Company;

(b) any taxes and other governmental charges and assessments payable by the Company and any expenses incurred by the Tax Matters Partner pursuant to Section 508;

(c) all costs incurred in connection with the preparation, printing and delivery of the federal, state or other tax returns of the Company, the financial statements and reports prepared pursuant to Section 502, any other reports to Members and any such expenses incurred in connection with any amendment to this Agreement or any other Company documentation;

(d) any costs and expenses of any litigation involving the Company or any Subsidiary and the amount of any judgment or settlement paid in connection therewith, excluding, however, the costs and expenses of any litigation, judgment or settlement in which the Managing Member or any officer of the Company is found culpable of willful misfeasance or bad faith; and

(e) any costs and expenses for indemnity or contribution payable by the Company to any Person, whether payable under Article Six or otherwise and whether payable in connection with any litigation involving the Company or otherwise, and all costs for any insurance contemplated under Section 603(f).

All of the Company's expenses shall be paid out of cash funds of the Company determined by the Managing Member to be available for such purpose. The Managing Member may, in its sole discretion, advance funds to the Company for the payment of such expenses and shall be entitled to the reimbursement of any funds so advanced. No expenses paid by the Managing Member in the first instance shall constitute a Contribution.

Section 207.  **Title to Property.**  All property of the Company shall be held in the name of the Company and shall be deemed to be owned by the Company, and no Member shall have any ownership interest in such property.

Section 208.  **Interest of Creditors.**  A creditor, including a Member, who makes a nonrecourse loan to the Company shall not have or acquire at any time, as a result of making the loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a secured creditor with respect to specific assets.

Section 209.  **Filings.**  The Members shall from time to time execute or cause to be executed all such certificates (including fictitious name certificates) or other documents or cause to be made all such filings, recordings, publications or other acts as may be necessary or desirable to comply with the requirements for the formation and operation of a limited liability company under the laws of the State of Delaware, for the purpose of qualifying the Company to do business as a foreign limited liability company under the laws of any other jurisdiction in which the Company may conduct business and, generally, to establish and protect the limited liability of the Members under the laws of any such jurisdiction.

## ARTICLE THREE

## CONTRIBUTIONS AND INTERESTS

Section 301.  **General.**

(a)     There shall be two classes of Interests:  Class A Interests held by the Class A Members and the Managing Member Interest held by the Managing Member.

(b)     As of the date hereof, BV, Diamante Properties, CSL and KAJ are being admitted as into the Company as Class A Members.  Such Class A Members have contributed to the capital of the Company the cash set forth for them in the schedule attached to this Agreement (the "Register").  Each such contribution by a Class A Member, as increased by any additional amounts contributed pursuant to Section 302, as well as the amounts contributed by the Managing Member pursuant to subparagraph (d) of this Section 301, is referred to as the "Contribution" of such Member.  In addition, certain of the Class A Members have made additional, non-cash initial Contributions through the provision of the services of certain of their respective members with respect, among other things, to assisting the Managing Member in the evaluation and acquisition of the Property, the negotiation of a contract for the acquisition of the Property, obtaining appraisals and environmental and engineering studies of the Property and dealing with the providers thereof and in obtaining working capital and debt financing for the acquisition of the Property and the development of the Resort from various parties.  It is also expected that the such members of such Class A Members shall continue to provide management, marketing, security, planning or legal services to the Company for the duration of the development of the Resort, for which any salary compensation paid by the Company pursuant to Section 403 is likely to be below market rates for such services charged by independent third parties in arms'-length transactions, and such differential shall be deemed to be additional initial Contributions by such Class A Members.

(c)     The Managing Member shall maintain the Register, which shall set forth the amount that each Class A Member and the Managing Member contributes to the Company, as well as each Class A Member's name, address, facsimile number and taxpayer identification number.  As of the date of this Agreement, the Class A Members shall have the Percentages shown on the Register.

(d)     As of the date hereof, the Managing Member has contributed $1,000 in cash to the capital of the Company.

### Section 302.    Additional Interests.

(a)     No Class A Member shall have any obligation or right to make Contributions in addition to those made as of the date of this Agreement.  The Managing Member shall have no obligation to make Contributions in addition to those made as of the date of this Agreement, but may do so, in its sole discretion.  No such additional Contribution by the Managing Member shall, however, dilute the Percentages of the Class A Members set forth in Section 301 or as they may subsequently be adjusted pursuant to Section 302(b) unless a Majority in Interest of the Class A Members consents to such dilution.

(b)     The Managing Member at any time may cause the Company to offer and sell additional Interests to Persons who are not then Members if he determines that the working capital needs of the Company require that additional equity capital be obtained or that equity incentives be provided to the Company's employees (other than any who are Affiliates of the Managing Member).  Such Interests shall have such rights and obligations as are determined by the Managing Member, but shall have no priority over the Class A Members as to distributions.  Nevertheless, any sale of such Interests may dilute the Percentages of the Class A Members set forth in Section 301 or as they be subsequently adjusted pursuant to this Section 302(b), subject to the following:

(i)     The Managing Member shall notify each Class A Member of the Company's intention to sell additional Interests, specifying the rights and obligations of such Interests, the total amount proposed to be raised through such sale, the price thereof and the other terms and conditions of sale and the amount of cash Contributions that such Class A Member would be required to make to preserve its then current Percentage as of the consummation of such sale of Interests (the "Equalization Amount").

(ii)     Each Class A Member shall have the right to make up to the Equalization Amount of additional Contributions at the time the sale of additional Interests is consummated.  Each Class A Member may exercise such right by providing to the Managing Member (i) a written acceptance indicating the amount of additional Contributions it wishes to make up to its Equalization Amount within the 15 days following the date of the Managing Member's notice and (ii) payment in full of such additional Contributions not later than 30 days following such date.

(iii)     For a period of 90 days following the date of the Managing Member's notice, he may sell additional Interests to Persons who are not then Members in an amount equal to its originally proposed amount less the aggregate amount of

additional Contributions that the Class A Members have timely made pursuant to clause (i) above at the price and on the terms and conditions set forth in the notice referred in clause (i). If the Managing Member is unable to sell all of such amount within such 90-day period, he shall refund to each Class A Member who made additional Contributions pursuant to this Section 302 such amount thereof that is in excess of the minimum amount needed to maintain its then current Percentage as of the date of consummation of the sale of additional Interests.

(iv)    The foregoing procedure shall apply each time that the Managing Member proposes to offer and sell additional Interests to Persons who are not then Members.

Section 303.  No Interest on Contributions.  No interest shall be paid by the Company to any Member with respect to any Contribution or Capital Account.

Section 304.  No Priority Among Members.  Except as provided in Section 313, no Member shall have priority over any other Member either as to the return of its Contribution or as to distributions made by the Company.  No specific time has been agreed on for the repayment of, or the payment of any return on, any Contribution.  Except as provided in Section 313, no Member shall have the right to demand or receive property other than cash in return for its Contribution or as a distribution of income.  Each Member shall look solely to the assets of the Company for the return of its Contribution, and if such assets are insufficient for such purpose, no Member shall have any recourse against any other Member as a result thereof.

