FILED
CLERK

9:15 am, Feb 02, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  . Criminal No. 13-cr-00607-JFB-AYS
                          .
          Vs.              . 100 Federal Plaza
                          . Central Islip, NY 11722
PHILLIP A. KENNER,         .
TOMMY C. CONSTANTINE       . DATE January 29, 2021
. . . . . . . . . . . . .  .

               TRANSCRIPT OF TELEPHONIC HEARING
            BEFORE HONORABLE JOSEPH F. BIANCO
               UNITED STATES VISITING JUDGE

APPEARANCES:

For the Government:          UNITED STATES ATTORNEYS OFFICE
                            EASTERN DISTRICT OF NEW YORK
                            BY:  DIANE LEONARDO, ESQ.
                                 MADELINE O'CONNOR, ESQ.
                            271 Cadman Plaza East
                            Brooklyn, NY 11201

For Defendant Kenner:       PHILLIP A. KENNER, Pro se
                            Metropolitan Detention Center
                            Brooklyn, NJ 11232

                            MATTHEW W. BRISSENDEN, ESQ.
                            (Standby counsel)
                            666 Old Country Road, Suite 501
                            Garden City, NY 11530

For Defendant Constantine:  TALKIN MUCCIGROSSO & ROBERTS
                            BY: SANFORD TALKIN, ESQ.
                            40 Exchange Place, 18th Floor
                            New York, NY 10005

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

ADDITIONAL APPEARANCES:

For Danske Bank:          VENABLE LLP
                          BY:  GEORGE KOSTOLAMPROS, ESQ.
                               DOREEN MARTIN, ESQ.
                               KELLY WEINER, ESQ.
                               XOCHITL STROHBEHN, ESQ.
                          1290 Avenue of the Americas
                          20th Floor
                          New York, NY 10104

For Owen Nolan:           PROSKAUER ROSE, LLP
                          BY: SEETHA RAMACHANDRAN, ESQ.
                          Eleven Times Square
                          New York, NY 10036

For Diamante:             FREEH SPORKIN & SULLIVAN
and Jowdy:                BY:  THOMAS SOUTHER, ESQ.
                          350 5th Ave, Suite 6903
                          New York, NY 10118

                          FARRELL FRITZ
                          BY:  KEVIN MULRY, ESQ.
                          622 Third Avenue, Suite 37200
                          New York, NY 10017

For CSL Properties:       STEVE MAIN, ESQ.

For the homeowners:       BARRY SKOVGAART, ESQ.
                          800 6th Avenue
                          New York, NY   10001

1                      I N D E X

2

3  ORAL ARGUMENT                    PAGE

4       BY MR. KOSTOLAMPROS    13/21/27

5       BY MS. O'CONNOR           19/30

6       BY MS. RAMACHANDRAN        22

7       BY MR. SOUTHER             32

8       BY MR. SKOVGAART           33

9

10

11

12

13

14

15

16

17

18

19

20

21  ***Transcriber note: Static and background noise on phone

22  connection, some inaudibles in transcript.

23

24

25

 1            THE CLERK: Calling case number 13-Criminal-607,

 2    United States of America Phillip A. Kenner and Tommy C.

 3    Constantine.   Counsels, please state your appearances for the

 4    record.

 5            MS. O'CONNOR:   Good afternoon, Your Honor, this is

 6    the US Attorney, Madeline O'Connor, for the United States.

 7    Also appearing for the United States is Attorney Diane

 8    Leonardo.

 9            THE COURT: Good afternoon.

10            MS. KOSTOLAMPROS:   Good afternoon, George

11    Kostolampros of Venable, and I'm here with colleague, Xochitl

12    Strohbehn, Doreen Martin and Kelly Weiner.

13            THE COURT: Good afternoon.

14            MS. RAMACHANDRAN:   Good afternoon, Your Honor, this

15    is Seetha Ramachandran for Owen Nolan, I'm from the law firm of

16    Proskauer Rose.

17            THE COURT: Good afternoon.

18            MR. BRISSENDEN:   Good afternoon, Your Honor, Matthew

19    Brissenden, standby counsel for Phillip Kenner.

20            THE COURT: Good afternoon.

21            MR. MAIN:   Your Honor, this is Steve Main on behalf

22    of CSL Properties 2006.

23            THE COURT: Okay, good afternoon.

24            MR. TALKIN:   Your Honor, this is San Talkin for Mr.

25    Constantine.   I was contacted by the Court, but I'm not sure

1  that Mr. Constantine or my presence is necessary.  I didn't

2  know if something came up or if this is a continuation of the

3  other litigation that we haven't been involved in for some time

4  now.

5          THE COURT: I don't think you need to be present.  I

6  think we just give you notification just case you and/or Mr.

7  Constantine had some interest in participating. But I'm

8  certainly, I wasn't expecting you to be on the line.

9          MR. TALKIN: Okay, great, my office got a call, so I

10  thought I was missing something.  I'm going to -- if it's okay

11  with the Court, I'm going to sign off.  Thank you, Your Honor.

