February 24, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Re: <u>Kenner – Compassionate Release under 18 U.S.C. 3582(c)(1)(A)</u>

Your Honor:

The defendant submits this letter under 18 U.S.C. 3582(c)(1)(A), the "compassionate release" reduction of sentence time statute.   The defendant has exhausted his administrative remedies with the Warden at MDC Brooklyn ("MDC") thru the <u>required</u> internal Unit Team submission on December 26, 2020, and as such, seeks instant remedy with the Courts.   The Court, following the defendant's exhaustion of remedies, has the authority to grant the motion at this time.   In concert with the First Step Act ("FSA") and the emerging decisions to define judicial tolerances for unforeseeable harsh conditions, this motion for sentence reduction should succeed on its merits.

Post sentence—Kenner was been subjected to 141 straight days of solitary confinement conditions—without sunlight, exercise, and other basic human needs (lifted February 22, 2021, allowing 1:30 per day, M-F for basic human activities and family communication).   Concurrently—dozens of inmates submitted to suicide watch protocols under these humanely abusive conditions—with approximately 80% COVID-19 contamination amongst the staff and inmates.

<u>Case Law and Statute</u>
Under 18 U.S.C. 3582(c)(1)(A), the director of the Bureau of Prisons ("BOP") used to be the gatekeeper for compassionate release motions: a Court could not reduce a prisoner's sentence to allow compassionate release, except "upon motion of the Director of the BOP."   The FSA eliminated this exclusive power to the BOP by adding the words "or upon motion of the defendant" after that.   As one court put it, "Defendants no longer need the blessing of the BOP to bring such motions".   The court also clarified that once a prisoner files a compassionate release motion in the sentencing court, the BOP "may never weigh in or provide guidance" on whether that motion should be granted or denied.   See *United States v. Haynes*, 2020 U.S. Dist. LEXIS 71021 (EDNY Apr. 22, 2020).   Several courts have recognized that the amended 18 U.S.C. 3582(c)(1)(A) "vests courts with independent discretion" to

1

grant the compassionate release.   See *United States v. Hope*, 2020 U.S. Dist. LEXIS
85395 (S.D. Fla. Apr 10, 2020).   In fact, "the district court assumes the same
discretion as the BOP director when it considers a compassionate release motion."
*United States v. Brown*, 411 F. Supp. 3d 446 (S.D. Iowa 2019).

"Cruel and unusual" conditions
The Supreme Court has instructed that "when the state takes a person into custody
and holds him there against his will, the Constitution imposes upon it a
corresponding duty to assume some responsibility for his safety and general
wellbeing…The rationale for this principle is simple enough: when the state by the
affirmative exercise of its power so restrains an individual's liberty that it renders
him unable to care for himself, and the same time fails to provide for his basic
human needs—e.g., food, clothing, shelter, exercise, medical care, and reasonable
safety—it transgresses the substantive limits on state action set by the Eighth
Amendment…[and the] Due Process Clause."  *DeShaney v. Winnebago County Dept. of
Social Services*, 489 U.S. 189, 199-200 (1989)(citation omitted).

"The Due Process Clause of the Fourteenth Amendment, rather than the Cruel and
Unusual Punishments Clause of the Eighth Amendment governs a pretrial detainee's
claims of unconstitutional conditions of confinement."  *Benjamin v. Fraser*, 343 F.3d
35, 39 (2d Cir 2003), overruled on other grounds by *Caiozzo v. Korman*, 581 F.3d 63,
70 (2d Cir 2009); see also *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).
A pretrial detainee's claims are evaluated under the Due Process Clause because
"[p]retrial detainees have not been convicted of a crime and thus 'may not be
punished in any manner—neither cruelly or unusually nor otherwise'." *Igbal v.
Hasty*, 490 F.3d 143, 168 (2d Cir 2007) (quoting *Benjamin*, 343 F.3d at 49-50), rev'd
on other grounds sub nom., *Ashcroft v. Igbal*, 556 U.S. 662, 678 (2009).   A detainee's
rights are "at least as great as the Eighth Amendment protections available to a
convicted prisoner."  *City of Revere*, 463 U.S. at 244; see also *Malinski v. New York*,
324 U.S. 401, 415 (1945) (Frankfurter, J. concurring) ("To suppose that 'due process
clause' meant one thing in the Fifth Amendment and another in the Fourteenth is
too frivolous to require elaborate rejection").

"No evidence exists to show that the Sentencing Commission took the conditions of
a pre-sentence detainee's confinement into account in creating the Guidelines."

Why does the court need to act?
The defendant has served over 70 months at MDC under restrictive pretrial
detention conditions and intermittent unconstitutional housing conditions (and
approximately 17 additional months at other various facilities), more recent than

not, being denied "the minimal civilized measures of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981), such as the "basic human needs" of "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (internal quotation marks and citation omitted).

*Harsh conditions exacerbated (pre-sentence)*: Since April 1, 2020, the defendant has been confined to his 73 square feet of living space in co-habitation for 21-24 hours per day; experiencing restrictions on his ability to "exercise" and "shower" daily, creating a heightened "punitive" environment never considered by Congress.   The terms of confinement have drastically changed and the court should modify the remaining terms of sentence as such—considering a partial sentence reduction. The Sentencing Commission could not have foreseen the current possibilities when "creating the Guidelines".

*Incrementally harsh confinement*: Notwithstanding the Court's position on the pre-sentence day (10-5-2020) conditions of confinement and any applicable considerations—Kenner has experienced inhumane degradation since; specifically after one would think "*conditions could not get worse than a 'Third World Country'*" [1]. <u>They did</u>.   From October 5, 2020 thru February 22, 2021 (141 days), <u>Kenner was locked 24/7 in his cell under solitary confinement as one of the harshest COVID-19 protocols experienced at MDC Brooklyn </u>(the facility attempting to mitigate the 80% infection outbreak that occurred institution-wide).  Kenner has been tested approximately 9 times during this period.   None of this could have been foreseeable to the Court at sentencing, but highlighting that, the Court needs to intercede and make a reasonable adjustment to Kenner's sentence to reflect the ongoing unduly harsh conditions he has experienced.

<u>The BOP's documented response to COVID-19</u>
In the government's repeated proffers to the court regarding the conditions of confinement at MDC, they have offered textbook BOP procedures in detail.   Yet, they ignored a pre-dated, scathing expert report that shocks the conscience; See case 1:20-cv-01590-RPK-RLM: Dkt 72-1, filed 4-30-2020.   Dr. Homer Ventners, former Deputy Medical Director of the Correctional Health Services of New York City, conducted a "guided tour" evaluation of MDC on April 23, 2020.  By April 23, 2020,

---

[1] Judge Cheryl Pollak of this District described MDC in 2016 as a "Third World Country" prison based on its unconscionable conditions—long before any of the aforementioned 2019 power outage or 2020-21 COVID-19 disasters.

[2] Note: During the first 6-weeks of the pandemic lock-down protocols (April 1, 2020- May

less than 20 inmates and BOP employees had been diagnosed with COVID-19 at MDC. Dr. Ventners' analysis highlights appalling revelations, including but not limited to:

*At 1 (¶1):* "I visited the Metropolitan Detention Center in Brooklyn, New York (the "MDC") on April 23, 2020.   I was alarmed by the facility's failure to implement simple procedures, in-line with the Center for Disease Control (the "CDC") guideline, that could identify patients ill with COVID-19 throughout the facility, and ensure that high-risk patients receive adequate care."

*At 3 (¶6):*" The MDC's failures, described in detail below, represent gross deviations from adherence to correctional standards of care and CDC guidance."

*At 5 (¶13):* "In order to prepare this report, I visited MDC on April 23, 2020 and physically inspected the facility.   I toured and examined the entry and screening area, four housing areas, and the health service unit.   Housing areas inspected included the special housing unit, unit 82 (cadre), unit 41, and unit 84 (isolation)."
- Note: The cadre unit (82) is a camp-level facility, living in relative privileged conditions; managed unlike the typical violent and uncontrollable units at MDC.

*At 6 (¶16):* "The information I have gathered via the above referenced documents, in conjunction with the results of my physical site visit, are sufficient for me to come to the conclusions drawn below, with a high degree of confidence."

*At 6-7 (¶17):*  "Current practices in the MDC likely fail to detect all cases of COVID-19 and also fail to even track the presence of COVID-19 symptoms throughout the facility.   Therefore, the number of infected people and staff is likely much larger that currently appreciated."

*At 7 (¶18):* "The CDC recommends that all new admissions to a detention facility be screened for both signs and symptoms of COVID-19.   Several people I spoke with reported that they had not been screened at all when they arrived at MDC, a clear deviation from the basic CDC guidelines."

*At 9 (¶24):* "Multiple detainees reported filling out these sick-call forms repeatedly because they feared they had COVID-19.   After multiple requests, the only response was for a health staffer to come to their cell and take their temperature…this was even the case even when they reported a shortness of breath."

*At 10, Header:   "Paper sick calls were destroyed and not scanned to patient medical records*"[2]

*At 10 (¶29):* "This represents a gross deviation from basic health care standards because the sick-call request form is part of the patient's medical record."

*At 11 (¶34):* "These responses raise the concern that MDC is not only failing to provide adequate COVID-19 response, but is failing to provide the most basic assessment of patients in other types of medical stress or emergency."

