

**Government Exhibit**

3500 - MP - 5
13-CR-607(JFB)

ORIGINAL

1

2    UNITED STATES GRAND JURY

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - x

5    UNITED STATES OF AMERICA

6    -v-                                    August 2009
                                           :Special
7    PHILLIP KENNER                         :

8    - - - - - - - - - - - - - - - - - - x

9

Peca confirms knowledge of loans to Jowdy from Hawaii investors "as a group" -- Pages 30-33, 35, 40, 42, and 45...

                         UNITED STATES COURTHOUSE
                         500 Pearl Street
                         New York, New York 10007

                         March 29, 2011
                         10:20 a.m.

15   APPEARANCES:

16           ARLO DEVLIN-BROWN, ESQ.

17               Assistant United States Attorney

18

19

20                   Rivka Teich, R.P.R., C.S.R.
                     Acting Grand Jury Reporter
21

22

23

24

25

26

GRAND JURY
EXHIBIT
2
10-28-13

```
 1                    M. Peca   03/29/11                    2
 2              (Colloquy Precedes.)
 3              (Witness Enters Room.)
 4              (Time Noted: 10:20 a.m.)
 5   MICHAEL PECA, called as a witness, having been
 6         first duly sworn by the Foreperson of the
 7         Grand Jury, was examined and testified as
 8         follows:
 9   BY MR. DEVLIN-BROWN:
10      Q    Please state an spell your full name for the
11   record.
12      A    Michael, M-I-C-H-A-E-L, Anthony, A-N-T-H-O-N-Y,
13   Peca, P-E-C-A.
14      Q    Mr. Peca, I'm an Assistant United States
15   Attorney -- my name is Arlo Devlin-Brown -- that just
16   means I'm a federal prosecutor.
17              You've been subpoenaed to testify to this Grand
18   Jury about potential violations of federal law,
19   including laws relating to securities fraud, bank fraud,
20   other types of fraud offenses.
21              If this Grand Jury uncovers evidence of
22   criminal activity it can return indictments on those
23   charges or any other charges of federal law that it
24   finds evidence of.
25              I want to advise, you first of all, I'm sure
26   you know this, you're not a target or subject of this
```

3

2  Grand Jury inquiry.  You've been subpoenaed solely

3  because we believe you may have information relevant to

4  it as a witness.  I wanted to give you some piece of

5  mind there and explain that to you.

6          You did receive, I guess, from your lawyer a

7  subpoena for today; is that correct, Mr. Peca?

8      A   Did I get it from him?

9      Q   Yes.

10     A   No, to my home in Buffalo.

11     Q   Okay.  We're going to get started in a few

12  minutes.  I'll give you an overview of things I'll talk

13  about, I'll ask you questions about your background,

14  then we're going to ask you questions about various

15  financial investments that you've made, some of the

16  people you've entrusted with money, and go over some

17  documents as well.  Okay?

18     A   Okay.

19     Q   Before I do that I want to advise you of rights

20  and responsibilities you have before the Grand Jury,

21  just so you understand how it works.  I'm sure you may

22  have gone over some of these things with your attorney,

23  but it's a good idea to do it on the record as well.

24  Okay?

25     A   Okay.

26     Q   So, first of all I'm sure you understand you

M. Peca   03/29/11                                    4

1

2   have a right not to incriminate yourself.  Do you

3   understand that?

4          A    I do.

5          Q    So if you believe that a truthful answer to a

6   question would incriminate you, you have the right to

7   refuse to answer that question.  Do you understand?

8          A    I do.

9          Q    Do you understand that your testimony is taken

10  down here by a court reporter?

11         A    I do.

12         Q    You're not recording this yourself in any way?

13         A    No, they took everything I had at the front

14  door.

15         Q    They do it to the Grand Jurors too.

16              So you understand then that the testimony taken

17  down can be used in any kind of proceeding?

18         A    Yes.

19         Q    Do you have an attorney representing you in

20  this matter?

21         A    Yes.

22         Q    Who is your attorney?

23         A    Ronald Richards.

24         Q    Does he represent anyone else connected to

25  these issues?

26         A    The other two gentlemen here today, Turner

1                      M. Peca    03/29/11                    5

2     Stevenson and Darryl Sydor.

3           Q    Do you know if he now or previously represented

4     anyone else connected to this Grand Jury's inquiry?

5           A    Not that I'm aware of.

6           Q    Do you know, for example, if he's represented

7     Phillip Kenner?

8           A    I believe he has.

9           Q    Do you have any understanding as to whether he

10    continues to represent him?

11          A    That I'm not sure.

12          Q    As you probably were told, your attorney is not

13    allowed inside of the Grand Jury room.  But I want to

14    advise you that if you want to talk to him at any point,

15    whether because there is a particular question or if you

16    need to go to the bathroom -- you don't to talk to him

17    for that -- let us know and let the Foreperson know and

18    she'll give you a break.

19          A    Great.

20          Q    Do you understand that you're required to give

21    truthful, non-misleading testimony to this Grand Jury?

22          A    Yes.

23          Q    Do you understand that if you make any false

24    statements or give misleading testimony under oath, you

25    could be prosecuted for perjury or making false

26    declarations to a Grand Jury?

M. Peca   03/29/11                                    6

2        A    Yes, I do.

3        Q    Do you understand everything that I've asked

4    you so far?

5        A    I have.

6        Q    Let me advise you of one other thing before we

7    start.  The Grand Jury proceedings are secret.  No one

8    in this room, with the exception of you, is allowed to

9    reveal what you've said, here absent a court authorizing

10   it.  So your testimony is secret.  You can share it with

11   whoever you want, but no one else will know what your

12   testimony is unless you do so or a court orders it.

13       A    If I tell my wife, it's not a big deal?

14       Q    It's up to you.

15            Who knows that you're testifying here today?

16       A    Who else knows, just my wife and the guys that

17   are in the other room.

18       Q    Does Phil Kenner know?

19       A    I believe he does, yes.

20       Q    Why do you believe he knows?

21       A    I think he was scheduled to come and speak to

22   somebody and it was postponed because of this proceeding

23   today.

24       Q    Let's go over -- start with a little background

25   about yourself.  Where are were you born?

