FILED
CLERK

2:05 pm, Apr 08, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, . Criminal No. 13-cr-00607-JFB-AYS-1
                          .
            Vs.           . 100 Federal Plaza
                          . Central Islip, NY 11722
PHILLIP A. KENNER,        .
TOMMY C. CONSTANTINE      . DATE April 5, 2021
. . . . . . . . . . . . . .

                  TRANSCRIPT OF HEARING
                      (Via Video)
          BEFORE HONORABLE JOSEPH F. BIANCO
             UNITED STATES VISITING JUDGE

APPEARANCES:

For the Government:            UNITED STATES ATTORNEYS OFFICE
                              EASTERN DISTRICT OF NEW YORK
                              BY:  MATTHEW HAGGANS, ESQ.
                              271 Cadman Plaza East
                              Brooklyn, NY 11201

For Defendant Kenner:         PHILLIP A. KENNER, Pro se
                              Metropolitan Detention Center
                              Brooklyn, NJ 11232

                              MATTHEW W. BRISSENDEN, ESQ.
                              (Standby counsel)
                              666 Old Country Road, Suite 501
                              Garden City, NY 11530

For Owen Nolan:               PROSKAUER ROSE
                              BY:  SEETHA RAMACHANDRAN, ESQ.
                              Eleven Times Square
                              New York, NY 10036

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044     Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

1                    I N D E X

2

3    ORAL ARGUMENT                    PAGE

4         BY MR. HAGGANS              10

5         BY MR. KENNER               12/23

6         BY MS. RAMACHANDRAN         20

7    DECISION RESTITUTION             29

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK: Calling criminal case 2013-607, United

2     States of America versus Philip Kenner. Counsel please state

3     your appearances for the record.

4          MR. HAGGANS:  Good morning, Your Honor, this is

5     Matthew Haggans for the United States.

6          THE COURT: Good morning Mr. Haggans.

7          MR. HAGGANS: Just for the Court's attention, I think

8     some of my colleagues may be dialed in to listen to the

9     proceedings, but it will be just me on video today.

10          THE COURT: Okay, that's fine.  Go ahead, Mr.

11     Brissenden.

12          MR. BRISSENDEN: Good morning, Your Honor, Matthew

13     Brissenden, standby counsel for Mr. Kenner.

14          THE COURT: Good morning, Mr. Brissenden.  And we have

15     Mr. Kenner.  Mr. Kenner, can you see and hear everybody okay?

16          THE DEFENDANT: Yes, sir, thank you, Judge.

17          THE COURT: All right, good morning, Mr. Kenner.

18          THE DEFENDANT: Good morning.

19          THE COURT: As you know we scheduled this proceeding

20     to address the restitution issue.  I know that Mr. Kenner has

21     submitted other things, which I'm happy to discuss at the

22     conclusion, but I want to deal with the restitution issue

23     first.

24          The first order of business is just to confirm with

25     Mr. Kenner, we had discussed proceeding by way of video with

1   respect to the restitution issue. I just want to again confirm

2   that you consent to proceeding by way of video this morning.

3           THE DEFENDANT: Yes, sir.

4           THE COURT: All right, so and the Government has no

5   objection?

6           MR. HAGGANS: No, Your Honor, no objection.

7           THE COURT: All right, under the Cares Act I find that

8   obviously the pandemic is ongoing and impacting the court

9   system.  As we have discussed previously, if Mr. Kenner is

10  produced in court he then he has to quarantine for a number of

11  weeks.  I don't, I find that this proceeding cannot be further

12  delayed without serious harm to the interest of justice

13  because, among other things, it leaves the victims without a

14  restitution order. It leaves Mr. Kenner unable to file his

15  notice of appeal and proceed with is appeal.  So I believe that

16  we should proceed by way of video today for those reasons.

17          Just a couple of preliminary matters, as it relates

18  to the restitution.  The Court has stated previously, and I

19  just want to emphasize, and I know Mr. Kenner has put in a

20  number of submissions with respect to, among other things the

21  restitution.  A number of affidavits of loss have been

22  submitted by various victims.  I think I've made clear, I just

23  reiterate for purposes of today's proceeding, is the Court's

24  intention not to rely on those affidavits of loss in terms of

25  determining what the amount of restitution is.  Instead the

5

1  Court is relying on the evidence that was submitted at trial as

2  supplemented at the forfeiture hearing.

3         The reason for that is, the affidavits contain the

4  victims' views as to all of the different losses they believe

5  they incurred as a result of their interactions with Mr.

6  Kenner.  Many of those transactions, as we have discussed

7  before, were not part of the charges at trial.  Were not part

8  of the proof at trial.  And it is the Court's view that

9  therefore we should proceed by way of the evidence at trial and

10 at forfeiture to, as it relates to the conduct that was the

11 subject of the trial.

12        To the extent that the victims claim that they should

13 be entitled to more amounts for those particular offenses that

14 were the subject of the conviction, I find that having a

15 further hearing on that would prolong the sentencing process

16 and complicate it beyond measure and lead to additional delay.

17 And therefore, to the extent that the amounts that the Court

18 imposes today is viewed by the victims as lower than what

19 they're entitled to, either with respect to the offense conduct

20 or beyond the offense conduct, which would not be subject to

21 restitution, they obviously have the civil, the ability to file

22 civil lawsuits, many of which have been filed. And I believe

23 that that is the best mechanism to address any differences that

24 remain.

25        However, in an abundance of caution, I did have the

1   Probation Officer put together all the affidavits of loss.  I

2   had my administrative assistant send those to Mr. Brissenden.

3   I couldn't get them to you directly, Mr. Kenner, so I gave

4   them, had them emailed to Mr. Brissenden and to the Government.

5   I believe that Mr. Kenner already had all of these.  But I also

6   didn't want him to start working on them and responding to them

7   because I'm not using them. So to some extent they're

8   immaterial to today's proceeding. But I just wanted them to be

9   part of the record going forward.

10          I will also note there have been other sort of

11   independent submissions on the issues of restitution, one of

12   which I do want the Government to address because it came in

13   after Mr. Constantine's sentencing. But for example, Mr. and

14   Mrs. Peca filed a letter and documents back in July.  Mr.

15   Kenner responded in August.  But in any event, the bottom line

16   is, we're relying on the evidence at trial, at the forfeiture

17   hearing.

