

**U.S. Department of Justice**

*United States Attorney
Eastern District of New York*

SK/JMH
F. #2013R00948

*610 Federal Plaza
Central Islip, New York 11722*

April 16, 2021

**Exhibit 2 to be
Filed Under Seal**

<u>By ECF</u>

The Honorable Joseph F. Bianco
Visiting United States Circuit Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Phillip A. Kenner
     <u>Criminal Docket No. 13-607 (JFB)</u>

Dear Judge Bianco:

  The government respectfully submits this letter in opposition to the defendant's motion for compassionate release. <u>See</u> ECF No. 1006 (Mar. 9, 2021) (hereafter "the Motion"). In the few of its pages addressing the compassionate release statute, 18 U.S.C. § 3582 ("Section 3582"), the Motion fails to establish that any reduction in sentence is warranted. The remainder of the Motion and its exhibits are merely the latest admixture of the defendant's challenges to the trial record and the jury's verdict. These claims of error have already been resolved by the Court and cannot be advanced via a compassionate release motion. In any event, they are without merit.

  The Motion therefore should be denied.

I. <u>The Motion Relies Upon Facts Already Considered By the Court At Sentencing</u>

  The opening pages of the Motion do address compassionate release but rely in large part upon allegations that were already before the Court, and considered by the Court, in mitigation at the defendant's October 2020 sentencing. <u>See</u> generally Tr. of Sentencing, attached hereto as Exhibit 1 (Oct. 5, 2020).

  Most of the Motion's claims relating to compassionate release rely upon conditions of the defendant's confinement at the Metropolitan Detention Center ("MDC").

Even assuming that the defendant's claims regarding MDC conditions are true—which the government does not concede—the record of the sentencing proceeding makes clear that the Court has already considered MDC conditions in fashioning its ultimate sentence. The Motion does not allege anything that has happened between October 2020 and today that renders the Court's prior conclusions erroneous. Indeed, a comparison of the Motion to the sentencing transcript shows considerable similarities between Kenner's claims now, and the Court's consideration of those same claims at sentencing:

| **Kenner, in the Motion** | **The Court, at sentencing** |
| --- | --- |
| "The defendant has served over 70 months at MDC under restrictive pretrial detention conditions and intermittent unconstitutional housing conditions[.]" Motion at 2. | "I am taking into account some of the things you wrote about, some of the things you said today, [regarding] the MDC. I think it's fair to take the conditions there into account and you have had issues there that I think go beyond the normal inmate[.]" Tr., Ex. 1 at 82. |
| "It is difficult to comprehend the severity of the MDC conditions . . . (more shocking after following the widely publicized and litigated 8-day power outage in January-February 2019[).]" Motion at 8. | "Primarily, I do think the time at the MDC warrants some consideration as a mitigating factor . . . [I]t is a pretrial facility . . . and this has been a particularly bad [period] at the MDC because of the blackout and other things that have happened there regardless of whose fault they are." Tr., Ex. 1 at 100. |
| "It is difficult to comprehend the severity of the MDC conditions throughout 2020[,]" (i.e., during the COVID-19 pandemic); "Furthermore, the courts would be hard-pressed to fairly calculate the long-term effects of the extended traumatic events [of the COVID-19 pandemic] on this defendant[.]" Motion at 9. | "[T]he fact [is] being in jail under the [COVID-19] pandemic makes the time worse. So that deserves some mitigation here." Tr., Ex. 1 at 101. |

Put another way, the relief Kenner seeks in the Motion relating to MDC conditions has already been afforded to him by the Court in mitigation of sentence. No further relief is warranted.

As for the remainder of the Motion, the defendant spends most of his time regurgitating different versions of the same arguments he has raised in repetitive, vexatious filings since the jury's verdict. Compare, e.g., Motion at 12 (alleging that Kristen Peca gave "fabricated" testimony about the Northern Trust lines of credit) with ECF No. 784 at 1 (Kenner's argument making the same claim); compare Motion at 11 (alleging that Michael

Peca's grand jury testimony absolves the defendant), with Tr., Ex. 1, at 43 ("What we do know is, Mr. Peca gave tremendous testimony to a Southern District Grand Jury in secrecy[.]").

