1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     :  13-CR-607

    -against-                    US District Court
                           Central Islip, NY
PHILLIP A. KENNER and
TOMMY CONSTANTINE,                October 5, 2020
             Defendants.:  11:30 am
- - - - - - - - - - - - - - X

      TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE JOSEPH F. BIANCO
      UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          SETH D. DUCHARME
                            United States Attorney
                            100 Federal Plaza
                            Central Islip, New York 11722
                            By:  SARITHA KOMATIREDDY, ESQ.
                                 J. MATTHEW HAGGANS, ESQ.
                                 MADELINE M. O'CONNOR, ESQ.
                                 DIANE C. LEONARDO, ESQ.
                            Assistant US Attorneys

For the Defense:            PHILLIP A. KENNER
                            Pro Se

Stand-By Counsel:           MATTHEW BRISSENDEN, ESQ.
                            For Defendant Kenner

                            SANFORD N. TALKIN, ESQ.
                            For Defendant Constantine

Court Reporters:            Dominick M. Tursi, CM, CSR
                            Owen Wicker
                            US District Courthouse
                            100 Federal Plaza
                            Central Islip, New York 11722
                            (631) 712-6108
                            DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by CAT.

2

1          (Call to Order of the Court.)

2          MS. KOMATIREDDY:  Saritha Komatireddy for the

3     United States.  I am joined by AUSA Matthew Haggans, AUSA

4     Diane Leonardo, and AUSA Madeline O'Connor.

5          I am also joined by the case agents on this

6     case:  FBI Special Agent Matthew Galioto and IRS Special

7     Agent Joshua Wayne.

8          THE COURT:  Good morning to all of you.

9          MR. BRISSENDEN:  Good morning, your Honor.

10         Matthew Brissenden, standby counsel for Mr.

11    Kenner.

12         THE COURT:  Good morning, Mr. Brissenden.

13         MR. KENNER:  Phil Kenner, defendant.

14         THE COURT:  Good morning, Mr. Kenner.

15         MR. TALKIN:  Good morning, your Honor.  Sanford

16    Talkin for Mr. Constantine, who is on the telephone.

17         And, your Honor, if I do touch my phone during

18    the proceedings, it is because I am communicating with him

19    by telephone.

20         THE COURT:  That's fine.

21         And Mr. Constantine, are you on the phone?

22         MR. CONSTANTINE:  Yes, your Honor.

23         THE COURT:  At any point if you can't hear, let

24    us know.  And if you get cut off, text Mr. Talkin right

25    away so he can let us know that you have dropped off the

3

1   line.

2           Okay, Mr. Constantine?

3           MR. CONSTANTINE:  Yes, sir, your Honor.

4           THE COURT:  And I believe we also have some of

5   the lawyers on the phone in connection with forfeiture

6   issues, although we are not going to be discussing

7   forfeiture today.

8           Does the government know, are there any victims

9   on the phone?

10          MS. KOMATIREDDY:  Yes, your Honor.  We had

11  advised before today that we would be calling victims who

12  plan to make statements.

13          THE COURT:  That's fine.

14          And you do have victims present in court.  Do

15  you have a list of who is here?

16          MS. KOMATIREDDY:  Yes, your Honor.  I can speak

17  to that.

18          THE COURT:  And do you have a list here?

19          MS. KOMATIREDDY:  Yes, your Honor.

20          Speaking and present in court are Mr. Bryan

21  Berard, Mr. John Kaiser, Mr. Michael Peca, and Mrs.

22  Kristin Peca.

23          Prior to today's proceeding, Ms. Ethyl Kaiser

24  also submitted a letter that she asked be read in court,

25  which I will do at the appropriate time, your Honor.

4

1    Also present in court are Mr. Nicholas

2  Privitello, Mr. Bob Rizzi, and Mr. Theodore Hughes.

3    THE COURT:  What was the last name?

4    MS. KOMATIREDDY:  Hughes.

5    THE COURT:  Good morning to all of you.

6    We are here for sentencing today.  Are both

7  sides ready to proceed?

8    Is the government ready to proceed?

9    MS. KOMATIREDDY:  Yes, your Honor.

10    THE COURT:  Mr. Kenner, are you ready to

11  proceed?

12    MR. KENNER:  Yes, sir, your Honor.

13    THE COURT:  I'm going to ask Mr. Kenner to pull

14  the microphone a little closer.  You can remain seated.

15  You don't have to stand.

16    MR. KENNER:  Thank you.

17    THE COURT:  I just want to confirm that

18  obviously we had the first stage of the sentencing, with

19  respect to the objections to the presentence report, back

20  in February.  On February 13.  And then the pandemic hit,

21  so we had to adjourn the March conclusion, which we are

22  conducting today.

23    I want to confirm with both sides that, with

24  respect to the documents from the probation department, we

25  have the presentence report, we have the probation

5

1    department's recommendation, and we have the two addenda.

2           Have both sides received those and reviewed

3    them?

4           From the government?

5           MS. KOMATIREDDY:  Yes, your Honor.

6           THE COURT:  Mr. Kenner?

7           MR. KENNER:  Your Honor, I'm not sure I received

8    the probation's second addendum.  I have seen the July

9    2016 addendum.

10          THE COURT:  It is one page.  I will give you my

11   copy.

12          MR. TALKIN:  Your Honor, while we are doing

13   that.  I got a text from Mr. Constantine.  He requested

14   that all the people that are on the line mute their lines

15   because there is so much background noise he is having

16   trouble.

17          THE COURT:  Yes.

18          Everyone who is on the phone should mute their

19   lines so that it does not create background noise.

20          (There was a pause in the proceedings.)

21          THE COURT:  The court reporter is asking for

22   everybody to remain seated so they can stay close to the

23   microphone.  So everyone can remain seated.

24          Obviously, this relates to all the issues that

25   we discussed in February.  So you have all the documents,

6

1    Mr. Kenner?

2              MR. KENNER:  Yes.  I believe so.

3              THE COURT:  All right.  So just to summarize.

4              With respect to the guidelines calculation from

5    the February proceedings, I ruled on various objections in

6    calculating the offense level to be a level 39, criminal

7    history category I, resulting in an advisory guidelines

8    range of 262 to 327 months.  Okay.

9              Obviously, Mr. Kenner, your objections are all

10   preserved for purposes of appeal with respect to that.

11             Are there any outstanding issues with respect to

12   objections?

13             From the government?

14             MS. KOMATIREDDY:  No, your Honor.

15             THE COURT:  Mr. Kenner?

16             MR. KENNER:  No, sir.

17             THE COURT:  So now we will proceed to the

18   remainder of the sentencing.

19             The way we will conduct this sentencing

20   proceeding is, I will hear from the victims, the ones

21   speaking first under the Victim's Rights Act, which is

22   reflected in Rule 32.

23             I just note for the record that Mr. Owen Nolan's

24   counsel had requested to speak on his behalf by phone.

25             Is counsel for Mr. Nolan on the line?

7

1    I guess not.  Does the government know if she is
2    online?

3        MS. KOMATIREDDY:  We don't know, your Honor.

4        THE COURT:  In any event, Mr. Kenner objected.

5        Under the rule, we give victims the right to
6    speak at the sentencing.  The request made by counsel
7    indicated that she requested permission to appear by
8    phone, which is obviously fine.  But in connection with
9    speaking on his behalf at his sentencing, unless there was
10   something in the letter indicating his inability to appear
11   in person and/or her inability to speak by phone as well,
12   given the pandemic, because the letter did not indicate
13   any reason why Mr. Nolan could not speak on his own
14   behalf, I denied that request.

15       I did note, however, in my order that to the
16   extent she wanted to address the issue of restitution, we
17   are not addressing the issue of restitution today.  It
18   would be too much to do in one day and we have ongoing
19   submissions in connection with that.  If Mr. Nolan's
20   counsel wants to be heard with respect to the restitution
21   amount, that discussion will take place on the date that
22   we set for that at the conclusion of this proceeding.

23       So I will hear from the victims, I will then
24   hear from Mr. Kenner, and then I will hear from the
25   government and then I will impose the sentence.  So that

8

1    is how we will proceed.

2              I would just ask that everyone keep their masks

3    on during the proceedings, obviously we have done our best

4    so everybody maintains social distance in the courtroom.

5    I know it is uncomfortable to speak with masks on, but we

6    are just going to have to bear with it.

7              And we have the microphone there, and the

8    microphone is excellent so you don't have to be worried

9    that.  I will be able to understand you with the masks.

10   So I ask that everybody keep their mask on at all times.

11             So I will hear from the victims first.  I don't

12   know whether the government has discussed the order of who

13   wishes to speak first.

14             MS. KOMATIREDDY:  Yes, your Honor.  Mr. Berard

15   will be going first.

16             THE COURT:  And let me say, with respect to the

17   victims.  I want to say this to all of you collectively.

18             I am not going to say anything after each of you

19   speaks.  I will wait until everyone speaks.  I am going to

20   have something to say to you overall, after everyone

21   speaks.

22             So I don't want you to have a reaction if I

23   don't say anything after you speak.  I will address your

24   comments overall.  Obviously, I heard you at the trial and

25   I know your testimony.  Even though I am in the Circuit

9

1    Court now, I have kept this case because I presided at the

2    trial and I am conducting the sentence.  I did not assign

3    this case to another judge.

4          So Mr. Berard, you speak first.  Please speak

5    slowly and clearly so that the court reporter can get

6    everything down.

7          MR. BERARD:  Good afternoon, your Honor.

8          Actually, on this date 24 years ago, I played my

9    first NHL game.  I have been waiting for this day to end a

10   tough and sad chapter in my life.

11         First, I would like to thank the government for

12   their hard work, especially Matt Galioto.

13         Next, I would like to thank the court.  I know

14   your Honor has shown great patience and fairness and

15   treated both defendants and victims with respect.  Thank

16   you.

17         I know your honor will impose a fair sentence to

18   consider what Phil Kenner did and the impact that his

19   crimes had on the victims including me.

20         At 17 years old, Phil started to recruit me and

21   told me I needed to have someone to watch my back and the

22   money I made.  Phil promised me he would make sure that I

23   would be protected with him as my financial advisor.

24         I was the number one draft pick in the 1995 NHL

25   draft, and in 1997 I won the Calder trophy as the top

10

1  player in the NHL.  I had the honor of playing for the

2  United States in the 1998 Winter Olympics.

3        On March 11, 2000, I basically lost my right eye

4  in a game by getting hit with a stick.  The insurance

5  company paid me $6.3 million and everyone said I would not

6  play hockey again.  In 2001 I made a comeback.  I gave the

7  money back to the insurance company and ended up playing

8  seven more years in the NHL.

9        By 2010 I was done with hockey and looking

10  forward to my new life.  Phil had promised me that if I

11  focused on my hockey game, he would focus on building my

12  personal fortune.

13        Judge, Phil would often spend holidays with me

14  and my family.  And now, looking back, it is obvious that

15  he was playing me.  Getting me to trust him.

16        My mom.  My mom never felt good about Phil.  I

17  should have listened to my mom.

18        Judge, Phil Kenner robbed me of my life.  When I

19  realized all the moneys I earned were gone, I was in

20  shock.  I vividly remember walking for months in shock.  I

21  was depressed to the point of being concerned with my own

22  well-being.  I would just cry by myself.

23        It wasn't only the money, judge.  It was a guy I

24  knew for 15 years.  He was a friend that robbed me.  That

25  I trusted.  But, judge, Phil Kenner is not just a

11

1  financial advisor who robbed dozens of his clients.

2  Judge, please understand that Phil Kenner is

3  much worse than that.  When I started to discover Phil's

4  fraud, he didn't run.  He didn't hide.  He tried to

5  destroy me and John Kaiser.  Why?  Because we were

6  exposing him for the fraud he is.

7  I suddenly found myself being called a drug

8  dealer.  Phil actually wrote a letter to the DEA in Rhode

9  Island.  Phil spread the word that I'm evil; I'm a traitor

10  who was out only for myself.  To this very day, some

11  former NHL players think that I had something to do with

12  them not getting their money.

13  Judge, Phil Kenner will never, ever stop trying

14  to hurt me or John Kaiser or some of his other victims.

15  I beg this court to understand that Phil Kenner

16  was truly a menace to society.  Most people would have

17  accepted their guilt and begged for forgiveness.  Phil

18  Kenner will never do that.  Phil Kenner sits in prison and

19  plots his revenge, judge.  He will never change.  So I ask

20  this court, I beg this court, keep him in prison so that

21  he can't come out and go after other victims.

22  Judge, not only has Phil Kenner ruined the lives

23  of 20 NHL players, but also their families.  He did that

24  to generations of families.  He deserves, and I pray the

25  court gives him, the maximum time allowed under the law.

1        Thank you.

2            THE COURT:  Thank you, Mr. Berard.

3            MS. KOMATIREDDY:  At this time, your Honor, I

4    would like to read the letter submitted by Ethyl Kaiser.

5            THE COURT:  Yes.  I did receive it but you can

6    read it out loud.

7            MS. KOMATIREDDY:  It is dated March 8, 2020.

8        *I would like to start by telling you a little*

9    *about myself so you can understand how I feel about this*

10   *person.*

11       *I came from a family of nine; very poor, never*

12   *having enough food.  I had to worry about finding*

13   *cardboard to fill my shoes.  I knew I wanted a big family*

14   *of my own but never have them without.  So I had eight*

15   *children, worked three jobs, slept 4 hours a day, and I*

16   *made it, only to have it taken away.*

17       *I am 86 years old and I don't fear this person.*

18   *What could he do to me?  I fear for my son because this*

19   *person is not done with his evil doings.  I feel he's just*

20   *beginning.  He's hurt a lot of people and took a lot of*

21   *hard work from them.  He is a very dangerous person.  I*

22   *only pray he pays for his evil deeds.*

23       *Thank you, your Honor.*

24           Signed, Ethyl Dolores Kaiser.

25           THE COURT:  Thank you.

13

1          Who would like to speak next?

2          MS. KOMATIREDDY:  Next, your Honor, will be Mr.

3    John Kaiser.

4          THE COURT:  Good morning, Mr. Kaiser.

5          JOHN KAISER:  Good morning, Judge.

6          I just want to thank you.  This has been a tough

7    road for everybody.

8          I also want to thank the government, especially

9    Matt Galioto for his tireless work.

10         It is tough hearing my mom write that letter.

11   She is 88 years old.  This is the last thing she needed.

12   The last thing.  But we are here and hopefully we can

13   finally get past this.

14         There were a lot of victims that weren't, you

15   know, great hockey players; just regular guys.  Like Nick

16   Privitello, electrician.  Working hard.  Working extra

17   hours.  Saving money.  Guys like Bob Rizzi, police officer

18   for 32 years, working hard.  Again, everyone working hard

19   so that when it gets later in life, that they can relax a

20   little bit and just enjoy their family.

21         My brother Keith, he's had a rough road.  And

22   he's in a wheel chair; having a hard time medically.  I've

23   been helping them out every month, along with my mom.

24   Because they don't have any more savings.  You're talking

25   about pensions.

14

1       And what Bryan said:  It went through

2   generations.  This didn't just affect us.

3       And once Kenner got his claws into me, that

4   opened him up for my family, for my friends, because my

5   family and friends trusted me.  So I have that burden for

6   the rest of my life.

7       But just getting back to my mom.  She taught me

8   good work ethics.  So did my dad.  My dad worked until he

9   was 68, until he was in a bad accident and he died.  So I

10  wanted to do things different.  So I started at 10, 12

11  years old in construction, working my butt off.  I started

12  doing renovations, doing building.  At the same I became a

13  police officer in my early 20s and I worked midnights and

14  I went to the construction site every day.  That's what I

15  did because I wanted to have a life where I didn't have to

16  go to work at 68, like my dad.

17      It turned out, it didn't work out like that.  So

18  in June 21, 2005, that's kind of when I started turning my

19  life around.  That was the day my wife and I lost the

20  baby.  That was also the day when Kenner saw an

21  opportunity for investment, which he ended up getting from

22  me and family and friends.

23      Also, that was a significant day for him.  That

24  was the first day he actually forged my name.  On that

25  date, if you can believe that.  In 2006, I was working on

1  another house, selling a house in California.  That

2  actually sold and paid millions of dollars.  Turns out,

3  that money did not go to me.  It went to Kenner and

4  Constantine.

5       But while I was flying back and forth, I met a

6  girl named Kristie Myrick who used to work for Phil Kenner

7  as an assistant.  Well, it turns out she had a falling out

8  with him.  And during that, once it happened, because

9  Kristie Myrick discovered that he was stealing from hockey

10  guys, and then it was game on for Phil Kenner.  He did the

11  usual:  Destroyed her credibility first, hit her with a

12  bunch of lawsuits.  Just backed her into a corner, saying

13  that she was sleeping around, was a whore, all kinds of

14  bad stuff.

