April 12, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Re: <u>Victim impact statements & proffers</u>

Your Honor:

Following the 10-5-2020 sentencing day hearing, I was able to review the transcripts weeks later and discovered several alarming statements, some of which I was unable to comprehend on 10-5-2020 (in the absence of my hearing aids).[1] After the 4-5-2021 hearing, I received the victim impact statements, which raised more substantive issues with respect to loss calculations. Both are argued with detail, *infra*.

Kenner is requesting that the Court:

1) Require Kristen Peca confirm who told her about the IRS letter on Kenner's laptop, per her 10-5-2020 allocution—and

2) Receive for "in camera" review, the three Northern Trust settlement agreements: Peca, Nolan and Berard for proper application under MVRA.

<u>10-5-2020 hearing statements…</u>

Multiple unfounded and shocking allegations were levied that day—but consistent versus any person (especially Kenner)—*since 2006*—who acted in opposition to Ken Jowdy[2] and his hostile and antagonistic efforts to intimidate those who could not be

---

[1] Previous addressed in ECF No. 1006 at 34, f.21.

[2] The investors—minus Galioto's "cadre of followers" (ECF No. 765 at 43) (including Kaiser, Berard, and Peca—all of whom robbed millions as documented from Kenner thru real estate transactions—and have ulterior motives to protect: See Exs. 1, 2, 3, 4) are aware that the government is *deftly afraid* to bring criminal actions versus Jowdy and his cabal, based on their highly-connected legal and government connections—fearing personal repercussions. It is apparent to those paying close attention to the factions protecting the two-decades of documented Jowdy thefts from Kenner and Kenner investors that opposition can and has been met with termination, like former FBI Director Hoover implemented with his "squad"

1

bribed to go along with his embezzlement plans (like Kaiser and Berard chose to do in late 2011—after "wining and dining": ECF No. 628 at 4); documented by (as a subset):

    (1) Government forfeiture submissions in July 2020 and August 2020 (alleging a decade-plus of complicity between Jowdy and Danske Bank); as Kenner proffered in 2009 to the FBI and advocated for DOJ help since that date for the investors (see ECF No. 553, 554), following the documented thefts from Lehman Brothers with former Lehman Brothers banker, Bhatti's, known participation since month-1 of the Lehman Brothers funding and continuing independently according to star-government-witness, Kaiser (ECF No. 628 at 2)—

    (2) ECF No. 667: totaling tens of millions of dollars—
        a. Jowdy's DCSL $2.5 million capital account thefts (Id. at 10-13);
        b. Jowdy's DCSL millions-plus of budget thefts since June 2006 (Id. at 13-15) once Jowdy's DDM budget thefts drained the previous DDM project accounts (Id. at 21-23, 24-28)—and the $3 million KSI DDM project loan (Id. at 13, 13-f.6, 21-23); including…
            i. Jowdy's specific admissions to FBI agent Galioto in March 2010 (Id. at 20-21) (See also 3500-KJ-2); and including Jowdy-attorney-fixer, Tom Harvey complicity (Id. at 23-24);
            ii. And known to all investors, per Michael Peca's 2011 Grand Jury testimony[3] (ECF No. 986-1 at 28-30, 35, 42—also juxtaposing Hawaii and Cabo "vertical construction" for the first time: and fabricated at trial, Trial Tr.381—et.al. [Michael Peca], Tr.697, 699 [Kristen Peca]);
        c. Jowdy's DCSL golf villa construction thefts for personal use and funding his personal stake in another Lehman Brothers co-funded project (a.k.a. racketeering with Lehman Brothers employees) (Id. at 15-16);
        d. Jowdy's DCSL and Danske's $8.4 million Jowdy equity fraud (with no other documented DCSL capital account partners: Id. at 16-18—contradicting *government-forfeiture-36*);

---

during his heavy-handed FBI-tenure—with the playbook still active in Washington DC to this day.

[3] In 2011—the FBI and SDNY Grand Jury also heard testimony from Hawaii-Mexico investors Sydor (3500-DS-2: Tr.43—et.al.) and Stevenson (3500-TS-1, Tr.44) who re-verified Peca's Grand Jury testimony.

