FILED
CLERK

8:57 am, May 04, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,   . Criminal No. 13-cr-00607-JFB-AYS-1
                            .
            Vs.             . 100 Federal Plaza
                            . Central Islip, NY 11722
PHILLIP A. KENNER,          .
TOMMY C. CONSTANTINE        . DATE April 28, 2021
. . . . . . . . . . . . . .

TRANSCRIPT OF HEARING
(Via Video)
BEFORE HONORABLE JOSEPH F. BIANCO
VISITING JUDGE

APPEARANCES:

For the Government:            UNITED STATES ATTORNEYS OFFICE
                              EASTERN DISTRICT OF NEW YORK
                              BY: DIANE LEONARDO-BECKMANN, ESQ.
                                  MADELINE O'CONNOR, ESQ.
                              271 Cadman Plaza East
                              Brooklyn, NY 11201


For Danske Bank:              VENABLE LLP
                              BY:  GEORGE KOSTOLAMPROS, ESQ.
                                   XOCHITL STROHBEHN, ESQ.
                                   KELLY WEINER, ESQ.
                                   DOREEN MARTIN, ESQ.
                              Rockefeller Center
                              1270 Avenue of the Americas
                              24th Floor
                              New York, NY 10020


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044     Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

2

**ADDITIONAL APPEARANCES:**


For Owen Nolan:                   PROSKAUER ROSE
                                  BY:  SEETHA RAMACHANDRAN, ESQ.
                                  Eighth Avenue & 41st Street
                                  New York, NY 10036

For Diamante:                     FREEH SPORKIN & SULLIVAN
and Jowdy:                        BY:  THOMAS SOUTHER, ESQ.
                                  350 5th Ave, Suite 6903
                                  New York, NY 10118

                                  FARRELL FRITZ
                                  BY:  KEVIN MULRY, ESQ.
                                  622 Third Avenue, Suite 37200
                                  New York, NY 10017

For CSL Properties:               STEVE MAIN, ESQ.

For Marc Wolinsky                 BY: MARC WOLINSKY, ESQ. Pro se
and Homeowners:

1                             I N D E X

2

3    ORAL ARGUMENT                           PAGE

4         BY MS. LEONARDO                5/15/21/28

5         BY MR. KOSTOLAMPROS            11/17/23/30

6         BY MS. RAMACHANDRAN              26/30

7         BY MR. MAIN                       32

8         BY MR. SOUTHER                    33

9         BY MR. WOLINSKY                   33

10   DECISION                             25/35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE CLERK: Calling criminal case 2013-607.  United

 2   States of America versus Philip Kenner. Counsel, please state

 3   your appearances for the record.

 4          MS. LEONARDO:  For the United States of America,

 5   Diane Leonardo, Assistant US Attorney.  And also with me is

 6   Madeline O'Connor, AUSA.

 7          MR. KOSTOLAMPROS:  For Danske Bank, this is George

 8   Kostolampros, and also with me are Doreen Martin, Kelly Weiner,

 9   and Xochitl Strohbehn.

10          MS. RAMACHANDRAN: Seethe Ramachandran for Owen Nolan.

11          MR. MAIN:  Steve Main for CSL Properties.

12          MR. SOUTHER: Tom Souther for Ken Jowdy and Diamante.

13          MR. MULRY:  Kevin Mulry also for Mr. Jowdy and

14   Diamante.

15          MR. WOLINSKY:  Marc Wolinsky for the ad hoc group of

16   Diamante Homeowners.

17          THE COURT: All right, good afternoon everybody.  As

18   you know I've scheduled this status conference because I

19   received the letter from Danske Bank indicating that the

20   settlement discussions with the Government had terminated, were

21   unsuccessful.  I also received Mr. Wolinsky's letter regarding

22   his views with respect to the next steps in the case.  And I

23   also received the Bank's letter yesterday setting up

24   essentially an agenda for purposes of today's call.

25          So, and I think that letter was helpful for me to

1  understand sort of what the next steps might be.  And I think

2  the first thing might be for the Government, obviously item 1

3  in Mr. Kostolampros' letter was what I had in mind with respect

4  to this conference, trying to figure out how to move forward

5  with respect to the limited discovery that I said that I would

6  allow to proceed.

7         But I think I'd like to hear the Government's

8  response to items 2 and 3 in his letter regarding the potential

9  for an interlocutory sale, as well as a potential Bank might

10  sell its interest and note to a third party.  So does the

11  Government want to respond to that?

12         MS. LEONARDO: Yes, Your Honor, with regard to the

13  interlocutory sale process, I think, and in going back through

14  some of our prior transcripts and letters to the Court, I think

15  it was clear that Danske had wanted to move to the

16  interlocutory sale and honestly I think that's the best way to

17  move forward, is to move forward with an interlocutory sale

18  process.

19         In terms of what we had been discussing in terms of a

20  settlement, that's what the parties had been discussing,

21  contemplating an interlocutory sale.  One of the major points

22  though which led to a breakdown in settlement negotiations, was

23  whether or not the third party -- the third parties had the

24  right to weigh in on the sale.  And under the statute they do.

25  So I think that the sale process is set forth under Rule 32.2

1  and also under Rule G7 of the supplemental rules.  And I think

2  that Danske has indicated many times that they want to move

3  forward with an interlocutory sale, and I think that's the way

4  to go.

5         Your Honor has also indicated previously that we

6  would, the Government would be part of that sale process.  I

7  think it's important to note also that you know, at this

8  juncture we don't, the Government doesn't have title to the

9  property until there is a final order of forfeiture.

10        Previously during settlements Danske had indicated

11 that they would be, you know, as their condition as of the

12 first place beneficiary that they would be able to do the sale.

13 And then we had conversations with Mr. Jowdy's attorneys

14 because he would be the second place beneficiary of this sale.

15 And that he would be willing to do that also.

16        So I think that's the process that we should be doing

17 at this juncture.

18        THE COURT: All right, so in other words, if I

19 understand what you're saying, even in the absence of an

20 agreement, the Government believes that they should proceed

21 with this process even in the absence of any type of settlement

22 agreement among the various parties.  Is that what I heard you

23 say?

