April 30, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Re: Compassionate Release under 18 U.S.C. 3582(c)(1)(A)
(Kenner Rebuttal to ECF No. 1022: government reply to ECF No. 1006)

Your Honor:

<mark>*DOJ's new policy statement under the CARES ACT...*</mark>

The DOJ Director Carvajal has recently confirmed to Congress that all BOP officers will be offered the COVID vaccine as of Mid-May.   To date, less than 65% of the BOP staff that have been offered the vaccine has participated in the immunization program.   The remainder of the staff, arguably the less vulnerable amongst the BOP throng will participate at an even lower rate (commensurate with the general U.S. population ratios)—further jeopardizing the risks of older inmates who like Kenner, are above the CDC high-risk age guidance, with BMI over 25 (like Kenner), and already suffering from documented brain fog, chronic vertigo, and neuro-degeneration: a CDC documented side-effect of COVID (like Kenner).  These are some of the "extraordinary and compelling reasons" typically associated with granting s.3582 motions by the Court: thru BOP advocacy or directly by detainees after the exhaustion of their administrative remedies (like here).

In recent Congressional testimony, Carvajal responded to California Senator Feinstein's allegations of inhumane conditions in the BOP by retorting that Prisons are not made for social distancing but rather the opposite.  Later in his Congressional testimony he said that prisons were made to contain people closely. Currently with the new guidance, the BOP (notwithstanding what the Courts can access independently) can consider low and medium PATTERN scores for home confinement.   Kenner has no appreciable incident reports in 7-½ years (90 months of incarceration), thus would qualify as a LOW PATTERN detainee (if detention facilities evaluated their population)—and critically a detainee with no violence associated with his indictment or incarceration.

Carvajal also affirmed the new guidance removes the BOP restrictions under the CARES ACT for detainees who have served less than 50% of their sentence—if the

1

BOP is considering advocating. Without "good time" credits and FIRST STEP ACT "anti-recidivism" class-credit calculations, Kenner has served 44.11% of his gross sentence in the harshest of BOP facilities: MDC—referred to before the 2019 power outage and 2020-21 COVID pandemic as conditions of a "Third World Country".[1] With the BOP calculations in concurrence with First Step Act ("FSA") credits and existing "good time", Kenner has served approximately 70% of his total incarcerated time, to date.

The government argued that a defendant seeking relief under s.3582(c)(1)(A) "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist[.]" *United States v. Gotti*, 33 F. Supp. 3d 613, 619 (SDNY 2020); see also *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant the decrease."); *United States v. Greenhut*, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. November 21, 2019) (defendant seeking relief under 3582(c)(1)(A) bears the "initial burden to put forward evidence that establishes an entitlement to a sentence reduction"). (*ECF No. 1022 at 5*)

And, ultimately the government reminds the Court that § 3553(a) factors are relevant to whether release is warranted; identifying 18 U.S.C. 18 U.S.C. 3582(c)(1)(A); U.S.S.G. § 1B1.13.

While 18 U.S.C. 3582(c)(1)(A) says that a court can reduce a sentence for "extraordinary and compelling reasons", it doesn't say what that means. Instead, it points to U.S.S.G. s.1B1.13 under the sentencing guidelines to define what criteria for compassionate release meet that definition. The problem is that s.1B1.13 was last updated <u>before</u> the FSA, and it still says that only the BOP can file a motion, which mainly focuses on medical reasons, just like the BOP's policy says—and the government thrusted as argument in their reply (*ECF No. 1022 at 5*).

> The contradiction has divided the courts on whether s.1B1.13 is still relevant for defining "extraordinary and compelling" under 18 U.S.C. 3582(c)(1)(A). See *United States v. Fox*, 2019 U.S. Dist. LEXIS 115388 (D. Me, July 11, 2019) (collecting cases on the split among the courts). For example, in *United States v. Cantu*, 423 F. Supp. 3d 345 (S.D. Texas 2019), the court found that s.1B1.13 "clearly contradicts" the new 18 U.S.C. 3582(c)(1)(A) amendments under the FSA, and that because Congress changed the statute to expand the

---

[1] Judge Cheryl Pollak of this District described MDC in 2016 as a "Third World Country"

use of compassionate release, the guideline "no longer fits with the statute and thus does not comply with the congressional mandate." See also *Haynes*, *supra* (noting "at least twelve other federal district courts" have held s.1B1.13 inapplicable under amended 18 U.S.C. 3582(c)(1)(A)).

Besides all of that, it should be noted that "the district courts have always had the discretion to determine what counts as compelling and extraordinary" for compassionate release standards.

Specifically since October 5, 2020 (Kenner's sentencing day), MDC conditions have deteriorated and 80% infection rates ravaged MDC, resulting in Kenner's 141 solitary confinement condition days thru February 22, 2021.

In opposition to Kenner's argument that 141 days of solitary should trigger a "sentence reduction" (separate from Kenner s arguments for exclusive home confinement thru compassionate release), the government vainly asserts a 10-month old opinion in *Chunn v. Warden Edge*, No. 20-cv-1590 (RPK), ECF No. 112 at 2 (June 9, 2020) ("Rather than being indifferent to the virus, MDC officials have recognized COVID-19 as a serious threat and responded aggressively.") Id. at 61 ("The record reflects that MDC officials recognize their duties to inmates and have taken extensive measures to combat the virus. The record also gives reason for cautious optimism about the effectiveness of those measures so far[.]")

Since this June 9, 2020 opinion (more than 500,000 COVID-19 deaths ago in the United States), MDC Brooklyn has been <u>more</u> infected than virtually any BOP facility in the United States. As such, the June 9, 2020 reference could not be more tone deaf. It is insulting to anyone who was locked in their 73 sq' bathroom (with a bed), *alone*, for 24 hours per day for over 4 months; without additional punitive measures required or expected post-sentencing by the Court. It also fails to consider the prodigious efforts of the staff and MDC officials, insulting those who did what they could—regardless of its ultimate futility.

The presentation of that June 9, 2020 fact, strictly opining from the cheap seats of the unencumbered world, is commensurate to citing a FAA Boeing 737-MAX 8 safety report from <u>before</u> March 2019: the first date, of several, 737-MAX 8 crashes when 346 people died, as the reason for "cautious optimism" and belief in the "effectiveness" of the 737-MAX 8 airplanes safety.

