April 30, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

<strong>RE: <u>Restitution conflicts</u></strong> [1]

Your Honor,

The government (originally relying on PSR conclusory tables)[2] argued their gross loss calculations for sentencing enhancements and restitution loss amounts were based on their own conclusory tables (*ECF 812 at 5-6*).   These conclusory tables fail statute requirements for a myriad of reasons.  Noteworthy is the fact that the government and PSR have argued at least a half-dozen different totals for alleged investors and various scheme losses—without the foundation to maintain a single theory or back-up evidence required by statute.   That is why almost 6-years since trial, the Court demanded a follow-up hearing (in May 2021) to *re-re-re*-reconfirm that they were sure about the totals—*that were still in error.*

The government has failed many parties in the instant case, based on their intrinsic desire to *just get it over*: (1) failing the Court (who relied on their innate integrity: *July 2, 2019, H'rg Tr.24-25*), (2) the former Kenner clients (perhaps including the individuals that empirical evidence confirms Kaiser robbed like his friends & family and never repaid, setting a cornerstone issue for most every mis-representation in the instant case—subset *infra*),[3] and (3) the defendant himself (to minimize

---

[1] At sentencing, "the Court is virtually unfettered with respect to the information it may consider."  *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir 1988).

[2] This is the same thorough investigations that PSR relied on when they announced in their July 2016 addendum that Jowdy, Gaudet, and Kaiser all testified at the government's 2016 forfeiture hearings about the inauthenticity of the Hawaii-loan agreement—<u>although none of them were there</u>, and despite each of them previously authenticating it in various jurisdictions and verified to the Court per its request (*4-6-2016, H'rg Tr.288-90*). Comically—probation's submission also referred to Jowdy as an "*innocent victim*" in the instant case.  See *United States v. MacCallum*, 2018 U.S. Dist. LEXIS 101047 (WDNY – 2018) (*ECF 815 at 21*).

[3] Like Jowdy—the FBI is aware of Kaiser's millions of dollars of personal thefts (while jointly withholding *Brady* materials [*Ex. 1*] to conceal Kaiser's criminal acts), including: 1) admitted to the FBI in October 2010 (*Ex. 2 at 7*: from his handi-capped brother "*Keith*", his

appellate issues in the future and avoid wasting more Court time).

The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2014).  The decision to hold or not hold a *Fatico* hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014).  If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.  The Court denied Kenner's request (*ECF 1024-1 at Tr.9*).

Here, the Court adopted the government's conclusory tables, despite Kenner's fully documented rebuttals (Guideline calculation: *ECF 790*—forfeiture: *ECF 701, 788*—and restitution), wholly supported with exculpatory records (*ECF 770*—and charts for simplification: *Id. at 54-65* [Hawaii], *66-68* [Eufora], *69-72* [GSF])—none opposing.

The government has still chosen to ignore these exculpatory records—originating from their own production.

> "When a man hears himself mis-represented, it provokes him…but when the mis-representation becomes very gross and palpable, it is more apt to amuse him."
>
> – Abraham Lincoln, Illinois Senate Debate—1858

---

DEA friend "*Bobby [Rizzi]*", and his "*doctor*" friends [Sconzo and "willy" Krueger: *ECF 668 at 235*)]], 2) from "*Vin*"cent Tesoriero (*ECF 958 at 12-13, f.12*: "*I have been working everyday to pay paying back everyone…150 vin*"; *Ex. 5 at ¶ 12-13*), 3) the LedBetter partners [Kenner and Tesoriero] with a *forged* and *fabricated* LLC operating agreement, specifically known to the FBI from their *BINDER-######* pretrial production (*Ex. 7: BINDER-450, BINDER-451*) and property sale records (*Ex. 8*), proceeds split between Kaiser and Berard after selling the stolen property on 5-9-2012 (once employed by Jowdy and working with Galioto); 4) the Arizona renovation project (*Ex. 9*: including five former Kenner clients [Sydor, Nash, Ranford, Khristich, Lehtinen]—caught lying with Berard [*Ex. 10: 3500-BB-??*] and Donlan about forgeries [*Ex. 11*] approximately 10 times in the contemporaneous 2015 Arizona trial)—et.al.

*Kaiser's ill-effects on the proceeding—and*
*The government's full knowledge of his repeated perjury...*
*(Napue violations)*

Three weeks post sentencing—Kaiser *shocked the conscience*—again. Kaiser admitted to *Giglio* violations by the government and confirmed his trial perjury about Jowdy theft knowledge—at a minimum.

The Second Circuit opined in *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that

> "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act. The considerations under *Brady* and *Giglio*, however, are quite different. *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information. The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."

Kaiser's reformative statements highlight the never-ending morass and testimony changing the government and Kaiser have been permitted to present to the jury (confronted by Kenner thru exculpatory records time-after-time) and then post-trial Court to support their factual needs of the moment—no different than presenting the *tracing of the Hawaii money* (government-forfeiture-44 and government-forfeiture-36) during forfeiture hearings that verified the government's summation emphasis (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) that "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*"[4] was all based on a lies despite positing (*10-28-2020, H'rg Tr.37*):

> [Government]: *Your Honor, as you're aware, the crimes that were charged did not include the crime involving the funds that went to the resort [the Jowdy loans]. The government's investigation was expansive, certainly took a number of years, and the government takes its time...the government o[f]*

---

[4] Kristen Peca July 2012-FBI recording exposure of Galioto's coercive tactics to re-write history to the Pecas and other—in contradiction of Michael Peca's 2011 Grand Jury testimony (*ECF 986-1*).

*course as you know is required to do significant investigation and make sure that its position is justified.*

They spent six years in pretrial investigations, "*justif[ying]*" it and got it all wrong—but three weeks post-trial, they cleared it up on "*August 3, 2015*" (*ECF 440 at 5*)—proposing the unfortunate timing like the Court and defendants are imbeciles and can't see thru their graft. Apparently—their star-witness, Kaiser, knew the truths that the FBI couldn't figure out even after he told them!

> [*10-28-2020, H'rg Tr.46-50*: John Kaiser]: *"I went down there in 2012 it wasn't long before I caught wind of how he [Jowdy] was doing this and – which was roughly 2013. I actually audioed, videotaped...and then I go to the government and say it's a crime what's going down there. He's stealing millions of dollars. I even had the accountant on tape, Antonio Marques, talking about the criminal activity. And I said if only the FBI knew what Danske and Ken Jowdy were doing..."*

While representing the Hawaii investors as Managing-Member, Kaiser voluntarily testified in 2009. Kaiser confirmed his complete knowledge of all Hawaii investors and Jowdy loans and "*no secret handshakes*" (corroborating the attorney "*update[s]*" he verified to the FBI in 2010: *Exs. 12, 13, 14*—highlighted *infra*). Kaiser specifically testified in 2009 (*Ex. 15 at 6*):

> *Q. So at the time was there any representation about getting paid back this [Jowdy loan] money when the Cabo deal closed?*
>
> *A [Kaiser]: It was supposed to be a short-term loan.* __*I thought it was three to six months*__*, because I had also raised some other funds from family and friends that were getting a little antsy about it.*[5]
>
> *Q. You'd been dealing with Mr. Kenner now for a couple of years?*
>
> *A [Kaiser]: Yes.*
>
> *Q. Have you ever seen him do anything inappropriate?*

---

[5] Six-years later, Kaiser testified in 2015 that the loan was "*approximately 30 days*" (*Tr.976*)—without explanation why he allegedly "*paid back [his] family members and friends with interest*" only 30-something days later (*Tr.980*), yet again, disproven with his own 2011 text to Kenner (*infra*).

- Liars, like Kaiser, typically cannot keep their stories straight—because exculpatory evidence will always refute *he-said-she-said* bluster.

*A [Kaiser]: No.*[6]

*Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

**A [Kaiser]: No.  Otherwise I wouldn't have lent it.**  *I wouldn't want to go down that route.*

*Q.   Do you blame Mr. Kenner for him not paying the money back?*

*A [Kaiser]: No.*

---

[6] Note: Kaiser's May 2009 testimony confirming nothing "*inappropriate*" would have occurred after Kaiser's revisionary allegations of:

  (1) Kaiser's "*confront[ation]*" (*Tr.983*) meeting in summer 2006 about Kenner allegedly stealing $1 million from his 2005 contribution (neither of which ever happened—the theft or the meeting);
  (2) Kaiser was not repaid his California proceeds of approximately $1.7 million (although he was fully re-paid, and then some per banking records);
  (3) Kaiser had been duped in the Sag Harbor project (also never occurred—notwithstanding Kaiser and Berard stole the property with forged and fabricated documents, known to the FBI, U.S. Attorneys Office and IRS—discussed *infra*);
  (4) Kaiser chose to re-invest with Kenner in the May 2008 Arizona project;
  (5) Kaiser took over as Managing-Member of the Hawaii project (later confirming that he "*did see the Hawaii bank acct statements*" (*Ex. 2 at 10*) and verified the Constantine consulting agreement (*Id. at 5*)—et.al...

But—in 2015, after never saying a word about any of it in the thousands of texts and emails between Kenner and Kaiser (and now that the Court knows Kaiser actually robbed his friends & family and never repaid the Hawaii money: per his testimony: *Tr.979-80*) or others funds he re-directed (*Ex. 2 at 7*) for his personal benefit (*Ex. 32 at 3*) and known to the FBI (*Id. at 2*), while he concurrently admitted he was "*broke*" (*Id. at 4*)—Kaiser somehow because of the friends & family Kaiser robed, Kenner "*ruined*" his life (*Tr.1089, 5753*).

The Court cannot disregard for loss factors (guidelines and restitution) that Kaiser told the Court that the Cabo investment is the "*only investment I have left*" (*Tr.1089*), after receiving the alleged collateral agreement from Kenner in 2006—fully repaying him.  All of it after his 2011 Jowdy employment diversion defies logic—yet the government/FBI let it happen and concurred with Kaiser's mis-representations time-after-time to the Court who was "*relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.*" (*July 2, 2019, H'rg Tr.24*)—further opining, "*I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.*"—but still confused, and wrongly positing "*I understand that a significant amount of the money went to Mexico.*" (*Id. at 29*)

5

*Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*

*A [Kaiser]: No.*

*Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*

*A [Kaiser]: It was open. There was no secret handshakes or nothing like that.*

*Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*

*A [Kaiser]: No.*

*Q: Not one complaint?*

*A [Kaiser]: No.*

Kaiser's further corroborations: In 2010—Kaiser verified thru testimony to the FBI (*Ex. 2 at 2, 3, 10*) that he vetted the Jowdy loans face-to-face, and independently, with Jowdy on behalf of the Hawaii investors. But—even though they expected Kaiser was about to lie about his FBI proffer (*Tr.1117-18*), the government let Kaiser testify (in opposition to their requirements under *Napue*) that he never said it (*Tr.1120-22*), even with Galioto sitting in the courtroom; also present during Kaiser's October 2010 interview (*Ex. 2 at 1*).

Even Jowdy's attorney, McSouther ("McC"), who is part of Jowdy's defense team that originally denied the loans to weasel out of the Arizona loan-case thru threats and graft (*Ex. 16 at 1*), excoriated Kaiser about his ever-changing stories, while delicately not enjoining Galioto's complicity in Kaiser's lies (*10-28-2020, H'rg Tr.54*) (*ECF 958 at 13*):

> [McC]: "*[I]t's kind of incredible to me that here's a man who in 2009 testified on behalf of Phil Kenner in an arbitration proceeding that was brought by Owen Nolan in which he said that he knew that the loan – the money was (indiscernible). And then six years later he testifies before Your Honor that he had no idea it was a loan until after the fact.*"

It should shock the conscience that even Jowdy's attorney—who counted on Kaiser's alternative reality 2015-testimony to assist in the *concealment* conviction of Kenner for those specific loans, would attack Kaiser for the same perjury years later.

In 2010—Kaiser was the Managing-Member when final legal actions versus Jowdy to recover the loans were being prepared—and demanded by Berard:



| 1 7 1 5 0 | +14015 246929 Bryan Berard* | 10/15/2010 1:27:47 AM(UTC+0) | R e a d | [Berard]: Any word when ur coming to NYC yet to meet wth Stolper and Lawyer from Rhode Island for the Hawaii lawsuit |
|---|---|---|---|---|

And—during the legal activities versus Jowdy (4-months later), Berard expressed litigation fatigue (as Jowdy's defense strategy designed):

| 1 9 9 6 6 | +14015 246929 Bryan Berard* | 2/16/2011 7:36:42 PM(UTC+0) | R e a d | [Berard]: <u>Don't know wd uve done this for this long</u>. <u>I don't know how much longer I can.</u> |
|---|---|---|---|---|

In late 2011, legal actions versus Jowdy and Lehman Brothers with Giuliani's assistance <u>were canceled</u> by Kaiser, as Managing-Member (along with Berard), once they went to work for Jowdy and become Jowdy's new henchmen (*Ex. 17 at ¶9*) (*ECF 668 at 21-22, f.12*)—et.al.

At trial—changing his story again (as McC berated him for, *supra*), Kaiser testified that he never was repaid from his 2005 Hawaii deposits (*Ex. 18*), in spite of the empirical evidence to the contrary.   Kaiser's revisionary story of "*back pay*" and "*expenses*" (*Tr.1413-14*) cannot be substantiated with any empirical records (hearings and supplemental subpoenas denied by the Court).   So after Kaiser's alleged "*confront[ation]*" of Kenner stealing $1 million from him and the Hawaii project (*Tr.983*), Kaiser testified he "*didn't read through this document*" (the 2006 Hawaii JV closing documents: *Tr.1132-34*) that affirmed he was ***repaid in full*** for the $1 million, 2005 transaction (*Ex. 19 at 6*, signed *at 7*).   Then—assuming Kaiser was fully satisfied with not being repaid per his testimony (*insert irony here*), Kaiser next investment was to immediately create a new LLC with Kenner as Managing-Member in Sag Harbor NY to develop a parcel of land previously owned by another Kaiser-led group of investors (buying two of them out).[7]

---

[7] Note: even though Kaiser testified that he was unaware of Berard entering the deal (*Tr.1008-09*), Kaiser's closest NYPD friend (and original police academy trainer, Vincent Tesoriero—only known to Kaiser in 2006) proffered to the FBI in 2014 (after Kenner's indictment) that he knew "*Phil Kenner and Bryan Berard were coming in the [Sag Harbor] deal*", and "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*"—not invest $375,000, after Tesoriero verified that he received the LedBetter operating agreement from "*only Kaiser*" (*Ex. 5, ¶8-9*).   <u>Kaiser's testimony was the exact</u> <u>opposite</u> of everything, 9-11 hero, Tesoriero verified thru testimony during the FBI proffer

Furthermore—Kaiser alleged a year later (in 2007-08) that Kenner failed to re-pay him another $1-2 million from their California renovation project (*Tr.1042*)—but again did nothing about it (as a former 20-year cop?!?).   Granting Kaiser the benefit of the doubt (because Galioto has supported his testimony emphatically as the truth), Kaiser then chose in May 2008 to participate in a third multi-million transaction with Kenner in Arizona, titling the property again in Kenner's name—while now allegedly $3 million (or so) in the hole from alleged Kenner lies over a 18-month period of time; without sending Kenner one message about funds Kenner owed Kaiser (or his friends & family).

