FILED
CLERK
1:44 pm, Jun 09, 2021
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, . Criminal No. 13-cr-00607-JFB-AYS-1
                          .
            Vs.           . 100 Federal Plaza
                          . Central Islip, NY 11722
PHILLIP A. KENNER,        .
TOMMY C. CONSTANTINE      . DATE June 7, 2021
. . . . . . . . . . . . .

TRANSCRIPT OF HEARING
(Via Video)
BEFORE HONORABLE JOSEPH F. BIANCO
VISITING JUDGE

APPEARANCES:

For the Government:          UNITED STATES ATTORNEYS OFFICE
                            EASTERN DISTRICT OF NEW YORK
                            BY: DIANE LEONARDO-BECKMANN, ESQ.
                                MADELINE O'CONNOR, ESQ.
                            271 Cadman Plaza East
                            Brooklyn, NY 11201


For Danske Bank:            VENABLE LLP
                            BY:  GEORGE KOSTOLAMPROS, ESQ.
                                 XOCHITL STROHBEHN, ESQ.
                                 KELLY WEINER, ESQ.
                                 DOREEN MARTIN, ESQ.
                            Rockefeller Center
                            1270 Avenue of the Americas
                            24th Floor
                            New York, NY 10020




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**PO BOX 688**
**Middletown, NJ 07748**
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
**www.tgribbentranscription.com**

2

ADDITIONAL APPEARANCES:


For Owen Nolan:                 PROSKAUER ROSE
                                BY:  SEETHA RAMACHANDRAN, ESQ.
                                Eighth Avenue & 41st Street
                                New York, NY 10036

For Diamante:                   FREEH SPORKIN & SULLIVAN
and Jowdy:                      BY:  THOMAS SOUTHER, ESQ.
                                350 5th Ave, Suite 6903
                                New York, NY 10118

                                FARRELL FRITZ
                                BY:  KEVIN MULRY, ESQ.
                                622 Third Avenue, Suite 37200
                                New York, NY 10017

For CSL Properties:             STEVE MAIN, ESQ.

For Marc Wolinsky               BY: MARC WOLINSKY, ESQ. Pro se
and Homeowners:

3

1                          I N D E X

2

3                                              PAGE

4  PRELIMINARY DECISIONS                      5

5  ORAL ARGUMENT

6        BY MR. KOSTOLAMPROS              10/33

7        BY MS. O'CONNOR                      18

8        BY MS. RAMACHANDRAN              23

9        BY MR. WOLINSKY                      25

10       BY MR. SOUTHER                       28

11  DECISION                                  34

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           THE CLERK: Calling criminal case 2013-607.  United

2  States of America versus Phillip Kenner and Tommy Constantine.

3  Counsel, please state your appearances for the record.

4           MS. O'CONNOR:  Assistant US Attorneys Madeline

5  O'Connor and Diane Leonardo for the United States.  Good

6  afternoon, Your Honor.

7           THE COURT: Good afternoon.

8           MR. KOSTOLAMPROS: Good afternoon, Your Honor, this is

9  George Kostolampros of Venable representing Danske.  And here

10  with me are Xochitl Strohbehn, Doreen Martin, and Kelly Weiner.

11          THE COURT: Good afternoon.

12          MR. WOLINSKY: Good afternoon, Your Honor, this is

13  Marc Wolinsky, one of the Diamante homeowners.  And there's

14  quite an audience of homeowners on the line.

15          THE COURT: Good afternoon.

16          MR. WOLINSKY: Good afternoon.

17          MS. RAMACHANDRAN: Good afternoon, Your Honor, this is

18  Seethe Ramachandran, on behalf of Owen Nolan.

19          THE COURT: Good afternoon.

20          MR. MULRY: Good afternoon, Your Honor, Kevin Mulry

21  from Farrell Fritz, for the DTSL parties.

22          THE COURT: Good afternoon.

23          MR. SOUTHER: Good afternoon, Your Honor, Tom Souther

24  also on behalf of the DTSL parties.  I'm with Freeh Sporkin and

25  Sullivan.

1          THE COURT: Good afternoon.

2          MR. MAIN: And Your Honor, Steve Main on behalf of the

3    CSL Properties.

4          THE COURT: Okay, good afternoon.  I think that covers

5    everybody.  And I would just ask, it sounds like everybody has

6    their phones mute, I would, because we have a lot of people on

7    this call, to make sure that your phones are muted so that we

8    don't have any background that will interfere with our ability

9    to hear.

10          As you know, I scheduled this conference to address

11   the ongoing issues with respect to the forfeiture of the

12   resort.  I've reviewed all the various submissions that have

13   been filed with the Court since the last conference.  So

14   similar to other conferences, I'm going to just give you my

15   preliminary thoughts based upon my review of the papers of how

16   I should proceed, and then I'll give everybody a chance to be

17   heard and you know, persuade me that there's a better way

18   forward, if you think my approach is not the one that should be

19   followed.

20          So there were three issues that were outlined in the

21   letters.  First, with respect to the interlocutory sale, my

22   view is that absent all the parties working together toward an

23   interlocutory sale, I'm not going to pursue that.  I did ask

24   the Government to outline what the interlocutory sale would

25   look like.  However it's my view that, although the Government

1   believes that the Court has the authority to order third

2   parties such as the Bank and a foreign entity to participate in

3   an interlocutory sale, my view is the law is less clear on

4   that.  And even if I had the authority, I think as a practical

5   matter, as Mr. Kostolampros outlined briefly in his latest

6   letter to the Court, there are a lot of practical

7   considerations that the Government has not really addressed.

8           So I'm not going to waste any more time on that.

9   Obviously if the parties were all in agreement that that was

10  the best course and I know obviously at one point the Bank was

11  urging me to do an interlocutory sale, at one point the

12  Government was telling me as soon I entered the preliminary

13  order of forfeiture we would be able to move forward on an

14  interlocutory sale.  And obviously that was a long time ago.

15          But the Government is not moving for an interlocutory

16  sale now.  The Bank doesn't want an interlocutory sale now. So

17  it seems to be it would be not prudent for the Court to try to

18  force that issue under these circumstances.  So I'm really done

19  talking about that.  Again unless everybody agreed, which I

20  don't think is going to happen, but unless everybody agreed for

21  whatever reason that that was a viable option at this point.

22          On the broader issue raised in the letters, and Mr.

23  Wolinsky spoke to this as well, I know the view is that the

24  Government is overly optimistic, I guess is the best way to put

25  it, that the Government makes this distinction between and

1  interlocutory sale and a final order of forfeiture.  And they

2  are of the belief that once the Court enters a final order of

3  forfeiture that some of the issues with respect to an

4  interlocutory sale, practical and/or legal issues, will be

5  resolved by their ability to begin that process, seeking

6  immediate assistance of the Mexican Government, to achieve the

7  forfeiture of the resort.  I know Mr. Wolinsky pointed out in

8  his letter that he thinks that that is not necessarily going to

9  be the Mexican Government's response.

