June 1, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

    Re: <u>Kenner – Compassionate Release supplement -- 18 U.S.C. 3582(c)(1)(A)</u>

Your Honor:

The defendant, Kenner, respectfully submits this supplemental letter to his pending Compassionate Release motion (ECF 1006—and rebuttal submission: ECF 1024) after receipt and review of government-docketed entry ECF 1046 and Jowdy/Diamante's docketed submission ECF 1027.

The more the government and alleged victims provide statements to the Court, post-trial, the more they expose the lack of veracity in the government's original prosecution and specific ignorance of exculpatory records in their possession to get there.[1] This is again the case.

---

[1] The government's reluctance to notify the Court about their knowledge of inconsistent statements by their witnesses (*Napue* violations) has repeatedly led to the Court's altered view of evidence; because exculpatory evidence was concealed.  I.e.—The Court posited sentencing day that Gaarn's testimony about not repaying Kenner for loans (Tr.2580: Gaarn verified them) was accurate and Kenner's testimony not reliable (or worse) (10-5-2020, Sentencing H'rg Tr.78).  Yet—the government/FBI sat silent knowing Gaarn verified thru testimony during his 2012 FBI proffers that Kenner loaned him hundreds of thousands of dollars and repaid Kenner *some* of the funds (confirmation bank records were presented to Gaarn—who feigned ignorance during trial: Tr.2581-83).  **There have been seven transfers from Gaarn to Kenner documented on Gaarn's stipulated bank records; none other**.  <u>All seven</u> transactions occurred during Gaarn's sale of private Eufora stock that he <u>also</u> signed-off as <u>his</u> on Eufora's 2009 operating agreement (ECF 668 at 11, 208-f.106, 419-f.201, 482-83 [obtusely misrepresented by the government: Tr.5988]) despite denying his ownership (Tr.2628).

- What re-payments could Gaarn alternatively have been describing to the FBI 3-years before trial that he failed to recall—and failed to recall verifying the FBI (Tr.2583) (like Ranford and Kaiser's surreal FBI proffer amnesia)?  Kenner's testimony is simply corroborated by Gaarn's 2012 FBI proffers—<u>Gaarn's is inconsistent</u> (identically echoing Ranford and Kaiser's testimonial discrepancies).

As an example of a simple veracity issue, Gaarn was the sole introducing agent to Lehman Brothers, leading to the 2006 funding in Hawaii and Mexico (an active part of Gaarn's normal mid-2000s daily consulting work); yet at trial, Gaarn had zero recollection during direct-examination (Tr.2558):

1

Both recent submissions raise additional mitigating circumstances and exculpatory items not considered at the time of sentencing.  They are incremental to Kenner's original motion (ECF 1006 at 9-34 [3553(a) factors], see specifically 25-34) including mitigating exculpatory records originally requested by the Court post-trial (4-6-2016, Forfeiture H'rg Tr.206-208) and submitted as requested (see various ECF filings: ECF 668—et.al.):

> [Court]: "*If you have uncovered any documents since the trial that you believe suggest that there is something inaccurate about the testimony in the trial, Mr. Haley [trial counsel] should definitely submit them to me*."

Kenner indulged the Court's request.

Background...

The government prosecuted three alleged schemes: (1) the Hawaii real estate transaction ("Hawaii"), (2) the Global Settlement Fund ("GSF"), and (3) the Eufora private stock sales ("Eufora").

Specifically regarding the Hawaii transaction (representing approximately 73.799% of the alleged loss: ECF 1024 at 2-4)[2], the government alleged:

(1) Kenner loaned funds to Mexico business partner, Ken Jowdy, as part of an unauthorized transaction **and** "[i]t bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas" (Tr.5711)—and

(2) Kenner paid Constantine consulting fees allegedly unknown to the Hawaii passive-equity investors.

Both allegations have been *debunked* post-trial thru government submissions (during forfeiture hearings: government-forfeiture-36 and government-forfeiture-

---

> Q Mr. Gaarn, the last topic. Did you have anything to do with raising money for a development of land in Hawaii?
>
> **A [Gaarn]: No.**

[2] These funds increase the guideline range by +4 loss enhancement points, extending the low-end of the sentencing range 156 months (13 years); a revised sentence guideline would begin 3 years below the current sentence.

2

44)—and Kenner submissions[3] regarding management team (Kaiser and Manfredi) 2010-FBI proffers and real time emails from Hawaii inside counsel.  Despite overwhelming exculpatory evidence that corroborates Kenner's trial testimony and post-trial submissions (as requested) on <u>every</u> specific issue, the Court posited (10-5-2020, Sentencing H'rg Tr.57):

> [Court]: "*This has all been in front of me for years*." And "*I am sentencing you on th[e] verdict.*"

<u>Hawaii: The Jowdy loan transparency</u>...

