June 15, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: Diamante money laundering known to the government at trial—including Bhatti's complicity (the expected Silverpeak white-knight)**

Your Honor,

In light of the government's recent announced failures to secure any negotiated settlement between the Cabo san Lucas investors in CSL Properties 2006, LLC ($2.3 million—second round of equity financing) and Jowdy's entities, they have ignored, at a minimum, the documented $4.1 million Baja Ventures 2006 capital contribution (first round of equity financing) thru Kenner's partners, Stumpel and Lehtinen (See government-forfeiture-36) [1]—the crucial hard-money deposits on the Cabo property months before any lending had been secured and the CSL Properties 2006 parties entered the investment picture.  Every investor was aware of the two

---

[1] Baja Ventures 2006 deposits to Jowdy/Mexico singularly, controlled entities for the Cabo acquisition (not counting "*at least $375,000 in additional expenditures on behalf of the Cabo project*" that Kenner paid, which Attorney Najam required "*February 6, 2006*" for "*Lehman before closing*": per Bates stamp: *PKHOME00005856*):
    5-17-2005 -- **$350,000** (Stumpel—from $956,000 deposit: Bates stamp: NAAZ000171; tracked on government-forfeiture-36);
    5-17-2005 -- **$325,000** (Stumpel—from $956,000 deposit: Bates stamp: NAAZ000527; tracked on government-forfeiture-36);
    5-18-2005 -- **$225,000** (Stumpel—from $956,000 deposit: Bates stamp: NAAZ000527; tracked on government-forfeiture-36);
    5-18-2005 -- **$45,000** (Stumpel—from $956,000 deposit: Bates stamp: NAAZ000171);
    5-23-2005 -- **$1,599,573** (Stumpel—per government-forfeiture-36); and
    6-7-2005 -- **$1,499,990** (Lehtinen—per government-forfeiture-36); and

- The Stumpel and Lehtinen deposits/investment agreements were introduced during forfeiture hearings (*4-4-2016, Forfeiture H'rg Tr.28-29*)—without objections; and
- Attorney Najam's February 2006 email also re-verified that the Hawaii-Jowdy loans were known to all involved parties, identifying "*All funds for the Cabo project have to be identified as 'investments' and not as 'loans'.*"  Only Jowdy and Najam were involved in the final documentation of the capital accounts with Bhatti (now, a.k.a. Silverpeak).

1

separate funding periods,[2] *debunking* the government's prejudicial allegations of misappropriated equity (*ECF No. 765 at 8*)—and Kristen Peca's sentencing mis-informed representations.   These items were posited on the Court (and left uncorrected) despite the government's awareness of Jowdy's February 19, 2006 email confirming the equity was changed for the Cabo closing (per Bhatti-Lehman Brothers) "*for now*" (*Bates stamp: 22412*—from Jowdy production).  **Galioto sat silent every time**.  Post-sentencing, the confusion grew exponentially when the government reformatively announced 10-28-2020 the Jowdy loan transactions were not part of the indictment, in the first instance—after "*significant investigation to make sure their position is justified*" (*H'rg Tr.37)*.   The need for the fruitless negotiations—with an admitted party of no nexus who has no desire to settle anything since 2007—defies logic in the instant case and begs the overwhelmingly apparent question (more than 2,170 days post-trial)

> "With the tens of millions of *documented* criminal embezzlements by Jowdy and his complicit Cabo team (including Kaiser and Berard from 2011-2017), why isn't the government simply indicting the parties based on the overwhelming evidence in lieu of the 5-year protracted negotiations that helped Jowdy's team steal tens of millions ***more*** and drain the separate investment equity from Kenner's clients—concluding in more criminal activity and to who's benefits?"

Even the titillating anticipation of the Silverpeak's Danske-takeout deal should not slow real justice any longer; the form of justice that has allowed Jowdy's ever-changing cabal to extract nearly one hundred million of payments and value from the DCSL project and equity investors since 2015—and tens of millions more since Kenner's 2009 FBI proffer that should have resolved the investors nightmare. Instead…it extended it 11-years and into infinity thanks to Silverpeak—none of it a

---

[2] After months of fruitless negotiations with Jowdy and Attorney Najam (later discovered as Jowdy's brother-in-law) after the discovery of their true plans in late 2006 after the Hawaii JV closed (and still screwing the investors 15-years later)—attorney Madia highlighted that in his May 17, 2007 "*update*" email after a group conference call:
> [Attorney Madia]: "*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC (your investment LLC as attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.*

result of Kenner's actions other than not taking the Jowdy and FBI-backed bribes that were presented in 2007—perhaps altering their paradigm at least until they carried out their underlying plan with Kenner (*ECF No. 730 at 74-75*): eliminating him permanently.

