July 26, 2021

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Re: <u>Kenner – Rebuttal to government</u> <i>ECF No. 1082</i>

Your Honor:

Kenner submits that items covered in the June 28, 2021 hearing (*ECF No. 1078*) are
addressed, in detail, herein.   Note: The government responded to several of the
open items, in kind as the Court requested, while others were systematically ignored
in their papers or obfuscated.   Kenner, for thoroughness, will endeavor to address
all of them.

I. <u>Items ignored</u>[1] (and addressed, *infra*):
    (1) Determination of "*sound methodology*" used to identify loss (for restitution
       and guideline factors);
    (2) Kaiser 2006 collateral agreement—submitted in his June 22, 2021 third
       party ancillary claim (*ECF No. 1070-2; 10-28-2021 H'rg Tr.26*) (*ECF No. 1024*
       *at 28-30*);[2]

---

[1] The government's response highlights a refusal to address salient issues argued by Kenner
(during oral arguments and vis-à-vis written submissions) <u>and</u> requested by the Court
effect sentencing factors and moves their actual response from avoidance to premeditated
negligence (while obviously written by an intern in the U.S. Attorneys office).

[2] See "*[E]gregious*" Kaiser 3rd party submission arguments, *infra* (*ECF No. 1086 at*
*2*).July 21, 2021 (ECF No. 1086), Nolan's counsel submitted opposition to several
ancillary filings (v. forfeiture).  Its noteworthy that Nolan has received full
recompense for any possible funds traceable to the Jowdy loans (Mexico resort)—
despite the Court's revelation 10-28-2020 (H'rg Tr.37) that "the crimes that were
charged <u>did not include</u> the crime involving the funds that went to the resort [the
Jowdy loans].   The government's investigation was expansive, certainly took a
number of years, and the government takes its time...the government or course as
you know is required to do significant investigation and make sure that its position
is justified.

(3) Kaiser's non-investment in Eufora alleged as a loss (*Tr.1058-59*: independently solicited by Kaiser from his friends & family, per all Rule 16 evidence) (*ECF No. 1024 at 2*);

(4) Berard LedBetter transaction has no loss—based on Berard's testimony of stealing the real estate (with Kaiser) from Kenner (a criminal act), selling the stolen property (a continuing criminal act), and splitting the sale revenues with Kaiser (*Tr.3047-49*);

(5) Rucchin GSF contribution *no loss example* (*10-28-2021 H'rg Tr.16-18*);

(6) Peca alleged "*anonymous*"..."*unsigned*" IRS whistleblower letter (*10-28-2021 H'rg Tr.27-28*);

    a. Another *new evidence* issue exposed by Kristen Peca (*10-5-2020, Sentencing H'rg Tr.26*);

(7) Northern Trust interest offsets of $1,601,572 or $2,088,324 with (incremental un-named LOC investors: Norstrom, Gonchar, Murray) (*ECF No. 1024 at 25-27*);

II. Items addressed:

(1) Northern Trust settlements;

(2) Kaiser *Giglio* materials (although double-talked: *ECF No. 1082 at 1*);

(3) Late submission (5-years after oral arguments) restitution requests (*ECF No. 1082 at 2-5*).


Sound methodology required:

Kenner is requesting that the Court identify what methodology they used to determine the monetary losses from the individual investments (Hawaii and Eufora) and contributions (GSF) for guideline, restitution and forfeiture.   Did they utilize a co-mingled approach or a skip-tracing (money-in-money-out) methodology to trace what individuals were allegedly defrauded by which alleged schemes?

As the Court knows, the purpose of restitution is compensatory and 18 U.S.C. § 3664(f)(1)(A) provides that restitution order is limited to "the full amount of each victim's actual, provable loss." *United States v. Zangari*, 667 F.3d 86,91 (2nd Cir 2012), and the amount of restitution ordered must reflect a "reasonable approximation of losses supported by a sound methodology"; See *United States v. Gushlak*, 728 F.3d 184, 196 (2nd Cir 2013).

"*[E]gregious*" Kaiser 3rd party submission arguments (per Nolan's counsel: *ECF No. 1086*):

July 21, 2021, Nolan's counsel submitted opposition to several ancillary filings (v. forfeiture).  It's noteworthy that Nolan has received full recompense for any possible funds traceable to the Jowdy loans (Mexico resort) vis-à-vis his "*Settlement Agreement*" (*ECF No. 874-1*) despite the government's blockbuster revelation 10-28-2020 that

> "*the crimes that were charged <u>did not include</u> the crime involving the funds that went to the resort [the Jowdy loans].   The government's investigation was expansive, certainly took a number of years, and the government takes its time… the government or course as you know is required to do significant investigation and make sure that its position is justified.*" (10-28-2020, H'rg Tr.37)

So, why is the claim being adjudicated—if the loan funds were not part of the charges?  It is <u>not</u> part of the superseding indictment prosecution; but moreover it was simply lost in the government's morass of moving the goalposts for 6-years and counting—understandably confusing all involved.   Note: Every real time email identified the Jowdy loans and "*group*" recovery efforts—**as authorized and known**—to the Hawaii investors (See *10-5-2020, Sentencing H'rg Tr.49-57*):

> [Hawaii inside-counsel, Attorney Madia "*February 24, 2006*" (*ECF 785 at 2-4*)]: "*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the **Hawaii loans** at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project….**Based on the meetings John Kaiser had with Ken before we agreed to lend him the money in 2004** Phil [Kenner] has asked me again to attach for your records <u>a copy of the lending agreement</u>.  Please contact me with any questions but <u>you should already have your copy</u> from previous communications.*"

Attorney Madia continued (still without equivocation):

> "*The questions during our last conference call by <u>Owen Nolan</u>, <u>Mike Peca</u>, and <u>Bryan Berard</u> were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   **You should have the operating agreements I previously forwarded to you <u>after every member signed them</u>**.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*
>
> *Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records.   It has been given to Masood [Bhatti]*

*at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations."*

Attorney Madia "*update[d]*"[3] again "*May 17, 2007*":

> "*Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC (your investment LLC as attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.  Tommy Constantine and John Kaiser have been urging Phil not to sue Jowdy.  They want to negotiate with Jowdy through Tommy.   You understand that with Louis Freeh and John Behnke involved with Jowdy this will require megafunding and fortitude to take them on.*"

*How could anyone not be aware—with Nolan individually identified on the conference calls with Berard and Peca (unless its due to willful blindness on their part)? Alternatively and unaddressed, it could still be a result of ulterior motives (financially like Peca, Berard, Kaiser—et.al.) or medical conditions (now discovered as admitted by Berard and others post-trial: See ECF No. 782—et.al.)?*

Despite overwhelming pretrial knowledge by every Hawaii-Mexico investor of the loans to Jowdy (that 3 cherry-picked investors by Galioto re-verified to the 2011

---

[3] Former FBI Agent Galioto had possession of the multiple "*update*" emails when he surprised Kaiser 10-19-2010 at his Long Island, palatial estate, and asked Hawaii Managing-Member Kaiser specifically about them.   Kaiser authenticated the "*update*" emails to Galioto (*3500-JK-2-r at 3*: verified in the FBI raw notes)—yet, regardless of the <u>verified</u> empirical evidence in hand (for all Hawaii-Mexico investors), Kaiser, Berard and the prosecutorial team proceeded to coerce Hawaii-Mexico investors that *they no longer knew what they used to know*—because Kenner "*stole all of the Hawaii money and never gave it – the loan money --to…uhhhh…Jowdy*".   The Court should reveal the farce once and for all and reset the graft the prosecutorial team continues to hide from the coerced (or cooperative)—and announce its untruth.

SDNY Grand Jury; See *ECF No. 112-3* [Peca], *ECF No. 112-4* [Sydor], *ECF No. 112-5* [Stevenson]), the ruse remains unaddressed by the Court—affecting monumental guideline calculations and restitution issues.

At a minimum—the Court should explain to Nolan's counsel, and the other alleged victims (for all to finally learn what the government knew all along); **Jowdy received 100% of the Hawaii-loan funds** that Galioto and the government have been lying for a decade by juxtaposing Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*" (see Kristen Peca, 2012-FBI recording: *ECF No. 892 at 17*—her belief following Galioto's coercion beginning after Michael Peca's affirmation of knowledge to the 2011 SDNY Grand Jury: *ECF No. 112-3 at 30-33*).

- Note: Kenner recently invited Nolan's counsel to meet in-person and address every single transaction in Nolan's financial sphere.   This included all Rule 16 correspondence with Nolan's wife's independent knowledge of his LOC (*ECF No. 815 at 41-43*: mostly produced by Nolan's former counsel who worked with Jowdy to terminate Kenner—Bates stamp: *MYR0001066, NOLAN0005267, NOLAN0005249, NOLAN0005044*—et.al. all from Nolan's production).   Kenner's invitation included open discussions of the macro-financial transactions that the government and Galioto (following years of Jowdy/Attorney Harvey graft) have misled them (specifically including *government-forfeiture-44* and *government-forfeiture-36*—as relevant to Nolan).   The pretext was to assist Nolan's counsel's recovery of funds documented as stolen by Jowdy (perhaps complicit with Nolan's former counsel—who charged Nolan over $500,000 in legal fees for his 2009 arbitration; while sabotaging other Jowdy-adverse investors who knew then and still know the truths).[4]

*The government debunked Galioto's coercive statements—but continues to conceal it from those who deserve to know...*
Their own coercive lie to the Kenner investors was government-debunked when they submitted *government-forfeiture-44* and *government-forfeiture-36* in 2016 (*government-forfeiture-36*, also debunking Kenner bought anything with the funds that he apparently did not steal, either)—eliminating the 6-year litigated nexus (as

---

[4] The same California counsel charged two other Jowdy settlement persons **over $250,000 apiece** for the filing (only) of litigation with Kenner that Kenner forced into dismissal with prejudice and no settlement as a result of the Nolan arbitration victory for Kenner on every similar allegation.  The only resolution was their identical settlements with Jowdy (*Tr.339* [Juneau verification]) (*ECF No. 790-1*).

another reformative issue).   Thankfully for the government's prosecutorial team, they only disclosed and debunked their previously-known and egregious trial misrepresentations in 2016, post-trial (via *government-forfeiture-44* and *government-forfeiture-36*), <u>after</u> they received the verdict they desperately sought alleging the opposite as their rock-solid **lynchpin** prosecutorial issue.   Apparently, it was all a hoax.

Nolan received full settlement from Jowdy and had every opportunity with counsel to recover *anything* thru independently negotiated sales transaction with the one individual who would approve it: Jowdy—who settled Nolan's claim in the first instance.   There was nothing that prohibited Nolan from financial recovery—considering Jowdy controlled the settlement and recovery processes.   The government has not produced a single correspondence that elucidates efforts by Nolan for recovery, in lieu of riding out the investment with Jowdy at the helm—by independent choice.[5]

> Justice Sotomayor previously opined on this exact issue positing, "If a victim chooses to hold collateral rather than reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline."  *United States v. Robers*, 134 S. Ct. 1854, 1860-1861 (2014), 188 L. Ed. 2d, at 891-892 (explaining that where a victim "does not intent to sell" collateral, "other provisions of the statute may come into play," enabling a court "to count, as part of the restitution paid, the value of the collateral previously received but not sold").

As opined from the highest bench, Nolan's non-execution cannot be passed to Kenner for guideline loss or restitution with the 1% equity "*Settlement Agreement*" valued at over $3 million at the time of settlement—**over a decade ago**.

The Court should recall that Nolan's counsel and the government attempted to hide this settlement from the Court by denying its existence (but Kenner exposed it thru their-own future submissions) (*ECF 781 at 3, ¶ II*):

---

[5] With Lehman Brothers and Danske's (and eventually Silverpeak's) overt support for uber-developer Jowdy, why wouldn't everyone simply trust they were finally on the right path? It is inarguable from the bank's empirical actions—and never-ending advocacy for Jowdy at the helm.

> [AUSA Komatireddy]: "*Based on discussions with Nolan's counsel and counsel for the DCSL parties, it is the government's understanding that no settlement matching Kenner description exists, wither in '2008 [or] 2009', or at any other time.*"

*No repercussions befell either complicit party for specifically lying to the Court.* Now—after a decade of Nolan and his various counsel supporting Jowdy versus the investors (like Kaiser and Berard joined in late 2011), Nolan's counsel argues against others 3rd party claims; *although statutorily accurate.*   They have now turned on those who they advocated with to blame Jowdy's thefts on Kenner for years.

*Jowdy's former (5-year) co-conspirator admits to no loss...*
As discussed *infra*, even Nolan's counsel raises the "*egregious*" nature of Kaiser's submission (*ECF No. 1070-2*) that the government labels as a loss (*ECF No. 1086 at 2*).   Nevertheless—the reliability of Kaiser's submission, *res ipse loquitor*, from the government's star-witness eliminates Kaiser as a Hawaii victim ("*$1,080,000*": *ECF No. 1024 at 2*).   It was Kaiser's voluntary submission—and should be counted on those merits to remove his victim-status accordingly.   Notwithstanding the Court's responsibility to flush out "*the substantial danger of false claims in forfeiture proceedings*" (See *United States v. Lamid*, 663 F. App'x 319, 323 (5th Cir 2016)), it highlights Kaiser's life was never "*ruin[ed]*" according to himself (*Tr.1089*—and vouched for thru government rebuttal summation: *Tr. 5753*) with $150 million of collateral received for the $1 million Kaiser's banking records verify he already received for his friends & family (as stipulated at trial and produced thru government Rule 16 production).

As Kenner points out (continually), star-witnesses from nearly 7 years ago have been intimately involved in the multitude of inter-machinations, hearing by hearing (specifically including Peca, Kaiser, and Berard).   Yet—only after Kenner points out more government graft with their star-witness' own reformative statements (impeaching trial testimony and exposing *Brady/Giglio* violations), the government presents another flurry of victim impact statements (years after-the-fact) and 3rd party claims to distract the Court from reformative issues that should be ruled on (many addressed herein).   It should be highlighted that the submissions are being made by the government (as solicited by them) and not to the Court as statute dictates; See 18 U.S.C. 853 (n)(2).   The government knows this—but submitted these as distractions instead of relaying the statute to any individual that wanted to legitimately file.   Why didn't the government produce these timely?   It is pure graft

on the Court by the government to avoid other submissions (i.e. *ECF No. 1026*—
et.al.)

Background:

<mark>Alleged victims—the cornerstone of an indictment…</mark>

Former FBI agent Galioto chose his victims in the first indictment (*ECF No. 1*)—just like he cherry-picked *with Jowdy's attorneys* for the 2011 SDNY Grand Jury testimony that failed miserably (with Peca, Sydor, and Stevenson's exculpatory testimony—*infra*). Then, after nearly 2-years (inclusive: 2013-15) of documented coercion and misrepresentations by Galioto in contradiction to their cherry-picked victims own personal knowledge and previous statements, the government specifically chose to remove practically half of their Kenner-investment clients as victims on the eve of trial (April 22, 2015: *ECF No. 214*). Simultaneously—Galioto was frantically attempting to terminate a 2015, criminal investigation and macro-criminal-case versus Jowdy, Kaiser, Berard, **himself**, and others in the Mexico Supreme Court for bribery, embezzlements, Kenner's abduction and Mexico jailhouse near-death torture, the subsequent murder of the investors' attorney, their complicity with it, etcetera.[6]

The Court should recall that after Michael Peca's unambiguous 2011 SDNY Grand Jury testimony where he specifically verified his and his co-Hawaii investors' <u>knowledge</u> and <u>authorization</u> to loan funds to Jowdy (*Tr.496-99*) (*ECF No. 112-3 at 30-31*: simply frustrated because Jowdy did not repay the funds—and corroborated in Grand Jury testimony by Sydor [*ECF No. 112-4 at 19-21, 25-26*] and Stevenson [*ECF No. 112-5 at 17-18*]). Kristen Peca recorded Kenner for the FBI in July 2012 (one-year later). She affirmed her anxiousness for the Kenner-jailhouse-torture and subsequent Mexico attorney's death for liberating Kenner with a Mexico City Federal District Court *amparo* (the equivalent of a U.S. writ; plus-or-minus). Kristen Peca explained to Kenner (*ECF 892 at 81*):

> [Kristen Peca]: "*…maybe that golf guy [Gaudet] told Michael about you being in [the Mexico] jail and them hurting you – and…and the [Mexico] attorney guy*

---

[6] As Galioto was losing coerced investors as alleged victims (because exculpatory bank records were being shared between all of the Kenner investors to debunk that *Kenner stole the Hawaii money or the GSF funds*), the Court should recall Galioto (with another FBI agent) *ironically* attempted to frame Kenner in the months before trial with a legendary jailhouse snitch on a murder-for-hire plot by recording him in jail. **It failed** (for a 2nd time; once pre-arrest by Galioto, as well)—but the government waved their CDs in front of the Court April 22, 2015 as sure-fire impeachment information if in fact Kenner testified.

> Note: None was used because it was another Galioto-misdirection ploy, this time carried out by a complicit U.S. Attorney's Office unchallenged rhetoric.

9

> *getting killed.  It's too scary.   Michael and I can't thank you enough for keeping the fight going after the [Mexico] jail thing and the [Mexico] attorney but -- I just want this to be over no matter what it takes.   I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that?*"

> [Kenner]: *a protected criminal – that's who.*

During the same 2012-FBI recordings, Kristen Peca *clearly* affirmed her knowledge of the Jowdy-loans (certainly thru her husband—and not vis-à-vis Kenner as a non-client).  But—she never addressed any concerns for the validity or knowledge of the <u>actual</u> Jowdy-loans other than "*how mad Michael and the other guys are with Jowdy for not paying the loans back*".  Only the **newfound** coercion by Galioto (with Kaiser and Berard, post Jowdy employment in late 2011) to her and her husband changed the paradigm of reality that everyone knew firsthand (see Norstrom affidavit cite, *infra*)—but when the FBI tells you what happened; their above reproach reputation is difficult for any simpleton to argue (or just a coerced one—because she "*just want[ed] this to be over no matter what it takes*"...now that she learned about it from Galioto in 2012).

- So how was it that the loans every Hawaii-Mexico was deftly aware (as her husband so eloquently relayed to Galioto's 2011 Grand Jury) were now alleged by Galioto a year later as, Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*"? [7]

- How could this be true if Kristen Peca explained to Kenner "*how mad Michael and the other guys are with Jowdy for not paying the loans back*"?

The Court should recall that the government relentlessly harangued Kenner throughout trial—and moreover thru summation—that Kenner "*stole*" the Jowdy-

---

[7] Kristen Peca 2012-FBI recordings of Kenner (ECF 788 at 11, f. 10):

> [Kristen Peca]: **Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy**.

> [Kenner]: *Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already.  You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> [Kristen Peca]: *but – I don't understand why he would say it.*

Hawaii funds, yet the government (with Galioto's main contact, Jowdy's attorney Tom Harvey) produced *government-forfeiture-44,* allegedly 3-weeks post-trial (*ECF No. 440 at 5*) debunking all of it.   The new production was despite their 6-years of pretrial communication, multiple Jowdy-FBI proffers (on the record), countless off the record communications, joint media slander campaigns versus Kenner, and a December 2014 in-person Jowdy-proffer [*3500-KJ-8*] that is missing all *Brady* and *Giglio* materials (and most likely the date of *government-forfeiture-44's* original production).   The missing Jowdy *Giglio/Brady* documents continue unaddressed; synonymous with the Kaiser and Peca issues recently discovered (as new evidence) and raised by Kenner pursuant to the Second Circuits *Rodriguez* ruling. [8]

Galioto's coercion worked with some projected Galioto-cherry-picked victims—but others who refused to recreate history with him for *anything* were removed on the eve of trial (including many of the new but untimely submissions: *ECF No. 1082 at 2-5*).

==So what changed that triggered a dozen (or so) investors who were unwilling to cooperate in 2015—based on their first-hand pretrial knowledge—to submit loss statements 6-years post-trial (most for the first time)?==

Six-years post-trail—the government received amplified pressures from investors who were told Kenner *stole* the Hawaii loans (of about $5 million), the entire GSF money (of millions)[9]—and Galioto had frozen the accounts with the money.  Galioto

---

[8] The Second Circuit opined in *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that

> "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act.   The considerations under *Brady* and *Giglio*, however, are quite different.   *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information.   The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."

[9] The government response identified the Ronald Richards' GSF tracking spreadsheet (*GX-767*) as "*the conspirators' own ledger*" (*ECF No. 1082*).   This is incorrect—because clear Rule 16 production and Attorney Richards' trial testimony verified his office produced it and Kenner (as a GSF contributor) only received it after the Eufora (and future-Hawaii-GSF) investigation team (of Giuliani's group led by Attorney Stolper) requested it as Ronald Richards identified to the California Bar, "*May 3, 2012*" (*Bates stamp: DS-0000283-285*):

promised, to those he coerced, that once the Kenner conviction was complete (in 2015)—they were promised the return of the funds he and the FBI had confirmed as frozen.  **The implication was that their funds were traced by the FBI to Kenner's accounts; misleading government-witnesses to coerce testimony**. The post-conviction repayment failed to come to fruition—because it was all based on a tremendous lie.   That was commensurate with the sentencing day statements by Kristen Peca, exposing the government's IRS scam on them and non-existent "*anonymous*", "*unsigned*", whistleblower letter that has <u>never</u> been produced as Kenner requested (*ECF No. 1026*, and re-requested *6-28-2021, H'rg Tr.27*).   that is also a hoax on the Pecas—because the letter ***DOES NOT EXIST***!

