**Execution Version**

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**EUFORA, L.L.C.**

**Dated as of February 23, 2009**

*PHX 328420976v9*

GOVERNMENT
EXHIBIT
**210**
13-CR-607 (JFB)

# TABLE OF CONTENTS

**Page**

Article 1 DEFINED TERMS...................................................................................................... 1

Section 1.1. Definitions................................................................................................ 1

Article 2 CONTINUATION OF COMPANY AND TERM ......................................................... 7

Section 2.1. Continuation of Company......................................................................... 7
Section 2.2. Name........................................................................................................ 7
Section 2.3. Term......................................................................................................... 7
Section 2.4. Known Place of Business; Statutory Agent; Principal Office; Other Offices .......... 7
Section 2.5. No State Law Partnership ........................................................................ 8
Section 2.6. Qualification in Other Jurisdictions .......................................................... 8
Section 2.7. Business Transactions with Company ..................................................... 8

Article 3 PURPOSEs AND POWERS OF THE COMPANY ................................................... 8

Section 3.1. Purposes ................................................................................................. 8
Section 3.2. Powers of the Company ........................................................................... 9

Article 4 CAPITAL CONTRIBUTIONS, MEMBER INTERESTS, CAPITAL ACCOUNTS ...... 10

Section 4.1. Capital Contributions ............................................................................. 10
Section 4.2. Member's Units...................................................................................... 10
Section 4.3. Status of Capital Contributions ............................................................. 10
Section 4.4. Capital Accounts.................................................................................... 10
Section 4.5. Warrant.................................................................................................. 11

Article 5 MEMBERS, MEETINGS AND AMENDMENTS ..................................................... 11

Section 5.1. Powers of Members ............................................................................... 11
Section 5.2. Resignation............................................................................................ 12
Section 5.3. Meetings or Other Approvals of the Members........................................ 12
Section 5.4. Additional Members; Additional Units .................................................... 12
Section 5.5. Amendments .......................................................................................... 13
Section 5.6. Confidentiality Obligations of Members ................................................. 13

Article 6 MANAGEMENT ..................................................................................................... 13

Section 6.1. Management of the Company ................................................................. 13
Section 6.2. No Management by Other Persons ......................................................... 14
Section 6.3. Major Decisions of the Board of Managers ........................................... 14
Section 6.4. Major Decisions of the Members ........................................................... 15
Section 6.5. Reliance by Third Parties ....................................................................... 15

Article 7 ASSIGNABILITY OF MEMBER INTERESTS ........................................................ 15

Section 7.1. Assignability of Interest ......................................................................... 15
Section 7.2. Permitted Transfers ............................................................................... 16
Section 7.3. Recognition of Assignment by Company or Other Members.................. 16
Section 7.4. Effective Date of Assignment ................................................................ 16
Section 7.5. Limitations on Transfer .......................................................................... 16
Section 7.6. Right of First Refusal ............................................................................. 17

Article 8 DISTRIBUTIONS TO MEMBERS........................................................................... 17

Section 8.1. Distributions........................................................................................... 17
Section 8.2. Tax Distributions .................................................................................... 17
Section 8.3. Withholding............................................................................................. 18
Section 8.4. Limitations on Distribution ..................................................................... 18

i

**TABLE OF CONTENTS**
**(cont.)**

| | | Page |
|---|---|---|
| Article 9 TAX ALLOCATIONS | | 18 |
| Section 9.1. | Profits and Losses | 18 |
| Section 9.2. | Special Allocations | 18 |
| Section 9.3. | Allocation and Other Rules | 19 |
| Article 10 BOOKS AND RECORDS | | 20 |
| Section 10.1. | Inspection Rights Pursuant to Law | 21 |
| Section 10.2. | Books and Records | 21 |
| Section 10.3. | Annual Financial Statements | 21 |
| Section 10.4. | Monthly Statements | 21 |
| Section 10.5. | Accounting Method | 21 |
| Article 11 TAX MATTERS | | 21 |
| Section 11.1. | Taxation as Company | 21 |
| Section 11.2. | Federal Tax Returns | 21 |
| Section 11.3. | Member Tax Return Information | 22 |
| Section 11.4. | Tax Matters Member | 22 |
| Section 11.5. | Right to Make Section 754 Election | 22 |
| Article 12 LIABILITY, EXCULPATION AND INDEMNIFICATION | | 22 |
| Section 12.1. | Liability | 22 |
| Section 12.2. | Exculpation | 22 |
| Section 12.3. | Indemnification | 22 |
| Section 12.4. | Expenses | 23 |
| Section 12.5. | Insurance | 23 |
| Section 12.6. | Certain Liabilities | 23 |
| Section 12.7. | Acts Performed Outside the Scope of the Company | 23 |
| Section 12.8. | Liability of Members to Company | 23 |
| Section 12.9. | Attorneys' Fees | 24 |
| Section 12.10. | Subordination of Other Rights to Indemnity | 24 |
| Section 12.11. | Survival of Indemnity Provisions | 24 |
| Article 13 DISSOLUTION, LIQUIDATION AND TERMINATION | | 24 |
| Section 13.1. | No Dissolution | 24 |
| Section 13.2. | Events Causing Dissolution | 24 |
| Section 13.3. | Notice of Dissolution | 24 |
| Section 13.4. | Liquidation | 24 |
| Section 13.5. | Termination | 24 |
| Section 13.6. | Claims of the Members or Third Parties | 25 |
| Section 13.7. | Distributions In-Kind | 25 |
| Article 14 MISCELLANEOUS | | 25 |
| Section 14.1. | Notices | 25 |
| Section 14.2. | Failure to Pursue Remedies | 25 |
| Section 14.3. | Cumulative Remedies | 25 |
| Section 14.4. | Binding Effect | 26 |
| Section 14.5. | Interpretation | 26 |
| Section 14.6. | Severability | 26 |
| Section 14.7. | Counterparts | 26 |
| Section 14.8. | Integration | 26 |
| Section 14.9. | Governing Law | 26 |
| Section 14.10. | Partition of Property | 26 |
| Section 14.11. | Third Party Beneficiaries | 26 |

**TABLE OF CONTENTS**
(cont.)

Page

Section 14.12.   Effect of Waiver or Consent ...................................................................... 26

Section 14.13.   Trial Arbitration/Waiver of Jury Trial .......................................................... 26

Section 14.14.   Legal Counsel .............................................................................................. 28

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## EUFORA, L.L.C.

THIS AMENDED AND RESTATED OPERATING AGREEMENT of Eufora, L.L.C., an Arizona limited liability company, is entered into as of February 23, 2009 by and among the Company and the Members listed on Schedule A attached hereto.

### Recitals

**WHEREAS**, the Members entered into that certain Operating Agreement, dated as of August 16, 2002 (the "Original Operating Agreement"); and

**WHEREAS**, the Members desire to amend and restate the Original Operating Agreement and for that purpose have entered into this Agreement.

### Agreement

**NOW THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

Section 1.1.    Definitions.   Unless the context otherwise requires, the terms defined in this Article 1 shall, for the purposes of this Agreement and any schedules and/or exhibits attached hereto, have the meanings herein specified.

"AAA" shall have the meaning set forth in Section 14.13.

"Act" means Chapter 4 of Title 29, Sections 29 601 et seq., Arizona Revised Statutes, as amended from time to time.

"Additional Members" shall have the meaning set forth in Section 5.4(a).

"Adjusted Capital Account Deficit" means a deficit balance in a Member's Capital Account after giving effect to any amounts the Member is obligated to contribute or restore to the Company pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), and subsequently such Member's share of the items described in Treasury Regulation Sections 1.704-2(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means with respect to a Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise. Ownership of more than fifty percent (50%) of the beneficial interests of an entity shall be conclusive evidence that control exists. For purposes of this definition, "Affiliate" shall include, with respect to any natural Person, the spouse, parents, siblings and children of such Person.

"Agreement" means this amended and restated operating agreement, as amended, modified, supplemented or restated from time to time.

"Approval of the Members," "Approved by the Members" and "Consent of the Members" or words of similar import, whether or not appearing with the initial letter capitalized, shall mean the approval of the Members holding a majority of the Units.

"Articles" means the Articles of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the state of Arizona pursuant to the Act.

"Assignment Notice" shall have the meaning set forth in Section 7.6(a).

"Bankruptcy" means, with respect to a Member or the Company, the happening of any of the following: (i) the making of a general assignment for the benefit of creditors; (ii) the filing of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing an inability to pay debts as they become due; (iii) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Company or a Member to be bankrupt or insolvent; (iv) the filing of a voluntary petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) the filing of an answer or other pleading admitting the material allegations of, consenting to or defaulting in answering an involuntary bankruptcy petition filed against the Company or a Member in any bankruptcy proceeding; (vi) the filing of a voluntary application or other pleading or any action otherwise seeking, consenting to or acquiescing in the appointment of a liquidating trustee, receiver or other liquidator of all or any substantial part of the Company's or a Member's properties; (vii) the commencement against the Company or a Member of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation which has not been quashed or dismissed within one hundred eighty (180) days; or (viii) the appointment without the consent of the Company or such Member or acquiescence in the appointment of a liquidating trustee, receiver or other liquidator of all or any substantial part of the Company's or a Member's properties without such appointment being vacated or stayed within ninety (90) days and, if stayed, without such appointment being vacated within ninety (90) days after the expiration of any such stay.

