UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, . Criminal No. 13-cr-00607-JFB-AYS-1
                          .
          Vs.             . 100 Federal Plaza
                          . Central Islip, NY 11722
PHILLIP A. KENNER,        .
TOMMY C. CONSTANTINE      . DATE July 30, 2021
. . . . . . . . . . . . . .

TRANSCRIPT OF SENTENCE/RESTITUTION
(Via Video)
BEFORE HONORABLE JOSEPH F. BIANCO
VISITING JUDGE

APPEARANCES:

For the Government:          UNITED STATES ATTORNEYS OFFICE
                             EASTERN DISTRICT OF NEW YORK
                             BY:  MATTHEW HAGGANS, ESQ.
                             271 Cadman Plaza East
                             Brooklyn, NY 11201

For Defendant Kenner:        PHILLIP A. KENNER, Pro se
                             Metropolitan Detention Center
                             Brooklyn, NJ 11232

                             MATTHEW W. BRISSENDEN, ESQ.
                             (Standby counsel)
                             666 Old Country Road, Suite 501
                             Garden City, NY 11530

For Owen Nolan:              PROSKAUER ROSE
                             BY:  SEETHA RAMACHANDRAN, ESQ.
                             Eighth Avenue & 41st Street
                             New York, NY 10036

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**PO BOX 688**
**Middletown, NJ 07748**
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
**www.tgribbentranscription.com**

2

1                            I N D E X

2

3

4   ORAL ARGUMENT                      PAGE

5        BY THE DEFENDANT             5/13

6        BY MS. RAMACHANDRAN           9

7        BY MR. HAGGANS                20

8   DECISION/RESTITUTION               22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        THE CLERK: Criminal cause for a hearing on sentencing

2 in 13-cr-607, the United States of America against Phillip

3 Kenner. Counsel, please state your appearances, starting with

4 the Government.

5        MR. HAGGANS:  Good morning, it's Matthew Haggans this

6 morning for the United States.

7        THE COURT: Good morning, Mr. Haggans.

8        THE DEFENDANT:  Good morning, It's Phil Kenner,

9 defendant, and Mr. Brissenden as standby counsel is here with

10 us.

11        THE COURT: Yes. Good morning Mr. Kenner.  Mr. Kenner,

12 are you able to move that camera a little bit or no?

13        THE DEFENDANT: It's stationary.  I'll try and sit up

14 the best I can.

15        THE COURT: It's just when you put your head down.

16 Like that you're fine, when you put your head down, I just see

17 the top of your head, but.

18        THE DEFENDANT: I'll do my best, Your Honor.

19        THE COURT: It's fine, fine.  So as you know, this is

20 a continuation of the restitution portion of the sentencing.

21 Before we proceed, I just want to, we talked about this, but I

22 just want to confirm for the record, and Chief Judge Brodie

23 issued another administrative order with respect to the

24 pandemic.  And I just want to confirm that Mr. Kenner you are

25 agreeable to proceeding by way of video today, is that correct?

4

1          THE DEFENDANT: Yes, sir, thank you for asking, Judge.

2          THE COURT: All right.  So based upon, I conclude that

3     to further delay this proceeding would be detrimental to the

4     interests of justice. Obviously this has been going on for many

5     months.  Mr. Kenner obviously wants to be able to appeal his

6     conviction. We want to resolve these issues with respect to

7     restitution for the victims.  And I don't want to unnecessarily

8     jeopardize Mr. Kenner by having him transported to court

9     against his will in order to be here in person, given that

10    we're fully able to conduct this by way of video.  So we will

11    proceed by way of video today for those reasons.

12          I did receive the supplemental submissions as I had

13    requested.  Mr. Haggans put in his July 13th letter.  And Mr.

14    Kenner put in his response, including the exhibits, many

15    exhibits that he attached.  So my intention today was to just

16    give both sides, again you don't have to repeat what's in your

17    papers, if there's anything you want to highlight to the Court

18    I'll let you do that. And then my hope was to rule on the many

19    issues that are outstanding. I may have some questions before I

20    do that.  So that's how we'll proceed.

21          I should just verify, are there any other counsel on

22    the line who wish to identify themselves for purposes of being

23    presence today?

24          MS. RAMACHANDRAN: Yes, Your Honor, this is Seethe

25    Ramachandran on behalf of Owen Nolan.

5

1        THE COURT: Yes, good morning, Ms. Ramachandran.  All

2   right, do we have Mr. Main on the line or no?

3        MS. RAMACHANDRAN: Your Honor, Mr. Main couldn't

4   attend this morning.

5        THE COURT: All right. So Mr. Kenner, I'll let you go

6   first.  All your arguments obviously are in your papers.  You

7   don't have to go through all the arguments.  But if there's

8   anything you want to highlight, I'll give you a chance to do

9   that right now.

10        THE DEFENDANT: Your Honor, just briefly, I just

11   wanted to just reiterate to the Court that I believe based on

12   the Government's prior submissions and Your Honor's recognition

13   of it, I believe that back in July, maybe July 2nd of 2019,

14   that we weren't going to have a Fatico Hearing for anything

15   outside of the four corners of the indictment and the trial

16   testimonies.  And --

17        THE COURT: Let me just interrupt you, because I was

18   going to address that.  That's a different issue, Mr. Kenner,

19   than we have today.  I certainly did, the Government did

20   indicate, the Court said it wasn't going to consider anything

21   outside of the offenses of conviction, which obviously related

22   to Hawaii, Eufora, global settlement funds, Led Better with

23   respect to you, and the Government indicated that it wasn't

24   going to prove any other frauds as relevant conduct that were

25   all contained in the PSR.  And therefore we eliminated those

1 alleged frauds from consideration for purposes of sentencing.

2          And however, with respect to restitution, I did

3 obviously advise the Government that they would -- if they

4 needed additional evidence to prove the restitution, they would

5 have to do so at an evidentiary hearing.  But to the extent

6 that they can prove restitution to a particular victim based

7 upon the trial evidence and forfeiture hearing evidence, in

8 conjunction with the affidavits of loss, they don't need to

9 have additional hearing then if they're sufficient, but for

10 preponderance purposes, for the Court making those conclusions,

11 then no additional hearing is necessary.

12          And that's what Mr. Haggans is arguing in his July

13 13th submission with citations to the trial record, that with

14 respect to these non testifying victims, that there's

15 sufficient evidence in the record for the Court to conclude by

16 a preponderance of the evidence that they were victimized by

17 the offenses of conviction, the frauds that were part of the

18 trial.  And that the amounts are also supportable based upon

19 the evidence that's in the record.

