*Kenner (13-cr-607) (JFB)*

August 10, 2021

The Honorable Judge Bianco
U.S. District Courthouse – EDNY
100 Federal Plaza
Central Islip, NY 11722

                Re: August 6, 2021 cancelled call (RE: *ECF No. 1099*)—
                      18 U.S.C. § 3664(j) issues—*et.al.*

Your Honor:

The August 6, 2021 court call was cancelled—but Kenner had no influence on the matter.[1]  To the contrary—Kenner understands that the U.S. Attorneys Office alleged Kenner requested that he be transported to the West Visiting Room ("VR") in lieu of being available for the 9:00am call.  **This is 100% inaccurate**—but commensurate with the fabrications, lies, and half-truths represented by MDC's staff (if it is they to blame) &/or the U.S. Attorneys Office when the Court has "*apparently*" relied on them for integrity.

*So what the h3ll really occurred (all verifiable—as usual)—that Kenner needed to be the scapegoat for someone not making proper calls and arrangements?*

1) At 7:30am, Kenner asked to remain in his cell (locked-down) to CO Persaud, so Kenner could wait for the officer in charge of Court calls to find Kenner in his unit; and

2) At 9:15, nobody had come to find Kenner for the 9:00am call.  As such—Kenner sent communication from his locked cell to the CO (Persaud) to discuss the non-activity;

3) At 9:20am—CO Persaud arrived at Kenner's cell and let him out and made calls at MDC to have Kenner escorted to the West Visiting Room to work—*because no 9:00am call materialized*;

4) At 9:30am – Kenner was placed in the hallway to wait for the elevator transport to the West VR.
   a. Prior to being picked-up, Kenner entered the unit team's offices on the floor at 9:30am and inquired as to why there was no 9:00am call. Unit Team Counselor Waller showed Kenner the call list for the day. Kenner's name was not on the call list.  Kenner explained his expectation (thru stand-by counsel) that a 9:00am call was scheduled.

---

[1] Kenner remained locked in his MDC-cage until after the 9:00am call was scheduled to begin.

1

> Waller double-checked her computer list and re-affirmed there was no scheduled call; and

5) At 10:15 (in VR) – Legal Department personnel, Cardou, visited Kenner. Kenner explained the issue with the call. Cardou expressed that he was unaware of anything scheduled – but would look into it. No reply materialized after that moment; and

6) Kenner was alerted by stand-by counsel later in the day (via email) that the U.S. Attorneys Office had spoken with MDC and they collectively (or in part) decided it was Kenner's non-compliance and non-availability that wasted the Court's time Friday, August 6, 2021.
   a. **This is 100% fabricated – with Kenner locked in his cell until 9:20am that morning; and verifiable.**

*What does this little white lie represent?*

Although the Court may not have given this a second thought—freeing its time for less burdensome issues, not having to listen to Kenner explain government cover-ups and ignorance of the empirical facts because "*its in this document, its in that document*"; the call was re-scheduled for this Friday (August 13th).

*That is not the point*. This is emblematic of the lies that end on Kenner's plate, regardless of exculpatory records and empirically provable issues.

The Court posited during the July 30, 2021 hearing (*ECF No. 1096-1 at 32*), "*Part of the problem with your submission, Mr. Kenner, they're all over the place. You tell me its in this document, its in that document…And that's not a criticism of you*". Yet—every time Kenner presented a singular issue (i.e. *ECF No. 1026* [request Kristen Peca IRS "*anonymous*"…"*unsigned*" letter[2]]; or now-conceded McKee GSF-texts as

---

[2] With the questionable integrity of former FBI agent Galioto (that many are terrified to address: highlighted in REDACTED portion at the end of this submission)—and disregarding Galioto's documented threats to virtually everyone involved in the instant case—an ultimate government concession to the Court and Kristen Peca that there really is no IRS "*anonymous*"…and "*unsigned*" document from Kenner's laptop. It would expose two major *reformative* issues—because the letter doesn't exist and the Court knows it.
> **One**—the government lied about this within the first 3 minutes beginning trial (*Tr.4*), while knowing it was a farce—but setting early defaming and slanderous precedents (unchecked); and
>
> **Two**—the denial of production, and confession of the hoax, would then require Kristen Peca to admit to the Court who exactly told her the coercive lie **pretrial** (although its apparent to the blind)…and complimenting another Galioto **pretrial** macro-coercion top Mike and Kristen Peca that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*" (*ECF No. 815 at 10, f.8; ECF*

2

exculpatory; or Kaiser's IRS evidence of "*back pay*" or payment receipts for over $600,000 of "*expenses*" [*Tr.1413-14*])—the government &/or Court replied that Kenner may be correct about those singular errors.

But—when Defendant-Appellant requested hearings to check off the now-debunked misrepresentations from trial (post-submissions); one-by-one to satisfy *Youngblood* arguments, the court *denied* every request.

*Reliance on Youngblood to avoid the macro-prosecutorial misconduct…*
To defend their *cumulative* graft post-trial (ignoring devastating evidence they possessed &/or hid form the defenses)—they focused the court on *singular* issues, even confessing to a few, (avoiding their cumulative prosecutorial misconduct, *Brady* and *Giglio* violations, Rule 1002 violations—et.al.) to argue that even assuming there was a *singular Brady* violation or otherwise, Kenner cannot assert that the result of the trial would have been different based on that *singular violation*. See *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006).

