# EXHIBIT B



FOIA CONFIDENTIAL<br>TREATMENT REQUESTED<br>CONFIDENTIAL

August 12, 2021

**By Email**

Diane C. Leonardo
Madeline O'Connor
Assistant United States Attorneys
U.S. Attorney's Office
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

>   Re: **United States v. Philip A. Kenner, et al, 13-CR-607 (JFB)—Danske Bank A/S London Branch's Responses to Certain of the Government's Document Requests**

Dear Counsel:

Per the parties' agreement during our meet and confers, we write to provide Danske's responses to government Request Nos. 3, 5, 7, 8, 11, 15, 17, 18, 19, and 21.

\* \* \* \* \* \* \* \* \*

1. **GOVERNMENT REQUEST NO. 3:**

   *Documentation and correspondence pertaining to any agreements and/or proposed agreements in which Danske would be conferring a, direct or indirect, personal or financial benefit on Kenneth Jowdy ("Jowdy"), individually, or seeking to confer a, direct or indirect, personal or financial benefit on Jowdy, individually, including, but not limited to, any agreements between Danske and Jowdy/the Borrower in which Danske agreed to pay Jowdy for Jowdy's services from Danske's own funds, and Danske's proposed settlement agreements that would permit Jowdy to purchase the DCSL Resort in a forfeiture related sale.*



August 12, 2021
Page 2

Subject to Danske's objections and per the parties' meet and confers, Danske represents that, other than the agreements the government already possesses, there are no agreements responsive to this Request.

2. **GOVERNMENT REQUEST NO. 5:**

   *Documentation identifying the procedures, policies, and practices of Danske, and its officers, employees or owners, for receiving, soliciting, preparing, reviewing, approving or denying loans or client relationships.*

Subject to Danske's objections and per the parties' meet and confers, Danske provides the following explanation of its policies and procedures relating to the DCSL loan.

When Danske acquired the initial Lehman loan and began advancing funds directly, Danske implemented procedures to protect Danske's interests by monitoring Danske's exposure to risk along with the Borrower's use of loan advances and repayments to the Bank. From 2009, Peter Hughes, who retired in 2019 from the Bank as Head of Non-Core, and David Daniel, currently Credit Consultant, Large Special Credits, had primary responsibility and oversight for the DCSL loan and relationship with the Borrower. Jovan Atkinson, counsel for Danske Bank, has been involved in reviewing proposed modifications to the loan agreements and ensuring that such modifications are acceptable from a legal standpoint. Any modifications of the underlying loan agreements have been and must be approved by Danske's credit approval personnel or credit committee.

From 2009 to the present, Danske has also engaged Mr. Michael Delvin to review draw requests and monitor progress at the development and the Borrower's use of funds. From 2009 to December 2016, Danske engaged a loan servicer, Trimont, to administer draw requests and receive and disburse draw proceeds to the Borrower. In January 2017, after Trimont was no longer the loan servicer, Danske engaged Mr. Will Dewey who performs additional oversight as to whether what the Borrower submitted as part of a draw request complied with the loan agreements. The professionals Danske has engaged throughout the course of its relationship with the Borrower have monitored the status of the development, ensured the Borrower's compliance with the loan agreements, and advised Danske as to whether to proceed with funding draw requests.

3. **GOVERNMENT REQUEST NO. 7:**

   *Documentation pertaining to any agreements and guarantees between Danske and any and all Jowdy related entities, including, but not limited to, Legacy Cabo, LLC, Legacy Properties, LLC, KAJ Holdings LLC and Silverpeak.*



August 12, 2021
Page 3

Subject to Danske's objections and per the parties' meet and confers, Danske represents that other than the agreements already produced and in the government's possession, there are no other agreements with Jowdy, Legacy Properties, LLC, or KAJ Holdings LLC. Danske further represents that there are no agreements between Danske and Silverpeak. As the government is aware, there was a proposed loan modification between Danske, the Borrower and Silverpeak conditioned on Silverpeak acquiring certain equity interests in the Borrower as part of a potential sale of equity interests in 2015. That transaction ultimately never came to fruition.

