FILED
CLERK

11/12/2021 10:40 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - X
                                        :
UNITED STATES OF AMERICA
                                            13-CR-0607 (JFB)


        -against-                    :

                                        United States Courthouse
                                        Central Islip, New York

PHILLIP KENNER,
                                        June 22, 2017
        Defendant.          :        1:25 p.m.

- - - - - - - - - - - - - - X

            TRANSCRIPT OF STATUS CONFERENCE
        BEFORE THE HONORABLE JOSEPH F. BIANCO
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          BRIDGET M. ROHDE
                             United States Attorney
                             100 Federal Plaza
                             Central Islip, New York 11722
                             BY:  SARITHA KOMATIREDDY
                                  MATTHEW HAGGANS
                             Assistant United States Attorneys

For the Defendant:           JESSE SIEGEL, ESQ.




Court Reporter:              Perry Auerbach
                             100 Federal Plaza
                             Central Islip, New York 11722
                             (631) 712-6103


        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

2

1    THE CLERK:  Criminal cause for oral argument in

2   13-CR-607, the United States of America against Phillip

3   Kenner.  Counsel please state your appearances.

4    MS. KOMATIREDDY:  Good afternoon, your Honor.

5   Saritha Komatireddy and Matthew Haggans for the United

6   States along, joined by Special Agent Matt Galioto of the

7   FBI and Special Agent Josh Green for the IRS.

8    THE COURT:  Okay.  Good afternoon.

9    MR. SIEGEL:  Good afternoon, your Honor, Jesse

10   Seigel for Mr. Kenner.

11    THE COURT:  Good afternoon.  Mr. Kenner is

12   present as well.

13    The Court scheduled this for argument on the

14   pending post-trial motions that have been filed by

15   Mr. Kenner.  And this is the opportunity that I give to

16   the lawyers to highlight anything they wish to highlight

17   from their papers.  I just want to emphasize, I know there

18   are many, many arguments in the papers and you had a

19   number of different submissions by Mr. Kenner and his

20   earlier lawyer, as well as Mr. Seigel.  And you don't have

21   to repeat everything that's in the papers. I want

22   Mr. Kenner to understand just because Mr. Seigel doesn't

23   cover every single item that you and he and your prior

24   lawyer raised in the papers doesn't mean I'm not

25   considering it.  It's a chance I give to lawyers not to

1  repeat everything that's in their papers, but to highlight

2  anything they want to highlight to me in their papers.

3      So it's the defendant's motion, so I will let

4  Mr. Seigel go first.

5      MR. SEIGEL:  Actually, Judge, this motion was

6  made pro se.  Prior counsel had submitted what he

7  considered to be a roadmap to it.  But it was always the

8  intention to have Mr. Kenner make the argument.  And if

9  he's then allowed to do that -- I've actually worked with

10  him quite a bit over the last six weeks to get him in the

11  position to do that, the help clarify his claims and help

12  the Court locate where the documents are in his

13  submission.

14      THE COURT:  Okay.  I'm just going to confirming

15  with Mr. Kenner that he wants to do the argument himself

16  for purposes of today's proceeding.  Is that your wish,

17  Mr. Kenner?

18      THE DEFENDANT:  Yes, sir, your Honor.

19      THE COURT:  Mr. Seigel, if there's anything that

20  you want to submit after he's done -- Mr. Kenner, this is

21  the same warning I give to the lawyers, I didn't knkow

22  that you were going to do the argument yourself, but --

23  and I don't know what you prepared today.  I just don't

24  want you to go through every single -- I'm going through

25  every single argument when I decide this and address them

4

1    all.  So don't feel like you have to go through every

2    single word in your submission, do you understand that?

3            THE DEFENDANT:  Yes, sir, your Honor, I

4    appreciate your guidance.

5            MR. SIEGEL:  Your Honor, Mr. Kenner is suffering

6    from vertigo, so would it be okay if he sits.

7            THE COURT:  Yes.

8            THE DEFENDANT:  Thank you, your Honor.  Your

9    Honor, first you I'd like.

10           MS. KOMATIREDDY:   Another thing, your Honor.  I

11   just need to give one moment caution.  I wonder if the

12   Court needs to advise the defendant as to his Fifth and

13   Sixth Amendment implications of making a statements on the

14   record in this context.

15           THE COURT:  Yes.  Let me just -- if you were to

16   make certain factual statements, Mr. Kenner, those could

17   be used against you.  You understand that obviously to the

18   extent that you're making some legal argument as a lawyer

19   would, that would be one thing, but if you were to make

20   certain statements of facts, you don't have any

21   protection.  You're representing yourself here.  And if

22   you make certain representations of fact, the government

23   could seek to use that against you in some way.  Do you

24   understand that.

25           THE DEFENDANT:  Yes, sir, your Honor.

1      THE COURT:  Okay.  Go ahead.

2          Obviously you have a right to have a lawyer do

3   this, but -- a defendant has the right to represent

4   themselves for the entire proceeding, or in this case just

5   for the the purposes of this motion, but; you understand

6   for you have the right to have an attorney do this

7   argument for you, even though you prepared the papers you

8   could have Mr. Siegel do it and one of the reasons why a

9   defendant would choose to have a lawyer do it is to avoid

10  some of these issues that the government just raised.  You

11  understand that?

12      THE DEFENDANT:  Yes, sir, your Honor.

13      THE COURT:  You want to argue it yourself.

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  Okay, go ahead.  You.

