FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 29 2021 ★
LONG ISLAND OFFICE

March 15, 2021

Judge Bianco (visiting)
U.S. District Courthouse
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

**RE: 13-cr-607 (JFB) – 3rd party forfeiture claim**

Judge:

I mailed my 3rd party claim using FedEx to you a few months ago. I just got told that my paperwork was not included in the case when the government said who they are and are not fighting against. I sent you this time a copy of the tracking info that explained someone at your office signed for my letter months ago. Is this another scam because I am telling the truth about Phil Kenner that the FBI wants to squash?

The government never sent me notice of this in the first place, even though they know I have $2.5 million invested in the Cabo project that Jowdy robbed from day 1. I sue Jowdy in Mexico for $1.6 million of it and he got Kaiser to lie about his name being forged to get out of that criminal Mexico case. It was a total lie about more forgeries from Jowdy and his team who rob us and rob us with FBI protection. I know my partner, Phil Kenner in Baja Ventures 2006 company, fights for me since we found out the Jowdy thefts but no one understands why the FBI guy fights against us to protect Jowdy and Berard and Kaiser during this fight to get back our Hawaii loans and our Cabo investment that he does not care about. I am not from America but even in my country this stuff does not happen.

I hear the government does not think our partner Jere Lehtinen is in the Cabo investment with his $1.5 million in Baja Ventures 2006 and try to steal his money too. Its a joke. Jowdy stole our Baja Ventures 2006 money before Lehman Brothers papers were signed, and FBI people dont care because they have to make sure Jowdy is safe to keep stealing money. Phil Kenner showed all the investors Jowdy bank records with the stolen money. The government is lying about Phil. He did not steal any of our money for the Cabo project because me and Kenner and Lehtinen had about $5 million in there because Kenner paid all of the legal fees and expenses to get the deal done, like $400,000 or something. And Jowdy stole our Hawaii loans and refused to give them back after he admitted it in our California case. Jowdy says he did not need us anymore with his FBI people protecting him.

JS

Now I hear that Jowdy is getting 10% or something when they sell the bad bank loan from Cabo they already robbed for themselves from the Danske bank.  Is this serious while we may not even get our Cabo investment money?  I know the FBI guy wants everyone to think Phil Kenner stole the Hawaii loans but that is another lie to everyone. They tried that lie to all the investors and fooled a few. I am sure FBI people will never help us get that money back because it does not equal what they lied to us about so we would be mad at Phil.  Who is fighting for me and the other investors and Phil from these lies of Jowdy and the FBI guy and others who got their illegal help and got paid for it?

Even though the government and FBI let Jowdy rob the Cabo money, why are you not helping us get it back?  Phil was helping and they tried to say he hid things from us to destroy him.  Phil never hid anything.  I was there for every conference call and email and talked to all the lawyers for us like everyone.

Can you make sure my paperwork gets in this time because this seems like another FBI protection scam to keep me and Jere and Phil away so they can steal more of our money and probably give it to Jowdy and the people who protect his stealing?

I appreciate your help.

Jozef Stumpel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

UNITED STATES OF AMERICA

against-

PHILLIP A. Kenner

Defendant.

-----------------------------------------------------X

Docket No. 13-cr-607 (JFB)

February 2021 affidavit
Jozef Stumpel

I, Jozef Stumpel, being duly sworn upon oath, depose and say:

1. I am over the age of 18 and otherwise competent to execute this affidavit.
2. The contents of this affidavit are of my own personal knowledge.
3. I have information related to Philip A. Kenner and this criminal matter in the Eastern District of NY.
4. I was a professional hockey player in the NHL, the Olympics for my home country of Slovakia, and several European Professional Hockey Leagues for nearly 20 years.
5. My home is in Nitra, Slovakia.
6. I have been a client of Phil Kenner's since the early 1990s when I first arrived in the United States of America to play with the Boston Bruins in the NHL.
7. Mr. Kenner remains my most trusted advisor, even today, after all of the criminal activity that I know he has been wrongly accused of, through my own first hand knowledge of each and every event related to this matter.
8. The same attorneys represented me that all of Mr. Kenner's clients had access to at all times.
9. I spoke freely with each one of them, separate and apart from Mr. Kenner's interactions.
10. I have never been restricted by Mr. Kenner from access and knowledge of 100% of the things I chose to invest in; with authorizations I gave for each of those investments, and the risk pros-and-cons of each, at all times.
11. To date, I am fortunate to not be suffering from Chronic Traumatic Encephalopathy symptoms like many of my former teammates (over 300 publically announced and hundreds more unpublicized). Hundreds of them

JS
Initials

sued the National Hockey League in 2014 for brain damage thru multiple class action lawsuits in Minnesota and other jurisdictions—like Brian Berard.

12. Based on my mental acuity, I know and recall each of the following facts clearly:
    a. I signed three affidavits for Mr. Kenner: in 2009 (Ex. 1), 2014 (Ex. 2), and 2017 (Ex. 3). The first of which (2009) I forwarded to the FBI through my Hawaii counsel—acknowledging the Jowdy loans and the Hawaii LOCs and capital accounts paying the monthly LOC fees. I also spoke with Sergei Gonchar, Mattias Norstrom, Glen Murray, and Bryan Berard about them signing affidavits in 2009 for the Nolan arbitration. I submitted the latter two affidavits (2014, 2017) to Mr. Kenner's criminal court in support of his innocence and transparency; related to a decade of false forgery claims by Ken Jowdy related parties (even upon myself at one time: as referenced in my 2017 affidavit). All are attached as references.
    b. I was never contacted by Mr. Kenner's trial attorney, Richard Haley, to discuss the details of my group knowledge of the Hawaii investment details and loans to Jowdy, the Global Settlement Fund, or my Eufora stock ownership.
    c. I had planned to testify at Mr. Kenner's criminal trial as to all of my firsthand knowledge, the majority of which Brian Berard and John Kaiser had attempted to intimidate me and any investors against Jowdy in Mexico; once Jowdy employed them around 2011. I know Berard very well from my NHL days, and Kaiser from our multiple Hawaii conference calls between 2004-2009.
        i. Kaiser's first action for Jowdy in Mexico was to lie about his name being forged on a Mexico testimonial in my $1.6 million criminal case versus Jowdy; the loan which Jowdy admitted to in his January 2010 deposition (attached: Ex. 4).
        ii. This was my incremental Baja Ventures 2006 capital account contribution; totaling approximately $2.6 million with my partners: Mr. Kenner and Mr. Lehtinen.
    d. My first Hawaii conference call with John Kaiser occurred in 2004 after he met with Ken Jowdy in NYC to discuss our Hawaii group opportunity to loan funds to Jowdy for two reasons: 1) continue funding our $70 million Diamante del Mar project (until commercial funding was acquired), and 2) fund expenses and acquisition efforts for a Cabo san Lucas project (which became the current DCSL project, after several failed attempts in Cabo according to Jowdy).

Initials

e. While speaking to Mr. Kenner after his arrest in 2013, I was also part of an investor group in Mexico City who attempted to file continuing litigation versus Ken Jowdy to recover our Hawaii loans and rectify the tens of millions Jowdy stole from us in various projects.

f. Our 2015 Mexico City filing was foiled by FBI agent Galioto and another FBI agent who arrested our intermediary just prior to my trip to testify in front of the Mexico City Supreme Court and other high-level public officials. Several other investors were scheduled to testify alongside me. The FBI agent called me and the other investors to brag that they had arrested our intermediary, and just like the day they arrested Mr. Kenner in November 2013, he gloated that the FBI protection would never end for Jowdy and we should just accept it (referring to my investment loss through Jowdy's thefts).

13. Independently, attorneys disconnected from Mr. Kenner through my NHL contracts and NHL Player's Association always represented all Mr. Kenner's clients, and me, in the event independent legal counsel was required.

14. **Re: Hawaii –**

a. Any representation by my fellow investors-contributors to the Hawaii real estate project were known to every investors through regular conference calls and follow-up email updates from attorney Madia.

b. The conference call topics included: the Hawaii loans to Jowdy, the various hard money lending efforts through paid consultants (like Constantine) and banks all authorized transactions allowed by our Hawaii By-Laws and Operating Agreements, and land acquisition-planning issues.

c. The conference calls were organized by Mr. Kenner, John Kaiser, and other Hawaii management team members, like Chris Hawkins.

d. After every conference call, we received multiple email updates sent to all of the investors from our attorney, Rob Madia.

e. At all times, I was aware of the capital account uses by Mr. Kenner, including the monthly LOC fees that Jowdy, Berard, and Kaiser had begun to spread as a rumor of criminal activity since 2011, once Jowdy hired them, along with an FBI agent.

15. **Re: GSF –**

a. I contributed $250,000 to Mr. Constantine's Global Settlement Plan on June 18, 2009. I was told that Mr. Kenner could not be involved because Jowdy could attempt to steal the money if managed or

VS
Initials

deemed under Mr. Kenner's control to satisfy his legal fees judgment in the Arizona case versus the our Hawaii company.

b. I signed an "acknowledgment and approval" for Mr. Constantine to use the GSF contributions for legal fees versus several adverse parties (not just Jowdy), and expenses to buy Juneau, Moreau, and Nolan (adverse parties working with Jowdy by 2009) out of Eufora, our Avalon air park project, the Falcon 10 airplane, and take over the Las Vegas Palms condos.

c. Immediately after my signed authorization, Mr. Constantine provided me with another detailed email of the projected uses for the GSF. They were the same as the acknowledgement and authorization I had signed a week earlier before he used any of my funds.

d. I participated in multiple conference calls with all GSF, Mexico, or Hawaii investor who wanted to participate after notification from Mr. Constantine.

e. In the Hawaii investment versus Jowdy, I was independently represented by: Arizona attorney Baker (signing an 8-page disclosure about the Jowdy loan lawsuit, prior to the GSF litigations), California attorney Richards (signing various authorizations to sue Jowdy for the Diamante del Mar and Diamante Cabo san Lucas frauds, as part of the GSF litigations), and Mexico attorney Javier Troncoso to sue Jowdy for the $1.6 million Jowdy stole from me and my Baja Ventures 2006 capital account contribution with Mr. Kenner and paid for independently by Mr. Kenner and myself (Ex. 5 at 1-2, also including my engagement agreement with attorney Augustine to stop Jowdy's attorneys from harassing me, Id. at 3-4).  The Mexico case included John Kaiser lying to a Mexico court about signing an affidavit for me in the Mexico courthouse (ECF No. 112-9), calling his signatures forgeries, once Jowdy employed him.

   i. Jowdy and associated California counsel attempted a previous forgery scam on me in 2008, alleging Mr. Kenner forged my name to open bank accounts and steal the money from them. After my investigation through independent counsel, I discovered that the accounts and the bank in question (Northern Trust Bank) never had accounts in my name and the original funds were always in my account, never transacted.  It was a complete fraud on me to separate myself from Kenner once litigation started versus Jowdy in Arizona (Ex. 3 at paragraphs 6-8, and Ex. 1 at paragraph 9).

