FILED
CLERK

12/9/2021 8:48 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, . Criminal No. 13-cr-00607-JFB-AYS-1
.
Vs.                        . 100 Federal Plaza
                           . Central Islip, NY 11722
PHILLIP A. KENNER,         .
TOMMY C. CONSTANTINE       . DATE August 25, 2021
. . . . . . . . . . . . . .

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE HONORABLE JOSEPH F. BIANCO
VISITING JUDGE

APPEARANCES:

For the Government:        UNITED STATES ATTORNEY'S OFFICE
                           EASTERN DISTRICT OF NEW YORK
                           BY:  MADELINE O'CONNOR, ESQ.
                                DIANE LEONARDO, ESQ.
                           271 Cadman Plaza East
                           Brooklyn, NY 11201

For Owen Nolan:            PROSKAUER ROSE
                           BY:  SEETHA RAMACHANDRAN, ESQ.
                           Eighth Avenue & 41st Street
                           New York, NY 10036

For Danske Bank:           VENABLE LLP
                           BY:  GEORGE KOSTOLAMPROS, ESQ.
                                DOREEN MARTIN, ESQ.
                                KELLY WEINER, ESQ.
                                XOCHITL STROHBEHN, ESQ.
                           1290 Avenue of the Americas
                           20th Floor
                           New York, NY 10104

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**PO BOX 688**
**Middletown, NJ 07748**
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
**www.tgribbentranscription.com**

ADDITIONAL APPEARANCES

For Diamante:              FREEH SPORKIN & SULLIVAN
and Jowdy:                 BY:  THOMAS SOUTHER, ESQ.
                           350 5th Ave, Suite 6903
                           New York, NY 10118


For CSL Properties:        HILL RUGH KELLER & MAIN
                           BY:  CHRISTOPHER HILL, ESQ.
                           390 North Orange Avenue
                           Suite 1610
                           Orlando, Florida 32801


For Marc Wolinsky:         WACHTELL LIPTON ROSEN & KATZ
                           BY:  MARC WOLINSKY, ESQ.
                           51 West 52nd Street
                           New York, NY 10019


For Silverpeak:            WINDELS MARX LANE & MITTENDORF
                           BY:  JOHN HOLDEN, ESQ.
                           156 West 56th Street
                           New York, NY 10019

3

1                          I N D E X

2

3    COMMENTS                              PAGE

4        BY MS. O'CONNOR              6/8/10/15/19

5        BY MR. KOSTOLAMPROS              7/20

6        BY MR. HILL                       9

7        BY MR. WOLINSKY                  13

8        BY MS. RAMACHANDRAN            13/15

9        BY MR. HOLDEN                  16/20

10       BY MR. SOUTHER                   17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1      THE CLERK: Criminal cause for a telephone status

2 conference, 13-cr-607.  The United States of America against

3 Phillip Kenner and Tommy Constantine.  Counsel, please state

4 your appearances, starting with counsel for the Government.

5      MS. O'CONNOR: Madeline O'Connor and Diane Leonardo

6 for the United States.   Good afternoon, Your Honor.

7      THE COURT: Good afternoon.

8      MR. KOSTOLAMPROS: George Kostolampros, of Venable,

9 for Danske Bank.  Along with me are Xochitl Strohbehn, Doreen

10 Martin, and Kelly Weiner.  Good afternoon, Your Honor.

11      THE COURT: Good afternoon.

12      MR. WOLINSKY:  Good afternoon, Your Honor, this is

13 Mark Wolinsky, pro se, for the homeowners.

14      THE COURT: Good afternoon, Mr. Wolinsky.

15      MR. WOLINSKY: Good afternoon.

16      MR. HILL:  Good afternoon, Judge, Chris Hill for CSL

17 Properties, minority owner in the property.

18      THE COURT: Yes, good afternoon, Mr. Hill.

19      MS. RAMACHANDRAN:  Good afternoon, this is Seetha

20 Ramachandran on behalf of Owen Nolan.

21      THE COURT:  Good afternoon, Mr. Ramachandran.

22      MR. SOUTHER:  Good afternoon, Your Honor, this is Tom

23 Souther from Freeh Sporkin and Sullivan on behalf of Diamante

24 and Ken Jowdy.

