1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    13-CR-607(JFB)
                             :
                             :    U.S. Courthouse
                             :    Central Islip, New York
        -against-            :
                             :    TRANSCRIPT OF
                             :    PROCEEDINGS
                             :
                             :
PHILLIP A. KENNER and        :    April 28, 2015
TOMMY C. CONSTANTINE,        :    2:00 p.m.
                             :
        Defendants.          :
- - - - - - - - - - - - - - X

BEFORE:
            HONORABLE JOSEPH F. BIANCO, U.S.D.J.

APPEARANCES:

For the Government:       LORETTA E. LYNCH, ESQ.
                          United States Attorney
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                          BY:  JAMES MISKIEWICZ, ESQ.
                               SARITHA KOMATIREDDY, ESQ
                               Assistant U.S. Attorneys


For the Defendant
Kenner:                   RICHARD HALEY, ESQ.

Constantine:              ROBERT LaRUSSO, ESQ.
                          ANDREW OLIVERAS, ESQ.




Court Reporter:    Perry Auerbach, CSR
                   Official Court Reporter



Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

2

1      THE CLERK:  United States versus Kenner and
2  Constantine.
3      Counsel, please state your appearance for the
4  record.
5      MR. MISKIEWICZ:  Good afternoon, Your Honor, James
6  Miskiewicz for the United States.
7      MR. HALEY:  Good afternoon, Judge, Richard Haley for
8  the defendant Phillip Kenner.
9      MR. LaRUSSO:  And Robert LaRusso for Mr. Constantine
10  who I believe is on the phone, Your Honor.
11      THE COURT:  Yes.  Mr. Constantine, you're on the
12  phone?
13      DEFENDANT CONSTANTINE:  Yes, Your Honor.
14      THE COURT:  Okay, so why don't we get started.
15  First thing, we did get a call from someone from Northern
16  Trust Bank but I guess there was a little confusion because
17  initially I thought that was from you, Mr. Haley, but the guy
18  on the phone indicated that they were from Mr. LaRusso.  So,
19  did you serve a subpoena on Northern Trust as well?
20      MR. LaRUSSO:  No, Your Honor, I served a subpoena on
21  Louis Freeh's firm, they accepted the service for Mr. Jowdy.
22  Last time we spoke with Mr. Freeh's associate and he was going
23  to provide those documents that we subpoenaed to us and we
24  told him under the law they have to go back to the Court.
25  However, Mr. Miskiewicz and I, we just had a conversation, we

3

1   will take custody of them probably, provide them to the

2   government to make copies and we'll share them rather than

3   burden the Court if that's agreeable.

4           THE COURT:  That's fine with me.  The Northern Trust

5   guy thought it was going to you, is that wrong?

6           MR. LaRUSSO:  Absolutely.  I spoke to Northern

7   Trust.

8           THE COURT:  You should probably call them back.

9           MR. HALEY:  Your Honor, I spoke with your law clerk,

10  we certainly have no problem, my office, accepting the records

11  that were subpoenaed.

12          THE COURT:  I don't know why the guy at the bank

13  thought the records were for Mr. LaRusso.  We'll correct that.

14  I assume he's going to share them.

15          MR. HALEY:  I spoke with the government, Your Honor,

16  if they're received by my office, I have zero problem

17  delivering them immediately to the government because they

18  have they greater technical ability to download all those

19  documents.  So, I have no problem giving them to the

20  government and then we can share obviously the CD-roms.

21          THE COURT:  We'll try to fix that then.

22          MR. HALEY:  Unless they come to the Court, they can

23  go right to the government.

24          THE COURT:  I was trying to save time and give them

25  directly to whoever had directed them.

4

1          MR. HALEY:  It was my subpoena, Your Honor.

2          THE COURT:  Okay.

3          (Pause while clerk confers with the Court.)

4          THE COURT:  Did he speak to one of you yesterday,

5    someone from Northern Trust?

6          MR. HALEY:  Not my office.

7          MR. LaRUSSO:  My partner, Mr. Conway, spoke to

8    somebody from Mr. Freeh's office, not Northern Trust.

9          THE COURT:  Maybe it's not Northern Trust, maybe

10   it's the Jowdy documents.  You thought they were going to come

11   today?

12         MR. LaRUSSO:  That is correct.

13         THE COURT:  So you may be getting the Jowdy

14   documents.

15         MR. LaRUSSO:  Okay, that's fine.

16         MR. HALEY:  I would be surprised if Northern Trust

17   responded so quickly.

18         THE COURT:  Okay, it must be that.  You're going to

19   share those with co-counsel, correct?

20         MR. LaRUSSO:  I'm going to give them to

21   Mr. Miskiewicz and they'll make copies and they'll provide it

22   to both of us.

23         THE COURT:  Mr. Haley, go ahead.

24         MR. HALEY:  First of all, Your Honor, thank you very

25   much, these are housekeeping matters and I will endeavor to be

5

1    brief, Your Honor.