Section 305.  No Withdrawals.  Except as may otherwise be provided under the Act, no Member shall have the right to withdraw from the Company or to be repaid all or a portion of its Contributions.  On written request of a Class A Member, however, the Managing Member, in its sole discretion, may, but shall not be obligated to, permit such Class A Member to withdraw.  In such event, the withdrawing Class A Member shall be entitled to receive cash equal to the value of its Capital Account, determined as provided in Section 306, and payable not later than the 180th day following the last day of the Fiscal Quarter in which the withdrawing Class A Member's request for withdrawal is received by the Managing Member.  The Managing Member may withdraw from the Company only with the approval of a Majority in Interest of the Class A Members.

Section 306.  Capital Accounts and Adjustments.

(a)    The Company shall establish and maintain on its books a Capital Account for each Member, which shall have an initial balance equal to such Member's Contribution made pursuant to Section 301.  A Member's capital account shall be (i) increased by (A) the amount of any additional cash Contributions by such Member, (B) the fair market value of any Contributions of other property (net of any liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) by such Member, (C) the amount of any Net Profits allocated to such Member pursuant to Section 307 and (D) the amount of any liability of the Company that is assumed by such Member (other than any liability secured by any of the Company's property distributed to such Member) and (ii) decreased by (A) any Net Losses allocated to such Member pursuant to Section 307, (B) cash distributions to such

Member pursuant to Section 313, (C) the fair market value of any property distributed to such Member pursuant to Section 313 (net of any liability secured by such property that such Member is considered to assume or take subject to under Section 752 of the Code), and (D) the amount of any liability of such Member assumed by the Company (other than any liability secured by any property contributed by such Member to the Company). It is the intention of the Members that capital accounts be maintained strictly in accordance with Treas. Reg. Section 1.704-1(b)(2)(iv).

(b)     Except as otherwise provided herein, the Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times: (i) the acquisition of an additional Interest by any new or existing Member in exchange for more than a *de minimis* Contribution or any other issuance of Interests by the Company, (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for all or any part of an Interest owned by the Member and (iii) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; *provided, however*, that adjustments pursuant to clauses (i) and (ii) shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.

(c)     The Book Value of any asset of the Company distributed to any Member shall be its gross fair market value as of the date of distribution, as determined by the Managing Member.

(d)     The Book Value of any Company asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations.

(e)     A Member's Capital Account shall be also increased or decreased to reflect other items not taken into account under this Section 306 as necessary to comply with the requirements of Section 1.704-1(b)(2)(iv) of the Regulations or any successor provision.

(f)     On the transfer of all or part of any Interest in accordance with this Agreement, the Capital Account attributable to such Interest shall carry over to the transferee in accordance with the provisions of Section 1.704-1(b)(2)(iv)(l) of the Regulations.

### Section 307.   Allocation of Net Profits and Net Losses.

(a)     After giving effect to the special allocations set forth in Section 309, Net Profits for a Fiscal Period shall be allocated as follows:

(i)     first, in respect of prior allocations of Net Losses to the Members (A) first, to the Members in proportion to the excess of each Member of (I) the aggregate allocations of Net Losses to such Member pursuant to Section 307(c) over (II) the prior allocations of Net Profits to such Member pursuant to this clause (i)(A), until all such excesses are reduced to zero and (B) second, to the Members in proportion to the excess of each Member of (I) the aggregate allocation of Net Losses to such Member pursuant to

-11-

Section 307(b)(i), over (II) the prior allocations of Net Profits to such Member pursuant to this clause (i)(C), until all such excesses are reduced to zero;; and

        (ii)     thereafter, to the Members in proportion to their Percentages.

    (b)    Subject to the limitations of Section 307(c) and after giving effect to the special allocations in Section 309, Net Losses for a Fiscal Period shall be allocated as follows:

        (i)     first, to the Members until the aggregate allocation of Net Losses to the Members pursuant to this clause (i) equals the aggregate allocations of Net Profits to them pursuant to Section 307(a)(ii); and

        (ii)     second, thereafter, to the Members in proportion to their Percentages.

    (c)    The Net Losses allocated pursuant to Section 307(b) to any Class A Member shall not exceed the maximum amount of Net Losses that can be so allocated without causing such Class A Member to have an Adjusted Capital Account Deficit (determined after all cash distributions for the Fiscal Period) at the end of the Fiscal Period for which the allocation relates. If some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of the allocation of Net Losses pursuant to Section 307(b), the limitation set forth in this Section 307(c) shall be applied on a Member by Member basis so as to allocate the maximum amount of permissible Net Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations. All Net Losses in excess of the limitation set forth in this Section 307(c) shall be allocated to the Managing Member.

    **Section 308.  Allocations in Fiscal Year in which a Transfer of Interest Occurs.** Subject to Section 907, if a Member transfers or is required to transfer all or part of its Interest during any Fiscal Year, or is permitted to withdraw from the Company, then Net Profits or Net Losses shall be allocated between the transferor and the transferee (which shall be all of the other Members in the event of withdrawal) based on the respective portions of the Fiscal Year that the transferor or transferee held such Interest without regard to the result of Company operations during particular portions of such Fiscal Year.

    **Section 309.  Special Allocations.** The following special allocations shall be made in the following order:

    (a)    *Minimum Gain Chargeback.* If there is a net decrease in Minimum Gain with respect to the Company during any Fiscal Year, certain items of income and gain, including gross income or gain, of the Company for such year (and if necessary, subsequent years) shall be allocated to the Members in the amounts and manner described in Sections 1.704-2(f), (g) and (j)(2)(i) of the Regulations. This Section 309(a) is intended to comply with the minimum gain chargeback requirements relating to partnership non-recourse liabilities (as defined in Section 1.704-2(f)) and shall be so interpreted. Allocations pursuant to this Section 506(a) shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto.

    (b)    *Member Nonrecourse Debt Minimum Gain Chargeback.* If there is a net decrease in Minimum Gain attributable to Member Nonrecourse Debt (determined pursuant to

-12-

Section 1.704-2(i) of the Regulations) during the Fiscal Year, certain items of income and gain, including gross income and gain, for such year (and, if necessary, subsequent years) shall be allocated to those Members that had a share of the Minimum Gain attributable to the Member Nonrecourse Debt (such share determined by Section 1.704-2(i)(5) of the Regulations) in the amounts and manner described in Sections 1.704-2(i)(4) and (j)(2)(ii). This Section 309(b) is intended to comply with the minimum gain chargeback requirement relating to partner non-recourse debt set forth in Section 1.704-2(i)(4) of the Regulations and shall so be interpreted. Allocations pursuant to this Section 309(b) shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto.

(c)     *Allocation of Non-Recourse Deductions.*    Any Member Nonrecourse Deductions during any Fiscal Year shall be specially allocated to the Member that bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with the requirements of Section 1.704-2(i)(1) of the Regulations. "Non-recourse Deductions" (as such term is defined in Sections 1.704-2(b)(1) and § 1.704-2(c) of the Regulations) of the Company shall be allocated to the Members in proportion to their respective Percentages.