12          THE COURT: Yes. Well actually before you sign off.

13          MR. TALKIN: Yes.

14          THE COURT: Because we have the Government on the

15  line, I was going to issue an order on this.  But since the

16  Government is on the line, it would save me time.  I know we

17  don't have the criminal AUSA, but Ms. O'Connor, if you could

18  just pass along to the other AUSAs, Mr. Talkin put in a motion

19  for bail pending appeal on behalf of his client.  And I want

20  the Government obviously to respond to that, maybe a week from

21  today.

22          MS. O'CONNOR: I'll relay the message, Your Honor.

23          THE COURT: All right.  And Mr. Talkin, on that issue,

24  let me just ask you, because I don't remember seeing this in

25  the letter, has your client -- the facility been designated?

1    Has he received a designation yet?

2             MR. TALKIN: I have not, and we're in probably day in

3    the 60s. What I'll do is, by the time they reply I'll keep

4    working on them for an answer on that.  I think what happened

5    was, there was two things.  The marshals didn't get the

6    judgment. And second of all, I changed, remember I changed the

7    request for the facility.  And I think those two things might

8    have delayed things.  But I'll follow-up.

9             THE COURT: All right, thank you.  All right, thank

10   you, Mr. Talkin.

11            MR. TALKIN: Thank you, I'll talk to you.

12            MR. SKOVGAART:  Another appearance, Your Honor, Barry

13   Skovgaart, attorney here today on behalf of the homeowners, as

14   well as an owner at Diamante.

15            THE COURT: Yes, good afternoon.

16            MR. SKOVGAART: Good afternoon.

17            MR. SOUTHER:  Good afternoon, Your Honor, Tom Souther

18   on behalf of Mr. Jowdy and the resort.

19            THE COURT: Good afternoon.

20            MR. MULRY:  Kevin Mulry from Farrell Fritz, also on

21   behalf of Mr. Jowdy and the resort.  Good afternoon, Your

22   Honor.

23            THE COURT: Good afternoon.  All right, I think that's

24   everybody.  So, as you know we scheduled this to address the

25   submissions that the Court requested following our last

conference. I have received all those, I'm not going to go
through each one of them.  But obviously I received the
opposition that was expected from Mr. Nolan and CSL regarding
the Bank's summary judgment motion and their argument regarding
a constructive trust.  I received the Government's letter that
I requested for January 15th. And I received Mr. Kostolampros'
responses to those submissions.

So what I want to focus on -- obviously the bulk, the
purpose and part from the last conference of the supplemental
submissions was, I asked the Government to advise the Court, it
was the Bank's position based upon the Court's rulings on the
matter that the Court believed could be decided based upon the
evidence in the record, the uncontroverted evidence in the
record. It was the Bank's view that it had an undisputed claim
of at least 176 million, had a superior interest in the amount
of at least 176.3 million, or at a minimum of $164.2 million.
And in light of that position, I guess, and their argument that
they believed that based upon the equity left in the property,
that the Court's discovery on the remaining -- if that indeed
was the amount, that the Court's discovery that the Court was
going to allow the Government to have with respect to the
additional loans, would become essentially moot.  And that the
Government might not even be interested then in being involved
in any type of forfeiture, because it would not yield any
additional money for forfeiture purposes.

1    So that was why the Court then allowed this

2   supplemental submission, and the Government respond to that.

3   And to see if in fact the Court could determine an amount. And

4   I will note, before I get to that issue, there was a back and

5   forth, and I think Mr. Nolan's counsel had advised the Court,

6   had asked for an extension, and advised the Court there are

7   ongoing settlement discussions.  And there was a back and forth

8   on that. And a concern that the Court would potentially, Mr.

9   Wolinsky's letter addressed this as well, would potentially

10  hold off a ruling so as not to disturb the ongoing settlement

11  discussions.

12    I just wanted to emphasize and make absolutely clear

13  that that is not my view of what the Court should do in these

14  types of situations.  It has been my, and I think there's

15  obviously a long track record of this, it's been my view that

16  given the situation and the (inaudible -static) of everybody's

17  interests with respect to this situation, that the Court should

18  decide these matters expeditiously as possible.  So even though

19  this obviously has taken an enormous amount of time, and each

20  day my goal has been to have what issues can be decided,

21  decided as expeditiously as possible.  And you know, that

22  continues to be my objective and that will continue to be what

23  I do in these situations.

24    Any settlement discussions have to take place in a

25  time frame that the Court is operating in and the only time I

1  alter that is when everybody involved in the litigation asks me

2  to hold off because they believe it would benefit everybody to

3  have the Court wait until the negotiations are complete. But we

4  obviously don't have that situation here.  So I continue to

5  proceed as expeditiously as possible.

6       With respect to this underlying issue, I would just

7  note, the Government in its response letter first took the

8  position that although -- I should -- it's later in their

9  letter, but respect the threshold issue, that it's the

10  Government's view that even if, they dispute this, but even if

11  the Court were to determine that the -- it become my ruling

12  that the -- and the overall situation, that the undisputed

13  portion of the Bank's claim was $176.7 million, that the

14  Government would still continue to pursue forfeiture of the

15  resort.

16       So I just note that to begin with, because that

17  obviously creates an issue because it was the belief based upon

18  the circumstances that the Government might withdraw any effort

19  to forfeit the property if that were the Court's determination.