*At 11 (¶31):* "This practice, described by Ms. Vasquez, appears to be the intentional destruction of medical records.   During a viral pandemic, such as the COVID-19 outbreak, this is a very alarming practice."

*At 11, Header:   "MDC Response To Urgent Sick-Calls Is Inadequate"*

*At 11 (¶32):* "While I was present at the MDC facility, several patients reported that when they had an urgent or emergency medical problem, the only response was for staff to come and take their temperature, without removing them from their cell for clinical assessment."

*At 11 (¶34):* "The responses raise concern that MDC is not only failing to provide adequate COVID-19 response, but is failing to provide the most basic assessment of patients in other types of medical distress or emergency."

*At 11, Header:   "MDC Nurses Are Not Attending To Sick-Calls Or Tracking COVID-19 Symptoms"*

*At 12 (¶39):* "When asked about the tracking of COVID-19 symptoms, Ms. Vasquez, who is the lead health administrator at MDC, stated that it was not being done and that it was not possible given their data systems.   I view this refusal to track the incidence of COVID-19 symptoms among the patients in their charge as especially egregious and intentionally designed to avoid knowing the extent of the outbreak and providing the necessary care."

---

[2] Note: During the first 6-weeks of the pandemic lock-down protocols (April 1, 2020- May 18, 2020), only "paper sick-call" notices for medical attention were available when sick.   No records of "sick-call" requests exist at MDC during this period of time: per Dr. Ventners' report.

5

*At 13 (¶40):*  "Based on my physical inspection of the MDC, it is my assessment that several current practices in MDC actually promote a more rapid spread of COVID-19 inside the facility and serve to work against some of the infection control measures already in place."

*At 13, Header:*  "*MDC Has Not Implemented Adequate Infection Control Practices*"

*At 13, (¶43):* "While at MDC, I observed several correctional staff not wearing gloves or masks, and it was not clear who was mandated to wear masks or gloves."

*At 14 (¶47):* "I spoke with one detainee who is at high-risk of serious illness or death from COVID-19 who was transferred into the isolation unit for non-COVID-19 reasons."

*At 15, Header:* "*The Physical Environment At MDC Is Conducive To The Spread Of COVID-19*"

*At 15 (¶48):*  "During my physical visit to the MDC, I was concerned that the cells were much colder than the tier.  In fact, as soon as we entered into the unit, detainees began to yell about how cold their cells were."

*At 16, Header:*  "*The MDC Has Not Implemented Any Special Procedures For High-Risk Patients*"

*At 16 (¶54):* "Detainees also confirmed that the institutional toilets cause a spray – or plum[e] – when flushed.   This is critical concern because of potential fecal-oral transmission of COVID-19 between cellmates, and the practice of having high-risk detainees in cells with other people.   Conditions reported by these patients included poorly controlled asthma and coronary artery disease.   These patients indicated that the way they would need to report and COVID-19 symptoms would be to rely on sick-call, which is defective."

*At 11, Header:*  "*Illustrative examples*"
- Dr. Ventners could have expanded this entire section *tenfold* if the MDC did not direct the inspection to the "best" of the units with the most mitigated conditions, not the "typical" housing units of detainees.

*At 18-19 (¶62):* "Virtually none of these [CDC] guidelines were followed in these two examples.   It is doubtful that MDC will be able to enact these guidelines if they

6

continue to utilize a shared unit, which lacks a clinical examination room, PPE cart and other basic infection control features."

*At 18 (¶63):*  "The gross failures in MDC's response to their repeated attempts for assessment and care indicate multiple system failures in the overall COVID-19 response.   I am therefore concerned that people are infected with COVID-19 who are not being detected by the facility, and that as the outbreak spreads, some of these people (detainees and staff alike) will become gravely ill when early detection for their illness, and slowing the outbreak spread, could have instead been implemented."

*At 22 (¶67-68):* "Based on the above considerations, it is evident that the MDC has failed to implement straight-forward best-practices derived from the CDC guidelines as well as outbreak best practices.   I am therefore concerned about the ongoing health and safety of the population at the MDC, and the likelihood of the continued spread of COVID-19 therein."

<u>December 2020</u>
After months of cover-up statistics for COVID-19 infections at MDC, the situation became unmanageable when five housing units were excessively infected, forcing MDC to initiate building-wide lockdown conditions.   Those units included approximately 500 inmates.   For the first time since April 1, 2020 (the initiation of COVID-19 protocols at MDC), the unit officers wore masks full-time and donned plastic garbs and face shields (full PPE).   As NYC became an orange-red zone for un-incarcerated individuals, MDC became a hotbed of infection with the transient correctional officer interactions and lack of protocol implementation/interactions with the inmates; leaving the most vulnerable at full risk.   The impending catastrophe befell the institution.

<u>Extraordinary and compelling reasons: not just for illness anymore</u>
BOP deaths reached 110 by the week of August 1, 2020 (105 in the BOP and 5 federal inmates in private prisons).   In the last month, the number of BOP employees with COVID-19 has quadrupled, with the reported number at 503. Approximately 10% of the nationwide BOP infections for officers occurred at MDC. The virus is *still* active in 106 facilities, 86% of all BOP prisons.  As of 8-1-2020, the BOP had completed 41,000 tests, 26% of all inmates.  A full 28% have tested positive.   At MDC, testing was literally non-existent thru August 2020, months after Dr. Ventners' MDC report.

While 18 U.S.C. 3582(c)(1)(A) says that a court can reduce a sentence for "extraordinary and compelling reasons", it doesn't say what that means.   Instead, it points to U.S.S.G. s.1B1.13 under the sentencing guidelines to define what criteria for compassionate release meet that definition.   The problem is that s.1B1.13 was last updated <u>before</u> the FSA, and it still says that only the BOP can file a motion, which mainly focuses on medical reasons, just like the BOP's policy says.

The contradiction has divided the courts on whether s.1B1.13 is still relevant for defining "extraordinary and compelling" under 18 U.S.C. 3582(c)(1)(A).  See *United States v. Fox*, 2019 U.S. Dist. LEXIS 115388 (D. Me, July 11, 2019) (collecting cases on the split among the courts).   For example, in *United States v. Cantu*, 423 F. Supp. 3d 345 (S.D. Texas 2019), the court found that s.1B1.13 "clearly contradicts" the new 18 U.S.C. 3582(c)(1)(A) amendments under the FSA, and that because Congress changed the statute to expand the use of compassionate release, the guideline "no longer fits with the statute and thus does not comply with the congressional mandate." See also *Haynes*, *supra* (noting "at least twelve other federal district courts" have held s.1B1.13 inapplicable under amended 18 U.S.C. 3582(c)(1)(A)).

Besides all of that, it should be noted that "the district courts have always had the discretion to determine what counts as compelling and extraordinary" for compassionate release standards.   The courts have never been a "rubber stamp" for the BOP on compassionate release.   Indeed, the FSA's "key change" was "the removal of the [BOP] Director's role as gatekeeper".   Similar to the defendant, here, having completed innumerous months of his "rehabilitation" under the harshest of BOP conditions, in *United States v. Milan*, 2020 U.S. Dist. LEXIS 59955 (SDNY Apr. 6, 2020), Judge Preska cited a host of reasons that were "extraordinary and compelling" to grant compassionate release.  None of Judge Preska's criteria were medical issues, yet she granted release.

<u>The instant case's anomaly</u>
The defendant completed over 70 months in wholly unusual pre-trial (un-sentenced) detention at MDC (after approximately 17 months in other federal facilities); notwithstanding Dr. Homer Ventners' findings of relative condition commensurate with a "Third World Country". It is difficult to comprehend the severity of the MDC conditions throughout 2020 from afar (more shocking after following the widely publicized and litigated 8-day power outage in January-February 2019—during the coldest sub-freezing January-February on record in

over a decade).[3]   Furthermore, the courts would be hard-pressed to fairly calculate the long-term effects of the extended traumatic events on this defendant (or any).

Administrative Remedies exhausted

While the BOP may be out of the picture for non-medical compassionate release, 18 U.S.C. 3582(c)(1)(A) still requires that a written request is filed with the BOP for compassionate release before a prisoner can file his own motion to the court.   The defendant's written request has never been responded to (Ex. 1).  This aligns with statute, which says that a prisoner can file a motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendants behalf <u>or</u> the lapse of 30 days from the receipt of such request by the warden."   <u>This has been satisfied.</u>   See *United States v. Arthaloney*, 2020 U.S. Dist., LEXIS 89245 (D. Neb. May 21, 2020) ("if the warden denied the request within 30 days of receipt, the defendant must exhaust administrative remedies.")   Here, the warden (or emissary) failed to respond, now 60 days after the "internal mail" was sent.  No further remedies with the BOP are required under statute.

3553(a) factors

The Court may consider other factors when addressing the individual circumstances for partial sentence reduction.   The goal of sentencing is to "reduce the unjustified disparities and so reach toward the evenhandedness and neutrality that are distinguishable marks of any principled system of justice."; *United States v. Jones*, No. 20-3701, 2020 WL 6817488 (6th Cir, Nov. 20, 2020).