26       A    I was important in suburb of Toronto, Ontario,

Peca does not say "BECAUSE Kenner prepped me last night on the phone for this testimony" -- like he misled the EDNY court 4 years later (*2015*)...

```
 1                      M. Peca    03/29/11                   7

 2    Canada.

 3         Q    You're a Canadian then?

 4         A    Dual citizen, I live in Buffalo, New York and a

 5    U.S. citizen as well.

 6         Q    You've had a long career in hockey?

 7         A    Played 15 years.

 8         Q    Where did you start your hockey career?

 9         A    I started in Vancouver, British Colombia, then

10    spent time in Buffalo, New York, New York Islanders,

11    Edmonton, Toronto and Columbus.

12         Q    Have you played in the NHL at some point?

13         A    That was the 15 years, yes.

14         Q    All 15 was in NHL?

15         A    Yes.

16         Q    What are you doing presently?

17         A    Presently I do some on-air analysis work up in

18    Toronto for NHL.  I sit on various charitable boards,

19    and coach youth hockey.

20         Q    Where do you coach youth hockey?

21         A    In Buffalo.

22         Q    Let's start off with Phil Kenner, when did you

23    first meet Mr. Kenner?

24         A    I first met Phil Kenner from my first agent I

25    had when I turned professional, Anton Thun, either in

26    '95 or '96, my first year in Buffalo.  I believe there
```

M. Peca   03/29/11                                    8

1  was a meeting at my house.  I had started making a lot

2  of money at that point and wanted to get into a program

3  where I was budgeting myself and responsible with my

4  money.  So I was introduced to him; I think several of

5  Anton Thun's clients were.  And then we started working

6  a relationship from that point on.

7      Q    Did you come to any agreement with him at that

8  meeting or shortly after with Mr. Kenner about what

9  services he performed for you?

10     A    I'm sure I did, yes, I don't recall the exact

11 transaction but I started working with him.  I'm sure

12 that took place before.

13     Q    What was it in general that he started doing

14 for you?

15     A    Just helping me manage money, budget myself,

16 and trying help me secure a future.

17     Q    Does that mean he would sort of have access to

18 your bank accounts and would tell you, give you the

19 money to use and say you need to spend more or less?

20     A    Not my savings or checking account.  But it was

21 a case where I believe at the time it might have been

22 Wells Fargo was the bank that held, whether it was

23 investing in Pepsi Cola or whatever it was.  And my

24 paychecks would go there and I would get wired to my

25 account from those paychecks whatever I needed to pay

M. Peca   03/29/11                          9

utilities and daily expenses, things of that nature.  I

didn't have an abundance of money in my checking account

that would force me to want to spend it.

    Q   You would have in your checking and savings

account your day-to-day living expenses.  Then stuff you

were putting away for the long-term in some other

account?

    A   Correct.

    Q   This other account was one that Phil Kenner

managed?

    A   Yes.

    Q   Did he have any kind of company when he

started?

    A   At the time I believe he was working with State

Street Capital out of Boston.  I think that was the

house.  There was a gentleman I dealt with there, I

can't remember his name though, it was State Street

Capital in Boston.

    Q   Would you get statements on what the investment

account was in?

    A   Every month.

    Q   What kind of authority did -- let's start at

the beginning -- did Phil Kenner have authority in terms

of how he could invest that money in that account?

    A   I won't say a full autonomy, but he had power

M. Peca   03/29/11                    10

2   of attorney to help me.  If I needed to send money, he

3   could to it on my behalf.

4        Q   What if he had an investment idea?  To take

5   your example, buy Pepsi Cola, was that something he

6   needed to check with you first to see if you wanted to

7   do it, or did he have authority to just make investment

8   decisions on your behalf?

9        A   I think when it comes to that level of

10  investing, whether money to goes to Pepsi or Disney, I

11  didn't need to know the details.  I didn't have

12  experience in that area.

13       Q   Do you still use Phil Kenner as an investment

14  adviser?

15       A   I don't.  I've been retired for two years and

16  Greenberg Gram out in California handles that stuff.

17       Q   How long has Greenberg Gram been handling --

18       A   They've managed my account for quite a few

19  years now.

20       Q   How did Mr. Kenner, to your knowledge, earn

21  money for performing these services for you?  What was

22  your arrangement?

23       A   There was a percent, I can't remember the exact

24  amount, about $50,000 a year.  The reason I stopped

25  using him, because I was done I had started handling my

26  own insurance issues, mortgage issues.  When I was

M. Peca   03/29/11                                    11

playing I didn't have the time or the ability to do a

lot of that myself.  He was able to do a lot of that for

me.  It just got to the point where my wife and I were

able to do that stuff.  We didn't require the services

so we ceased the relationship.

Q   When was that?

A   Two, three years ago.

Q   Was it a flat fee or?

A   Percentage-based, it worked out to about 12,500

a quarter.

Q   Was it a percentage of the money that he had,

that he was managing for you?

A   Correct.

Q   Did he get any additional money, as far as you

know?  If he made transactions with the money would he

get a percentage?

A   No, not that I'm aware of.

Q   Do you know if he ever put your money into

projects where he had a personal interest?

A   No.  More than -- other personal interest as

far as him getting a kickback-type scenario?

Q   I mean him investing your money into say a

company he owned or that he had some kind of ownership

in?

A   No.

1                    M. Peca    03/29/11

2       Q    You're not aware of any situation?

3       A    No.

4       Q    What about what you were talking about,

5  kickback scenario?

6       A    Not that I'm aware of.

7       Q    Some of your money just going to just stocks

8  and bonds?

9       A    Primarily.

10      Q    What about other types of investments that

11 Mr. Kenner made for you?

12      A    I didn't start getting into outside the stock

13 market and bonds until it was about 2002, 2003.

14      Q    What happened in 2002, 2003?

15      A    I made my first investment in a company

16 TechNeck.  The president at the time was Bob Thompson.

17 And it was a telecommunications company that basically

18 put cable lines into schools for educational purposes.

19 That was my first venture outside of the stock market.

20      Q    Who recommended Tech Connect to you?

21      A    Phil Kenner brought the idea to me.

22      Q    How much money did you invest into it?

23      A    $250,000.

24      Q    Are you aware of whether the investment made

25 money or not?