18          Obviously the standard as it was for all the

19   determinations the Court made with respect to sentencing, the

20   enhancements, the loss amount, is preponderance of the

21   evidence.   The Government has the burden.

22          The only other thing I wanted to mention with respect

23   to the findings that the Court has made already, which are

24   going to be the starting point obviously for the restitution, I

25   did conclude, and I went back and verified this, this was on

1  page 21 of the sentencing -- not of the sentencing transcript,

2  the February proceeding when we went through all of the,

3  February 13th, 2020 proceeding, where I determined that the

4  loss amount for purposes of the guidelines, for purposes of

5  sentencing, was $14,072,097.  The Government, as instructed by

6  the Court, broke that out in a chart on February 26th, victim

7  by victim, dividing up the loss amounts as related to each

8  transaction that was the subject of the trial.

9       And obviously, all of those various rulings that I

10  made modified the presentence report, excluded certain things

11  from the presentence report.  The remaining aspects of the

12  presentence report, the Court, as this will be made clear in

13  the judgment of conviction, adopts to the extent that I did not

14  modify them, I adopt all those as findings of fact by the

15  Court.

16       The only other thing I want to mention with respect

17  to the loss amount, and I mentioned this at Mr. Constantine's

18  sentencing, and I want to make clear for purposes of Mr.

19  Kenner's sentencing, and this does relate somewhat to the

20  restitution issue I'm going to discuss in a moment, but the

21  Court is aware of Second Circuit case law that suggests that

22  simply because some interest that a victim has is illiquid, and

23  not immediately available to be liquidated to some extent, does

24  not mean that it cannot be considered by the Court in

25  determining what the loss amount is for that victim.

1    I have determined, notwithstanding, and this came up

2 obviously in Mr. Constantine's sentencing, he continues to

3 claim that their interest in Eufora have some value.  Obviously

4 the victims continue to have some interest in the resort in

5 Mexico.  But the Court has determined this, for purposes of

6 both the loss amount for the guidelines, and as it relates to

7 any credit that Mr. Kenner would be arguing should be applied

8 to restitution, this is a situation in my view where it's

9 unclear whether those interests are ever going to produce a

10 dollar of return.  It's not that it's illiquid and it would

11 take time, and it's difficult to valuate, I don't view this

12 case as any of those scenarios.  This is something where they

13 have some interest that may or may not some day be worth

14 something, and therefore it would be too speculative to the

15 Court to either adjust the loss amount at sentencing or

16 restitution in order to try to predict what that interest,

17 whatever interest that, what value that interest could have

18 somewhere down the line.

19    And as it relates to Mr. Nolan in particular, because

20 I know Mr. Kenner has gone back and forth with Owen Nolan's

21 counsel, and on this issue of whether or not he received a

22 settlement that should somehow be credited.  The counsel for

23 Owen Nolan did respond back in last July before the pandemic, I

24 guess during the pandemic, and noted that this assignment of

25 interest from Mr. Jowdy, which is now part of the public

1  record, again similar to what I talked about before, has not

2  generated any return for Mr. Nolan at this point.

3       So I think any offset for restitution purposes with

4  respect to that is unwarranted.  And obviously the bank and the

5  Government continue to negotiate with respect to the resort.

6  And if there is some settlement reached with respect to that,

7  obviously that's something the Court can go back and look at.

8  Any credits regarding restitution as the Government has pointed

9  out in their letter to the Court, and Owen Nolan would be an

10 example of this as well, the Court can always go back and

11 modify the restitution amount to reflect any credits based upon

12 settlements or anything that affects the amount that the Court

13 imposes.

14      So that would be an ongoing obligation of the Court

15 to continue to look at, to the extent there are any

16 developments down the line.

17      The only other thing before we get into the actual

18 amount, Mr. Kenner has repeatedly requested a hearing with

19 respect to restitution.  But again, it's the Court's

20 determination, its discretion, that it's relying only on the

21 evidence at trial and forfeiture, which Mr. Kenner obviously

22 was present for.  Had counsel. Was able to fully litigate all

23 the issues related to those victims' claims.  And to the extent

24 that he wants a hearing on the restitution amount beyond that

25 evidence, I'm denying that application.

1          All right, I think those are the only preliminary

2    issues I wanted to address.  So before I hear from Mr. Kenner,

3    I did want the Government to address -- just the other thing, I

4    just don't want to forget this at the end, it's my view that

5    whatever restitution amount is ordered here, should be joint

6    and several liability for restitution purposes, with Mr.

7    Constantine. Obviously his restitution amount is less.  But the

8    victims obviously shouldn't receive the money twice.  So I do

9    want to hear the parties, I assume everybody agrees with that.

10   But I'll hear everybody's view on that.

11          So Mr. Haggans, I did want, there was this November

12   12th 2020 letter, which I assume you're aware of.  But there

13   were several individuals who basically when they saw the

14   sentencing for Mr. Constantine, were unhappy with the fact that

15   even though they had submitted affidavits of loss with respect

16   to Hawaii, Eufora, and GSF, that I did not order restitution as

17   it related to them for those categories.  And those four

18   individuals are -- Murray, Greg DeVries, Mattias Norstrom, and

19   Brian Campbell. And it comes out to I guess a total of about

20   $1.5 million.

21          So I assume that was because that was not part of the

22   trial evidence, or do you want to want to address that?

23          MR. HAGGANS: That's correct, Your Honor.  The charts

24   that the Government prepared and filed in our initial

25   sentencing memorandum of November 1st 2019, ECF number 765, we

1  made some revisions to that on December 19th, excuse me,

2  December 27th of 2019.  That's ECF 781.  And then based upon

3  the Court's rulings as summarized by the Court earlier in this

4  proceeding, submitted that revised loss amount calculation on

5  February 26 of 2020.  That's ECF number 812.

6          I have seen in affidavits of loss the submissions

7  that Your Honor summarized.  But the Government's summaries in

8  those other ECF citations, that's the Government's best effort

9  to synthesize the trial evidence with respect to the loss for

10 those investors.