The jury's verdict, and the Court's rejection of the defendant's myriad post-verdict challenges, have already resolved these issues against the defendant. See, e.g., Tr., Ex. 1, at 57 ("You want to continually read these documents to me that . . . you have put before me for many years. The jury found you guilty. You have made a motion for a new trial. I have denied your motion for a new trial. I am sentencing you based upon that verdict."). The crispest rejection of this latest reprise of Kenner's claims is the Court's rejection of them at sentencing:

> Instead of taking responsibility[y], all I get is [']the hockey players have CTE, Mrs. Peca is lying['], this is wh[at] [I] got year after year, document after document . . . [I]t was clear to me during the trial that the witnesses were credibly testifying to your fraud. You want everyone in this courtroom to believe Brian Berard, Joe Juneau, Ethel Kaiser, John Kaiser, Jay McKee, Tyson Nash, Owen Nolan, Kristin Peca, Michael Peca, William Ranford, Steven Rucchin, Darryl Sydor and others are all lying. They are all lying or misrepresenting, misremembering and it's ridiculous. It's ridiculous.

Tr., Ex. 1, at 77-78.

Compassionate release applications are not the proper forum to litigate Kenner's long-standing complaints about witness credibility and evidence sufficiency. The jury's verdict, and the Court's resolutions of the defendant's challenges to that verdict to date, have turned away those complaints. Kenner is free to pursue these claims, if he chooses, on direct appeal or collateral attack.

II.     COVID-19

Because the Motion makes references to the COVID-19 pandemic, the government briefly addresses the BOP's responses to that pandemic. The BOP has taken and continues to take significant steps to respond to the threats posed by the novel coronavirus COVID-19. Throughout 2020 and now into 2021, the BOP has acted to mitigate the spread of the virus.[1] As part of these measures, every confirmed case of COVID-19 in the BOP's inmate and staff population is reported and tracked. See bop.gov/coronavirus/. On March 13, 2020, the BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. Id. As of that date, the Action Plan comprised certain preventive and mitigation measures,

---

[1] See generally "BOP Modified Operations," available at bop.gov/coronavirus/covid19_status.jsp (last updated Nov. 25, 2020).

3

including the following: all incoming inmates were screened, and staff were regularly screened; contractor visits were limited to essential services, while nearly all attorney, social, and volunteer visits were suspended; inmate movements between facilities were extremely limited; and institutions were taking additional steps to modify operations to maximize social distancing. Id.; see also n.1, above.

On April 1, 2020, the BOP began implementing its Phase Five Action Plan to decrease the spread of COVID-19, which provided for securing each inmate in every BOP institution to his or her assigned cells/quarters for a period of fourteen days, while still providing inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education. The BOP continues to process newly-arriving inmates via screening protocols. Asymptomatic inmates with exposure risk factors are quarantined, and symptomatic inmates with exposure risk factors are isolated and tested for COVID-19 based on local health authority protocols. See n.1 Within facilities, BOP has implemented "modified operations to maximize social distancing," including efforts to minimize inmate gathering, while still allowing for mental health treatment, medical care, commissary visits, telephone and legal call usage, and other functions. Id.

BOP has also been granted wider authority to designate inmates for home confinement. See generally Mem. from the Attorney General, Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020);[2] Mem. from the Attorney General, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020).[3] The BOP has placed more than 24,000 inmates on home confinement during the pandemic.[4] BOP's release of inmates indirectly protects those who remain in custody, simply by reducing the number of inmates within the BOP system.

At MDC, there are currently zero inmate cases of COVID-19. As vaccines have become available, BOP has begun to distribute vaccines. Some MDC inmates have received vaccinations, among the more than 130,000 vaccine doses BOP has administered. See bop.gov/coronavirus.