15       And fast-forward to 2010, when I was on the

16  other side of that, when Kenner realized that myself,

17  Bryan, and the Pecas were working with the FBI, then it

18  was our turn.  And at that point, all of a sudden he

19  turned it on.  It became, how I made my money?  I was a

20  cop in Brooklyn working for the mob, shaking drug dealers

21  down.

22       Then, anyone who would listen, any of his

23  clients that were still around, that's what he told.  But,

24  like I told him on the phone, that only works if nobody

25  knows me.  But they met me.  They know I wasn't like that.

16

1    When I started working over in Diamonte to try

2    to pull that back in one good investment we had, he said I

3    was working in cartels.  It just, it just never ended.

4    Then what happens?  The lawsuits.  Then the

5    lawsuits.  Because he knows at this point we don't have

6    money to defend, so he comes back at us.  And that is his

7    wheelhouse.  And he did not stop.  He was relentless.

8    Then he would send demand letters about Led

9    Better.  Led Better was the property out East, if you

10   remember.  He sent it.  He wanted money.  He wanted it

11   now.  He sent threatening letters to my wife.  He did the

12   same thing reference Hawaii.  He said I wouldn't back pay.

13   Here he is, the same fraud.  He just wouldn't

14   stop and was relentless.  And then, Judge, even after he

15   was arrested -- right? -- he made a website *Let's Save*

16   *Kenner*, something like that.  And in that of course he

17   exposed my social security number, all my private

18   information so that I had different frauds and credit card

19   companies and everything else that would come from it.

20   And then of course he called the IRS.  All the

21   usual stuff.

22   And then, even from jail, sending a demand

23   letter reference my interest in Baja Ventures.

24   Threatening lawsuits.  Calling my wife.  And then it just

25   happened to be, even when I was in Mexico, three thugs

17

1   actually appeared at my apartment.  Why?  Nobody even knew

2   me, so it wasn't because they were looking to do a

3   burglary.

4          Judge, this guy is a sick individual.  He's

5   dangerous.  And will stop at nothing.  Nothing.  And

6   unlike what my mom said, I'm not afraid of him.  He

7   doesn't have the balls to go after someone like me.  But

8   what he does, he goes after the wives, girlfriends, the

9   children.  He's a predator.  No different than a predator

10  in the woods.  And this guy needs to be put away as long

11  as possible.

12         Thank you, judge.

13         THE COURT:  Thank you, Mr. Kaiser.

14         MS. KOMATIREDDY:  Your Honor, next I would like

15  to put the Pecas together, if that is all right with the

16  court.

17         THE COURT:  Yes.  That's fine.

18         Good afternoon, Mr. and Mrs. Peca.

19         MR. PECA:  Good afternoon, judge.

20         I would like to start by echoing the sentiments

21  of the two gentlemen previous, in thanking you for your

22  professionalism and patience through this entire process.

23         You know, what strikes me initially is to see

24  two strong men, and how hard this is to do.  Don't tell me

25  financial crimes don't leave a scar.  An emotional scar.

18

1   And the reason it is hard is because we know things with

2   Phil Kenner go deeper than just financial crimes.

3          What he did has left a ripple in all our

4   families for generations to come.  He is sick.

5          To speak more about this stuff, I am going to

6   allow my wife, Kristin, to speak.

7          MRS. KRISTIN PECA:  I would like to start by

8   thanking the jury, even though they are not here, for

9   their focus and commitment during the long and arduous

10  trial.

11         I also want to thank the prosecutors for their

12  hard work.

13         And a special thanks to FBI agent Matt Galioto

14  for his determination and commitment.

15         Also, thank you to the many other people who

16  worked tirelessly on this case.

17         And of course, thank you, Judge Bianco, for all

18  of your hard work and for seeing this case through to the

19  and.

20         Please forgive me if I go a bit long here but

21  this case -- Kenner's actions -- has affected me and my

22  family tremendously, and I want to try my best to properly

23  explain just how difficult and painful all of this has

24  been.

25         As we know, Phil Kenner has been convicted of

1  multiple fraud-related crimes; however, his repeated

2  forgery, perjury, and his harassment of victims in an

3  attempt to obstruct justice needs to be noted and taken

4  into consideration as well.

5          Kenner's numerous crimes were carefully planned

6  out and committed over several years and involved tens of

7  millions of dollars and dozens of victims.

8          So what do Kenner's crimes mean to me and to my

9  family?  Well, to begin with, Phil Kenner stole money from

10  us.  A lot of money.  A majority of the money my husband

11  had earned from his playing career:  the largest earning

12  years he will ever have.

13          Phil Kenner lied to us on numerous occasions,

14  took advantage of our trust and relationship, looted our

15  retirement and safety net, purposely misled us on

16  investments, stole our money for his own use and benefit,

17  forged Michael's name on financial documents, lied to get

18  us into a bad real estate investment in order to bail

19  himself and Constantine out before they lost their

20  deposit, and used a line of credit of ours, that was

21  supposed to be used for construction of a Hawaii project,

22  as his own personal piggy bank.

23          There were many instances of Kenner's fraud and

24  theft.  It was clearly not just a one-time thing.  It took

25  lots of planning, manipulation, and deception over several

20

1   years.  There were other schemes and frauds that weren't

2   even a part of the trial, such as Los Frailes and The

3   Palms.  And, after stealing millions of dollars from us,

4   Kenner had the audacity to continue to act as our

5   financial advisor while blaming others for the "stolen

6   money."

7          Kenner's defense emphasized that my husband,

8   Michael, made a lot of money in his NHL career, which he

9   did.  However, like I said, his biggest earning years are

10  now behind him.  He will never make that kind of money

11  again.  And a majority of it was stolen by Kenner.

12         My husband spent his entire life -- since he was

13  two years old -- honing his craft, tirelessly training and

14  working hard to get to the point where he could play in

15  the NHL and earn that money.  It doesn't matter how much

16  money someone makes or made.  Having a majority of it

17  stolen by someone you hired to protect and grow your money

18  is egregious, no matter how much you earned.

19         Kenner stole our retirement money.  He stole our

20  kids' college funds.  He stole the money we had planned on

21  passing on to our kids and grandkids.  He stole our

22  financial legacy.

23         I want to share a quick back story on why it's

24  especially heartbreaking to have had so much money stolen

25  from Michael.

21

1      His father was an Italian immigrant who didn't

2   have a college or even high school education but worked

3   hard by taking any job he could, from drywall installation

4   to deliveryman, to make ends meet.

5      Michael's mother would babysit children at their

6   apartment while his dad was at work.  His family didn't

7   have much money and moved every time the rent was raised.

8   Michael recalls moving at least eight times while he was a

9   kid.  From a young age, Michael knew he wanted to play in

10   the NHL.  He worked very hard to achieve his goal.  In

11   fact, his father told me a story I'll never forget.

12      While Michael's teammates and other hockey

13   players were working out with their trainers -- something

14   he couldn't afford to do -- Michael would walk to the

15   local public school, tie a rope around his waist, attach

16   it to an old tire, and run laps around the track to get

17   his legs stronger.  It was that kind of determination and

18   dedication that helped him make his dream a reality.

19      Michael worked that hard, since he was a young

20   boy, to make it to the NHL.  He put countless hours in, a

21   lot of work into becoming a professional athlete.

22      Furthermore, once he made it to the NHL, Michael

23   sacrificed his body over and over and is still feeling the

24   consequences today.  He has had many surgeries, broken

25   bones, torn joints and ligaments.  He suffered several

1   concussions.  He has multiple plates and screws in his

2   leg. He had to get his face reconstructed with seven metal

3   plates, where he shattered his entire left side.

4            He lost multiple teeth, had his bottom lip torn

5   off, and as a result, had many oral surgeries.

6            His one ear was also almost completely torn off

7   as well.

8            Michael still feels the effects of his injuries

9   today.  Some days he can't lift his arm over his head.

10  Some days the pain from the bone growing over the screws

11  and plates in his leg is unbearable.  He broke many toes

12  blocking shots, and the resulting arthritis hurts him

13  tremendously.  In fact, he just had surgery a couple of

14  months ago on one of his toes.  And he still faces

15  multiple surgeries to get hardware removed and to complete

16  his oral surgery work.

17           What I am emphasizing here is that, while

18  Michael did make a lot of money during his NHL career --

19  as the defense felt the need to point out -- he earned

20  that money.  Many times over, in my opinion.

21           And I need to mention that our kids sacrificed

22  in their own ways, too.  They had to move to different

23  cities many times, each time having to adjust to new

24  schools, new teammates, make new friends, leave old ones

25  behind.  At one point our son had been in seven different

23

1    schools in seven years.  That's not easy on any kid.

2            And personally, I often had to shoulder the

3    burden of planning and arranging our last-minute moves,

4    packing and unpacking, quickly finding a home to live in,

5    while registering the kids in new schools and finding new

6    sports teams for them to play on, raising our kids far

7    from the help and support of family and friends:  All so

8    Michael could focus on training and his playing career.

9            Basically, I am mentioning this to show how our

10   whole family made sacrifices in our own ways to support

11   Michael's career.

12           And Michael and I wanted the money he worked so

13   hard for to be passed on to our kids.  The money that

14   Kenner stole was supposed to go to our kids' college

15   funds, their inheritance; not to line Kenner's pockets,

16   fund his extravagant lifestyle, and to keep his Ponzi

17   schemes going.

18           Having said that, it wasn't just a monetary loss

19   that we experienced.  There has been a lot of pain and

20   suffering.  It is hard to accurately describe, but I will

21   try my best.

22           What brings Kenner's crimes to a whole new level

23   and takes it beyond the "white-collar" description -- as

24   if what he did wasn't egregious enough -- is the way he

25   harassed us and other victims repeatedly.  And it wasn't

24

1    just threats, although there were plenty of those.

2             This is hard to revisit, but I had strange men

3    calling and scaring me when Michael would travel.  I

4    received anonymous threatening calls from Mexico, where

5    Kenner spent a lot of time.  Calls from men threatening to

6    kill our pets; telling me I'm being watched; that he knew

7    Michael was out of town and I was home alone with the

8    kids; that I'd better be careful.

9             I turned a recording over, of one of the

10   threatening voicemails, to the FBI.  I was made very aware

11   that I was literally being watched.  It felt like I was

12   living a nightmare.  For a while, I lived with the

13   curtains drawn and often wouldn't let the kids play

14   outside when Michael traveled.

15            We would literally hole up in the house to stay

16   safe.  I called my father or brother to come stay with me,

17   at times.  I had a deep, genuine fear knowing that the

18   threats were credible because the pattern of Kenner's

19   behavior towards people he deemed his adversaries was

20   deeply disturbing.  They had been physically attacked, had

21   houses broken into, cars and clothing set on fire, and

22   pets were killed.

23            Furthermore, my husband received death threats.

24   Never before had either of us ever experienced any death

25   threats.  And having your life seriously threatened

25

1    affects how you live.  It affects you emotionally,

2    mentally, physically.  The toll it takes is very real,

3    severe, and lasting.

4            One night, a drive-by death threat was yelled

5    out to us, at our home.  We were specifically told Michael

6    would be killed the next day.

7            I called the cops.  Filed a report.  I started

8    sleeping with a knife on my nightstand.  Michael had a

9    baseball bat by his.  Needless to say, I was not sleeping

10   well at all and ended up needing the assistance of a sleep

11   specialist for the chronic insomnia that I developed, as

12   well as a therapist for the severe anxiety that was

13   brought on.

14           I was constantly worrying.  I was worn out, run

15   down, mentally and physically exhausted, scared and

16   worried.  And this lasted for the better part of a decade.

17           And it didn't and there.  Kenner's witness

18   tampering and harassment rose to the level of contacting

19   the IRS through an anonymous letter that contained false

20   and misleading information about us.  And because he was

21   our former financial advisor, Kenner knew enough facts

22   about our situation that he was able to make the claim

23   seem real, like we were tax cheats.  And he succeeded.

24   The IRS put us through a full 4-year-long audit.

25           Everyone knows how stressful it is to deal with

26

1    the IRS.  Try dealing with them when they were given false

2    information and think you are guilty of tax crimes.  We

3    spent countless hours, days, weeks, months, and eventually

4    years fighting this claim.  We had to hire accountants and

5    lawyers.  We had to spend a lot of money just to prove our

6    innocence.  We will never get that money or valuable time

7    back.  Too many days were spent stressed out, emotionally

8    drained because of this audit.

9              Eventually, we not only proved our innocence;

10   the IRS ended up owing us money in the and.  Kenner and

11   his defense said it was his "civic duty" to report us to

12   the IRS; yet, he couldn't even put his name on the letter;

13   left it anonymous.

14             At the time, our accountants knew there must've

15   been a reason the IRS was so aggressive, persistent, and

16   unreasonable.  Then they found out the audit was triggered

17   by an anonymous letter.  And thankfully, that letter was

18   later found on Kenner's laptop to validate our suspicions

19   and prove that he was harassing us and obstructing

20   justice.

21             As far as Kenner's "civic duty" defense.  Last

22   time I checked, civic duty means a duty, obligation, or

23   responsibility.  Nowhere in there does it say harass

24   innocent people, who happen to be witnesses and victims of

25   your criminal behavior, by anonymously providing false

27

1    information about them to the IRS with the hope that they

2    will deal with a lengthy, costly, and stressful audit.

3          The IRS letter is just another example of

4    Kenner's intimidation of witnesses.  He will stop at

5    nothing to get away with his crimes.

6          Even more troubling is that the harassment

7    didn't stop once Kenner was in jail.  The website Kenner

8    created from his jail cell -- yet claimed his son was the

9    author -- defamed and further harassed us and others by

10   revealing personal information such as Social Security

11   numbers, addresses, and private phone numbers, to detail

12   patently false information about the victims and spreading

13   vicious untruths designed to cause harm and humiliation.

14         One such example is how Kenner stated that my

15   husband had cheated on me in his presence, which never

16   happened.  This malicious act was clearly done to cause

17   marital stress, humiliation, and to harm the reputation of

18   my husband.  Again, this website, Kenner claimed, was put

19   together by his teenage son while he sat in jail.

20         If Kenner is capable of this kind of egregious

21   behavior while still awaiting the trial and sentencing,

22   imagine what he's capable of after he's been sentenced.

23         It should also be noted that an enormous amount

24   of time was taken from Michael and me during this whole

25   process.  Time that we'll never get back.  Time that was

1    spent on trying to figure out Kenner's complicated crimes.

2    Time wasted on lawsuits that Kenner had us involved in.

3    Time spent on investigations, hearings, trying to recoup

4    our money.  Time dealing with the negative physical and

5    emotional side effects.  Time preparing for this case.

6    Time that should have been spent as a family, with our

7    kids.

8              Our kids missed out on valuable time with us.

9    And they shouldn't have had to witness their parents

10   dealing with the stressful effects of this situation.

11   They shouldn't have had to feel the stress and gravity of

12   the situation we were faced with.  That took away from

13   their childhood.  They grew up with their mom and dad

14   dealing with this crap for years.

15             There was fear.  For years I had to live in fear

16   due to the financial uncertainty created by Kenner's

17   crimes and due to the serious threats and harassment we

18   received.  I was afraid for our lives.  For our kids'

19   lives.  I was afraid whenever Michael traveled.  I was

20   afraid to answer the door.  To answer the phone.  I was

21   afraid I was always being watched.  I was afraid to let

22   the kids go outside to play.  I was afraid of the IRS and

23   the lengthy audit that Kenner started.

24             And we lived with the fear and stress of not

25   knowing what would happen next.  We unknowingly and

29

1    unwillingly passed our fear and stress onto our kids.  And

2    that, itself, brings tremendous pain to this day.

3           Lastly, the public humiliation of this needs to

4    be mentioned.  Professional athletes are proud, by nature.

5    And to have this stressful and painful situation in the

6    local and national press created a lot of additional

7    anguish and stress for us.  People often ask us about it.

8    And talk about it.  It's hard to escape it.

9           Phil Kenner deserves a long sentence for many

10   reasons.  He clearly has no regard for others and their

11   sacrifices, their families, their savings.  His criminal

12   actions affected many families' financial structure for

13   generations to come.

14          His schemes were well thought out and executed

15   over years.  This wasn't a one-time crime.

16          And keep in mind, Kenner committed these crimes

17   while presenting himself as both financial advisor and

18   friend.  And then he tried to avoid prosecution and a

19   conviction by engaging in relentless harassment against us

20   and other victims.