- e. Jowdy's contemporaneous thefts from his airplane management company (Id. at 28-29, 30-32);
- f. Jowdy's Cabo san Lucas airport capital account thefts (Id. at 29);
- g. Jowdy's other Cabo land deal deposit thefts from Kenner (Id. at 29-30);
- h. Jowdy's adjudicated thefts from investor-lender Glen Murray in Nevada (Id. at 32-32) (Ex. 10)[4]—et.al.

(3) Former Jowdy co-conspirator Kaiser's February 2019 submission (ECF No. 628)—and

(4) Kaiser's stunning and self-impeaching October 2020 announcement that he told the FBI/government pre-indictment "in 2013", Jowdy was "stealing millions of dollars" (admitted: 10-28-2020, post-sentence H'rg Tr.49). Kaiser's 2020 post-sentencing revelation was evidence never heard in the 2015-courtroom (or previously disclosed—as exculpatory[5]). It impeached Kaiser's testimony, at a minimum—when he denied ever calling Jowdy a "thief" (Tr.1231-32) (impeached by audio played away from the jury: Tr. 1258) and contradicting trial testimony (Tr.1229, 1236—et.al.)—but now—complicit with the government's documented knowledge (*Napue* violation).[6]

---

[4] In Murray's independently filed 2008 Nevada complaint versus Jowdy for $791,000 in *more* stolen loan money (immediately after Harvey and Jowdy terminated all global settlement discussions (in 2008), Murray specifically identified the Hawaii loans and his previous approvals (Ex. 11 at 3, ¶13, 15):

"13. Jowdy had sought and obtained several previous loans with the assistance of Kenner"—and

"15. Murray authorized Kenner to lend Jowdy monies."

[5] Relating to Kaiser's pretrial exculpatory statements about Jowdy, the Second Circuit opined in *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act. The considerations under *Brady* and *Giglio*, however, are quite different. *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information. The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."

[6] The use of false evidence is *still* improper whether the prosecutor affirmatively elicits such evidence; *See Miller v. Pate*, 386 U.S. 1, 7 (1967) or merely "allows it to go uncorrected when it appears"; *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (prosecutor failed to correct witness's false testimony); see *Jenkins v. Artuz*, 294 F.3d 284, 295-96 (2d Cir. 2002) (prosecutor failed to correct witness's technically true but misleading testimony).

## Kristen Peca…

Kristen Peca spoke 10-5-2020 as an alleged victim (although she was never a Kenner-investor: only Michael Peca). She offered allegations that conflicted directly with her husband's 2011 SDNY Grand Jury testimony and 2015 trial testimony.

- Perhaps, Michael Peca is still hiding all his previous investment-actions from his wife (at his prerogative—with Kristen Peca never a Kenner-client) (ECF No. 958 at 19-20, f.20).

Kristen Peca alleged "repeated forgery" (10-5-2020, H'rg Tr.19)—despite Michael Peca verifying all of his crucial signatures for the Northern Trust/Hawaii investment to the SDNY Grand Jury (ECF No. 986-1 at 17-18, 31-33, 38-40). And alleging someone (insinuating Kenner) "forged Michael's name on financial documents" (none ever presented)—with every critical financial document authenticated by Michael Peca—under oath. She constantly harangued the "majority stolen" by Kenner; referring to Michael Peca's $21 million in career earnings. Yet—the government has traced only $100,000 thru Constantine's Eufora private equity sales to Kenner (arguably and documented by the government as loan repayments from Constantine)—*nothing more*. She reiterated that victims "had most, if not all, of their life savings stolen from them" (10-5-2020, H'rg Tr.31). Kristen Peca remains oblivious to the facts that her husband, and every investor, signed off on multiple documents for every private investment deals—and the FBI (despite every desire to do so) was unable to trace more than approximately $280,000 to Kenner (from the Constantine and Gaarn loan repayments: as Gaarn verified to the FBI in 2012: See 3500-TG-1-r at 3-4—and verified at trial, Tr.2580).[7]

This follows the same pattern as Galioto's 2011-12 coercion to the Pecas, exposed by Kristen Peca during her surreptitious 2012-FBI recording (ECF 770 at 41):[8]

---

[7] Although Gaarn denied his Eufora sales re-paid Kenner for a portion of his previous loan—there are no other loan re-payments ever made to Kenner by Gaarn. Gaarn verified to the FBI (on 1-11-2012) that he made loan re-payments to Kenner from the personal loans, yet no other re-payments exist in banking records, anywhere. Gaarn's January-February 2010 re-payments are the only ones that ever occurred.