24        MS. LEONARDO: Yes, Your Honor. And we've actually

25 during settlement talks we had actually talked about that.  We

would have one agreement concerning the interlocutory sale

process, and a different settlement agreement.  Because there's

two really different things. I think the most important thing

was with regard to the interlocutory sale process, that the

other third parties have a right to be heard.  And like I said,

that's statutory. So we're really --

THE COURT: Okay, well --

MS. LEONARDO: We're really kind of in the same

position we were in settlement discussions, but the Bank was

not willing to let the third parties have any say in this or

you know, object to the sale.

THE COURT: All right, and what about his belief that

the Government is not going to be able to effectuate the sale

because it will have to be done through Mexican authorities,

and that this process will undoubtedly take years. What's the

Government's view with respect to both the need to go through

the Mexican authorities, as well as the length of the process.

MS. LEONARDO: Well, Your Honor, we can't even get to

that point until there's a final order of forfeiture. So until

all the other third party interests have been adjudicated we

don't even get to that point.

And then correct, we would have to go through the

Mexican authorities.  I know recently it was done and the

Mexican authorities proffered it with the United States in

terms of the drug money laundering case.  You know, so that,

1  it's not undoable, but I think honestly if the Bank's intention

2  is to try to make this move expeditiously as possible, this is

3  the way to do it.  And the way to do it is to have all the

4  parties cooperate like we've been discussing, and really one of

5  the only major sticking points for the Bank was allowing the

6  third parties, and like I said before, the third parties

7  statutorily have to be involved.

8          THE COURT: All right.  We'll come back to that.  And

9  I'll let Mr. Kostolampros respond. But what about his third

10 item with respect to the Bank potentially selling its interest

11 and note to a third party. What's the Government's view with

12 respect to that?

13         MS. LEONARDO: Well Your Honor, our view with regard

14 to Silver Peak is, Silver Peak has been involved in the resort

15 for a long time.  So when we -- we didn't receive the Bank's

16 letter until last night obviously.  Silver Peak and Danske have

17 been involved for a long time in dealings with the resort.  In

18 fact in 2015, I don't know if Your Honor recalls, in 2015, Mr.

19 Jowdy was planning on selling off part of the resort to Silver

20 Peak as an investor.  And that sale was stopped because a

21 protective order was ultimately entered.

22         So there have been many previous dealings with Silver

23 Peak.  Obviously we haven't been able to go through all the

24 documentation, Your Honor.  But it appears Silver Peak and Mr.

25 Jowdy have some kind of connection. There were instances were,

1   I believe DCSL, and I'm trying to find the document, where DCSL

2   was paying Silver Peak a fee for trying to get funding, or an

3   infusion of capital.

4          So our position with regard to Silver Peak is we

5   would be very suspect about whether or not Mr. Jowdy's

6   involvement in that deal, and whether or not that this is just

7   merely an end run to get around the forfeiture process.

8          THE COURT: I don't understand, if the deal was

9   essentially, I understand you'd have to look into and

10  understand the terms.  But if essentially Silver Peak is just

11  standing, going to stand in the shoes of the Bank, I don't know

12  how that could prejudice the Government's interest or any third

13  party interest.  They would just be getting whatever it is

14  ultimately the Bank is entitled to with respect to the resort.

15  Right, or am I missing something?  What would the prejudice be

16  to anyone else if they're just switching shoes?

17         MS. LEONARDO: I think of it depended on, and we

18  didn't know Silver Peak was a potential buyer.  We talked about

19  Danske possibly selling the note and the name of a buyer was

20  not disclosed.  For instance, let's just say discovery is not

21  completed, if we're doing an interlocutory sale and discovery

22  is not completed with regard to Danske, and they're no longer

23  in the case, I think they would become a non party, and I don't

24  know that the Court would retain jurisdiction over them,

25  especially of a foreign bank.  At that point they're

1  essentially a non party.

2           THE COURT: All right.

3           MS. LEONARDO: You know, we had --

4           THE COURT: All right.

5           MS. LEONARDO: We had considered, again, as Your Honor

6  said, it's something that we could consider.  And look at the

7  terms and prime (phonetic) of the deal.  But again, we've gone

8  back and forth with Danske Bank about selling the note, and

9  we've gone -- you know, it literally changes day by day.  One

10 day we can sell note, we even discussed it during settlement

11 negotiations whether or not we they could sell the note.  And

12 they flatly rejected that.  So, and this is something I think

13 we've discussed with the Court a number of times.

14          THE COURT: All right, well it certainly seems if

15 obviously these issues such as the discovery and whether or not

16 as a non party, the Bank might not be subject to such

17 discovery, would be an issue. But it does seem, especially if

18 Silver Peak is interested in trying to further negotiate a

19 settlement and is allowing to sell, you know, allow people to

20 continue to sell parcels and timeshares, where the Bank is

21 indicating some reluctance to do that going forward.  You know,

22 those may be additional benefits to having Silver Peak be able

23 to do this, if possible.

24          But let me, Mr. Kostolampros, I don't know if you

25 want to some of the things the Government just said.

1    MR. KOSTOLAMPROS: Yes, I would, Your Honor.  And let

2  me address one inaccuracy.  Is that the Bank somehow wouldn't

3  allow third parties to object to a proposed interlocutory sale.

4  That is absolutely not the case.  We always envisioned, and you

5  know, insisting from day one, and until today, the Government

6  to present a plan to the Court so all third parties could

7  understand what that plan is.  Number one.

8    Number two, what you're hearing from the Government

9  is what we've said from day one.  And which they finally

10  admitted to us in our discussions over the past couple of

11  months, they cannot sell this property without a settlement

12  agreement from Danske and the borrower, because the property is

13  located in Mexico.

14    Now, Ms. Leonardo is talking about, she raises an

15  issue that they can't execute an interlocutory sale until a

16  final order.  Well that's what an interlocutory sale is.  It's

17  interlocutory, before a final order.  And this is the very

18  reason why an interlocutory sale is allowed for in, by statute,

19  is because the resort can't pay its bills and ultimately it's

20  got to be sold.

21    So this is finally where I think you know, the

22  forfeiture road here ends here.  We either can effectuate an

23  interlocutory sale or they can't. And from what I'm hearing

24  right now, and what she hasn't said explicitly is, they need

25  Danske and the borrower to agree to an interlocutory sale.

1        Not only that, Your Honor, they need Danske or the

2   borrower to actually effectuate the sale. That means Danske or

3   the borrower has to engage the third party. The Government

4   cannot because that would be a violation of Mexico's

5   sovereignty.