Truth be told, even MDC is not reporting all of their COVID deaths, unlike in the general public where any death that can be encircled into the COVID sphere are

counted to alarm the world—and govern by fear (a typical Marxist, Stalin, and Third Reich leadership style).   But at MDC, several "upper-respiratory" deaths have been reported internally amongst the staff—just not externally to the media.  See *Ex. 1* (the death of inmate Edwin Segarra—after a full night of banging on his cell door, begging for medical attention).  Already in the panicked living environment of 24-7 lockdowns, the majority of the detainees on Segarra's floor (like Kenner) witnessed the horrification of his dead body being removed from the cell and the indifference to detention life as another detainee repopulated his bed space within 24 hours.

Next, the government favorably cites that "there are currently zero inmate cases of COVID-19" (*ECF No. 1022 at 4*)—while failing to acknowledge that unit-by-unit testing has literally ceased since Kenner's last February 22, 2021 NEGATIVE COVID-19 result.   Yet—the inmate detention units are posted outside the entrance doors with ZOMBIE OUTBREAK warnings (*Ex. 3*)—humor (if so) lost on the confined.   In 2020, former President Trump was mercilessly attacked in the media for suggesting *less testing would result in less reportable cases*.  But—for MDC, the government espouses their innate genius in the "zero" infection report.    Assuming the MDC lock-down protocols are the intrinsic cause of going from 80% detainee-staff infections in December 2020-February 2021 to "zero", why would they need to continue to have MDC under the 23.5 hour/per day punitive environment (*Ex. 2*)—if the infection levels are "zero".  MDC detainees have also learned that the draconian quarantine restrictions are so abysmal that one would need to be suffering symptoms *far-beyond* any normally acceptable standard to alert MDC staff that they are symptom-prone, and request testing to trigger worse, hyper-quarantine conditions.

<mark>*Government continues to steer clear of the empirical and exculpatory facts...*</mark>
*(18 U.S.C. 3553(a) factors)*

Commensurate with the government's refusal to address exculpatory records that mitigate the conviction in their possession, delayed thru the pretrial late dump of Rule 16 records &/or prosecutorial and summation lies that were debunked thru *government-forfeiture-36* and *government-forfeiture-44*, because it would begin unpeeling their prosecutorial onion...the government in *ECF No. 1022* ignores the un-foreseeability of Kenner's 141 days of straight solitary confinement from October 5, 2020 thru Kenner's February 21, 2021 sixth, negative COVID-19 test, Kenner BMI factor, CTE brain fog/migraines, and a terminally sick person at home (without help available from others).

In addition, the 3553(a) factors raised 10-5-2020 are mitigated by overwhelming exculpatory evidence (submitted in part vis-à-vis *ECF No. 1006 at 9-25*)—and specific issues mentioned inconsistent with exculpatory records from the government's Rule 16 prod (*Id. at 25-33*)—not a re-litigating effort.

Since 10-5-2020 (Kenner's sentencing day), two reformative exposés have stunned the defendant (upon reading of the 10-28-2020 transcript weeks later). The reformative disclosures beg the question what effects these foundational and material statements would have had on the underlying trial proceedings and other witness testimony (*supra* at *ECF No. 1006 at 25-33*)—effecting 3553(a) factors and the Court's impression of Kenner's veracity not being "*ridiculous*" (*10-5-2020, sentencing H'rg Tr.78*). If disclosed to the defense and all potential witnesses pretrial, it would have been different (specifically including the government admissions of *government-forfeiture-36* and *government-forfeiture-44*).[2]

> Doesn't a *Brady* violation occur even when the evidence is delivered late so long as the delay created— a reasonable probability of a different result; defined as "probability sufficient to undermine confidence in the outcome . . . the question is not whether the defendant would more likely than not have received a different verdict, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *DiSimone v. Phillips*, 461 F.3d 181, 196 (2d Cir. 2006) (internal quotations and citations omitted)? Wayne's silence certainly carried a titanic weight on allegations— now promoted as not part of the indictment in the first instance.

---

[2] While the government sat silent during the myriad of known prosecutorial and testimonial misrepresentations, they specifically ignored what IRS Agent Wayne <u>knew</u> and later <u>confirmed</u> during his post-trial, 2016 testimony about Kenner's two Baja Ventures 2006 partners: Stumpel and Lehtinen's $4.1 million capital account contributions:

> *Q: Would you kindly take a look at Page 2 of **Kenner Exhibit F-2**? The third paragraph. Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas?*

> *A [Wayne]: Yes.*

> *Q: What is your recollection of that, sir?*

> *A [Wayne]: That Kenner borrowed the money from Jozef Stumpel and Jerry Linton [sic].*

The Baja Ventures 2006 were 100% *untainted* nor *ill-gotten*. They were <u>not</u> stolen from the Hawaii project as the government berated during summations at least five times (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*); see also *ECF No. 1006 at 21-22*.

The government's forfeiture disclosures verified FBI agent "Matt" Galioto lied to the Pecas (and others: see Stumpel 2017 affidavit *ECF No. 4 at 6, ¶17*) per Kristen Peca's 2012-FBI recording:

> [Kristen Peca]: *Matt told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy.*[3]

**The 10-28-2020 hearing reformative statements...**

Thru Probations July 2016 (post-trial) addendum, they referred to Mexico uber-developer as an "*innocent victim*"—echoing what the Court knows is now false despite the government's opening remarks of Jowdy-innocence (*Tr.31*), as did Jowdy in his loquacious 2016 affidavit to this Court chock-full of documented lies (*ECF No. 432*, highlighted by Jowdy declaration [*Ex. 5 at 7, f.4*]).