Instead—Kaiser was working hand-in-hand with Constantine to negotiate with Jowdy over the unpaid Hawaii loans (which would have been millions more of Kenner mischief—with Kaiser never raising ire over the Jowdy-loan transactions as unknown either; and to the contrary, giving voluntary arbitration testimony 2 years later:

> *Q: Even now, sitting here in May 2009, <u>is there anything you've uncovered</u>, as someone who obviously knows how to investigate, <u>that Mr. Kenner has done anything inappropriate throughout these transactions?</u>*
>
> **A [Kaiser]: No.**
>
> *Q: <u>Not one complaint?</u>*
>
> **A [Kaiser]: No.**

<u>December 2009 Eufora transactions</u>: It is simply incredible to this temporal point—until you add the fact that Kaiser is the only contact person with Constantine (on behalf of Kaiser's friends & family) who invested $200,000 in early December 2009 (Privitello) and $200,000 more in late December 2009 (Ethel Kaiser, Hughes, and Rizzi) at the exact time Kenner had separated communication from Constantine over Kenner's disappointment with the GSF transactions and results, controlled by "*only Mr. Constantine*" (*Tr.3805-16*) because, regarding Kenner's GSF role, Peca testified "*he didn't seem to have one*" (*Tr.540*).

If Kaiser's graft (Jowdy-style, including the forgery of everything nonsense) is unraveled, the government's case collapses in synchronicity with their star-witness.

---

(Galioto and Wayne) in 2014 (*Tr.1005, 1008-09*).  One of them is lying—and common sense leads you to Kaiser, again (known to Galioto and affirmed thru documents—see *Napue*).

> "[D]etermining that a new trial was necessary, because lies of his key witness who 'tied all the pieces together' even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

Isn't it *still* serious misconduct for a prosecutor to obtain a conviction through the knowing use of false evidence? *See United States v. Wallach*, 935 F.2d 445, 473 (2d Cir. 1991) (Altimari, J. concurring) knowing use of false testimony is "perhaps the most grievous accusation that can be leveled against a prosecutor"?

Isn't the use of false evidence *still* improper whether the prosecutor affirmatively elicits such evidence; *See Miller v. Pate*, 386 U.S. 1, 7 (1967) or merely "allows it to go uncorrected when it appears"; *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (prosecutor failed to correct witness's false testimony); see *Jenkins v. Artuz*, 294 F.3d 284, 295-96 (2d Cir. 2002) (prosecutor failed to correct witness's technically true but misleading testimony)?

Isn't it *still* misconduct, making an argument the prosecutor knows to be factually untrue, even though it may be consistent with the evidence admitted at trial; *See United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987) (reversal for prosecutorial misconduct where prosecutor's argument was refuted by unoffered evidence in the government's files)?

As to materiality, defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Cromitie*, 727 F.3d at 221-22 (quoting *Agurs*, 427 U.S. at 103). "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir 1991) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975)).

With Kaiser's testimony, altering reality to cover his own thefts from friends & family since he joined Jowdy's cabal (with Berard and Donlan), it has transgressed from the absurd to the outright unbelievable. What standard of justice is evaluating this—especially when the government (*ECF 1024 at 2*) considers Kaiser a $1,080,000 Hawaii victim and $200,000 Eufora victim without empirical evidence, while also double-counting the Ethel Kaiser funds (*Tr.1058-59*)?

Ultimately to substantiate Kaiser's revisionary testimony about who took money from who, the government/FBI had to ignore the Kaiser text confession to Kenner in July 2011, *infra*, that he <u>never</u> repaid his friends & family from the Hawaii transactions (*Tr.979-80, 1215*)—but instead still owed them all—including Kenner—significant money 6-years later (his double-down re-investment plan with his friends & family money failed with the 2008 Lehman Brothers bankruptcy and 2009 global recession—*Tr.4588*) (*Ex. 18*) (*ECF 985 at 12-13, f.12*):

| 1 2 6 7 2 | +163123 50308 **John Kaiser*** | 7/22/2011 2:17:04 PM(UTC+0) | R e a d | [Kaiser]: Yes and ==that is ~~nit~~ [sic] [not] the only money that is owed out==, that ==I have been working everyday to pay back everyone== |
|---|---|---|---|---|
| 1 2 6 7 4 | +163123 50308 **John Kaiser*** | 7/22/2011 2:57:35 PM(UTC+0) | R e a d | [Kaiser]: 5k month for back taxes on the sale of 87 laurel made 250 k, ==100k went to u== [to Kenner for loan repayments], ==150 vin== [Tesoriero] owes, 3300 a month goes towards cards from Pv [Arizona] Reno, ==was paying my mother== [Ethel], ==$ 2500 a month for the 1 mil…took from her, left her with no money to live==, now paying her $1500 a month, ==Took 380k from brother Keith, left him w/shit==, we where supposed to send him back money after sale of [Kenner's] little house in mex, u sent me 4k for him, i send him $500 a monyh to live on . . And 4k to 6k to Pv a month . Should I continue ????? It's a fucking joke. ==And please don't tell me about Mex I am not one of the hockey guys== |

Notwithstanding the impeaching text, in Kaiser's own words, it is illogical why Kaiser would have paid Kenner "*100k*" in July 2011 (not the other way around) if Kenner had allegedly "*ruined*" his life (*Tr.1089*) by not repaying: (a) millions to him from the 2005 Hawaii transactions (a proven Kaiser-lie) (*Exs. 20, 21*) and (b) the 2006-07 California transaction (another documented lie by Kaiser) (*ECF 668 at 223-226*).

- Kaiser is not a victim of any transaction here—certainly not with respect to direct dealings with Kenner; and guideline and restitution must be adjusted.

<span style="background-color:cyan">*Unresolved issues…*</span>

<span style="background-color:cyan">*Separating the fraud and non-fraud factors of the various schemes…*</span>

Even when 'but for' causation is present, if 'proximate' causation is lacking (as a result of non-fraud factors, *See Ebbers*), the defendant's conduct "is not a legal cause of the loss." Restatement (Second) of Torts § 548A cmt. b.

The Second Circuit has upheld in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007) that "a key component of the guidelines calculation is the amount of loss caused by the wrongful conduct."; see U.S.S.G. § 2F1.1(b)(1).  The *Rutkoske* Court identified the basic *Ebbers* standard as applicable in all guideline loss and restitution matters regardless of "the complexities inherent in calculating the loss amount" *Id*. at 178.  The Fifth Circuit referenced *Ebbers* as well for identical application in *United States v. Olis*, 429 F.3d 540, 545 (5th Cir 2005).  *Rutkoske*'s Court highlighted the *Olis* ruling, leveraging *Ebbers* standards, that were "[a]pplying the teachings of the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) citing any "portion of a price decline caused by other factors must be excluded from the loss calculation."  The *Rutkoske* Court disagreed with the government's typical challenge "that the principles set forth in *Dura Pharmaceuticals*, a civil case, should not apply to loss calculation in a criminal case." The *Rutkoske* Court opined "[t]he dicta in *Ebbers* strongly undermines that position." Further pronouncing, "[m]oreover, we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by fraud is a critical determinant of the length of a defendant's sentence." *Rutkoske* 506 F.3d at 179.  The *Rutkoske* Court settled that "the District Court's basic failure at least to approximate the amount of loss caused by the fraud without even considering other factors…require[d] a remand to redetermine the amount of the loss, both for purposes of the sentence and restitution." *Ibid*.  The *Olis* Court extended the premise that actual loss "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e. guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." U.S.S.G. Supp 2 App. C, Amendment 617 (November 1, 2001).  The Seventh Circuit concurred in *United States v. Marlatt*, 24 F.3d 1005, 1016 (7th Cir 1994) ("[there is a] difference between 'but for' causation and the causation – for which the presence of but-for causation is ordinarily a necessary condition but rarely a sufficient one – that imposes legal liability.  The distinction runs throughout the law.  Criminal law is no exception").[8]

---

[8] See generally, Wayne R. LaFave, Substantive Criminal Law, § 6.4(c) (2d Ed. 2003) (noting that "even though A's conduct may actually cause B's [injury], his conduct is not necessarily the "legal" (or "proximate") cause of B's [injury], and that "requirement of [legal] causation in criminal law, more often than not, serves not to free defendants from all liability, but rather to limit their punishment consistent with accepted theories of punishment").

In further concurrence, the Second Circuit opined in *United States v. Marino*, 654 F.3d 310, 319-20 (2d Cir 2011) ("[R]estitution is authorized only for losses that [were]…directly caused by the conduct composing the offense of conviction and only for the victim's actual loss." (internal citation and quotation marks omitted) highlighting the notation in *United States v. Boccagna*, 450 F.3d 107, 112 (2nd Cir 2006) ("Criminal restitution…is not concerned with a victim's disappointed expectations but only with his actual loss.") (e.g., *Archer*) because the government bears the burden of proving a victim's actual loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Here—nothing but conclusory tables have been presented to contrast the money-tracing and empirical evidence Kenner has presented via submissions (*ECF 770, 788, 790*—et.al.).

Similar to the instant case, in *United States v. Calderon*, 2019 U.S. App. LEXIS 48, the Second Circuit remanded for re-calculation—because the court failed to separate but-for from proximate causation. The *Calderon* Court ordered a re-calculation of restitution and guidelines using proper methodology, not just but-for causation. The *Calderon* restitution, post-remand, was reduced from $18 million to zero, because the *other factors* following the but-for causation were the determinant for loss, not the but-for fraud. *Calderon's* proximate cause analysis was far more complex than the linear elements, here; although closely based in the proximate causation of the 2008 global recession, the Lehman Brothers bankruptcy, and third-party theft (by Jowdy—as the court acknowledged). In *Calderon*, the Court correspondingly applied *Ebbers*, such that "[t]he loss must be the result of the fraud." *Id*. at 128   And—"[l]osses from causes other than the fraud must be excluded from the loss calculation."   Id.

*Both are the case here*.   After separating fraud and non-fraud factors of loss causation, per *Ebbers*, and tracing of funds from the indictment named persons to: (1) Hawaii-Jowdy loans, and (2) Constantine consulting payments (not conceding that either were unauthorized criminal acts—with or without intent)—the traceable Constantine distributions equal zero.   The traceable Jowdy-loans equal $1,315,000. Thus—$1,315,000 is the high-water-mark for any alleged Hawaii fraud, before applying Peca's testimony to his "*fungible*" capital account and his authorizations/expectations are applied—and causation factors.

In the prevalent financial allegation (Hawaii)—the government perplexed the court 3-weeks post-sentencing—*shocking the conscience* and resetting the "fraud and non-fraud factor" baseline (*10-28-2020, H'rg Tr.37*):

> [Government]: *Your Honor, as you're aware, the crimes that were charged <u>did not include</u> the crime involving the funds that went to the resort [the Jowdy loans]. The government's investigation was expansive, certainly took a number of years, and the government takes its time…the government or course as you know is required to do significant investigation and make sure that its position is justified.*

> [Court]: *I was going back to say your position is <u>the government didn't know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?</u>*

How can the Court even reconcile the government's post-sentence statements with the defendant's sentence factors?

<mark>*Statute and case law must be applied by the government…*</mark>

The application of well-seasoned Second Circuit precedent in *Novak, Starr, Leonard* and *Shellef* were ignored by the government in their presentation of summary and conclusory tables (*4-5-2021, restitution H'rg Tr.17*). Statute and precedent case law requires their application; specifically including causation analysis (but-for versus legal/proximate causation); See *Berry v. Sugar Notch Burrough.* [9]

---

[9] Take the classic tort case of *Berry v. Sugar Notch Burrough*, 191 Pa. 345, 43 A. 240 (1899), in which a falling tree damages a negligently speeding trolley car. The wrongfulness – *the speeding* – is a but-for cause of the accident and injury: had the trolley car not been speeding, it would have been elsewhere when the tree fell. As a general matter, though, and apart from the chance occurrence in this case, speeding does not make it likelier that trees would fall on trolley cars. Indeed, speeding arguably reduces the likelihood of such accidents by reducing the amount of time that one is under a given tree. **But-for cause is present; causal link or tendency is not.** See Guido Calabresi, *Concerning Cause and the Law of Torts*, 43 U. Chi. L. Rev. 69, 72 (1975).) <u>The train conductor is not held liable for the loss</u>.

Where does this leave us in the present case with documented transparency—separate from Peca (Hawaii) and Gonchar's (GSF) "*fungible*" investment verifications, *supra*? An investor may agree to contribute to a private passive-equity transaction because his "advisor" falsified – or neglected to mention some detail [neither occurred, here] but then suffered a loss due to nationwide recession. Loss (proximate) causation is lacking. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir 1995). <u>The defendant is not liable for the loss.</u>; see also *Archer*.

13

Under the guidance of the government, the court failed to apply *Leonard*, *Novak*, *Starr*, and *Shellef* analysis.[10]

> The Court opined in *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

Kenner addressed these issues—even when the government refused to reply with guidance upon the Court's request, *supra* (*ECF 770 at 54-65* [Hawaii], *66-68* [Eufora], *69-72* [GSF]).

Loss amounts...

The government removed multiple investors who refused to cooperate with FBI agent Galioto's coercion tactics and fraud theories; resulting in the superseding indictment (*ECF 214*) two-weeks before the commencement of trial.

Alternatively, the government could have named every Hawaii, GSF, and Eufora investor/contributor in the indictment. They did not and removed many of them as alleged victims—**by choice**.

> Chief Judge Tymkovich, in *United States v. Mendenhall*, 945 F.3d 1264 (10th Cir 2019) opined: "Relying on controlling Supreme Court precedent, we conclude that Congress has authorized restitution only 'for the loss caused by the specific conduct that is the basis of the offense of conviction.'" *Hughey v. United States*, 495 U.S. 411, 413, 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990)...Continuing "[S]ince the Supreme Court decided *Hughey* almost 30 years ago, prosecutorial decisions to frame indictments with a 'view to success at trial rather than a victim's interest in full compensation' are made

---

[10] *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987). It is not enough to show that a defendant used deception to induce victims to enter into transactions they would otherwise avoid. See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007). Rather, the government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver. *Starr*, 816 F.2d at 98. Intent to harm cannot be found when alleged victims "received all they bargained for, and defendant's conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

with the full understanding of the potential consequences"; See 495 U.S. at 421. "There are tradeoffs in such decisions."