10        But the bottom line on that issue is, I have no way

11  of making that judgment as we sit here today.  The property is

12  forfeitable under American Law, for the reasons I've already

13  outlined, and you know, it's not really the Court's role at

14  this point to try to predict what the Mexican Government's

15  response would be to a final order of forfeiture.

16        So, as long as the Government has the legal right to

17  pursue this under US Law, which they clearly do, that issue

18  unfortunately I think has to await further adjudication.  So to

19  the extent there's any request for the Court to somehow abandon

20  or discontinue the Government's ability to seek such a final

21  order of forfeiture at this juncture, I'm declining to do so

22  for the reasons I've just indicated.

23        On the Silver Peak assignment, I'm not making any

24  final decision with respect to that today.  I did read

25  obviously the letters as it relates to the legal issues

1  surrounding that.  I was somewhat surprised at what I would

2  consider to be the dearth of authority as to whether or not

3  Silver Peak can stand into the shoes of the Bank and have

4  whatever interest the Bank ultimately, is adjudicated by the

5  Court to have.  The Court partially ruled on that.  There's

6  another piece that's left outstanding.

7          My instincts are that there should be no reason why,

8  it's not prejudicing the Government interests if the Bank has

9  an interest that's superior to the Government's, it's unclear

10 to me why that they could not assign that.  But I'm not

11 prepared to make that ruling here.  And the reason at this

12 point, the reason I don't think I need to address that at this

13 point -- I do think that the amount of information given to the

14 Government regarding this transaction is really insufficient

15 for them and/or the Court to evaluate it and determine whether

16 or not it is an assignment that should be recognized under the

17 law for the issue of forfeiture and bona fide purchase of

18 value, that whole issue as it relates to forfeiture.

19         But just in general, whether or not it's a valid

20 assignment, and also whether or not there is some aspect to the

21 nature of that transaction to Silver Peak itself that could

22 somehow diminish the value of the property or cause some issue

23 with respect to the property that the Court would not

24 anticipate based upon the information it has now.

25         So if in fact, and I understand Mr. Kostolampros

1  indicated that not everything has been put to paper because of

2  the uncertainty surrounding whether or not the Government

3  and/or the Court would approve this.  But there has to be more

4  details that could be provided to the Government and/or to the

5  Court, so that the Court could properly assess whether or not

6  there are any issues.  I know the Bank has agreed to continue

7  to be bound by the jurisdiction of the Court, which is

8  something that the Government raised.  But my view is that

9  there may be more issues than that that I can't fully envision.

10       And again, if you want to explore this further we

11  can.  I could ask the Government more details about exactly how

12  they think this arrangement could injure the Government's

13  interest in obtaining forfeiture in some way.  But that's where

14  I stand with respect to Silver Peak.

15       So having formed those two views, my bottom line for

16  purposes of today call is, is that -- and I am sensitive

17  obviously to the interests of innocent third parties that

18  continue to be potentially impacted by this proceeding.  And so

19  I'm going to back to what I had anticipated in November, when I

20  made that partial ruling with respect to the summary judgment

21  motion, I anticipated at that time that there would be limited

22  discovery on the outstanding issue with respect whether the

23  Bank, bona fide purchaser of value with respect to the

24  remaining amount.  I anticipated that would be relatively

25  brief.  That there would be supplemental submissions on that

1    issue that would be relatively brief.  And then the Court would

2    make a decision very quickly after receiving those papers, to

3    reach a final adjudication with respect to the Bank's summary

4    judgment motion.

5            Obviously I was persuaded that it might be resolved

6    and that's why we lost another six months.  But I'm not going

7    to be persuaded any more. I'm going forward. And my own

8    question really for the purposes of that -- actually it's two

9    questions, I did obviously see that the Government narrowed its

10   request.  The Bank responded.  And I still think the

11   Government's requests are not narrow enough for purposes of

12   what the outstanding issues are.  Some of them are very broad

13   and very vague. And some of them I think would take a long time

14   for the Bank to do, such as providing emails for very broad

15   categories of requests.

16           So I'm going to require narrowing of those document

17   requests.  But I'm trying to endeavor what the most expeditious

18   amount of time that could have that happen.  Have any remaining

19   discovery produced.  And what I think would be two depositions.

20   And then have the supplemental submissions.

21           So that's my intention to begin discussing that right

22   now.  But before I do that, let me hear from everybody to see

23   if there's something they want to bring to my attention at this

24   point.  Mr. Kostolampros, you can go first.

25           MR. KOSTOLAMPROS: Sure, Your Honor.  There's a couple

1  of other issues that remain outstanding.  And this goes back to

2  the interlocutory sale.  The reason why we thought an

3  interlocutory sale was proper was because the isn't paying its

4  bills, right. So, and then the question becomes is, especially

5  now that it's really unclear whether the Government could

6  effectuate a sale here.

7         Let's say Danske's claim is recognized to the amounts

8  that we think it is, right now if the status quo is as it

9  remains, the underlying asset is being depleted.  The

10 underlying properties are being sold.  So what ultimately is

11 going to be sold will be less than what it is right now.  So

12 that remains unclear as to how or why properties should be

13 continued to be sold on the resort when Danske will never a

14 return on those amounts.  None of those sale amounts are being

15 set aside for repayment to the lender.

16         So you know, that's a real issue I think going

17 forward as to what happens given that it's unclear.  Even if

18 you move expeditiously, Your Honor, we move expeditiously

19 through discovery, once a final order of forfeiture is reached

20 the question remains how long will the property be, you know,

21 left as is.  So that is one issue that's left unaddressed.

22         And you know, the Government has raised this issue

23 about a distinction between a final order of forfeiture and a

24 preliminary order of forfeiture, I don't see anything in the

25 basis of law on a distinction of why they can't move forward.

1  It just seems to me that a sale needs to happen.  It should

2  proceed.  And the Government should proceed in effectuating

3  that sale and that requires them to go through Mexico.  And

4  they should be ordered to do so if they don't withdraw the

5  property because ultimately, you know, the underlying resort is

6  going to be devalued. And it leaves uncertainty, obviously for

7  the Bank as what we think is the only secured lender here, and

8  claimant --

9          THE COURT: Why do you say that that doesn't make a

10  difference in terms of the process, why wouldn't it make a big

11  difference if the Court ordered final order of forfeiture of

12  the resort to believe that under those circumstances the

13  Government's ability to move forward would be much higher than

14  it would be at this point where you're telling me that if I

15  were to order an interlocutory sale it would not work.  So, I'm

16  not sure why you think that we're in the same position at this

17  point as we would be if there was a final order of forfeiture.