For specific mitigation, Kenner read several of the Hawaii attorneys "*update*" email statements into the sentencing day record to re-highlight the real time (2006-07) legal strategy discussed amongst the Hawaii-Mexico investors about Jowdy's unpaid loans.   These exact "*update[s]*" have been in FBI possession since, at least, October 19, 2010, when former FBI-agent Galioto presented them to Hawaii Managing-

---

[3] Incrementally—the Court has been presented with <u>exculpatory</u> and "*truthful*" (Peca: Tr.498-650) (Sydor: Tr.2300) 2011 Grand Jury testimonies; from Peca (ECF 112-3: Tr.496-99), Sydor (ECF 112-4: Tr.2299-2300), and Stevenson (ECF 112-5)—plus 2009 arbitration testimonies from Jowdy's two main advocates between 2011-2017; Kaiser (ECF 668 at 191-92; Tr.1125-27), and Berard (ECF 668 at 176-77; Tr.3084-90); <u>100% affirming</u> the Jowdy loans were known at all times—**without a single testimonial objection**—and verified thru real time, <u>signed</u> investor affidavits in government *Jenks* materials (Norstrom [3500-MN-2 at 3-4], Gonchar [3500-SG-4 at 4-5])—and Stumpel (ECF 668 at 275-76) amongst others.
    Note: Berard testified at trial about Kenner's full-disclosure to him (corroborating his arbitration testimony, 6-years earlier) (Tr.3055):

> *Q. And did you have any <u>firsthand</u> knowledge about any of those -- about the money going from Hawaii to Mexico?*
>
> > *MR. HALEY: Objection. Just the leading -- I object. Without a speaking objection, I object.*
> > *THE COURT: Overruled. That one's okay. You can answer that.*
>
> *A [Berard]:* **I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico**.

- "*Firsthand*" knowledge was the only issue at hand: transparency (like Berard voluntarily affirmed to the 2009-arbitration panel—6-years earlier)—since the transactions were all authorized by the Hawaii corporate By-Laws (ECF 557 at 29-f.15, 56 [highlighted under Big Isle V's operating agreement—approved by Centrum attorneys before the Centrum loan transaction]; ECF 788 at 20—et.al.).

3

Member Kaiser for authentication (See 3500-JK-1-r at 3: ECF 668 at 155, f.78)—and Kaiser verified them specifically thru testimony.

In addition to continued and detailed documentation of the business problems with Jowdy's unwillingness to repay the loans once discovered (10-5-2020, Sentencing H'rg Tr.49-57), Hawaii attorney Madia highlighted <u>before</u> the April 2006 Cabo closure (Id. at Tr.49-57):

> [Attorney Madia— February 24, 2006]: "*For those of you who are not aware Ken Jowdy and Bill Najam have informed us that the Lehman Brothers closing in Cabo will be delayed another 30 days.  They have legal issues to handle in Mexico prior to their final signoff and funding.*
>
> *<u>We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans</u> at the closing by collateralizing Ken's 20% equity he received for managing the Cabo project...*
>
> *<u>Based on the meetings John Kaiser had with Ken before we agreed to lend him the money in 2004</u> Phil has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications.*[4]
>
> *The questions during our last conference call by Owen Nolan, Mike Peca and Bryan Berard were important to all of you.  If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.  I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*"

---

[4] Kaiser's surreal trial testimony denied telling the FBI about his multiple meetings with Jowdy (Tr.1120-22) that were fully documented in the October 19, 2010 FBI raw notes (3500-JK-1-r at 2, 3, 10).  Kaiser affirmed "*= was Agreement to borrow $ from Hawaii -*" (Id. at 3).  During trial, the Court was aware of Kaiser's pending perjury (Tr.1117-18)—and despite occurring **as expected**, known as false, the government sat silent (specifically Galioto who was present during the 2010 proffer), violating *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (prosecutor failed to correct witness's false testimony).