Lost in the forfeiture and negotiations is the fact that the government traced $4.1 million of Baja Ventures 2006 funds capital account funds (despite Jowdy and Najam only documenting $2.5 million in the Baja Ventures 2006 capital account). They also traced the funds separately utilized by Jowdy (as part of the actual loan [3500-KJ-2 at 24-25] and his capital account). In both instances, it was verified that no ill-gotten funds ended up with Kenner in the Hawaii &/or Mexico transactions: the government's **lynchpin** issue—and now debunked. Yet—the government prejudiced their integrity thru a multitude of known-false statements to the jury thru cross-examination badgering (*Tr.4597-98*) and summation mis-representations (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*)—and alleging as a subset:

> [Government summation]: *"what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him."…" you know what,* **Baja Development Corporation** [3] *…You know*

---

[3] The FBI knew Ken Jowdy individually owned Baja Development Corporate (since at least 2010; 5-years pretrial)—but insinuated it was Kenner's account throughout trial vis-à-vis feigned ignorance of the known-truths (*infra*). Jowdy directly verified it during his March 2010 FBI proffer (3500-KJ-2 at 2) to Galioto. Jowdy verified the Hawaii loans (Id. at 11-14)—contradicting the government's cross-examination attacks about them being "*phony*" (*Tr.4597-98*). Yet—with IRS agent Wayne as a witness (and Galioto in the courtroom), it was stunning—and frankly inconceivable—that Wayne did not know who owned the Baja Development Corp account—the recipient of the majority of the authorized Hawaii loans (*Tr.4046*):
> *Q Do you know who the principal of the Baja Development Corporation is?*
>
> *A [Wayne]: I don't.*

- Galioto, Wayne, and the U.S. Attorneys knew that Michael Peca verified thru testimony to the 2011 SDNY Grand Jury that he expected his entire $1.8[75] million Hawaii capital contribution to go to the Jowdy loans (3500-MP-5 at 30-31: **making Peca a non-victim of the Hawaii transactions**). Peca's expected funds exceeded the total $1,315,000 traceable to the Jowdy loans (*ECF No. 770 at 54-65*: chart *at 54*) (now verified by the government as not part of the indictment) from individuals in the superseding indictment (*ECF No. 214*)—**leaving no loss for any other Hawaii investor from any proximate causation issue inflicted by Kenner**.

3

> *exactly what the money was for…Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."…" He used it for personal use to get an interest in that resort in Cabo."* [4]

- **Kenner <u>never</u> used the money—It was not in evidence—And Kenner <u>never</u> told YOU that…**

The Hawaii-Mexico settlement negotiations with Jowdy had begun in 2007 by Constantine (14 years ago), thru Kaiser and Constantine's documented "*urging*" of Kenner in 2006-07, following group conference calls of the same information, with the Hawaii-Mexico investors by inside Hawaii counsel, Madia (as follows):[5]

> [Attorney Madia, "*May 17, 2007*" "*update*": *ECF No. 958 at 17*—and read into the sentencing transcripts as a mitigating factor: *H'rg Tr.53-57*]: "*Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy. They want to negotiate with Jowdy through Tommy. You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on.*"

Despite the mock investigation into Jowdy and the Diamante monies that began and ended with former Agent Galioto's proffer of Kenner in June 2009 and terminated Grand Jury appearance in July 2009 (as scheduled)[6]—and notwithstanding

---

[4] Agent Wayne testified at the March 9, 2016 forfeiture hearing (post-trial) and <u>confirmed</u> he was aware that Jowdy told he and Galioto pretrial during FBI proffer that the 39% Baja Ventures 2006 interest was funded by Stumpel and Lehtinen's funds—**not stolen by Kenner** (*ECF No. 788 at 18-20*). Jowdy could have fabricated *that* storyline if they had thought of *that* graft earlier. **They didn't**—but while in possession of the knowledge, they ignored it to attack Kenner with a prejudicial premise. It worked as fabricated—thru summation and conviction (confusing the jury with items not charged in the indictment according to the government, but only confirmed post-sentencing).