> Note: The Court is deftly aware that under no circumstance would an *anonymous*, *unsigned* submission to a random IRS office trigger a whistleblower audit (or otherwise)—highlighting the absurdity not realized or explained to the Pecas (on purpose).[10]   This is perhaps why the

---

> [Ronald Richards]: "*I was contacted by Mr. Kaiser's attorney, Michael Stolper, in September 2010.  Mr. Stolper also represents Philip Kenner, a former client and business manager referenced in my response to the other complaint and in the pleadings in this case.  I provided Mr. Stolper and Mr. Kenner with all of the [GSF] evidence and confirmations they requested as to the transmittal of the funds to Mr. Constantine.*"

**Noting**: Michael Peca testified he received the GSF spreadsheet but *could not authenticate it* (See *Tr.652-53*)—while attorneys Ronald Richards and Michael Stolper represented him—*independently*.  Jay McKee, the person Peca received the GSF tracking spreadsheet from) testified that he did not receive it from Kenner *without a delay*—while empirically not in Kenner's possession any earlier than it was also in two of his own attorney's possession (*Tr.1827*); perhaps more timeline confabulations or CTE symptoms; leaving unexplained innuendo and unexplainable temporal anomalies to prejudice Kenner.

[10] Immediately after IRS Agent Wayne's initial appearance in the instant case (without a scintilla of IRS related allegations, in or around 2011 after Galioto's failed SDNY Grand Jury—and Galioto's re-hiring by the FBI to specifically handle Kenner's prosecution—not deemed an investigation), it appears that the Peca IRS audit occurred simultaneous to the termination of the verified Jowdy, Berard and Kaiser IRS criminal investigations by the IRS-Denver Regional Criminal Investigations Office.   that is too much IRS coincidence to be overlooked as happenstance.

Concurrently ironic, Hawaii COO-Manfredi testified he received "*$172,000*" of "*back pay*" in 2006 (while no IRS taxes were paid) (*Tr.2978*) and Gaarn (who recorded Kenner for 5-hours for the FBI) had $700,000 of taxable capital gains (minus original acquisition costs). **Note: No IRS issues were addressed versus Kenner in the instant case—if the stock was really believed as Kenner's**.   For COO-Manfredi, the IRS apparently waived the criminal tax avoidances as a result of their testimony: both Manfredi and Gaarn recalling nothing to do with *anything*, *anywhere*—while testifying in direct contradiction to their (1) FBI proffers, (2) signed corporate documents, (3) emails and texts.

government prays that the Court will not hold their feet to the fire for Kenner's *anonymous*", "*unsigned*" IRS letter request—exposing *another* ridiculous hoax in their house-of-cards; and it can be pushed to an appellate issue.  This *fly-in-the-ointment* must be exposed for what it is—a gross ruse on the Court without consequence at this point—while effecting every bit of the prosecutorial integrity.

Kristen Peca exposes the Galioto/government lies—empirically...
(With Berard, Kaiser, Galioto, and Jowdy's attorneys' coercion complicity)

Ultimately—the government hid from the Court that FBI agent Galioto ("Galioto") (with Berard, Kaiser and Jowdy's attorneys), were coercing investors to think Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*" (see Kristen Peca, 2012-FBI recording—per Galioto's coercion: *ECF No. 892 at 17*).  Kristen Peca's 2012-surreptitious recordings revealed the Jowdy-cabal graft Kenner <u>exposed</u> and <u>documented</u> for the Hawaii-Mexico investors since 2006—while the FBI/government ignored all of it to form their fabricated-prosecutorial narratives (*ECF No. 730 at 125-26; ECF No. 958 at 25-26*).

During Kristen Peca's 2012-FBI recordings—Kenner addressed Galioto, Kaiser, and Berard's coordinated allegations; including denouncing that Kenner set someone's car on fire, killed their pets, stalked Michael Peca, made death threats, and sent anonymous letters to the IRS (which the government opened trial insinuating was Kenner's handi-work: *Tr.4*).  Their statements were without a scintilla of empirical evidence, they knew it; and certainly **not from a letter found on Kenner's laptop**—which the government refuses to address.

Kristen Peca's utter sentencing-nonsense included Kenner's recent challenge to the government/FBI to produce the anonymous IRS letter (*ECF No. 1026*) after Kristen Peca espoused (*10-5-2020, Sentencing H'rg Tr.26*):

> [Kristen Peca]: "*And thankfully, that letter was found on Kenner's laptop to validate our suspicions and prove that he was harassing us and obstructing justice.*"

---

• Too many IRS chips fell in the favor of needed witness-testimony to be ironic for Wayne's appearance in the case—because it was evident.

Does Kristen Peca even know she is part of the fraud—or just willing to go along to get along, because she "*just want[s] this to be over no matter what it takes*" (*supra*)?

The government and the Court know this was fabricated.  Yet—it was used to coerce the Pecas into believing them—not the previously verified, empirical facts.  *Hoover-esque* harassment tactics were implemented to control their witnesses thru PRAVDA-like propaganda (and still implemented from "The 7th Floor").  The fake IRS letter story was clearly a manipulative plan; just a portion of the other harassing events and lies Kristen Peca presented as the government mouthpiece sentencing day.   The Court must take actions to preserve what little empirical integrity the government has left in this proceeding—despite the necessary favors they have satisfied to date.

Most likely, long-since forgotten by the Court, this provable "*anonymous*" misrepresentation, began 30 seconds into day 1 of the trial (*Tr.4*), positing "*We have recently located -- both of those were instigated by, we know, anonymous, quote-unquote, tips to those agencies.*"   Despite knowing their planned prejudice—then-and-now, it was amazingly re-kindled by Kristen Peca in her sentencing day speech (*10-5-2020, H'rg Tr.24*), along with a myriad of other outrageous criminal allegations [subset *supra*]—despite originating with Jowdy's attorneys and Galioto—again.   Kristen Peca previously exposed it in 2012 for the FBI recordings:

> [Kenner]: *Kristen – please – are you really asking me that after all of the lies you have heard from Bryan [Berard] – and John [Kaiser] – and that matt [Galioto] guy who refuses to meet with me and review the evidence?   Why would they have beaten me in Mexico in that jail if I had the money – and then [they] killed our attorney?*

> [Kristen Peca]: *…this is too scary.   I told you that when we heard from – I don't remember who –*

> [Kenner]: *I did not tell you…*

> [Kristen Peca]: *…maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed.  It's too scary.   Michael and I can't thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes.   I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that?*

[Kenner]: *a protected criminal – that's who.*

- **The Court must demand the production of this highly corrosive—and reformative item, verifying prosecutorial misconduct: the "unsigned" and "anonymous" IRS letter.   Justice cannot be served if this remains unaddressed.   The government must be held to some standard; any minimal ethical standard would do at this point.**

The government debunked any Hawaii loss vis-à-vis Kenner theft—the prosecutorial **lynchpin**…

Even the government's accounting of the Cabo san Lucas funding per *government-forfeiture-36* verified Kenner never bought any of his Baja Ventures 2006 Mexico equity with the funds Galioto perpetrated as the blatant coercion premise to the investors pretrial (at least anyone who would answer his threatening calls). *Shockingly*—and still unaddressed by the government (as their ethical responsibility, under *Berger*, 295 U.S. 78: "not that it shall win a case, but that justice shall be done")[11] or the Court is that while the government knew the Hawaii, lynchpin truths (self-exposed as false during forfeiture hearings, *infra*), they nevertheless harangued Kenner about the Jowdy-loans at trial being "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*)—and lied throughout summations; all prejudicing Kenner and influencing the jury to believe there was something the government knew but simply was not readily apparent that (*Tr.5711*—et.al.):

> [AUSA Michiewicz]: "*that 5 million or however much more or less that netted out to be [and] bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas*"

> [AUSA]: "*I'm telling right now, the evidence, I submit to you, is that loan agreement is bogus. Never happened. Didn't exist. Created as part of the hall of mirrors as part of the deception and lies to divert attention away from these two men.*" (*Tr.5709*)

---

[11] *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935)

15

> [AUSA]: "*But it is more than just that. The bogus nature of the loan agreement.*" (*Tr.5709*) **12**

Lost in the morass (again incremental to their pretrial banking knowledge of no stolen funds per stipulated banking records)...Wayne and Galioto were told by Jowdy their prosecutorial trial theory was untrue during FBI proffer (years pretrial). Yet—to assist Jowdy's cabal in removing their greatest thorn (while Kenner was leading litigation versus Jowdy in every possible jurisdiction to recover the funds and be a <u>leader</u> to his investors), the government ignored Galioto and Wayne's pretrial knowledge of the loans and who really had the money.

> Isn't it *still* misconduct, making an argument the prosecutor knows to be factually untrue, even though it may be consistent with the evidence admitted at trial; *See United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987) (reversal for prosecutorial misconduct where prosecutor's argument was refuted by unoffered evidence in the government's files)?

> As to materiality, defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Cromitie*, 727 F.3d at 221-22 (quoting *Agurs*, 427 U.S. at 103) [13] "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir 1991) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975))

As a reminder, IRS Agent Wayne testified (after feigned ignorance to one of the most critical issue at the forfeiture hearings under his guise—after he was thankfully *refreshed*) (*3-9-2016, Forfeiture H'rg Tr.44-45*) (*ECF 1006 at 21-22*):

---

[12] <u>This is the loan agreement</u> Jowdy produced to the FBI and authenticated in 3 other jurisdictions.  They were verified as authentic after the Court's request for them during forfeiture hearings (*4-6-2016, H'rg Tr. 288-291*).  They were known and concealed by the government from the Court—but only produced after the government <u>lied</u> to the Court about prior testimony by the loan document witness (*Id.*).  They were caught again—but no consequence for their graft followed; including Probation contemporaneously alleging in their July 2016 submission that Jowdy, Kaiser, and loan-signature witness (Gaudet) testified at the forfeiture hearings against Kenner's authentication of the loan agreements.  Shocking (although in this case it is not a useful word any longer—or needing re-definition), **none of the 3 named-persons testified**—so who told Probation to shelve their ethics and write it?

[13] *United States v. Cromitie*, 727 F.3d 194, 221-22 (2nd Cir 2013) (quoting *United States v. Agurs*, 427 U.S. 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976))

*Q: Would you kindly take a look at Page 2 of **Kenner Exhibit F-2**?  The third paragraph.  Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas?*

*A [Wayne]: Yes.*

*Q: What is your recollection of that, sir?*

*A [Wayne]:* ==*That Kenner borrowed the money from Jozef Stumpel and Jerry Linton [sic].*== [14]

Incremental to Galioto and Wayne's designed silence at trial (a severe *Napue* violation—and chargeable 18 U.S.C. 1001), the government was also in possession of—and blatantly ignored—the Hawaii-Mexico investors' 2009 California litigations versus Jowdy (organized thru Constantine's GSF plan) identifying the Baja Ventures 2006 capital account investors (*Ex. 20 at 5, ¶7*):

---

[14] The FBI knew Jowdy also stole an additional $1.6 million from the $4.1 million Baja Ventures 2006 capital account (per *government-forfeiture-36*, 5-23-2005 contribution) redirected it to Jowdy's own capital contribution; while listing <u>only</u> a $2.5 million Baja Ventures 2006 capital account on the closing documents instead of <u>over $4 million</u> (including what he stole from Kenner's contributions).  Galioto ignored it like the tens-of-millions of additionally documented Jowdy-embezzlements (*ECF No. 667*-et.al.).

**Multiple prosecutorial team members were aware pretrial—and re-confirmed it on the eve of trial**.  They subpoenaed Jowdy's August 2002 Baja Development Corp bank statements one-week before trial (*Ex. 26*).  The statements confirmed Jowdy stole—within days—*at least* $417,000 of the first $804,000 Mexico-investment (from Kenner, Woolley and Khristich: the remainder untraceable without further subpoenas)—yet days later, the government alleged Defendant-Appellant fabricated the decade-plus Jowdy thefts as a cover-up (*Tr.31*)—**knowing it was a lie**.

> Note: Jowdy's thefts in the first 3-weeks (August 2002) exceeded the court's sentencing day assertion that Kenner's <u>13-year scheme</u> "*overlooked*" (*10-5-2020, H'rg Tr.79*) the less than $280,000 of documented loan repayments from legit stock sales as the criminal "*proceeds*"—and the basis for a <u>204 month sentence</u>.  It is confounding at best—since Kenner highlighted the $280,000 for years (*ECF 770 at 66-68*—et.al.), including minutes earlier thru allocution—while those specific transactions had been thoroughly identified via attorney communication in the government's Rule 16 production—and vetted by investors' independent Eufora attorneys (*Ex. 28*—et.al.).

[DCSL Complaint]: "*Specifically, two of the Plaintiffs (Jozef Stumpel and Jere Lehtinen) invested in Baja Ventures 2006, LLC, which owns 38% of Diamante Cabo san Lucas, LLC...*" (alterations in original).

The California litigation corroborated Baja Ventures 2006 two debt-equity agreements (intro'd during forfeiture hearings: *4-4-2016, Tr.28-31*).

Secondly—the California litigation highlighted (*Exs. 19 at 7*—and *20 at 7*) (*ECF 668 at 21-23, f.12; at 30, f.19*—et.al.):

[DDM and DCSL Complaints]: "*Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

It was impossible that anyone was unaware during the filings of these 3rd, 4th, or 5th Plaintiff lawsuits they independently chose to participate in; unless willful blindness like Berard testified to was allowed (*Tr.3157*—et.al.):

*Q. Did you ever receive copies of the complaints?*

*A [Berard]: I think I did, yes.*

*Q. And from whom did you receive copies of the complaints?*

*A [Berard]: I would say Phil Kenner or Ron Richards.*

*Q. I guess the question then would be having received the copies of the complaints, <u>did you look at them</u>?*

 ***A [Berard]: I said before I did not read them, no.***

Isn't this the definition of transparency—and concurrently unmitigated willful blindness?   How was Kenner concealing anything at this point from anyone?

<mark>With respect to any loss—it must begin as the government defines in their indictment (a Sixth Amendment requirement: the right to confront)...</mark>

18

Since the Supreme Court decided *Hughey* over thirty years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990). Relying on *Hughey*, the Tenth Circuit opined, "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, No. 19-7006 (10th Circuit Dec. 23, 2019)

With respect to the restitution issues and loss amounts that are still outstanding, they are still based on the unsupported loss tables (*ECF No. 1024 at 2-4*), without back-ups as the Court requested (*July 2, 2019, H'rg Tr.24-25*).  The Supreme Court in *Hughey* decried the government's attempt at an end-a-round—because, here, the government did a "*significant investigation*" pretrial (of 6 years)[15] and re-determined on the eve of trial who they had convinced were victims of their theories (*ECF No. 214*)—while removing those who would not comply with Galioto's coercion tactics.

> Note: As such—the government removed Norstrom, Gonchar and Murray from the eve of trial Northern Trust subpoena (*Kenner trial exhibit 210*, intro'd at *Tr.4205*)—concurrent with their respective removals from the superseding indictment (April 22, 2015).  Yet years later, after purposely obscuring overwhelming exculpatory evidence in the Northern Trust subpoena, they allege Gonchar and G. Murray as *ex post facto* victims (plus others) (*ECF No. 1024 at 2-4*).  *Hughey* defines this as improper—and in totality, Kenner was not charged with proving his innocence with respect to those two specific investors (no different than the government's *re-re*-reintroduction of deVries, Norstrom, Campbell, R. Murray, Tsyplakov, and Stevenson: *ECF No. 1082 at 3-4*).  Based on the government's back-door tactics "*—perhaps mistakenly—*" (*Id. at 4*), while blaming themselves for not adding more victims, their misdirections were designed to obscure obvious graft, ignoring Kaiser and Rucchin's testimony of loss, recovery, and victim status that Kenner raised in the June 28, 2021 hearing (*H'rg Tr.26, Tr.16-17*: respectively).

---

[15] The government announced post-sentencing, unabashedly:
> [Government]: *Your Honor, as you're aware, the crimes that were charged did not include the crime involving the funds that went to the resort [the Jowdy loans].  The government's investigation was expansive, certainly took a number of years, and the government takes its time...the government or course as you know is required to do significant investigation and make sure that its position is justified.* (*10-28-2020, H'rg Tr.37*)

To note—despite identifying Kristen Peca as a non-participant in any financial meeting between Kenner and her husband (per her-own 2012-FBI confessions):

> [Kristen Peca]: "*I guess – I mean Michael was the one who agreed to all of that stuff because I really do not understand it.   That is the business between you two – not me.*" (*ECF No. 730 at 125-26*, *ECF No. 1006 at 11*—et.al.)

—She specifically verified no knowledge of her husband's LOC until the FBI-2012 disclosure by Kenner): [16]

[At approximately 5.45 of the 1:34.50 call] – Kristen Peca tells Kenner:

> [Kristen Peca]: *Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the [Jowdy] loan, the line of credit, that happened when we were in Ohio [2008 & 2009]?   I don't understand how it could have been open for 5 years before that?   Because we had a bond account going?* **Do you mean the Hawaii; you had a line of credit, but not for us?**
>
> **[Kenner]: No, no, you guys had lines of credit for 5 years at Northern Trust.**
>
> [Kristen Peca]: *...for 5 years?*
>
> [Kenner]: *for 5 years?   When you were in Ohio, that's when the thing closed.*

The government's macro-loss and restitution analysis would require the Court to identify nothing more than government created spreadsheets that Kristen Peca testified her husband was part of in macro-investments *with un-named others*—thus one perjured testimony could lead to dozens of incremental victims thru nothing more than glorified and unsubstantiated bluster (proven here)—regardless of the

---

[16] Kristen Peca <u>cannot</u> believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge—but nevertheless testified, **as coached**, 3-years later to her implicit, first-hand participation in the 2005 LOC decisions (*Tr.696-700*).  It is unmitigated perjury (a clear *Napue* violation). The government planned and solicited the suborned perjury with the person (a non-victim of anything to do with Kenner) as their mouthpiece because she told Kenner that she "*just want[ed] this to be over no matter what it takes*"; perhaps finding her medium.

exculpatory records in the Courtroom &/or known to the government at the time of trial.

By choice, the government excluded dozens of investors/contributors from their prosecutorial case after speaking with approximately 50 Kenner clients (including each of those listed: *ECF No. 1082*).  Now—6-years later (or thereabouts), they are suggesting that these people should be deemed victims without a single right to confront their knowledge that was abundant and exculpatory in 2015 (and should not have changed today).   Each newly named individual, (victim submissions per government influence *ex post facto*) avoided cross-examination during trial of their-own:

(1) **Signed Northern Trust subpoena documents** (never seen by the Court for any LOC investor): confirming:

    a. They signed *Letters of Authorization* to access the LOC investment funds (*Ex. 22* [All LOCs])—contemporaneous with the account opening;

    b. They annually signed verifications of *Disbursement Request & Authorization* knowledge (*Ex. 18* [Berard example]); and

    c. They signed the originating purpose of their individual LOC via signed & dated *Extension of Credit* documents (*Ex. 17* [Berard example]: "*$900,000*"…"*Investment in speculative real estate*")—contemporaneous with the account opening;

(2)  **Signed Attorney Baker disclosures:** Signed by 19 Hawaii-Mexico investors—including every newly addressed person (*ECF No. 1082*) (although only produced by the government during forfeiture production—contemporaneous with a multitude of other unaddressed *Brady* violations). Their signed disclosure highlighted on page-1 (*ECF 668 at 117-118, f. 62*):

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

(3) **Signed GSF "Acknowledgment and Acceptances"** by all (government Bates stamp: *SMC-000######*…—et.al.); and

(4) **Eufora representation by Giuliani's investigative and legal team** (headed by attorney Stolper) which identified the 2008-09 Gaarn transactions as vetted, known by counsel and their clients—and ultimately debunked as either a civil or criminal issue (*Ex. 28*; specifically *at 7* [signed at 9-16 by all]—et.al.).

Note: Of the above exculpatory records—contradicting <u>all</u> possible concealment issues and confirming implicit knowledge by the individual investors via transparency, the Court **only** saw a subset of the GSF "Acknowledgment and Acceptances" (which ironically McKee, Sydor and others testified at trial they *signed but did not read* &/or *cannot remember*)—**none of the others**.

None of these newly named persons could withstand reasonable cross-examination during a *Fatico* hearing (and the re-trial)—which would consequently (in Kenner's favor) highlight the government's pretrial knowledge and graft to let the false testimonies stand for their *chosen ones*.

The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2014). The decision to hold or not hold a *Fatico* hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014). If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.

"*Law and order are everywhere the law and order which protect established hierarchy*" -- Herbert Marcuse

I. <u>Items ignored</u>:

<mark>Kaiser issues unaddressed by the government's papers...</mark>

The government had every opportunity to define Kenner's position as incorrect but refused, including: Kaiser's 3rd party collateral agreements (*ECF No. 1070-2*) after specifically being raised as significant restitution, loss, and victim issues in the June 2021 hearing (*H'rg Tr.26*) (notwithstanding their *Giglio* violation non-sequitor: *ECF No. 1082 at 1*—only addressing Kaiser's exculpatory and impeaching *Giglio* statements with a virtual word vomit about "*recordings*", and not responding to Kenner's *ECF No. 1026* submission). Their conscious avoidance verifies the

surrender-flag waving willingness (as unexplainable issues continue to mount) and just move-on, in the hopes the Court will not hold them accountable for another unfulfilled specific request—and certainly not hold them to the merits of their loss and victim issues.[17]

Kaiser's 3rd party ancillary claim submission creates incremental, reformative issues related to (1) the government's star-witness' perjured-testimony (See *Wallach* 935 F.2d at 457, *infra*), (2) his misrepresentation about transactions and repayments on behalf of his friends & family (singularly solicited for Hawaii specifically—and *also* Eufora transactions), (3) highlighting his *Giglio* statements to the government as consequential to a verdict of confidence, and (4) grossly effects loss calculations.