"Board of Managers" shall have the meaning set forth in Article 6.

"Business" shall have the meaning set forth in Section 3.1(a)(i).

"Business Day" means a day other than a Saturday, Sunday or a legal holiday as recognized in the state of Arizona.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the provisions of Article 4 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company pursuant to Article 4 hereof with respect to such Member's Interest, reduced, in the case of a contribution of property, by the amount of any liabilities of such Member that are assumed by the Company in connection with such contribution or that are secured by any property contributed by such Member to the Company.

"Capital Proceeds" means the net proceeds from a Capital Transaction net of (i) any expenses incurred in connection with the Capital Transaction and (ii) the payment of any outstanding debts of the Company.

"Capital Transaction" means (i) any merger or consolidation of the Company with another Person in which the outstanding Units of the Company are converted into or exchanged for securities or other consideration issued, or caused to be issued, by the other Person and, as a result of which transaction, the Members own 50% or less of the voting power of the surviving entity, (ii) a sale, transfer, lease, exclusive license or other disposition (other than a pledge or grant of a security interest to a bona fide

lender) of all or substantially all of the assets of the Company; or (iii) the receipt of proceeds from a refinancing of the Company's assets as determined in the sole discretion of the Board of Managers.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement.

"Company" means Eufora, L.L.C., an Arizona limited liability company.

"Company Minimum Gain" shall have the same meaning as the meaning of "partnership minimum gain" set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Company Nonrecourse Liability" shall have the same meaning as the meaning of "partnership nonrecourse liability" set forth in Treasury Regulation Section 1.704-2(b)(3).

"Confidential Information" means data and information relating to the Company and which has material value to the Company and is not generally known to its competitors.  Confidential Information does not include any data or information that has been voluntarily disclosed to the public by the Company or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

"Covered Person" means a Manager; a Member; any Affiliate of a Member; any officers, directors, shareholders, partners, employees, representatives or agents of a Member; any employee or agent of the Company or its Affiliates; any Tax Matters Member of the Company; or any officer of the Company that is not an employee.

"Damages" shall have the meaning set forth in Section 12.2(a).

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided, further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Eufora Capital" shall have the meaning set forth in Section 3.1(a)(ii).

"Eufora Capital Interest" shall have the meaning set forth in Section 3.1(a)(iv).

"Eufora Capital LLC Agreement" shall have the meaning set forth in Section 3.1(a)(iv).

"Family Member" shall have the meaning set forth in Section 7.2(a).

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2001; and (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31.

"Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Board of Managers;

(b)     the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or in exchange for services; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to Clause (i) and Clause (ii) of this sentence shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c)     the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Board of Managers.

(d)     The Gross Asset Values of Company assets shall be adjusted to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Gross Revenue" means the gross revenue of the Company for each Fiscal Year, or part thereof, arising from the Company's business other than Capital Contributions and proceeds from loans; provided, that with respect to revenue of the Company from Eufora Capital, such Gross Revenue shall include only the distributions actually received by the Company in accordance with the Eufora Capital LLC Agreement, and not any other Eufora Capital revenue.

"Guaranty" shall have the meaning set forth in Section 3.1(a)(ii).

"Guaranty Documents" shall have the meaning set forth in Section 3.1(a)(iii).

"Indebtedness" shall have the meaning set forth in Section 3.1(a)(ii).

"Indemnitees" shall have the meaning set forth in Section 12.7.

"Indemnitor" shall have the meaning set forth in Section 12.7.

"Interest" means, with respect to any Member, such Member's: (i) interest in the Company's capital; (ii) share of the Company's net Profits and net Losses (and specially allocated items of income, gain and deduction), and the right to receive distributions of Net Cash Flow from the Company; (iii) right to inspect the Company's books and records; and (iv) right to participate in the management of and vote on matters coming before the Members, each to the extent permitted by, and as provided in, this Agreement.

"Interest Holder" shall have the meaning set forth in Section 7.2(a).

"Lender" shall have the meaning set forth in Section 3.1(a)(ii).

"Liquidating Trustee" shall have the meaning set forth in Section 13.4(a).

"Manager" means a member of the Board of Managers.

"Member" means any Person executing this Agreement and any Person admitted as an Additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as a Member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as Members of the Company.

"Member Nonrecourse Debt" has the meaning set forth for "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" shall have the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2).

"Minimum Distributions" shall have the meaning set forth in Section 8.2.

"NCMA" means Neptune Company Management Advisors, LLC, a Delaware limited liability company.

"Net Cash Flow" means, for each calendar month, Fiscal Year or other period of the Company for which it must be determined, the Gross Revenue of the Company from all sources, other than Capital Proceeds, less all Operating Expenditures, provided that Net Cash Flow shall not include unexpended Capital Contributions or loan proceeds unless determined by the Board of Managers.

"Note" shall have the meaning set forth in Section 3.1(a)(ii).

"Notice of Mediation/Arbitration" shall have the meaning set forth in Section 14.13.

"Operating Expenditures" means the expenditures of the Company for each Fiscal Year, or part thereof, arising from the Company's business, including, but not limited to, the following:

(a) general operating expenses including, but not limited to, management, legal, accounting and other professional fees, wages, salaries and other compensation in connection with its business operations; all monies expended to comply with and perform contractual and other obligations; and any other expenses expended on behalf of the Company in relation to its general administrative and management needs;

(b) payments of principal and interest upon any indebtedness of the Company (whether third-party indebtedness or loans made to the Company by Members or their Affiliates pursuant to this Agreement);

(c) any other cash expended by the Company for business operations, including, without limitation, capital expenditures; and

(d) the establishment of appropriate reserves for debt service, to provide working capital or any other contingency of the Company as determined by the Board of Managers.

"Percentage Interest" means a Member's Percentage Interest as described in Schedule A, as amended from time to time in accordance with this Agreement. A Member's Percentage Interest shall equal the number of Units held by such Member divided by the number of Units then outstanding.

"Permitted Assignee" shall have the meaning set forth in Section 7.2(a).

"Person" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

"Profits" or "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a)    any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)    in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)    gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" above; and

(f)    notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 9.2 hereof shall not be taken into account in computing Profits or Losses.

"Regulatory Allocations" shall have the meaning set forth in Section 9.2(i).

"Selling Member" shall have the meaning set forth in Section 7.6(a).

"Tax Matters Member" shall have the meaning set forth in Section 11.4(a).

"Transfer" means any transfer, assignment, sale, conveyance, hypothecation, license, lease, partition, pledge, grant of an option or grant of a security interest in a Member's Interest in the Company, and includes any "involuntary transfer" such as a sale of any part of the Interest therein in connection with any bankruptcy or similar insolvency proceedings, or any other disposition or encumbrance of a Member's Interest.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Units" means units representing Interests.

"Unrecovered Capital" means the aggregate Capital Contributions of a Member reduced by (i) distributions pursuant to Section 8.1(a), to the extent such distributions exceed the allocation of Profits to such Member, and (ii) distributions pursuant to Section 8.1(b)(i).

"Warrant" means the right of the Warrantholder to acquire Units pursuant to the Warrant Agreement.

"Warrantholder" means B. Nerguizian LLC, an Arizona limited liability company, d/b/a Neptune Company.

"Warrant Agreement" means that certain Warrant Agreement, dated on or about February 23, 2009, by and between the Warrantholder and the Company.

"Warrant Units" shall have the meaning set forth in Section 4.5(b).

## ARTICLE 2
## CONTINUATION OF COMPANY AND TERM

Section 2.1.    Continuation of Company.

(a)    The Members hereby agree to continue the Company as a limited liability company pursuant to the provisions of the Act, and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein.  An authorized person has previously filed the Articles.

(b)    The name and mailing address, the total Capital Contributions and the Capital Accounts of each Member as of the date of this Agreement are listed on Schedule A attached hereto. The Board of Managers shall update Schedule A, from time to time, as may be necessary to accurately reflect the agreements of the Members with respect to the information therein or to add any Additional Members admitted to the Company in accordance with this Agreement.  Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A, as amended and in effect from time to time.

Section 2.2.    Name.  The business and affairs of the Company shall be conducted under the name "Eufora, L.L.C." unless the Board of Managers determines to use a different name.   The Company's officers shall execute such assumed or fictitious name certificates as may be desirable or required by law to be filed in connection with the formation of the Company and shall cause such certificates to be filed in all appropriate public records.

Section 2.3.    Term.  The term of the Company commenced on the date the Articles were filed and shall continue as provided in Section 13.2, unless the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.4.    Known Place of Business; Statutory Agent; Principal Office; Other Offices.  The known place of business of the Company required by the Act to be maintained in the state of Arizona shall be the office of the initial statutory agent named in the Articles or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in the manner provided by law.  The statutory agent of the Company in the state of Arizona shall be the initial statutory agent named in the Articles or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by law.  The principal office of the Company shall be at such place as the Board of Managers may designate from time to time, which need not be in the state of Arizona, and the Company shall maintain records there and at the Company's known place of business.  The Company may have such other offices as the Board of Managers may designate from time to time.