20          And as you saw, they attached exhibits numbers,

21 transcript cites, and obviously you responded to that. But I

22 don't want to be under the impression that there's some ruling

23 where I said to the Government you can't try to seek

24 restitution for any victims who did not testify, that's not my

25 position.  That's not the law.  And that's my position. So I

1  didn't want to interrupt you, but I did not want you to be

2  under that misimpression.

3          THE DEFENDANT: Under that context, Your Honor, and I

4  appreciate the detail of that, I'd just like to point out that

5  none of these individuals had any testimony on their behalf

6  with respect to the transactions that were all individual

7  transactions.  Each of them had signed previous acknowledgments

8  and acceptances, authorization forms, bank records, personal

9  transfer documents, had never raised a prior issue, even after

10 speaking with the Government.  I believe most every one of

11 these had Government proffers pretrial.  And so there was never

12 an opportunity to test any of that evidence for its concern

13 whether these were alleged victims or not based on what they

14 had signed, their empirical evidence versus their recollection

15 of what may or may not have taken place.

16          So on that context, I know that the Government

17 submitted a 1,000 charts and documents, but none of them were

18 referenced with respect to these particular individuals. And as

19 I'm sure the Court remembers at trial, even with respect to the

20 global settlement fund, you had individuals like Tyson Nash

21 represent every detail of the, what Mr. Constantine was going

22 to use the global settlement for, and much like Mr. Berard

23 explained to the Court during testimony, where others couldn't

24 remember any of it, even though there are empirical evidence

25 through email and text reconfirmed the actual meetings like Mr.

1  McKee or the Pecas did.

2          So I just raise that issue, Your Honor, that there

3  wasn't a chance to test any of the evidence on any of these

4  other individuals.  And the rest of it, the rest of the

5  submissions with respect to whether it's a sound methodology

6  the Government didn't apply case or statute to some of their

7  loss amounts or Mr. Kaiser's new collateral submission, which

8  was ECF 1070-2 which confirms he's a non victim.  Or Mr.

9  Berard's testimony about Led Better that he sold the property,

10  he sold the property with Mr. Kaiser and split the proceeds

11  50/50 at transcript 3093.  I mean it's obvious the guy got all

12  of his money back after they stole the property through a

13  forged and fabricated document.

14          You know, Mr. Rucchin's testimony, I outline from

15  page 2750 to 2751 of the transcript, that he, the 50 grand he

16  gave Constantine for the global settlement fund, he said he was

17  for legal funds, fees, and you trace the legal fees, as you

18  trace Mr. Rucchin's deposit, it was used only for  legal fees.

19          And then ultimately I don't know that there's been a

20  court ruling on the offset interest that the individual

21  collateralized investors had received during the course of the

22  Hawaiian investment, which totaled about $1.6 million for guys

23  just in the, that were named in the superceding indictment.

24          And I think the Court was going to probably address

25  the Northern Trust settlement issues, and then the fact that

1 whoever submitted the Government's reply on document 1082,

2 really did not address the Giglio issue or the Brady issue that

3 I had represented to the Court.  Because it wasn't about the

4 recordings it was about Mr. Kaiser's exculpatory statement, et

5 cetera, so.

6           THE COURT: All right, thank you.

7           THE DEFENDANT: Yes, thank you, Your Honor.

8           THE COURT: With respect, I just want to mention one

9 other thing with respect to the Northern Trust.  I did receive

10 under seal a settlement agreement with respect to Mr. Nolan

11 which I've reviewed ex parte, which is consistent with the

12 Government's crediting of $500,000 in its chart on April 16th,

13 the submission where they went through and decreased amounts

14 based upon what they understood to be credits from either

15 distributions with respect to Hawaii or money that Northern

16 Trust returned.

17           So, but let me just -- Ms. Ramachandran, is anything

18 you want to speak to with respect to that?

19           MS. RAMACHANDRAN: Yes, Your Honor. I would argue here

20 that Mr. Kenner's not entitled to any restitution credit for

21 the document I submitted under seal because my client Mr. Nolan

22 hasn't actually received any compensation as a result of that

23 settlement that would require a reduction in his award. It's

24 the defendant's (indiscernible - audio skip) to show that he

25 should get a credit, and you know that only becomes an issue

1  after the victim has been compensated.  You know, and when the

2  victim is compensated, if there's any sort of double recovery,

3  it's between the victim and the third party, and that is

4  actually governed by State Law.

5        But in terms of the actual restitution amount imposed

6  on Mr. Kenner, I believe it affects it and I don't believe he's

7  met his burden to show that there should be any reduction.

8        THE COURT: I guess I'm a little confused.  Are you

9  saying that your client didn't receive the money yet under the

10 settlement agreement?  Is that what you're saying?  Or you're

11 just saying it shouldn't be credited.

12       MS. RAMACHANDRAN: He has not received any money under

13 the settlement agreement.

14       THE COURT: Okay.

15       MS. RAMACHANDRAN: The agreement is a reduction in a

16 line of credit, but he hasn't actually received any money from

17 Mr. Kenner or from a third party.

18       THE COURT: All right, well that's -- that is -- I've

19 been looking at this issue and under the statute it's a little

20 bit confusing in this type of situation.  The Hawaii crediting

21 is a little bit easier because it's money that was returned.

22 But with respect to settlements, under 3018 USC 3664, its

23 suggests that you're not supposed to reduce the restitution

24 amount based upon third party payments, but then you would

25 reallocate that amount to the third party.  Which is confusing

1  in this context, and Mr. Haggans will correct me if I'm wrong

2  on this, but my understanding is that these, there was an

3  acceleration of default with respect to these lines of credit,

4  so Northern Trust wouldn't really be a victim with respect to

5  these amounts.  Is that accurate?  I mean they're not claiming

6  to a victim, they're not claiming to be out all of this money.

7  But I'm not sure that that was appropriate under these

8  circumstances.

9           MR. HAGGANS: That is correct, Your Honor.  Northern

10 Trust has not made any claim to being a victim of any -- either

11 in restitution or otherwise.  As for the underlying crediting

12 or not crediting of recoveries from Northern Trust, the

13 Government is not familiar with and does not have the contents

14 of those documents.  It has proposed those credits in the chart

15 that was filed at ECF 1024, on April 16th, based upon its

16 review of the trial testimony and the records that did go in at

17 trial.

18           But as, if I am understanding counsel's argument

19 correctly, her proposition is that this was not a recovery from

20 Northern Trust, it was a reduction in loss due to Northern

21 Trust on the line of credit.

22           THE COURT: Is that --

23           MS. RAMACHANDRAN: I think that's correct, I think

24 that's correct and my argument is also that we only get to the

25 issue of any reduction in a restitution award to Mr. Nolan when

1  he actually receives money, you know, and then at that point

2  that, any dispute between him and a third party from whom he

3  received compensation would be governed by State Law.  It

4  doesn't impact this proceeding, which is to determine Mr.