The avoidance of addressing their cumulative graft was the government's key to maintaining the verdict lacking confidence—because every evidentiary misrepresentation unfurled in Kenner's evidentiary favor, submission-after-submission (chock-full of exculpatory records; never *he-said-she-said* reliance like the government's feeble testimony-only positions).   The Court has rejected requests to address macro-evidentiary issues (left unaddressed while in the government's possession at trial).

Every *Youngblood* analysis must be accompanied in this complex case with a *cumulative* analysis; recognized by the Second Circuit, "Whether any one error would, absent the others, have been harmless is irrelevant in light of the cumulative prejudice caused"; *United States v. Long*, 917 F.2d 691 (2nd Cir 1990); *See also Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15, 56 L. Ed. 2d 468, 98 S. Ct. 1930 (1978) (concluding that "the cumulative effect on the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.").

It is also misconduct, making an argument the prosecutor knows to be factually untrue, even though it may be consistent with the evidence admitted at trial; *See United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987) (reversal for prosecutorial misconduct where prosecutor's argument was refuted by unoffered evidence in the government's files).

- So—while understanding the Court's time is limited to review issues in this case as they unfurl before them, Kenner has been faced with an uncooperative government who would argue about the *opening of an envelope* if it distracted

---

*No. 892 at 17—et.al.*)—Even contradicting Mike Peca's own, 2011 Grand Jury testimony (*ECF No. 112-3 at 30-33*).

the Court from the macro-authorizations (not failed memory) and post-trial *Brady* disclosures that just so happened to be produced by the AUSA forfeiture team when evidence confirms the prosecutorial team had them in possession for years pretrial (like Arizona attorney Baker's signed and dated disclosures: *ECF No. 1006-1*—signed by 19 Hawaii-Mexico investors; including Peca, Berard, Sydor, Rucchin and Nash [named in the superseding indictment] and 12 more including Campbell, R. Murray, deVries, G. Murray, Norstrom, Gonchar, Stevenson, Tsyplakov).[3]

Without *Fatico* hearings to address the underlying issues (macro first related to guideline loss)—with a broad stroke and not hearing from 85% of the investors, there is no realistic basis to allege others *could not recall* the same authorizations government-witnesses granted (thru signature) and could not recollect a decade later (despite their empirical records—not Kenner's).

*Overwhelming witness testimony must be construed as unreliable to maintain loss calculations—et.al…*
Gonchar's isolated GSF testimony about his own money (typically the only person who can grant authorizations regarding it: *Tr.4826-27*) was construed as unreliable (*ECF No. 1096-1 at 23*); resulting in the Court's decision that the entire GSF was a fraud (no *Ebbers* standards[4] were applied under required a "sound methodology" analysis (See *United States v. Gushlak,* 728 F.3d at 196; referenced at *ECF No. 1096-1 at 22*) by the government as guidance for the Court).

---

[3] The government-concealed independent attorney disclosures identified the Jowdy-loan theft as the cornerstone to the Arizona litigation, as follows (leaving no one unaware—contradicting 2015 trial testimony memory and the prosecutorial desires):

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

On this issue, the Second Circuit has repeatedly opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant. Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e. having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

[4] "[t]he loss must be the result of the fraud." *U.S. v. Ebbers*, 458 F.3d 110, 128 (2d Cir 2006)—and "[l]osses from causes other than the fraud must be excluded from the loss calculation." Id.

4

Yet—this is not the only testimony that would have to be discredited to arrive at any significant loss calculation (for guidelines, forfeiture, and restitution), including but not limited to (yet without *Fatico* hearings, the government's *Youngblood* defense has no opponent):

> "While a criminal trial is not a game in which participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *U.S. v. Cronic*, 466 U.S. 648, 657 (1984) (internal quotations marks omitted).

As such—[5]
(1) Peca testified his money was authorized for the Jowdy-loans (*Tr.496-99*: corroborated by SDNY Grand Jury testimony: *ECF No. 112-3*)—but must be rebuked by the Court to find loss;

(2) Hawaii Managing-Member, Kaiser testified the Hawaii project loans to Jowdy (*ECF No. 770 at 36, ECF No. 815 at 20-21, f.15*) were to "*if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize it for a loan**, so we actually made some money off if it*" (*Tr.1170: Kenner trial exhibit 39*)—but must be rebuked by the Court to find loss;

(3) Berard testified "*truthfully*" his money was authorized to go to the Jowdy loans (*Tr.3087-90*)—and Berard was "*I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico.*" (*Tr.3055*)—but must be rebuked by the Court to find loss;

(4) Sydor testified "*truthfully*" (*Tr.2300*) that he knew and authorized the Little Isle 4 (Hawaii) money to go to the Jowdy-loans (*3500-DS-1; ECF No. 112-4 at 19-21, 25-26: Kenner trial exhibit 76*)—but must be rebuked by the Court to find loss;

(5) McKee exculpatory text records—conceded by the government in the Constantine appeal arguments (*Case: 20-4278—Opp'n Dkt. 62 at 22-23*)—but must be rebuked by the Court to find loss;

---

[5] When separating fraud and non-fraud factors (as required by the Second Circuits' *Ebbers* decision)—literally each of these <u>individual</u> testimonies cover the entire value of allegations of specific fraud in the **Hawaii** (Jowdy loans and Constantine consulting payments allegations of fraud) and the **GSF** (Constantine's overspend of his side-deal and personal funds in the case totaling $1,624,982; notwithstanding Kenner's $20,000 initial fee for Ronald Richards engagement for the "*Bad apples*" (*Tr.1919* [Nash]) and Jowdy-adverse investor/contributors.