4. **GOVERNMENT REQUEST NO. 8:**

   *Documentation, or correspondence between Danske and the Borrower and/or Jowdy, regarding the Borrower's ability or inability to meet its loan obligations to Danske and/or Lehman.*

Subject to Danske's objections and per the parties' meet and confers, Danske refers the government to the only notice of default, dated January 14, 2020, sent to the Borrower for failure to pay debt service. DANSKE_0015713 (MSJ. Ex. 90 (Dkt. No. 860-10)). The government, which was told on January 7, 2020 that Danske would be sending this notice, already possesses it.

In addition to the above representation, as agreed, Danske provides the following explanation as to why the government's view as to prior purported defaults are incorrect.

In the government's June 25, 2021 email, the government cited a March 2009 internal Danske credit application, DANSKE_0016943, as the basis for its contention that the Borrower had defaulted as of 2009. **Ex. A** (June 25, 2021 Email from M. O'Connor to X. Strohbehn). This document, however, never states that the Borrower defaulted—instead it states that there was a *lender* (Lehman) default. The application references Danske's view that foreclosure would leave Danske vulnerable to counterclaims from the Borrower. *See* DANSKE_0016943 at DANSKE_0016944. The reason the application never states that there was a Borrower default is that the Borrower had not defaulted as of March 2009. Danske analyzed the risks of foreclosure because all amounts due under the loan were due on the maturity date, March 31, 2009, and Danske anticipated that the Borrower would be unable to pay amounts due and would therefore default.

The government has also repeatedly alleged that the Borrower defaulted because it did not pay interest on Facilities A and B from approximately February 2009 through December 2011. We reiterate our earlier comments – interest accrued through this period meaning that there were no cash-pay interest obligations for the Borrower to meet. This interest was subsequently capitalized in April 2013 when Danske increased the principal amount of Facility A from $109,138,327.83 to $123,500,000. DANSKE_0015736 (April 29, 2013 Funding Memorandum). This accrual and capitalization of interest was not a Borrower default. The government's view is based on the government's consultant's incorrect analysis of the underlying loan agreement. Specifically, in a June 25, 2021 email you wrote the following—



August 12, 2021
Page 4

>   Most iterations of the Loan Agreements or Amendments include a provision describing Events of Default. For example, Article XVIII "Events of Default" of the Amended and Restated Loan Agreement dated March 6, 2009 identifies situations which qualify as an Event of Default, including: (a) Failure of Borrower (i) (A) to make any payment of principal, interest, the Profit Participation Fee, the Breakage Fee, the Non-Utilization Fee, the Future Equity Requirement, and any periodic payments. The Amended and Restated Loan Agreement identified only interest payments as being required, and did not specify that principal payments were required . . . . The Amended and Restated Loan Agreement stated that "unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance . . . ." *See* Article V, Section 5.1 of the above referenced Loan Agreement. Because DCSL failed to make the interest payments for accrued interest on Facility A, the unpaid, accrued interest was capitalized, which increased the principal balance. Danske's capitalization of the interest demonstrates that the interest payments hadn't been made and thus that DCSL was in default on the Loan.

**Exhibit A**.

For the period in which interest was accrued, the 2009 Amended & Restated Loan Agreement (as amended in January 2010[1]) governed the parties' relationship. Section 5.1(b) of that agreement expressly provided that interest was only due when the Borrower had funds to pay it and that Danske was entitled to capitalize accrued interest. *See* MSJ. Ex. 40 (Dkt. No. 853-10) at DANSKE_0013890 (§ 5.1(b)) (emphases added). Provisions like these are common in acquisition and construction loans, like this one, and are intended to provide borrowers with flexibility in recognition that in the earlier phases of projects before a project is revenue producing, a borrower may not have sufficient cash flow to pay interest. Under the terms of Section 5.1(b), interest was not due until the Borrower had sufficient funds to pay it. Therefore, the accrual of interest from 2009 to 2011 is not an event of default under Section 18.1, which provides that a failure to pay interest is a default ***only*** when interest is not paid ***when due***. *See id.* at DANSKE_0013918-18 (§ 18.1(a)).

>   5. **GOVERNMENT REQUEST NO. 11:**
>
>   *Danske's internal correspondence and documents regarding its decision to continue lending, documentation regarding the DCSL Resort's defaults, and documentation regarding Danske's decisions pertaining to foreclosure.*

---

[1]   The January 2010 amendment to the 2009 loan agreement is not relevant.