16      THE DEFENDANT:  Your Honor, first I'd like to

17  thank the Court for the time today and also extend a brief

18  apology for the Court and the prosecutors for my Rule 33

19  submission in such an unconventional way.  But as the

20  Court knows, I was moving through attorneys at the time

21  and couldn't get much guidance on that.  So I just want

22  the Court to know I did the best that I could in that

23  context.  And I'm forward to clearing up some of the

24  voluminous reports, so if you please bear with me I'll try

25  exhibit some brevity for the Court today as well, your

1   Honor.  First what I'd like to do is, I'd like to just

2   briefly address the newly discovered evidence issue.  Then

3   I would like to cover some of the prosecutorial misconduct

4   issues that were raised briefly and known perjury that was

5   allowed to stand uncorrected over and over throughout the

6   the trial, and then I'd like to finish up, touch briefly

7   on a few Brady violations that were highlighted with

8   respect to Mr. Kaiser and some of the theft that was

9   systematically withheld from the pretrial documents by

10   Mr. Galioto.  Under newly discovered evidence, your Honor

11   Forfeiture 44 was a document that was submitted by the

12   government during the forfeiture hearings and it was

13   allegedly presented to the government about three weeks

14   after the conclusion of trial in 2015.

15          That document, the majority of the discussions

16   today I want to focus on that document and a few

17   contradictory government witness testimony that was given

18   years before the 2015 trial, proving that the document was

19   not only in concert with my defense strategy and my

20   defense testimony but it also contradicted the main

21   government theories throughout the trial.

22          Forfeiture 44, as your Honor saw during the

23   trial, was the spreadsheet presented by Mr. Jowdy and his

24   attorneys post-trial confirming all of the Hawaii money

25   that were sent to Mr. Jowdy from 2004 to 2006 were deemed

1  loans on Mr. Jowdy's books and records under the same

2  premise that I presented them throughout trial as part of

3  our defense.

4          Forfeiture 44 confirms that all of the Hawaii

5  funds from the Little Isle LLC were sent to Mr. Jowdy as

6  loans and it contradicted the government's main trial

7  theme of the alleged theft of the Hawaii funds and

8  Forfeiture 44 also contradicted the government's main

9  claims that the Jowdy loans were made up and used as a

10  cover-up and a finger-pointing scheme by both myslef and

11  Mr. Constantine.

12          Now that the loans effectively are true, Jowdy

13  confirmed it post-trial to the government on Forfeiture 44

14  and the government introduced it into evidence and I

15  believe it creates a substantial reformative effect on the

16  government's trial theories.  Throughout the trial the

17  prosecution called the loans bogus, phony, purported, and

18  they called me a liar for making those claims and that

19  bell cannot be unrung even though that effectively has

20  been the case, and now is substantiated by Forfeiture 44.

21          Second, I raise the issue that under new

22  evidence there were 17 disclosure letters that were signed

23  back in 2009 and turned over to Arizona attorney Tom Baker

24  on behalf of all of the plaintiffs in the Arizona/Hawaii

25  lawsuit against Mr. Jowdy.

1            Each one of the witnesses that testified at this

2   trial testified that they were unaware of those loans to

3   Mr. Jowdy, but in 2009 they all signed off on disclosures

4   from Mr. Baker that the first paragraph of the seven page

5   disclosure said the gist of the lawsuit is to recover

6   certain monies loaned to Mr. Jowdy by Mr. Kenner, Little

7   Isle IV and Ula Makika, Mr. Kenner estimated the total

8   amount of the monies loaned to Mr. Jowdy which have not

9   been repaid to be approximately $5 million.  This is the

10  estimated principal only, exclusive of any accrued

11  interest.

12            In summary, Mr. Jowdy denies be that the money

13  were loans, but rather characterizes them as investments.

14  His own document, Forfeiture 44, shows we were fighting an

15  uphill battle against something that Mr. Jowdy proffered

16  to the FBI months later, testified in a California

17  deposition months later was actually loans and now through

18  Forfeiture 44 confirms they are loans.

19            You can find Mr. Jowdy's confession of the loans

20  at 3500 material KJ-2 at page 12 where he tells Mr.

21  Galioto that he in fact borrowed the money from Little

22  Isle IV and Ula Makika and myself.  He made those claims

23  in 2010, five years before the government claimed that

24  those loans were actually fake and made up.

25            Ultimately I received the Baker disclosures from

1   Mr. Constantine's attorney, Mr. Oliveras, months after the

2   conclusion of the trial and that was the first that I had

3   knew that any of those signed disclosures were actually in

4   existence.

5            At trial I think we heard from Mr. Berard,

6   Mr. Peca, Mr. Sydor, Mr. Rucchin, Mr. Goncher and Mr. Nash

7   all deny that they knew there were loans to Mr. Jowdy

8   although each one of them signed the disclosures that I

9   found out about after trial.  Apparently they didn't know.

10           And then last I wanted to address the Northern

11  Trust subpoena documents that arrived, as your Honor

12  knows, very late in the trial.  These documents confirm

13  that each of the line of credit clients knew that they had

14  authorized me to withdraw the line of credit funds for

15  deposit into Little Isle IV, the Hawaii corporate bank

16  account; 2, that they were signing the Northern Trust

17  deposits for their line of credit as a capital account for

18  quote investments into Little Isle IV; 3, that they gave

19  authorization to me to use the funds under the Little Isle

20  IV operating agreement; and, 4, that they signed off

21  annually to use those funds.  As a example, Mr. Nolan, his

22  2004 extension of credit called the money he borrowed an

23  investment in Little Isle IV, $2.2 million, and he signed

24  that on October 29th of 2004.

25           Annually all of the investors signed

1   disbursement requests and authorization documents from

2   Northern Trust, and they confirm that each of the

3   investors knew at all times that their funds were used and

4   in fact Mr. Nolan in 2005 signed his disbursement request

5   that acknowledged that $2.1 million had already been used.