16. **Re: Eufora –**


Initials

a. I purchased a Member Equity interest in AZ Eufora Partners I for myself on 11/01/03 for $ 200,000.00.
b. I purchased a Member Equity interest in AZ Eufora Partners II for myself on 02/01/04 18 $ 250,000.00.
c. I was contacted by Tim Gaarn in 2005 after his takeover of AZ Eufora Partners I from Mr. Kenner . Mr. Gaarn informed me he was combining AZ Partners I – II – III – and IV (of which I was a member of I and II).
d. In this investment, I was represented by NY attorney Michael Stolper and the Giuliani group.
e. With independent access to my attorneys, I signed a July 16, 2010 letter in the Constantine/Eufora matter (Ex. 6 at 11).
f. On multiple conference calls beginning at the end of June 2010, my attorneys discussed all of the Eufora purchases from 2003 until 2009 with me and the other Eufora related parties. This issue was highlighted by Mr. Constantine claiming stock was stolen from the company by Board member Tim Gaarn and resold to certain people in 2008 and 2009. After discussions and investigations, my attorneys verified this was another Mr. Constantine misrepresentation to the investors to divert attention from the Eufora investigation of his management team's issues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and would be prepared to testify to the information.

Jozef Stumpel

Passport:
Country: SLOVAKIA

Passport number: BA 0780884

Photocopy attached

Signed and dated: 15/10/2021

JS
Initials

12 Titul | Academic degree | Titre

13 Úradné záznamy | Page reserved for issuing authorities | Page réservée aux autorités compétentes pour délivrer le passeport

BA0780884

CESTOVNÝ PAS
PASSPORT/PASSEPORT

SLOVENSKÁ REPUBLIKA
SLOVAK REPUBLIC/RÉPUBLIQUE SLOVAQUE

Typ/Type/Type: P
Kód/Code/Code: SVK
Číslo pasu/Passport No./Passeport n°: BA0780884

SVK

1 Priezvisko/Surname/Nom: **Stümpel**
2 Meno/Given names/Prénoms: Jozef
3 Štátne občianstvo/Nationality/Nationalité: Slovenská republika
4 Dátum narodenia/Date of birth/Date de naissance: 20.07.1972
5 Pohlavie/Sex/Sexe: M
6 Miesto narodenia/Place of birth/Lieu de naissance: Nitra
7 Dátum vydania/Date of issue/Date de délivrance: 22.09.2021
8 Dátum platnosti/Date of expiry/Date d'expiration: **22.09.2031**
9 Pas vydal/Issued by/Autorité: Nitra
10 Identifikačné číslo/Identity No./Identifiant personnel: 720720/6831
11 Podpis držiteľa/Signature

P<SVKSTUEMPEL<<JOZEF<<<<<<<<<<<<<<<<<<<<<<<<<<
BA07808844SVK7207200M3109225720720683 1<<<<64

VS





T-Mobile
3:16 AM
fedex.com
61%
FedEx.

Delivered
Friday 10/02/2020 at
10:43 am

**DELIVERED**

Signed for by: R.DEANNA

**FROM**

NITRA SK

**TO**

CENTRAL ISLIP, NY US

**SEE FULL DETAILS >**

VS



**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | R.DEANNA | **Delivery Location:** | |
| **Service type:** | International Priority | | |
| **Special Handling:** | Deliver Weekday | | CENTRAL ISLIP, NY, |
| | | **Delivery date:** | Oct 2, 2020 10:43 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 815159208315 | **Ship Date:** | Sep 30, 2020 |
| | | **Weight:** | |

**Recipient:**

CENTRAL ISLIP, NY, US,

**Shipper:**

NITRA, SK,

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

JS

29/09 2005 16 06 FAX

**EXHIBIT E**

002/005

18 05 05 19:34 nhlpadmin 0376519220 s.1

Stránka č. 1 z 1

Dear Martin/Daniel

Please liquidate my account 19.993 as soon as possible. I need to wire the funds as soon as they are available using the instructions below to Mexico for a transaction that is pending the receipt of these funds. Please wire the funds in smaller amounts if necessary to move the first available money sooner.

Wiring info:
HSBC NEW YORK SWIFT: BIMEMXMM

FOR CREDIT: HSBC MEXICO, S.A.
BENEFICIARY: LOR MANAGEMENT S.A. DE C.V.
ACCOUNT NUMBER: 7001869239
BRANCH: BAHIA BRANCH NUMBER: 139 CITY: ENSENADA
STATE: BAJA CALIFORNIA COUNTRY: MEXICO
CLABE: 021922070015692390

Thank you for your immediate assistance with this transaction.

Sincerely,

Josef Stumpel

Unterschrift geprüft und für gut befunden

| LEGITIMACY OF PAYMENT ORDERS | |
|---|---|
| Controls performed by FB | Empowerment |
| ☒ Signature check ☒ Call back (exp. stamp) ☐ Signal number | 1st person level & initials |
| ☒ Not waiver ... ☐ yes ☐ no | 2nd person level & initials |
| ☐ Reason/Substitution for waived call back ☐ Doc. Client confirmation ahead ☐ Other (specify) | |
| Name date & initials | Verification by Operations ☒ checked ... ☒ checked Empowerment |

| CALL BACK TO CLIENT | |
|---|---|
| Date/Time | 19.5.05 09.32 |
| Duration No. | 6/8 |
| Caller (name stamp & initials) | M. Spring |
| Dual call back (name stamp & initials 2nd person) | Pascale Engler |

23.5.05

D. Moser

Dept/Pers. ... to ...
Order-Type ...
23. Mai 2005
Order-No. 1885615
Visa: ... Kontroll

https://www.nhlpasource.com/Exchange/dodo/Inbox/Liquidation%20letter.EML?Cmd... 18.5.2005

PKHOME-00012003

23/05 2005 16:06 FAX → LENNER 003/005

Coutts

COUTTS BANK VON ERNST AG
[illegible] 1, Postfach
CH-8022 Zürich
Telefon +41 (0)43 245 51 11
Telefax +41 (0)43 245 51 96
www.coutts.com

MAY 23, 2005
PB: SPRING MARTIN / POFML
TELEPHONE 043 245 51 11

Y

VAT NUMBER 232621

HOLDER:
19993

19993

ACCOUNT NR. V019993AB
CURRENT ACCOUNT, US DOLLARS

IBAN CH41 0862 0000 V019 993A B

DEBIT

| TEXT | | | VALUE | AMOUNT |
|---|---|---|---|---|
| REFERENCE: AA1885615 | | | | |
| YOUR PAYMENT TO: | | | | |
| /7001889239<br>LOR MANAGEMENT S.A. DE C.V. | | | | |
| ACCOUNT WITH: | | | | |
| HSBC MEXICO, S.A. INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIER HSBC MEXICO | | | | |
| AMOUNT | USD | 1,600,000.00 | | |
| + CHARGES | USD | 28.93 | | |
| TOTAL TO YOUR DEBIT | | | 23.05.2005 | 1,600,028.93 - |
| ORDER: TELEFAX 18.5.2005 | | | | |

ARCHIVE COPY

YOURS FAITHFULLY
COUTTS BANK VON ERNST LTD

VALID WITHOUT SIGNATURE

State of [illegible]
County of [illegible] ss.

On this 6 day of May 2016 before me personally appeared Philip Kenner, who was proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument and acknowledged that he/she executed the same.

Notary Public
residing at Bank of America
My commission expires 2-14-2013

Philip Kenner pg 1-22

PKHOME-00012004

JS



LAW OFFICES OF
THE STOLPER GROUP
155 AVENUE OF THE AMERICAS, NEW YORK, NY 10013

TELEPHONE: 212-337-3502
FAX: 646-390-1584
EMAIL: MICHAEL@STOLPERGROUP.COM

July 16, 2010

Lee M. Weinberg
Weinberg Gonser LLP
Century Plaza Towers
2029 Century Park East
Suite 900
Los Angeles, CA 90067

Karl Freeberg
Greenberg Traurig, LLP
Suite 700
2375 E. Camelback Road
Phoenix, AZ 85016

Re: A Proposal and Requests concerning Eufora LLC ("Eufora")

Gentlemen:

I am writing with several purposes.

First and foremost, I want to reiterate my request that your clients proceed with the transaction that I have been proposing for weeks now – insiders, mostly professional hockey player members of AZ Eufora Partners I LLC ("AZ Eufora") and certain investor members in Eufora acquiring the Loan Package and warrants from the Lender – rather than your clients continuing with a purported transaction through a group of outsiders. Our objectives, which I first shared with Karl and his client (the Lender) weeks ago, and then subsequently with Tommy Constantine two weeks ago, and most recently last Friday evening during my call with Lee, include having Constantine dilute his controlling membership interest and relinquish day-to-day control of Eufora as part of taking responsibility for the Loan and corresponding issues. My understanding from Constantine two weeks ago and Lee's July 14th letter (which inexplicably was not sent to me) is that Constantine has already agreed to these two material terms so we should be very close to a deal along the lines we are proposing. The next step, in my view, ought to be a call to schedule an in person meeting.

To be abundantly clear, we believe that it is NOT in the best interest of Eufora and its members for Constantine to:

(i) pursue a deal with outsiders to Eufora (Mr. Volpe's group), in secret, with undisclosed terms (see the questions below) rather than execute a deal through Company insiders;

(ii) refuse to provide us with the requested agreements among the Lender, Mr. Volpe's group and Eufora that you claim have already been signed, and proof that monies have been exchanged; and

(iii) ignore our requests for Constantine to meet with us to address our very firm evidence of his breach of fiduciary duties and to give him the opportunity to support his allegations against his co-managers of Eufora.

JS

We cannot harmonize how an innocent person, as Constantine claims to be, would avoid engaging in a substantive exchange of information and documentation, as we have repeatedly proposed. Lee, your advice to Constantine to ignore me and the individuals that I represent simply because I am a litigator is ill conceived. I will reiterate what I told you last Friday: based on the overwhelming evidence that we have uncovered against your client, if our sole purpose was to litigate, we not only could have initiated a very solid lawsuit weeks ago but we also would have been able to obtain emergency relief, restraining Constantine, the Lender, Volpe and anyone else from proceeding until the serious issues we uncovered were addressed. The reason we have not proceeded down this path yet, as I have told both of you several times, is because, as a litigator and a professional who has seen this movie before, I believe it is in everyone's best interest to try and resolve the issues before seeking judicial intervention, recognizing that the time to do so is very short.

To the extent that your advice to ignore me turns on your claimed uncertainty as to whom I represent, I have attached a self-explanatory Consent of Members, which authorizes me to act on behalf of AZ Eufora Partners I and each of the 27 signatories (20 members of AZ Eufora and 7 members/investors of Eufora) individually. We anticipate additional signatories to the Consent over the next few days. As a practical matter all contact with the signatories shall flow through me from this point forward. As you should know, where professionals have been retained to address issues of misappropriation, breach of fiduciary duty, unjust enrichment, loyalty and corporate opportunity, any attempt to resolve such issues, including a proposed transaction that seeks to gloss over past misdeeds, under tight time constraints, can only be done through representation by professionals with the requisite experience. Constantine's continued attempts to provide misinformation, without any supporting evidence, directly to the members/investors of Eufora, either through phone calls, texts, emails and, most recently, under your firm's letterhead, is not productive. Aside from the formality of my representation, most of the individuals that I have spoken with are frustrated, angry and/or would rather not speak with Constantine.

That brings me to another point. Lee, in our last conversation on Friday night I had encouraged you to vet what your client was representing to people, particularly in this highly charged and critical period for Eufora. I read your July 14th letter and email of yesterday and do not understand how you can make some of the statements that you did. For example:

- You stated that Constantine "pursued the Plan on behalf of Eufora [since late 2009]." What proof do you have of that? I have a lot of documents, text messages and the words of Constantine's confidants who are now cooperating with us that up until the time Constantine discovered our investigation of him, he had pursued a deal with his friend Nerguizian on behalf of just a handful of people and expressly intended to exclude most of Eufora's investors.