25      THE COURT: Good afternoon, Mr. Souther.  I think

1  that's everybody.

2        MR. HOLDEN:  Your Honor, sorry, Your Honor, good

3  afternoon, this is John Holden from Windels Marx Lane and

4  Mittendorf, on behalf of Silverpeak.

5        THE COURT: Yes, good afternoon, Mr. Holden.  So the

6  Court scheduled this status conference as you know to resolve

7  both the timing and scope of the discovery that is outstanding.

8  I've received the supplemental letters with respect to that,

9  including Danske Bank's letter of today, August 25th. So I'm

10  prepared to discuss that.  As well as related to that I guess

11  is the desire for the Bank to get the appraisal from the

12  Government, which I'm prepared to discuss.

13        But I also, the Bank indicated in its letter that

14  it's understanding is the Government, the settlement

15  discussions with Silverpeak have progressed with the

16  Government.  So I don't want I ask the Government just to

17  update me with regard to the settlement discussions.

18        MS. O'CONNOR: Yes, Your Honor, the Government has

19  reached a settlement in principle with Silverpeak.  While the

20  Government, Danske, and some of the third parties originally

21  contemplated an interlocutory sale of the resort property,

22  which would implicate the interests asserted by Danske and the

23  other third parties, the settlement currently contemplated

24  involves only a sale of the note.  And therefore won't affect

25  any interests other than Danske's.

1              Basically the Government's willing to consent to

2    Danske selling its note to Silverpeak, in exchange for

3    Silverpeak paying the Government a sum of money in lieu of the

4    Government forfeiting the resort in equity interest.

5              This proposed settlement would end the majority of

6    the litigation in the ancillary proceedings.  CSL and the other

7    entities and individuals would retain their respective

8    ownership interest in the resort because the Government would

9    forego forfeiting those interests.

10             None of the third parties who have asserted an equity

11   interest in the resort would need to be parties to the stip.

12   And their petitions would be effectively mooted.  So while

13   we're willing, certainly willing to consider settlement options

14   with other investors, as the Court might be aware, counsel for

15   CSL and Nolan have presented the Government and Danske with

16   other potential investors, we're going to see where the

17   potential settlement with Silverpeak goes first.

18             About a week and a half ago, the Government provided

19   Silverpeak with a proposed settlement stipulation.  Silverpeak

20   then provided the proposed stip to Danske.  We are informed by

21   Silverpeak yesterday that they're awaiting Danske's comments to

22   the stipulation.  If the stipulation can be agreed upon, and we

23   don't see why it wouldn't be because it's very basic, the

24   Government can seek the additional internal and DOJ approvals

25   that are required.  And we've begun that process but cannot

1   move it along further until we agree upon the stip.

2          So at this point the question is whether Danske is

3   agreeable to the settlement stipulation.  And as the Court is

4   aware, each time a settlement seemed to have been reached,

5   Danske changed its mind about what it wanted.  Most recently,

6   Danske has been arguing that it should be permitted to sell its

7   note to Silverpeak.  The current proposed settlement will

8   permit them to do just that.

9          So we're not really sure why Danske has not provided

10  us with their comments about the settlement stipulation.  And

11  perhaps they can speak to that.  But as of now we're prepared

12  to move forward with it.

13         THE COURT: All right, let me hear from Mr.

14  Kostolampros regarding that issue.

15         MR. KOSTOLAMPROS: Sure, Your Honor.  We're just

16  recently received the settlement agreement, so we are reviewing

17  it and will provide comments as soon as we can.  And we take

18  issue with the Government's representations about us not moving

19  forward with the settlement and changing our position.

20         THE COURT: Yes.

21         MR. KOSTOLAMPROS: It's not worth getting into. But

22  just for the record, so just as to that.