2          Shortly after my appointment as CJA counsel for

3    Mr. Kenner I did by letter dated June 25th of 2014 request the

4    government identify all those documents alleged to be forged

5    or fictitious as represented in the bail letter written by

6    Ms. Capwell.  On August 29 following that June 25th letter the

7    government did respond and provided four documents, two

8    documents known as funding consulting agreements, one document

9    known as a revolving line of credit purportedly signed by

10   Mr. Jowdy, and a fourth document, Judge, which bears the

11   purported signature of John Kaiser which is actually in

12   Spanish and it deals with underlying litigation in Mexico.

13         So, we received four documents that the government

14   represented to be forgeries in response to our letter.  In

15   that letter they supplied the documents and represented the

16   forged documents and said these documents among others we

17   represent to be forged.  I then responded, and it's all on the

18   ECF filings, Judge, please identify among others; well and

19   good we have four but what do you mean by "among others."

20   Then there became communication between myself and the

21   government that relates to the claim that there were among

22   other forged documents and my recollection, Judge, is either

23   on November 7th, I believe it was November 7th, perhaps

24   March 6th but I think it was November 7th and the issue was

25   raised in front of Your Honor.  Your Honor did say to the

6

1    government in substance you really need to speak with all your

2    witnesses, have them identify the among other forged documents

3    and give the defense notice of those other documents you claim

4    to be forged.

5            I have ordered the transcript of those proceedings,

6    Judge.  Harry Rappaport was the stenographer, I emailed him

7    about 7:00 last night to try to obtain those transcripts

8    because, as you know, he's no longer employed as a

9    stenographer.

10           So, my question, Judge, and the application to the

11   Court is really quite simple, are there any other documents

12   that the government will through witness testimony in its

13   case-in-chief as relates to the four corners of that

14   indictment alleged to be forged.  I don't want to be in a

15   situation where I don't have some prior notice of that.  I

16   believe as a matter of fundamental fairness there's going to

17   be a claim that there's a forged document to be presented to

18   the trier of fact, that is powerful evidence and I believe the

19   defense ought to have the opportunity to be able to confront

20   that evidence in advance of trial.  Thank you.

21           THE COURT:  Mr. Miskiewicz, are there any other

22   documents other than the four previously identified that the

23   government is going to argue are forged?

24           MR. MISKIEWICZ:  Forged, no, and the four documents

25   that we identified early on that Mr. Kaiser consulted -- the

7

1   consulting agreement that was signed by Mr. Kaiser, we have

2   subsequently during our most recent face-to-face meeting we

3   explained what the nature of Mr. Kaiser's testimony is going

4   to be and it will be our position that it's a fraudulent

5   document that he had neither the authority to authorize the

6   payment of over two million dollars to Mr. Constantine and he

7   certainly didn't do it on the day that it purports to be his

8   signature.  As far as forgeries, he's looked at it and I told

9   counsel he really can't even tell if it's his signature or not

10  for sure.  All he can do is say he's not a member of this

11  company and therefore had no reason to sign the document, so

12  it's fraudulent.

13         As far as other forgeries, we have shown a whole

14  bunch of records to people, most of them again, kind of like

15  Mr. Kaiser's, would say it looks like my signature, frankly,

16  Mr. Kenner had during the period of time of the conspiracy had

17  me sign many documents that I didn't look at closely or

18  sometimes sign documents -- sign blank sheets of paper

19  supposedly because they would be needed at a later date when

20  the players were on the road or whatever.

21         It's not going to be our theory of the case that

22  except for the Jowdy documents and others maybe that I can't

23  think of right now that there are -- that the forged documents

24  are critical to the proof of the fraudulent scheme here.  So,

25  I've conveyed that I think to counsel in emails and in

8

1    face-to-face meetings.  The bottom line is we have no other

2    documents that we would say right now this is a forgery or

3    that's a forgery.  I know that's not the clearest answer,

4    particularly for Mr. Kaiser, but that's the best we can do.

5         THE COURT:  If that's his testimony, that's his

6    testimony, there's nothing you can do about it.

7         MR. MISKIEWICZ:  Also I'll add I have witnesses who

8    will say, and I've conveyed this to counsel, they observed

9    Mr. Kenner during the course of the conspiracy imitating or

10   forging people's signatures, even telling one of the witnesses

11   how good he was at forging them, again ostensibly because in

12   case I need your signature, I have it, you know, I can convey

13   it, I can do your business.  That's what he told witnesses.

14   The fact that there may be actual forgeries, again, is not

15   part and parcel of our proof, it's that the transactions, not

16   the signatures are fraudulent.

17        THE COURT:  Okay.

18        Mr. Haley?

19        MR. HALEY:  Thank you, Judge.  I have listened to

20   the government's response, thank you.