(d)     *Qualified Income Offset.*    If any Member unexpectedly receives any adjustment, allocations or distributions described in Sections 1.704-2(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Company income and gain (consisting of a *pro rata* portion of each item of Company income, including gross income, and gain for such year) shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; *provided, however,* that an allocation pursuant to this Section 309(d) shall be made if, and only to the extent that, such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article Three have been tentatively made. This Section 309(d) is intended to comply with the qualified income offset provision of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be so interpreted.

(e)     *Regulatory Allocations.*    The allocations set forth in subparagraphs (a) through (d) of this Section 309 are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all such allocations shall be offset either with other such allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 309(e). Therefore, the Managing Member shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner he determines appropriate, so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the allocations set forth in subparagraphs (a) through (d) of this Section 309 were not part of this Agreement and all such items were allocated pursuant to Section 307.

(f)     *Section 754 Adjustment.*    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining the Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the

adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such regulation.

Section 310.   Allocation Rules.  For the purposes of determining the Net Profits, Net Losses or other items allocable to any Fiscal Period, Net Profits, Net Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Managing Member using any method that is permissible under Section 706 of the Code and the Regulations thereunder.   Except as otherwise provided in this Agreement, for income tax purposes, each item of Company income, gain, loss and deduction shall be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to this Article Three.

Section 311.   Section 704(c) Allocations.  In accordance with Section 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.  In the event the Book Value of any Company asset is adjusted pursuant to Section 306, subsequent allocations of income, gain, loss or deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Section 704(c) of the Code and the Regulations thereunder. Allocations pursuant to this Section 311 shall be calculated by the Managing Member using any permissible method under Section 704(c) of the Code and the Regulations thereunder and are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any other provision of this Agreement.

Section 312.   Allocation of Nonrecourse Liabilities.  For purposes of Section 1.752-3(a) of the Regulations, the Members' interests in the Company's Net Profits shall be determined based on their respective Percentages.

Section 313.   Distributions.

(a)      Any cash profits of the Company, net of reserves for expenses and the working capital needs of the Company established by the Managing Member, shall be distributed to the Members, as and when determined by the Managing Member, as follows:

(i)      first, 100% to the Members in proportion to their Unrecovered Contributions until the Unrecovered Contributions of each Member are reduced to zero; and

(ii)     thereafter, to the Members in accordance with their Percentages.

In determining the timing and amount of distributions, the respective federal and state income tax obligations of the Members with respect to the operations of the Company shall be taken into account.   The Company shall make no distribution to the Members if, after making such distribution, (A) the Company would be unable to pay its debts as they become due or (B) the

-14-

Company's liabilities would exceed the fair market value of the Company's assets. Amounts distributed may include any combination of income, capital gains or return of capital. The Managing Member shall notify the Members at least 15 days in advance of each distribution of the amount and date of such distribution.

(b) All amounts withheld pursuant to the Code or any provision of any state, local or foreign law with respect to any payment, distribution or allocation to any Member shall be treated as amounts distributed to such Member pursuant to this Article Three for all purposes of this Agreement and shall be charged against distributions to which such Member would otherwise have been entitled. The Company is authorized to withhold and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state, local or foreign law and shall allocate such amounts to those Members with respect to which such amounts were withheld.

## ARTICLE FOUR

### MANAGEMENT

Section 401. Management. The Company shall be managed and operated exclusively by the Managing Member. The Class A Members, as such, shall have no part in the management of the Company and shall have no authority or right to act on behalf of the Company in connection with any matter. In this regard, it is expected that certain members of the respective Class A Members shall provide management, marketing, planning, security or legal services to the Company and may have such authority to act on behalf of the Company as may be granted to him or her by the Managing Member. The Managing Member shall devote such time as may be reasonably required to further the business affairs and activities of the Company in accordance with procedures established by it, but shall not be precluded from engaging in other business activities or from organizing and managing other similar entities. Each of the Class A Members agrees that all determinations, decisions and actions made or taken by the Managing Member shall be conclusive and binding on the Company, the Class A Members and their respective successors and assigns. The Managing Member shall have the power, among other things, on behalf of the Company:

(a) to carry out all aspects of the management of the Company and to exercise all of the powers and authority accorded to the Company, as managing member, including carrying out all aspects of any development plan for the Resort and the Property, with such modifications as the Managing Member may deem necessary or desirable or, if such plan is determined to be impractical or otherwise inadvisable, to develop and implement other development plans for, or to dispose of, the Property;

(b) to enter into contracts and other agreements with architects, site planners, designers, developers, surveyors, managers, engineers, brokers and land use, environmental, topographic, resort, recreational, hotel, restaurant, landscape, transportation, marketing, sales and other consultants and service and material providers and other third parties, all for the purpose of carrying out management of the Company and the development and management or disposition of the Property and the Resort;

(c)     to cause and manage the development of the Property and any other properties that the Company may acquire, directly or indirectly, through one or more Subsidiaries,

(d)     to invest and reinvest any funds of the Company not invested in the Mexican Subsidiary, the Property or the Resort in short-term money market investments (including, without limitation, U.S. Treasury obligations, high grade commercial paper, bank certificates of deposit and other instruments having short maturities or call features that the Managing Member believes will be exercised in the short term) and to deposit the funds of the Company on a temporary basis in one or more accounts bearing interest at a fair market rate, which may be a variable rate;

(e)     to raise capital for the Company or any of its Subsidiaries by (i) selling equity interests in the Company or any of its Subsidiaries and (ii) borrowing funds from banks or other lenders to further the purposes of the Company, and in connection therewith, causing the Company or any of its Subsidiaries to grant mortgages, security interests, liens and other encumbrances to secure the repayment of any such borrowings;

(f)     to organize and manage the Mexican Subsidiary and one or more Subsidiaries, in any jurisdiction, including, without limitation, Mexico, or any state thereof, to vote any share of stock or other equity interest in any Subsidiary and to conduct any portion of the Company's business through any such Subsidiary;

(g)     to apply for all governmental permits, licenses and other authorizations required for the development of the Property and any other properties or assets of the Company, or for any other lawful purpose, and to take all lawful steps necessary to complete and process such applications and to obtain such authorizations, directly or indirectly through one or more Subsidiaries;

(h)     to buy and sell assets of any kind and to cause, where desirable, assets of the Company to be acquired or held in the name of one or more nominees on behalf of the Company, and to direct such nominees to deliver investments and other assets of the Company for the purpose of effecting transactions or otherwise;

(i)     to execute any agreement, contract, mortgage, certificate or instrument that the Managing Member deems necessary or desirable in connection with the conduct of the Company's or any Subsidiary's business or affairs;

(j)     to incur reasonable expenditures for the conduct of business of the Company and any of its Subsidiaries, and to pay all expenses, debts and obligations of the Company and any of its Subsidiaries;

(k)     to employ, retain, dismiss and instruct any employees, agents, attorneys, accountants, advisors, brokers and consultants, including, without limitation, any Affiliate of the Managing Member or of any Class A Member, and to delegate any of the Managing Member's powers and duties to them for the purpose of carrying out the business of the Company and any of its Subsidiaries; *provided, however,* that with respect to any employment or retention of, or other arrangement with, any such Affiliate (i) the arrangement shall be governed by a written

-16-

agreement and (ii) the compensation paid to such Affiliate is comparable to that which would be payable to unaffiliated third parties for comparable services;

      (l)    to institute, defend, compromise or settle any action, suit or proceeding with respect to the business and affairs of the Company and any of its Subsidiaries;

      (m)    to open, maintain and close bank accounts and to sign checks drawn on such accounts; and;

      (n)    generally, to engage in any kind of activity necessary or desirable to achieve the purposes of the Company and as may be lawfully carried on or performed by a Company under the laws of each jurisdiction in which the Company is then doing business.