20  But more fundamentally the Government disputes the $176 million

21  amount.  I won't go through their arguments, but the bottom

22  line is they believe that the undisputed claim would be at most

23  $119 million, a little over $119 million. They also believe

24  that the money that's been repaid on the additional loans, to

25  the extent the Court did determine after discovery and

1   additional argument that there was, with respect to the

2   additional loans, that the Bank was not a bonafide purchaser of

3   value and it was not an arm's length.  That that money, they'd

4   be using the term, I guess, clawback, but it's the Government

5   argument that that money would be forfeitable in and of itself

6   because it should not have been removed from the resort in a

7   non arm's length transaction.

8          They also argue in a separate argument that it's a

9   violation, what occurred was a violation of the Court's

10  protective order.  And I know, and I'll hear from Mr.

11  Kostolampros in a minute, I know the Bank has responses to all

12  that.  There's a footnote 4 in their letter that outlines why

13  you believe some of the premises of the Government's argument

14  are factually incorrect.  So I understand all that.

15         But the bottom line is, having reviewed these

16  submissions, it's my view that I should not -- I cannot

17  segregate what the Bank thinks should be the amount based upon

18  the initial loan and the PPF.  And somehow reach an undisputed

19  number with respect to that without considering the issues with

20  regard to the additional loans and the possibility, and I

21  stress possibility, because obviously it has to be shown, that

22  the money from the additional loans somehow, because it's a

23  violation of the protective order, or because it's forfeitable

24  in and of itself, should operate -- should be essentially

25  operated as an offset to what the Bank believes it would be

1  entitled to under the initial loan and the PPF.  I don't think,

2  I think it's too intertwined.  I think there are plausible

3  arguments, again emphasizing if shown, that could require some

4  type of offset based upon my review of the papers.

5        So (inaudible) that the discovery on that issue,

6  although more limited than the Government sought in its

7  December 7th letter, which I'm going to address in a minute,

8  should proceed expeditiously and the Court should try to

9  resolve that issue. I'm not going to go too much into the

10 constructive trust argument at this point.  But, and also the

11 Government doesn't take a position with respect to the third

12 party claimant argument with respect to that.

13        But part of that argument also could potentially

14 revolve around, not all of it, but it was part of it, around

15 the bonafide purchaser argument because the Bank's defense of

16 the constructive trust and the case law surrounding that does

17 obviously have that as an element with respect to overcoming a

18 constructive trust argument, at least in part.  So I'm not

19 going to try to resolve that at this point, I don't think that

20 would even be productive or (inaudible) given the other issues

21 with respect to the Government.  I'm going to hold that issue

22 in abeyance and obviously the third party claimants would be

23 entitled to review the discovery, the Government as well.

24        The last thing I'll say before I hear from everybody

25 is, it's my view, the Bank did put in its letter that, and I

1  want to discuss it, that they want to make a motion for an

2  interlocutory sale. I believe, I'm not even -- I still don't

3  quite understand, I'm asking Ms. O'Connor to explain to me, why

4  the Bank would even need to make a motion for an interlocutory

5  sale at this point, based upon what I'm reading, what I've

6  understood for a long time, and I thought the interlocutory

7  sale would go forward a year ago. But if the Government

8  prevails with respect to this forfeiture, the Government is not

9  going to run a resort. So it seems like everybody understands

10  that this resort needs to be sold. And I just don't understand

11  why, given all these issues with the ongoing -- the Bank having

12  to continue to carry the debt and have the resort continue to

13  be sort of, have this cloud hanging over its head, why the

14  Government does not consent to an interlocutory sale while

15  these remaining issues are being resolved. I don't understand

16  why that should await whatever the Court needs to do to resolve

17  these remaining issues. I continue to scratch my head at that,

18  because it's pretty clear to me that the Government is not

19  going to run a resort if it does prevail in whole or in part

20  with respect to the final order of forfeiture.

21         So in terms of the mechanism the Bank said in their

22  letter that it would be best done through the foreclosure

23  process. I don't, I can't claim to be, understand it

24  completely what the mechanism would be and what the best way of

25  doing that would be. But and the Bank proposed money could be

1  put in escrow awaiting the Court's ruling with respect to these

2  remaining issues.

3         So again I'm not necessarily weighing in on the

4  particular format with respect to it.  But it's my strong view

5  that there should be an interlocutory sale of the property.  If

6  the Government is not willing to agree to that I'm going to ask

7  the Bank to put in their written motion.  And if I have the

8  discretion to do that under that these circumstances, I believe

9  it would be appropriate for me to exercise my discretion to

10 allow that to go forward to avoid any further harm to everybody

11 involved.

12         So that's another thing I wanted to address today in

13 light of the Court's rulings and views with respect to the

14 remaining portion of the forfeiture proceeding.

15         But Mr. Kostolampros, I'll hear from you first.

16         MR. KOSTOLAMPROS: Sure, Your Honor, thank you.  Again

17 I'd like to at least raise some of our points as to why we

18 believe that the Government can't seek what it's doing here.

19 You know, again none of the case law that they've provided,

20 which they said they would, supports their theory.