Considering the recentness of sentencing (notwithstanding the aforementioned cruel, unusual, and unforeseeable punishment), the court's representation of sentencing factors for harshness are significant to review, based on a multitude of vilifying statements of Kenner's integrity, while the empirical evidence presented to the court—at its post-trial request—refutes the integrity accusations en masse (*April 6, 2016 Forfeiture H'rg at 206-208):*

> [Court]: *"If you have uncovered any documents since the trial that you believe suggest that there is something <u>inaccurate</u> about the testimony in the trial, Mr. Haley should definitely submit them to me."*

---

[3] The Warden during the January-February 2019 power outage was transferred from MDC as a result of his misleading comments to the media about the conditions of the facility and atrocious care of the inmates during the crisis.   In addition, his emergency protocols were attacked as severely inept during the execution of the solution while inmates froze in their cells.

Respectfully, Kenner does not believe the court's position was based on avoidance of key exculpatory materials submitted to the court (only after its request)—but moreover the never-ending government morass of misrepresentations, leading to macro-confusion—understandable under any normal circumstance.   Five-and-a-half years of post-trial government innuendo prior to sentencing has overwhelmed even the most interested parties.   Note: Kristen Peca's sentence day speech and Owen Nolan's New York attorney have posited on the Court in 2020 that they still believe FBI Agent Galioto's misrepresentation[4] that *Kenner stole the Jowdy loan money from Hawaii to buy his Cabo equity*—despite the government debunking during their forfeiture presentation in 2016, claiming the received the verifications from Jowdy's attorneys 3-weeks after trial, "*on August 3, 2015*", despite a 6-year pretrial investigation (2009-2015) (*ECF No. 440 at 5*).   Nevertheless—Kristen Peca explained to Kenner on her surreptitious 2012-FBI recording:

> *Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already.  You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca – but – I don't understand why he would say it.*

---

[4] The Danske Bank attorneys repeatedly pointed to the government and former FBI agent Galioto's misrepresentations about events in 2017—14 years after the various government witnesses testified in contradiction to their mid-2000 actions, corroborated by their under oath statements, emails, signed bank records, text, et.al.  Danske's attorneys hi-light, "If Mr. Galioto and the government cannot recall that Mr. Daniel attended a meeting with the government in 2017, it calls into question their recollection of what was actually said in the first meeting, almost two years earlier, in 2015." (*ECF No. 939 at 1*).   Further along—Danske highlights that the government's business analysis defies all Business 101 logic (*Id. at 2*); identical to the government's Monday morning quarterback analysis about authorized paid consultants and lending practices in the Hawaii project—and how business cash flow works in reality.

Agent Galioto's pattern of lies is an underlying factor to all of the judgments of veracity, many times relying on temporal incongruence —whether for Kenner or the government witnesses (with all of the empirical evidence falling in support of Kenner's testimony and various submissions).

These are the same recordings that <u>Kristen Peca admitted she did not know her husband had a LOC at Northern Trust Bank</u>—thru July 2012, the date of the FBI call.

> [Kristen Peca]: *Well, I was referencing the earlier stuff that you said, <u>I don't remember a large amount being distributed back to our account</u> and the timing of the years of the loan, the line of credit, <u>that happened when we were in Ohio [2008 & 2009]?   I don't understand how it could have been open for 5 years before that?   Because we had a bond account going?</u>   <u>==Do you mean the Hawaii; you had a line of credit==, **but not for us**?*
>
> [Kenner]: *<u>No, no, you guys had lines of credit for 5 years at Northern Trust</u>.*
>
> [Kristen Peca]: ==**for 5 years?**==
>
> [Kenner]: *for 5 years!   When you were in OHIO, that's when the thing [LOC] closed.*

Kristen Peca continued her admissions during her 2012 FBI recordings of Kenner:

> [Kristen Peca]: "*I guess – I mean Michael was the one who agreed to all of that stuff because I really do not understand it.   That is the business between you two – not me.   If the bank accounts show Jowdy got the money from Hawaii – well – <u>then why are the FBI guys saying you stole it all</u>…I just don't understand…<u>why would they lie if you did not take the money?</u>*"

"Why" is a great question?

Note: Kristen Peca was <u>completely</u> aware of the *loan to Jowdy from the Hawaii partners* but simply upset (rightfully so if actually true) that Kenner "*never gave it – the loan money -- to…uhhhh…Jowdy*".   Michael Peca must have explained the Jowdy-loan to his wife (at one point in time—since Kristen Peca was never a Kenner client). Michael Peca reiterated his loan knowledge and feelings to the 2011 SDNY Grand Jury, in secrecy: reaffirmed as "*truthful*" during trial (*Trial Tr.498, 602, 650*).

Never once did Michael Peca mention any of the elements of his 2015 trial testimony to the 2011 SDNY Grand Jury (of: *vertical construction only*—or—

*unknown access to his LOC*) or any Kenner misdoings with or without his knowledge.[5]

> [Michael Peca, 2011 SDNY Grand Jury: *Ex. 6 at 30-33, 35, 40, 42, 45*]: *"Here's where a lot of the cross starts to happen.   A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars,[6] on the closing.   **It was never paid back**.  And then communication basically seized at that point from him. That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy."*

Kristen Peca's fabricated LOC testimony, included her receipt of the March 2009 Northern Trust LOC default letter in Columbus, Ohio (*Tr.709-711*).  Considering she admitted in 2012 she did <u>not</u> know about her husband's LOC and, perhaps more nauseating, the default letter was sent FedEx to a New York house address (Getzville, NY) (*Ex. 7*) she was not living in when she testified, "*one day I got mail that I had to sign for*" (*Tr.709*).  **FedEx does not forward mail, nor does it leave a "signature required" package**.  Kristen Peca's testimony was from an individual who: (i) was <u>never</u> Kenner's client (absent all fiduciary responsibilities), (ii) had her husband's investments and business transactions hidden from her <u>at Michael Peca's</u>

---

[5] Neither the government, the FBI agent, or the individual investors have presented a scenario that any or all of the Northern Trust bank LOC clients <u>discovered</u> their LOC funds were <u>used</u> without their permission or knowledge at one point in time—but did nothing in the future when they *discovered* the crime (unauthorized use)—except sign, sign, and sign more and more annual renewal documents (all on the Northern Trust Bank subpoena received in week 7 of the trial: *Trial Tr.4205-06*) without any documented communication with Northern Trust bank employees—or any of the independent attorneys (all with independent attorneys who handled their contracts and other legal matters).   Owen Nolan sued Kenner in 2009—but for unsuitable investments (of $3 million in private equity deals—all signed off by Nolan personally) after $40 million plus in earnings; <u>never alleging theft of his LOC funds (or others)</u>.

[6] The Jowdy-loan amount details—that Peca explained in 2011 to the SDNY Grand Jury (*Ex. 6*)—specifically matched Arizona attorney Tom Baker's disclosures <u>that the FBI withheld from the defendants</u> (a *Brady* violation)—but turned over, *most likely in error: with the right hand not knowing what the left hand previous concealed*, once the AUSA Forfeiture team engaged the case in 2015 (*Ex. 1*).   The Baker disclosures were <u>signed-off</u>, <u>initialed</u>, and <u>dated</u> by Michael Peca (*Id. at 81-88*)—yet denied by the government and their witnesses— including Peca—at the time of trial.

<u>request</u>,[7] and (iii) had met Kenner face-to-face less than 10 times during the 15 years Kenner was Peca's Business Manager.

Kristen Peca explained to Kenner in July 2012 (FBI recording) she clearly knew about the Jowdy loan non-payment angst of all the investors; the same Jowdy-loan that none of the government witnesses could recall being involved in during trial testimony:

> [Kristen Peca]: *maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and...and the attorney guy getting killed.  Its too scary.  <u>Michael and I cant thank you enough for keeping the fight going after the jail thing and the attorney but</u> -- I just want this to be over no matter what it takes.  <u>I know how mad Michael and the other guys are with Jowdy for not paying the loans back</u>.  Who does that??*

> [Kenner]: *A protected criminal – that's who.*

In 2020, Owen Nolan's counsel also mis-represents: "*Mr. Kenner clearly carried out a scheme to defraud Mr. Nolan...by gaining their trust and persuading them to <u>invest</u> in various development projects and then <u>stole</u> their money.*" (*ECF No. 843 at 2*). Mimicking Kristen Peca (on the 2012-FBI recording)—Nolan's attorney in 2020—

---

[7] Michael Peca concealing his business from his unknowing wife (only 2-months prior to Michael Peca's authorized LOC collateral default independently with Northern Trust Bankers Catherine Brill and Aaron Mascarella: *ECF No. 770 at 13, f.12*):

| 6216 | +17163743234 Michael Peca* | 2/1/2009 9:07:32 PM(UTC+0) | Sent | [Kenner]: **I'm on the phone with our Atty about your insurance now**. Enjoy the game. Speak later. |
|---|---|---|---|---|
| 5287 | +17163743234 Michael Peca* | 2/2/2009 8:07:47 PM(UTC+0) | Read | [Michael Peca]: **Have an idea. Agaist my better judgement and my wife is not to know.** Call me |
| 5288 | +17163743234 Michael Peca* | 2/2/2009 8:16:16 PM(UTC+0) | Read | [Michael Peca]: <u>Can u talk now</u> |
| 5289 | +17163743234 Michael Peca* | 2/2/2009 8:27:44 PM(UTC+0) | Read | [Michael Peca]: **Just get me a general letter saying the matter is concluded without mention of the payment.** |

Kristen Peca told the FBI during a February 22, 2012 proffer (*3500-MP-3-r at 2*) that she thought the $360,000 insurance "*payment*" money for "*2 $180k transactions*" was stolen by Kenner—despite Michael Peca ordering Kenner to conceal the transactions from his wife, *supra*.  <u>Michael Peca was present in the 2012 FBI proffer and remained silent</u>.

exhibits no concerns for the well-documented loans to Jowdy *"contributed"* to the "*development projects at the heart of this matter*" *(Id. at 1)*—merely alleging Kenner "*stole*" it and never gave the known-loans to Jowdy…yet still untrue…If anyone were in Nolan's position, they would have testified that they had no "*memory*" of the LOC/investment (*Tr.2065-66*) if promised by former FBI agent Galioto to receive all the money back that Kenner "*stole*".