26      A    It was promising at the start.  Unfortunately,

M. Peca    03/29/11                    13

1  the war took place and Federal funding dried up for

2  educational funding.  The company was acquired by Dime

3  Tech.

4      Q    What happened to your investment, did you get

5  any of it back?

6      A    No, we did not.

7      Q    What is the next sort of company that you

8  invested in?

9      A    In chronological order --

10      Q    If you can't do chronological.

11      A    I can't recall now.

12      Q    Forget the next one, what are some of the other

13  ones that you invested in?

14      A    Impact was a protective equipment company based

15  out of New Jersey.  Then we started getting into some

16  real estate ventures.

17      Q    Let's talk about Impact a little bit.  Who

18  recommended that to you?

19      A    A gentleman by the name of Tim Garn, who I met

20  in New York.

21      Q    How did you meet Tim Garn?

22      A    Acquaintance of mine, guys that played football

23  at University of Maryland knew the guy, Mark Monica, who

24  is, I think he worked for Rye Dell Protective Equipment.

25  He's an engineer who came up with a product, thinner,

M. Peca  03/29/11                                          14

more stream-lined equipment.  And, again, the concept

seemed pretty good, quite a demand for it.  Something I

was interested in getting involved with.

    Q    Protective equipment, what are you talking

about?

    A    Football shoulder pads.

    Q    Did Phil Kenner have anything to do with that

investment?

    A    I don't know to what level, no.  I know he

was -- I would talk to him about it because he was my

adviser at the time.

    Q    Did you bring him the company as an idea or did

he bring it to you?

    A    He had a relationship with Tim Garn at the time

or got to know him at that point.

    Q    How much did you invest in Impact?

    A    $100,000 at the time.

    Q    Did you invest more later?

    A    I believe I put in another $100,000 a year or

two later.

    Q    What time of year?

    A    That was early after the TechNeck investment,

so maybe 2003-ish.  I was still in Long Island, New York

at the time.

    Q    What happened to that investment?

```
 1                    M. Peca   03/29/11                    15
 2        A   I just got a notice probably four months ago
 3   that they weren't paying the rent and the doors were
 4   locked shut on them.
 5        Q   Before we get to real estate, any other
 6   companies that you remember investing in through Phil
 7   Kenner?
 8        A   No, not at the time.
 9        Q   You invested in real estate deals as well?
10        A   I did.
11        Q   Before we get into them in detail, just go over
12   each one so I know what we're talking about.  What are
13   the real estate deals?
14        A   In chronological order there was El Rosario in
15   Baha, Mexico.
16        Q   Did that have any other names?
17        A   Demonte Delmar.
18        Q   That was the first one?
19        A   Correct.
20        Q   What was the next one?
21        A   Next one was in Hawaii.
22        Q   What about Cabo San Lucas?
23        A   That was after that, yes.
24        Q   Next one is that Hawaii?
25        A   Correct, Demonte Cabo San Lucas.
26        Q   San Lucas is not Hawaii?
```

M. Peca    03/29/11                           16

1

2    A    No, that's not Hawaii; the other Mexico one.

3    Q    Hawaii is which one?

4    A    Little Isle.

5    Q    Was it Little Isle IV?

6    A    Yes.

7    Q    Any others in Hawaii?

8    A    No.

9    Q    Any other real estate projects?

10   A    Not that I can recall.

11   Q    Any other investments at all that you can

12   recall through Phil Kenner other than the two companies

13   you mentioned, the three real estate deals, and of

14   course just buying stock and bonds things of that

15   nature?

16   A    This would be a good time to speak to my lawyer

17   to help me refresh.  I know there is a couple, I don't

18   want to miss them.

19         MR. DEVLIN-BROWN:  That's fine.

20         THE FOREPERSON:  You're excused.

21         (Witness Temporarily Excused.)

22         (Time Noted: 10:43 a.m.)

23

24

25

26

M. Peca    03/29/11                    17

1

2    (Colloquy Precedes.)

3    (Witness Enters Room.)

4    (Time Noted: 10:43 a.m.)

5    THE FOREPERSON:  I remind you, you are still

6    under oath.

7  BY MR. DEVLIN-BROWN:

8    Q   Mr. Peca, you said you needed to speak with

9  your attorney to see if it prompted your memory on any

10  companies?

11    A   Yes.  Two other ones, one at that time was

12  small investment in a kind of technology company but

13  more of a gaming company.  It was Code Fire to start

14  then Technique Digital Arts.  As well as -- I think that

15  was it.

16    Q   One other company was Technique Digital Arts?

17    A   Yes

18    Q   Who brought that to your attention?

19    A   It was presented to me by Phil.

20    Q   How much money did you invest?

21    A   $116,000, something like that.

22    Q   What happened to that investment?

23    A   It didn't work out.

24    Q   When did you make that investment?

25    A   It round the same time, 2004, 2005.  I want to

26  say they were my very much -- they were presented to me.

M. Peca   03/29/11                    18

1

2  On all of them, through all the times, I made the final

3  decision.  I may have not done as much due diligence

4  that some may have done.  It's not like I had to say yes

5  or forced.  I made the decision to say, yeah, I want to

6  do that.  Based on the money I was making at the time it

7  didn't bother me to invest those kinds of dollars.

8       Q   For any of these three companies you mentioned

9  did, since you were making the investment decision

10 yourself, did you receive materials from the companies

11 how your investment would be used?  What the plans were

12 for?

13      A   I would get updates on the plans.  To say -- I

14 mean, it was a long time ago.  I can't remember if I got

15 all the documents for all the companies, but I was

16 getting, I would get updated from time to time, sure.

17      Q   That's after you made the investment?

18      A   Correct.

19      Q   Before you made the investment did you receive

20 any materials from the companies, memos, brochures,

21 anything that would guide you in making your investment

22 decision?

23      A   Some I did, some I didn't.

24      Q   Do you remember any you did?

25      A   I remember getting Impact, getting information

26 background on the founder of the product, Mark Monica,

M. Peca     03/29/11                                    19

1

2   who developed the product.  That one in particular

3   allowed me to make a decision that I was comfortable

4   with.

5       Q    Were you buying stock in the companies or do

6   you know?

7       A    We were making investment in getting a share in

8   the company.

9       Q    Let's talk about the real estate -- before we

10  do that.  Your investment account or accounts what banks

11  have you had those funds out over the years?