11         THE COURT: All right. So again, consistent with my

12 earlier ruling, it's my view that I'm not going to prolong this

13 proceeding by having a hearing where they could try to document

14 and argue for restitution.  I assume the Government agrees with

15 that at this point.

16         MR. HAGGANS: No objection at this point, Your Honor,

17 correct.

18         THE COURT: All right.  So before I hear from Mr.

19 Kenner, so first of all, does the Government agree this should

20 be joint and several liability with Mr. Constantine?

21         MR. HAGGANS: Yes, Your Honor.  With, and I think this

22 will be apparent in the forthcoming judgment.  There are some

23 investors I believe that Mr. Constantine was ordered to owe

24 restitution, but Mr. Kenner was not, and I think there may be a

25 visa versa situation for a couple of investors. But as the

1  judgment will reflect, each investor individually, I don't

2  think that's an issue.

3        THE COURT: Yes, and we'll try and make clear in the

4  judgment that it's only joint and several, obviously as it

5  relates to the particular victims that they are jointly being

6  held responsible for.   All right.

7        And in terms of the amount, is it the Government's

8  view that the amount should be consistent with the loss amount

9  that the Court used for purposes of the sentencing, the

10 $14,072,097?

11        MR. HAGGANS: Based upon the Court's prior rulings,

12 yes, Your Honor.

13        THE COURT: All right.   Okay.   Go ahead, Mr. Kenner,

14 and again Mr. Kenner, I think you know, obviously you've been

15 before me many times, you don't have to go through all your

16 various submissions on the issue of restitution.   They're all

17 part of the record.   This is a chance for you, if you want to

18 highlight anything you can highlight that to the Court.

19        THE DEFENDANT: All right, thank you, Your Honor.   If

20 I could just touch on a few items here.

21        THE COURT: Can you move the camera.   There we go.

22 That's better, thank you.

23        THE DEFENDANT: Okay.   Before I start on that, I just

24 wanted to ask the Court if you wouldn't mind just delaying the

25 signing of the JNC until the end of the month when I can

1  complete the submission of a rebuttal or reply, however you

2  call it, for the 3582 motion that the Government is going to

3  submit on the 16th.

4          THE COURT: Yes, that's fine.

5          THE DEFENDANT: Okay. And I'll --

6          THE COURT: -- a week or two to put the judgment

7  together.  It's a pretty complicated judgment.  So I won't

8  enter it until, you said the end of the month?

9          THE DEFENDANT: Yeah, I'll get my rebuttal back to the

10 Government as soon as I can.  I don't know when I will receive

11 their reply. I know it's due on the 16th, plus or minus.  But

12 I'm not sure when I will actually receive it.  So but I'll --

13         THE COURT: One of the things, and again why don't we

14 wait until the end to discuss it.  I had some issue with

15 respect to that in my mind.  I don't know whether the

16 Government was going to address this or not.  But it's, the

17 procedural aspect of your motion is -- I've got a lot of

18 compassionate release motions, but this one is, you know, where

19 the judgment hasn't even been issued yet. And then obviously

20 you're filing a notice of appeal.  So I'm just not sure

21 procedurally what -- usually when you file a notice of appeal

22 it divests the Court of jurisdiction to even consider a motion

23 for compassionate release.

24         So it's a somewhat complicated issue I guess is the

25 bottom line.  But why don't we address restitution, and we'll

1 come back to that. But the bottom line is, I won't enter the

2 judgment until May, okay?

3          THE DEFENDANT: All right, thank you, Your Honor. And

4 it can be as soon as I have a chance to send my reply in, which

5 I'll get it to the Court as fast as I can --

6          THE COURT: All right.

7          THE DEFENDANT:  -- based on circumstances here.  If I

8 could just address maybe one of the issues that you discussed

9 just a moment ago. And that is as far as Nolan's settlement

10 assignment.  It was my understanding that the District Court's

11 authorized under 3663(b)(1)(b)(ii) to order restitution in the

12 amount of a victim's loss, less the value as of the date the

13 property is returned or any part of that property is returned.

14 And the victim had the power to dispose of the property.

15          So Mr. Nolan, as we have found out, had an assignment

16 agreement with Mr. Jowdy and a settlement with him, somewhere

17 between 2009 and 2011, as Nolan's counsel had submitted.  So

18 they've had nearly a decade to work with Mr. Jowdy, who they've

19 worked with since 2008, to dispose of his one percent, which at

20 the time of the transfer, was worth a little over $3 million.

21          So that was just one issue I'd just like to raise to

22 the Court, that based on my understanding of 3663(b)(1)(b)(ii),

23 Nolan has had a decade to --

24          THE COURT: I know, but Mr. Kenner, I think it's

25 pretty obvious, if he had the ability to try to get that $3

 1 million back he would have done so.  The whole problem

 2 obviously with the resort is that they can't get their interest

 3 out, and you have the bank who is arguing they're owed close to

 4 $200 million I think it is.  So I don't -- I hear what you're

 5 saying, but again if he does get that interest out of there, it

 6 will be credited against whatever amount I impose with respect

 7 to him.  But I don't think it can be deducted to this point

 8 because I don't see that he has the ability to obtain that

 9 money.  But anyway, your objection is preserved for the record

10 on that.

11          THE DEFENDANT: Thank you, Your Honor. And with

12 respect to Mr. Norstrom, I noticed you mentioned his name as

13 one of the four individuals who sent a November 2020 letter to

14 the Court.  Mr. Norstrom, I believe, and I have not seen

15 submissions ECF 812, so I'm not familiar with what the

16 breakdown of the chart looks like.  But as far as the $14

17 million loss amount that was adjudicated at sentencing, I

18 believe that Mr. Norstrom's investment dollars were included in

19 those totals.  Again we've seen a number of different totals

20 between the Probation's chart, several Government charts, so

21 I'm at a loss to say specifically, because I don't have ECF

22 812, nor have I ever seen it.

23          THE COURT: I'm a little confused as to why you don't

24 have document 812.  That was filed publicly.

25          THE DEFENDANT: I --

1    THE COURT: I also think, maybe Mr. Haggans can could

2  correct me if I'm wrong.  I think that chart was, at least

3  related to you, I know Mr. Constantine's chart changed.  But

4  Mr. Haggans, is that, the $14 million was that reflected in a

5  prior chart too?