No one can doubt that COVID-19 is a serious public health concern. Nor can there be any doubt that COVID-19 has impacted BOP operations at MDC. But COVID-19 existed in October 2020. Its presence did not merit the defendant's release in October 2020. It does not merit the defendant's release now, for the reasons set forth in more detail below.

---

[2] Available at: https://www.justice.gov/file/1262731/download (last accessed Sept. 17, 2020).

[3] Available at: https://www.justice.gov/file/1266661/download (last accessed Sept. 17, 2020).

[4] See bop.gov/coronavirus (last accessed Apr. 16, 2021).

III.     Legal Framework

Assuming the defendant has exhausted his administrative remedies, Section 3582(c)(1)(A)(i) permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons." Specifically, a court may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." See Section 3582; see also United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

A defendant seeking relief under Section 3582(c)(1)(A) "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist[.]" United States v. Gotti, 33 F. Supp. 3d 613, 619 (S.D.N.Y. 2020); see also United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019) (defendant seeking relief under Section 3582(c)(1)(A) bears the "initial burden to put forward evidence that establishes an entitlement to a sentence reduction").

The Sentencing Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to Section 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age, or a need to care for a child, spouse, or registered partner. See id. (defining criteria applicable to "Terminal Medical Condition(s)," "Debilitated Medical Condition(s)," and "Elderly Inmates with Medical Conditions," among others); see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress indicated that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

The Second Circuit in United States v. Brooker (also referred to as United States v. Zullo), 976 F.3d 228, 237 (2d Cir. 2020), pet'n for reh'g denied, No. 19-3218-CR, ___ WL ___ (2d Cir. Dec. 9, 2020), recently held that that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." Although the government respectfully submits that Brooker was wrongly decided,[5] the defendant has failed to identify "extraordinary and compelling reasons" even under Brooker, as the government discusses below.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

IV. The Motion Should Be Denied

The defendant fails to establish that COVID-19 is an extraordinary or compelling reason as applied to him. Similarly, he fails to demonstrate that any other factor, either individually or in the aggregate, constitutes an extraordinary or compelling reason. Moreover, even if the defendant could make such showings, he fails to show that the sentencing factors would counsel in favor of his release. The motion should therefore be denied.

As to COVID-19 in particular, the Motion fails to allege that the defendant is at elevated or severe risk of complications were he to contract COVID-19. The Motion does allege in general terms that the BOP's response to COVID-19 at MDC has been inadequate, see Motion at 3-7, but fails to take account of judicial opinions considering and rejecting the claim that the BOP's response to COVID-19 at MDC has been as inadequate as Kenner alleges. See, e.g., Chunn v. Warden Edge, No. 20-CV-1590 (RPK), ECF. No. 112, at 2 (June 9, 2020) ("Rather than being indifferent to the virus, MDC officials have recognized COVID-19 as a serious threat and responded aggressively."); id. at 61 ("The record . . . reflects that MDC officials recognize their duty to inmates and have taken extensive measures to combat the virus. The record also gives reason for cautious optimism about the effectiveness of those measures thus far[.]").

Moreover, the defendant's most recent medical records suggest that the defendant is not at any elevated or severe risk of complications were he to contract COVID-

---

[5] As set forth in the government's brief to the Second Circuit in Brooker, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.

19. See Ex. 2 (defendant's BOP medical records). Because Exhibit 2 relates to the defendant's personal medical information, the government respectfully requests permission to file Exhibit 2 under seal.

A review of the defendant's medical records reveals, for example: the defendant has been prescribed vitamins to treat a vitamin deficiency, Ex. 2 at 10 (Jan. 18, 2021); and that the defendant has complained of hearing loss, but refused to attend audiology follow-up appointments to treat that condition, see Ex. 2 at 1, 6 (Jan. 27, 2021). These conditions do not appear individually or in the aggregate to have any correlation to the defendant's risk of serious complications were he to contract COVID-19, and the defendant alleges no such risks in the Motion.