21          Kenner has no empathy.  He has zero remorse.  In

22   fact, he's still denying he did anything wrong, and

23   remarkably continues to blame others.  Kenner is

24   completely indifferent.  Dishonest to the core.  He is a

25   criminal.  A career con man.  He lacks a sense of moral

30

1    responsibility and a social conscience.

2            He can be charming, but he lies and cheats with

3    incredible ease and comfort.  He is never wrong, according

4    to him, is manipulative, plays the victim, has a distinct

5    lack of conscience, a disregard for the law.

6            And, yes, those are the traits of a sociopath.

7    Sociopaths are gifted at leaving others holding the bag

8    while they run away with the profits of someone else's

9    labor.  Sociopaths, always cunning, have an avid knowledge

10   of police, court, and tax law.  They con others for

11   personal profit and pleasure.

12           And while it is common knowledge that sociopaths

13   don't and can't change, a prominent psychiatrist offered a

14   different view.  A sociopath does change in one way:  he

15   changes his target.

16           If let out, Kenner will continue to con, scheme,

17   and steel.  He will find new targets.  He will continue to

18   threaten and harass.

19           I stand here before the court today to represent

20   not only myself, but my husband, Michael, and our

21   children, Trevor and Emily.

22           I am also here on behalf of those who were too

23   nervous to speak.  I'm representing those victims who were

24   too afraid to speak due to the harassment that other

25   victims had endured.

31

1         And I'm representing those who were so

2    devastated by Kenner's crimes that they chose to pick up

3    the pieces, rebuild, and move on:  Not an easy task,

4    especially for those victims who had to file for

5    bankruptcy due to Kenner's crimes.

6         I am also here to represent those who did not

7    have the emotional strength to show up.  Not just the

8    hockey players, but the victims that come from all walks

9    of life who had most, if not all, of their life savings

10   stolen from them.

11        I am here for the future victims:  The children

12   who will never receive the money that should have been for

13   their college educations; the money that was supposed to

14   be passed on to them; the grandchildren and the

15   generations to come that have been affected.

16        I'm here today to represent all of the victims.

17   And lastly, I'm here because it is my civic duty.

18        On behalf of my husband and our kids, thank you,

19   Judge Bianco.  I hope you will take our hardships into

20   consideration for sentencing.

21        A sociopath is the worst kind of criminal, as

22   they will never change.

23        MR. PECA:  Judge, I would just like to end on

24   this.

25        As you know, he is a sick individual.  His

32

1   sickness is evil.  And as you've seen in your courtroom

2   over the years, evil has no cure.

3            Thank you.

4            THE COURT:  Thank you very much, Mr. and Mrs.

5   Peca.

6            Is there anyone else who is going to speak?

7            MS. KOMATIREDDY:  That completes the victim

8   statements, your Honor.

9            THE COURT:  All right.  Let me just speak to you

10  as a group.

11           And also I will say, as Mrs. Peca noted, even

12  though there are other victims who are not here today, I

13  am speaking to them, as well.

14           I want to thank all of you for being here today.

15  It is very important that you are here.  It takes a lot of

16  courage to be here.  It takes a lot of courage to speak.

17  And I appreciate you coming.

18           I do want to apologize for the delay in the

19  sentencing.  You testified many, many years ago.  It has

20  been a long time.  The practice usually is for the

21  sentencing to take place six months or so after the trial.

22  And I know the toll.  Reference was made to how much time

23  has passed, and I fully recognize that.  And I do

24  apologize for the amount of time that has gone by.

25           I think, as you know, is not as if we were doing

33

1   nothing.  After the trial, we had a very complicated

2   forfeiture proceeding relative to the forfeiture of a

3   resort in Mexico, which I think was unprecedented.  That

4   was very complicated, so it took an enormous amount of

5   time, years actually, to have the hearing and then to work

6   through the various weighty issues.

7            My hope is that the government, through that

8   forfeiture and another forfeiture, the government does

9   have the discretion to utilize those funds for purposes of

10  restitution for the victims, and so I hope that you will

11  see at least some of the money that you lost, through the

12  forfeiture and through the restitution that I intend to

13  impose.

14           Also, Mr. Kenner is now representing himself.

15  And Mr. Constantine got a new lawyer.  The lawyer had to

16  become familiar with the case.  There were a lot of

17  post-motions for ineffective assistance of counsel.

18           So I am just explaining to you that I cannot

19  tell you how many motions we had and how many decisions I

20  had to make over that period of time.  And that was on top

21  of everything else.

22           But I appreciate your patience and I apologize

23  for that delay.

24           Even though I heard your trial testimony and the

25  jury heard your trial testimony and believed your trial

34

1   testimony, all of it was credible, including your

2   testimony here as well.

3         It is important that you all are here today

4   because, as you know, under the rules of evidence, the

5   jury does not get to hear the impact of the crime.  They

6   get to hear the facts.  This is the time when we get to

7   hear the impact of the crime.

8         And it is important for the public to hear that,

9   for me to hear that before I sentence somebody, and it is

10  important that Mr. Kenner hears that.

11        I agree that I don't think he has any remorse.

12  I have not seen any remorse in the seven years that he has

13  been before me.  I don't know what he is going to say

14  today.  I am not expecting to hear any remorse.  I don't

15  think he has any empathy or remorse.  I am not just saying

16  that.  It is important that he hears it.

17        And I do understand.  Unfortunately, I have

18  presided over many fraud cases and I do understand not

19  just the economic toll but, as many spoke so powerfully

20  and eloquently about the psychological, the emotional toll

21  that it has, when someone who is your friend, who you

22  trust with your money, betrays you and takes that money.

23        And it is not just the money that is lost --

24  which is obviously important, and it is hard-earned

25  money -- but it is the psychological impact of having been

35

1    victimized in that way after trusting somebody and then,

2    for many years after that, living with that and the

3    ramifications of that.

4         I know it is an ongoing thing and you all still

5    feel it.  You are all together here and you all still feel

6    the scar.  It is an emotional scar that will always be

7    there.

8         I do want to also emphasize that Mrs. Peca

9    provided a lot of details as to the sort of ongoing

10   harassment that she and her husband experienced.

11        I have seen harassment in the papers.  I'm sure

12   you have read many of the papers Mr. Kenner has submitted

13   to the court, and for years after the trial he has done

14   nothing but attack the credibility of all of you in an

15   unbelievable way.

16        I don't think I've ever seen, in my 13 years as

17   a judge, for someone to go after the victims in every

18   single way that he can.  I have never seen that before.

19   He stops at nothing to try to tear down every one of you

20   personally and attack your credibility, and to me that is

21   ongoing victimization as well.  He has done nothing but

22   try to tear down every one of you personally; not just

23   your reputation, but even emotionally and psychologically.

24   To have someone not only taking your money but attacking

25   you in that way, I think obviously makes it even worse.

36

1          So you can rest assured that I am considering

2     all of those things as I sentence Mr. Kenner today.

3     Obviously, I will balance all the factors under the law,

4     which I am prepared to do.  But you can rest assured that

5     this sentence will reflect the harm that he has done to

6     all of you, and the other victims who you speak for today

7     by your presence, and by speaking, as well.  The economic

8     harm, the psychological harm, and the ongoing nature of

9     that for many years to come.

10          I did want to emphasize -- and, Mrs. Peca, I

11    believe you made reference to this, about other

12    transactions and details in the affidavits of loss.

13          I just want to emphasize, I didn't know this

14    before, but I think it is important to understand.  There

15    were many transactions that you were involved in with Mr.

16    Kenner that were not part of the trial.  I have told him I

17    am not sentencing him on those because I did not hear the

18    evidence on that and so that is not something I can

19    consider in this sentence.  I don't know what happened in

20    those transactions, so it would be inappropriate for me to

21    consider.

22          And for the same reasons, in terms of the

23    restitution, that is not something that I can impose

24    restitution on, not knowing what the facts are.

25    Obviously, you can pursue those things civilly.  And I

37

1    know that may seem unsatisfactory to you, but that is the

2    way the criminal process works.  I can only sentence the

3    defendant on what he was convicted of, or if I hear

4    testimony that I find to be credible, I can consider it at

5    sentencing.  A lot of these transactions were not the

6    subject of testimony at the trial.  So I want to make sure

7    that you understand that.

8              Obviously, we are going to set another date for

9    restitution and you are all free to come back, if you

10   want.  But whether you are here or not, I want you to

11   understand I will be fully considering all your requests

12   for restitution because I know how important that is.

13             In sum, again I just want to express my deepest

14   gratitude for your being here today.  I found both of your

15   statements very powerful in their own way, from your own

16   perspectives that you brought to bear today.

17             So thank you for coming and thank you for your

18   words.

19             I will hear from Mr. Kenner.

20             Mr. Kenner, before you start, I just want to

21   remind you that obviously you have submitted hundreds and

22   hundreds of pages to the court and I don't want you to

23   rehash everything that is in those papers.  This is your

24   opportunity to highlight whatever it is you want to

25   highlight in connection with sentence.

38

1        We are not retrying your case.  You are being

2   sentenced today.  So I'm going to give you sufficient time

3   to do that but I am hoping that you are not going to try

4   to go through the whole trial again with me.  All right?

5   So I don't want you to waste your time relitigating.

6        How much time do you think you are going to be

7   speaking for?

8        THE DEFENDANT:  25 minutes.

9        THE COURT:  Okay.

10       THE DEFENDANT:  I'm just guessing, your Honor.

11       THE COURT:  Okay.  That is more than reasonable.

12   Go ahead.

13       THE DEFENDANT:  Your Honor, I'm very moved by

14   your statement you just made to the people who spoke

15   today.  And whether I agree with some of their

16   recollection of the facts or not, or if all of this

17   evidence agrees with them or not, I'm not here to retry

18   the case today.  So I apologize for that, if you thought

19   that was the case.

20       This has been an incredible winding road.  I am

21   hurt by the statement that you don't find any remorse in

22   what I did, what the jury found me guilty of.

23       THE COURT:  You can point me to anything that

24   you submitted in seven years to indicate remorse.  I'm

25   happy to look at it because I've been looking for it.

39

1          THE DEFENDANT:  Your Honor, I appreciate that

2     statement.  And I probably deserve that statement.

3          What I can tell your Honor is that, through the

4     millions and millions of documents that you have seen,

5     whether they showed up on the eve of trial or during

6     trial, everything that I have put forth has never relied

7     on the he-said she-said testimony.  I'm sure your Honor

8     knows that.

9          But moreover, when I make a statement like I

10    just did, generically speaking, that Mr. Kaiser was repaid

11    100 percent of his money that he borrowed from his mom and

12    his friends and family in Hawaii, and he refuted that,

13    claiming it is back pay and expenses, I'm relying on the

14    fact that Mr. Kaiser signed a document in July of 2006

15    that confirms he was repaid his entire $1.176 million.

16    That is not my words.

17          So if your Honor could, at least just for the

18    moment, just understand that anything I have put forth is

19    based on empirical evidence that the government had in

20    their possession and turned over to me.

21          So, much the same, the government stated they

22    believed I was -- went improperly after Mr. Jowdy for the

23    funds that were stolen from us in our Hawaii investment.

24          Those were investments.  Those loans of Mr.

25    Jowdy were fully vetted by Mr. Kaiser long before, for a

40

1    year before we decided to make that loan.  Mr. Kaiser told

2    the FBI that.  It is in the FBI notes.  I didn't make that

3    story up.  I figured 20 years he would be the perfect guy

4    to sit down face-to-face with Mr. Jody.  And he explained

5    that to Mr. Galioto, that he did it six times before we

6    made the initial loan to Mr. Jowdy.

7            Mr. Kaiser became the managing member of that

8    corporation shortly thereafter, and again, still had no

9    problem with it.  Participated in multiple lawsuits in

10   America and in Mexico to recover those loans.

11           I will get to a few of those items in a moment.

12   But again, I am not trying to retry the case.  Please

13   don't take it as that.  I hope, your Honor has seen at

14   some point, in whatever advocacy I have for the facts as I

15   see them or as I read them, those facts are based in

16   evidence that the government had in possession and

17   transactions that Mr. Kaiser, Mr. Berard, Mr. and Mrs.

18   Peca participated in real time, through text messages,

19   emails, signed disclosures, signed documents, signed

20   authorizations.

21           I would dispute the amount of money that ever

22   passed through my management or my hands.  And it is not a

23   he-said she-said.  This is a white-collar case and there

24   is money traceable.  Every penny of it is traceable in all

25   of these documents.

41

1          I do appreciate them coming in today and

2    expressing how they feel.  It does move me.  But there are

3    some items that temporally just don't add up.

4          Mr. Berard made a lot of money in his career, as

5    did Mr. Peca, and they earned every dollar of that.  And

6    they hurt every day because of it.  And when we found out

7    that we had an investment partner that was introduced to

8    us by another, other hockey players and Mr. Jowdy, when we

9    found out in 2006 that he had been robbing us, we went

10   after him with the same vigor that I think you have seen

11   in some of my submissions.  And again, at that point in

12   time everybody was in the know through group

13   communications and conference calls and emails.  And I

14   will get to those in a moment.

15         But Mr. Berard mentioned a submission to the

16   Rhode Island DEA.  That was after I was arrested.  The

17   only money I ever managed for Mr. Berard was $650,000 he

18   had in the Hawaii project.  There was no other money out

19   of the tens of millions Mr. Berard made.  That was the

20   only money that was ever under my direct management.

21   Everything else were his own decisions, and he had his own

22   investment advisors.

23         Mrs. Kaiser.  I feel terrible for her.  She told

24   us that Mr. Kaiser paid her back, as he addressed.  But

25   his mom's money was solicited by Mr. Kaiser and paid back

42

1    to her eight months, nine months later at the Hawaii joint

2    venture closing.  The bank transactions show that.  That's

3    not my work.

4          Mr. Kaiser said we did a project in California.

5    Again, Mr. Kaiser said he was never paid back that money

6    in California.  There's years of bank records that confirm

7    every dollar was paid back to Mr. Kaiser, and then some,

8    in addition to the $1.7 million he was repaid.

9          Mr. Kaiser said at the trial that I used his

10   money to buy stock with Mr. Constantine and give it to

11   him.  That would put him over the $1.7 million.

12         That I bought my home in Mexico with his money.

13   Never happened.  It's untrue.  Those funds come from a

14   completely different source.  There is bank records that

15   prove all that.

16         Again, in view of what went on the last number

17   of years, I just find a hard time swallowing when they

18   just don't accept.  All the information that went up on

19   that website was all stuff the government produced and was

20   found on PACER, as far as I'm aware.  And so there was

21   nothing I produced that the government hadn't already

22   produced in their own forum.

23         I think Kaiser said I triggered an IRS audit

24   from jail?  I'm not sure how I triggered an IRS audit of

25   anybody from jail.  And maybe that was with the Pecas

43

1    also?

2           When I was in jail, Mr. Kaiser said that I sent

3    three thugs to his place in Cabo San Lucas.  I'm in

4    detention.  I don't even know how that happened.  I read

5    about it in the newspaper the first time.

6           The Pecas.  I feel terrible that they believe

7    that there were wasted efforts on lawsuits to recover

8    money that they believe I stole.  What we do know is, Mr.

9    Peca gave tremendous testimony to a Southern District

10   Grand Jury in secrecy, and when he gave that testimony, he

11   confirmed that every dollar he invested in the Hawaii

12   project, that he signed off on, that those monies went to

13   where he expected them to go, to Mr. Jowdy.

14          And when Mr. Jowdy didn't pay his taxes, we sued

15   for those.  That's what we were supposed to do, use the

16   jurisprudence system to go after those who received the

17   money.  I didn't receive any of those monies.  None of it

18   is traceable to me.  I did not benefit from those monies.

19   And my investment dollars are alongside each of theirs.

20          So I don't know how any of the lawsuits were

21   wasted.  We went after, Mr. Peca signed off on them with

22   independent lawyers.

23          I don't know if the government had told the

24   Pecas, but Mr. Jowdy admitted to all the money he stole.

25   He admitted it to the FBI in March of 2010.  It is in the

44

1    FBI notes.  And I've read them.  It's not my words.

2            None of those funds come to me.  Nor does Mr

3    Jowdy tell the FBI that I have any of that money.

4            Mr. Kaiser even explained that to the court in

5    his letter in February 19.  He says Mr. Jowdy still wants

6    the court to believe I stole their money.  None of the

7    money came to me.

8            Mr. Jowdy would just put the money up and show

9    me.  The government hadn't shown us.  Nobody showed that I

10   had stolen anybody's money.  I was the administer (sic) of

11   the Hawaii project.  Those are funds that were under my

12   control as a manager.  We followed the operating

13   agreements that were signed off by everybody.