[8] Stunningly in contradiction to the government prosecution of concealment—Kristen Peca is not concerned about the Jowdy loans (wholly transparent, even to her thru her husband's disclosures)—only concerned Kenner "stole" it and "never gave it – the loan money -- to…uhhhh…Jowdy". Again—her statements are in direct contradiction to the government theories that keep unraveling the more investors speak freely (un-coached by Galioto) post-trial trying to figure out who really has their money. The FBI/government continue to conceal this from the investors (even after the government admitted Jowdy has all of the

4

> [Kristen Peca]: ==Matt told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy==.
>
> [Kenner]: Kristen – <u>I have all of the bank records that prove the money went to Jowdy and his accounts at all times</u>.  I told you that already. <u>You told me that you saw the bank records after I sent them to Michael</u>.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?
>
> [Kristen Peca]: but – I don't understand why he [Galioto] would say it.

Ultimately—beyond absurdity (with Kristen Peca lacking actual empirical evidence), she identified multiple criminal allegations (10-5-2020, H'rg Tr.23-25)—insinuating Kenner was the person involved, *infra*.   Kristen Peca alleged she turned over "one of the threatening voicemails, to the FBI"—yet this was never presented to Kenner (because the source of the call is obvious).

- **No investigation was ever brought** by the FBI or law enforcement for any of Kristen Peca's outrageous allegations of "death threats", "houses broken into", "pets were killed", people "physically attacked", "cars..set on fire", criminal stalking knowing "Michael was out of town and I was home alone with the kids…"—and "we were specifically told Michael would be killed the next day"—et.al.   Why?

    NO INVESTIGATION will ever take place—<u>because</u> these are the tactics of Jowdy's cabal (since 2007) and Galioto's pattern (since 2009) towards every adverse party (ECF No. 892 at 38):
    > [Kristen Peca]: maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed.  Its too scary.   <u>Michael and I can't thank you enough for keeping the fight going after

---

millions from Hawaii and Mexico; <u>never Kenner</u>: See government-forfeiture-44 and government-forfeiture-36).   As previously noted post-trial—Nolan's personal assistant wrote to Kenner's early teenage son, demanding (ECF No. 770 at 18)  (ECF No. 1006 at 14)—et.al:

> "**They want to know where their fucking money is!**"

Why won't the government tell them—especially Nolan, that Jowdy has it all?  Because—it contradicts their pretrial narrative to enrage Hawaii-Mexico investors, that Kenner "==stole==" it and "==never gave it – the loan money -- to…uhhhh…Jowdy==".

Kaiser and Berard promoted Galioto and Jowdy's false narrative once they joined Jowdy's conspiratorial efforts in 2011.

<u>the jail thing and the attorney</u> but -- I just want this to be over no matter what it takes. <u>I know how mad Michael and the other guys are with Jowdy for not paying the loans back</u>. Who does that??

[Kenner]: A protected criminal – that's who.

The Court should note that the only persons who have brought forth allegations (nonsensical as they are once a single investigative question is asked, requiring back-up proof) are the three (3) main persons who worked with Jowdy's cabal to disrupt the actual investors' recovery (and investors' attorneys—*infra*) for the funds Jowdy actually admitted to stealing during his January 5-6, 2010 deposition (with Kaiser present[9]) and during FBI proffer 2-months later (FBI raw notes: 3500-KJ-2 at 11-14).