6        So those are, the Government hasn't answer how it

7   will effectuate a sale on its own without the borrower, without

8   the agreement of the borrower or Danske.  And Danske is not

9   willing to sell the -- to take all the responsibility of

10  selling the resort property on its own without an agreement as

11  to its claim.

12       Finally, as to, and I have to raise as to the sale of

13  Danske's note, it hasn't changed. We've presented to the

14  Government and asked them, look, are you going to object if

15  Danske sells its interest and ultimately its interest in a

16  settlement agreement.  And that, whatever that may be, whoever

17  the new buyer is going to be, whether it's Silver Peak or

18  somebody else, would take only Danske's interest.  That's it.

19  No more. This issue about Danske would be a non party, Danske

20  would be willing to acknowledge that you know, if ultimately

21  the new buyer wants to litigate Danske's claim, we'll make

22  ourselves available for discovery.

23       So those are the three points Your Honor. And you

24  know, you've raised it as well, if we cannot sell our note, the

25  Government's got to come up with a plan on how it will

1  effectuate a sale.  And how to do so on a timely basis, Your

2  Honor. At the same time --

3         THE COURT: All right.

4         MR. KOSTOLAMPROS: At the same time, Your Honor, one

5  other point, is you've raised it is, the status quo cannot be

6  maintained. Collateral is being sold and we have no idea how

7  long it will take for a sale to be effectuated.  That's why

8  it's important to at least set aside amounts in escrow.

9         THE COURT: All right, let me just, on the issue of

10 interlocutory sale, I understand what you're saying. But if

11 you're telling me, even though there's not an agreement, you

12 should push the Government forward to go forward with the

13 interlocutory sale, but then you're saying to me, but they're

14 not going to be able to do it without the Bank's and the

15 borrower's consent.  I guess I'm a little confused as to why I

16 would send the Government on that mission if you're ultimately

17 telling me that they're going to be unsuccessful.

18        MR. KOSTOLAMPROS: Well --

19        THE COURT: -- without your support.

20        MR. KOSTOLAMPROS: Let me tell you why, Your Honor, is

21 because they've told the Court from months ago, years ago

22 frankly, that they can effectuate a sale.  So what, how do they

23 plan to effectuate a sale.  Even if there is a final order of

24 forfeiture, how do they effectuate a sale.  They still have to

25 go through Mexican authorities.  At that point, and according

14

1  to the Government essentially, is the property is the

2  Government's at this point.  Danske is fighting for its claim

3  for ultimately whatever is sold out of that property, right?

4  So --

5        THE COURT: Why couldn't money be put in escrow.  If a

6  settlement can't be reached with regard to the Bank's claim,

7  but everybody agrees the interlocutory sale should go forward,

8  why wouldn't the Bank and the borrower work with the Government

9  and the Mexican authorities, to do an interlocutory sale, and

10  then preserving you know, the ability to figure out later the

11  ultimate issue of what the Bank's share of that would be.

12        MR. KOSTOLAMPROS: Because, Your Honor, there are

13  provisions that would be required.  Danske would be responsible

14  for effectuating that sale to the extent there is litigation

15  over that sale in Mexico.  Who is responsible for litigating

16  that?  Those are the questions, the details, that are just,

17  cannot be answered. The Government is unwilling to indemnify

18  Danske if it has to effectuate the sale for the US Government.

19        THE COURT: All right.  Ms. Beckmann, can you clarify

20  how this would be done if the Bank and the borrower are not

21  part of the process for the interlocutory sale, how are you

22  going to proceed.  And the other situation that you noted, in

23  another case, I don't know what the situation was there, but it

24  would seem perilous to try to do an interlocutory sale with

25  that type of posture.

1      MS. LEONARDO: Well, Your Honor, I think it was a

2  little confusing with an interlocutory sale and a final order.

3  So we're not pushing -- I think we said a couple of times

4  before the Court, we're not pushing for an interlocutory sale.

5  And we didn't want to do it until we knew the primers of what

6  the Bank's claim is, is going to be the recognized amount of

7  their claim.  And I think we've set it out for Your Honor, and

8  Your Honor has recognized a couple of times that, you know, if

9  there's any kind of offset, you know, when we're talking about

10  arm's length transactions and if there's to be an offset if the

11  Court finds that there were not arm's length transactions.

12      So that was our position.  The Bank has said many,

13  many times that they want to do an interlocutory sale.  And as

14  I said earlier, that's really the way to go.  And I think Your

15  Honor just said, why wouldn't the Bank and Mr. Jowdy agree to

16  work with us to do the interlocutory sale. Everybody wants this

17  to be sold. And that's the way to do it.

18      We don't have title to the property until there's a

19  final order.  And that's after, I think I said, earlier

20  (inaudible-voice interference)

21      THE COURT: Hold on a second.  Okay, go ahead.

22      MS. LEONARDO: So Your Honor, we don't have title to

23  the property. So we can't, we are not the titled owner in an

24  interlocutory sale.  It would be the first place and second

25  place beneficiaries because it's being held in the trust.  And

1  that's the Bank and Mr. Jowdy.

2         THE COURT: So you're telling me that the Government

3  can't essentially run an interlocutory sale without the final

4  order of forfeiture?   Is that what you're telling me?

5         MS. LEONARDO: No, once there's a final order of

6  forfeiture, just do a sale period.   The terms of an

7  interlocutory sale are in Federal Rule of Criminal Procedure

8  32.2.  And anybody can move for an interlocutory sale if, and

9  if what the Bank is saying is true, if the assets are being

10  dissipated, that kind of thing, the Court can order that sale.

11         THE COURT: But who is going to run it, who is running

12  the sale?  If I order the sale, who is running it?

13         MS. LEONARDO: Well under the terms of the sale, under

14  the terms of the Rule it has to be a US agency or anyone else

15  that the Court designates.  So we had discussed, I mean when we

16  had been talking about you know, working out the terms of a

17  sale, we had discussed that the Marshals would be, would

18  participate in the sale. We had agreed to hire Colliers to run

19  the sale.  They were going to get paid out of the proceeds of

20  the sale.  So that was all set up.