In typical government protocol, even Jowdy's counsel, McSouther ("McC") identified Galioto's graft (after years of protectionism) in his December 2016 submission:

> "*On August 21, 2015, the Court signed the Protective Order, ex parte, based on the declaration of Agent Galioto.  As described [], Agent Galioto's declaration was conclusory, unsupported by evidence, and factually inaccurate in its description of Jowdy.   Moreover, even assuming Agent Galioto was unaware of the correct facts at the time he signed his declaration, he made no effort to advise the Court of the proper facts once they became known.*"

McC's 2016 statements to the Court echoed the surprise Kristen Peca had after confronted by Kenner about the "*stole[n]*" Hawaii funds, *supra* (that were never stolen—see *government-forfeiture-44*).   Furthermore, the Court should acknowledge the government shocked the proceedings 10-28-2020 by declaring the government never charged Kenner with transferring the Hawaii loans to Jowdy (juxtaposed as "*Mexico*"—*infra*) (*10-28-2020, H'rg Tr.37*):

> [Government]: *Your Honor, as you're aware, the crimes that were charged did not include the crime involving the funds that went to the resort.   The government's investigation was expansive, certainly took a number of years, and the government takes its time...the government or course as you know is*

---

[3] Kristen Peca (on the 2012 recording) **exhibited no concerns for the loans to Jowdy**, merely alleging Kenner "*stole*" it and never gave the known-loans to Jowdy—*yet still untrue*...

> *required to do significant investigation and make sure that its position is justified.*

> [Court]: *I was going back to say your position is <u>the government didn't know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?</u>*

Jowdy's declaration tried to highlight another Galioto factoid that Kenner "*stole*" the Hawaii funds despite their forfeiture evidence confirming the prejudice trial position was "*conclusory, unsupported by evidence, and factually inaccurate*" (again)—because for years, Jowdy's cabal with Galioto were focused on the same goal: make Kenner the scapegoat for the Jowdy thefts.

Jowdy espoused his innocence in 2016, bellyaching (*Ex. 5 at 2*)—while the government did nothing with his perjurious submission (if known):

> [Jowdy, 2016 declaration: *Ex. 5*]: *"I firmly believe, however, that the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated and promoted by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints."*

But they did know—and ignored it to frame Kenner's indictment and prosecutorial strategy.   The government's star-witness, John Kaiser, although dealing with chronic selective amnesia at trial about Jowdy being a "*thief*", was impeached in part by his audio recording (*Tr.1258*).  Yet—one could still have argued that the government was not aware of Constantine's surreptitious recording of Kaiser calling Jowdy a "*fucking thief*" repeatedly—and avoiding clear *Napue* issues before this Court—according to Kaiser's snaking testimony.

Kaiser affirmed—*as a 2015 Jowdy employee*—that he still did not believe Jowdy was a "*thief*" (*Tr.1230-32, 1236*):

> *Q. So when you're told this information, you believed that Mr. Jowdy had stolen money?*

> *A [Kaiser]: No.*
...

> *Q. ...Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?*

*A [Kaiser]: Yes.*

But—the government defense finally cracked (5-years later—and conveniently post-sentencing) when Kaiser opined 10-28-2020, triggering clear *Brady* and *Giglio* violations by the government—and creating the exact reformative issues that would have effected the trial proceedings (leaving a verdict lacking confidence) and a sentence that was prejudiced by known perjury (*Napue* violations).  Material elements of the case have clearly changed.

Kaiser explained the *egregious* Jowdy thefts to the Court on October 28, 2020 (*H'rg Tr.47-50*):

> [Kaiser]: "*And I was treating it like an investigation, just like I was a police officer, and I was uncovering everything.  And then I go to the government and say it's a crime what's going down there.   He's stealing millions of dollars.*"

And Kaiser confirmed he

> "*actually audioed, videotaped*"…"*Jowdy and company, including his attorneys, Fernando Garcia, accountant, Antonio Marques.*" (*Id.*)

And notified the FBI and government

> "*in 2013*" (*Id.*).

Kaiser's 2020 courtroom brashness overlooked he was impeaching his-own 2015 trial testimony denials about his former employer, Jowdy (*Trial Tr.1229-30, 1236* [denials]*,* impeaching recording played at *Tr.1258*, and final perjury-hedge thru a word-vomit-like reply, *Tr.1313-14*).

By the time the government responded to Kenner's 18 U.S.C. 3582(c)(1)(A) motion for (a) a reduced sentence or (b) home confinement in February 2021, the government was aware of the reformative statements made 3-months earlier: 10-28-2020.   Yet—the government emphasized, notwithstanding the documented "extraordinary and compelling" issues for Kenner and his significant other (See Grissom letter—under seal):

> "*Nor does he identify anything that has occurred since sentencing that s of such gravity as to justify the Court sitting that sentence…*" (*ECF No. 1022 at 9*)

They are deaf and grossly incorrect.

In the context of American jurisprudence, it is normal for the Court to show compassion at sentencing for criminals who quickly admit to their indictments (guilty or not) and beg the Court's forgiveness for their transgressions; more likely than not for falling under a dependency of alcohol &/or drugs—leading to their compromised decisions.   That is not this case.

Here, Kenner worked tirelessly to recover investment funds from business partners since 2003 (discussed *infra*) *who did wrong* (like Jowdy and Constantine)—once Kenner, himself, or others discovered their graft.   Kenner led these related legal efforts from 2006 thru 2015—despite the government's allegations that Kenner was eventually complicit with both of them to defraud his investors—opposite every documented action and transparent disclosure for years, with and without independent counsel for the investors.   In that vein, one of the investors' independent attorneys, Michael Stolper, acknowledged this transparency to the SEC—after completing 24-hours of Kenner SEC deposition[4]—positing (*Ex. 6*) (*Bates stamp: TR-SEC000426*):

> [Stolper, August 2011]: *"The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

> ***And I think that the conversations that I have been a part of****, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal, and Constantine] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct*

---

[4] The SEC and FBI investigations were triggered by Jowdy's cabal and predicted in April 2009 by attorney Harvey and sued for extortion (*Ex. 9*) after Harvey's October 2008 threats failed versus Kenner and Kenner investors (*Ex. 8*).

*communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning. Just a point of information."*

Just months later in consistent context, Giuliani's partner Stolper told his Eufora clients "*January 31, 2012*" (*Ex. 7*):

[Stolper]: "*I've also notified the SEC about our New York lawsuit and Constantine's federal crimes. I know that I've compressed a lot of information into a short email. Feel free to reach out to me if you would like more detail or if you have any questions. Rest assured that I will not let this guy off of the hook for what he's done to all of you. Michael*"

The simple—yet specific exculpatory submissions—raise issue after issue of government-witness veracity with their-own inconsistent previous statements—all contributing 3553(a) factors under the weight of the evidence (*ECF No. 1006 at 9-33*).   Kenner was forced into ProSe representation based on three consecutive CJA counsel's repeated refusal to meet-and-confer with Kenner regarding the defendant's desire to challenge evidentiary and legal issues in the instant case. Each CJA counsel claimed their non-actions were based on not wanting to prolong the proceedings: while consistently citing their experienced expectations of a "*time served sentence…but not more than 5-6 years*" and clear appellate issues to address sooner than later.

In ProSe—Kenner's submissions cannot be considered anything more or less than private counsel would be expected to advocate for under his or her obligations as an Officer of the Court.  As such—Kenner advocated vigorously with empirical and exculpatory evidence; never asking the Court to weigh any submission based on Kenner's *he-said-she-said* posture to challenge the testimony-only prosecution of recollections.

Chronic Traumatic Encephalopathy ("CTE"):[5] Once confirmed thru social media postings and corroborating legal research, in 2018 for the first time, Kenner

---

[5] **CTE** is Chronic Traumatic Encephalopathy.   The primary symptoms of **CTE** have been described neurological experts, including Dr. Anne McKee at Boston University's Neurological Center as:
*"CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as cognitive dysfunction, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of*

highlighted for the Court the <u>new evidence</u> of various investors' CTE symptoms (meeting the Court's ire for facts discoverable in the public forum: *10-5-2020, sentencing H'rg Tr.77*) (*ECF No. 788 at 38-39*—et.al.).  But, Kenner never presented CTE evidence until long-after the government first-raised it in their January 18, 2017 "*confusion, mistake, or faulty memory*" justification of documented inconsistencies by their witnesses at trial (*ECF No. 440 at 16*)—the exact and scientifically documented symptoms of CTE.   Kenner first discussed the turning-point issue 19-months post-trial;[6] more than 13 months past when the Court's "*practice usually is for the sentencing to take place six months or so after the trial*".[7]   Most significant is the government <u>never</u> argued their witnesses testimonies were truthful, just inconsistent based on stupefaction or other factors.

*Remorse was defined differently here...*

Kenner exemplified it with his willingness to keep fighting with Jowdy and company under threats from Galioto and Jowdy's attorneys to serve prison time if Kenner opposed Jowdy on behalf of himself and his investors.  In May 2007, shortly after discovering the joint, Jowdy, Lehman Brothers embezzlement plans (separately and collectively) and confronting all of the guilty parties, Jowdy's attorney, Najam, sent an email to Jowdy highlighting Kenner's adversity to their bribes: "*The last thing you need is a conflict situation with another partner*" (*Ex. 10*).   Years later and even after Kenner's 2010 Mexico jailhouse near-death torture of 3-4 days—and the subsequent murder of the investors Mexico attorney who rescued Kenner, Kenner returned a dozen more times to Mexico (mostly under Mexico federal protection and private security) to file criminal litigation and solve the Jowdy loan thefts and resort budget embezzlements (with Lehman Brothers and eventually Danske Bank complicity).   Jowdy's (2011-17) co-conspirator, Kaiser, corroborated Kenner's decade-long verifications and re-exposed this for the first time publically as an insider in his February 2019 letter (*ECF No. 628*)—and *astoundingly* post-sentencing on 10-28-2020.   Kaiser announced that he exposed the Jowdy crimes "*in 2013*" to

---

*anger, and* <u>dementia</u>, *among others. Until recently, CTE could only be confirmed through an autopsy.* **Tau proteins are released whenever concussion occurs.***"*

[6] Kenner raised the CTE issues to trial counsel in 2014 (pretrial)—including referencing necessary communication with Dr. Ann McKee as a memory expert.  It was ignored.

[7] The government defended their witnesses, relying on opinion that: "[a] witness perjures herself when 'she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

the FBI/government. How were Kaiser's "*2013*" corroborations of Kenner then-six years of exposés about Jowdy crimes not enough to draw federal attention to Jowdy? Why was the government/FBI not interest in the Jowdy criminality while knowing the assertions about Kenner at trial (*Tr.31*—et.al.) were falsely based? Their star-witness and Jowdy insider confirmed it—thus not *ridiculous*.

Note: Kristen Peca commiserated with Kenner during her 2012 FBI recordings about Kenner's jailhouse beating, the murdered attorney—and the unpaid Jowdy loan angst by her husband and the "*other guys*":[8]

> [Kristen Peca]: *"…maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed. Its too scary.* ==*Michael and I can't thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes*==*. I know how mad Michael and the other guys are with Jowdy for not paying the loans back. Who does that??*"

Perhaps—Kenner's "remorse" (per government definition) should have been to ignore the truth of history thru empirical and exculpatory records submitted to the Court, fall on the sword of guilt thru false assents to this Court, and cry a river of *crocodile tears* to satisfy the grave burden of *forever guilt* Kenner will not outlive; only sedated by a future drug &/or alcohol addiction. It bears no merit.

In contrast to a conspiracy-man, Kenner's immediate actions were to expose Jowdy's non-payment and embezzlement plan and sue him immediately. The lawsuits began in 2007 (in Mexico) and continued in the USA starting in 2008 (Nevada, Arizona, and California) with the full knowledge and Plaintiff status of the investors (ironically continuing in Delaware in 2014—after the Kenner indictment and in Mexico thru 2015).[9] Separately on behalf of the similar investors, Kenner

---

[8] In 5-recorded hours for the FBI in 2012, Kristen Peca <u>never once</u> mentioned a concern for Kenner "*hiding in a cave*" (*Tr.712*)—or not being able to find Kenner at any point in time; notwithstanding the years she described (2009-2010) has over 1,200 texts between Michael Peca and Kenner, over 100 emails, 6 face-to-face meetings between Michael Peca and Kenner, September 2009 vacation plans at Kenner's Arizona home, a January 2010 California mediation with Jowdy with Michael Peca and Kenner present, and a 10-day multi-visit stay in Vancouver Canada during the February 2010 Olympics (all empirically documented)—*but Kristen Peca could not find Kenner?!?* (all in Rule 16 production)

[9] Galioto arrested a individual for obstruction of justice to stop the Mexico litigation in 2015 versus Jowdy, brought by Norstrom (*ECF No. 668 at 21*), Murray and others. Norstrom's 2015 Mexico affidavit, similar to Murray's, affirmed:

cooperated immediately with the Giuliani/Stolper investigation of Constantine and Eufora in 2010.