The MVRA permits restitution to be ordered only to a "victim" of an offense. 18 U.S.C. § 3663A(a)(1)-(a)(3). The statute defines a "victim" as "a person *directly* (but-for) and *proximately* harmed as a result of the commission of an offense for which restitution may be ordered," including harm from "the defendant's criminal conduct in the course of" a scheme or conspiracy. Id. § 3663A(a)(2) (emphasis added). Thus, the MVRA "by its language" imposes "a requirement of proximate cause"; *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011). The MVRA's requirement that the victim have been "directly and proximately harmed as a result of" the offense, 18 U.S.C. § 3663A(a)(2), incorporates the common law requirement of proximate causation. *See Archer*, 671 F.3d at 171 & n.16.

MVRA requires direct *and* proximate causation, because the loses resulting from the 2008 global recession (affecting all GSF companies promised by Constantine to the GSF contributors[11]) and the 2008 Lehman Brothers bankruptcy, cannot be attributable to any Kenner 'proximate' actions. Any loss (if they even exist) were not in any sense "directly *and* proximately" caused by Kenner's conduct. 18 U.S.C. § 3663A(a)(2). The direct cause of those loses were the crises Kenner undisputedly had nothing to do with and were *specifically excluded by the government* (*Tr.4588*).

The MVRA provides redress to the victims of fraud, but it does not supply a windfall for those who independently enter into a risky financial enterprise thru no fault of the fraudsters. The Second Circuit defined in *Archer*

> "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." *United States v. Archer*, 671 F.3d 149, 171 (2d Cir 2011)

*Unnamed persons in the superseding indictment were erroneously counted as victims...*

The government verified at trial (*Tr.5993*):

---

[11] Notwithstanding the global recession and external other proximate causation influences (*Tr.4588*—et.al.), the government never traced the "*$267,000*" (*ECF 501 at 60*) gross amount the Court deemed overspent by "*only Mr. Constantine*" (*Tr.3805*) to any particular GSF contributor—and as such, it is equally possible that the Gonchar, Kenner, and Constantine contributions directly covered each transaction without applying a "*fungible*" theory.

[AUSA rebuttal summation]: "*The government called 39 witnesses in this case, multiple victims, <u>every John Doe</u>. They told you their story. That's what you have to consider; all of them.*"—

Four-years later, the Court posited (*July 2, 2019, H'rg Tr.33*):

[Court]: "*I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds. The scope of sentencing relates only to the frauds that were proved at trial*…"

Stevenson, Gonchar and Murray were not named as victims in the superseding indictment (*ECF 214*)—leaving no need for Kenner to prove his relative innocence with those individuals or others (un-named by government choice). The government referenced them in *ECF 812*—with Stevenson absent in *ECF 781 at 5.*

- All three should be removed as named victims for guideline calculation and loss factors—because Kenner was never charged with proving his innocence with their specific transaction details.

The Court and government's specific removal of uncharged conduct from the case echoed other non-charges (*Tr.296*: GSF *other elements*) related to "*Bad Apples*":

[Court]: "*The government is not alleging that the [GSF] settlement between Mr. Constantine and Mr. Juneau with respect to the airplane is fraudulent. They're not alleging that that settlement was fraudulent in some way. It is not part of the alleged fraud in the indictment.*"[12]

The Court announced, but that the government ignored post-trial to conflate more loss amounts (*Tr.4588*: raising causation issues never addressed). None of this has been resolved by any method other than *sweeping it under the carpet* by the government—hoping to just move on by exhausting all involved parties.

Kenner was never charged with proving Sergei Gonchar, Glen Murray, and Turner Stevenson (or others outside the superseding indictment) were *not* victims—

---

[12] The Court contradicted itself, asserting the "*Bad Apples*" buyout with the airplane transaction, amongst others controlled by Constantine "*arguably do not fall within the GSF's ambit*" (*ECF 501 at 60, f.18*). Note: the government never traced the actual funds that paid for the airplane buyout: with explicitly funds from 3 un-named persons in the superseding indictment involved (once the back-tracing is done).

otherwise that standard would have required calling 40-50 investors as defense witnesses to prove one's innocence, investor-by-investor; the opposite of the standard *presumption of innocence* clause. Arguably the government could have suggested that a reasonable juror would have given little weight to actual trial testimony or the Court's instructions and simply relied on un-named persons and non-victims who *may have been defrauded*.

The government consciously chose to remove Gonchar, Murray and Stevenson (and several others) from the superseding indictment 2-weeks before trial as their case crumbled with multiple Hawaii-Mexico investors still suing Jowdy in Mexico for the same stolen loan funds they blamed on Kenner (*Tr.31*). They contemporaneously denied Kenner's subpoena access to Norstrom and Gonchar's Northern Trust banking materials, referring to them as *immaterial* (*ECF 235 at 46-47*)—because they were disinterested parties at that point according to the government. See *Hughey*, *infra*. The government cannot have it both ways.

*No causal analysis*

*(As required by statute)…*

Nevertheless—the government added Sergei Gonchar, Glen Murray, and Turner Stevenson as part of theie 14 alleged victims (*ECF 1024 at 2-4*)—without any *Ebbers* factors (and its progeny) applied to the guidelines or loss amounts either—despite acknowledging the extrinsic factors (*Tr.4588*). See *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006)

> "'The loss must be the result of the fraud." *Id*. at 128. "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id*.

Under U.S.S.G. 3664(e), "the burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the government".

During the 4-5-2021 restitution hearing, Defendant-Appellant highlighted that no credits-against-loss or causal analysis were done (*ECF 1024-1, H'rg Tr.17-18*), and the well-seasoned principles of *Ebbers*, *Leonard* (529 F.3d 83, 92—2008), *Starr* (816 F.2d 94, 98—1987), and *Novak* (443 F.3d 150, 159—2006) were never applied or analyzed by the government in response to Defendant-Appellant's documented submission (*ECF 770 at 53-72*) addressing "bargained for" value and the separation of the "fraud and non-fraud factors" (*ECF 815*—et.al.). Defendant-Appellant

repeatedly objected to the government summary tables, solely relying on conclusory analysis—originally prompting the court's demand for more information from the government (*July 2, 2019, H'rg Tr.24-25*—*infra*).   It never came.

*Credits against loss...*

The District court is authorized by 18 U.S.C. § 3663(b)(1)(B)(ii) to order restitution in the amount of the victim's loss
> "less the value (as of the date the property is returned) or any part of the property that is returned."

Appellate Courts have held that this plain language requires property to be valued as of the date the victim took control of the property.  See *United States v. Smith*, 944 F.2d 618, 624-25 (9th Cir 1991).
> "As of that date, the [victim] had the power to dispose of the property and receive compensation." Id. at 625.

*Nolan and Kaiser...*
*(Independent collateral control—worthy of credits by statute)*

Both Nolan and Kaiser fall under this language while in possession of their "collateral property" for at least the last 10 years; specifically while working hand-in-hand with Jowdy versus Kenner and Kenner investors who were attempting to recover the Hawaii loans and sue for the Mexico project thefts and embezzlements. Also—Kaiser was the Hawaii Managing-Member since 2007, per agreement—but defending Jowdy, ultimately breaching his fiduciary duty to Kenner and Kenner investors; conveniently ignored by the government (*Ex. 31*).

Under statute, it was not Kenner's responsibility to force the completion of Nolan, Kaiser, Juneau, Moreau (or others) collateral sale by involving himself in the sale of their independently negotiated settlements (*Ex. 33*: noted *at 5*).   That decision is subject to their independent analysis without foreseeability of recovery—noting they were friendly with Jowdy at all times, and adverse to Kenner and Kenner investors.   Kaiser and Nolan—via settlements—were both made whole regardless of foreseeability.

The Court should recall that the government blatantly lied re: Nolan's property/settlement with Jowdy (*ECF 781 at 3, ¶ II*):

> [AUSA Komatireddy]: "*Based on discussions with Nolan's counsel and counsel for the DCSL parties, it is the government's understanding that no settlement matching Kenner description exists, wither in '2008 [or] 2009', or at any other time.*"

This was clearly another fabrication without consequence by the government to avoid more cover-ups of the truths. Nolan's counsel—as part of their 3rd party ancillary claim (now that they needed proof, months later) submitted the actual settlement agreement (*ECF 874-1*: signed by Owen Nolan, Diana Nolan, and Jowdy 2-times).

The degradation of integrity from any party needing Kenner to be responsible for others graft is outrageous and not being protected by the neutral advocate system—the ethics called for in *Berger* almost 90 years ago; see *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935).

Justice Gorsuch has previously ruled on these matters: In a similar case where recoverable assets were transferred to a conservator (out of the defendant's control), Judge Gorsuch, before his Supreme Court appointment, opined: "[w]ithout an actual loss, there could be no victims"; *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014), referencing the Second Circuit *Ebbers* standard. In Evans' 2nd appeal for improper loss calculation (a second time), *United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017), Evans was released "time served" with **no loss** (even that which was solicited after his accounting fraud began) and **no victims**. The conservator on the *Evans* assets failed to sell the real estate holdings until recession and bad times struck the underlying assets—like Kaiser and Nolan's situation: perhaps unsold (a) due to personal choice, (b) future betting[13] on Jowdy's decades of real estate *successes*, or (c) simply ignorance—like Juneau's aloofness displayed during testimony about his settlement with Jowdy for the same equity (*Tr.339*).

---

[13] Investors do not get to re-choose from a list of what they are upset about after the fact due to 'proximate cause' issues that affected the underlying investment—not caused by defendants; *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).

> As the Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

See Michael Peca SDNY Grand Jury testimony (*ECF 986-1 at 17-18, 30-32*):

> [Michael Peca]: *"I made the decision to say, yeah, I want to do that. Based on the money I was making at the time it didn't bother me to invest those kinds of dollars."*

Justice Sotomayor also previously opined in this exact issue positing, "If a victim chooses to hold collateral rather than reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *United States v. Robers*, 134 S. Ct. 1854, 1860-1861 (2014), 188 L. Ed. 2d, at 891-892 (explaining that where a victim "does not intent to sell" collateral, "other provisions of the statute may come into play," enabling a court "to count, as part of the restitution paid, the value of the collateral previously received but not sold").

Justice Sotomayor offered, "Suppose, for example, that a bank received shares of a public company as collateral for a fraudulently obtained loan. 'Common stock traded on a national is readily convertible to into cash,' *Reves v. Ernst & Young*, 494 U.S. 56, 69, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990), so if the bank waited more than a reasonable time to sell the shares, a district court could infer that the bank was not really trying to sell but instead was holding the shares as investment assets. If the shares declined in value after the bank chose to hold them, it would be wrong for the court to make the defendant bear that loss." Justice Sotomayor acknowledged that a victim's choice to hold collateral – rather than selling it in a reasonably expeditious manner – breaks the chain of proximate causation. See, *e.g.* Tr. of Oral Arg. 38-39, 44-45. If the collateral loses value after the victim's choses to hold it, then that, "part of the victim's net los[s]" is "attributable to" the victim's "independent decisions." *Id.* at 39. The defendant cannot be regarded as the "proximate cause" of that part of the loss, *Ibid.*, and so cannot be made to bear it.

Justice Sotomayor continued in *Robers*, citing "[R]estitution must be reduced by the 'value (as of the date the property is returned), of any art of the property that is returned.'" 18 U.S.C. 3663A(b)(1). The Supreme Court has further noted that defendants are not "responsible for everything that reduces the amount of money a victim receives for collateral." *Robers*, 134 S. Ct. at 1859. The determination factors are foreseeability and causation. *Id.* This is consistent with the language of the MVRA, which requires the government to prove "the loss sustained by a victim *as a result of the offense*..." (18 U.S.C. 3664(e) (emphasis added in original). Justice Sotomayor has suggested "unreasonable delay in selling collateral might similarly break the causal chain." *Robers*, 134 S. Ct. at 1859-60 (J. Sotomayor concurring).

Similarly, the compensatory purpose of the MVRA may not be served where collateral's ultimate sale is artificially low due to the victim's affirmative actions. With Nolan and Kaiser working hand-in-hand with Jowdy, they have clearly chosen

to ride out the investment under Jowdy's stewardship for over a decade—otherwise the government would have presented their correspondences to refute it.[14]

Government's forfeiture delay: Here, the 5-year delay post-trial in the forfeiture process (2015-2020) afforded the Jowdy-Danske budget-looting scheme (as the government affirmed in their July 2020 and August 2020 submissions) the opportunity to sell off the proverbial donut while loading the donut hole with overwhelming debt load; reducing the intrinsic value of the resort to zero (or less) as the proximate cause of the collateral decreased.   This breaks any causal chain related to Nolan or Kaiser's unsold collateral sales—even for 2 cents on the dollar (in 2010) to cover the alleged criminal actions of diversions or concealments.  The same application of facts (the delay) can be applied to the ability to recover the Hawaii loan value (*ECF 553, 554*: June 2018); acknowledged as authentic by the Hawaii-Mexico investors who sued Jowdy in Arizona as 19-signed disclosures withheld by the government until forfeiture production—a.k.a. a *Brady* violation. Page-1 of each disclosure pinpointed (*Ex. 16*):

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

The government obstructed recovery of the Jowdy loans for at least 3-years at this point (since the submission of *ECF 553*) (in spite of Kaiser's ignorance for 14-years, as Managing-Member since 2007); specifically with Jowdy, personally, the Hawaii documented "*Borrower*" (*Ex. 60 at 24-25*) "*being paid $225,000 per month*" as the developer of the Cabo project (*ECF 871 at 10*) and an egregious "*10% of the principle payment*" from an interlocutory sale (*Id.*) for his "*broker-lender relationship*" (*ECF 990 at 5, f.4*) to eventually extract more funds away from the investors—as a side deal; see also government December 7, 2020 submission (*at 4* [$50 million PPM], *at 10-11* [side-deal and Silverpeak conspiracy to defraud investor value]).

---

[14] Note: with their full "*investment*" amounts offset, respectively, for the collateral agreements Kaiser and Nolan testified they acquired, then their collective 2009-10 net value of $150 million-plus of newly acquired equity could have been sold to Jowdy, Danske Bank, or any other 3rd-party for $3 million (2% of value)—and they would have been whole. Only Jowdy and Danske could have refused the equity transfer to re-compensate them—making any premise 10-years later of illiquidity irrational.