18  I understand your first point. But in any event.

19          Let's go back to your first point for a minute.  I'll

20  have the Government address that.  But you know, my view is, I

21  don't know how this summary judgment motion is going to be

22  resolved. If it is resolved in the way that you believe it's

23  going to be resolved, then that issue that you raised in my

24  view would fall by the wayside, if the Court ends up

25  recognizing the Bank's claim at an amount that's higher than

13

1  the -- the value, then I think all other issues going to fall

2  away.  You can correct me if I'm wrong, but -- right?  Or am I

3  missing something?  What you're saying I think --

4            MR. KOSTOLAMPROS: I don't know that --

5            THE COURT:  -- problem if the Court were to rule, it

6  ruled otherwise, but --

7            MR. KOSTOLAMPROS: I don't know that to be the case,

8  Your Honor.  I mean we've got every indication that regardless

9  of Danske's claim amount, the Government is going to move for

10 forfeiture and won't withdraw the property. So you could

11 recognize 160, $180 million worth of Danske's claim, and I

12 expect that the Government is going to ask and move forward

13 with the forfeiture and ultimately a sale.

14            And the issue that we have again I go back to this

15 is, the property is being sold right now, time share interests,

16 homeownerships are being sold and marketed.  And every time

17 there's a sale of that, that will affect ultimately what is

18 sold later on. And the longer that the sale or this process

19 takes, the more depletion of value of the underlying resort

20 itself.  So we will never be able to go back and call back sale

21 amounts that are being used now to just keep the resort alive.

22            And for Danske that's a real problem because we're

23 depleting the underlying collateral that is the collateral that

24 forms the basis of its underlying loan.  Before --

25            THE COURT: Why isn't it in the Bank's interest to

14

1  keep the resort alive?  I don't understand that.

2          MR. KOSTOLAMPROS: It is, Your Honor, it is to keep to

3  alive.  But it also is time to keep the highest value of the

4  underlying property, especially since it's so uncertain as to

5  when a sale will happen.  And then, and for us it's important

6  -- if the Government is going to stick to its position that

7  it's going to seek forfeiture regardless of Danske's claim,

8  then that's a real problem because the underlying collateral

9  could be sold.

10          THE COURT: All right. Do you want to address the

11  other points?

12          MR. KOSTOLAMPROS: Sure, Your Honor.  The other point

13  was as to a note sale.  You know, we've raised in our letter

14  that we think we provided enough information. And I understand

15  Your Honor's ruling. One thing that would be helpful to know

16  is, if we were to move forward with at least papering a deal,

17  with Silver Peak or anyone else, could we provide those, the

18  underlying contracts or draft contract, draft agreements ex

19  parte to the Court, for the Court's determination as to

20  whether, you know, there's any issues with the underlying

21  agreements themselves.

22          THE COURT: Well, the only problem with that is --

23          MR. KOSTOLAMPROS: We would provide a copy to the

24  Government as well.  But redacting certain portions that we

25  think are just not relevant to the Government.  But we would

15

1   leave those unredacted portions for the Court.

2          THE COURT: The only issue with that is, you know,

3   it's very difficult for me to determine, you know, these are

4   business type decisions I guess.  It would be hard for me to

5   know whether something -- there could be some detriment to a

6   particular provision that might not jump out at me.  So it puts

7   me at a disadvantage to try to figure that out myself.  But my

8   suggestion, you know, provide as much as you can to the

9   Government and I would even -- maybe the Government will object

10  to this, but under these circumstances, even doing it under

11  seal to both the Court and to the -- not ex parte to the Court

12  but some type of protective order to the Government that

13  they're not going to disclose that beyond just commenting, you

14  know, in a sealed letter back to the Court, that you would

15  receive obviously.  What any outstanding issues would be with

16  respect to it.  So I don't know.  That's something to think

17  about.

18         But I just think it would be very difficult for me to

19  start analyzing provisions to try to figure out on my own

20  whether or not there's some hidden issue with that provision

21  that I might not be aware of.

22         MR. KOSTOLAMPROS: Okay.  And Your Honor, one other

23  thing is, you know, the Government has made a distinction about

24  a final order of forfeiture as compared to the preliminary

25  order that we have now, is you know, we were very close on a

1  settlement.  And the Government agreed to a sharing

2  arrangement.  I think that the Court could move quickly to a

3  final order of forfeiture given that the Bank and the

4  Government were in agreement at least on the sharing

5  arrangement.  And I believe two of the claimants of the five

6  claimants out there were willing to agree to that sharing

7  arrangement as well.

8          So what you have left is three claimants out there

9  who were not brought into the discussion.  If the Government

10 were willing to do so, we could move to a final order of

11 forfeiture I would think pretty quickly and move out any

12 discovery issues, any other findings of the Court, move to a

13 final order of forfeiture and then have the Government do what

14 it plans on doing with the property.

15         THE COURT: Well, I'm happy to hear from the

16 Government on that.  But that sounds good to me.  But what

17 about the other three claimants though.  What are you proposing

18 with respect to them?

19         MR. KOSTOLAMPROS: What I would propose is to present

20 the sharing arrangement to those claimants, and then have them

21 consider whether they would agree. And if not then I think we

22 could move quickly to a motion to dismiss on those claimants,

23 because I don't think they even have standing.

24         THE COURT: But I thought you told me the last time, a

25 couple of weeks ago, that there were more than -- I think we

1  had a discussion about that, and you said, well the issues are

2  much bigger than just that.  Or was I misunderstanding what you

3  were telling me?

4          MR. KOSTOLAMPROS: No, I think from our standpoint it

5  was, we didn't know what those claimants were. And I think for

6  our -- our position has always been that if someone hasn't

7  filed a claim yet, they don't have a claim.  You know, the law

8  is pretty strict that you have to file your claim within a

9  certain time period.  And the Government was raising an issue

10 that they may not have -- that Your Honor may entertain those

11 claims.  And I suggest otherwise.  That no, you don't have to.

12 The law is clear, there's plenty of case law that makes very

13 clear that if you don't file your claim within a certain time

14 period, you have no right.

15         Again I think this can move pretty quickly, Your

16 Honor.  Basically the agreeing to the sharing arrangement, and

17 we would all agree to a final order of forfeiture.

18         THE COURT: All right, I'll ask the Government about

19 that.  All right, anything else?

20         MR. KOSTOLAMPROS: That's it for now, Your Honor.  I

21 obviously want to address discovery, but I'll do that --

22         THE COURT: Right, yes.

23         MR. KOSTOLAMPROS:  -- when you get there.

24         THE COURT: All right.  Let me hear from the

25 Government.

18

1          MS. O'CONNOR:  Your Honor, it's apparent to the

2    Government that there's a misunderstanding between the sale

3    processes.  An interlocutory sale, as you know, occurs during

4    the pendency of the proceeding.  And the Government doesn't

5    have title.  So each time the Bank says that they don't

6    understand why we're not conducting a sale, we don't have

7    title.  But we can oversee it.  We're willing to do that.

8          But they, the current title holders would be the ones

9    that would have to convey the title.  We can handle the

10   majority of the aspects of the sale.  But that would require

11   Danske and DCSL to transfer the paperwork.  And that's what

12   ordinarily happens on a regular basis when the Court orders an

13   interlocutory sale.  If it's the defendant that owns the

14   property --

15         THE COURT: All right, let's not, I don't want to

16   waste time on the interlocutory sale because that's not

17   happening.