Kaiser (Tr.1127) and Murray (Tr.3608) verified thru testimony their independent possession of the Hawaii loan agreement with Jowdy, as attorney Madia documented sending.  Additionally—Murray verified thru testimony that he knew Jowdy had not repaid the Hawaii loan (Tr.3540):

> *Q. …My question is, sir, do you have an understanding, based upon conversations you have had with individuals, that as relates the Hawaii investment, the Hawaii project, Ken Jowdy also, by virtue of a loan made to him for monies from the Hawaii project, has not paid that back?*
>
> *A [Murray]: Correct. No, he hasn't.*

Notwithstanding—Murray <u>independently</u> sued Jowdy in 2008 (in Nevada) for another $791,000 Jowdy stole from him vis-à-vis another unpaid loan.  In Murray's Nevada complaint, he identified the prior Hawaii-Jowdy loan: (ECF 668 at 228, f.112):
> "*13. Jowdy had sought and obtained several previous loans with the assistance of Kenner.*"—and
>
> "*15. Murray authorized Kenner to lend Jowdy monies.*"

<u>Hawaii Managing-Member, Kaiser's February 2019 submission</u>…
(ECF 628)

Post-trial, Kaiser re-verified that the $5 million (principle) loan to Jowdy was part of the smoke-screen—previously spread by Galioto, Kaiser, and Berard while assisting Jowdy's conspiratorial graft.  Kaiser documented (Id. at 1):

> "*Jowdy would like the Court to think Kenner stole $7 million from the hockey players and others*"

As Kaiser explained 4-years post-trial (ECF 628), and government-forfeiture-36 and government-forfeiture-44 *debunked*—all of that was prejudicial to Kenner, affecting every element of the jury's deliberations and sentencing factors.

Kristen Peca <u>verified</u> Galioto's coercion on her 2012-FBI recordings (ECF 788 at 11, f. 10):

5

[Kristen Peca]: *Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*

[Kenner]: *Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times. I told you that already. You told me that you saw the bank records after I sent them to Michael. You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

[Kristen Peca]: *but – I don't understand why he would say it.*

- This is the same "*loan money*" that Michael Peca verified thru testimony to the 2011 SDNY Grand Jury (ECF 112-3 at 30-31) that he expected Jowdy to receive, covering more than the "*[$] 1,315,000*" (ECF 770 at 54-65) traceable to superseding indictment named persons:

    [Michael Peca]: "*$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*

    *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.*

    *I knew 100 percent it was going to Little Isle IV initially. Shortly after that the short-term loan was something that took place.*"

Ironically at trial—the government wanted the Court and jury to think Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*", violating Supreme Court precedent in *Donnelly* (Tr.5996, 5722-23, 5744-45, 5990,

6

5991-92, 5707-5709)—including doubling-down during summations to known lies:[5]

> [Government summation]: "*Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*" (Tr.5990)…
>
> [Government summation]: "*He [Kenner] used it for personal use to get an interest in that resort in Cabo.*" (Tr.5996)—et.al…

The Court should also note that pretrial, the FBI/government identified that investors were fully aware of Kenner's access to their LOC funds—the same ones that Nolan (Tr.2065-66) and others testified they were not aware of, specifically or in detail (despite nearly 100 signed authorizations and renewal notices in the Northern Trust subpoena—never seen by the Court: Kenner trial exhibit 210, intro'd at Tr.4206).

November 13, 2013, the arrest day FBI press release identified (a.k.a. unconcealed):

> "*Kenner also convinced several NHL players to open lines of credit, to which Kenner was given access*"

AUSA Michiewicz re-verified the investors <u>authorized</u> access 8-months pretrial (ECF 235, Tr.46-47) (unconcealed):

> [Government]: "*And some of them will even say they understood that some of their money would go to a real estate development in northern [Baja] California run originally by Mr. Jowdy.   That's immaterial.*" (ECF 892 at 28—et.al.)

Prior to alleging Kenner "*stole*" the funds and made up the story about Jowdy (Tr.31), the Court discovered on 10-28-2020 (3-weeks post-sentencing) that Kaiser had already proffered to the FBI/government that Jowdy was a "*thief*" (but

---

[5] The Supreme Court recognizes that "summations, and particularly rebuttal summations, are not fully constructed in advance."   See *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).   But "[t]he improvisatory nature of a rebuttal summation is no license for improper vouching, referencing facts not in the record, or appealing to extraneous 'consequences' of a verdict."   *United States v. Friedman*, 909 F.2d 705, 710 (2d Cir 1990)

7

providing another government-concealed amnesiac moment for Kaiser at trial, while protecting his then-boss' pre-proffered graft: Tr.1231-32)⁶, offering (in part: 10-28-2020, H'rg Tr.47-50):⁷

> [Kaiser]: "*I went down there in 2012 it wasn't long before I caught wind of how he [Jowdy] was doing this and – which was roughly 2013. I actually audioed, videotaped...and then I go to the government and say it's a crime what's going down there. He's stealing millions of dollars. I even had the accountant on tape, Antonio Marques, talking about the criminal activity. And I said if only the FBI knew what Danske and Ken Jowdy were doing...*"