[5] Note: the FBI (specifically including Galioto) presented Hawaii inside counsel, Madia's various "*update*" emails to Hawaii Managing-Member, John Kaiser, during Kaiser's surprise October 19, 2010 proffer to which <u>Kaiser verified</u> (3500-JK-1-r at 3): "*update Letter on Hawaii project – JK – yes, I recall letter…PK made these; many times*".
- Why did the FBI/government ignore the documented transparency by Kaiser—*in their possession*—to claim investors could possibly be under-informed—notwithstanding specific choice thru willful blindness as passive-equity investors: their ultimate right as ostrich-investors?

[6] The government mocked Kenner and attacked his veracity about the mere existence of the 2009 Grand Jury subpoena—despite knowing it was issued from their-own EDNY office—

4

corroboration of Kenner's facts by Jowdy's former assistant 5-days after Kenner (3500-SH-1), the government ignored the Jowdy, Legacy Properties LLC (multiple) banking accounts, which verified hundreds of thousands of dollars of money laundering from the Cabo san Lucas project and other accounts Jowdy jointly operated with Masood Bhatti from Lehman Brothers and Mike Delvin of Delvin and Associates (the hand-picked 3rd party accounting firm that managed every Bhatti, budget looting, financed project; **including the 2006 Hawaii JV**, with Bhatti's life-long friend, Alan Worden).[7]

After the government ignored the actual tens of millions of documented Jowdy crimes—the basis for Kenner and Kenner investors gaining the 2009 attention of the FBI and other federal agencies (thru filed civil litigation to recover the same loans alleged as unknown), the prosecutorial team received further corroboration of Kenner's proffer statements of Jowdy embezzlements by independently subpoenaing Jowdy's Baja Development Corp 2002 August bank statements (Jowdy's first investment receipts of $804,000)—*on the eve of trial*. Jowdy's Baja Development Corp records confirmed diversions to his personal accounts, his independent restaurant, its payroll account, his father's car loans—et.al. Yet—received on the eve of trial, clearly requested for a specific reason, and

---

**with Galioto's collective involvement**; while Galioto sat silent, allowing the graft to occur and prejudice the proceeding (*Tr.5065*):
>   [Government]: *Q. Aren't you lying about being summoned to the grand jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you. Aren't you lying about that?*

[7] Note: in Kenner's June 2009 FBI proffer, Kenner explained to Galioto and others that Bhatti and Worden had drained over $11 million from the 2006-08 Hawaii/Lehman Brothers budgets without moving a single shovel of dirt (also with Mike Delvin as the 3rd party accounting entity)—and **the Hawaii investors needed investigative help from the FBI**.

The Hawaii/Lehman Brothers *approved* thefts mirrored the $30 million-plus Jowdy could not account for during his January 2010 California depositions—in front of Kaiser (the Hawaii Managing-Member at the time) (*ECF No. 557 at 67, ECF No. 667 at 17-18*)—yet Kaiser refused to sue Worden and Bhatti to recover the stolen Hawaii funds and others from the broken JV agreement. Instead after one face-to-face meeting with Jowdy—Kaiser (and Berard with Donlan) were rewarded with jobs in Mexico to help Jowdy avoid investor retributions thru thugery, threats of litigation (*ECF No. 668 at 21-23, f.12*), and intimidations (a subset entered in previous submissions—including former Jowdy employee, Gaudet, identifying Berard's physical assault on him for opposing Jowdy to the FBI—who laughed at it: 3500-RG-9, ¶9).

unfortunately verifying a contradiction to their planned opening remarks…**they ignored it**.

>One—they clearly knew Baja Development Corp belonged to Jowdy; and Two—they *re*-confirmed that Jowdy was the thief "*who [wa]s stealing from them*" (*Tr.31*).