Kaiser's 6-22-2021 exculpatory submission impeached his trial testimony (yet again) and raises prosecutorial misconduct issues of the government vouching for him during summations (*ECF No. 1070-2*)—to something they knew to be false.   As now presented by Kaiser, it *also* grossly affects loss, victim status, and guideline calculations—and must be rectified.

Kaiser's reformative submission was Kenner's basis for requesting the information submitted but not docketed since October 2, 2020 (*6-28-2021, H'rg Tr.25-26*) for another 3rd party claimant; with anything possible after the reformative statements by the government, Kaiser, Peca and others since trial, and most recently during sentencing and post-sentencing (raising clear *Giglio, Wallach,* and *Napue* issues).

---

[17] The government's non-response—affecting Kenner's jurisprudence—is commensurate with its previous:

(1) Failure to produce the Court-requested Northern Trust settlement agreements in June 2021 (*6-28-2021, H'rg Tr.7*—et.al.) (Ironically—the settlements were secured thru Jowdy's counsel and Galioto's interference in the first instance—further enriching the Jowdy legal cabal at "*35%*" contingency fees for those who were coerced into the recreation of history: See Kristen Peca victim impact submission, 2021);

(2) Failure to secure the original Jowdy-Nolan settlement agreement upon Kenner and Court request (while compounding their ineffectiveness by lying to the Court that Jowdy's counsel and Nolan's counsel verified no such document exists)—until Nolan's counsel produced it to ground their 3rd party ancillary claim (*ECF No. 874-1:* a.k.a. *woops*);

(3) Ignoring submissions of Second Circuit case law to retain Kenner's original laptop and iPhone (obscuring all of Kenner's email accounts from review still thru today);

(4) Non-compliance with producing the *government-forfeiture-61* and *government-forfeiture-62* original signatures from Jowdy's counsel after forfeiture hearing production by the government (again proving a Jowdy cabal member forged Kenner's name—in contrast to the 11-year hoax that Kenner forged anyone's name, anywhere), *etcetera…*

<span style="background-color: cyan">Kaiser has no loss and is not a victim…</span>
(As a result of his exculpatory submission: *ECF No. 1070-2*)

Kaiser's submission requires a *Fatico* hearing of its own—for the sheer outrageousness of either/both, (a) Kaiser's trial testimony contradiction to the recent submission—&/or (b) the authenticity of the most lopsided collateral arrangement in history (that defies reality).[18]   Ironically—neither the government nor Kaiser raised these agreements during the trial.

**Nevertheless—it is Kaiser's submission**, thus taken on face value in either sense—**Kaiser is not a victim**.

And—as the governments-star-witness, and never-ending source of new revelations (*ECF No. 628, 10-28-2020, H'rg Tr.47-50*—et.al.), the foundation of the government's prosecution relied on Kaiser's mouthpiece, testimony, and relentless misdirections to posit his cover-ups of-the-day; and it should be placed squarely on the record with its consequence to sentencing factors (specifically guidelines).

> "[D]etermining that a new trial was necessary, because lies of his key witness who 'tied all the pieces together' even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

- **The effective removal of Kaiser as a victim alone—solely based on his recent submission revelation—would effect guideline calculations by between 114 and 156 months (using the low end of the ranges).   That significance cannot be ignored.**

Kaiser's 3rd party ancillary submission (*ECF No. 1070-2*) <u>verified</u>:
   (1) Kaiser had collateral of $150 million—for a $1 million transaction in 2006 (15-years ago): thus a non-victim;

---

[18] The government cannot produce a single document from Rule 16 production (email, text, etcetera) between Kaiser and Kenner since the alleged 2006 signing that identifies this agreement—or the collateral agreement in general—**but based on Kaiser's submission (docketed by the government as fact)…no loss and no victim status is required for Kaiser**.

24

(2) Kaiser lied at trial that Kenner "*ruin[ed]*" his "*life*" (*Tr.1089*) (while in possession of $150 million of collateral—per his submission)—and the government utilized the known lie to vouch for Kaiser's alleged victim status during summations (*Tr.5753*).

Note: Kaiser identified the transaction as "*LOAN from John R. Kaiser to Philip A. Kenner*" (*ECF No. 1070-2 at 7*)—thus in reality (using the Jowdy model as the government's ethical standard), if the $1 million was not repaid (as the Na'alehu Ventures 2006 bank records confirm they were; Bates stamp: *NAAZ000433-435*), the money would be Kenner's personally and not relevant to any Hawaii transaction.   Here—the assertion by the government (on Kaiser's behalf) is that they want it both ways according to Kaiser's submission: a victim—with outrageous collateral.

The Court should recall that Jowdy employed Kaiser for 5-years (2011-2017) while Kaiser was allegedly the largest Cabo san Lucas shareholder.   There is no evidence—nor could there be—of Kaiser's requests to Jowdy &/or Danske Bank to buy Kaiser's alleged $150 million (*yes that is correct*) in equity to replace the alleged $1 million loan/investment (or whatever Kaiser refers to it the day he is asked about it).  As the Court recalls—Kaiser explained that he interrupted the 2017 Silverpeak buyout of the CSL Properties 2006, LLC investors (*ECF No. 628 at 2*)[19]— thus no foreseeability application can favor Kaiser's non-recovery (especially with the submitted agreements authorized by Jowdy with Kaiser (*ECF No. 1070-2 at 6*). Kaiser wanted to remain in the perceived lucrative deal—and wanted other to stay with him thru his inside-knowledge and influence.

---

[19] No single person—more than Kaiser per his own admissions to this Court—obstructed and influenced Kenner investors to not recover funds that were being offered to them in various settlements (*ECF No. 628 at 2*—Cabo equity capital) (*Tr.1065-66*—Eufora stock). The Court should recall that after discovering the Jowdy frauds in 2006—Kenner offered to buy all CSL Properties 2006, LLC investors out of their Cabo stock (*10-5-2020, sentencing H'rg Tr.56-57*):

[Attorney Madia: "*May 17, 2007*" Hawaii-Mexico investor email update—read into the record as a mitigating factor]: "*Phil has offered to buy any or all of you out of the contributions to CSL Properties.   We do not know if our Mexico legal efforts [versus Jowdy's cabal] will be successful.  And Phil wants to make it clear that you can cash out now, if you want.  Just contact me and I will handle the paperwork with you and your personal attorneys.*"

Not one investor asked for the buyout—because if Kenner was staying in the deal, then they wanted to stay in—but Kenner did not stop the recapture of investment capital like Kaiser repeatedly interfered.  How does that leave a restitution issue for Kenner?

Nevertheless—It is not believable that Jowdy could have permanently removed Kenner's equity (or further complicated Kenner's monetizing of it) by simply using more of the embezzled Cabo budget funds (with or without Danske's complicity), or requested Masood Bhatti (of Silverpeak: the current Danske debt white knight) to pay for it and buy out the Jowdy-granted Kaiser equity; *wherever they took the funds from*.   **They never did it**.   Nothing more needs to be said.

Kaiser's submission makes him a non-victim and his trial testimony perjured.   The Court must act to protect whatever integrity is left.

Kaiser did not invest the $200,000 the government alleged as a loss—nor was it charged in the superseding indictment (*ECF No. 214*)…<br>(*ECF No. 1024 at 2*)

Kaiser testified that the late December 2009 investment he solicited from three unknown friends & family for Constantine was not his money.

That transaction was not charged as a criminal act in the superseding indictment.

There is no testimony that Kenner was involved in Kaiser's second December 2009 friends & family solicitations.   In fact, Rule 16 evidence confirms that Kaiser told Kenner about the December 2009 transactions for the latter $200,000 investors in or about August 2010.   Thus—and again—it appears that the lion's share of alleged investment fraud or misstatements and inability (obstruction) for investors to recover their funds is under Kaiser's leadership, influence and direction—and ran in contradiction to Kenner's specific recovery actions.

Kaiser's friends' late December 2009, $200,000 Eufora transaction…

The $200,000 Eufora transaction originated from Kaiser's friends & family (Ethel Kaiser, Rizzi, and Hughes: *Tr. 1058-59*)—solicited entirely by Kaiser—and was documented as <u>unknown to Kenner</u> (*infra*).   Noting: when Constantine/Eufora cross-claimed versus Kaiser (and others) in the November 2010 Arizona cross-complaint, Attorney Stolper (who represented Kaiser—and 28 others) requested that Kenner (a non-client of his) prepare a *white paper* response for him and his clients (specifically including Kaiser).   Kenner wrote (from government production *ED-0001978/_2* [without Bates stamp]):

[Kenner]: "*ON page 3 and 4, Kenner NEVER had any interaction with the Plaintiffs regarding their December 2009 investment in Eufora.   Constantine specifically left Kenner out of the communication in his attempts to persuade Kaiser, without Kenner's expected interference at the time, to look to his friends (current Plaintiffs) for financial assistance.   At that time Kenner and Constantine were at odds over the abusive use of the GSFs that Constantine blew through at a record primarily for his own personal benefits.*"

- Neither Kaiser nor his attorney (Stolper) raised a single retort.

...(*Tr.1339*):

*Q. And it's your best recollection that what you told him is that this $200,000 was investments by your mother, Mr. Rizzi, and Mr. Hughes; is that correct?*

*A [Kaiser]: Yes.*

*Q. Certainly not yours?*

*A [Kaiser]: Certainly not mine, correct.*

The superseding indictment does not charge this transaction.   In addition—Kenner was found not guilty of the Privitello fabrications (Counts 5 & 6)—despite every government/Kaiser/Privitello effort to tie Kenner to the transactions (perhaps thru a $25,000 cabana party [*Tr.1429*]—that <u>never</u> existed; unless "*in a cave*").   In fact without couth, the government had to remind Privitello of the fabricated "*cabana*" story they wanted him to *organically* recall.

Note: Upon information and belief—Privitello received very lucrative audio-video transactions thru Kaiser from the Cabo san Lucas project once Kaiser received employment from Jowdy.   The Privitello transactions were more *pay-for-play* benefits Jowdy handed out to anyone who would assist in the elimination of Kenner—Jowdy's main adversary.   This favor was arranged by Kaiser (thru the Cabo project)—also because he needed Privitello's testimony to retroactively verify a Eufora-theft-turned-equity side deal that was actually more Kaiser-theft from his friends & family (*Tr.1559*).

In July 2010—7-months after Kaiser's $200,000 December 2009 transaction directly with Constantine when Kaiser explained the additional issues, Kenner asked Kaiser "*Who wired the other $200,000?*" (*infra*).   Kenner never knew Kaiser solicited

funds for his friend, Tommy Constantine (specifically after Kenner cut off Constantine).   It is clear, Kaiser was cutting his own side-deals of equity in Eufora private stock with Constantine, and praying for profits to re-pay his friends & family from his previous non-repayments (*Ex. 4 at 7*: 2010 FBI proffer—and 2011 text verification—*infra*).

Note: Kaiser (1) needed to repay millions of dollars he *stole* from his friends & family, (2) lied to the Court about selling his home to repay them (*Tr.980*), but (3) confessed to Kenner in a 2011 text message that he never did and <u>*still*</u> (*ECF No. 1024 at 10*):

> (1) **Owed Kenner money**—repaying Kenner $100,000 in 2011 when one would think Kaiser would be screaming that Kenner had *his* millions for over 6-years by then—if true (yet <u>not one</u> email or text exists anywhere; out of *over ten thousand* between the parties);
>
> (2) **Owed his mom**, Ethel, approximately one million dollars he "*took from her*"; despite Ethel's testimony that her "*son*" repaid her the <u>entire</u> "*$390,000*" (*Tr.933-34*)—*ironically* out of the $700,000 John Kaiser took from her in 2005 (per stipulated banking records);
>
> (3) **Owed Vincent Tesoriero** money from the LedBetter theft and 2005 Hawaii money (*Ex. 3 at 4-11: 3500-VT-1-r*)—known to Galioto and Wayne;
>
> (4) **Owed Tesoriero' parents** their original Hawaii short-term loan of approximately $150,000 (*Id. at 3, ¶13*)—also known to Galioto and Wayne; and
>
> (5) **Owed Drs. Sconzo and "Willy" Kruger** for the funds he was about to be sued for—also known to Galioto and Wayne (who specifically withheld faxes confirming Kaiser stole $200,000 additionally from Dr. Sconzo pretrial (*Ex. 5*)—and inadvertently produced them thru AUSA Forfeiture attorneys post-trial);[20]

---

[20] Kaiser confessed his $550,000 thefts from DEA Agent Rizzi, Drs. Sconzo and "*Willy*" Krueger (excluding *Ex. 5* money), and his handi-capped brother Keith to the FBI in 2010 (*Ex. 4 at 7: 3500-JK-1-r*)—but Galioto overlooked it (&/or leveraged it) to secure his star-witness whose lies throughout testimony showed no bounds, were known to the government, and were left uncorrected to their prosecutorial benefit (See *Napue*).

In February 2011—without alleging Kenner owed him a single red cent, Kaiser confirmed Dr. "*Willy*" Krueger (Dr. Sconzo's partner) was going to sue him for the money he never repaid:

| 19 97 5 | +16312350308 John Kaiser* | 2/17/2011 8:40:28 PM(UTC+0) | Read | **[Kaiser]: On the phone w / <u>willy</u> he is going to be suing me** |
|---|---|---|---|---|

(6) **Owed Kaisers handi-capped brother Keith** (which he previously confessed as well to the FBI/Galioto in 2010: *Ex. 4 at 7—3500-JK-1-r*)—et.al.

| 1 2 6 7 2 | +163123 50308 **John Kaiser*** | 7/22/2011 2:17:04 PM(UTC+0) | R e a d | [Kaiser]: Yes and ==that is nit [sic] [not] the only money that is owed out==, that ==I have been working everyday to pay back everyone== |
|---|---|---|---|---|
| 1 2 6 7 4 | +163123 50308 **John Kaiser*** | 7/22/2011 2:57:35 PM(UTC+0) | R e a d | [Kaiser]: 5k month for back taxes on the sale of 87 laurel made 250 k, ==100k went to u== [to Kenner for loan repayments], ==150 vin== [Tesoriero] owes, 3300 a month goes towards cards from Pv [Arizona] Reno, ==was paying my mother== [Ethel], ==$ 2500 a month for the 1 mil…took from her, left her with no money to live==, now paying her $1500 a month, ==Took 380k from brother Keith, left him w/shit==, we where supposed to send him back money after sale of [Kenner's] little house in mex, u sent me 4k for him, i send him $500 a monyh to live on . . And 4k to 6k to Pv a month . Should I continue ????? It's a fucking joke. ==And please don't tell me about Mex I am not one of the hockey guys== [21] |

The real time acknowledgment from Kaiser to Kenner in July 2010 (7-months after the December 2009 transactions occurred) verifies that Kaiser never told Kenner about any of them when he solicited his friends & family in December 2009—certainly confirming they were never co-solicited by Kenner.   After Kaiser's textual confession of the incredible funds he never repaid…anyone—contradicting his trial testimony of repayments by selling his home (*Tr.980*);[22] Kenner exchanged texts

---

[21] In July 2011—Kaiser cries: "*And please don't tell me about Mex I am not one of the hockey guys*"; because he had no investment or interest in the Mexico projects.  But—by 2014 (after helping Galioto indict Kenner)—Kaiser and Jowdy, then, produced a few *new* agreements alleging Kaiser owned the largest share of the Cabo Mexico resort since 2006 (*ECF No. 1070-2*).   Note: Kaiser never participated in the repeated litigation related to the Jowdy frauds in Cabo in the USA or Mexico—because Kaiser never had any standing.   **If Kaiser's new submissions were authentic—it does not comport as the equity owner of over $150 million—but the government/FBI ignore the obvious to allege the absurd—yet again.**

[22] Kaiser's temporal timelines about placing his home for sale; selling it, and then repaying his friends & family do not match reality—or his previous voluntary 2009 arbitration testimony—yet Galioto allowed it to occur (*Tr.980*).   Clearly—observing Rich Kaiser's "*10/21/2012*" communication with the FBI, they were aware.

     Note: Known to Galioto, Rich Kaiser had *also* robbed approximately $50,000 worth of tools from Kenner home in January 2012—promising to borrow them for 30 days (Jowdy and John Kaiser style).   Kenner sent a December 4, 2012 text to the person

with Kaiser's brother (Rich Kaiser).  Kenner discovered that the FBI wanted to confirm Kenner's representations that John Kaiser had indeed robbed his friends & family like he previously confessed to Kenner via text (*supra*).   Galioto knew all of this and suborned Kaiser's testimony.

- The Court should still inquire <u>why</u> a septuagenarian (Ethel Kaiser) testified she was <u>fully</u> (?) repaid her "*$390,000*" (*Tr.933-34*) out of the $700,000 the banking records verify she contributed (yes…that Jowdy-esque math is correct).

| | | | | |
|---|---|---|---|---|
| 1<br>3<br>0<br>8<br>1 | +163139<br>84887<br>Rich<br>Kaiser* | 10/21/2012<br>4:51:10<br>PM(UTC+0) | R<br>e<br>a<br>d | [Rich Kaiser]: Call you tomorrow from another line. **F.b.I called me am not using this phone** |
| 1<br>0<br>9<br>5<br>6 | +163139<br>84887<br>Rich<br>Kaiser* | 10/21/2012<br>4:57:57<br>PM(UTC+0) | S<br>e<br>n<br>t | [Kenner]: I'll be here. **They probably want to know why your brother stole all the money from your mom and took loans from his friends that he cannot account for now**. It's too bad that your brother decided to stir up all this shit with Berard. It was completely unnecessary, but he totally got tricked by Jowdy. It's embarrassing… |
| 1<br>0<br>9<br>5<br>8 | +163139<br>84887<br>Rich<br>Kaiser* | 10/21/2012<br>5:02:09<br>PM(UTC+0) | S<br>e<br>n<br>t | [Kenner]: All this shit got stirred up because your brother decided to be on Jowdy's team… |

Kenner completed this communication spool days after no response about the criminal thefts of Jowdy and John Kaiser:



| | | | | |
|---|---|---|---|---|
| 1<br>2 | +163139<br>84887 | 12/9/2012<br>9:53:51 | S<br>e | [Kenner]: I hear your brother tells anyone that'll listen I screwed guys...well, we will see what happens when the legal |

---

who helped Rich Kaiser package and ship the $50,000 of industrial tools 11-months after-the-loan-turned-theft:



| | | | | |
|---|---|---|---|---|
| 1<br>1<br>9<br>6<br>2 | +163137<br>93500<br>Tommy<br>Dittmeier<br>* | 12/4/2012<br>1:11:15<br>AM(UTC+0) | S<br>e<br>n<br>t | [Kenner]: Happy holidays, Tommy! Was it was fruitless from my end to believe that Richey [Kaiser] was ever going to send those tools back to me? My best avenue is probably to let my attorney take care of it with the police in Arizona. **With John in Mexico Working with the criminal [Jowdy] who stole all my And my friends money, John stealing all of the money from his mother and his handicapped brother**, and Richie keeping my tools after living with me for 3 years is pretty depressing. I assume you will put a good word with Richie to do the right thing!! your-old friend, PK |

| 0 6 7 | Rich Kaiser* | PM(UTC+0) | n t | process plays out. **He tried to STEAL the PV [Arizona] house from me when I have over $1.5mm into the home and he has ZERO**! I cannot wait to drag him through that one in court. **He will pay for the Long Island [LedBetter] theft as well**. It is COMING SOON! How does Vinny [Tesoriero] feel about being fucked by him! **Remember, John took all your mom's $$ and Keith's $$, not me!** That's fucked up!! Now he is Jowdy's right hand guy! KARMA...IT'S A BITCH WHEN SHE BITES BACK. pk |
| --- | --- | --- | --- | --- |

Kenner could not have been more transparent and forward about the non-repayment of Kaiser's friends & family—and Galioto knew all of it thru the Kaisers. Even his brother was protecting him—and then (upon information and belief) went to work in Mexico for Jowdy.   Thus—not just for Jowdy, now, Kenner had to be eliminated and framed as their scape-goat.   Galioto arranged it all—as instructed from the wizard above.