Section 2.5.    No State Law Partnership.  The Company is an Arizona limited liability company that will be treated as a partnership only for federal income tax purposes and, if applicable, state income tax purposes and no Member or Manager shall be deemed to be a partner or joint venturer of any other Member or Manager for any purposes other than federal income tax purposes and, if applicable, state income tax purposes, and this Agreement shall not be construed to suggest otherwise.  The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

Section 2.6.    Qualification in Other Jurisdictions.  The Board of Managers shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business.  The officers of the Company shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 2.7.    Business Transactions with Company.  Any Member and any affiliated person may engage in business transactions of any kind whatsoever with the Company.  Such dealings shall be on terms no less favorable to the Company than those that could be obtained from an unaffiliated party.  Any such transaction shall be approved by a vote of the Members.

**ARTICLE 3**
**PURPOSES AND POWERS OF THE COMPANY**

Section 3.1.    Purposes.

(a)    The purposes of the Company are to engage in any lawful business except such business as the Board of Managers shall otherwise prohibit, including the following activities:

(i)    to market to prospective customers who will be issued a pre-paid MasterCard with "Credit Builder," or any similar debit card arrangement with MasterCard or any other institution that may or may not permit the holder to establish credit history with the "Credit Builder" program or any derivation thereof, upon receipt of a duly executed and qualified application (the "Business");

(ii)    to guarantee indebtedness (the "Indebtedness") of Eufora Capital II, LLC, a Delaware limited liability company ("Eufora Capital"), in the maximum principal amount outstanding at any one time of Three Million Dollars and Zero Cents ($3,000,000.00), which Indebtedness is evidenced by a Multiple Advance Note (the "Note") made by Eufora Capital in favor of Neptune Company Asset Holdings, LLC (together with its successors and/or assigns, the "Lender"), pursuant to that certain Guaranty (the "Guaranty"), dated on or about February 23, 2009, made by the Company in favor of the Lender;

(iii)    to execute, deliver and perform (A) the Guaranty and (B) such other agreements, documents, instruments, certificates or papers required by the Lender or in furtherance of the foregoing, including, without limitation, (1) that certain Security Agreement, dated on or about February 23, 2009, by and between the Company and the Lender; and (2) that certain Pledge Agreement, dated on or about February 23, 2009, by and between the Company and the Lender (collectively, the "Guaranty Documents");

(iv)    to hold a membership interest in Eufora Capital (the "Eufora Capital Interest") pursuant to that certain Limited Liability Company Agreement, dated on or about February 23, 2009, by and between the Company and NCMA, as amended, modified, supplemented or restated from time to time (the "Eufora Capital LLC Agreement");

(v)     to pledge the Eufora Capital Interest pursuant to the Guaranty Documents;

(vi)     to comply with all of the provisions set forth in the Eufora Capital LLC Agreement, including, without limitation, Section 5.5 thereof; and

(vii)     to do such other things and carry on any other activities which the Board of Managers determines to be necessary, convenient or incidental to any of the foregoing purposes, and have and exercise all of the power and rights conferred upon limited liability companies formed pursuant to the Act in furtherance of the foregoing.

(b)     The Company, by or through the Managers on behalf of the Company, may enter into and perform the Guaranty Documents and all documents, agreements, certificates or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of the Members notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not, subject to the terms and conditions contained herein, be deemed a restriction on the powers of the Managers to enter into any other agreements on behalf of the Company. All actions taken by the Managers on behalf of the Company or on behalf of any of its Affiliates prior to the date hereof, to effect the transactions contemplated by the Guaranty Documents, are hereby ratified, approved and confirmed in all respects.

(c)     In no event shall this Agreement be held or construed to imply the existence of a general partnership or joint venture among the Members with regard to matters, trades, businesses or enterprises outside the scope of the Company, and no Member shall have any power or authority under this Agreement to act as the agent or representative of the Company or any other Member with regard to any matter beyond the scope of the Company, or as the agent or representative of any other Member on any matter. Without limiting the foregoing, the Members specifically acknowledge that the Managers shall only be required to spend such time on the affairs of the Company as is reasonably necessary to perform their duties and obligations hereunder and shall not be required to manage the Company as their sole and exclusive function and may engage in other business and investment activities. Neither the Company nor any Member shall have any right, solely by virtue of this Agreement or its relationship to the other Members or the Company, to share or participate in any such other investments or activities of the Members or their Affiliates or to the income or proceeds derived therefrom. Without limiting the foregoing, and subject to the right of first refusal of the Warrantholder and/or NCMA set forth in Section 5.5(c) of the Eufora Capital LLC Agreement to the extent applicable, the parties acknowledge that the Company or its affiliates may participate in separate ventures through one or more other entities, including without limitation Eufora Capital even if competitive with the Company of its business, and the Members hereby waive any fiduciary or other obligation that might preclude them from doing so.

Section 3.2.     Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes set forth in Section 3.1, including, but not limited to, the power:

(a)     to conduct the business of the Company, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)     to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, pledge, mortgage, transfer, demolish or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(c)     to enter into, perform and carry out contracts of any kind, including contracts with any Member or Affiliate thereof, necessary to the accomplishment of the purposes of the Company;

(d)     to sue and be sued, make claims and defend, and participate in administrative or other proceedings, in its name;

(e)     to appoint agents of the Company, and define their duties and fix their compensation;

(f)     subject to the provisions of Article 12, to indemnify certain Persons in accordance with the Act and to obtain any and all types of insurance;

(g)     to borrow money and issue evidences of indebtedness, including loans from any Member or Affiliate thereof, and to secure any of the same by a deed of trust, mortgage, pledge or other lien on the assets of the Company;

(h)     to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(i)     to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purposes of the Company.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS, MEMBER INTERESTS, CAPITAL ACCOUNTS

Section 4.1.    Capital Contributions.    The Members have made the respective Capital Contributions to the Company in the amounts set forth on Schedule A hereto. Each Member shall have the Percentage Interest and the number of Units set forth on Schedule A hereto. In the event that the Board of Managers admits Additional Members, such Additional Members shall make Capital Contributions as determined by the Board of Managers in its sole discretion. The Members may, but shall not be required to, make additional Capital Contributions with the consent of the Board of Managers.

Section 4.2.    Member's Units.    A Member's Units shall for all purposes be personal property. A Member has no interest in specific property, unless and until distributed to such Member.

Section 4.3.    Status of Capital Contributions.

(a)     Except as otherwise provided in this Agreement, no Member, or the successor or assign of a Member, may demand a return of its Capital Contributions, in whole or in part.

(b)     No Member or Affiliate thereof shall receive any interest, return, compensation or drawing with respect to its Capital Contributions or its Capital Account or for services rendered or resources provided on behalf of the Company, except as otherwise specifically provided in this Agreement or except as otherwise approved by the Board of Managers.

(c)     No Member shall have any personal liability for the repayment of any other Member's Capital Contribution.

Section 4.4.    Capital Accounts.

(a)     A separate Capital Account shall be established and maintained for each Member. The original Capital Account established for any Member who acquires Units by virtue of a Transfer in accordance with the terms of this Agreement shall be in the same amount as and shall replace the Capital Account of the assignor of such Units, and, for purposes of this Agreement, such Member shall be deemed to have made the Capital Contributions made by the assignor of such Units (or made by such assignor's predecessor in interest). To the extent such Member acquires less than all of the Units of the assignor of the Units, the original Capital Account of such Member and its Capital

Contributions shall be in proportion to the Units it acquires, and the Capital Account of the assignor who retains Units, and the amount of its Capital Contributions, shall be reduced in proportion to the Units it retains.

(b)     The Capital Account of each Member shall be maintained in accordance with the following provisions:

(i)     to such Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits, special allocations of income and gain and the net amount of any Company liabilities that are assumed by such Member or that are secured by any Company assets distributed to such Member;

(ii)     to such Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses, special allocations of loss and deduction and the net amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company; and

(iii)     in determining the amount of any liability for purposes of this Section 4.4(b), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

Section 4.5.     Warrant.

(a)     The Board of Managers has caused the Company to issue the Warrant in connection with the Guaranty.  Such Warrant has the terms and conditions as set forth in the Warrant Agreement.

(b)     The Warrant provides that the Warrantholder may purchase up to 100,000 Units of the Company (the "Warrant Units"), which Warrant Units, as of the date of this Agreement, represent a Percentage Interest equal to 10.0%.  If the Company issues additional Units after the date of this Agreement in accordance with Section 5.4 below and the Percentage Interest of each Member is diluted (other than as set forth in Section 4 of the Warrant Agreement), the Percentage Interest represented by the Warrant Units shall be proportionately diluted; provided, that the number of Warrant Units shall not be adjusted upon the issuance of such additional Units.

(c)     Upon exercise of the Warrant, in whole or in part, (i) the Company shall issue the number of Warrant Units for which the Warrant is exercised, (ii) the Warrantholder shall execute a joinder agreement to this Agreement; (iii) the Company shall designate the Warrantholder as a Member on an amended Schedule A (which shall set forth the number of Units, Percentage Interest, Capital Contribution and Capital Account of the Warrantholder as of the date of such exercise); and (iv) the Warrantholder shall become a Member with all of the rights and obligations of a Member hereunder.  Upon the exercise of the Warrant, the Gross Asset Value of the Company assets shall be adjusted as provided in the definition of Gross Asset Value herein, and the Warrantholder shall receive a Capital Account equal to its Percentage Interest after the exercise of the Warrant of all of the Capital Accounts of the Members in accordance with Proposed Treasury Regulation Sections 1.704-1(b)(2)(iv)(d)(4), (h)(1) and (2), and 1.704-1(b)(4)(ix) and (x) or any subsequent Proposed or Final Treasury Regulations dealing with noncompensatory options.