5  Kenner's restitution obligation.

6           I think at most, you know, later on, if he's actually

7  compensated, then it might impact his award then. But he hasn't

8  received any money, so.

9           THE COURT: Yes, the key is he hasn't received any

10 money.  If he had received money then again, you don't want to,

11 it shouldn't be a windfall for the victim, then you would

12 reallocate whatever loss there was to the third party and the

13 statute if clear, the victims get paid first. The third party

14 wouldn't get paid ahead of the victims.  The victims get paid

15 first.  And then to the extent there's money left over, the

16 third party would be paid. But I guess --

17          MS. RAMACHANDRAN: Yes, Your Honor.

18          THE COURT: I'm a little concerned too, I have to go

19 back, I don't know whether this is the same issue with Mr.

20 Berard and the Pecas, is it the same issue with them or did

21 they actually get money?

22          MR. HAGGANS: The answer to that, I don't know, Your

23 Honor, we have, per the Court's instruction at the last

24 conference, we did reach out to those victims who indicated

25 that they had received some sort of recovery from Northern

1   Trust.  As of today none of them have located any documents nor

2   provided them to the Government.  And as we pointed out in our

3   filing earlier this month, at docket entry 1082, that the

4   Government believes it does not have the authority under the

5   restitution statute to require the production of those

6   documents.   We did make the request, as the Court has made the

7   request of the Government.

8              THE COURT: Right.

9              THE DEFENDANT: Your Honor if I may address the point

10  for a moment.

11             THE COURT: Sure.

12             THE DEFENDANT: Thank you.  You may have two separate

13  situations here, if I can try and delineate for Your Honor and

14  for the Court.  Counsel for Mr. Nolan, I believe what she's

15  referring to is the fact that Mr. Nolan had approximately $2.2

16  million line of credit, and before he was forced to release his

17  collateral to close the line of credit, which was open for

18  years beyond the April 2009 date of all the other line of

19  credit individuals, Mr. Nolan had chosen to continue to pay his

20  line of credit on his own.  Where everybody else had agreed

21  with Northern Trust to a seizure of collateral.  So net, net,

22  Mr. Nolan's loss would still be accurate at that $1.6 million

23  range, with his $500,000 reduction or whatever the reduction

24  amount is you have in the ex parte filing.

25             Contrasting that, Mr. Berard and the Pecas, when they

1  dealt with Northern Trust Bank at that same time, whether it be

2  2011 or thereabouts, as the ex parte agreement will show, they

3  had already had their collateral seized.  So at that point the

4  testimony from Berard that he received about 300,000 after

5  legal fees, is the same the Pecas referred to when they paid 35

6  contingency fee to the lawyers, most likely Mr. Jowdy's

7  lawyers, who were handling that transaction for them.

8          So Mr. Nolan's 2.2 million was actually reduced as a

9  loss, a collateral seizure to 1.6 million more likely than not.

10  And that's why they haven't received any money. But they

11  received the reduction in loss, so the loss was capped at 1.6,

12  just the same. The Pecas and the Berards are different, they

13  received a gross settlement and then testified at trial to a

14  net of legal fees for their 300,000 and 600,000 settlements.

15  They were in two different categories, Your Honor.

16          THE COURT: All right, I think the most prudent way to

17  proceed as it relates to, and my understanding, the Government

18  and Ms. Ramachandran can correct me if I'm wrong, but this

19  issue does not apply to the residual Hawaii funds, which were

20  returned. This issue relates -- there was some crediting for

21  the distribution of residual Hawaii funds, that we can reduce

22  amount, this would relate only to the issues regarding any

23  agreements with Northern Trust. Is that the Government's

24  understanding?

25          MR. HAGGANS: As to Hawaii, I believe that's correct,

1 Your Honor.  And if I may, I think, if I'm understanding the

2 issue correctly on the lines of credit, I believe it may amount

3 to the same number in the end. So if we were to say that the

4 line of credit that was liquidated for each victim was $100, to

5 make the math simple, and Mr. Nolan, if the Government's

6 understanding correctly, paid $50 to Northern Trust to retire

7 that line of credit, and Northern Trust forgave the additional

8 $50.

9        Either way, Mr. Nolan is out the $100 that was the

10 line of credit, because of the foreclosure upon his collateral,

11 if I'm understanding correctly.

12        Say the Pecas had the same $100 collateral foreclosed

13 upon, if I'm understanding their testimony correctly, they

14 recovered $35.  They're out the remainder of that foreclosed

15 collateral, which would be the $65.

16        Either way the losses amounts to the same number.

17 Both were out $100.  Their collateral was foreclosed upon.

18        THE DEFENDANT:  That's incorrect based on the

19 different, the two different transactions, Your Honor.  The

20 Nolans had a collateral seizure of the net 500,000, which left

21 them at approximately 1.6.  And the, in Mr. Haggans' example,

22 Berard and Peca both lost their $100 at seizure, but then were

23 paid two years later by Northern Trust Bank in the settlement,

24 and they referred to the Court their net of 35 percent

25 contingency fee amount that they received.

1    Nolan had no legal fees or contingency fee because

2  his was just a net settlement directly with the bank, and

3  Berard and Kaiser -- excuse me, Berard and Peca, they had their

4  money seized as they authorized in April of 2009, and then were

5  paid back some amount after a settlement that Jowdy's lawyers

6  had settled with Northern Trust Bank.  And then Jowdy's lawyers

7  just took 35 percent of that fee.

8    THE COURT: All right, I think view is, the most

9  prudent thing for the Court to do, it's clear under that

10 statute the Court should not reduce total amount of restitution

11 owed, again it's amount of allocation.  And under 3664(j) the

12 procedure for that, including a defendant filing some type of

13 motion to reduce the amount based upon some recovery is

14 available post issuing of the restitution order.

15    My view is, and this only further crystalized it for

16 me, is that I don't have enough information to include that any

17 of these victims have actually been compensated in some way or

18 forgiven to the extent that I should reduce the amount. And as

19 I mentioned to the Government, I wouldn't even know whether to

20 reallocate it or not to Northern Trust in some way.  But bottom

21 line is, there was insufficient evidence in this record to

22 conclude that it should be reduced based upon compensation that

23 has been received by the victims, that's without prejudice to

24 such credits being made with respect to Northern Trust at a

25 future time.