5

(6) Northern Trust settlement funds (greater than skip-traceable funds to their Jowdy-loan contributions) were testified as recovered by Nolan (*Tr.2074*), Peca (*Tr.506*), and Berard (*Tr.3042*)—but must be rebuked by the Court to find loss;

(7) Northern Trust Banker Mascarella testified that he was aware that LOC clients received monthly statements (like the ones he arranged for Kenner as the banker in-charge of them)—opposite the government's foundationless theories (*Tr.912*) (re-corroborated by the Northern Trust subpoena production of monthly LOC statements: *Kenner trial exhibit 210*)—but must be rebuked by the Court to find loss;

(8) Rucchin testified (*Tr.2750*) that he wanted his GSF funds to go to Ronald Richards for legal fees—and *GX-767* (Ronald Richards tracking spreadsheet) verified they 100% did, but the Court alleged this was not good enough because "*these people put their money in under the understanding that this group of individuals were all doing the same thing*" (*ECF No. 1096-1 at 27-28*);
 a. Yet—this raises several additional testimonial discrepancies.

    One—Rucchin cannot direct his own money?—and

    Two—when McKee testified (*Tr.1821-24*) that he did not know about Constantine's other elements of the GSF (opposite his government-conceded texts), he was also not allowed to only know what he recalled?

    - It is a circular effect of logic that's unresolvable—but must be rebuked by the Court to find loss;

…And so-on…

The categorically denied testimony was systematic and precise to thread losses thru the eye of a needle; that doesn't exist, like:

(1) Trial testimony called "*ridiculous*" while 100% corroborated by the government's Rule 16 production and *Jenks* materials of their-own witnesses (with the knowing government sitting silent each time) (*ECF No. 1006 25-34—et.al.*); and

(2) Kaiser's *third* tranche of Eufora investments—when it never existed in the first instance; not because Kenner says it—but because there is no "*evidence*" to "*review*" (now alleged as a $200,000 loss originating in never-never-land: *ECF No. 1096-1 at 30*);[6] and

---

[6] **Like Kaiser** who has un-provable and fictitious contributions to—**not just**—Eufora, *but also* the "*grocery list*" or "*shopping list*" funds (*Tr.1404-05*), Kenner's Cabo house (*Tr.1087*),

6

(3) Berard's victim status is mis-guided in the Sag Harbor/LedBetter real estate project (*ECF No. 1096-1 at 30*)—**because** Berard testified (*Tr.3048-50*) that
   a. He knowingly made two transfers (neither from his LOC—as the indictment alleged; nor unknown) to buy his equity in the LedBetter transaction (while testifying he sent it to a different bank), then
   b. He and Kaiser stole the property (with the *forged* and *fabricated* LedBetter operating agreement in Rule 16 [*Ex. 2 -- BINDER---00000450, 452*]—specifically turned over by the government, thus known, then
   c. He and Kaiser sold it using the fabricated operating agreement, and to complete their criminal transaction (with Galioto complicit), then

---

"*back pay*" and "*expenses*" (*Tr.1413-14*)—and other government-supported fabrications (all a joke to the naked eye—never requiring empirical corroboration)—

**Berard** attempted the same fabrication in their contemporaneous joint 2015 Arizona civil defense case for stealing Kenner's $1-million-plus capital account and equity thru an adjudicated "*fraudulent transfer*" of title (a.k.a. a criminal act—*ECF No. 1026-2 at 12*)—and another $500,000 from Ranford, Sydor, Lehtinen, Khristich, and Nash (interveners claims also defended by claiming forgeries that they were grossly impeached over—*including Lanie Donlan caught in the forgery fabrications again*: *3500-LD-2*, all while known and covered-up by the FBI: *ECF No. 1026-1 at 1*; including the Kaiser emails and attached signature pages: *Id. at 2-5*). The Arizona court required empirical proof (a higher standard than applied here); and not the repeated *ipse dixit* only testimonials that contradicted every empirical banking record (*ECF No. 1026-2*)—specifically the ones Kenner questioned. The Arizona court ruled against each and every Kaiser-Berard-Donlan defense allegation that Kenner took their money and forged documents—without producing a shred of evidence; just *ipse dixit* claims that the government promoted as above reproach in the EDNY trial. In contrast, the Arizona court opined (subset of money and forgery lies):

[Court: *Id. at 9*]: "Berard testified that in the early part of 2010, Kenner made a second request for an additional $160,000.00 in order to continue with the renovations at the property. Berard could not provide a specific date for this second loan, nor did he provide any documentation".

[Court: *Id. at 4*]: "Kaiser denies signing the Shangri-La Trust 1999 Revocable Trust Agreement, but the document was notarized by a local Maricopa County Notary Public (exhibit 38). Kaiser did not subpoena the notary or obtain his notary records. Kaiser admits that he subsequently executed documents as the trustee of the Shangri-La Trust 1999."

- Unlike the government and Kaiser's EDNY fabrications—without transactional proof – or in contrast to it—their EDNY proffers were relied upon as unchallengeable when they are simply palpable. The Court should hold them to a minimum evidentiary standard to promote integrity; even 6-years too late.