August 12, 2021
Page 5

Subject to Danske's objections and per the parties' meet and confers, Danske agreed that, in response to this Request, Danske would provide the government with the date upon which the Borrower first began paying interest from cash flow generated by the Resort Property to Danske. Based on our review of existing materials, we understand that date to be on or around April 4, 2012. MSJ Ex. 45 (Dkt. No. 854-5), DANSKE_0015502 at DANSKE_0015510.

6. **<u>GOVERNMENT REQUEST NO. 15:</u>**

   *Documentation or an explanation for why Danske did not account for capitalized interest until April 2013 even though interest began accruing in March 2009 after the DCSL Resort first failed to make required interest payments.*

Subject to Danske's objections and per the parties' meet and confers, Danske disagrees with the premise of this Request because, as explained above, the Borrower was not obligated to pay interest current. Further, it is incorrect to suggest that interest accrual automatically results in capitalization of such accrued interest. Lenders, including Danske, have the discretion to decide whether and when to capitalize interest. The fact that Trimont recorded capitalization of interest in its records reflects only that Trimont recognized that Danske *could* capitalize accrued interest—it does not mean that accrued interest *actually had* been capitalized.

7. **<u>GOVERNMENT REQUEST NOS. 17 AND NO. 18:</u>**

   *Documentation or an explanation as to why $3,020,424 of interest payments included in Trimont's Invoices were not included in Danske's bank statements.*

   *Documentation or explanation for the notable inconsistencies between the various Trimont documents provided by Danske, as well as the discrepancies between the Danske loan statements and the Trimont Invoices.*

Subject to Danske's objections and per the parties' meet and confers, Danske states as follows: As an initial matter, and in contrast to the assertion in Kellie Fedkenheuer's affidavit at ¶ 14, interest payments do not reduce the amount of principal owed. In addition, Danske represents that it is common practice for a lender to engage a loan servicer for the purpose of maintaining the records of payments and managing other administrative matters with respect to such loans, including monitoring the Borrower's use of funds, draw requests, and payments made.

Until the end of 2016, Trimont was the servicer Danske engaged for the loan and therefore, was responsible for maintaining the records of the loan. During this period, Danske did not maintain records of each payment although it did maintain internal records relating to the loan



August 12, 2021
Page 6

including but not limited to principal balance. The government's consultant's conclusion that the "Danske loan statements and the Trimont Invoices should report the same transactions regardless of the transactions' impact, as both sources are reporting the same loan activity" is simply incorrect. As David Daniel explained previously—

> The assumption that these documents should report the same transactions is incorrect. While Trimont was in place as servicer, Danske maintained its own statements related to the DCSL Loan as internal records of Danske only. Some of the transactions booked on Danske's internal loan statements are internal transfers between Danske's own accounts that would not have been included on Trimont's statements. The purported differences between Danske's and Trimont's loan statements are addressed below.

Dkt. No. 925, ¶ 15. Danske also refers the government to Mr. Daniel's explanation of the purported discrepancies claimed by the government's consultant. As we have offered to the government numerous times before, Danske is available to answer specific questions the government or its consultant have instead of the government and its consultant making meritless conclusions and assertions based wholly on false assumptions. It is not surprising that the government's consultant would reach these baseless conclusions given that the government's consultant appears to be a forensic accountant without any knowledge or experience regarding lending and real estate, let alone commercial real estate lending and development.

8. **GOVERNMENT REQUEST NO. 21:**

   *Documentation to support Danske's assertion that the increase in the PPF reflected Danske's view of how the risk profile of the DCSL Loan had changed as a result of Danske advancing additional funding.*

Subject to Danske's objections and per the parties' meet and confers, Danske states as follows: In January 2009, Danske agreed to assume all of Lehman's interests, rights, and obligations with respect to the lien. When Danske and the Borrower amended the loan documents in March 2009, Danske agreed to waive the Additional Fee of at least $125 million that Lehman had been entitled to receive. In lieu of the Additional Fee, Danske agreed to a Profit Participation Fee to be calculated as set forth in the 2009 Loan Agreement with a minimum payment of $45,000,000 if paid at loan maturity. MSJ Ex. 40 (Dkt. No. 853-10), DANSKE_0013865 at DANSKE_0013891.