6   In 2006 he signed one that showed 1.3 million was used

7   after he received over 700,000 back from our Lehman

8   closing.

9            And then lastly, in 2007 Mr. Nolan also signed a

10   document after he had a -- which was exhibit R 33480 in my

11   submission, and he used my FedEx account to personally

12   return that to Northern Trust Bank at R 33460.  A five day

13   text message conversation between myself and Mr. Nolan

14   identify the documents, what they were for and why he

15   needed to sign them, and ultimately Mr. Nolan signed them

16   and sent them back.  So when he told the arbitration panel

17   in 2009 and this courtroom in 2015 that he had no

18   knowledge of the line of credit, did not know it was

19   signed and had never gave any permission for it, it was

20   clearly under false pretense or clearly a misstatement.

21            Mr. Nolan then signed the 2007 distribution

22   request and authoization which was exhibit R 30480, that

23   identified the full $2.2 million being used in his

24   account.  And despite the evidence of Mr. Nolan's

25   signatures on almost 40 documents with Northern Trust, he

11

1    testified during trial at transcript 2065 and 2066 that he

2    had no understanding or no knowledge of these whatsoever.

3    At trial Mr. Nolan, Mr. Berard, Mr. Peca, Mr. Suder and

4    Mr. Rucchin all testified contrary to the documents that

5    were finally -- that finally arrived in Northern Trust

6    package.

7              These are crucial documents, your Honor showing

8    that each of these investors had full knowledge of what

9    was going on with their funds, the intention of their

10   funds, and annually the use of the funds.

11             We tried to obtain the records over a month

12   before trial when the government objected to it, calling

13   the subpoena burdensome and -- for Northern Trust, and a

14   fish expedition meant to harass the alleged victims, but a

15   week before trial they withdrew the objection and the

16   subpoena went in to Northern Trust although it took 10

17   weeks to arrive and it arrived after the close of the

18   government's case.  At that point we had asked Mr. Haley

19   to re-call each of the witnesses, which we refused to do,

20   to confront them with the documents.  And all I would ask

21   your Honor is for consideration, if you don't find the

22   Northern Trust documents that fully disclose the use of

23   the funds, the intent of the funds, on an annual basis for

24   each of the Hawaii investors that are claiming losses,

25   that they didn't know about, if you deem these to be not

12

1    new evidence because Mr. Haley had access to it but simply

2    refused to use them properly at trial, I would ask the

3    Court permission to be able to make a submission of

4    ineffective counsel claim under the Rule 33, and it would

5    take about 30 days to have that done, if your Honor would

6    allow me to.

7         At this point, your Honor, I'd just like to go

8    through a couple of other items.  The government

9    throughout the trial had called each of the

10   representations of the loan by me and by defense counsel

11   as bogus, phony and supposed.  They also called the loan

12   document that Mr. Jowdy had signed to borrow the funds

13   back in 2009 "purported."  Although they had in their

14   possession throughout the trial Mr. Jowdy's own attorney's

15   admissions of the document as an authentic document, his

16   December 2010 Nevada trial defense where his own attorney

17   Ms. Lee actually submitted it.

18        During the forfeiture hearing -- excuse me,

19   your Honor, sorry about that.

20        Your Honor, we -- during the forfeiture hearing

21   when we addressed the authenticity of the loan agreement

22   that substantiated the loans that now Forfeiture 44

23   corroborates, the government, when they argued with me

24   over that point, I think we offered to present the

25   transcripts from the Nevada trial, the transcripts from

13

1    Mr. Gaudet, the loan document witness, and Mr. Gaudet's

2    testimony from the 2009 arbitration all substantiating the

3    authentication of it.  What I did was in our submission at

4    R33 D as in David, in that file, all three of those are

5    there and present for you to look up, your Honor.

6            In FORF-B, that is Mr. Gaudet's testimony in the

7    Nevada trial, you can find his testimony at transcript

8    page 197, 198, where he authenticates the document for Mr.

9    Jowdy's defense.  Forfeiture 44 was confirmed by Mr. Jowdy

10   as real.  But five years after Mr. Jowdy and his attorneys

11   confirmed it, the underlying loan agreement as real, the

12   government ignored it, contradicted it throughout the

13   trial and call it fake, bogus, phony, and supposed, fully

14   prejudicing the defense in all context.

15           The loans ultimately were specifically

16   authorized through Little Isle IV through the operating

17   agreement which you can find in R 33571 and also in my

18   point 3 submission at page 21, and under the first section

19   of the operating agreement it reads:  At the sole

20   discretion of the managing member Little Isle IV may

21   participate as a lender if deemed by the managing member

22   to be in the best interest of the LLC.  I was the managing

23   member at all times of Little Isle IV, your Honor, and I

24   still am.

25           When the government allowed their witnesses to

14

1   claim no knowledge of the Jowdy loans they had to ignore a

2   significant amount of contradictory evidence and this is

3   where I begin to discuss some of the prosecutorial

4   misconduct issues.

5           From Mr. Kaiser, in order for him to testify

6   that he had no knowledge of the loans to Mr. Jowdy, the

7   government had to ignore his 2009 arbitration testimony at

8   R 33637 at point 3 at page 154 and 155.  Mr. Kaiser's only

9   relationship with the alleged trial schemes was his

10  investment in Hawaii, which he was also the only person

11  who was fully paid back in 2006, thus had no capital

12  remaining in the investment, which you can see at R 33052.