- You stated that besides CR Gentry "no other individual or entity had any control over the Loan." As incredible as that sounds, what support do you have for that contention? Again, I have a volume of emails, documents and the words of those involved in the transaction that contradict your statement.

- You stated that Gentry "without prior approval" "self directed" his own compensation package. What is the basis for this statement? Nothing was done without Constantine's sign-off, including Gentry's compensation, which is also reflected in documents.

JS

- In your email you contend that I have made statements that "simply are not true." Please let me know what statements to which you're referring and the basis for your contention.

With respect to the purported "Plan," which is effectively what Constantine had told me when I spoke with him two weeks ago, Lee's July 14th letter raised a number of questions:

- Why did Lee not send the July 14th letter to me?
- Why did Lee not address with Constantine, as I had requested, the possibility of doing a deal with the Lender through insiders? There are a number of investors and members of Eufora who are rightfully upset that Constantine pursued a deal outside of the Company, in secrecy, and did not attempt to engage insiders in resolving the Company's problems. Unquestionably a deal via insiders is financially and otherwise in the best interest of the members of Eufora.
- How much is proposed to be paid to the Lender for the Loan Package and warrants? What are the payment terms and over what period of time are they to be made? Are there any conditions to payment?
- Who will own the patents at the conclusion of the "Plan"?
- Has any collateral been pledged to Volpe's group?
- When is the Volpe deal scheduled to close?
- What are the conditions to closing?
- What is the proposed allocation of membership interests in "New Eufora"? If in the July 14th letter you can represent that "nearly" everyone's membership interest will not be diluted as a result of the Plan, then you certainly should know what everyone's membership interest will be, and who Constantine is attempting to dilute or eliminate.
- How much membership interest will Constantine retain according to the Plan?
- How is Constantine providing Volpe 12% and the Lender 1% of his membership interest and at the same time providing membership interests to John Kaiser and the individuals who have invested through Kaiser, which Constantine promised Kaiser and others that he would do?
- Lee, have you been able to confirm what I told you, namely, that Constantine owns the largest share of Eufora despite having invested very little of his own money (inclusive of funds from others that Constantine directed to one of his entities such as Constantine Management Group)?
- What is the capitalization value and the basis for valuing Volpe's proposed $3 million investment in Eufora at 12%?

JS

- With respect to Volpe, why is he referred to as Dominick and not Santo, the name Constantine used in internal email communications?  What is his background and why do you believe that he is a plus to Eufora?  Is he a U.S. Citizen?  Where is he based?

- Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers in the Eufora saga."  We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).  I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.

- Why would Constantine remove the two Eufora Managers who raised and attempted to address red flags around Constantine's actions – CR Gentry and Tim Gaarn without notice, dialogue or any evidence of wrongdoing?  It cannot be viewed favorably that Constantine would remove whistleblowers and, in the case of Tim Gaarn, the person designated to represent the interests of the AZ Eufora members.

- How are Don Berman's responsibilities as CEO of public company Cardworks and owner of Merrick Bank conducive to being available to run Eufora day-to-day?  What is the value proposition of Mr. Berman as CEO of Eufora?  Has he signed an agreement and if so, what are the terms?

Lee asked for more specificity on our issues with Constantine.  The following are three areas for which Constantine and, to some extent, Brent Nerguizian, will have to account with evidence (I'm sure you'll excuse me if I am not willing to accept only Constantine's word on these issues):

- At the top of our list are Constantine's actions with respect to the Loan Package, its terms, its default and his attempt to resolve the default in secret through outsiders.

- The $500k "Financial Advisory Fee" paid to Nerguizian, at Constantine's direction (your attempt to blame CR Gentry defies logic and the documents).

- Constantine using Eufora as his personal ATM machine, with hundreds of thousands in unaccounted for value loads on prepaid cards and hundreds of thousands of his personal bills paid out of Eufora (I mentioned to Lee that even his legal bill for recent work on Constantine's unrelated airline business was paid for by Eufora).

We need answers to the serious issues we have raised.  Obviously one cannot propose a final resolution without first addressing and confirming the liability issues, though I suspect Constantine's offer to dilute his interest (details unspecified) and step down from Eufora's management (again, details unspecified) may go a long way towards resolving the issues.  I will continue to extend an olive branch until time and the immediate needs of Eufora no longer permit us to do so.  I also do not intend to engage in a further letter writing campaign.  As stated above,

JS

the next communication ought to be by phone to arrange an in person meeting. To reiterate, we have the ability to immediately fund the Company to the same extent ($3m) that Mr. Volpe's group is purportedly prepared to commit. I look forward to speaking with you.

Sincerely,

Michael Stolper

Attachments

cc: Eric Hatzimemos
Members of AZ Eufora Partners I LLC
Signatories to the Attached Consent of Members

JS

**WRITTEN CONSENT
OF THE MEMBERS
OF
AZ EUFORA PARTNERS I LLC**

**July 8, 2010**

The undersigned, being all of the Members (the "***Members***") of AZ Eufora Partners I LLC (the "***Company***"), hereby adopt the following resolutions in accordance with applicable law and the limited liability company operating agreement of the Company:

WHEREAS, the members of the Company have invested in the Company for the purpose of investing in Eufora LLC ("Eufora");

WHEREAS, Tim Gaarn is the Manager of the Company and as of February 23, 2009 has served as a co-manager of Eufora along with Tommy Constantine, Carlton R. Gentry, Mark D'Ambrosio and Brent Nerguizian;

WHEREAS, at a meeting of managers of Eufora on August 9, 2009, Constantine recommended and the managers agreed to have Constantine replace Gentry as President and Chief Executive Officer of Eufora as a result of cash flow issues, and for Gentry to remain with Eufora as a Manager until additional capital could be raised and Gentry could resume his role as President and Chief Executive Officer;

WHEREAS, in late March and early April of 2010, Gaarn and Gentry became concerned with certain actions and inactions of Constantine and the state of affairs of Eufora;

WHEREAS, Gaarn engaged Eric Hatzimemos, a former prosecutor and principal of a crises management consulting firm (not a law firm), and Hatzimemos engaged an attorney, Michael Stolper, a commercial litigator with extensive experience in corporate crisis management, to assist Hatzimemos in investigating the state of affairs of Eufora and Constantine's role therein;

WHEREAS, on June 30, 2010 Hatzimemos and Stolper reported their findings to the members of the Company who made themselves available either in person or by conference call; they reported that Eufora is in a state of crisis, effectively insolvent, in default under a loan that permits the lender to immediately take possession and sell the assets of Eufora, and that they have identified several actions and inactions of Constantine that run counter to the interests of Eufora and its members;

WHEREAS, Stolper and Hatzimemos recommended that they meet with Constantine in New York to address their findings and determine if a solution with Constantine can be achieved;

JS

WHEREAS, one of the members in attendance for the June 30th debriefing, Sergei Gonchar, offered to facilitate a phone call between Stolper and Constantine, and at the conclusion of the June 30th meeting Gonchar, Stolper and Constantine spoke for an hour and a half via conference call, during which:

- Constantine made allegations against Gentry and Phil Kenner, a money manager of the members of the Company;
- Constantine alleged that the defaulted loan had been resolved through additional investors and agreement(s) that he was going to provide to Stolper via email immediately following the telephone call;
- Constantine alleged that the resolution of the loan default included Constantine diluting his equity interest in Eufora in exchange for the financing necessary to resolve the outstanding loan, and that he would be stepping down as President and Chief Executive Officer and replaced by Donald Berman; and
- Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.

WHEREAS, neither Constantine nor his counsel has provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos to resolve the open issues;

WHEREAS, time is of the essence to resolve the open issues of Eufora and protect the Company's investment therein.

NOW, THEREFORE, the following is resolved and agreed upon by each of the members of the Company who sign this Consent below:

1. Stolper and Hatzimemos are hereby authorized to serve as the representatives ("Representatives") of the undersigned and in that capacity shall be charged with the responsibility of, and shall be authorized to take any steps necessary for: (a) further investigating any material issues of Eufora and Constantine; (b) communicating with Constantine and his counsel to address the open issues and his allegations; and (c) negotiating a resolution, if feasible, with Constantine.

2. It is imperative that the Representatives meet with Constantine in New York by no later than July 12, 2010.

3. The failure of Constantine to meet with the Representatives in New York in a timely manner, and failure to provide sufficient evidence to support his allegations, including his representation that the loan default issue has been resolved through signed agreement(s), will constitute a breach of Constantine's fiduciary duty to the members of Eufora, including the signatories hereto.

VS

4. Immediate action is necessary to resolve the open issues of Eufora.

5. The Representatives shall keep each of the signatories below timely informed of all developments.

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AZ Eufora Partners I LLC, effective as of the date first set forth above.

| | |
|---|---|
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________<br>Name: __________<br>Date: __________ | Signature:__________<br>Name: __________<br>Date: __________ |
| Signature:__________ | Signature:__________ |

JS

LIST OF INDIVIDUALS WHO SIGNED THE CONSENT OF MEMBERS

| AZ EUFORA MEMBERS | EUFORA MEMBERS |
|---|---|
| 1. Brian Campbell | 1. John Kaiser |
| 2. Bryan Berard | 2. Robert J. Rizzi |
| 3. Bryan Marchment | 3. Theodore R. Hughes |
| 4. Darryl Sydor | 4. Ethel Kaiser |
| 5. Dimitri Khristich | 5. Nicholas L. Privitello |
| 6. Glen Murray | 6. Standard Ventures (Tim Gaarn) |
| 7. Greg Devries | 7. C.R. Gentry |
| 8. Jason Woolley | |
| 9. Jay McKee | |
| 10. Jere Lehtinen | |
| 11. Jozef Stumpel | |
| 12. Mattias Norstrom | |
| 13. Michael Peca | |
| 14. R. Murray | |
| 15. Steve Rucchin | |
| 16. Turner Stevenson | |
| 17. Tyson Nash | |
| 18. Vitali Yachmenev | |
| 19. Vladimir Tsyplakov | |
| 20. William Ranford | |
| | |

JS

4. Immediate action is necessary to resolve the open issues of Eufora.

5. The Representatives shall keep each of the signatories below timely informed of all developments.

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AZ Eufora Partners I LLC, effective as of the date first set forth above.

| | |
|---|---|
| Signature: [signature]<br>Name: [illegible]<br>Date: 7/9/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: [illegible]<br>Date: 7/10/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: [illegible]<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: GLEN MURRAY<br>Date: 7/10/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: Raymond (Ren) Murray<br>Date: 7/10/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: MICHAEL PECA<br>Date: 7-12-2010 | Signature:<br>Name:<br>Date: |

4. Immediate action is necessary to resolve the open issues of Bolton.

5. The Representatives shall keep each of the signatories below timely informed of all developments.

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AZ Bolton Partners I L.L.C., effective as of the date first set forth above.

| | |
|---|---|
| Signature: [illegible]<br>Name: [illegible]<br>Date: [illegible] | Signature: [illegible]<br>Name: [illegible]<br>Date: [illegible] |
| Signature: [illegible]<br>Name: [illegible]<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [illegible]<br>Name: [illegible]<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [illegible]<br>Name: GLEN MURRAY<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [illegible]<br>Name: Raymond (Ron) Murray<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [illegible]<br>Name: [illegible]<br>Date: [illegible] | Signature:<br>Name:<br>Date: |

4. Immediate action is necessary to resolve the open issues of [illegible].

5. The Representatives shall keep each of the signatories below timely informed of all developments.

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AZ [illegible] Partners I LLC, effective as of the date first set forth above.