23         THE COURT: Right.

24         MR. KOSTOLAMPROS: And there's no reason to even get

25  into that.  But we are and we're hopeful that we can move

1   forward, Your Honor.  The only issue that we have is we know it

2   takes a while. We've been through this process before where we

3   haven't been able to finalize an agreement.  And not only that,

4   we understand that there needs to be other DOJ approvals.  And

5   our concern is, if we don't move forward we could be left, you

6   know, three or six months down the road in the same position

7   that we found ourselves, you know, three, six months ago.

8          THE COURT: Well let me ask the Government.  Once the

9   Bank gets back to you, if the Bank says we don't have any

10  objection to this, how long would it take the Government to get

11  whatever necessary approvals it would need to finalize it?

12         MS. O'CONNOR: Well, Your Honor, we'd have the

13  internal approvals which we would expect to have those in short

14  order.  Of course we can't speak on behalf on behalf Main

15  Justice (phonetic) but we would certainly make it clear that we

16  would need this to, an expeditious response.  And we don't

17  anticipate any issues given that the stip is relatively simple,

18  because it's not involving all the other third party petitions.

19         So as I said, this is a very basic stipulation.  So

20  we would anticipate this moving along quite quickly.

21         THE COURT: All right.  But what does quite quickly

22  mean?  Weeks, a couple of weeks?

23         MS. O'CONNOR: We would be hopeful it would be a

24  couple of weeks.  Again we can't speak on behalf of Main

25  Justice, however, we would plan to do this within a couple of

1  weeks, that would be our --

2          THE COURT: All right, well I'm prepared, once the

3  Bank gives its approval, I'm prepared to set a date, you can

4  let Main Justice know that I've set a date by which I want the

5  Government to respond to this.  This is a highly unusual

6  situation with a lot of issues. So, and given how basic this

7  seem to be, in terms of what it's trying to resolve, I agree

8  with you that it shouldn't take long.  So I'll set a date and I

9  hope Mr. Kostolampros, that would alleviate the Bank's concern.

10          MR. KOSTOLAMPROS: Yes, Your Honor, it would.

11          THE COURT: All right.  So does anybody else -- let me

12  see if anybody else wants to speak to that.  I know we have Mr.

13  Holden on the line for Silverpeak.  But does anybody else want

14  to speak to the settlement issue?

15          MR. HILL: Judge, if I could, this is Chris Hill for

16  CSL Properties.  We're in a unique position and we're in a bit

17  of a legal pickle.  As you know, we're made up of mostly the

18  victims of the Kenner claim.  And in fact many of our CSL

19  members are, would benefit from the current settlement.  So, to

20  that extent, we don't want to get in the way of it.

21          The problem is, as far as CSL the entity, this is

22  going to be a great deal -- Danske's out, the Government is

23  out, and they just get to walk away from the chaos that has

24  really been created with this entity.  We have no idea, is

25  Kenner -- are they walking away from Kenner's forfeiture of

10

1    Baja Ventures -- does the guy who defrauded my clients still

2    remain a 35 percent owner?  You know, everyone is walking away

3    from this deal and we're left holding the proverbial bag for a

4    project that's been basically put on hold of what the

5    Government's been doing for the last four or five years.

6           Again, I'm in a little bit of a bind on how to

7    respond to that. But I represent CSL Properties.  I've got to

8    tell you, on behalf of CSL what has happened is incredibly

9    detrimental, that the victims keep getting punished. So now

10   everybody is getting paid and the guys who funded the entire

11   project in the beginning, and got probably a far too small

12   percentage, are facing being foreclosed out by Silverpeak.  I

13   have a problem with that.

14          THE COURT: Well, let me just ask -- Mr. Kenner

15   obviously has, he has forfeited his interest by virtue of the

16   Court's forfeiture order as well to him. But does the

17   Government want to speak to that issue?

18          MS. O'CONNOR: Yes, Your Honor, the settlement in

19   principle, we believe is in the best interest of everyone

20   involved because CSL and all the other entities will retain

21   their respective ownership interest in the resort.  So they're

22   not suffering any loss in that they still have ownership.  And

23   it will, the Government will obtain a lump sum payment from

24   Silverpeak and then request Main Justice apply those forfeited

25   funds to restitution.