21        THE COURT:  Okay.  Next issue?

22        MR. HALEY:  Your Honor, the next issue and, by the

23   way, I do want to convey my thanks to the government, I was

24   interested in knowing what the lineup might be in terms of

25   witnesses because of the volume of material and I would

9

1    certainly represent to the government, as well as the Court,

2    we do intend on putting on a defense.  It is my intention to

3    call Mr. Kenner as a witness, we've identified other

4    prospective defense witnesses, and I would certainly before we

5    commence our case give them a lineup in terms of our witnesses

6    as well.  So, I would represent that to the Court and the

7    government to move the matter along.

8         But the other issue, Judge, really it's still a

9    little bit problematical and has to deal with the MacBook

10   computer, it seems to be a recurring issue.  I have been in

11   contact with Mr. Polemeni and I apologize because I didn't

12   realize, perhaps it's not an issue that these prosecutors can

13   address, Mr. Polemeni, did write a letter, actually it's on

14   ECF, dated April 24th which details what the government

15   anticipated would be the schedule for my client's use of the

16   MacBook computer at MDC.  The letter is comprehensive, it is

17   certainly acceptable to us.  I'm not pressing, Judge, but I

18   mentioned that my fear was given -- I don't mean this

19   critically, given the reality of dealing with a bureaucracy at

20   MDC Brooklyn, it hasn't made it through the system and what's

21   transpired is on Sunday my client was told that, no, he has no

22   access to the computer today, he was told that his hours were

23   limited to -- on Saturday from noon to 2:30.  I was hopeful

24   that yesterday he would be here with his laptop computer.  He

25   was told that because it's not on the property list at MDC

10

1   Brooklyn he's prohibited from ever taking it out of the

2   facility to court.

3          The point is simply this, Judge, I don't know how to

4   resolve this, perhaps if Your Honor so orders this letter and

5   it's served on the Legal Department at MDC Brooklyn it might

6   then sift through the various levels of command but it's

7   absolutely a unique circumstance, Judge, I know that to be a

8   fact for an inmate at MDC Brooklyn to have that level of

9   access to a MacBook a laptop computer.  I can only suspect

10  that it may cause issues there, an inmate sees that one inmate

11  has his own private computer.

12         THE COURT:  Have you spoken to the AUSA about these

13  issues or not?

14         MR. HALEY:  For my own final comment, it strikes me

15  that one possible solution, I understand why Mr. Kenner was

16  moved from the Queens private correctional facility to MDC

17  Brooklyn and I don't quarrel with that decision.  Again, we

18  established through a great deal of time on my part to

19  establish the protocol, we had no problems with the access to

20  the computer at the Queens private correctional facility.  To

21  the extent that there's an allegation that a person in the

22  facility recorded conversations between himself and Mr. Kenner

23  and to the extent that Mr. Kenner now knows who that person is

24  and there would be a security certain which I think it's

25  legitimate under those circumstances that they be separated.

11

1    I'm advised that there's any number of separation orders in

2    the Queens Correctional Facility and Mr. Kenner could be

3    housed in a different section of the Queens Correctional

4    Facility so that that security issue is alleviated rather than

5    having him moved to MDC Brooklyn.  Thank you, Judge.

6            THE COURT:  My position -- we did have an ex parte

7    sealed proceeding which is reflected in that letter --

8            MR. HALEY:  Yes, sir.

9            THE COURT:  -- where the government advised me what

10   the reason was and they did assure me that he was going to

11   have the access to the computer in the MDC and, again, it's a

12   matter of discretion, that as long as Mr. Kenner is able to

13   prepare for his trial from MDC, even assuming what you're

14   saying is true that they could try to separate him in some way

15   in the Queens facility, it's not my role to interfere with

16   that decision.  I have inmates who come from the MDC who are

17   housed for space reasons and I don't interfere with those

18   decisions either.  So, I'm not going to direct them to move

19   him back to Queens and try to keep him in a separate area.

20           Let me just ask Mr. Miskiewicz; do you know why

21   there are continuing issues at MDC?

22           MR. MISKIEWICZ:  I spoke to Kenneth Bork at MDC and

23   he advised me that the decision by some of the corrections

24   officers not to give the defendant access on Sunday was a

25   mistake.  He has met with the lieutenant in charge of those

12

1   officers.  They misunderstood for whatever reason because

2   there were family meetings taking place, they thought that

3   they could not allow him to have access to the computer.

4        To make a long story short, he recognized that that

5   was a screw up and he's advised me that he's met with the

6   lieutenants and various staff members to make clear that from

7   here on he should be given access as per -- and I didn't

8   realize that there was a schedule letter, but per whatever

9   agreement has been made.

10        THE COURT:  What about bringing the computer to

11   court, are you talking about that?

12        MR. MISKIEWICZ:  Yes, that's a bigger issue, and I

13   understand the court orders of last week, I'm going to just

14   merely reflect what was said to me and then maybe offer some

15   possible solutions; but what Mr. Bork told me was that it

16   would constitute a security concern of theirs for a computer

17   that's been on the outside for some number of hours during the

18   day and might have access to Wi-Fi and any other, you know,

19   things, that upon return to the MDC in the evening they would

20   need to have an IT specialist look through the computer,

21   review it, see if there are things there that were different

22   from when it left the facility in the morning and that would

23   put an enormous strain on the staff, they don't have -- there

24   is probably only one individual in the entire facility who

25   could do that and that person would have to be around for late

13

1   nights whenever Mr. Kenner returns during the trial.