      **Section 402.  Restrictions on Authority.**  The Managing Member shall not, without the consent of a Majority in Interest of the Class A Members, have authority to:

      (a)    possess Company property, or assign any rights in specific Company property, for other than a Company purpose;

      (b)    admit a Person as a Member, except as provided in Articles Three, Eight or Nine;

      (c)    make loans to, or guarantee the indebtedness of, any party other than a Subsidiary or a contractor or service or materials provider engaged by the Company or any Subsidiary;

      (d)    do any act in contravention of the Company's Articles of Organization, as it may be amended, or of this Agreement;

      (e)    do any act which makes it impossible to carry on the ordinary business of the Company;

      (f)    do any act which would require the Company to register (or to seek an exemption from registration) as an investment company under the Investment Company Act of 1940; or

      (g)    make any material change in the Company's purposes set forth in this Agreement.

      **Section 403.  Delegation to Agents and Officers.**  The Managing Member may delegate functions relating to the day-to-day operations of the Company to such officers, agents and employees of the Company as he may from time to time designate or appoint. Such officers, agents and employees shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Managing Member, and may be removed from office at any time, with or without cause, in the sole discretion of the Managing Member. In this regard, the Managing Member has designated himself, as the Company's President, and William J. Najam, Jr. as its Vice President and Secretary and Laurence S. Markowitz as its Assistant Secretary.

Section 404. **Reliance by Third Parties.** Any Person dealing with the Company shall be entitled to rely conclusively on the power and authority of the Managing Member as set forth herein. Further, any Person dealing with the Company or the Managing Member may rely on a certificate signed by the Managing Member as to (a) the identity of the Managing Member or any Class A Member, (b) the existence or nonexistence of any fact which constitutes a condition precedent to acts by the Managing Member or any agent or employee of the Company or which are in any other manner pertinent to the affairs of the Company, (c) the authority of the Managing Member or any agent or employee of the Company to execute and deliver any instrument or document of the Company, (d) any act or failure to act by the Company or (e) as to any other matter whatsoever involving the Company.

Section 405. **Management Fee.** The Company expects to be paid a monthly development and management fee of approximately $20,000 by the Mexican Subsidiary in consideration of the services it shall provide the Mexican Subsidiary in managing the development of the Property and the Resort. To the extent that such monthly fees are not timely paid due to budgetary, lender or other constraints placed on the Mexican Subsidiary, they shall nevertheless accrue and be payable at such time as such constraints are removed. The Company shall pay the Managing Member a monthly management fee equal to such portion of the development and management and fee paid by the Mexican subsidiary as is determined by the Managing Member to be appropriate, in his sole discretion, in light of whatever other cash needs of the Company then exist and the respective amounts of such other fees as the Company may then be paying.

Section 406. **Affiliated Transactions.** The Managing Member, any Class A Member and their respective Affiliates may provide services to the Company or any of its Subsidiaries for which the Managing Member is not otherwise responsible under this Agreement and may charge any of them for such services; *provided, however,* that the charges for such services shall be reasonable in relation to the value of the services provided and comparable to the charges of unaffiliated Persons providing comparable services in arms'-length transactions.

Section 407. **Other Business of Members.** The Managing Member, any Class A Member and any Affiliate of any of them, may make investments and engage in or possess any interest in any other business venture of any kind, alone or with others, including the organization and management of other limited liability companies, funds or similar vehicles to invest in real estate. Neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to such independent investments or ventures or the income, profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper. None of the Managing Member, any Class A Member or any Affiliate of any of them shall be obligated to present to the Company any particular investment opportunity, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and the Managing Member and each Class A Member and the Affiliates of any of them shall have the right to take for their own account (individually or as a trustee, shareholder, member or fiduciary), or to recommend to others, any such particular investment opportunity.

# ARTICLE FIVE

## GENERAL ACCOUNTING PROVISIONS

**Section 501. Fiscal Year.** The Fiscal Year of the Company for financial statement and federal income tax purposes shall end on December 31 of each year; *provided that* the final Fiscal Year of the Company shall end on the date of termination of the Company.

**Section 502. Capital Determined; Financial Statements and Reports.**

(a)     At the end of each Fiscal Quarter, the books of account of the Company shall be closed and appropriate financial statements shall be prepared in accordance with generally accepted accounting principles and reflecting the Interests of the Members in accordance with Article Three. The financial statements of the Company shall be prepared and/or reviewed annually by such independent certified public accountants as are selected by the Managing Member.

(b)     After the end of each Fiscal Year, the Managing Member shall cause the Company's independent certified public accountants to prepare and transmit, as promptly as practicable after the close of the Fiscal Year, a report setting forth in sufficient detail such transactions effected by the Company during such Fiscal Year as shall enable each Member to prepare its federal and state income tax returns. The Managing Member shall mail such report to each Member and former Member (or its successor or legal representative) who may require such information in preparing his or her federal and state income tax returns, such information to include a copy of the Company's information return filed for federal and state income tax purposes.

(c)     Further, the Managing Member shall prepare and transmit to each Member, as promptly as practicable after (i) the close of each Fiscal Year, unaudited financial statements of the Company prepared in accordance with this Section 502 and (ii) the close of each Fiscal Quarter, a business report of the Managing Member.

**Section 503. Valuations by the Managing Member.** In determining the accounts of the Company for all purposes, the assets and liabilities of the Company may be taken at such valuations as the Managing Member in his reasonable discretion determines, and the Company may, but shall not be required to, set up reserves against doubtful accounts and contingent and unliquidated liabilities, all subject to compliance with applicable generally accepted accounting principles.

**Section 504. Determinations of the Managing Member Conclusive.** Any valuation of the assets and liabilities of the Company, of any property contributed in kind to the Company or of the Interest of any Member, in each case as determined in good faith by the Managing Member, shall be binding and conclusive on each Member and any other interested Person unless such Member or interested Person objects to such valuation in writing within 10 days after receipt by the Member of a statement of its Interest and, in the absence of such written objection, the correctness of such Interest shall not be questioned by any Member or other Person. If a Member timely objects to any such statement, the Managing Member and such

Member shall attempt to resolve such dispute promptly.  If they are unable to do so, the dispute shall be submitted to arbitration pursuant to Section 1001.