21         They're now moving back two steps and claiming that

22 amounts paid to the, to the Bank, for amounts that it lent, and

23 that the Government knows was being lent and relent, are

24 somehow recoverable.  Again, none of the cases that the

25 Government has provided supports this theory. The Government

1  has multiple opportunities to put in their forfeiture, the

2  proposed order of forfeiture, preliminary order of forfeiture,

3  what they believed was forfeitable and never did they assert

4  that amounts paid to Danske, which they were well aware of, was

5  potentially forfeitable.

6         And you know, Your Honor, several hearings back, and

7  you mentioned to the Government, you know, you never came to

8  the Court and said that there was anything improper as to

9  amounts being spent on the resorts.

10        THE COURT: I did read that and I thought about that.

11 I don't want you to think -- but they make some argument that

12 even though they were aware generally, obviously that the Bank

13 was continuing to fund the resort in some way, they're arguing

14 that they didn't understand what was going on with respect to

15 paying down interest as opposed to principal. That's sort of

16 behind the scenes what was going on. They did not understand

17 what was occurring that essentially the Bank was loaning money

18 and that the money is then being utilized to simply pay off

19 interest with no principal. But in any event, I understand the

20 argument.

21        MR. KOSTOLAMPROS: Yeah, but Your Honor, I mean that's

22 factually incorrect.  You know, and I think there's still an

23 issue here as to, the Government is claiming that everything

24 that was repaid to Danske on the facility B and facility C, is

25 subject to basically setoff and apply to facility A.  Well how

1  could that possibly be when the majority of those payments to

2  Danske are for, were for principal. So that means that Danske

3  advanced funds and got those funds back. If the Government is

4  coming back -- the only thing that I could see based on what

5  your ruling is here, is okay, subject -- the only thing that

6  could be potentially subject to setoff would be the interest.

7  And that interest is no where near the 90 million that the

8  Government is claiming that was potentially setoff.

9         Frankly that's probably under $10 million.  And I

10  think it's really important for us to get this straight here

11  because why are we going to prolong these proceedings which not

12  only has issues with, okay, determining Danske's claim, but

13  also what happens to the resort in the meantime when we're

14  figuring out who's got priority here and what the claim is.

15         Obviously yes, to move forward with an interlocutory

16  sale, but also, also you know, look, my client has spent

17  millions of dollars litigating this at this point in time.  Has

18  advanced millions of dollars. And to continue to lend -- to

19  advance those funds, you know, in this proceeding, is just

20  frankly, when there may not be a need to ultimately because I

21  believe that when, if you take into account what potentially,

22  even under the Government's theory, what would be potentially

23  subject to setoff, it should only potentially be whatever

24  interest payment is.

25         Is the Government saying that amounts Danske actually

1 advanced under facility B and those amounts that were repaid,

2 that the Government somehow has, can seize and forfeit in this

3 proceeding?  That strikes me as completely improper.

4       THE COURT: I think their argument, at least to the

5 parts that were advanced after the bill of particulars and the

6 Court's protective order, that I think their argument is that

7 money advanced after that date, it was not an arm's length

8 transaction, that that could be problematic. I don't -- or that

9 was paid I guess after that date on those facilities.  So I

10 think that is their argument.

11       MR. KOSTOLAMPROS:   But my understanding Your Honor,

12 what they're arguing is that it's proceeds traceable to the

13 DCSL resort.  So those aren't monies traceable to the DCSL

14 resort.  Those are monies that were paid by Danske to the

15 resort and Danske has a right to get those payments back,

16 otherwise it's, it's just an inappropriate taking at the end of

17 the day.  Basically the Government is taking money from Danske

18 that is advanced for the resort.

19       THE COURT: Well I think the bottom line is, I

20 understand what you're saying.  I understand that there are sub

21 arguments and sub issues with respect to what the Government is

22 claiming, factually and/or legally.  But it's my view that, you

23 know, and I'm willing to, I spent this time trying to dig into

24 weeds to see if there's a way to resolve both legally and

25 factually, and I don't think it's a wise exercise for this

1    Court to endeavor.  I was willing to try to embark on it.  But

2    I don't even think it's in the Bank's interest that, it's in

3    the Bank's interest for the Court to resolve all these issue so

4    you don't have piecemeal litigation that goes on forever.

5         And I note that to the extent you're concerned, and

6    rightfully concerned about additional delay, that's why I want

7    to pursue the interlocutory sale. My view is if the Court were

8    to decide these issues today, that's what the Bank would do. So

9    what I'm suggesting is that the Bank hopefully, with the

10   Government's involvement and the Court's supervision, can

11   embark on that while these remaining issues are litigated. And

12   I'll emphasize again, I don't, I was going to tell the

13   Government, the December 7th letter that they put in and the

14   categories of things that they asked for in connection with

15   this issue, I thought were much too broad.  I don't think that

16   we're talking about extreme long period.  What I told the

17   Government initially when this came up, that they could take a

18   deposition, a video deposition. I'd give them some

19   documentation.  But I don't anticipate that this is going to go

20   on and on and on like other phases of this case have.

21        So, all right, Mr. Kostolampros, let me just hear

22   form the Government and I'll come back to you. Ms. O'Connor, do

23   you want to respond to anything he said or for the Court's

24   ruling?

25        MS. O'CONNOR: Yes, Your Honor.  Protective order was

1  entered (inaudible) coming to (inaudible) --

2         THE COURT: You're breaking up.  I'm having trouble

3  hearing you.