Even Nolan's personal assistant re-verified the misrepresentation in 2017, in clear, bar-room claptrap to Kenner's pre-teenage son via email, demanding:

*"They want to know where their fucking money is!"*

Why hasn't the government shared with Nolan or any investor that Jowdy received the funds (per government-forfeiture-44) just like they always believed, until coerced by Galioto?   The answer is clear: because anarchy would ensue and the Court would be flooded with confessions, witness-by-witness, like Kaiser, *infra*.

Nolan's counsel ignores the government's post-trial government-forfeiture-44 evidence to think Kenner "*stole*" the funds—assuming the government made Nolan and his attorney aware of the contradiction of post-trial evidence.   Jowdy's attorneys, Galioto, and IRS special-agent Wayne confirmed that Jowdy received 100% thru their creation of the government-forfeiture-44 loans.

Nolan was independently identified by Hawaii counsel as participating via conference calls in real time (*Ex. 3*) and both follow-up "*update[s]*" (*Ex. 4*) (*Ex. 5*), all of which Kaiser verified to the FBI in October 2010 (*Ex. 2 at 3*).   Perhaps, Nolan and the rest of the Hawaii-Mexico investors who were coerced by Galioto's graft are unaware that Kenner did not steal the Jowdy loans (per government-forfeiture-44) to purchase anything—specifically not the Baja Ventures 2006 Cabo equity (per government-forfeiture-36).   The government proved during their forfeiture case that $4.1 million Baja Ventures 2006 capital account is traceable directly to Kenner's documented partners—none from the Hawaii loans.

Attorney Madia recapped following the conference call (*Ex. 3: "February 24, 2006"*):
"*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project….**Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004** Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact me*

*with any questions but you should already have your copy from previous communications.*"

Attorney Madia continued:

"*The questions during our last conference call by <u>Owen Nolan</u>, <u>Mike Peca</u>, and <u>Bryan Berard</u> were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.   Most of you are involved in both deals.   **You should have the operating agreements I previously forwarded to you after every member signed them**.   If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

***Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records**.   It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.*"

Attorney Madia "*update[d]*" again (*Ex. 4*: "*May 17, 2007*"):

"*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call <u>including the $2.3 million capital account for CSL Properties, 2006, LLC</u>[8] (your investment LLC as*

---

[8] CSL Properties 2006, LLC contributed $2.3 million, as the last, and lowest risk money in the Cabo purchase—as noted in the May 17, 2007 update to the Hawaii-Mexico investors (*Ex. 1275*).   The CSL funds were applied to the CSL capital account (with $300,000 left out by Jowdy in 2006) and still being argued by Kenner as Managing Member a year later.   The "*update*" clearly laid out the approximate $5 million capital account contribution from Kenner, Stumpel, and Lehtinen to Baja Ventures 2006—seemingly forgotten by the government and other investors as the "*initial investments before Lehman agreed to fund*".   All CSL money was contributed <u>after</u> the Lehman Brothers commitment—thus lowering their investment risk to minimal—notwithstanding Jowdy's unchecked and protected 15-years of embezzlements (per Kaiser's, *ECF No. 628*, and 10-28-2020 proffer "*And then I go to the government and say it's a crime what's going down there.   He stealing millions of dollars.*") (*10-28-2020, H'rg Tr.49*)

- Prepared trial counsel could have debunked the Cabo-Mexico capital account issues by hiring a forensic accountant.   Trial counsel failed again to staff properly.

Kaiser's 2020 statements are a new evidence issue and *Brady* disclosure issue; fully

> *attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.  Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy.  They want to negotiate with Jowdy through Tommy.   You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on.*"

Kenner reply to Attorney Madia:

> "*nolan and peca called me about an hour or so ago after reading your message and said f-jowdy.  berard called and told me he wanted to choke Jowdy…kaiser and constantine do not want to sue Lehman…*"

And Attorney Madia Continuing, (*Ex. 5*: "*July 13, 2007*"):

> *"I am sure many of you are concerned about the settlement talks between Tommy and Ken and rightfully so.   I have been told that Tommy exchanged a final revision last week with Ken to the deal points.  Ken acknowledged his loans in excess of 8 million with the Hawaii deal and unpaid.   The final points if we sign this version of the agreement will relieve Ken of the debt in exchange for Ken leaving the Cabo project.   Phil or Tommy will assume the management for good or until another developer deal can be done.   Either way the deal will be finally managed properly.   Ken will be reduced to a 15% equity stake in Cabo. Phil told me he heard from Darryl Sydor, Glen Murray, and I think one or two other guys that you do not understand why Ken in retaining anything after what he did to us but sometimes deals require compromise.   This appears to be one of those times because ridding ourselves of any involvement in the future*

---

exculpatory to the government preeminent claims that Kenner lied to the investors about the Hawaii loan money (*Tr.33*):

> [AUSA Komatireddy]: *"This is the fraud where the defendants lie to the investors about who's stealing from them…The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it"*

- According to Kaiser's 10-28-2020 proffers (*10-28-2020, H'rg Tr.47-50*)—the government knew about the Jowdy crimes pretrial, directly from Kaiser, and covered up this explosive evidence Kaiser explained to the prosecutorial team.  Its reformative status highlights gross prejudice—yet pretrial interviews by trial counsel would have exposed this.  None occurred.

*from Ken and his people is far more valuable than many of you may realize at this point.   I was equally annoyed as you but we will begin real work in Cabo without him assuming Lehman approves the deal.   There are several other deal point that include the Diamante air planes and others.   We will resolve those with the incremental equity we take back from Ken and disburse it to cover the Hawaii loans and personal loans Jowdy received and failed to honor.   If any deal affects you like Glen Murray and Ken's unpaid Vegas loan we will deal individually with those.   Some of the Diamante del Mar issues are still in progress but we have covered the majority of issues Phil and Tommy have deemed critical.   It is more than enough for the attorneys on both sides to generate the final settlement agreements.   I see this as an overdue success after Phil exposed Jowdy almost nine months ago.*

*You may call me directly or email any group questions.   I expect us to be completing this deal in the next thirty to sixty days.   Rob"*

Contemporaneously, Kenner forwarded another set of the Nolan LOC documents in 2007 to Nolan thru the attorney, at Nolan's request—further highlighting Nolan's "*memory*" loss issues at trial about the LOC (*Tr.2065-66*):

[Kenner to attorney Madia, *Id. at 2*]: "...*send a full copy to Owen at his California address as well with my FedEx account. I just spoke with Owen and his wife and they need another copy of what he signed in 2003 for Little Isle 4 and all the renewals from 2004-06 for his personal LOC.   I think he was trying to sort out last years land loan versus the LOC for the Hawaii investment and the Jowdy loans..thx.pk*"

Only willful blindness could explain any lack of knowledge—but certainly not criminal intent.   Kenner—and those involved in the Hawaii project—could not have been more transparent about information.

Nolan's 2020 NY counsel attempted to circumvent reality by alleging Kenner had no proof of the Nolan settlement with Jowdy (with Nolan's $350,000 capital account contribution on 5-4-2005, traceable to the Jowdy loans, via government-forfeiture-36).   As a result of the Jowdy-Nolan relationship starting in 2008 (between counsel)—and their intimate knowledge of the transactions, Nolan received compensation for these transactions from Jowdy (valued at $3,250,000 at the time)—from Jowdy; the person who received them.   Nevertheless, stand-by counsel for Kenner was forced to call Nolan's counsel to the mat for her graft (*ECF No. 889*,

including the 2017 settlement agreement specifically detailing Nolan's settlement with Jowdy: *ECF No. 889-1 at 5*):

> "*The Plaintiff related-parties agree (i) to refrain from commencing, prosecuting, instigating, or in any way participating in the commencement, prosecution, or instigation of any action or proceeding asserting any Released Claim, either directly, representatively, derivatively, or in any other capacity against the Defendant-Related Parties, or any of the Released Persons…*"— and—"*Ethan Moreau, Owen Nolan, and Joe Juneau…(b) entered into prior separate settlement agreements with Jowdy and/or Jowdy related entities as a result of other litigation, which prior agreements will be unaffected by this Settlement Agreement, and Plaintiffs' Counsel and the Parties do not object to such separate agreements…*".)

The 'Kenner stole the Hawaii loan money' is the rhetoric originated by former FBI agent Galioto and Jowdy's cabal (participated by Kaiser and Berard during their Jowdy-Mexico employment beginning in 2011).   John Kaiser confirmed it to the Court in February 2019 (*ECF No. 628*, [Kaiser]: "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…*").   These are the Hawaii loan funds—as none other are of issue.   Kaiser knew it, confirmed it in February 2019; but exhibited *selective amnesia* symptoms during his animosity filled 2015 testimony while employed by Jowdy.