12      A    I believe just the two -- I'm not sure.  State

13  Street back in the time if it was Wells Fargo.  Then it

14  was Wells Fargo a long time.  Now it's at Schwab.

15      Q    That holds what kind of money at Schwab?

16      A    Just all my investment accounts, stuff like

17  that, stocks, bonds.

18      Q    Cash?

19      A    Yes.  There is a cash portion to it, yes.

20      Q    That money used to be at State Street and/or

21  Wells Fargo?

22      A    State Street was the manager of the account,

23  and whether it was State Street bank, it might have

24  been, I can't remember.  It was a long time ago.

25      Q    Then it got moved to Schwab?

26      A    Correct.

M. Peca    03/29/11                    20

1

2    Q    When?

3    A    The people managing the account were leaving

4  State Street, so then I started using a company Asante.

5  Phil, who is my adviser, moved over to Asante Global.  I

6  think at the time formed a relationship based out of

7  Winnipeg.  Any ways, the accounts came together and a

8  company was Asante.  I think that's when it went into

9  the Wells Fargo account.

10   Q    You mean it went into the Schwab account?

11   A    No, the Wells Fargo.  After State Street it was

12 Wells Fargo then Schwab.  It's in Schwab currently.

13   Q    When did it go to Schwab?

14   A    I don't know.

15   Q    Do you know why it went to Schwab?

16   A    Maybe just because it was a different manager

17 of the account, maybe their accounts were in a different

18 bank.  I'm into the sure.

19   Q    Let's talk about some of the real estate.  The

20 first one El Rosario, as you refer to it?

21   A    Demonte Delmar it's more known as.

22   Q    Let's call it Delmar, which just means by the

23 ocean?

24   A    "Diamond by the sea."

25   Q    Who brought the "Diamond by the sea" to your

26 attention?

M. Peca   03/29/11                                    21

2    A  It was presented to me in conversation briefly

3  by Phil.  I have a passion for golf and for development

4  at the time.  At the time he brought it to me I signed a

5  five-year, 25 million-dollar contract.  I grew up in a

6  family with no money so now was an opportunity to do

7  some of the things I thought would be fun and

8  adventurous.  He told me how he was introduced to a

9  gentleman Ken Jowdy, who owned land in El Rosario and

10  was looking for charter members.  And we made an

11  investment as a charter member for that particular

12  development.

13    Q  What was El Rosario?

14    A  El Rosario was the town in Baha.

15    Q  In Baha, California?

16    A  Correct, north Baha.

17    Q  Tell the Grand Jurors where that is?

18    A  About an hour south of San Diego I think.

19    Q  Only an hour?

20    A  I think so.

21    Q  By car?

22    A  I flew in on a small plane.  I'm not sure the

23  how long the car ride is.  The roads are not that easy

24  in that part of town.

25    Q  Did you fly in to make the investment or after?

26    A  After.

Peca confirms that he knew of the KPMG appraisal (68.9mm) on the DDM property -- thus felt comfortable with Jowdy and DDM...

M. Peca    03/29/11                    22

2      Q    What was the status of the development at the

3   time you made the investment?

4      A    Piece of property that was in good shape and it

5   was appraised by KPMG at a good value.  And if anything,

6   it was potential.  It was a beautiful piece of property

7   on the Pacific Ocean.

8      Q    How much did you invest in it?

9      A    The charter member initiate was $500,000.

10      Q    Did you receive documents when you made the

11   investment stating what you would be getting in return?

12      A    Yes.

13      Q    What did it say you would get in return?

14      A    It was broken down in different ways.  It was

15   $300,000 portion was for a lot that the charter member

16   had the ability to sell back to the development and get

17   $300,000 back.  A time-share portion of villas going to

18   be built, things to that nature.

19      Q    What did you -- when did you put in the

20   $500,000?

21      A    It was early 2003 or late 2002.

22      Q    How did you do it actually, did you wire money

23   somewhere?