6    MR. HAGGANS: I believe an earlier version of it is

7  contained in the PSR.  But I would just note for everyone's

8  attention, that Mr. Norstrom's losses are not reflected in the

9  chart --

10   THE COURT: Right.

11   MR. HAGGANS: -- of ECR 812.

12   THE COURT: Yes, he's not in that list, Mr. Kenner.

13 But I don't want you to be -- this is the chart I'm using for

14 purposes of restitution, so I'm a little concerned that you're

15 saying that you don't have it.  But I'm a little confused by

16 that.

17   THE DEFENDANT: Yeah.  And I if I could just let Your

18 Honor know, Mr. Brissenden has done a herculean job of getting

19 information to me and items on the record. So I wouldn't.

20   THE COURT: Mr. Brissenden is the best.

21   THE DEFENDANT: He's been a fantastic counsel of, for

22 me since he's been appointed. So I do appreciate that part of

23 it.  But I just want to make the Court know that it wasn't, I'm

24 not suggesting that Mr. Brissenden didn't send me 812.  But I

25 haven't received that chart from anybody.  I was not even aware

1 of the chart frankly until you just mentioned it.

2       So, at least based on you know, whatever the final

3 JNC is, if Your Honor doesn't mind just asking the Court or

4 someone to send me a copy of it so I have it for the record.  I

5 wouldn't mind that.

6       You know, ultimately I had fully briefed any credits

7 against loss calculations.  In ECF 770, I'm sure Your Honor is

8 aware of that. I also had documented it beyond argument in

9 chart format.  And had referenced in each occasion, you know,

10 relative Second Circuit rulings dealing with fraud and non

11 fraud factors, dealing with what victims received that were

12 bargained for.  As many of the examples are, someone buying a

13 $10,000 gold coin that, and it being sold to them for $20,000.

14 You know, it's a $10,000 loss as opposed to a $20,000 loss.

15       Discrepancies between anticipated and expected

16 benefits.  Misrepresentations of value as opposed to something

17 that's worthless.  And those are all things I quoted in the

18 United States versus Ebers (phonetic); United States versus

19 Novak; United States versus Starr; United States versus

20 Leonard. So I've got those cites for Your Honor, but they're

21 also in ECF 770 for Your Honor's reference.

22       So each of those credits, in fact I believe in the

23 Government's submission, ECF 765, they had conceded the actual

24 settlement amount that Northern Trust had settled with, I

25 believe it was Mr. Peca, Berard and Nolan, totaling about $1.6

1  million.  And I didn't see any of that in, that would not have

2  been calculated as part of that $14 million loss and/or

3  restitution.

4       So the other item I argued in ECF 770, just for the

5  Court's attention, is that during the collateralized investment

6  period, in Hawaii, that the named individuals in superseding

7  indictment I think was ECF 214, that the individuals that

8  earned approximately $1.6 million in interest through the

9  period of the investment, and I didn't see that as a credit

10  against loss either at that point in time.

11       And then lastly just to raise for the record, I'm

12  still at a loss to understand perhaps with respect to the

13  Hawaii investment, why Mr. Peca's Grand Jury testimony that he

14  verified as being truthful at trial, at transcript 498. And I

15  think the second was at 650, forgive me if I'm wrong on that

16  second transcript number.  But he testified that his entire

17  Grand Jury testimony was truthful.  And in there he testified

18  he expected his entire Hawaii capital of $1.8 million to go and

19  cover Mr. Jowdy's loans.

20       And second on that same note, I was not sure why Mr.

21  Gonchar when he testified that his $1.5 million he gave Mr.

22  Constantine and deposited into the same commingled global

23  settlement account for Mr. Constantine to use, it's his money.

24  I'm not sure how Mr. Gonchar's not allowed to authorized that

25  it's all his own money.

1    So those are all in my submission in previous

2 submissions.  And then ultimately I had objected to the

3 complete summary tables that the Government had submitted and

4 PSR had submitted with backup records.  And it was my

5 understanding under statute that a Government, if the defendant

6 either in pro se through counsel, objects to the summary

7 tables, that the obligation became that of the Government to

8 document the backup materials of how they got to their totals.

9    And if I recall that Your Honor had actually

10 requested that the Government and/or Probation do that.  And

11 there was no response from them whatsoever.  They ignored the

12 request of the Court to substantiate the summary tables at that

13 time.  So --

14    THE COURT: All right.

15    MR. HAGGANS: Your Honor, this is Matt Haggans, I'm

16 sorry to interrupt.  I just got an email from counsel for Mr.

17 Nolan, I think they may have gotten the wrong dial in for the

18 audio line.  I sent them the correct dial in.  But we may just,

19 we may want to pause briefly to see if they're able to join.

20    THE COURT: All right --

21    MS. RAMACHANDRAN:  Your Honor --

22    THE COURT: I was going to ask you whether there were

23 any victims who wanted to be heard on the restitution, so I'm

24 glad you reminded me of that.  Is Mr. Nolan's counsel on the

25 line now?

20

1          MS. RAMACHANDRAN:  Your Honor, this is Seethe

2   Ramachandran, Mr. Nolan's counsel.  I was able to join around

3   9:15 or so, or 9:20 maybe.  My associate called chambers and

4   got the number.  So I'm on now.

5          THE COURT: Let me just make sure, we did have a

6   discussion, I'll just summarize it, as it relates to your

7   client, what I said.  First of all, for purposes of the

8   restitution, I said I'm using the chart that I used for

9   purposes of the sentencing.  Which, the total is over $14

10  million as it relates to your client $2,198,910.  I made clear

11  on this issue of whether or not there should be an offset based

12  upon your client's settlement with Mr. Jowdy.  I noted that

13  because that, as you had written in your letter to me, because

14  that interest had not been realized, the credit would be at

15  best premature.  And Mr. Kenner did speak to that briefly a

16  moment ago.

17          But that's pretty much as relates to your client,

18  what's been discussed.  But if there's anything you want to add

19  now, feel free to do so.

20          MS. RAMACHANDRAN: Your Honor, I think what my

21  arguments are pretty summarized in my submissions to the Court.