The defendant has been tested for COVID-19 at MDC and monitored for its symptoms when he has been potentially exposed. Each of his tests has been negative—anecdotal evidence that the BOP's mitigation protocols at MDC have been effective as applied to the defendant. See Ex. 2 at 24 (negative test result for sample collected on Feb. 19, 2021); id. at 26 (negative test result for sample collected on Feb. 1, 2021); id. at 28 (negative test result for sample collected on Jan. 21, 2021); id. at 30 (negative test result for sample collected on Jan. 14, 2021). More importantly, in addition to testing, the defendant has been evaluated as needed when potentially exposed to monitor for potential infection and complications from the COVID-19 virus. See, e.g., Ex. 2 at 15 (summarizing various evaluations of the defendant screening for COVID-19 symptoms between January 18, 2021, and February 20, 2021). In each of these evaluations, the defendant's fever was at or below 97.9 degrees Fahrenheit, and—for those evaluations where the defendant's comments are recorded—the defendant denied that he was suffering any COVID-19 symptoms. Cf. United States v. Shkreli, 460 F. Supp. 3d 287, 290 (E.D.N.Y. 2020) (denying motion where defendant was "a 37 year old man who suffers from seasonal allergies, for which he takes . . . over the counter medication . . . [B]ecause the defendant is considerably younger than the CDC guideline for 'higher risk' individuals, and does not currently suffer from an existing medical condition that would place him into a high risk category," and concluding that "defendant has not demonstrated that he is at a higher risk for the adverse outcomes of COVID-19").

Even if the defendant could demonstrate that COVID-19 or some other constellation of facts amounted to extraordinary and compelling circumstances, compassionate release must still be justifiable under the Section 3553(a) factors. Such a release is particularly inappropriate where, as here, a defendant has a majority of their sentence yet to be served. See, e.g., United States v. Stitsky, No. 06-CR-357 (KMW), 2020 WL 7488065, at *2–3 & n.4 (S.D.N.Y. Dec. 14, 2020) (denying compassionate release motion for a "non-violent" FCI Otisville inmate convicted of a fraudulent financial scheme, who had served a decade in prison, but less than 15 percent of the sentence imposed); United States v. Efrosman, No. 06-CR-95 (NGG), 2020 WL 4504654, at *2 (E.D.N.Y. Aug. 5, 2020) (rejecting compassionate release that would result in "an approximate 25% reduction of Defendant's sentence—effectively sentencing him to less than the bottom of the guidelines range for his offense" because that result would not "adequately reflect the

7

seriousness of the offense or provide adequate deterrence"); United States v. Binday, No. 12-CR-152 (CM), 2020 WL 4017822, at *7 (S.D.N.Y. July 16, 2020) ("Permitting [defendant] to be released after serving less than a third of his twelve-year term of imprisonment would neither provide just punishment nor would it promote respect for the law."); United States v. Danilovich, No. 12-CR-171 (JPO), 2020 WL 3642246, at *2 (S.D.N.Y. July 6, 2020) ("[T]he Court cannot conclude that release to home confinement now—just four years into a 25-year sentence—is justified based on consideration of the factors set forth in 18 U.S.C. § 3553(a)."); United States v. Nissen, No. 17-CR-477 (PAE), 2020 WL 2614825, at *3 (S.D.N.Y. May 22, 2020) ("The vast majority of his sentence is ahead of him. In these circumstances, his release now would neuter the sentence the Court thoughtfully imposed and undermine the goals of just punishment and general deterrence that largely undergirded it."); see also Shkreli, 460 F. Supp. 3d at 291 ("Reducing Mr. Shkreli's sentence by half would not further the goals of 3553(a).").