14           The transactions took place and we got caught up

15   with some really bad people.  You know, your Honor, I know

16   that they have given statements about people threatening

17   them at their homes.  I was in jail when they are talking

18   about the events happening.  None of these events happened

19   due to my interaction.  I was in federal custody during

20   the time of all this.

21           The Pecas' audit, IRS audit.  I remember them

22   announcing it in the courtroom to you, your Honor, in

23   2014.  I was in federal custody when that audit took

24   place.  The anonymous letter somehow was on my laptop?

25   I've never seen that anonymous letter.  It's never been

45

1   shown to me.  I didn't see it in any discovery.  And I've

2   parsed as much, millions of documents as possible.  But

3   it's an anonymous letter, not signed by me, to trigger

4   audits?

5          I mean, I don't want to get into the weeds, but

6   these are all the exact same things that Mr. Jowdy was

7   doing to me and everybody else when we were going after

8   him to create side shows.

9          Now, I don't know if it's appropriate, your

10  Honor, and I have been here seven years, and that's not a

11  bearing on anything other than what I am about to tell

12  you.  I haven't seen my children in seven years.  It's not

13  been financially feasible for them to come here and visit,

14  nor is the environment at MDC conducive, based on

15  everything I know your Honor has read about in the

16  newspapers starting as far back as 10 years ago.

17         And my fiancé, I haven't been able to see her in

18  4 years because of her severe liver condition while she's

19  waiting on the liver donor list.  She is two years past

20  her life expectancy.

21         I've brought some pictures for your Honor, if

22  you care to see them, what my children looked like the

23  last time I saw them, to what two adult children look like

24  right now, and what my fiancé looks like who has suffered

25  right alongside with whatever context this entire process

46

1    has been.

2           But it tears my heart to hear that anybody feels

3    they have been victimized by what has gone on.  I have

4    been told by several defense attorneys that there is a

5    real thin line between espousing your innocence based on

6    empirical evidence and accepting responsibility for

7    something that the transactions they described just didn't

8    happen.  Again, it's not he-said she-said.  These are the

9    paper works (sic) that show all of this stuff.

10          Perhaps I can just read a couple of items.  I

11   certainly brought a lot that I was thinking about talking

12   about today.  I don't want to waste the court's time.  I

13   know we've been here seven years working through this.

14   But your Honor had made a handful of very astute

15   observations back when we were going through pretrial, one

16   of which was, you know, you asked wouldn't it be important

17   to see all the authorizations that people have signed to

18   give access to all the transactions that actually took

19   place.

20          As I did some of my research, I see back nearly

21   a century-and-a-half ago, in a case called *Austin v*

22   *Tripplecock*, the Supreme Court ruled that basically, your

23   Honor, if you sign a document, you own it.  And that case

24   has been referenced most recently, in the last 10 years,

25   by the Circuit.  Every transaction that took place was

47

1    signed off by these gentlemen -- I should say at least Mr.

2    Berard and Mr. Peca -- that were under my control.  And we

3    followed the letter of every corporate document.  We

4    followed the letter.

5            I believe it is 91 US 50, your Honor.  I can get

6    that for you.  I apologize.  But in the context of that,

7    your Honor asked shouldn't we see all the authorizations

8    that have been signed?

9            And the government, frankly, bought you that

10   day.  I believe it was you.  I don't believe it was a

11   magistrate on the bench that day.  Talking about

12   subpoenaing the records from the Northern Trust Bank

13   months and months before trial.

14           And the government convinced the court that it

15   was a fishing expedition to find all the authorizations,

16   the line-of-credit statements, the signed extension of

17   credit, the signed distribution memos from these

18   individuals and the rest of them that invested with us.

19           Those statements did not show up until 10 weeks

20   later, after the government, on the eve of trial, had

21   agreed to a pared-down subpoena after they filed their

22   April 22 superseding indictment.  It clearly showed,

23   according to *Upton v Tripplecock,* that they signed off on

24   every transaction that took place.

25           One of the things I do know, your Honor, is that

48

1   had we had those in the courtroom, it certainly would have

2   given your Honor a chance to take a look at those.  And I

3   know that those have not been addressed or haven't been

4   viewed by the court, because they did not come out in the

5   proceedings other than Mr. Haley, on a weekday of the

6   trial, asked me if I had seen the documents and if I had

7   forged any of the names.

8           Well, that was the end of it.  It was 12 years

9   of documents, 5 inches of documents, and that was his only

10  question on some of the most exculpatory items in the

11  case.

12          And I feel bad.  But as soon as I whistle-blew

13  on Mr. Jowdy and Tom Harvey, who may even be in attendance

14  today, the first thing that happened is Mr. Harvey started

15  threatening me, Mr. Kaiser, Mr. Manfredi, and everybody

16  against Jowdy was willing to do jail time for calling the

17  money we gave him loans.

18          Mr. Jowdy admitted to them that they were loans,

19  to the FBI, just a year later, after we were being

20  threatened that we were going to go to jail at the hands

21  of the FBI, not to mention that Mr. Harvey's cocounsel to

22  Mr. Jowdy was a very powerful law enforcement officer, as

23  your Honor knows.

24          You know, I was arrested in Mexico two times

25  based on Jowdy's criminal allegations that I was calling

49

1   the money he took from us, and then admitted he took from

2   us.  I was arrested.  One time it was a fairly harmless

3   incident.  The second time, I was almost beaten to death.

4   Our attorney in Mexico was shot in the back of the head

5   after getting out of that the second time in jail.

6          You know, Jowdy admitted all the loans, in a

7   California deposition.  I think Mr. Kaiser was there.  And

8   what he texted me during the deposition was kind of

9   unbelievable:  Can we get the 50 million in small bills?

10  He knew right then and there.  Mr. Jowdy admitted after

11  fighting us for two years.

12         The fact that the government still says that the

13  loans are fake is a bit surreal.  But, you know, back in

14  2006 we had a forfeit attorney that worked with us on both

15  the Hawaii and the Mexico deals.  The attorney had written

16  to the group of investors, which included Brandice Lister,

17  Brad Lukowich, Berard, Campbell, Simon, Boyle, Sydor,

18  Christich, Moreau, Murray, DeVries, Wooley, McKee, Letvin,

19  Glatt, Junos, Stumple, Meirick, Norstrom, Peca, Nolan,

20  Gonchar, Ruchin, Green, Stevenson, Nash, Sipilkov, Chris

21  Mandredi, John Kaiser, Chris Hawkins.

22         And the attorney had written:

23         *For those of you who are not aware, Ken Jowdy*

24  *and Bill Machin have informed us that Lehman Brothers*

25  *closing in Cabo was delayed another 30 days.  They have*

50

1   *legal issues to handle in Mexico prior to their final*

2   *sign-off and funding.*

3   *We have been reassured that their delays are not*

4   *complications.  We have been informed that part of the*

5   *closing costs was that Lehman Brothers rejected the*

6   *original proposals to repay the Hawaiian loans at the*

7   *closing by collateralizing 10 to 20 percent equity*

8   *received from managing the Cabo project.*

9   *We were also informed that Kenner would not be*

10  *accepted as a joint manager with Ken.  Ken will be the*

11  *sole manager.  We have received full assurances that*

12  *management will still receive our input.*

13  *It is complicated but has something to do with*

14  *the 2005 deal Phil and the Hawaiian management team*

15  *rejected in concert with my advice.  These are meetings*

16  *John Kaiser had with Ken before we agreed to lend him the*

17  *money in 2004.*

18  *Phil has asked me again to attach to your*

19  *records a copy of the lending agreement.  Please contact*

20  *me with any questions, but you should already have a copy*

21  *from previous communications.*

22  *Questions during our last conference call by*

23  *Owen Nolan, Mike Peca and Bryan Berard were important to*

24  *all of you.  If you are still confused about the*

25  *individual equity you invested in the Cabo project versus*

51

1    *the Hawaii equity and loans, please reply to me.*

2    *I thought Phil clarified it by the agreements I*

3    *previously forwarded to you after every member signed*

4    *them.  If not, please contact me about what you cannot*

5    *find in your personal records and I will forward them*

6    *again to you or your advisors.*

7    *Based on the delay, I have also re-sent the*

8    *updated loan calculations from the Hawaii loans to Jowdy*

9    *for your records.  It has been given Lehman Brothers so he*

10   *is aware of the amount that's continuing to accrue to*

11   *Jowdy.*

12   *As a result of the phone call with Ken and Bill*

13   *about the delayed closing, they confirmed the 15 percent*

14   *was still accruing in spite of the delay.  They were*

15   *confident that the initial real estate sales in Cabo, that*

16   *the first few would produce the funds needed to fully*

17   *repay their loans plus additional interest.  I find*

18   *comfort in their representations.*

19   *The 15 percent is not a normal loan interest.*

20   *The extra accrued interest for the Hawaii project will*

21   *assist in defraying the development expenses Chris*

22   *Manfredi and Chris Hawkins and John Kaiser had explained*

23   *to you on previous conference calls.*

24   *Once we have received the development*

25   *authorizations based from the district in Hawaii, we will*

1    *have more funds available to begin the next phase. You*

2    *should recall the Centrum loan from 2005 could also be*

3    *extended upon request and verification when construction*

4    *and development funds are required.*

5         *Lehman Brothers has suggested that once they*

6    *complete the Cabo funding, they want to sit down with Phil*

7    *again and try to finance the entire project. They have*

8    *proposed a macro lending deal, not just a 5000 -- $5*

9    *million acquisition loan that caused the 2005 issue*

10   *determination prior to the Tommy Constantine loan that*

11   *saved the oceanfront parcel in need of extension, which*

12   *Phil negotiated with Hawaii Senator Chumly.*

13        *We will determine Lehman Brothers' future*

14   *involvement in time, but Tommy has another developer that*

15   *he and Phil have been dealing with. They already made*

16   *their initial trip plans to Hawaii with land manager Chris*

17   *Hawkins, and that joint venture seems to have real*

18   *promise. They currently have successful developments in*

19   *Canada and the US so he may also be invested with them.*

20   *They have a number of NHL players as investment partners.*

21        *For those of you who are in Mexico, if there are*

22   *questions you want to discuss with Ken or Bill directly,*

23   *I'm sure they would welcome your calls about the delay*

24   *issues. While we are completing the Cabo funding, I*

25   *believe that Chris and John are working in Hawaii on*

53

1    *premises to begin construction on the Discovery Harbor lot*

2    *that the company bought in 2005.*

3            *As you will recall, these are the small lots*

4    *that can be used to test the material import timing and*

5    *problems from the mainland on a smaller scale*

6    *construction.*

7            *Our Carl Smith LLP attorney Steve Willen and his*

8    *staff have completed the initial registration work for the*

9    *501(c)(3) property that was split off from the 1500-acre*

10   *property based on remediation issues that came with the*

11   *10-acre lot adjacent to the highway.*

12           *If you are unaware of or have forgotten the*

13   *strategy of how we district to build the local museum on*

14   *the parcels and give back to the community, please contact*

15   *the people who are managing this strategy.*

16           Months later he replies to another one.  He says

17   to the investors in May of '07:

18           *I'm sure you're all aware that Phil has been*

19   *traveling all around the US and Mexico to find Jowdy for a*

20   *face-to-face meeting for quite some time about his lack of*

21   *communication and nonpayment of the Hawaii loans.*

22           *Finally, Phil tracked him and Bill Machin down*

23   *in Cabo.  Phil discussed the misrepresentation and*

24   *documentation issues referred to in our last conference*

25   *call, including the $2.3 million capital account for CSL*

54

1    *properties, your investment LLC, as attached, and the $5*

2    *million capital account for Baja Ventures 2015. That's an*

3    *LLP for Phil, Stumbel, and Wetman. And they all made*

4    *initial investments before Lehman agreed to fund.*

5            *Phil discussed the 40 percent Baja Ventures, 40*

6    *percent CSL, and 20 percent Jowdy Equities split getting*

7    *fixed that Jowdy changed for the closing but promised to*

8    *reallocate post-funding. There were other items.*

9            *But in summation, Jowdy and Machin had no*

10   *interest in discussing any changes we previously agreed to*

11   *in order to complete the March 2006 funding in Cabo under*

12   *duress. I think the pressure was created by Jowdy to hide*

13   *these frauds from us and close the deal with Bati. They*

14   *offered Phil bribes to keep quiet and not tell you, Phil's*

15   *investors, what they were doing and not doing with the*

16   *money, as Phil discovered with the bank records.*

17          *This also included their refusal to now address*

18   *the Hawaii loan repayments like they don't exist. For*

19   *those of you who know Bati in Cabo, Jowdy is doing the*

20   *same to him. I understand that Bati is going to sue Jowdy*

21   *and start his personal legal process. I've advised Phil*

22   *that we should run parallel to Bati's Mexico litigation*

23   *efforts for maximum impact if you are not seeing other*

24   *alternatives to resolve the crap Jowdy has created.*

25          *Phil met with Mexico legal counsel and is*

55

1    *prepared to sue both criminally and civilly for all of*

2    *you.  I cannot project the results because this is*

3    *uncharted territory and so soon after the March 2000*

4    *closing that it all appears planned by Jowdy and Bati.*

5         *How many times have you seen that John Kaiser*

6    *had been hurt and still not pursue Jowdy?  They think it*

7    *will destroy the value in Cabo, and Lehman will be*

8    *foreclosed on the property.  They may be right.  They want*

9    *to negotiate with Jowdy through Tommy.  I do not agree.*

10   *But you must remember that Lehman has also funding on the*

11   *Hawaii project through Bati.  They have not begun to*

12   *address the $4 million milestones payments, as required.*

13        *You know, Phil gave up control in Hawaii for all*

14   *of you to receive your proportionate share of the $7*

15   *million closing funds while Phil left his capital account*

16   *in the deal and signed over his home in Hawaii to the*

17   *project absent profits of nearly $500,000.  Time will*

18   *expose the Lehman banker and his development friend Alan*

19   *Worden.*

20        *Some of you should know that Phil has met legal*

21   *counsel in New York through Robert Thompson's contacts to*

22   *discuss a US strategy versus Jowdy and Lehman.  Mr.*

23   *Thompson was President Carter's former legal attaché to*

24   *Congress.*

25        *You understand that with Louis Freeh and John*

56

1  *Behnke involved with Jowdy, this will require mega funding*

2  *and fortitude to take them on.  For now we need to think*

3  *about Cabo and what's going on in Mexico.  Freeh will have*

4  *less input there but Jowdy's project money and leverage*

5  *can buy a lot of protection.*

6  *Phil has offered to buy any or all of you out of*

7  *the contributions to CSL Properties.  We do not know if*

8  *our Mexico legal efforts will be successful.  And Phil*

9  *wants to make it clear that you can cash out now, if you*

10  *want.  Just contact me and I will handle the paperwork*

11  *with you and your personal attorneys.*

12  *This is not how any of us planned the Cabo or*

13  *Hawaii deals to pan out, but when there is tremendous*

14  *money at stake, these are things that can only be*

15  *mitigated, not eliminated, through legal due diligence.*

16  *It does not stop bad people or criminals from doing*

17  *illegal things.*

18  *Send me a reply if you want to cash out or*

19  *discuss the details any further.  I am always available to*

20  *your attorneys or other advisors for additional*

21  *discussions.*

22  *I need your permission by email to discuss the*

23  *details with them like I have before.  We will take this*

24  *legal process one step at a time and navigate it as a*

25  *group.*

57

1    *Phil said he will not let them steal from us as*

2    *a group, but if he wants to cash out, we will make it*

3    *happen to alleviate the Cabo portion of the issues.*

4    *Sincerely, Ron.*

5    THE COURT:  Mr. Kenner, you have been going for

6    25 minutes.  I don't know if you have lost track of time,

7    but I am just giving you a warning that, you said you did

8    not want to go over and relitigate your trial, but it

9    looks like that is what you're going into.

10   I just want to remind you, I am sentencing you

11   today.  This is your opportunity to tell me what I should

12   know.  This has all been in front of me for years.  I am

13   sentencing you today.

14   MR. KENNER:  Yes, sir.

15   THE COURT:  So I am going to give you 10 more

16   minutes.  Tell me anything you want to tell me before I

17   sentence you.  You want to continually read these

18   documents to me that I know, that you have put before me

19   for many years.

20   The jury found you guilty.  You have made a

21   motion for a new trial.  I have denied your motion for a

22   new trial.  I am sentencing you based upon that verdict.