<u>Kristen Peca IRS claims</u><br>(Again—launched by Jowdy's cabal)[10]

Notwithstanding other *horrifying* allegations (including Kaiser and Berard allocutions) that demand further criminal investigation by impartial investigators (with Galioto allegedly retired)—Kristen Peca presented (Id. at 25):

[Kristen Peca]: "Kenner's witness tampering and harassment rose to the level of contacting the IRS through anonymous letter that contained false and misleading information about us."[11]—and

---

[9] Out of sheer disgust (on top of the Hawaii loan thefts Jowdy admitted that day)—Kaiser texted Kenner during the January 2010 deposition about the $50 million Jowdy stole from the DCSL project budget by January 2010 and could not identify where it went (ECF No. 557 at 67-68) (ECF No. 642 at 44)—later testifying falsely at trial (Tr.1236):
    Q: Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?
    A [Kaiser]: <u>Yes</u>.

[10] Prior to 2010—Jowdy cousin, Edward Essa who was a large Jowdy lender and recipient of stolen Jowdy funds (unknowingly) worked for a short period of time with Kenner and Kenner investors' attorneys to expose Jowdy until he went under IRS personal and corporate audit; mirroring the comments made by Kristen Peca 10-5-2020. Essa terminated communication with Kenner and Kenner investors immediately— understanding the "warning".

[11] False allegations to the IRS are also a criminal offense—but with IRS agent Wayne present, not a word was mentioned in the 6 years since trial—until Kristen Peca's allocution.

"I was afraid of the IRS and the lengthy audit Kenner started." (Id. at 28)

The FBI and IRS know these allegations are 100% empirically false—specifically because she attested that she was told:

> [Kristen Peca]: "And thankfully, that letter was later found on Kenner's laptop to validate our suspicions and prove that he was harassing us and obstructing justice." Allegedly as Kenner's "civic duty" (Id. at 26)

**This letter never existed on Kenner's laptop**—and the Court must demand who made these affirmations to the Peca's and when.   This is the *crack* in the harassment plan by Galioto and Jowdy, even to their inside people to maintain control over necessary people: even insiders (an obvious and millennium-old anarchist ploy known by any historical scholar—dating back to the times of Gilgamesh).

**If it exists—thwarting Kenner's emphatic denial, then the government should produce it; immediately.**
> Note: When Kenner assisted the IRS in their tax evasion investigations of Jowdy, Kaiser, and Berard in 2012—the introduction to the criminal IRS division was made by a former U.S. State Attorney General, then referred to the Arizona IRS criminal division and after full scrutiny and face-to-face meetings, finally referred to the Denver Regional office for high-level IRS scrutiny—all before any audit took place.[12]   *None of it occurred by an anonymous, unsigned letter that does not exist.*   Anyone who looks into IRS Whistleblower protocols would know Kristen Peca's representation of the triggering facts is a fraud and could never occur.

When the Court receives the information about who told Kristen Peca, they will know who manufactured all of the criminal threats et.al., *supra*, that she, Berard, and Kaiser alleged to the Court.   They are relevant—because none of the other financial allegations Kristen Peca raised 10-5-2020 would hold up to empirical and exculpatory evidence the government has continued to hide from her and the other former Kenner clients.

---

[12] The investigations regarding the documented IRS tax-evasion schemes by Jowdy, Kaiser and Berard were terminated a month-or-so before Kenner's 2013 indictment—after one year of processing.

7

Victim Impact Statements – Kristen Peca

Michael Peca's "Oct 28, 2015" Affidavit of Loss included multiple private equity investments that were either affected by the 2008 Lehman Brothers bankruptcy &/or the 2009 global recession (not proximate causation issues)—yet every investor post-trial has been told that *Kenner stole <u>all</u> of the private equity deal money and is criminally liable for them*.[13]   But—in

> *United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011), the Second Circuit opined, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

Peca previously verified this to the 2011 SDNY Grand Jury (ECF No. 986-1 at 17-18, 39-40: 3500-MP-5)—without ever telling his wife (his prerogative):

> Q: When did you make that [Hawaii] investment?
>
> A [Michael Peca]: It round the same time, 2004, 2005.  I want to say they were my very much – <u>they were presented to me</u>.  **On all of them, through all the times, I made the final decision**.   I may not have done as much due diligence as some may have done.   <u>It's not like I had to say yes or forced</u>.   <u>I made the decision to say</u>, <u>yeah</u>, <u>I want to do that</u>.  **Based on the money I was making at the time it didn't bother me to invest those kinds of dollars**.
>
> …
>
> Q: <u>Did you understand at the time if you didn't pay back the line ever credit the bank was going to take your bonds</u>?
>
> A [Michael Peca]: **Yes. And they did**. What they took was just under $2 million, I believe it was in 2008, maybe after a while.   We were just, when the loan, **the short-term loan from Mr. Jowdy was not paid back**, the line of