21         So we're back to, as I said initially, I think we're

22  back to the process, we're pretty close to being done.  And I

23  disagree with counsel for Danske, I mean they were pretty clear

24  that involving the third parties to have their consent to the

25  sale was not negotiable for them.  They did not want to do

1  that.  And that's also statutory. And if there are third

2  parties that don't agree then there are certain safeguards put

3  into place by 28 USC 2001.

4       THE COURT: What if there's litigation in Mexico, who

5  is going to pay the cost of fighting litigation in Mexico?

6       MS. LEONARDO: I think that's -- I think that's kind

7  of speculative.  But I would imagine there's some kind of title

8  insurance. I don't know.  But I think that's speculative.  And

9  you know, if the Bank is aware of anything, you know, we're not

10  aware of anything, I don't know if the Bank is aware of

11  anything.  I don't know if Mr. Jowdy is aware of anything.  But

12  I think that's kind of speculative. And I'm sure there's some

13  kind of title insurance that would cover that.

14       MR. KOSTOLAMPROS: Your Honor, we already have Mr.

15  Wolinsky already filed, and the interested homeowners filed

16  proceeding in Mexico.  I mean, the Government doesn't want to

17  take into account any potential, you know, risk factors here.

18  And doesn't, and wants Danske to bear all of those risk

19  factors.

20       THE COURT: That's not the issue, you're saying the

21  Government is wrong, you're okay with obviously giving notice

22  to third parties regarding the plan.  Right?

23       MR. KOSTOLAMPROS: Of course, Your Honor.  And let me

24  tell you a little bit more about that issue.  The issue that we

25  have is not giving notice to an interlocutory sale.  The

1  agreement was conditioned on there could be third party

2  claimants who have claims. So a distribution would not made

3  until, pursuant to a waterfall provision that we had agreed to,

4  essentially couldn't be, wouldn't be made until those third

5  party claims were determined. It's not about an interlocutory

6  sale that we had an issue.

7          And let me give you a little bit more information. Is

8  that we understand that there are more individuals with claims

9  who have yet to have been filed.  But those have been provided

10  to the Government.  But the Government is sitting on those

11  claims.

12          THE COURT: So what, if it's not the notice issue,

13  what's the issue with the Bank in terms of going forward with

14  the interlocutory sale, it's the risks associated going

15  forward, is that potentially what it comes down to?

16          MR. KOSTOLAMPROS: That is, Your Honor, it is.

17          THE COURT: So what do you propose --

18          MR. KOSTOLAMPROS: It's addressing the risk factors

19  Your Honor.  It's also addressing the finality of the process,

20  Your Honor. The Government says that it could take a year or

21  more. And ultimately the Government has final say on whether to

22  approve a buyer.  So the Government could say, look, no, we

23  don't like the buyer.  We're not going to do it. These are

24  terms that caused us to say look we can't agree to this.

25          The final term or the two final terms was to hold the

1  Government harmless arising from any litigation.  So if a third

2  party comes in to this proceeding and challenges it all, we

3  would have to hold the Government harmless from anything that

4  the Government that would have to pay or whatever (inaudible-

5  static) Finally the Government insisted that we couldn't even

6  sell our interest if we wanted to.

7           So these are all things that we just weren't able to

8  come to an agreement with the Government about.

9           THE COURT: All right. But the bottom line is, you

10 want me to have the Government propose a plan for interlocutory

11 sale?  That's what you're asking me to do?

12          MR. KOSTOLAMPROS: That's exactly what I'm asking you

13 to do, Your Honor.  The statute, or the Criminal Rule of

14 Procedure, this is why an interlocutory sale is applicable.

15 And frankly, required in this circumstance.  The resort isn't

16 paying its loan.  There is -- ultimately the Government --

17          THE COURT: You don't have to convince me of that.

18          MR. KOSTOLAMPROS:  -- has to sell this.

19          THE COURT: Right, I've been convinced of that for a

20 long time.  So you don't have to persuade me that an

21 interlocutory sale is the way to go.

22          MR. KOSTOLAMPROS: Right.

23          THE COURT:  But it sounds like the Government even

24 agrees.  So, but what's your view regarding the issue regarding

25 the Bank's claim and the discovery issues. You're envisioning

1  that that would proceed while the issue regarding the

2  interlocutory sale and the potential selling of your client's

3  interests, note, that all those things would be occurring

4  simultaneously?

5       MR. KOSTOLAMPROS: Yes. Yes, Your Honor. So the way

6  that we would envision this is, the Government present a plan

7  so that all parties have notice of the plan and can object to

8  it or agree to it.  So that needs to continue.  That needs to

9  move forward quickly.

10       The second aspect of this is determining Danske's

11  claim.  If the Government, and specifically if the Court were

12  to agree that Danske could sell its note, the new buyer stands

13  in Danske's shoes, no more, no less.  Then that could obviate

14  the need for litigating Danske's claim.  Because the new buyer,

15  Silver Peak, is interested in discussing settlement with the

16  Government.  Is interested in allowing, you know, sales to

17  continue without portions of those sales being put in escrow.

18  It seems to me like, you know, that's a real opportunity here

19  to avert further litigation and potentially reach a settlement.

20       THE COURT: All right, are you at the position where

21  you could present the Government with documents that would

22  indicate what the terms and conditions of such a sale would be?

23  Or it's not to that point yet?

24       MR. KOSTOLAMPROS: I don't think it's at the point

25  where we could present a document.  What we can do Your Honor,

1  is have the parties speak.  Have a call between the Government,

2  the interested third parties being Mr. Main and Ms.

3  Ramachandran.  And have them, we're happy to participate as

4  well. And talk about sort of what a note sale would look like.

5  And ultimately what, you know, whether a settlement will work

6  as well.

7            THE COURT: All right, that sounds reasonable to me.

8  I don't mean reasonable, but a good idea.  So is Ms. Beckmann,

9  is there any reason why you shouldn't have some type of

10  discussion regarding what the potential terms would be, to see

11  if whatever concerns the Government would have could be worked

12  out in the transaction?