These are the distinctive characteristics of a <u>leader</u> who cared enough to lead legal efforts against business partners whose private-equity deals had gone horribly wrong (juxtapose the legal efforts as remorse). The government has described (and perhaps adopted by the Court) Kenner as a person who one would believe actually stole the $14 million (or whatever new amount of the day they are now proposing)[10], dissipated the funds on personal lifestyle rubbish, and begged for forgiveness once caught for the traceable criminal acts. None of the typical stigmatisms occurred here.

Legal framework...

**Show me a businessman and I will find you a crime**. Former U.S. Attorney for the State of Utah, Brett Tolman, used to boast, "*Give me the executives of any company and I could prosecute them for a federal crime*".

---

*"Hawaii loan:*
*In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawaii would lend him some bridge funding **personally** until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.*

*As a group, we agreed to lend him funds at a 15% interest rate. Jowdy signed an official loan agreement with us in December of 2004. Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans. In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the 'investments' he declared as his defense in the case. **Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received**. Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."*

[10] Shorty after Kenner's 2013 indictment and arrest, Berard was quoted in the NY Daily News by Jowdy's pay-for-play reporters that the Kenner embezzlements according to Berard and the FBI could run as high as $80 million—perhaps to preemptively prejudice a future NY jury.

As the Court is aware, cases can be found to support literally any legal position in this over litigated environment.   Even though the Compassionate Release options are in the Court's hands (release to home confinement—or a modified, reduction of sentence for extraordinary circumstances: compensating for the unforeseeable and punitive solitary confinement period after 10-5-2020), the government cites the BOP Program Statement 5050.50; noting the "limit [of] compassionate relief to cases of serious illness or impairment…or need to care for a child, spouse, or registered partner."  Assuming some of the BOP guidance is considered or parallels the Court's analysis, see ***SEALED letter from Marlene Grissom***.

With respect to the request for a sentence reduction (either home confinement or reduction of remaining time based on the confluence of events not foreseen by the Court at the time of sentencing)—Kenner specifically identified these issues, while the government proposes that no "extraordinary and compelling" reasons exist. They are wrong.

*Denial of request*: As example, the government cites *United States v. Stitsky*, No. 06-CR-357 (KMW), 2020 WL 7488065, at *2-3 & n.4 (SDNY December 14, 2020).   Judge Woods denied release for an inmate who served less than 15% of the sentence imposed (referencing a sentence of 85 years).   In contradiction, Kenner practically served 15% of his ultimate sentence by the end of his 2015 trial (nearly 6-years ago).  Yet—Kenner has remained in the short-term, maximum security, detention conditions for the subsequent 70 months (to-date) as a LOW RISK detainee, and no disciplinary issues.   Contrast that with the average detainee who goes to trial and the sentencing "*practice usually is for the sentencing to take place six months or so after the trial*" (*10-5-2020, Sentencing H'rg Tr.32*), noting the Court "*wasn't blaming [Kenner] for the delay*" (*Id. at 104*).

Ultimately, the Court posited sentence day, "*I have also considered the need to avoid unwarranted sentencing disparities among similarly situated defendants*" (*Id. at 95*); while imposing a sentence of 7.5 years less to co-defendant, Constantine, with a greater criminal history (Kenner having zero) and Constantine's receipt of over 90% of the alleged "proceeds" traced to the instant allegations (typically afforded to the leader of the conspiracy, discussed *infra* in 3553(a) factors; see *Osmanson*). Following the direction, and words, of the Court during Kenner's sentencing, the government reasoned that Constantine's sentence should be commensurate with Kenner's 204 months (or as close as his guidelines would permit).   The government also quoted "*the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*" 18 U.S.C. § 3553(a)(6). (*ECF No. 946 at 3*).  This did not occur, in fact, while Kenner was subject

to the "*Third World*" lockdown conditions at MDC (141 days of solitary confinement—notwithstanding the ongoing 23.5 hour lockdowns/per day, since), Constantine was permitted to self-surrender at a minimum-security facility. No greater contradiction of sentence could be imaginable (perhaps). The government even highlighted that "*Constantine cannot argue any basis for mitigation at sentencing due to conditions of confinement*" (*Id. at 5*)—further highlighting the disparate sentences.

*Granting of request*: Granting compassionate release in *United States v. Vondette*, No. 97-CR-1010, 2007 U.S. Dist. LEXIS 27627, 2007 WL 1120432, at *1 (EDNY April 13, 2007) (Platt, J.) aff'd, 351 F. App'x 502 (2d Cir 2009), the *Vondette* Court noted the defendant was convicted and sentenced for his direct involvement in "one of the world's largest drug smuggling enterprises" having a street value of at least eighteen million dollars ($18,000,000)." The Court opined that " It is thus true that the 'severity of the [Defendants] conduct remains unchanged;' however, the 'environment where [he] is serving his sentence' has certainly changed." *United States v. Zuckerman*, 451 F. Supp. 3d 329, 336 (SDNY 2020) ("When the Court Sentenced [defendant], the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of illness or death' brought on by a global pandemic." (quoting *United States v. Rodriguez*, No. 03-CR-0271, 451 F. Supp. 3d 392, 407 (ED Pa. Apr. 1, 2020))).

In *United States v. MacFarlane*, 438 F. Supp. 3d 125; 2020 U.S. Dist. LEXIS 65509 (April 14, 2020), Judge Gorton reduced the sentence to time served while opining, "*two-week confinement in solitary quarantine in a higher security facility is the equivalent of two months in a Camp.*" Here, Kenner endured 141 days (20 weeks and 1 day), immediately following sentencing before re-entering the institution-wide 30-minute/per day regimen for family communication (emails and phone calls), recreation (exercise), and shower—all in 30 minutes (*Ex. 2*).