If not financially, at least the investors (specifically Nolan and Kaiser who chose to "ride" with Jowdy) can find comfort in the 2013 public affirmations to Fortune Magazine's online paid-for Jowdy pump-piece by Danske Bank loan manager, Peter Hughes, who reassured the investors (*ECF 871 at 12*):

> [Peter Hughes]: "*[i]f there had been mismanagement, I think it would have turned up in the due diligence we've conducted on the project over the past three years.*"

Regardless of Kenner's overwhelming and indisputable presentations of Jowdy thefts since 2002 (*ECF 667*—et.al.)—government star-witness, Kaiser re-verified post-sentencing that <u>before</u>: (a) Kenner was indicted, and (b) the government gave opening remarks in contradiction to Kaiser's "*2012*" whistleblowing (*10-28-2020, H'rg Tr.47-50*):

> [John Kaiser]: "*I went down there in 2012 it wasn't long before I caught wind of how he [Jowdy] was doing this and – which was roughly 2013.   I actually audioed, videotaped...and then I go to the government and say it's a crime what's going down there.  He's stealing millions of dollars.  I even had the accountant on tape, Antonio Marques, talking about the criminal activity.  And I said if only the FBI knew what Danske and Ken Jowdy were doing...*"

The only consistency is that the government and Kaiser (with Berard's participation), <u>all to Jowdy's documented benefit</u>, have been able to delay any possible recovery regarding Eufora, *infra*, &/or the Jowdy-Hawaii loans based on a immeasurable incompetency.   To date, no party has been held responsible, even once, for their ever-changing testimonies or proffers to the Court; specifically changing to fit the newly required narrative after Kenner debunked them (time-after-time) with exculpatory evidence they chose to ignore.

<mark>*2009 Cabo san Lucas valuation...*</mark>
*(With Nolan, Kaiser, Berard, Peca all working with Jowdy: allowing recovery if desired)*

In 2009, approximately the date of the Nolan-Jowdy settlement (in contradiction to the government's lies about multiple conversations and confirmations that "*no settlement matching Kenner's description exists in 2008 or 2009, or at any other time*": *ECF 781 at 3, ¶ II*)[15]—the Diamante Cabo san Lucas property was appraised at $450

---

[15] To falsely present that to the Court (in addition to not discussing it with either Jowdy or Nolan counsel)—the government had to ignore the 2017 Delaware settlements that they

million (*Ex. 22 at 4*) and the Danske debt could not have exceeded $125 million (the top end of the existing loan agreement, believed to be approximately $109 million outstanding in 2009: *Ex. 23*).   Thus Nolan's "*1%*" settlement (*ECF 874-1*) had a <u>transfer value of at least $3.25 million</u>—See *Robers, supra*.

Considering the *Ebbers* factors and separating Nolan's "*investment*" (*Ex. 4 at 3*) funds that are traceable to the Jowdy loans (not conceding they were unauthorized: See Little Isle 4 By Laws, *Ex. 36*)—and with zero traceable to the Constantine consulting payments, Nolan's $350,000 arguable loss (under the government's analysis: vis-à-vis *government-forfeiture-36*, "*5-04-2005*" transfer) was the top end for any Nolan loss.   Independent of Kenner (by choice), Nolan had every chance since 2008 to negotiate with Danske bank, Jowdy, or any approved 3rd party to recover his $350,000 (approximately 10% of his recovered 2009-intrinsic equity value—or trade for an airplane like Juneau did with Constantine: *Tr.327*).

Also—attorney Ronald Richards in the California litigations represented nineteen (19) Mexico-Mexico investors in 2009. Per Attorney Richards, they had direct access to Jowdy to negotiate a settlement face-to-face—independent of Kenner (*Ex. 24 at 2*).   Again—not one investor followed-up on the offer, while Kristen Peca wrote to attorney Ronald Richards 11-4-2009 to declare her loyalty to his litigation strategies: *absent Kenner*.   Thus—it was incredible that Peca (*Tr.539*), McKee (*Tr.1830-31*), or anyone could assert that without Kenner they thought they could lose all their money out of "*fear*" because it "*all hinged on Phil*" (also after they were represented by Giuliani/Stolper in the Eufora matters, etcetera: *Ex. 25*).

By late 2011, these same investors were working with Jowdy and Attorney Harvey. While multiple criminal lawsuits were pending in Mexico versus Jowdy's cabal (including FBI agent Galioto who signed Kenner's 2010 Mexico detention order as an FBI-interested party, the precursor to Kenner's 4-day jailhouse beating: known to all investors)[16]—Jowdy's cabal (including Kaiser and Berard by this time) began

---

dragged into the EDNY courtroom: documented by Kenner (*ECF 790-1 at 5: Ex. 33*) referencing Nolan (and others) previous settlements with Jowdy:

> "*WHEREAS, plaintiffs' Counsel and the Parties have been made aware that Ethan Moreau, <u>Owen Nolan, and Joe Juneau all of whom were Kenner clients (a) never filed or participated in any of the Kenner-initiated legal proceedings and complaints against Jowdy or any Jowdy-controlled entities, and (b) entered into separate settlement agreements with Jowdy &/or Jowdy-related entities as the result of other litigation</u>…*"

[16] Kristen Peca affirmed the group knowledge when she recorded Kenner for the FBI in July 2012 (after her California Bar complaint was dismissed), identifying:

lying to Kenner investors that Kenner had stolen the entire GSF, plus Hawaii loans that investors expected to go to Jowdy.   Any of these investors could have cashed out their Cabo equity (&/or related settlement deals).

The Pecas (like Kaiser, Berard, McKee—and others) chose Jowdy, Harvey and Galioto as their horses to ride—and re-started the assaults on any adverse Jowdy party.   In lock step as instructed by them, Kristen Peca forwarded her November 2009 email reply with Attorney Richards to Kaiser in December 2011 (*Ex. 24 at 1*, forward at top) (immediately after Kaiser and Berard received high-paying jobs in Mexico).   Less than one-month later, convinced that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*", the Peca's sent a form letter (written by Harvey) to allege Attorney Richards owed Peca their GSF funds back (*Ex. 34*).   Attorney Richards pointed out clearly that he
> "*never asked [Peca] to wire [Richards] funds for further capital contributions to your various investments with Tommy Constantine.  You made that decision with him directly  You wired your funds based upon your own agreement with him.*"…notably *absent Kenner involvement.*

As part of their newfound Team Jowdy efforts (with Kaiser, Berard, Harvey and Galioto), Kristen Peca immediately forwarded Attorney Richards' reply to Kaiser, Jowdy, and Harvey within hours (*Id. at 5*, bottom).   Within a month, Peca, McKee, Kaiser and Privitello filed California Bar complaints versus Richards (all written by Harvey) to further *warn* anyone adverse to Jowdy to back off, *or else*.   Ronald Richards replied to all of them, and they were summarily dismissed based on complete and utter nonsense—once the California Bar reviewed the signed documents (see *Upton*) (*Exs. 35, 37*).
> Note: Jowdy, Harvey and Harvey's legal cabal were still pissed at Ronald Richards for handily defeating them in the December 2010 Nevada lawsuit, recovering a $1 million-plus judgment from Jowdy for stealing Murray's $791,000 of loans (ironically that Jowdy tried to blame on Kenner thru a 3rd party cross-complaint, which Kenner easily defeated in ProSe in a 4-day bench trial) (*ECF 1026-11*).

---

[Kristen Peca]: "*maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed.  Its too scary.   Michael and I can't thank you enough for keeping the fight going after the jail thing and the attorney* but -- *I just want this to be over no matter what it takes.   I know how mad Michael and the other guys are with Jowdy for not paying the loans back.  Who does that??*

[Kenner]: *A protected criminal – that's who.*

Nolan, like Juneau, Kaiser, Peca, or Berard <u>never</u> presented to the Court any potential settlement correspondences with Jowdy to capitalize their equity stakes—that were turned down.  Again, it is not Kenner's responsibility—after their independent settlements were reached.

- *Just the opposite*, Kenner negotiated a $20 million equity sale to a Jowdy-friendly third-party vis-à-vis an independent mediator in 2012 to settle *the lion's share* of all the Jowdy thefts (from Hawaii loans, individual loans, the Mexico embezzlements, and the airplane embezzlements—see *ECF 667*) and permanently separate Kenner and Kenner investors from Jowdy.   Jowdy's attorneys and the FBI influence terminated the 2012 deal—because they did not want any new, unmanageable 3rd-party to look under the Danske-Jowdy proverbial skirt and see the real books & record thefts (*Ex. 26*).   The FBI was aware (see redacted area).


<span style="background-color:cyan">*Jowdy Hawaii-loans received from superseding indictment persons...*</span>

The total funds traceable to the Jowdy loans from the named persons in the superseding indictment equals $1.315 million (*ECF 770 at 54*), back-traced as follows (*Id. at 56-57*):

1) Michael Peca (**$240,000** distributed to Jowdy thru Little Isle 4's capital account);
2) Darryl Sydor (**$200,000**);
3) Owen Nolan (**$425,000**);
4) Steve Rucchin (**$300,000**);
5) Bryan Berard (**$150,000**)...

Thus—$1.315 million is the top end of losses attributable to the Jowdy loans for the entire Hawaii project—no more; and far less than $6,465,752 (*ECF 1024 at 2-4*).


<span style="background-color:cyan">*Northern Trust offsets*</span>
*(Northern Trust settlements—and Northern Trust interest payments)*

<span style="background-color:cyan">*2003-09 Northern Trust Settlement payment offsets...*</span>

The Northern Trust legal settlement gross amounts need review via "in camera" review by the Court (*ECF 1026 at 1*, see item "*2)*").

As example:

(1) Nolan's settlement with Northern Trust Bank of "*$500,000*" (*Tr.2074*) was several hundred thousands of dollars more—before contingency fee payments to the attorneys. Kristen Peca's victim impact statement identified the "*35%*" attorney fees.   Nolan's Northern Trust settlement exceeded his traceable funds to the alleged Hawaii schemes.   Plus, (2) Nolan received **$592,878**[17] between 2003-09 via interest from his collateralized investment strategy that he <u>signed</u> and <u>authorized</u> regardless of his 2015 "*memory*" of anything (*Tr.2065-66*).

> Note: Nolan's 2007 text communication with Kenner identified he knew his Northern Trust funds were "*tied up*"—a.k.a. pledged (*ECF 668 at 272-274*); see *Kenner trial exhibit 210* (intro'd at *Tr.4205-06*)—with Nolan's 19 <u>signed</u> Northern Trust LOC documents, including independently signing to initiate his:
> - 2004 Letter of Authorization (*Ex. 3 at 2*);
> - 2004 Extension of Credit (*Ex. 4 at 3*: <u>dated in his own handwriting</u>—like all); and
> - Multiple annual Disbursement Request & Authorizations (*Ex. 6*)—identifying the use of approximately $2.2 million; see *Upton*.

"*In camera*" review is requested for Berard and Peca as well to affirm the gross settlement amounts—which are the appropriate offsets, not the net settlements (after contingency fees).

- Peca testified he received "*just over $600,000*" (*Tr.506*); and
- Berard testified he received "*roughly after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*).

Both of these amounts (akin to the Nolan settlement)—even before the gross settlement review are greater than the loans traceable to Jowdy initiating from their

---

[17] Nolan annual Northern Trust interest distributions—offsetting any cash investment risk (referencing Nolan's Northern Trust banking records, stipulated at trial):

| | |
|---|---|
| 2004 | $40,122 |
| 2005 | $119,458 |
| 2006 | $137,994 |
| 2007 | $140,379 |
| 2008 | $114,178 |
| 2009 | $40,747 |
| Total: | **$592,878** |

"*capital account*" "*investments*" (*Ex. 4 at 5, 7*)—reducing their loss to zero for guideline factors and restitution.

*2003-09 Northern Trust Interest payment offsets...*
(*Ex. 27*)

The Hawaii-LOC investors received: Nolan [$592,878], Peca [$300,052], Sydor [$249,215], Rucchin [$210,113], and Berard [$129,314] totaling **$1,481,572**.

Un-named persons: Murray [$243,470], Gonchar [$144,339] and Norstrom [$218,943] receipts totaled **$606,752**.

- The government ignored all of these real-time, annual payments—which are no different than the 42.553% JV payments received in August 2006 (*Ex. 20*).

Note: If offset per statute, the traceable funds from the investors to the Jowdy loans are fully reimbursed for Nolan, Peca, and Sydor solely with the investment-interest distributions, and almost for Berard and Rucchin; but with Berard fully overpaid for "loss" considering his "*roughly after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*)—*supra*.   Ignoring these offset receipts, as part of the alleged illegal transactions, would provide a windfall of payments thru restitution, specifically prohibited by statute.

| | Traceable "investment" capital account to Jowdy loan | Northern Trust settlement amount—per testimony (ø) | Collateral interest earned (2003-09) | Net investment amount (loss) |
|---|---|---|---|---|
| Peca | 240,000 | 600,000 | 300,052 | 660,052 |
| Nolan | 425,000 | 500,000 | 592,878 | 667,878 |
| Berard | 150,000 | 300,000 | 129,314 | 279,314 |
| Sydor | 200,000 | - | 249,215 | 49,215 |
| Rucchin | 300,000 | - | 210,113 | (89,877) |

(Ø) – April 22, 2021 (*ECF 1026*), Kenner requested the Court verify "in camera", the actual gross settlement amounts.   Upon information and beliefs, the settlement amounts represented by Nolan and Peca were net of attorney fees (which are not deductible under MVRA loss calculations).   Berard testified his $300,000 was <u>net</u> of attorney fees – believed to be "*35%*" contingency fees and handled by Jowdy's attorneys with *nudging* from Galioto towards Northern Trust to settle.  The gross total would have been approximately $2.1 million--$700,000 greater.


**[------------------------------------------------------------------------------------]**

Not to complicate matters, but the government did. Post-sentencing, the government further explained to the Court that the Jowdy transfers (the only alleged illegal funds traceable to Nolan) were not part of the indictment, conveniently explained for the first time to the Court 3-weeks, post-sentencing (*10-28-2020, H'rg Tr.37*):

> [Government]: "*Your Honor, as you're aware, <u>the crimes that were charged did not include the crime involving the funds that went to the resort.</u>  The government's investigation was expansive, certainly took a number of years, and the government takes its time…the government or course as you know is required to do significant investigation and make sure that its position is justified.*"

The government's reformative admission, 11-years after the investigation began, was in direct contradiction to Hawaii LLC funds they insinuated as "*stole[n]*" by Kenner throughout trial, to buy Kenner's Cabo equity (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*)—disregarding clear exculpatory evidence in their possession (including FBI raw notes: *Ex. 2 at 12-14* [Jowdy]*, Ex. 28 at 2* [Jowdy]*, Ex. 29 at 8-9* [Gonchar]*, Ex. 2 at 2, 3, 10* [Kaiser]—et.al.).   The government was deftly aware—including from Jowdy himself for years before their opening remarks to the contrary (*Tr.31*).