18         MS. O'CONNOR: Fine.

19         THE COURT: So why don't you address the final order

20   of forfeiture. First of all, what about the Bank and Mr.

21   Wolinsky's point that even with a final order of forfeiture

22   it's far from clear how long it would take, if ever, for the

23   Government to be able to forfeit this property in Mexico.

24   What's your response to that?

25         MS. O'CONNOR: Your Honor, very recently the Mexican

1    Government assisted the US Government with forfeiture of

2    property in Mexico.  In fact it assisted our office in 2020,

3    our office filed a civil forfeiture case.  And the Mexican

4    Government assisted us with noticing and forfeiture of the

5    property in Mexico.  We requested an MLAT (phonetic), and the

6    Mexican Government assisted in restraining the property,

7    providing notice. And then the Government was able to

8    effectuate the forfeiture of several of the properties down

9    there.  And there are a couple more that the Government is

10   working on.

11        But the bottom line is, in November of 2020, we

12   received assistance from the Mexican Government to achieve

13   forfeiture. So it is not out of the question by any means.

14   Obviously we can't guarantee anything.  But that being said, we

15   have received assistance very recently.

16        So I think the concerns that the Government would be

17   unable to achieve forfeiture are unfounded at this point.

18        THE COURT: There's also the issue of timing right, I

19   mean how long would that take?  And Mr. Kostolampros points out

20   that people, the Bank is allowing people obviously to continue

21   to sell their time shares and things of that nature.  What

22   about that?

23        MS. O'CONNOR: Your Honor, that's an interesting

24   point, because the Government doesn't understand why Danske is

25   only now forcing the resort to choose between paying down the

1  debt or funding the ongoing operations with the revenue from

2  the sales.  For the past 11 years Danske has allowed the resort

3  to use revenue to fund the ongoing operations under the guise

4  of the revolving loan arrangement, where the resort would pay

5  down the revolver, immediately reborrow the same funds, and it

6  created this false appearance that the debt was being paid down

7  when in reality Danske was just accruing the debt while the

8  resort was surviving on the existing time share and parcel

9  sales.

10       So it would be continuing to do the same thing here.

11  Yet now that Danske has reached the $210 million claim, it's

12  saying we're putting an end to that.  We think the timing is

13  interesting.

14       But we also don't understand (inaudible-background

15  noise) the sales are depleting the value of the resort.  They

16  generate the revenue.  Those are the sales in the ordinary

17  course.  Those help the resort sustain itself and the resort

18  has sustained itself on those sales for the past 11 years.  So

19  it's unclear how that is actually damaging the resort, and if

20  so why was the Bank allowing that to happen for the past 11

21  years.

22       THE COURT: All right, what about Mr. Kostolampros'

23  view that the parties were very close to settling it in terms

24  of you know, agreeing to a sharing arrangement and entry of a

25  final order of forfeiture and that that is still the quickest

1   way to resolve these issues.  What's the Government's response

2   to that?

3           MS. O'CONNOR: We agree that we were very close to it.

4   We don't understand why Danske abandoned the settlement

5   agreement that had been in place.  And in fact, the concerns

6   that Danske filed in its letter about the timing of the sale,

7   and their claim being recognized, all of those issues would

8   have been resolved in the settlement that we had contemplated.

9   In fact we were willing to allow Danske to step back from the

10  sale process so it was further removed from any potential

11  liability, although we still don't understand what liability

12  they're exposed to and they haven't been able to articulate

13  any.  But that being said, settlement in place --

14          THE COURT: They articulated that a lawsuit has

15  already been filed in Mexico.  Why isn't that a concern?

16          MS. O'CONNOR: The only, our understanding is that --

17  Mr. Wolinsky can probably speak to that, but that the concern

18  was that that property should be sold according to the current

19  Master Plan, and our sale proposal and our sale agreement,

20  would have had the sale be conducted pursuant to the existing

21  Master Plan.  So if that's the case, we're unaware of any other

22  --

23          THE COURT: But the Bank is saying that all that

24  really needs to be done to bring in these other additional

25  claimants to see if they have any objection to what was being

1  proposed, and that then it might be able to move forward.  Is

2  that not true?

3          MS. O'CONNOR: We, that's what we actually had said is

4  the case, Your Honor.  And it was Danske that said that they

5  didn't want to wait for the other parties to come in and to

6  have a say in the process. And our position was, we can agree

7  to a sale.  But under the statutes, the third parties had a

8  right to weigh in.  And then if depending on whether we had the

9  consent of all parties, you know, the statute, a particular

10  statute would dictate the procedure for the sale.

11          But we've always been of the opinion that we can

12  reach a settlement of Danske's claim, at the same time that we

13  would reach a settlement agreement that is an agreement for an

14  interlocutory sale.  We could move forward. And then any

15  outstanding claims could be resolved while the sale is

16  occurring or after the fact.

17          So we still believe that's the best course forward,

18  reaching a settlement of Danske's claim and interlocutory sale

19  agreement.

20          THE COURT: All right.

21          MS. O'CONNOR: But we can't -- just to be clear, Your

22  Honor, we can't have a final order of forfeiture, that's what

23  the Government receives after the litigation and the ancillary

24  proceeding is fully concluded.  Because I think that's where

25  the difference is coming in.

23

1    THE COURT: All right.  I'll come back to that.  Let

2  me hear from everybody else.  Ms. Ramachandran.

3    MS. RAMACHANDRAN: Your Honor, I'll just speak to the

4  issue of the other claimants coming in.  Because we were, Mr.

5  Kostolampros is right, we were very close to reaching an

6  agreement here.  Certainly we have reached an agreement in

7  principle with respect to how the proceeds of any sale were to

8  be shared.

9    But I think the issue with the claimants is that

10 there are some claimants out there that they haven't actually

11 filed a claim. The Government believes they do have claims.

12 They said that those claims haven't been filed on the docket.

13 And that created an uncertainty where because those claimants

14 are potentially still out there, you know, that created too

15 much uncertainty for the Bank in entering into this settlement

16 agreement.  At least that was my understanding of it. Not that

17 they weren't willing to wait for that to happen.

18    And it had always been my view that whoever is out

19 there should come in because I would like an opportunity to, I

20 mean to the extent they do have an objection to the settlement,

21 to you know, challenge their claim if it's been filed in an

22 untimely way.  And that was always my view, it's still my view.

23 And so I think that needs to happen very promptly, if there are

24 any other claimants.  I mean we've been, I've only been

25 involved in this case for a year, but I know other people have

24

1   for five years.  So I think that needs to happen immediately.

2   And that would also lend some clarity to you know, any

3   settlement discussions, if there are to be any, moving forward.

4           I mean my understanding of why the settlement didn't

5   end up happening was there were a few sticking points between

6   the Government and the Bank, they were minor in my view.  But I

7   don't represent either party, so I'm not fully versed in all of

8   their concerns.  But I think that was the reason. Not that, you

9   know, we didn't want to wait for the other claimants.  I mean I

10  didn't want to wait to the extent that I think the claimants

11  should be coming forward if they really have claims here so

12  that we have an opportunity to challenge it.