Re—the PPF: Danske and Jowdy (in part thru Jowdy's original $125 million PPF agreed to with Lehman Brothers in 2006) have settled on a $50 million PPF (or "$45 million") (ECF 1027 at 1, f.1). This fee is identical to the PPF Kenner signed with the Urban Expansion partners in 2005. The prosecutorial double-standard seems illogical, considering the Urban Expansion fee was referred to as (Tr.5715-20):

> [Government summation]: *"Crooked, $2 million dollar prepayment penalty in Urban Expansion. Why? There was absolutely no reason for it."*

Specifically noting: Despite COO-Manfredi's testimony that no other funding options were available after trying the "*gamut*", COO-Manfredi's sole job in Hawaii was to manage the funding process—so he, better than anyone, would have known. COO-Manfredi confirmed his fund-raising responsibilities to the FBI in 2010 (ECF 668 at 24: 3500-CM-2-r). COO-Manfredi verified he, not Kenner nor Kaiser nor the management team—but he alone (Tr.2954):

> [Manfredi]: *I really didn't have -- really didn't have a choice. We had*

---

⁶ Constantine's attorney, LaRusso, explained to the Court (Tr.1233):
   [LaRusso]: "*We have a tape where he accuses Mr. Jowdy of being a thief in conversation with Mr. Constantine who is expressing concerns about whether the allegations against Mr. Jowdy are true.*"

⁷ Due to Kaiser's explosive and material *Giglio* statement "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)

8

> *been through the gamut of trying to find these hard money lenders, and this happened even before Centrum, so <u>I was working on it pretty much nonstop and not being able to close on Waikapuna</u>, not having been successful to that point, you know, there wasn't a lot of choices left.*

And—(Tr.3012-13):

> *Q. Any other lender come forward and say, I'll pay the money, forget Urban Expansion, I can give you better deals?*
>
> ***A [Manfredi]: No, sir, not to my knowledge.***

Coupled with the government's concealment of Kaiser's clear *Brady* and *Giglio* statements, the Second Circuit opined in *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that

> "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act. The considerations under *Brady* and *Giglio*, however, are quite different. *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information. The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."

**The government never produced them.**

The same day as Kaiser's explosive and reformative statements (post-sentencing, 10-28-2020), the government reversed course (after 7.5 years) and explained Kenner was not prosecuted for the loans that went to "*the resort*" (see 3500-KJ-2 at 24-25).

Why not? **Because—**every investor knew Jowdy received them (notwithstanding zero direct or indirect funds benefitting Kenner from the loans), occasionally juxtaposed as "*Mexico*" (10-28-2020, H'rg Tr.37):

> [Government]: *Your Honor, as you're aware, the crimes that were charged <u>did not include</u> the crime involving the funds that went to the resort [the Jowdy*

9

> *loans]. The government's investigation was expansive, certainly took a number of years, and the government takes its time...the government or course as you know is required to do significant investigation and make sure that its position is justified.*
>
> [Court]: *I was going back to say your position is <u>the government didn't know when it was indicting the case that money had been diverted from Hawaii to Mexico and to the resort?</u>*

Even Kristen Peca explained the transparent "*group*" (ECF 112-5 at 17-18, Tr.44) knowledge of the loans to Kenner during her 2012-FBI recordings (ECF 892 at 81):

> [Kristen Peca]: "*...maybe that golf guy [Gaudet] told Michael about you being in [the Mexico] jail and them hurting you – and...and the [Mexico] attorney guy getting killed. It's too scary. Michael and I can't thank you enough for keeping the fight going after the [Mexico] jail thing and the [Mexico] attorney but -- I just want this to be over no matter what it takes. <u>I know how mad Michael and the other guys are with Jowdy for not paying the loans back.</u> Who does that?*"

Finally (but not in totality of exculpatory records)—the government chose to withhold Arizona Attorney Baker's lawsuit disclosures from their pretrial Rule 16 production.[8]  Independently, Attorney Baker had 19 Hawaii-Mexico investors sign-off on his 8-page disclosure (signed, initialed and information completed in their individual handwriting).  Pinpointed on page-1 of the 8-pages, each <u>signed</u> disclosure emphasized (ECF 668 at 117-118, f. 62):

> "*the gist of the lawsuit is to recover certain monies <u>loaned</u> to Mr. Jowdy from Mr. Kenner, <u>Little Isle 4</u> and <u>Ula Makika LLC</u>. Mr. Kenner estimates the <u>total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000</u>. This is the estimated principle only, <u>exclusive of accrued interest</u>. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Lacking knowledge of the loans (uncharged according to the government), could only be based on willful blindness by passive-equity investors (or other unexplored

---

[8] The Baker disclosures were inadvertently disclosed by the AUSA Forfeiture team post-trial (a ripe *Brady* issue), more likely than not, unaware of what the prosecution team had concealed due to their highly destructive exculpatory materiality: **full transparency**.