To further the hoax, IRS agent Wayne willingly testified he did not know who owned Baja Development Corporate (*Tr.4046*)—another government falsehood to protect the illusion that the Baja Development Corp money belonged to Kenner…and was used by Kenner for *<fill in the blank>*.  They not only knew it was untrue—but they independently *re*-confirmed it on the eve of trial; creating a highly apparent conclusion of deception in support of the prosecutorial goal.  Yet—it has been overlooked to maintain the government's perceived veracity.  **They failed again**—but this time with the foundation of their **lynchpin** issue: Kenner robbing the Hawaii loans and never giving them to Jowdy, as Kristen Peca exposed (of Galioto's coercion) on her surreptitious 2012 FBI recordings with Kenner (*ECF 788 at 11, f. 10*—et.al.):

>*[Kristen Peca]: Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.[8]*

>*[Kenner]: Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

>*[Kristen Peca]: but – I don't understand why he would say it.*

Not only did the investigation team ignore Kenner's 2009 proffer, the Jowdy banking records, and their surreptitious recording of Kenner (by Kristen Peca)—but they *re-re-re*-confirmed Jowdy's actual crimes (as Kenner proffered in 2009) when they subpoenaed Jowdy's Baja Development Corp records again; 6-years later. There is no excuse and their opening statements ignored all empirical evidence to claim (*Tr.29-30*):

---

[8] Although previously noted and consistently unrecognized by the government—Kristen Peca was never concerned about the actual loan (as learned thru her husband)—only the simple fact that Galioto told her Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*".

6

> [Government]: *Well, Kenner bought land in Hawaii, sold it, took the profit for himself.*

- While the government knew this was untrue…

—And (*Tr.31*):

> [Government]: *This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again. The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it*

- While the government knew this was untrue…

—And (*Tr.33*):

> [Government]: *Kenner used the victims' money to pay for the mortgage on his million dollar home in Scottsdale, Arizona, for beach-front property in California, and to fund a tequila company he was starting in Mexico.* [9]

---

[9] Despite the government promises to the jury and the court about tracing <u>any</u> money to a tequila company (thru opening remarks, etcetera), when they knew it never happened, they mentioned the tequila company and/or alleged transactions over 35 times (*Tr.1075-76*):

> *THE COURT: I think the allegation is, it went to the tequila company. Right?*
>
> *MR. MISKIEWICZ: Yes.*
>
> *MR. HALEY: Is the government's proffer that the money was wired directly into the tequila company account?*
>
> *MR. MISKIEWICZ: Mr. Richards was handling all the disbursements out of the Ron Richards escrow account.*
>
> *THE COURT: So it went from the Ron Richards account to another?*
>
> **MR. MISKIEWICZ: <u>To the tequila company account</u>.**

Yet—they <u>never</u> traced a single dollar to the fabricated scheme.  Furthering their graft on the Court, the government produced a tequila bottle (GX-4509), manufactured by "*Don Abraham*" (embossed in the glass for authenticity), while scoffing at Kenner's testimony that he did not manufacture that bottle (lacking all materiality to the instant case—simply another Red Herring) (*Tr.5752*: Michiewicz summation—banging the bottle on the jury box):

- While the government knew this was untrue…and so-on.

**Jowdy actually stole the Hawaii funds** (and it was known to the government at all times)—specifically after Jowdy admitted to it during his 2010 FBI proffer (3500-KJ-2 at 11-14) corroborating his previous January 2010 California deposition confessions that were forwarded to Galioto by California counsel and Hawaii counsel.  Thus—Constantine's basis for the GSF was not to steal money from Kenner investors (with Kenner the first and largest contributor to the GSF collective efforts), but to sue Jowdy and recover the loan funds (*ECF No. 557 at 42—ECF No. 668 at 23, f.12*)—and separate the investor group from the "*bad apples*" vis-à-vis buyouts (*Tr.1919-21*: Nash's GSF multi-use verifications that cross-corroborate the signed-authorizations and follow-up email confirms by Constantine: *ECF No. 668 at 250-52*).  It was documented thru litigation that the few "*bad apples*" were assisting Jowdy in his fight versus the other 30+ investors—and the group decision was to buy them out of future dealings—to avoid more conflict.  McKee's exculpatory texts, recently conceded by the government as identified by Constantine's appellate counsel (*Case: 20-4278, Dkt 65 at 10; reference ECF No. 62 at 22-23*) confirm the take out of the "*black sheep*" as part of Constantine-GSF plan (*ECF No. 668 at 159-61*)—not what McKee failed to recall during testimony; but somehow with 100% certainty *never being told* (*Tr.1822-24*).  **Apparently McKee was wrong**—and the government waited until post-sentencing to concede the obvious.

> Note: No objections were lodged after the receipt of the authorization (sign-offs), the follow-up emails, or the monthly conference call topics.  *Zero*.