## Kenner helped Kaiser track the late December 2009 Eufora funds he never knew about...

Kaiser asked Kenner 7-months after his December 2009 transfers to track down the last $200,000 he (not Kenner) solicited and sent to Constantine for Eufora—clearly without Kenner's knowledge:

| 1 7 4 8 8 | +163123 50308 John Kaiser* | 7/30/2010 10:47:50 AM(UTC+0) | S e n t | [Kenner]: <u>Where did the last 200k get wired in December</u>? Remember, the 150k & 50k from nick [Privitello] went to RR [Ronald Richards] first. Check the GSF spreadsheet, but ~150k went right to the Falcon! <u>FF [Constantine] is a total thief for all of this and must pay</u>! I wonder where the rest of the 200k went and what ia was used for!?! |
| --- | --- | --- | --- | --- |
| 1 5 2 2 0 | +163123 50308 John Kaiser* | 7/30/2010 11:28:52 AM(UTC+0) | R e a d | [Kaiser]: I will check I thought it went to Ron. J |
| 1 7 4 9 0 | +163123 50308 John Kaiser* | 7/30/2010 11:34:04 AM(UTC+0) | S e n t | [Kenner]: Nope. Only the first 200k went there... |
| 1 7 4 9 | +163123 50308 John Kaiser* | 7/30/2010 11:50:34 AM(UTC+0) | S e n t | [Kenner]: Who wired the other 200k? |



| | | | | |
|---|---|---|---|---|
| 1 5 2 2 1 | +163123 50308 John Kaiser* | 7/30/2010 11:53:27 AM(UTC+0) | R e a d | [Kaiser]: Looking thru my wires now |
| 1 7 4 9 4 | +163123 50308 John Kaiser* | 7/30/2010 11:59:50 AM(UTC+0) | S e n t | [Kenner]: <u>Did you ask CR [Gentry] if the 200k you are looking for ever made it to Eufora in December</u>? That's VERY important. There's a fraud in the fact that hop-a-long [Constantine] took the first 200k for some other use <u>and then issued shares of Eufora to cover the funds! You should raise that to Michael [Stolper] asap.</u> We know he stole 150k of the other 200k for the FALCON! |
| 1 5 2 2 2 | +163123 50308 John Kaiser* | 7/30/2010 12:01:06 PM(UTC+0) | R e a d | [Kaiser]: On 12/16 I wired 150k to Ron Richards acc# 2100017561. And 50k on 12/29. All 400k went to Ron , FF [Constantine] was very clear about not sending directly to him |
| 1 7 4 9 5 | +163123 50308 John Kaiser* | 7/30/2010 12:04:27 PM(UTC+0) | S e n t | [Kenner]: Ron only shows 150k and 50k hitting his account...not 400k total. <u>Send me the confirms and I'll discuss it with Ron's office today</u>. |

Kenner <u>never</u> knew there was another wire for $200,000 to Constantine in December—the basis for the $200,000 (*ECF No. 1024 at 2*) let alone the December 2009 Privitello transaction…further confirming that Kenner had *no involvement* in the Privitello & Kaiser wires of $400,000 in December 2009 to Ronald Richards and then to Eufora (per Constantine instructions—*supra*)…the government knew all of this thru Kaiser at all times—and hid it from the Court.

With full knowledge of no Kenner involvement—the government *still* tried to hold Kenner responsible for them in 2020 (*ECF No. 812 at 5*) when Kenner re-verified in oral arguments (based on 100% of the empirical evidence) that he had nothing to do with Kaiser soliciting funds from his friends & family for any Constantine investment (supported by Kaiser's 2010-FBI proffer: in Las "*Vegas*"; *3500-JK-1-r at 7—Ex. 4*).

     Note: Whether Kaiser contrived the Kenner involvement in the December 2009 transactions with Galioto—or the government/FBI thought it would help further muck up an already heavy-fabricated case, the evidence was

clear that Kenner had zero involvement.  Again, Kaiser got himself overextended with friends & family, while attempting financial recovery from his previous *double-down* investment plans <u>after</u> he received the full re-paid capital from the California and Hawaii transaction with Kenner (see Rule 16 stipulated banking records).

Galioto knew he had Kaiser over a proverbial barrel and leveraged Kaiser's trial testimony exactly how he wanted the fabricated history to appear (notwithstanding Kaiser's unaddressed IRS criminal frauds Galioto instructed Wayne to hold at bay)[23]—but the deep dive into empirical evidence the government ignored from Rule 16 production verifies their complicity of frauds on this Court.

- Judge Nathan in the *United States v. Sadr* case was one of the few Judges to hold obvious government malfeasance responsible and protect ethical jurisprudence—in a situation much like these.

As a result of the July 30, 2010 text communication, Kenner emailed Ronald Richards's office to inquire about the unknown $200,000 in accordance with the text communication with Kaiser, *supra* (*Ex. 23*).

Kaiser cannot be a $200,000 victim (in the Eufora transactions) from Kenner—notwithstanding it was <u>never</u> a charged transaction in the instant case (*ECF No. 214*).

Not only is Kaiser improperly listed as a victim in the indictment for the Hawaii ($1.08 million) or Eufora ($200,000) transactions (*ECF No. 1024*)—but the superseding indictment does not charge either of them (inside the four corners of the indictment).   Furthermore—if they did, it is clear thru empirical and

---

[23] The stipulated records in Rule 16 production verify that Wayne interceded in the clear IRS tax evasion frauds of **COO-Manfredi** (*Tr.2978*), **Kaiser** (*Tr.1413-14*—and the Hawaii and California capital gains), **Berard** (under 2012-13 IRS criminal investigation—and terminated concurrently with Kaiser, and **Jowdy**'s criminal investigations), and **Donlan** (from her August 2006 Hawaii bonus payment)—influencing the needed alterations and fabrications of history for testimony at trial.  It must be deemed stunning that with all of the IRS issues related to this case (not forgetting **Gaarn**'s $700,000 in <u>his</u> documented private stock sales: *Exs. 29, 30*) (all for government-star witnesses; who feigned memory loss &/or offered uncorroborated testimony defying reality)—the government failed to identify a single IRS issue with Kenner—while they created the extensive audit scenario on the Pecas and then lied about Kenner soliciting it thru an "*anonymous*" and "*unsigned*" submission— that IRS Agent Wayne would verify is 99.9999% impossible—if not greater.

exculpatory records that Kaiser and Galioto manufactured Kaiser's testimony for trial to re-create a history of events for both transactions that never occurred.

Not only should Kaiser be removed as a victim—but (1) the egregious Rule 1002 violation and (2) Wayne's reformative forfeiture hearing testimony should be addressed by this Court to leave *something* for the appellate courts to review as to why those sinister representations were not so contrived, premeditated as presented, and vouched for, that the entire proceeding was not tainted—eliminating any chance of a fair trial under *Berger*'s inherent standards.

==Berard's LedBetter transactions...==

With respect to Berard's transactions—for loss or victim status—Kenner could not have been found guilty.

Berard's LedBetter transactions [24]—verify no fraud:

1) Berard <u>authorized</u> his $375,000 capital contribution to the Sag Harbor project (*Tr.3044*):

> *Q. Mr. Berard, are you familiar with a piece of property in the Sag Harbor area of Long Island sometimes referred to as Led Better?*
>
> *A [Berard]: Yes, I am.*
>
> *Q. And what do you know about that?*
>
> *A [Berard]: <u>I invested in Led Better $375,000</u> for the purchase of the property.*
> *...*

(*Tr.3046*):

> *Q. So do you recall where you sent any of the money that you were investing in Sag Harbor?*
>
> *A [Berard]: Yes. <u>I made two separate wires</u> to the LLC, Led Better.*

---

[24] Fully known to Galioto and the prosecution—Kaiser and Berard worked in tandem to steal the LedBetter LLC (vis-à-vis forgery and fabrication in 2011) from Kenner and were sued in 2013 upon discovery of the title theft (similar to their contemporaneous, multi-million dollar theft in Arizona—also from Kenner and Kenner investors; including Sydor, Ranford, Nash, Khristich, and Lehtinen—all contemporaneously Jowdy victims).

> *Q. And you sent it to Led Better?*
>
> *A [Berard]: That's correct.*
>
> *Q. For a total of how much?*
>
> *A [Berard]: $375,000.* [25]

...

(*Tr.3050*):

> *Q. And do you know whether or not the property was ultimately sold?*
>
> *A [Berard]: Yes, we sold the property.*

2) No funds are traceable from Berard's LOC (nor were they unknown transactions, per Berard's testimony)—as alleged by the government.   And—**Kenner received zero of Berard's LedBetter funds (or anyone's) directly or indirectly**;

3) Berard admitted to **stealing** the property with Kaiser from Kenner's corporate (LedBetter LLC), legal control (*GX-703*: intro'd at *Tr.672*):

> [Berard]: "*So I took control…I had to set up the LLC properly so we could put it on the market.*" (*Tr.3049*) [26]

—Selling it "*5/9/2012*" as "*Vacant Land*" for "*$740,000*" as "*LED Better Development Company, LLC to Larry and James Realty*" (*Ex. 2*) (*ECF No. 815 at 27, f. 20*) (while employed by Jowdy—with Kaiser)

---

[25] Berard told the FBI 4-22-2013 that he knew he sent his LedBetter investment funds to an account at Northern Trust Bank that Kenner controlled (*Ex. 14 at 2*)—but this never happened—simply more confabulation; even years before trial.

[26] Known to the FBI/government as a criminal fraud (including forgery by their two star-witness: Kaiser and Berard): See *Wallach*, 935 F.2d at 457-8) (as produced in their pretrial *BINDER-####* production: *at 452, 450*—out-of-order [*Ex. 1*]), Berard and Kaiser (a) fabricated a new and illegal LedBetter operating agreement, (b) forged Kenner's girl-friends name, and *if that was not enough stupidity and criminal-graft in one effort*—(c) they listed the new stolen LLC's address as Kenner's Arizona property—all under Galioto's knowledge and blind-eye (*Ex. 7*: withheld by Galioto—another *Brady* issue).

—By <u>criminally</u> fabricating a fake operating agreement to "*set up the LLC properly*", *again with Kaiser* (*Ex. 1*). [27]

Once Kaiser and Berard criminally <u>fabricated</u> and <u>forged</u> LedBetter operating agreement, they sold the property and kept the proceeds:

> *Q What did the Sag Harbor property sell for? How much?*

> *A [Berard]: Roughly probably I would say the low seven hundreds. 700,000.*

---

[27] Galioto knew Kaiser and Berard were <u>fabricating agreements</u>, <u>forging names</u>, and <u>passing them off as real</u> (like Jowdy did with *government-forfeiture-61, government-forfeiture-62*: with Kenner requesting back-up proof by the Court to the government.   The government ignored the Court's demand without consequences.   It was part of Jowdy's forge and fabricate patterns of documents to criminally deceive Kenner and Kenner investors. incrementally—Jowdy fabricated a Diamante Air LLC operating agreement to steal the Falcon 10 airplane (a Jowdy trait passed to Kaiser/Berard) to cover their collective thefts and misrepresentations in multiple transactions.

- As learned in Rule 16 production, Kaiser also signed as the Managing-Member of an entity he was—in reality—only a small investor—*mentioned over two dozen times at trial* (*Ex. 21 at 1-11*)—but Kaiser defrauded more of his friends & family.

Galioto systematically withheld the fabricated "*Membership Interest Purchase Agreement*" from Rule 16 production that Privitello sent Galioto.   Galioto realized that the original that Kaiser and Privitello were supposed to sign was recovered as well during the search and seizure of Kenner's office (*Id. at 12-21*)—and Kaiser altered the document by changing his role (to Managing-Member) and signed with Privitello (also hiding the identical fabrication frauds with Smith, Sconzo, and Krueger's agreements).   **Kaiser (and Berard) were document <u>forgers</u> and <u>fabricators</u>**—so they alleged the 180-degree opposite to front-run the truths with their own fantastical allegations (with Galioto's documented cover-ups). Galioto's complicit-graft builds greater and greater *Brady* problems left unaddressed to date.

- The Court should finally announce that "*enough is enough*" and follow Judge Nathan's lead—and echo the Ali Sadr rulings (Case 1:18-cr-00224-AJN, ECF No. 350 at 1).

The Court should recall Privitello's confabulated cover-up FBI recording about him splitting Eufora equity with Kaiser in his December 2009 purchase *at that time* (*Tr.1559*)—but because he had a side deal that Kaiser would pay him something in the future—which no one ever heard about prior; like another *word vomit-double talk* that <u>even Privitello could not recall</u> (*Tr.1560*).   Privitello verified thru testimony that Charges 5 & 6 were nonsense (to include Kenner) because **the government knew** Kaiser and only Kaiser introduced Privitello to Constantine (**not Kenner**) because Privitello had

> [Privitello]: "*stressed to John Kaiser about that I was stressing out about my wife going back to work and would love for her to stay home. After communicating back and forth with him, he said I don't know if you ever heard of the company Eufora, I said sure, he said there might be a good opportunity, if you'd like I can put you in contact with Mr. Constantine.*"(Tr.1441-42).

36

*Q I see. And the money that you put into the Led Better -- withdrawn. Was it 375,000 that you would invest in that property?*

*A [Berard]: That's correct.*

*Q How much of that sales price was returned to you, sir?*

*A [Berard]: Again, I don't recall the sales price but I got 50 percent of the sales price.*

Kaiser and Berard ignored a document Kaiser testified at trial he never saw (later discovered at his home—like the original ink Constantine consulting agreements)—while Galioto knew Kaiser gave the original LedBetter operating agreement (*GX-703*) to partner, Vincent Tesoriero (*Ex. 3*—2014 FBI-proffer: *3500-VT-1-r ¶4-11*; specifically *¶9*: "*Tesoriero received the LedBetter agreement from only Kaiser*"). Tesoriero verified it thru testimony.   Tesoriero was unknown to Kenner and Berard.

Shockingly—the government let Kaiser testify he never received the operating agreement (without correcting the known-fabrication; another *Napue* violation) while Kaiser testified Kenner was not at the closing (*Tr.1147*); highlighting the absurdity of the superseding indictment allegations of Kenner possibly concealing who owned what (*ECF No. 214, ¶23, 25*).

—How was ownership possibly concealed if Kaiser's attorney authenticated it to this Court and was present for Kaiser's 2006 closing with him (*Tr. 672...*)? [28]

---

[28] Kaiser and Berard's temporal anomalies—and surreal recollections defy reality and are outrageous, while stealing millions in real estate from Kenner with Berard under Galioto's protection (*Ex. 7*).

Anyone who attempts to support the Kaiser and Berard perjured statements is equally complicit with the underlying frauds they perpetrated on this Court—not just complicit with Galioto's hiding of *Brady* records confirming Kaiser and Berard's repeated forgery frauds and thefts totaling millions of dollars versus Kenner (a substantial ulterior motive—notwithstanding their Jowdy allegiance, for-pay).  **These thefts are in addition to the funds Berard and Kaiser admitted stealing from *other* Kaiser friends & family** (*See [Ex. 4] 3500-JK-1-r at 7*; *See ECF No. 1024 at 10*; *See ECF No. 668 at 235; Tr.1160, Tr.1161, 3102*). They all needed an excuse (a.k.a. Kenner) to blame for the funds (like Jowdy did and Galioto fabricated to the Pecas and presumably others: *ECF No. 770 at 41*)—even after Kaiser received 100% of the 2005 funds back before continuing to borrow money from Kenner, Gaarn, Mahoney (Mexico friend of Kenner's), Dr. Sconzo (*Ex. 5*: *Brady* materials withheld by

Galioto), Dr. Kruger (*ECF No. 668 at 235*)—et.al.   All Kaiser's thefts are in Rule 16 production—BUT ignored by Galioto/government to protect their suborned perjury and victim-storyline with Kaiser (their star-witness).

> Note: In the cover-ups, Berard included his "*close friend*", and real estate business partner, Lanie Donlan (*Tr.3081-82*: who never worked for Kenner; a courtroom misrepresentation) in Berard's forgery allegation in the Arizona case (*Ex. 6 at ¶49*) (*Ex. 9*).   Galioto and IRS agent Wayne were aware of the fabricated forgery allegation and called Donlan to check on the *fly in their forgery ointment* (*Ex. 8: 3500-LD-2*)—after Berard's false deposition testimony (*Ex. 10 at 1-2*).  In contrast—if they would have discovered this notarized document was forged and not in the notary's Massachusetts notary register—they would have had their smoking gun—so where is the Notary's 302(b)?   Again—it is missing…

> After realizing the truth (corroborated by Berard's texts: *Id. at 2-3*)—it revealed another Jowdy cabal related forgery lie.  Apparently—Galioto and Wayne never followed up with the Massachusetts notary that Berard confirmed vis-à-vis contemporaneous texts to Kenner, he and Donlan signed in front of (a stunning investigation-101 lapse—if not on purpose).  Berard's own texts confirmed he sent Kenner the documents using Kenner's FedEx account; *Id*.  This Berard-Donlan forgery hoax (like the *ECF No. 112-6* and *112-9* debunkings) were ignored by Galioto/government—**tying their last remaining forgery ruse** to the Constantine consulting agreements they recovered (with original ink) from Kaiser's home on the eve of trial (yes…that is correct – *ahem?!?!*) (*Id. at 112-7, 112-8*)

Kaiser testified he "*confronted*" Kenner in summer 2006 (*Tr.983*) about allegedly *stealing one million dollars* from him—while Kaiser's voluntary 2009 arbitration testimony (*ECF No. 668 at 191-92*) and Kaiser's 2010 FBI proffers (*Ex. 4: 3500-JK-1-r at 2, 3, 10*) verified thru testimony the exact opposite.

—But if you follow Kaiser's testimony thru the "*confront[ation]*" meeting in summer 2006 (while neither actually occurred: the "*confront[ation]*" or the theft)…

…How could any rational human being—*not just a retired 19-year NYPD cop*—who was just allegedly robbed $1 million (not reporting it to anyone), then, turn around and sign—*the same month*—

(1) His Hawaii JV agreement, which verified (*Ex. 15*; *ECF No. 892 at 22: "the risks attendant with your investments should be greatly reduced by he return of your capital…"*—Bates stamp: *ED-0003140-46*)—without reading it (*Tr.1164*—et.al.);

(2) Not receive his loaned million-dollars back (or "*investment*", depending on Kaiser's recollection-of-the-day—now see Kaiser's *fraudulent* 3rd party claim: June 2021 submission—*ECF No. 1070-2*); and

(3) **Sign over control of his Sag Harbor project to Kenner** (the same alleged million-dollar thief) without reviewing the closing documents (*Tr.1149*—et.al.)………………**And, "oh yeah"** (vis-à-vis: Randy "Macho Man" Savage)…

(4) Then, decide to wire $620,000 for a down payment to Kenner (plus Kenner's $380,000) for a $5 million California home ($1 million deposit) that was titled and mortgaged in Kenner's name?

Note: Berard testified he was told the 2006 LedBetter deal was only with Kaiser [29]— whom he intimately knew at the time (*Tr.3044*):

> *Q. How did you learn about Led Better?*
>
> *A [Berard]: Led Better was the LLC we bought the property under. I became familiar with the property, I got a phone call from Phil Kenner asking if I would be interested in being partners with John Kaiser on the purchase of a property out in the Hamptons.*

(*Tr.3047*):

> *Q. How did you first find out about the Led Better development company and who was a partner in that company?*
>
> *A [Berard]: I would say sometime in late 2010, 2011 we started going through some documentation, myself and John Kaiser, we were hurting for cash and I wanted to put the property on the market, the property in Sag Harbor, list it and get it in the market, hopefully to try to sell.*

Admittedly—after Berard and Kaiser went "*through some documentation*" that they had <u>at Kaiser's home</u>…"*in late 2010, 2011*", they possessed the original LedBetter operating agreement (*GX-703*: from the 2006-closing Kaiser attended *without Kenner*) and <u>then fabricated</u> a new operating agreement (*Ex. 1*: Bates stamp: *BINDER0000452, 450*) (criminally cutting Kenner out—just like Arizona Attorney Baker explained to Galioto in another *Brady* issue/withheld document by Galioto

---

[29] (*Tr.3047-48*):

> *Q. And did there ever come a time that you saw the operating agreement for Led Better?*
>
> *A [Berard]: Yes. I saw it at John Kaiser's house for the first time.*

Note: Kaiser testified he never saw the operating agreement (*Tr.1146*)—but his partner, Tesoriero (unknown to Berard and Kenner) told the FBI he received it "*from only Kaiser*"

—And now, Berard verified thru testimony Kaiser possessed it.  Questions with Berard continued *(Tr.3048):*

> *Q. Show you what's in evidence as Government Exhibit 703, specifically page two of 703. For the record, who are the individuals listed there as members or partners of Led Better development company?*
>
> *A [Berard]: Phil Kenner, Brian Berard, John Kaiser, Vincent Tesoriero, I guess is his name.*

(*ECF No. 1006 at 30, f.19: Ex. 8*)[30] for the Arizona home title theft [*ECF No. 668 at 212*][31] by the same two, Galioto-protected, Jowdy employees).

How did Kaiser and Berard execute their LedBetter crime?

Kaiser and Berard **forged** Kenner's girl-friend's name—while **backdating** the fabricated document to the original closing date (5-years earlier) (*Ex. 1*—in contradiction to *GX-703*).  With Galioto and Jowdy's attorneys handling their FBI-protection program—no consequences occurred, criminal or otherwise (notwithstanding the trial perjury effecting the verdict: a *Napue* violation at a minimum with full-government knowledge).  Instead Kaiser and Berard were allowed to keep millions of dollars they *stole* from Kenner in Arizona and Sag Harbor—as their pay-for-play protection booty.  These are similar to the FBI protection and Jowdy bribes Kenner rejected outright in 2007,[32] which Kaiser and Berard chose to gladly accept after Jowdy's "*wining and dining*" (*ECF No. 628 at 4*).