**ARTICLE 5**
**MEMBERS, MEETINGS AND AMENDMENTS**

Section 5.1.     Powers of Members.  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

Section 5.2.    Resignation.  Except as expressly provided in this Agreement, a Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company.  If a Member resigns or withdraws in violation of the foregoing prohibition, such Member shall not be entitled to receive any compensation, shall not be able to exercise any of the rights granted to such Member under this Agreement, shall not be relieved of any obligations under this Agreement and shall not receive any distribution from the Company until the Company is dissolved pursuant to Article 13.

Section 5.3.    Meetings or Other Approvals of the Members.

(a)    A meeting of the Members may be called at any time by the Board of Managers.

(b)    Each meeting of the Members shall be called with at least five (5) Business Days but not more than thirty (30) Business Days written notice, specifying the agenda for the meeting.  Such notice may be waived by a Member at any time, and will be deemed to have been waived if the Member participates in the meeting and has been provided with a written agenda for the meeting.  Meetings may also be held telephonically whereby each of the Members can hear each of the other Members.  The Board of Managers shall establish all other provisions relating to meetings of Members, including the time, place or purpose of any meeting at which any matter is to be voted on by any Members, voting in person or by proxy or any other matter with respect to the exercise of any such right to vote.  Except as expressly provided in this Agreement, actions of the Members shall be taken by the Approval of the Members.  Any action to be taken at any meeting of the Members may be taken without a meeting, and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the Members holding not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting.  The Company's Secretary or such other officer designated by the Board of Managers shall be responsible for taking minutes of the Member meetings and safekeeping them on behalf of the Company, if requested to do so, by the Board of Managers.

Section 5.4.    Additional Members; Additional Units.

(a)    The Company, upon the approval of the Board of Managers as set forth in Section 6.3, is authorized to issue additional Units (including pursuant to warrants) and admit any Person as an additional member of the Company (each, an "Additional Member" and collectively, the "Additional Members") or to issue additional Units to an existing Member.  Each such Person shall be admitted as an Additional Member at the time such Person (i) executes a signature page, agreeing to be bound by this Agreement, and (ii) is designated as a Member (with a corresponding Percentage Interest) on an amended or supplemental Schedule A hereto.  The Board of Managers may issue Units to an existing Member or to an Additional Member in exchange for cash, property or services or any combination thereof, at the sole discretion of the Board of Managers.  Such Units issued to an Additional Member or an existing Member shall (i) have the same rights, and be subject to all of the same terms and conditions, as all other Units as set forth in this Agreement; and (ii) dilute the existing Members' Percentage Interests proportionately (unless and to the extent certain existing Members shall agree to be disproportionately diluted).

(b)    Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other items; provided, that, subject to the restrictions of Section 706(d) of the Code, Additional Members shall be entitled to their respective share of the Company's income, gains, losses, deductions, credits and other items arising under contracts entered into before the effective date of the admission of such Additional Members to the extent that such income, gains, losses, deductions, credits and other items arise after such effective date.  To the extent consistent with Section 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time Additional Members are admitted (as though the Company's tax year had ended) or the Company may credit to the Additional Members pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the admission of the Additional Members.

Section 5.5.    Amendments.    The Board of Managers may amend this Agreement or the Articles if the amendments (i) are of a ministerial nature or (ii) are necessary or desirable to comply with any applicable law or governmental regulation. All other amendments shall be adopted and be effective as an amendment thereto only if it receives the Approval of the Members (which Approval of the Members, while the Warrant is outstanding, shall include the Warrantholder as a Member solely for purposes of determining whether the requisite percentage has approved the amendment as contemplated by Section 5 of the Warrant Agreement).

Section 5.6.    Confidentiality Obligations of Members.    Each Member expressly covenants and agrees that neither such Member nor any of its Affiliates (to the extent any such Affiliate has received Confidential Information) will disclose, divulge, furnish or make accessible to anyone (other than the Company or any of its Affiliates or representatives) any Confidential Information, or in any way use any Confidential Information in the conduct of any business except on behalf of the Company; provided, however, that nothing in this Section 5.6 will prohibit the disclosure of any Confidential Information (a) which is required to be disclosed by the Member or any such Affiliate in connection with any court action or any proceeding before any judicial or similar authority or under any applicable law or regulation; (b) in connection with the enforcement of any of the rights of the Member hereunder; (c) to the extent required by federal or state securities laws; (d) in connection with the defense by the Member of any claim asserted against it hereunder; or (e) as necessary to conduct the Company's business or to obtain loans for the Company; provided, further, however, that in the case of a disclosure contemplated by Clause (a), to the extent reasonably practicable no disclosure shall be made until the Member shall give notice to the Company of the intention to disclose such Confidential Information so that the Company may contest the need for disclosure, and the Member will cooperate (and will cause its Affiliates and their respective representatives to cooperate) with the Company in connection with any such proceeding, all such cooperation at the expense of the Company.

## ARTICLE 6
## MANAGEMENT

Section 6.1.    Management of the Company.

(a)    The business and affairs of the Company shall be managed by a Board of Managers, which shall be comprised of five (5) Managers.  The Managers immediately following execution of this Agreement shall be Tommy Constantine, Mark D'Ambrosio, Carlton R. Gentry, Tim Gaam and Brent Nerguizian.  Subject to this Article 6, the Board of Managers shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise.

(b)    Each of the Managers shall serve until (i) he or she is removed by the Members as set forth below; (ii) he or she dies, resigns or is removed because he or she is deemed disabled and incapable of performing services as a member of the Board of Managers in the opinion of a physician selected by all of the other Managers; or (iii) with respect to Brent Nerguizian, until such time as the principal amount and all accrued interest under the Note has been repaid.  A Manager may be removed upon the Approval of the Members and his or her successor may be elected by such Members; provided, however, that the Members may not remove Brent Nerguizian from the Board of Managers, until such time as the principal amount and all accrued interest under the Note has been repaid. Upon the death, resignation or disability of a Manager, the remaining Managers may, in their sole discretion, elect a substitute Manager; provided, however, that in the event that of the death, resignation, or disability of Brent Nerguizian, the substitute Manager shall be elected by the Lender, until such time as the principal amount and all accrued interest under the Note has been repaid.  A Manager may resign at any time by giving at least five (5) days written notice to the other Managers.  Unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective.

(c)    The Board of Managers may, from time to time, elect to increase the number of Managers.  Such additional Managers shall be selected by the Board of Managers.

(d)     Except as otherwise provided in this Agreement, no decision of the Board of Managers shall be made except at a meeting duly called with at least three (3) Business Days written notice, specifying the agenda for the meeting (which notice may be waived by any of the Managers, and such notice and agenda requirements will be deemed to have been waived if a Manager participates in the meeting and has been provided with an agenda for the meeting, unless the Manager objects at the outset of such meeting).  Meetings may be held telephonically whereby each of the Managers can hear the other Managers.  Except as expressly provided in <u>Section 6.3</u>, the vote of a majority of the Managers in attendance at a meeting of at least a majority of the Managers shall constitute action by the Company.  Any action to be taken at any meeting of the Board of Managers may be taken without a meeting, and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by all of the Managers.  The Company's Secretary shall be responsible for taking minutes of the meetings and safekeeping them on behalf of the Company.

(e)     The Board of Managers may appoint individuals with such officer titles as it may select, including the titles of Chairman, Vice Chairman, Chief Executive Officer, President, Vice President, Treasurer and Secretary, to act on behalf of the Company, with such power and authority with respect to the Company as the Board of Managers may delegate to any such Person.  No officer need be a resident of the state of Arizona, a Member or a Manager.  Any officers so designated shall have such authority and perform such duties as the Board of Managers may, from time to time, delegate to such officer.  Unless the Board of Managers otherwise decides, if an officer title assigned to a particular individual is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to (i) any specific delegation or limitation of authority and duties made to such officer by the Board of Managers pursuant to this <u>Section 6.1(e)</u> and (ii) any limitation on the authority of the Board of Managers pursuant to <u>Section 6.3</u> or <u>Section 6.4</u>.  Each officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board of Managers.  Any officer may be removed at any time, with or without cause, by the Board of Managers and his or her replacement may be selected and approved by the Board of Managers at the time of or subsequent to such removal.

Section 6.2.     <u>No Management by Other Persons</u>.  Except as described in this Agreement or as authorized by further action of the Board of Managers under the provisions of this Agreement, no Person other than the Managers and the duly authorized officers, employees and agents of the Company, if any, shall take part in the management or the operation or control of the business and affairs of the Company or have any right, power or authority to transact any business in the name of the Company or to act for on behalf of or to bind the Company.