1  The reason the statute does it this way, and I read

2 some Second Circuit cases regarding this, if the Court were to

3 lower the amount now, you can't increase the amount later.  You

4 know, if I incorrectly understand the situations with respect

5 to -- and with what Ms. Ramachandran told the Court, I would

6 have no way of knowing, I just assumed that this was money that

7 was paid out and received.  So it proves the point that there's

8 insufficient information in the record to make these reductions

9 at this point.  And they can be made you know, with additional

10 information that becomes available, although it is complicated

11 by the fact, as Mr. Haggans noted, that the Court can't require

12 the victims to participate.

13  But I think the, based upon the record before the

14 Court, both from the trial and from the forfeiture proceeding,

15 is that the restitution of these amounts should be ordered,

16 subject to any offsets or crediting that can be established,

17 you know, and Mr. Kenner, you can, I'm not persuaded based upon

18 what I heard today, and what you submitted to me, that there's

19 enough evidence to do so.  I'm not sure you have enough

20 evidence to prove what you're articulating.  But again this is

21 without prejudice to you making such an application under

22 3664(j) at some future time.

23  But is the Government agreeable to that approach?

24  MR. HAGGANS: Yes, Your Honor.

25  THE COURT: Ms. Ramachandran, you want to be heard on

1  that approach?

2        MS. RAMACHANDRAN: I agree with that, Your Honor,

3  thank you.

4        THE COURT: All right.

5        THE DEFENDANT:  So Your Honor, just so I'm clear,

6  with respect to any future filing, if necessary, is that the

7  only evidence before the Court is the three individuals'

8  testimony that they received 500,000 Nolan, 600,000 Peca, and

9  300,000 Berard.  The question that has been raised before the

10 Court that I raised after the Government conceded those

11 recovery amounts, either net or gross, which they did, is that

12 I raised the issue that the Pecas and the Berards, according to

13 what Nolan's counsel just said, are the only two that paid a 35

14 percent contingency fee after their recovery from Northern

15 Trust Bank. It's all in documents on the record.  So there's

16 nothing to show that they did not recover, either Nolan the

17 500, leaving him with a net 1.6, and Berard and Kaiser, or

18 Berard and Peca with a gross amount. And then received a cash

19 recovery as they both testified at trial.

20        So other than those records, I'm not sure what else

21 there would be because we don't --

22        THE COURT:  -- Northern Trust is out that money, do

23 you know whether Northern Trust is out some of that money or

24 not?

25        THE DEFENDANT: Northern Trust isn't out any of that

1  money, because that was just accrued interest that they just

2  never collected from them.  They haven't had a motion in 11

3  years to say that they haven't, they're out a particular amount

4  of money during that period of time.  And they gladly settled

5  with those individuals.

6           THE COURT: Again Mr. Kenner, I'm happy to consider

7  it, you have to put it all in one place for me. I'm not going

8  to, I don't want to continue to hold off your, this restitution

9  issue, especially because there is this procedure for doing it.

10  So it's not in your interest.  So that, this is the way we're

11  going to handle it.  But you know, I'm happy to look at it.

12  Okay?

13           THE DEFENDANT: Yes, sir, Your Honor.

14           THE COURT: All right.

15           THE DEFENDANT: With respect to Northern Trust, Your

16  Honor, the only other open issue there was that the individuals

17  named in the superceding indictment also received as part of

18  their collateral investment, a little over $1.6 million.  And

19  that was not credited as recovery of investment income.  I

20  address that in the interest offset section of the submission.

21           THE COURT: Again, I'm not persuaded at this point any

22  of those offsets should be made.  But you can make that

23  application in the future.   All right?

24           Other than the Hawaii funds distribution which is not

25  disputed. All right, Mr. Haggans, do you want to respond to Mr.

1  Kenner, who spoke to the individuals who did not testify, do

2  you want to speak to that?

3        MR. HAGGANS: I believe we addressed that in our

4  submission on July 13th, docket entry 1082, Your Honor.

5        THE COURT: Yes.

6        MR. HAGGANS: In which we cite evidence in the record

7  that the Court can and should rely upon to reach the

8  preponderance standard.  I think as the Court has already

9  stated, in this proceeding, or the Court implied, is perhaps a

10 better word, it's not strictly necessary for a victim to

11 testify directly before the Court at trial or at a hearing, for

12 the Court to reach a conclusion by a preponderance that they

13 suffered losses attributable to the counts of the conviction.

14 And that's what's laid out here at pages 2 through 4 of our

15 submission on July 13th.

16        And so the Government's request, taking into account

17 the Court's ruling with respect to the Northern Trust credits

18 or lack of credits, just so the Government is clear, the

19 Court's expected ruling is the amount specified in the

20 Government's letter at docket entry 1024 of April 16th, not to

21 include any credits going to recoveries or offsets from

22 Northern Trust. And the Government's requesting to also include

23 the amount specified in its filing at docket entry 1082, for

24 Mr. DeVries, Mr. Norstrom, Mr. Campbell, Mr. Murray, and the

25 widow of Mr. Tsyplakov and Mr. Stevenson.

1          THE COURT: I had a question, there was some things in

2     the footnotes, it's not clear to me that there is evidence in

3     the record beyond affidavit of loss with respect to $175,000 by

4     Dmitri Khristich to Eufora.  Nor is there $10,000 for, I don't

5     know how you pronounce it, Tsyplakov for Eufora.  There's no

6     cites to the record or anything with respect to those.

7          MR. HAGGANS: Forgive me, Your Honor, but we do

8     address Mr. --

9          THE COURT: For the Hawaii you have cites to the

10    record. But not for Eufora.  I guess I shouldn't --

11         MR. HAGGANS: So, thank you, Your Honor, I can

12    clarify.  And I apologize if this was not clear in our July

13    13th submission.  So we have included those footnotes, footnote

14    1, and footnote 2 for the Court's information.  So that the

15    Court is aware that these victims have made claims that are

16    larger than or different than what the Government has set out

17    in the main text of the letter.  But the main text of the

18    letter is the Government's request.

19         So as to the widow of Tsyplakov, the Government cited

20    to I believe it's Hawaii losses, Government Exhibit 63 alpha, a

21    total of 50,000.  We do note in footnote one that she indicates

22    additional losses.  But the Government has not cited a record

23    cite other than her affidavit in support of that Eufora loss.

24    And I believe the same is essentially true of Mr. Khristich

25    which we're noting in footnote 2 for the Court's attention, but

1    it's not included in our recitation of losses either at docket

2    entry 1024 or at docket entry 1082.