7

    d. Kaiser and Berard split the $740,000 cash-sale price 50-50% (all criminal acts—against Kenner) (*ECF No. 1036-8*) – *but somehow…Berard has a loss*?; and

(4) Nolan's $2.2 million collateral seizure – when the facts bear it was $500,000 less (lied by Nolan's counsel to support the Court's confusion [*ECF No. 1096-1*] and quickly-supported by the government – despite Nolan's specific trial testimony (*Tr.2074*: "*They gave us $500,000*");

Nolan's attorney described, as Kenner did, that Nolan's seizure was not $2.1 million by Northern Trust but $500,000 less (as the government correctly designated—*ECF No. 1024 at 3*. Technically Nolan didn't receive any money—but the facts are clear, Nolan had approximately $1.6 million seized post-settlement with the bank (*Id. at 3*). Under the Court's position, they could have deemed Nolan's investment $100,000,000 (or whatever other fictitious number they pulled out of the rabbit's hat)—but the restitution is based on loss, not magic—noting

    a. This led to the Court to remove Berard (*Tr.3042*: "*after lawyer's fees and stuff, it was close to $300,000*") and Peca (*Tr.506*: "*It was just over $600,000*") from the credits against loss calculations with no evidence but their recovery testimony to weigh;[7] and

(5) The alleged IRS "*unsigned*" and "*anonymous*" letter that the government/FBI told Kristen Peca was found on Kenner's laptop (*10-5-2020, Sentencing H'rg*

---

[7] With the Court – apparently exhausted by the never-ending torture of Kenner's 8-year detainment (6-years post-trial without a completed sentencing) – the government and Nolan's counsel took advantage of the Court thru double-talk. Nolan's settlement-recovery (critically with his LOC still active at the time of settlement with Northern Trust) was simply reduced the amount they seized: **$500,000**. Nolan testified to it—*supra*. Nolan's counsel double-talked the issue, claiming that Nolan had *not recovered any money*…addressed cunningly to fool the Court—unless her status as a former U.S. Attorney (thru information and belief) was the basis for her perceived veracity—while **not questioning her second blatant lie to this Court** (following the "*no settlement agreement exists*" lie: then producing *ECF No. 874-1* when submitting 3rd party forfeiture claims). Her prior, loyal service diminished her criminal misrepresentations; now two times (unless the statutes for lying in a federal courtroom have changed). **To the contrary – and per Peca and Berard specific testimony – their LOCs were verified as closed and the collateral seized on April 1, 2009 after their specific authorizations on the phone with Northern Trust bankers Mascarella and Brill** (*ECF No. 668 at 119-120*). Because their collateral no longer existed, Northern Trust issued repayment-funds to Peca and Berard. Per Peca's victim statement, and identified in Berard's testimony—they paid Jowdy's attorneys "*35%*" of the gross recovery fees for "*leaning*" on Northern Trust with Galioto's intimidation to settle "*or else*". The only MVRA issue that Kenner challenged was the gross amount of recovery for Peca and Berard (gross recovery) – and whether or not Nolan had paid a similar contingency fee. ***All three recovered <u>at least</u> $1.4 million in total—per their trial testimony.***

8

*Tr.26*)[8] – despite 100% fabrications. **The government has avoided producing the fake-letter &/or telling the Pecas and this Court that they lied to them for years about the source of the IRS audit** (an old-school manipulation tactic to keep the Pecas upset—*in case their*
  a. *Threatening phone calls about murdering Michael Peca;*
  b. *Killing someone's dogs;*
  c. *Breaking into houses;*
  d. *Attacking someone; and*
  e. *Setting cars on fire was not enough manipulation*: *Id. at 25*); yet

- None of the actual evidence was produced upon request (specifically the IRS tip-letter: *ECF No. 1026*); and

(6) Hughes, Rizzi and Ethel Kaiser have no nexus to Kenner (with Rizzi and Hughes never met or spoken to—and Ethel Kaiser perhaps *once* at a 2006 baby christening—not 2005 as implied at trial to substantiate contact before John Kaiser, alone, took her $700,000: *Tr.933*)—ultimately uncharged in the superseding indictment (*ECF No. 214*). Not only was this second December 2009 transaction *independently* solicited by John Kaiser from his friends & family (verifiable in exculpatory records the government produced in Rule 16) but when John Kaiser, Rizzi, Hughes, Ethel Kaiser and 25 others were represented by Giuliani's investigative/legal team in 2009-2011, their attorney, Michael Stolper, Stolper updated his Eufora clients "*June 28, 2011*" (Kenner culpability noticeably absent—even two years after Stolper's investigation) that

> [Stolper—*Ex. 1*]: *"As you may recall, we filed a lawsuit in Arizona state court against Tommy Constantine and his cohorts for misappropriating and mismanaging Eufora. We brought the case in the name of AZ Eufora Partners I, LLC, the company through which many of you invested in Eufora, as well as in the name of the two police officers in New York who were part of a $400k investment in Eufora in December 2009, Robert Rizzi and TR Hughes, both close friends of John Kaiser."*
> …
> "*I recently filed a federal lawsuit in New York on behalf of the two police officers against Constantine for stealing their money. When we served him, he was in an airplane hangar (financed by a number of you [Kenner, Stumpel, Juneau, Nolan]) about to board a private jet (also financed by a number of you [Kenner and Gonchar]) with a bunch of strippers (or women that looked like strippers or washed up Playmates). The process server said that Constantine turned white and was very*

---

[8] [Kristen Peca—sentencing day]: "*And thankfully, that letter was found on Kenner's laptop to validate our suspicions and prove that he was harassing us and obstructing justice.*"

9

> *surprised when she served him with our New York lawsuit. So far, Constantine has failed to comply with the New York Judge's Order that he appear in the New York action. He was supposed to put in papers in opposition to our preliminary injunction motion to freeze his assets but has not. I've also notified the SEC about our New York lawsuit and Constantine's federal crimes.*"