In April 2013, Danske agreed, pursuant to an amended and restated loan agreement, to increase the principal balance of the loan by $3 million in a new Facility C, to increase the principal balance of Facility A by approximately $13 million, and to extend the maturity dates for existing facilities. MSJ Ex. 51 (Dkt. Nos. 855-1, 855-2), DANSKE_0011080 at DANSKE_0011087-88,



August 12, 2021
Page 7

DANSKE_0011128. The PPF was modified from the calculation method with $45 million minimum in the 2009 loan agreement to a flat fee of $50 million. DANSKE_0011080 at Recital N, § 2.1. This increase reflected the fact that the loan became riskier for Danske by increasing the amount of money Danske was owed by $3 million and allowing the Borrower more time to repay amounts owed, both of which increased the odds that Danske might not be paid in full or perhaps at all.

* * * * *

To the extent that you have additional questions as to anything set forth above, Danske proposes that the parties engage in a meet and confer. Danske believes that having such a call would result in a more fruitful dialogue that will avoid the government making inaccurate conclusions based in its failure to understand the underlying documents and ultimately unnecessarily burdening the Court and causing Danske to incur further unnecessary legal fees.

Sincerely,

George Kostolampros
Doreen S. Martin
Kelly S. Weiner
Xochitl S. Strohbehn

# EXHIBIT A

**Strohbehn, Xochitl S.**

| | |
|---|---|
| **From:** | O'Connor, Madeline (USANYE) 1 <Madeline.OConnor@usdoj.gov> |
| **Sent:** | Friday, June 25, 2021 1:16 PM |
| **To:** | Strohbehn, Xochitl S.; Kostolampros, George |
| **Cc:** | Beckmann, Diane (USANYE); Weiner, Kelly S.; Martin, Doreen S. |
| **Subject:** | RE: Danske Meet and Confer |
| **Attachments:** | 4.29.2014 Legacy Subordination Agreement (DANSKE_0012837).pdf; 10262382-v1-Danske_Diamante Notice of Default (Breach of Financial Covenant).PDF |

**Caution: External Email**

George, Kelly, Doreen and Xochitl:

 Our responses to your questions are as follows:

1) Dates for the 10 draw packages, 10 funding memoranda, and 20 Delvin reports you have asked Danske to produce. While Danske has agreed to produce only 10 Delvin reports (in addition to the 3 already in your possession), having the dates of the 20 reports you have requested would be helpful for purposes of identifying the burden associated with producing 10 additional reports.

| Draw Packages Corresponding to the Identified Transactions | | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 1 | C | 6 | 07/23/14 | OUTWARD 4022-42049409644 | $2,000,000 |
| 2 | C | 7 | 12/30/14 | OUTWARD 4022-43644982596 | $1,587,637 |
| 3 | C | 9 | 04/02/15 | OUTWARD 4022-50928178314 | $1,750,000 |
| 4 | C | 10 | 08/04/15 | OUTWARD 4022-52162524448 | $1,250,000 |
| 5 | C | 11 | 11/06/15 | OUTWARD 4022-53105862840 | $1,394,488 |

| | Draw Packages Corresponding to the Identified Transactions | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 6 | C | 12 | 01/06/16 | OUTWARD 4022-60068010908 | $1,402,000 |
| 7 | C | 22 | 04/12/18 | OUTWARD 4022-81024789440 | $2,500,000 |
| 8 | C | 23 | 09/28/18 | OUTWARD 4022-82714119646 | $1,905,000 |
| 9 | C | 24 | 11/30/18 | OUTWARD 4022-83347713714 | $2,000,000 |
| 10 | C | 28 | 11/05/19 | OUTWARD 4022-93098099318 | $1,000,000 |

| | Funding Memoranda Corresponding to the Identified Transactions | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 1 | C | 5 | 05/06/14 | OUTWARD 4022-41266802658 | $2,000,000 |
| 2 | C | 7 | 10/07/14 | OUTWARD 4022-42802014522 | $2,000,000 |
| 3 | C | 8 | 03/04/15 | OUTWARD 4022-50637156334 | $2,000,000 |
| 4 | C | 10 | 07/03/15 | OUTWARD 4022-51841485826 | $1,500,000 |
| 5 | C | 10 | 09/15/15 | OUTWARD 4022-52583918698 | $1,750,000 |
| 6 | C | 11 | 12/10/15 | OUTWARD 3826-53447096398 | $1,250,000 |
| 7 | C | 21 | 02/23/18 | OUTWARD 4022-80542422980 | $2,000,000 |
| 8 | C | 22 | 06/22/18 | OUTWARD 4022-81738787708 | $2,100,000 |
| 9 | C | 24 | 12/19/18 | OUTWARD 4022-83538891662 | $2,250,000 |