13  He received his full 1.176 million at the closing.  And

14  whether or not he chose to repay his friends and family he

15  raised the money from was his own business or had nothing

16  to do with myself or Little Isle IV, leaving Kaiser very

17  difficult claim to be a victim at all from this.

18          He gave very substantial testimony in his

19  arbitration in 2009, your Honor, and I think, you'll be

20  able to find that in his arbitration testimony, let's see

21  if I can be succinct in where you can find that.

22  Mr. Kaiser did not give a very long testimony, it was

23  probably seven pages of deposition.  So perhaps I'll just

24  leave it in your Honor's hands to be able to go through

25  that without taking up the Court's time.

1          In addition to Mr. Kaiser in that arbitration

2     testimony claiming not only did he participate in the

3     decisions to raise money for Mr. Jowdy's loans, but after

4     he realized that there was collateral and good collateral

5     by Mr. Jowdy from the loan agreement that he had in his

6     possession, he met with Mr. Jowdy on several occasions,

7     after those meetings Mr. Kaiser raised about one million

8     dollars from his friends and family.  He testified to all

9     of that and the reason that he raised that money was to

10    contribute to Mr. Jowdy's 15 percent move.

11         And ultimately he had stated at one point the

12    first thing Mr. Kenner told me, and I met Mr. Jowdy a

13    couple of times, he seemed a big thing, it was 15 percent

14    interest rate and I thought it was a good move.

15    Mr. Kaiser also corroborates that 2009 arbitration

16    testimony in October of 2010 in his 3500 material, in an

17    interview with Mr. Galioto at JK-1-R.

18         Your Honor, this testimony by Mr. Kaiser and

19    several others I'll mention in a moment all are

20    prosecutorial misconduct because they not only were

21    overwhelming testimony that contradicted their 2015

22    courtroom testimony here that stood uncorrected at all

23    times, but in many occasions like in Mr. Kaiser's, he also

24    corroborated that testimony directly to FBI Agent Galioto

25    in face-to-face meetings represented in FBI raw notes or

16

1   transcribed notes after the fact.  Mr. Kaiser had given

2   testimony about his money being stolen at transcript 983

3   and also given erroneous testimony about an alleged

4   confrontation in 2006 at transcript 1043.  But three years

5   later Mr. Kaiser was asked are you aware that Mr. Jowdy

6   hasn't paid the money back?  He says correct.  Do you

7   blame Mr. Kenner for him not paying the money back?  He

8   says no.  He says that he's been dealing with a lot of the

9   Hawaii investors for years and it's never been a secret

10  that anybody was unaware of the loans, there were no

11  secret handshakes.  All that language in his 2009

12  testimony is corroborated in his 2010 FBI interview, and

13  none of it was corrected during the trial.

14          Mr. Kaiser's also present during Mr. Jowdy's

15  2010 deposition in California when Mr. Jowdy finally

16  admitted to all the loans in a public setting, and

17  although he was there for, present fpr two days for

18  Mr. Jowdy's confessions, which were also sent to Agent

19  Galioto.

20          Mr. Kaiser told this court he never believed

21  Mr. Jowdy stole any of the money, which also contradicts

22  the new evidence in Forfeiture 44 the the money was loaned

23  to Mr. Jowdy and he's refused to pay it back for over 11

24  years.

25          I'd like to have one second, your Honor.

1          (Pause.)

2          Your Honor, I apologize for the delay.

3          With respect to Mr. Kaiser, I'm also with

4    Mr. Berard's testimony that he had given in 2009 at his

5    arbitration fully corroborating his knowledge of the Jowdy

6    loans.  In each of these circumstances some of the

7    government's most crucial witnesses at trial had made

8    representations that -- and very definitive

9    representations -- that they were unaware of any of the

10   loans that were made to Mr. Jowdy at any point in time nor

11   would they have approved any of them.

12         This fully contradicted the 2009 testimony in

13   every action they had taken with respect to Mr. Jowdy and

14   myself, until just prior to trial when they took a 180

15   degree change in their approach to what they knew six

16   years earlier.

17         Each one of these pieces of evidence,

18   your Honor, had been in the government's hand and were in

19   the government's hand for as many as six years prior to

20   trial, and contradicted the government's main theories

21   throughout the entire trial.

22         Forfeiture 44, which was admitted as new

23   evidence during the forfeiture hearing by Mr. Wayne

24   effectively corroborates that the loans to Jowdy today are

25   worth over $25 million to the Hawaiian investors and

18

1   nobody has attempted to recover them, especially with

2   Mr. Kaiser and Mr. Berard working for Mr. Jowdy and me

3   being unable to pursue those legally any longer.

4          If -- Mr. Berard's testimony during the '09

5   arbitration was incredibly short as well, but it was

6   specific and to the point that Mr. Berard was clearly

7   aware of the Jowdy loans and approved them.  In fact in

8   2010 Mr. Berard continued to work hand in hand with myself

9   and the attorneys to pursue Mr. Jowdy for those unpaid

10  loans, and had some confrontations with some of

11  Mr. Jowdy's people in order to substantiate the fact that

12  he was not going working with Mr. Jowdy but with all of us

13  until later in 2012 when Mr. Kaiser and Mr. Berard ran

14  into their own financial troubles.

15          Mr. Peca was a very crucial witness for the

16  government in the same context.  In 2011, your Honor,

17  there were three Southern District of New York grand jury

18  testimonies.  Mr. Peca gave his, which can be found at

19  R 33419 and at point three in my submission, pages 20 to

20  23, where Mr. Peca specifically outlined his investment in

21  Little Isle IV to the Southern District grand jury four

22  years before this trial.  He outlined his knowledge of the

23  loans to Mr. Jowdy to the Southern District grand jury.