| | |
|---|---|
| Signature: [signature]<br>Name: [illegible]<br>Date: [illegible] | Signature: [signature]<br>Name: JERE LEHTINEN<br>Date: 7/12/2010 |
| Signature: [signature]<br>Name: Patrick Kaleta<br>Date: [illegible] | Signature: [signature]<br>Name: JAY MCKEE<br>Date: 7/18/2010 |
| Signature: [signature]<br>Name: [illegible]<br>Date: [illegible] | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: GLEN MURRAY<br>Date: 7/12/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: Raymond (Glen) Murray<br>Date: 7/12/2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: MICHAEL PECA<br>Date: 7-17-2010 | Signature:<br>Name:<br>Date: |

Jul 09 10 03:59p VITALI YACHMENEV (705)476-5395 p.1

JUL 09 2010 9:02AM HOWARD EXPRESS SHIPPING 12129661389 P.1

May.11.2010 09:51 PM PAGE. 1/ 1

fax to 617-249-1911

07/08/2010 16:36 604-540-2730 RANFORD FAMILY PAGE 01/01

4. Immediate action is necessary to resolve the open issues of Eufora.

5. The Representatives shall keep each of the signatories below timely informed of all developments.

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AZ Eufora Partners I LLC, effective as of the date first set forth above.

| | |
|---|---|
| Signature: ____ Name: ____ Date: ____ | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: William Ranford Date: July 8, 2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: BRIAN CAMPBELL Date: July 8, 2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: Ronald Richardson [illegible] Date: July 8, 2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: Bryan Berard Date: July 8, 2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: Greg deVries Date: July 8/2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: [signature] Name: VITALI YACHMENEV Date: JULY 8/2010 | Signature: ____ Name: ____ Date: ____ |
| Signature: ____ | Signature: ____ |

07/08/2010 20:45 12265530770 CAMPBELL PAGE 01/01

JUL-09-2010 09:21 FROM: TO:16172491911 P.1

VS

CARLSON WAGONLIT 2505635224 p.1

This FAX received with evaluation version of 32bit Fax 09.12.09

Jul 09 2010 3:41PM HOWARD EXPRESS SHIPPING 12129661389 p.1

FROM : S.Rucohin PHONE NO. : 949 6738598 Jul. 05 2010 02:09PM P1

07/09/2010 16:23 9197913359 RALEIGH MARRIOTT PAGE 02

Jul 09 2010 2:56PM HOWARD EXPRESS SHIPPING 12129661389 p.1

Jul 09 10 03:59p VITALI YAKHNENEV (705)478-8395 p.1

Jul 09 2010 2:02PM HOWARD EXPRESS SHIPPING 12129661389 p.1

May.11.2010 09:15 AM fax to 617-249-1911 PAGE. 1/ 1

4. [illegible]

5. [illegible]

IN WITNESS WHEREOF, the undersigned have executed this Consent of the Members of AS ... LLC, ... of the date first set forth above.

| | |
|---|---|
| Signature: <br> Name: <br> Date: | Signature: [signature] <br> Name: Jason Waltz(?) <br> Date: July 9, 2010 |
| Signature: [signature] <br> Name: William ... <br> Date: July 9, 2010 | Signature: [signature] <br> Name: Steve Rucchin <br> Date: July 9, 2010 |
| Signature: [signature] <br> Name: [illegible] <br> Date: [illegible] | Signature: [signature] <br> Name: Turner Stevenson <br> Date: July 9, 2010 |
| Signature: [signature] <br> Name: [illegible] <br> Date: July 9, 2010 | Signature: <br> Name: <br> Date: |
| Signature: [signature] <br> Name: [illegible] <br> Date: July 9, 2010 | Signature: <br> Name: <br> Date: |
| Signature: [signature] <br> Name: Bryan Berard(?) <br> Date: July 9, 2010 | Signature: <br> Name: <br> Date: |
| Signature: [signature] <br> Name: [illegible] <br> Date: [illegible] | Signature: <br> Name: <br> Date: |
| Signature: | Signature: |

JS

**ACKNOWLEDGEMENT:**

I have read the Written Consent of the Members of AZ Eufora Partners I LLC dated July 8, 2010 ("Consent") and I am familiar with its contents. As an investor in or member of Eufora LLC, I agree that my interests are aligned with the interests of the members of AZ Eufora Partners I LLC and, as such, I agree with the sum and substance of the Consent and its resolutions. In particular, I agree to be represented by Michael Stolper and Eric Hatzimemos in accordance with the terms of the Consent.

| | |
|---|---|
| Signature: [signature]<br>Name: Dimitri Christich<br>Date: 7/12/10 | Signature: ____<br>Name: ____<br>Date: ____ |
| Signature: ____<br>Name: ____<br>Date: ____ | Signature: ____<br>Name: ____<br>Date: ____ |
| Signature: ____<br>Name: ____<br>Date: ____ | Signature: ____<br>Name: ____<br>Date: ____ |
| Signature: ____<br>Name: ____<br>Date: ____ | Signature: ____<br>Name: ____<br>Date: ____ |

JS

**ACKNOWLEDGEMENT:**

I have read the Written Consent of the Members of AZ Eufora Partners I LLC dated July 8, 2010 ("Consent") and I am familiar with its contents. As an investor in or member of Eufora LLC, I agree that my interests are aligned with the interests of the members of AZ Eufora Partners I LLC and, as such, I agree with the sum and substance of the Consent and its resolutions. In particular, I agree to be represented by Michael Stolper and Eric Hatzimemos in accordance with the terms of the Consent.

| | |
|---|---|
| Signature: [signature]<br>Name: Vladimir Tsyplakov<br>Date: 2.11.2010 | Signature:<br>Name:<br>Date: |
| Signature:<br>Name:<br>Date: | Signature:<br>Name:<br>Date: |
| Signature:<br>Name:<br>Date: | Signature:<br>Name:<br>Date: |
| Signature:<br>Name:<br>Date: | Signature:<br>Name:<br>Date: |

VS

Jul 02 10 08:32a p.1

Jun 25 10 09:40a p.1

ACKNOWLEDGEMENT:

I have read the Written Consent of the Members of AZ Eufora Partners I LLC dated July 8, 2010 ("Consent") and I am familiar with its contents. As an investor in or member of Eufora LLC, I agree that my interests are aligned with the interests of the members of AZ Eufora Partners I LLC and, as such, I agree with the sum and substance of the Consent and its resolutions. In particular, I agree to be represented by Michael Stolper and Eric Hatzimemos in accordance with the terms of the Consent.

| | |
|---|---|
| Signature: [signature]<br>Name: [illegible]<br>Date: 07/09/10 | Signature: [signature]<br>Name: John Robert Kaiser<br>Date: 7/9/2010 |
| Signature: [signature]<br>Name: Theodore Hughes<br>Date: 07/09/10 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: Ethel Dolores Kaiser<br>Date: 07-09-2010 | Signature:<br>Name:<br>Date: |
| Signature: [signature]<br>Name: Nicholas [illegible]<br>Date: 7/9/10 | Signature:<br>Name:<br>Date: |

JS

**ACKNOWLEDGEMENT:**

I have read the Written Consent of the Members of AZ Eufora Partners I LLC dated July 8, 2010 ("Consent") and I am familiar with its contents. As an investor in or member of Eufora LLC, I agree that my interests are aligned with the interests of the members of AZ Eufora Partners I LLC and, as such, I agree with the sum and substance of the Consent and its resolutions. In particular, I agree to be represented by Michael Stolper and Eric Hatzimemos in accordance with the terms of the Consent.

| | |
|---|---|
| Signature: [signature]<br>Name: C.R. Gentry<br>Date: 07/08/2010 | Signature: ______<br>Name: ______<br>Date: ______ |
| Signature: ______<br>Name: ______<br>Date: ______ | Signature: ______<br>Name: ______<br>Date: ______ |
| Signature: ______<br>Name: ______<br>Date: ______ | Signature: ______<br>Name: ______<br>Date: ______ |
| Signature: ______<br>Name: ______<br>Date: ______ | Signature: ______<br>Name: ______<br>Date: ______ |

JS

# Guerrero & Guerrero Abogados, S.C.

d) Other Services:

Any other services to those mentioned within this agreement will be subject to another proposal.

Please indicate your approval of the terms of this engagement by signing where indicated below. Should you have additional questions, please do not hesitate to call me.

Very truly yours,

Max Guerrero Garcia, Esq.

*Accepted by:*

*Print Name:* JOZEF STUMPEL

*Title:*

*Date:* 28.12. 2005

Álvaro Obregón # 1 • Marina Plaza Local "O" Centro San José del Cabo
Los Cabos, B.C.S., 23400 • México
Ph / Fax: (011-52) 624-142-6545 / 624-142-6546
maxguerrero@prodigy.net.mx / mglegal15@yahoo.com.mx

JS

PK-000109539

# Guerrero & Guerrero Abogados, S.C.

San José del Cabo, B.C.S. November 26, 2008.

At'n: Mr. Josef Stumpel

Re: Engagement Letter

Dear Mr. Stumpel:

We are pleased that you have considered Guerrero & Guerrero Abogados for your legal needs, and assure you that each associate and employee of this Firm will do his or her utmost to fulfill these needs in a courteous and expeditious manner. Our ability to best represent you should be based upon mutual understanding of what you want us to accomplish and how you will be chard for our services, which is the purpose of this engagement letter. I also want to assure you that our conversations and our relationship should and will be kept absolutely confidential.

a) Objective:

The objective of this engagement is to recuperate the amount of US$1,600,000.00 (one million six hundred thousand dollars 00/100 USCY) that was loan and wire to LOR Management S.A. de C.V. (Ken Jowdy)

b) Legal Fees:

It is our policy to obtain an advance retainer for all new clients. The amount and terms of the retainer are determined by the complexity of each case, lawyer's time, legal assistants and specialized support required and some minor out-of-pocket costs that we will incur on you behalf. Therefore we will require the amount of US$10,000.00 (Ten thousand dollars 00/100 USCY), which shall be payable at the time of accepting the present proposal and this fee for this engagement is not contingent on the results of our services. Retainers do not earn interest and are held in the Firm's trust account in your name.

In case that you require an official invoice a 10% tax will be added.

When you get a favorable result and recover any money from the loan, goods or any value, this law firm is entitled to charge an 18.5% (eighteen point five) as a "Success fee" of what is recovered.

c) Expenses:

Any extraordinary expense that has to be made on your behalf shall be informed to you in a timely manner for you approval and given the amount of money needed.

Álvaro Obregón # 1 • Marina Plaza Local "D" Centro San José del Cabo
Los Cabos, B.C.S., 23400 • México
Ph / Fax: (011-52) 624-142-6545 / 624-142-6548
maxguerrero@prodigy.net.mx / mglegal15@yahoo.com.mx

JS

PK-000109540

**LEGAL SERVICES CONTRACT**

This agreement is made this 28, day of December, 2008, by and between Augustine & McKenzie, PLLC, and Jozef Stumpel ("client").

1. **Legal Services To Be Provided.** Client has retained attorney to represent him in his legal affairs in the United States. Attorney's services may include client consultation, discovery of relevant facts, factual analysis, witness interviews, telephone conferences, legal research and analysis, pretrial preparation, drafting legal pleadings, written correspondence and other legal documents, appearances at depositions, negotiation or settlement conferences, pretrial conferences, and trial, and other miscellaneous trial preparation which may be necessary to properly represent client in this matter. This does not cover an appeal.