1              So we don't see that this is something that is
2    detrimental to the third parties at all. And while it is
3    unfortunate that Kenner, his interests would no longer be
4    forfeited because we would now forego the forfeiture of the
5    equity interest, if the third parties have an issue with that,
6    they certainly have civil remedies of their own to pursue.
7              And we would point out that John Kaiser has filed a
8    petition claiming an interest in Baja interest.  So you know,
9    if in fact he is the owner of it, that would mean that Phil
10   Kenner is not the owner.  So --
11             THE COURT: So you're saying as a result of this
12   settlement, the Government is not seeking any forfeiture at
13   least as to Mr. Kenner's interests in these entities, is that
14   what I understood you to say?
15             MS. O'CONNOR: Yes, the Government would forego
16   forfeiting any of the resort property equity interests, other
17   than the home owned by Jowdy at this point.
18             THE COURT: All right, so Mr. Hill, I don't know if
19   that gives you any --
20             MR. HILL: Obviously we don't --
21             THE COURT: -- given the discretion of the Government,
22   but not the Court, they pursue forfeitures, they decide how to
23   resolve them.  But I was hoping -- I am aware under the law
24   that the Government can utilize the forfeiture money, get
25   permission to then apply it to restitution.  It sounds like

1  that's what the US Attorney's Office intention is here, which I

2  think is what the victims like to hear.  So I don't know what

3  else I can tell you with respect to that.

4         MR. HILL: Right, Judge, we love good intentions,

5  they're wonderful.  The problem is, this is like someone

6  condemning a home that you own a portion of, and keeping it in

7  litigation for five years, and then depressing the value. And

8  at the end of the five years saying, okay, you get your house

9  back, here's your minority interest.  It doesn't make you

10 whole. It doesn't.  It's --

11        THE COURT: I understand what you're saying, but you

12 do have the interest, which hopefully will still be, even

13 though it may be depressed, will be worth something. And

14 hopefully your individual clients, who are behind CSL, are

15 going to get restitution, are going to get cash as well.  So,

16 you know, I understand it's not, it's far from perfect, but

17 given where we're at, you know, I don't think -- I don't look

18 at what the Government is doing and say what is the Government

19 doing.  We are where we are at this point.  And this is what

20 I've been urging the Government to do. So you know, I don't see

21 any other clear path forward.  Let's put it that way. But in

22 any event, it's in the discretion of the Government.

23        MS. O'CONNOR: Your Honor, we also would like to point

24 out that there are other assets of the defendants that we're

25 going after, seeking forfeiture of, for example the airplane

13

1  and other property.  It would just be these particular

2  interests that we would forego forfeiting.

3         THE COURT: Right.  And the other thing, Mr. Hill, is

4  that whatever the property and the interest is worth now, is

5  only going to be further depressed if this were to continue,

6  which has been the problem all along.  So, you know, I think

7  unfortunately we have to look at where we're at now and see

8  what the best path forward is.

9         So, in any event, anybody else want to add anything?

10        MR. WOLINSKY:  Your Honor, it's Marc Wolinsky, just

11 to state the obvious, this is a usually positive development.

12 And I request that you keep it on a very short leash to keep it

13 on track.

14        THE COURT: Yes, it's my intention.  Let me just ask

15 the Bank and the Government, in light of this -- I don't want

16 to waste everybody's -- I know the Bank in its letter said that

17 you don't want to waste time.  And, but I don't know, do you

18 want to set a schedule with respect to the discovery, or do we

19 just -- it sounds like it's going to be resolved in literally a

20 matter of two weeks or so.

21        MS. RAMACHANDRAN: Your Honor.

22        THE COURT: Yes.

23        MS. RAMACHANDRAN: This is Seetha Ramachandran on

24 behalf of Owen Nolan.  I'd just like to quickly say something.