2          The other security concern is that it poses a target

3   within the MDC, not necessarily just making Mr. Kenner a

4   target but the actual equipment becomes a target of other

5   inmates who want to get access to it because it is a highly

6   highly unusual item to have inside the MDC.

7          So, there are two possible alternatives and I offer

8   this, and I also told Mr. Kenner (sic), relayed it to him your

9   very strong order that the laptop follow the defendant, that

10  one alternative would be to simply allow Mr. Haley to have

11  possession of that laptop during the trial and keep possession

12  of it so that the defendant can have access to it here in

13  court.  That raises the problem that he wouldn't then have

14  access to the laptop during the weekends or when the Court

15  is not meeting.

16         Another alternative would be to buy another

17  laptop, make a copy, which copy would remain in possession of

18  Mr. Haley and the other laptop remain in the MDC and there

19  wouldn't be this need to constantly check it, check it in and

20  check it out.  Anyway, that was the sum and substance of my

21  discussion with counsel this morning.

22         THE COURT:  Okay.

23         Mr. Haley?

24         MR. HALEY:  Your Honor, for purposes of the record,

25  we spent time, I did, my office did in an effort to resolve

1   the issue about Wi-Fi access and we actually engaged an

2   expert, a forensic expert -- I shouldn't say that, a computer

3   expert to permanently disable the Wi-Fi function on the

4   laptop, it's permanently disabled, because it did become an

5   issue with the laptop being in the Queens Correctional

6   Facility.  We disabled it, we sent it to Queens, they had

7   their technical people -- as a matter of fact, I even think

8   the government had one of their FBI technical people confirm

9   that the Wi-Fi function was disabled.  It is disabled.

10          So, the idea that there would be a legitimate

11  concern that somehow he would be here gaining Wi-Fi access and

12  downloading material on the computer I believe is resolved.  I

13  don't necessarily see the difference between an individual who

14  brings let's say boxes of material or his paper file to court

15  to prepare for trial with his attorney and then brings those

16  paper files back to the facility.  Certainly someone can slip

17  within those paper files I guess documents that didn't belong

18  there and I guess they could then go through and look at that.

19  I don't know if they do during a trial when an individual is

20  going back and forth.

21          Judge, I don't know how to -- my only comments are

22  this, it's because of the volume of material and because it's

23  no one fault, the material gets delivered in electronic form.

24  That laptop computer is our database, it's my database, it's

25  Mr. Kenner's database, we share it together.  He's able to

15

1    pull up a document immediately for me.  It is our source of

2    preparation.

3            THE COURT:  That's what I was going to ask you, so

4    you don't have another computer that you're using, you're

5    using his computer or you have all the same documents on

6    another computer?

7            MR. HALEY:  What I do, Your Honor, is -- this is the

8    protocol, when I get the government's Rule 16 discovery and I

9    download it to my computer at my office, not a notebook, my

10   office computer, the PC.  So, I do have on my PC at my office

11   most but, quite frankly, not all of the material that my

12   client has for the simple reason that he's much more adept at

13   being able to pull files off the CD-roms than I am.  I

14   probably have a good 80 percent of what I've received from the

15   government on my PC computer in my office but the computer

16   that he has in his possession is the primary source of

17   information for both of us, that is the most comprehensive and

18   complete source of information.

19           THE COURT:  Okay.  I'm asking Mr. Miskiewicz to go

20   back to the MDC in light of the fact that it's been disabled,

21   and obviously I understand the security issues the jail has to

22   deal with, but if the computer is disabled I'm not sure what

23   the security issue would be.  Given that this is basically

24   what they're going to be using at trial sitting at counsel

25   table, if it means even having the computer come with him each

16

1    day but not being given to Mr. Kenner, maybe somehow being

2    given to Mr. Haley at the beginning of each day so he has

3    physical custody of it in the courtroom and then hand it back

4    to the Marshals at the end of the day so Mr. Kenner is not

5    going to have it in his cell downstairs or wherever else, I

6    would be willing to go along with that.

7                MR. MISKIEWICZ:  I agree.  I'll call counsel.

8                THE COURT:  If they say no, we're going to have a

9    conference call, someone from the MDC is going to have to be

10   on the phone with me and explain to me why this -- you can

11   convey to them I understand it is an unusual request but it is

12   an unusual situation where their ability to function in the

13   courtroom is dependent upon a computer that -- I guess we can

14   buy another one if we had to, couldn't we do that, just

15   download everything onto an exact same computer?  I don't

16   think that's the best way to do it but is there any reason

17   that you couldn't do that if you had to?