Section 505.  **Books and Records.**  The Managing Member shall maintain complete and accurate books and records of all matters relating to the Company, including, without limitation, copies of the Company's Certificate of Formation, this Agreement, all amendments to each and the Company's state and federal income tax returns.  Each Class A Member and its representatives shall have access to such books and records at any time during reasonable business hours for proper purposes, on at least ten business days' notice.  The Company shall maintain its books and records on the accrual method and shall utilize generally accepted accounting principles consistently applied in the preparation of its financial statements.  All decisions as to accounting principles and tax elections (including, without limitation, elections as to depreciation methods) shall be made by the Managing Member in its sole discretion.

Section 506.  **Tax Elections.**  The Managing Member may, in its sole discretion, make or revoke the election referred to in Section 754 of the Code or any similar provision enacted in lieu thereof or any other election under the Code.

Section 507.  **Information Tax Returns.**  The Managing Member shall cause to be prepared and filed all federal and state information tax returns required of the Company and any Subsidiary.

Section 508.  **Designation of Tax Matters Partner.**  The Managing Member is designated as the Tax Matters Partner, under Section 6231(a)(7) of the Code, with respect to the Company.  The Tax Matters Partner is specifically directed and authorized to take whatever steps it deems necessary or desirable to perfect such designation, including, without limitation, filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations.   Expenses of any administrative proceedings undertaken by the Tax Matters Partner shall be expenses of the Company.  Further, the cost of any adjustments to a Member and the cost of any resulting audits or adjustments of such Member's tax return, shall be borne solely by the affected Member.

## ARTICLE SIX

## EXCULPATION AND INDEMNIFICATION

Section 601.  **General Fiduciary Duty.**  The Managing Member shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Class A Members, including the safekeeping and use of all Company funds and assets, whether or not in their possession or control, and the Managing Member shall not employ, or permit another party to employ, such funds and assets in any manner except for the exclusive benefit of the Company.   The Managing Member and his Affiliates shall not receive any remuneration for any services they may perform for the Company other than as permitted under this Agreement.

Section 602.  **Limitation on Liability.**  To the fullest extent permitted under applicable law, neither the Managing Member nor any of his Affiliates, nor any Class A Member who provides services to the Company or the Mexican Subsidiary, or any Affiliate of any such Class A Member, shall be liable in damages or otherwise to the Company or any of the Class A Members for any act or omission or error in judgment in performing his or its duties under this Agreement if he or it acted in good faith and in a manner he or it reasonably believed to be within the scope of the authority granted by this Agreement and in or not opposed to the best interests of the Company; *provided, however,* that the Managing Member, any such Class A Member and any of their Affiliates shall not be relieved of liability in respect of any claim, issue or matter arising out of his or its gross negligence or willful misconduct in the performance of his or its duties to the Company or the Mexican Subsidiary.  The Managing Member may consult with attorneys and accountants in respect of the Company's affairs and shall be fully protected and justified in acting or failing to act in accordance with the advice or opinion of such attorneys or accountants, provided that they have been selected with reasonable care.  The Managing Member and his Affiliates shall have no liability for the acts or omissions of any nominee, custodian or other third party retained or used with respect to the assets of the Company, except on account of gross negligence or willful misconduct in their selection.  The foregoing limitations on liability shall not apply to the extent, and shall in no event constitute a waiver or limitation, of any right which the Company or any Class A Member has under the federal or any applicable state securities laws which cannot be waived, including any right which may impose liability, under certain circumstances, on persons even if they act in good faith and with due care.

Section 603.  **Indemnification.**  To the fullest extent permitted under applicable law, but subject to the limitations set forth in Section 602:

(a)     In any threatened, pending or completed claim, action, suit or proceeding in which the Managing Member or any of his Affiliates was or is a party or is threatened to be made a party by reason of the fact that the Managing Member is or was the Managing Member of the Company or that any other such Affiliate is or was affiliated therewith (other than an action by or in the right of the Company), the Company shall indemnify the Managing Member or such Affiliate against judgments, fines and amounts paid in settlement and expenses, including, without limitation, attorneys' and accountants' fees and disbursements, actually and reasonably incurred by the Managing Member or such Affiliate in connection with such action, suit or proceeding, or in connection with an appeal therein, if the Managing Member or such Affiliate acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and provided that his or its conduct is not adjudged to have constituted gross negligence, willful misconduct or an intentional breach of his or its fiduciary obligations in the performance of his its duties to the Company.  The termination of any action, suit or proceeding by judgment, order or settlement shall not, of itself, create a presumption that the Managing Member or such Affiliate did not act in good faith or in a manner reasonably believed to be in or not opposed to the best interests of the Company.

(b)     In any threatened, pending or completed claim, action, suit or proceeding by or in the right of the Company, to which the Managing Member or any of his Affiliates was or is a party or is threatened to be made a party, involving an alleged cause of action by one or more Class A Members for damages arising from the activities of the Managing Member or such Affiliate in the performance or management of the business or affairs of the Company as

-21-

prescribed by this Agreement, the Company shall indemnify the Managing Member or such Affiliate against judgments, fines and amounts paid in settlement and expenses, including, without limitation, attorneys' and accountants' fees and disbursements, actually and reasonably incurred by the Managing Member or such Affiliate in connection with such action, suit or proceeding, or in connection with an appeal therein, if the Managing Member or such Affiliate acted in good faith and in a manner he or it reasonably believed to be in or not opposed to the best interests of the Company, and provided that his or its conduct is not adjudged to have constituted gross negligence, willful misconduct or an intentional breach of his or its fiduciary obligations in the performance of his or its duties to the Company. If the court in which such action, suit or proceeding was brought finds the Managing Member or such Affiliate liable to the Company, but, nevertheless, determines on application, that, despite such adjudication, but in view of all circumstances of the case, the Managing Member or such Affiliate is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper), the Company shall so indemnify the Managing Member or such Affiliate.

(c)     To the extent that the Managing Member or any of his Affiliates has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subparagraphs (a) or (b) of this Section 603, or in connection with any appeal therein, or in defense of any claim, issue or matter therein, the Company shall indemnify the Managing Member or such Affiliate to the fullest extent permitted by law against the expenses, including, without limitation, attorneys' and accountants' fees and disbursements, actually and reasonably incurred by the Managing Member or such Affiliate in connection therewith.

(d)     Expenses incurred by the Managing Member or any of his Affiliates in defending an action, suit or proceeding shall, from time to time, be paid by the Company in advance of the final disposition of such action, suit or proceeding on receipt of an undertaking by or on behalf of the Managing Member or such Affiliate to repay such amount if it is ultimately determined that he or it is not entitled to be indemnified by the Company as authorized in this Section 603.

(e)     The indemnification and advancement of expenses provided by this Section 603 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may otherwise be entitled.