4         MS. O'CONNOR: Sorry, Your Honor, is this better?

5         THE COURT: Yes.

6         MS. O'CONNOR: The Government wanted to point out,

7  Your Honor, that since the protective order was entered, and

8  the Court action started, Danske has been coming to the Court

9  beating a sense of urgency and despair, consistently uses this

10 (inaudible) to pressure, the Government to walk away from the

11 forfeiture.  To sway the Court to expedite the ancillary

12 proceedings so that there won't be full discovery on Danske's

13 claim.

14        The truth Your Honor, is that the financial condition

15 of the resort is the same that it's been since Danske acquired

16 the (inaudible) in 2009.  The resort has been in default since

17 that time. Danske stated in January 22nd letter to the Court

18 that the resort has not been in default since they acquired the

19 loan.  But Danske's own records prove otherwise.

20        And the position the Government's been taking is that

21 because the resort was in default from the beginning, Danske

22 did not have to continue (inaudible) any new money as it said.

23 It could have foreclosed at that time.  But it took advantage

24 of the situation and allowed the debt to (inaudible) through

25 and substantially consume the equity in the resort.

1        We filed a letter (inaudible) the Court with some

2   examples of if Danske had foreclosed years ago, how much equity

3   it would have made in the property.  We think it's very telling

4   that it's not until now that the Court is pressing for

5   foreclosure (inaudible) all those years, a decade up until the

6   Government commenced the forfeiture, Danske didn't seek to

7   foreclose on the property.

8        But that being said, Your Honor, we would point out

9   to the Court that what Danske didn't tell the Court is that the

10  Government has been (inaudible) the idea of an interlocutory

11  sale (inaudible) in significant settlement negotiations that

12  contemplate an interlocutory sale.

13       Right now the parties are negotiating a sale that

14  would have certain safeguards to protect the Government and the

15  third parties.  If Danske is given a free reign and conduct the

16  foreclosure that the Government is not involved in and the

17  third parties are not involved in, can sell the property for

18  whatever price it wants and to whomever it wants, including

19  Jowdy, and the Government has grave concerns that Danske

20  (inaudible) sale that's in the best interest of the Government,

21  third parties and victims --

22            (Background voices)

23       MS. O'CONNOR: Especially considering the Bank's prior

24  conduct.  If Your Honor will recall, Danske was willing to let

25  Jowdy sell the San Marcos parcel to a friend of his for a

1  fraction of its value.  So the Government strongly objects to

2  Danske's request to conduct an immediate foreclosure sale.  But

3  that's why the Government has been trying with the third

4  parties to come to an agreement, a settlement, for an

5  interlocutory sale, which everyone agrees to the terms.

6      THE COURT: All right, well look, when I was proposing

7  an interlocutory sale, I was not suggesting the Government

8  would not be involved in it. I assumed given the situation and

9  the ongoing litigation, the Government would be involved in it.

10 But my view is that that has to be like, that has to be in

11 light again, in light of the Court's view that you know, the

12 case would need to proceed with some discovery, and additional

13 rulings by the Court, that it's important that that be the

14 focus of the Government, to get that in place so that it

15 doesn't continue to be damage under the circumstances.

16     So, you know, I don't know when would be a reasonable

17 time to hear back on what that proposal would be, but I don't

18 want too much time to go by.  So --

19     MS. O'CONNOR: Your Honor, we've been actively

20 negotiating parameters of an interlocutory sale.  Perhaps the

21 Government and the third parties (inaudible) circle back and

22 discuss an interlocutory sale that doesn't necessarily resolve

23 how the funds will be distributed but at least agree on the

24 terms of the sale that's mutually agreeable.

25     THE COURT: Has the Bank, has Mr. Kostolampros been

1 involved in these as well?  Or is this just with the other

2 third parties?

3          MS. O'CONNOR: Counsel for CSL, counsel for Mr. Nolan,

4 and the Bank have been involved in these settlement.

5          THE COURT: All right.  Let me just ask Mr.

6 Kostolampros.

7          MR. KOSTOLAMPROS: Sure, Your Honor, just to be clear,

8 I mean the discussions are over an overall resolution that

9 includes the sale of the resort property.  Yes, we've had

10 discussions, the discussions have moved forward.  But we have

11 not, you know, agreed in principle to a final, you know, term

12 sheet or anything like that yet.

13          But I can say, look, those discussions have moved

14 forward.  And you know, again we've always been and remain open

15 to talking about a resolution.

16          But I would like to address at least one point that

17 the Government raised, is that the resort has been in default

18 since 2009.  And as our papers say, that's not true.  What has

19 changed and why the resort property is in default now, is that

20 was as of September 2019.  When interest payments were not

21 made.  At that point in time -- at every point prior to that

22 interest payments were being made.  That's the reason why the

23 resort property is in default under the loan agreements now.

24 Prior to that there simply was not a default.

25          THE COURT: All right, let me just -- I want to hear

1  briefly from Ms. Ramachandran and/or Mr. Main, if they have

2  anything they want to add.  Ms. Ramachandran.

3          MS. RAMACHANDRAN: Your Honor, are you asking if I

4  have something to add to the interlocutory sale discussion or

5  you know, in general to the points that Mr. Kostolampros raised

6  in his latest submission?