Kaiser's 2019 admission (4-years post-trial) is absolutely exculpatory to Kenner. Note: Kaiser re-confirmed that he also knew Jowdy was robbing the Cabo san Lucas project pre-trial (corroborating his October 2010 FBI proffer about his specific involvement in vetting and managing the Jowdy loan interactions to Galioto: *Ex. 2 at 2, 3, 10—*identifying the Jowdy ["KJ"] loan was still unpaid, *Id. at 3*: "*Never got money back from KJ/Mexico*"⁹—and verifying the Constantine ["TC"] consulting work and others, *Id at 5*: "*TC trying to ~~raise~~ fund money for Hawaii land*", a.k.a. Urban Expansion loan).

Kaiser explained the *egregious* Jowdy thefts to the Court on October 28, 2020 (*H'rg Tr.47-50*) [Kaiser]: "*And I was treating it like an investigation, just like I was a police officer, and I was uncovering everything.  And then I go to the government and say it's*

---

[9] It is critical to note that despite Kaiser's temporal anomalies after-the-fact, he verified to the FBI in October 2010 (as the Hawaii Managing Member) that he "*did see Hawaii bank acct statements*" (*Ex. 2 at 10*)—never claiming the Jowdy loans transfers (or the Constantine consulting payments) were unknown, unauthorized, or a surprise to him worthy of raising to the FBI at that time—further refuting concealment at any time.

18

*a crime what's going down there.   He's stealing millions of dollars.*" (*10-28-2020, post-sentencing H'rg, Tr.48*), and Kaiser confirmed he "*actually audioed, videotaped*"…"*Jowdy and company, including his attorneys, Fernando Garcia, accountant, Antonio Marques.*" (*Id.*), and notified the FBI and government "*in 2013*" (*Id.*).   Kaiser's 2020 brashness forgot he was impeaching his 2015 trial testimony denials about his employer, Jowdy (*Trial Tr.1229-30, 1236* [denials], impeaching recording played at *Tr.1258*, and final perjury-hedge thru a word-vomit-like reply, *Tr.1313-14*).

Yet—ironically after Kenner was sentenced, the court still incorrectly believed the Hawaii loans were part of the Kenner prosecutorial case of unknown &/or unauthorized.[10]

---

[10] (*10-28-2020, Post-sentence H'rg Tr.37*):

> [Ms. O'Conner]: *Your Honor, as you are well aware, the crimes that were charged did not inclue the crime involving the funds that went to the resort.   The government investigation was expansive, certainly took a number of years, and the government takes its time rather than –…-- the government of course as you know is required to do significant investigation and make sure that its position is justified.*

> [Court]: *I was going back to say your position is the government didn't know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?*

The Court was less baffled than Kenner who read the conscience-shocking interaction weeks later.   It wasn't alleged—because the government could never have alleged the funds were unauthorized with the overwhelming exculpatory knowledge thru prior statements (almost entirely with former FBI agent Galioto present), including but not limited to (all available upon request from government Rule 16 production):
(1) 2009 arbitration testimony (Kaiser and Berard, Kenner—and Jowdy attorney William Najam);
(2) 2009 arbitration affidavits (Gonchar, Norstrom, Stumpel, Peca, Nash, Murray, et.al.);
(3) Nineteen (19), 2008-09 signed Arizona lawsuit disclosures to sue Jowdy for the funds (withheld by the government until forfeiture production, massive *Brady* issue);
(4) The fully disclosed Hawaii loans to Jowdy in the Arizona lawsuit Complaint, transaction-by-transaction;
(5) The two 2009 California lawsuits versus Jowdy to recover the same Hawaii-loan funds (including 19 Hawaii-Mexico investors);
(6) Jowdy's January 5-6, 2010 admissions to the Hawaii-loans during his California deposition (with Hawaii Managing Member Kaiser, and Hawaii-Mexico investors Woolley and deVries in attendance—and the videos sent to former FBI agent Galioto following the deposition).  Woolley live streamed the deposition to all Hawaii-Mexico investors in real time;
(7) Jowdy's admissions to receiving all the Hawaii loan funds again—during his March 24, 2010 FBI proffer (with Galioto present);

Perhaps most telling of the trial fraud of memory loss or graft was Jowdy's attorney, McSouther, excoriating Kaiser for lying at trial about lacking knowledge of the loans (*Id. at 54*)—when even Jowdy's attorneys verify their authenticity:

> [Attorney McC]: "*But, frankly, its kind of incredible to me that here's a man who in 2009 testified on behalf of Phil Kenner in an arbitration proceeding that was brought by Owen Nolan in which he said that he knew that the loan – the money was actually a loan to the property in advance of when the money was (indiscernible).   And then six years later testifies before Your Honor that he had no idea it was a loan until after the fact.  Its just – its mind boggling to me –*".

Even Hawaii Managing Member, John Kaiser (since 2007), explained to the FBI agent in October 2010 that transparent "*update[s]*" were circulated amongst the Hawaii-Mexico investor pool regularly [FBI notes]: "*update Letter on Hawaii project*" – [Kaiser]: "*JK-yes I recall letter PK made these; many times*" and [Kaiser]: "*never got money back from KJ [Jowdy]/Mexico*"; (*Ex. 2 at 3*).

Nevertheless—the government's constant haranguing thru its 2019 sentencing misrepresentations, contradicted their-own forfeiture evidence submissions, but may be the foundation for the Court's confusion almost 6-years post-trial to the lion's share of the proceedings monetary issues (*ECF No. 765 at 8: "Kenner used approximately $2.4 million to buy a personal stake in property in Mexico"*).[11]

---

(8)  October 2010 Kaiser FBI proffer verifying his 5+ pre- and post-loan meetings with Jowdy—and his verification of the "*update[s]*" with the Hawaii-Mexico investors: including the Jowdy loan issues (with Galioto present).

(9)  The three (3) 2011 SDNY Grand Jury testimonies (with Galioto present—<u>along with the SEC and U.S. Attorneys office</u>);

(10)   Etcetera.

- That is why the government never charged it—moreover resorted to layering trial morasses to confuse the most legally keen amongst us.

[11] As Kenner highlighted during his sentence allocution (*10-5-2020, Sentence H'rg Tr.60*), <u>no more than $280,000 of *proceeds*</u> were traced to Kenner, arguably for the previous personal loans to Eufora Board Member, Tim Gaarn (as Gaarn admitted to the FBI during his initial voluntary proffer January 11, 2012: *3500-TG-1 at 3, 4*).  <u>Kenner reiterated Gaarn's previous FBI-proffer admissions</u>; nothing more.

The government's repeated double-down about the Hawaii loan funds and the Cabo equity is <u>not provable</u> thru any banking documents—notwithstanding they debunked it themselves with government-forfeiture-36 and government-forfeiture-44, during their forfeiture presentation.  They simply have continued to mislead the investors to maintain

Despite their own *debunking* evidence (exculpatory to Kenner), the government continued post-trial to promote the misrepresentations to the Hawaii investors to maintain their "*cadre of followers*" (*ECF No. 765 at 43*) who believed the government and FBI agent were above reproach.   No investor has received the truth—documented by the government themselves.  In fact, the repeated government grandstanding against their forfeiture evidence, which led to the forfeiture of Baja Ventures 2006 despite its <u>untainted</u> capital contributions of $4.1 million (from Kenner's two documented partners, Stumpel and Lehtinen: *March 9, 2016, Forfeiture H'rg Tr.44-45*); see *United States v. One 1980 Rolls Royce, Vin. No. SRL 39955*, 905 F.2d 89 (5th Cir 1990) (holding that property cannot be forfeited to the extent that a claimant can establish that certain portions were purchased with legitimate funds).  IRS agent Wayne verified the untainted source of 100% of the Baja Ventures 2006 capital contribution (re-verified by the government submission of government-forfeiture-36), after originally feigning ignorance (not included *infra*):

> *Q: Would you kindly take a look at Page 2 of* **Kenner Exhibit F-2**? *  The third paragraph.   Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas?*
>
> *A [Wayne]: Yes.*
>
> *Q: What is your recollection of that, sir?*
>
> *A [Wayne]:* ==*That Kenner borrowed the money from Jozef Stumpel and Jerry Linton [sic].*==[12]

Strikingly, the government crossed ethical boundaries to ignore their prosecutorial knowledge of the aforementioned to reassert its baseless argument during summations and thru sentencing (5-½ years later: *ECF No. 765 at 8*).   So today—

---

the animosity towards Kenner because former FBI agent Galioto coerced testimony by misrepresenting Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*" (See Kristen Peca 2012-FBI recording, *supra*).

[12] Jerry Linton is actually Jere Lehtinen, Kenner's Baja Ventures 2006 partner who contributed $1.5 million, documented by government-forfeiture-36 as received by Jowdy on June 7, 2005.

how could the government admit their misrepresentations to the Court after such graft and affirmative summation statements during trial (regardless of their contradicting forfeiture production in evidence)—without the first of dozens of prosecutorial themes coming unraveled like a skein of yarn?