24      A    I wired money.

25      Q    From which account?

26      A    I think at the time it was the Wells Fargo

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
1                    M. Peca    03/29/11                    23
2    account.
3         Q    When you say you wired, did other people have
4    access to the account?
5         A    They did, but I had to approve everything that
6    what went out of the account; nobody could make
7    transactions without my approval.
8         Q    You said you visited the property, how many
9    times have you visited?
10        A    Just the one time.
11        Q    When was that in relation to when you made the
12   investment?
13        A    Trying to think of the year, I was at the
14   National Hockey League Players in San Diego and flew in
15   from there, I think June 2005.
16        Q    What prompted the trip?
17        A    I was just down there and wanted to set up an
18   opportunity to go down and see it.
19        Q    Who did you go there with?
20        A    With Phil, Phil Kenner.
21        Q    How did you get there?
22        A    The development itself had a plane out of San
23   Diego and a pilot that would fly perspective buyers or
24   investors down there.
25        Q    Was there an airport?
26        A    Airport strip built on the property.  One of
```

M. Peca    03/29/11                                    24

1
2    the first things done there.  It's on top of the Mesa,
3    which sits about 600 feet above sea level.
4         Q    So you went on the developer's plane, went on
5    the developer's air strip, what else was going on at the
6    development?
7         A    There was stakes in the ground where potential
8    holes and tee boxes may be.  There were a couple of
9    homes by the water inhabited by squatters, who were
10   moved out.  And employees for the project that were down
11   there basically take perspective buyers or investors
12   down there and showing them the property.  We hopped on
13   the four-wheelers and looked over the property.
14        Q    Did you spend the night there?
15        A    I did not.
16        Q    Was there anywhere to spend the night?
17        A    There were homes in the area if we wanted to,
18   but I flew back.  My wife and son were in the hotel in
19   San Diego.
20        Q    Were the homes built by the developer?
21        A    Pre-existing homes.
22        Q    Meant to be torn down eventually?
23        A    Correct.
24        Q    Had anything actually built --
25        A    No.
26        Q    -- by the developer?

M. Peca     03/29/11                          25

2    A    No.

3    Q    Do you know if that's changed to this day?

4    A    Nothing has changed.  Having said that, I know

5    that when you invest in real estate development there is

6    no quick return.  It could be a lengthy process.

7    Q    To your knowledge what is the status of the

8    project today?

9    A    As far as the status of that project today,

10   it's on hold.  I don't want to jump ahead, I'm sure

11   you're going to ask about Cabo San Lucas, but that

12   portion of the project put the northern project on hold

13   because Cabo got hot and that was able to used to

14   cross-market the northern property.  So the focus was

15   shifted from north to the south.  Delmonte Delmar and El

16   Rosario in north Baha would shift to Cabo in south Baha.

17   Q    Let's talk about the San Lucas project.  When

18   did you invest in that one?

19   A    I can't remember the exact year, it was later

20   on in 2000s, mid to late 2000s.

21   Q    Who brought that to your attention?

22   A    Phil, always the same group of guys, same

23   investment group from the other one.

24   Q    What was the pitch as to why it was a good

25   investment?

26   A    Cabo was hot.  Cabo San Lucas is a much more

M. Peca    03/29/11                                    26

1
2   desired destination than a town El Rosario which there
3   is no easy access.  The thought was, it was an easier
4   way to get a development going.  And maybe, I guess, the
5   thought process they did at time is they did fly them to
6   the north to show them the Demonte brand up north.
7       Q   I see.  Was it your understanding that the San
8   Lucas project was starting in part because the other one
9   wasn't going anywhere?
10      A   That wasn't my impression of that.  It was
11  more, things aren't going as quickly as they would have
12  liked up north.  The real estate market is slowly
13  starting to cool.  They figured the sales would be
14  hotter in a destination in the south so they focused
15  there.
16      Q   I'm not sure I understand the cross marketing.
17  If the south is a more desirable location, you got
18  people looking at south how does that help sell the
19  place up north?
20      A   In these destinations -- it's a unique buyer.
21  I don't think -- some people might like a lot of the
22  action like in Cabo and those people would be attracted
23  to that.  But they are down there and got to see north,
24  maybe there are people who are little more private and
25  reserved.  It's a quite location, then it would appeal
26  to them.  It was just a personality-based thing.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

M. Peca     03/29/11                    27

1

2    Q    How much money did you put into San Lucas?

3    A    200,000.

4    Q    We're talking about 2004 somewhere around

5    there?

6    A    Maybe a little later that 2004.

7    Q    2005?

8    A    Maybe five or six.

9    Q    What were you going to get in return?

10   A    It was the -- we were still business partners

11   with Mr. Jowdy, the managing partner of the projects.

12   It was kind of the same thing we got in.  The difference

13   is in the northern property we were told he owned the

14   land, we were becoming charter members for the

15   investment.  In the south our money was going, money was

16   going to purchasing the property.  So the investments

17   were a little different, both places had the same idea.

18   Q    Did you get any documents on that property as

19   to what your investment was?

20   A    No.  At the time we're all business partners,

21   so we'll get it in due time.

22   Q    What happened with of that investment?

23   A    That investment, what went on there is probably

24   why we're here today.  I've never gotten any clear

25   understanding of what was going on.  After we purchased

26   the property --

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Still 5 years after 2006 acquisition and Lehman funding -- Peca, Kenner and the other investors cannot get any info from Jowdy...

[Handwritten margin note: Still 5 years after 2006 acquisition and Lehman funding -- Peca, Kenner and the other investors cannot get any info from Jowdy...]

M. Peca   03/29/11                    28

1

2    Q    You say "we" who do you mean by we?

3    A    Our investment group, everybody involved in it.

4    I'm not sure who everybody is.

5    Q    Did it have a name your investment group?

6    A    It does, I can't remember it now.  But

7    basically we closed on the land negotiations immediately

8    started with Lehman Brothers to fund the real estate

9    loan for the project.

10   Q    And did you get the loan?

11   A    Yes, $129 million loan to develop the property.

12   Q    What happened then?

13   A    That's the question were looking to get from

14   Mr. Jowdy, where the $129 million went.  To only get a

15   golf course with $129 million real estate loan, where

16   was that money spent, if know only a golf course exists

17   on the property.

18   Q    Have you gone down and visited the property?

19   A    I have not gone down to Cabo.

20   Q    Where is your source of information?

21   A    Other lawsuits that are going on, I get updated

22   on information.  I mean as of now there -- I guess the

23   golf course is a nice one.  They are getting greens fees

24   that's subsidizing the property on a daily basis.

25   Q    Your understanding is still there is just a

26   golf course at this point and some lawsuits?

[Handwritten margin note: Peca info coming from attorneys representing him in various litigation -- not just Kenner...]

M. Peca    03/29/11                              29

1
2    A    No vertical development as all.

3    Q    Let's talk about Little Isle IV.  What was that

4    investment?

5    A    That again was a land acquisition deal.  An old

6    sugar cane farm, I think southwest or east of the big

7    island.

8    Q    In Hawaii?

9    A    Correct.

10   Q    Who brought that to your attention?

11   A    That was Phil Kenner who brought me that one.

12   Q    What was supposed to happen with this project?

13   A    It was a same thing where Lehman Brothers were

14   involved in a potential loan.  We were going to buy some

15   land and we were going to start some development fairly

16   quickly.

17   Q    When you say "we", is this the same we in the

18   San Lucas property?

19   A    I don't know if all the same people were

20   involved in that or not.  I never cared to know who was

21   involved.  If I knew -- I wanted to get involved, I

22   wasn't concerned about the others.

23   Q    Who put together the group?

24   A    Phil Ken.

25   Q    Was Jowdy involved in the Hawaii property as

26   well?

```
                              M. Peca    03/29/11                    30

  1

  2        A    I don't believe he was.

  3        Q    Do you know who the developer was in Hawaii?

  4        A    I can't remember the name.  I know there is a

  5   managing partner, Allan Warden, was Dan supposed to be

  6   involved.

  7        Q    How much money did you put in Little Isle IV?

  8        A    $100,000 cash investment that was going to go

  9   towards that.  Then we had lines of credit.  I had one

 10   out for $1.7 million that was going to be used at the

 11   time.  Here's where a lot of the cross starts to happen.

 12        A short-term loan to Mr. Jowdy, because at the

 13   time Cabo -- we hadn't gotten the lending from Lehman

 14   Brothers yet.  We made a short-term loan until the

 15   lending came in.  Once the lending came through they

 16   were to pay back the loan, I think in the neighborhood

 17   of five-and-a-half million dollars, on the closing.  It

 18   was never paid back.  And then communication basically

 19   seized at that point from him.