22  I believe that, you know, in addition to the amounts proven up

23  at trial (indiscernible - background noise) course of conduct

24  that the other amounts relating to Eufora, Arizona, and so

25  forth, are also compensable to Mr. Nolan.  That's primarily the

1  argument.

2        I understand that those numbers aren't going to match
3  up with what the Court is ordering.  But you know, I believe
4  he's also entitled to prejudgement interest, which I think the
5  Government agreed with in its last submission on the issue.

6        So that's what I would say on that. And then as for
7  the forfeiture, you know, any amounts he might recover through
8  forfeiture -- his separate interest in the property, you know,
9  I think that is within the Court's discretion. But here, his
10 losses far exceed you know, what he could ever recover through
11 evenly through restitution or forfeiture.  So I don't believe
12 an offset for restitution is appropriate, even if he's able to
13 recover, which is unclear at this point.

14        THE COURT: All right.  I did discuss this issue of
15 proven amounts beyond what was proven at trial and at
16 forfeiture.  And my ruling, and obviously I understand you
17 object to this and you put in submissions on this. But my view
18 is to have another hearing, opening up this litigation to
19 another hearing about the differences in those amounts, would
20 prolong and complicate the sentencing beyond what is prudent
21 under these circumstances.  And it's a discretionary decision
22 by the Court that any additional amounts could be pursued by
23 the victims in civil litigation.

24        On the issue of offsets or credits, again we can
25 revisit that should that become necessary. But I believe that,

1   obviously as we sit here now, there's no offset as it relates

2   to your client.  And on the issue of interest, I waived the

3   interest as it relates to restitution for Mr. Constantine's,

4   again it's a discretionary decision by the Court.  It's my

5   intention to do so here, given the restitution amount that the

6   Court is ordering.  And given Mr. Kenner's current lack of

7   assets.  We're talking about $14 million to all the victims.

8   And litigation has gone for, these were like ten years ago

9   these investments.  So, I think to stack on the interest on top

10  of the payments is unwarranted at this point.  And impactful

11  affecting other victims' ability to recover principal as

12  opposed to interest, because I don't believe it seems to me

13  remote in the extreme that he's going to be able to pay off the

14  principal of $14 million.  All right.

15          MR. BRISSENDEN: Your Honor.

16          THE COURT: Yes.

17          MR. BRISSENDEN: I was wondering, I was myself

18  surprised and concerned by Mr. Kenner's representation that he

19  doesn't have access to document number 812.  It's been my

20  practice as we've been going along to send all the docket

21  filings to Mr. Kenner, including this document. But I will note

22  that it was filed some time ago, back in February of 2020.

23  There's been a lot of filings. I don't know if somehow Mr.

24  Kenner doesn't have it in front of me or if it got lost in the

25  shuffle.  I am concerned, given the centrality of that document

23

1 and that calculation that he does not have it in front of him.

2 I don't know if he's comfortable proceeding at this point

3 without having that chart in front of him. I don't know what

4 the Court's view is on that.

5           THE COURT: What was I was going to do is, I was going

6 to read out the amounts and individuals on there out loud so he

7 could hear them.  And ask him whether if he wants to put this

8 off to look at that.  I'm asking my deputy to confirm as he was

9 speaking, that the Government, it was indicated in their letter

10 to the Court that they mailed it to him.  This is the same

11 number that the Court used at sentencing in the fall.  So, I

12 don't think it's a number that Mr. Kenner is unfamiliar with.

13 He may not have it in front of him right now.  But I'm quite

14 certain that he has seen this information.

15           But Mr. Kenner, it's up to you.  Obviously, do you

16 want me to read it out loud so you can hear it, or do you want

17 to --

18           THE DEFENDANT: Perhaps just to short-circuit the time

19 on that, Your Honor.  Just as a matter of record, if someone

20 could just mail it to me I would be pleased with that.

21           THE COURT: I don't want there to be an issue on

22 appeal when you're saying, the Judge ordered restitution and I

23 didn't have the chart that he was using. That's, you know, I

24 don't want this to be an issue later.  Giving it to you after

25 the fact isn't going to give you the ability to object.  My

1  intention is to read it out loud.

2       THE DEFENDANT: That's fine, Your Honor.  I appreciate

3  your concern to make sure that we've got it properly documented

4  on the record. I wasn't raising it for that issue prior, I was

5  just asking if I could have a copy of it.

6       THE COURT: All right.

7       THE DEFENDANT: But if you, maybe I could address two

8  issues prior that, one that Mr. Nolan raised and then the last

9  one that you had previously raised.

10      THE COURT: Yes.

11      THE DEFENDANT: And then if you would read out the

12 chart numbers, I would appreciate that then, and then we can

13 satisfy that issue.  And unless there's anything on ECF 812, it

14 can or could not be sent to me, it doesn't matter.

15      First, Your Honor had mentioned that there were other

16 civil lawsuits filed.  And I'm not familiar with any other

17 civil lawsuits that were filed in this matter.  So maybe

18 there's something the Court knows that I'm not aware of.

19      THE COURT: No, I'm just making -- there's been talk

20 about civil lawsuits over the years forever. But I'm not

21 talking about anything -- way back when, so I'm not aware of

22 anything you're not aware of.

23      THE DEFENDANT: Okay, Your Honor.  Because other than

24 the Nolan arbitration that we discussed, ad nauseam, I think

25 the only other lawsuits were suits that I filed as a plaintiff

1    or filed on behalf of my investors as plaintiffs.  So I just

2    wanted to make sure there wasn't something out there that I

3    didn't understand or was unaware of.

4            And then second, with respect to Mr. Nolan's attorney

5    and the finding of restitution or loss to Mr. Nolan, I just

6    wanted to put on the record that I believe that Mr. Nolan had

7    given his only testimony relative to the Hawaii investment, of

8    which that's the only part of the charged counts that I believe

9    he's involved with, I think it was at transcript 2065 and 66,

10   that he had no memory of his line of credit whatsoever.

11           We did find out, which Your Honor probably has not

12   seen in Kenner Trial Exhibit 210, which was the Northern Trust

13   subpoena that arrived in week 7 of the trial, Nolan had signed

14   19 documents over a five year period of time with respect to

15   his line of credit.  And his initial document in 2004, when he

16   signed his $2.2 million line of credit, was all signed in his

17   own handwriting.  So that was the initiation of his line of

18   credit authorizing a $2.2 million investment in Little Isle IV.