Moreover, defendants facing long prison sentence who have been granted compassionate release have typically shown a considerable and dedicated effort at rehabilitation and remorse. See, e.g., United States v. Vargas, No. 88-CR-325 (VEC), __ F. Supp. 3d __, 2020 WL 6886646 (S.D.N.Y. Nov. 24, 2020) (reducing sentence where defendant demonstrated record of rehabilitation and submitted statements from BOP counselors to corroborate that record, among other factors); United States v. Rice, No. 83-CR-150 (LGS), 2020 WL 4505813 (S.D.N.Y. Aug. 5, 2020) (reducing sentence where defendant submitted credible evidence of a release plan and rehabilitation, including "multiple letters submitted by fellow prisoners and [] family members . . . all highlighting the positive and persistent role that Defendant has played in their lives" notwithstanding decades in custody, among other factors); United States v. Mapp, 467 F. Supp. 3d 63 (E.D.N.Y. 2020) (reducing sentence where defendant was a "model inmate" who had submitted substantial evidence of rehabilitation, and government "acknowledge[d] [defendant has a 'model prison record'").

By contrast, the Motion makes one passing and conclusory reference to the defendant's claimed rehabilitation, for the proposition that simply by being incarcerated, the defendant has been rehabilitated. Motion at 8. The Motion makes no reference to the defendant's remorse. As the Court's comments at sentencing makes plain, the Motion submits no evidence of rehabilitation or remorse because the defendant has not been rehabilitated and is not remorseful:

> I agree that I don't think [the defendant] has any remorse. I have not seen any remorse in the seven years that he has been before me . . . I don't think he has any empathy or remorse. I am not just saying that. It is important that he hears it.
>
> \*    \*    \*
>
> I don't think I've ever seen, in my 13 years as a judge, for someone to go after the victims in every single way that he can.

8

> I have never seen that before . . . To have someone not only taking your money but attacking you in that way, I think obviously makes it even worse.
>
> \* \* \*
>
> I have no assurance and confidence that you will not go out and do this again. Someone who is refusing [to] recognize they did anything wrong who is smart as you are . . . I have no confidence that you would [not] do it again and that is unusual when I sentence somebody.

Tr., Ex. 1, at 34, 35, 82.

The defendant was sentenced to 17 years of imprisonment, 204 months. He has been in custody since November 13, 2013. As of the date of this filing, he has served approximately 89 months of his sentence. The majority of 115 months remains. At best, assuming good time credit, the defendant has served approximately half of a sentence the Court imposed just several months ago. A reduction of this magnitude would not promote respect for the law, would not reflect the seriousness of the defendant's offense conduct, and would not represent just punishment for that conduct, as no single fact nor any constellation of facts have changed so radically since October 2020 as to compel a 50% discount to the defendant's sentence. Cf. Stitsky, 2020 WL 7488065, at *2-3 (rejecting application for compassionate release where defendant "perpetrated a massive fraud that caused harm to more than 350 victims . . . Such an offense warrants severe punishment.").

V.  Conclusion

The Court imposed its ultimate sentence after careful deliberation. The Court imposed that sentence with good reasons, to reflect the harms the defendant caused, the seriousness of the scheme, and to provide just punishment. See generally Tr., Ex. 1, at 96-103.

The defendant fails to point to any legal error made by the Court at sentencing. Nor does he identify anything that has occurred since sentencing that is of such gravity as to justify the Court cutting that sentence in half. The Motion should be denied.

The government respectfully requests permission to file Exhibit 2 under seal because it relates to the defendant's personal medical information. See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common-law

right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).

               Respectfully submitted,

               MARK J. LESKO
               Acting United States Attorney

       By:  /s/ J. Matthew Haggans
          Saritha Komatireddy
          J. Matthew Haggans
          Assistant U.S. Attorneys
          (718) 254-7000

Enclosures (2) (Exhibit 2 filed under seal)
cc: Clerk of Court (JFB) (By ECF)
   Phillip A. Kenner (*pro se*) (By First-Class Mail)
   Matthew Brissenden, Esq. (By ECF)