23   So if you want to continue to relitigate the

24   trial, you can do so for the next 10 minutes.  I don't

25   want to cut you off without giving you an opportunity to

58

1   say whatever you want to say today on your own behalf.

2          MR. KENNER:  I appreciate that.

3          I wanted you to see that there was complete

4   transparency in some of the major transactions related to

5   this, and none of these were brought out at trial, for a

6   myriad of reasons that I have addressed before and will

7   address again.

8          The opportunity for us to recapture funding on a

9   deal went terribly sideways and I couldn't feel any worse

10  for that.  I worked for years and years, at my own

11  personal peril potentially, in Mexico to recover the

12  funds.

13         The transactions, Mr. Kaiser vetted them with

14  Mr. Jowdy ahead of time.  The Centrum loan that you heard

15  about at trial, Mr. Manfredi and Mr. Jowdy arranged that.

16  And Mr. Manfredi vetted that transaction.  It is all in

17  evidence.  It's all in emails.  And Mr. Jowdy, frankly,

18  took an adverse path to us once he got the funding from

19  Lehman Brothers and the protection he believed he needed.

20  I'm not sure what else one simple US citizen could have

21  done at that point in time other then continuing to fight

22  and fight.

23         You know, your honor had not heard from 25 of

24  the 30 investors in the Hawaii project.  You know, those

25  are people who, frankly, had spoken with the FBI, because

59

1    they are all in the 3500 notes, told the FBI the things

2    that Mr. Peca told the Southern District, that he was 100

3    percent aware of every transaction, that he authorized and

4    signed off on them and he granted me authorization to

5    transact on behalf of his investment funds.

6           I know it has been said that some people could

7    not remember when they started them, started their

8    investment funds with the lines of credit.  Mr. Murray

9    actually testified at trial he thought it happened five

10   years earlier than it actually did.  But each of those

11   authorizations also have the individual investor's

12   handwriting on those documents.  So not only did they sign

13   them from day one, but they also have their own

14   handwriting.

15          You know, your Honor, when I have looked at a

16   number of the cases -- and I'm going to move on to the

17   final thoughts.  When I have looked at a significant

18   number of the cases, the case I find that matches the

19   transactions in this company -- excuse me, in this case,

20   closer than any other, is probably the Martin Shkreli

21   case.

22          And assuming that you accept all the facts that

23   the government put forth in the testimony of the jury and

24   the verdict -- the testimony of the witnesses and the

25   verdict of the jury, I'm not here to dispute that today,

60

1   your Honor.  This is not the forum, as you eloquently

2   said.  That forum is a different day, if it happens at

3   all.

4          But in the Martin Shkreli case, the dollar

5   amounts are in the same guidelines ranges.  Mr. Shkreli

6   was involved with managing investment monies for different

7   individuals.  He was found to have used, for his own

8   personal benefit, over $10 million of investors' funds.

9          None of the funds in this case have come to me

10  other than the $280,000 repayment of Mr. Gaarn and Mr.

11  Constantine, which I have discussed many times with the

12  court.

13         Mr. Shkreli was in a position of trust, managing

14  a number of hedge funds.  Mr. Shkreli had control and

15  access to move funds to his own personal bank account, so

16  that $10-plus million is exactly what he was found guilty

17  of at trial.  The government was seeking 45 years through

18  sentencing guidelines to Mr. Shkreli.  The same thing had

19  happened with Mr.  Shkreli.

20         Judge Matsumoto, as I think you are aware,

21  sentenced him to 84 months in that case.  I know at the

22  end he broke down and cried in the courtroom, as I was

23  told by some observers, for the monies that he personally

24  pocketed and put into his own bank account for his own

25  personal use.

61

1        This case is absent of any of those dollars.

2   You know, I've got thank-you letters from a handful of the

3   investors right while I'm still sitting in jail.  TS

4   Nordstrom, who you have not heard from, but in 2014, while

5   I was still sitting in jail, he said:

6        *I'm truly sorry to hear about your situation.  I*

7   *can't even imagine what it would be like to be where you*

8   *are and the situation you have been put in.  It makes me*

9   *happy to hear that your spirits are high and that you are*

10  *pursuing the truth.*

11        *I know that you're doing everything in your*

12  *power to set everything straight.  I admire your strength*

13  *to keep pushing forward.*

14        *I have very little information regarding Mexico.*

15  *I've talked to DeVries twice during the last few months.*

16  *And after he and Rem tried to take control over the*

17  *project and did not succeed doing so, I've talked to him*

18  *once and he is still trying to find a way for us to get*

19  *access to all the paperwork, if it exists, from Jowdy.*

20  *Don't look back.  You're not going that way.*

21        *Your friend, Matias Nordstrom.*

22        Matias was involved every day just like Mr.

23  Berard and Mr. Kaiser were up until the moment that they

24  went to work for Mr. Jowdy.

25        There is a series of cases, If you would just

62

1    give me a moment to try to find them.  I just wanted to

2    put them on the record and identify them for your Honor.

3              (There was a pause in the proceedings.)

4              MR. KENNER:  If I can address, even before I

5    read those off.

6              You know, even my fiancé, when she was in the

7    hospital first in 2016, she was served with an arrest

8    warrant, summons and complaint for what had been

9    previously dismissed by mistake in Arizona as a noise

10   violation.  And she wrote to me:

11             *Why me?  I did everything right.  How can they*

12   *bring up new charges after it was dismissed?  I'm beside*

13   *myself.  If they charge me, I get six years for something*

14   *I didn't do.  How is this legal?*

15             At the hearing, when she went in, she had come

16   from ICU with the nurse, she had to go in and address this

17   rejiggered complaint to her 360 days later, and the judge

18   ordered the prosecutor to just try and straighten it out

19   because it seemed like there was a mistake.

20             And the prosecutor told her:  You and PK f'd

21   with the wrong people.  Get away from him.  And it took

22   her six more months of traveling from ICU to get that

23   finally dismissed again.

24             I've been at MDC for the better part of seven

25   years, as your Honor knows.  We have endured conditions

63

1   that are described by many judges in this district as

2   third-world conditions.  And we had an eight-day blackout

3   without power during the polar vortex that came through

4   here a year ago.  We had no power and no light, no warm

5   water, reduced food service, and we were locked in the

6   cells for eight straight days in single-digit and subzero

7   temperatures.

8             The prison tried to cover up what they were

9   doing to fix the problems, changing blankets, until the

10  eighth day, when they finally had auxiliary power to

11  repower everything.  I mean, it was an incredible

12  situation.  I never experienced anything like it.

13            I felt worse there than I did on my fourth day

14  in a Mexican jail, where I got, frankly, nearly beaten to

15  death.

16            As your Honor knows, we have been six months in

17  a strict COVID-19 lockdown at MDC.  69 of the 180 days, we

18  have been on a 24-hour lockdown.  The other days we are

19  free 1.2 hours a day.

20            It took almost 2 months before they gave us

21  access to a computer for more than 15 minutes a day for

22  groups of 20 to get on 4 computers and 4 phones.  So it

23  was terrible, to say the least.

24            As your Honor remembers, the government had me

25  thrown into the SHU at MDC for about three weeks for a

64

1    jump drive that the government had turned over.  Your

2    Honor had, thankfully, ordered me out of the SHU, much to

3    MDC's chagrin.  No only had they previously thrown away my

4    discovery hard drive, as your Honor knows, but they threw

5    away at that point almost all my paperwork and a couple of

6    hundred discs that the government had turned over at that

7    point in time.

8           The amazing part was that the jump drives that

9    they put me in the SHU for was in their possession.  It

10   wasn't in my possession.  All they did was allege that I

11   should have put it in their possession in my name, the

12   legal department.

13          One of my very good friends who worked for us in

14   Hawaii and Mexico had written to the court and said:

15          *Sir, my name is Christopher Hawkins.  I am*

16   *writing about Phil Kenner.*

17          *I worked in Hawaii from 2004 to '06 for the*

18   *Little Isle 4 Company.  I worked in Cabo from '06 to '08,*

19   *after we got the project funds from Lehman.*

20          *John Kaiser asked me to go there in 2006 so I*

21   *could watch my new boss Ken Jowdy.  PK said it was a good*

22   *idea and John needed me to relay information to him about*

23   *the Cabo business because Ken owed us over $7 million by*

24   *then.*

25          *I worked in Cabo until Ken's people threatened*

65

1    *me.  I was caught telling PK about Ken's team plans to*

2    *hurt PK physically.  They fired and threatened another*

3    *guy, named Matt, who was telling PK other bad stuff.*

4         *Ken said constantly that the FBI was protecting*

5    *him, and the Lehman people knew they would give him money*

6    *for anything he asked for.  They wanted to set up PK on*

7    *Mexico drug and gun crimes.  I know they did bad things to*

8    *PK in jail after I was gone from the fake gun charges in*

9    *Cabo.*

10        *Ken said they would not have to repay our Hawaii*

11   *group if they could blame PK after getting him arrested in*

12   *Mexico.  That was their plan.  Ken's lawyers said they*

13   *could take PK's ownership piece then without a fight.*

14        Your Honor, as I think you might know, Judge

15   Block had said:

16        *We now have an advisory guidelines regime for*

17   *any officer or director of virtually any public*

18   *corporation convicted of securities fraud confronted with*

19   *guidelines calculations either calling for or approaching*

20   *lifetime in prison.*

21        Now with respect to the conditions.  The First

22   Step Act has changed the court's ability to review the

23   circumstances surrounding incarceration.  And in the

24   Second Circuit, *United States v Zullo*, 19-3218-CR,

25   regarding compassionate relief, the court held that the

66

1   First Step Act permitted the court to consider any

2   potential extraordinary or appellate relief that a

3   defendant may raise for compassionate relief and vacated

4   any further proceeding.  They have broad discretion to

5   consider any extraordinary and compelling need for relief

6   that a defendant might raise.  It is no longer just for

7   old age and health concerns.

8           In the Northern District of Ohio, based on

9   COVID, a judge ruled that they violated inmates' Eighth

10  Amendment rights because of their neglect and reckless

11  response.

12          During COVID, one of our co-detainees was shot

13  and killed by officers.  We had an eight-day lockdown

14  because a gun was brought into the facility and they shut

15  down the entire facility, military style.

16          There was, in Forbes magazine they recently

17  quoted from an author who wrote two books on mental

18  illness who said:

19          *Someone does not have to have diagnosed mental*

20  *illness before going to prison, according to Elizabeth*

21  *Kelly.  It may well develop, during the pandemic, profound*

22  *anxiety and pressure, and later PTSD, caused by the trauma*

23  *associated with COVID conditions in federal prisons.*

24          The US Sentencing Commission studied the first

25  half in the initial year and reported that the average

1   length of sentence reduction was 68 months in 2018 and 84

2   months in 2019.

3          Mr.  Shkreli's case was 18CR819, if you didn't

4   have that for your records, your Honor.

5          THE COURT:  I sat on the appeal of the case on

6   the motion of Mr. Shkreli.  I sat on the case on appeal.

7          MR. KENNER:  Thank you, your honor.

8          Now, there is another case, Mr. McFarland, which

9   is another very high-profile case, where he had defrauded,

10  stolen $24 million from concert goers, stranded 1000-plus

11  people in a foreign country, and he was sentenced to six

12  years in federal prison.

13         Mr. Billy Walters, who had defrauded investors

14  of $25 million, went to trial, and after trial was given

15  60 months in prison.

16         There is a case in the Fifth Circuit by an

17  investment advisor, business manager who probably is also

18  very similar to me.  His name is Charles Banks.  And he

19  advised some professional basketball players.  It was

20  determined that there was an actual loss of $13.5 million

21  from loans that his investors said that they weren't aware

22  of what they were signing; although they admitted to

23  signing them but weren't aware.

24         He received a 20-level enhancement, much the

25  same as your Honor did for me.  He had a position of trust

68

1   with each of these.  He was sentenced to 48 months in

2   prison.

3           There is judge after judge after judge who spoke

4   out about the sentencing reductions and the qualifying

5   conditions in the Brooklyn jail, including Judge Pollock.

6           It has been seven years, your Honor, since I

7   have been in the sunshine.  I have had no vitamin D from

8   the sun, which is important, as your Honor knows, to our

9   vital quality organs.  We are not allowed to have any

10  Omega-3s for fish oil, which is very difficult on my own

11  CTE conditions.

12          In granting downward sentencing variances in a

13  series of cases after the blackout of a year ago, this is

14  pre-COVID, Judge Chen noted that inmates at the MDC were,

15  *"subjected to very cruel conditions,"* and that, *"there was*

16  *a reluctance on the part of the officials at MDC Brooklyn*

17  *to correct the conditions or even to disclose them*

18  *timely."*

19          Judge Fuhrman reached the same conclusion.  "It

20  is pretty clear to me that steps could have been taken,

21  and taken more quickly, to address the problem at MDC.

22  The bottom line is, the conditions I read about are the

23  conditions that one associates with a Third World country,

24  not a country like this, and nobody in detention should

25  have to endure that, what the detainees did in MDC for the

69

1    eight days of subzero polar vortex conditions.

2            Now, Judge Rakoff has made a number of

3    statements that I'm sure your honor is aware of.  But even

4    in 2020, in the *United States v Morgan*, the sentencing was

5    cut in half based on the conditions at MDC.

6            There are lawsuits in the federal centers

7    against the MDC for the way that they inhumanely treated

8    everybody.

9            THE COURT:  Mr. Kenner, I saw all of those

10   things in your submissions.  I read those things.

11           MR. KENNER:  Well, your Honor --

12           THE COURT:  I don't want you to waste all your

13   time with the conditions at the MDC.  I know what the

14   conditions are.  I understand them.

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

70

1              (Continued from previous page.)

2              THE DEFENDANT:  Your Honor, if I can just

3    surmise.  When I was a business manager who worked for a

4    lot of professional athletes, probably 150 in total, none

5    of their money ends up with me, none of it.  I couldn't

6    feel any worse, whether your Honor believes me or not, I

7    couldn't feel any losses sustained to investments

8    sustained by third party, group decisions I have made that

9    I can take responsibility for.  I mean when I was faced

10   with the problems with some of these bad investments, the

11   first thing we did we went after the people who got the

12   money.  I didn't get the money.  We had the money, we

13   traced the money, filed lawsuit with independent counsels.

14   Everyone who you heard from the e-mails from one of our

15   attorneys, everyone was kept in the loop, had direct

16   access to these attorneys, including Rudy Guilliani's

17   group when it came to Mr. Constantine in the Eufora

18   transactions.

19              Your Honor, I've been told by several different

20   defense attorneys, I have a very difficult dilemma, that

21   if I continue to advocate for the truth based on the

22   voluminous evidence that was never put before this Court,

23   for whatever reason, at trial, whether it was too late,

24   never delivered to us under United States versus Gill or

25   it was just unknown and not managed by my attorney under

71

1    the United States v. Cronic in the Supreme Court.  I can't

2    make up for that today, but I've never stopped advocating

3    for the people who lost their money.  If any of it was in

4    my hands, nobody has shown that to us that yet.  All of

5    the funds went exactly where they were supposed to and

6    their investments went bad.  I couldn't feel worse for

7    that but I didn't run from any of that feel.  I was

8    supportive, center of the target to try to get the money

9    back for these people.

10            We know Mr. Kaiser was paid back, he sent an

11   e-mail to me -- excuse me, a text message in 2011 saying

12   he still had his mom's $2 million, his brother's $208,000,

13   after he was paid back from everything.  We know he had

14   the money, what he represented at trial wasn't true.

15   But you know people who have suffered losses in whatever

16   investments, you know, the 2009 global recession certainly

17   affected that, the Lehman Brothers bankruptcy affected

18   that, but each of the people who touched the money and

19   went after the money I stood up for them and I fought for

20   them.

21            I'm not sure about some of these other stories

22   about people running in cars by their homes and

23   threatening them, that has not been presented anywhere

24   before.  I never heard the stories and there is no

25   connection to me, just like the anonymous unsigned letters

72

1    that the IRS triggered an IRS audit.  I think there's a

2    volume of misunderstandings through the last 18 years

3    since we met Mr. Jowdy through some of our clients, and I

4    couldn't be any sorrier that we ran across that guy.  If I

5    had the money, if the money had been wired off shore and

6    withdrawn if your Honor had designated $17 million worth

7    of losses and I had simply taken that money, absconded it

8    and wired it to the Bahamas and I had it sitting in the

9    bank account I would love to have everybody have it today.

10   But none of the money passed through my hands, none of it.

11   We've been sitting here with the same guideline range at

12   this time.  I know it was the same thing that happened a

13   to Mr. Shkreli so I would appreciate if you would consider

14   all of that.