---

[13] Nolan's 2020 attorney submitted to the Court that Kenner "persuaded them to invest in the various development projects and then stole their money" after "<u>contribut[ing]</u> to the various property and development projects at the heart of this matter" (ECF No. 843).  This contradicts Nolan's testimony failure to recall anything (Tr.2065-66)—despite his Wells Fargo private banker, **his wife**, his personal assistant, and his Northern Trust banker (Mascarella) all handling transactions for Owen Nolan's LOC from 2003 thru 2008—<u>independent of Kenner</u>—and notwithstanding Nolan's Hawaii LOC investment <u>authorization</u> acknowledged by Nolan's arbitration counsel (ECF No. 815 at 39-43).

> credit time matured. They had taken what was loaned, I guess, lent to me plus interest.
>
> Q: Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007 [for $1.775 million: Kenner trial Exhibit 210 (Northern Trust subpoena)]. Kind of technical document, do you remember signing documents putting up the bonds to secure the line of credit?
>
> **A [Michael Peca]: Uh-huh, yes. <u>I was very well aware of that scenario</u>**.

Being *criminally liable* was absurd—but when the FBI tells you, it begs the question: [Kristen Peca]: "why would they lie if you did not take the money?" (ECF No. 1006 at 11).

According to government cross-examination of Kenner (Tr.4588), "stealing money" **is** why Kenner was indicted:

> Q. You understand that the indictment in this case does not blame you for losing money in a risky venture. Right?
>
> A [Kenner]: That's my understanding.
>
> Q. You understand that <u>the indictment charges you with stealing money from your clients</u>, <u>correct</u>?
>
> A [Kenner]: That's my understanding.[14]

---

[14] After Constantine's 1st Eufora conference call allegation (8-18-2010), Kenner sent a text to Bryan Berard who was at the conference call meeting face-to-face with Constantine demanding more transparency—hi-lighting the Constantine nonsense of stolen stock transfers:

| 18 2 7 3 | +14015246929 Bryan Berard | 8/18/2010 8:11:23 PM(UTC+0) | Sent | [Kenner]: <u>Ask how Constantine thinks the Gaarn transfer affected the company</u>...if at all? |

Michael Peca acknowledged the "*allegations*" during the conference call to Kenner regarding the private stock sales—the next day:

| 15 7 9 6 | +17163743234 Michael Peca | 8/19/2010 2:40:01 PM(UTC+0) | Read | [Michael Peca]: I will later. <u>Hopefully everyone can get together to put the allegations to rest</u>. <u>There are bad ones going both ways</u>. |

9

> Q. So <u>the fact that Lehman Brothers went belly up</u>, that <u>the great recession happened</u>, the <u>real estate market bubble burst</u>, you understand there's <u>nothing in the indictment that blames you for that</u>, right?
>
> A [Kenner]: <u>I understand that</u>.

**Peca's Loss Affidavit confirms his monetary recovery from Northern Trust Bank thru civil litigation (¶ I), submitting:**

> "We reached a confidential settlement, but then had approx. 35% taken out in legal fees".[15]

As a result, the Peca recovery was <u>not</u> "just over $600,000" (Tr.506)—but moreover

---

(1) Michael Peca was aware of his 2008 private stock purchases from Constantine (notwithstanding his requirement with Schwab and his FINRA representatives to orally approve the transfer before it happened—even with Kenner's limited Power of Attorney); impeaching Peca's trial testimony (Tr.506-07). Constantine raised the private sales himself during the conference call (impossibly concealed by anyone at this point); just like Constantine's "predictable" (ECF No. 788 at 47-50) Home Depot rhetoric 2-weeks earlier—recorded by Kenner and shared with all Eufora investors and their attorneys; and
(2) While represented by attorney Stolper, Peca <u>never</u> raised confusion of how he acquired the 2008 stock from Constantine.