13            MS. LEONARDO: With regard to selling the note, Your

14  Honor?

15            THE COURT: Yes.

16            MS. LEONARDO: Yeah, I mean that's fine, if they want

17  to present something to us, of course we would take a look at

18  it.  But I just want to back up a little bit, Your Honor. I

19  think I said earlier, and we said a couple of times during

20  conferences, we the Government do not want to move for the

21  interlocutory sale.  And I believe the last time we discussed

22  this Your Honor even said that if the Government doesn't want

23  to do it he would direct the Bank to do it.  And I think that's

24  where we are right now.

25            And I've said many times, unless you want us to put

1   something together like what we had discussed, where Danske is

2   going to agree to participate or direct the trust in the sale,

3   and Mr. Jowdy is going to agree to direct, as the second place

4   beneficiary direct the sale.

5            THE COURT: Well, I'm going to have to think about it

6   a little more.  The Court thinks, and you can tell me what I'm

7   missing here, that it's in everybody's interest for the

8   interlocutory sale to go forward.  But I should direct the

9   sale, in terms of the details of how that would work, you know,

10  obviously I'm hearing for the first time some of the

11  complexities.  So I think it might be the best way to proceed

12  might be to have the Government submit a plan and have the Bank

13  comment on it.  Why wouldn't that be the way to proceed?

14  You're saying I should direct the Bank to do it?

15           MS. LEONARDO: Your Honor, any party, they certainly

16  have the right to move for it.  And honestly if we submit a

17  plan for the Court, it's going to include that, that you know,

18  the Bank needs to participate and Mr. Jowdy needs to

19  participate.  I don't know if his position has changed.  I know

20  when we spoke a couple of weeks ago, a month ago, he was on

21  board with it. I don't know if that has changed.

22           But again, as I said, if Danske truly, truly wants to

23  you know, get rid of this property, and move this as

24  expeditiously as possible, this is the way to do it.

25           THE COURT: All right.

1          MR. KOSTOLAMPROS: Your Honor, if I can add.

2          THE COURT: Go ahead.

3          MR. KOSTOLAMPROS: Sorry, Your Honor. If I can add one

4   other thing.  I mean, the Government should be able to execute

5   an interlocutory sale.  That's the reason why -- they said they

6   could.  And ultimately even if they get to a final order of

7   forfeiture, how do we plan on selling the property?  Danske is

8   not going to sell it.  The Government nor the Court can force

9   Danske to sell -- force a third party to sell a property that

10  it doesn't even have an interest in any more?  I mean all we

11  have is a claim.  That's it.  How does the Government plan on

12  selling the property even if it gets a final order of

13  forfeiture?  It still needs Danske's assistance.

14          THE COURT: All right.  But you obviously will have to

15  -- if I do direct the Government to do this, you're going to

16  have to provide input and assistance to help the Court

17  effectuate it.

18          MR. KOSTOLAMPROS: Your Honor, it's one thing to

19  provide assistance to effectuate it.  Like for instance,

20  providing instruction letters to the trust to sell the -- to

21  transfer ownership.  That's fine. But to force a third --

22  Danske to actually sell the property?  I think that's beyond

23  the Court's -- I'm not aware of any instance where a Court was

24  able to do that.

25          This is a process that's run by the US Marshal's

1 Office.  They effectuate interlocutory sales.  The Marshal's

2 Office was very up-front with us saying that they can't do this

3 unless they go through Mexico or get our assistance.  What

4 we're saying is, Your Honor, the Government has always said

5 it's got a plan to effectuate a sale.  Let's see it.  They said

6 they've reached out to the Office of International Affairs, the

7 DOJ.  They've gone all the appropriate routes.  Well let's see

8 it.  Have they spoken with the appropriate individuals at DOJ,

9 appropriate Mexican officials to make this happen.

10          THE COURT: All right.

11          MS. LEONARDO: Your Honor, if I can just add one

12 thing, and I'm sorry, I don't mean to belabor it.  But again,

13 counsel's confusing what an interlocutory sale is and what a

14 sale is after a final order.  At this stage the Government does

15 not own the property.  Danske still owns the property.  When

16 they keep talking about --

17          THE COURT: I can direct an interlocutory sale, right?

18          MS. LEONARDO: Correct.

19          THE COURT: Right, so if I direct an interlocutory

20 sale, and tell the Government I'm directing an interlocutory

21 sale.  I want you to make this happen.  The Government should

22 come up with a plan and whatever assistance you think would be

23 necessary from the Bank or the borrower, or anybody else, put

24 it in the plan.  Let me look at it.  And then obviously I'll

25 give them a chance to be heard with respect to what the

1  Government is, what the Government is asking them to do in

2  connection with the Government's interlocutory sale. Right?

3          MS. LEONARDO: Yes, Your Honor.

4          THE COURT: Okay. So we're going to do that.  We're

5  going to -- the Government, obviously I know you tried to work

6  it out, but this can't go on forever.  And the interlocutory

7  sale is clearly, everybody agrees that should happen.  So it's

8  not a difficult decision for the Court.  Just figuring out how

9  it could happen.  When everybody is not on the same page is the

10  challenge.  But we should at least get that ball rolling.

11          So we'll just talk about how long the Government

12  would need to put together a proposed plan. But all right, so

13  let me just hear from everybody else.

14          What I'm envisioning basically is a date by which the

15  Government would submit a proposed plan for an interlocutory

16  sale, and that would include obviously whatever notice,

17  including timing of the notice that the Government believes

18  would be necessary with respect to such plan, to third parties.

19  And then I expect in the next few weeks for there to be a

20  discussion regarding allowing the Bank to develop interest in

21  the note to Silver Peak.  And report back to the Court from the

22  Government on why that would create any issues in terms of

23  prejudice to the Government or anybody else, if we're allowed

24  to proceed.

25          So I think, again I don't think I need to reiterate

1　this.  In light of where we are with the Bank, whatever concern

2　the Government has about Silver Peak, you know, obviously the

3　Government can voice those concerns. But if you have a party

4　who is willing to try to work this, these issues out in a way

5　that's more favorable to the Government and potentially to

6　people who have timeshares and other interest in the property,

7　I think it would be potentially a good thing.

8　　　　　So, all right, but let me just hear from everybody

9　else briefly.  Ms. Ramachandran, do you want to be heard on the

10　proposed path forward?

11　　　　　MS. RAMACHANDRAN: Yes, Your Honor.  In principal I

12　think an interlocutory sale would be fine. In fact from the

13　beginning that's actually what you know, I think I had

14　recommended to you as to why isn't this property being sold on

15　an interlocutory basis.