The Court is virtually unfettered with legal precedent to support its decisions (either way), highlighting the crucial need to consider every changing element here, including but not limited to:
   (1) Kaiser's post-sentencing reformative proffer (10-28-2020);
   (2) The government's stunning affirmation of the indictment non-issues (10-28-2020—post-sentencing);
   (3) The inarguable empirical and exculpatory evidence Kenner provided the Court in contradiction to the government's testimony-only prosecution—based on "confusion, mistake, or faulty memory" (*ECF No. 440 at 16*); and

(4) The 18 U.S.C. 3582(c)(1)(A) factors which Kenner personally satisfies and those of his significant other of nearly 15 years.

*3553(a) factors...*

As Judge Gorton found in *MacFarlane*, *supra*, the Court should find that
>  in light of 1) the COVID-19 pandemic and the national emergency declared by the President of the United States; 2) the particular risk of infection and transmission risk in penitentiary [maximum security] facilities; 3) the fact that the defendant is a non-violent first-time offender who does not pose a danger to the community; and 4) the fact that he has been subject to a quarantine in solitary confinement at a high security facility, there exists extraordinary and compelling circumstances which warrant a reduction in sentence [not foreseeable at the time of sentencing].

In contrast to Kenner's unduly harsh conditions that violate the Due Process Clause of the Fourteenth Amendment, the government advocates for the BOP's (specifically at MDC) "*mitigation protocols*", citing "*Each of his tests has been negative—anecdotal evidence that the BOP's mitigation protocols at MDC have been effective as applied to the defendant*" (*ECF No. 1022 at 7*).   Perhaps, if the Court is conned by these irrational presumptions, on appeal the government could seek that Kenner serve the remaining year of incarceration in solitary confinement to "*anecdotal[ly]*" avoid the COVID-19 virus that still infected 80% of the detainees during the same "*mitigation protocols*" and led to the death of detainee Segarra (*Ex. 1*) and others.  Perhaps the "*ZOMBIE OUTBREAK*" sign was not strategically placed in Segarra's unit? (*Ex. 3*)

Leadership: In *United States v. Osmanson*, related to leadership and culpability, the Second Circuit referenced activity by a potential leader from *Osmanson*'s court records, the exact opposite than what Kenner exhibited, when the Court remarked:
> "So, again, I feel that it's a close question but I think that Mr. Osmanson was the center of the fraud scheme, that he recruited other professional who acted in concert with him, that they were licensed professionals who committed criminal or certainly unethical acts to **increase their joint profits**.   I feel that they were joint conspirators with him." (*United States v. Osmanson*, 2014 U.S. Dist. LEXIS 156247, at 165:20- 166:1)

Nevertheless, the *Osmanson* Court opined it to be a "[v]ery close" question, but elected <u>not</u> to impose the four-level enhancement.    For Kenner, there were no recruited professionals (FINRA governed or otherwise)—criminally culpable in the

allegations, and nothing Kenner did *increased his profits* considering there were no accountable *ill-gotten gains*—the ultimate *fruits of the crime*. Less than $280,000 loan repayments resulting from Gaarn and Constantine's 2008-09 Eufora private stock sales were "proceeds" traced to Kenner (arguably legal—and thoroughly vetted by the investors attorneys)[11] (*ECF No. 815 at 32-34*), contrary to the government's allegations of upwards of $80 million in frauds "*for Kenner's benefit*".

Ultimately, even with Constantine's involvement in some alleged secret scheme, the probation and government fail to explain that there was adequate evidence that Kenner exercised "control" over Constantine or was responsible for organizing Constantine in carrying out a crime.

As such in *Rajrajratnam*, the Second Circuit has held that persons cannot "be considered 'participants' within the above guidelines definition of that term where there is no indication in the record that they would be criminally liable." *United States v. Ware*, 577 F.3d at 453. It follows from the definition of a participant as someone criminally liable that "[i]n assessing whether a criminal activity 'involved five or more participants,' only knowing participant are included." *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir 2000).

Kenner's role (if any) is clearly similar with argument in *United States v. Holden*, 2018 WL 3580122 -- United States Court of Appeals, **Ninth Circuit** (No. 16-30186 -- Argued and Submitted June 8, 2018—Portland, Oregon -- Filed July 26, 2018) where "Defendant [Holden] did not exercise sufficient control or organizational authority over co-conspirator to qualify for...'organizer' sentencing enhancement to his sentence for mail and wire fraud, conspiracy to commit mail and wire fraud, and money laundering, **where co-conspirator was only other participant in conspiracy** to defraud investors in refinery project, **co-conspirators were co-equal conspirators** [if at all in the instant case], **joint venture agreement** between

---

[11] The government was aware that Gaarn proffered to the FBI in 2012 that he received over $200,000 in loans from Kenner and repaid him Kenner a portion of the personal loans (*3500-TG-1-r at 3-4*). Gaarn's stipulated banking records verify that the only wire transfers he ever made to Kenner are derived from the proceeds Gaarn received from selling his Eufora private stock—none other.

So, despite Gaarn's trial testimony that his sales and the transfers to Kenner were not related to his previous loans (*Tr.2581*—also failing to recall his FBI proffer, per the FBI raw notes presented to him: *Tr.2582*), *adequate preparation by trial counsel*, with a forensic accounting of Gaarn's banking records, would have exposed Gaarn's inconsistent previous statements—and eliminated any other possibility (then or now).

defendant and co-conspirator specified that their companies **would split profits from project evenly**, and defendant's instructions to co-conspirator for sending investors' funds to defendant's accounts was more akin to facilitation than organization."

Note: Kenner <u>never</u> benefitted from the Hawaii consulting payments to Constantine, nor the 2004-06 Hawaii Jowdy loans (actually contributing personal capital himself to the transactions—further defying the premise of the transactions' illegality). Kenner played a smaller role than the *Holden* Court's description—who was documented to *split* profits...yet, *Holden* was <u>not</u> deemed a leader for enhancements—highlighting a seriousness of the offense characteristic absent in the instant case.