<u>Nolan has no loss for restitution</u> (or loss related to guideline, for that matter—like every other Hawaii investor creating unsettled reformative issues; See U.S.S.G. Manual § 6A1.3 cmt. (2014))—certainly not $2.2 million for Nolan.

*Kaiser's "property"…*

<u>Kaiser has no Hawaii loss</u> (or otherwise) and testified to his full repayment (muffled in his testimony, that changed as often as his cover-ups required: see *ECF 628*, and *10-28-2020, H'rg Tr.48-50*—both impeaching the government's star-witness' trial testimony).[18]

---

[18] "[D]etermining that a new trial was necessary, because lies of his key witness who 'tied all the pieces together' even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

Kaiser testified that he was working in Mexico for Jowdy because "*that's the only investment I have left*" (*Tr.1089*)—referencing his alleged collateral transfer from Kenner in 2006, *infra*.   Regardless of Kenner's *forged* name on the alleged agreements (or photocopied) (*Ex. 30*), Kaiser further affirmed to the Court "*Baja Ventures was transferred to me due to the unpaid Kenner loan*" and "*Jowdy signed documents…to transfer Baja Ventures to me…*" (*ECF 628 at 1*).   According to Kaiser's 2006 agreement (authenticity aside), Kaiser affirmed his full re-compensation <u>over 15-years ago</u>; receiving over $150 million of collateral by January 2010 for a $1 million "*investment*" (*Ex. 30*) he has since juxtaposed as a "*loan*" (*Tr.975-76*)—as it fits his cover-up of the day.

Nevertheless (and ignored by Kaiser and the government to form their soliloquy during trial), the banking records and implausible Kaiser misdirection story (of "*back pay*" and "*expenses*": *Tr.1413-14*) verify that Kaiser actually received $1.176 million (*Ex. 20, 21, 31*) one-year after the "*investment*" as a *horse-trade* (like Manfredi's similar signature-hostage-ploy: *Ex. 19*).   July 2006, Kaiser acknowledge <u>by signature</u> that "*the risks attendant with your investments should be greatly reduced by the return of your capital*…"; see *Upton* and *Horvath*.[19]   Kaiser's surreal explanation at trial was despite a "*confront[ation]*" (*Tr.893*: which never happened, see his arbitration testimony, *Ex. 15*) with Kenner over his friends & family's $1 million "*investment/loan*"(??), yet he chose to <u>not</u> to "*read through the whole document*" (*Tr.1132-34*) before signing it.

- Kaiser has been fully recompensed by his own (1) signature-confirmation (*Ex. 19*); (2) testimony (*Tr.1089*); (3) submitted collateral agreement (*Ex. 30—and Jowdy transfer document: Ex. 37*)—and reality.  Thus—he is not a victim of the Hawaii transaction.

Nearly a century-and-a-half later—the Second Circuit *still* applies the stunningly apposite precedent

---

[19] *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012 (2nd Cir 2012) (citing *AXA Versichherrung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 30 (2ⁿᵈ Cir 2010) (summary order) ("If the signor could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir 1996) (Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent).

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir 1997)) (holding persons have a "basic responsibility…to review a document before signing it.")

==*Kenner is not the proximate cause of non-payments from investments in the instant case…*==

In the context of Cabo san Lucas investors being victims of Kenner's (somehow—yet never being charged with it—*supra*), Kenner offered in 2007 to buy out each investor from their CSL investment upon first discovery of the Jowdy embezzlements and refusal to repay the Hawaii-loan debt (*10-5-2020, Sentencing H'rg Tr.56-57*) (*infra*—see Attorney Madia May 17, 2007 "*update*": previously verified by Kaiser to the FBI in 2010, *Ex. 2 at 3*).   Kenner identified thru the Hawaii corporate attorney that he would buy out anyone at that time (with no takers for the offer in 2007)

> [Madia]: "*Phil has offered to buy any or all of you out of the contributions to CSL Properties.   We do not know if our Mexico legal efforts will be successful.  And Phil wants to make it clear that you can cash out now, if you want.  Just contact me and I will handle the paperwork with you and your personal attorneys.*" (*Ex. 13*) (Read into the sentence-day transcript records as a mitigating factor: *10-5-2020, Sentence Tr.56*).

==*Kaiser's self-admissions that he <u>impeded</u> most of the recovery in the instant case…*==

<u>Kaiser admitted</u> he is the reason investors did not recover their $2.3 million (CSL Properties 2006, LLC total investment: see *Ex. 13*) that Jowdy offered them in the "*Silverpeak*" buy out deal thru Masood Bhatti (regardless of their criminal but protected foreseeable plans) (*ECF 628*).  Kaiser said because of his intervention (like a self-proclaimed super-hero for the 2nd time)

> "*I can only say thanks to the government, otherwise the victims would have been victimized again.   I was the person who complained to the government…*" (*Id. at 2*)

Yet—now, the CSL investors cannot get a deal struck years later—with Jowdy or Danske who the government is terrified to prosecute (for obvious reasons). Kenner raised these non-settlement plans of Jowdy to the Court since 2016 thru submissions (as a pattern since Kenner's first confrontation with Jowdy in 2006).

The Court must note a few items, here, related to Berard and Kaiser's interjection in the Jowdy-defense (et.al.) from 2011-2017 (until Jowdy and attorney Harvey used them up like Calamity Jane—and then fired them):

*First*—Kaiser testified regarding the Constantine-Eufora matter that he, alone, convinced Eufora investors <u>not</u> to take Constantine's buyout offer in 2010 of 50% (or whatever they may have negotiated), removing the option in the first instance from the investors—wholly verifying intrinsic value in Eufora (*Tr.1065-67*):

> *Q What, if anything, did you hear Mr. Constantine say?*
>
> A [Kaiser]: *He called up all three individuals and he asked them if they were interested in selling their Eufora shares for half of what they paid for them.*
>
> *Q What, if anything, did they respond, that you heard?*
>
> A [Kaiser]: *They said yes, for sure, I'll sell it.*
>
> *Q What did you do afterwards?*
>
> A [Kaiser]: *After he hung up the phone, I said a few curse words, I guess. <u>And then I proceeded to call all three individuals up, Bryan [Berard], Jason [Woolley], and Greg [deVries] and said, ==Don't sell your shares. This is up hill==</u>.*
>
> *Q Why did you do that?*
>
> A [Kaiser]: *Because he had patents, I'd seen the documentation, and <u>it was about to go big, and they deserved to know</u>.*

*Second*—Kaiser helped stop the recovery of $2.3 million of CSL investments in the "*Silverpeak['s]*" deal (*ECF 628 at 2*)—*supra*; and

*Third*—<u>Berard</u> (like Kaiser) <u>confirmed</u> that his strong-armed, thugery as Jowdy's goon (acknowledged to the FBI in 2014 by Jowdy-victim, Gaudet: *Ex. 17, ¶9*—and text threats against Murray and deVries, and others, of USA litigation from Jowdy/Harvey versus any person who gave criminal testimony against Jowdy in

Mexico: *ECF 668 at 21-23, f.12*) was perceived as delaying or contributing to Jowdy's ongoing non-payment of the Hawaii-loans (*ECF 553*—and notwithstanding the government's reluctance to help: *ECF 554*) and continuing Cabo-Danske embezzlements from the investors (*10-5-2020 Sentencing H'rg Tr.11*):

> [Berard]: *"To this very day, some former NHL players think I had something to do with them not getting their money"*.

Kaiser and Berard <u>were</u> the proximate cause; interjecting their will on the investors in Cabo and Eufora; *not Kenner*.

The facts are clear:

(1) Berard was a Jowdy paid henchman, threatening litigation versus investors to protect his job and his boss; no different than Kaiser's fabricated testimony in the Mexico courtroom that his name was forged on the Stumpel-Mexico affidavit (*ECF 112-9 at 1-4*) (disproven again by a 2012-FBI recording; this time by Berard's affirmation of signing the documents in the Mexico courthouse with Kaiser and their Mexico attorney for Stumpel—*absent Kenner*: *ECF 668 at 177-78, f.90*)—and

(2) Kaiser and Berard are the proximate causation of any non-repayment in the Eufora transaction since 2009-10 (somehow now deemed as without value for guideline and restitution: *see Berard sentence day letter for Constantine*)—and the non-recovery of the CSL Properties 2006, LLC, $2.3 million capital contributions in the Cabo transaction[20] (unrelated to the instant case—but morphed into a nexus thru prosecutorial necessity).

Note: the government affirmed 10-28-2020 that Jowdy's receipt of the Hawaii loans in 2004-06 (*government-forfeiture-44*) was not part of the indictment—a

---

[20] Attorney Madia addressed this exact issue in his May 17, 2007 "*update*" (*Ex. 13*) (verified by Kaiser to the FBI thus known and authenticated to Galioto since October 2010: *Ex. 2 at 3*)

> [Attorney Madia]: "*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC (your investment LLC as attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund). Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist. <u>Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy.</u> They want to negotiate with Jowdy through Tommy.*" (*10-5-2020, Sentencing H'rg Tr.53-54*)

detail that took on a life of its own during and since trial as a *lynchpin* item the government repeatedly lied about to the jury—fully knowing its prejudicial benefit to the prosecution (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

Fortunately (only post-trial), it contradicted their forfeiture submissions of *government-forfeiture-36* and *government-forfeiture-44.* The Court never reconciled this *lynchpin* item after its outrageous prejudice, when it should not have been considered in the criminal case, in the first place according to the government…conveniently admitted post-sentencing (*10-28-2020, H'rg Tr.37*).

Kaiser's Baja Ventures 2006 affirmations (according to his testimony is his full recompense): There are no funds traceable in *government-forfeiture-36* from Kaiser to the Cabo resort, nor is Kaiser a member of the original Baja Ventures 2006 or CSL Properties 2006, LLC. Thus—Kaiser's reference of "*the only investment I have left*" is vis-à-vis his assertion about the two fabricated agreements (actually referring to the 2005 transactions as "*investments*" (*Ex. 30*) not "*loans*": *Tr.975*—et.al.).

- Kenner's name is *forged*—or *photocopied* on both documents, but Kaiser presented to this Court as authentic to affirm his collateral received in 2006.

Part of the Kaiser-Jowdy pay-for-play graft: These collateral agreements, lacking most elements of reality, were first presented during Jowdy's 2014 Delaware defense case versus deVries, Murray and other Jowdy Hawaii-Mexico investors (*Exs. 30, 38*). On Kaiser's behalf, Jowdy also signed a 2014 letter yielding Kaiser the Baja Ventures 2006 equity (without standing to do so—but irrelevant in Jowdy's cover-up world: *Ex. 38*). This 2006, $150 million collateral agreement should have "*[un]ruined*" Kaiser's life (*Tr.1089, 5753* [summation mis-representation])—if he could recall what fabrication he was presenting at that testimonial moment.

Regardless, per Kaiser's own testimony and fabricated documents, he has been fully reimbursed since 2006, but no later "*December 2009*" (*Ex. 30*) (1-½ years before he was employed by Jowdy—despite never raising the prior Baja Ventures 2006 equity status with anyone until Kenner was arrested).[21]

---

[21] As part of another Kaiser-laden temporal anomaly, he was present January 5-6, 2010 for the 2-day Jowdy California depositions with Jowdy (*Ex. 62*). Kaiser's presence would have been only 5-days after he became the largest Cabo san Lucas shareholder—but Kaiser said nothing to the Jowdy attorneys, the investors' attorneys, or Kenner while video and steno were being recorded. If actually true, Kaiser would have immediately asked to be added as a plaintiff to the DCSL lawsuit—or alt least recognized by every related party with Kenner present as well. **He did nothing**.

Considering Galioto was aware that Kaiser and Berard stole the Arizona renovation property title thru "*fraudulent transfer*" (*Ex. 9, ¶ 57*) and the Sag Harbor (LedBetter) title from Kenner via *forged* and *fabricated* documents (*Ex. 7*)—the $150 million (or so) Baja Ventures 2006 equity theft was just business-as-usual for the Jowdy-conspirators.   To complete their graft—all they had to do was cooperate with Galioto's theme that Kenner "==*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*==" (see Kristen Peca 2012-FBI recoding) and lie to a U.S. District Federal Court: as a simple matter.  *Piece-of-cake!*

None of this considers the simple facts that: 1) Kaiser signed off on his full Hawaii repayment (*Ex. 19*); and 2) Kaiser was repaid—yet abhorrently testifying that $1.176 million was paid to him in August 2006 (*Ex. 20*) for "*back pay*" and "*expenses*" (*Tr.1413-14*)—$816,000 in cash transfers (in addition to a separate $360,000 transfer agreement with Kenner [*Ex. 21*] that propelled Kaiser into the Managing-Member role in Hawaii: *Ex. 31*).   The Court should recall that Kenner requested an evidentiary hearing to have "in camera" 2006 or 2007 tax returns for Kaiser viewed by the court to substantiate the "*$195,000*" Kaiser testified was "*back pay*" (*Tr.988*) (simplified with IRS criminal agent Wayne involved in the case)—or the production of *even $1,000* of expenses paid to the Hawaii project by Kaiser worthy of reimbursements, ***let alone $605,000***.   <u>They simply do not exist</u>.   The Court, for what it is… should recognize the complicity of the government, allowing Kaiser's surreal testimony, again defying reality (See *Napue*).

Referencing Kaiser's 2006 payouts of $1.176 million (*Ex. 20*), Kaiser signed the July 2006 JV disclosure (*Ex. 19 at 7*), verifying he was fully recompensed for the 2005 transactions (*Id. at 6*).   Kaiser's signed disclosure confirmed (*ECF 892 at 23*); see *Upton*:

> "*the risks attendant with your investments should be greatly reduced by the return of your capital…*"

For four (4) independent reasons, Kaiser's $1,000,000 MVRA amount should be zero:

(1) Kaiser signed off on his repayment with the JV disclosure;
(2) Kaiser's bank records verify he received 100% of the funds;
(3) Kaiser cannot authenticate a single dollar of "*back pay*" or "*expenses*" to the Hawaii project; and

(4) Kaiser produced a collateral agreement in the Delaware case along with Jowdy's transfer letter that compensated Kaiser with over $150 million of equity in the Cabo resort of the $1,000,000 he borrowed from his friends and family in 2005.

Note: Further dissolving any perceived integrity, Kaiser testified that he repaid his friends & family (*Tr.980*) for the $1 million *he borrowed*, but in reality, as the government always knew, Kaiser sent Kenner a 2011 text (just prior to accepting his turn-coat job with Jowdy—like Berard) that verified he <u>never</u> re-paid his mother (Ethel), Vincent Tesoriero (a 9-11 hero), or Tesoriero's parents any of the $1 million deposits from August 2005 (*Ex. 18*) (*ECF 985 at 12-13, f.12*)—*supra*.