13          THE COURT: I'm a little -- are these claimants that

14  the Government received them but they weren't filed?  Are those

15  the claimants we're talking about?

16          MS. RAMACHANDRAN: I think so.

17          THE COURT: All right, well I saw the Government in

18  the papers agreed to provide -- have those been provided to the

19  Bank, or to the parties, or no?

20          MR. KOSTOLAMPROS:  No, Your Honor.

21          THE COURT: They have not?

22          MR. KOSTOLAMPROS:  No, they have not, Your Honor.

23          THE COURT: Okay. But they -- they did agree to do

24  that, right?

25          MR. KOSTOLAMPROS: They did in the letter, Your Honor.

1          THE COURT: Yes, okay.  We'll come back to that.  All

2    right.  Mr. Wolinsky.

3          MR. WOLINSKY: Yes, thank you, Your Honor.  I really

4    want to be constructive here.  So let me go through a list and

5    give you my reactions and perspectives.  Obviously I agree with

6    you that an interlocutory sale is not going to work.  You can't

7    force people to do something they don't want to something they

8    don't want to do.

9          On the final order of forfeiture, Your Honor, I don't

10   think I'm going to change your mind as to whether the property

11   is subject to forfeiture and whether it should be limited to

12   the equity interest in the US.  But I would repeat that point,

13   that is the only property that is subject to your jurisdiction

14   that can be forced sale without involving the Mexican

15   Government.

16         I heard the Government's position, answer one of the

17   two questions that you asked.  The first question was, does the

18   Government believe it has the ability to obtain cooperation

19   from the Mexican Government.  And there they said yes, in

20   November of 2020 they did get cooperation from the Mexican

21   Government.  But they never answered your question as to how

22   long this process is going to take.  And that's a really

23   important question for the homeowners in light of everything

24   you've heard from Danske Bank and its unwillingness to release

25   collateral during the period that this is going on.

1    So I would ask you to press the Government not only

2  for an estimate of how long it's going to take, but for a

3  commitment that it will be pursued on a very specific time

4  table that is acceptable to Your Honor and to other parties of

5  interest.

6    Way back when the Government represented to you that

7  a proceeding in Mexico to forfeit this property is not going to

8  take years, and we're now many years into this and we're no

9  closer to it.  So if there's going to be proceedings in Mexico,

10 it has to be pursuant to a tight committed time frame in light

11 of what Danske Bank has put forward.

12   Finally Your Honor, Silver Peak --

13   THE COURT: Yes, go ahead.

14   MR. WOLINSKY: Yeah, Your Honor, with respect to

15 Silver Peak, I am at a loss to understand from a business

16 perspective, from a practical perspective, why the Government

17 is standing in the way of that transaction.  There is no -- you

18 can throw up every objection in the world, legal or otherwise,

19 but if you step back and look at it from a perspective of

20 what's good for the resort and what's good for the victims,

21 taking out Danske Bank, which is saying it's not going to allow

22 (inaudible-background noise) of sales in the ordinary course to

23 fund the resort, allowing that, the note to be transferred to

24 Silver Peak which is saying it will allow the resort to be

25 funded on an ongoing basis, with ongoing sales, is a no

1  brainer.

2          And Your Honor I really ask you to press the

3  Government to articulate a business reason, as opposed to a

4  legal reason as to why the Government is objecting to a Silver

5  Peak sale.  Because from the homeowners' perspective, from the

6  victims' perspective, that, there's no reason why that

7  shouldn't go forward.

8          The only thing I've ever heard is that the Government

9  is concerned that Danske Bank, if Danske Bank exits it will not

10  be subject to discovery. Well Danske Bank is committed to make

11  itself available for discovery.  And obviously from Silver

12  Peak's perspective, Silver Peak wants Danske Bank to be

13  available for discovery because Silver Peak is going to

14  continue to litigate the priority of the loan that it just

15  purchased.

16          So Your Honor, those are the points that I offer to

17  you to try and move this forward.  I'm trying to be

18  constructive.  And those are my points.

19          THE COURT: All right, again, very briefly, on the

20  last point, I hear what you're saying. And I understand it

21  completely. I'm just in -- I think because the Government

22  hasn't received many details regarding the nature of the

23  transaction, it's tough to then, for me to put them on the

24  spot. They articulate, you know, what the problem is.  And if

25  their response is going to be well we don't know if there's a

1  problem because we don't have all the details.   But I hear

2  what you're saying.  And again I'm not shutting the door on

3  that.  But I do think there's going to have to more information

4  provided to them for me to have some degree of comfort that

5  they're able to assess it.

6          But on your other point, if there is, you know, the

7  Court has some ability to make sure that the Government, if

8  there is a final order of forfeiture that's entered, that

9  they're doing, they're expeditiously moving forward with

10 respect to the Mexican Government.  Or anything else for that

11 matter.  So I hear that concern.  And you know, my goal, I know

12 this will not sound, or ring hollow given how long this is

13 going on, but my goal has always been to try to move this

14 forward so that innocent third parties would not be hurt and

15 that the most value would be available for everybody.  But

16 unfortunately that's not the path that I've been able to keep

17 this on.  But in any event, I'll come back to your points when

18 we get to -- I want to make sure nobody else has anything else

19 to add. Mr. Mulry or Mr. Souther?

20         MR. SOUTHER: Yes, Your Honor, this is Tom Souther.

21 If I could, just to clarify one thing that the Government just

22 raised in terms of the, they raised the question about why

23 Danske is now saying after 11 years they're now saying that

24 the, they're taking this position about not releasing

25 collateral. And I just would point out from the borrower's

1  perspective, I mean we were current on our principal and

2  interest obligations up through the period of time when the

3  protective order was entered in 2015.  And continued to be

4  current thereafter.  It's really only in the last couple of

5  years that we have not been able to meet our principal and

6  interest obligations.

7         And it's only through the cooperation of Danske Bank

8  during that period of time, with the borrower, that we've been

9  able to utilize those proceeds to try and keep the operations

10 going.  And trying to preserve value.

11        You know, if the Bank hadn't been willing to do that

12 for the last two years, we would have had to been in a dire

13 situation, even more dire situation two years ago.  You know,

14 and if the Bank is not willing to release the collateral going

15 forward, you know, I guess we raise the question of, how are we

16 supposed to make payroll.  How are we supposed to maintain the

17 property.  These are practical things that we, on the ground,

18 that our client on the ground has to face every day. And I'm

19 not sure that the Government sort of appreciates that.

20        You know, the management team has been trying to keep

21 this going, but the Government seems to think that you know,

22 that they're figure out another way to keep it going to for,

23 you know, however long it takes to see it through to the end.

24 And without the support of the lender, that's just not

25 possible.

1          And if Danske has reached its limit, which it sounds

2    like they have, then you know, we need an alternative.  And

3    that alternative has been proposed in terms -- in the form of a

4    solution, which would be to allow Danske Bank to transfer the

5    note.  And assign the note.  And yet when we come up with that

6    proposal, again we're just faced with you know, the reaction by

7    the Government is, no, that's not, we object to that.  And they

8    raise some concerns.  But frankly they're not -- I mean I just

9    don't see them as being, you know, concerns that are

10   appropriate frankly.