10

symptoms) causing "confusion, mistake, or faulty memory" (ECF 440 at 6) as represented by the government to defend the voluminous perception of suborned perjury.

<u>Hawaii—the Constantine consulting payments</u>…

In the government's 2013 rush to stop Kenner's December 2013 Mexico Supreme Court testimony regarding Jowdy, Galioto, Kaiser, Berard and other Jowdy cabal members for tens of millions of dollars of straight thefts, corporate embezzlements, and cover-ups, they <u>never</u> bothered tracing the Constantine consulting payments to anyone in the superseding indictment who sustained a loss (ECF 214).

As a result, <u>zero</u> loss funds are related to any alleged victim named in the most recent government summary tables (ECF 1024 at 2-4).   In *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir 2006), the Second Circuit opined

>"[t]he loss must be the result of the fraud."—and

>"[l]osses from causes other than the fraud must be excluded from the loss calculation." Id.

Enormous reformative calculations have been left unaddressed—certainly altering any seriousness of the offense &/or culpability substantiations.

**[The remainder of this page left intentionally blank]**

<u>The recent reformative disclosures</u>…

<u>The Silverpeak transaction</u>…
(And completing the graft)

The April 2021 (Venable: ECF 1027) and May 2021 (government: ECF 1046) submissions highlight the potential final step in the 16-year Jowdy-Bhatti criminal plan to delete Kenner's investors from the Diamante Cabo san Lucas (DCSL") cash-cow they have been <u>looting</u> since May 2006 (ECF 667)

- Id. at 13-14 [DCSL budget];
- Id. at 15-16 [DCSL construction deposit accounts—resulting in ignored racketeering issues];
- Id. at 16-17 [$8.4 million capital account fraud with Danske];
- Id. at 2-f.1; 6-f.3 [Baja Ventures 2006 capital account theft]—et.al.).

Kaiser explained this to the Court—10-years after Kenner detailed the same in 2009 to Galioto triggering a Grand Jury subpoena for Kenner's testimony[9] (ECF 628 at 4):

> [Kaiser]: "*Jowdy has told me 'the hockey guys will never see a dime' because they said he was a crook.*"

The government's discovery actions are 11-years late with Jowdy's cabal, despite formal June 2009 notification by Kenner to former FBI-agent Galioto (of the above frauds and more).  The delay effectively provided the necessary time-cover for Jowdy's cabal (and complicit bankers) to <u>loot</u> every last-morsel from the DCSL value and equity members—while Galioto has been misleading the Diamante lemmings who blindly follow his graft.

---

[9] Kenner's 2009 disclosure to the FBI and subsequent discovery by Jowdy's well-connected attorneys led to the <u>immediate</u> cancellation of Kenner's August 2009 Grand Jury appearance by Galioto's new investigation—only ten days after the subpoena letter was issued.  Note: despite the subpoena/letter issuance from the EDNY U.S. Attorney's Office (the same as the prosecuting attorneys), the government vehemently attacked Kenner at trial about the subpoena and cancellation (Tr.5065)—alleging confabulation of the documented events; by attacking:

> *Q. Are you lying about even being summoned to the grand jury and then dropped like a hot potato?* —And

> *Q. Aren't you lying about being summoned to the grand jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you. Aren't you lying about that?*

13

> Note: While clearly complicit, Galioto convinced CSL Properties 2006, LLC attorney, Steve Main, to the thoroughness of <u>his</u> managed-investigation of Jowdy (absent and ignoring Kenner and Kaiser's FBI-proffers).   With full confidence from Galioto, Main emailed his Hawaii-Mexico legal clients (ECF 667 at 4—"February 20, 2017"):
>
> [Attorney Main]: "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project and the relationship between Kenner and Jowdy <u>has been exhaustively investigated over several years by the FBI</u>, <u>SEC and the U.S. Attorney of the EDNY</u>.*"

Main's affirmation is obviously absent knowledge of government-forfeiture-36 and government-forfeiture-44 (mirroring Nolan's attorney's blindness to the money-tracing facts: ECF 843)—leaving the company-line that Kenner "*<u>stole</u> all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*".   This is the same "*loan money*" Kaiser also debunked in February 2019 (ECF 628)—but no one is reading the voluminous submissions to corroborate Galioto's decade of graft.   The government forfeiture submissions contradict Main's foundationless and misleading statements to the same investors Jowdy, Galioto, Kaiser, and Berard have harangued for over a decade (to date)—during their pawn-like timeframes they worked to protect Jowdy's *entire* cabal.