Ultimately—this all disregarded the Gonchar side deal with Constantine (*Tr.4826-27*), allowing Constantine unmitigated access to his comingled $1,500,000 of deposits—far exceeding any erroneous spending by Constantine that originated in the attorneys co-mingled account but was not part and parcel to the Constantine-GSF, approved and authorized transactions.  They were all signed-off by the investors; see *Upton v. Tribilcock*

---

> [AUSA Michiewicz summation]: *"Finally, after I produced the bottle (indicating) and I don't know, I guess it's not a real bottle. You can have it. You can touch it. It's a real bottle."*

- Great, a real bottle (of what)—nothing more than one they stole from Kenner's Cabo home in or about April 2014 when they ransacked the property—causing tens of thousands of dollars of damage—again like Kenner's Arizona home in 2013-14 (for intimidation).

8

> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir 1997)) (holding persons have a "basic responsibility…to review a document before signing it.")

Although Kenner and Kenner investors were not pleased with the results of Constantine's GSF implementation; see *Archer*,[10] the expenses as documented thru the government admission of GX-767 show that <u>no</u> Constantine expenditures, as charged, violated the authorizations or the documented follow-up emails—specifically with the use of Gonchar's, Constantine's, and Kenner's various deposits. Thus, as the Second Circuit opined in *Ebbers* (identical to the Peca capital account coverage of the Hawaii-Jowdy loan funds, per his SDNY Grand Jury testimony):

> "[t]he loss must be the result of the fraud." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir 2006)—and "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id*.

### *The Jowdy Legacy thefts/embezzlements…*

The post-trial submissions—as requested by the Court (*4-6-2016, Forfeiture H'rg Tr.206-08*)—verify that:
   (1) Kenner did <u>not</u> use any Hawaii funds to buy anything;
   (2) Peca's SDNY Grand Jury testimony verified his expectation that his $1.8[75] million was forwarded to Jowdy as part of the Hawaii-loans (covering 100% of any potential unknown diversion—notwithstanding Kenner's own traceable and fungible funds); and
   (3) Gonchar's $1,500,000 side deal with Constantine—co-mingled with the Constantine-GSF funds—covering any possible misappropriation of the Constantine authorized transactions…

---

[10] Investors do not get to re-choose from a list of what they are upset about after the fact due to 'proximate cause' issues that affected the underlying investment—not caused by defendants; *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).
   As the Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171

9

Thus—there is **zero loss** and **zero victims** for the Hawaii and GSF transactions based on proximate causation (and fungible money-tracing reality; that the government avoided at all costs)—regardless of Kenner and Kenner investors' disappointments in the results; see *Archer*.

**So what happened here—and needed to be covered-up…**

**Massive IRS fraud** (part and parcel—<mark>YELLOW highlighting of tax evasion transfers</mark>—*infra*): Hundreds of thousands, if not millions, of dollars of unpaid income (and personal expense diversions) flowed thru the Jowdy and Baja Development Corp accounts—and Legacy transactions, alone.  A further deep dive—by legit DOJ agency members—would reveal a wider net of money-laundering efforts thru the various Texas and Tennessee accounts (funded by Bhatti and Lehman Brothers) prior to their September 2008 bankruptcy (a blessing in hindsight—as all of the records seemed to vanish in the bankruptcy abyss).

Now—Silverpeak (Bhatti) could resolve DCSL issues once and for all (for Jowdy's cabal)—primary among them; <u>eliminate</u> the rest of the equity classes as planned and executed since 2006.

Notwithstanding the IRS money-laundering discussed herein, Jowdy and Bhatti had begun their money-laundering and budget looting from day one (March 2006 Cabo closing) with the approvals of Mike Delvin, who was charged to verify proper implementation of budget approved funds.   Delvin failed—*by design*—and the looting free-for-all went untethered, extracting over $1,400,000 in the first six months of the Cabo funding—and then the fun ramped up: *ECF No. 667*
—*at 11-13* [Jowdy's $2.5 million DCSL capital account fraud];
—*at 13-14* [DCSL budget thefts thru December 2006];
—*at 15-16* [racketeering thefts from Cabo investor deposits to fund the Tennessee deposit];
—*at 16-17* [Jowdy-Danske document stolen $8.4 million Jowdy equity: zero in reality];
—*at 20-23* [following Jowdy's looting of the Diamante del Mar budgets and KSI $3mm loans];
—*at 23-24* [Attorney Harvey cover-up complicity since 2002];
—*at 24-28* [Diamante del Mar initial investment thefts];
—*at 28-32* [Jowdy multi- million-dollar airplane account thefts—and bank fraud with fabricated operating agreements];
—*at 29-30* [Jowdy deposit/loan thefts on Norstrom/Kenner]; and
—*at 33* [Jowdy $791,000 loan fraud on Murray]…

10

The Legacy transactions were not included in the 2012-13 criminal IRS investigation Kenner was assisting when it was terminated months before the Kenner indictment—at the specific request of the FBI and other government agencies: again protecting Jowdy because he was the tip of the spear that could never be unraveled with the cabal members it protected.