---

[30] The Promissory note Arizona interveners attorney <u>independently</u> wrote to FBI agent Galioto pretrial (10-3-2014) (*Ex. 7*), "*The recorded documents show that towards the end, Kaiser and Berard cut Kenner out of their deal and are now attempting to keep all of the equity proceeds from the sale of the property for themselves…*".  This email was discovered post-trial by Constantine's attorney, never turned over by Galioto (another of many documented *Brady* issues pending in this case—and raising more ulterior motive issues for the two government star witnesses).

> "[D]etermining that a new trial was necessary, because lies of his key witness [John Kaiser] who '**tied all the pieces together**' even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

[31] **Kaiser and Berard stole over $1 million form Kenner in Arizona real estate project (with Galioto's help).**  While Kenner was incarcerated in the EDNY as a result of Kaiser and Berard efforts with FBI agent Galioto (See NY Daily News Article: *"Former NHL player Bryan Berard and ex-cop [Kaiser] help feds nail two Arizona men in massive fraud", November 13, 2013, 1:33pm*) – a contemporaneous 2015 Arizona court ruled against Kaiser and Berard for their **second** fraudulent conveyance (*Ex. 6 at ¶57*); identical to what Attorney Baker expressed to Galioto in 2014 (*supra*):

> *57. The March 9, 2012, conveyance of the property by John R. Kaiser as Trustee of the Shangri-La Trust 1999 to "John R. Kaiser, a married man, as his sole and separate property and Bryan Berard, an unmarried man" (exhibit 29) <u>was a fraudulent transfer</u>. A.R.S. §44-1004(A).*

In October 2014, Berard was deposed in the Arizona theft case (*3500-BB-??*: never produced to Kenner).  Berard testified that when he and Kaiser signed the new Quitclaim deed from the Shangri-La Trust (that included Kenner: 50% owner) to Kaiser and Berard as individuals (deposition at Page 69):

Note: **First**—*GX-703* is the LedBetter operating agreement Kaiser testified he never received at the closing (*Tr.1005, 1008*)—feigning ignorance that they were "*available*" (*Tr.1146*).  **Second**—Berard believed he was <u>only</u> partners with Kaiser, whom he spoke to regularly and visited several times in Hawaii (the worst concealment plan, ever—*if true*) (*Ex. 14: 3500-BB-2-r*).  **Third**—Why would Berard continue <u>any</u> conversations with Kenner about the Sag Harbor property after depositing the funds in an account he believed he was sharing with Kaiser (his only partner)? **33**  **And Fourth**—*In G-D's name*—how could Kaiser possess <u>another</u>

---

> *Q: …So I'm saying, was it your and Kaiser's intention to cut Phil [Kenner] out of the deal, take him off the deed of the house at the time you signed exhibit 11?*
>
> *A [Berard]: Yes.*

- With Galioto's protection, why would either of them care about criminal transactions (Jowdy-style)?

32 During the 2015 Mexico criminal case versus Jowdy, Berard, Kaiser, Galioto and other cabal members (on behalf of the Hawaii-Mexico investors), victim Mattias Norstrom, signed an affidavit for the Mexico Supreme Court (*Ex. 11: ECF No. 557 at 80-81*), affirming:

[Norstrom-January-2015]:
> *Hawai'i loan*
> *In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawai'i would lend him some bridge funding personally until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.*
>
> *As a group, <u>we agreed to lend him funds at a 15% interest rate.  Jowdy signed an official loan agreement with us in December of 2004.</u>  Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.  In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the "investments" he declared as his defense in the case.  Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] <u>alleging that he [Kenner] stole the funds that Jowdy actually received.</u>  Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine.*

- Note: Norstrom identifies the Hawaii-Mexico investors' complete awareness of Galioto's repeated coercion lies that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*", while complicitly "*<u>alleging that he [Kenner] stole the funds that Jowdy actually received</u>*".  (See *government-forfeiture-44*)

---

[33] Contradicting the superseding indictment allegations and Berard and Kaiser's trial testimony—in June 2010 (while Kenner, Kaiser, and Berard are working hand-in-hand with Stolper's, Giuliani Team efforts) versus Constantine/Eufora LLC—Berard is asking Kenner—**4-years after the Sag Harbor purchase**—if <u>Kenner and Kaiser</u> would consider using the LedBetter property as collateral to help with the Eufora loan buyout guarantee money:

| 1 3 5 9 6 | +1401524 6929 Bryan Berard* | ==6/1/2010 11:54:34 PM(UTC+0)== | R e a d | [Berard]: What's up. How was ur weekend?? ==What's the town called where <u>our property</u> is out in eastern long island??== |
|---|---|---|---|---|

9-days later:

| 13 80 1 | +14015246 929 Bryan Berard* | ==6/10/2010 6:12:42 PM(UTC+0)== | R e a d | [Berard]: ==<u>R u and jonny comfortable</u>== to say to andy that if he's brother gives us the 250k <u>we will pay back wth</u> MY RCA or the PV house or ==<u>Hamptons house</u>== whateva happens 1st?? |
|---|---|---|---|---|
| ==15 85 6== | ==+14015246 929 Bryan Berard*== | ==6/10/2010 6:12:59 PM(UTC+0)== | S e n t | ==[Kenner]: **Yes**== |

- Wouldn't this be a question for his sole believed partner of the previous 4-years, John Kaiser?

Note: Berard's question is also related to the same Eufora loan buyout that Berard (*Tr.3110-11, 3179-80*) and Kaiser (*Tr.1362-63, 1400*) testified they were unaware of during trial (including leader-Gaarn who feigned ignorance: *Tr.2640*)—notwithstanding Stolper's 3 independent letters to the Eufora investors that identified the loan buyout plans by the Berard-led group (*ECF No. 668 at 426-27*), *infra*, and the acknowledgment of Gaarn's private stock sales (which Stolper's team vetted with their clients—absent Kenner—calling Constantine's *bearer stock* fraud language "*predictable*": *ECF No. 668 at 299, f.145*)—still misunderstood by the Court at sentencing as the government wanted it (*10-5-2020; Sentencing H'rg Tr.81*).

**7-weeks earlier**, Stolper's group spoke to the investors (on 6-30-2010) about the Constantine/Eufora issues and loan buy out strategy—Gaarn had a $2 million Eufora loan buyout investor and texted Kenner his expected great news; **but remembered nothing about it 5-years later**:



| 1 3 2 4 5 | +1201970 8712 Tim Gaarn* | 5/6/2010 2:41:02 AM(UTC+0) | R e a d | [Gaarn]: <u>Great progress today</u>. <u>Should hav $mm in attorney trust acct tomorrow</u>. <u>I'll call u in am.</u> |
|---|---|---|---|---|

**And—5-days after** Stolper's team with Gaarn, Berard, and Kaiser identified the Constantine/Eufora issues to the Eufora investor group (on 6-30-2010 vis-à-vis conference call)—**Berard needed Gaarn's verification (not Kenner's)** of loan buyout issues before

extending himself and other loan buyout investors he solicited—also 5-years before testifying he knew nothing (*Tr.3111*):

> *Q. Would it surprise you to learn it was with Eufora and not with Mr. Constantine?*
>
> *A [Berard]: You say surprise? I didn't understand the loan in general.*
>
> *Q. Well, do you remember any discussions about going to talk to Brent to buy the loan?*
>
> *A [Berard]: I do not, no.*
>
> *Q. Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent?*
>
> *A [Berard]: Not to my knowledge, no.*

Berard's June 5, 2010, real time, loan buyout text for Gaarn was forwarded by Kenner after Berard's request to do so:

| 1371917 | +14015246929 Bryan Berard* | 6/5/2010 10:43:22 PM(UTC+0) | R e a d | [Berard]: ==Obvisiouly we gotta move fast so I can b whereeva to meet timmy [Gaarn] in NY tomorrow or monday morning to see everything.== Thanks |
|---|---|---|---|---|

Kenner's *forward* to Gaarn from Berard (cut from text box for consolidation: in full text-box at *ECF No. 668 at 369-71*):

**[Kenner texts to Gaarn: 6-5-2010]:** "*From Bryan [Berard]...We r sending u all the questions that I wld like answered b4 I agree to taking this personal loan. I trust u but this is a big chance for me. So me and andy worked on this email.. So please get back to me then we can talk tonite. Obvisiouly we gotta move fast so I can b whereeva to meet timmy in NY tomorrow or monday morning to see everything. Thanks*"

Continuing:
**[Written by Berard's financial partner, Andy—and forwarded to Gaarn]:** "*Hey, Before we secure a loan from either my brother or the other giy in DC, I have a few questions on the terms of the agreement to be completed Monday, the new entity going forward, the liscensing deals on the forward calendar, etc. I just want to make sure Bryan's interests and ownership are protected, or if my brother is involved he would be making an investment on behalf of me. He doesn't need any money, so I'm cautious about what I go to him. Any info you have on the following questions would be helpful: - As you described, if the $250k is not paid, then the lender will foreclose on the note and take the whole company. Is that just exercising the convert on the note? So he would then own 40%?What other downside risk is there for shareholders? - What other consquences are there if this payment on the loan isn't funded? Does the company go bankrupt? What would the current owners be left with? I assume that the patents are worth a lot. - If the liscensing deals are in place what motivation does the lender have to agree to these terms and not exercise his option to convert the debt into equity? - What is the process to remove CEO?What potential pitfalls are there? Is there a successor in place? - How many shareholders are there currently? And does the makeup change after this deal closes? - Other than shareholders, who else is involved in the company (sales staff,*"

crucial document in the instant case (*GX-703*)—*at his home*—that he was never aware of...like the two Constantine consulting agreements <u>despite his original ink</u> on the documents (*GX-7004* and *GX-7005*)?

<u>The original ink agreements</u> (**Rule 1002 violation**):
Constantine filed a cross-claim versus Kaiser in the 2010 Eufora lawsuit identifying the 2004 and 2005 consulting agreements.   For jurisdiction, the cross-claim identified (*Ex. 12 at 12*):

"*8. John R. Kaiser ("Kaiser") is an individual and a resident of the State of New York.  Kaiser entered into consulting agreements with Constantine Management Group, LTD ("CMG") in Scottsdale, Arizona, in 2004 and 2005, to raise money for Little Isle IV, LLC, of which Kaiser was a member.  Kaiser is subject to personal jurisdiction in the Maricopa County Superior Court.*"

Kaiser, thru counsel, never objected to the authenticity of the two consulting agreements that he and the government alleged as forged years later (*GX-*

---

*support, etc). Who is in charge of handling the licensing agreements with the other prepaid card companies? - Is the company currently generating any revenue as a card issuer? I'm assuming the future liscensing deals will be the majority of the future revenue streams. - Has there been any revenue to date. When was inception? And what have the sources and uses been of the existing equity in company? - <u>What documentation is there for this current agreement with the lender?</u> The board has approved the exchange for equity? - If Bryan has the $ available Monday, where do those funds go? He should have these docs in place before he agrees to wire funds. - Is there any docs or proof of pending liscensing deal with NetSpend? - Are there any proforma statements? Revenue/growth projections? - After this deal closes and the company starts genersting revenue, when how often are distributions made to stakeholders? If the future of the company or at least a good chunk of equity is in jeopardy, this $250k is a lot more valuable than 2.5% under the circumstances. If Bryan is going to front the $ for this loan, then not only is he personally assuming this, he is also exposing himself to a lender (my brother or the guy in DC). Bryan and I spoke and we thought that 2 things were critical for him to agree to the terms assuming this situation: (1) Given how valuable this piece is, then the equity should be closer to 5% (without proforma numbers, it's hard to value this accurately). (2) the company should be responsible for his personal loan. He will likely pay 20-30% on this note, and will be personally guaranteeing it. If the first $1.45mm is paid to the lender, and the board/shareholders have agreed that the next $250k, then it seems to me that they would agree to paying out $300k. Sorry for all the questions--I just want to make sure everything is in place before he agrees to fund this. We'll also want to have our lawyer take a look at the docs.*"

- But Berard (like Gaarn) testified he really "*didn't understand the loan in general*".
  (*Tr.3111*).  **One can only imagine the detailed request Berard would have presented to Gaarn <u>if</u> he understood the "*loan in general*".**

*5104*)—while hiding the originals (*GX-7004* and *GX-7005*)[34] from their own signature expert to avoid disclosing the actual 10-year custody back-story of the original ink documents (an egregious Rule 1002 violation; part and parcel to the overall prosecutorial misconduct).

In fact—Kenner (although not a party to the AZ litigation) prepared a rebuttal overview (a.k.a. *white paper*) for attorney Stolper's team to Constantine's cross-complaint.[35]  Kenner identified the following regarding Eufora stock purchases (at 6):

---

[34] The *original ink* consulting agreements were recovered from Kaiser's home on the eve of trial; the most impossible place on earth for them to be custodied if Kaiser's name was forged.  Yet—the *square* story fit the government's *round-hole* prosecution, so they concealed the documents and back-story from their signature expert (Rule 1002 violation)—**and specifically the Court**.

[35] In Kenner's cross-complaint *white paper* for Stolper—and not once in the internal legal documents does Attorney Stolper, Kaiser of anyone allege Kaiser contributed money to the Eufora investment—or anywhere.

Kenner noted (at 7):
> "**On page 3, Kaiser has not invested Millions of dollars with Kenner, nor has a barrage of litigation ensued as a result – TOTAL UNTRUTH.**"

- Kenner's verifiable statement went unchallenged by Kaiser, Stolper or any party to the Arizona cross-complaint—**because everyone knew it to be true**.  If Kaiser did not lie about millions being unpaid to him and Kenner "*ruin[ing]*" his life (*Tr.1089, 5753*) in 2015—Kaiser would have screamed aloud in 2010 that millions were still due (in response to this internal legal-team memo).  **Kaiser remained silent**.

> "*ON page 3 and 4, Kenner NEVER had any interaction with the Plaintiffs regarding their December 2009 investment in Eufora.  Constantine specifically left Kenner out of the communication in his attempts to persuade Kaiser, without Kenner's expected interference at the time, to look to his friends (current Plaintiffs) for financial assistance.  At that time Kenner and Constantine were at odds over the abusive use of the GSFs that Constantine blew through at a record primarily for his own personal benefits.*"

- The government, Kaiser, and Privitello clearly knew this in 2010 and during trial (2015) but the government left the fabricated charges in the superseding indictment to complicate the case; perhaps to include the text message about "*kick[ing] Nick in the balls*" (*Tr.5748*).  The government knew Kenner was deposing "*Nick*" James the same day as the text in another lawsuit where someone stole funds from Kenner; and Kenner was simply replying to Constantine's supposed good news about a pending METABANK DEAL.  The government furthered their fabrication by asking Privitello if he ever heard the term "*Nervous Nick*" (*Tr.4743*) from the "*Nick*" James text—although they knew it was Nick James' infidelity being discussed at the deposition that was making a

"*Of the $400,000 solicited from the NY Plaintiffs solely through Kaiser, not Kenner (which everyone involved short of Constantine can attest to), ONLY $100,000 was sent to Neptune related to the reduction of the immediate and urgent loan repayment solicitation.*"

Note: Neither Kaiser, Privitello, or attorney Stolper's group replied to Kenner's December 2009 involvement with Privitello ($200,000) or the Ethel Kaiser, Rizzi, Hughes ($200,000) Kaiser singularly solicited. None of the four individuals were known to Kenner in December 2009, with any significance, if at all.

<mark>The world's worst concealment plan…</mark>
(The LedBetter operating agreement)

Kaiser testified that Kenner was not at the Sag Harbor/LedBetter closing (*Tr.1147*)—so how could Kenner hide Berard's ownership in the operating agreement that Kaiser's attorney testified was authentic during the instant proceeding; while verifying all of the LedBetter/Sag Harbor closing documents (*Tr.672-73*)—with Kenner and others closing signatures.

Even the Kaiser-Berard <u>fabricated</u> and <u>forged</u> LedBetter operating agreement (*Ex. 1*) documented Berard as a 25% partner (like the authentic one intro'd by the government at trial: *GX-703*)—in contrast to Berard's testimony expectations of 50% ownership (*Tr.3048*).   Even in criminality and cover-up with Galioto, they could not get their indictment stories straight.   Berard testified he never saw the fabricated LedBetter agreement—apparently placing the forgery of Kenner's girl-friend's name and fabrication of the FAKE operating agreement squarely on Kaiser's shoulders  (*Tr.3092-93*):

*Q Now, at any point in time, sir, did you become aware of a document created by John Kaiser, where John Kaiser listed his interest in Led Better Development Company as 50 percent, your interest, that is, 25 percent, and the interest of a Vincent J. Desoriero [sic] as 25 percent?*

*A [Berard]: No, I'm not.*

---

different "*Nick*"…"*nervous*".   There was zero integrity.   It was obvious.   —But who was holding the government's feet to the fire?

### When is Lady Justice going to tell the Emperor(s) that they are naked?

So—under Berard's premise (although false; verified thru a myriad of Berard texts with Kenner in Rule 16 production—subset *supra*), why would Kenner need to produce the LedBetter operating agreement to Berard?  That would occur thru direct dealings with Kaiser (Berard's close acquaintance since 2004); Berard's only expected LedBetter partner since 2006.

Regardless of Berard and Kaiser's obviously, fabricated trial lies about the Sag Harbor/LedBetter transactions, **Berard has no loss** in the LedBetter transactions (only profits with Kaiser after he "*got 50 percent of the sales price*": *Tr.3093*), while defrauding Kenner and **real** 9-11 hero, Vincent Tesoriero.

In the Hawaii end of the transactions—not one Hawaii partner sustained a loss as a result of Kaiser's 11-day short-term loan transaction and full repayment, authorized by the By Laws and necessary to secure Kaiser's signature at closing.   In contrast—since Kaiser testified he received "*back pay*" and "*expenses*" for phantom transactions (*Tr.1413-14*)—Kenner could have simply testified the short-term loan was another "*back pay*" transaction (like COO-Manfredi testified about his $172,000 "*back pay*": *Tr.2978*); requiring no re-payment instead of the *re*-payment the actual 11-day loan actually produced.
- The government allegation logic was disingenuous—and diaphanous.

Kaiser's short-term LedBetter loan was no different that the $172,000 *payoff*, sign-for-play hijacking COO-Manfredi extorted once Kenner caught him robbing Hawaii funds from the operations bank account and corporate credit card.   COO-Manfredi's testimony was a partial vendetta, encouraged to *forget-everything* in testimony at trial (&/or perhaps for Galioto and IRS-Wayne turning a blind-eye to Manfredi's lack of IRS payment for his "*back pay*" of $172,000)—with COO-Manfredi even denying his documented FBI raw notes as requested by Galioto (*3500-CM-2*: specifically the affirmed Constantine consulting agreements, "*Agreement - between PK [Kenner] or LLCs + Constantine*" proffer statements).[36]

---

[36] The Court should note that Galioto interviewed COO-Manfredi 3-weeks before the October 19, 2010 Kaiser surprise proffer—and 3-years before the FBI seized the Constantine consulting agreements from Kenner's office in the Hawaii files.  **Thus—**

(1)  Where are the Constantine consulting agreements Manfredi authenticated for Galioto during the 2010 proffer?  —And

The government-witness pattern of denying what they told the FBI years before trial and reversing their *recollections* to fit the prosecutorial narrative was not just surreal—but synchronized.   The Court must hold them responsible for the blatantly obvious *raw notes* graft (with Kaiser, Manfredi, Gaarn, Ranford—et.al.)

—Because "*the district courts represent the last line of integrity*" (Former SDNY AUSA Andrew McCarthy; defending the Court's crucial role in the Second Circuit).

For each of the above reasons, <u>Berard has no loss</u> in the Sag Harbor/LedBetter transaction.

<mark>Rucchin is not a GSF victim…</mark>
(Example referenced *6-28-2-21, H'rg Tr.16-18*)

The Court must determine which accounting *methodology* they are using to determine loss in the various schemes, per victim—because *Gushlak*, 728 F.3d at 196 requires it.   Either co-mingling or skip-tracing must be used to determine who and how much actual loss occurred.   The government, despite the Court's request (*July 2, 2019, H'rg Tr.24-25*), has supported no methodology at all; purposely avoided.   Kenner asserts under either "*sound methodology*", there is zero loss in the Hawaii and GSF transactions.

<u>Rucchin's testimonial authorizations</u>: Kenner described the Rucchin skip-tracing (money-in-money-out accounting) during the June 2021 conference call (described again, *infra*)—per Rucchin's explicit testimony—to confirm there cannot be a loss for Rucchin with respect to his GSF contribution of $50,000.