Section 6.3.     <u>Major Decisions of the Board of Managers</u>.  The Company shall not take the following actions without the approval of the Board of Managers (which approval, while Brent Nerguizian is a Manager and as long as the Note is outstanding, must include the approval of Brent Nerguizian):

(a)     Settling any legal claim of the Company involving payment or forbearance in excess of $50,000 other than settlements made in the normal course of business;

(b)     Making modifications or amendments to the terms of the Guaranty Documents;

(c)     Commencing any Bankruptcy proceeding with respect to the Company;

(d)     Engaging in any Capital Transaction;

(e)     Dissolving the Company;

(f)      Amending, modifying, supplementing, or restating this Agreement to (i) amend, alter, change, modify, or affect in any way (A) the economic rights of the Members or the Warrantholder; (B) the rights of the Warrantholder; (C) the rights of the Lender or the obligations of the Company pursuant to the Guaranty, the Guaranty Documents, and/or the Eufora Capital LLC Agreement; or (D) the indemnification rights of any Covered Person; or (ii) amend, modify, supplement, or restate any provision of this Article 6 in any way;

(g)      Amending, modifying, supplementing, or restating the Articles;

(h)      Changing the name, legal structure, place of business (or chief executive office of the Company if the Company has more than one place of business), or jurisdiction of organization of the Company; or

(i)      Certificating the Units or otherwise "opting in" to Article 8 of the UCC.

Section 6.4.    Major Decisions of the Members.  The Company shall not take the following actions without the Approval of the Members:

(a)      Merging or consolidating the Company with another Person; or

(b)      A sale of all or substantially all of the Company's assets.

Section 6.5.    Reliance by Third Parties.  Any Person dealing with the Company or the Board of Managers may rely upon a certificate signed by the Managers as to:

(a)      the identity of the Managers;

(b)      the existence or non existence of any fact or facts which constitute a condition precedent to acts by the Board of Managers in any other manner germane to the affairs of the Company;

(c)      the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)      any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

## ARTICLE 7
## ASSIGNABILITY OF MEMBER INTERESTS

Section 7.1.    Assignability of Interest.  No Member may Transfer the whole or any part of its Interest or any fractional or beneficial interest therein, except in accordance with all of the provisions of this Article 7, including without limitation the provisions set forth in Section 7.6.  If a Member Transfers its Interest in accordance with this Article 7, such Transfer shall, nevertheless, not entitle the assignee to become a substitute Member or to be entitled to exercise or receive any of the rights, powers or benefits of a Member other than the right to receive distributions to which the assigning Member would be entitled, unless (a) the assigning Member designates, in a written instrument delivered to the Board of Managers, its assignee to become a substitute Member and the Board of Managers consents to the admission of such assignee as a Member; and (b) such assignee executes an instrument reasonably satisfactory to the Board of Managers which shall at a minimum include an acceptance and agreement by such assignee to abide by all the terms and conditions of this Agreement.  The Transfer shall be conditioned upon the Company receiving a commitment from such assignee or the assigning Member sufficient to cover all reasonable expenses of the Company in connection with such assignee's admission as a substitute Member.

Section 7.2.    Permitted Transfers.

(a)    Notwithstanding the foregoing, a Member shall be permitted to assign, at any time and from time to time, all or any part of its Interest to a Permitted Assignee, and a holder of a direct or indirect interest in a Member (an "Interest Holder") shall be permitted to assign, at any time and from time to time, all or any part of its interest in such Member to a Permitted Assignee. For this purpose "Permitted Assignee" means, with respect to a particular Member or an Interest Holder, a Person that is (i) a spouse or a natural or adoptive lineal ancestor or descendant of such Member or Interest Holder (a "Family Member"); (ii) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or Interest Holder, or one or more Family Members or other Permitted Assignees of such Member or Interest Holder; (iii) an Affiliate of such Member or Interest Holder; (iv) an existing Member; and (v) a Person succeeding to the interest of a Member or of any Interest Holder of a Member as the result of the death of any other Person by will or intestacy or distribution from a trust without any payment of consideration by such Person. The subsequent Transfer of any Interest by a Permitted Assignee shall be subject to the same restrictions of this Article 7 in the same manner as if the Interest to be Transferred was still owned by the Member from whom such Permitted Assignee acquired such Interest; and for this purpose references herein to a Transfer by a Member shall include any Transfer by the Permitted Assignee(s) that acquired such Member's Interest.

(b)    If a Member Transfers all or a portion of its Interest in the Company to a Permitted Assignee, such Permitted Assignee shall become a substitute Member upon the execution by such Permitted Assignee of an instrument reasonably satisfactory to the Board of Managers which shall at a minimum include an acceptance and agreement by the Permitted Assignee to abide by all the terms and conditions of this Agreement. Such Permitted Assignee shall be admitted to the Company effective immediately prior to the effective date of the assignment (as set forth in Section 7.4 hereof), and, immediately following such admission, the assigning Member shall cease to be a Member of the Company to the extent of the portion of the Interest assigned hereunder.

Section 7.3.    Recognition of Assignment by Company or Other Members.    No Transfer of an Interest that is in violation of this Article 7 shall be valid or effective, and the Company shall not recognize the same for any purpose of this Agreement, including the purpose of making distributions of Net Cash Flow or Capital Proceeds pursuant to this Agreement with respect to such Interest or part thereof. No liability shall be incurred as a result of refusing to make any such distributions to the assignee of any such invalid assignment.

Section 7.4.    Effective Date of Assignment.    Any valid Transfer of a Member's Interest (or part thereof) pursuant to the provisions of this Article 7 shall be effective as of the close of business on the day preceding the closing of the transaction evidencing the Transfer. The Company shall, from the effective date of such Transfer, thereafter pay all further distributions on account of the Interest (or part thereof) so assigned to the assignee of such Interest (or part thereof). As between any Member and its assignee, the profits and losses of the Company for federal, state and local income tax purposes for the Fiscal Year of the Company in which such assignment occurs shall be apportioned for federal income tax purposes in accordance with any convention permitted under Section 706(d) of the Code and selected by the Board of Managers.

Section 7.5.    Limitations on Transfer.    No Transfer of Interest may be effectuated unless in the opinion of the Company's counsel the Transfer (a) would not result in the close of the Company's tax year or the termination of the Company within the meaning of Section 708(b) of the Code; (b) would comply with the Securities Act of 1933, as amended, and applicable securities laws of any other jurisdiction; (c) would not violate any other applicable laws, provided that the provisions of this Section 7.5 may be waived by the Board of Managers; and (d) would not result in twenty-five percent (25%) or more of the Units to be held, directly or indirectly, at any time by employee benefit plans or individual retirement accounts, or otherwise cause the assets of the Company or the Company to be classified as "plan assets" under the applicable ERISA rules and regulations promulgated by the U.S. Department of Labor.

Section 7.6.     Right of First Refusal.

(a)     Except in the case of an assignment to a Permitted Assignee, in the event of any proposed Transfer of all or any portion of a Member's Units (the "Transferred Units"), the Member proposing to make such Transfer (the "Selling Member"), or the third party succeeding thereto as a result of an "involuntary transfer," shall give to the Company a written notice ("Assignment Notice") stating the terms of the proposed Transfer and the name, address and a resume for the Person(s) to whom the proposed Transfer would be made.  Such Assignment Notice shall constitute an irrevocable offer by the Selling Member to sell the Transferred Units to the Company or any assignee(s), upon the same terms and conditions as the Selling Member is willing to sell such Transferred Units to the proposed transferee.  Upon receiving the Assignment Notice, the Company (or any assignee(s) or designee(s) of the Company approved by the Board of Managers) shall have the right to purchase the Transferred Units on the terms and conditions contained in the Assignment Notice, for a period of sixty (60) days from the date that the Company receives the Assignment Notice.  If this right of first refusal is exercised, the closing shall occur within thirty (30) days of the exercise of such right of first refusal.

(b)     If the Company (or its assignee(s) or designee(s)) fails to exercise this right of first refusal within the sixty (60) day period, the Transferred Units covered by the Assignment Notice may then be assigned to the Person(s) described in the Assignment Notice for exactly the same consideration and other terms and conditions provided therein; provided, however, that such Person acquiring the Transferred Units shall not become a substitute Member unless he, she or it has been approved in such capacity under the preceding provisions of this Article 7, including without limitation the acceptance and agreement of the transferee to be bound by the provisions of this Agreement.  In the event that the Company (or its assignee(s) or designee(s)) does not exercise its right of first refusal, the proposed Transfer shall be closed within sixty (60) days following the sixty (60) day period described in Section 7.6(a).  If such closing does not occur within that time period, then the Transferred Units shall once again become subject to the restrictions of this Article 7 and this Agreement.

## ARTICLE 8
## DISTRIBUTIONS TO MEMBERS

Section 8.1.     Distributions.

(a)     Net Cash Flow.  Net Cash Flow shall be distributed in the sole discretion of the Board of Managers; provided, however, that no distributions shall be made to the Members, other than Minimum Distributions, until the principal amount and all accrued interest under the Note has been repaid.  Except as otherwise provided in this Article 8, all distributions of Net Cash Flow, other than upon a Capital Transaction or liquidation of the Company, shall be made to the Members in accordance with their Percentage Interests; provided, however, that no distribution shall be made to a Member to the extent that such distribution would result in such Member having an Adjusted Capital Account Deficit.

(b)     Capital Proceeds.  Except as otherwise provided in this Article 8, all distributions of Capital Proceeds upon the occurrence of a Capital Transaction shall be made to the Members as follows:

(i)     First, to the Members in accordance with their Unrecovered Capital, until the Unrecovered Capital of the Members is zero; and

(ii)     Second, to the Members in accordance with their Percentage Interests.