3           THE COURT: So let me just, with respect to these

4    additional individuals, it's the Court's view, having reviewed

5    the submissions and obviously having presided over the trial,

6    and the forfeiture hearing, that they should be compensated in

7    the restitution order, notwithstanding the fact that they did

8    not testify. The standard, I mentioned this before but I'll

9    just reiterate for the record, that obviously under the law, a

10   court can order restitution even if the victim does not

11   testify.  The Government has to establish under the law, and

12   this is all set out in US v Gushlak among other cases.  That's

13   728 F. 3d 184 (Second Circuit, 2013), by a preponderance of the

14   evidence that the loss was proximately caused by an offense of

15   conviction.

16          Mr. Kenner in his submission requests a methodology.

17   The methodology here is not complicated.  It's based upon, as

18   he noted, the charts that the Government submitted in

19   connection with the case, in conjunction with the testimony of

20   all the other individuals who did testify, and I emphasize in

21   reaching this conclusion as I did with respect to the loss

22   amount for purposes of sentencing, I credit the Government's

23   evidence at trial, the testimony and forfeiture, the testimony

24   and the documentary evidence in support of it, which is

25   summarized in great detail in the Court's October 13, 2017

23

motions for a new trial decision, where I basically summarized
every witnesses' testimony and to some extent reiterated and
reanalyzed in the forfeiture opinion on March 10, 2020. I rely
on those summaries and those findings for purposes of this
ruling.  And make clear that I am crediting the Government's
evidence.

        I already said at sentencing I did not find Mr.
Kenner credible, nor did I find Mr. Gonchar credible as it
related to his statement for Mr. Constantine that some of those
investments for the GSF Fund were for any purpose that Mr.
Constantine wanted to use them for.  It appeared to me based
upon his demeanor and the other evidence before me that he was
just doing that in his effort to help Mr. Constantine for
purposes of the trial.  Although he is a victim for other
money, which he invested and didn't make such a similar type of
claim.  So I'm limiting my finding with respect to him as to
that one issue with respect to the global settlement fund.

        But as it relates to Mr. Kenner, I find by that that
standard that it was proven that he participated, obviously in
the Hawaii fraud, the GSF fraud, the Eufora fraud with Mr.
Constantine, and that any individual, this was a common scheme,
the witnesses testified over and over again, as to the
misrepresentations that were made with respect to those.  And
there's no question in my mind that this scheme was common to
all of the victims as it related to those particulate

1  investments.  And that they should be compensated for them.

2          In terms of the amount, the Government has

3  established through the financial records and the charts, in

4  addition to the affidavits of loss, corroborated those amounts.

5  And therefore I believe that they have met their burden.

6          One of the most obvious reasons for this ruling, I

7  think a couple of examples just to highlight. Even though Mr.

8  DeVries, if I'm pronouncing that right, didn't testify, as was

9  pointed out in the Government's June 27th letter, which

10 attached the chart with respect to Eufora, is clear that his

11 money went into Eufora, similar to someone who did testify, Mr.

12 Ranford, that it went through Mr. Garn (phonetic). And that

13 then money was diverted.  So it would, it's clear he should be

14 compensated for that even though he did not testify.  It was

15 part of the same scheme.

16         And with respect to the global settlement fund, again

17 every individual who put money into that fund, it was called a

18 global settlement fund, it obviously was supposed to be used

19 for that purpose.  And yet the money was diverted for other

20 uses that were not authorized and it's my view that those

21 victims, people who put money into that fund, are entitled to

22 that money back, and whether they testified or not, because the

23 scheme was clear.

24         And this was not the first time you know, in any type

25 of financial fraud, once the scheme is established, then again,

1  it's by preponderance of the evidence, as the Court believes

2  that those same misrepresentations were utilized based upon the

3  testimony with respect to all of the victims.  There's no

4  requirement that 100, 150 victims, whatever the number may be,

5  step into the courtroom and say the exact same thing.  And I

6  believe that this is one of those situations as it relates to

7  all three of the frauds here and the lines of credit.

8       The Government put the exhibits that show these

9  amounts with respect to Mr. Norstrom.  The Ponzi type scheme

10 with respect to the line of credit was exactly the same as it

11 was for the victim who did testify, in terms of paying one line

12 of credit with funds from the other, and he certainly should be

13 compensated for that, as well as for the global settlement fund

14 and the Eufora investments.

15      So I believe with respect to each of these

16 individuals, Mr. DeVries, Mr. Norstrom, Mr. Campbell, Mr.

17 Murray, $50,000 for Hawaii with respect to Tsyplakov and Mr.

18 Stevenson, the $200,000, all those amounts should be included

19 as part of the offense of conviction in compensation for the

20 victims. So that's the Court's ruling with respect to that.

21      I am not, as I noted, including, and the Government

22 is not seeking amounts that were not corroborated, that are

23 contained in that footnote.   Footnote 1 and footnote 2. So I'm

24 not including the -- $100,000 in connection with Eufora for Ms.

25 Tsyplakov.  Nor am I including the $25,000 for Hawaii by Mr.

1  Khristich.  Because that was credited, according to the

2  Government's exhibit. Nor am I including the $175,000 in Eufora

3  if there is no record of such a contribution.

4          Mr. Haggans, is that clear, the Court's ruling?

5          MR. HAGGANS: It is, Your Honor. I think the only

6  other element would be the Government is assuming that the

7  Court will be entering that order, but jointly and severally

8  with Mr. Constantine's order.

9          THE COURT: All of the, in addition, I didn't go back

10 to the rest of the issues, we still have some other outstanding

11 issues.  But I should make clear, with respect to all of these

12 amounts of restitution it is going to be joint and several, to

13 the extent it has been ordered Mr. Constantine to pay the same

14 victims in some amount, okay?

15          THE DEFENDANT: Your Honor, if I could just ask for

16 just some clarity, just because some of it I just couldn't

17 hear.  With respect to the tracing of the funds, was it the

18 application of either a commingled approach or were you tracing

19 money in, money out like a skip tracing accounting with respect

20 to victims in the case?

21          THE COURT: Obviously with respect to forfeiture, you

22 can forfeit money based on the commingling.  It's my view that

23 you utilized the same misrepresentations to defraud all of

24 these victims.  This was for scheme and it was clear from trial

25 the same misrepresentations repeated over and over and over

1  again with respect to Hawaii, with respect to global settlement

2  fund, with respect to Eufora.  And I find by a preponderance of

3  the evidence therefore that the monies that they contributed to

4  those projects should be returned to them.

5          So I don't know what you're talking about when you

6  say skip --

7          THE DEFENDANT: Skip tracing, Your Honor.

8          THE COURT: I don't know what that is, but.

9          THE DEFENDANT: Sorry, it's just a normal money in,

10  money out trace if you were to look at GX 767, the global

11  settlement spreadsheet, the Rucchin example is the one that I

12  guess I could refer to for the easiest, where he testified he

13  wanted his 50 grand to go to legal fees.  He put 50 grand in

14  and that day 50 grand was paid to legal fees.  So that was my

15  question is, is were we tracing individuals based on money in,

16  money out, or was it global settlement amounts.