(7) The government ignored Kaiser's *ECF No. 1070-2* submission that confirmed (per his presentation to the Federal Court) that he had $150 million of collateral in 2006 (from Kenner) for his friends & family $1 million loan/investment in the Hawaii project (*ECF No. 1096-1 at 31*).
   a. With the critical issue of whether those funds, with the Kenner loan agreement/collateral (as Kaiser presented) are actually Kenner's money to spend as he desired (the basis for a personal loan in the first instance); notwithstanding
      i. Kaiser was repaid the entire loan/investment – but re-imagined as "*back pay*" and "*expenses*" (*Tr.1413-14*); neither possible to substantiate to the Court (also ignored as suborned perjury—with evidentiary requests denied by the Court, which would have embarrassed the government ruse and Kaiser's perjury);[9]

---

[9] *Furthering the hoax that Kaiser was owed money—and not fully re-paid for millions of investment dollars…*

In spite of the Court's recollection (*ECF No. 1096-1 at 30*)—Privitello's testimony, recapped *infra*, verifies his entire solicitation and investment was thru Kaiser; not Kenner—unless based on his internalization of a fictitious "*cabana party*" that the government had to remind him about – two times – before he recalled the suborned testimony (*Tr.1429*):
> *Q. Did he tell you any stories or invite you to anything?*
> *A [Privitello]: Yeah, I'm sure he told me some stories, I'm not sure that I can recall them now, but stories.*
> ***Q. Does a story about a cabana ring a bell?***

- Were they serious about this graft—making the Kenner is "*living in a cave*" testimony appearing credible (*Tr.712*—et.al.); but only in comparison?

During the 2010, Arizona litigation versus Constantine/Eufora, Attorney Stolper asked Kenner to prepare a *white paper* of responses to the Constantine/Eufora cross-complaint for the cross-defendant group (specifically including Kaiser) (*Ex. 6*). The government delivered it with no Bates stamp: (in *ED-00001978/_2* production: *Ex. 7*). Kenner identified for Kaiser and Privitello's attorneys (*Id. at 7*):
> "*ON page 3 and 4, **Kenner NEVER had any interaction with the Plaintiffs regarding their December 2009 investment in Eufora**. Constantine specifically left Kenner out of the communication in his attempts to persuade Kaiser, without Kenner's expected interference at the time, to look to his friends (current Plaintiffs) for financial assistance. At that time Kenner and Constantine were at odds over the abusive use of the GSFs that Constantine blew through at a record primarily for his own personal benefits.*"

10

To refute this non-nexus 11-years later (for Privitello, Ethel Kaiser, Hughes, and Rizzi), the Court could claim that Kaiser's N.Y.S. Pension/insurance fraud that he began before meeting Kenner (and continues to collect on—a.k.a. still a criminal activity) is Kenner's fault because Kaiser's first childhood doll was "**Wetsie-Betsie**", made by the **Kenner Toy Company**;
> Noting: Galioto terminated the 2012 Long Island District Attorneys' investigation into Kaiser's pension-insurance frauds, identical to the cancellation of Kaiser's criminal IRS-fraud case—terminated immediately upon IRS Agent Wayne's entry into the instant case like Berard's and Jowdy's as well—after 1+ year of independent IRS criminal investigation backed up by banking records, not because (*Tr.3457*):

> "*I have the memory of it. It's just something I really remembered.*"

No response from Kaiser or Privitello refuted Kenner's 2010 *white paper* empirical statement to the Giuliani investigative group—but somehow Kaiser and Privitello agreed to fabricate Kenner's involvement (perhaps thru a "*cabana party*" (*Tr.1429*)—although in contradiction, Privitello testified he "*didn't really talk to anybody about it [Eufora]*" (*Tr.1430*) for the EDNY indictment—confirming (*Tr.1441-42*):

> *Q. How do you know Mr. Kaiser?*
> *A [Privitello]: Worked on some projects together, friends with him for I'd say approximately ten years.*
>
> *Q. And how, if at all, was he involved in this transaction in terms of your investment in Eufora?*
> *A [Privitello]: Well, he knew that I was stressing out about my wife going back to work.*
>
>> MR. LA RUSSO: Objection, your Honor.
>> THE COURT: Yes, sustained as to what someone else knew. Don't speculate as to what someone else knew. Describe the conversation.
>
> *A [Privitello]: I stressed to John Kaiser about that I was stressing out about my wife going back to work and would love for her to stay home. After communicating back and forth with him, he said I don't know if you ever heard of the company Eufora, I said sure, he said there might be a good opportunity, if you'd like I can put you in contact with Mr. Constantine.*
>
> *Q. Earlier you described that you had conversations with both Mr. Kenner and Mr. Constantine about investing in Eufora; is that correct?*
> *A [Privitello]: A. Correct.*

- It was temporally impossible—because in the Stolper *white paper* (*Ex. 7*), Kenner described being out of touch with Constantine over discovery of the Constantine-GSF spending frenzy (unknown to Kenner: *Id. at 7*—and directed by *"only Mr. Constantine": Tr.3805-16*), thus when Kaiser discussed the December 2009 Privitello-Eufora transaction, Kenner could not have been in the loop (evidenced by being absent on all 15-ish Constantine-Kaiser-Privitello solicitation emails in evidence during trial). The government also knew this—but ignored it to create another fabricated Constantine nexus to Kenner. Privitello even testified to it (expanded at *Tr.1537*)—while parsing

11

> (8) The Court referenced the LOC use of un-named superseding indictment individual (Mattias Norstrom, like Gonchar) as a "*Ponzi like scheme*" (*ECF No. 1096-1 at 25*): seeking the government's acquiescence to the government-known error: *Id. at 26*). The government/FBI agreed with the confusion/error (in their favor) and **sat silent** again knowing they received

---

his temporal re-creation takes patience—it clearly delineates any possible Kenner discussions at all (and these proceeded Kaiser's Hughes/Rizzi/ Ethel Kaiser independent solicitations—only by John Kaiser).