2

| Funding Memoranda Corresponding to the Identified Transactions ||||||
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 10 | C | 26 | 05/24/19 | OUTWARD 4022-91448050600 | $1,800,000 |

| Delvin Reports Corresponding to the Identified Transactions ||||||
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 1 | | | Delvin's most recent report | | |
| 2 | C | 7 | 10/07/14 | OUTWARD 4022-42802014522 | $2,000,000 |
| 3 | C | 8 | 03/04/15 | OUTWARD 4022-50637156334 | $2,000,000 |
| 4 | C | 12 | 01/06/16 | OUTWARD 4022-60068010908 | $1,402,000 |
| 5 | C | 10 | 09/15/15 | OUTWARD 4022-52583918698 | $1,750,000 |
| 6 | C | 21 | 02/23/18 | OUTWARD 4022-80542422980 | $2,000,000 |
| 7 | C | 22 | 06/22/18 | OUTWARD 4022-81738787708 | $2,100,000 |
| 8 | C | 24 | 12/19/18 | OUTWARD 4022-83538891662 | $2,250,000 |
| 9 | C | 26 | 05/24/19 | OUTWARD 4022-91448050600 | $1,800,000 |
| 10 | C | 28 | 11/05/19 | OUTWARD 4022-93098099318 | $1,000,000 |
| **Additional 10 Samples:** | | | | | |
| 11 | C | 6 | 07/23/14 | OUTWARD 4022-42049409644 | $2,000,000 |
| 12 | C | 7 | 12/30/14 | OUTWARD 4022-43644982596 | $1,587,637 |

3

| | | | Delvin Reports Corresponding to the Identified Transactions | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 13 | C | 9 | 04/02/15 | OUTWARD 4022-50928178314 | $1,750,000 |
| 14 | C | 10 | 08/04/15 | OUTWARD 4022-52162524448 | $1,250,000 |
| 15 | C | 22 | 04/12/18 | OUTWARD 4022-81024789440 | $2,500,000 |
| 16 | C | 23 | 09/28/18 | OUTWARD 4022-82714119646 | $1,905,000 |
| 17 | C | 24 | 11/30/18 | OUTWARD 4022-83347713714 | $2,000,000 |
| 18-20 | | | 3 most recent reports (not including the report requested for Sample No. 1) | | |

2)   A citation to the document you referenced as reflecting a default by the borrower by 2009.
   • DANSKE_0016943-DANSKE_0016949

3)   The sections of the loan agreement your consultant is relying on for the assumption that the 2013 capitalization of accrued interest reflected an event of default by the borrower.
   • Most iterations of the Loan Agreements or Amendments include a provision describing Events of Default.  For example, Article XVIII "Events of Default" of the Amended and Restated Loan Agreement dated March 6, 2009 identifies situations which qualify as an Event of Default, including: (a) Failure of Borrower (i) (A) to make any payment of principal, interest, the Profit Participation Fee, the Breakage Fee, the Non-Utilization Fee, the Future Equity Requirement, and any periodic payments.  The Amended and Restated Loan Agreement identified only interest payments as being required, and did not specify that principal payments were required, which implies that when Danske initially took over the loan, the Facility A and B loan accounts were interest-only loans.  The Amended and Restated Loan Agreement stated that "unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance . . . ."  *See* Article V, Section 5.1 of the above referenced Loan Agreement.  Because DCSL failed to make the interest payments for accrued interest on Facility A, the unpaid, accrued interest was capitalized, which increased the principal balance. Danske's capitalization of the interest demonstrates that the interest payments hadn't been made and thus that DCSL was in default on the Loan.

4)   The materials your consultant needs to evaluate the approximately $6.5 million in fees and costs the government is challenging.
   • Invoices or some sort of documentation breaking down exactly what each fee charge was for (i.e., the purpose of the charge/fee), plus proof that the services for which those fees were charged were actually performed.

4

5)      Excluding the commission agreement, more information, including the meeting date, for your recollection that Venable met with you and presented a proposal whereby Jowdy would purchase or otherwise benefit from a sale of the Resort Property.
- Danske's settlement proposals/term sheets relating to meetings/discussions with the government in: October-December 2015; April 2016; December 2016; June 2017; September-October 2017.