24  He acknowledged his complete cooperation in the loans and

25  his knowledge that they were made and his support for

1  them.  He acknowledged all of the money from his Capital

2  account going to Mr. Jowdy.

3          So ultimately through his Southern District

4  testimony, he confirmed that he expected $1.7 million from

5  this Hawaii funds to be in Mr. Jowdy's loan amount,

6  although it was far less than that amount.

7          The government had to ignore Mr. Peca's Southern

8  District testimony in order to allow him to say at the

9  trial here that he had no knowledge of it.  And if it's

10  based upon faulty memory, confusion and mistakes, it

11  certainly makes his 2015 testimony unreliable, as the

12  government proffered during their rebuttal to my Rule 33

13  submission.

14          Mr. Peca, his primary involvement with the case

15  here in New York was with respect to his use of funds from

16  the Little Isle IV line of credit.  There was testimony

17  also by Mr. Sydor and Mr. Stephenson at the same Southern

18  District trial.  Although Mr. Stephenson didn't testify

19  here, Mr. Sydor did, and he again did cooperate that he

20  had full knowledge in 2011 of the loans to Mr. Jowdy and

21  the Capital account uses from the Hawaii business.

22          He also corroborated that the money was not --

23  was no longer his, but it belonged to the corporation.

24          Your Honor, again for each of those that I have

25  represented, the government had full access to each of

20

1  these individuals.  They had all of this evidence in their

2  hands and in their possession for years before they made

3  the claims that nobody knew that there were loans to

4  Mr. Jowdy from our Hawaii project as being the fraud in

5  the case.  And as a result of the government allowing each

6  of these crucial witnesses to take the stand and testify

7  in contradiction to previous testimony that they had full

8  access to and the ability to go over and over with these

9  witnesses in preparation it exhibits pure signs of

10  prosecutorial misconduct by the government for allowing

11  these contradictory testimonies to be made when they were

12  made in very substantial ways to previous civil and grand

13  jury trials.

14        Ms. Komatiriddy during her opening remark at

15  transcript 31 actually made it very clear to the Court

16  that the alleged loans to Mr. Jowdy is where the fraud

17  occurred where the defendants lied to the investors about

18  who was stealing from them and find a way to steal from

19  them all over again, referring to the global settlement

20  fund.  According to Forfeiture 44 there was no lie and

21  there were no prior thefts and ultimately with all of that

22  being real, the global settlement was a fund that

23  Mr. Constantine conceived and all of us agreed to

24  contribute to in order to pursue Mr. Jowdy in additional

25  lawsuits to the approximate 10 that were already pending

21

1    versus him at that point in time.

2              Your Honor, if I can just have one second can

3    just to get a drink of water, please.

4              Your Honor, again I apologize for the brief

5    delay.

6              In fact in point three on pages eight and nine I

7    pointed out about 12 different instances that Mr. Jowdy

8    had stolen from myself and the rest of the Mexican

9    investors.  Some of them were so egregious they couldn't

10   be ignored by the government.  Again with evidence that

11   they had in their possession since Mr. Jowdy's grand jury

12   had begun through Mr. Galioto back in 2009.

13             So even the government's representations that

14   the loans to Mr. Jowdy were fake, that they were cover-up

15   and it was part of a finger-pointing scheme, again

16   exhibits pure signs of prosecutorial misconduct as they

17   ignored the evidence that they had in their hand to frame

18   a prosecutorial theory that had no foundation.

19             Mr. Jowdy had also proffered directly to FBI

20   agent Galioto in March of 2010, and in that proffer in

21   3500 material KJ 2 at page 12 he confirmed all of the

22   loans.  So it's possible in my perspective that

23   Mr. Miskiewicz and Ms. Komatiriddy were unaware of some of

24   this evidence since all of this was given directly to

25   Mr. Galioto at all times.

22

1    The evidence that Mr.  Jowdy had stolen
2    somewhere in the neighborhood of $25 million was all
3    represented by myself to Mr. Galioto back in June of '09
4    and it's all substantiated in point 3, pages eight and
5    nine, but in addition, just one piece of evidence I'd like
6    to point out, your Honor, is that just a week before the
7    trial, in one of my submissions in my timeline 012, the
8    government had subpoenaed Mr. Jowdy's August 2002 Baja
9    Development Corp. bank record which was his personal bank
10   account.  They received that one week before trial, and
11   that bank account statement substantiates that Mr. Jowdy
12   stole over $400,000 of the first 800,000 that myself,
13   Mr. Wooly and Mr. Cristich deposited with Mr. Jowdy, so
14   it's highly improbable that the government received that
15   subpoena the week before trial and when they received it,
16   they chose to ignore it and then call all the money that
17   Mr. Jowdy took from us cover-up, fake loans and
18   finger-pointing by me.
19            The myriad of other steps by Mr. Jowdy run the
20   gamut but they certainly culminate with north of $25
21   million worth of equity and unpaid loans that he's refused
22   to pay us back for over 11 years, and is the basis for
23   nearly 15 lawsuits that were filed by myself and all of
24   the plaintiffs and many of the a government's alleged
25   victims throughout the trial to recover those funds.

23

1    Without me involved in that litigation, approximately six

2    of those lawsuits folded in 2013 after I was arrested at

3    the hands of Mr. Galioto with Mr. Kaiser and Mr. Berard's

4    help.

5              Your Honor, ultimately under prosecutorial

6    misconduct I would like the Court to know that I recognize

7    that the government does not commit prosecutorial

8    misconduct every time a witness testifies on the stand in

9    contradiction to what they previously stated yet at a

10   certain point, when government is in possession of so much

11   evidence, including prior statements and other supporting

12   real evidence, then the government has an obligation

13   either to present it or to correct it when it occurs.