2. **Additional Legal Services.** If client needs any other legal services which may or may not be related to the subject of the agreement as described above in paragraph 1, attorney and client may make a new written agreement to provide the other services. Otherwise, attorney's services shall be limited in scope to the matter described in paragraph 1 above.

3. **Legal Fees.** Attorney cannot predict or guarantee what client's total bill will be because the total time to be spent by attorney is a function of unknown variables. Therefore, attorney's fee will be calculated as follows:

> **A. Hourly Rate.** Client understands that attorney will charge client attorney's fees for legal services performed at the rate of $200.00 per hour and client agrees to compensate attorney at this hourly rate.
>
> **B. Attorney's Billing Practices.** Client will be billed for all legal services performed (including travel time) in connection with client's case at the hourly rate set forth in paragraph 3.A. All billings by attorney are due and payable immediately upon receipt and must be paid in full by client **NO LATER THAN 30 days** from the date on the billing statement. Client will be charged interest at a rate of 18% per annum on any remaining balance outstanding on client's account.
>
> **C. Primary Responsibility For Bill.** Client understands that client is primarily responsible for the payment of all attorney's fees and costs due under this agreement. However, if attorney's fees due are paid by the adverse party by agreement or court order, such payment shall be credited to any outstanding balance due under this agreement. Any remaining balance shall be refunded to the client.

4. **Cost and Expenses.** In addition to legal fees, client must pay all costs and expenses which are necessary to handle this matter including, but not limited to, court costs, filing fees, service fees, expert witness fees, photocopying costs, messenger service fees, long distance telephone

JS

CTP4 16 ЯНВ 2006 0:18 ТЕЛ:+7 7172 291587 ОТ:ХОККЕЙНЫЙ КЛУБ БАРЫС

charges, postage, transcript preparation fees, and any other necessary expense incurred in this matter.

5. **Client's Duty To Cooperate.** Client must fully cooperate with attorney and provide him with all information which may be relevant to the issues involved in this matter. Client must also pay all bills as required by this agreement. If client does not comply with these terms, attorney may withdraw from representation.

6. **No Guarantees.** Attorney agrees to provide competent and diligent services and, at all times, will seek to achieve solutions which are just and reasonable to client. However, because of the uncertainty of legal proceedings, the interpretation and changes in the law and many other unknown factors, attorney cannot and does not warrant, predict or guarantee the results of the final outcome of any case.

7. **Miscellaneous Provisions.**

**A. Entire Agreement.** Client understands and agrees that this written document contains all of the terms and conditions of the parties' agreement and represents the complete and entire understanding of the parties. Attorney has made no representations to client other than those expressly set forth herein. All prior agreements, understandings or representations of the parties are hereby terminated and canceled in their entirety, and are of no force or effect whatsoever.

**B. Enforcement of Agreement.** If either party initiates legal action or has to employ the services of an attorney to enforce any of the provisions of this agreement, the losing party agrees to pay all of the prevailing party's attorney's fees and costs.

**C. Governing Law.** All matters affecting the interpretation or enforcement of this agreement, and the rights of the parties hereto, shall be governed by the laws of the State of Idaho.

**D. Voluntary Agreement.** Client has carefully read this agreement and understands it. Attorney has answered all of client's questions and fully explained this agreement to client's complete satisfaction. By signing below, client acknowledges receiving a copy of this agreement.

ATTORNEY

________________________
Paul J. Augustine, Esq.

CLIENT

________________________
Jozef Stumpel

Exhibit 4

SO BASICALLY YOU WERE TAKING MONEY FROM OTHER COMPANIES THAT YOU OWN AND JUST TRYING TO SERVICE SOME OF THIS DEBT; IS THAT FAIR TO SAY?
A. BASICALLY.
Q. OKAY. HAVE YOU PERSONALLY EVER -- HAVE YOU OR ANYBODY AT YOUR DIRECTION EVER FILED ANY COMPLAINTS AGAINST PHIL KENNER WITH ANY FEDERAL AGENCIES?
A. I DON'T BELIEVE SO.
Q. HAVE -- HAS -- HAVE YOU EVER DIRECTED TOM HARVEY TO HAVE ANY COMMUNICATIONS ON YOUR BEHALF?
MS. CROWTHER: OBJECTION. ATTORNEY-CLIENT.
MR. RICHARDS: NO. JUST "YES" OR "NO."
MS. CROWTHER: NO. IT'S AN ATTORNEY-CLIENT COMMUNICATION.
YOU ASKED HIM A SUBSTANTIVE QUESTION.
DON'T ANSWER THAT QUESTION.
///

BY MR. RICHARDS:
Q. HAVE YOU EVER -- HAVE YOU EVER ASKED TOM HARVEY TO FILE A COMPLAINT?
MS. CROWTHER: SAME OBJECTION. SAME INSTRUCTION.
BY MR. RICHARDS:
Q. WHAT ABOUT LOUIS FREEH?
MS. CROWTHER: SAME OBJECTION. SAME INSTRUCTION.
BY MR. RICHARDS:
Q. IS LOUIS FREEH REPRESENTING YOU IN ANY CAPACITY AT THIS POINT IN ANY LITIGATION ANYWHERE?
A. HE'S REPRESENTING ME, YES.
Q. WHAT SPECIFICALLY IS HE REPRESENTING YOU IN?
MS. CROWTHER: OBJECTION. CALLS FOR ATTORNEY-CLIENT COMMUNICATIONS AND WORK PRODUCT.
I INSTRUCT YOU NOT TO ANSWER.
MR. RICHARDS: I JUST WANT TO KNOW WHAT HE'S REPRESENTING.
MS. CROWTHER: HE TESTIFIED TO THAT YESTERDAY. HE TESTIFIED THAT IT WAS AS TO THE GRAND JURY INVESTIGATION AND THE S.E.C. INVESTIGATION.

JS

MR. RICHARDS: OKAY.

BY MR. RICHARDS:

Q. I ASKED YOU IF YOU WERE AWARE OF ANY LAWSUITS FILED OR PENDING YESTERDAY, AND YOU -- YOU PROVIDED SOME TESTIMONY.

ARE -- ARE YOU AWARE THAT THERE'S A CLAIM FROM JOZEF STUMPEL FOR A 1.6 MILLION DOLLAR LOAN TO PROPIEDADES D.D.M.?

A. NO.

Q. DID THEY BORROW MONEY FROM JOZEF STUMPEL?

A. I DON'T BELIEVE SO.

Q. WHAT -- HOW -- DO YOU KNOW IF JOZEF STUMPEL EVER GAVE ONE OF YOUR ENTITIES 1.6 MILLION DOLLARS?

A. HE DID.

Q. AND WAS THAT PAID BACK?

A. NO.

Q. AND WHEN IS IT GOING TO BE PAID BACK?

A. I DON'T KNOW.

Q. WHAT ABOUT MATTIAS NORSTROM, DID HE GIVE 400,000 DOLLARS TO LOR MANAGEMENT FOR THE C.S.L. AIRPORT IN MEXICO?

0412

A. I THINK SO.

Q. HAS THAT BEEN PAID BACK?

A. NO.

Q. DID MATTIAS NORSTROM GIVE -- WAS THERE -- THERE WAS A -- YOU TESTIFIED YESTERDAY THAT THERE WAS A 500,000 DOLLAR CHECK FROM BAJA DEVELOPMENT CORP. THAT WAS ISSUED TO MATTIAS NORSTROM BUT NEVER CASHED.

DO YOU REMEMBER THAT?

A. YES.

Q. IS THAT GOING TO -- IS THAT CHECK GOING TO BE MADE GOOD AT ANY TIME THAT YOU'RE AWARE OF?

A. I DON'T KNOW.

Q. GLEN -- GLEN MURRAY SPENT 800,000 DOLLARS FOR THE PALM UNITS THAT -- THAT -- THAT THERE'S -- THAT THERE'S LITIGATION WITH YOU.

ARE YOU AWARE OF THAT LITIGATION?

A. YES.

Q. AND THEN THERE WAS A -- THERE WAS A LAWSUIT THAT WE FOUND WITH SOME OF THESE HAWAIIAN ENTITIES IN FEDERAL COURT IN ARIZONA FOR 5.5 MILLION DOLLARS.

ARE YOU AWARE OF THAT LAWSUIT?

A. WHAT LAWSUIT IS THAT?

JS

Exhibit 3

***Jozef Stumpel affidavit***

1. I, Jozef Stumpel, am a full time resident of the country of Slovakia with my wife and family.

2. The contents of this affidavit are full of my personal knowledge and personal experiences.

3. This affidavit has been prepared for me, but I understand and agree with all of its representations.

4. I have been a professional hockey player for my entire adult life, including approximately 10 years in the NHL in the USA.

5. I previously signed an affidavit in support of Phil Kenner in 2009 during his arbitration with Owen Nolan related to investments that I also have in common with Nolan but disagree completely with the assessment Nolan and his attorneys presented to the 2009 arbitration panel.

6. I was a short-term client of the same attorney in California, Michael Meeks. Both Mr. Meeks and his people, including Kenner's former assistant, Kristine Myrick, grossly misled me about documents in 2008 they accused Mr. Kenner of:
   a. Forging in order to transfer funds from one of my investment accounts to Northern Trust Bank,
   b. Forging my name on documents to establish a new investment account (unknown to me) at Northern Trust Bank,
   c. Forging my name on new Line of Credit documents using my investment funds as collateral for a multi-million dollar loan at Northern Trust Bank, and
   d. Ultimately stealing all of the line of credit funds for himself.

7. In 2008, I learned that Mr. Meeks and Ms. Myrick worked with Ken Jowdy and his attorney, Tom Harvey, at the same time against Phil Kenner and the other investors. I was most bothered when I learned after filing a lawsuit versus Kenner that ***NONE OF THE FORGERIES OR TRANSFERS WERE TRUE.*** I explained this in my 2009 affidavit to the arbitration panel.

8. ***Meeks, Myrick and Jowdy's attorneys lied to me about everything.*** My money was exactly where it was supposed to be. In fact, I learned that no documents were ever signed at Northern Trust Bank by Kenner, myself or anyone else after speaking with the bank directly. I never had any accounts with money in it at that bank. ***It was all a 100% lie.*** I immediately dropped the case versus Kenner feeling deceived by the attorneys and demanded the $43,000 the attorney charged me to file the cookie-cut complaint (including the same typos from the Nolan complaint). No other work was done for me to support that overbilling scheme. They never returned any of the grossly overbilled amounts. I later learned that the same

Initial JS

JS

attorney charged Nolan about $750,000 for his arbitration as well as Juneau and Moreau about $250,000 apiece for cases that were dropped by them as soon as Kenner beat Nolan on all of the identical claims in his arbitration. I understand Nolan received a $2 million judgment in the arbitration after lying about his knowledge of his investment and Line of Credit in the Hawai'i project. Since then, Kenner has shown me texts, documents and depositions where Nolan, personally, and other Northern Trust bankers admit Nolan's 100% knowledge of Nolan's line of credit since 2003 when it was first opened.