25 I mean, like Mr. Hill, I'm not sure exactly how to respond

1 because I haven't seen the settlement agreements.  I'm not

2 privy to these discussions.  But with respect to Mr. Kenner's

3 interest in this property, it's my understanding that even if

4 the Government foregoes, you know, forfeiting the property

5 itself, you know, they could actually seek to enforce the money

6 judgment that was imposed as part of Mr. Kenner's sentence,

7 against any assets that he might come into in the future.

8          And you know, if they do that, then those monies

9 could also be applied to restitution or distributed in some

10 way.  So I just, I mean I'm -- like Mr. Hill, I'm not sure

11 exactly how to respond, it surprises me that after committing

12 this multimillion dollar fraud, Mr. Kenner would be allowed to

13 retain any interest in any property, especially in light of a

14 forfeiture judgment over him, which has not been satisfied.

15          THE COURT: Yes --

16          MS. RAMACHANDRAN: And it won't be satisfied from the

17 airplane or anything else.

18          THE COURT: No, I think that's what clarify -- let me

19 just ask Ms. O'Connor that, because I think you understand,

20 even if you're not forfeiting his interest in the Baja

21 Ventures, if there were money that was obtained in any of the

22 entities that Mr. Kenner has an interest in, the Government

23 could still, through the money judgment forfeiture, seek to

24 recoup any money that he would make as a result of any

25 subsequent transactions with respect to these interests.  Is

1  that accurate, Ms. O'Connor?

2          MS. O'CONNOR: Yes, Your Honor, that's actually what

3  we told Ms. Ramachandran on the phone.  We indicated that even

4  though it is -- he would potentially have an interest if in

5  fact he retains any kind of interest, and at some future date

6  liquidate it, the Government could then seek forfeiture of

7  those funds to satisfy the forfeiture money judgment.

8          MS. RAMACHANDRAN: Just to clarify, I think the

9  discussion I had with the Government was that normally that's

10 what they might do, but their view was, because Mr. Kaiser had

11 filed a claim to that, that Kenner no longer had that interest.

12 But I think that's subject to all kinds of you know, factual

13 disputes.  And by recognizing that, you know, before the

14 resolution of these claims, then it essentially puts the burden

15 on other claimants to litigate this through civil litigation.

16 And most of them just don't have the resources to do that.

17          So I don't think that's exactly what was discussed.

18 I'm aware of the issue.  But my understanding is, the

19 Government doesn't necessarily believe it needs to do that

20 here.  But I know that the US Attorney's Office in the Eastern

21 District routinely as a matter of course, aggressively pursues

22 substitute assets in criminal cases.

23          THE COURT: Ms. O'Connor.

24          MS. O'CONNOR: Yes, Yes, Your Honor, I think the

25 misunderstanding is that we understand that a petition was

1  filed by John Kaiser asserting an interest in Baja Ventures.

2  If the Government foregoes forfeiture of Baja Ventures and at

3  some point in the future the resort property is sold, and there

4  might be some (indiscernible - audio skip) at that point,

5  ownership -- or perhaps sooner, ownership would be resolved.

6  And then if it turns out that Kenner retained some sort of

7  interest, the Government then would seek any kind of income he

8  receives to satisfy the forfeiture money judgment.

9       On the other hand, if Mr. Kaiser pursues ownership of

10 Baja Ventures, and it's resolved in his favor, then the

11 Government of course would not be able to pursue those funds to

12 satisfy the forfeiture money judgment.  So it's not as though

13 we can't do it, it at this point, the ownership is still in

14 question.

15      THE COURT: All right, assuming the ownership gets

16 resolved in a manner where Mr. Kenner, again obtains some

17 money, the Government would then aggressively pursue obtaining

18 that money through the forfeiture money judgment from Mr.

19 Kenner?

20      MS. O'CONNOR: Yes.  That's what we would do.

21      THE COURT: All right.

22      MR. HOLDEN: Your Honor, if I could weigh in, this is

23 John Holden for Silverpeak.  We are working with the

24 Government, we're optimistic on this. And we're hoping to move

25 it forward as quickly as possible.  I should say the Government

1    and Danske Bank.