18               MR. HALEY:  No, Your Honor, as long as the Court

19   would be approving my CJA vouchers, but I have no reason to

20   believe it would not.  There is a little bit of a protocol I

21   did have to do pursuant to CJA funds that go through

22   authorization and things of that nature.  My only concern is,

23   it's no one's fault, we're just a week away from trial.

24               THE COURT:  I'm not suggesting -- it doesn't seem to

25   be a reasonable thing to do if it's disabled.  Would you be

17

1   willing to take custody of it each morning?

2          MR. HALEY:  Absolutely.

3          MR. MISKIEWICZ:  Your Honor, with your permission, I

4   kind of hinted to this in the morning that the Court wanted

5   this to be done so and I will tell Mr. Bork that this is what

6   you expect to be done and convey to them that they should work

7   out whatever they need to do.

8          THE COURT:  I don't want him to think I'm ignoring

9   him, I want him to understand that the computer is disabled,

10  we'll deliver it to Mr. Haley directly in the morning from the

11  Marshals.

12         MR. MISKIEWICZ:  The concern is that this kind of

13  piece of equipment can be imported to the outside more than

14  just through Wi-Fi, there are all kinds of other things most

15  of which probably neither Mr. Haley or myself fully understand

16  because we're not all that computer literate, but that there's

17  major concern but I will convey to Mr. Bork that they have to

18  find a way to deal with this issue and I'll report back to the

19  Court.

20         MR. HALEY:  As an officer of the court I will

21  obviously represent that while that computer is in this

22  courtroom I will not be making any efforts as counsel for the

23  defendant to put any information on that computer.  My client

24  is going to be here in the courtroom as well, Judge, actually

25  he will have the computer in front of him and he will be able

18

1  to pull up a document for me that will have relevance.  So, it

2  will be within our control and custody.

3       I'm a little concerned about -- it is a reality that

4  my client could be a target of others because he has this

5  device.  I don't know if we can reach a protocol where -- I

6  thought perhaps other inmates might be jealous.  When he comes

7  perhaps the computer when it's being transported could be kept

8  in the custody of a U.S. Marshal.

9       THE COURT:  That's what I was suggesting for

10 security reasons and also for your client's not being targeted

11 that he shouldn't have access to the computer, it should just

12 travel with him in the Marshal's van each morning and be given

13 to Mr. Haley, that would be the protocol.

14      MR. HALEY:  I guess the final matter; I take

15 it though we are in agreement because this does set forth

16 the schedule that Mr. Kenner would be, I'll use the word

17 entitled to in connection with the use of the computer, that

18 is to say the government's letter of April 24, 2015, correct,

19 Mr. Miskiewicz?

20      MR. MISKIEWICZ:  I haven't seen that letter.  It was

21 filed as part of the --

22      THE COURT:  They confirm it was a mix-up.  I'm sure

23 they have that letter.

24      MR. HALEY:  My only comment would be if it's so

25 ordered, perhaps it would be of greater assistance to the

19

1   legal authorities.

2           THE COURT:  I'm happy to so order it.  I'll so order

3   it and make sure they have a copy of the letter.

4           MR. HALEY:  Thank you, Your Honor.

5           THE COURT:  All right.  Are there any other issues

6   from the government today?

7           MR. MISKIEWICZ:  No major problems.  We're going to

8   attempt to continue to work on custodian stipulations for

9   business records.  I've also conveyed to Mr. LaRusso, I didn't

10  have a chance to ask Mr. Haley, but if they do intend to call

11  certain witnesses, we're going to ask for some early

12  production under 26.2 at some point given that.  I don't

13  really have any other issues to raise with the Court today --

14  oh, and also an expert report, notification of an expert

15  report because Mr. LaRusso is printing it out, actually two

16  experts; one I think is an accountant named yesterday during

17  jury selection, Mr. Sampel (ph).  Also he's I believe engaging

18  a forensic handwriting expert and, as I indicated in light of

19  that, we're probably going to do so for purposes of this John

20  Kaiser signature on the consulting agreements even though our

21  principal contention is whether it's a forgery or not, it's

22  still fraudulent.

23          So, we're going to provide Mr. LaRusso as soon as

24  possible with the photograph that his expert has indicated he

25  can work from and also provide to him exemplars from

20

1   Mr. Kaiser.  I told Mr. LaRusso we have signature exemplars we

2   can turn over.  He's asked me to obtain numeric exemplars

3   which we don't have.  I don't know where Mr. Kaiser is today,

4   he may still be in Mexico or on his way back but he may not be

5   back until next week.  So, as soon as we can do that, we'll

6   effectuate that.  I think that's it.

7             THE COURT:  Okay.

8             MR. LaRUSSO:  Your Honor, that is the extent of the

9   conversation we had today.  The only other matter regarding

10  handwriting is if our expert feels that it is necessary for a

11  complete analysis to look at the original, Mr. Miskiewicz

12  agreed that he will make that available for examination.