(f)     The Managing Member may, or may cause the Company to, purchase and maintain insurance on behalf of the Managing Member and his Affiliates with respect to any liability or expense against which the Company would be obligated to indemnify the Managing Member and his Affiliates pursuant to this Section 603. In no event shall the Company bear any portion of the cost of any liability insurance which insures the Managing Member or his Affiliates against any liability as to which indemnification is not allowed under this Section 603. All distributions made to the Members pursuant to Section 313 shall be subject to re-contribution to the Company to the extent necessary to fund any indemnification obligations under this Section 603 to the extent the assets of the Company are insufficient for such purpose.

(g)     If for any reason (other than the gross negligence or willful misconduct of the Managing Member any of his Affiliates), the foregoing indemnification is unavailable to the Managing Member or such Affiliate, or insufficient to hold them harmless, then the Company

-22-

shall contribute to the amount paid or payable by the Managing Member or such Affiliate as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and the Managing Member or such Affiliate on the other hand, but also the relative fault of the Company and the Managing Member or such Affiliate, as well as any relevant equitable considerations. The reimbursement, indemnity and contribution obligations under this subparagraph (g) shall be in addition to any liability which the Company may otherwise have, shall extend on the same terms and conditions to the officers, directors, employees, members and controlling persons (if any) of the Managing Member and such Affiliates and shall be binding on and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, the Class A Members, the Managing Member, his Affiliates and any such controlling persons. The provisions of this Article Six shall survive any termination of this Agreement and the dissolution and termination of the Company.

(h)     The foregoing provisions of this Section 603 shall also apply for the benefit of each Class A Member who provides any services to the Company and to its own members and Affiliates to the same extent as they apply to the Managing Member and his Affiliates, as if such Class A Member were substituted for the Managing Member throughout this Section 603.

## ARTICLE SEVEN

## DISSOLUTION

### Section 701.   Events Causing Dissolution.

(a)     The Company shall terminate and dissolve on the happening of any of the following events:

(i)     the expiration of the term of the Company on December 31, 2056 or, if such term is extended pursuant to Section 204, on the date to which it is extended;

(ii)     the voluntary complete withdrawal, Bankruptcy, death, permanent disability, disappearance for more than 45 days of the Managing Member or the adjudication of the Managing Member as incompetent to manage his estate by a court of competent jurisdiction, if there is no Additional Managing Member or Designated Additional Managing Member at such time, unless a Majority in Interest of the Class A Members appoints an Additional Managing Member pursuant to Section 701(c) within 60 days of such event;

(iii)     the disposition of all of the assets of the Company;

(iv)     the determination of the Managing Member to terminate the Company; or

(v)     the happening of any other event causing the dissolution of the Company under the Act.

-23-

(b)     Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Company's Certificate of Formation is canceled and the assets of the Company are distributed as provided in Section 702. Notwithstanding any such dissolution, prior to the termination of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement. If the Company is dissolved pursuant to clause (ii) of Section 701(a), a special liquidator shall carry out the liquidation of the Company in the manner described in Section 702. The special liquidator shall be a party previously designated as such in writing by the Managing Member or, if no such designation has been made, a party designated by a Majority in Interest of the Class A Members.

(c)     The Managing Member may designate a Person to be admitted into the Company as an Additional Managing Member automatically on the occurrence of any of the events with respect to the Managing Member set forth in Section 701(a)(ii) (a "Designated Additional Managing Member"). Such admission shall occur automatically on any such occurrence, without the need for any other action, other than as contemplated in Article Eight. If the Managing Member fails to make such a designation prior to the occurrence of any such event, a Majority in Interest of the Class A Members may appoint an Additional Managing Member, whose admission as such shall thereupon be automatic without the need for any other action, other than as contemplated in Article Eight.

### Section 702.  Dissolution Procedures.

(a)     On dissolution of the Company, the Managing Member (or a special liquidator) shall proceed diligently to wind up the affairs of the Company, to liquidate its assets and distribute the proceeds thereof as provided in Section 702(d). During the interim, the Managing Member (or special liquidator) shall, to the extent consistent with such liquidation and dissolution, continue to operate the business of the Company, exercising in connection therewith all of the authority of the Managing Member as set forth in this Agreement, but shall have no further authority to bind the Company except to wind up its affairs in compliance herewith.

(b)     On dissolution of the Company, the Managing Member (or special liquidator) shall make or cause to be made a complete and accurate accounting of the assets, liabilities and operations of the Company, as, of and through the last day of the month in which the dissolution occurs.

(c)     Distributions in dissolution may be made in cash or in kind or in combinations thereof. Distributions in kind shall be made subject to reasonable conditions and restrictions necessary or advisable in order to preserve the value of the assets so distributed or to comply with applicable laws. The Managing Member (or special liquidator) shall use its best judgment as to the most advantageous time for the Company to sell its assets or to make distributions in kind. In this regard, if the Managing Member (or special liquidator) determines that an immediate sale of all or part of the Company's assets would cause undue loss to the Members, the Managing Member (or special liquidator), in order to avoid such loss, may, after having so notified all of the Class A Members, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Company other than those necessary to satisfy the Company's debts and obligations to Persons other than the Members. Assets to be

distributed in kind shall be distributed on the basis of the fair market value thereof, as determined by the Managing Member (or special liquidator).

(d)   As expeditiously as possible, the Managing Member (or special liquidator) shall distribute the assets of the Company in the following order of priority:

(i)   payment of all liabilities and obligations of the Company, other than liabilities or obligations to the Members, shall be made or provided for, whether by the establishment of such reserves as the Managing Member (or special liquidator) shall deem appropriate or otherwise;

(ii)   payment of all expenses of the liquidation;

(iii)   the establishment of such reserves as are deemed necessary by the Managing Member (or special liquidator);

(iv)   payment of any loans or advances made to the Company, first by any Class A Member and then by the Managing Member; and

(v)   to all of the Members in accordance with the positive balances in their respective Capital Accounts after giving effect to all Contributions, distributions and allocations for all periods.

Notwithstanding the foregoing, the Managing Member (or special liquidator) may determine not to make any distribution to any Class A Member pursuant to this Section 702(d) if to do so would likely cause the Company to be in violation or breach of any contract or agreement to which it is a party or any applicable law, rule, regulation or order, including, without limitation, any pertaining to anti-money laundering or anti-terrorism.

Section 703.   Withdrawal or Death of a Class A Member.   The withdrawal, death or incompetence of a Class A Member shall not dissolve the Company.  On the death of an individual Class A Member, the rights and obligations of such Class A Member shall accrue to his or her estate.  Except as expressly provided in this Agreement, no Bankruptcy or other event affecting a Class A Member shall affect this Agreement.

## ARTICLE EIGHT

## TRANSFERABILITY OF MANAGING MEMBER INTEREST

Section 801.   Managing Member Interest.   The Managing Member may sell, transfer, assign, pledge or otherwise dispose of all or any part of the Managing Member Interest. In the case of any such transfer, the assignee may be admitted into the Company as an Additional Managing Member or, subject to Section 302, as a Class A Member, in the discretion of the Managing Member.  A Person may be admitted as an Additional Managing Member only if such Person agrees in writing to be bound by the provisions of this Agreement.