7          THE COURT: You can respond to anything you like to

8  respond to. Obviously as you heard, I'm going to hold off the

9  issue of the constructive trust argument that you raised

10 because I think you should try to resolve these other issues

11 first.  But go ahead, you can say anything you wish to say.

12         MS. RAMACHANDRAN: Okay.  I just, if I could just

13 briefly address, because we didn't put in a written response to

14 the Bank's latest letter on the constructive trust issue.  If

15 that's okay with the Court.

16         THE COURT: Sure.

17         MS. RAMACHANDRAN: Okay, I just wanted to talk about

18 the issue of standing first. I mean there's the argument that's

19 been made that we don't have standing because we have interest

20 to an LLC.  I think it's well settled law in the Second

21 Circuit, as well as the Eastern District and the Southern

22 District, that a constructive trust confers standing in a

23 forfeiture proceeding.  So you know, there's a number of cases

24 I could cite. Some of them are already in the letter that we

25 put in.  You know, Schwimmer (phonetic), Ovid (phonetic),

1  <u>People's Benefit Life Insurance</u>, and the point is that

2  standing, statutory standing in a forfeiture proceeding is just

3  another way of framing the question, does the petitioner have a

4  legal interest.  And there are a bunch of cases out there

5  holding that where a constructive trust is recognized, you

6  know, it's (inaudible) out with whatever interest a petitioner

7  had and it confers equitable title and you have standing in a

8  forfeiture proceeding.

9         I would also note that, you know, that's an argument

10 that should have been made I think you know, earlier, in a

11 motion to dismiss.  I think under the Rule 32.2, the Court

12 could have entertained that on a motion to dismiss, but once

13 the Bank has moved for summary judgment, which it has, I think

14 it's forfeited that standing argument.

15        I also just want to briefly address the argument that

16 Danske is making that their status as a bonafide purchaser for

17 value defeats our constructive trust claim.  And I think, you

18 know, there's a misunderstanding about what law applies here.

19 State Law governs the issue of whether a petitioner has a legal

20 interest at all.  And here that State Law, as we set forth in

21 our letter, is Delaware Law.  And I think we meet the elements

22 for a constructive trust under Delaware Law.

23        You know, I didn't see any arguments that Danske

24 made, factual or legal, challenging our assertion of a

25 constructive trust to begin with.

24

1   But the forfeitability of the property is actually

2 governed by Federal Law.  It's governed by the Federal

3 Forfeiture Statute, 21 USC 853.  The cases cited in their

4 brief, they don't have anything to do with forfeiture.  You

5 know, the forfeiture statute, you know, it looks to when and

6 how a petitioner acquired its interest. And I think here our

7 argument is that CSL and Mr. Nolan have a superior interest

8 under 853 and 6(a).

9   You know, if Your Honor will recall, there's two ways

10 you can prove an interest under 853 and 6, the first is that

11 you have a superior right, title or interest, and that interest

12 renders the order of forfeiture invalid or in whole or in part,

13 because the interest is superior to that of the defendant or

14 the Government.

15   The second way is a bonafide purchaser for value.  We

16 recognize that superior in the statute means superior to the

17 defendant, but it's also superior to the Government.  Because

18 the effect of a constructive trust is actually to invalidate

19 the forfeiture as to that portion, as to it whole or in part.

20   And here our argument is that Mr. Kenner, Phil

21 Kenner, he didn't have the authority to sign over our equity

22 interest to Lehman (phonetic) or Danske, or anybody else.  The

23 beneficiaries of the constructive trust here, they didn't enter

24 into the mortgage. They were really deprived here of any right

25 to control the equity or decide what happened to it.

1          So you know, the argument that they somehow consented

2   to this and that's why, you know, bonafide purchaser claim

3   should trump that of a superior interest holder under the

4   statute, I don't think that you know, works.

5          You know, even if you believe that Danske is a

6   bonafide purchaser for value, and I understand the Court

7   disagrees with us, we don't think they are.  You know, at least

8   we don't think they have proven that, carried their burden to

9   prove that on summary judgment.  You know, it only vested after

10  the Government acquired its interest.

11         And I think any other interpretation of this statute

12  would essentially let a defendant go commit a fraud, take

13  somebody else's money, and then either sell it to somebody

14  else, mortgage the property, and really, you know, leave the

15  victim with absolutely no recourse.

16         Under the forfeiture statute 853(o), it says the

17  provisions of this section shall be liberally construed to

18  effectuate its remedial purposes.  And I think here the only

19  reading that could effectuate the remedial purpose, which is to

20  not let a defendant profit from his crimes, would be to read it

21  this way. That you know, the cases are clear that a

22  constructive trust does confer a superior interest under the

23  first prong of the forfeiture statute.  And in this case, you

24  know, that interest is superior to that of Danske as a bonafide

25  purchaser.

And I just also just want to make clear, there was some back and forth in the correspondence about you know, that I somehow think they don't have a claim because I'm trying to settle this case, which you know, couldn't be further from the truth.  I think myself and Mr. Main on behalf of CSL, you know, we very much want to reach a resolution here and we have been trying to do that. We heard the Court loud and clear that a resolution would be in the interest of everybody here.