[*Tr.5721* – Michiewicz summation]:

> *"And what do you find out [about the Jowdy loan]? You find out, what did <u>that 5 million</u> or however much more or less that netted out to be, <u>what did it buy Mr. Kenner</u>? <u>It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas</u>. Didn't buy the players a 39 percent interest. <u>Him</u>. To this day, right now, <u>he is a partner in that resort</u>. <u>That's where the money went</u>. <u>That's what it bought him</u>. And on the backs, on the portfolios, <u>of the hockey players</u>."*

- **The government knew this was wholly false and prejudicial…**

And – [*Tr.5990* – Komatireddy rebuttal summation]:

> *"…you know what, <u>Baja Development Corporation</u>, on that chart, but there is some sort of misconduct; you don't know what the money was for. <u>You know exactly what the money was for</u>. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. <u>Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy</u>. <u>You know exactly what that's for</u>. <u>That's in evidence</u>."*

- **The government knew this was wholly false and prejudicial (and it was not in evidence)…**

And – [*Tr.5996* – Komatireddy rebuttal summation]:

> *"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

- **The government knew this was wholly false and prejudicial (and was debunked by the AUSA forfeiture attorneys)…**

The cumulative government-documented malfeasance, repeatedly misleading the Court and Hawaii-Mexico investors, has led to more unnecessary angst amongst the Hawaii investors (who have been systematically separated from the truth).   Nolan's counsel banks its anguish for the Court, re-quoting the government's misrepresentations, "*[b]ut for the stolen and laundered funds that were used by defendants to fund the down payment for the purchase of DCSL, there would not have been any purchase of DCSL.*" (*ECF No. 401 at 22*) (re-quoted by Nolan's counsel: *ECF*

*No. 988 at 2*).  Nolan's counsel adding, "*Mr. Kenner formed another Delaware limited liability company, Baja Ventures, 2006, LLC ("Baja Ventures")…Baja Ventures purportedly made a capital contribution to DCSL totaling $2,500,000 and, in exchange for that contribution, inexplicably received a 39% equity interest in DCSL.*" *Id.*

Yet—government-forfeiture-36 verified that Kenner's partners contributed $4.1 million, 4-5 months <u>prior</u> to any other investor funds were transferred by the investors directly to Jowdy's control.   Note: Their investment funds were only contributed <u>after</u> assurances from Lehman Brothers that they would fund the project—making the Baja Ventures 2006 funds wholly at risk as hard money deposits for months before confirmations from the lender were solidified (changing the entire risk profile of the CSL Properties, LLC ["CSL"] contribution funds—a.k.a. second round financing: typically receiving a lower equity valuation).   Despite the government droning about Kenner's uneven distribution of equity (factually inaccurate but echoed nonetheless by Kristen Peca in her October 19, 2020 post-sentence-day letter to the Court, *ECF No. 941: "Diamante Cabo san Lucas, is one of the investments that Phil Kenner had us involved in, through which he stole a lot of money from us in the form of ownership percentage"*), it was well documented by Hawaii attorney Madia (ignored again by the government to frame their "Russia collusion-esque narrative") that the agreed upon equity was still overly generous to the second round financiers, CSL (who frankly contributed less than 35.9% of the Kenner and Kenner investors investment capital directly with Jowdy—but were in line, minus Jowdy graft documented in a February 19, 2006 email to Kenner in Rule 16 production, to receive a commensurate 40% equity stake).  Attorney Madia updated the investors immediately after the discovery and exposure of Jowdy's alternative plans for not paying the Hawaii loans and interaction with Kenner and the investors[13] going forward (*Ex. 4*), *supra*:

> [Attorney Madia May 17, 2007 "*update*"]:"*Phil discussed the 40% (Baja Ventures 2006) – <mark>the 40% (CSL)</mark> – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This*

---

[13] Michael Peca <u>verified thru testimony</u> this exposé by Kenner to the Hawaii-Mexico group upon first discovery during his 2011 SDNY Grand Jury testimony (*Ex. 6 at 30*):

> [Michael Peca]: "*Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.   Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.   It was never paid back.  <u>And then the communication basically seized at that point from him</u>.   That was kind of the whole sticking point as far as me <u>and the other guys</u> with Mr. Jowdy.*"

*also included their refusal to now address the Hawaii loan repayments like they don't exist.*"

This real time representation of the equity-split thievery by Jowdy was presented during sentencing as a mitigating factor (*10-5-2020, Sentence Tr.54*)—with Kenner identifying thru the corporate attorney that he would buy out anyone at that time (with no takers for the offer in 2007), "*Phil has offered to buy any or all of you out of the contributions to CSL Properties.   We do not know if our Mexico legal efforts will be successful.  And Phil wants to make it clear that you can cash out now, if you want.  Just contact me and I will handle the paperwork with you and your personal attorneys.*" (*Ex. 4*) (Read into the sentence-day transcript records as a mitigating factor: *10-5-2020, Sentence Tr.56*).

Even after the 2016 forfeiture debunking, the FBI agent convinced the investor's Florida attorney, Steve Main, that Jowdy had been thoroughly investigated and reiterated that Kenner *stole* the money.  Thus, without any personal knowledge and solely relying on the integrity of Agent Galioto, without foundation—investors' attorney Steve Main declared February 20, 2017:

> [Attorney Main]: "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project and the relationship between Kenner and Jowdy has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"[14]

The Court knows the government ignored all Court requests to help identify the actual "tracing of the money"—because it would have exposed their never-ending

---

[14] The government knew a week before trial that Jowdy robbed over $417,000 of the first $800,000 invested in the Diamante del Mar project in August 2002 by Kenner, Khristich, and Woolley.  These thefts were only the first frauds by Jowdy (less than 3 weeks into the new investment relationship) of the tens of millions robbed and thoroughly concealed by those who are most at risk thru *above the law* influence.  The government *specifically* subpoenaed Jowdy's August 2002 Baja Development Corp bank record (available upon request, including the subpoena acknowledgment)—and ignored their prosecutorial conflicting empirical evidence about Jowdy's "*innocent third party*" status as Probation represented in their July 2016 addendum—the same person Kaiser affirmed 10-28-2020 he already explained to the government "*in 2013*" was "*stealing millions of dollars*" (*10-28-2020, H'rg Tr.48-49*).  Kaiser's exculpatory statements were 2-years before trial and before the Kenner indictment—fully alerting the government that their cover-up theories about Kenner were inaccurate (from a Jowdy insider).  The 3500 FBI-notes from these shocking exculpatory revelations have never been disclosed.

grandstanding about facts never substantiated. The Court acknowledge this 4-years post-trial (*July 2, 2019 hearing Tr.24-25*):

> [Court]: "*I'm a judge.   I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody. And I don't think we're at that point.   If the government just continues to not really focus on this, I'm going to have to try to figure out myself in terms of where I should draw the line.*"

The government never provided back-up tracing to their fabrications—considering the government-forfeiture-36 and government-forfeiture-44 tracing documents were exculpatory to Kenner's defense.

<u>Other integrity inaccuracies</u>
Sentencing allegations of Kenner's "*ridiculous*" allegations of witness inconsistencies between their prior statements and trial testimony was anything but—again believed to be lost in the five-and-a-half years of post-trial morass by the Court.  For brevity, a mere subset of documentable witnesses and Rule 16 production evidence is listed, *infra—all available for briefing or oral arguments*:

(1) Gaarn—
    a.  He identified the Kenner loans to the FBI in 2012 (*3500-TG-1-r*); forgotten at trial (*Tr.2583*).   In proffer, Gaarn identified loan repayments made to Kenner—with no other documented transaction paying Kenner other than those 2009 transfers.   Stipulated bank records confirm the 2009-only loan repayments.
    b.  The 2009 Eufora operating agreement (signed by Gaarn) verified Gaarn's ownership of the Eufora stock that he sold in 2008-09—impeaching his testimony (*Tr.2628*).
    c.  The 2005, 2006, 2007 and 2008 Eufora tax returns verified the Kenner to Gaarn 2005 transfer—and Gaarn's Standard Ventures, LLC ownership (*Tr.2570-71*)—impeaching his testimony (*Tr.2628*: attempting rejuvenation of the fraud thru re-direct testimony, *Tr.2667*).
    d.  Ultimately—Gaarn assisted the FBI in recording Kenner for 5-hours during *Operation Pederpuck* in 2012 (in 3500 production).   During the 5-hours, the closest Gaarn came to discussing <u>his</u> private stock sales was asking Kenner for advice about <u>his</u> tax bill for selling "*his stock*".   It is obvious in hindsight—Gaarn implicitly knew that he could not ask

Kenner about his stock, misrepresenting it as Kenner's, without a terse "WTF?" response from Kenner during 5-hours of surreptitious recordings.   The theory that is was Kenner's stock would have been the premise of the sting operation.

(2) Ranford—

    a.   Ranford filed a 2013 ProSe adverse Proceeding versus Constantine's Arizona Federal bankruptcy (verified by Ranford, *Tr.2860*)—identifying "*upon information and belief Ranford believes Constantine personal sold shares in Eufora as follows:*" listing himself as, "*William Ranford on 07-07-2008 $200,000*"—coinciding with his 2012 FBI proffer identifying the <u>exact</u> date and amount of each Eufora purchase, in addition to identifying the two 2009 purchases from Tim Gaarn.   Ranford verified filing the 2013 Adverse Proceeding to Constantine's bankruptcy (*Tr.2860-61*), just like Rucchin verified thru *foggy* memory (*Tr.2810*).  Ranford could not recall verifying that independently to the FBI in 2012 (*Tr.2823-24, 2858-60*).

    b.   Ranford could not recall his 2009 GSF transactions, which he also detailed to the FBI in 2012.  Ranford was deposed in 2014 (8-months pretrial) and re-verified the GSF transactions (*3500-WR-3 at 11, 12, 27*), corroborating what he verified to the FBI—also forgotten 8-months later during his trial testimony (*Tr.2858-60*).