 20        That was kind of the whole sticking point as

 21   far as me and the other guys with Mr. Jowdy.

 22        Q    I think we'll need to slow down and walk

 23   through that in more detail, because I'm a little

 24   confused.

 25        This $1.7 million line of credit that was for

 26   the Mexican project or Little Isle IV?
```

Peca verifies his 1.7mm LOC and use as well as LOANS to Jowdy from the Hawaii investor group...

**Peca confirms loan to PARTNER, Jowdy, and NOTHING to be worried about at the time...**

**Peca confirms his 1.7mm and 100k cash were both in his Capital Account**

```
                    M. Peca    03/29/11                      31
 1
 2        A    It was for -- you're right, we're ahead.
 3        The (1.7) along with the ($100,000) and whatever
 4   else put in this a Capital account, Little Isle IV I
 5   believe.  That Capital account was loaned to Ken Jowdy,
 6   our business partner, so there is no need at the time to
 7   be worried about anything.  That money was loaned to Ken
 8   Jowdy to basically help some of the purchase of the Cabo
 9   property so we can get the funding.  And then it was
10   supposed to a short-term loan.
11        Q    When you first took out the $1.7 million loan
12   was the idea first that that was going to go towards
13   Little Isle IV at the very beginning -- let me finish --
14   so at the very beginning did you understand, I'm taking
15   out this loan even though it's going first to Little
16   Isle, it's going to quickly go to be a short-term loan
17   for the Mexico stuff?
18        A    I knew 100 percent it was going to Little Isle
19   IV initially.  Shortly after that the short-term loan
20   was something that took place.
21        Q    So when you -- did you sign papers to take out
22   a loan in that amount?
23        A    Yes.
24        Q    When you signed those papers, where did you
25   think that money was going?
26        A    It was going to a Capital account for Little
```

FINK & CARNEY
RVICES
Y. 10018 (212) 869-1500

**Peca confirms that he KNEW that the LOC funds were going to his Little Isle 4 Capital Account -- THUS Kenner (per the signed Peca Letter of Authorization) had the authority to access the entire LOC immediately -- if necessary...**

M. Peca   03/29/11                    32

Isle IV.

Q   At the time you signed the papers, did you
think that Little Isle IV Capital Account for Hawaii was
used to lend money to Jowdy for the Mexico stuff, or
only later where that was a decision that was made?

A   I can't remember exactly what the time frame
was on those two things.

Q   Were you consulted an advance about whether to
use the money in the Little Isle IV Capital account to
loan money to the Mexico project?

A   I knew the short-term loan was made to
Mr. Jowdy.

Q   Did you know in advance of it being made?

A   I probably did, I mean at the time if I was
told about it, I probably would say, okay, sounds good.
It was probably explained to me.  I can't tell you
definitely right now that I know the day or time of the
conversation.  As it was happening I wasn't like what
happened to that, I didn't know it would happen.  I kind
of knew what we were doing.

Q   Let me paraphrase, you're not sure if you were
told but you basically approved of it.  You wouldn't
really have cared sounds like you're saying?

A   Correct.

Q   Then, you were getting into

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 1001[...]

Peca confirms that the loaned funds to Jowdy NEVER came back...



M. Peca    03/29/11                                                     33

2    that money was loaned to Ken Jowdy because they were

3    waiting for some kind of financing to come in?

4        A    Correct.

5        Q    And then it never came back?

6        A    Correct.

7        Q    So that money went back to the Little Isle IV?

8        A    It did not.

9        Q    What about the $100,000 cash, did that go to

10   Little Isle IV?

11       A    It did.

12       Q    What is the status of Little Isle IV?

13       A    We're part of a joint venture that still owns

14   the property.

15       Q    What is the status of the investment there?

16       A    We've been busy with a lot of this stuff.  I

17   haven't cared to look at it yet.  As far as I know it's

18   land and it hasn't been developed yet.

19       Q    As far as you know your 1.7 million was that go

20   to Little Isle IV at some point so they could use it?

21       A    It was all part of the land acquisition, yes.

22       Q    Obviously that 1.7 couldn't go there because it

23   got tied up in Mexico project.

24       A    Correct.

25       Q    I want to make sure I understand it right.  Was

26   the idea you took out this big loan, $1.7 million, was

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca NEVER tells the GJ that the money was a "6 month thing" like he and his wife told the EDNY in 2015

M. Peca    03/29/11                     34

1
2     the idea that after the Mexico project solved its
3     short-term problem, the money comes back to you and pays
4     off the loan.  Or was it that after the Mexico people
5     solve their problem it goes to Hawaii and funds your
6     investment out there?
7              THE WITNESS:  Can I step out for a second?  I
8         want to understand it so you get the answer that
9         you need.
10             THE FOREPERSON:  Yes.
11             (Witness Temporarily Excused.)
12             (Time Noted: 11:04 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
26

M. Peca   03/29/11                                    35

1
2    (Colloquy Precedes.)
3    (Witness Enters Room.)
4    (Time Noted: 11:10 a.m.)
5        THE FOREPERSON:  I remind you, you are still
6    under oath.
7    BY MR. DEVLIN-BROWN:
8        Q    About five minutes or so ago you stepped out,
9    you wanted to consult with your attorney to try to
10   refresh your recollection on certain facts?
11       A    The recollection is the two things were
12   happening almost simultaneously.  The loan by Lehman
13   Brothers was held up, and the short-term loan was to
14   make sure that loan was to come through.  The loan to
15   Mr. Jowdy was on a short-term basis.  We had a real
16   asset in Cabo, it pays different terms for us.  We were
17   able to make sure the land was acquired and we did get
18   the loan from Lehman Brothers.
19       Q    When did you make the investment in Little Isle
20   IV, to the best of your knowledge?
21       A    2004, 2005 maybe.
22       Q    I want to show you some documents, some of them
23   I'll show you on the screen others I'll walk over to
24   you.
25           Let me just ask you first, Northern Trust Bank?
26       A    That's where the line was credit was out on for

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
1                    M. Peca    03/29/11              36
2    the Hawaii investment.
3         Q    I'm showing you what's been marked as Grand
4    Jury Exhibit 101, which says, "Investment management
5    account agreement," with your name here, Michael Peca.
6    I mostly want to ask you if it's your handwriting on
7    here.  Is that your signature?
8         A    Yes.
9         Q    March 21, 2005, does that seem like the time
10   you would have taken out the loan?
11        A    Sounds like it.
12        Q    Do you remember signing these documents?
13        A    Yes.
14        Q    Did you authorize anyone to make, to have
15   access to your Northern Trust loan account so they could
16   make decisions as to how it could be used?
17        A    Phil Kenner was power of attorney on the
18   account, but nobody had the ability to make a decision
19   on my account but me.
20        Q    When you say that no one --
21        A    His power of attorney privileges were limited
22   to, "I need this wire, can you do it for me."  Often
23   times I'm traveling and didn't have the ability to do
24   it.
25        Q    Do you know if that was the instructions the
26   bank had or was the bank told he could access the lines
```