19           Also I'm not sure if Your Honor recalls from some of

20   the submissions, but Mr. Nolan's private banker at Northern

21   Trust, Aaron Mascarella, who made an appearance at trial, he

22   was deposed by Nolan's counsel in 2009 prior to the

23   arbitration.  And confirmed that he had been speaking -- he had

24   spoken with Nolan several times between '03 and '06 about

25   Nolan's line of credit.

1           And then I, in the late drop of discovery that came

2    in in the last month before trial, I had also forwarded to the

3    Court in several submissions emails that were between Nolan's

4    private banker at Wells Fargo, Nolan's wife, and Nolan's

5    private assistant, emails that I had never seen before, or some

6    of them I had never seen before, because I wasn't included.

7    But they were all making payments on Nolan's line of credit

8    throughout the period of time that Nolan's line of credit was

9    open.  So it was independent of me they were handling this

10   business with Mr. Mascarella at Northern Trust.

11           Also I don't know that the Court has seen, but it was

12   in submission, Mr. Nolan's 2006 K1, the Government at trial had

13   represented the only place that it was ever found was at my

14   house.  But that was incorrect, Your Honor.  The Nolan 2006 K1

15   document representing his entire $2.3 million Hawaii investment

16   was recovered from Mr. Nolan.  He Bate stamped it. I believe

17   off memory, was Nolan 0005044, for the 2009 arbitration.

18           And then just for the record, for Mr. Nolan's

19   counsel, I know that she has referenced several times and she's

20   advocating very well for Mr. Nolan and I do appreciate that on

21   his behalf.  I don't begrudge her for putting forth argument.

22   But she has consistently referenced that I had fraudulently

23   opened up Mr. Nolan's account, his line of credit and then

24   stolen all of the money.  There's no money from Mr. Nolan

25   that's traceable to anything that I have possession of now or

1 ever.

2       And I'm not sure that the Government has shared with

3 any of their, any of the people who testified at trial that

4 during forfeiture they submitted Government forfeiture Exhibit

5 44, which confirmed that all the money that Mr. Galioto had

6 told all the investors I stole, was actually the Government

7 documented that Mr. Jowdy received 100 percent of that money.

8 And then subsequently they submitted Government forfeiture 36,

9 which also confirmed that their five summation comments that I

10 had with the stolen money bought my Mexico equity.  That in

11 Government 36 it confirms that my partners, Mr. Stumble

12 (phonetic) and Mr. Letman (phonetic) had made $4.1 million

13 worth of contributions to the Cabo San Lucas purchase even

14 though Mr. Jowdy stole $1.6 million of that which I documented

15 for the Court.  And only 2.5 million was documented into our

16 capital account.

17       So just want Mr. Nolan's attorney to know that the

18 money, Mr. Nolan's money was not redirected in any manner into

19 my pocket or for my benefit whatsoever.  That the Government

20 actually documented that both in Government 44 and Government

21 36 during forfeiture hearings.

22       THE COURT: All right.  The bottom line is, again I

23 don't want to relitigate the trial.  You have your appeal. But

24 the bottom line is, we've talked about many times, if you took

25 their money in an authorized way and gave it to Mr. Jowdy, the

1  fact that Mr. Jowdy may have done what you expected or promised

2  him, he promised to do with the money, it's a whole different

3  issue -- they have still been defrauded by you.  You still owe

4  them that money because it shouldn't have been there in the

5  first place.

6        But I also want to make clear, the Court, it's not

7  just the testimony of Mr. Nolan, obviously I believe these

8  restitution amounts is supported by the documentation.  The

9  fact that, in other words he does not remember a particular

10  amount or certain things with respect to the line of credit

11  does not mean that it's not proven that it was used in an

12  unauthorized way.  And that the amounts have not been proven.

13        And the last thing I'll say is, I don't want to make,

14  I know you put a lot of time into making submissions to the

15  Court, when I say I've only considered the evidence at the

16  hearing, at trial, the trial evidence and the hearing evidence,

17  I'm also considering obviously all your submissions, even

18  though I'm denying you an evidentiary, I have considered all

19  your submissions that you've made on these issues over time,

20  and they're all part of the record as well.

21        All right.  But before I impose the restitution,

22  anything else the Government wants to add?

23        MR. HAGGANS: No, thank you, Your Honor.

24        THE COURT: All right.  So this is the amount of

25  restitution the Court is imposing. And again because Mr. Kenner

1  doesn't have the chart in front of him right now, I'll read the

2  amounts and the individuals.  I'll break it down by which --

3  with respect to the trial it relates to just so he can hear and

4  if you have any issue with proceeding based upon hearing that,

5  Mr. Kenner, I'll consider that. Even though, again, when I'm

6  asking you whether you want to proceed or not, you're not

7  consenting to the amounts, you're just telling me that you

8  don't want an adjournment to further contemplate those amounts

9  or respond to them.

10         So I find by a preponderance of the evidence based

11  upon the credible evidence at trial, and the forfeiture

12  hearing, that the following individuals should receive

13  restitution in the following amounts.

14         Brian Berard, $100,000 for Hawaii. $649,405 for the

15  line of credit. $375,000 for Led Better.  Mr. Sergei Gonchar,

16  $899,221 for the line of credit.  Ethel Kaiser, $700,000 for

17  Hawaii.  John Kaiser, $1 million for Hawaii.  Jay McKee,

18  $250,000 for the global settlement fund.  Glen Murray, $100,000

19  for Hawaii. $1,242,769 for the line credit. $250,000 for

20  Eufora. $250,000 for the global settlement fund.

21         Tyson Nash, $100,000 for Hawaii. $100,000 for Eufora.

22  $100,000 for GSF.  Mr. Owen Nolan, $2,198,910 for the line of

23  credit.  Michael Peca, $100,000 for Hawaii. $1,794,392 for the

24  line of credit. $100,000 for Eufora. $250,000 for the global

25  settlement fund.