15          It's tough to say sitting here and say I'm sorry

16   to take responsibility other than the actions to say I'm

17   sorry, but I don't have the money, your Honor.  It's not

18   in the investments, it's not in the records.  As your

19   Honor knows I even offered the government to help the GSF

20   553 and go back after Mr. Jowdy and recover the loan money

21   that is topping 33 million dollars today.  I don't know if

22   the people in the courtroom know but the government has

23   recently submitted in June, July and August this year

24   affirming Mr. Jowdy and Lehman Brothers and Danske Bank

25   starting 16 years ago and continues to loot the project

73

1   for their own personal benefits and personal investments.

2   I wish they would all know that.  I hope Mr. Nolan knows I

3   don't have any of his money.  I know he believes that I do

4   because he was told that by Mr. Galioto, much like several

5   of the others but Ms. Peca told us on a 2012 call that she

6   was told by Mr. Galioto that I stole all of their money

7   and never gave the money to Jowdy.

8           Your Honor, for whatever value it is I feel

9   sorry for any losses that have occurred.  I know you

10  probably don't see it as much value at this moment in time

11  but there is not much more after good investments went

12  back but to fight and recover those for our people.  If

13  any of the monies were traced to me people would have come

14  after to me for that, but we have all the bank records

15  although it's not the truth.  I'm sorry for the Pecas and

16  whatever they believe happened.  I'm sorry for Mr. Berard,

17  we had a lot of great transactions that went bad, sorry

18  for the transactions that Mr. Kaiser's went bad and

19  affected his family, regardless whether he got the money

20  back.  Nobody goes into investments and wants to lose

21  money.  They go into investments to make money and that

22  was the goal, and I ultimately want to thank my kids and

23  my fiancee for being so strong through this part of the

24  process which I'm sure is equally debilitating for

25  Mr. Berard, for Mr. Peca's families for what they believed

74

1    happened, whether it is factually accurate or not.  So

2    thank you, your Honor.

3             I appologize for going over but I thank you for

4    your patience.

5             THE COURT:  Thank you, Mr. Kenner.

6             We'll have to take a break at this point so

7    we'll reconvene at 2 o'clock.  I have something I'll say

8    briefly about Mr. Kenner's remarks and I'll hear from the

9    government.

10            I'll see you at 2 o'clock.

11            (Afternoon recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

75

1              A F T E R N O O N   S E S S I O N

2

3          THE COURT:  If everyone can be seated:  Before I

4    hear from the government I want to say a few things in

5    response to what I heard from Mr. Kenner today and a few

6    things leading up to the sentencing in connection with his

7    submissions, and having obviously presided over the trial.

8    Mr. Kenner, I think you know this already, I think you

9    were professional and respectful throughout the proceeding

10   and you ably represented yourself.

11          It's clear you are a smart person and the

12   victims know that as well in your defense here, but I see

13   this as sad that you wasted all that work and all those

14   skills towards defrauding these people.

15          This case is more troubling and disappointing

16   than most that I've seen in my career.  As I said before,

17   your lack of remorse and unprecedented continued attacks

18   on the character and credibility of the victims makes it

19   even worse, and I don't want you to think I'm considering

20   Mrs. Peca and the other victims' talked about threats and

21   audits, I'm not considering those things, they are not

22   before me.  I don't know what transpired there.  I'm

23   talking about what I read with my own eyes in your

24   submissions which made it clear that you were trying to

25   demean, humiliate and destroy their credibility, their

76

1   reputation and it's a refusal to take any responsibility

2   for what you've done; blame others, blame the FBI, blame

3   the victims, blame Mr. Jowdy.

4           And with respect to Mr. Jowdy, I'll say this.

5   Mr. Jowdy wasn't on trial here.  I don't know what

6   transpired in all the conversations you had with him and

7   it very well may be that he may have misled you in some

8   way and lied to you or made misrepresentations to cause

9   you to lose the victims' money.  I'll know you cite that

10  back that Judge Bianco found that Jowdy did illegal

11  things, I don't know.

12          I'm willing to give you the benefit of the

13  doubt.  I'm willing to give you the benefit of the doubt

14  after you gave him the money, he did things that you

15  didn't expect him to do and was inconsistent with the

16  agreement, but having said that that does not overlook

17  what you did.

18          You should not have been giving him money in the

19  first place without their authorization, I know you

20  dispute that.  I found it to be incredible, the jury found

21  it incredible by their verdict, and I think the victims

22  spoke to this as well.

23          You then continued to take their money and

24  mislead them.  Instead of telling them what is going on

25  with their money like a real and honest money manager

77

1    would do, instead you took more money from them and then

2    used that money in ways they did not authorize you to do,

3    victimizing them a second time.

4            So putting aside, whatever Mr. Jowdy did, you

5    refused to take responsible for what you did, that was

6    illegal, that was fraudulent.  You don't explain credibly

7    why you used one hockey player's line of credit off, you

8    know, a Ponzi-like scheme, to pay anothers line of credit

9    off in a like scheme.  I'll speak to this in a moment

10   because there's a lot of complicated transactions in this

11   case.  This one is so clearly illegal and fraudulent on

12   its face, and you can't even admit this one.  I'm

13   referring to the diversion of the hockey players' money to

14   Mr. Gaarn.

15           Mr. Jowdy also does not explain why you

16   knowingly allowed Mr. Constantine to divert some of the

17   money from Eufora and the Global Settlement Fund for his

18   own personal use and you facilitated that knowingly.

19   Instead of taking responsibilities, all I get is the

20   hockey players have CTE, Mrs. Peca is lying, this is why

21   you got year after year, document after document, it's

22   ironic that you say you got CTE but it was clear to me

23   during the trial that the witnesses were credibly

24   testifying to your fraud.

25           You want everyone in this courtroom to believe

78

1    Brian Berard, Joe Juneau, Ethel Kaiser, John Kaiser, Jay

2    McKee, Tyson Nash, Owen Nolan, Kristin Peca, Michael Peca,

3    William Ranford, Steven Rucchin, Darryl Sydor and others

4    are all lying.  They are all lying or misrepresenting,

5    misremembering and it's ridiculous.  It's ridiculous.

6           I would point out to you because I think it was

7    also ironic that you talked about if you sign it, you own

8    it, suggesting the documents to show if they sign certain

9    things -- I point you out as you point me out in the

10   transcript page 3423, Ms. Donlan used to work for you,

11   testified to assisting you in forging the names of the

12   hockey players on bank documents, and you could not have a

13   more credible person than she were.  She didn't

14   exaggerate, didn't happen every day.  She testified in a

15   particular time in her memory of helping you to forge the

16   hockey players' signatures.  No explanation for that,

17   Mr. Kenner.

18           Mr. Gaarn.  Again, he testified to you making

19   him the manager partner of AZ Eufora as a favor to you,

20   opening a Wachovia bank account.  You then backdated --

21   this is in 2008 -- you backdate a 2005 document

22   transferring membership interest to him, he puts in no

23   money into Eufora, and then you start funneling hockey

24   player money, Mr. Murray -- I think I got the names right

25   -- Mr. Ranford, Mr. Rucchin, funneling their money to that

79

1    bank account and then Mr. Gaarn testified you telling him

2    to wire it to you, a significant amount of money, hundreds

3    of thousands of dollars to you and other individuals who

4    should not have been getting that money.  That was money

5    that if the hockey players knew all, some of it, they

6    testified to knowing, although Mr. Branford said several

7    hundred thousand even though it went there, but in any

8    event you emphasize that I never got this money.  I guess

9    you overlooked that money.

10             Even in your documents, you say even assuming I

11   took that money, it's only $280,000, whatever it was.

12   I just use that as an example you could have, you say I

13   have to walk a fine line.  It would have been very easy

14   for you say look, Judge Bianco, Mr. Jowdy gave did X, Y

15   and Z once I gave him money but what I did was wrong

16   because I took their money, using it in ways I shouldn't

17   have been using it.  I was doing things with it that I

18   didn't know more about and I lost more of it because I

19   didn't want to tell them I already lost X millions of

20   dollars.  That's the truth but you just couldn't do.  You

21   just couldn't do it.

22             I find their testimony to be fully credible and

23   Mr. Gaarn came in, and if he was so credible, you thought,

24   oh, like he owed me money.  He testified I wasn't paying

25   for a personal loan.  You just made that up like you do

80

1  when you get caught in one of your lies.

2         It's sad for me to read letters from your kids.

3  I know you have pictures there.  I'm a father of six, I --

4  they clearly love you and miss you and it's sad for me to

5  hear that but you put yourself in this position and you

6  have no remorse for what you've done to the families of

7  these victims.  So I'm considering that, not the same

8  time, what you've done to your own family.  It is tragic,

9  the whole situation, and it's also tragic when I see these

10  letters they believe that the justice system has

11  wrongfully convicted their father.  They didn't sit in the

12  trial.  If they were here they would know that's not what

13  happened.  But in a sense to believe going through life

14  their father has been wrongfully convicted, had that

15  grudge against the system when it's not true.  You're

16  guilty and your guilty is overwhelming.

17         Mr. Constantine actually put -- there's two

18  other things about the Eufora thing I found particularly

19  noteworthy.  In your forensic report you submitted to me

20  in October last year, this is your own forensic report.

21  When it got to the Eufora investment, when you say it's

22  all documented, it's supported, documents don't lie.  This

23  is them saying in reference to Mr. Ranford's $400,000 that

24  went into the bank account.  Kenner has represented the

25  Constantine sole private stock for Ranford for $200,000.

81

1  That's your claim.  The stock sale is supported by

2  Kenner's complaint by the U.S. Bankruptcy Court in March

3  of 2013.  We don't have any other records in support of

4  that that transfer was a private sale of stock from

5  Constantine to Ranford.

6         And then on your representation that Eufora was

7  independently valued by Neptune Capital at $20 million

8  after your investment, your forensic accounting analysis.

9  We've not seen documents that support such valuations.

10 And Mr. Constantine in his conversation with you, this is

11 Mr. Constantine's own words.  What do you think will

12 happen when $700,000 shows up going from the players that

13 already voted first time to the bank account back to Tim

14 Gaarn to Eufora's bank account back to Tim Gaarn's account

15 to your account, like this will not look good, right?

16 There is so much expletive you are not thinking about in

17 this whole equation that needs to just be put to bed and

18 it goes on.

19         Here is Mr. Constantine describing this very

20 clear fraud that we can all see that you will not even

21 acknowledge.  So that's the way I view this case and as I

22 said to the victims I'm not surprised to hear -- I've

23 heard a lot of apologies, I've heard a lot of remorse,

24 I've sentenced hundreds of people.  I think I even wrote

25 down what you said.  I'm sure the victims noted it.  I

82

1    think you said to Mrs. and Mrs. Peca that you are sorry

2    for what they believed happened to them, I think were the

3    words.  I'm sorry for what they believed happened to them

4    and the other victims you said sorry that you lost your

5    money.  That is not an acceptance of responsibility.

6    Acceptance of responsibility is I'm sorry for what I did,

7    and you still can't just do that.  So I am taking into

8    account some of the things you wrote about, some of the

9    things you said today, the MDC.

10              I think it's fair to take the conditions there

11   into account and you have had issues there that I think go

12   beyond the normal inmate in terms of being in the SHU for

13   having the flash drive, that was wrong.  So I am

14   considering that and obviously I'm trying to get a

15   proportional sentence, but your failure in having remorse

16   what you did to the victims is giving me great remorse.

17              I think Ms. Peca said I have no assurance and

18   confidence that you will not go out and do this again.

19   Someone who is refusing they recognize they did anything

20   wrong who is smart as you are, maybe not as a money

21   manager, I don't know who would give you their money given

22   in case, but if there is a way, I have no confidence that

23   you would do it again and that is unusual when I sentence

24   somebody.

25   Before I sentence you, I'll hear from the government.

83

1          MS. KOMATIREDDY:  Thank you, your Honor.

2          I want to start by thank the Court for your

3     attention to detail as an incredible amount of work that

4     your Honor's clerks and your chamber's staff put into this

5     case.  This Court presided over a nine-week trial,

6     multiple hearings and thousands and thousands of pages of

7     transcripts and issued multiple lengthy opinions

8     confirming that the evidence set forth at trial proved the

9     defendant's guilt beyond a reasonable doubt.

10          This Court knows the truth better than anyone

11    and you've been gracious in retaining supervision in this

12    case to make it possible for all of that knowledge to be

13    brought to bear in imposing sentence.  So what I would

14    like to do is take this time to briefly respond to some of

15    the arguments the defendant made, highlight what the

16    government believes are the most important considerations

17    in the sentencing analysis under 18 USC 3553(a) speaks for

18    some of the victims who did not speak today and explain

19    why the government has proposed a sentence of at least

20    20 years incarceration for this defendant.

21    One of the most pernicious aspects of the defendant's

22    offenses is how he built relationships of trust with young

23    men at the start of their careers and exploited their

24    relationships.  It's important to keep in mind that when

25    Mr. Kenner met many of his victims, they are young men

84

1    only just starting out in their careers, only just

2    starting to make money.  Mr. Nash testified at trial prior

3    to being an NHL player he was a pizza delivery guy.

4            Mr. Sydor testified he worked at his uncle's

5    plumbing business, PDQ Plumbing.

6            Mr. McKee testified he only made 45 to $50 a

7    week, lived with his parents who were in debt to the tune

8    of about 70,000 to $80,000, that he himself didn't have

9    and money.

10           And Mr. Rucchin testified that it was his first

11   job, his first paycheck that he handed over to Kenner for

12   investment.  These were young men trying to be

13   responsible, aware they were entering a career that could

14   be lucrative but also a career that could end and any time

15   and Mr. Kenner was well aware of that.

16           He induced these individuals to place their

17   trust in him because he sold himself as someone who was a

18   former college hockey player himself, who understood them,

19   who would have their back, not take the shirt off their

20   backs.  He carefully cultivated those client relationships

21   into close friendships.

22           Joe Juneau testified that he was the best man in

23   Mr. Kenner's wedding and Mr. Kenner was the best man at

24   his.

25           Mr. Peca testified that he was like Jerry

1   McGuire.  Mr. Nolan called him like a brother.  And

2   Mr. Gonchar at trial acknowledged photos where they were

3   celebrating the Stanley Cup win together the night he had

4   won it.

5          Mr. Kenner specifically targeted these

6   individuals because they were vulnerable at a time in

7   their careers where they were making a lot of money but

8   didn't have the sophistication to know how to invest it.

9          As Mr. Nash testified he also knew that hockey

10  players were loyal, loyal like dogs, and he exploited all

11  of that.  When Mr. Kenner exploited those relationships he

12  stole more than money, he stole trust, he stole their

13  sense of security and he put them in a sense of

14  desperation.  As Mr. Juneau said at trial, it kept him

15  awake at night.

16  The other thing that really sets this offense apart and

17  the nature and circumstances of the offense apart is how

18  the exploitation of that relationship happened time and

19  time again.  This was a sustained and persistent fraud

20  where one lie led to another and one scheme led to

21  another.

22          At trial, the government proved three schemes

23  over the course of approximately a decade that victimized

24  more than a dozen people.  Fourteen victims testified at

25  trial as the Court recounted.  They suffered millions of

86

1    dollars in losses and those millions of dollars all ended

2    up in the defendant's and his codefendants' pockets.

3    That's what sets this apart from a typical fraud case.

4    But this was also more than fraud.  There were multiple

5    aggravating factors as the trial testimony also showed.

6    There was forgery, there was obstruction, there was

7    perjury, there was invasion of privacy and there was

8    harassment that continued until this day.  The Court saw

9    and heard these things with its own eyes and ears and

10   recorded phone calls that were introduced at trial when

11   Mr. Kenner told conflicting stories to the Pecas and has

12   seen and heard the same in the 8000 plus pages of filings

13   that Mr. Kenner has put in since the conviction in this

14   case.

15   Now, I want to be clear, Mr. Kenner has every right to

16   file post-trial motions and have a sound basis in fact and

17   law and that's not what we're talking about here.  What

18   we're talking about is the harassment, the insults, the

19   threats, the personal attacks, telling the victims that

20   they have brain damage, faulty memory in fabricating

21   things and repeatedly badmouthing them as bad apples to

22   others, telling them the facts that were proven beyond a

23   reasonable doubt were not facts.

24   This is more than fraud.  It is malicious and for the

25   victims the mouse never stops.

87

1          What is even more shocking is the defendant's

2     complete lack of remorse.  The Court saw this again today.

3     Mr. Kenner stated just a few minutes ago, that there were

4     a lot of misunderstandings, that this went terribly

5     sideways.  That is not an apology.  Shortly after stating

6     that, he then blamed Mr. Kaiser, Mr. Manfredi and others

7     for the losses in this case.