[15] The paragraph continued "we have filed and official [California Bar] complaint against attorney Ronald Richards for his role in the GSF". This complaint was summarily dismissed within a month-or-so without merit—following the presentation of the signed authorization agreements and other supporting, empirical evidence. But worthy of note—Jowdy's attorney, Tom Harvey (complicit in the original theft with Jowdy in 2002-03: Ex. 8), was the author of the Peca, McKee, Privitello California Bar complaints (all dismissed likewise without merit)—to ***warn*** another attorney, adverse to Jowdy.
> Note: With Jowdy and Harvey scrambling to intimidate anyone to protect their documented criminal cabal since 2002 (Ex. 8) (ECF No. 667)—Harvey continued into 2014 (notably after Kenner's arrest and detainment) to harass and threaten *other* interested parties who Jowdy/Harvey defrauded and were looking for solutions to the FBI-protected graft. Harvey immediately looked for Galioto's help—with the temporal evidence un-REDACT-ed [one of many discovered post-trial].
>
> Todd White is an unknown party to Kenner and most Kenner investors (Ex. 9; emphasized at 2).

**The FBI visited White during his Florida family vacation—to which White withdrew from communication immediately on the Jowdy issues.**

over $900,000. The 35% contingency legal fee agreement Peca (along with Nolan [Tr.2074: "They gave us 500,000 for settlement, Northern Trust"]—and Berard [Tr.3042: "roughly after lawyer fees and stuff, it was close to 300,000"]) agreed to is not deductible from recovery (for credits against loss) under Mandatory Victims Restitution Act ("MVRA") calculations. MVRA requires the full (pre-legal fees) amounts to be credited—to eliminate any potential graft, like….

Ironically—the attorneys for Peca, Nolan and Berard were provided by Jowdy and Tom Harvey who made over $750,000 from the "35%" contingency transactions. This highlighted several issues:
1) Only the three investors who agreed to worked *with Jowdy's cabal* filed litigation—further enriching Jowdy cabal members (the attorneys); and
2) Upon information and belief, Northern Trust was notified by FBI agent Galioto that they *may or may not be investigating* Northern Trust—depending on the settlements with the three LOC investors—encouraging settlements (to expand the alleged Kenner-Northern Trust conspiracy theme).

Why didn't the other five LOC investors sue Northern Trust—if settlements were so easily available? It makes no sense—*other than the obvious*. Those investors refused to cooperate with the Jowdy-Galioto scheme, even in the face of financial recovery, like Norstrom[16] who told the 2015 Mexico Supreme Court via exculpatory affidavit (Ex. 5: 2015 affidavit)—which re-verified his previous exculpatory 3500 *Jenks* affidavit (Ex. 6, ¶ 9,10: 2009 affidavit):

> [Norstrom: 2015]: "In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawaii would lend him some bridge funding **personally** until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.
>
> As a group, we agreed to lend him funds at a 15% interest rate. Jowdy signed an official loan agreement with us in December of 2004. Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were 'not

---

[16] Note: Commensurate with every investor—before they orally verified money transfers (as required by their custodians)—Norstrom exchanged a text message with Kenner to re-confirm Constantine Management Group selling the Eufora private stock and receiving his funds (Ex. 7).

11

loans' but rather investments from our group of lenders after he was sued in the USA for not repaying the loans. In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the 'investments' he declared as his [Arizona] defense in the case. **Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received**.[17] Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."

As such—Kenner requests that the Court acquire the actual settlement agreements for Peca, Nolan and Berard for "in camera" review to ensure the actual settlement amounts are credited against loss.

This request is separate from the other pending arguments regarding loss from the 4-5-2021 restitution hearing.

<u>Conclusion…</u>

To reiterate—Kenner is requesting that the Court:

3) Require Kristen Peca affirm who told her about the IRS letter on Kenner's laptop to expose the graft—and

4) Receive for "in camera" review the three Northern Trust settlement agreements: Peca, Nolan and Berard for proper application under MVRA.


Sincerely,


Phil Kenner, ProSe
Submitted April 12, 2021

---

[17] Attorney Harvey's allegations were identical to the fraudulent story Kristen Peca re-affirmed on her 2012-FBI recording:
>[Kristen Peca]: Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.

12