16　　　　　So I still think that's a good idea.  I think my hope

17　has always been to get some sort of resolution here for my

18　client so he can recover some money to mitigate his tremendous

19　losses.  I'm very hopeful that, you know, I don't have any

20　information about Silver Peak yet.  But I'm, I would willingly

21　participate in the discussions that Mr. Kostolampros has

22　indicated would happen.

23　　　　　I also just wanted to clarify, you know, we were

24　very, very close to reaching a settlement agreement, and I

25　think Mr. Main and I participated in that fully. We were on

almost every call.  We played a big role in that.  And I was very disappointed that it didn't end up happening.  My hope is that it would end up happening.

But as I recall there were only a few sticking points at the end.  One of them was about this third party issue.  And I just want to clarify, by third party I don't think the Government is referring to my client or Mr. Main's client, who have filed claims, and have participated in this process.  They're referring to parties who have not filed claims.  In my view those claims are waived.  And I've always been of the view that any claims should be brought before the Court, you know, if there's an interlocutory sale people would have an opportunity to weigh in.

And I think that, I actually thought that was what was going to happen.  So I was surprised to see that, you know, everything fell apart over that. I mean I still don't believe that claimants who have not filed a timely claim within the time period set forth in the statute, 853(n)(6), have a claim that should be recognized.  But apparently there are claimants who have put the Government on the notice of their claims, but not the Court.  And I think that's something that the Court may need to weigh in on to just resolve the issue.  Because it's likely to be an issue even if Silver Peak steps into the Bank's shoes and takes this over.

THE COURT: You're saying, if there were to be notice

1  of an interlocutory sale, if new people came in objecting to

2  it, you're saying they've waived it, they can't object, it

3  would only be people who have already filed a claim?

4          MS. RAMACHANDRAN: Well I don't think -- I think

5  they've waived their interest in like recovering an interest.

6  I don't know that they, I mean they may have the opportunity to

7  object to a sale, but my view it should just be before the

8  Court.  Like there shouldn't be any more claims hanging out

9  there, you know, it just needs to be open and decided here.

10         THE COURT: I mean -- let me ask the Government about

11  that.  Because Mr. Kostolampros also referenced that. And I'm a

12  little confused by that.  Ms. Beckmann, so are there claims

13  that weren't filed with the Court that were filed with the

14  Government that the Court should be aware of?

15         MS. LEONARDO: Your Honor, I believe we did receive

16  some ancillary petitions from per se claimants.

17         THE COURT: All right, but what's your response to

18  what Ms. Ramachandran is saying?  Is that, what's the issue

19  regarding these third party claims and the Bank's issue about

20  how long those claims could be out there, I guess.

21         MS. LEONARDO: Well Your Honor, I think you know,

22  we're trying to look into this.  I think it's really it's in

23  the Court's discretion if it's going to allow a late claim.

24  You know, we didn't file them on the docket.  We did indicate

25  to some of the -- ultimately some of the victims, that are also

1 owners of the resort.  They asked if they could file with the

2 Court.

3         THE COURT: All right, but is that the sticking point

4 with respect to the third party claims?  That batch, or is

5 there something bigger that I'm missing?

6         MS. LEONARDO: No there were a couple of other third

7 party claimants that did file on the docket.

8         THE COURT: Right, but in terms of, the Bank is saying

9 that they are okay with notice going out, and then the issue,

10 maybe I'm misunderstanding from what has been said, is that

11 there's going to be continuing a lack of resolution all the way

12 to the final determination regarding those claims and that it's

13 unacceptable to the Bank. Is that the issue?

14         MS. LEONARDO: Your Honor, I don't think so. I think

15 what, in terms of interlocutory sale, what happens there is if

16 the third parties, they just have to be in agreement with the

17 sale.  I think if they're not, that's where other statutory

18 safeguards kick in, it's under 28 USC 2001.

19         The other third party claims, I mean that's going to

20 be up to the Court, and much like deciding Danske's, the amount

21 of Danske's claim also.

22         THE COURT: All right.

23         MS. LEONARDO: So interlocutory sale is different.

24         THE COURT: Let me go back to Ms. Ramachandran.   So

25 Ms. Ramachandran, what is the issue the Court would need to

1  resolve in order to have that not be a sticking point that you

2  think is one of the remaining sticking points for the

3  settlement?  What does the Court have to resolve?  The ones

4  that the Government is holding?

5          MS. RAMACHANDRAN: Yeah, I just think if there are

6  claims out there, I mean my position would be that those claims

7  haven't been timely filed.  But obviously you know they have an

8  opportunity to come in and be heard. And I would object to that

9  or argue it.

10          But I can't do anything if I don't know what those

11  claims are, and what amounts they're in.  I mean it seems like

12  --

13          THE COURT: But is that the only issue with respect to

14  the claims and the notice and timing, or is there something

15  else beyond that?

16          MS. RAMACHANDRAN: I think that's it. I mean, I think

17  it could be resolved immediately.

18          THE COURT: Mr. Kostolampros, what, is that the issue

19  with respect to the third party claims that is the sticking

20  point? I can't hear you.

21          MR. KOSTOLAMPROS: Sorry, Your Honor, I was on mute.

22  Your Honor, that's one of the sticking points.  That won't

23  resolve our issues and get us to a settlement.

24          THE COURT: Okay.

25          MR. KOSTOLAMPROS: You know, so and let me add one

1  other point, Your Honor, about this.  Basically our settlement

2  agreement would be two agreements. One for an interlocutory

3  sale.  And one for a settlement of Danske's claim.  Those are,

4  in our view, have to be tied together. It can't just be one

5  interlocutory sale and you know, not have an agreement.

6            And ultimately the agreement would have been

7  contingent on a final determination on claim, third party

8  claims, including claims that aren't even before the Court.  So

9  that just left out -- it leaves uncertainty for the Bank.

10            THE COURT: But so the sticking point was whether

11  those would be resolved earlier? Or I mean they have to

12  resolved right?