Coupled with the empirical and exculpatory records previously presented (*ECF No. 1006 at 9-33*—et.al.), merely offered to mitigate the Court's distorted impression from years of misleading government rhetoric and constant avoidance of Kenner's submissions: avoiding the empirical and exculpatory challenges at every cost—the reality is that at every turn (without exceptions), <u>Kenner was the leader</u>; but **just the kind investors want**.

Kenner acted exactly as the Business Manager the investors expected and repeatedly led legal recovery efforts with independent counsel for every passive, private-equity transaction where wrongdoing occurred (the Jowdy and Constantine issues; only relevant here—while several other litigations versus private-equity scandalmongers occurred).

- Perhaps—unaware to the Court, in 2003 Kenner risked his Business Management career by suing his former employer, Assante Asset Management (a subsidiary of a billion dollar Canadian publically traded firm—with endless legal resources), for stealing from his *same* investors thru a ghosted mutual fund schemes.   To force a settlement, Kenner walked away from millions owed to him by Assante to effectuate a similar litigious strategy versus wrongdoers: a <u>client-first protective stance</u>.   Assante settled out-of-court with Kenner and the investors were all released from their agreements—saving the investors millions in illegal ghost fees that Kenner discovered and exposed.   <u>That is the epitome of a leader</u>.

*(Wasting argument on un-related medical issues [ECF No. 1022 at 7]: clearly in contradiction to reality of the Pandemic and MDC medical shortcomings)*

During a NYC red zone alert period and 24/7 MDC lockdown with MDC COVID-19 rates at 80% institution-wide, MDC medical staff attempted to escort Kenner to a Manhattan ENT specialist to "tune Kenner's hearing aids" (for the 3rd time in the last 3 years.   Kenner has never been issued the hearing aids, in the first instance—so what would be tuned?[12]

After Kenner's face-to-face meeting with the head of MDC medical, 1-27-2021, Bruce Bailor MD: documented "*inmate refused medical trip...audiology offsite trip*"—failing to comprehend that MDC has <u>failed</u> for years to issue the same hearing aids. Following the inaccurate documentation (but more normal than not—see Dr. Homer Ventners MDC evaluation[13]), on 3-11-2021, NER-Regional Medical Director, Diane Sommer MD: documented "*inmate refused the audiology consult...was scheduled for a ENT consult following audiology exam...will cancel this consult as there is not testing to review at this time*" <u>without addressing the absence of the actual hearing aids</u>.

Why is the government raising the issue in the first place?  Was Kenner supposed to accept the nonsensical trip during the apex of the COVID catastrophe in NYC and at MDC and proverbially "bend over" and go to the 7th or 8th outside appointment to test and tune the hearing aids?  The BOP, not Kenner, has failed for years to deliver them after the first auditory specialist recommended them and the MDC medical staff approved them.   5-6 useless trips to the external-ENT specialists followed the non-production of the hearing aids (pre-pandemic).  Perhaps, Kenner would appear in more favorable light to the U.S. Attorneys if he had gone to the appointment (again) without the actual devices—and then endured another 3-weeks in solitary confinement quarantine (a far harsher condition that being locked in one's normal cell where access to one's Bible, Torah or Quran and commissary food exists).   The sheer lunacy of the suggestion verifies the "attack on any grounds" approach to the

---

[12] It was less absurd to think they could "*tuna fish*" during the external medical trip than they could tune Kenner's hearing aids <u>that he was never given</u>.

[13] See case 1:20-cv-01590-RPK-RLM: Dkt 72-1, filed 4-30-2020.   Dr. Homer Ventners, former Deputy Medical Director of the Correctional Health Services of New York City, conducted a "guided tour" evaluation of MDC on April 23, 2020.

entire case, built on and later defended by "confusion, mistake, or faulty memory"—**never the truth**.

Similarly, while offering, "*The motion does not allege anything that has happened between October 2020 and today that render's the Court's prior conclusions erroneous*" (*ECF No. 1022 at 2*)—they disregard the 80% infection rate at MDC despite the 24/7 lockdown protocols they cite as "*cautiously optimistic*" temporally out-of-order.

> Kenner's solitary confinement conditions were without sunlight, exercise, and other basic human needs (lifted February 22, 2021, yet still allowing insufficient time for basic human activities and family communication). Concurrently—dozens of inmates submitted to suicide watch protocols under these humanely abusive conditions—"*with approximately 80% COVID-19 contamination amongst the staff and inmates*." (*ECF No. 1006 at 1*)

The government offered, "*Compassionate Release applications are not the proper forum to litigate Kenner's long-standing complaints about witness credibility and evidence sufficiency*" (*ECF No. 1002 at 3*)—but they disregard, the Court called Kenner's testimony and submissions "*ridiculous*" while defending cherry-picked government-witnesses were "*credible*" indirect contradiction to Kenner's empirical and exculpatory submissions.

> Note: the government replied to a mere subset (perhaps less than 10%) of the total evidentiary submissions post-trial, while barely, if at all, addressing the details of their witnesses perjury, moreover referring to the voluminous inconsistent testimony as "confusion, mistake, or faulty memory"—**never the truth**.

Kenner's credibility and witness veracity issues (for any number of possible reasons, previously argued)—juxtaposed as "*long-standing complaints*" are the critical 3553(a) factors that determine the level of culpability of any defendant (Like leadership).  Thus, they carry enormous relevance here, and the government cowers from every evidentiary challenge Kenner has brought forth, the least of which is their star-witness Kaiser, who outed the government for *Brady* and *Giglio* violations (conveniently post-sentencing: *10-28-2020, H'rg Tr.47-50*).

• That changed several reformative dynamics that remain unaddressed.

The Second Circuit opined in *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that

> "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act.  The considerations under *Brady* and *Giglio*, however, are quite different.  *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information.  The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."

Clearly—this has not been addressed; affecting every case element from pretrial preparation until today.

Incrementally—the government shocked the conscience (and maybe befuddled the Court) when they affirmed Kenner was not charged with funds that went to Mexico as part of the Jowdy-Hawaii loans (*10-28-2020, H'rg Tr.37*).  That was clearly not the Court's impression six years post-trial (and the jury)—more likely than not by the government's cautious design during trial.