It is illogical why Kaiser would have paid Kenner "*100k*" in July 2011 (not the other way around) if Kenner had allegedly "*ruined*" his life (*Tr.1089*) by not repaying: (a) millions to him from the 2005 Hawaii transactions (a proven lie) (*Exs. 20, 21*) and (b) the 2006-07 California transaction (another documented lie by Kaiser) (*ECF 668 at 223-226*).

In addition to confirming—via July 2011 text—the money he still owed Kenner, Tesoriero and his mother, Ethel, from the 2005 Hawaii transactions (despite lying to the Court that he repaid them: *Tr.980*), Kaiser reconfirmed he still owed his brother Keith "*380k*" he took from him for some Vegas transaction *with Constantine* as he explained to the FBI in 2010 (*Ex. 1a at 7*)—when in reality he actually stole the money and used it to buy land from Kenner in Mexico via *notarized* document (*Ex. 32 at 3*), fully known to Galioto, Wayne and AUSA Beckman (*Id at 2*).

After a herculean effort to disseminate the variations of Kaiser lies, fraud by fraud, only one resolution can be reached: Kaiser has been fully repaid any number of ways you dissect his evidentiary representations &/or testimonies (to fit his cover-up-of-the-day).   <u>Kaiser has no loss under any metric.</u>


## *The Hawaii LLC...*

Michael Peca <u>verified thru testimony</u> to the 2011 Grand Jury that he expected his entire "*capital account*" investment funds to be used for (*ECF 986-1*).  Peca confirmed that his $1.8[75] million capital account investment was expected by him to contribute to the "*short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet*" (*Id. at 30-31*).  Peca testified (in Grand Jury secrecy):

*Q: When you signed those papers, <u>where do you think that money was going?</u>*

*A [Michael Peca]: **It was going to a capital account for Little Isle 4.***

*Q: How much did you put into Little Isle 4?*

*A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*

*The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.</u>*

Peca further verified that his LOC funds were available to pay all Little Isle 4 expenses, including other LOC payments (*Id. at 45*):

*Q: <u>Would you have authorized your line of credit to be transferred to pay his line of credit off?</u>*

*A [Michael Peca]: I think, I don't think they came in separately to that extent. **It was all in one account.***

The Court acknowledged Peca's unequivocal testimony of Jowdy loan knowledge after re-canting his original direct-examination ambiguity of "*just...Hawaii*" (*Tr.422*). Peca verified his "*truthful*" knowledge of the Jowdy-loans (*Tr.498, 650*)—just as the controlling, corporate By-Laws authorized (*Ex. 36: Tr.4458-59*). The Court acknowledged Peca (*ECF 501 at 9, Tr.499*):

[Court]: *However, he admitted that he had testified before the grand jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account.*

After applying Peca's "*fungible*" money (*Tr.4024* [Wayne]—and *Tr.760* [Kristen Peca]), there is zero loss from the $1.315 million loans traced to Jowdy—and zero loss resulting from the Constantine consulting payments: with either accountable to named individuals in the superseding indictment (*ECF 214*).

Under any counting method, no more than $1.315 million can be attributed to begin the causal analysis followed by the offset calculations (*ECF 770, Appendix 1 at 54*); not $10.794 million (*ECF 812 at 5-6*).

Originating from capital account contributions as Peca (*ECF 986-1 at 30-31*), Sydor (*Ex. 40 at 19-21, 25-26*), and Stevenson (*Ex. 61 at 17-18*) <u>also</u> testified <u>they expected</u> Jowdy to receive the Little Isle 4 capital account funds for the loan to a 2011 SDNY GJ)—<u>totaling $1.315 million</u>:

6) **Peca** ($240,000 distributed to Jowdy thru LI4's capital account);
7) **Sydor** ($200,000...);
8) Nolan ($425,000...);
9) Rucchin ($300,000...);
10) Berard ($150,000...).

<u>Sydor's 2011 SDNY Grand Jury</u>:  Sydor identified that his "*line of credit originally use[d] to invest in Little Isle LLC*" (*Ex. 39*: not produced by Northern Trust Bank in the Northern Trust subpoena at trial) were his "*1,223,758.33*" "*paid to others on Borrower's behalf*".   Sydor testified his LOC funds were authorized by him for "*Philip A. Kenner to access...for direct deposit into the Little Isle 4 account at Northern Trust Bank.*" –and "*he is authorized to sign for the release of funds related to my LOC.*" (*Ex. 40 at 20-21)*—and they would be "*paid back to Little Isle IV*" by Jowdy and "*not to [him] personally*" and when "*Lehman came up with the $129 million loan.*"—Specifying "*It was supposed to be paid back at the closing.*" (*Id. at 26*); leaving full clarity in Sydor's transactions, expectations, and control—thru his uncompromised 2011 Grand Jury testimony.

When asked by the AUSA/FBI during the 2011 Grand Jury about "*Why did you borrow money?*", Sydor emphasized that his original LOC was started "*to help out the transaction in Cabo*" (*Id. at 19*).

With (a) clairvoyant testimony from Sydor, Peca and Stevenson to the Grand Jury in 2011, (b) Berard and Kaiser to the arbitration panel in 2009, (c) affidavits signed by Norstrom, Gonchar and Stumpel for the 2009 arbitration, and (d) the Arizona, California, Mexico, Nevada and Delaware lawsuits to recover the same stolen funds by Jowdy by 19+ Hawaii-Mexico investors, the government *still* overlooked the Little Isle 4 (Hawaii) By-Laws (*Ex. 36*) authorized: (1) acting as a "*lender*", (2) "*can engage in outside ventures…including…lending opportunities*", and (3) "*can compensate all members and non-members for their roles in the LLC*".

Only the government alleged these overtly acknowledged, <u>legal</u>, and authorized activities as illegal…relying on failed memory tests as their sole evidence—of 3 out of 26+ investors.

After Galioto authenticated and verified the regular email "*update[s]*" from the Hawaii attorney with Kaiser in 2010 (*Ex. 2 at 3*), the Hawaii Managing-Member at the time of his confirmation, they ignored the entire Hawaii-Mexico investors' corroborated knowledge of everything (*Exs. 12, 13, 14*):

Attorney Madia 2006 "*update*" email (*Ex. 12*):

> [Hawaii inside-counsel, Attorney Madia "*February 24, 2006*"]: "*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project….Based on the meetings John Kaiser had with Ken before we agreed to lend him the money in 2004 Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications*."

Attorney Madia continued:
> "*The questions during our last conference call by Owen Nolan, Mike Peca, and Bryan Berard were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

*Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records.   It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.*"

Attorney Madia "*update[d]*" again (*Ex. 13*: "*May 17, 2007*"):

"*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC (your investment LLC as attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.  Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy.  They want to negotiate with Jowdy through Tommy.   You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on.*"

Nevertheless, *Ebbers, Rutkoske, Calderon* and their progeny must be applied to loss before totals can be affirmed per well-seasoned case law.   The government failed and the Court acknowledge this 4-years post-trial (*July 2, 2019 hearing Tr.24-25*):

[Court]: "*I'm a judge.   I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.  And I don't think we're at that point.   If the government just continues to not really focus on this, I'm going to have to try to figure out myself in terms of where I should draw the line.*"

The government never provided back-up tracing to their fabrications—considering the *government-forfeiture-36* and *government-forfeiture-44* tracing documents were exculpatory to Kenner's defense.  Statute requires it.

The proper application of statute and case law for credits and offsets reduces any Hawaii loss factor to zero.

*GSF...*

Despite Kenner and Kenner investors' disappointment in the Constantine GSF results—*not an element of a crime*—there isn't anything in statute that rewards contributors thru MVRA.   The *other elements* of Constantine's plan (Avalon, Falcon airplane, Eufora, and Palms condos—as signed off: *Ex. 41*) were devastated by the aforementioned global factors (*Tr.4588*) causing the proximate loss.

Notwithstanding—the government has presented no alternative calculation other than complete loss of the GSF contributions without any consideration to the Constantine plan—that all contributors independently authorized "*Acknowledged and approved*" (*Ex. 42 at 2*) (at least once)—like Jay McKee who was only involved in the GSF in the instant case per the government's affirmation (*Tr.1846*).   8-days after McKee's face-to-face dinner and follow-up texts (*Ex. 42 at 6-9*), McKee received a follow-up email from Constantine (like all GSF contributors) that more comprehensively recapped his GSF plan; including Constantine's addition of several Las Vegas condos (*Ex. 43*) stating (in part):

> *"Finally, as Phil and I stated, I also settled the* <u>*Palms condo*</u> *issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).*
>
> *Please do not hesitate to call me if you have any questions and please just to follow the program in terms*
> *of documentation.*

*TC*
*(602) 363-5676"*

Despite every GSF contributor receiving an identical notification email from Constantine (after their previous "*Acknowledged and approved*" confirmations: *Ex. 41*), not one person voiced (on conference calls or via email) that any *other element* of Constantine's plan was under explained or took them by surprise after they made their contributions—requesting a return of their funds.  Only loss of memory over 6-years later vexed the situation, coupled with the equivalent disappointment in results Kenner shared.

Emphasizing McKee's catastrophic memory loss during trial testimony (*Tr.1821-24*), were personal texts McKee exchanged with Kenner the same night after he and his wife heard the Constantine-GSF plan (*ECF 700 at 20-21*; *ECF 867-1 at 89-90; Ex. 42 at 6-9*).

> Note: None of McKee's trial testimony wavered about his gross-recollections; including his recap of the jet details (slightly off in detail only).   At trial, McKee was steadfast in response that "*No*", he was never told about the "*Airpark building*", "*Eufora*", or the "*jet*"—and later about the Las Vegas Condos (*Tr.1821-24*).

There is no trier of fact—considering all Kenner submissions were represented by the Court as reviewed and weighed—that could amply satisfy that McKee was misled or elements were concealed per his testimony after review of the exculpatory evidence received by Kenner in the late dump—&/or the texts that never received by co-defendant (*ECF 867*—et.al.; an ongoing, ripe *Brady* issue).

*The Gonchar-Constantine side deal covered any alleged Constantine malfeasances…*
*(ECF 501 at 60)*

Despite catastrophic GSF memory loss details by some (like McKee—*supra*), other government-witness opined on the specific details of Constantine's plan—like Tyson Nash.   Nash detailed his recollections in concert with everyone's "*Acknowledged and approved*" authorization and follow-up emails (*Tr.1919-21*).

As such, the Court identified "*$267,000.40*" that Constantine "*exceeded*" in spending on unauthorized items (*ECF 501 at 60*).  This conclusion disregarded the entirety of the $1.5 million Gonchar-Constantine side-deal (or the direct deposits of $20,000 by

Kenner: *Ex. 45*—or Constantine's "*$124,982*" deposit on 9-8-2009 to the comingled fund).  Gonchar affirmed that the government/FBI were aware of the arrangement, yet they ignored it anyhow to frame their GSF allegations; notwithstanding wasting more than 35% of the courts time during the 10-week trial with third-party witnesses who received funds from Constantine (alleged as unrelated—but covered by Gonchar's contributions).   Gonchar testified that his funds were fully accessible to Constantine and they covered 100% of "*only Mr. Constantine['s]*" spending (*Tr.3805-16*).  Under any analysis after applying their side-deal (*Tr.4826-27*)—no misappropriated funds can be identified to the government's chagrin.[22]

Only Gonchar can validate the use of *his* funds—as authentic—via the side-deal (assuming it is for legal purposes: never alleged otherwise)—specifically because with the tracking of GSF funds and Gonchar's four (4) contributions,[23] Constantine's alleged erroneous spending amounts (*ECF 501 at 60*) not authorized by the GSF authorizations never dips below zero.   Alternatively—using a complete disregard for Gonchar's testimony and authorized contributions, the total "*only Mr. Constantine*" overspends was "*$267,077.40*" (*ECF 501 at 60*); producing a cap of potential fraud amount for Constantine's GSF transactions; not $1.55 million (*ECF 1024 at 2-4—or ECF 812 at 5-6*).

Note: On day-one of the trial, the Court affirmed (*Tr.296*) to the jury that

> [Court]: *"Everyone be seated. Members of the jury, before we continue with the cross-examination, I just want to make sure there is no confusion on this issue as far as Mr. Juneau's testimony. The government is not alleging that the settlement between Mr. Constantine and Mr. Juneau with respect to the airplane is fraudulent. They're not alleging that that settlement was fraudulent in some way. It is not part of the alleged fraud in the indictment."*

Juneau was identified as one of the "*Bad Apples*" (*Tr.1919-20, 1944, 1989, 2003*) or

---

[22] Note: Gonchar's precise and articulate testimony regarding his side-deal with Constantine (whether known to Kenner or the other contributors or not: lacking relevance) was testified to in his fourth language without ambiguity (after Russian, Ukrainian, and German).

[23] Gonchar's side-deal contributions to attorney Richards' account solely under Constantine's engagement (*Ex. 44*):
- 5-5-09 – $250,000
- 9-9-09 – $749,985
- 11-6-09 – $362,355.58
- 11-30-09 – $138,000

"*Black Sheep*" (*Ex. 42 at 6-9* [McKee via text]: "*Hey, also, could u email me what the 3 black sheep are getting in the end*") related to "*Authorized and Approved*" transactions on behalf of every contributor.

As a result—even ignoring Gonchar's affirmation of *complete use of funds* (*Tr.4826-27*), only "*$267,000*" is traceable to Constantine's unrelated expenditures—creating a top-line number for loss calculations.

The loss calculation is therefore incorrect; See *Archer*—and should be reduced to zero.

==*Eufora…*==

No causal analysis was done by the government—simply applying a full loss as a result of the investment totals.   This is inappropriate—again.   The government verified during Kenner cross-examination haranguing "*the fact that Lehman Brothers went belly up, that the great recession happened, the real estate market bubble burst, you understand there's nothing in the indictment that blames you for that*" (*Tr.4588*).

Under that analysis, the only variable is the application of private stock purchase funds—and where they ended up. *See Novak, Starr, Leonard* and *Shellef—infra.*

Notwithstanding Constantine's attempts in 2010 (post-reveal of the Giuliani investigation) to create a *bearer stock fraud* allegation regarding Kenner and the two whistleblowing Eufora Board Members (CEO-Gentry and Gaarn), these items were thoroughly flushed out **several times** before the August 2010 surreptitious recording by Kenner at Home Depot.

> Note: Kenner turned the recording over to counsel (Giuliani's investigative/legal team) immediately.  Thus—every salacious allegation that Constantine fabricated, threatening (Jowdy-style):
>
> *"What do you think will happen when $700,000 shows up going from the players that already bought it the first time to the bank account to Tim Gaarn…"*

…Was misunderstood by the Court.  Note: Constantine was not concerned about any legit sales, yet the Court misconstrued Constantine's textual fabrication—common

when deciphering Constantine analogies.   The sales had been vetted four independent times by the investors attorneys.