11         Now what, I'm sort of at a loss as what does the

12   Government want here.  A note sale at least would provide a

13   short term reprieve and may lead to a longer term solution. You

14   know, in terms of a short term reprieve, it at least will allow

15   the parties to maintain the status quo, which has been the

16   Government's mantra for six years.

17         But if the sale is not permitted, you know, the value

18   is likely to be further eroded.  And I don't think there's any

19   guarantee that the project will remain viable in the near term.

20   So you know, to me that's a critical component in the near

21   term.  I mean we're not talking about, you know, six months

22   from now.

23         If the Bank is going to -- I'll just give you a

24   concrete example, Judge.  If property owners have put down

25   deposits on real property that the borrower is now not going to

1  be able to deliver title to those people, then the borrower is

2  going to have to return those deposits to the purchasers of

3  that real estate. And you know that's, not only is that going

4  to hurt future cash flow, you know, in terms of the ability of

5  the borrower to receive the subsequent payments that are due

6  from that purchaser, but it's going to force them to repay

7  monies that have already been paid to the borrower.

8            I mean this is a real time current problem that we're

9  facing.  And you know, I do think that the solution, which

10 doesn't put the Government in any different posture, it just,

11 it puts a lender in place that has expressed a willingness to

12 allow the operations to continue in the manner that they are

13 currently operating.

14            And the Government would have --

15            THE COURT: Why is there such concern -- why is this

16 concern of giving the Government the details of the transaction

17 to the extent they've been agreed upon. It's not like the

18 Government is like a competitor, a business competitor or

19 something like that.  I'm a little at a loss to understand why

20 has there not been more information given to the Government so

21 that they can articulate, try to articulate to the Court why

22 this might be a problem.  I don't know if you can answer that.

23            MR. SOUTHER: Well we're not a party to the

24 negotiations, Judge, so I'm probably not the right person to be

25 answering that.  But I can give you my client's perspective on

1  that, is that that information really has the potential to have

2  an adverse impact on a future sale of the property, if that's

3  the direction that the Government is going in.  You know, to

4  disclose those kinds of details.

5        And frankly, I just don't see what relevance it is to

6  the Government as to what some of the details of that

7  transaction are.  I get the one point that the Government has

8  made was, you know, they have a concern under the forfeiture

9  law that Mr. Kenner, the defendant, is not somehow using this

10 vehicle as a means of using a straw person to try and reclaim

11 some interest in the property.  But you know, to the extent

12 that the Government goes beyond that and says, well, we don't

13 want Mr. Jowdy to have some sort of an interest.  We've told

14 the Government that Mr. Jowdy will not have an equity interest

15 in the entity that may acquire this note.

16        I mean what more do they want from him. He's already

17 not challenged their bid to forfeit his interest in DCSL.  I

18 don't know what more that they want from him.

19        THE COURT: All right.  Mr. Main, is there anything

20 you want to add?

21        MR. MAIN: Nothing at additional, Your Honor.

22        THE COURT: All right.  So here's what I'm going to

23 propose, and I'm going to back to Mr. Kostolampros now. I'm

24 done --

25        MR. KOSTOLAMPROS:  Your Honor, can I --

1           THE COURT: Yes.

2           MR. KOSTOLAMPROS:  I apologize if I interrupted you.

3           THE COURT: Go ahead.

4           MR. KOSTOLAMPROS:  I would like to address a couple

5    of points that the government made.

6           THE COURT: Sure.

7           MR. KOSTOLAMPROS: One of which is what has changed

8    and why we're raising sales can't go on as they are right now.

9    The issue is is that interest payments stopped in September of

10   2019.  Right now, I mean those were amounts that were going to

11   Danske. And we get it, that the Court still, you know, has got

12   to decide what our claim is.  But it seems to us here, and

13   again it just from an equitable standpoint, how could the Court

14   allow those -- those amounts could be used by the borrower, I

15   know this is not what the borrower and others on this call what

16   to hear, but Danske as a lender has a responsibility here. I

17   mean these are amounts that we'd be getting paid.

18          Now those amounts are free monies to the borrower,

19   right now, to continue on.  Those amounts, there should be some

20   amount set off, not to pay Danske right now, but to be set off

21   and cordoned off and escrowed for determination of how to be

22   used later, assuming that Danske's claim is recognized.

23          That is the biggest difference from why Danske

24   allowed sales to go on before and why now we're saying look, we

25   can't continue on this. And the reason why is because this

34

1  process has been -- it's taken a long time and we get that you

2  could get to our claim pretty quickly we think, but the sale

3  process won't.  So that's number one.

4        Number two as to why we didn't provide the underlying

5  document, Your Honor, it's really practical reasons.  We're

6  going to have to negotiate with Silver Peak on the agreement.

7  We've already spent you know, God knows how much on litigating

8  this.  We want to get from the Government that look, we think

9  these terms are good enough for us to move forward with this

10 sale. Or at least we're not going to object to these terms.

11       But we don't even get that.  We've gotten from the

12 Government, Silver Peak was in a deal before with Jowdy, they

13 raised that -- you know, our allegations against Silver Peak.

14 You know, I just don't get the sense, we can present them any

15 document and they're going to still say no.  That's the issue

16 ultimately.

17       So those are the two points I wanted to raise Your

18 Honor.  Thank you.

19       THE COURT: All right.  That was helpful.  Let me

20 just, this is the way we're going to proceed.  I don't think,

21 I'm not in a mindset where I think we should proceed only on

22 one of these three tracks that remain.  So, we're going to

23 proceed potentially on all three.  It will be up to the Bank

24 obviously to decide whether or not for example they want to

25 pursue the Silver Peak angle, and/or to try to continue to

1 resolve the whole matter with the Government. Which you know,

2 I'm hoping that track continues. I'm hoping both of those

3 tracks continue actually, because I think they're preferable

4 than continued litigation.

5          But I'm going to -- I can't not try to move

6 ultimately the claim forward so that I'm in a position to do

7 the one thing I know I can do for sure, which is adjudicate the

8 claims that are before me and the motion for summary judgment.

9          So what I'm going to suggest is, on the issue of

10 trying to reach a settlement, it sounds like it was real close.

11 It sounds like, I'm not hearing that there's any, you know,

12 obstacle that's insurmountable. And I would suggest, as has

13 been noted, and I'm urging the Government, because I don't know

14 how -- time to continue to pursue this, bring in -- if it means

15 bringing in the additional claimants to make sure that there

16 are no objections or issues to what is being proposed, that

17 sounds like a reasonable thing to do.

18          If as a result of that there's some issue where

19 there's an objection but there's a belief that maybe that

20 claimant, claim is not timely or recognizable, the Court is

21 prepared to have that issue litigated so that that doesn't

22 remain an unknown. So the Court is fully prepared to help try

23 to resolve any of the issues that remain with respect to the

24 other claimants, if that really is the only major obstacle to

25 the settlement. That seems crazy to me that that would derail

1  what would otherwise be in the best interest of everybody.