The DCSL embezzlements since April 2006 (and with Galioto's full knowledge since 2009)—occurred in complicity and under former Lehman Brothers banker, Masood Bhatti's watch[10] (with Mike Delvin's 3rd-party accounting cover in the Cabo, Hawaii,

---

[10] Former Diamante-Cabo land manager, Robert Burdick, was interviewed by Galioto on February 22, 2010 (3500-RB-1-r).  Burdick "*got fired 2008-August/Sept.*" (Id. at 7) for opposing Jowdy's thefts after discovered and exposed by Kenner.   Burdick verified the complicit FBI cover-ups for Jowdy (Id. at 8).

Burdick verified, "*last time spoke to PK – a week ago – did tell PK that Feds called him  - **PK said to talk to them** – no problem*" (Id. at 12). And—most shockingly (completing the circle of graft), Burdick verified:
> "*= Masood involved*
> *→ had bad <u>feelings</u> about him since Cabo + El Rosario [DDM]*
> *= deals under the table*"

- Perhaps, the Burdick, Kenner, and Hughes (Jowdy's executive assistant—interviewed 5 days after Kenner in June 2009: 3500-SH-1-r, explaining Jowdy "*tricked a lot of people*" while "*'living the life' on other people's money*") **were correct**; and absent a well-

14

Texas and Tennessee project's budget schemes: ECF 1046 at 4).  The initial 2006 thefts were just a stepping-stone; notwithstanding their concurrent budget-looting schemes, totaling tens of millions more, in contemporaneous, pre-bankruptcy projects: in Texas and Tennessee (also known to the government—Rule 16 production documents verify tens of millions of dollars of embezzlements and money laundering).

The elimination of the Cabo-equity class…

As Kenner predicted to the FBI in 2009 and thru multiple submissions to this Court, Jowdy's final graft would be the elimination of equity in the DCSL project—making the final looting unfettered.  Without a fundamental legal reason, the government's forfeiture team delayed the inevitable several years with their soft-handed approach to Jowdy—fearing the same repercussions for *anyone* who opposes their wizard behind the curtain.[11]  Thus—now, with the breakdown in leverage-less negotiations (ECF 1027 at 3), the bank foreclosure or debt-sale will occur and all equity will be erased.  Fortuitously, a buyer has emerged.

This new debt-entity, headed by Silverpeak, is a "*buyer willing to purchase it*" Id.  The principle of Silverpeak is, none other than, the original Lehman Brothers banker who assisted Jowdy's budget-looting, *supra*, since 2006: **Masood Bhatti**.  Bhatti approved every Lehman-DCSL distribution between April 2006 and September 2008 (Lehman Brothers' bankruptcy)—with millions looted in the first few months alone (ECF 667 at 13-15).  This is only a minor subset the government alleged as a cover-up in opening remarks (Tr.31) when they knew the truths and ignored them.

Of note, Bhatti's bio at *www.Silverpeak.com* reveals that immediately after his bankruptcy-dismissal from Lehman Brothers in September 2008 (or so), Bhatti was opportunistic, finding employment as Managing Partner of Scout Real Estate Capital ("Scout").  The irony is that Scout is the firm Bhatti replaced Kenner's Hawaii

---

connected and above the law cover-up miracle, the investors would have been protected by the FBI investigating agent **over a decade ago**—and not complicitly subverted.

[11] The draconian delay ultimately increased the unexpected punitive issues with Kenner stuck in detention for an extra 5+ years post-trial (an incredibly unprecedented situation), instead of in a BOP facility where rehabilitation and re-training options for a new career would be abound.  The delay amplified Kenner's punishment, shamefully in contradiction to co-defendant, Constantine's, circumstances for "similar crimes" as the government explained in Constantine's sentencing memo.

15

Managing-Member status with in Bhatti's second 11th hour bait-and-switch deal in 2006—leading to the non-payment of $4 million of pre-negotiated Milestone payments (Tr.1165).[12]  Once Managing-Member in Hawaii (2007), Kaiser never pursued the Milestone payments with Lehman Brothers or Worden (a.k.a. Scout); specifically derelict in his Managing-Member duties.  Bhatti and Alan Worden of Scout (Bhatti's Hawaii version of Jowdy) looted $11 million in monthly budget funds from the Hawaii project between August 2006 and September 2008—without moving a single shovel of dirt; averaging $458,333/month.   Worden was paid $109,000/month by Bhatti (or $1,308,000 annually) to accomplish <u>nothing</u> (similar to Jowdy).  These egregious developer fees would have been received by Kenner if "*he knows Lehman is coming in*" and set up the deal.   There is no synergy to the umpteenth government lie or nexus to reality in their theories.