Every government action related to Jowdy and his protectorate takes on the clear appearance of fear: including Probation's 2016 affirmation of Jowdy as an "innocent victim".  Here, the actions have been reduced to 5+ years of poking Jowdy parties instead of real government interventions with documented criminal activity and cover-ups in hand.  Layer after layer has been exposed by Kenner with the FBI's own Rule 16 production, *Jenks* disclosures, and previous records Kenner obtained thru the various civil litigations versus Jowdy.
> Note: The Court should recall that after the government identified Jowdy as a co-conspirator in docketed materials (in the instant case); Jowdy's team threatened the government via litigation to remove Jowdy's name and reference therein.   Instead of sticking to their documented statements—supported by empirical evidence, they cowered and requested the Court remove their reference.   That exposed all any observer needed to know about where the wizard resided.

Galioto's possession of Jowdy's Legacy banking records, alone, are more than enough to create a macro-indictment of Jowdy, complicit Lehman Brothers employees (and eventually Danske's), Mike Delvin and his associates (extending to the cover-ups in the Hawaii, Texas, and Tennessee projects of hundreds of millions of transactional dollars)—and the attorneys who actively participated in the Jowdy cover-ups since 2002.

Because money-laundering provides cover and confusion to any observer, most every Jowdy business account was in duplicate (or more).   The Legacy Property accounts were no different; with multiple North Fork Bank (NV address) and Wachovia accounts (CT address).

The Rule 16 production of Jowdy controlled bank records included a myriad of FBI accounting notes on the actual statements—verifying millions of dollars of diversions by Jowdy to himself and his family for countless embezzlements were known and ignored; specifically.   The mere presence of the FBI accounting notes verifies that the Jowdy crimes were necessary for knowledge (to assist in the cover-up)—but never for a single-application of law.

11

*In 2007…*

The following deposits occurred and were re-directed to Jowdy's personal accounts; including Baja Development Corp, his main, personal money-laundering account (not counting the hundreds of shopping expenses and transactions also recorded).

Every one of these transactions originated thru Lehman Brothers (and Masood Bhatti approvals) after corroboration for actual expenses by Mike Delvin's 3rd party accounting firm—the complete failure of the alleged check-and-balance system to protect Lehman Brothers from Jowdy fraud, and investors from complicit Lehman Brothers-Jowdy graft.   Their complicity was identical for the Hawaii-Bhatti-Worden cover-up as well as the Texas and Tennessee project Jowdy and Bhatti were simultaneously looting to each of their respective detriments—unchecked.
- The Texas and Tennessee banking records identify more of the Sam budget looting and money-laundering practices.

**North Fork/Capital One ####5216 (June-2007)**
- Deposit *directly* from LAUREL COVE account ("Tennessee") -- $75,000
    - $15,000 transfer to undisclosed Jowdy personal account
    - $30,000 transfer to cover Jowdy personal travel (Diamante Air ["DAir'] account)[11]

---

[11] Jowdy's personal use of the Falcon 10 airplane and expense payments from multiple corporate accounts, violates unreported IRS taxable benefits, and occurred contemporaneously to Jowdy failing to pay down the Falcon loan (as promised in the deal)—while in possession of the plane.  The plane was personally guaranteed by Kenner and Gonchar on behalf of the Diamante Air LLC.  Instead, Jowdy destroyed the planes value thru overuse, neglecting maintenance, and ignoring the plane's debt service.   Jowdy's non-payments occurred after Jowdy filed a **fabricated** operating agreement with First Source Bank once he was caught signing as Managing-Member of Diamante Air <u>when he was not</u> (in Rule 16 production)—replacing the real operating agreement Frist Source Bank possessed.  Kaiser and Berard mirrored this fraud in the Sag Harbor transaction (ala Jowdy-style) once Jowdy hired them.   Galioto and the government are aware of these incremental criminal activities (both Jowdy's and the subsequent Kaiser/Berard schemes); ***sitting silent in complicity—again***.
- In 2009—the plane had an appraised value of about $1 million with approximately $650,000 of debt—but to recover the title from Jowdy's control (via the fabricated document in the bank's possession), Kenner and Gonchar had to let the plane be repo'd from Jowdy.  Jowdy refused to allow Kenner and Gonchar reclaim the plane's title without litigation to resolve the fabricated title fraud with First Source Bank: another distraction technique from the massive Jowdy frauds in Mexico.   Thus—the Constantine-GSF plan took over the plane and recovered the $350,000 residual value in the plane as part of the reclamation plan (with the remaining $400,000 debt secured