As a simple example for the Court, Kenner addressed Rucchin's $50,000 GSF contribution.   Rucchin is listed by the government as a $50,000 GSF loss victim (*ECF No. 1024 at 4*).   **This cannot be true** based on Rucchin's own testimony; as Peca (*Tr.496-99*) and Gonchar (*Tr.4826-27*) identified via testimony for their Hawaii/GSF <u>investments</u> and <u>authorizations</u> for their-own monies; respectively; a separate analysis the government refuses re: co-mingled and "*fungible*" corporate funds.   The

<mark>(2)  Why were <u>these</u> documents withheld again (another *Brady* issue) from government Rule 16 production?</mark>

48

government introduced *GX-767* during trial (intro'd at *Tr.1826*) regarding the transaction tracing for Constantine's GSF plan.[37]

<u>The Rucchin GSF analysis:</u>

(1) Rucchin deposited $50,000 into the Ronald Richards co-mingled account: 5-26-2009 (per *GX-767*: not the "*conspirators' own ledger*" as the government mis-references—*ECF No. 1082*);

(2) Rucchin signed an "*acknowledged and approved*" form (via email) like all of the GSF investors that outlined Constantine's proposed multi-use GSF-plan; *nevertheless*…

(3) Rucchin testified (*Tr.2750*):

*Q During that meeting and in those phone calls, what did the defendant [Constantine] say the money in the Global Settlement Fund would be used for?*

---

[37] The Court knows Attorney Ronald Richards testified that "*only Mr. Constantine*" had access to the GSF funds (*Tr.3805-16*), corroborated by Constantine's engagement agreement for the GSF (Bates stamp: *SMC-00000032-37*).   Kenner was: (1) simply a contributor, (2) "*didn't seem to have one*"…that is a role in the GSF according to Michael Peca (*Tr.540*), and thus (3) relegated Kenner to a status no different than any other contributor who expressed displeasure after Constantine's ineffective execution of his plan (See *Archer, infra*)—certainly <u>not</u> in a leadership position.  This was all separate and apart from Constantine's *side deal* with Gonchar and Gonchar's deposits into the co-mingled attorney's account (*Tr.4826-27*).   The government's position is that Gonchar was not a GSF victims (with $1.5 million deposited)—but Gonchar's testified *side deal* was not legally allowed to be used as co-mingled funds.  **Its logic is irrational—but required to maintain any fraud in the GSF.**

The Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." *United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).

- The Court should note that the flurry of late GSF victim statements (6-years post-trial) are a result of Galioto's renewed efforts to re-allege Kenner stole all of the GSF funds (despite zero control) and used them for his own person—because Galioto's **failed** 2013-15 promises that *he froze all of the cash* after Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*"—plus now the GSF funds…now that his coercion statements are being challenged by those who he tried to coerce a few years ago (and some he succeeded with—like the Pecas).

- Despite it's obvious and known-untruths—no GSF contributor or former Kenner client has parsed the voluminous records in the instant case; moreover simply relying on the "*above reproach*" reputation of agent Galioto (vis-à-vis his former FBI agent status). One needs to only look to the recent scandals inside the highest echelon of the FBI to note that there is possible misconduct as well, even at its lowest level.

*A [Rucchin]: It would be going to the use -- to pay for legal fees for lawyers toward that lawsuit.*

*Q What specific -- any lawyers or specific lawyers?*

*A [Rucchin]: One specifically, Mr. Ronald Richards.*

(4) Ironically—Rucchin's funds in their entirety—were transferred to Ronald Richards for legal fees **the same day** (5-26-2009): **exactly as Rucchin testified**.

- As a result, the only analysis available to the Court *res ipse loquitor* (which the government wants ignored) is that Rucchin's 2009 funds were administered exactly how Rucchin recalled in testimony 6-years later (without equivocation)—nothing more.   Thus—no GSF fraud occurred and Rucchin's $50,000 must be removed based on well-seasoned *Ebbers* standards.[38]
- This identical analysis has <u>not</u> been completed for other alleged victims re: loss, because the government is afraid of the outcome—merely continuing to desire nothing be analyzed to avoid exposing their hoaxes for actual loss (restitution: *ECF No. 1024*) and sentencing factors under 18 U.S.C. § 3553(a)(2)(a).

The government cannot substantiate loss based on the proceedings—without ignoring the obvious and feigning ignorance to their responsibilities under *Berger*'s guidance—nearly a century ago.

It is their responsibility under *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935), as the Supreme Court noted:

*"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is <u>not</u> that it shall win a case, but that <u>justice shall be</u>*

---

[38] The *Ebbers* standards define
"[t]he loss must be the result of the fraud." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir 2006)—and "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id.*

> *done.   As such, he is in a peculiar and very definite sense the servant of the law. He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, <u>he is not at liberty to strike foul ones</u>.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one."*

The Court must address the GSF testimony versus loss issue for Rucchin, no different than the loss calculation for the rest of the GSF and Hawaii transactions. They are a major sentencing variable—left un-adjudicated and without "*sound methodology*".

If the Court is denouncing Rucchin's own testimony to create a loss scenario that does not exist—because it is concluding that all Constantine's GSF funds were co-mingled; then, the Court must include Gonchar, Constantine, and Kenner contributions to the GSF co-mingled account as available for all transactions—specifically those in question (Constantine's $267,000 overspend: *ECF No. 501 at 60*).

In the Hawaii transactions, the same either/or application must be made, or at a minimum, and ruled on—because the un-named investors (including Kenner himself) cannot be assumed as unauthorized by a few investors who do not speak for the Hawaii corporate control LLC (via failed memory tests—or Q&A based on retroactive *Archer* issues).   At most (if allowed by the Court)—the investors can retroactively change their mind (under some bizarro government theme that allows retroactive perjury) and un-authorize transactions the LLC corporate control documents approve—like any common operating agreement would (*Ex. 13*).   This resolve seems highly unethical—and moreover unlikely sanctioned by this Court.

Under either method—the government's theory of prosecution <u>and</u> loss fail, based on any money tracing method and the application of common sense; notwithstanding the government's 10-weeks of bluster that legal and authorized transactions were not legal.  Post-trial, their denial of *res ipse loquitor* is the only thread that holds their conviction in place, once actual trial testimony is applied (corroborated by all of their-own prior statements under oath, signed authorizations, and legal actions to recover funds they feigned ignorance to up to a decade later—despite all of their aforementioned affirmative conscience intents). The government's misdirection orating has left the Court with a clouded recollection of the trial (civil litigations example: *ECF No. 1024-1 at 24*).

51

Because the Rucchin testimony is unambiguous; representing a no loss event, the Court must address these issues as reformative to guideline calculation, and the current restitution matters—not just in this scenario but in total.

Kristen Peca IRS claims...

(Again—launched by Jowdy's cabal)[39]

Notwithstanding other *horrifying* allegations (including Kaiser and Berard sentencing allocutions) that demand further criminal investigation by impartial investigators (with Galioto allegedly retired)—Kristen Peca presented (*10-5-2020, Sentencing H'rg Tr.25*):

> [Kristen Peca]: "*Kenner's witness tampering and harassment rose to the level of contacting the IRS through anonymous letter that contained false and misleading information about us.*"[40]—and

> [Kristen Peca]: "*I was afraid of the IRS and the lengthy audit Kenner started.*" (*Id. at 28*)

The FBI and IRS know these allegations are 100% empirically false—specifically because she attested that she was told:

> [Kristen Peca]: "*And thankfully, that letter was later found on Kenner's laptop to validate our suspicions and prove that he was harassing us and obstructing justice.*" Allegedly as Kenner's "*civic duty*" (*Id. at 26*)

**This letter never existed on Kenner's laptop**—and the Court must demand who made these affirmations to the Peca's and when.  This is the *crack* in the harassment scheme by Galioto and Jowdy, even to their inside people to maintain control over

---

[39] Prior to 2010—Jowdy cousin, Edward Essa who was a large Jowdy lender and recipient of stolen Jowdy funds (unknowingly) worked for a short period of time with Kenner and Kenner investors' attorneys to expose Jowdy until Essa went under IRS personal and corporate audit; mirroring the comments made by Kristen Peca 10-5-2020.  Essa terminated communication with Kenner and Kenner investors immediately—receiving his "warning" loud-and-clear.

[40] False allegations to the IRS are also a criminal offense—but with IRS agent Wayne present, not a word was mentioned in the 6 years since trial (*Tr.4*)—until Kristen Peca's allocution.

necessary people: even insiders (an obvious and millennium-old anarchist ploy known by any historical scholar—dating back to the times of Gilgamesh).

**If it exists—thwarting Kenner's emphatic denial, then the government should produce it; immediately.**

> Note: When Kenner assisted the IRS in their tax evasion investigations of Jowdy, Kaiser, and Berard in 2012—the introduction to the criminal IRS division was made by a former U.S. State Attorney General, then referred to the Arizona IRS criminal division and after full scrutiny and face-to-face meetings, finally referred to the Denver Regional office for high-level IRS criminal scrutiny—all before any audit took place.[41]   *None of it occurred by an anonymous, unsigned letter—that does not exist.*   Anyone who looks into IRS Whistleblower protocols would know Kristen Peca's representation of the triggering facts is a fraud and could never occur.   And—during Kenner's yearlong presentation of criminal IRS frauds by Jowdy, Kaiser, and Berard (not Peca), the IRS could have arrested Kenner if any of the statements were false or misleading.   They did not—because every empirical record was corroborated with banking records (that ironically Galioto and Wayne also have).

When the Court receives the information about who told Kristen Peca, they will know who manufactured all of the criminal threats (not just the fabricated IRS scheme to harass them) that she, Berard, and Kaiser alleged to the Court (whether true or not).   They are relevant—because none of the other financial allegations Kristen Peca raised 10-5-2020 would hold up to empirical and exculpatory evidence the government has continued to hide from her and the other former Kenner clients.

<mark>2003-09 Northern Trust Interest earned offsets…</mark>
(The collateralized investment strategy)
(*Ex. 31*)

The Hawaii-LOC investors named in the superseding indictment received: Nolan [$592,878], Peca [$300,052], Sydor [$249,215], Rucchin [$210,113], Berard [$129,314], and Juneau [$120,000] totaling $**1,601,572**.

---

[41] The investigations regarding the documented IRS tax-evasion schemes by Jowdy, Kaiser and Berard were terminated a month-or-so before Kenner's 2013 indictment—after one year of processing.

Un-named persons: Murray [$243,470], Gonchar [$144,339] and Norstrom [$218,943] receipts totaled $**606,752** (or $2,088,324 in total).

- The government ignored all of these real-time, annual payments—which are no different than the 42.553% JV payments received in August 2006 (*Ex. 16*).[42]

Note: When properly offset per statute, the traceable funds from the investors to the Jowdy loans of $1,315,000 (*ECF No. 770 at 54-65*) are fully reimbursed for Nolan, Peca, and Sydor solely with the investment-interest distributions, and almost entirely for Berard and Rucchin; but Berard is fully overpaid for and possible loss considering he was incrementally paid "*roughly after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*).   Ignoring these offset receipts, as part of the alleged illegal transactions, would provide a windfall of payments thru restitution, specifically prohibited by statute.

| | Traceable "investment" capital account to Jowdy loan | Northern Trust settlement amount—per testimony (ø) | Collateral interest earned (2003-09) | Net investment amount (loss) |
|---|---|---|---|---|
| Peca | 240,000 | 600,000 | 300,052 | 660,052 |
| Nolan | 425,000 | 500,000 | 592,878 | 667,878 |
| Berard | 150,000 | 300,000 | 129,314 | 279,314 |
| Sydor | 200,000 | - | 249,215 | 49,215 |
| Rucchin | 300,000 | - | 210,113 | (89,877) |

(Ø) – April 22, 2021 (*ECF 1026*), Kenner requested the Court verify "in camera", the actual gross settlement amounts.   Upon information and beliefs, the settlement amounts represented by Nolan and Peca were net of attorney fees (which are not deductible under MVRA loss calculations).   Berard testified his $300,000 was <u>net</u> of attorney fees – believed to be "*35%*" contingency fees and handled by Jowdy's attorneys with *nudging* from Galioto towards Northern Trust to settle.   The gross total would have been approximately $2.1 million--$700,000 greater.

**[--------------------------------------------------------------------------------------]**

Not to complicate matters, but the government did.   Post-sentencing, the government further explained to the Court that the Jowdy transfers (the only

---

[42] These payments are identified by the government at *ECF No. 1024 at 2, f.2*—et.al.   Several are still missing—addressed in part, herein.

alleged illegal funds traceable to Nolan) were not part of the indictment, conveniently explained for the first time to the Court 3-weeks, post-sentencing (*10-28-2020, H'rg Tr.37*):

> [Government]: "*Your Honor, as you're aware, the crimes that were charged did not include the crime involving the funds that went to the resort.   The government's investigation was expansive, certainly took a number of years, and the government takes its time...the government or course as you know is required to do significant investigation and make sure that its position is justified.*"

The government's reformative admission, 11-years after the investigation began, was in direct contradiction to Hawaii LLC funds they insinuated as "*stole[n]*" by Kenner throughout trial, to buy Kenner's Cabo equity (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*)—disregarding clear exculpatory evidence in their possession (including FBI raw notes: *3500-KJ-2-r at 12-14* [Jowdy], *3500-KJ-6-r at 2* [Jowdy], *Ex. 25 at 8-9* [Gonchar], *Ex. 4 at 2, 3, 10* [Kaiser]—et.al.).   The government was deftly aware—including from Jowdy himself for years before their opening remarks to the contrary (*Tr.31*).

For multiple aforementioned evidentiary applications—<u>Nolan has no loss for restitution</u> (or loss related to guideline, for that matter—like every other Hawaii investor creating unsettled reformative issues; See U.S.S.G. Manual § 6A1.3 cmt. (2014))—certainly not $2.2 million for Nolan.

II. <u>Items addressed</u>

<mark>2003-09 Northern Trust Settlement payments...</mark>
(*ECF No. 1026*: Berard, Peca, Nolan)

The Northern Trust legal settlement gross amounts need review via "in camera" review by the Court (*ECF 1026 at 1*, see item "*2)*").

If there were no formal settlement agreements with Northern Trust for millions in payments—*which is frankly almost impossible to believe* (but no longer in this case as all normal lexicons definitions have newfound extremities of exasperation), the Court can simply request "in camera" review of the bank accounts that received the actual gross settlement payments before any third party distributions that either

they made (or notify the Court of payments Northern Trust made on their behalves). *Simple solution*.   Considering the government previously verified Nolan's counsel and Jowdy's counsel denied any "*settlement*" agreement for the funds Jowdy previously stole from Nolan in exchange for an incremental 1% equity stake in the Cabo san Lucas project, but was later found another lie to this Court (*ECF No. 874-1*: Nolan's counsel's submission of the "*assignment*" agreement that matched the same definition thru parsed semantics), Kenner requests the Court does not let this salient issue slide into the typical government unaddressed abyss.

Although the government continues on in their submission to support Kenner's gross settlement payment application versus loss via *Lagos v. United States*, they pivot and provide unintelligible language, most closely deciphered as *not deducting some upcharge* or similar for the fees &/or Kenner repaying Northern Trust for (G-d knows what they paid the three Jowdy-sycophants for in the first place—alternatively settling to simply rid themselves of Galioto's strong-arm tactics to settle and threats of criminal complicity).

**The recovery offset is simple: the gross amount Northern Trust paid is applied**.   Considering Jowdy's related attorneys received the 35% contingency payments (of approximately $800,000—and the thieves got richer), it was their individual choice to pay contingency fees and not applicable under 18 U.S.C. § 3663A(4)(b).[43]

As example:
(1) Nolan's settlement with Northern Trust Bank of "*$500,000*" (*Tr.2074*) was several hundred thousands of dollars more—before contingency fee payments to the attorneys. Kristen Peca's victim impact statement identified the "*35%*" attorney fees.   Even Nolan's testified "*$500,000*" Northern Trust settlement exceeded his traceable funds to the alleged Hawaii schemes (of $450,000: per *government-forfeiture-36*).   Plus, (2) Nolan received **$592,878**[44] between 2003-09 via interest,

---

[43] The government's upcharge (or whatever they were describing) was as misdirected in language and application as pre-indictment claims by Berard and Galioto to Ranford (and others) that if Kenner could not produce Eufora private stock certificates (which have never existed) then Kenner was a criminal.   It was complete nonsense—but when an FBI agent batters a simple person with rhetoric of that sort (with Berard's reiterations)—a simple person is incapable of applying logic and ferreting out its absurdities (notwithstanding Kenner was not an officer of Eufora nor capable of fabricating those documents—ala Kaiser, Berard, Jowdy—et.al.).

[44] Nolan annual Northern Trust interest distributions—offsetting any cash investment risk (referencing Nolan's Northern Trust banking records, stipulated at trial):

noted *supra*, from his collateralized investment strategy that he <u>signed</u> and <u>authorized</u> regardless of his 2015 "*memory*" of anything (*Tr.2065-66*).

> Note: Nolan's 2007 text communication with Kenner identified he knew his Northern Trust funds were "*tied up*"—a.k.a. pledged (*ECF 668 at 272-274*); see *Kenner trial exhibit 210* (intro'd at *Tr.4205-06*)—with Nolan's 19 <u>signed</u> Northern Trust LOC documents, including independently signing to initiate his:
> - 2004 Letter of Authorization (*Ex. 22 at 2*);
> - 2004 Extension of Credit (*Ex. 32 at 3*: <u>dated in his own handwriting</u>—like all); and
> - Multiple annual Disbursement Request & Authorizations (*Ex. 33*)—identifying the use of approximately $2.2 million; see *Upton*.[45]

Peca testified he received "*just over $600,000*" (*Tr.506*); and
Berard testified he received "*roughly after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*).

Both of these amounts for Berard and Peca (akin to the Nolan settlement; eliminating any potential loss amount)—even before the gross Northern Trust settlement review are greater than the loans traceable to Jowdy initiating from their "*capital account*" "*investments*" (*Ex. 32 at 5, 7*)—reducing their Hawaii investment loss based on fraud (See *Ebbers*) to zero for guideline factors and restitution.

Because they know they are skating the loss issue without application of statute &/or case law precedent, the government has failed to produce any accounting that

| | |
|---|---|
| 2004 | $40,122 |
| 2005 | $119,458 |
| 2006 | $137,994 |
| 2007 | $140,379 |
| 2008 | $114,178 |
| 2009 | $40,747 |
| Total: | **$592,878** |

[45] Nearly a century and a half ago, the Supreme Court set the precedent regarding owning what you sign.   The Second Circuit still applies its timeless logic that
> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir 1997)) (holding persons have a "basic responsibility…to review a document before signing it.")

would refute Kenner's co-mingled or skip-tracing analysis—nor have they produced any other alternative for debate.

<mark>Kaiser's post-trial epiphanies...</mark>
(*Giglio* issues still unaddressed)

Kaiser reversed his testimony (6-years post-trial—while still under pressures from the friends & family whom he robbed: documented in Rule 16 production, *Jenks* materials, and known to the government—specifically Galioto).  Kaiser told the Court post-sentencing that <u>before</u> Kenner's arrest and <u>before</u> Kenner's indictment, he explained to the FBI/government (*10-28-2020, post-sentencing H'rg Tr.47-50*):

> [Kaiser]: "*I went down there [Cabo, Mexico] in 2012 it wasn't long before I caught wind of how he [Jowdy] was doing this and – which was roughly 2013. I actually audioed, videotaped...and <u>then I go to the government and say it's a crime what's going down there</u>.  He's stealing millions of dollars.  I even had the accountant on tape, Antonio Marques, talking about the criminal activity.  And I said if only the FBI knew what Danske and Ken Jowdy were doing...*"

Kenner requested (*6-28-2021, H'rg Tr.27; ECF No. 1026 at 3*—et.al.) "*Kaiser's 2012 statements*" under *Giglio*; not the "*recordings*" (*ECF No. 1082 at 1*) Kaiser made of Jowdy's Mexico cabal members; although now that they are known to Kenner—they are being specifically requested as well as paramount to star-witness impeachment (See *Napue* and *Wallach* issues).

Kaiser's October 28, 2020 proffer contradicted his trial testimony (3-years after his newly revealed exculpatory statements to the government: *Tr.1229-36*):

> *Q: Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?*
>
> **A [Kaiser]: Yes.**

—And his trial testimony further contradicted his previous FBI proffers—as noted by Galioto's investigation team (*Ex. 4 at 3: 3500-JK-1-r*):

> [Kaiser]: "*never got $ back from KJ/Mexico*"

The Court must recall that Galioto (with Kaiser and Berard's assistance post-2011) convinced Kenner's investors that Kenner stole all of that investment money (still evidenced by Kristen Peca's post-sentencing statements; not knowing she is still being misled to maintain her loyalty based on the ultimate ruse that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy*"). Kristen Peca posited on cue, with Galioto's assurances—despite the 100% government-debunked evidence (*government-forfeiture-36* and *government-forfeiture-44* concealed):

> [Kristen Peca]: "*As a reminder, Diamante Cabo san Lucas is one of the investments Phil Kenner had us involved in, one in which he stole a lot of money from us in the form of ownership percentage.*" (*10-28-2020, Post-sentencing H'rg Tr.46*)

As generally identified, *supra*, IRS agent Wayne debunked any possible Kenner theft from Hawaii—as harangued—thru Wayne's testimony post-trial, March 9, 2016 (*H'rg Tr. 44-45*).   But—5-years later (in 2020, *supra*), Kristen Peca was spewing the same rhetoric that coerced her and her husband in the first instance: that Galioto lied to them (*supra*).   Why won't the government tell Kristen Peca, or Nolan, or any of the people they now are defrauding by alleging Kenner stole all of their GSF funds (in addition to the Jowdy-Hawaii loan funds)?   That is why the government presented a late flurry of restitution submissions—designed to **overwhelm** the Court and **distract** it from the undressing of the wizard by Kenner; with government evidence—not Kenner *he-said-she-said*, yet again.

Known perjury left uncorrected (the definition of Napue): The Court must recognize that Wayne's forfeiture hearing testimony, *supra*, referred to his knowledge pretrial—but when the government battered Kenner about the same issues (they all knew to be false—with Galioto present at the same Jowdy proffer confessions), deafening silence was emitted from the prosecution table while sneering at Kenner.