Section 8.2.     Tax Distributions.  Notwithstanding the foregoing, to the extent Net Cash Flow is available, the total distributions ("Minimum Distributions") to a Member for each Fiscal Year (and the 90-day period following such Fiscal Year) shall not be less than an amount equal to the product of (x) the Company's net taxable income allocated to such Member for such Fiscal Year and all prior Fiscal Years for federal income tax purposes, multiplied by (y) the highest marginal federal tax rate for an individual set

forth in Section 1 of the Code for ordinary income or capital gain, as the case may be, plus the rate of tax for residents of Arizona, after taking into account the federal income tax deduction for such taxes, reduced by all prior distributions pursuant to Section 8.1, regardless of the actual federal tax rates applicable to the Members. The Company will use reasonable best efforts to cause such distributions to be made in a manner which permits such Member to use the proceeds of such distributions to make on a timely basis all required estimated payments of income taxes in respect of the taxable income so allocated to them (including as soon as is reasonably feasible following the end of each calendar quarter, but in no event later than January 10, April 10, June 10 and September 10 of each calendar year). To the extent that such Minimum Distributions requirement increases the amount of distributed Net Cash Flow beyond the amount to which a Member would be entitled in the absence thereof, the excess portion shall be considered a prepayment of future distributions of Net Cash Flow allocable to such Member; provided, that adjustments to any such future distributions to that Member shall not decrease his, her or its aggregate Net Cash Flow distributions below an amount necessary to meet the Minimum Distribution requirement for such Member for subsequent Fiscal Years.

Section 8.3.    Withholding.  All amounts withheld pursuant to the Code or any provision of any foreign, state or local tax law or treaty with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members with respect to whom such withholdings were made pursuant to this Article 8 for all purposes of this Agreement.  The Company is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, foreign, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, foreign, state or local law or treaty and shall allocate such amounts to those Members with respect to which such amounts were withheld.  The Members shall cooperate with the Company to provide for withholding to the extent any withholding may be required at any time where corresponding distributions are not being made.

Section 8.4.    Limitations on Distribution.  Except as provided in this Agreement, no Member shall be entitled to any distribution of cash or other property from the Company.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its Interest in the Company if such distribution would violate the Act or other applicable law.

**ARTICLE 9**
**TAX ALLOCATIONS**

Section 9.1.    Profits and Losses.

(a)    The rules set forth below in this Section 9.1 shall apply for the purpose of determining each Member's allocable share of the items of income, gain, loss and expense of the Company comprising Profits or Losses of the Company for each taxable year, determining special allocations of other items of income, gain, loss and expense, and adjusting the balance of each Member's Capital Account to reflect the aforementioned general and special allocations.  For each taxable year, the special allocations in Section 9.2 shall be made immediately prior to the general allocations of Section 9.1.

(b)    For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Section 9.2 with respect to such Fiscal Year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 9.2) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (i) the amount which would be distributed to such Member, determined as if the Company were to sell all of its assets for the Gross Asset Value thereof and distribute the proceeds thereof pursuant to Section 13.4 hereof, minus (ii) the sum of (A) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Sections 1.704 2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according

to Treasury Regulation Section 1.704 2(I)) and (B) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

(c)    Notwithstanding anything to the contrary in this <u>Section 9.1</u>, the amount of items of Company expense and loss allocated pursuant to this <u>Section 9.1</u> to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any taxable year. All such items in excess of the limitation set forth in this <u>Section 9.1(c)</u> shall be allocated first to Members who would not have an Adjusted Capital Account Deficit, pro rata in proportion to their Capital Account balances.

Section 9.2.    <u>Special Allocations</u>    The following special allocations shall be made in the following order:

(a)    If there is a net decrease in Company Minimum Gain during a Company fiscal year so that an allocation is required by Treasury Regulation Section 1.704-2(f), then each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent fiscal years) equal to such Member's share of the net decrease in Company Minimum Gain as determined by Treasury Regulation Section 1.704-2(g). Such allocations shall be made in a manner and at a time which will satisfy the minimum gain chargeback requirements of Treasury Regulation Section 1.704-2(f) and this Section shall be interpreted consistently therewith.

(b)    If there is a net decrease in the Member Nonrecourse Debt Minimum Gain during any Company fiscal year, any Member who has a share of such Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Treasury Regulation Section 1.704-2(i)(5)) shall be specially allocated items of income or gain for such year (and, if necessary, subsequent fiscal years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Treasury Regulation Section 1.704-2(i)(4). This Section shall be interpreted in a manner consistent with such Treasury Regulations.

(c)    If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), any of which causes or increases an Adjusted Capital Account Deficit in such Member's Capital Account, then such Member will be specially allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance created or increased by such adjustment, allocation or distribution as quickly as possible; <u>provided, however</u>, an allocation pursuant to this <u>Section 9.2(c)</u> will be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 9</u> have been tentatively made as if this <u>Section 9.2(c)</u> were not in the Agreement.

(d)    Deductions attributable to any Nonrecourse Liability, as defined in accordance with Section 1.704-2(b)(3) of the Treasury Regulations shall be allocated among the Members in proportion to their respective Percentage Interests.

(e)    Deductions attributable to any Member Nonrecourse Debt shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i).

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if such gain or loss increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(g)     If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483, or 1271 through 1288 or corresponding provisions of subsequent federal income tax law, then any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, as appropriate.

(h)     In the event that a guaranteed payment to a Member is ultimately recharacterized (as the result of an audit of the Company's return or otherwise) as a distribution for federal income tax purposes, and if such recharacterization has the effect of disallowing a deduction or reducing the adjusted basis of any asset of the Company or a Member, then an amount of Company gross income equal to such disallowance or reduction shall be allocated to the recipient of such payment. In the event that a distribution to a Member is ultimately recharacterized (as a result of an audit of the Company's return or otherwise) as a guaranteed payment for federal income tax purposes, and if any such recharacterization gives rise to a deduction, such deduction shall be allocated to the recipient of the distribution.

(i)     For purposes of calculating a Member's share of "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulation Section 1.752-3(a)(3)), the Members intend that they be considered as sharing profits of the Company in proportion to their respective Percentage Interests.

(j)     The allocations set forth in this Section 9.2 (collectively the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Sections 1.704-1 and 1.704-2. Notwithstanding any other provisions of this Article 9 (other than the Regulatory Allocations), the Members shall, with the advice and assistance of the Company's tax accountants, take the Regulatory Allocations into account in allocating other Profits, Losses and items of income, gain, loss, deduction and Code Section 705(a)(2)(B) expenditures among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

Section 9.3.     Allocation and Other Rules.

(a)     In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Profits or Losses allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Percentage Interests during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Board of Managers.

(b)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any method that is permissible under Section 706 of the Code and the Treasury Regulations thereunder.

(c)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses for the Fiscal Year in question.

(d)     Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value at the time of its contribution to the Company. If the Gross Asset Value of any Company property is adjusted, as provided in Treasury Regulation Section 1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction shall be as provided in Code Section 704(c) and the related Treasury

Regulations. Allocations under this Section 9.3(d) shall be made in accordance with the traditional method set forth in Treasury Regulation Section 1.704-3(b) and are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement.

(e)      All other tax elections required or permitted by law or Treasury Regulations or similar state or local rule or regulation shall be made by the Board of Managers. The Members are aware of the income tax consequences of the allocations made by this Article 9 and hereby agree to be bound by the provisions of this Article 9 in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE 10
## BOOKS AND RECORDS

Section 10.1.    Inspection Rights Pursuant to Law.  The Company shall have obligations to the Members as set forth in this Article 10 respecting books, records and financial statements of the Company.

Section 10.2.    Books and Records.  At all times during the continuance of the Company, the Company shall maintain at its known place of business all records and materials the Company is required to maintain at such location under the Act.

Section 10.3.    Annual Financial Statements.  Within one hundred eighty (180) days after the end of each Fiscal Year, the Company shall cause to be delivered to each Member an audited financial statement of the Company for the prior Fiscal Year, prepared at the expense of the Company, which financial statement shall set forth, as of the end of and for such Fiscal Year, the following:

(a)      a profit and loss statement and a balance sheet of the Company;

(b)      the balance in each Member's Capital Account; and

(c)      such other information as reasonably shall be necessary for the Members to be advised of the financial status and results of operations of the Company.

Section 10.4.    Monthly Statements.  Within thirty (30) days after the end of each month, the Company shall cause to be delivered to each Member if requested a profit and loss statement and balance sheet. Upon request, a Member may also inspect a monthly operating statement and report of the financial condition of the Company, including all supporting third party statements, bank reconciliations, customer reports and any other information related to the business of the Company at such Member's expense.

Section 10.5.    Accounting Method.  For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the method of accounting as determined by the Board of Managers and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

## ARTICLE 11
## TAX MATTERS

Section 11.1.    Taxation as Company.  The Company shall be treated as a partnership for U.S. federal income tax purposes. The Members intend that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code.

Section 11.2.    Federal Tax Returns.   The Company shall cause the Company's independent public accountants to prepare, at the expense of the Company, for each Fiscal Year or part thereof, federal tax returns in compliance with the provisions of the Code and any required state and local tax returns.

Section 11.3.    Member Tax Return Information.   The Company, at its expense, shall use reasonable commercial efforts to cause to be delivered to each Member not later than April 1 of the subsequent year such information as shall be necessary (including a statement for that year of each Member's share of net income, net losses and other items of the Company) for the preparation by the Members of their federal, state and local income and other tax returns.

Section 11.4.    Tax Matters Member.