17          And then was there any ruling on the record that I

18  haven't been able to find with respect to like the Ebers

19  (phonetic) factors of the separation of fraud versus non fraud

20  factors, in the case, in the event that somebody's money went

21  entirely to the purchase of a piece of a property in Hawaii,

22  was there separation of that for loss factors under Ebers?

23          THE COURT: Mr. Kenner, my view is, again with respect

24  to global settlement fund, that these people put their money in

25  under the understanding that this group of individuals were all

1  doing the same thing, and did not get, due to the fraud, the

2  use of that fund in the way that it should.  The fact that some

3  amount went to some legal fees at some point, from some of that

4  money, does not mean that there should be some offset to the

5  money that they invested all together. They were putting that

6  money with the understanding it would all be used for that

7  purpose, and obviously would be more effective used for that

8  purpose, and they did not get that because they were defrauded.

9          So I don't believe to the extent you're saying

10 because there was some amount of the global settlement fund

11 that went to legal fees that I should deduct from some

12 particular victim, I don't believe that's appropriate given

13 what the fraud was.

14         THE DEFENDANT: Okay, I understand that, Your Honor.

15 And then with respect to Hawaii, if I could just, just for

16 clarity, again because I'm having a little trouble hearing

17 today.  The fraud versus non fraud factors, so if someone put a

18 million dollars into the Hawaii investment and their money went

19 to purchase one of the parcels of land, the entire million

20 dollars, is that included as loss, or was there a ruling about

21 separating what was delineated for a fraud with respect to like

22 loans to Mr. Jowdy versus money that was spent on property?

23         THE COURT: I don't believe you met your burden to

24 show that with respect to those losses that the money was

25 utilized in the -- the losses at least that I have imposed

1  here, was utilized in the fashion that was agreed to by the

2  victims.  All right?

3          But I want to move on to the other issues.

4          THE DEFENDANT: Thank you, Your Honor.

5          THE COURT: The Court concludes with respect to Mr.

6  Privitello, that although the Government notes that although

7  Mr. Kenner was acquitted with respect to those particular

8  amounts, I find again based upon the preponderance of the

9  evidence, credible evidence, that he should be held responsible

10 too for that $200,000 investment in Eufora for the following

11 reason.  Again he was part of this conspiracy. He knew this

12 money was being diverted. In fact many months before Mr.

13 Privitello put in that money, he, Mr. Kenner himself diverted

14 money through Mr. Garn from Eufora and knew that there was a

15 fraud that he and Mr. Constantine were jointly involved in with

16 respect to Eufora.

17         He then told Mr. Privitello about Eufora and the

18 ability to invest in Eufora and sent him to Mr. Constantine.  I

19 believe he should then be responsible, again the fact that the

20 jury found the debt was not proven beyond a reasonable doubt

21 that Mr. Kenner was involved in those particular transactions,

22 does not preclude the Court from finding, based upon my view of

23 the evidence, that he's responsible for that because he was

24 part of the conspiracy to do that, knew that Mr. Constantine

25 was engaging in fraud with respect to these victims.  And

1  should be held responsible for that part of the conspiracy,

2  notwithstanding the acquittal as to those particular

3  transactions. So that's the Court's ruling with respect to Mr.

4  Privitello.

5         Mr. Berard, I conclude that based upon his testimony,

6  that he should be compensated with respect to the Led Better

7  losses. Again to the extent that Mr. Kenner wants to make any

8  type of motion under 3664 for some type of crediting that Mr.

9  Berard received subsequent to the fraud, the Court is willing

10 to consider it.  I don't believe that's been demonstrated at

11 this point.

12        The Court's ruling is the same with respect to Mr.

13 Kaiser, based upon the trial testimony and the exhibits, I

14 believe that Mr. Kaiser is owed the 1.280 million in

15 restitution.  As well as the 200,000 investment in Eufora.

16 Based upon, I know Mr. Kenner thinks Mr. Kaiser is lying and

17 should not be credited, I disagree based upon my review of the

18 evidence.

19        Similarly, I believe that the, with respect to the

20 Government noted I had not ruled with respect to testimony that

21 the $200,000 investment, there was testimony in the record, let

22 me just find it.  In addition to Mr. Kaiser's personal

23 investment there was another $200,000 investment on behalf of

24 Ethel Kaiser who also did testify, and Mr. Hughes and Mr. Rizzi

25 did not testify.  I believe there is sufficient evidence in the

1  record based upon the, both Ms. Kaiser's testimony as to her

2  particular investment, as well as Mr. Kaiser's affidavit, that

3  investment was split equally among Rizzi, Hughes and his

4  mother.  That that's how it should be broken down for purposes

5  of restitution.  And that's what the Court intends to do.

6          THE DEFENDANT: Your Honor, with respect to Kaiser, I

7  just wanted to ask, the Court has seen Mr. Kaiser's most recent

8  submission at docket 1070-2, with respect to having a 15 year

9  old collateral agreement that was worth approximately $150,000

10 million at the time of the collateral transfer?

11         THE COURT: Again Mr. Kenner, I don't believe there's

12 been any -- there's not been a sufficient basis to make any

13 credits with respect to the submissions at this juncture.

14         THE DEFENDANT: Thank you, Your Honor.  Just referring

15 to Mr. Kaiser's submission himself, admitting to the 150

16 million of collateral, 15 years ago.

17         THE COURT: All right --

18         THE DEFENDANT: It wasn't my submissions it was his.

19         THE COURT: I understand, I don't think it establishes

20 he's not entitled to this money that you took from him. Okay.

21         I don't believe, the Government, are there any other

22 outstanding issues in the letters that were submitted to the

23 Court?  But in essence, the bottom line, is other than those

24 two individuals that were in the footnotes, and they were not

25 documented, I believe all the other amounts the Government is

1   seeking with respect to the victims has been established, with

2   respect to the testimony and the exhibits.  And that any

3   offsets that Mr. Kenner wants to claim under statute, can be

4   reviewed by the Court on submission on those particular issues.

5           Part of the problem with your submission, Mr. Kenner,

6   they're all over the place.  You tell me, oh it's in this

7   document, it's in that document.  If you want to make a motion

8   for a reduction, you have to stop relitigating the trial and

9   focus on those particular things so the Court could see what

10  your position is all in one place.

11          And that's not a criticism of you.  Obviously you've

12  been working very hard and diligently to present your position.

13  I've complemented you on that before. But yet, you have to stay

14  focused on what the issues are at this point if you're going to

15  make those applications in the future.