*Q. Was that after you had talked to Mr. Kaiser?*
*A [Privitello]: A. Yeah, I think he [Kaiser] introduced Kenner to me.*

- Clearly—Kaiser introduced Privitello to Kenner after Kaiser solicited him for the Kaiser-Constantine transactions, which cut Kaiser a secret ½ percent of Eufora for delivering Privitello (*Tr.1559-60*).

    Note: In the same *white paper* (*Ex. 7 at 7.*), Kenner highlighted (regarding any other real estate transaction: i.e. Hawaii, California, Arizona, Sag Harbor):
    "*On page 3, Kaiser has not invested Millions of dollars with Kenner, nor has a barrage of litigation ensued as a result – TOTAL UNTRUTH.*"

Again in the *white paper*—it is impossible that this statement could have been made by Kenner to the group without Kaiser screaming that Kenner owed him millions at the time of Kenner's November 2010 *white paper* to Kaiser's attorney, Michael Stolper; while Kenner was allegedly "*ruin[ing]*" Kaiser's life (*Tr.1089* [Kaiser]—and vouched for *Tr.5753* [government summation fabrication of more known falsities]).

*Further highlighting the forgery ruse as a known-government hoax…*

Underscoring the 2015-forgery-claims as beyond "*ridiculous*"—and <u>before</u> Hawaii-COO-Manfredi and Kaiser verified the agreements to the FBI—October 2010—the Eufora-investors sued Constantine/Eufora (thru Giuliani's investigative/legal team). Constantine/Eufora cross-claimed against several parties—November 2010; including Kaiser. For jurisdiction, the cross-claim identified (*Ex. 6 at 12, ¶8*):

"*8. John R. Kaiser ("Kaiser") is an individual and a resident of the State of New York. Kaiser entered into consulting agreements with Constantine Management Group, LTD ("CMG") in Scottsdale, Arizona, in 2004 and 2005, to raise money for Little Isle IV, LLC, of which Kaiser was a member. Kaiser is subject to personal jurisdiction in the Maricopa County Superior Court.*"

For the umpteenth time in 2010 (and multiple *white paper* contradictions to the government/Kaiser suborned testimony)—Kaiser, thru counsel, <u>never</u> objected to jurisdiction vis-à-vis the authenticity of <u>these</u> two consulting agreements; the same ones Kaiser and the government alleged as forged 5-years later (*GX-5104*)—while hiding the originals with the government (*GX-7004/GX-7005*); a blatant Rule 1002 violation. *Oh well…why not at that point?*

12

Norstrom's 2009 affidavit (from the Nolan arbitration) from Norstrom, himself, during a 2012-FBI proffer (*3500-MN-2*: See *Kenner rebuttal to government ECF No. 1082, Ex. 34*—herein *Ex.10 at 3-4*) that identified (*ECF No. 668 at 275-76*):

[Norstrom]: "*I was aware that my funds would be used to make distributions for the company, including but not limited to: …loans to outside entities [Jowdy entities] and distributions to other members that would satisfy their monthly line of credit payments to Northern Trust Bank*"

"*Phil Kenner has always disclosed the complete and detailed use of these funds to me from time to time and per my every request.*"

And in context—when the Court (relying on the government's direction) posited that Gonchar had not made statements to support the Jowdy loans or legal use of Gonchar's "*Investment in Little Isle IV LLC*" (*ECF No. 1096-1 at 23*) (vis-à-vis his 2004 signed and dated Northern Trust *Extension of Credit* document)—the government/FBI—again—ignored two **exculpatory** documents they received from Gonchar ("SG") during 2010 FBI proffer (*3500-SG-2* and *3500-SG-4*)—both refuting the Court's position.

> One—Gonchar's 2-8-2010 FBI-proffer (*3500-SG-2*: identified at *ECF No. 642 at 21*, *ECF No. 805 at 16*—*et.al.*) stated: "*SG heard from KJ that $ from Hawaii loaned to KJ…KJ only entity Hawaii loaned $ to*"
> - Thus, as of that date, FBI agent Galioto knew Gonchar, like others who previously confirmed it, were aware of the Jowdy loans and Jowdy embezzlements as the heart of the 2008-09 Nevada, Arizona and California litigation to recover the Jowdy-loans— and…
>
> Two—Fully corroborating Gonchar's proffer, Gonchar's 2009 affidavit (*3500-SG-4*), in FBI possession, verified <u>authorizing</u> the Hawaii project as follows (*ECF No. 668 at 446, f.214*):

[Gonchar]: "*In addition to setting up a Line of Credit for the sole use and benefit of the Hawai'i investment Group, I wired $100,000 to Northern Trust Bank…for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion. I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, loans to outside entities and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank…Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request.*"

13

(9) Etcetera…etcetera…etcetera…

*To re-verify the manipulation of the truths—again (in a near-meaningless issue)…*

In follow-up, Tuesday August 10, 2021, Kenner spoke with Unit Team Counselor Waller *again* about the past Friday events and expressed that the Court was told by the U.S. Attorneys Office -- either thru MDC legal department – or of their own accord that Kenner refused to be present for the call and "*apparently*" demanded movement to the work area (the West Visiting Room).   Waller was annoyed and offered that no one identified Kenner's 9am call on her call-sheet (as the person in charge of the call) – and agreed that someone was apparently lying to the cover their clichéd asnos.   Complimenting her surprise for the mis-assertion was when she rhetorically asked Kenner if he thought he controlled any of his movements at MDC?   And—Waller asked if the call was re-scheduled that day, why they would not have moved Kenner back to receive it (a 5-minute task—the same as if in Kenner's housing zoo)?