In addition to the foregoing, in reviewing our files, we discovered an agreement between Danske and a Jowdy-related entity that you did not identify as responsive to Request 7, i.e., a 2014 Subordination Agreement with Legacy Properties.  *See* attached.  The government therefore renews its request that Danske conduct a diligent and thorough search for all documentation pertaining to any agreements and guarantees between Danske and any and all Jowdy-related entities, including, but not limited to, Legacy Cabo, LLC, Legacy Properties, LLC, KAJ Holdings LLC and Silverpeak.

Lastly, in reviewing our files, we also discovered a November 2, 2015 letter Danske sent Jowdy notifying him that the Borrower was in breach of a sales performance covenant, and stating that failure to cure the breach within 30 days would be deemed an Event of Default under the Loan.  *See* attached.  A review of the financial records indicates that the breach was not cured, and, thus, the Borrower defaulted on the Loan.

When would you be able to produce the requested documents?  We intend to file a letter with the Court on Monday, so please let us know your response to our email by Monday morning.

Thank you and have a great weekend.

Maddie

---

**From:** Strohbehn, Xochitl S. <XSStrohbehn@Venable.com>
**Sent:** Tuesday, June 22, 2021 3:45 PM
**To:** O'Connor, Madeline (USANYE) 1 <MOConnor1@usa.doj.gov>; Kostolampros, George <GKostolampros@Venable.com>
**Cc:** Beckmann, Diane (USANYE) <DBeckmann@usa.doj.gov>; Weiner, Kelly S. <KSWeiner@Venable.com>; Martin, Doreen S. <DSMartin@Venable.com>; Krieger, Clifford (USMS) <CKrieger@usms.doj.gov>; Newbold, Wesley (USMS) <WNewbold@usms.doj.gov>
**Subject:** RE: Danske Meet and Confer

Thank you

Xochitl S. Strohbehn, Esq. | Venable LLP
t 212.370.6224 | f 212.218.2200 | m 347.331.6922
1290 Avenue of the Americas, 20th Floor, New York, NY 10104

XSStrohbehn@Venable.com | www.Venable.com

**From:** O'Connor, Madeline (USANYE) 1 <Madeline.OConnor@usdoj.gov>
**Sent:** Tuesday, June 22, 2021 2:13 PM
**To:** Strohbehn, Xochitl S. <XSStrohbehn@Venable.com>; Kostolampros, George <GKostolampros@Venable.com>

**Cc:** Beckmann, Diane (USANYE) <Diane.Beckmann@usdoj.gov>; Weiner, Kelly S. <KSWeiner@Venable.com>; Martin, Doreen S. <DSMartin@Venable.com>; Krieger, Clifford (USMS) <Clifford.Krieger@usdoj.gov>; Newbold, Wesley (USMS) <Wesley.Newbold@usdoj.gov>
**Subject:** RE: Danske Meet and Confer

**Caution: External Email**

Xochitl,

We're working on getting the information and should be getting back to you within the next day or two.

Thank you.

Madeline

---

**From:** Strohbehn, Xochitl S. <XSStrohbehn@Venable.com>
**Sent:** Tuesday, June 22, 2021 11:00 AM
**To:** O'Connor, Madeline (USANYE) 1 <MOConnor1@usa.doj.gov>; Kostolampros, George <GKostolampros@Venable.com>
**Cc:** Beckmann, Diane (USANYE) <DBeckmann@usa.doj.gov>; Weiner, Kelly S. <KSWeiner@Venable.com>; Martin, Doreen S. <DSMartin@Venable.com>; Krieger, Clifford (USMS) <CKrieger@usms.doj.gov>; Newbold, Wesley (USMS) <WNewbold@usms.doj.gov>
**Subject:** RE: Danske Meet and Confer

Diane and Maddie,

Following up on certain of the open items concerning discovery from our meet and confers, we wanted to inquire as to whether you have any update concerning the below:

1) Dates for the 10 draw packages, 10 funding memoranda, and 20 Delvin reports you have asked Danske to produce. While Danske has agreed to produce only 10 Delvin reports (in addition to the 3 already in your possession), having the dates of the 20 reports you have requested would be helpful for purposes of identifying the burden associated with producing 10 additional reports.
2) A citation to the document you referenced as reflecting a default by the borrower by 2009.
3) The sections of the loan agreement your consultant is relying on for the assumption that the 2013 capitalization of accrued interest reflected an event of default by the borrower.
4) The materials your consultant needs to evaluate the approximately $6.5 million in fees and costs the government is challenging.
5) Excluding the commission agreement, more information, including the meeting date, for your recollection that Venable met with you and presented a proposal whereby Jowdy would purchase or otherwise benefit from a sale of the Resort Property.