14             If they choose to present it, then, your Honor,

15   it does cross the line into prosecutorial misconduct, and

16   in this instance this is the case.  Notwithstanding the

17   previously mentioned and ignored Jowdy loan and line of

18   credit usage knowledge from previous Northern Trust

19   documents and the late submission of the Northern Trust

20   documents at trial, in a one occurrence of misstatements

21   on a minor trial issue could be deemed harmless, but when

22   every crucial government witness provided egregious

23   misstatements and he the government called them faulty

24   memory, confusion and mistakes, they never called them the

25   truth.  It must be addressed as to when they acquired the

24

1   knowledge of these misstatements before, during or

2   afterwards, but nonetheless, none of that evidence put on

3   by the witnesses can be deemed as reliable in 2015

4   contradicting every bit of evidence that the government

5   had in their hands ahead of time.

6            Your Honor, under Brady there were two documents

7   that I would just like to briefly touch on.  One document

8   Mr. Kaiser had about 15-page signed agreement with his

9   friend Mr. Nick Privitello who testified here at trial.

10  That document allowed Mr. Kaiser to receive funds from

11  Mr. Privitello as the managing member of an entity in

12  Mexico known as Los Fralies, which was mentioned a myriad

13  of times during Mr. Privitello's testimony in 2015.

14           Mr. Kaiser was never the managing member of that

15  entity nor did he have any authority to ever sign a

16  subscription agreement with Privitello or anybody else.

17  In pretrial, there were dozens and dozens of documents

18  turned over from Mr. Privitello related to the Los

19  Frailies project, but systematically this one signed

20  agreement was withheld by Mr. -- by someone from the

21  government and not given to us at that point in time.

22           Second, which I referenced in the Brady

23  material, was that Mr. Kaiser, excuse me, Mr. Galioto had

24  received a fax statement in 2014 from one of Mr. Kaiser's

25  investors, Dr. Frank Sconzo.  That fax was also

1   systematically removed from the other pretrial evidence

2   that was turned over to the defense.  And it's only three

3   pages, but it corroborates that Mr. Galioto had the

4   evidencee before the trial, because of the fax cover page,

5   and it also substantiates that Mr. Kaizer stole $190,000

6   in one check and $10,000 in another check from Mr. -- from

7   Dr. Sconzo.  Somehow some of that money is represented in

8   the government's forfeiture one to me as funds that I

9   received when they were clearly cashed and deposited to

10  Mr. Kaiser's account.  If I can have one second,

11  your Honor, then I'll be able to wrap up for you.

12          The two documents that I just represented,

13  your Honor, were turned over on disks in -- prior to the

14  forfeiture hearing.  They were -- one of them was on

15  victim-Nick Privitello, the file, and second one for

16  Dr. Sconzo was under the file name Victim-Frank Sconzo and

17  Willy, at page 15 through 17.  These pages if they were

18  not a critical flaw in Mr. Kaizer's specific integrity I

19  find it har to believe that Agent Galioto would not have

20  removed it from the rest of the documents in the Sconzo

21  file and the Privitello files that were turned over

22  pretrial.  Otherwise he could have turned over all of them

23  or none of them to us.  But had we learned about these we

24  certainly would have been able to address Mr. Kaizer's

25  integrity specifically about this, and we would have had

26

1    the opportunity to call Dr. Sconzo with respect to Mr.

2    Kaizer's integrity cashing checks with these forged

3    contracts.  We also believe -- excuse me, I also believe,

4    your Honor, that Dr. Sconzo and another victim of

5    Mr. Kaizer's, John Smith who is a friend of his and

6    unknown to me for the mostpart also have signed agreements

7    that we were unaware of and we didn't realize there were

8    any signed agreements until we saw the Privitello disk

9    about six months after the trial.

10          Your Honor, these acts are not just bad acts by

11   Kaizer, but rather attack the credibility of Mr. Kaizer's

12   honesty with his friends and family.  They involve

13   dishonestly, deceit and fraud known to the government

14   concealed from the defense systematically.  In fact

15   Mr. Kaiser's credibility is crucial to all of the counts

16   in the indictment counts in the indictment as he was one

17   of my closest associates from 2002 to the tiem of the

18   indictment.  While Mr. Kaizer was simultaneously acting

19   outside the scope of my knowledge utilizing my managed

20   projects to repeatedly steal from his friends and family.

21          In fact counts 2, 3 and 4 were based on alleged

22   unpaid debts by me to Mr. Kaiser that were also proven

23   false through Mr. Kaiser's own bank records that were in

24   the government's possession which you can see at exhibit

25   exhibit R 33 B.

1    With Mr. Kaizer fully repaid as I mentioned from

2  the Hawaii project and fully repaid from the California

3  projects, Mr. Kaizer was due no money from me for any of

4  the related or unrelated charges in this case and counts,

5  2, 3 and 4 were represent by Mr. Miskiewicz to the Court

6  at transcript 1020 to be the sole reasons for counts 2, 3

7  and 4, which were the only venue ties I believe to the

8  Eastern District.

9    When discussing the credibility -- when

10  discussing the government's failure to turn over the

11  material that undercutted Mr. Kaiser's credibility, it's

12  one thing if Mr. Kaizer was a drug dealer in an unrelated

13  matter to anything that was in front of the 2015 court,

14  but when Mr. Kaizer is engaged in wire fraud, specifically

15  including fabrication and forgery of documents to support

16  his own thefts from his own friends and family, it

17  addresses his complete willingness to commit crimes,

18  deceit and fraud which directly goes to his credibility.