9. After my discoveries of the Meeks and Jowdy scams on me, two other NHL hockey players who I knew (Dimitri Khristich and Jason Woolley) also explained the same scams they also discovered and what had happened to them by Jowdy. They travelled to Russia with Kenner to meet me face-to-face. After our meeting in Russia, I immediately rejoined Kenner and his efforts with the rest of my friends versus Jowdy in 2008 to sue him in México and the USA. As a group and individually, we began our efforts with Kenner to recover all of the funds I directly sent to Jowdy accounts or we agreed as a group (like Hawai'i) to send to Jowdy for short-term loans. I was a participant in lawsuits for:

   a. The $1.6 million loan I loaned Jowdy in México from my account in Europe in 2005,
   b. The $5 million plus Jowdy stole from me and the rest of our Hawai'i investors in unpaid loans since 2004 (known to all of the Hawai'i investors I discussed it with since 2004 when Kenner disclosed the idea to us as a group on a conference call),
   c. The $250,000 Jowdy stole from me from my 2004 investment in the Falcon 10 airplane that was supposed to help our México projects, even though we learned from Jowdy in his 2010 deposition that he only used the plane for his own uses.
      i. On top of that, I learned from Jowdy's own bank records that Jowdy stole my $250,000 and never used it for the airplane in 2004, but later convinced some of our airplane partners (Gonchar and Kenner) to take a loan to help repair the plane engines. This was also a scam, since Jowdy used the 2005 loan to actually buy the plane (over a year after we gave him the money to do so). Once Gonchar and Kenner were sued by the bank, we also learned that Jowdy stole another $430,000 in cash advances from the plane loan before defaulting the loan and losing the planes for all of us to the bank.
   d. Jowdy stole the $500,000 I invested in the Diamanté del Mar project from 2002 through 2006. Kenner has provided me these bank statements as well for confirmation.

Initial JS

JS

10. I have discussed all of the loans and scams by Jowdy on me and my former teammates and friends independently with Arizona attorney, Tom Baker, and California attorney Ronald Richards, both of which sued Jowdy for the various frauds against me and the other investors. I have also discussed all of the Jowdy scams with the other investors, since we began suing Jowdy in 2008. Kenner made sure that everyone was 100% aware of all the funds that Jowdy received through actual Jowdy bank records and what Jowdy did with them, so no one was in the dark about it.

11. I know that my friend and former teammate, Glen Murray, and Kenner had to go to trial with Jowdy in Nevada in December 2010 to try and recover about $1 million that Jowdy also borrowed from Glen Murray and never repaid for 5 years (at that time) since 2005. I know that Jowdy tried to blame the unpaid money on Kenner (like in all of the México deals) but lost to both Kenner and Murray in the Nevada lawsuit when Kenner represented himself in the trial.

12. In 2009, after Jowdy terminated all of the settlement discussions with Tommy Constantine, on our behalf (in 2008), our group of investors sued Jowdy in two major California lawsuits with Ronald Richards. I was a Plaintiff in both lawsuits for the Diamanté del Mar and Diamanté Cabo san Lucas projects. In both California lawsuits, we were all aware and claimed in the lawsuits that:

    a. Jowdy had received approximately $8 million dollars from our Hawai'i partners and had not repaid the loans to us.
        i. I saw the January 2006 original closing documents that confirmed Lehman Brothers and Jowdy were expecting to pay our investors (Hawai'i loans) $7,000,000 at the closing (expected only days later), but that also changed as a fraud by the lender at Lehman Brothers and Jowdy.
    b. Jowdy had mismanaged the two México resort projects for years while stealing funds from the budgets for his own personal uses.
        i. Bryan Berard (in May 2010) and Jason Woolley (after the January 2010 Jowdy deposition) confirmed the mis-management to me personally after dealing with Jowdy in his CA depositions.
        ii. Kenner showed me and other investors the Jowdy bank records for Baja Development Corp and other Jowdy companies confirming that Jowdy began stealing funds from us with days of our first investment in August 2002 (by Woolley, Khristich, and Kenner).
    c. Jowdy had mismanaged and stolen funds from others and myself who invested with Kenner in an airplane that was supposed to be used exclusively for the promotion of the México projects. We later learned after Jowdy 2010 deposition that he ***never*** used the planes for

Initial JS

JS

the intended purpose, never paid down the fraudulent loan, stole over $1mm cash from the plane investment directly from our deposits, stole another $430,000 from the fraudulent loan (guaranteed by Kenner and Gonchar), and left the plane loan in default and disrepair to punish the investors who began to take legal actions against him as a result the scams Kenner discovered in 2007 and shared with all of us.

i. In 2007, Kenner also disclosed to me and our friends that Jowdy and his attorney, Tom Harvey, tried to bribe Kenner with millions in equity on future Jowdy-led projects that were funded by Lehman Brothers in Texas and Tennessee without us.

    1. Kenner declined the bribes and fought Jowdy for the investors until he was arrested in 2013. Jowdy confirmed the bribes to Kenner in his 2010 deposition with Ronald Richards.

ii. Kenner shared the 2-day depositions with me and all of the investors who read the Jowdy's confessions of stealing our money and having no plans to repay any of us, specifically including my $1.6 million loan.

    1. All of the investors knew that Kenner and our attorney, Ronald Richards, sent copies of Jowdy's 2-day deposition to FBI Agent Matt Galioto who was supposed to be helping us get our money back from Jowdy in the various scams that Kenner explained to him in June 2009, on all of our behalf.

13. In 2005, I loaned $956,000 to Ken Jowdy from my USA accounts (in addition to another $1.6 million from one of my European accounts). The $956,000 loan was supposed to be repaid by Jowdy within a month. Jowdy informed us that he was selling several of his personal real estate holdings to come up with the short-term repayment funds. Neither of which apparently sold, since I was never repaid. Jowdy did make a $50,000 interest payment to me on the $956,000 loan but no more. At that time, Kenner told me and another investor, Jere Lehtinen, that he would secure our loans to Jowdy if Jowdy did not repay us from the Lehman Brothers loan in Cabo that Jowdy was working to close as soon as he could. I was thankful that Kenner made that security deal with Lehtinen and me to protect our interests, based on the Jowdy default. The other loan was supposed to be fully repaid at the time of the Lehman Brothers closing. Neither Kenner nor myself learned about the new Jowdy plans to not repay us at the closing until some time in February 2006 – after seeing the January 25, 2006 Lehman Brothers project assessment report.

    a. Kenner immediately told Lehtinen and me that he was opening a new LLC to secure our investment (if we remained unpaid at the time thru

Initial JS

JS

the time of the closing) and we would now be partners with Kenner in the new LLC, just like the documents we signed with Kenner as Kenner's guarantee. I was thankful that I was not at a total loss for that deal, because Kenner protected us. In addition, Kenner explained that the lender from Lehman Brothers confirmed that he was going to set aside real estate commissions in the first year of the Cabo project (totaling about $14 million) to be used to repay my $1.6 million loan plus interest, the unpaid Hawai'i loans plus interest to me and the other Hawai'i investors as well as other personal loans that Jowdy had with Glen Murray, Kenner, Robert Gaudet, Mattias Norstrom and others. I was aware of all of these loans. I was a teammate and friend of both Norstrom and Murray. This repayment never happened. After Jowdy refused to repay any of the loans to my friends and me in 2006-07, Bob Gaudet also assisted me with my México attorneys versus Jowdy for his frauds in México.

14. In 2007, Kenner explained to all of us as a group (on conference calls and individually) that he caught Jowdy stealing our funds and had no plans to return them. This is the first time I saw Jowdy bank records from Kenner for both the airplane thefts and the original Diamanté del Mar investment thefts through Jowdy's Baja Development Corp.

15. In 2010, I was aware that Kenner was arrested and detained in México by the federal police after Jowdy's attorneys in the USA and México filed a complaint (with Nolan's attorney, Meeks). I know that Kenner was physically beaten and told he had to sign transfer paperwork to Jowdy in México if he wanted to get out. I know that a former attorney of ours, Palos, got Kenner released from jail and the torture after a few days. I also know that our México attorney was murdered shortly after Kenner's release. I know that it was not easy for Kenner to continue fighting for us in México for the next three years even with federal México protection on his trips to testify for us versus Jowdy in the various criminal lawsuits for me individually and others as a group.

16. In 2014, I spoke with Kenner (while he was in jail) and a few other investors who Jowdy scammed about going to México and filing new criminal actions in México City. I was relieved that I was able to file another lawsuit against Jowdy to finally recover the money he stole from my family and me since 2003.

    a. The week before I was supposed to fly to México City in April 2015 with two other investors (Mattias Norstrom and Rem Murray), I learned that our contact who was arranging the filings and related testimonies in front of the México City Supreme Court judges, the Office of the Ministerial Publico and the PGR, was arrested by FBI Agent Galioto and FBI Agent Mike Cassidy for Obstruction of Justice in

JS

the USA to protect Jowdy. I am not from the USA but do not understand how this can happen. He was helping us with real thefts, which we have the paperwork for.

17. Since April 2015, I have heard from Agent Galioto on a few occasions to let me know that Kenner is a thief and Jowdy did nothing wrong. He is wrong, because I have seen the paperwork and bank records. Jowdy stole from my friends and me. I personally know that he scammed Kenner and me. Now, I have been instructed to sign paperwork giving up some of my rights to Jowdy for the money he has stolen from me for a small piece of the Cabo project (that Jowdy also stole from us). It is incredible that Jowdy stole our money to buy his interest in the project, stole money for 10+ years from the project to pay for his protection and legal fees against the people he stole from, stole some of our equity in Cabo, and I am now being told that signing the deal with Jowdy to receive some of the stolen equity back is my best deal and I need to do it. I do not understand why Agent Galioto of the FBI is working to protect Jowdy who stole all of our funds and against all of us.

18. Phil Kenner has worked to protect my family and I for years against Jowdy and his people who have stolen from us. I have received all of the bank records to prove where my funds have gone and the Jowdy depositions that confirmed he received them. Without Kenner, no one has ever tried to help me recover the money that is so important to me.

19. Bryan Berard, John Kaiser and other people working for Jowdy, since Kenner arrest in November 2013, have lied to me about information I already know is not true. Berard and Kaiser have been working hard to protect Jowdy since 2011, because they are employed by him in México and working with FBI Agent Galioto against Kenner's efforts to help us recover our funds from Jowdy.

This is signed, executed and affirmed on March 10th, 2017.

[signature]

Jozef Stumpel

Initial JS

JS

Exhibit 2

## ***Jozef Stumpel***

I, Jozef Stumpel, have been an investor and lender to Ken Jowdy and his development projects since 2003. I have invested (for equity) and loaned (personally to Jowdy and his companies) over $3,000,000 USD from 2003 to 2006.

Since 2003, I have never received a single dollar back from Jowdy (or any of his controlled investments) despite the fact that over $1,600,000 USD of the funds were loans, which Jowdy has admitted to in testimony in the USA during civil cases in which Jowdy was sued for fraud by other investors and personal friends of mine.

One friend of mine, Glen Murray, also loaned Jowdy about $800,000 USD on a short-term loan in 2005 and had to sue Jowdy when Jowdy failed to repay him. Glen won a $1,000,000 judgment after a four (4) day bench trial in Nevada.

Diamante del Mar

Initially in 2003, I was told by my business manager in the USA, Phil Kenner, that Jowdy was seeking $500,000 investors in his Mexican golf resort project in El Rosario Mexico (Baja Norte). I agreed to invest in the project and transferred $500,000 to Jowdy's control in or about 2003. I later learned that the resort was foreclosed on after 2009, as a result of a $3,000,000 USD loan that Jowdy and his brother-in-law, Bill Najam, executed by collateralizing the entire project site – appraised at $68,900,000 at the time in February 2006.

I later learned through evidence produced in several cases in the USA that Jowdy personally withdrew about $1,000,000 from the loan proceeds for his personal benefit, unrelated to the project itself – but masked in later accounting documents as "investments" that he purportedly made and was being reimbursed for ahead of all the other investors and lenders. Jowdy never made the investments according to his own records. I was never notified about the loan on the property or the later foreclosure by Jowdy. I had to learn about both events through 3rd parties – long after the fact. This became a total loss to me due to Jowdy's frauds.