2            But with respect to Mr. Kenner's shares, we're

3    kicking around some options that we're trying to work through

4    that might avoid at least part if not all of the problem, by

5    our comments to the Government throughout settlement agreement.

6    We haven't finalized them yet.  But we will circulate them to

7    the Government as soon as we have all of the comments and

8    Danske Bank and collectively can get them a redline.

9            THE COURT: When you say, resolve the issue of Mr.

10   Kenner's interest?

11           MR. HOLDEN: Potentially.  We're looking at it.  We're

12   trying to figure out some solutions in terms of, you know, our

13   understanding is that the forfeiture order as to Mr. Kenner's

14   equity interest is final.  And so we're trying to figure out a

15   way in which we can resolve that in terms of the Government now

16   having (indiscernible - audio skip) in connection with the

17   settlement agreement.

18           THE COURT: All right. But either way you're confident

19   this is going to go forward?

20           MR. HOLDEN: We're confident, from our perspective,

21   yes, Your Honor.  We're optimistic.

22           THE COURT: All right.

23           MR. SOUTHER: Your Honor, this is Tom Souther, I'm

24   sorry to interject here.  I have not been privy to the

25   settlement discussions and the settlement agreement. And I'm

1  hearing for the first time today that -- I was under the
2  impression this was going to be a resolution of the forfeiture
3  proceeding, and now hearing for the first time that while it
4  would resolve most of it, the Government continues to pursue
5  plans to continue to pursue the forfeiture of Mr. Jowdy's
6  personal property.
7          Which I mean the irony is befuddling, because you
8  know, here they're talking about leaving the convicted felon
9  who orchestrated this whole crime, you know, with his shares.
10  And yet they're going to continue to pursue trying to recoup
11  Mr. Jowdy's home.  And I'm, I mean I'll take it up with the
12  Government separately, but I just thought you know, it seems
13  somewhat ironic that that's the direction that the Government
14  is going here.
15          THE COURT: Well, it's obviously more complicated than
16  that. First of all the Government is trying to extricate itself
17  from the forfeiture of the resort in a foreign country, with
18  all the problems that we have discussed over many years.  So,
19  that's what they're trying to do.  And obtain some money
20  hopefully on behalf of the victims.
21          Mr. Kenner is not getting off free as a result of
22  this settlement, because as you heard, he has an enormous money
23  forfeiture judgment, so if he were to recoup any money in
24  connection with any of his interests, in any of these entities,
25  the Government could then quickly turn around and get that

1 money from him. So the idea that Mr. Kenner is somehow

2 benefitting from this, I think is not ultimately going to be

3 accurate.

4          And then as to your client and his home, again this

5 is in the discretion of the Government.  And you can obviously

6 discuss it with them, take it up with them.  But you know, they

7 are entitled to always try to pursue it.

8          So Ms. O'Connor, you did say the majority of the

9 forfeiture proceeding would be complete, other than Mr. Jowdy's

10 property. Is there anything else that the Government

11 anticipates would be moving forward, or that would be it?

12          MS. O'CONNOR: Well there are the other assets that

13 the Government seeks forfeiture of the airplane for example and

14 so forth.

15          THE COURT: Right.

16          MS. O'CONNOR: But in terms of the Mexican property,

17 it would just be Mr. Jowdy's home, that would be the remaining

18 property at issue.

19          THE COURT: All right.  I'm trying to think now, are

20 there any other petitions relate, the third party petitions,

21 any of them relate to the plane or any of the other assets, or

22 have petitions been put in with respect to those?

23          MS. O'CONNOR: I don't believe so, Your Honor.

24          THE COURT: Okay.  All right.  So my view with respect

25 to -- I don't want to waste everybody's time or my time going

1  through discovery disputes. I think most of them have been

2  resolved.  So my intention would be to put it off for a couple

3  of weeks in the event that this does not come to fruition.  Mr.