13            The only thing we haven't discussed, and we were in

14  the process of doing that before the case got called, was the

15  question of the tape analysis and our expert who I haven't

16  spoken to but through hearsay I understand would like to have

17  access to the original Home Depot tape if it is available, at

18  least whatever first generation tape that they have and,

19  secondly, the machine on which the recording was made.  I'll

20  discuss this with Mr. Miskiewicz to see if we can work it out

21  without the need to burden the Court with this.  If we have an

22  impasse, we'll address it later.

23            MR. MISKIEWICZ:  We never made the recording so we

24  don't have the machine, we have no idea how it was made.  The

25  best we can simply say is it was forwarded to I think one of

1   our witnesses, maybe several of our witnesses who would say

2   they got it from the defendant, Mr. Kenner, so we don't know

3   that we're going to be able to provide -- we don't have the

4   first generation, we have whatever copy we turned over.

5          THE COURT:  Whatever the earliest generation the

6   government has, you should make it available, whether it's the

7   quote/unquote original, but for purposes of examination the

8   earliest generation you should make available.

9          MR. MISKIEWICZ:  Okay.

10          MR. LaRUSSO:  Thank you, Your Honor.  I believe the

11   last one, you reserved on the motion to strike the alias.

12          THE COURT:  I have a couple of questions on that.

13   I just want to make sure, Mr. Constantine, are you still on

14   the line?

15          DEFENDANT CONSTANTINE:  Yes, Your Honor, I have

16   the mute button pushed so you didn't hear the background

17   noise.

18          THE COURT:  I wanted to make sure you were still on

19   the line.

20          I guess I want the government to explain a little

21   bit further -- well, first, Mr. LaRusso, they did put in a

22   letter explaining what the relevance is.  One area of

23   relevance is I guess they wanted to show that he used an image

24   building firm for reputation I guess.  I don't understand what

25   the significance of that is.  You're saying some of the --

22

1   what's the significance of him going to that firm?

2            MS. KOMATIREDDY:  Your Honor, I can explain it

3   briefly.  I would say the primary significance of the former

4   name is that the defendant, Mr. Constantine, told the victims

5   about it in his initial conversations with them and the

6   rapport --

7            (The court reporter seeks clarification.)

8            THE COURT:  The rapport building, is that what you

9   said?

10           MS. KOMATIREDDY:  The rapport building effort to

11  gain their trust.  The defendant used proceeds of the fraud to

12  hire HL Group, the group that is a New York PR firm to then

13  respond to an article that had appeared in the New York Post

14  that mentioned the prior name.  I have a copy of the short

15  article with me in court.

16           THE COURT:  First I want to ask Mr. LaRusso -- I'll

17  come back to the first one.  I don't quite understand that

18  theory of the government because usually the government makes

19  that argument of trust when two people are agreeing on

20  something criminal; in other words, you disclose your criminal

21  background to gain the trust of someone else who is a criminal

22  if you're doing a crime together.  Obviously that wasn't the

23  relationship here so I'm not sure why someone is going to come

24  to court and testify that he built a rapport with me, I

25  trusted him because he told me he has a prior drug conviction,

23

1   I'm not sure how that would build trust with an investor.

2          But the second one is the one I'm more focused on

3   which is are you disputing that part of the theory of the case

4   that he used investment proceeds to pay this company to

5   develop his image?  If that's in dispute, then it would be

6   important for the jury to understand.  If you're saying he

7   never did that, it would be more important for the government

8   to elicit why he was doing it.  So, is that in dispute that he

9   spent that money?

10          MR. LaRUSSO:  Your Honor, if I may, Mr. Oliveras has

11  been dealing with this, may he address the Court?

12          THE COURT:  Sure.

13          MR. OLIVERAS:  Thank you, Your Honor.

14          THE COURT:  Make sure that you use the mic so

15  Mr. Constantine can hear you.

16          MR. OLIVERAS:  The article I believe didn't mention

17  his former name -- oh, it didn't mention his former name, I

18  take it back, but that wasn't the crux of the article.  The

19  crux of the article was about the way the funds were working.

20  It wasn't -- the purpose of hiring the HL firm which was

21  authorized under the Global 7 fund wasn't to just go after his

22  image, it was to build up Eufora in general to help the

23  investors money because they were being -- the victims were

24  being slammed by -- it was a tit for tat in the papers is what

25  it came down to but it wasn't him personally that was doing

1   it.  It happened to have been in the same article because he

2   happened to be the founder of the company, but that's all it

3   was and it was in an effort of full disclosure why he was

4   giving people the -- he was telling people what his former

5   name was -- he hadn't told the former investors, told them

6   that he was changing his name which had nothing to do with the

7   drug conviction but he did tell them that he had a former drug

8   conviction.

9         He changed his name, if Your Honor remembers

10  yesterday, he tried to pronounce his name, he couldn't -- it

11  wasn't pronounced.  When he was doing his race car driving

12  announcers on live TV were having trouble -- a tough time

13  saying it and so he wanted it easier to pronounce his name.

14        THE COURT:  You're saying he told the investors

15  about the prior conviction?