## ARTICLE NINE

### TRANSFERABILITY OF A CLASS A MEMBER INTEREST

Section 901. Restrictions on Transfer. Notwithstanding any other provision of this Article Nine, no sale, assignment, pledge, transfer or other disposition of all or any portion of any Class Interest (a "Transfer") may be made without the prior written consent of the Managing Member, which consent may be withheld in the Managing Member's sole discretion (except for transfers on the death of an individual Class A Member by will or the laws of descent and distribution or by operation of law pursuant to the reorganization of a Class A Member that is an entity), and without the following conditions being satisfied:

(a)     counsel for the Company is not of the opinion that the Transfer would (i) be in violation of the securities laws of any jurisdiction, (ii) require the Company to register or to seek an exemption from registration as an investment company under the Investment Company Act of 1940, (iii) cause the Managing Member to be a "fiduciary" within the meaning of Section 3(21) of ERISA with respect to the proposed transferee or any other party, (iv) result in the termination of the Company for federal income tax purposes, (v) cause the Company to lose its status as a partnership for federal income tax purposes or (vi) cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the Regulations thereunder without the Company being ineligible for "safe harbor" treatment under Section 7704 of the Code and the Regulations thereunder;

(b)     an instrument of assignment executed and acknowledged by the transferor and the transferee evidencing, among other things, the agreement of the transferee to be bound by all of the provisions of this Agreement, containing appropriate investment representations of the transferee and otherwise in form and substance satisfactory to counsel for the Company, is delivered to the Managing Member; and

(c)     the transferor or the transferee pays all of the Company's costs incurred in connection with the Transfer and, if applicable, the transferee's becoming a Substituted Class A Member, including, without limitation, the reasonable fees and disbursements of the Company's counsel.

Any purported Transfer in violation of this Section 901 shall be null and void as against the Company, except as otherwise provided by law.

Section 902. Indemnification by Transferor. If the Company or the Managing Member becomes involved in any capacity in any action, proceeding or investigation in connection with any Transfer by a Class A Member, or the admission into the Company of such transferring Class A Member's transferee or assignee (any such transferee or assignee, when so admitted, being referred to as a "Substituted Class A Member"), the transferring Class A Member shall periodically reimburse each of the Company and the Managing Member, on demand, for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. The transferring Class A Member shall also indemnify the Company and the Managing Member, to the fullest extent permitted under applicable law, against any losses, claims, damages or liabilities to which they may become subject in

connection with such Transfer. The reimbursement and indemnity obligations of the transferring Class A Member under this Section 902 shall be in addition to any liability which the transferring Class A Member may otherwise have, shall extend on the same terms and conditions to the officers, directors, employees and controlling Persons (if any) of the Managing Member and shall be binding on and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, the Managing Member and any such Persons. The foregoing provisions shall survive any termination of this Agreement.

Section 903. **Effect.** No Transfer by a Class A Member shall relieve it of any obligations or liabilities under this Agreement unless and until such obligations and liabilities are assumed by a transferee who is admitted as a Substituted Class A Member pursuant to Section 905. A transferee who does not become a Substituted Class A Member shall have no rights as a Class A Member except to receive its share of allocations and distributions pursuant to this Agreement and any other rights of an assignee of a limited liability company interest under the .Act, and any such transferee who desires to make a further assignment of its interest in the Company shall be subject to all of the provisions of this Article Nine to the same extent as if it were a Substituted Class A Member.

Section 904. **Status of Transferor.** Any Class A Member that transfers all of its Interest shall cease to be a Class A Member, except that, unless and until a Substituted Class A Member is admitted in its stead, such assigning Class A Member shall retain the statutory rights of an assignor of a Class A Member's interest under the Act. Anything herein to the contrary notwithstanding, each of the Company and the Managing Member shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions made in good faith to it, until such time as the assignee of the Interest has been admitted into the Company as a Substituted Class A Member.

Section 905. **Substituted Class A Members.** No Class A Member shall, except as stated in Section 901, have the right to substitute an assignee, transferee, donee, heir, legatee, distributee or other recipient of such Class A Member's Interest as a Class A Member in its place. Any such assignee, transferee, donee, heir, legatee, distributee or other recipient of an Interest (whether pursuant to a voluntary or involuntary Transfer) shall be admitted to the Company as a Substituted Class A Member only (i) by satisfying the requirements of Sections 901 and 906, (ii) on the receipt of any necessary governmental consents and (iii) on an amendment to this Agreement and the Company's Certificate of Formation recorded in the proper records of any jurisdiction in which such recordation is necessary to qualify the Company to conduct business or to preserve the limited liability of the Class A Members.

Section 906. **Conditions of Admission.** Each Substituted Class A Member, as a condition to its admission as a Class A Member, shall execute and acknowledge such instruments and agreements, in form and substance satisfactory to the Managing Member, as the Managing Member reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Class A Member to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired.

Section 907. **Transfers During a Fiscal Year.** In the event of the Transfer of a Member's Interest at any time other than at the end of a Fiscal Year, the distributive shares of the various items of Company income, gain, loss and expense as computed for tax purposes shall be allocated between the transferor and the transferee on such proper basis (other than as provided in Section 308) as the transferor and the transferee shall agree; *provided, however,* that no such allocation shall be effective unless (i) the transferor and the transferee give the Company written notice, prior to the effective date of such Transfer, stating their agreement that such allocation shall be made on such proper basis, (ii) the Managing Member consents to such allocation and (iii) the transferor and the transferee agree to reimburse the Company for any incremental accounting fees and other expenses incurred by the Company in making such allocation.

## ARTICLE TEN

## MISCELLANEOUS

Section 1001. **Resolution of Disputes.** If any dispute or disagreement respecting the Company or the relationship among any of the Members cannot be resolved, such matter shall be submitted to arbitration before the American Arbitration Association in New York, New York, in accordance with its Commercial Arbitration Rules. Any decision of the arbitrators shall be conclusive and binding on each of the Members and their successors, assigns and personal representatives. Judgment on any award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each Member irrevocably submits, and waives any objection with respect to, the jurisdiction of any such arbitration and to such venue, and to the jurisdiction and venue of the federal and state courts sitting in New York County, New York, for the enforcement of any resulting arbitration award. Nothing in this Agreement shall require the arbitration of disputes between the parties that arise from proceedings instituted by third parties.

Section 1002. **No Bill for an Accounting.** Subject to any mandatory provisions of law or to circumstances involving a breach of this Agreement, each of the Members agrees that it shall not (except with the consent of the Managing Member) file a bill for an accounting with respect to the Company, or otherwise proceed adversely in any way whatsoever against the other Members or the Company.