But I think what's happening is that the Bank is arguing that their claim should come first.  Which really has the practical effect of extinguishing everybody else's claims. And what we are arguing is that, not that they don't have a claim at all or they don't have an interest, but that we should come first.  And you know, our claims in the end are just a small slice of what's at stake here.  It would still allow very substantial recovery for Danske.

So I just, you know, want to make clear to the Court that we are trying to settle this.  We very much hope that we can reach a resolution.  But we also need the Court to recognize our interest as a constructive trust.  You know, that is an equitable remedy. And I believe the Court is empowered to recognize it here.

And just speaking for Mr. Nolan, you know, usually victims don't have to do this. They don't have to hire their own counsel.  But you know, given a situation where you know,

1  he's trying to recoup some of his millions of dollars in

2  losses. You know, this isn't -- unfortunately this hasn't been

3  a case where the Government has been able to you know, reach a

4  settlement that takes care of the victims.  You know they have

5  an obligation to do that under the MVRA.  And that for all

6  kinds of reasons, the length of this litigation, it just hasn't

7  happened. And that's really you know, the core interest that we

8  have here and that's why we're making the constructive trust

9  argument.

10          THE COURT: All right, let me just make sure I

11 understand.  Mr. Kostolampros, first of all, the negotiations

12 that are going on, if there was a resolution, it would be a,

13 not just a resolution in terms of moving forward with the sale,

14 it would be a resolution of the whole matter, including the

15 outstanding issues with, that I've identified.  Is that, is my

16 understanding correct?

17          MR. KOSTOLAMPROS: That is right, Your Honor.  Our

18 negotiations concern the whole matter that would resolve the

19 forfeiture proceeding.  Or this aspect of the forfeiture

20 proceeding.

21          THE COURT: All right, so let me just ask you first,

22 and then I'll see if anybody objects.  So what do you want the

23 Court to do in terms of -- I'm prepared to, I wasn't going to

24 do it today, I was going to ask the Government to narrow their

25 discovery request from that December 7th letter, and then make

1  rulings to the extent that the Bank was, I assume the Bank,

2  whatever they narrow it to, was still going to have some

3  objections.  But do you want me to set a schedule for moving

4  that forward, or do you want me to await a certain period of

5  time to see if you can resolve --

6          MR. KOSTOLAMPROS: I think -- go ahead.

7          THE COURT: No, go ahead.

8          MR. KOSTOLAMPROS: From our perspective, I think

9  anywhere between ten days to two weeks to allow the parties

10  time to either, to move forward with their discussions and get

11  an agreement in principle.  Otherwise move forward with the

12  Government submitting a plan for an interlocutory sale, and

13  also the discovery, the limited discovery that you allow, that

14  you ordered or allowed I should say.  So allow us, I think ten

15  to 14 days to come back to the Court and provide a status as to

16  where we are.  And frankly, you know, if we can't move forward

17  with an agreement in ten days or two weeks, then a sale needs

18  to go forward, and the limited discovery as well.

19          THE COURT: All right.  That's acceptable to me.  Does

20  anybody have any objection to that schedule?  All right.  I

21  don't hear any objection.  So I'm going to ask two weeks, Mr.

22  Kostolampros, I'll let you put in the letter in two weeks

23  advising me of what the situation is.  Again, because the Bank

24  is the one, you bear the brunt of the additional discovery and

25  providing additional discovery, and the deposition.  If you

1  believe in two weeks that it's close enough that you don't want

2  to start embarking on that discovery, and everybody else is on

3  the same page, again, if everybody is in agreement, then I'm

4  not as concerned. But if after two weeks it appears that a

5  resolution is not going to be reached, or it's not going to be

6  reached any time soon, then you can consult with everybody

7  else, and maybe there will be an agreement of what I'm going to

8  want if there is no resolution, I'm going to want the

9  Government to put in another letter narrowing its discovery

10  request to what I think would be a more reasonable request in

11  terms of you know, understanding, litigating the issue of

12  whether or not these transactions were at arm's length.

13         And also in that same submission, the Government, I

14  want the Government to tell me why I do not have the discretion

15  at this point to order an interlocutory sale while preserving

16  everybody's legal rights and whatever monies would be

17  recoverable based upon the Court's rulings.

18         So if you don't reach a resolution within two weeks

19  and you want to move forward on that, the Government and the

20  other lawyers can figure out a date for the Government to make

21  that submission.  And the Bank would then obviously respond to

22  that.  Anybody else who want to respond to that.  And we'd have

23  a conference call after that for me to rule on the scope of the

24  discovery, timing of the discovery, and on the interlocutory

25  sale issue.

1          Does that make sense, Mr. Kostolampros?

2          MR. KOSTOLAMPROS: Yes, Your Honor.

3          THE COURT: All right. Anybody else -- I did, there

4    was one thing, Mr. Skovgaart is on the line.  I know Mr.

5    Wolinsky put in the letter.  There was a request in Mr.

6    Wolinsky's letter for the appraisal from many years ago. What's

7    the Government's position on that?