(3) Chronic Traumatic Encephalopathy ("CTE")—[15]

    a.   Berard sued the NHL for CTE (brain damage) in 2014 along with 300+ NHL players in a class action lawsuit (including several other involved as alleged victims in the instant case)—pretrial.   This verifiable memory loss issue was withheld by the government—hi-lighting its critical nature considering the government's concealment prosecutorial themes of *what*

---

[15] If identified pretrial as known to the government (and concealed from the defense, a *Brady* violation)—Kenner would have presented Dr. Ann McKee, the foremost CTE specialist in the world to give expert opinion about "memory loss" and its resulting symptoms from CTE (*Ex. 8*).

Note: the government, not Kenner, first raised the issue of "*memory loss*" by their witnesses in their January 18, 2017 submission as defense to the multitude of clearly inconsistent statements Kenner raised post-trial by the government witnesses—contradicting volumes of their previous empirical evidence (*ECF No. 440 at 16*: citing, "witness perjures herself when 'she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

*investors could not remember be told.*   At least four other Kenner investors have since been identified as participating in the CTE Class Action litigation in 2014 for CTE versus the NHL.

(4) Kristen Peca—

    a.  *Supra*, she verified on the 2012-FBI recoding of Kenner that she was not aware of Michael Peca's LOC until the 2012 phone call.   Thus—her entire testimony about *involvement* in the transactions was fabricated for trial (*Tr.696-704*)—specifically including the transfer of bonds as collateral (*Tr.699*).   No bonds were ever transferred—verifiable thru Northern Trust bank statements stipulated into evidence.   Sadly—the government had Michael Peca verify he authorized the bond transfer to Northern Trust, the same one that never occurred (*Tr.384*).

(5) Michael Peca—

    a.  Michael Peca verified to the 2011 SDNY Grand Jury that he expected <u>all</u> of his Hawaii investment to be part of the Jowdy loan—identified as "*The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.*

        i.  These funds were greater than the entire $1.315 million traceable to investors named as victims in the superseding indictment (*ECF No. 214*).

    b.  Peca verified his SDNY Grand Jury testimony as "*truthful*" (*Trial Tr.498, 650*).

(6) Nolan—

    a.  Nolan's wife, Wells Fargo private banker, and personal assistant all independently handled LOC transactions for Nolan—documented in multiple emails; *none of which included Kenner* (*ECF No. 892 at 6-7*).

    b.  Northern Trust banker, Aaron Mascarella, verified in a 2009 deposition that he spoke with Nolan about Nolan's LOC between 2003-06 (*Id. at 6, 26 f.17*).

    c.  Nolan and Kenner exchanged 5-days of text messages (including 2 phone calls) before Nolan signed his 5th LOC renewal, all detailed in the texts Nolan had no "*memory*" of at trial (*Tr.2065-66*) (*ECF No. 668 at 271-274*).

d. In 2020—Nolan's counsel identified Nolan "*contributed*" to the Hawaii real estate project, simply alleging Kenner "*stole*" the funds and never sent the loan money to Jowdy (*ECF No. 843*) (a Galioto-Jowdy cabal fabrication: verified thru the Kristen Peca 2012-FBI recordings, *supra*).

e. Nolan's 2006 Hawaii k-1 tax records confirm his $2.3 million "*capital contributed during the year*" to the Hawaii "*investment*".   This document was produced by Nolan during his 2009 arbitration evidence productions—ironically not argued as "*stolen*" in the arbitration but moreover "*unsuitable*".   The government falsely alleged at trial only Kenner had the K1 (*Tr.2145: Bates Stamped Nolan00005044*—and forwarded to the SEC in 2011 by Kenner after the Nolan arbitration: *Bates Stamp PK_SEC_013677*) (*ECF No. 892 at 8*).

f. The Northern Trust bank subpoena records included over 19 Nolan signatures during the 5+ years his LOC was open—never seen by the court or jury—granting full authorization to access Nolan's "*investment*" funds.

(7) McKee—

a. He testified he was <u>never</u> told about the elements of the Constantine GSF plans (*Tr.1820-24*).   His real time text communication with Kenner (the night of the initial face-to-face meeting impeached his testimony (*ECF No. 668 at 159-161*).   McKee also signed off his acknowledgement of the exact same use of funds for Constantine via email "*Acknowledged and approved..*" on 5-18-2009 (*GX-6602*, introduced at *Tr.1819*).   In the week between the meeting and his disclosure signoff, McKee received another full-disclosure email from Constantine identifying every element he testified he was never told (*ECF No. 668 at 250-252*).

b. McKee was <u>only</u> involved in the GSF element of this case, according to the government (*Tr.1846*, [AUSA Komatireddy]: "*Your Honor, we object based on relevance. We also objected because Mr. McKee is here as a witness with respect to the Global Settlement Fund. He's not alleged to be a victim of the Eufora fraud in this case.*").

(8) Berard—

a. He verified his Jowdy loan knowledge and authorizations during his 2009 <u>voluntary</u> arbitration testimony—including the Hawaii Company paying his monthly LOC fees (as expected) (*ECF No. 750 at 14-15*).

b. Berard alleged he was never told about his LOC default—despite text communication between Kenner and Berard 5-days before he authorized the seizure of his collateral (*ECF No. 668 at 361-362*).

28

    c.  Berard was <u>only</u> involved in the Hawaii element of the instant case.

    d.  Berard led the 2010-11 Eufora loan buyout efforts with NY Attorney Stolper and the Giuliani group—specifically with board member Gaarn, Kaiser, McKee, and Peca[16], none of whom could recall their participation in the buyout (with 100s of texts between the parties in real time about buying out the loan[17]) (*Tr.3106-11*: Berard denials).

    e.  Berard submitted a 2020 sentencing letter for the Constantine proceeding, alleging he bought Eufora stock in 2008 from Constantine. Yet—no 2008 transaction ever occurred.   Berard's only Eufora investment was in 2004—simply confabulated thru his admitted CTE symptoms (*ECF No. 948*).

(9) John Kaiser—

    a.  He voluntarily verified his Jowdy loan knowledge during 2009 arbitration testimony.   Kaiser was the Hawaii Managing Member when he testified in 2009 (*ECF No. 668 at 201-203*).

    b.  Kaiser verified vetting the Jowdy loans to the FBI in October 2010—but denied telling the FBI what was in the raw notes (*Tr.1120-22*) (*Ex. 2 at 2, 3, 10*).

    c.  Verified the Hawaii "*update[s]*" by attorney Madia to the FBI in October 2010—disputing his lack of Jowdy loan knowledge (*Ex. 2 at 3*).

---

[16] July 14, 2010 buyout demand from Peca to Kenner—14 days after the initial conference call with attorney Stolper:

| 147 27 | +171637 43234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC+0 ) | R e a d | [Michael Peca]: ***If not all willing members get a chance to be part of the loan buyout,*** *mean more % there may be a* ***lynching****. FYI* |
|---|---|---|---|---|

[17] July 4, 2010 Berard text to Kenner—only 5 days after the initial June 30, 2010 conference call announcement of the Constantine/Eufora investigation by attorney Stolper:

| 1 4 3 5 1 | +14015 246929 Bryan Berard* | 7/4/2010 3:26:05 AM(UTC+0 ) | R e a d | [Berard]: U heard that he's lawyer from LA called Michael? Michael said convo went well. **I'm sure if Brent knows all Hockey guys r against Tommy we shld. B able to buy loan and fuck Tommy**. Hopefully that's still an option |
|---|---|---|---|---|

Berard further *confirmed* his solicitation of Jay McKee to Kenner for the same loan buyout:

| 1 4 8 0 | +14015 246929 Bryan Berard* | 7/15/201 0 1:31:11 PM(UTC+0 ) | R e a d | [Berard]: Call me now or at 1015am est. Michael [Stolper] wants to talk to me u and jonny [Kaiser]... *Mckee says before he signs he wants to help pay off loan too* |
|---|---|---|---|---|

    d.  Was identified by Jowdy loan signature "witness" as having a hand in the creation of the Jowdy loan agreement for the Hawaii partners, during a July 2, 2009 Arizona deposition about the loan agreement—as part of the Arizona loan lawsuit versus Jowdy with attorney Baker.   The verification deposition was turned over to the court by Kenner after the Court's forfeiture hearing request (*April 6, 2016, Tr.289-290*).[18]

(10)  Lanie Donlan—

    a.  Donlan is Berard's New England real estate partner.

    b.  Donlan never worked directly for Kenner as she testified.

    c.  In 2015—Donlan, Berard, and Kaiser were caught lying in an Arizona courtroom about nearly a dozen alleged forgeries (still at the time Jowdy was employing them)—all disproven thru empirical evidence, as part and parcel to attempting to steal over $500,000 from Promissory Note lenders: Sydor, Ranford, Nash, Khristich, and Lehtinen—and retain over $1 million from Kenner (all documented in that case by the 2015 trial

---

[18] July 2, 2009 signature witness Gaudet testimony, deposed by Jowdy's Arizona counsel:

*Q: During the meeting with Mr. Kaiser, did you – did you discuss at all the loan – this loan agreement document, Exhibit 1?*

*A [Gaudet]: He asked me if I could recall anything, yes.*

*Q: Tell me everything you remember about what you said in the discussion about the loan agreement document?*

*A [Gaudet]: With John Kaiser?*

*Q: Did he ask you if you remembered signing it?*

*A [Gaudet]: Yes.*

*Q: Did he mention that he had any involvement with the creation of this loan agreement document?*

*A [Gaudet]: Yes.*

*Q: What did he tell you?*

*A [Gaudet]: He told me that it was a document that he needed for – it was a document he had for the Hawaii entity, for the Hawaii company.*

judge)—after a "fraudulent transfer" (*ECF No. 668 at 212*) conveying title thru a title fraud process—known to the FBI.[19]

    i. The critical Donlan-Berard Arizona case document was notarized in Massachusetts after Berard and Donlan signed and witnessed the "power of attorney" document. Berard's text communication with Kenner *the same day* verified Berard's signing and mailing it to Kenner via Kenner FedEx account (*ECF No. 782 at 8-9*). The FBI was aware of the Berard-Donlan fabrication (*3500-LD-2*).

    ii. Berard lied about the document forgeries on his and Donlan's behalf during a 2014 Arizona deposition that the government never delivered to Kenner pretrial (identified by Kenner as a Rule 33 item) (*3500-BB-??*).

    iii. Berard also claimed during the 2015 Arizona trial that he deposited a $160,000 investment in the Arizona project with Kenner—but could <u>not</u> produce a single bank record (more CTE-coping confabulation).