M. Peca   03/29/11                    37

1

2     as he wished?

3          A   No idea.

4          Q   Let me show you this document, marked 102, Greg

5     Cygan, do you know who that is?

6          A   I don't know that person, no.

7          Q   June 3, 2005, "The following is a list of

8     standard adviser employees that are permitted to

9     instruct Northern Trust with regard to client accounts,"

10    signed by Phil Kenner and Christine -- how do you say

11    the last name?

12         A   Heirick.  I believe she was an employee of

13    Mr. Kenner's.

14         Q   Had you met here?

15         A   The only time I met her the time is when I flew

16    from San Diego to El Rosario.

17         Q   There is a Grand Jury Exhibit 103, which is a

18    credit application.  Is this your writing on the top?

19         A   I didn't write that, no.

20         Q   The same real estate investments, the amount

21    1.775 million.  Did you write that?

22         A   I did not write that.

23         Q   What about --

24         A   That's all my writing there.

25         Q   Just so the record is clear, I'm pointing to

26    the "information about me" section.  What about this

M. Peca    03/29/11                    38

1

2  signature dated December 26, 2007, is that your

3  signature?

4      A   That is my signature.

5      Q   Do you recall completing any kind of financial

6  statement in order to obtain the line of credit?

7      A   I remember them doing some due diligence.  I

8  don't remember exactly what was required at the time.

9      Q   I'm going to show you 104, personal financial

10  statement.  The first blank where it has your name and

11  information, is that your handwriting?

12      A   It is.

13      Q   Then numbers written down on the page that says

14  income statement, is that your writing?

15      A   That is not my writing.

16      Q   Let me show you Grand Jury Exhibit 107,

17  starting with the signature.  Is that your signature?

18      A   It is.

19      Q   This letter is dated March 11, 2005,

20  "Gentlemen, this letter is your authorization to allow

21  Phillip A. Kenner to access my above-referenced line of

22  credit."  it says, "For line of credit, for direct

23  deposit to the Little Isle IV account at Northern Trust,

24  he is authorized to sign for the release of funds

25  related to the line."  Do you remember signing this?

26      A   I do.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca confirmed that he signed the *Letter of Authorization* for Kenner to access his LOC at NT Bank

Confirmed his signature after receiving the document...

1                    M. Peca    03/29/11                    39

2          Q    Did you write this or was it written and given

3     to you?

4          A    It was prepared for me, I read it, and signed

5     it.

6          Q    Who prepared it for you?

7          A    I'm not sure.

8          Q    Who gave you it to?

9          A    Phil.

10          Q    It references direct deposit to the Little Isle

11     IV account.   Is that what you were calling the Capital

12     account?

13          A    Correct.

Peca confirms all LOC funds were part of his Capital Account -- not a short-term loan (of 6 months)

14          Q    Do you know what kind of interest you were

15     paying on the line of credit?

16          A    Can't remember.

17          Q    To get this kind of line of credit, even though

18     you were a professional hockey player, did you have to

19     put up collateral?

20          A    The collateral, at the time I moved my bond

21     account over to Northern Trust, which I think was just

22     in excess of $2 million or just under, to kind of use as

23     collateral for the line of credit.

24          Q    Did you understand at the time if you didn't

25     pay back the line ever credit the bank was going to take

26     your bonds?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca confirmed FULL KNOWLEDGE fo the consequence of the LOC funds and the fact that the non-repayment of the Jowdy loan was a factor in the seizure...

Peca (and his wife) told the 2015 court that they were told the collateral would NEVER be touched.

```
 1              M. Peca    03/29/11                40

 2       A    Yes, and they did.  What they took was just

 3    under $2 million, I believe it was 2008, maybe after a

 4    while.  We were just, when the loan, the short-term loan

 5    from Mr. Jowdy was not paid back, the line of credit

 6    time matured.  They had taken what was loaned, I guess,

 7    lent to me plus interest.

 8       Q    Let me show you what is marked Grand Jury

 9    Exhibit 106, which is the pledge agreement dated

10    November 5, 2007.  Kind of a technical document, do you

11    remember signing documents putting up the bonds to

12    secure the line of credit?

13       A    Uh-huh, yes.  I was very well aware of that

14    scenario.

15       Q    Is this your signature?

16       A    That is, yes.

17       Q    You say to do this you transferred the bonds

18    from your Schwab account; is that right?

19       A    If it was Schwab, I think it was Schwab at that

20    time, whatever it was in.

21       Q    Do you recall ever getting updates from

22    Mr. Kenner in sort of written form, a little formal,

23    about what was going on with the Little Isle IV project?

24       A    It was pretty informal.

25       Q    Do you recall getting letters or anything like

26    that?
```

Peca claims VERY WELL AWARE of the collateral he secured the LOC with to NT Bank...

*Peca does NOT recall the July 2006 disclosure doc he signed for the Hawaii deal -- although Peca's signature was faxed from his home fax machine...See **Peca signed July 20067 LI4 disclosure letter (with Peca fax confirm)***

M. Peca   03/29/11                              41

A    No.

Q    Let me show you one letter and see if you recognize it.  I'm going to mark this as Grand Jury Exhibit 110A.  Take a look through that.  On the last page it's signed by Phil Kenner.