1  Nicholas Privitello, $200,000 for Eufora.  William

2  Ranford, $400,000 for Eufora. $300,000 for GSF.  Steven

3  Rucchin, $100,000 for Hawaii. $856,200 for the line credit.

4  $250,000 for Eufora. $50,000 for GSF.  Turner Stevenson,

5  $100,000 for GSF.  Darryl Sydor, $100,000 for Hawaii. $856,200

6  for the line of credit.  $50,000 for Eufora. $250,000 for the

7  global settlement fund.  For a total of $14,072,097, joint and

8  several with Mr. Constantine to the extent that I have imposed

9  restitution to that particular victim in some amount.

10  As I noted before, in my discretion given the amount

11  of the loss here, which is astronomical, given Mr. Kenner's

12  lack of current assets, I'm waiving the interest on the

13  amounts.

14  So Mr. Kenner, again, are you requesting an

15  adjournment to review the chart, or you're okay with me

16  imposing that now?

17  THE DEFENDANT: No, you can impose that.  I just had

18  three questions, just to make sure I heard something correctly.

19  Mr. Privitello you had for 200,000 and those are the two counts

20  that I was found not guilty of, I just wanted to make sure that

21  Your Honor had recalled that.

22  Turner Stevenson, I'm not sure that his name had come

23  up during, throughout the trial, other than during opening

24  remarks.  And then Mr. Berard for the Led Better 375, I'm sure

25  Your Honor recalls that in submission I put in that through --

1       THE COURT: Wait, wait, go back to the second one,

2  what was the second one?

3       THE DEFENDANT: Turner Stevenson, he was not mentioned

4  at trial that I'm aware of, other than during opening remarks.

5  Was never named as a victim in the case.  You know, in the

6  Tenth Circuit, in United States versus Mendenhall, Chief Judge

7  Tomkovich (phonetic) had noted that since that United States,

8  since Hughey versus United States which was 495 US 411 at 413,

9  in 1990, that since Supreme Court decided Hughey almost 30

10  years ago, the prosecutorial -- an indictment was viewed a

11  success at trial rather than a victim's interest in full

12  compensation are made with the full understanding that the

13  potential consequences of victim restitution, and that Congress

14  has authorized restitution only for the loss caused by the --

15       THE COURT: All right, what was the third one?

16       THE DEFENDANT: The third one was, and I give you the

17  Tenth Circuit if you like that, the cite. But the third one was

18  in Mr. Berard, I had submitted multiple documents on that Led

19  Better 375 that confirmed that Mr. Berard and Mr. Kaiser had

20  stolen the Led Better title through, what the FBI considered as

21  one of their greatest frauds these days through title fraud,

22  with forged documents. And that Mr. Kaiser and Mr. Berard had

23  sold that property and kept the entire proceeds of $700,000

24  plus.  So not only did they, I not touch Mr. Berard's money,

25  but Berard and Kaiser stole that property from the LLC.  And

1  then kept the 700,000 proceeds --

2          THE COURT: Obviously Mr. Kenner, the jury disagreed

3  with you on that evidence.  And so do I.  So, again I don't

4  want to relitigate the trial.  But I am more concerned about

5  the other two you raised.  Let me have -- respond to that.

6          MR. HAGGANS: So with respect to the Turner Stevenson

7  losses, Your Honor, those are cited in the PSR at paragraph 29.

8  Global settlement fund at to Mr. Stevenson in the amount of

9  $100,000.  So that's where that citation is drawn from.

10         And the other as to Mr. Privitello, that's the same

11  citation, paragraph 29 in the PSR.  And the, I believe that, I

12  think Mr. Kenner's objection to that one was limited to the

13  prospect that he may -- he was acquitted of Counts related to

14  that.  I believe that restitution can accrete based upon the

15  entirety of the convicted conduct.

16         So if the Court were to find that notwithstanding

17  acquittal on some counts that there are still losses linked to

18  the remaining counts of conviction, the Court can impose

19  restitution as to those amounts.

20         THE COURT: All right, why don't we do this. I'm going

21  to hold off finally imposing restitution. I want to look at

22  those two issues.

23         THE DEFENDANT: And Your Honor, if I could just raise

24  two others, just on the chart if I recall it properly.

25         THE COURT: Yes.

1          THE DEFENDANT: Mrs. Kaiser, she testified at trial

2   that she was completely repaid her contribution.  You had

3   listed her as 700,000 which I'm sure the Government or PSR has

4   documented in the chart somewhere. But she testified at trial

5   she made a $390,000 contribution and that her son had

6   completely paid her back.  And then Mr. Kaiser hasn't, never

7   identified that he had a single dollar of his own invested in

8   the, by the bank records that the Government stipulated into

9   the case.

10          So the million dollars he was paid back.  I know he

11  gave the excuse that it was for back pay and expenses.  But we

12  had requested that either $10 worth of expenses be documented

13  for the Court.  Which the Government never did because it's not

14  possible.  And/or that Mr. Kaiser for in camera review could

15  present his 2006 or 2007 IRS taxes to show that the 195,000 of

16  that million he said that he did receive, that was actually for

17  back pay.  And ultimately the banking records confirm all of

18  this, Your Honor.

19          The PSR totals, I mean this is the same PSR that

20  documented in July of 2016 that Mr. Jowdy, Mr. Gaudet and Mr.

21  Kaiser all testified at the forfeiture hearing with respect to

22  the Jowdy loan agreement.  And as Your Honor recalls, none of

23  those people testified.  So I'm not sure where PSR is getting

24  any of their information.

25          THE COURT: Well again, I don't want to -- I

1  obviously, as it relates to the loss amounts, not relying on

2  the PSR.  We're way beyond that.  But and I do want the

3  Government to respond to these things, especially Mr.

4  Stevenson, because if, again if there's no -- it doesn't have

5  to be that he testified at the trial, but if there's not

6  documentation that's part of the trial record or the forfeiture

7  record that would establish that he suffered that loss, then it

8  should be eliminated.  It's a relatively small dollar amount.

9  And you know, obviously wouldn't have impacted the Court's

10 sentence on the bottom line several months ago.