8     Mr. Kenner also stated none of the money ends up with me,

9     none of it.  I didn't get the money.  That is a stunning

10    rejection of the truth.

11          As the Court will recall, the government put in

12    reams of bank records and summary charts that showed in

13    every instance a hockey player putting money into an

14    investment and that money ending up in Mr. Kenner or

15    Mr. Constantine's pockets for paying off their personal

16    expenses time after time after time.  Those were

17    government's charts one through twenty.  Sometimes it was

18    the same day.

19          The Court will recall one of the most stunning

20    examples was the first investment in Eufora where

21    Mr. Kenner persuaded Mr. Peca to put $100,000 into Eufora

22    and when you look at the bank records Mr. Kenner signed

23    using his power of attorney, $100,000 of Mr. Peca's money

24    straight into Mr. Constantine's personal account and the

25    same day it was wired straight into Mr. Kenner's personal

1    account.  That is only one example.

2    The Court will also recall that all of these transfers

3    were intentional because text messages recovered from

4    Mr. Constantine and Mr. Kenner showed real-time

5    coordination between the two and specifically referenced

6    the transactions.  To say that none of the money ended up

7    with Mr. Kenner is completely inexplicable and highly

8    concerning because a defendant who fails to acknowledge

9    reality is truly dangerous.  He appears to be convinced of

10   his own lies, convinced that he is a hero in every story,

11   convinced that everyone else is the problem and someone

12   who is convinced of that will never stop what he's doing.

13   Indeed the letters that have been written in support of

14   him by his family and by others who still believe his

15   story, underscore this point.  They repeatedly say he will

16   not stop fighting, in other words, he will not stop

17   insisting that his fraud is real and he will not stop

18   victimizing these victims.  That is what makes this

19   sentencing difficult.

20   There is a level of depravity here that we rarely see.  I

21   want to address a couple of the points that Mr. Kenner

22   made.

23   First, he went into a relitigation of the case.  The

24   government did not hear anything in Mr. Kenner's statement

25   that calls for a response beyond what we've already

89

1  briefed in this case.

2  Second, Mr. Kenner spoke of his children and his fiancee

3  and how they have suffered.

4  Now it's always difficult to talk about family

5  and the consequences that this criminal justice process

6  has on family because the consequences of a defendant's

7  decision to commit a crime is often borne most heavily by

8  others, including the defendant's innocent family and

9  friends.  That has to be acknowledged and recognized in

10  the 3553(a) analysis.  But the question under the law and

11  in accordance with the precedent that the government cited

12  in his brief is whether the harm suffered for this

13  particular defendant is far outside the heartland of the

14  kinds of crime suffered by any defendant who is taken away

15  from his family.  And I think when you look at the law in

16  this area, it is simply not in this case.  It is not

17  outside the heartland.  Unfortunately this defendant

18  inflicted this harm himself when he made the decision, the

19  repeated, deliberate, calculated decision over ten years

20  to defraud his victims.

21  Third.  Mr. Kenner referenced the Shkreli case and asked

22  for a comparable sentence of 84 months.  This Court is

23  very familiar with the Shkreli case, but it's safe to say

24  that that case was different and the factors were

25  different.

90

1  I will not say anything to suggest that Mr. Shkreli

2  merited a lower sentence than or the sentence that he got

3  as opposed that the government advocated for in that case

4  which was 15 years, but I will note at least Mr. Shkreli

5  at least pretended to apologize at his sentencing and the

6  loss amount in that case was different because at the end

7  of the day the victims were paid back with stolen money.

8  In any event, there are too many differences to compare

9  the two cases.  Mr. Shkreli's victims involved

10  sophisticated investors.  The victims in this case as I

11  said before were young men who were reaching out to Kenner

12  and were relying on him for his sophistication, for his

13  financial expertise as their financial advisor.

14  Fourth.  Mr. Kenner mentioned the MDC and the conditions

15  that have been in place during that time.  I want to note

16  two things in that respect.  The conditions of the MDC

17  during COVID of course have been different as they have

18  been for all of us during this time.  Everyone has been on

19  a certain kind of lockdown and so part of this has to be

20  placed in context.  But when Mr. Kenner talks about the

21  COVID situation being negligent or grossly negligent, it's

22  important to note that MDC's management of the COVID 19

23  pandemic has been the subject of litigation most notably

24  in Chenn v. Edge, and Judge Kovner has found the MDC was

25  not grossly negligent, that they have gone to great

91

1  efforts, great lengths to keep prisoners safe and that

2  they have in fact had a very low infection rate and a very

3  low hospitalization rate.

4  With respect to Mr. Kenner's other complaints regarding

5  the handling of emergencies at the MDC, that is also the

6  subject of litigation and monitoring under a current case

7  that is currently being supervised by Judge Brody and that

8  is proper place to litigate the MDC and its actions, not

9  here. It does not help Mr. Kenner to shift the focus from

10  himself to the MDC.

11         His crimes require a severe punishment and any

12  treatment that he has had or mistreatment at MDC would be

13  resolved after sentencing once he's transferred out of

14  that institution.

15  I will also note that the MDC has given Mr. Kenner special

16  access to a laptop that as of last week when I spoke with

17  them I was advised he's the only inmate with access to a

18  laptop and the only one permitted to leave his particular

19  cohorts at MDC for the purpose of COVID in order to go to

20  the visiting room and use his laptop, so they have been

21  particularly accommodating with Mr. Kenner to ensure he

22  can represent himself in this case.

23  I will conclude by turning to the 3353(a) factors for the

24  Court. Every single one of these factors militates a

25  severe sentence. The nature and the circumstances of the

92

1    offense show that the offense was particularly pernicious,

2    involved a breach of trust and repeated calculated

3    manipulation and theft from the victims over the course of

4    a decade.

5           The history of the characteristics of the

6    defendant showed that he completely lacks any capacity for

7    remorse or reformation.

8           The seriousness of the offense is reflected in

9    the millions of dollars that have been lost and the

10   generations that will pay for that.

11   The need to promote respect for the law is even more acute

12   here with the defendant who has obstructed justice and

13   uses the laws as a tool for harassment instead of a tool

14   for justice.

15          The need to provide deterrence and protect the

16   public from further crimes is again extraordinarily great

17   in this case where this defendant shows no signs that he

18   will change.

19   In one of the things I've seen as an attorney in this case

20   is that the lawyers come and go, and for us as lawyers in

21   this case the case will end, but for the victims it will

22   never end.  This will go on.

23          Kenner has spent 18 years lying to them,

24   stealing from them, demeaning them, harassing them, and

25   his total lack of remorse, his utter failure to

93

1   acknowledge any wrongdoing and his frank refusal to accept

2   any responsibility provide this Court with every reason to

3   believe that Kenner will continue victimizing these people

4   for another 18 years.

5   For those reasons the government requests a sentence of at

6   least 20 years imprisonment.  The guidelines advise it,

7   this Court's probation department recommends it and this

8   defendant's unrelenting determination to continue

9   perpetrating the fraud and committing acts of malice

10  against its victims necessitates.

11  Thank you.

12          THE COURT:  All right.  Thank you, Ms.

13  Komatireddy.

14          I'll now describe the sentence I wish to impose

15  I'll give the parties a final opportunity to make legal

16  objections before I impose the sentence on Mr. Kenner.

17          MR. TALKIN:  Your Honor, I'm sorry.  There is

18  one fact I'd like to put on the record because it may go

19  into your calculus into your sentencing.  It's brief and

20  it's about Eufora which you raised before.  You had asked

21  me for periodic updates what was happening with Eufora and

22  the status we have right now is they are moving along with

23  the SEC process but nothing has been made firm yet.

24  However, we have been authorized to release the shares and

25  the company that did purchase Eufora and they were

94

1   purchased by AZ Eufora Partners, so those will be given to

2   the government this week.

3           I can't tell you what value they have or any, so

4   I will not represent that to think about in the sentence

5   but I just want you to know this fact exists.

6           We also have a breakdown of the shares we

7   believe the individual members of AZ Eufora who were many

8   of the victims here.  There is one hockey player who is

9   actually in his name from other transactions but separate

10  from that individual, they'll be separated with their

11  percentages what they put in the AZ Eufora and we

12  anticipate they may be able to trade those privately and

13  if they'll be able to make those own decisions if they

14  want to hold them when they are able to traded publicly.

15  I know from Mr. Constantine's point view he wants the

16  victims to be able to make or have the opportunity to get

17  some recuperation from the sale of the stocks or to keep

18  them, and I assume Mr. Kenner shares the same sentiment.

19  I don't know if he does, I'm not in a position to speak

20  for him, but I don't think it's fair for your Honor to not

21  know that before sentencing.

22          THE COURT:  Thank you, Mr. Talkin, for placing

23  that on the record.

24          Obviously we'll discuss more with respect to the

25  restitution issues, but based upon what you are saying it

95

1  doesn't seem we'll know what particular value it will

2  have; is that correct?

3          MR. TALKIN:  That's correct.

4          THE COURT:  In imposing sentence today I've

5  carefully considered as I'm required to the factors set

6  forth by Congress in Section 3553(a).  I'm considering all

7  the factors, although I'm not listing all of them, the

8  nature and the circumstances of the offense, the history

9  and characteristics of Mr. Kenner, the need for the

10  sentence imposed today to reflect the seriousness of the

11  offense, to promote respect for the law, to provide a just

12  punishment for the offense, to afford adequate deterrence

13  for criminal conduct and to protect the public from

14  further crimes by the defendant.

15          I've also considered as we discussed at the

16  prior sessions before the pandemic, the advisory

17  sentencing guidelines issued by the sentencing commission,

18  the applicable advisory range in this case as well as the

19  applicable policy statements issued by the sentencing

20  commission.

21          I've also considered the need to avoid

22  unwarranted sentencing disparities among similarly

23  situated defendants.

24          Mr. Kenner in his submission as he highlighted

25  today as his many cases he wanted to bring to my attention

96

1  involving fraud.  I looked at those.  I'm familiar with

2  what other judges have sentenced to, based upon my own

3  experience, and I'm also familiar with the sentences I've

4  imposed in fraud cases and I'm considering this factor

5  very carefully.

6          I've also -- I'll not do it today but I'll

7  consider the factor regarding restitution at a future

8  date.

9  Having carefully considered those factors and all the

10  3553(a) factors I find in the exercise of my discretion

11  that a sentence of 17 years total sentence is the

12  appropriate sentence in this case.

13          I'll now state how I arrived at that particular

14  number.  It's 204 months.  I emphasize first that this

15  sentence is not being driven by the guideline calculation,

16  we spent an exhaustive amount of time reaching that

17  calculation but my sentence would be the same regardless

18  of that guideline calculation.  This is being driven by

19  the other 3553(a) factors and would not be affected by any

20  recalculation of that range and I'll explain which of the

21  3553(a) factors in particular resulted in the sentence.

22          Similarly Mr. Kenner made reference to downward

23  departures for families and age and things like that in

24  his papers.  With regard to the guideline calculation,

25  that my understanding of my discretion to depart from the

97

1    guidelines based upon those types of factors I don't

2    believe that his circumstances warrant such a departure

3    under the guidelines.  I didn't want it to appear that I

4    missed that.  I'll also note I made reference to his

5    letters, the two different letters I received at different

6    times from his children.  I didn't want him to think I

7    didn't read all the records.  His fiancee has health

8    issues.  I read the letter from his mother, from the

9    inmate, I've read all of those letters and have considered

10   them in addition to Mr. Kenner's outlining of things that

11   he has done in the jail to try to help other inmates, so

12   that is not overlooked.

13          People may disagree with the number I arrived at

14   one way or the other but I can assure the public and

15   everyone here including the victims that I carefully

16   thought out and reweighed all the factors.

17          I understand the seriousness of these decisions

18   and the impact it has on people's lives and the

19   difficulties it has.  I spent many, many hours, many years

20   considering and reading in order to make sure I'm properly

21   weighing all the factors.

22          The first factor the government pointed out and

23   I want everyone to understand, including Mr. Kenner, how I

24   arrived at the number.  I want to emphasize how serious

25   this offense is.  This is a massive multifaceted fraud

98

1    scheme as the government noted, went on for many years, it

2    was deliberate, complicated.  I made reference to the

3    Eufora, Mr. Gaarn at the time we had to highlight and

4    rebut some of the things Mr. Kenner said today that were

5    not true, but many of these transactions are very

6    complicated and the bottom line is the victims trusted

7    him, he was there, whatever you want to call it, money

8    manager, financial advisor.  He befriended them and they

9    trusted him and he abused that trust and he betrayed them

10   over a long,  of time through a web of deception and

11   continued taking money from them, using unauthorized ways

12   often for his personal benefit.

13         So this is a massive fraud with devastating

14   financial and emotional impact on the victims as we've

15   heard a lot of that today, very powerfully.  So the

16   sentence has to reflect the harm that was caused, the

17   seriousness of the scheme and provide just punishment for

18   the crime and the harm that was done to these victims.

19         In terms of history and characteristics,

20   normally someone who does not have any history criminal,

21   that that is a mitigating factors, he has had no trouble

22   with the law before, but I'm faced with someone who has no

23   remorse, who lied over and over again at the trial and

24   even post-trial, blaming everybody but himself, the

25   victims.

1        The government, Mr. Jowdy, I don't want to

2   repeat what I said before, and the bottom line is he has

3   in my view through the demeaning and attacks on the

4   credibility of these victims over the years, shown that he

5   has no remorse and as I said continues to pose an economic

6   danger to society upon getting out.  I didn't know this

7   before and one of the victims made reference to this.

8   It's not just -- obviously they worked very hard for this

9   money and everyone knows a hockey player has limited time

10  he can make that money in the league, especially given all

11  the injuries, but I had a page number and I didn't mark

12  it, but it was more than once that Mr. Kenner, I forget

13  which player it was, noted the money he got was only some

14  small percentage of his overall income, sort of suggesting

15  like, oh, it wasn't that much of their personal money.  I

16  just find that mentality unbelievable, unbelievable for

17  him to even suggest he could have made other money, that

18  he didn't defraud them of and take, and somehow that is a

19  mitigating factor.  It just highlights the lack of

20  remorse, the need for society to be protected from him for

21  a long time.

22        So this sentence is necessary to send a message

23  to him and also I think a general deterrence message is

24  important.  There are people out there now who are

25  managing people's money, who will be managing their money

100

1    in the future who need to be sent a message if they commit

2    a fraud like this they will be going to jail for a very

3    long time.  Certainly the government, the sentence

4    proposed today is 20 years is a reasonable one and I think

5    if those were the only factors even supporting a 25-year

6    sentence, but I believe Mr. Kenner doesn't have a lot of

7    mitigation unfortunately in his favor, especially given

8    his lack of remorse, but I don't believe -- I believe the

9    government's sentence is a little bit too high for a

10   couple of reasons.

11          Primarily, I do think the time at the MDC

12   warrants some consideration as a mitigating factor.  In

13   general, you know, we don't have to get into the details

14   of litigation and things like that, but the bottom line it

15   is a pretrial facility, it's not the same as being

16   designated to another facility in terms of conditions of

17   confinement and this has been a particularly bad,  at the

18   MDC because of the blackout and other things that have

19   happened there regardless of whose fault they are.

20          The bottom line is Mr. Kenner was experiencing

21   those things and as I pointed out he has pages and pages,

22   almost like a diary, going through each incident with the

23   MDC with the guards and things like that, but, you know,

24   we all know he was put in the SHU even though he was

25   allowed to have that flash drive and even though the

1    pandemic was under control at the facility, the fact being

2    in jail under the pandemic makes the time worse.  So that

3    deserves some mitigation here.

4           The other thing the Court believes in terms of

5    why his sentence should be imposed is a little bit too

6    high, Mr. Kenner pointed to the Shkreli case.  We can't

7    take one case and suggest where that becomes a benchmark

8    for the other case.  I would note there are plenty of

9    cases.  I'll point out a few of the sentences in this

10   range that state a 15 to 20-year range in the loss amounts

11   similar to what Mr. Kenner has, including U.S. v. Norman,

12   240 months, loss of 2.5 to $7 million.

13   U.S. v. Williams, 240 months, intended loss of 4 million.

14   U.S. v. Burke, 210 months, loss amount between one and 2.5

15   million.

16          U.S. v. Feldman, 188 months, $2 million loss.

17   U.S. v. McGinn, 180 months, $6 million loss.

18   Abreu, $180 months, 1.3 million loss.

19   Again, I don't want to get too cause up in the individual

20   cases because every case is different and I doubt any of

21   these cases had the defendants not only showing no remorse

22   but on behalf of the victims after years of the trial.