13            MR. KOSTOLAMPROS: They would have to, but we don't

14  even know, we haven't even seen the ones that we haven't seen

15  obviously.  Your Honor, that wasn't the only --

16            THE COURT: But what was your proposal?  What was your

17  proposal how to solve that.  If the Government --

18            MR. KOSTOLAMPROS: Our proposal --

19            THE COURT:  -- filed those claims, what's the Bank's

20  position on how that issue could be resolved then?

21            MR. KOSTOLAMPROS: It was two.  First, pull those

22  parties into the settlement agreement.  Secondly, if those

23  parties were unwilling to settle, it's our view that the other

24  claimants, the claims that have already been made, stand behind

25  Danske.  So the Court was, if you recall, way back when now,

1  several months ago when the Court was issuing its ruling, its

2  oral ruling, the Court said, you think that Danske has a

3  greater interest than any other claimants.  So that really

4  solves the problem there.  But the Government was unwilling to

5  agree to either proposals.  You know, well they were agreeable

6  to at least begin discussions with the other claimants. But we

7  don't even know who the other -- the claimants who have not yet

8  filed a claim.

9          But Your Honor, I don't mean to make it sound like

10 that's the only issue, that's not.

11          THE COURT: All right.

12          MR. KOSTOLAMPROS: That's one of probably three to

13 four issues that cause us to -- the settlement couldn't go

14 forward.

15          THE COURT: All right, Mr. Main.

16          MR. MAIN: Yes, Your Honor, I don't think have

17 anything additional than what's already been discussed.  I

18 would echo Ms. Ramachandran as it relates to my understanding

19 of the third party issue.  CSL Properties is absolutely in

20 favor of moving forward with the interlocutory sale.

21          And on the issue of Silver Peak or someone else, I

22 mean, CSL Properties' position has always been there needs to

23 be a resolution that provides for some recovery, you know,

24 short of months more of litigation to the end of a forfeiture

25 proceeding.  So anything that can help us accomplish that, CSL

1  Properties would be in favor of.

2          THE COURT: Mr. Souther or Mr. Mulry.

3          MR. SOUTHER:  Yes, Your Honor, this is Tom Souther.

4  I think, you know, one of the concerns is that, you know, we've

5  been facing uncertainty for years.  And we need to get

6  certainty to this.  But you know, I think a component of that

7  is to determine with some certainty, or least a range, what is

8  the Bank's claim.  Because if you're going to down the

9  interlocutory sale path, then you know, it may become a moot

10 point if the Bank's claim exceeds the amount that the property

11 is going to recover in an interlocutory sale.  So I think it's

12 important for that to be, to be settled.  That's my position on

13 that.

14         THE COURT: All right, Mr. Wolinsky.

15         MR. WOLINSKY: Your Honor, I hate to be a negative

16 voice, but it strikes me that --

17         THE COURT: There's a lot of negative voices, Mr.

18 Wolinsky. They're all negative voices today.

19         MR. WOLINSKY: Okay.

20         THE COURT: I can handle it, go ahead.

21         MR. WOLINSKY: Let me be a voice of reason maybe,

22 hopefully.  I really feat that we're going off on a fool's

23 errand here.   The Government is going to propose a plan for an

24 interlocutory sale that's going to require the consent of

25 Deutsche Bank -- excuse me, Danske Bank and Jowdy. Putting

1  aside Jowdy Danske is telling you that they're not going to

2  consent to an interlocutory sale without a settlement of its

3  claim.  Now maybe they'll change their position, but the

4  Government, it strikes me that the Government is proposing to

5  put forward a sale plan that's going to be dead on arrival.

6            THE COURT: Well --

7            MR. WOLINSKY: And you're also hearing --

8            THE COURT: Go ahead.

9            MR. WOLINSKY:  You're also hearing that the Bank is

10 not -- I'm sorry, Your Honor, obviously I shouldn't interrupt

11 you.

12           THE COURT: No, no.  I want to hear what the rest of

13 you're going to say. But it crossed my mind too, believe me,

14 that's why I was asking all the questions.  But go ahead.

15           MR. WOLINSKY: And the other thing you're hearing is

16 that the Bank is not going to be willing to release its

17 collateral in the short term, which is necessary to fund the

18 ongoing operation of the resort and the needed capital

19 improvements.

20           THE COURT: Yes.

21           MR. WOLINSKY: So you know, we're really headed into a

22 period where everyone is standing on their rights, and nothing

23 is going to happen.  And obviously that's not good for the

24 homeowners, it's not good for the victims of the fraud.

25           Your Honor, I go back to where I was before.  I mean

1  people, my recommendation, and it's consistent with my position

2  and it's consistent with Mr. Souther's, you need to -- my

3  recommendation and request is that you just go ahead and

4  adjudicate everyone's rights.  And if there's a settlement,

5  great. The history has been that there's not a settlement.  And

6  hope against hope that there's going to be a settlement has

7  proven to be a, has not been a productive way to proceed.

8          And I can recall probably the first time I stood up

9  in front and spoke to you in court, I don't know if it's two,

10 three, or four years ago, but you said this is, you know, we're

11 going to get this done.  And here we are, two, three, four

12 years later and it's not done.

13         So I think the short way to get --

14         THE COURT: I agree with everything that you said and

15 that's why I said to Mr. Kostolampros, my intention is to

16 proceed on everything simultaneously, for all the reasons that

17 you indicated, that I'm not going to just continue to hope that

18 there's going to be -- my, even though it may, you know, be at

19 least a dead on arrival, my hope is that forcing the Government

20 to put down on paper what an interlocutory sale would look

21 like, will allow me, would allow the Bank, to see it.  The

22 Bank's position could hopefully maybe change in terms of, the

23 settlement part of the case once they see the plan.  We could

24 have Silver Peak come in, which could obviously facilitate the

25 interlocutory sale going forward with a settlement that they

1  are agreeable to.

2         So I think even though currently it doesn't seem

3  promising, the way I'm hearing it, I think holding off on

4  seeing a plan doesn't make sense.  There's going to be a sale

5  of this resort.  So, let's see what it would look like and try

6  to figure out the path forward to getting that done.

7         But I do agree, I'm going to tell the Bank and the

8  Government to submit to me what the limited discovery would

9  look like. So we're going to proceed on that path as well.