First—the government knew they could not dare to present that pretrial allegation with nearly every Hawaii-Mexico investor (none opposing) who had given under oath testimony that they were aware and authorized the transactions in the private-equity deal (that the corporate control documents already authorized)—and participated in multiple lawsuits to recover the exact same loans.  Note: zero of the alleged misappropriated funds are paid to Kenner, directly or indirectly; and

Second—Grand Jury testimony plus Arizona, California, NV, Delaware, and Mexico litigation identified the exact same loans as authentic yet unrecovered.  The authenticity has been repeatedly verified thru testimony in Jowdy's FBI proffers and California deposition admissions.  The admissions alone would warrant an indictment for anyone who wasn't *above the law* and protected (by someone).

Despite star-witness Kaiser's trial testimony that defended Jowdy's impeccable honor and integrity, he submitted to this Court in February 2019 his umpteenth revised position that (*ECF No. 628*):

> [Kaiser]: "*Jowdy has told me that 'the hockey guys will never see a dime' because they said he was a crook*".

Kenner identified this to the investors in 2006 (15 years ago) and sued Jowdy immediately in Mexico—and following failed mediation efforts (thru Kaiser and Constantine: *10-5-2020, Sentencing H'rg Tr.55*) in the USA.   Hawaii Attorney Madia explained to the Hawaii—Mexico investors:

> "*Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy. They want to negotiate with Jowdy through Tommy.   You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on."*

John Kaiser protected the investors from recovery—yet again (like his Eufora interjections [*Tr.1065-67*] and his Diamante, 2018 Silverpeak interference [*ECF No. 628 at 2*]), voicing contradiction to Kenner's specific recovery attempts (a.k.a. legal remorse).

<mark>*Danske Bank's failed settlements…*</mark>
*(Highlighting where the frauds have really been)*

Ironically—just like Kenner's 2006 exposé of the Jowdy cabal thefts and perceived protection 15-years ago (documented by Hawaii counsel, *supra*), the government received an update from the Danske Bank attorneys: April 2021.

The letter to the Court highlighted the inability to negotiate a settlement between Jowdy-Danske and the $2.3 million CSL Properties 2006, LLC investors (still having zero to do with the instant case and questioning why the Court is involved without a Jowdy-Danske-Bhatti-Lehman Brothers indictment).   To no one's shock, the useless efforts to settle *anything* have reiterated the 20-year plan by Jowdy and attorney Harvey: steal the donut and leave the (worthless) donut hole to fight over.   The proverbial donut hole has a $200 million (or so) debt.  Jowdy has received $225,000 per month for nearly a decade while bankrupting the place.   This is what Kaiser wrote the Court in February 2019 (*ECF No. 628 at 4*)—10-years after Kenner's identical proffer in 2009.  Kaiser also confirmed that he exposed (from the inside) the Jowdy crimes "*in 2013*" (*10-28-2020 H'rg Tr.47-50*)—but Galioto (protecting Jowdy's crime cabal at the time) and the government failed to act to protect these same investors "*in 2013*"—clearly out of fear for repercussions they were unwilling to stand-up to…like Kenner did for years on behalf of the actual investors: investment-by-investment.

The good news is that according to Danske Bank, there is a potential buyer to sort out the Diamante Cabo default situation with Danske.   Silverpeak (investment

company) appears ready to step in and buy the distressed property.   This is where the Diamante Cabo completes its scheme.   Silverpeak is owned/managed by Masood Bhatti, the former and original Lehman Brothers lender to Jowdy and Diamante.   Collectively at the 2006 closing, they absconded with the $17 million finder's fee while eliminating the $7 million Jowdy Hawaii-loan repayment they confirmed prior to Kenner and Kenner investors signing off on the deal (*ECF No. 668 at 96, f.47*).   Kenner outlined the first few millions robbed by Jowdy-Bhatti thru the original Cabo loans in 2006 (*ECF No. 667 at 13-4*), the racketeering thefts to fund the next Jowdy-Bhatti project in Tennessee (*Id. at 15-16*), the Jowdy-Danske documentation of $8.4 million Jowdy capital contributions (versus the truth of zero) excluding Kenner and Kenner investors (in Baja Ventures 2006 and CSL Properties) (*Id. at 16-17*)—and millions more (grossly documented in *ECF No. 667*).   Since then, Kaiser represented to the Court (from the Danske funds):

> [Kaiser]: "*Jowdy didn't tell the Court that Silverpeak is a company run by his close friend Masood Bhatti, of that Jowdy was paying Diamante funds to Silverpeak $150,000 to $200,000 every month to find "investors" or "loans" for Diamante.*" (*ECF No. 628 at 2*)[14]

As the government glad-hands anyone related to Jowdy, to the detriment of the Diamante investors (CSL, Baja Ventures 2006, Kenner and others), Bhatti and Silverpeak expect to buy out the distressed Danske debt and finally get rid of the last of the Kenner investors.   There 20-year scheme to rob over one hundred million (and keep going) will be complete and unfettered—while Galioto continues to tell investors that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*"—so they never see who the wizard behind the curtain really is.

Kenner's 3553(a) factors—coupled with (a) unchallengeable submissions that verify every instant case transaction could not have been concealed from anyone, (b) independent counsel vetting of literally every transaction in the years prior to the 2013 indictment, and (c) the *real* cash flow was known by the FBI/IRS prior to trial (*ECF No. 815 at 11-12*) and concealed from the witnesses they *still* need to *remember what they were never told*, but proven by Kenner thru exculpatory submissions as inaccurate.   Regardless, the government has failed to yield

---

[14] This is commensurate with the Constantine consulting charges in the instant case—but ignored.

defending the "confusion, mistake, or faulty memory"—**but never advocating for it as the truth**!

For the reasons aforementioned, and the myriad of unresolvable circumstances that continue to "*move the goalposts*" (*Tr.118-21*) and reveal the proverbial wizard, the Court should act and reduce Kenner's sentence thru a time reduction for the harshness 141 days of solitary that was unforeseeable and the conditions that continue thru today at MDC—if not willing to release Kenner to home confinement under his 18 U.S.C. 3582(c)(1)(A) conditions and that of his immediately family needs.

Sincerely submitted,

Phil Kenner, ProSe
April 30, 2021