*Attorney Stolper's July 8, 2010 letter...*
*(Ex. 46)*

Giuliani's investigative team vetted the *allegations* first made by Constantine a month before the Home Depot recording.

As such—Eufora investors' attorney Michael Stolper addressed the capital allocation issues in a July 8, 2010 letter to Eufora/Constantine's counsel identifying the AZ Eufora Partners I (investors) capital account private stock purchases from Constantine (*Id. at 1*) requesting:

*"(vi) The finances of, and each of your client's personal transactions with, Eufora and/or the Borrower; and*

*(vii) All capital contributions to Eufora, AZ Eufora Partners I, AZ Eufora Partners II, AZ Eufora Partners III or AZ Eufora Partners IV"*;

*Attorney Stolper's July 16, 2010 letter*
*(Ex. 25)...*

Eight days later, after no responsiveness from the Constantine/Eufora defense counsel, Stolper further highlighted the *allegations* in a July 16, 2010 letter to Eufora/Constantine's counsel.   This letter was signed off by 29 Eufora related parties (*Id. at 9-18*); *absent Kenner—highlighting more transparency*.   Thus—if Giuliani's team found any validity in Constantine's *allegations* about concealed transactions from Giuliani's clients (including Berard, Kaiser, McKee, Murray, Nash, Peca, Ranford, Rucchin, Stevenson, or Sydor), they could have sued Kenner immediately (concurrent with the Constantine lawsuits).   But instead—they vetted the ludicrous allegations of *bearer stock* frauds and dismissed them—by directly confronting the issues in the July 16, 2010 letter.   If any Eufora investor signed the letter and chose *not to read* it, that was their prerogative; see *Upton* and *Horvath*. But—collateral estoppel was established.

Attorney Stolper re-documented to Constantine's Eufora attorneys <u>and all the Eufora investors</u>, in his July 16, 2010 letter, the need for Constantine to support the

same *bearer stock* allegations (*Ex. 25*) (*ECF 668 at 83*).[24]   Stolper emphasized for all to see:

> "*...to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*" (*Id. at 1*)

> "*Lee [Eufora and Constantine's attorney], you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga.*" (*Id. at 4*)

> "*We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> "*Constantine made allegations against Gentry (Eufora CEO) and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I];*" (*Id. at 7*)

> "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*" (*Id. at 7*)

> "*...neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;*" (*Id. at 7*)

<span style="background-color:cyan">*Home Depot recording...*
*(August 3, 2010)*</span>

Now—ignored in the government's temporal analysis is that Kenner recorded

---

[24] In *Horvath v. Banco Comercial Portugues*, the investor argued that the terms and conditions of his agreement were <u>written in Portuguese</u>, which he did not understand, but the Court of Appeals found the investor was charged with knowing and understanding the contents of the documents he signed.

- The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

Constantine at Home Depot two weeks after the July 16, 2010 exposé letter from Attorney Stolper, *supra*.   Thus—there is nothing in the Constantine rhetoric—which expressly peeved the Court at sentencing—that the investors and Giuliani's team had not already heard, vetted, and dismissed as Constantine's nonsense (2 times before the Home Depot recording); specifically including:

> [Constantine]: *"What do you think will happen when $700,000 shows up going from the players that already bought it the first time to the bank account to Tim Gaarn..."*[25]

The answer to Constantine's *gibberish* was that Giuliani's team thought *NOTHING*— because like the government's GSF allegations (that required ignoring their knowledge of the Gonchar side-deal—et.al.), it was another *nothing-burger*.

In fact, unlike typical private attorneys, Giuliani and Stolper had every Second Circuit criminal connection necessary if they thought Kenner was involved in criminal activity with their clients.   Not only did they do nothing, but also a year later when they filed an EDNY case versus Constantine (ironically) in the Central Islip Courthouse, Stolper emailed the Eufora group about Constantine (*Ex. 47*: "*June 28, 2011*"):

> [Stolper]: "*It was crazy to think that he could solicit their investment in Eufora through emails, take their money, treat them as Eufora members in writing, in voicemails, at members only meetings (like last August) but then turn around and claim after-the-fact that the two police officers were not members, but that is exactly what Constantine did.*"

==*Constantine's bearer stock allegations exposed and highlighted by Kenner for the fourth time...*==

Ultimately sealing the Constantine rhetoric as *nonsense*—Stolper and Kenner exchanged texts 2-weeks after Stolper and Giuliani received the August 3, 2010 Home Depot recording from Kenner.   Kenner initiated the communication after

---

[25] Note: Constantine rhetoric was typically more confusing than helpful.  Consider Constantine's attempt to describe himself or Jowdy as the "*bank robber*" and the "*get-a-way driver*" in another indecipherable analogy during the Home Depot recording—*but not Kenner*.   Constantine trial counsel identified Constantine's typical and incomprehensible analogies during in their 28 U.S.C. 2255 reply—as well as agreeing with Kenner at trial (*Tr.4425*: stating, "*I know what you mean.*" to Kenner's responsive confusion related to a Constantine analogies) (*ECF 770 at 5-6, f.6*).

Constantine reiterated (for the fourth time) the *bearer stock* fraud scheme to anyone he could get an audience from.   Stolper was nonplussed—but the government 5-years later, tried to re-write history as *concealed transactions* (in lieu of the overwhelming disclosure and identifications in real time—specifically by Kenner).

During the Constantine-Eufora 8-18-2010 conference call in Constantine's attempt to defend the Stolper/Giuliani investigation findings, Constantine (like Jowdy before him, followed by Kaiser and Berard fantastical re-creations of reality) created an alternative history of events to obscure the truths.   Kenner immediately highlighted it for the investors' attorney—the dichotomous action to concealment (*ECF 668 at 82*):

| | | | | |
|---|---|---|---|---|
| 1 8 2 7 1 | 1917626 1175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | S e n t | [Kenner]: Tommy has the Kenner gave Gaarn stock as an <u>illegal transfer</u> issue on the table. He's threatening with law enforcement to go after us |
| 1 5 7 5 0 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC+0) | R e a d | [Attorney Stolper]: **Predictable** |
| 1 8 2 7 2 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | S e n t | [Kenner]: He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn <u>transfer</u>! |
| 1 5 7 5 1 | 1917626 1175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | [Attorney Stolper]: **Hopefully recorded**. |

Even Michael Peca (who bought 2008 private stock from Constantine) was aware of the allegations by Constantine—as he texted Kenner (the alleged perpetrator):



| | | | | |
|---|---|---|---|---|
| 1 5 7 9 6 | +1716374 3234 Michael Peca | 8/19/2010 2:40:01 PM(UTC+0) | R e a d | [Michael Peca]: I will later. <u>Hopefully everyone can get together to put the allegations to rest</u>. <u>There are bad ones going both ways</u>. |

With Stolper still the investors attorney, <u>opposite another government trial fabrication</u> (*Tr.5960*) and one year later, no one (not Kaiser, Privitello, Rizzi, Hughes, Ethel Kaiser—or any other Eufora investor Kaiser independently took funds from) claimed Kenner had anything to do with the Constantine solicitations—*especially not Kaiser*.

Contemporaneously with the 2011 EDNY lawsuit versus Constantine (filed by Stolper) after Constantine made harsher allegations in his 2010 Arizona countersuit

against Kenner et.al., Stolper sat thru 24-hours of Kenner's SEC testimony and concluded at the end of day 3 to the SEC (*Ex. 58*) (*Bates stamp: TR-SEC000426*):

> [Stolper, August 2011]: *"The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients. I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of****, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal, and Constantine] who did wrong here. And we see it as a welcome thing, as a positive thing.*
>
> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*
>
> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning. Just a point of information."*

Note: just months later and in consistent context, Giuliani's partner Stolper told his Eufora clients "*January 31, 2012*" (*Ex. 47*):

> [Stolper]: "*I've also notified the SEC about our New York lawsuit and Constantine's federal crimes. I know that I've compressed a lot of information into a short email. Feel free to reach out to me if you would like more detail or if you have any questions. Rest assured that I will not let this guy off the hook for what he's done to all of you. Michael*"

The Court must note that although the government alleged Kenner was involved in the December 2009 transactions between Constantine and Kaiser's people, every document in the government's possession is between Constantine and Kaiser (with some Privitello interjections) (*ECF 214 at 5, ¶14*). Even the Privitello, Kaiser, Hughes, and Rizzi attorneys were not convinced (*Ex. 25,* signed together *at 17*). Kenner is <u>not</u> even copied on a single email—because Kenner was not even notified about the December 2009 Privitello purchase until weeks after the fact by Kaiser. Privitello hedged his cross-examination responses to admit Kaiser was the person who initiated the direct communication regarding Privitello's purchase, *absent Kenner* (*Tr.1441-42, 1489, 1492-93*). Furthermore—Kenner first learned of Kaiser's

subsequent $200,000 investment (for Ethel Kaiser, Hughes, and Rizzi) on or about August 31, 2009 (7-months later), when Kenner emailed Attorney Richards's office to get documentation for Kaiser (*Ex. 48*).

> Note: Kenner has no recollection of ever meeting or speaking to Rizzi or Hughes—nor has Kenner ever *touched* the money that Kaiser independently negotiated with Constantine and contributed to Eufora for his friends & family in December 2009—while Kaiser was back-dooring side-deals for equity with Constantine from his own investors (*Tr.1559-60*: an after-the-fact failure to recollect even by Privitello who attempted a revisionary history to the actual Kaiser theft...to protect his friend).

Unequivocally, Kenner has no involvement in Kaiser's December 2009 solicitation of Privitello, Ethel Kaiser, Hughes or Rizzi.    Kaiser has no money invested in Eufora (identified as $200,000 for restitution: *ECF 1024 at 2*).   Furthermore—the government double-counted Ethel's "*$66,666.67*" that her son solicited and took from her based on promises independently made between the two of them—*absent Kenner's involvement or knowledge.*


<span style="background-color:cyan">*Conclusion on the individual restitution issues...*</span>
*(Raised during the 4-5-2021 hearing—re: ECF 1024 totals at 2-4)*

Notwithstanding the necessity to apply Gonchar's testimony to the GSF transactions (*Tr.4826-27*) reducing any GSF loss to zero—and applying Peca's Grand Jury testimony (*ECF 986-1 at 30-32*) and corroborating and "*truthful*" EDNY trial testimony (*Tr.496-99, 650*) to the Hawaii allegations—reducing any Hawaii loss to zero...**no loss or victims can be derived from either alleged fraud**.  The government rushed to judgment and failed to "*trace the money*" (*Tr.4594*).

<u>Privitello</u>
Privitello's loss from Kenner was **zero** on the December 2019 chart (*ECF 781 at 5*) but changed to $200,000 (*ECF 812 at 5*), with Kenner <u>not guilty</u> on both Counts 5 and 6 (*ECF 214 at 8*).   As detailed, *supra*, there is zero empirical evidence tying the Kaiser-Constantine-Privitello December 2009 negotiations to Kenner (including Privitello's testimony—*supra*).   The lack of nexus is identical to the Kaiser-

Constantine negotiations for Hughes, Rizzi, and Ethel Kaiser's late December 2009 Eufora investments.[26]

- Privitello's restitution and guideline loss should be zero.

Stevenson

Stevenson testified to the SDNY Grand Jury and raised zero issues about his GSF. Stevenson signed an "*acknowledged and accepted*" authorization for "*only Mr. Constantine*" (*Tr.3805-16*) to access the funds per his authorization. No testimony was adduced at trial in contradiction to the Constantine-Stevenson arrangement— or that Kenner was invovled. Notwithstanding "*fungible*" (*Tr.4024*: IRS agent Wayne) accounting, the linear tracking of Stevenson's funds were distributed as follows (from the Ronald Richards accounting spreadsheet):

| | |
|---|---|
| 8-26-09 Stevenson deposit | $100,000 |
| 9-2-09 Alliance Bank (Eufora distribution) | (80,000) |
| 9-8-09 First Source Bank (Falcon 10 distribution) | (4,065) |
| 9-8-09 Northwest Partners (Constantine) deposit | $124,982 |
| 9-9-09 G55 Fdtn (Gonchar) deposit | $749,985 |
| 9-9-09 Neptune company (Eufora distribution) | (500,000) |
| 9-9-09 Eufora LLC (Eufora distribution) | (250,000) |

Note: although the government alleged Kenner concealed the spending for an account he had no access to (*Tr.3805-16*) under an engagement agreement he was not a party to (*Ex. 44*)—no one but Constantine had access to the spending until Attorney Richards documented (*Ex. 35*):

[Ronald Richards]: "*I was contacted by Mr. Kaiser's attorney, Michael Stolper, in September 2010. Mr. Stolper also represents Philip Kenner, a former client and business manager referenced in my response to the other complaint and in the pleadings in this case. I provided Mr. Stolper and Mr. Kenner with all of the [GSF] evidence and confirmations they requested as to the transmittal of the funds to Mr. Constantine.*"[27]

---

[26] Kaiser notified Kenner 9-months later in August 2010—for the first time, that he wired $200,000 to Constantine thru the Ronald Richards account for Ethel Kaiser, Hughes, and Rizzi. At first notification of the transaction, Kenner requested confirmation of the fund transfers with Ronald Richards' office (and copied Kaiser) (*Ex. 48*).

[27] **Noting**: Michael Peca testified he received the GSF spreadsheet but '*could not verify it*' (*Tr.652-53*)—while attorneys Ronald Richards and Michael Stolper represented him— *independently*. Jay McKee testified that he could not receive it from Kenner *without a*

Kenner had no more access to the funds (or the information surrounding Constantine's transactions) than did any other GSF contributor thru their collective attorney, Michael Stolper (as attorney Richards documented).

Zero of the Constantine transactions from the Stevenson funds are traceable to anything but transactions authorized by Stevenson (similar to the group authorizations), without overlapping and evaluating the Gonchar-Constantine side deal application of $1,500,000.

- Notwithstanding Stevenson was not a named person in the superseding indictment—Stevenson's restitution and guideline loss should be zero.

Berard

Berard had a final $100,000 cash contribution to the Hawaii project (of which he received $42,553 in August 2006 like every other cash investor: 42.553% repayment from the Lehman Brothers transaction—not deducted)[28] and had a gross $649,405 LOC for his "*investment*" (*Ex. 4 at 7*—originally *"$900,000"* and reduced to $650,000 after the 2006 JV [*Ex. 49 at 15*] per his independent, unfettered communication with Northern Trust banker Mascarella: *Ex. 50*).   Berard received a gross settlement amount from Northern Trust Bank thru Jowdy's attorneys with Galioto's influence (like Peca and Nolan) after pledging support for Jowdy against the recovery of the macro-group of Hawaii-Mexico investors and Kenner.   Berard's net amount was "*roughly after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*).