2          So I would urge that dialogue, it sounds like it

3  completely stopped after it broke down.  But I would urge that

4  to get restarted and to see if that could be done fairly

5  quickly. It sounds like if there was an agreement on that could

6  be done fairly quickly.

7          But on Silver Peak, again I don't want to repeat

8  what I've said, but I'm prepared and I -- the Court, whatever

9  the Government's objections are, if I can't identify a legal or

10 practical reason why I should not allow that to proceed and

11 allow Silver Peak to stand in the shoes of Danske Bank as it

12 relates to this litigation, you know, I'm prepared to look at

13 that without the Government's consent.  But there would have to

14 be some more information provided to the Government. To the

15 extent Mr. Kostolampros your concern was this is a waste of

16 time, we're giving all these details and they're never going to

17 agree to this, I'm telling you the Court is prepared to look at

18 it.  You know, if the Government is given those details and

19 still can't articulate a reason why, again, legally or

20 practically I should not allow this to occur, I'm willing to

21 move forward.

22          And on the last piece, I want, my suggestion -- I

23 could go through each of the things the Government has

24 requested, and I have some views on each of them. But I was

25 going to ask, let me just confirm, I think I know the answer to

1   this.  Were there any meet and confer processes related to

2   those Mr. Kostolampros, before those letters went in? I assume

3   not, right?

4           MR. KOSTOLAMPROS: No, there wasn't, Your Honor.

5           THE COURT: Right. So you know, in the next week I

6   want there to be a meet and confer, it may be futile, but you

7   know, that's what parties are supposed to do, and this should

8   be no exception.  I saw that the Bank did make certain

9   concessions, which I was happy to see, with respect to you

10  know, a sampling of the draws. I think the Bank proposed one

11  for every year, over like a decade.  It sounds reasonable to

12  me.  I'm assuming the Government get to pick which ones.  But

13  in any event, that's an example of how some of these issues can

14  be potentially narrowed before the Court rules on them.

15          My preliminary view is, with respect to depositions,

16  that as I said previously, Mr. Delvin, the Government should

17  get to depose.  I think that can be done pretty quickly. I do

18  think they should be able to depose Mr. Jowdy on the limited

19  issues with respect to his relationship with the Bank and the

20  money the Bank was providing to the resort and any

21  arrangements. I know the Bank has said they produced the only

22  agreement that they had, that the Government was already aware

23  of.  But I think the Government should be able to explore that

24  with him.

25          Not -- not going through his whole history with Mr.

1    Kenner and the whole case, because that's not what the issue is
2    right now.  It's whether or not he has an, is at arm's length
3    with the Bank, for the money that was loaned and the additional
4    loans.
5            But other than -- the Government's request to depose
6    someone in London from the Bank.  Right now those are the two
7    depositions I'm thinking of which I think can be done quickly.
8            And in terms of the categories of documents, based on
9    what the Bank has already provided and what they've agreed to
10   now, there are certain things that I thought could be narrowed
11   by the Government.  But I don't think once they're narrowed
12   it's going to, from a practical standpoint, require the Bank to
13   spend weeks compiling them.
14           So my, that's a long introduction, but basically I
15   want there to be a meet and confer to see if the Government is
16   able to narrow some of those broad requests that the Bank has
17   identified.  And if not, I will rule on them.  And but
18   ultimately what I would like to come out of that discussion is,
19   I basically want to set a time schedule for, there's going to
20   be final decision by the Court on the summary judgment motion.
21   So it depends in part obviously on when the Bank thinks it can
22   get these documents and how quickly those two depositions can
23   take place. And you know, when those supplemental letters can
24   come to the Court.
25           But I can tell you this, once, if the Bank says that

1   it can be done by this date, then not just the Bank, everybody

2   will know that you know, within a very short time after that,

3   I'm going to make a decision with respect to that.  So if

4   that's helpful I'm going to do my best to make sure that we

5   keep that on a tight time frame, and that the Court's decision

6   is on a tight time frame as well to try to address some of

7   these difficult issues that we're facing.

8          So that's my plan.  Mr. Kostolampros, does that make

9   sense?

10         MR. KOSTOLAMPROS: It does, Your Honor. I'd just like

11  to circle back on one point, just to make the record clear.  Is

12  we were very close on a settlement.  The issue we had, it

13  wasn't just the claimants that were out there. The Government's

14  proposal was for an interlocutory sale where the borrower and

15  Danske would lead the sale process.  And what was wanted was

16  like, as you mentioned, is we raised issues about the

17  Government insisting that Danske be indemnifying the Government

18  and basically taking all the risk of the sale process. That was

19  the key issue of why we couldn't move forward with the

20  settlement.

21         What I'm proposing here is, why don't we just to a

22  final order of forfeiture, agree to transferring title, agree

23  to the sharing arrangement, and let the Government you know, go

24  the MLAT process.  That's what I was proposing.  And I'm happy

25  to discuss that with the Government when we speak later this

1  week at our meet and confer.  But that was the key stumbling

2  block.

3          THE COURT: Yes, Ms. O'Connor indicated she doesn't

4  think that -- I don't know whether she's saying that's not

5  legally possible, but why don't I just ask, because I heard her

6  say that too, but Ms. O'Connor, why, if there was agreement on

7  how that should play out, what would be the problem with that?

8          MS. O'CONNOR: The Government doesn't get title until

9  the final order, and the final order is upon a resolution of

10 all claims. What he's suggesting is trying to -- he's trying to

11 conflate an interlocutory sale with a sale upon a final order.

12 So --

13         THE COURT: But if all the claimants agree to whatever

14 final order is being proposed and whatever sharing arrangement

15 is being proposed, why wouldn't that, why couldn't the Court

16 then enter -- if every claimant is on board with this, why

17 couldn't the Court then just move to a final order of

18 forfeiture?  I don't know what I'm missing.

19         MS. O'CONNOR:  Well that would be a settlement of

20 everything in the case, and we're certainly agreeable to doing

21 that. But then that would be Danske conveying title to us, or

22 the trust, and then we can do the sale.  But again that would

23 be settling everything.  And we're certainly agreeing to do

24 that, but that's different from litigating and concluding and

25 then getting a final order.

41

1          So if what he's suggesting is settling everything and

2    then doing a sale upon a final settlement of everything, we're

3    happy to do that.

4          THE COURT: Mr. Kostolampros, what am I missing here?

5    I'm confused.

6          MR. KOSTOLAMPROS: I don't think you're missing

7    anything, we think that would be a -- that's sort of a silver

8    bullet here.  We are in agreement, and I think Ms. Ramachandran

9    and Mr. Main are in agreement on that sharing arrangement.  All

10   we need to do is get the other claimants to the table and see

11   if they agree.  And if they do, we -- you could issue a final

12   order of forfeiture and we're done here.  All that needs to be

13   done is the Government needs to move forward with the sale.