Nevertheless, Bhatti pre-funded his Lehman Brothers departure by draining the Hawaii budget with his lifelong friend, Worden.

Now—Bhatti is in position to re-emerge as Jowdy's white-night and buy the gravely discounted Danske debt while Danske pays "10%" deal fees to Jowdy (ECF 1046 at 3) and Bhatti retains Jowdy as DCSL's development partner—*most likely based on his unparalleled developer successes since 2002*.

---

[12] Although the government lied to the Court and jury, suggesting (Tr.5996-97):

> "*In  2005 Lehman is interested in investing in Hawaii but Kenner puts them off for another year and he sets up the Urban Expansion loan, a loan that would not have been necessary if he used the Centrum money as he was supposed to or let Lehman come in a year early. Instead he sets up this is a sweetheart deal. He sets up the deal for Kenner and Constantine. He sets up a loan with a prepayment penalty he knows will get paid because he knows Lehman is coming in and that they are going to pay it off before the five years.*"

First—the Centrum comment is not based on reality—and

Second—Kenner does not benefit from the Urban Expansion loan (both Red Herrings).

Concealed by the government/FBI was <u>their</u> knowledge that the first Lehman Brothers funding attempt is the loan that Hawaii COO-Manfredi called "*egregious*" in 2005 (ECF 770 at 79-80, and f.42: Bates stamp: KJ2343).  If signed in 2005—Bhatti and Lehman Brothers would have foreclosed the entire Hawaii real estate project within 24 months—for a total project loss.   The structure of Kenner's 2005 deal termination is exactly the opposite of
   "*he knows Lehman is coming in and that they are going to pay it off*" (Tr.5996-97)

—And the government knew it as well.

16

Kenner announced the planned depletion of equity over a decade ago…but not until 5-20-2021 did the government document their perception of Jowdy's plan (ECF 1046 at 1)—absent arms-length transactions.

<u>All unknown to the DCSL investors</u> (including Kenner)…

In May 2021 (11-years after first proffered as "*deals under the table*"), the government highlighted Bhatti's consulting fees (ECF 1046 at 7). These were all unknown to Kenner and Kenner investors—*so how can they be legal*? The consulting fees are the same as Constantine's consulting fees, with one striking difference. The Constantine agreements were documented by the FBI in Manfredi and Kaiser FBI raw notes (a.k.a. known at all times)—and Constantine produced a loan as paid to do. Yet—the government verified, only after millions paid to Bhatti that (ECF 1046 at 7, f.5):

> "*the only lender/financer the government is aware of is Danske*"…years after identifying (from the proposed 2015 Silverpeak deal):
>
> "*the fact that the original proposed Silverpeak deal, which was negotiated by Danske, Jowdy, and Silverpeak in 2015, would have materially benefitted Jowdy, and Jowdy's personal mortgage was to be paid off from the sale escrow funds as part of the deal.*" Id.

Kaiser raised Bhatti's consulting fees as a revelation in February 2019 (ECF 628)—because they were unknown to every investor until that epiphany.[13]

> Note: Related to the alleged Kaiser loss calculation (ECF 1024 at 2), perhaps Kaiser is documenting the same criminal issues the government pursued with Constantine <u>as an interested investor</u>? Nevertheless—assuming Kaiser's testimony about owning Kenner's Cabo equity (Tr.1089), Kaiser has been fully repaid and is crying for government help to prosecute the criminal Jowdy-Bhatti consulting fee scheme. Kaiser reiterated his Cabo equity

---

[13] Bhatti's fees will amount to tens of millions of dollars for carrying out the final steps of the two-decade scheme along with Jowdy and their protections, based on (ECF 1046 at 7, f.5):
- $20,000 per month (ECF 628—noted);
- 1.5% of financing arranged by Bhatti; and
- A capital advisory fee of 3% of any sale price (like Jowdy's 10%), financing or capital infusion.

17

ownership in February 2019 (ECF 628: "*Baja Ventures was transferred to me for the unpaid Kenner loan*").

As such—Kaiser cannot be a $1,000,000 victim of anything. Kaiser testified to this Court he was recompensed—while reiterating his Jowdy-Cabo victim status post-sentencing (10-28-2020, H'rg Tr.50):
> [Kaiser]: "*So me being the victim, knowing everything [in 2013], I was pleading with the government or someone to listen to say get this guy out of here and his family because he's going to steal every single penny.*"

While Bhatti has produced nothing but a debt enhancement diversion with Jowdy and Danske, Constantine produced a loan that saved a $35.750 million property (2005 Waikapuna appraisal addressed to COO-Manfredi; Bates stamp: PKHome-00012651-755).