**Wachovia ####5216 (July-2007)**
- Unregistered deposits totaling -- $258,000
    - $95,000 transfer to Legacy account at North Fork Bank
        - $63,000 transfer to Baja Development Corp account
        - $35,000 transfer to cover Jowdy personal travel (DAir account)
        - $11,000 transfer to undisclosed Jowdy personal account
    - $45,000 transfer to undisclosed Jowdy personal account

**Wachovia ####5216 (August-2007)**
- Unregistered deposits totaling -- $70,000
    - $70,000 transfer to Legacy account at North Fork Bank
        - $75,000 transfer to Baja Development Corp account
        - $38,000 transfer to cover Jowdy personal travel (DAir account)
    - $25,000 transfer to Legacy account at Capital One
    - $20,000 undisclosed debit to Jowdy

**Wachovia ####5216 (September-2007)**
- Deposit from LAUREL COVE ("Tennessee") -- $50,000
- Deposit from Boot Ranch ("Texas") -- $100,000
    - $100,000 transfer to Legacy account at Capital One
        - $15,000 transfer to Baja Development Corp account
        - $63,000 transfer to Diamante del Mar account (Bates stamp: 12223)
            - $17,000 undisclosed Jowdy debit
            - $8,000 transfer to Jowdy Mexico money-laundering account (LOR Management)[12]

---

again by Kenner and Gonchar: not the GSF contributors).  Thus—this was not a scheme on a repo'd plane as the government convinced the Court.  It was Business 101.

[12] LOR Management is Jowdy and his Mexico counsel's Mexico corporate account they used to launder money and rob Diamante del Mar investors regarding title issues (with Attorney Harvey's cover-up lien-scheme since 2002: *ECF No. 557 at 34-35*).  Jowdy received approximately $537,000 illegally thru LOR Management from the KSI $3 million loan in 2006 (out of the approximately $2 million they robbed in total from the KSI development loan)—alleging Diamante del Mar owed the $600,000 to Jowdy account, yet the LOR funds were already stolen from the Diamante del Mar investors and laundered thru the LOR account years earlier.  Ultimately—Jowdy was re-funding his prior embezzlements and laundering scheme—so he could wash the funds again for personal use.  A third-grader could trace these schemes.  The government should find one—since Jowdy testified in 2009

13

- $16,000 transfer to cover Jowdy personal travel (DAir account)

**Wachovia ####5216 (October-2007)**
- Deposit from LAUREL COVE ("Tennessee") -- $75,000
- Deposit from Boot Ranch ("Texas") -- $75,000
    - $100,000 transfer to Legacy account at Capital One
        - $55,000 transfer to Baja Development Corp account
        - $40,000 transfer to Diamante del Mar account (Bates stamp: 12227)
            - $6,000 transfer to Jowdy Mexico money-laundering account (LOR Management)

**Wachovia ####5216 (November-2007)**
- Deposit from Diamante ("DCSL") -- $25,000
- Deposit from LAUREL COVE ("Tennessee") -- $150,000
- Deposit from Boot Ranch ("Texas") -- $150,000
    - $100,000 transfer to Legacy account at Capital One
        - $11,000 transfer to Brain McNamee [13]
        - $58,000 transfer to Diamante del Mar account (Bates stamp: 12223)
            - $9,000 transfer to Jowdy Mexico money-laundering account (LOR Management)
        - $40,000 transfer to cover Jowdy personal travel (DAir account)
        - $15,000 transfer to undisclosed Jowdy personal account

**Wachovia ####5216 (December-2007)**
- Deposit from LAUREL COVE ("Tennessee") -- $150,000
- Deposit from Boot Ranch ("Texas") -- $210,000

---

that there was "*no development loan on it*" (*ECF No. 667 at 21-22*); another fraud because Kenner and Kenner investors were not aware at t hat time (even 3-years after he robbed it).