These coercive and misleading exposés are more of the same Kenner statements and submissions that were deemed "*ridiculous*" at sentencing when Kenner's statements have always been corroborated by the actual witnesses previous statements (specifically including Kaiser's)—not in contrast to them (*ECF No. 1006 at 25-34*—et.al.).  **It has always been the government witnesses that were inconsistent with their-own pretrial statements**.

At trial, **the government sat silent**—but after Kaiser's stunning revelation *10-28-2020, post-sentencing H'rg Tr.47-50*, the government parsed the basic principle of

the Second Circuit's *Rodriguez* decision, *infra*, and suggested *"[t]he government is not in possession of materials matching the description offered by Kaiser on October 28, 2020".*   *Of course they are not*.   By definition, in *Rodriguez*, they would not have *"possession of materials"* but their star-witness affirmed they were told—and it is the information that they were supposed to convey to Kenner—by obligation, not by choice.   Kaiser's exculpatory statements are all they needed for the *Rodriguez* Court's opinion to be triggered and, now, a *Giglio/Brady* violation to have occurred. See *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) that

> "the absence of memorialization is determinative with respect to any obligation to disclose a witness's statements under the *Jenks* Act.  The considerations under *Brady* and *Giglio*, however, are quite different.   *Brady* and *Giglio* obligations, which apply only to material exculpatory and impeaching information, arise because it would be unfair to the defendant – and might cast doubt on the reliability of the verdict – for the trial to be conducted without informing the defendant of such information.   The obligation to disclose information covered by the *Brady* and *Giglio* rules exists **without regard** to whether that information has been recorded in tangible form."[46] (Bolding not in original)

The government knows it, more likely than not reminded Kaiser that they have his IRS tax avoidance schemes and N.Y.S. Pension fraud issues with the Police department as leverage, and Kaiser's public statements will be curtailed from this point forward.   The government knows that an evidentiary hearing, conducted by Kenner who knows where the truth lies and the exculpatory evidence is stored (unlike trial counsel's ineffective efforts—with evidence and defense witnesses) would be explosive and shocking to the senses.   Thus—the government will continue to takes their 11-year, well-seasoned ostrich approach because of who is orchestrating their directions.

**In the alternative—is the government calling Kaiser a liar and his trial testimony false?**   There does not appear to be a third option—as most lies usually expose themselves as they continue to unfurl in front of the Court: hearing-after-hearing.   The Court must seek an answer, so an appellate court can opine on the government's assertions and this Court's attempted resolve.

---

[46] The *Giglio* materials were requested by Defendant-Appellant no later than 4-months pretrial (*ECF No. 154*)

Regarding Kaiser—the government has multiple issues to address, in this arena:

(1) Why haven't they presented to the Court their scheme to hide Kaiser's original ink documents (*GX-7004* and *GX-7005*) at trial that were inexplicably recovered from Kaiser's home.  Instead, they produced *GX-5104* from the Kenner home office search and seizure in 2013.   This blatant Rule 1002 violation extended to the government's concealment from their-own signature expert and trial Court.

(2) Why hasn't the government empirically proven that Kaiser received "*back pay*" and "*expenses*" (*Tr.1413-14*) to support their Kaiser victim claim in Hawaii?   They know it's a fraud—because IRS criminal agent Wayne has already scoured Kaiser's 2006 and 2007 tax returns and knows Kaiser never listed his "*$195,000*" of alleged income (or the $55,000 of 2006 cash-advances to him).   The government also knows that Kaiser's testimony alleges approximately $621,000 of "*expenses*"—yet they could not produce thru Kaiser even $5,000 of documented "*expenses*" that remain unpaid; not even $5,000.

    a.  The Court should note that Kaiser testified that he did not make the $1 million contribution in 2005 that are documented in stipulated banking records as from his friends & family (none from Kaiser personally); further impeaching Kaiser's claim that he contributed "*Approximately 180,000*" (*Tr.977*).   Lost in the typical sideshow morass with government-witnesses, herein, this time period would parallel Kaiser's alleged $621,000 "*expenses*" he testified as advanced. It is not possible—and the Court must identify this incremental suborned perjury for the record.

    b.  In the alternative—if Kenner is wrong about the "*back pay*" and "*expenses*"—the government should simply produce it.

        Note: This is commensurate with the government's failure to produce the alleged letter[47] that Kristen Peca confirmed she was told by the government (*10-5-2020, Sentencing H'rg Tr.26*):

        [Kristen Peca]: "*And thankfully, that letter was found on Kenner's laptop to validate our suspicions and prove that he was harassing us and obstructing justice.*"

        The government should produce this alleged letter, just the

---

[47] Without ever addressing until Kristen Peca's speech 6-years later, the government introduced the anonymous letter ruse 5 minutes into the 10-week trial (*Tr.4*); knowing it was false.   They set the standard for their ethics throughout.

same (*ECF No. 1026*)—since Kristen Peca told the Court the government/FBI has it.

The Kaiser statements and submissions and the Kristen Peca post-trial statements have moved the proceedings from the absurd to the downright ludicrous.

Consulting payments are all right (even without proof of work or parameters of payments)—but only if you work with the transient Galioto/Jowdy cabal.   The government's exposé of the Jowdy/Diamante/Silverpeak consulting deal (without paperwork to verify the payments or work) runs parallel to the allegations of Constantine's consulting agreement (and 16 other paid hard-money lenders; none of which were charged with criminality).   **There was one single difference**: Constantine produced a loan during desperation, soon after COO-Manfredi's own emailed words to Kenner after an umpteenth failed effort (Bates stamp: *KJ2467*):

> [Manfredi email to Kenner]: "*I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does…I think the likelihood of losing Waikapuna and Moa Ula [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.*
>
> *Chris Manfredi*
> *COO/Project Manager*
> *Big Isle Ventures, LLC*
> *516-526-xxxx*"

Yet—the government fails to move on the parallel criminal allegation.   It is baffling.

For the aforementioned reasons (and empirically evidenced), the Court should move to eliminate Kaiser as a Hawaii victim including his loss.

<mark>Additional restitution claimants…</mark>

Six-years post-trial seems a little late based solely on common sense.   Nevertheless, the Sixth Amendment provides Kenner's right to confront any alleged victim.   Not only were the new submissions from un-named in the superseding indictment—but moreover, most were removed on the eve of trial because of their empirical knowledge and legal confrontations with Galioto and Jowdy's cabal (defended by Galioto…at least at the time).

Although brevity has not been alleged in Kenner's submissions, the addressing of the Hawaii, GSF and Eufora stock issues will be done under one example for the Court to extrapolate to the others.  Kenner is more than willing to brief the Court with details of every transactions vis-à-vis skip-tracing or co-mingled analysis for loss (or both for the convenience of the Court) &/or present the government's Rule 16 production documents that exonerate Kenner, scheme-by-scheme and alleged victim-by-victim (upon request).

> Note: Adverse to statute and legal precedent, the government previously added Gonchar and G. Murray as victims *ex post facto* while they specifically chose to remove them (amongst many other Kenner investors) who refused to engage in Galioto's representation of the various allegations—like the recent 2021 submissions. Kenner's necessity to confront was eliminated from Kenner's defense sphere.  In fact post indictment, multiple removed individuals, *plus* others never named by the government at any time, continued litigation: (1) in the USA and Mexico versus Jowdy for the Hawaii loans—*not Kenner*—(i.e. Delaware) and (2) re-filed a second civil complaint versus Constantine in the EDNY (after Kenner's arrest and detainment of the same complaints)—in both criminally charged arenas...neither against Kenner.  It begs the question of whether the government theories were based on the global evidence—or merely based on the individuals they could coerce into *failure to recollect* testimony (from only a tiny subset of total investors). the latter is the reality...

## Hawaii (Norstrom example)

The government removed Norstrom as a victim and concurrently had his Northern Trust LOC documents removed from the eve of trial request for production (like Gonchar and Murray LOC documents)—identifying them all as *immaterial*.  Why would they do that?  Norstrom was part of a Hawaii-Mexico investors group that was suing Jowdy in Mexico City Federal Court (criminally and civilly—with Galioto, Berard, Kaiser, Danske Bank officials—et.al.).  Galioto was in possession of Norstrom (and others) signed affidavits for the criminal litigation, which Norstrom's verified (in part: *Ex. 11*):

> [Norstrom—January 2015]:
> *"Hawai'i loan*
> *In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawai'i would lend him some bridge funding personally until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san*

*Lucas which several were pending at the time funded with a purchase and development loan.*

*As a group,*[48] *we agreed to lend him funds at a 15% interest rate.   Jowdy signed an official loan agreement with us in December of 2004.   Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were 'not loans' but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.   In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the 'investments' he declared as his defense in the case.   Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he stole the funds that Jowdy actually received.   Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."*

- Note: Norstrom's 2015 affidavit repeats identical language that Galioto used to coerce the Pecas (and G-d knows who else) into believing the Hawaii loans that the "*group*" of investors agreed to (a.k.a. authorized) loan to Jowdy (personally: *3500-KJ-2-r at 24-25*) were misrepresented by Galioto as *stolen by Kenner* to

---

[48] The "*group*" authorization language was echoed by Turner Stevenson to the 2011 SDNY Grand Jury (*ECF No. 112-5 at 17-18*):

*Q: When you put up the $100,000 for Hawaii, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawaii project?*

*A [Stevenson]:  In the beginning it was supposed to go to Hawaii.   Then I saw they needed, the group of us got together, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to transfer as a group like one big blanket to get money into Cabo and pay for that land to hold it until the [Lehman] loan came.*

*Q: So are you saying you agreed to transfer some of the money from the Hawaii project to the Cabo project?*

*A [Stevenson]: I would say that, yes.*

*Q: Who made the decision?*

*A [Stevenson]: I think all of us as a group.*

*Q: What do you mean "as a group", who is the group?*

*A [Stevenson]: All the guys who were invested in it.*

secure anti-Kenner sentiments.   *Government-forfeiture-44* verifies that Jowdy received 100% of the loan-funds Galioto alleged as never given to him, with Berard and Kaiser's help (post-Mexico-employment).   They were also spewing the same rubbish to the investors who authorized the loans in the first place.   Even Kristen Peca had the chance to refute seeing the bank record confirmations that Jowdy got the money during her 2012-FBI call with Kenner—but <u>she did not</u>.   Recall, Kristen Peca outed Galioto for his graft, perhaps inadvertently.[49]

Norstrom's 2015-affidavit was in Galioto's possession pretrial after Galioto arrested another individual who was assisting investors file and manage the Mexico City litigation versus himself, Jowdy, Berard, Kaiser et.al.   Norstrom highlighted (*Ex. 11*):

> [Norstrom]: "*Jowdy even tried to bribe Kenner with a 20% stake in his new Texas development.   Kenner declined…From that time forward, myself and many of my friends and investors/partners were forced to sue Jowdy multiple times in the USA and Mexico. At that point, Jowdy began to fight back using the funds from our own Cabo budget to pay for legal fees and other bribes in Mexico to keep himself from being arrested and deter future litigation.   Jowdy actually sued me in 2010 in the USA for Malicious Prosecution despite the millions he defrauded me personally.   Jowdy's frauds seem to have no limits.*"[50]

Yet (without a scintilla of empirical proof)—the government asserts, "*Kenner opened a line of credit in Mr. Norstrom's name*" (*ECF No. 1082 at 3*).  This is the same, unsupported misrepresentation by the government about each Northern Trust LOC

---

[49] (*ECF 788 at 11, f. 10*—et.al.):

> [Kristen Peca]: *Matt [Galioto] told Michael and I that <u>you stole</u> all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*

> [Kenner]: *Kristen – <mark><u>I have all of the bank records that prove the money went to Jowdy and his accounts at all times</u></mark>.  <mark><u>You told me that you saw the bank records after I sent them to Michael</u></mark>.  You know -- <mark><u>the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued</u></mark>?*

> **[Kristen Peca]: *But – I don't understand why he would say it.***

[50] Norstrom completes his 2015-affidavit by identifying:
> "*$1,200,000 -- line of credit (Jowdy loans)*" (alterations in original)

There can be no equivocation of Norstrom's knowledge—commensurate with his voluminous partners' pre-indictment testimonial truths.  Only time and Galioto's relentless coercion has eviscerated the documented history of events.

client—in contradiction to <u>all</u> empirical evidence admitted at trial (but not wanting to let a good lie go un-repeated).

**The empirical evidence verified Kenner <u>never</u> opened a single LOC for the Northern Trust clients**.   There is no evidence to the contrary.  *Kenner trial Exhibit 210* [the Northern Trust in-trial subpoena] (with nearly 100 signatures handled directly between Northern Trust Bank and their clients: absent Norstrom, Gonchar, and Murray—after their removal from the superseding indictment) <u>verified</u> that every account opening record (and successive "*renewal*" package: See *ECF No. 668 at 270-74* [Nolan example])[51] was signed by the individual LOC clients of Northern Trust (**never Kenner**: nor were any alleged as forgeries pretrial when the Court demanded the government produce *anything* from their universe of Rule 16 documents they intended to introduce as such; amounting to no new production).  In fact—despite the government's slanderous rhetoric, they cannot produce a single communication *in any format* to Kenner or Northern Trust bankers that questions the origination of the LOCs *in any sense*.  Common sense would suggest that if those communications existed *anywhere*:

    (1) The original signatures would be forged;

    (2) The investors (at least one of them) would have inquired years before the 2013 indictment about how the LOCs opened without their signatures (while being asked to renew something up to 5-times that they were unaware of in the first instance); and

    (3) Northern Trust &/or their LOC clients would have called the FBI (or alternative DOJ organization) to lodge a criminal complaint.

**But—none of that ever occurred**, or the Court would have been bombarded with it.  Instead—the government continues to pray the Court will not notice the

---

[51] During his arbitration testimony, Nolan <u>verified</u> his initial Northern Trust *Letter of Authorization* for Kenner to access his account (See Nolan's 2009 arbitration production of the signed document: *Ex. 35* [from his personal records]).   Nolan's attorney was confronted by the savvy former Federal judge, as follows:

[Nolan arbitration May 2009 -- Day 5 at 1049] – Judge Meyerson & Nolan's attorney:
    [Attorney Meeks—Nolan's counsel]:  *He [Nolan] admits that's his signature. His testimony is he wasn't aware.*

    [Judge Meyerson]:  *So somebody signs a statement that says, **Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4**.   Doesn't somebody have to take responsibility for that?*

nonsensical misrepresentation.   To date—the morass has overwhelmed all involved.

In the Norstrom presentation, the government continued in mis-representations that Kenner "*diverted money intended for the Hawaii project and which he used for his Ponzi-like scheme to conceal the fraud*" (*ECF No. 1082 at 3*).   Again—the government selectively ignored their-own *Jenks* materials that Galioto independently received from Norstrom (*Ex. 34: 3500-MN-2*).   Norstrom's 2009 <u>signed</u> affidavit (in the Nolan arbitration) debunks this nonsense: both the Jowdy loan and LOC payment scheme malarkey.   In fact, the government possesses Gonchar's similar 2009 <u>signed</u> affidavit (*Ex. 24: 3500-SG-4*).   This was also received and ignored to make these recurring, unsubstantiated claims.   Norstrom's 2009 affidavit specifically identifies (*Ex. 34 at 3-4*):

> [Norstrom]: "*In addition to setting up a Line of Credit for the sole use and benefit of the Hawaii investment Group, I wired $100,000 to Northern Trust Bank…for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.   I was aware that my funds would be used to make distributions for the company, <u>including but not limited to</u>; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, <u>loans to outside entities [a.k.a. Jowdy]</u> and <u>**distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank**</u>…Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request.*
>
> *From day one, I have also been made aware of Phil Kenner's significant interest in the Hawaii Investment Group in consideration of his ongoing capital contributions, day-to-day management, personal loan guarantees (including securing the Waikapuna loan with his Arizona residence at the time), his environmental guarantee on behalf of the Joint Venture (so none of the other members would be liable), as well as other contributions.*"

Thus—the (1) Ponzi-issue ("*distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank*") and the (2) Jowdy loan issue ("*loans to outside entities*") are debunked—yet the government ignores empirical and exculpatory records that refute their theories (as a pattern).

There is no contradiction of testimony to allege otherwise.   None is cited.

<mark>GSF (Norstrom example)</mark>

When Galioto interviewed Norstrom ("MN") in person, January 11, 2012 (8-months after Galioto's failed SDNY Grand Jury), Norstrom explained to Galioto (per Galioto's raw notes):

> "*Tommy Constantine – told MN about a world Fund [a.k.a. GSF] over telephone*" (absent identification of Kenner)—and

> "*TC [Constantine] got world Fund together – for investors in other investments*" (absent identification of Kenner)—and Constantine said

> "*PK can't be in charge*" (a.k.a. Kenner)[52]

There was no mention of Kenner's GSF solicitation—**just the opposite**.

Norstrom went on to explain (as identified in Galioto's FBI raw notes):

> "*MN on a conference call w/ Stolper – atty = involved now*"—and Berard explained to Norstrom (as identified in Galioto's FBI raw notes)

> "*B. Berard → to get $ back from TC and Fund*" (note: TC is Tommy Constantine)

As FBI-noted, Norstrom specifically spoke with independent counsel for Constantine's Eufora and discussed related issues to Constantine's GSF.   Clearly— Berard was a significant protagonist (with Attorney Stolper's investigative group) to recover various transactions that were thoroughly investigated with transparency by independent counsel.   Again—even with Berard involved, there was no mention of Kenner's control &/or irresponsibility.

Norstrom explained (as identified in Galioto's FBI raw notes) that he spoke with Berard "*over 1 year ago*"—and that would have occurred after the deep dive Eufora,

---

[52] This 2012 FBI proffer statement by Norstrom to Galioto echoes Michael Peca's identical trial testimony (*Tr.540*):

> *Q. And what was Phil Kenner's participation in that [GSF], as you recall?*

> **A [Michael Peca]: He didn't seem to have one.**

GSF and Hawaii transaction investigations by Giuliani's investigative team (led by Attorney Stolper).   Yet—not one single representation via Norstrom identified anything erroneous related to Kenner's involvements (including Berard's 2011—pre-Jowdy employment interactions).

- Ironically—concurrent with Berard's (and Kaiser's) late 2011 Jowdy employment—every narrative changed.

But immediately prior to that, Norstrom knew the truths.  Norstrom explained the known truths to Galioto (all of which—ironically—concurred with Peca, Sydor and Stevenson 2011 SDNY Grand Jury testimonies).  The evidence is that Norstrom spoke unfettered and independently with his attorney and other co-investors (Stolper: See July 16, 2010 signoff—*Ex. 28 at 10*).[53]   Apparently (according to Galioto's raw notes), Berard told Norstrom—independently from Kenner—that they would get the Fund issues and Constantine/Eufora management issues settled with Constantine; never raising the 2008-09 Constantine/Gaarn private stock sales that every Eufora investor acknowledged thru signature (*Id.*).

Lastly—in irrelevant nexus to Norstrom's GSF transaction, Kenner (as designated limited Power of Attorney for Norstrom), initiated the transfer to Constantine's GSF co-mingled account.   What the government wants the Court to stay in the dark about is that after that single, authorized act by Kenner, Norstrom (like every other of the 1000s of transactions) was required to give verbal authorization to his institutional custodian (Charles Schwab) before they would release funds; specifically including payee and amount.   Thus nothing could have left Norstrom's Schwab account without his implicit knowledge.   Furthermore—and continually overlooked as a full debunking communication—Norstrom was *independently* represented by a FINRA regulated firm (Greenberg Graham and Assoc. – "GGA").  Immediately following any Schwab transfer out of a GGA client account, they sent an email to their client, which read (*Ex. 27* [deVries GSF transfer example]):[54]

> *From: Doug Jankowski djankowski@ggaadvisors.com*
> *To: de7vo@rogers.com [Greg deVries]*

---

[53] Berard managed the Stolper sign-off process for the engagement and acknowledgment letter of July 16, 2010—independent of Kenner.  only willful blindness (or ulterior motives) could have restricted recollection of the well known (and FBI documented) facts concurrent with Norstrom's January 2012 FBI proffer.

[54] Although redacted, this message was forwarded to Galioto—thus he was deftly aware years pretrial and continued to allow the government misrepresentations to the Court (Bates stamp: *EMAIL-0000307*).

*Cc: 'James R. Graham' jgraham@ggaadvisors.com*
*Sent: Friday, June 12, 2009 10:44:46 AM* [55]
*Subject: deVries Wire*

*Wire Amount: $250,000*
*Wire Fee: $25*
*Beneficiary: Law Offices of Ronald Richards & Associates, Beverly Hills CA*
*Process Date: 6-11-2009*
*Status: Complete*
*Fed Reference #: 0611|1B7031R021911*

*Doug Jankowski*
*Greenberg|Graham Advisors LLC*
*2600 Michaelson Drive, Suite 1700*
*Irvine, CA 92612*
*(714) 437.0040*
*(714) 200.0763 (efax)*
*DJankowski@gggaadvisors.com*

Galioto was aware of all this.

But with concealment an impossibility—the Government continues to hide it from the Court—because of its devastating effects on their empirically debunked theories.   Additionally—the Court should note that Norstrom (or deVries—et.al.) received independent monthly statements from their Institutional Schwab account which would have identified any transaction (including these); further debunking any concealment.