(a)    The "Tax Matters Member" of the Company for purposes of Section 6231(a)(7) of the Code shall initially be Tommy Constantine, but may be changed from time to time by the Board of Managers.   The Members shall direct the Tax Matters Member with respect to any administrative proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes.   The Tax Matters Member may not settle any controversies with the Internal Revenue Service without the approval of the Members holding a majority of the Interests.

(b)    The Tax Matters Member shall, within five (5) business days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail a copy of such notice to each Member.

Section 11.5.    Right to Make Section 754 Election.   At the request of any Member, the Company shall make an election in accordance with Section 754 of the Code so as to adjust the basis of Company property in the case of a distribution of property within the meaning of Section 734 of the Code, and in the case of a transfer of a Company Interest within the meaning of Section 743 of the Code.   In the case of a Transfer of an Interest, the incremental costs incurred by the Company as a result of the Section 754 election shall be borne by the transferring Member, unless the transfer is a result of default by the transferee, in which case the transferee shall bear such costs.

**ARTICLE 12**
**LIABILITY, EXCULPATION AND INDEMNIFICATION**

Section 12.1.    Liability.

(a)    Except as otherwise provided by the Act or any other provision of this Agreement, including, without limitation, Section 12.7, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

(b)    Except as otherwise expressly required by law, a Member, in its capacity as a Member, shall have no liability in excess of (i) the amount of its Capital Contributions; (ii) its share of any assets and undistributed profits of the Company; (iii) its obligation to make other payments expressly provided for in this Agreement; and (iv) the amount of any distributions wrongfully distributed to it.

Section 12.2.    Exculpation.

(a)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, claim, liability, demand, action, suit, proceeding or right of action (collectively "Damages") incurred by reason of any act or omission performed or omitted by such Covered Person in

good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any Damages incurred by reason of such Covered Person's fraud or willful misconduct or for any Damages for which the Covered Person has obligations to indemnify under Section 12.7.

(b)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits or Losses or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 12.3.   Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any Damages incurred by such Person by reason of any act or omission performed or omitted by such Person provided that: (a) any such action was undertaken in good faith on behalf of the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; (b) any such action was reasonably believed to be within the scope of authority conferred on such Person by this Agreement; and (c) with respect to any criminal action or proceeding, such Person had no reasonable cause to believe its action or omission was unlawful, except that no Person shall be entitled to be indemnified in respect of any Damages incurred by such Person by reason of fraud or willful misconduct with respect to such acts or omissions or for any Damages for which it has obligations to indemnify under Section 12.7; provided, however, that any indemnity under this Section 12.3 shall be provided out of and to the extent of Company assets only (including the proceeds of any insurance policy obtained pursuant to Section 12.5 hereof), and no Person shall have any personal liability on account thereof, including without limitation, any obligation to contribute money or other property to the Company.

Section 12.4.   Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Person described in Section 12.3 in defending any against any claim, demand, action, suit or proceeding that would result in Damages shall, from time to time, be advanced by the Company prior to the final disposition of such claim for Damages upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 12.3 hereof.

Section 12.5.   Insurance.  The Company may purchase and maintain insurance on behalf of Covered Persons and such other Persons against any Damages that may be asserted against or that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such Damages under the provisions of this Agreement.  The Company may enter into indemnity contracts with Covered Persons and such other Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.4 hereof and containing such other procedures regarding indemnification as are appropriate.

Section 12.6.   Certain Liabilities.  Each Member agrees to be liable for the Capital Contributions required to be made by such Member.

Section 12.7.   Acts Performed Outside the Scope of the Company.  Each Member (the "Indemnitor") shall indemnify, defend, save and hold harmless the other Members (the "Indemnitees") from any and all Damages that shall or may arise by virtue of any act or thing done or omitted to be done by the Indemnitor (directly or through agents or employees) outside the scope of, or in breach of, the terms of this Agreement; provided, however, that the Indemnitor shall be properly notified of the existence of the asserted Damages, and shall be given reasonable opportunity to cure any act or omission causing Damages and participate in the defense thereof.  The Indemnitees' failure to give such notice shall not affect the Indemnitor's obligations hereunder, except to the extent of any actual prejudice arising therefrom.

Section 12.8.   Liability of Members to Company.  Unless otherwise provided in this Agreement, no Member shall be liable to any other Member or to the Company by reason of such Member's actions in connection with the Company, except in the event of a violation of any provision of this Agreement, fraud, gross negligence or willful misconduct.

Section 12.9.   Attorneys' Fees.  All of the indemnities provided in this Agreement shall include reasonable attorneys' fees, including appellate attorneys' fees, litigation expenses and court costs.

Section 12.10.   Subordination of Other Rights to Indemnity.  The interests of the Members in any proceeds of the Company by way of repayment of loans, return of any Capital Contributions or any distributions from the Company shall be subordinated to the right of the Members to the indemnities provided by this Article 12.

Section 12.11.   Survival of Indemnity Provisions.   Except as otherwise specifically provided herein, all of the indemnity provisions contained in this Agreement shall survive a Member's ceasing to be a Member hereunder.

## ARTICLE 13
## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 13.1.   No Dissolution.  The Company shall not be dissolved by the admission of additional Members or substitute Members in accordance with the terms of this Agreement, or the withdrawal of a Member.

Section 13.2.   Events Causing Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

    (a)   the approval of the Board of Managers to the dissolution of the Company;

    (b)   at such time as there are no Members;

    (c)   the entry of a decree of judicial dissolution under the Act; or

    (d)   the sale of all or substantially all of the assets of the Company and the receipt of the proceeds from such sale.

Section 13.3.   Notice of Dissolution.  Upon the dissolution of the Company, the Members shall be notified of such dissolution.

Section 13.4.   Liquidation.  Upon dissolution of the Company, the Managers (in such capacity, the "Liquidating Trustee") shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. During the period of winding up all of the provisions of this Agreement shall remain in full force and effect, other than those provisions that are clearly inconsistent with the winding up process, such as distributions in accordance with Section 8.1.  No Member may take any action during the winding up period not otherwise permitted by this Agreement.  The proceeds of liquidation shall be distributed in the following order and priority:

    (a)   first, to payment of all expenses and debts of the Company and purchasing insurance polices that will provide for any contingent liabilities or obligations of the Company, the amount of such insurance to be based on the experience of the Company for such liabilities and obligations; provided, that the unpaid principal of and interest on any loans made to the Company by Members (and their Affiliates) shall be distributed pro rata to the Members (and their Affiliates) who made such loans, in proportion to the total amount of principal and interest payable on such loans, such distributions being

treated first as a payment of accrued interest on such loans and next as in payment of principal on such loans; and

(b)     second, the balance to the Members in accordance with the provisions of Section 8.1(b).

Section 13.5.   Termination.   The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article 13 and the Articles shall have been canceled in the manner required by the Act.

Section 13.6.   Claims of the Members or Third Parties.   The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member; provided, however, that nothing contained herein shall be deemed to limit the rights of a Member under applicable law.   In the event any Member has a deficit balance in its Capital Account at the time of the Company's dissolution, it shall not be required to restore such account to a positive balance or otherwise make any payments to the Company or its creditors or other third parties in respect of such deficiency.

Section 13.7.   Distributions In-Kind.   If any assets of the Company shall be distributed in kind, such assets shall be distributed to the Members entitled thereto as tenants-in-common in the same proportions as such Members would have been entitled to cash distributions if (a) such assets had been sold for cash by the Company at the fair market value of such property (taking Code Section 7701(g) into account) on the date of distribution; (b) any unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) that would be realized by the Company from such sale were allocated among the Members; and (c) the cash proceeds were distributed to the Members in accordance with this Article 13.   The Capital Accounts of the Members shall be increased by the amount of any unrealized income or gain inherent in such property or decreased by the amount of any loss or deduction inherent in such property that would be allocable to them, and shall be reduced by the fair market value of the assets distributed to them under the preceding sentence.

**ARTICLE 14**
**MISCELLANEOUS**

Section 14.1.   Notices.   All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered or upon receipt if sent by electronic mail or telecopy (with hard copy to follow); (b) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (c) five (5) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.   Unless another address is specified in writing, notices, demands and communications to the parties shall be sent to the addresses indicated below:

(i)     if given to the Company at the principal place of business of the Company set forth in Section 2.4 hereof.

(ii)     if given to any Member, at such address as set forth in Schedule A or at address as such Member may hereafter designate by written notice to the Company.

Section 14.2.   Failure to Pursue Remedies.   The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 14.3.   Cumulative Remedies.   The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.   Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 14.4.   Binding Effect.   This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

Section 14.5.   Interpretation.   Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.   All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.

Section 14.6.   Severability.   The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 14.7.   Counterparts.   This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.   All counterparts shall be construed together and shall constitute one instrument.

Section 14.8.   Integration.   This Agreement and any schedules and exhibits to the Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

Section 14.9.   Governing Law.   This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the state of Arizona and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Section 14.10.   Partition of Property.   Each Member agrees that it shall have no right to partition the property of the Company, or any portion thereof, and each Member agrees that it shall not make application to any court or authority having jurisdiction in the matter to commence or prosecute any action or proceeding for partition of the property, or any portion thereof.   Upon the breach of this Section by any Member, the other Members, in addition to all other rights and remedies in law and equity, shall be entitled to a decree or order dismissing application, action or proceeding.