16          But are there any other outstanding issues from the

17  Government?

18          MR. HAGGANS: I don't believe so, Your Honor. If I

19  may, would the Court benefit from a revision to the chart

20  previously filed at docket entry 1024 to reflect the Court's

21  rulings today?

22          THE COURT: Yes, I don't want to try to do this

23  without revisions, the math is much too complicated for me to

24  do that right now based upon my rulings.

25          MR. HAGGANS: I think the Government should be able to

1   put that, based on the Court's rulings on the record, the

2   Government should be able to do that fairly promptly and file

3   it.

4          THE COURT: All right, but I -- I have to formally

5   order the amount both as to each victim and the total. So what

6   do you propose I do then?

7          MR. HAGGANS: I think Your Honor could alternatively

8   simply just run through 1024, in the revised amounts column,

9   which is the fourth column from the left. And simply identify

10  where the Northern Trust offsets are not being incorporated.

11  And I can in the background do a quick calculation to include

12  all those amounts and the amounts in 1082 so that the Court can

13  orally pronounce them on the record in this proceeding. I

14  believe that is correct that the Court has to pronounce them in

15  the defendant's presence.  But then --

16         THE COURT: You can do the math right now you're

17  saying?

18         MR. HAGGANS: I'm going to endeavor to do the math

19  right now, Your Honor.

20         THE COURT: All right.  So I'm going to do that.  Just

21  give me one second.  So based upon the evidence at trial and

22  the forfeiture hearing, credible evidence, I find the following

23  individuals should be, are entitled to forfeiture.  I'm

24  ordering this on Count 1 in the following amounts to the

25  following individuals.

1              (indiscernible - audio skip) 100,000 for Hawaii;

2    649,405 for the line of credit; $375,000 for Led Better.

3    Sergei Gonchar $899,221 for the line of credit. Ethel Kaiser --

4    I'm sorry, I read the wrong column there.  Hold on.

5              MR. HAGGANS: Your Honor, are we looking at the

6    revised amounts or the --

7              THE COURT: I read the wrong column, I forgot to -- I


9              The Court orders the following amounts.  Bryan Berard

10   $100,000 for Hawaii; $349,405 for the line of credit; $375,000

11   for Led Better.  Mr. Gonchar $856,668 for the line of credit.

12             MR. HAGGANS: Your Honor, I'm sorry, I'm sorry, I was

13   on mute. Relating to Mr. Berard, if I understand the Court's

14   prior ruling correctly, the Court is not ordering offsets.

15             THE COURT: Right.

16             MR. HAGGANS: For Northern Trust.  So the amounts of

17   the line of credit should therefore, based on footnote 1 in ECF

18   1024, it should be 649,405.

19             THE COURT: Okay.

20             THE DEFENDANT: So just for my edification, Your

21   Honor, and I won't interrupt past this, I just want to make

22   sure. So Berard's testimony that he did recover the 300,000 is

23   not being attributed to this?

24             THE COURT: Not at this point.  It's without

25   prejudice.

1           THE DEFENDANT: Okay.

2           THE COURT: It's the same issue I'm concerned about

3 that I referenced.  But not at this point. But I see what I

4 have to do based upon my rulings today.  So I apologize, let me

5 start one more time.

6           And Mr. Kenner, you're free to interrupt me or Mr.

7 Haggans, if you think that I'm doing something inconsistent

8 with my rulings.  Because I do have to bounce from one chart to

9 the other.

10          So, starting again for Bryan Berard, $100,000 on

11 Hawaii; $649,405 on the line of credit; $375,000 on Led Better.

12 For Mr. Gonchar, $856,669 on the line of credit. For Ms. Ethel

13 Kaiser, $66,666.67. For John Kaiser, (background noise) on

14 Hawaii; $200,000 on Eufora.

15          THE DEFENDANT: Your Honor, before we get off Mr.

16 Kaiser, Ethel Kaiser and John Kaiser's money is the same money

17 within that $200,000 based on Kaiser's testimony at trial that

18 he solicited his mom, Hughes and Rizzi for those monies. So

19 it's the same money.

20          THE COURT: My understanding he separately invested

21 $200,000 based upon that testimony.  But --

22          MR. HAGGANS: That's correct, Your Honor, its separate

23 pots to money. Mr. Kaiser did testify as to additional amounts

24 that he spoke with other victims who invested.  But he

25 essentially acquired their losses because he paid them back,

1  that is not the same case with the $200,000 invested by his

2  mother, Mr. Hughes and Mr. Rizzi.

3          THE COURT: That's --

4          THE DEFENDANT:  If I could just understand, Your

5  Honor, I'm confused.  So Mr. Kaiser, there were two blocks of

6  money, there was Mr. Privitello's 200,000 and then there was

7  the Ethel Kaiser/Hughes/Rizzi 200,000.  Those were the two

8  blocks of money. But according to what Mr. Haggans said, there

9  are now three blocks of money.  And there's no bank records or

10 any documents that show that anywhere.  Mr. Kaiser's testimony

11 was -- I don't have the transcript in front of me, refers to

12 that 200,000 being just for those, his three friends and

13 family.  There was not a third block of money ever mentioned.

14         MR. HAGGANS: The Government addressed this with

15 respect to Mr. Kaiser's losses many times, Your Honor.

16         THE COURT: My understanding is he was referring to a

17 third block of money.  That's the Court's ruling.

18         THE DEFENDANT: Thank you, Your Honor.

19         THE COURT: Jay McKee, $250,000 for the GSF

20 investment.  Glen Murray, 57,447 for Hawaii; $1,242,769 for the

21 line of credit; $250,00 for Eufora; $250,000 for GSF.  Tyson

22 Nash, $57,447 for Hawaii; $100,000 for Eufora; $100,000 for

23 GSF.  Owen Nolan --

24         MR. HAGGANS: Here there's going to be a change, Your

25 Honor.

1          THE COURT: Yes.

2          MR. HAGGANS: To --

3          THE COURT: I'm doing that right now.

4          MR. HAGGANS: Not including the offset for any line of

5    credit recovery.  The amount the Government gets for Mr.

6    Nolan's losses on the line of credit is 2 million 156 -- I'm

7    sorry that's

8          THE COURT: Well you have to subtract the 2198910, you

9    have to subtract out 42,553, right?  We're still taking out the

10   Hawaii funds, but not the Northern Trust.

11         MR. HAGGANS: Yes, I'm sorry, Your Honor. It should be

12   -- $2,113,804.  That's the amount on 1024, 1.6138904, plus the

13   500,000 reflected in footnote 6.  Again for the record,

14   2,113,804.