Later that morning (of the 10th) – Kenner spoke with Legal department member, Cardou, to explain the cover-up issues.   Cardou said he was *still not aware* of the Friday call, nor a record of it.

*Why is this <u>nonsense</u> relevant (at a minimum—more s.3582 issues of "cruel and unusual punishment")?*

After witnessing the lies presented to the media to cover-up the 2019 Power outage disaster and the "*cautious optimism*" from the MDC medical mitigation efforts (regurgitated with pleasure in the government's s.3582 reply memo); which resulted in draconian, 24/7 lockdowns and 80% COVID-19 infection rates at MDC, nevertheless…it is no wonder the Delta variant re-infections are going untested at MDC.

Literally nothing that has been presented as factual is actually so, including the complicit graft to discard over 200 of Kenner's discovery discs (a.k.a. all of them) (when the Court ordered Kenner out of the SHU: May 16, 2019)—plus the destruction of 2 hard drives: one years prior to the SHU incident, previously discussed—and the other "taken" 7 days after the *infamous* jump drive (*ECF No. 191*) was transferred to an external hard drive and delivered to Kenner (June 1, 2020) <u>over 13-months after</u> the court ordered the information transfer to happen "*within 2-weeks*" (from the May 16, 2021 hearing); exposing the government's reckless disregard for Court orders (beyond the demands for case law (*Tr.2143-44*)—production of documents, agreements, original signatures—et.al.).   Clearly— the government doesn't want Kenner to search its contents and maintain the information from the jump drive of more and overwhelming transparent communication between Kenner and the various investor/contributors (*ECF No. 191*)—notwithstanding originally placing him in the SHU (with orders from the U.S. Attorneys office to initiate that punishment: verified thru MDC staff).

14

- Shamefully—and perhaps typical pretrial protocol in white collar, money cases—Galioto attempted to trap Kenner in a 2015 murder-for-hire plot at PDC Queens.   It failed in the weeks before trial, and Kenner could not be *terminated* forever from Jowdy and Galioto's cover-up concerns; allow never-ending money-looting to continue (now exposed by the government—while *too afraid* to prosecute those **above the law**).   Galioto's second murder-for-hire plot failed in 2015—yet they leveraged it as another ruse to move Kenner to MDC where they could terminate Kenner's trial preparation and in-trial work; creating a pre-designed and leveraged advantage (after threatening trial counsel's performance: documented in letter-communication pretrial).

The cancelled August 6th call could have been admitted as a simple mistake by any involved party, but under U.S. Attorney guidelines, **they cannot let a good *issue* go to waste**—transferring blame to where they may be able to get additional mileage with the Court.

It continues to be shameful – even in the most trivial matters (a cancelled call).   But—from the relegated cheap seats, this grade-school graft is dishonorable.   The government has expressed their disdain outwardly and often (as relayed to Kenner by multiple counsel unrelated to this case who say they heard "*Kenner better stop if he knows what's good for him*" for constantly exposing government lies and misrepresentations—and "*the Court isn't going to let a ProSe litigant show up the U.S. Attorneys, right or wrong*".   Kenner has empirically exposed them with their-own Rule 16 exculpatory records – while they continue to double-down – instead of representing justice and admitting their *Youngblood*[10] (if not this one then that one) defense would fail at a new trial.

The Court has asked Kenner to stay focused—but when any one of the particular issues are clearly exculpatory and favor Kenner; the government replays it's *Youngblood* position, and the Court follows.   Thus—Kenner's sole option is to identify overwhelming graft—with exculpatory and empirical records never relying on *he-said-she-said* testimony—to rebuke the government misrepresentations…now deemed "*all over the place*" (*ECF No. 1096-1 at 32*).   The false government-witness' false testimony is the basis for the comparison to empirical records the government ignored to solicit their testimonial anomalies.   It is not re-;itigating, it is point-by-point documentation, often thru mis-remembered trial testimony that people received what they expected—but are upset because the government continues the ruse that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*".   It cannot be both ways—certainly after every evidentiary request was denied despite concrete empirical records supporting the need for

---

[10] See generally, *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) – because if the Court peels back any single layer of the evidentiary-onion (beyond *Youngblood* arguments), the reveal would be another prejudicial finding (favoring Kenner)—*and so-on*.

15

follow-up discovery &/or *Fatico* hearings on the facts, not theories (i.e. Kaiser's "*back pay*" and "*expenses*"—*Tr.1413-14*, when Hawaii bank records prove Kaiser was fully repaid—while IRS records or expense records concurrently would expose government/Kaiser complicity in the perjury).

- If the Court is so inclined, *pick a single issue*, and Kenner will prove it unambiguously with exculpatory and empirical records—specifically including all relevant prior statements, actions (like Plaintiff litigations), and signed records concealed by the government from the trial.  Then—the Court could address the next at their choice…*and so-on…and so-on.*

The government knows **every one** of their fabrications have been exposed (with exculpatory records); and Kenner would systematically parse the lies if attempted again: one-by-one—certainly at a re-trial.  Humility has no place in this system for the government – because a *win-at-all-costs* mantra is not the leitmotif; it is their ideology.