We are keen to move discovery forward as expeditiously as possible, and to that end, we will be sending Danske's letter of explanation this week; please let us know when we can expect to receive the government's responses to the above queries.

Thanks,

Xochitl

**Xochitl S. Strohbehn, Esq.** | **Venable LLP**
**t** 212.370.6224 | **f** 212.218.2200 | **m** 347.331.6922
1290 Avenue of the Americas, 20th Floor, New York, NY 10104

XSStrohbehn@Venable.com | www.Venable.com

**From:** Strohbehn, Xochitl S.
**Sent:** Monday, June 14, 2021 5:27 PM
**To:** O'Connor, Madeline (USANYE) 1 <Madeline.OConnor@usdoj.gov>; Kostolampros, George <GKostolampros@Venable.com>
**Cc:** Beckmann, Diane (USANYE) <Diane.Beckmann@usdoj.gov>; Weiner, Kelly S. <KSWeiner@Venable.com>; Martin, Doreen S. <DSMartin@Venable.com>; Krieger, Clifford (USMS) <Clifford.Krieger@usdoj.gov>; Newbold, Wesley (USMS) <Wesley.Newbold@usdoj.gov>
**Subject:** RE: Danske Meet and Confer

Diane and Maddie,

As discussed during our call earlier today, I attach a letter to the court as well as an exhibit setting forth Danske's positions as to each request. While the letter and exhibit remain subject to further client review and comment in all respects, we wanted to provide you with drafts prior to filing. We plan to file around 7:30.

Thanks,

Xochitl

**Xochitl S. Strohbehn, Esq.** | **Venable LLP**
**t** 212.370.6224 | **f** 212.218.2200 | **m** 347.331.6922
1290 Avenue of the Americas, 20th Floor, New York, NY 10104

XSStrohbehn@Venable.com | www.Venable.com

**From:** O'Connor, Madeline (USANYE) 1 <Madeline.OConnor@usdoj.gov>
**Sent:** Friday, June 11, 2021 4:44 PM
**To:** Kostolampros, George <GKostolampros@Venable.com>
**Cc:** Beckmann, Diane (USANYE) <Diane.Beckmann@usdoj.gov>; Weiner, Kelly S. <KSWeiner@Venable.com>; Martin, Doreen S. <DSMartin@Venable.com>; Strohbehn, Xochitl S. <XSStrohbehn@Venable.com>; Krieger, Clifford (USMS) <Clifford.Krieger@usdoj.gov>; Newbold, Wesley (USMS) <Wesley.Newbold@usdoj.gov>
**Subject:** Re: Danske Meet and Confer

**Caution: External Email**

George,

How about Monday at noon?

Maddie

> On Jun 11, 2021, at 11:13 AM, Kostolampros, George <GKostolampros@venable.com> wrote:
>
> Diane and Maddie,
>
> Attached is a chart listing out the government's requests, Danske's objections and our understanding of our positions on the meet and confer as to each. I believe that the Court instructed Danske to submit a letter on Monday updating it on our meet and confer. I suggest we have a follow-up call on Monday to go through the chart to confirm your positions as well as the Court and then we can report back by letter to the Court on Monday.
>
> Let us know if there is a time Monday in the am or early afternoon that works best for you.
>
> George
>
> **George Kostolampros, Esq. | Venable LLP**
> **t** 202.344.4426 | **f** 202.344.8300 | **m** 703.635.8501
> 600 Massachusetts Avenue, NW, Washington, DC 20001
>
> GKostolampros@Venable.com | www.Venable.com
>
> ************************************************************************
> This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
> ************************************************************************
> <Meet & Confer Discovery Chart(52556618.2).docx>

************************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply

transmission and delete the message without copying or disclosing it.
**********************************************************************

**********************************************************************
This electronic mail transmission may contain confidential or privileged information. If
you believe you have received this message in error, please notify the sender by reply
transmission and delete the message without copying or disclosing it.
**********************************************************************