19  Those documents would have helped us present that to the

20  jury.

21    The government argued that this evidence was not

22  material during their reply to my Rule 33, but to the

23  contrary, these are not simply bad acts by Kaizer, they go

24  specifically to Kaiser's engagement of dishonestly, deceit

25  and fraud which go directly to his credibility as a

28

1    witness, deceiving his own friends and unknown to me.

2         Your Honor, the government's response to all of

3    the allegations of perjury by me throughout my Rule 33

4    submission, which could be deemed misstatements by the

5    witnesses, their only response is faulty memory, confusion

6    and mistakes.  These are not just misstatements on

7    peripheral issues, your Honor, they are the crucial issues

8    in this case.  Whether the investors were aware of how

9    their investments were used and if they approved it,

10   instead the government claimed the statements were all

11   based upon faulty memory, confusion and mistakes.  Yet in

12   the government's Rule 33 reply, the government never says

13   that their witness statements are true.  They never

14   corrected the statements during trial and in fact the

15   government relied on all of those statements for their

16   summation.

17        In the government's reply, they do not claim at

18   any point that their witness statements were true during

19   trial, yet the government did nothing to bring these

20   misstatements on every crucial fact to anyone's attention

21   and in fact they continued to rely on their overwhelming

22   misstatements during their summation and through their

23   Rule 33 reply and their request to deny my Rule 33 in its

24   entirety.  That's why this partucalar case it does cross

25   the line, your Honor, into prosecutorial misconduct.

29

1          With a response of faulty memory, confusion and

2     mistakes, your Honor, I believe the government has more of

3     an obligation to correct the record for the Court. The

4     government has failed to correct the mistakes made by

5     their witnesses and that they are not disputing.  Thus,

6     the government is relying on the statements that are

7     wholly unreliable and violating my constitutional rights

8     to a fair trial and proceeding.

9          Your Honor, unless there are any questions for

10     me, I think that's enough for today, and I think the

11     voluminous papers are plenty for the Court to review.

12          THE COURT:  The only question I have, some of

13     these things that you refer to, it's my memory that these

14     things were covered during the trial, that you had

15     materials, like for example, the prior grand jury

16     testimony that you're saying was inconsistent.  That's not

17     something that you learned about after the trial.  That

18     was part of of the 3500 material of the witnesses, right,

19     like Mr. Peca.

20          THE DEFENDANT:  Yes, sir, your Honor, those

21     documents were delivered to us in pretrial.  But --

22          THE COURT:  And they were questioned, I believe

23     there being questioning about their prior statements in

24     the grand jury, right?

25          THE DEFENDANT:  There were some questions to.

1   Mr. Peca, not to Mr. Sudor, but there was to Mr. Peca

2   about his grand jury testimony.  But, your Honor, I think

3   the government carries a much larger obligation than to

4   allow their witnesses to turn over=, excuse me, to proffer

5   through endless misstatements to the Court and they are

6   somehow let off the hook by simply turning over what they

7   know are planned, perjured or misstatements throughout the

8   trial.  Just because they deliver voluminous pretrial

9   evidence to the defense I don't think relinquishes the

10  government from their obligation to not put on faulty

11  testimony through their witnesses, and when effectively

12  the witnesses if it were not planned with the government,

13  if the witness did speak in direct contradiction to prior

14  testimony, I believe the government also carries the same

15  obligation to make sure it's corrected and at a minimum

16  raise that issue at a sidebar to your Honor so the Court

17  can decide on how to deal that at the time.

18          THE COURT:  These transcripts of the

19  arbitration, when and how did you obtain that?  You're

20  saying that was obtained after the trial.

21          THE DEFENDANT:  No, sir.  Those were also

22  obtained before trial.  But those statements are in as

23  much a grave contradiction to what Mr. Kaiser and

24  Mr. Berard's main theme has been since they joined

25  Mr. Galioto's efforts two years before my indictment.

31

1          THE COURT:  But that's not quote/unquote new

2     evidence then.

3          THE DEFENDANT:  No, sir, I was representing

4     that, and I apologize to the Court, but I was representing

5     that as prosecutorial misconduct knowing that the

6     government had that and they were more than just

7     substantial exculpatory pieces of evidence, but they went

8     to the core elements of the government's theory in direct

9     contradiction.

10          THE COURT:  Okay.  Let me hear from the

11     government.

12          MS. KOMATIREDDY:   Your Honor, the government

13     has addressed each one of Mr. Kenner's arguments in its

14     briefing.  We rest on that briefing.  I will only add, to

15     the extent that Mr. Kenner claims that we don't stand by

16     our witnesses statements, let me make it very clear for

17     the record, we believe the government witnesses testified

18     truthfully, we pursued the truth in good faith at trial,

19     and I think the trial transcript reflects that.  It

20     reflects that on multiple occasions me and Mr. Miskiewicz

21     examined the witnesses in good faith and raised with them

22     exhibits, grand jury testimony and documents to explain

23     statements that they had made in the past.

24          We did that on direct, we did that on redirect.

25     If the Court has any questions, I'm happy to answer them.

1          THE COURT:  The only question, I mean Mr. Kenner

2    obviously takes the position as he did during the trial

3    with respect to the Mr. Jowdy that these were loans.  He

4    claims that the new evidence, including Forfeiture Exhibit

5    44 proved conclusively that they were loans and my

6    question to you is is the government's position changed

7    with respect to that regarding any evidence that has been

8    uncovered since the trial?

9          MS. KOMATIREDDY:  No, your Honor.  The

10   government's position hasn't changed with respect to that.