Jowdy/ loan to LOR Management (Mexico)

In or about 2005, Jowdy again approached my Business Manager to ask if I could "help" a partner (Jowdy personally) and lend $1,600,000 to his personal LLC in Mexico, LOR management (named after Jowdy's mother). I agreed with the understanding that Jowdy was repaying me at the earliest opportunity in the following year as a result of Jowdy financing one of the two (2) projects under his control in Baja Mexico with 10% interest on the funds. Jowdy never repaid me even after both projects were funded in February 2006 and March 2006. Despite dozens of requests to repay the loan over the early years, Jowdy always had a volley of excuses for the lack of funds and begged for patience. Later, through other litigation with Jowdy, I discovered that Jowdy actually had millions of dollars pass through his various bank account from the time I loaned him the money until 2006. Over the years, I learned that Jowdy used the LOR Management account to "wash" or "launder" funds that investors sent him for other specific purposes. I am still without the repayment of those funds 10 years later.

Jowdy & his attorney, Garcia, actually testified in a USA case against him for fraud that any funds sent to his company, LOR Management, were held as a "pass through" until they were directed by Jowdy to the intended project. That testimony was unbelievable to me.

Diamante Air (planes)

In or about 2005, Jowdy approached the group of investors from the Diamante del Mar project and asked, again through our Business Manager, if we would like to purchase a private jet and begin a side business chartering flights. The idea made sense to us because the project(s) that we were investing in Mexico were in the practice of leasing private jets several times a month for the resort promotions. As a result, Jowdy claimed that we could make the difference in the rental fees versus the costs and our own company would be handling the chartering through the defined group of real estate prospects which the resorts were paying for in the first place. I invested $250,000 (in Jowdy's Diamante Air) and later found out that not only did Jowdy not pay me any dividends as

JS

promised in 2005, but he flew the planes over 90% of the time as his own without regard for the long-term condition of the planes or the existence of a loan he fraudulently signed for – further withdrawing $430,000 over a three (3) month period of time from November 2005 to January 2006 without the knowledge or consent of the members of the LLC or the two (2) guarantors, one of which was Kenner. Jowdy, in 2007, after Kenner demanded repayment for the incredible outstanding loans and other frauds within the resort management, allowed the planes to be repossessed. The LLC lost our assets that we had paid for, with no money from Jowdy, and Kenner and another partner (Sergei Gonchar) were sued by the lending bank for the unpaid $1,000,000 PLUS loan Jowdy defaulted on. That project became a total loss for me and the other investors with only gains through fraud to Jowdy.

Cabo san Lucas Aeropuerto

Kenner and I discovered through emails from Jowdy's attorney, Fernando Garcia, that Jowdy had also fraudulently diverted $500,000 from my $1,600,000 loan to Jowdy that was supposed to be used exclusively for the closing efforts on the Cabo san Lucas project. Apparently, Jowdy failed to raise the necessary funds for his portion of the commitment and later sued Romo.

In testimony in 2010, Jowdy confirmed that he had sued Romo, but the Plaintiff was Jowdy and Garcia's company, LOR Management. Kenner, Norstrom and I were not recognized as members of the investment funds, even though we represented 100% of the $1,000,000 PLUS in contributions according to Garcia's emails to Kenner. Jowdy proposed in the 2010 USA deposition that he was suing the airport owner and would gladly return the funds to the investors, but he never did. After a five (5) year legal battle, Romo won. Kenner met with Romo in Cabo san Lucas in 2012 on our behalf. Romo explained that Jowdy lost all of the funds as a result of the litigation. I am still at a 100% loss for these funds.

Diamante Cabo san Lucas

During the ongoing investments in Mexico, the final investment occurred during the later funding period of the Cabo san Lucas property acquisition prior to Lehman Brothers funding the initial $125,000,000 loan. I, along with Kenner had also agreed to loan Jowdy $956,000 for further assistance in funding the new Cabo san Lucas project. Again, Jowdy promised as he also did to my acquaintance, Jere Lehtinen ($1,500,000), to repay my advanced funds. When the 30-days passed and Jowdy did not repay the funds, my Business Manager who arranged the deal with Jowdy guaranteed more security for my funds. Kenner offered to include my funds (for safety) into his 40% equity stake in the Cabo project in the event that Jowdy failed to repay the funds. Kenner was confident that Jowdy would repay the money no later than the closing of the financing by Lehman Brothers. When that time passed and Jowdy failed to repay the $956,000 plus 10% interest (AGAIN), Kenner included me and Lehtinen into a newly formed LLC (Baja Ventures 2006, LLC) to secure our funds. I was thankful for Kenner's security or else I would simply have another loan outstanding to Jowdy who has clearly shown that he does not care about others and their money.

From the funding date forward, in addition to the frauds (not yet known to me) about the prior deals, Jowdy began to distance himself from the group of investors and our main connection to him, Phil Kenner. After one (1) year of development time, and virtually no development progress in Cabo despite the outrageous expenditures and salaries to Jowdy and his team of swindlers, Kenner finally said that we as a group had enough of Jowdy's perpetual lies. Jowdy tried to sedate Kenner on my behalf (and others) but the promises continued to unravel as quickly as they were made. Jowdy even tried to bribe Kenner with a 20% stake in his new Texas development. Kenner declined. In the summer of 2007, after Jowdy had again abandoned the 2nd Mexican development site to work on unrelated investments – with the entire Diamante Cabo staff while on Cabo payroll – Kenner began a settlement negotiation with Jowdy to resolve the $8,000,000 PLUS in unpaid loans to me and my friends as well as the embezzlement, mismanagement and other frauds that had gone unchecked since 2003 with Jowdy. After two (2) months, Jowdy with the help of Bill Najam (the Diamante general counsel and COO), Jowdy agreed to leave the project and reduce his equity position considerably in return for Kenner and the other investor/ lenders forgiving the outstanding loans and other issues to Jowdy. Jowdy finally presented the deal in 2007 to Lehman Brothers for final signoff, but immediately the negotiations took a turn for the worse. The original and sign-able deal that

JS

would have resolved years of conflict was VETOED by Jowdy's friend at Lehman Brothers for fear of future criminal prosecution regardless of the settlement terms.

From that time forward, myself and many of my friends and investor/partners were forced to sue Jowdy multiple times in the USA and Mexico. At that point, Jowdy began to fight back using the funds from our own Cabo budget to pay for his legal fees and other bribes in Mexico to keep himself from being arrested and deter future litigation. Jowdy actually sued me in 2010 in the USA for Malicious Prosecution despite the millions he defrauded me personally. Jowdy's frauds seem to have no limits.

To date, I have been unable to recover any of my funds while Jowdy has continued to loot the Cabo budget for his own personal protections and gains against the same people who invested 100% of the funds into all of his projects.

I believe that in Mexico, Jowdy would not have been able to protect himself without the assistance of the following people in his conspiracy:

- **Fernando Garcia** – Diamante's attorney. Garcia engaged in ongoing payoffs, witness intimidation, physical threats and extortion to protect Jowdy.
- **John Behncke** – Former FBI agent and Diamante head of security. John has continued to engage in ongoing frauds with Jowdy and intimidation tactics related to victims of Jowdy in Mexico.
- **William Najam** – COO of Diamante (with sign off powers for the ongoing fund embezzlement and misappropriations).
- **John Kaiser** – Former NY Police officer who defrauded the largest shareholder in the Cabo deal (Kenner) with forged documents to steal his equity (worth over $100,000,000 in 2014) accompanied by an unauthorized and fraudulent sign-off by Jowdy to complete the fraud and theft of Kenner's equity. Kaiser is a construction manager who has continued to engage in frauds, extortion, and intimidation tactics related to victims of Jowdy in Mexico.
    - Kaiser signed an affidavit for me in Mexico in 2010 that he specifically travelled to Cabo from NYC and back in 24 hours (to help) and later withdrew the testimony once he became employed by Jowdy in or about 2011. This was a malicious act against me as a conspiracy between the parties to defraud me and my loans.
- **Bryan Berard** – Jowdy investor and salesman who has continued to engage in frauds, extortion, and intimidation tactics related to victims of Jowdy in Mexico.

The following cash investments and loans from me to Jowdy and Jowdy related companies are still outstanding as many as eleven (11) years and counting with 100% of the benefit to Jowdy.

- **$1,600,000 – Jowdy loan to LOR Management (Mexico)**
- **$500,000 – Diamante del Mar**
- **$250,000 – Diamante Air**
- **$956,000 – Loan to Jowdy (converted by Kenner in Diamante Cabo san Lucas)**
- **Total: $3,316,000.00**

Sincerely,

Jozef Stumpel

Passport Number: BA 1413161

Date: 2/10/2014

JS

Exhibit 1

**AMERICAN ARBITRATION ASSOCIATION**

DIANA NOLAN, an individual, and OWEN NOLAN, an individual,

Claimants,

vs.

PHIL KENNER, and individual; STANDARD ADVISORS, INC., a Delaware Corporation and STANDARD ADVISORS, LLC, a Delaware Limited Liability Company,

Respondents.

**NO. 76 148 Y 00223 08 DEAR**

**AFFIDAVIT OF Jozef Stumpel**

I, Jozef Stumpel, being duly sworn upon oath, depose and say:

1. I am over the age of 18 and otherwise competent to execute this affidavit.

2. The contents of this affidavit are based upon my own personal knowledge.

3. I have information in the above-captioned matter and have personal knowledge of the statements contained in this declaration.

4. I have been a professional hockey player for over 15 years. I either personally know, or know of, the following individuals; Owen Nolan, Ethan Moreau, Joe Juneau, Dan Boyle and Brad Lukowich. All of these individuals are also professional hockey players.

JS

JS

5. My home state is Florida although I reside part of the year in Slovakia. The State of Florida has been my primary residence for the last four years.

6. I have known Phil Kenner for over 10 years. I met him while he was representing other friends of mine who were being assisted by him. At that time, Kenner was acting as a family advisor and these friends had expressed their high level of satisfaction with his service and commitment to their families. I subsequently worked with Kenner in a similar capacity and have experienced the same high levels of satisfaction with his service and commitments to my family. On many occasions, Phil has flown all over the world to visit me on short notice upon my request.

7. In 2003, I decided to join Phil Kenner at his new Family Office practice at Standard Advisors after he had left his former employer, Assante Global Advisors. I was aware that Phil actually sued Assante Global Advisors in California Federal Court shortly after his departure. I was aware of Phil's status as a licensed advisor when he established Standard Advisors in 2003 and I was also aware that approximately one year later, Phil Kenner gave up his licensed status. I neither had any concerns about this issue then, nor do I feel that it this issue has negatively impacted his ability to act as my Family Advisor now.

8. I am aware that Owen Nolan is suing Phil Kenner and his company, Standard Advisors, in Arizona and is alleging several improprieties by Phil Kenner related to certain investments that I am part of, such as; the Hawaii Investment Group, Diamante Del Mar (managed by Ken Jowdy), Diamante Cabo San Lucas (managed by Ken Jowdy), Eufora, LLC (managed by Tommy Constantine) and the Avalon Airpark Project (managed by Tommy Constantine). Per Phil's advice, I recently visited the Avalon project site and Eufora, LLC in Scottsdale, Arizona. At that time, I also met with Tommy Constantine personally. After a very comprehensive analysis of the Avalon project and Eufora's current business activities, I found Constantine to be an honorable individual who, like Phil Kenner, holds my investments in his companies with the highest

JS

JS

level of integrity. Phil Kenner has always made himself available to my family and I and has always addressed any and all of my inquires. As a professional hockey player, not a full time businessman, it is important to me and my family to have access, often face-to-face, with the people who are directly and indirectly involved in my business affairs. To date, I have never seen any indications of any improprieties or wrongdoings by Phil Kenner, his company Standard Advisors, and/or his advice for my family's best interest.