4  Kostolampros?

5       MR. KOSTOLAMPROS: Your Honor, I think if that's your

6  inclination, our suggestion would be, and we would say to keep

7  this moving so that we're not left in the position where we

8  were before, is to schedule a status conference, you know,

9  within two to three weeks.  Not only to apprise the Court, but

10 maybe within two weeks apprise of the Court of what the status

11 is. But also have a conference set so that if we are in a

12 position where things haven't moved forward, or the settlement

13 is not going forward, we're able to move forward quickly on

14 your decision on discovery.  And also setting a schedule.

15      THE COURT: Why don't we -- I'm not, this is not

16 binding in any way, but if you can give me an estimate of when

17 you think the Bank might get back to the Government, that would

18 be helpful to me in terms of figuring out when to schedule it.

19 Do you have an idea of like how long we're talking about or --

20      MR. KOSTOLAMPROS: Sure, Your Honor, I think we could

21 probably get back to the Government by Friday.

22      THE COURT: All right, so --

23      MR. HOLDEN: Your Honor, I'm sorry, this is John

24 Holden again.  I'm sorry to interrupt, but based on some of the

25 comments made today, I think we need to go back and make some

1 revisions to our comments.  So if, we might be able to get it

2 done Friday, but if we could have to early next week it would

3 probably be better.  Because I ideally we'd like to consult

4 with Danske Bank and try to get on the same page to streamline

5 this as much as possible and just have one set of comments

6 going back to the Government.

7           THE COURT: All right, so what I think I'll do is, I'm

8 going to -- the deadline on (indiscernible - audio skip)

9 Government get this settlement approved, once the Bank, once

10 these revisions are made and the Bank okays it, I want the

11 Government to advise Main Justice that I want a response from

12 the Government in two weeks, as to whether or not it is

13 approved.  And then my plan is to set a conference the third

14 week in September, a phone conference, just to discuss where

15 we're at.  And what needs to be done at that point.   Does that

16 make sense?

17           MS. O'CONNOR: Yes, Your Honor, we can certainly seek

18 approval within a two week period. However, if the comments

19 that come back entail significant changes to the stipulation,

20 they might, we might have to have a little additional

21 discussions about the language.  So we'd just ask the Court to

22 consider that when setting the schedule.

23           THE COURT: Yes, well, I'm kind of factoring that

24 there might be a back and forth there.  If there's some

25 monumental or major change that's going to give the Government

1  some pause, you can certainly send me a letter.  But I'm

2  assuming whatever these changes are, they're not going to be so

3  substantive that it derails the process.  Okay?

4          MS. O'CONNOR: Yes, thank you, Your Honor.

5          THE COURT: Let me just get a proposed date.  Hold on

6  one second.  How about we'll have a status conference September

7  24th at 3 p.m. again.

8          MS. O'CONNOR: That's good for the Government, Your

9  Honor.

10         MR. KOSTOLAMPROS:  That's good for us, too, Your

11 Honor, Danske Bank.

12         THE COURT: All right.  All right, but my expectation

13 is, again based upon this time frame, assuming again that

14 there's not any major revisions that derail the process, is

15 that two weeks from when the Bank signs off on the settlement,

16 two weeks for the Government -- if the Government is unable to

17 get that approval from Washington in two weeks, I want a letter

18 explaining to me why that is.  And this is again expedited

19 under the circumstances.  So that should give them plenty of

20 time to do that.

21         All right.  Any other issues?

22         MR. HILL: Chris Hill for CSL. To the extent that the,

23 apparently the settlement is going to impact the ownership

24 structure of DCSL moving forward, we don't need to see

25 everything, but could we be made privy, as an owner, of that,

1  of that settlement agreement to the extent that it impacts

2  that, so that we can address it?

3           THE COURT: Does the Government want to respond to

4  that?

5           MS. O'CONNOR: Your Honor, I'm not sure what counsel

6  means by that.