16        MR. OLIVERAS:  He did tell the investors about the

17  prior conviction but that wasn't why -- that it had something

18  to do with his prior name, although it was his name at the

19  time but he wasn't trying to hide that from them by changing

20  his name.

21        THE COURT:  So, is it the government's theory then

22  that the use of the investor money, that that was a diversion,

23  in other words, that was an illegitimate use of the investor

24  money?

25        MS. KOMATIREDDY:  Yes, Your Honor, the government's

1   theory is that it is an illegitimate use of money that

2   investors had given to the Global settlement fund.  In

3   particular, the government witness will testify that

4   Mr. Constantine hired HL Group to respond to a Page Six

5   one paragraph article that ran on April 22nd, 2009, that

6   stated that Mr. Constantine recently gave a speech at the

7   University of Southern California but he failed to mention

8   that he changed his name from Tommy Hormovotis and he was

9   sentenced to six years in an Illinois state prison for drugs

10  or that he was a business associate of Phil Kenner and was

11  being sued and the individual at the HL Group who initiated

12  the relationship with Mr. Constantine was referred to this

13  article by Mr. Constantine and asked to respond to that

14  article and that individual was paid using the proceeds of the

15  fraud.  That's the government's theory.  And in order to

16  explain that diversion we would seek to submit this article

17  into evidence as evidence of why this individual was being

18  paid with the money and in order to tell that part of the

19  story.

20          THE COURT:  I am concerned given what I've heard.  I

21  thought I heard you say -- if Mr. Constantine's position is

22  that was a legitimate use of the money, that investment money

23  was used to develop the investment in some way, how is the

24  government going to respond to that without referring to what

25  they say is the real reason for the use of the money which is

26

1    his own image, nothing to do about the investments; I don't

2    know how they can respond to that, how can they prove that

3    without referencing what their witness is going to say was the

4    whole purpose of the use of the funds.

5            MR. OLIVERAS:  I understand that, Your Honor, and I

6    apologize for interrupting but it was -- if that was the only

7    reason why he had contact with HL Group, I would wholly agree

8    with the government, but that's not what it was, it was one

9    facet of a number of different things that HL Group was doing

10   to turn around the image of Eufora as a whole and as the CEO

11   and president he needed to do that for himself, so that's why

12   there was a response to that.

13           THE COURT:  What's the government's witness going to

14   say, this was part of a larger effort?

15           MS. KOMATIREDDY:  The witness will say that he also

16   did work in order to enhance the image of some of the hockey

17   players, not all of them.  We believe that the victim hockey

18   players would say -- some of them did not authorize this.  I

19   think the response that Mr. Oliveras is offering, really

20   that's an argument for the jury whether 100 percent of the

21   funds were with diverted or some of the funds were diverted

22   and diversion is still unauthorized use of investor money and,

23   therefore, part of the government's theory of fraud.

24           THE COURT:  I understand that but there is -- under

25   403 obviously I have to consider the fact of a conviction,

1   that an article that references that conviction of six years

2   in jail, it's a 403 concern.  I understand the relevance of it

3   but I'm going to think about it.  I'm going to continue to

4   reserve on it.  My concern is that there may be a way of

5   having the witness describe in more general terms being able

6   to respond to an article in the Post without referencing the

7   details of what it was about.  I don't know how much

8   limitation can be done without sort of gutting the probative

9   value of it.  I do want to look at the article.

10          MS. KOMATIREDDY:  Yes, Your Honor.  If I may add one

11  comment, I think it could be limited or redacted in a way that

12  is not obvious.

13          The other part of our theory I think actually

14  requires a little bit more explanation which is

15  Mr. Constantine discussed -- actively discussed his prior drug

16  conviction with the victims and portrayed himself as someone

17  worthy -- as someone who had had a past who turned his life

18  around and now is worthy of trust and that is something that

19  the victims were told as part of the story of how they met

20  Mr. Constantine and why he was convincing, why they trusted

21  him.  That is a natural part of the way they tell the story.

22  I think we can instruct our witnesses not to mention the

23  length of any jail term or the details of the conviction and

24  to limit it to accommodate the Court's concerns but we see it

25  arising in the victims's testimony.

28

1      THE COURT:  Did the victims know about it or he

2   self-disclosed it to them?  Did they know?

3      MS. KOMATIREDDY:  He self-disclosed it, Your Honor.

4   It was part of an effort to look as if he is being forthright

5   and straightforward in his initial meeting with the

6   individuals so that if they did later Google his name, that

7   they wouldn't be taken aback; rather, it was taking the sting

8   out of it, if you will, in the very first meeting by coming in

9   saying, I know you don't know me, here's who I am, I do have a

10   past but I've turned my life around and I'm somebody that you

11   can trust and I'm here with Phil Kenner who is someone you

12   already trust.