Section 1003. **Firm Name.** On the termination and dissolution of the Company, neither the firm name, nor the right to its use, nor the related goodwill, if any, shall be considered as an asset of the Company, and no valuation shall be put thereon for the purpose of liquidation or any distribution, or for any other purpose whatsoever, nor shall any value ever be placed thereon as between the Members and the successors or assigns or personal representatives of any Member.

Section 1004. **Binding Nature of Agreement.** This Agreement shall be binding on and inure to the benefit of the successors, assigns and personal representatives of each of the Members.

Section 1005. **Amendments.** This Agreement may be amended by the written agreement of the Managing Member and a Majority in Interest of the Class A Members; *provided, however,* that without the consent of each Member, if any, to be adversely affected by

any amendment, this Agreement may not be amended to (a) modify the limited liability of a Class A Member, (b) increase the Contribution required to be made by any Class A Member or (c) modify the interest of any Class A Member in allocations or distributions.

Section 1006. Amendments Without Consent. In addition to amendments pursuant to Section 1005, amendments of this Agreement may be made from time to time by the Managing Member without the consent of any of the Class A Members, (a) to cure any ambiguity, or to correct or supplement any provision hereof which may be inconsistent with any other provision hereof, (b) to reflect a change in the name of the Company or the location of the principal place of business or registered office of the Company, (c) to effect a change that the Managing Member in its sole discretion determines to be necessary or desirable to qualify or continue the qualification of the Company as a limited liability company or an entity in which the Class A Members have limited liability under the laws of any state or to ensure that the Company will not be treated as an association taxable as a corporation for federal income tax purposes, (d) to create and sell additional Interests in accordance with the provisions of Section 302 and to effect necessary or desirable related modifications of this Agreement, (e) to effect a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state agency or judicial authority or contained in any federal or state statute, as now or subsequently in effect, compliance with any of which the Managing Member deems to be for the benefit of the Company and the Class A Members and (f) to reflect the admission, substitution or withdrawal of any Member in accordance with the provisions of this Agreement; *provided, however,* that no amendment shall be adopted pursuant to this Section 1006 unless the adoption thereof, in the reasonable opinion of the Managing Member, is for the benefit of or not adverse to the interest of the Class A Members and in the opinion of counsel, does not affect the limited liability of the Class A Members or the status of the Company as a Company for federal income tax purposes. The Managing Member shall promptly notify each Class A Member of any amendment adopted pursuant to this Section 1006, which notice shall include a copy of each amendment.

Section 1007. Execution of Amendments. If this Agreement is amended as a result of substituting a Class A Member, the amendment to this Agreement shall be signed by the Managing Member, the Person to be substituted and the assigning Class A Member. If this Agreement is amended to reflect the designation of an Additional Managing Member, such amendment shall be signed by the Managing Member and by such Additional Managing Member.

Section 1008. Communications. All notices, consents and other communications given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when delivered by hand or by FEDEX or a similar overnight courier to, (b) seven days after being deposited in any United States post office enclosed in an airmail postage prepaid registered or certified envelope addressed to, or (c) when successfully transmitted by facsimile (with a confirming copy of such communication to be sent as provided in (a) or (b) above) to, the party for whom intended, at the address or facsimile number for such party set forth below, or to such other address or facsimile number as may be furnished by such party by notice in the manner provided herein; *provided, however,* that any notice of change of address or facsimile number shall be effective only on receipt.

-29-

p. 2

If to the Managing Member:

Mr. Kenneth A. Jowdy
c/o Mr. William J. Najam, Jr.
2 Dogwood Drive
Danbury, Connecticut 06811
Fax.: (203) 205-0016

If to a Class A Member:

At the address for such Class A Member
set forth in the Register

Section 1009. **Governing Law; Severability.** This Agreement shall be governed
by and construed in accordance with the laws of the State of Delaware applicable to agreements
made and fully to be performed in such state, without giving effect to conflict of laws principles.
In particular, it shall be construed to the maximum extent possible to comply with all of the
terms and conditions of the Act. If, nevertheless, a court of competent jurisdiction determines
that any provision or wording of this Agreement shall be invalid or unenforceable under said Act
or other applicable law, such invalidity or unenforceability shall not invalidate the entire
Agreement. In that case, this Agreement shall be construed so as to limit any term or provision
so as to make it enforceable or valid within the requirements of applicable law, and, in the event
such term or provision cannot be so limited, this Agreement shall be construed to omit such
invalid or unenforceable provisions.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement
as of the date first above written.

MANAGING MEMBER:

KENNETH A. JOWDY

CLASS A MEMBERS:

BAJA VENTURES 2006, LLC

By
Philip A. Kenner
Managing Member

DIAMANTE PROPERTIES, LLC

By
Kennedy A. Jowdy
Managing Member

CSL PROPERTIES 2006, LLC

By
Philip A. Kenner
Managing Member

KAJ HOLDINGS, LLC

By
Kenneth A. Jowdy
Managing Member

-30-

If to the Managing Member:                    If to a Class A Member:

Mr. Kenneth A. Jowdy                          At the address for such Class A Member
c/o Mr. William J. Najem, Jr.                 set forth in the Register
2 Dogwood Drive
Danbury, Connecticut 06811
Fax.: (203) 205-0016

     Section 1009. Governing Law; Severability. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and fully to be performed in such state, without giving effect to conflict of laws principles. In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Act. If, nevertheless, a court of competent jurisdiction determines that any provision or wording of this Agreement shall be invalid or unenforceable under said Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

     IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

MANAGING MEMBER:

                                         KENNETH A. JOWDY

CLASS A MEMBERS:                              BAJA VENTURES 2006, LLC

                                   By _____
                                       Phillip A. Kenner
                                       Managing Member

                                   DIAMANTE PROPERTIES, LLC

                                   By _____
                                       Kenneth A. Jowdy
                                       Managing Member

CSL PROPERTIES 2006, LLC                      KAJ HOLDINGS, LLC

By _____            By _____
   Phillip A. Kenner                             Kenneth A. Jowdy
   Managing Member                               Managing Member

REGISTER

OF CLASS A MEMBERS OF

DIAMANTE CABO SAN LUCAS, LLC

| Name | Address | Fax Number | Taxpayer ID No. | Cash Contribution | Percentage |
|------|---------|------------|-----------------|-------------------|------------|
| Baja Ventures 2006, LLC | c/o Philip Kenner<br>10705 East Cactus Road<br>Scottsdale, AZ 85259 | 646-827-0832 | | $2.5 million | 39% |
| Diamante Properties, LLC | c/o Mr. William J. Najam, Jr.<br>2 Dogwood Drive<br>Danbury, CT 06511 | 203-205-0016 | | $0.1 million | 13% |
| CSL Properties 2006, LLC | c/o Philip Kenner<br>10705 East Cactus Road<br>Scottsdale, AZ 85259 | 646-827-0832 | | $2.0 million | 8% |
| KAJ Holdings, LLC | c/o Kenneth A. Jowdy<br>74 Innisbrook Avenue<br>Las Vegas, NV 89113 | 702-222-9281 | | $2.5 million | 40% |
| | | | | | |
| | | | | | |