8          MS. O'CONNOR: Yes, Your Honor, the Government's

9    position is that, well to begin with, Wolinsky and the ad hoc

10   committee have (inaudible) remind the Court they don't have

11   standing in this action. But in any (inaudible) the

12   Government's position was that it would not continue to pursue

13   the forfeiture of the resort (inaudible) Danske's entire

14   (inaudible) is recognized.  Unlikely we'd move forward

15   (inaudible)

16          However at this point the entire claim has not been

17   recognized (inaudible) Government would move forward

18   (inaudible) been obtained that there would be equity at this

19   point.  So why the Government (inaudible) and we don't believe

20   that there's any purpose for unsealing the appraisal. It's

21   still Government work product.  It doesn't serve any purpose.

22          THE COURT: All right. I'm going to hold that motion

23   in abeyance. I'll just say with respect to that appraisal, and

24   I have to go back and look at the entire circumstances, but

25   it's my recollection, because it was a while back, but the

1  Court, the question I guess on this issue is whether or not

2  it's a judicial document or not.  Whether it's something that

3  the public and/or parties should have -- the public I guess,

4  whether they're a party or not, should have access to something

5  that was submitted to the Court under seal.

6           My recollection with respect to that was that that

7  appraisal was not submitted to the Court in connection with the

8  Court making any determination with respect to the case.  I

9  actually remember the surprise actually to have received it

10 because the whole point of that appraisal, and my urging, which

11 I did, the Government to do the appraisal, was the Bank

12 basically saying that there was not sufficient equity based

13 upon what their view was of their interest for the Government

14 to pursue this.  And they wanted the Government to try to

15 verify that fact. And I urged the Government to do that, and

16 the Government did that.

17          So, but I don't believe I made any determination

18 based upon that appraisal.  I wasn't waiting for it, I wasn't

19 making any decision with respect to it.  I think the Government

20 just submitted it to me because there was a discussion about it

21 and they wanted to, I guess to show me that they had done it.

22          But, so I don't believe under the standard of what a

23 judicial document is that we have a presumption of public

24 access that that under those circumstances would apply.  So at

25 least at this juncture I'm not going to unseal it. But I guess

1  I will revisit that down the line if circumstances make it

2  clear to me that the Court, something about that appraisal, the

3  Court is relying on that appraisal in some way, which I have

4  not done to date.

5          All right, any other issues anyone needs to raise

6  with the Court today?

7          MR. SOUTHER: Judge, this is Tom Souther, just on the

8  appraisal point if I may.

9          THE COURT: Yes.

10          MR. SOUTHER: I just would like to remind the Court,

11  so the appraisers visited the property in November of 2019, and

12  the appraisal was issued in January of 2020.  And just to state

13  the obvious, it was prior to the pandemic.  So at this point

14  any reliance on the appraisal I think would have to be

15  dramatically discounted or discarded because the resort and

16  hospitality and travel and restaurant industries are among the

17  industries that have been most adversely affected by the

18  pandemic.

19          So to the extent the Government keeps pointing to

20  that appraisal as a reflection of, oh, there's significant

21  value in excess of the Bank's claim, I think that's something

22  that I would encourage the Government to go back and revisit

23  with its appraiser, because the circumstances have changed

24  dramatically, so the calculations I think have changed

25  dramatically.

1         THE COURT: All right, I mean I thought about that

2  too, and it's a valid point. But I guess at this point I'm just

3  trying to comment on why based upon the Government's prior

4  submissions to the Court back when, why I didn't think it

5  should be publicly available. But in terms of any, its ongoing

6  utility, obviously it's a valid point and I assume the

7  Government is aware of that as well.

8         All right, anybody else?

9         MR. SKOVGAART: Mr. Skovgaart, can I just comment on

10  that point?

11         THE COURT: Yes.

12         MR. SKOVGAART:  Even if it is not a judicial document

13  -- if it is a judicial document it's only a common law

14  presumption of asset (inaudible) to this. But the Government in

15  addition has to show good cause to continue the protection of

16  the appraisal.  And it has to show that the appraisal contains

17  the Government trade secrets or confidential commercial

18  information.

19         The appraisal is based on documents and information

20  provided by Diamante.  And in particular its financials and

21  cash flow.  So on behalf of the homeowners we again request the

22  appraisal be released.  Releasing it now would let all the

23  parties know that are prolonging the process, there's likely to

24  be (inaudible) or as we believe much more likely a waste of

25  everyone's time and a source of even further delay in getting

34

1  the project recapitalized.

2         THE COURT: All right, again I'm going to ask the

3  Government, if there is not a resolution of this within the

4  time period, this two week period, I'll ask the Government in,

5  I'll set a date for them to respond in writing to your, the

6  arguments you made in the letter.  But at least at this point I

7  don't think it's necessary to resolve that right now.

8         Okay.  Anybody else?  All right.  So I'll wait to

9  hear, obviously if any issues come up in the interim, you can

10 always write me a letter and the Court will be available, all

11 right?  Thank you everybody, have a good day.

12                        * * * * *

13           **C E R T I F I C A T I O N**

14         I, **PATRICIA POOLE**, court approved transcriber,

15 certify that the foregoing is a correct transcript from the

16 official electronic sound recording of the proceedings in the

17 above-entitled matter.

18

19 /S/ PATRICIA POOLE

20 TRACY GRIBBEN TRANSCRIPTION, LLC     DATE:  February 2, 2021

21

22

23

24

25