(11) Northern Trust Banking records—

    a. Kenner exhibit 210 was not received (and only partially filled) after week seven of the trial immediately after the government rested its case-in-chief (introduced at *Tr.4206*). The defense counsel presented none of the individual exculpatory documents to the court—nor recalled the Northern Trust LOC investors to verify their 5+ years of knowledge and signatures.

        i. Note: Despite some trial insinuations that investors found out about their LOCs *afterwards* (like Juneau, *Tr. 136*—despite dozens of emails in Juneau's 3500 production to the government verifying detailed 2005 discussions of his Hawaii investment and Hawaii LOC "*loan*" to support it)—there is <u>not</u> one FBI proffer or

---

[19] The Promissory note Arizona interveners attorney wrote to FBI agent Galioto pretrial (10-3-2014), "*The recorded documents show that towards the end, Kaiser and Berard cut Kenner out of their deal and are now attempting to keep all of the equity proceeds from the sale of the property for themselves…*". This email was discovered post-trial by Constantine's attorney, never turned over by Galioto (another of many documented *Brady* issues pending in this case—raising more ulterior motive issues for the two government star witnesses).

    "[D]etermining that a new trial was necessary, because lies of his key witness [John Kaiser] who '**tied all the pieces together**' even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

communication with Kenner (or Northern Trust bankers) that raise any issue about originating signatures for the LOC—because each investor independently signed every year to renew the LOCs directly with Northern Trust bankers.

b. The unseen records include *authorizations* to access the funds.  The FBI field office <u>verified</u> the investors knowledge of it on arrest day, stating Kenner "*convinced several NHL players to open lines of credit, to which Kenner was given access*".   The subpoena documents included the "*investment*" amount and expectations, such as "*$2,200,000*"..."*Investment in Little Isle IV LLC*" (Nolan example: signed and dated in his own hand-writing).   Annually, the subpoena verified the amount of funds used, such as "*Amount paid to others on Borrower's behalf*"..."*$1,600,000*" (Peca example, impeaching his trial testimony: *Trial Tr.429-30*).

c. Michael Peca signed his 2005 Disbursement Request & Authorization form 3-months after his account opened which clearly identified "*Amount paid to others on Borrower's behalf*"..."*$1,600,000*".

(12)   Eufora—[20]

a. A July 8, 2010 letter from attorney Stolper to Constantine's Eufora attorneys identified the private stock allegations by Constantine; that board members Gaarn and CEO Gentry were involved in <u>stealing</u> corporate stock and re-selling it to the investors.   The Giuliani group's investigation on behalf of the investors debunked this.

b. A July 16, 2010 letter from attorney Stolper to Constantine's Eufora attorneys included a multipage disclosure for 29 Eufora-associated parties to sign for official representation from Stolper and Giuliani's group.   Kenner was not a represented party—concurrent with any allegations of Kenner-Eufora wrongdoing.   Twenty-nine (29) Eufora parties signed off on Attorney Stolper's incremental disclosure to Constantine's attorneys and his internal letter.

　　i. Both July letters identified the 2008 and 2009 stock sales by Constantine and Gaarn.

c. On or about August 3, 2010—Kenner recorded Constantine at Home Depot in Scottsdale, Arizona.   Constantine reiterated his "stolen stock" rhetoric to Kenner who scoffed on tape at the nonsense.   Unfortunately—the court at sentencing read aloud the Constantine nonsense, while misunderstanding the Constantine "stolen stock" allegation (*10-5-2020,*

---

[20] The Eufora investigation attorneys did <u>not</u> represent Kenner in these transactions.

> *Sentence Tr.81: "What do you think will happen when $700,000 shows up going from the players that already bought it the first time to the bank account to Tim Gaarn..."*).  Note: Constantine was not concerned about any legit sale, yet the Court misconstrued Constantine's textual fabrication.   This was identified as common by Constantine's trial attorneys in their 18 U.S.C. 2255 reply as well as during cross-examination of Kenner (*Tr.4425*, agreeing with Kenner about Constantine's confusing analogy rhetoric: *"I know what you mean"*).

Dozens and dozens more specific prior statements and stipulated evidence supported every one of Kenner's assertions that government witness were not forthright with their testimony; unless influenced by CTE or other undue circumstances effecting memory as the government defended in 2017.   Note: Suspiciously absent, the government never substantiated the witness testimony as the truth.

Disparity issues

For additional consideration, even the government solicited the court to provide a non-disparate sentence between Kenner and his co-defendant—offering, "*the government has requested a sentence for Constantine of no less than 20 years' imprisonment (240 months).  See ECF No. 764 at 45...In light of the Court's [guideline] rulings, the government respectfully submits that a sentence at the top end of the revised guideline range of 135 to 168 months is appropriate in this case...because of 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.' 18 U.S.C § 3553 (a)(6).*"; (*ECF No. 946 at 3*).   Note: Kenner had no prior criminal history, in contrast to Constantine's Criminal History II.   The government further substantiates the harshness of Kenner's detainment, "*Constantine cannot argue any basis for mitigation at sentencing due to conditions of confinement.   Constantine has been at liberty since June 12, 2014*" *Id. at 4*; noted by Constantine's Presentence Report, "*[B]eing in jail under the pandemic...deserves some mitigation here.*" *Id.*

The harshest 141 days of all conditions occurred, unforeseeably to the Court, after Kenner's sentence—due to "second wave" conditions (reference, Dr. Anthony Fauci, head of the Presidential Pandemic response team).   The atypical lockdowns currently continue with slight modifications Monday thru Fridays (still maintaining over 22-½ hours of lockdown daily—when offered).

Conclusion

Moses gave a complete reckoning to the Jewish people of what their donations to the build the Temple had been used for.   Financial transparency is essential for all organizations and especially those that are supported by the community. Reference—Book of Exodus (38:21-31)

The empirical evidence supports Kenner was overtly transparent; simply forgotten for any number of reasons by the cherry-picked subset of investors.

For the foregoing reasons, the defendant respectfully submits that this motion under 18 U.S.C. 3582(c)(1)(A) and the FSA be granted with an appropriate reduction in sentence.   In the alternative, an evidentiary hearing is requested if required to address the consequences on the proceedings.[21]

Respectfully submitted,


Phil Kenner

---

[21] Ironically (perhaps more appropriate in this circumstance than others)—in November 2020, during the 141 day 24-7 lockdown, MDC Brooklyn requested Kenner go to an outside hospital—again—(requiring 3-weeks +/- of more special-quarantine upon re-arrival at the facility) in order to have his hearing aids "tuned".   Kenner refused and demanded to speak with MDC's head medical person (Dr. Bailor, a fine man).   Dr. Bailor could not understand why Kenner was refusing to go "outside" (in the Pandemic – to a Red Zone -- with NYC hospitals over-infected, in the same Red Zone) and get his hearing devices "tuned".   It required nearly 10-minutes of explanation from Kenner to Dr. Bailor to force the understanding that MDC has taken Kenner out for "tuning" at local hospitals (approximately 5 times) and "specialized audio analysis" at a E.N.T. specialist in Manhattan (approximately 2 times) in the last 5 years (all verified by Dr. Bailor during the conversation thru his online medical records)—**all while Kenner has never been given the hearing aids in the first instance** that the audio specialists recommended with Kenner's severe hearing disorder (a genetic issue, passed along to Kenner's progeny, but exacerbated thru CTE symptoms). Every previous external hospital visit to the ENT specialists were after Kenner was supposed to receive his BOP authorized devices—which never occurred.   At this point and perhaps post-COVID-19-vaccination, this matter can be handled at Kenner's next facility— especially now that the collateral effects has passed in Kenner's ProSe courtroom environs where Kenner's handi-cap has hindered specific oral arguments and real-time understanding of the proceedings (and who knows what else—et.al.).

- Under Compassionate Release under 18 U.S.C. 3582(c)(1)(A) considerations, the BOP violated the Eighth Amendment, acting with "deliberate indifference" to an "unreasonable risk of serious damage" to a post-conviction detainee's health. *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).