6

7        A    Do you want me to read what is highlighted?

8        Q    Not necessarily, just look at it and see if it

9    refreshes whether you got this or any similar update,

10   it's dated 2006, about what was going on with the

11   project.

12            (Witness reviewing document.)

13       A    No, I don't recall this document.

14       Q    Let's talk a little about some of the various

15   litigation.  You mentioned there was all kinds of

16   litigation; is that right?

17       A    Yes.

18       Q    Are you party to some litigation?

19       A    Not currently.  We did have a suit against

20   Mr. Jowdy that was filed in State of California.

21       Q    Who you were a plaintiff in the lawsuit?

22       A    Correct.

23       Q    Who were the other plaintiffs generally?

24       A    I believe Mr. Stevenson was one, there was

25   maybe 15 to 20 guys, I think.  You want me to go through

26   all the names that I can?  Rob.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

M. Peca   03/29/11                          42

1

2     Q    Were they all hockey players?

3     A    The majority.

4     Q    What happened in the lawsuit?

5     A    The case was dismissed without prejudice, so we

6  have the ability to go back and file the suit, there was

7  just a thing we were -- at the end of the day we're

8  trying to get the accounting for the Lehman $129 million

9  loan and how that was used.  We've yet to receive that

10  information.  That's been the frustration on our side

11  all along.

12     Q    Do you know why the case was dismissed?

13     A    The lawyer can answer that better than I could.

14     Q    Same lawyer, Mr. Richards, represented you

15  there?

16     A    Correct.

17     Q    Did he represent the other plaintiffs as well?

18     A    Yes, he did.

19     Q    Was Mr. Kenner one of the plaintiffs?

20     A    He was not.

21     Q    Were you deposed in that case?

22     A    I -- not for that case.  The last time I was

23  asked any questions was informally maybe year-and-a-half

24  ago over-the-phone with, I think several district

25  attorneys from this area, somebody from the SEC, nothing

26  from that case.

M. Peca   03/29/11                                    43

1
2     Q   In that case you were not deposed?
3     A   I was not.
4     Q   Did someone seek to depose you or did you get a
5  notice of deposition?
6     A   I did not.
7     Q   Do you know if the case was dismissed because
8  certain plaintiffs were not appearing for their
9  depositions, does that ring any bells for you?
10    A   That's not -- I know there was a question of,
11  you know, Mr. Jowdy's side wanted to depose players that
12  were in the Olympic.  It was an inconvenience.  They
13  were playing in the Olympics, to take time to be
14  deposed.
15    Q   That was not an issue for you?
16    A   I was retired at the time.
17    Q   Any other lawsuits that you're a party to?
18    A   Currently no that I can recall.
19    Q   Any former lawsuits to these things?
20    A   To these things, no.
21    Q   Who paid the attorneys fees in that lawsuit out
22  in California?
23    A   We all took part in paying Mr. Richards.
24    Q   What about your fee for his representation of
25  you in the Grand Jury, are you paying that or is someone
26  else?

M. Peca    03/29/11                    44

2    A    I am paying it, reluctantly.

3         MR. DEVLIN-BROWN:  I propose excusing the

4    witness for the moment.  I'm going to ask the

5    Grand Jurors if they have other questions.  This

6    might be it for you.

7         THE WITNESS:  Okay.

8         MR. DEVLIN-BROWN:  We'll call you back in if

9    you we need you, otherwise you're excused.

10        You should know, however, that the Grand Jury's

11   investigation is continuing so although -- I'm

12   sure you hope this is not the case -- they may

13   request that your testimony continue on a later

14   date.  We're excusing you pursuant to potentially

15   coming back on a later date if there are more

16   questions.

17        THE WITNESS:  Okay.

18        MR. DEVLIN-BROWN:  May I ask the witness be

19   excused.

20        THE FOREPERSON:  Yes.

21   (Witness Excused.)

22   (Time Noted: 11:24 a.m.)

23   (Colloquy Follows.)

24

25

26

```
                              M. Peca    03/29/11                      45

 1
 2              (Colloquy Precedes.)

 3              (Witness Enters Room.)

 4              (Time Noted: 11:28 a.m.)

 5              THE FOREPERSON:  I remind you, you are still

 6         under oath.

 7    BY MR. DEVLIN-BROWN:

 8         Q    Just a few more questions for you.  Do you know

 9    a hockey player Mr. Nolan?

10         A    He was my roommate at the Olympics.

11         Q    Do you know if he invested in Little Isle IV as

12    well?

13         A    I believe he did.  I think.  I don't have any

14    evidence that he did, but I think he did.

15         Q    Do you know if his line of credit -- if he took

16    out a line of credit as well?

17         A    I believe he did.  He filed suit against

18    Mr. Kenner, that was part of his complaint.

19         Q    Do you know if his line of credit got paid off?

20         A    I have no idea.

21         Q    Would you have authorized your line of credit

22    to be transferred to pay his line of credit off?

23         A    I think, I don't think they came in separately

24    to that extent.  It was all in one account.  If the

25    money is in the account and something paid something, I

26    don't know.  I don't know how that process would work.
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca confirms the (Capital Account process) money all went to the Little Isle 4 account where he was aware bills were paid...

M. Peca   03/29/11                                46

1

2    Q    Have you heard that that happened?

3    A    No.  I got a document from Northern Trust at

4  the time that said my line of credit expired and my

5  money, and they were taking the money from that bond

6  account.

7    Q    Do you know who Lewis Volpini is?

8    A    Never heard the name before.

9    Q    Do you know who Led Betterville is?

10   A    No idea.

11   Q    Do you know who Shaman Manbetzi is?

12   A    I do not.

13   Q    Do you know why any of those people would be

14 getting money from the Little Isle IV capital account

15 funded by your line and credit and other lines of

16 credits?

17   A    I don't.

18         MR. DEVLIN-BROWN:  No other questions.

19         May I ask the witness be excused.

20         THE FOREPERSON:  Yes.

21   (Witness Excused.)

22   (Time Noted: 11:30 a.m.)

23

24

25

26

47

C E R T I F I C A T E

STATE OF NEW YORK    )
                                      )
COUNTY OF NEW YORK   )

        I, RIVKA TEICH, hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

_Rivka Teich_

Rivka Teich, R.P.R., C.S.R.

Acting Grand Jury Reporter