11        THE DEFENDANT: Your Honor, I'm not suggesting that

12 100,000 is a small amount to Mr. Stevenson.  I don't want the

13 Court to misconstrue my representation.

14        THE COURT: No, I'm not saying, I'm not saying it's a

15 small amount for him, I'm saying it's a small amount compared

16 to the extent that the Court sentenced you based upon $14

17 million of loss. I'm saying if it turns out we're going to take

18 Mr. Stevenson's out, you wouldn't receive less than 17 years

19 because it was $100,000 less. That's what I'm suggesting.  I'm

20 not suggesting that it's not important.

21        THE DEFENDANT: Your Honor, I wasn't challenging any

22 of that, I was just making --

23        THE COURT: All right.

24        THE DEFENDANT: -- Mr. Stevenson's money is just as

25 important as everyone else who made these respective --

1           THE COURT: All right.  I agree.  So Mr. Haggans, you

2  can put in a letter, I don't know, is a week from today enough

3  time?  Or ten days?

4           MR. HAGGANS: I know I owe the Court a brief on the

5  16th on the compassionate release motion.

6           THE COURT: Yes.

7           MR. HAGGANS: Perhaps we can make it the same date.

8           THE COURT: Yes, why don't we do that.  And then Mr.

9  Kenner, if you get that on the 16th, how long, you want two

10 weeks to respond?  Is that enough?  I know sometimes you have

11 issues about access to things you need.

12          THE DEFENDANT: Your Honor, you have my word that as

13 fast and as expedite as I can get it back to you, I will. Let's

14 set two weeks as the time frame, and then perhaps Mr.

15 Brissenden can let you know if there's any access issues from

16 my ability to work --

17          THE COURT: That's fine.

18          THE DEFENDANT: -- based on ongoing quarantine issues.

19          THE COURT: I'll --

20          THE DEFENDANT: We're suffering a fourth wave here

21 right now. So we, we'll take it day by day.  But I'll have Mr.

22 Brissenden keep you abreast if there's any changes that will

23 affect either reply by the end of the month.

24          THE COURT: All right.  And Mr. Haggans, why don't you

25 plan, I know sometimes it's hard to get a time with the jail.

36

1  But why don't we plan to have in early May a final conference

2  on the restitution and obviously on the compassionate release

3  issue, all right?

4          MR. HAGGANS: Just so, that's absolutely fine, Your

5  Honor. Just so I'm absolutely clear for the letter addressing

6  restitution issues. Is it only the Turner Stevenson citation?

7          THE COURT: No, I do, the other issue he raised at the

8  end, again like the trial was so long ago I don't have any

9  independent memory of it.  But he's saying Ethel Kaiser said

10  she was paid back the money.  So I want you to address that.

11  And Mr. Privitello, I don't know, I am going to consider that.

12  I obviously know the law that the fact that he's acquitted

13  doesn't mean that the Court can't still find. But I'm going to

14  back and look at that issue, if the Government wants to address

15  that it would be helpful.

16          MR. HAGGANS: So as to Mr. Privitello, Mr. Stevenson,

17  Mr. Berard, John Kaiser and Ethel Kaiser, I think were the

18  issues Mr. Kenner raised.

19          THE COURT: Right, that's it.

20          MR. HAGGANS: Understood, Your Honor.

21          THE COURT: All right.

22          THE DEFENDANT:  And Your Honor, just to clarify the

23  record.  Was Mr. Nolan's number $2.2 million?

24          THE COURT: A little under, $2,198,910.

25          THE DEFENDANT: Okay.

37

1          THE COURT:  But we'll make sure you get this chart so
2   you'll have it and obviously in early May if you have anything
3   you want to add, you can.  So, Mr. Brissenden, just work with
4   him just to make sure he gets this chart, okay?

5          MR. BRISSENDEN: I'll do that, Your Honor.

6          THE DEFENDANT: If you can get the, just so the number
7   is correct, Mr. Nolan also had a $100,000 cash contribution
8   investment to the project.  But I'm not sure why the Government
9   didn't calculate that if in fact they're deeming like Mr. Peca
10  or for Mr. Berard or Rucchin, or Sydor also had the $100,000
11  contributions.

12         THE COURT: All right.  Anything else from the
13  Government?

14         MR. HAGGANS: No, I would just, for the record I would
15  confirm Mr. Brissenden's impression, you know, the letter does
16  state that we did mail it on or about the date of filing. And
17  I, in addition to Mr. Brissenden' providing another copy, I
18  will send another copy after this proceeding, of 812, to the
19  defendant's attention.

20         THE COURT: Okay.  All right very much.  Mr. Kenner is
21  there anything else for today?

22         THE DEFENDANT:  No, that's -- thank you Mr. Haggans
23  for sending that along.  I didn't think that you guys didn't do
24  it, but things get lost in the mail here from time to time.  So
25  thank you.

1          MR. HAGGANS: Your Honor, before we adjourn, are we

2    going to set a date for early May?

3          THE COURT: Yes.

4          MR. HAGGANS: It would be good, if only to reserve the

5    --

6          THE COURT: Yes. I would say, how about May 5th?   Let

7    me just check.

8          THE DEFENDANT: What are we going to address on May

9    5th, Your Honor?

10         THE COURT: May 5th would be finalize the restitution.

11   And to address the compassionate release issues.

12         THE DEFENDANT: Thank you, Your Honor.

13         THE COURT: But let me just make sure.

14         MR. HAGGANS: I can do that date so long as it's not

15   10:30, I have another appearance at 10:30.

16         THE COURT: Well we can do it, what do they have, 9,

17   11, what are those slots?

18         MR. HAGGANS: I think it would be 9 or noon.

19         THE COURT: Let's do noon.  9 is a little early.

20         MR. HAGGANS: Okay.  So that's May 5th at noon.

21         MR. BRISSENDEN: I'm available, Your Honor.

22         THE COURT: All right.  Thank you very much everybody

23   have a good day.

24         MR. HAGGANS: Thank you, Your Honor, you too.

25         THE DEFENDANT: Thank you.

39

1          MR. BRISSENDEN: Thank you, Judge.

2                    *  *  *  *  *

3              **C E R T I F I C A T I O N**

4          I, **PATRICIA POOLE**, court approved transcriber,

5  certify that the foregoing is a correct transcript from the

6  official electronic sound recording of the proceedings in the

7  above-entitled matter.

8

9  /S/ PATRICIA POOLE

10  TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: April 7, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25