23          In any event I think 20 years -- there's one

24   case actually, Michael Romano who I presided over his

25   trial that involved a massive telemarketing fraud scheme

1    that focused on elderly people, taking all their money

2    through telemarketing with gold coins and it was a

3    horrific scheme with the vulnerable, and I had to recuse

4    myself after the case after trial and Judge Johnson gave

5    him 20 years which I think was appropriate, but I had that

6    sentence in my mind, so Mr. Kenner shouldn't get the same

7    sentence as Mr. Romano.

8             I don't want the victims to take that the wrong

9    way because you all understand how serious I view what he

10   did to you in this case but I'm trying to make it

11   proportional not only sentences generally but sentences

12   that have happened in my courtroom too.  So that's how I

13   arrived at the 17-year sentence.

14            I intend to impose that amount on every count to

15   run concurrently.  I'm going to impose three years of

16   supervised release that will follow the term of

17   imprisonment.  I intend to impose all the special

18   conditions that are in the recommendation, seven of them,

19   except the eighth one which is a search condition which I

20   don't believe is warranted in a fraud case, that's when

21   there is some type of contraband.  I believe all these

22   other conditions are necessary to ensure Mr. Kenner

23   doesn't return to fraud in terms of his employment and

24   also to monitor his finances to try to make sure he

25   complies with the restitution order that I will set at

103

1    another date.

2           I intend to impose a $100 special assessment for

3    each account for a total of $600.  Although obviously he

4    has ongoing ancillary proceedings with respect to

5    forfeiture, I intend to order the forfeiture with respect

6    to Mr. Kenner that I ordered in the preliminary order of

7    forfeiture I signed on March 13, 2020, which will be final

8    as to him, not prejudicing other individuals or other

9    entities rights with respect to their interest in that

10   property.

11   Is there anything else the government -- is there any

12   legal reason why I cannot impose that sentence?

13          MS. KOMATIREDDY:  Just one thing, your Honor.

14   One technical note, your Honor.  The Second Circuit

15   recently found Standard Condition 12 to be inappropriate

16   under the law.  That's the condition with respect to risk

17   notification by the probation officer, and our suggested

18   addition is that rather than the probation officer being

19   empowered to direct risk notification on his or her own,

20   for that to be subject to the approval of the Court.

21          THE COURT:  Yes, I'm aware of that case law.  I

22   didn't realize the standard condition in this district.

23   The standard condition is written that way?

24          MS. KOMATIREDDY:  Yes, your Honor.  I believe it

25   is still written that way because that was a pretty recent

104

1    case.

2              THE COURT:  All right.

3              I'll make sure that the risk notification

4    provision is modified to reflect that no notification

5    would be done without -- I have to approve the risk is

6    necessary for notification and approve the notification of

7    any employer or any person.

8    Mr. Kenner, I'm not asking you to have an opportunity to

9    reargue anything.  The only question is are you aware of

10   any legal reason why I cannot impose this sentence,

11   preserving all your objections you previously noted?

12             THE DEFENDANT:  No, your Honor.

13             I would also like to thank the Court for your

14   time and consideration in applying the sentence and I just

15   want to apologize for the government for the time it has

16   taken to get through this beyond the normal course as

17   you've described, typically six months after a trial.  I

18   apologize for the extra five years of time and resources

19   it has cost the government and your Honor.

20             THE COURT:  Well, I wasn't blaming you for the

21   delay.  Obviously the government noted you have every

22   right to assert your rights in this case so I wasn't

23   blaming you for it.  These were all things that happened

24   in the case, they were all proper, it just took time and

25   the government pointed out your 6000 pages of submissions,

105

1    other than the disparity of the victims.  I didn't mind

2    that either.  The defendant was working hard to, you know,

3    represent himself.  I have no issues with either, but

4    certainly the substance of some of things you wrote in

5    there were certainly highlighted and concerning to me.

6    I'll now impose the sentence.

7              We'll talk about setting a date for restitution,

8    the restitution portion.

9              THE DEFENDANT:  Your Honor, if I could ask one

10   question of the Court.

11             THE COURT:  Yes.

12             THE DEFENDANT:  Is there a standard objection

13   that needs to be filed just to preserve rights under

14   Booker or any other case law I might not be aware of at

15   the moment?

16             THE COURT:  No.  You've objected to my

17   guidelines calculations.  All your objections with respect

18   to the guideline calculations I overruled, all preserved,

19   and you are objecting to the sentence I impose, right,

20   today?

21             Correct?

22             THE DEFENDANT:  I just wanted to make sure if I

23   needed to do that, that it's on the record, your Honor.

24             THE COURT:  That's fair.  It's preserved for

25   purposes of appeal.

1           THE DEFENDANT:  Okay.

2           THE COURT:  Mr. Kenner, you'll not be designated

3    yet because we still have to do the restitution portion

4    which I hope to do in the next couple weeks --

5           THE DEFENDANT:  -- your Honor, I apologize,

6    because of my hearing loss --

7           THE COURT:  I said you will not be designated

8    yet because we have to do the restitution portion of the

9    case which I hope to do within the next couple weeks, but

10   I have no issue recommending a place of designation that

11   would allow your children, you said they can't afford to

12   visit you, but if you want me to tell the Bureau of

13   Prisons to designate California, Arizona.  I don't know

14   where are they.

15          THE DEFENDANT:  I'm not aware where they will be

16   at the time of designation but I'll let the Court know

17   soon enough.

18          THE COURT:  Send me a letter.  They don't have

19   to recommend what I'm saying, but it's important where a

20   defendant serves their time.  You tell me where they can

21   visit you.

22          THE DEFENDANT:  I appreciate that, your Honor.

23          One last question --  I believe it is one last.

24          With respect to the signing of the J and C, are

25   you just planning to hold that until after the final

1    restitution issue?

2         THE COURT:  Yes, I can sign it and check

3    deferring restitution, because I think the restitution, I

4    hope will happen within the next couple weeks, I'll just

5    not issue the judgment.  So your time to file the appeal

6    will not run until the judgment issues, so Mr. Brissenden

7    will keep you informed as to the time when that happens.

8         THE DEFENDANT:  Thank you.  Will we be handling

9    it just because of the COVID issues, will we be handling

10   the restitution issue by video conference which I don't

11   have a problem with if your Honor --

12        THE COURT:  I was going to ask you your

13   preference, but let me sentence you first and then we'll

14   discuss that, Mr. Kenner.

15         It's the judgment of this court in its

16   discretion in considering all the 3553(a) factors that you

17   be sentenced to the custody of the Attorney General

18   through the Bureau of Prisons to a term of imprisonment of

19   17 years, 204 months on each count of conviction, Counts

20   One, Two, Three, Four, Seven and Nine, all to run

21   concurrently to each other for a total of 17 years.

22   I impose three years of supervisory release on each count

23   which run concurrently to each other by operation of law.

24         I impose the standard conditions with a

25   modifying risk notification provision to indicate that I

1   have to approve any use of that particular provision in

2   terms of whether the risk has been demonstrated and

3   whether notification should be made.

4           I impose the following special conditions of

5   supervised release.

6           One.  You shall maintain full-time verifiable

7   employment.

8           Two.  You shall comply with the restitution

9   order I shall set on another date.

10          Three.  You shall comply with the forfeiture

11  order I'm imposing in connection with the sentence.

12  For.  Upon request you shall provide the U.S. Probation

13  Department with full disclosure of your financial records

14  including co-mingled income, expenses assets, liabilities

15  to include yearly income returns with the exception of the

16  financial accounts reported and noted within the

17  presentence report.  You are prohibited from maintaining

18  individual and/or joint checking, savings or other

19  financial accounts, for either personal or business

20  purposes without the knowledge and approval of the U.S.

21  probation department.

22          You shall cooperate with the probation officer

23  in the investigation of your financial dealings and shall

24  provide truthful monthly statements of your income and

25  expenses.

109

1      You shall cooperate in the signing of any

2  necessary authorization to release information forms

3  permitting the U.S. probation department access to your

4  financial information and records.

5      Five.  You shall cooperate with the U.S.

6  Probation Office in the investigation and approval of any

7  position of self-employment, including any independent

8  entrepreneurial, or freelance employment or business

9  activity.  If approved for self-employment, you shall

10  provide the U.S. Probation Office with full disclosure of

11  your self-employment and other business records, including

12  but not limited to all of the records identified in the

13  Probation Form 48F, a request for self-employment records

14  or otherwise requested by the U.S. Probation Office.

15      Next.  You are prohibited from incurring any new

16  credit card -- new credit charges, opening additional

17  lines of credit or incurring any new monetary loan

18  obligation or debt, by whatever name know, without the

19  approval of the U.S. Probation Office.

20      You shall not encumber or liquidate interest in

21  any assets unless it is in direct service of the

22  forfeiture and restitution obligation or otherwise has the

23  express approval of the Court.

24      You shall not possess a firearm, ammunition, or

25  destructive device.

110

1        I impose a $100 mandatory special assessment on

2    each account for a total of $600.  I didn't mention

3    before, but I'm imposing no fine given the forfeiture

4    given what I expect to be a very high amount of

5    restitution and given his incarceration for a very long,

6    of time.  I don't believe a fine is warranted.

7        I do impose forfeiture.  I will not read it into

8    the record.  I incorporate it by reference the Court's

9    March 13, 2020 preliminary order of forfeiture which I'm

10   making finalized to Mr. Kenner and will attach to his

11   judgment of conviction.

12       The total amount of the $17,706,395 is the

13   forfeiture money judgment and then it lists on multiple

14   pages all the properties whose interests -- his interest

15   he's forfeiting.

16   Mr. Kenner, I need to advise you of your statutory right

17   to appeal.

18       You have a right to appeal the Court's

19   conviction of sentence.  If you are unable to pay the

20   costs to appeal, you may apply to appeal in forma

21   pauperis.  Even though you've been representing yourself

22   here, you can get an attorney on appeal.  If you cannot

23   afford an attorney one will be appointed to represent you

24   on appeal.

25       As we've discussed, a notice of appeal must be

1  filed within 14 days of the judgment of conviction which

2  will be issued following the restitution order of the

3  court.

4         So in terms of the date for the restitution, I

5  was thinking soon after Mr. Constantine's sentencing which

6  I think we've scheduled for November 5th, right?

7         MR. TALKIN:  November 10th.

8         THE COURT:  10th.  So maybe a week after that.

9         Before we September the date, figure it out,

10  Mr. Kenner.  As you know I required you to be here in

11  person because I think it is important sentencing someone

12  in the courtroom and not on video, but I would prefer to

13  have you here in person for the restitution because I

14  think it's better, not only with the technology but I also

15  know they'll quarantine you again upon return to the jail.

16  So you tell me if you want to be on video.  I don't have a

17  problem with that.  So I don't know if you want to think

18  about it.  Send me a letter or tell me.

19         THE DEFENDANT:  Your Honor, I appreciate you

20  asking and I prefer to do it by video.  The quarantines

21  are now running in the neighborhood of 28 days.

22         THE COURT:  On return to the jail, 28 days?

23         THE DEFENDANT:  Yes, sir, your Honor.

24         THE COURT:  Has the government heard about that?

25         MS. KOMATIREDDY:  I'm not aware of that.

112

1        THE COURT:  Whether it is 14 or 28 days, the

2   government has no objection to that?

3        MS. KOMATIREDDY:  No objection, your Honor.

4        THE COURT:  So I think we have to do it on a

5   Monday, Wednesday or Friday.

6        THE DEPUTY CLERK:  One second, Judge.  I need to

7   double-check.

8        Counsel can you be available November 18th at

9   10:30, video?

10        THE COURT:  Is that okay, Mr. Brissenden?

11        MR. BRISSENDEN:  I'm sorry, your Honor, I was

12   speaking with Mr. Kenner.

13        What was the date?

14        THE DEPUTY CLERK:  November 18th at 10:30.  It's

15   a Wednesday.

16        MR. BRISSENDEN:  I'm available.

17        MR. TALKIN:  Your Honor, is it okay both myself

18   and Mr. Constantine call in on that appearance?

19        THE COURT:  Yes, for the same reason.  But if

20   you would rather do it here in person we can do it on a

21   different date.

22        MR. TALKIN:  I don't think we need a change of

23   date.  We've made our point on those issues.  I don't

24   think those issues are germane to that litigation.

25        THE COURT:  You can appear by phone and/or video

113

1    but phone is fine.

2           MR. TALKIN:  I'll talk to the staff and see what

3    we can do.

4           THE DEFENDANT:  And phone is fine with me too,

5    your Honor.  We don't have to make special video

6    arrangements.

7           THE COURT:  No, we'll do video.

8           One other thing on the record.  It will take a

9    minute.  I saw Mr. Kenner's filings and his forensic

10   report and made reference to my opinion with respect to

11   the Global Settlement Fund and I wanted to clarify the

12   record.  He seems to suggest in his filing I made it a

13   finding that the loss amount for the Global Settlement

14   Fund was a little over $17,000 and it kept being repeated

15   over and over again and it was cited to my 93 page opinion

16   in October of 2017 denying the motions by the defendants

17   for a new trial or judgment of acquittal.

18          I want to clarify so I don't think anybody

19   reading the opinion needs to think that I made that

20   finding but to be clear for the record, this is around

21   page 59 to 60 of the opinion.  That $17,000 reference was

22   me saying even assuming arguendo that the jury credited

23   the defense witness, Mr. Gonchar, even if they credited

24   his testimony, that I was trying to show that it still

25   wouldn't have covered the money taken out of the Global

1  Settlement account for personal expenses by

2  Mr. Constantine.  But I don't -- that was not my

3  conclusion, that that was the loss amount, and also I was

4  not concluding that Mr. Gonchar's testimony was credible.

5  In fact I want the record to be clear I did not find him

6  credible on that testimony.

7           As I recounted in that opinion, he initially

8  said he didn't remember telling Mr. Constantine that he

9  could use Mr. Gonchar's three subsequent GSF

10  contributions, I think for over one million dollars for

11  personal expenses but he later clarified it was his

12  "understanding."  It was like as long as Mr. Constantine

13  was going to pay it back he didn't mind him using it I

14  guess for whatever purposes.  I did not find that

15  testimony to be credible.  So I think that is important.

16          To the extent any of these things can be

17  considered for purposes, I think they are all part of the

18  jury's verdict, but to the extent it falls back to

19  relevant conduct, my loss calculations that I put on the

20  record back in February are all based upon my view of the

21  credible evidence and I emphasis "credible evidence" with

22  respect to each of these frauds that were testified to at

23  the trial as well as the forfeiture hearing.  So that was

24  even assuming arguendo argued to show the conviction is

25  still standing under that worst case scenario for the

1   government, but obviously that is not the standard for

2   purposes of that motion and not the standard for purposes

3   of what I can consider in sentencing.

4   All right.  I don't think I have anything else.

5            I want to say to the victims, I appreciate your

6   patience today.  You are welcome to come back for

7   Mr. Constantine's sentencing obviously in November, and if

8   you want to listen to the restitution portion of this,

9   because obviously you have an interest in that, there is a

10  call-in number that you can listen on audio to what has

11  transpired with respect to that.  But I don't want you to

12  feel if you don't make it back for Mr. Constantine's

13  sentencing and/or on the restitution portion of the

14  proceeding, that I'll take that the wrong way, that you

15  are not interested.  I understand you have an interest but

16  I also understand you have lives to live and may not make

17  every court proceeding.  I think the government checked

18  with you but if for some reason you want to be present and

19  that date is no good, I'm prepared to move it.  If you

20  want to be here we'll make sure you can make it, but I

21  don't want you to think if you are not here I will not

22  remember what you said today.

23           I wish you all and your family the best.

24  Anything else from the government?

25           MS. KOMATIREDDY:  Not from the government, your

1    Honor.

2              THE COURT:  I'm reminded I guess because there

3    was a superseding indictment, there are underlying counts

4    on the original indictment.

5              Does the government wish to dismisses any

6    underlying open counts?

7              MS. KOMATIREDDY:  Your Honor, the superseding

8    indictment contained all the same counts as the underlying

9    indictment and the jury reached a verdict as to each.  I

10   don't believe so but we move to dismiss the underlying

11   indictment.

12             THE COURT:  The underlying indictment obviously

13   is not the indictment for purposes of the trial and it is

14   dismissed.

15             Anything else we need, Mr. Kenner, today?

16             THE DEFENDANT:  No, sir.  Thank you very much.

17             THE COURT:  Thank you very much.

18             (Proceedings adjourned.)

19

20

21

22

23

24

25