10         All right, so let's talk about dates. First, in terms

11  of Silver Peak, I want a report back from the Government after

12  a meeting, I was thinking two weeks for that, May 14th maybe,

13  a letter from the Government indicating -- obviously I'm not

14  anticipating like there would be a final -- to Government would

15  say, you know, we're good with this, because it doesn't sound

16  like you know, there would be time to get that kind of

17  finality. But I want to hear from the Government if the broad

18  terms are sort of outlined at a meeting, whether the Government

19  thinks it's promising.  If it doesn't think it's promising,

20  what the issues would be with respect to a prejudice to any

21  parties if the Court were to allow such a transfer to occur.

22         Does that sound like a reasonable time for there to

23  be a meeting and then the Government to report back? Ms.

24  Leonardo?

25         MS. LEONARDO: Your Honor, just to clarify, you want

1  us to meet with the Bank, parameters of the sale, and what

2  other documentation they have?  And then you want us to report

3  back.

4          THE COURT: Yes, they're going to give you the broad

5  outline of what the agreement would look like, you can raise

6  these issues about the Bank being a non party.  Hopefully

7  they're be able to provide you some assurances of what could be

8  put into an agreement to alleviate those concerns.  And for you

9  to just report back to the Court preliminarily, like you know,

10 based upon what we heard you know, we're hopeful for there to

11 be terms worked out.  Or you're not hopeful and I want to

12 understand the reasons why you're not hopeful.  All right?

13         MS. LEONARDO: Your Honor, could we have three weeks,

14 only because I have an appellate due --

15         THE COURT: May 21st.

16         MS. LEONARDO: Okay.

17         THE COURT: All right.  And then how about a proposed

18 plan for the interlocutory sale?

19         MS. LEONARDO: We could do that also by the 21st, Your

20 Honor.

21         THE COURT:  All right.  And let's do that date too

22 as well where, and again in I don't know whether this is

23 wishful thinking, but just revisit the discovery requests, you

24 know, many months ago the Government put in a letter with a,

25 what I views as very broad requests. And I want them to be

1  narrowed in terms of both documents and/or depositions that the

2  Government might seek in connection with, you know, that

3  portion of the case.  So I want the Government to submit a

4  revised proposal by that same date, May 21st.

5          You know, on the issue of whether or not it was at

6  arm's length.  Obviously it focuses, in my view, on the Bank's,

7  any terms and conditions they had with Mr. Jowdy. So I saw

8  there were some requests in there that wanted documentation

9  with respect to that.

10         And then again, we're going back many months, I

11 haven't gone back and looked at that letter, but you know,

12 making sure the Bank was properly monitoring the money going

13 in, you know, while I didn't view, I did use the term limited,

14 I didn't think this, this should not be a situation where the

15 Government is looking for every last receipt for every last

16 transaction, but essentially you know, essentially thought like

17 a spot check, making sure that there were proper procedures in

18 place to make sure that the money was going for, you know,

19 legitimate expenditures for the resort.

20         So again, I know it's pretty broad, but I want the

21 Government to narrowly focus its discovery.  It obviously would

22 be preferable for you to have some back and forth with the Bank

23 regarding that, to see if there's agreement that could be, or

24 could not be. But since I'm not hopeful in that, bottom line is

25 the Government should put in a revised narrower request and

1  then assuming the Bank agree in advance to any of it, I'll ask

2  Mr. Kostolampros to respond to that.  All right?

3            MS. LEONARDO: Yes, Your Honor.

4            THE COURT: All right.  Mr. Kostolampros, is there

5  anything else you want me to address today? You're on mute

6  again.

7            MR. KOSTOLAMPROS: Sorry about that.  My apologies.

8  The only thing, Your Honor is, we keyed up in our letter that

9  if we were to litigate we'd also want narrow discovery from the

10 Government.  So we would propose -- I mean hopefully we're not

11 there.  Hopefully on the 21st, you know, we'll have some better

12 news to report.  But assuming we'd litigate, we'd also like to

13 key up --

14           THE COURT: Right, yes, why don't you put in a letter

15 on May 21st, if you want to request discovery as well, put that

16 letter in.  What I envision happening, we can even, if you

17 want, we can set a date now or we can wait. But I envision you

18 know, in late May, just so, I don't know when Memorial Day is,

19 but we would have another conference call where we can discuss

20 all these things that I've seen and sort of figure out where

21 we're at.  And then I would start the process on that call,

22 maybe complete the process, but at least start the process, by

23 making any rulings on the scope of the discovery.

24           MR. KOSTOLAMPROS: I think it would be very helpful to

25 actually have a date set for a status conference, Your Honor.

1  Whatever may be before the Court at that point in time, so at

2  least we have it set.

3          THE COURT: All right, I would say, hold on.  How

4  about June 2nd?

5          MR. KOSTOLAMPROS: Sure.

6          MS. LEONARDO: That's fine with the Government, Your

7  Honor.

8          THE COURT: Let me just get a time.  Actually how

9  about June 1.

10         MS. LEONARDO: (inaudible)

11         THE COURT: I'm sorry, say that again.

12         MS. LEONARDO: June 1st is not good for the

13  Government, Your Honor.

14         THE COURT: I could do June 4 or June 7.

15         MS. LEONARDO: Either one of those are fine.

16         MR. KOSTOLAMPROS: Either one is fine for us as well,

17  Your Honor.

18         THE COURT:  Let's do June 7, at 2 p.m.  And

19  obviously, that will give time, if either side wants to comment

20  on any of the submissions on May 21st, you could put in a

21  letter sort of responding to any of these issues so I can get

22  more clarity going into the call.  All right?

23         MS. LEONARDO: Yes, Your Honor.

24         THE COURT: We'll say Wednesday June 2nd for that.  So

25  if there's any response to the letters that each side puts in

41

1  on May 21, we'll say June 2nd. And then we'll have the call

2  June 7th.

3          All right, thank you everybody, have a good day.

4          MR. KOSTOLAMPROS: Thank you, Your Honor.

5          MS. LEONARDO: Thank you, Your Honor.

6                      * * * * *

7          **C E R T I F I C A T I O N**

8          I, **PATRICIA POOLE**, court approved transcriber,

9  certify that the foregoing is a correct transcript from the

10 official electronic sound recording of the proceedings in the

11 above-entitled matter.

12

13 /S/ PATRICIA POOLE

14 TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: May 3, 2021

15

16

17

18

19

20

21

22

23

24

25