- Kenner requested (via 4-12-2021 submission: *ECF 1026*) "in camera" review for the gross settlements for proper calculations (same requests for Nolan and Peca settlement amounts)—because the net settlements had a "*35%*" contingency payments (per Peca's victim impact statement): more enrichment for Jowdy's cabal.

Incrementally, after applying the *Ebbers* standards to the Berard-Hawaii "*investment*", Berard has no loss.   $150,000 is traceable from Berard to the Jowdy

---

*delay*—clearly not in Kenner's possession any earlier than it was also in two of his own attorney's possession (*Tr.1827*); perhaps more timeline confabulations or CTE symptoms; leaving unexplained innuendo and unexplainable temporal anomalies to prejudice Kenner.

[28] The same 42.553% of cash was not deducted from Michael Peca's cash investment (*ECF 1024 at 3*).

loans (*ECF 770 at 54*)—as Berard testified to the 2009 arbitration panel that expected (*Ex. 51*)—and <u>zero</u> to the Constantine consulting payments. Berard's government-conceded gross "*investment*" amount of $706,852 [$649,405 – (100,000-42,553)] (*ECF 1024 at 2*) must be offset by:

(1) His gross Northern Trust settlement (not net of attorney fees)—and
(2) His receipt of 2004-2009 interest payments from his collateralized "*investment*" strategy, which totaled $<u>129,314</u> (*Ex. 27*).

These totals far exceed any traceable funds to Constantine and Jowdy—leaving a zero loss factor.

- Berard's Hawaii restitution and guideline loss should be zero.

<u>Berard-LedBetter</u>
Despite the Court's position that they believed the Berard testimony about his LedBetter investment (*ECF 1024-1 at 32*), there is no testimony that Berard lost any funds or was unaware that he invested the funds with his own <u>signed</u> and orally authorized transfer requests. Berard profited from the LedBetter deal <u>after he and Kaiser stole</u> the LLC thru a *forged* and *fabricated* document; known at all times to the government and FBI (*Ex. 7*).

Berard transferred $275,000 on 10-23-2006 (*Ex. 52 at 6, 12*) for the October 2006 closing from his Northern Trust investment account—*independent of Kenner*. Berard's transfer <u>required</u> his signature per his Northern Trust IMUS (Investment Management Agreement—like every Northern Trust client who made post collateral seizure external transfers: *Ex. 53 at 1*). Berard's additional $100,000 was transferred 10-24-2006 after his oral approval from his Schwab Institutional custody account—<u>also as required</u>. Berard's Schwab Institutional account statement for October 2006 verified the $100,000 transaction (*Ex. 59 at 3, 6*), mailed to his Rhode Island home address on record (*Ex. 52 at 1*—and *Ex. 59 at 1*).[29]

After Kaiser and Berard first met with Jowdy in late 2011 to discuss working with him and Galioto versus Kenner and Kenner investors, Kaiser and Berard fabricated a new LedBetter operating agreement (*Ex. 7*), replacing the one the government presented at trial thru the closing attorney (*Ex. 55: GX-703*) (*Tr.672*)—and Tesoriero told the FBI he received from "*only Kaiser*" (*Ex. 5, ¶9*) despite Kaiser's testimony

---

[29] Ironically—this is the same Rhode Island address that Berard received multiple Northern Trust LOC monthly statements (received in the 2015 Northern Trust subpoena) (*Ex. 54 at 3, 6*—et.al.). These were alleged—only by unsupported government rhetoric—as not delivered to Berard and the other Northern Trust LOC clients.

regarding the new operating agreement that he "*didn't see this document at the closing*" (*Tr.1004-05*).   The government (pretrial) was aware of Kaiser and Berard's *fabricated* and *forged*[30] document and included it in their BINDER-##### production to the defendants for use at trial (initial production—Bates stamp: *BINDER-000450* and *BINDER-000451*).  Kenner's trial counsel alerted the FBI to the *fabricated* and *forged* document (*Ex. 7*) versus the original (*GX-703*).   As a result, the government dropped the use of the previously disclosed document, once they realized Kaiser and Berard *fabricated* and *forged* the document.

Nevertheless—and in addition to the Arizona real estate project criminal theft from Kenner (*Ex. 9*: Arizona ruling against Kaiser and Berard's title theft thru "*fraudulent transfer*"—*at ¶57*) while <u>also</u> known to Galioto (*Ex. 56*: hidden from *Brady* production), Kaiser and Berard sold the Sag Harbor property on "*5-9-2012*" for "*$740,000*" (*Ex. 57*) and kept all of the proceeds, *as another sanctioned criminal act* (including the nearly $100,000 Kenner expensed for engineering, taxes ["*$27,303*"— *Id.*], construction drawings and permits).   Kaiser—who according to the fourth partner, Tesoriero, had less than $30,000 in the LedBetter deal (*Ex. 5, ¶5*)—but spilt the $740,000 with Berard leaving both of those criminals well into *the black* on the deal—and Tesoriero and Kenner victims (again).

- Berard's LedBetter restitution and guideline loss should be zero.

<u>John Kaiser</u>

---

[30] Berard &/or Kaiser forged Kenner's girl-friend's name on the fabricated operating agreement in order to transfer control of the LedBetter LLC to Kaiser.  Ironically—their incompetence (although rewarded for Jowdy-loyalty) made four (4) amateur errors on the title theft conspiracy document (*Ex. 7*):
   (1) They replaced the Managing-Member (forged signature) in contradiction to the actual government exhibit from trial (*GX-703*)—which the person (who they forged the signature) was already removed as a co-Managing-Member from any future role in the LLC;
   (2) They changed the indemnity clause 3 times (via hand-written alterations), eliminating the original indemnity—clearly not comprehending the legal nuance of the original transaction (with Kaiser needing to hide it from Manfredi and Milana in the buy out, *Ex. 5, ¶4*);
   (3) They actually changed the Nevada address from the authentic operating agreement that Kaiser originally initiated (at Jowdy's home) and used Kenner's Arizona address (defying any logic); and
   (4) They named Kaiser a 50% partner and Berard 25%—conflicting with both of their trial testimonies about what they *were told by Kenner* before entering the deal (*Tr.1001-02*).

For multiple reasons that the government and Kaiser cannot refute versus the empirical and exculpatory records, *supra* and thru multiple Kenner submissions, there is **no loss** for Kaiser in the Hawaii project, notwithstanding his fabricated 2006 collateral agreement (*Ex. 30*) and complicit Jowdy transfer letter without standing (*Ex. 38*), as Kaiser testified, for the "*only investment I have left*" (*Tr.1089*).

• John Kaiser's Hawaii restitution and guideline loss should be zero.

Second, Kaiser does not have any money in the Eufora transaction (*Tr.1058*), despite his fabrications that have never been supported by bank records or transactional records (emails, texts—etcetera). Any Eufora dealing regarding Kaiser took place independently with Constantine and at a time after Kenner terminated dealings with Constantine over the GSF usage issues.

Kaiser—desperate to repay his friends & family from his multiple thefts (including those he personally verified to the FBI: *Ex. 2 at 7*; for his own benefit: *Ex. 32 at 2-3*, and known to Galioto, Wayne, and Beckmann, *Id. at 2*) while not repaying Ethel Kaiser, Tesoriero, and Tesoriero's parents as he testified (*Tr.979-80, 1215*) (see Kaiser's 2011 text to Kenner—*supra*)—Kaiser tried to create an investment side-deal with Constantine for raising funds for Constantine's company (later discovered by Privitello who covered for him with indefensible testimony: *Tr.1559-60*).

As such—zero empirical records tie Kenner to the early December 2009 Privitello investments (discussions, transactions or otherwise)—or the late December 2009 Ethel Kaiser, Rizzi and Hughes transactions. The Court should note that in 2014, after Kenner was indicted and charged for the Privitello transactions, Attorney Stolper (who was not "*a different lawyer*": *Tr.5960*) re-filed litigation in the EDNY courthouse versus Constantine for the Ethel Kaiser, Hughes and Rizzi transactions (not "*a different group of investors*": *Id.*). Stolper *still* did not include Kenner as a culpable party (See case2:11-cv-02692-SJF-GRB).

• John Kaiser's Eufora restitution and guideline loss should be zero.

Ethel Kaiser

Kenner had no financial dealings with her at any point in time. The government juxtaposed a 2006 social visit during a christening (*Tr.933-34*) as a 2005 event (one year provably out of order) to allege Kenner met Ethel Kaiser to entice her participation in John Kaiser's $1 million, 2005 transaction in Hawaii (*Ex. 18*: with Ethel Kaiser, Vincent Tesoriero, and Tesoriero's parents $1 million—none from Kaiser as he testified *"$180,000", Tr.976-77*).

Now—at least the Court knows Kaiser never repaid his mother (or Kenner, Tesoriero, his handi-capped brother—etcetera) as he testified (*Tr.1089*) (See 2011 Kaiser text confession to Kenner—*supra*)—but had his septuagenarian mother testify that she was repaid "*by her son*" (*Tr.933-34*). It was shameful—moreover because she thought she recovered "*$390,000*"..not the $700,000 the banking records verified (*Ex. 18*).

Incrementally—the government failed to apply *Leonard, Novak, Starr*, and *Shellef* Second Circuit case law to any of the Eufora loss calculations as Kenner raised 4-5-2021 (*ECF 1024-1 at Tr.17*) for all investor's totals in the April 16, 2021 charts (*Id. at 2-4*). The Kaiser-Constantine December 2009 transactions were devoid of Kenner involvement. In fact, eight (8) months later—when Kaiser first alerted Kenner to his late December 2009 $200,000 transactions with Constantine after seeing they were absent from the Richards GSF transaction spreadsheet that Stolper and Kenner requested (mid-2010: *Ex. 35*), Kenner requested the information (*Ex. 48*). No other empirical evidence exists of Kenner's knowledge of or involvement in the Kaiser-Constantine dealings.

• Ethel Kaiser's Eufora restitution and guideline loss should be zero.

<u>Nolan</u>
Nolan is only involved in the Hawaii transaction in the instant case.

After separating Nolan's "*$2,200,000*" "*Investment in Little Isle IV LLC*" (*Ex. 4 at 3*) from the alleged criminal acts: (1) the Jowdy loans and (2) the Constantine consulting payments, only $425,000 is traceable to Jowdy with $350,000 traced by *government-forfeiture-36* on "*5-4-2005*".

Baselessly, the government lied to the Court about the underlying settlement—alleging they conferred with Nolan's attorneys and Jowdy's attorneys (*ECF 781 at 3, ¶ II*)—yet Nolan's counsel produced it months later when the nexus to the forfeiture required proof of Nolan's additional interests (*ECF 874,* including *exhibit 874-1*). No reprimand was issued to either party for blatantly lying to the Court. The Nolan-Jowdy settlement was valued at approximately $3,250,000 at the time of transfer, as Justice Sotomayor opined was the correct date of analysis for restitution, *supra*. Furthermore—the Court's suggestion that "*I think its pretty obvious, if he [Nolan] had the ability to try and get that $3 million acknowledgment he would have done so*" (*4-5-2021, restitution H'rg Tr.14-15*) is overly broad—because any number of personal decisions could have been made by Nolan (under advice of counsel who

negotiated the Nolan, Juneau, and Moreau deals with Jowdy: *Ex. 33 at 5*).  The least of which would be to continue with the larger equity stake, trusting Jowdy's unchallengeable real estate development track record—a proximate cause of the settlement value, un-relatable to Kenner.

> Note: when the same opportunity to cash out presented itself in May 2007 from Kenner to the CSL investors (including Nolan) (*Ex. 13*) after attorney Madia offered:

> [Madia]: "*Phil has offered to buy any or all of you out of the contributions to CSL Properties.   We do not know if our Mexico legal efforts will be successful.  And Phil wants to make it clear that you can cash out now, if you want.  Just contact me and I will handle the paperwork with you and your personal attorneys.*"[31]

Nolan's $425,000 traceable funds to the Jowdy loans are offset twice over.
> *First*—before "in camera" review of the gross Northern Trust settlement, Nolan verified he received "*$500,000 for settlement*" (*Tr.2074*)—and

> *Second*—Nolan (like Berard—*supra*, Sydor, Rucchin, Peca, Norstrom, Murray, Gonchar, Juneau: *Ex. 27*) received interest payments as part and parcel to the collateralized investment strategy.   Nolan received $<u>592,878</u> between 2003 and 2009.

- Nolan's restitution and guideline loss should be zero.

---

[31] Neither Nolan, nor any other investor wanted out in 2007.  To a man, they told Kenner and Madia that if Kenner is staying in the deal, then they were staying in.  And for Nolan, post Jowdy settlement, Nolan and his attorneys had unfettered access to Jowdy (a.k.a. "the man"), the developer wunderkind that Lehman Brothers, and subsequently Danske Bank, has presented to this Court as the only uber-developer they believe in (more likely than not based on his development and track record efficacies).   At best—the government has made toothless attacks on the Danske-Jowdy relationship, by noting the graft of: 1) "*paying him 10% of principal payment received by Danske through a sale of the resort*", and 2) while in perpetual default, "*Jowdy was and is being paid $225,000 per month*" (obviously out of fear for retribution by Jowdy's cabal if they indicted any Jowdy-party, including attorney Harvey) (*ECF 871 at 10, 12*—and *ECF 926* subpoena requests).  But clearly (with intestinal fortitude), an indictment for the tens of millions of Kenner-documented racketeering and embezzlements would resolve to the investors' benefits (unfortunately embarrassing a lot of influential individuals who strapped their integrity to Jowdy).

Regarding the remaining loss figures, Kenner has not abandoned his prior arguments of zero (Hawaii and GSF) to negligible (Eufora) losses, at best—based on exculpatory evidence previously presented thru submission, well-seasoned case law, and statute.  The remaining named persons in the government's umpteenth version of the loss charts (*ECF 1024 at 2-4*) should have the same application of law and statute applied to reach an appropriate total—not just one that the government provides again out of exhaustion: via *ipse dixit* and *conclusory* reasoning.

Based on the aforementioned arguments—supported by overwhelming exculpatory evidence, and the proper case law and statute applications, Kenner requests the Court reduce the restitution amounts for Kaiser, Berard, Privitello, Ethel Kaiser, and Nolan to zero.

Separately, Kenner requests a hearing to address the remainder of the named persons in *ECF 1024* charts *at 2-4* for the macro-Hawaii-GSF-Eufora loss calculations—accurately.   As the U.S.S.G. acknowledges that

> "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2014).  The decision to hold or not hold a *Fatico* hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014).  If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.

Alternatively, the government could take another opportunity to apply the case law and statute to the remaining investors/contributors/lenders.

Sincerely,

Phil Kenner, ProSe

Submitted April 30, 2021