14         THE COURT: Right, and in the final -- it would state

15   what the sharing is going to be with respect to that?

16         MR. KOSTOLAMPROS: Yes, it would.

17         THE COURT: Yes, I don't see why that's a problem

18   either.  The Government is kind of suggesting that there's

19   still going to be outstanding issues, but I don't know what

20   those issues are.  What would be the outstanding issues if an

21   order of forfeiture had those provisions in it?

22         MS. O'CONNOR: No, I think, Your Honor, the Government

23   is saying, we wanted to do the settlement of everything all

24   along and Danske took the position that it didn't want to wait

25   for final resolution of all claims.  So our --

1    MR. KOSTOLAMPROS: No, Your Honor.  The reason is is

2    that they wanted us to -- and I apologize, I want to make clear

3    for the record here, is that they wanted us to effectuate the

4    sale.  This process -- and that would be an interlocutory sale.

5    What I'm proposing here is a final order of forfeiture, the

6    Government has its title.  It could do whatever it wants with

7    the property.

8    THE COURT: Right.

9    MR. KOSTOLAMPROS: And effectuate a sale.  And we can

10   make that happen.

11   THE COURT: Ms. O'Connor, what's the problem with

12   that?  The Government would run the sale, there's a final order

13   of forfeiture, the Government would run the sale.  Go the

14   Mexican Government, say we have a final order of forfeiture,

15   and the Government would run the sale.  And would know what the

16   sharing arrangement is with respect to the sale of the

17   property.

18   MS. O'CONNOR: Your Honor, that, the Government again

19   did not have a problem with that.  We have the emails to the

20   effect that Danske did not want to wait for that to happen.

21   And then we said the only alternative is to do an interlocutory

22   sale where the third parties have a right under statute to

23   weigh in on the process, and then it either goes against their

24   will, it would be without consent, or if everyone agrees to the

25   interlocutory sale and then the remaining claims in their

1  (inaudible-static) will be resolved.

2          THE COURT: All right, I think the Government should

3  reach out to the other claimants who are not part of these

4  negotiations, and see whether they would object to this. This

5  sounds pretty basic to me, to reach out to them and see what

6  their position would be.  Okay?  Can the Government do that?

7          MS. O'CONNOR: We're able to -- we're willing to do

8  that as long as Danske has no problem with us sharing the terms

9  of the settlement of their claim and the interlocutory --

10         THE COURT: Mr. Kostolampros, is there any problem

11  with sharing that with the other claimants?

12         MR. KOSTOLAMPROS: I haven't talked to my client about

13  it, but I don't see -- right now I need to check with them, but

14  I don't anticipate that being a problem.  So I can get back to

15  the Government literally within minutes after this call.

16         THE COURT: All right.  Do that, I think that should

17  happen immediately, I mean, if that is the major issue,

18  everything that has been proposed sounds so reasonable and

19  relatively easy, and the hardest thing is to agree on the

20  sharing arrangement.  You've already agreed on the sharing

21  arrangement it seems to me not, not a major stumbling block.

22  Depending on what they say, I guess.  But that should happen

23  immediately.

24         All right, and Ms. Ramachandran, you obviously can

25  help facilitate that as well, that discussion at least.

44

1          MS. RAMACHANDRAN: Sure, Your Honor.

2          THE COURT: So I think, what's a reasonable time to

3    allow the meet and confer and to allow this potential

4    resolution.  Can, is a week, a letter to me in a week Mr.

5    Kostolampros, is that -- the reason I'm asking the Bank, is the

6    Bank is obviously the one that's having issues with the current

7    time frame.

8          MR. KOSTOLAMPROS: Your Honor, we can have the meet

9    and confer this week and get back to you next week.  I think

10   for us it's going to be important to know what the scope of

11   discovery is.  Because once you get into emails, it's going to

12   be difficult -- look the Bank is located overseas. It's subject

13   to UK and European privacy laws.  So that's inevitably going to

14   slow a discovery process down if we get into emails.

15         So again it's going to be dependent on how, what the

16   Government is willing to narrow its request to, and then I can

17   get back to you and let you know and --

18         THE COURT: I would ask if you're not agreeing with

19   the Government on all the categories, I want you to give me an

20   estimate in that letter on Monday assuming, that there were no

21   such broad categories that would require that type of process,

22   what you think -- I'm not going to bind you to it I don't want

23   you to think if you give me an estimate.  I just want to get a

24   sense for what time period we're looking at.  So if you can

25   just give me an estimate assuming there are no broad categories

1 of documents that would require that type of review and

2 process, what you think a reasonable time frame would be for

3 the things that we're outlined.  Okay?

4         MR. KOSTOLAMPROS: Yes, definitely.

5         THE COURT: All right.

6         MS. O'CONNOR: Your Honor, just to be clear, are we

7 also addressing Danske's request to the Government, because

8 Danske's requested discovery would be greater than the

9 discovery they're willing to give the Government based on their

10 filings.

11        THE COURT: Yes, I wasn't overwhelmed by the Bank's

12 request. I understand there's an equitable estoppel potential

13 claim, but my view is, and you know having gone through the

14 papers the first time around, the Bank's arguments with respect

15 to equitable estoppel don't relate to what those document

16 requests are.  The document requests -- what's the Government's

17 basis for claiming X, Y or Z.  Which you know, I don't think is

18 what this equitable estoppel issue revolves around.  And the

19 Government you know, they put in declarations from the

20 accountant, sort of articulating what their basis is for the

21 claims that they're making.

22        So I don't anticipate that -- the equitable estoppel

23 portion of the case that I think the Court was looking at is to

24 the extent, you know, the Bank has claimed that they raised

25 things -- the Government raised at a meeting, they presented

1  for example, the best example is the agreement with Jowdy, to

2  the extent that that the Government is claiming somehow is

3  problematic or shows a lack of arm's length -- or should

4  somehow operate against the Bank, I think the Bank should be

5  able to point out to the Court that they made that available to

6  the Government and what the Government's response was to that.

7          But I don't know that there needs to be any discovery

8  on that because I think based on my review, you know, what was

9  previously, based upon the documentation, I think those points

10 were made by the Bank without having the deposition about, it

11 was at a meeting or something like that.  So if I'm wrong about

12 that, I would allow some, again limited discovery of the Bank.

13 But I'm not anticipating granting the Bank's request for those

14 things that they asked for.  Again the Bank is free to try to

15 narrow them in some way, but I just didn't see them as relating

16 to what I would think would be the equitable estoppel issue

17 going forward. All right?

18         All right, thank you very much everybody.  I'll look

19 forward -- I anticipate having a conference sometime late next

20 week.  But why don't I see the letter on Monday and then we'll

21 be setting a date for that.  Okay?

22         MS. O'CONNOR: Thank you, Your Honor.

23         THE COURT: All right, have a good day.

24                    * * * * *

25

# C E R T I F I C A T I O N

I, **PATRICIA POOLE**, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/S/ PATRICIA POOLE

TRACY GRIBBEN TRANSCRIPTION, LLC     DATE: June 8, 2021