Note: COO-Manfredi managed every financing transaction for the Hawaii project. COO-Manfredi bragadociously verified this to the FBI in October 2010—but after announcing (August 16, 2005) (ECF 668 at 12, 78, 219-220—et.al.):

[Manfredi]: "*the deal with Lehman was cancelled by us as being too egregious*"

COO-Manfredi then explained to Kenner 5-weeks later (September 30, 2005) (ECF 770 at 79-80, f.42):

[Manfredi]: "*I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does...I think the likelihood of losing Waikapuna and Moa Ula [another parcel under agreement] is very real. I never thought I would be leaving this trip without funding. Chris Manfredi, COO/Project Manager, Big Isle Ventures, LLC, 516-526-xxxx*").

- Note: In September 2005, Kenner and Manfredi were in Hawaii to sign a $15 million acquisition and development loan with another lender (prior to Urban Expansion), who failed to fund at the 11th hour (a recurring distress COO-Manfredi espoused 9-30-2005); clearly not part of some distressful scheme to spend $451,00 in unrecoverable extension fees (ECF 557 at 52-53—and ECF 770 at 80, f.43) and "*puts them [Lehman Brothers] off for another year*" to introduce Constantine's Urban Expansion deal (Tr.5996).

18

In over 100 email messages between Manfredi and Kenner (all parsed post-trial)—never once does Manfredi mention the Centrum funding as being misused (Tr.2950-51) or the 2005 "*egregious*" Lehman Brothers loan "*cancelled by us*" was a mistake…just the opposite every time.   COO-Manfredi verified thru testimony (Tr.2954):

> [Manfredi]: "*We had been through the gamut of trying to find these hard money lenders, and this [Urban Expansion loan] happened even before Centrum…*"

Manfredi testified the Urban Expansion loan occurred before the Centrum loan—so how could he (or the government) explain that (Tr.2950-51):

> [Manfredi]: "*the intention of this encumbrance or this [Centrum] mortgage was to leverage the equity in Honuapo to close Waikapuna*"

- Manfredi's induced testimony was temporally out-of-order—but the government <u>knew it</u> and <u>needed it</u> to fit their theory.

Regardless of Kaiser and COO-Manfredi's amnesia 5-years after they verified thru testimony to the FBI (in 2010) their personal knowledge of Constantine's funding efforts—Constantine produced the much-needed loan.

Bhatti has been the financing puppet master who created the embezzlement platforms for Jowdy, Worden, himself, Danske Bankers (and any other cabal members who remain loyal to their criminal enterprise).   Kenner rebuffed their bribes to *just go along* in 2007, prompting Jowdy's inside counsel to write to Jowdy:
> "*May 8, 2007*"…"*Ken, I'm not so worried about <u>the past failures</u>…The last thing you need is a conflict situation with another partner*" (ECF 668 at 19-20).[14]

---

[14] The "*past failures*" were the Diamante del Mar investment and loan looting Jowdy and his brother-in-law attorney, Najam, started in August 2002 (subpoena received by the government 2-weeks before Kenner's trial—and ignored: ECF 668 at 476—and ECF No. 667 at 24-28) and completed in or about April 2006 (when the $3 million KSI Capital loan was drained by them for personal use: ECF 667 at 21-24; including attorney Harvey's lien fraud on Nolan and other DDM investors), leaving the formerly $68.9 million appraised property in perpetual forbearance—effectuating a $10 million investor loss to Kenner and Kenner investors.   But "*past failures*" were no longer relevant with the Bhatti-Jowdy team just oiling themselves up to begin a prosperous 15+ year run.

19

That is when Jowdy's protected cabal began their relentless slander and defamation campaign to protect their budget-looting scheme (and gossip-columnist, Michael O'Keefe's NY Daily News paid-for stories began).

Conclusion...

As the Court re-considers the 3553(a) factors as a component of the sentence reduction or home confinement decision, Kenner requests that the Court recognizes that the exact consulting fees that Jowdy and Danske Bank have been paying Bhatti (and others) for years are more than commensurate with the Constantine consulting fees (minus the actual production element of the Diamante agreements and consultants, Jowdy is lacking).

In addition—the government, Kaiser and others continue to make post-sentencing statements to this Court that defy logic after years of positing to the Court (likewise to the jury in 2015) that the government knew to be incorrect at the time.

Every additional submission by the government, Jowdy's advocate, or the Cabo investors raises more discrepancies with unsupportable 2015 trial testimony and government theories that are growing in their outrageousness.

Sincerely,

Phil Kenner, ProSe