[13] This transfer to McNamee was one of many Jowdy made.  They included funds stolen from Owen Nolan's August 2006 DCSL investment (in Rule 16 production: *ECF No. 557at 34*—et.al.)—and ignored by the FBI/government.  McNamee was the steroid whistleblower in the Roger Clemens scandal.   The Jowdy payments were *hush* money (whether or not Clemens knew) after Jowdy attorney and Clemens' sycophant, Tom Harvey (Louis Freeh's co-counsel in the Jowdy affairs) instructed McNamee to *forget what he used to know*—even after McNamee's previous admissions to MLB investigators.   The repeated *hush* payments from various Jowdy accounts were ignored despite McNamee's compliance and feigned ignorance during Clemens' DC federal criminal trial for perjury in front of Congress.

14

- o   $98,785 transfer to Legacy account at Capital One
    - <mark>$40,000 transfer to Diamante del Mar account</mark>
    - <mark>$17,000 transfer to cover Jowdy personal travel</mark> (DAir account)

These diversions by Jowdy to circumvent IRS personal taxes continue thru the 2008 and 2009 statements (the end of the Rule 16 disclosures), but because this pattern of theft began in 2002 per the government's eve of trial subpoena (totaling tens of millions of dollars by 2009), it is unfathomable to believe it has not continued thru today—while star-witness Kaiser exposed, thru *Giglio* violations, that he told the government/FBI pretrial (*10-28-2020, post-sentencing H'rg Tr.47-50, infra*).
- A cursory view of the 2008 debits equal approximately $1,119,000—and
- A cursory view of the 2009 debits (only January-July) equal approximately $406,000. [14]

None of these totals include the direct transfers totaling millions of dollars previously identified by Kenner as extracted from the DCSL, Texas and Tennessee accounts that were co-mingled by Jowdy before final embezzlements—creating a web-like laundering structure even Charlotte would struggle to comprehend. But—the FBI's sole investigating agent ignored it all: former FBI employee, Galioto.

Former Jowdy co-conspirator, John Kaiser, proffered that he informed the government/FBI (*October 28, 2020 Hearing Tr.48-50*):
> "*I went down there in 2012 it wasn't long before I caught wind of how he [Jowdy] was doing this and – which was roughly 2013.  I actually audioed, videotaped…and then I go to the government and say it's a crime what's going down there.  He's stealing millions of dollars.  I even had the accountant on tape, Antonio Marques, talking about the criminal activity.  And I said if only the FBI knew what Danske and Ken Jowdy were doing…*"

Kaiser's honest pronouncements that highlighted serious *Giglio* violations by the government, also contradicted his 2015 trial testimony; 3-years after his 2012 exculpatory proffer (*Tr.1229-36*):
> *Q: Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?*

---

[14] The same bank records identify hundreds of thousands of dollars of additional direct personal expenses recorded by Jowdy via account debit cards on these business accounts—never identified as IRS benefit-income.

15

>   *A [Kaiser]: Yes.*

—And further contradicting his previous FBI proffers (3500-JK-1-r at 3):

>   [Kaiser]: "*never got $ back from KJ/Mexico*"

Despite the finely tailored testimony and concealment of its knowledge by the government, the Court has never held it to an equal standard.   The trouble is that the statements and known criminal activity by Jowdy, Kaiser, Berard and others was obscured by Galioto (and more likely than not the remainder of the prosecutorial team)—disturbing the veracity of the trial proceedings, while prejudicing that and every element of the post-trial proceedings.

For starters—the government (or any representative of the DOJ) should notify the former Kenner investors about who really has their money and when the government actually knew about it.   They may not recover the funds—due to the elaborate cover-up scheme that Jowdy's cabal (supported by Galioto's graft and coercion—and the Kaiser/Berard/Donlan team after Jowdy's "*wining and dining*": *ECF No. 628 at 4*).

Lastly—the Kenner submission (*ECF No. 1026*) regarding: (a) Kristen Peca's sentence day allegations, (b) *Ex parte* review of the Northern Trust settlements with Nolan, Peca, and Berard, and (c) the recovery of the Kaiser *Giglio* admissions from the government have not been addressed—remaining open issues in the proceedings.


Submitted June 15, 2021

Sincerely,

Phil Kenner, ProSe


16