**This transactional transparency is unchallengeable**.   The Court should address the consequence of the government's misrepresentations on the proceeding—because (again) this is empirical evidence the government ignored to frame their prosecution; not once "*ridiculous*" Kenner testimony that was unsubstantiated by empirical fact: almost exclusively the investors' facts (based in their signed

---

[55] *GX-767* confirms deVries' GSF transaction was received by Ronald Richards co-mingled account June 11, 2009—thus no lag time in deVries (or anyone's) wire transfer third party communications which could have allowed for complete obliviousness to a single transaction (despite several individuals testifying to the contrary at trial: *Tr.446* [Peca example]).

documents, their prior testimony, their FBI raw notes, their participation in litigation as Plaintiffs—et.al.).

## Eufora (Norstrom example)

Norstrom had to authorize his $100,000 transaction in 2008 to acquire the private stock from Constantine (vis-à-vis: Constantine Management Group).   Norstrom was deftly aware of every aspect of the transaction (like all investors) based on a number of universal and empirical facts.

**One**—the prior example (deVries, *supra*) confirmed every transaction was re-confirmed in real time by their independent FINRA representative, after they gave verbal authorization to their Charles Schwab Institutional custodian (*Ex. 27*).

**Two**—Norstrom exchanged a "*March 19, 2008*" text communication with Kenner in real time before his authorization was granted (per transparent protocols that alerted Norstrom: *Ex. 36*):

> [Norstrom]: *Account name:constantine Management group?*

> [Kenner]: *Yes.  That's where the 1% os being transferred from…*

> [Norstrom]: *Sent the fax to WF [custodian]*

And **Third**—Norstrom, **like 9 other Eufora investors** (*Ex. 37*: list of all 2013 bankruptcy filings versus Constantine), filed 2013 adverse proceedings against Constantine's bankruptcy to insure that Constantine, as Chairman Emeritus of Eufora, properly documented his and all of their 2008-09 purchases (et.al.) **from Constantine** based on the stay on proceedings in the Arizona and EDNY lawsuits versus Eufora and Constantine (because of Constantine's Arizona bankruptcy filing) (*Ex. 40*).

The government concealed this information of all the investors' inherent knowledge from the Court—to their sentencing day advantage (*10-5-2020, sentencing H'rg Tr.81* [Ranford example]).

> [Court]: "*Kenner has represented the Constantine sole [sic] private stock for Ranford for $200,000.   That's your claim….We don't have any other records in*

> *support of that transfer was a private sale of stock from Constantine to Ranford.*"

The government knew this exculpatory evidence existed—**and sat silent**…

Like Norstrom (and 9 other Eufora investors), <u>Ranford filed</u> a 2013 ProSe Adverse Proceeding versus Constantine's 2012 Arizona Federal bankruptcy (*2:13-ap-00334-EWH*).   <u>Ranford verified</u> his bankruptcy filing during trial testimony (*Tr.2860*). Ranford's 2013-bankruptcy filing identified (*Ex. 38 at 5*):

> [Ranford]: "*upon information and belief Ranford believes Constantine personal sold shares in Eufora as follows:*" —listing himself as,

> [Ranford]: "*William Ranford on 07-07-2008 $200,000*" (along with 8 other private stock purchasers).[56]

Norstrom's identification language (in *2:13-ap-00335-EWH: Ex. 40*) was identical and was recovered recently by stand-by counsel.  Norstrom's $100,000 private stock purchase was concurrently identified in all the adverse proceedings bankruptcy filings.   Norstrom stated (*Ex. 40 at 5*):

> [Norstrom]: "*upon information and belief Norstrom believes Constantine personal sold shares in Eufora as follows:*" —listing himself as,

> [Norstrom]: *"Mattias Norstrom on 03-19-2008 $100,000"*

Worthy of note based on government concealment of well-known facts pretrial—the Court excoriated Kenner as "*ridiculous*" (*Id. at 78*) for alleging inconsistent prior testimony of many government-witnesses (for a myriad of reasons; previously

---

[56] Ranford's 2013 bankruptcy filing (in ProSe) corroborated Ranford's 2012 FBI proffer that identified the <u>exact</u> date and amount of his Eufora purchase (*Ex. 39: 3500-WR-2-r—"7/2008 = $200k"*).   In addition, Ranford identified his two, 2009 Eufora-purchases from Tim Gaarn (*Id. at 2: "-2009 - $100k – Feb.  $100k – May"*).

But—with Ranford under tremendous duress from Galioto to be deported if his testimony was not perfect (per Ranford's 2015 jailhouse phone calls with Kenner), Ranford vehemently denied verifying the Eufora stock transaction (in general) independently to the FBI in 2012—fitting the FBI narrative of concealment, 3-years after he independently knew the details in Galioto's raw notes (*Tr.2823-24, 2858-60*).

identified—and debunked with government Rule 16 empirical records: *ECF No. 1006 at 25-34*); including the Ranford bankruptcy filing information, *supra*.[57]

Note: deVries (as recently identified by the government: *ECF No. 1082*) also filed an adverse proceeding versus Constantine's Arizona bankruptcy (*Ex. 37*).   DeVries' filing specifically highlighted his 2008 transfers related to Constantine.    This is incremental acknowledgment and transparency to Constantine's Home Depot bluster (*10-5-2020, sentencing H'rg Tr.81*) and Constantine's Eufora August 2010 conference call follow-up rhetoric about alleged illegal Gaarn transactions that 29 Eufora investors had already been alerted to by independent counsel <u>multiple times</u> and <u>signed</u> corresponding disclosures (See Stolper July 16, 2010 acknowledgment and sign-off: *Ex. 28*).   Stolper (as independent counsel) identified Constantine's allegations (and the government's eventual criminal charges) to his 29 clients. Three (3) independent July 2010 letters, cc'ing Stolper's own clients (of July 8 [Bates stamp: *ED-0001400-01*], July 15 [Bates stamp: *PK-000138022-25*], and July 16 [Bates stamp: *NONE*—discovered in the late dump materials by the government on the eve of trial]), identified the previously vetted allegations, and <u>challenged</u> Constantine (and counsel) to document *anything illegal* after Giuliani's group raised and vetted the same with their clients (independent of Kenner).

---

[57] The Court should recall that the government attempted the same veracity assault on Kenner during trial about the 2009 appearance subpoena (actually issued from their-own EDNY office) (*Tr.5064-65*):

> *Q. Aren't you just making all of this up as you sit there?*
>
> *A [Kenner]: No, sir.*
>
> *Q. <u>Aren't you lying about these documents</u>, your interactions with the people who relied upon you to take care of their money? Aren't you just lying about everything?*
>
> *A [Kenner]: No, sir.*
>
> *Q. <mark>Are you lying about even being summoned to the grand jury and then dropped like a hot potato</mark>?*
>> *MR. HALEY: Now I will object, your Honor.*
>> *THE COURT: Sustained.*
>> *MR. HALEY: Thank you.*
>
> *Q. <mark>Aren't you lying about being summoned to the grand jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you. Aren't you lying about that</mark>?*

Kenner was forced to produce the actual <u>EDNY U.S. Attorneys Office subpoena</u> a day later (from Rule 16 production: *Tr.5154-55*)—but the prejudicial assault hang rung its bell.

- Any Eufora investor (since 2003) who was unaware of the entire Giuliani investigative team's findings (vetting all 2003-2010 transactions—not just the private stock transactions) was willfully not paying attention, by their own choice.   The government knew these transactions were vetted, were in possession of Stolper's correspondences with his 29 Eufora parties, and left the Court to believe no one knew: resulting in sentencing day confusions (*10-5-2020, Sentencing H'rg Tr.81*).

The Court has never heard that after Stolper's challenge to present the private *bearer stock* fraud proof (or any unaware investor)…

> **Constantine and his Eufora counsel were silent**—because their veil threats were confronted head-on by attorney Stolper (on behalf of his 29 Eufora clients).

> <mark>Constantine's last attempt to scare off the Eufora investors…</mark>
> (One-month after 29 Eufora parties hired the Stolper/Giuliani's team *en masse*: *Ex. 28*)

Two-weeks after Kenner's surreptitious recording of the Constantine bluster (of the same false allegations) at Home Depot (and attempting to separate Stolper and Kenner from the other Eufora investors),[58] *Constantine tried his rhetoric again*.

The Eufora conference call/shareholders meeting (with Berard and Nash in attendance: and the balance of the 29 interested parties on a conference call) began after Constantine had a paid Sheriff to physically restrict access to the meeting for Kenner, Kaiser, and Attorney Stolper's stenographer.

> Note: Berard (present of the shareholders meeting) was undoubtedly in charge of the Stolper-investors investigation team.   Berard handled 100% of the investors' communication for Stolper and kept Kenner abreast of his interactions (not the opposite).   Nothing could be more transparent that that (including referencing the July 16, 2010 engagement letter Kaiser could not recall at trial: 5-years later, *infra*):

---

[58] With Giuliani clearly in direct communication to whatever Second Circuit and DOJ contacts necessary to criminally indictment Kenner (if guilty of Constantine's allegations on the Home Depot recording), he could have contacted them—**but Giuliani and Stolper did not**.   In contrast to concealing Constantine's inculpatory statements—Kenner immediately turned the babbling rhetoric over to the Eufora investors' counsel: clearly not concealing anything.

| 1 5 6 2 5 | +140152 46929 Bryan Berard* | 8/17/201 0 9:05:45 PM(UTC+0 ) | R e a d | [Berard]: <u>Are you guys getting on board wth the rest of us and signing this engagement letter</u>?? If getting your own counsel, u shld have them call Stolper. We are going ahead wth this, 100K is in escrow and ready to begin process. I hope u guys join. If not U r on your own. ( <mark>I just texted to to Peca and Mckee</mark>) one more chance |
| --- | --- | --- | --- | --- |

During the conference call—while listening thru another investors' connection, Kenner and Stolper had direct-text communication when Constantine raised the stolen *bearer stock* issues (for the fourth time, at least)—as a mere distraction to the Giuliani/Stolper investigation findings.   Kenner highlighted (the opposite of concealment):



| 1 8 2 7 1 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:09:12 PM(UTC+0 ) | S e n t | [Kenner]: **Tommy [Constantine] has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
| --- | --- | --- | --- | --- |
| 1 5 7 5 0 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:10:45 PM(UTC+0 ) | R e a d | [Stolper]: **<u>Predictable</u>** |

And again moments later:

| 1 8 2 7 2 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:10:37 PM(UTC+0 ) | S e n t | [Kenner]: **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
| --- | --- | --- | --- | --- |
| 1 5 7 5 1 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:12:24 PM(UTC+0 ) | R e a d | [Stolper]: **<u>Hopefully recorded</u>.** |

Note: Stolper had already become frustrated about Constantine blocking Kenner, Kaiser, and Stolper's stenographer's entry to the in-person, shareholders meeting (with others on conference call):

| 1 5 6 7 0 | +191762 61175 Michael Stolper* | 8/18/201 0 3:40:02 AM(UTC+0 ) | R e a d | [Stolper]: <u>Try to record the meeting</u> if the stenographer is not permitted. Make sure non-members (like TC's lawyer) are not allowed in if you guys aren't allowed in. |
| --- | --- | --- | --- | --- |

Yet of note—Stolper made a "*hopefully recorded*" reference to Kenner's Home Depot recording (2-weeks prior) of Constantine's confabulations.  Stolper reference was

that each *repeated* and *debunked* allegation sunk Constantine's credibility lower with hired, independent counsel for the 29 Eufora related parties (*Ex. 28 at 9*)— while noteworthy, <u>not representing Kenner in the Eufora matter</u>.

With Berard in attendance for the Constantine/Eufora conference call (8-18-2010), Kenner also alerted Berard about the Constantine *bearer stock* rhetoric and asked Berard to confront it on the call—<u>for every Eufora investor and their attorneys to hear</u>.

*What else could Kenner do or say publically to expose the nonsense that the government leveraged 5-years later* (despite its clear nonsense to everyone in real time)?  Kenner instructed Berard (one-minute before Stolper texted "*hopefully recorded*"):

| 18 2 7 3 | +14015 246929 Bryan Berard* | 8/18/2010 8:11:23 PM(UTC+0) | S e n t | [Kenner]: **Ask how Constantine thinks the Gaarn transfer affected the company...if at all?** |
|---|---|---|---|---|

And one-hour later during the conference call:

| 18 2 9 1 | +14015 246929 Bryan Berard* | 8/18/2010 9:12:28 PM(UTC+0) | S e n t | [Kenner]: You can say in closing that after hearing all this...**now you know why Tommy wouldn't let kaiser & Kenner in the meeting** |
|---|---|---|---|---|
| 18 2 9 1 | +14015 246929 Bryan Berard* | 8/18/2010 9:12:51 PM(UTC+0) | S e n t | [Kenner]: **It's because we know all the rest of the truths** |
| 18 2 9 1 | +14015 246929 Bryan Berard* | 8/18/2010 9:14:50 PM(UTC+0) | S e n t | [Kenner]: **He didn't want Kenner in to address the Gaarn transfer. That's is his SMOKE SCREEN** |

- Regardless of Berard's memory issues—obviously, nothing was concealed in real time like the government alleged and the Court is still.

Again (in synchronized memory loss), Berard with Kaiser were in full control of the Eufora loan buyout operation with Attorney Stolper (day-to-day) (exculpatory evidence *infra*).  As instructed by Galioto, they feigned total ignorance to the loan buyout at trial, *infra* (*Tr.3106* [Berard]):

> *Q: Was there also an effort underway not only to buy this loan but also to take the company over from Mr. Kaiser -- I'm sorry -- from Mr. Constantine?*

*A [Berard]: No.*

...(*Tr.3111* [Berard]):

> *Q. Would it surprise you to learn it [the loan] was with Eufora and not with Mr. Constantine?*

> *A [Berard]: You say surprise? I didn't understand the loan in general.*

> *Q. Well, do you remember any discussions about going to talk to Brent to buy the loan?*

> *A [Berard]: I do not, no.*

> *Q. Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent [lender]?*

> *A [Berard]: Not to my knowledge, no.*

(*Tr.1400* [Kaiser]—including review of *another* full disclosure document Kaiser cannot recall: this time the Kaiser-signed July 16, 2010 letter: *Ex. 28*):

> *Q Does this refresh your recollection, at all, Mr. Kaiser, with regard to being told that this group that you were part of was seeking to acquire loan packaging warrants from the lender of Eufora?*
> > *MR. MISKIEWICZ: Objection.*
> > *THE COURT: Overruled.*

> *A [Kaiser]: No.*

> *Q Does this letter refresh your recollection your lawyer, Mr. Stolper, is telling you that they are looking to take over the loan, of Eufora's loan?*

> *A [Kaiser]: No.*

Yet—despite selective amnesia to the most critical Eufora investigation/litigation elements (the loan buyouts—and private stock documentation) Berard and Kaiser were collectively heading the investigation/litigation with Stolper. **Their own texts impeach them—in sync**.

PROOF OF PREMEDITATED, SUBORNED PERJURY:

The day before the Constantine/Eufora conference call, Berard asked Kenner (via text):

| 1 5 6 2 9 | +1401524 6929 Bryan Berard* | 8/17/2010 9:43:31 PM(UTC+0) | R e a d | [Berard]: Shld I tell that retard mckee I'm the one that put up 100K. Or just keep that quiet. What u think? **Only reason saying this is we cld use him to help buy loan if necessary** |
|---|---|---|---|---|

And 7-minutes later, Berard confirmed Kaiser-Peca communication:

| 1 5 6 3 1 | +1401524 6929 Bryan Berard* | 8/17/2010 9:50:48 PM(UTC+0) | R e a d | [Berard]: **Was just a thought. More think abt it I agree wth u. Just get pissed off talkn to them.** JK said he straightened out Peca today. Have good lunch |
|---|---|---|---|---|

Note: Peca spoke with Berard about the Eufora loan buyout options 3-days earlier and wanted to make sure he was part of the capital contributions, expressing his sentiments vehemently to Kenner (based on Berard's representations to him):

| 1472 7 | +17163743 234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC+0) | Read | [Michael Peca]: **If not all willing members get a chance to be part of the loan buyout, mean more % there may be a lynching.** FYI |
|---|---|---|---|---|

Kenner responded one-minute later in the affirmative to Michael Peca, as follows:

| 169 13 | +17163743 234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **[Kenner]: I don't disagree** |
|---|---|---|---|---|
| 169 14 | +17163743 234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **[Kenner]: Why wouldn't they?** |

And 2-minutes later after Berard's comments about McKee, Kaiser verified the loan buyout plans to "*take it out*":

| 1 5 6 3 2 | +1631235 0308 John Kaiser* | 8/17/2010 9:52:15 PM(UTC+0) | R e a d | [Kaiser]: I told B[erard] , that we are going to take it out , put it in diff/ acc |
|---|---|---|---|---|

78

Kaiser reiterated this to Kenner 2-hours later (the day prior to the conference call):

| 1 5 6 4 5 | +1631235 0308 John Kaiser* | 8/17/2010 11:43:44 PM(UTC+0) | R e a d | [Kaiser]: **We are going to raise the funds to take down the loan** |
|---|---|---|---|---|

The government knew all of this and let their perjured testimony stand in-sync (another clear *Napue* violation).

The next day, the investors' attorney (Stolper) reached out to Kenner after the Constantine/ Eufora conference call to ask, poignantly:

| 1 5 7 2 1 | +191762 61175 Michael Stolper* | 8/18/201 0 7:19:27 PM(UTC+0 ) | R e a d | [Stolper]: **Who do we need to un brain wash**? |
|---|---|---|---|---|

Even a day later—after the Stolper re-cap conference call that evening with his clients/Eufora investors about everything Constantine defended and alleged (including the Gaarn allegations for the umpteenth time), Peca reached out to Kenner (despite his full communication with Stolper, Kaiser, and Berard):

| 1 5 7 9 6 | +1716374 3234 Michael Peca | 8/19/2010 2:40:01 PM(UTC+0) | R e a d | [Michael Peca]: I will later. **Hopefully everyone can get together to put the allegations to rest**. **There are bad ones going both ways**. |
|---|---|---|---|---|

Nothing was concealed about the 2008-09 transactions, the government knew it, but they let the Court think the Constantine Home Depot statements were based in reality.   Clearly—everyone knew they were fabricated—including the investors' attorneys who called them "*predictable*".

Neither Norstrom, nor any other Eufora investor, was absent a clairvoyant understanding of their initial private stock purchases (*Ex. 36*), the latter Constantine rhetoric (during letter correspondences and conference call bluster), and ultimately Norstrom (like 9 others) filed ProSe Adverse Proceedings *en masse* versus Constantine's bankruptcy for the same Eufora stock.

This is all the same stock the government needs to Court to deny anyone knew about.   The empirical records are overwhelming in Kenner's favor of transparency—and a memory test is just another government-circus act to attempt recreation of history as if it never occurred.   It's foundationless—at best.

Conclusion…

Kenner had the right to confront individuals the government identified as victims in their superseding indictment (*ECF No. 214*).   That document was their prosecutorial choice; not anyone else's.   As such—without being named as a John Doe within the 4-corners of the indictment, Kenner could not be expected to raise any or all of the exculpatory records available in the courtroom (like non—victims Murray and Gonchar's appearances as witnesses—not superseding indictment victims).   The government cannot move the goalposts once trial begins—or 6-years after-the-fact to fill their *round-hole* with a proverbial *square peg*.

Despite the government's assertions for reliance solely on "affidavits in determining restitution" (See *Gushlak*, 728 F.3d at 193-94), they mis-represent the underlying issue in *Gushlak* that

> the amount of restitution ordered must reflect a "reasonable approximation of **losses supported by a sound methodology**"; *See United States v. Gushlak*, 728 F.3d 184, 196 (2nd Cir 2013) (alterations not in original)

The government *must* provide this information for the Court to conclude it, far beyond the government's current assertions based on *ipse dixit*.   Only Kenner has submitted calculations based on sound methodology (including well-seasoned case law) and supported them with empirical evidence on the record, further complimented by the government's Rule 16 production materials (*ECF No. 770 at 53-72*).   They were all ignored by the government to reach their foundationless loss conclusions (*ECF No. 781 at 5*—and their progeny).

The instant case prosecuted Kenner for *legal transactions* that were alleged as *concealed*.   The government attempted to prove their theories based on a minor subset of the total participants' memory tests of their prior and empirical transactions (approximately 6 of 30 individuals – 20%).   Their cherry-picked crew gave varying "*foggy*" (*Tr.1956, 2722*) and "*I don't remember*" testimony about *crucial and material information, in passive-equity investments, that they had previously verified and acknowledged 'under oath*.

Sadly for justice—the government never defended these representative anomalies as the truth (*supra*—and previously argued ad nauseum); moreover they defended them in their entirety as "confusion, mistake, or faulty memory", See *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (*ECF No. 440 at 16*).

In *Hughey*, the Supreme Court interpreted the restitution statute; See 495 U.S. 411, 415-16 (1990) (interpreting what is now 18 U.S.C. §3663).   The Court held that statutory language authorizing restitution to the victim of "an offense" permitted district courts to order restitution "only for losses caused by the conduct underlying the offense of conviction." *See Id. at 416*.

The government told the court (*Tr.5993*):

> [Government rebuttal summation]: *The government called 39 witnesses in this case, multiple victims, <u>every John Doe</u>. They told you their story. That's what you have to consider; all of them.*

They must be held to that standard—but now they want to move the goalposts again.   The Court must end this façade.


Respectfully submitted,


Phil Kenner, Pro Se