Section 14.11.   Third Party Beneficiaries.   Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person, firm or corporation other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in their being deemed a third party beneficiary of this Agreement; provided, however, that the Warrantholder shall be an express third party beneficiary to this Agreement.

Section 14.12.   Effect of Waiver or Consent.   A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.   Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 14.13.   Trial Arbitration/Waiver of Jury Trial.   If any dispute arises based upon or arising out of this Agreement, it is expected that the parties will attempt in good faith to resolve any such dispute in an amicable and mutually satisfactory manner.

In the event such efforts are unsuccessful, either party may serve a notice of mediation/arbitration ("Notice of Mediation/Arbitration") on the other party. Notice of Mediation/Arbitration shall be personally delivered or sent by prepaid registered mail and shall be effective on receipt thereof by the party to whom it is addressed. Proof of receipt shall be a receipt signed by any officer or responsible official of the party to whom it is addressed. The Notice of Mediation/Arbitration shall be dated, and without prejudice to any right under any applicable rules permitting subsequent modifications, shall specify the claims or issues which are to be subjected to mediation/arbitration.

IF DIFFERENCES CANNOT BE RESOLVED BY MEDIATION THE PARTIES AGREE THAT IN ORDER TO PROMOTE TO THE FULLEST EXTENT REASONABLY POSSIBLE A MUTUALLY AMICABLE RESOLUTION OF THE DISPUTE IN A TIMELY, EFFICIENT AND COST-EFFECTIVE MANNER, THEY WILL WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY AND SETTLE THEIR DISPUTE BY SUBMITTING THE CONTROVERSY TO ARBITRATION IN ACCORDANCE WITH THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") EXCEPT THAT ALL PARTIES SHALL BE ENTITLED TO ALL DISCOVERY RIGHTS ALLOWED UNDER THE FEDERAL RULES OF CIVIL PROCEDURE AS THOSE RULES EXIST IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA.

The parties shall attempt to select a mutually agreeable mediator/arbitrator from AAA's Panel of Mediators/Arbitrators. If no agreement is reached within fifteen (15) days of the first written notice of intent to mediate/arbitrate, the current Director of Professional Services for AAA in Arizona shall serve as the mediator/arbitrator.

The parties acknowledge that the Agreement evidences a transaction involving interstate commerce, and that the Federal Arbitration Act, and to the extend not inconsistent, the AAA Rules as they exist as of the time the dispute is submitted, shall govern the interpretation, enforcement and proceedings pursuant to this mediation and arbitration clause, except as otherwise provided herein. In the case of arbitration, the parties agree that no claim shall be adjudicated, in arbitration or any other proceeding, as a class action, and that no arbitration conducted pursuant to the Agreement shall allow class claims, or consolidation or joinder of claims or parties. Further, no Member shall solicit or attempt to solicit any other current or former Member to conduct any proceeding in violation of this provision.

The Arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §1 et. seq., and the judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Any substantive or procedural rights other than the enforceability of the arbitration agreement shall be governed by Arizona law, without regards to Arizona's conflict of laws principles. Any Arbitration shall be held in Maricopa County, Arizona.

The parties further expressly agree that (i) the arbitrator shall only reach his or her decision by applying strict rules of law to the facts, (ii) the arbitration shall be conducted in the English language, in Maricopa County, Arizona, (iii) the party in whose favor the arbitration award is rendered shall be entitled to recover costs and expenses of the arbitration including, but not limited to, attorneys' fees and the cost and expense of administration of the arbitration proceedings, and any costs and attorney's fees incurred in executing on or enforcing the arbitration award, and (iv) the arbitral award shall be issued in Maricopa County, Arizona.

Except as provided in the following sentences, neither the Company nor any current or former Member shall be entitled to commence or maintain any action in a court of law upon any matter in dispute until such matter shall have been submitted and determined as provided herein and then only for the enforcement of such arbitration award. However, notwithstanding this dispute resolution policy, either party may apply to a court of competent jurisdiction in Maricopa County, Arizona, to seek injunctive relief before or after the pendency of any arbitration proceeding. The institution of any action for injunctive relief shall not constitute a waiver of the right or obligation of any party to submit any claim seeking relief other than injunctive relief to arbitration. Judgment upon the award may be entered by the United States District Court or Maricopa County Superior Court located in the state of Arizona, or application may be made to such court for the judicial acceptance of the award and order of enforcement, as the case may

be, if the Arbitrator's award or decision is not complied with within seven (7) days of the Arbitrator's decision.

Arbitration shall be the sole and exclusive procedure for resolution of disputes between the parties, including any disputes that might arise after termination of this Agreement.

Section 14.14.  <u>Legal Counsel</u>.  Legal counsel for a Member or one of its Affiliates may represent the Company in connection with legal work or issues arising in connection with the Company.  Each Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company with respect to each such matter and shall not be acting as the legal counsel of any individual Member.  Each Member further recognizes and accepts that its interest with respect to any such matter may be adverse to the interests of the other Members and of the Company.  Each Member nevertheless consents to the representation of the Company by such counsel with respect to each such matter and waives for the benefit of each other Member and of such counsel any potential or actual conflict of interest between or among such Members and between any such Members and the Company.  Each Member acknowledges that in the event of any future dispute or litigation between or among the Members and/or between any of the Members and the Company, such counsel may continue to represent its Member client, notwithstanding any such dispute and its prior representation of the Company.

[Remainder of Page Intentionally Left Blank]

[Signature blocks on next pages]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

**EUFORA, L.L.C.**

By: _____
Carlton R. Gentry, President and Chief Executive Officer

**MEMBERS:**

_____
**TOMMY CONSTANTINE**

**AZ EUFORA PARTNERS I L.L.C.**

By: _____
Name: _____
Title: _____

_____
**MARK D'AMBROSIO**

**C9 CONSULTING L.L.C.**

By: _____
Name: _____
Title: _____

**STANDARD VENTURES, L.L.C.**

By: _____
Name: _____
Title: _____

_____
**MICHAEL ANDRETTI**

SIGNATURE PAGE TO AMENDED AND RESTATED OPERATING AGREEMENT

_____

**MIA EDROZO**

_____

**CARLTON R. GENTRY**

PHX 328420976v9

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first
above written.

COMPANY:

EUFORA, L.L.C.

By: _____
Carlton R. Gentry, President and Chief
Executive Officer

MEMBERS:

_____

TOMMY CONSTANTINE

AZ EUFORA PARTNERS I L.L.C.

By: _____
Name: Timothy R. GAARN
Title: _____

MARK D'AMBROSIO

C9 CONSULTING L.L.C.

By: _____
Name: _____
Title: _____

STANDARD VENTURES, L.L.C.

By: _____
Name: Timothy R. GAARN
Title: Pres.

MICHAEL ANDRETTI

SIGNATURE PAGE TO AMENDED AND RESTATED OPERATING AGREEMENT

PHX 328420976v9

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EUFORA, L.L.C.

By: _____
      Carlton R. Gentry, President and Chief
      Executive Officer

MEMBERS:

_____
TOMMY CONSTANTINE

AZ EUFORA PARTNERS I L.L.C.

By: _____
Name: _____
Title: _____

_____
MARK D'AMBROSIO

C9 CONSULTING L.L.C.

By: _____
Name: _____
Title: _____

STANDARD VENTURES, L.L.C.

By: _____
Name: _____
Title: _____

_____
MICHAEL ANDRETTI

SIGNATURE PAGE TO AMENDED AND RESTATED OPERATING AGREEMENT

*PHX 328420976v9*

## SCHEDULE A

| Name and Address | Units | Percentage Interest | Capital Contribution | Capital Account |
|---|---|---|---|---|
| Tommy Constantine<br>P.O. Box 27590<br>Scottsdale, AZ 85254 | 388,368 | 43.152% | $312,134 | $-1,118,760 |
| AZ Eufora Partners I L.L.C.<br>10705 E. Cactus Road<br>Scottsdale, AZ 85259 | 256,050 | 28.450% | $870,318 | $584,148 |
| Mark D'Ambrosio<br>6812 E. Joan de Arc<br>Scottsdale, AZ 85254 | 138,429 | 15.381% | $83,178 | $-455,624 |
| C9 Consulting, L.L.C.<br>5010 E. Shea Blvd., D-200<br>Scottsdale, AZ 85254 | 40,005 | 4.445% | $7,140 | $-261,335 |
| Standard Ventures, L.L.C.<br>63 Garry Road<br>Coster, NJ 07624 | 30,618 | 3.402% | $1,519,409 | $1,385,473 |
| Michael Andretti<br>630 Selvaggio Dr Null<br>Nazareth, PA 18064 | 9,000 | 1.000% | $75,592 | $62,195 |
| Mia Edrozo<br>3497 S Joshua Tree lane<br>Gilbert, Az. 85297 | 15,030 | 1.670% | | |
| Carlton R. "C.R." Gentry<br>P.O. Box 731<br>Puyallup, Washington, 98371 | 22,500 | 2.500% | | |
| **Total** | **900,000** | **100.0%** | **$2,867,771** | **$196,097** |

Members and their respective percentages are as of 02/23/09. Capital Contribution and Capital Accounts are based upon the capital accounts on Form 1065 of the US return of partnership income as of 12/31/2007 for Eufora LLC and will be adjusted as needed on Form 1065 of the US return of partnership income for 2008 when completed. Capital Contribution amounts are net of deposits, withdrawals and distributions. Capital Accounts are net of profit/loss allocations.