15         THE DEFENDANT: No, Your Honor, although that math is

16   correct, Owen's counsel said that they had, they reduced the

17   settlement amount, the collateral seizure amount by the

18   500,000, but they had not received any actual cash beyond that

19   amount.  That's what she said earlier today.

20         THE COURT: Again Mr. Kenner, I'm not addressing those

21   offsets today.  All, right?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT: I just -- Ms. Ramachandran, you believe

24   that's the amount?

25         MS. RAMACHANDRAN: Yes, Your Honor.

1          THE COURT: All right.  $2,113,804.

2          THE DEFENDANT:  So if in the future, Your Honor, her

3  records reflect that the seizure was not the 1.6 million

4  amount, but it was more over closer to the 2.1 million amount.

5  Just want to make sure I understand what she's saying

6  correctly.

7          THE COURT: Mr. Kenner, we're not -- I don't want to

8  repeat what I just said.  We're not, this is based upon the

9  record that's before me.  You can make your application.

10          THE DEFENDANT:  I'm sorry, Your Honor, just having

11  difficulty hearing and following, thank you.

12          THE COURT: Mr. Peca, $100,000 for Hawaii.

13          MR. HAGGANS: There will another change here, Your

14  Honor.

15          THE COURT: $1,794,392 for the line of credit, right?

16          MR. HAGGANS: One moment, please, Your Honor.  Yes,

17  that's correct, 1,794,392, that's the Government's number.

18          THE COURT: Eufora $100,000; GSF 250,000. Mr. Nicholas

19  Privitello, 200,000. Mr. Ranford, 400,000 to Eufora; 300,000

20  GSF.  Mr. Rucchin $57,447 for Hawaii; $1,010,645 for the line

21  of credit; $150,000 for Eufora; 50,000 for GSF.  Turner

22  Stevenson, $100,000 for GSF.  Darryl Sydor, $60,000 for Hawaii;

23  $856,200 for the line of credit; 50,000 for Eufora; 250,000 for

24  GSF.

25          MR. HAGGANS: Your Honor, just give me a moment, I'm

1  compiling the additional amounts from docket entry 1082 and

2  then I think I'll be ready to -- All right, Your Honor, thank

3  you.  I apologize for the delay, I'm sorry.

4          THE COURT: And then based upon today's rulings, I'm

5  also ordering restitution for Mr. Greg DeVries in the total

6  amount of $450,000, consisting of 100,000 for Hawaii; 100,000

7  for Eufora; 250,000 for global settlement.  Mattias Norstrom a

8  total of $1,561,897.81 consisting of 100,000 for Hawaii;

9  1,211,897.81 for the line credit; 250,000 for the global

10 settlement fund.

11         Mr. Brian Campbell, $250,000 -- excuse me, $350,000

12 consisting of 100,000 for Hawaii; 250,000 for global

13 settlement. Raymond Murray, 100,000 in connection with the

14 global settlement fund.  Elena Tsyplakov, the widow of Vladimir

15 Tsyplakov 50,000 for Hawaii project. And Mr. Stevenson I

16 already awarded $100,000 for -- I already awarded him the

17 100,000 for GSF, but I'm adding 100,000 for Hawaii.  Is that

18 clear Mr. Haggans, I don't want you to double count it.

19         MR. HAGGANS: Yes, thank you, Your Honor I did.  I

20 noted, I do now see in my listing 100,000 for GSF; 100,000 for

21 Hawaii as to Mr. Stevenson, 200,000 total.

22         THE COURT: Right.

23         MR. HAGGANS: Which is correct.

24         THE COURT: I think that completes the amounts,

25 correct?

40

1          MR. HAGGANS: It does, Your Honor.  And I'm just

2    running a quick total now.  The Government's total number, Your

3    Honor, just for the record, is $16,300,000.48.

4          THE COURT: All right, so the total amount of the

5    restitution order is $16,300,000.48, based upon the Court's

6    rulings and the amounts stated on the record today.  It's due

7    immediately and payable at a rate of $25 per quarter, and at a

8    rate of 10 percent of gross monthly income while Mr. Kenner is

9    on supervised release.  It is joint and several with Mr.

10   Constantine, to the extent the Court has imposed such

11   restitution on him for these victims.

12         All right, I advise you -- so Mr. Kenner what's going

13   to happen is the Court is going to issue the judgment of

14   conviction that will obviously contain the Court's sentencing

15   in its entirety, including the restitution order that the Court

16   has imposed today.  I think I advised you this back at the time

17   of sentencing, but I'll advise you again, that you have the

18   right to appeal your conviction and sentence and this

19   restitution order.  If you cannot afford an attorney, one will

20   be appointed on appeal to represent you.

21         If you cannot afford the cost of an appeal you may

22   apply for leave to appeal in forma pauperis.  And notice of

23   conviction must be filed within 14 days of of the judgment of

24   conviction. It will probably take a couple of weeks for that

25   judgment to be filed, and Mr. Brissenden obviously will assist

1  you in filing the notice of appeal.

2          Are there any other issues today the Government wants

3  to raise with the Court?

4          MR. HAGGANS: No, Your Honor, thank you.

5          THE COURT: Mr. Kenner, are there any other issues you

6  want to raise with the Court today?

7          THE DEFENDANT: No thank you, Your Honor.

8          THE COURT: All right.

9          THE DEFENDANT: (inaudible)

10         MR. BRISSENDEN: I'm sorry I didn't mean to speak over

11 Mr. Kenner, but just briefly, and I understand the Court's

12 rulings today, but just for the sake of preservation and I

13 think it's already clear, but if it's not, I just want it made

14 clear, that Mr. Kenner, based on my discussions with him, he's

15 objecting to the lack of offset for those settlement

16 agreements.  So I just for the sake of preservation, I just

17 wanted to make that clear.

18         THE COURT: He definitely has preserved that,

19 certainly. And again I said it before, but I'll say it now at

20 the end that the Court is not, based upon Second Circuit case

21 law and the statute, the Court in my view is supposed to order

22 the amounts for the restitution, and to the extent that

23 additional information is provided that establishes clearly

24 that it should be reduced, and reallocated potentially to some

25 third party, the Court is fully prepared to do that under

1  3664(j)(1) or (2).  All right.

2          MR. BRISSENDEN: Understood, Your Honor, thank you.

3          THE COURT:   Thank you very much everybody have a

4  good day.

5          MR. HAGGANS: Have a good weekend, Your Honor.

6                      * * * * *

7              **C E R T I F I C A T I O N**

8          I, **PATRICIA POOLE**, court approved transcriber,

9  certify that the foregoing is a correct transcript from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13  /S/ PATRICIA POOLE

14  TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: August 2, 2021

15

16

17

18

19

20

21

22

23

24

25