More Courts should hold prosecutorial misconduct to an equal standard of graft like Judge Nathan's *Sadr* rulings[11] – holding the government to a standard of excellence

---

[11] Unlike to the instant case—Judge Nathan identified only a few items that had been withheld from the defense—some simply delayed in production into trial to minimize their effectiveness (See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002)); unlike the multitude of post-trial production hiccups by the AUSA forfeiture team disclosures, *supra*—and including but not limited to—(a) Kaiser and Kristen Peca's post-trial *Giglio* revelations; (b) the Attorney Baker disclosures (*ECF No. 1006-1*), (c) the Kaiser thefts from Dr. Sconzo and Dr. Krueger (*ECF No. 1036-1*), (d) the fabricated operating agreements between Privitello and Kaiser (*Ex. 3 -- identified as Ex. 21; Kenner reply to ECF No. 1082, dated July 26, 2021*)—all known by FBI agent Galioto and selectively withheld from Rule 16 production (cherry-picked and removed as a subset of other contemporaneous submissions).

> Note (*Ex. 3*): The Kaiser fabrication fraud (juxtaposing himself as Managing-Member in another Mexico real estate transaction, mentioned over 35 times at trial—and known to Galioto) was another Kaiser criminal act—as Galioto withheld it from Rule 16 production (mistakenly released during government forfeiture production).
>
> In 2012, Kenner discovered Privitello, Smith, Sconzo (all Kaiser close friends) signed fabricated operating agreement that Kaiser fraudulently produced.  Kenner requested to Privitello (*Ex. 4*): "*July 26, 2012*" "*Thanks for getting the docs so we can sort out the deals*"—and all relevant Frailes documents from Privitello, Smith and Sconzo—but once they called Kaiser about the allegations, they all communicated with Galioto and stopped the production of documents (concealing their existence: *Ex. 5*).  Privitello replied, "*…I'll see what I have as far as docs and I'll ask smitty too… Tks*".

Judge Nathan quoted the government's admissions in her order, "[t]he Court is familiar with disclosure related issues that arose during the March 2020 trial as well as in pre-trial and post-trial motion practice…" (Case 1:18-cr-00224-AJN, ECF 350 at 1). As such—Judge

16

(perceived by the public at large). It is the only solution to terminate this abomination of the system that may only clean itself from within – long after this malfeasance has polluted the instant case; from the insignificant to the most macro of issues.

> ```
> "[R]epetition has been intentionally indulged, in
> order the better to impress particular arguments
> that were most material to the general scope of the
> reasoning.  The great wish is that it may promote
> the cause of truth and lead to a right judgment of
> the true interests of the community."
> ```
>
> New York, March 17, 1788—Preface, The Federalist Papers.

In a similar miscarriage of justice (specifically regarding restitution and loss calculations in the 10th Circuit *Evans* case,[12] Judge O'Brien intervened in the second remand for re-calculations to the district court who refused to address the Appellate re-calculation order from Justice Gorsuch in the first appellate review (before his Supreme Court appointment). Judge O'Brien opined

> [Judge O'Brien]: "*The result here may not be heralded as a model of perfect justice, but it will stand as a conscientious application of the law*."

*Conclusion…*
The Court should review the various loss calculations *de novo* with the information known to the government and ignored, *addressed supra*. The government ignored

---

Nathan dismissed the guilty jury verdict and ordered the government to answer unambiguous questions—holding them to task—such as (Id. at 3):

> "a. For each item responding to 1 [*Brady* failures], indicate all Government attorneys who were responsible for the disclosure failures, including supervisors.
>
> b. For each item responding to item 1, indicate whether the Government agrees or disagrees that the withholding of the item was intentional withholding of exculpatory evidence."

Judge Nathan refused to allow the government's repeated malfeasances to go unchecked—even after trial, insuring justice—like Appellate Court Judge Gorsuch (pre Supreme Court selection) and Judge O'Brien (10th Circuit).

[12] *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014)—referencing the Second Circuit *Ebbers* loss standards.

17

their responsibility to assist the resolve of justice—and instead, placed the undue burden on an exhausted Court (*July 2, 2019, H'rg Tr.24-25*).   The government's malevolence, while taking orders from outside their offices, have shown no bounds to keep the investors in the dark as to Jowdy's approximately $100 million fraud on Kenner and Kenner investors.   The inherent knowledge of the truth would shock the senses of the investors—whose every current belief (and sheep-like following) is wholly derived in the Galioto/government re-enforcement of lies that Kenner "*stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy*"—and everything else was a cover-up to hide the thefts of the Jowdy-loans…by not giving them to Jowdy (not making them in the first instance).

The Court should recall that the government refused Kenner's offer to assist in the real recovery of the Hawaii LLCs last asset (the Jowdy loans: *ECF No. 553*—with government immediate refusal, *ECF No. 554*) after the 2008 Lehman Brothers bankruptcy, frankly the proximate cause of the real Hawaii losses, as the government conceded (*Tr.4588*).

Unfortunately for the investors the government cannot allow the Hawaii-Mexico investors to know that Kenner did <u>not</u> actually steal the Jowdy loans; because anarchy would ensue and the house-of-cards would fall, embarrassing many!

**[REQUEST FOR SEAL]**



---

13 ■

18



**[END OF REQUEST FOR SEAL]**

Respectfully submitted,

Phil Kenner, ProSe