11          Forfeiture 44 is a document that is an Excel

12   spreadsheet.  That document -- and the brief lays this

13   out, but I will go back through it again in detail, that

14   document is, by Mr. Kenner's own admission, not new in

15   information that it presents.  Because as Mr. Kenner just

16   explained, according to him the notes of Mr. Galioto's

17   interview and in 3500 KJ 2 already provide a so-called

18   confession of loans.  There was testimony in a California

19   case in 2010, and there's multiple statements that

20   Mr. Kenner claims show that there was a loan to Mr. Jowdy.

21   All of these statements which he cites at length in his

22   own Rule 33 motion were available to Mr. Kenner at trial,

23   and through pretrial discovery.  They were raised during

24   the trial.  All of them, including Forfeiture 44 are

25   inadmissible hearsay, and in order to get any of that

33

1   evidence or those statements in and have it authenticated,

2   Mr. Kenner would have had to call Mr. Jowdy or Mr. Gaudet.

3   He was free to do that at all times, as was

4   Mr. Constantine.  Both chose as a strategic matter not to

5   call those witnesses.  So to the extent that Mr. Kenner

6   now argues that there is evidence this is available to him

7   that was not before, that is not true, because the

8   evidence to the extent that he could have gotten it in at

9   trial was always available to him.  He was always free to

10  call Mr. Jowdy and free to call Mr. Gaudet as to whether

11  or not there was a loan.

12         That being said there's even more reason to

13  disregard this argument because we're getting into the

14  weaves of the relationship between Mr. Kenner and

15  Mr. Jowdy, which is the very distraction that Mr. Kenner

16  has pushed throughout the fraud and throughout the trial.

17         At the end of the day, the victims testified

18  that they did not authorize their money in the Hawaii

19  investment to be used for anything other than the Hawaii

20  investment, and not even for a loan to Mr. Jowdy.  That is

21  the misrepresentation.  That is the fraud and the

22  diversion of proceeds.  It flows from the fact the victims

23  were told their money would be used for Hawaii.  Now,

24  Mr. Kenner claims there's a Little Isle IV operating

25  agreement that allows him to use money however he sees

34

1    fit, and that there were certain authorizations in the

2    Northern Trust documents that allow him to transfer money

3    from the lines of credit to the Little Isle IV account.

4         As an initial matter, the operating agreement

5    and the authorizationa came in at trial.  They didn't come

6    in at the tenth week.  The government put in the

7    authorizations at the outset of the trial by stipulation

8    and we went through one of them with the witnesses, with

9    one of the very first witnesses, Mr. Peca, to describe the

10   nature of the authorization and what from a victim's

11   perspective what he believed he was authorizing and what

12   he did believe he was authorizing.

13        It is very clear from that that the victims

14   believe that their authorizations based upon their oral

15   conversations with Mr. Kenner's and Mr. Kenner's

16   explanation to them of the investments and the purposes of

17   the line of credit and the investments was that the money

18   for Hawaii would be used for Hawaii and nothing else.

19        I will note it was brought to my attention this

20   morning that yesterday the Second Circuit decided a case

21   United States versus Weaver, in which it noted in the

22   context of a wire fraud case that contractual disclaimers

23   do not render oral representations immaterial.

24        So regardless of the exact text or any

25   disclaimer in the Little Isle IV operating agreement, Mr.

1    Kenner's oral representations to the victims which the

2    victims testified about were material and were material

3    misstatements.

4           The jury had the opportunity to consider all of

5    this, they had the opportunity to consider all of the

6    Northern Trust documents, the Northern Trust documents

7    didn't just come in in the tenth week of trial as we laid

8    out in our trial, all of those documents were available

9    for Mr. Kenner.  They were produced in the production of

10   the documents recovered from Mr. Kenner's home, they were

11   produced in the production of the documents recovered from

12   Mr. Kenner's computer, they were produced in the

13   production of the subpoena response that Northern Trust

14   gave to the government.  And then a fourth time when there

15   was another subpoena response, there were wholly moved in

16   at trial, Mr. Kenner testified about them at length, the

17   authorizations, extensions of credit, everything that he

18   describes.  And the jury had them with them during

19   deliberations.

20          That's the long answer to your question, sir,

21   but in essence, our position has not changed.  We believe

22   that the addition of one document to a pile of evidence

23   that already was available to the defendant and a pile of

24   evidence that were already available to the defendant,

25   many of which he made through cross-examination, through

36

1    his own lengthy testimony and in closing arguments, does

2    not change the picture here and does not require or

3    warrant a new trial.

4            THE COURT:  Okay.  I'm going to to reserve

5    decision on the motion.  I'll be issuing a written

6    decision.  Mr. Siegel, if you want to order a copy of this

7    transcript so you can provide it to the court, Mr. Kenner

8    made a number of citations to the record, to his

9    submission, I'm sure they're in his written submission as

10   well, but if you want to provide that, obviously it will

11   be available for any appellate review, I'm authorizing

12   pursuant to CJA.

13           Do we have another conference scheduled?

14           MR. SEIGEL:  I believe we do have something in

15   July.

16           THE COURT:  I thought we did, too.  I wanted to

17   make sure we have something in place.

18           MR. SIEGEL:  I do have my calendar July 18th at

19   one.  And the Rule 33 motions for the codefendant.  I note

20   there was a motion for an extension for the defense on

21   that motion yesterday.  So I don't know if that date is

22   going to hold but that's the next date.

23           THE COURT:  I think we were trying to keep that

24   date.  I don't remember how long the extension it was.

25   For present purposes I'm keeping that date.  All right.

37

1    Thank you.

2            MS. KOMATIREDDY:   Thank you, Judge.

3            (Matter concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25