9. In 2008, Kristine Myrick, her former attorney, Jennifer McGrath, and her current attorney, Michael Meeks, in California, contacted me about Phil Kenner and his alleged acts of impropriety and negligence with respect to all of my investments. Myrick and her attorney coerced my wife and I to file suit against Kenner and convinced us that Phil had "forged" documents to set up an account at Northern Trust Bank in Arizona. Myrick further suggested that Kenner had transferred $2,500,000 from one of my other investment accounts into this Northern Trust account and that he had stolen the money from me. After I agreed to a face-to-face meeting with Phil Kenner, who traveled to Russia to meet with me in late 2008, I later learned that I had been completely deceived by Kristine Myrick, Jennifer McGrath and Michael Meeks. In fact, I learned that I have NEVER even had a bank account at Northern Trust Bank and therefore the basis of their claim was without any merit whatsoever. I confirmed this information independently after meeting with Kenner and have determined definitively that Phil Kenner has never stolen any of my money. After familiarizing myself with all of the facts, I dropped my lawsuit immediately and was billed $43,000 by Meeks' firm for filing the complaint, which was virtually identical (including typos) to the complaint which was filed against Kenner by Nolan. Shortly after I dropped the lawsuit, Michael Meeks attempted to convince me via email to continue my lawsuit by alleging that Phil Kenner is a "professional con artist" who was running a "Ponzi scheme". He also attempted to convince me to re-engage him as my attorney and to refile my lawsuit against Kenner on

JS

JS

the basis that Phil's sole purpose for his visit to Russia was to lie to me and to perpetuate a fraud.

10. **DIAMANTE AIR, LLC;** I am currently at odds with Ken Jowdy as a result of his gross mismanagement of an investment that I have made in his airplane company, Diamante Air, LLC. Ken Jowdy and Mark Thalmann, his childhood friend, acting as the Managers of this company, operated a Falcon 10 airplane and a Metroliner III. In the fall of 2008, Ken Jowdy and Mark Thalmann stopped making the monthly loan payments on the two (2) airplane loans under Diamante Air, LLC that they had been making since 2005. Phil Kenner notified me that Jowdy and Thalmann had failed to properly manage and maintain the business and had allowed our investment to become virtually worthless. As a result, this left Phil and one of our other partners, Sergei Gonchar, with over $1,000,000 in personally guaranteed debt with the lender for these airplanes. Phil, as well as all of our other partners and I were led to believe by Jowdy, and Thalmann, that the loans for these planes were being paid down aggressively based on the representation that Jowdy's extensive usage of the planes, was generating charter revenue for the business. In fact, the loan obligation was not reduced as represented by Jowdy and Thalmann in spite of their extensive use of the airplanes. After numerous requests, neither Phil, our attorney, Paul Augustine, or myself have been able to obtain the bank records, financial reports or tax records from Jowdy or Thalmann to review the status of our investment and where it all went wrong.

11. **HAWAII INVESTMENT GROUP;** I have been an investor in the Hawaii Investment Group since about 2004. I wired $100,000 to Northern Trust Bank for my equity stake in the Hawaii Investment Group through Little Isle IV, LLC and for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion. I was aware that my funds would be used to make distributions for the company, including but not limited to; Land Acquisition, Travel & Entertainment expenses, Legal Fees, Planning Fees, Payroll, Permitting fees, Loans to outside entities

JS

JS

and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank. I also understood Phil was the sole signatory on the Little Isle IV, LLC bank account. I have never had any reservations or issues regarding the use of these funds. Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time and per my every request. We discussed in detail the risks associated with the Hawaii Investment Group and I elected to invest accordingly. Phil also discussed in detail, the merits of the Joint Venture agreement with WWK Hawaii Holdings, LLC prior to me personally signing the Acknowledgement and Acceptance letter Phil provided to me through our attorneys, Larry Markowitz and William Najam in July of 2006, which was prior to my agreement of the Joint Venture. I understand the global markets have caused many issues with the Joint Venture's ability to sell or liquidate the land holdings, but I am confident that the ~$100,000,000 of land that Phil Kenner was instrumental in acquiring on behalf of the Joint Venture, is more that sufficient to ensure a positive investment result as originally contemplated prior to my involvement. From day one, I have also been made aware of Phil Kenner's significant interest in the Hawaii Investment Group in consideration of his ongoing capital contributions, day-to-day management, personal loan guarantees (including securing the Waikapuna loan with his Arizona residence at the time), his environmental guarantee on behalf of the Joint Venture (so none of the other members would be liable), as well as other contributions.

12. **DIAMANTE CABO SAN LUCAS;** I have been involved in real estate investment projects in Mexico since approximately 2003, specifically, Diamante Del Mar and Diamante Cabo San Lucas. I was aware that Phil Kenner has had an ownership interest in the two Mexico projects operated by Ken Jowdy prior to my making an investment into each respective project. I have invested $956,000 in the Diamante Cabo San Lucas through Phil Kenner's entity Baja Venture 2006, LLC and have trusted Phil Kenner with respect to this investment. I am also aware that Phil Kenner and Tommy

JS

JS

Constantine had been working diligently over the last two years to resolve certain partnership issues between Ken Jowdy and our investor group, which were related to our investment in Diamante Cabo San Lucas. I understand that approximately eighteen (18) months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of Jowdy's brother-in-law, William Najam, to a) relieve Ken Jowdy of the $10m+ in personal debt, b) his management control of the project, and c) any additional personal financial obligations he had to our Hawaiian Investment Group, Glen Murray, Mattias Norstrom, Bob Gaudet, myself and others. I was also aware that Ken Jowdy presented the settlement agreement to Masood Bhatti at Lehman Brothers in New York, who at that time was a Senior VP and was acting on behalf of the lender for the Cabo project. Subsequently, after Jowdy met with his brother in law William Najam and Masood Bhatti, Jowdy decided that he would not follow though with the agreement that he had made and elected to renig on the settlement that Tommy Constantine and Ken Jowdy had negotiated over a six (6) month period of daily negotiations. Furthermore, in spite of being a significant investor and shareholder of Diamante Cabo San Lucas, per an email recently written by Jowdy and sent to Phil Kenner, I as well as other investors, have been prohibited from entering the property. Among other extravagant expenditures and instances of corporate waste, I am aware that Ken Jowdy has utilized various resources of the Diamante Cabo San Lucas project, including the use of personnel who were on the Cabo payroll and other financial resources to pay for several private jet flights around the country. I am also aware that the individual in charge of the Lehman Brothers loan to Jowdy and Diamante Cabo San Lucas, Masood Bhatti, also acquired a secret equity interest in the Diamante Cabo San Lucas project through an entity owned by his Goddaughter named Somerset Properties, LLC. This was unknown to Phil Kenner or myself prior until recently.

13. **DIAMANTE DEL MAR;** I am an investor in Diamante Del Mar (DDM), in El Rosario, Mexico, which Ken Jowdy also acts as the sole Managing Member. I

JS

JS

invested $500,000 in the project and have not received a single communication in several years, from Ken Jowdy, William Najam or others representing the project regarding the status or development of the project. I also hold a $250,000 Promissory Note from Ken Jowdy and Diamante Del Mar that has not been paid by Ken Jowdy even though the note matured several months ago. I am aware that the project has not been proceeding with any development in the last three (3) plus years. This is primarily due to the fact that Ken Jowdy has focused his efforts on two unrelated projects, which Phil Kenner and the rest of our investors in Diamante Del Mar and Diamante Cabo San Lucas are not involved.

14. **EUFORA, LLC**; I have been an investor in a few LLCs that have a direct investment in Eufora's Pre-paid card business. I have visited Tommy Constantine the company's offices to discuss the merits of the actual business. From day one, I have been aware of the risks associated with a start up company in the payment card industry. I understood that at the time of my first investment in the LLC, which held our interest in Tommy Constantine's Eufora, LLC, Phil Kenner was a shareholder in the company. Phil Kenner disclosed his investment in Eufora, LLC prior to my making my investment.

15. **AVALON-CMG, LLC**; I have been an investor in the LLC, which owns an interest in the Scottsdale Airpark real estate project named Avalon. I have visited the completed project and discussed the merits of the actual business directly with Tommy Constantine. From day one, I have been aware of the risks associated with the investment. Phil Kenner disclosed to me that he was contemplating becoming an investor in the Avalon project at a later date, prior to my making my investment. I understand that subsequently Phil decided not to be an investor in the project.

16. I have always been made aware by Phil Kenner that I am able to request outside assistance from attorneys, accountants, or other professionals to audit the strategies that Phil Kenner has assisted in implementing. I have always had direct access to third party advisors involved with the planning decisions for my family, whether I have included Phil Kenner or not in those conversations. Through conversations with other

JS

JS

clients of Phil Kenner's over the years, I am aware that this is his common approach with his Family Office clients.

Further Affiant Sayeth Not.

Executed on this 22 day of May, 2009.

Jozef Stumpel

**To be filed:**

**United StatesDistrict Court**
**Eastern District of New York**
**Long Island Courthouse**
**Clerk of the Court**
**100 Federal Plaza**
**Central Islip, NY 11722**



From: Jozef Stumpel
Panská dolina 88
NITRA 94901
SLOVAKIA
NITRA 1
949 01 #000045075
Slovenská POŠTA
72967
€009.10
20.10.2021 01
To: Judge Bianco (visiting)
U.S. District Courthouse
Eastern District of New York
100 Federal Plaza
Central Islip
NY 11722 USA
R
RF560243082SK
RF560243082SK
FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 29 2021 ★
LONG ISLAND OFFICE
CN 22
COLNÉ VYHLÁSENIE
CUSTOMS DECLARATION
Zásielka môže byť úradne otvorená
May be opened officially
SLOVENSKÁ POŠTA
SLOVAK POST
DÔLEŽITÉ!
IMPORTANT!
Pozri pokyny na zadnej strane
See instructions on the back
Darček
Gift
Obchodná vzorka
Commercial sample
X Dokumenty
Documents
Vrátený tovar
Returned goods
Predaj tovaru
Sale of goods
Iné (Uveďte)
Other (please specify)
Množstvo a podrobný popis obsahu (1)
Quantity and detailed description of contents (1)
Váha netto v kg (2)
Net weight in kg (2)
Hodnota a mena (3)
Value and currency (3)
Tarifné č.tovaru* (4)
HS tariff number (4)
Krajina pôvodu*
Country of origin* (5)
0,293
10 €
Celková hmotnosť v kg (6)
Total weight in kg (6)
Hodnota celkom (7)
Total value (7)
Odosielateľ, ktorého meno a adresa sú uvedené na zásielke svojím podpisom potvrdzuje, že údaje uvedené v tomto vyhlásení sú správne a že táto zásielka neobsahuje žiadny nebezpečný tovar alebo tovar zakázaný legislatívnymi, colnými a poštovými predpismi.
I, the undersigned, whose name and address are given on the item, certify that the particulars given in this declaration are correct and that this item does not contain any dangerous article or articles prohibited by legislation or by postal or customs regulations.
Dátum a podpis odosielateľa (8)
Date and sender's signature (8)
20.10.2021
14 - 452
VII/17