7           MR. HILL: I can respond, Judge, if you want.

8           THE COURT: Yes.

9           MR. HILL: I don't -- to the extent it affects the 39

10 percent stake ownership in DCSL, it's either going to be

11 forfeited or subject to forfeiture, or not, that's obviously

12 going to impact the entity moving forward and the rest of the

13 remaining owners.  So to the extent that this settlement is

14 going to impact that holding of Kenner or honestly of Mr.

15 Jowdy, in KHA, we would want to know what is out there, and

16 what's going to be left of our entity when they're done with

17 this process.

18          THE COURT: My understanding is the settlement is not

19 going to affect those, but Ms. O'Connor.

20          MS. O'CONNOR: No, we agree with you Your Honor, the

21 settlement is not going to affect any of the current ownership

22 of the resort.

23          THE COURT: The current ownership of the resort is

24 going to stay exactly as it is.  All right, so I don't think

25 the Government has any obligation, obviously they can if they

1  want to, but I don't think they have any obligation to share

2  the terms of the settlement agreement with any of the other

3  entities who are not impacted by the Government essentially

4  leaving the forfeiture.

5          MS. RAMACHANDRAN:  Your Honor.

6          THE COURT: Yes.

7          MS. RAMACHANDRAN:  Sorry to keep -- this is Seetha

8  Ramachandran.  I think what Mr. Hill is trying to say, and I

9  agree with it. I mean I don't want to hold up this settlement

10 either. You know, this is a good thing for most of the victims

11 here.  I think the concern with the 39 percent, as I understand

12 it, you know, there's an open question as to whether Kenner is

13 going to be either recognized as the owner of that, and then

14 his interest would later be forfeited as a substitute asset,

15 you know, any monies he recovers from that.  Or whether Kaiser

16 is going to be recognized as the owner of that.

17          And what I understand from the Government is that

18 they're just going to recognize John Kaiser as the owner of

19 that interest, rather than Phil Kenner.  And that's really an

20 issue of fact.  Because we don't know that he's really the

21 owner of that property.  And so to the extent that they are

22 forfeiting that later as a substitute asset, that potentially

23 affects everybody's interest in DCSL.

24          THE COURT: I didn't hear them say they're going to

25 recognize Mr. Kaiser's interest.  I thought I heard them say

1  they don't -- they're not going to resolve his interest,

2  they're going to await resolution of that through litigation or

3  whatever process. And if it turns out that Mr. Kenner prevails

4  in that then they're going to seek to recover the money from

5  Mr. Kenner.

6          But let me just ask Ms. O'Connor, is the Government

7  recognizing Mr. Kaiser's interest in that over Mr. Kenner's?

8          MS. O'CONNOR: No, Your Honor, as you said we're not

9  recognizing anything with respect to ownership.

10          THE COURT: Right, there's a dispute and the

11  Government is not taking a position. The Government is going to

12  wait for that dispute to be resolved.

13          MS. O'CONNOR: Correct, if and when any litigation on

14  that issue occurs.

15          THE COURT: Right.

16          MS. RAMACHANDRAN: Okay.

17          THE COURT: Ms. Ramachandran, would that answer your

18  question?

19          MS. RAMACHANDRAN: Yes, it does.

20          THE COURT: All right.

21          MS. RAMACHANDRAN: Thank you.

22          THE COURT: All right, so I appreciate everyone's hard

23  work on this and I hope that it continues to move forward

24  expeditiously.  So I'll await, in advance of that date I do

25  want the Government, if they do get the approval from

1  Washington, advise the Court that it was received so that I

2  know that going into the conference, okay?

3          MS. O'CONNOR: You will, Your Honor, thank you.

4          THE COURT: All right, thank you very much counsel.

5  Have a good day.

6                        * * * * *

7          **C E R T I F I C A T I O N**

8          I, **PATRICIA POOLE**, court approved transcriber,

9  certify that the foregoing is a correct transcript from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13  /S/ PATRICIA POOLE

14  TRACY GRIBBEN TRANSCRIPTION, LLC      DATE: December 8, 2021

15

16

17

18

19

20

21

22

23

24

25