13      THE COURT:  Yes.  Again, unless I'm persuaded that

14   someone is investing the money, that that would have been a

15   critical determination that someone told them about a prior

16   conviction, told them I turned my life around, I assume

17   there's other aspects to what he said in relationship to

18   Mr. Kenner that were driving their decision to invest rather

19   than someone saying, I have a prior conviction but I turned my

20   life around, I just don't think that has a high probative

21   value under 403.  I can't understand why an investor would be

22   unable to explain why they gave their money to someone,

23   trusted someone without referencing the fact that, oh, he also

24   told me he had a prior conviction but it was okay.  That would

25   seem to be tangential.  Maybe I'm misunderstanding what the

29

1  nature of the testimony is but I don't see how that's a

2  pivotal reason for them to invest --

3          MS. KOMATIREDDY:  I apologize, Your Honor, I didn't

4  mean to interrupt.  I think it is part of the emotional

5  reason, Your Honor, I think there's a desire to give people

6  second chances and this is part of playing on investors' good

7  faith.

8          THE COURT:  Again, if they had known about it and

9  presented it to him and he said something like that, to me

10  that would be more probative value, but someone self-discloses

11  something, again, they can describe the nature of their

12  conversation, he was open with us, he talked openly about his

13  background with us, but I have a hard time viewing that as

14  highly probative in terms of an investor's decision whether he

15  self-discloses it, especially the prejudicial effect.

16          I'm more concerned about the second aspect because

17  the government should be entitled to if there was unauthorized

18  diversions of doing that, so let me see the article.  The

19  government should not reference this in their opening.  I'll

20  resolve this first thing Monday morning.  So, until you hear

21  otherwise from the Court, Mr. Constantine's prior conviction

22  discloses the use of another name should not be questioned --

23  who is your first witness?  Is that going to come up with the

24  first witness or not?

25          MS. KOMATIREDDY:  It will not come up with the first

30

1  witness, Your Honor.

2          THE COURT:  All right.

3          MR. LaRUSSO:  Your Honor, could I chime in briefly?

4  The name still has nothing to do with whether or not -- the

5  name shouldn't be there whether or not he has an alias or it's

6  not even an alias, it's a prior name, it's a legal name.

7          THE COURT:  I thought the name was in the article.

8  Didn't you just tell me the name was mentioned in the article?

9          MR. OLIVERAS:  It is but I guess what I'm saying is

10  what makes it -- when they're talking about the drug

11  conviction and any name change, our worry is that it's too

12  prejudicial to have an alias, a quote/unquote alias out there

13  which isn't really an alias.

14          THE COURT:  I understand.  Don't you hear what I'm

15  saying, I'm agreeing with you.  I already expressed my

16  concern.  An alias has a potential prejudicial impact, so I

17  understand they are two separate issues.

18          Mr. Constantine, are you still there?  I heard a

19  beep.  Maybe he just fell off.

20          Mr. Constantine, are you still there?  I just heard

21  a beep.

22          So, I don't want to do it without him.  I'm going to

23  read the article and discuss it more on Monday, all right.

24          MR. HALEY:  It's a minor matter, Judge, it doesn't

25  involve Mr. Constantine.

31

1      THE COURT:  Mr. LaRusso, are you okay with

2  proceeding with this issue with Mr. Kenner?

3      MR. LaRUSSO:  I am, Your Honor.

4      MR. HALEY:  I have done my best to isolate documents

5  already in hard cover copy for purposes of what would be

6  potential defense exhibits at trial.  There may be an instance

7  where based upon what a government's witness has to say on the

8  witness stand, there may be a document that I would like to

9  have marked for identification and shown to the witness and,

10  depending upon that witness' testimony, offered into evidence

11  if they authenticate the document.

12      My theory, Judge, is that I may not have that

13  document currently in my file, so I mention very simply, it

14  does again have to do with the computer but I believe we

15  resolved the issue over the weekend, I may look into

16  purchasing a printer, and I mention it to the Court because I

17  would be seeking the Court's CJA authorization, so we'd be

18  able to have a printer here in the courtroom that I could then

19  hard wire to my client's laptop computer to the printer and I

20  would be able to pull up a particular document and then print

21  it out here in the courtroom.  I already spoke to the

22  technical people here today setting up for the government and

23  they advised me that they should be able to do that as long as

24  the MacBook computer has a USB port.  I wanted to alert the

25  Court to that.

32

1          THE COURT:  That's fine but I want you to do that --

2     obviously I don't want us all sitting here with the jury while

3     you're printing up documents.

4          MR. HALEY:  I agree.

5          THE COURT:  If you do it in advance, that's fine.

6          MR. HALEY:  Thank you.

7          THE COURT:  All right.  So, my law clerk will give

8     you a copy of the preliminary instructions I intend to use on

9     Monday morning.  They're standard instructions for a criminal

10    case.  So, you'll have those and you can tell me if you have

11    any objection on Monday morning.  All right.  So, I'll see you

12    all at 9:30.  Thank you.

13         MR. LaRUSSO:  Thank you, Your Honor.

14         MR. HALEY:  Thank you, Your Honor.

15         MR. MISKIEWICZ:  Thank you, Your Honor.

16         (End of proceedings.)

17

18

19

20

21

22

23

24

25